**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re iRobot Corporation Securities Litigation | No. 1:19-cv-12536-DJC |
| | Judge Denise J. Casper |
| | <u>CLASS ACTION</u> |
| | JURY TRIAL DEMANDED |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................2

II.     JURISDICTION AND VENUE ......................................................................14

III.    PARTIES ........................................................................................................15

        A.      Lead Plaintiff ........................................................................................15

        B.      Defendants ............................................................................................15

        C.      Relevant Third Parties..........................................................................17

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS .........................20

        A.      iRobot's Background ............................................................................20

        B.      iRobot Touted Roomba's Dominant Market Share and Massive Growth............22

        C.      Increasing New Competition Began to Flood the RVC Market............24

        D.      Per Numerous Former Employees, Defendants Knew but Failed to
                Disclose That During the Class Period iRobot's Sales and Market Share
                Were Substantially Declining Due to Increased Competition ...............28

        E.      Throughout the Class Period, Defendants Repeatedly Downplayed the
                Impact of Increased Competition on iRobot's Sales  and Revenues ...................35

        F.      The Negative Impact of Competition on iRobot's Profitability Gradually
                Begins to Emerge ...................................................................................37

        G.      According to Former Employees, as the Negative Impact of Increased
                Competition on iRobot's Business, Particularly Its Entry-Level Product
                Sales, Intensified in 2018, Defendants Pivoted iRobot's Focus to the
                Premium-Tier ........................................................................................40

        H.      Later in 2018, Defendants Continued to Deny That Competition Was
                Significantly Impacting iRobot's Sales and Market Share ...................43

        I.      Tariffs Further Eroded iRobot's Competitive Advantage, Crippling
                iRobot's Strategic Shift to the Premium-Tier Space..............................45

        J.      Defendants Publicly Downplayed the Impact of Tariffs on iRobot's
                Competitive Position and Financial Performance...................................47

        K.      Shortly After the Tariffs Were Announced, iRobot Launched Two New,
                More Expensive Robots While Continuing to Tout Strong Demand for Its
                Premium-Tier Products...........................................................................50

L.      iRobot Raised Prices on the Premium Tier i7 Roombas in an Attempt to
        Mitigate the Impact of Competition and Tariffs ....................................................54

M.      iRobot Issued Positive Guidance Despite Knowing that Its Ability to
        Mitigate Tariffs Hinged on Its Failing Premium-Tier Strategy ...........................55

N.      The Truth About iRobot's Competitive Positioning in the Premium-Tier
        Begins to Emerge Through Partial Disclosures About the Impact of Tariffs
        on iRobot's Margins .............................................................................................58

O.      The U.S. Government Increased Tariffs to 25% at the Same Time as
        iRobot Introduced a $1,300 Roomba, Further Exacerbating the Risks
        Associated With iRobot's Premium-Tier Strategy ................................................61

P.      The Truth About iRobot's Declining Competitive Position and the Risks
        Associated with the Premium-Tier Strategy Continued to Emerge.......................62

Q.      The Full Extent of the Negative Impact of Increased Competition and
        Tariffs on iRobot's Business, Including the Failure of Its Premium-Tier
        Strategy as a Mitigation Measure, Was Finally Revealed .....................................65

R.      Post-Class Period Developments ..........................................................................68

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................................68

A.      September 13, 2017 – Morgan Stanley Laguna Conference ..................................69

B.      October 25, 2017 – 3Q17 Earnings Call...............................................................70

C.      February 8, 2018 – 4Q17 / FY2017 Earnings Call and Partial Disclosure............73

D.      March 1, 2018 – 2018 Analyst Day ......................................................................76

E.      April 25, 2018 – 1Q18 Earnings Call ...................................................................78

F.      July 25, 2018 – 2Q18 Earnings Call .....................................................................79

G.      September 13, 2018 – Morgan Stanley Laguna Conference ..................................82

H.      October 24, 2018 – 3Q18 Earnings Call...............................................................83

I.      December 5, 2018 – Raymond James Technology Investors Conference............87

J.      February 7, 2019 – 4Q18 / FY2018 Earnings Call ...............................................87

K.      April 24, 2019 – 1Q19 Earnings Call and Partial Disclosure ..............................90

L.      July 23, 2019 – 2Q19 Earnings Call and Partial Disclosure.................................92

VI.     LOSS CAUSATION ......................................................................................95

     A.     February 7-8, 2018 – First Partial Disclosure/Materialization of the Risk ...........96

     B.     April 23 -24, 2019 – Second Partial Disclosure/Materialization of the Risk ........99

     C.     July 23-24, 2019 – Third Partial Disclosure/Materialization of the Risk ...........102

     D.     October 22-23, 2019 – Final Disclosure/Materialization of the Risk .................106

VII.     ADDITIONAL INDICIA OF SCIENTER ....................................................109

     A.     Core Operations Allegations: The Roomba Was Critical to iRobot's Business, and Its Sales and Competitive Position Were Closely Monitored by the Individual Defendants ................................................................................109

          1.     The Roomba Was iRobot's Core Product.............................................. 109

          2.     The Individual Defendants Had Access to and Closely Monitored Roomba Sales and the Impact of Competition on iRobot's Business......................................................... 111

          3.     The Individual Defendants Also Closely Followed the Impact of Tariffs on iRobot's Sales and Financial Performance ................................................................... 115

     B.     Defendants' Statements Support a Strong Inference of Scienter ........................117

     C.     The Timing and Circumstances of Defendants Dean's and Cerda's Resignations Support a Strong Inference of Scienter ..........................................119

VIII.     CONTROL PERSON ALLEGATIONS.........................................................121

IX.     CLASS ACTION ALLEGATIONS ..............................................................122

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ................................................................................124

XI.     NO SAFE HARBOR ....................................................................................125

XII.     CAUSES OF ACTION .................................................................................127

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants .........................................................................................................127

COUNT II Violation of Section 20(a) of the Exchange Act Against All Individual Defendants ........................................................................................................128

XIII.     PRAYER FOR RELIEF ...............................................................................129

XIV.   JURY DEMAND .................................................................................................................130

Court-appointed Lead Plaintiff Carpenters Annuity Trust Fund for Northern California and Carpenters Pension Trust Fund for Northern California ("Northern California Carpenters" or "Lead Plaintiff") individually and on behalf of all persons and entities who or which, during the period from September 13, 2017 to October 22, 2019, inclusive (the "Class Period"), purchased the publicly traded common stock of iRobot Corporation ("iRobot" or the "Company") and were damaged thereby (the "Class"),[1] brings this Consolidated Class Action Complaint against Defendants iRobot and three of its senior executives—Chief Executive Officer ("CEO") Colin Angle, Chief Financial Officer ("CFO") Alison Dean, and Chief Operating Officer ("COO") Christian Cerda (the "Individual Defendants," and together with iRobot, "Defendants").

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by iRobot with the Securities and Exchange Commission (the "SEC"); (2) reports issued by analysts covering or concerning iRobot and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about iRobot, its business, and the Individual Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys, including interviews with former employees of iRobot and other relevant third parties; and (5) other publicly-available information concerning iRobot, its business, and the allegations contained herein.  Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

---

[1] The following are excluded from the Class: (1) Defendants; (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of iRobot during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) iRobot's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

## I.      NATURE OF THE ACTION

1.      This is a securities fraud class action arising out of Defendants' misrepresentations and omissions downplaying the threat that an influx of new competition in the robot vacuum cleaner ("RVC") market posed to iRobot's business—namely, the demand for and sales of its flagship product, the "Roomba" robot vacuum, which accounted for *90%* of the Company's revenue during the Class Period.

2.      Launched in 2002, the Roomba was the first RVC to succeed commercially, and its sales and revenues grew rapidly in the following years.  As a result, in the years preceding the Class Period, iRobot dominated the RVC market, particularly in the United States (where the Company was headquartered), even as other manufacturers gradually began to introduce their own competing products.  In fact, at the start of the Class Period, the Roomba held an 85% share of the U.S. RVC market.  Thus, during the Class Period, iRobot's continued ability to maintain these strong Roomba sales and its leading competitive position in the RVC market was crucial to the Company's financial success, including the value of its publicly-traded shares at issue here.

3.      By the start of the Class Period on September 13, 2017, however, the competitive landscape had shifted substantially as new RVC competition—including established vacuum manufacturers like Dyson and Hoover, electronics manufacturing giants like Samsung and LG, as well as start-up RVC specialists like Neato Robotics and Ecovacs—had begun seeping into the U.S. market.  Importantly, unlike in the past, many of these new competitors' RVCs had technology, features, and performance similar to iRobot's high-end (*i.e.*, "premium-tier")[2] Roombas, but retailed for a fraction of the price—some as low as $200, compared to the $500-$1,300 price range of the various premium Roomba models during the Class Period.  In

---

[2] During the Class Period, iRobot offered a variety of Roomba models in two distinct tiers: 1) the premium-tier, which was its more expensive, higher-end lines with more advanced technology and features; 2) the "entry-level" tier, which consisted of its cheaper, lower-end models with fewer and more basic features.  The premium-tier models accounted for approximately 60% of overall Roombas revenues, while the entry-level Roombas accounted for the other 40%.  Thus, both tiers were crucial to iRobot's continued success.

particular, on September 12, 2017, SharkNinja ("Shark"), the manufacturer of the best-selling traditional upright vacuum in the United States, introduced its own line of RVCs known as the Shark ION.  Securities analysts quickly noted that the Shark ION's "features [] appear to match capabilities of the iRobot [premium] Roomba 600 and 800 series, *[but] with a lower price* [$349]," thus recognizing that Shark potentially represented a more serious threat to iRobot than its early competition.

4.      Accordingly, at a public analyst conference on September 13, 2017, analysts directly questioned Defendants about iRobot's "strategic response to the competition starting to emerge" and how the Company was "differentiating [its] products" from these "new competitors" entering the U.S. RVC market.  In response, Defendant Dean, after noting "the buzz [] about SharkNinja coming into the market," immediately dismissed such concerns.  Specifically, Dean assured analysts (and, thereby, investors) that, based on iRobot's internal market research, such *new competition was "not resonating"* with consumers given "the combination of the price point they're coming in at and the features, functionality and, ultimately, the quality of the experience."  Likewise, on an October 25, 2017 earnings call, Defendant Angle minimized the emerging competition as "*not particularly material* at this point in time because, to date, *there really hasn't been much [competition] at least in the United States at the low-end*," adding that "*[w]e don't view it as cannibalistic of our growth*" and further insisting that iRobot "*even benefits from this low-end emergence*."

5.      Analysts were encouraged by such statements discounting the potential financial harm from this new competition.  For example, PiperJaffray wrote on October 25, 2017 that, despite "increasing concerns that competition is increasing," "*we remain upbeat* about the future of home robot adoption *and iRobot's position in this market*."

6.      However, the above statements, and numerous others like them made by Defendants during the Class Period, were false and misleading because, according to multiple former employees, by September 2017, Defendants internally were greatly concerned about this surging new competition, which at that time was already beginning to significantly erode

iRobot's product demand and sales.   Importantly, Defendants were aware of, but failed to disclose to investors, internal market research data and analyses revealing adverse competitive trends that directly contradicted Defendants' positive public assurances.

7.       In particular, according to one Confidential Witness ("CW"), a former Marketing Development Manager ("CW 1") at a company contracted by iRobot to conduct market research on iRobot's and its competitors' sales and other competitive trends at key retail stores across the United States, no later than fall 2017 when the Shark RVC launched, iRobot saw its store shelf space (a critical indicator of competitive performance for the Company) and sales *decline due to increased competition* (*e.g.*, from Shark, Dyson, and Neato), which had saturated the RVC market and provided consumers with cheaper alternatives that had similar features and performance to the Roomba.   Thus, according to CW 1, by no later than fall of 2017, iRobot management internally had grave concerns about the impact of such increasing RVC competition on iRobot's business—at the same time as Defendants publicly dismissed such competition to investors.

8.       According to former employees, iRobot's competitive position only grew worse in 2018 as competitors continued to chip away at iRobot's shelf space, sales, and market share. Specifically, according to CW 1, soon after the holiday season in December 2017 (*i.e.*, early 2018), iRobot's sales, particularly at the entry-level tier that was saturated by new cheaper competition, began to decline substantially as a result of this increased competition, causing the Company's internal concerns about competition to intensify.   Critically, per CW 1, iRobot management knew internally that its U.S. market share was declining due to such new competition in early 2018.   Specifically, this market share decline was discussed by iRobot sales and marketing personnel on weekly sales calls with CW 1 and other field marketers, which were led by an iRobot senior marketing manager.

9.       Per CW 1, the situation deteriorated rapidly later in 2018 as iRobot continued to lose more and more shelf space at Best Buy, Bed Bath & Beyond, and other key retailers to its competitors (particularly, Shark and Neato)—including, notably, the more desirable "endcap"

space at the end of a store aisle, with iRobot relegated to the less visible side shelf.

10.     Critically, all of this market research about iRobot's declining shelf space and sales, competitors' strong sales performance at retail stores, and similar adverse competitive trends was regularly communicated to iRobot's headquarters through weekly Field Marketing Reports compiled from field market data gathered by CW 1 and other such field marketers across the U.S., as well as discussed at weekly sales calls with iRobot sales and marketing personnel. According to CW 1, Defendant Angle assured employees at a Company meeting attended by CW1 that he regularly read these Field Marketing Reports, and this point was repeatedly reiterated to CW 1 and her colleagues by the iRobot senior marketing manager on their weekly sales calls.

11.     The truth regarding iRobot's weakening competitive position as a result of increased RVC competition began to slowly emerge to investors through a series of partial corrective disclosures.  Specifically, on February 7-8, 2018, Defendants for the first time partially disclosed that iRobot had experienced some adverse impact from increased competition, reporting disappointing financial guidance for the year and expressly acknowledging that "***there is absolutely an increased competitive pressure***."  In response, iRobot's stock price plummeted ***over 32***%, and analysts like J.P. Morgan, for example, noted that their "concerns regarding increased competition ***are seemingly beginning to play out***."

12.     However, Defendants simultaneously downplayed the full extent of this negative impact of competition.  For example, on the same earnings call Defendant Angle immediately followed up his tempered admission of "increased competitive pressure" by falsely assuring investors this that this "***competitive pressure [] is embedded in the guidance that we've given***"—*i.e.*, was not significant enough to alter the Company's aggressive guidance of increased growth rates—and that iRobot remained presently "well equipped to win in 2018" over the competition.  The market, therefore, remained misled about the true impact of increased competition on iRobot's business.  Indeed, a February 8, 2018 Loup Ventures report stated that "we remain believers in the long-term iRobot story,"  and PiperJaffray similarly explained that

"[a]lthough competition is creeping up, we believe . . . iRobot still has very strong market share and will be able to leverage their higher performing products to continue to ride the wave of this industry."

13.     Defendants continued to mislead investors that iRobot was successfully combating these new competitive threats as 2018 progressed.  For example, in July 2018, Defendant Angle represented that iRobot "***continue[d]*** to have strong performance ***across price points***," highlighting, in particular, its "***continued*** strength down ***at the entry-level price points***." Further, he expressly assured this new competition had "enter[ed the market] ***without substantially impacting the performance we had predicted***" and that the "[competitive] "environment [was] ***not demonstrating new disruptions***." Analysts were encouraged by these false reassurances, with J.P Morgan, for example, noting that Defendants' "[c]ommentary regarding competition seems more optimistic" and Loup Ventures showing that they remained convinced that "***concerns around competition continue to be overblown***."

14.     The internal reality at iRobot, however, was far different.  Indeed, at this time in 2018, Defendants knew, but continued to conceal, that surging competition was in fact "substantially impacting" iRobot's financial performance and causing major "new disruptions," particularly in the demand for the entry-level Roombas that Defendants continued to tout.  In reality, at this time, iRobot internally began to pivot its sales and marketing strategy to the premium-tier products, effectively ceding the lower-end entry-level segment of the market— which still represented 40% of iRobot's revenues—to its competition.

15.     Specifically, CW 1 stated that by summer 2018, in response to the increased competition and resultant poor Roomba sales, especially at the ***entry-level*** where the market was saturated by the competition, iRobot decided to refocus its sales and marketing efforts (*e.g.*, training of store sales representatives on Roombas, including product "demos") to its premium-tier line.  According to CW 1, this "Champion Program" represented a "fundamental change" to iRobot's sales and marketing strategy and was implemented in October 2018 after a national training meeting with sales personnel in iRobot's Boston headquarters that CW 1 attended.

However, per CW 1, the Champion Program came at the expense of the lower-end Roombas, which were the "gas that made the engine go"—*i.e.*, the key revenue driver for iRobot that it was now essentially abandoning in favor of a risky bet on its expensive premium-tier line.

16.     In September 2018, iRobot launched two new sets of Roomba models. The first set, the i7 and i7+, were the Company's most expensive premium-tier offering to date, retailing for $699 and $949, respectively.  The second was iRobot's new entry-level offering, called the e5, which, despite being lower-tier, retailed for $449—$100 more than Shark's highest-end model, the ION 750.  Meanwhile, Defendants concealed from investors that the Company would not spend any money promoting this new e5 product, despite that fact that such entry-level models typically accounted for 40% of iRobot's Roomba revenues and were already being eroded by increased cheaper competition in the lower-end RVC segment. In fact, CW 1 recalled that she and other field marketers were instructed not to waste their time on promoting iRobot's lower-end models at stores like Target, Wal-Mart, and Lowe's.

17.     However, according to CW 1, the new i7 models sold poorly after their release in September 2018, including because of their high price point and software and other performance issues, which resulted in high return rates.  CW 1 noted that internally iRobot was "desperate" to sell the i7—while, publicly, Defendants continued to tout the purportedly strong demand for these premium-tier products.

18.     Further, Defendants' risky premium-tier strategy was premised on the flawed assumption—disproved by internally available data, including the Field Marketing Reports that Defendant Angle and other management reviewed, which showed alarming competitive trends— that iRobot's customers would still be willing to pay these higher prices for its Roombas, despite its competitors' ***less expensive*** RVCs, which nevertheless came with similar features and performed comparably.  Accordingly, Defendants falsely assured investors throughout the Class Period that based on iRobot's continuous market research and analysis of RVC consumers' "price elasticity" (*i.e.*, price sensitivity) to product pricing, consumers would continue to buy iRobot's premium-tier Roombas despite their increasing prices (which rose to well over $1,000

7

for the highest-end models as the Class Period progressed) and growing cheaper competition.

19.     These assurances became particularly crucial beginning in July 2018, when the U.S. government announced that it would be implementing 10% tariffs on all Chinese imports, effective September 24, 2018.  Because 100% of Roombas were manufactured in China, iRobot either had to either absorb these tariff costs (thereby decreasing its profit margins) or pass them on its customers by increasing its already-high product prices accordingly.  Although iRobot initially opted to absorb the tariff costs and not increase product prices in 2018, Defendants acknowledged publicly that the latter option was likely in 2019 and investors and analysts accordingly focused on how this would impact iRobot's business.

20.     However, rather than truthfully disclose to investors that such tariff-related price increases would compound the competition problem that they were already downplaying, Defendants doubled down by repeatedly minimizing this additional threat that tariffs represented. Defendants accomplished this by touting iRobot's premium-tier focus and continued strong product demand, which would, therefore, enable it to successfully pass on these tariff costs to consumers, based on iRobot's purported price elasticity research.

21.     For example, on an October 24, 2018 earnings call, Defendant Angle suggested that product price increases in response to tariffs were likely, but assured that they **would not adversely affect the Company's "competitive positioning within this growing market"** as "iRobot is the premium player and that's very advantageous because **price sensitivity at the high end is much lower than at the bottom end**."  Thus, Angle concluded that the Company was **"better positioned than our major competitors [that] play at the low end"** to weather the tariffs storm unscathed.

22.     Analysts bought into Defendants' story, with an October 24, 2018 analyst report, for example, emphasizing that "**[g]iven what appears to be strong demand for [iRobot's] products** . . . we think that the tariffs could be largely offset."  Likewise, another analyst on October 25, 2018 echoed Defendants' statements that iRobot would be able to successfully pass on these tariff costs to consumers based on the Company's purported price elasticity analyses:

"Management would offer that they have looked a[t] various scenarios and that 'a lot' of those scenarios include passing some of the tariff cost on to consumers.  Additionally, *management emphasized that as a premium brand they believe there will be less cost sensitivity vs. low end competitors*."

23.     Moreover, Defendants continued to falsely represent that increased competition and tariffs were not impacting iRobot's dominant market share.  For example, on December 5, 2018, Defendant Dean insisted that iRobot has "*been able to maintain [its leading RVC market] share* despite the fact that these new entrants are coming in."  This and other similar statements regarding iRobot's market share were false and misleading because Defendants knew internally, but concealed from investors, that by this time, increased competition had significantly eroded both iRobot's sales and market share.  Critically, according to CW 1, by no later than *summer of 2018*, iRobot's internal market analyses showed that its market share had declined *10%* since Shark's launch in September 2017 as a result of increased cheaper competition reducing iRobot's sales, particularly at the entry-level tier.

24.     Nevertheless, in January 2019, Defendants doubled-down on iRobot's premium-tier strategy, announcing that, as previously expected, the Company would pass along tariff costs to consumers by increasing prices on its recently released, top-of-the-line i7 and i7+ Roombas by 15%, to $799 and $1,099, respectively.  Thus, for the first time, iRobot's products exceeded the $1,000 threshold that many market participants worried would operate as a price ceiling for iRobot's consumers.

25.     On a February 7, 2019 earnings call discussing the Company's results for the 2018 fiscal year, iRobot issued guidance that exceeded analysts' expectations given the lingering concerns about the impact of tariffs.  Defendant Dean also reassured investors that the tariff-related price increases on the i7 and i7+ models *were not adversely impacting iRobot's business* because these "*price increases mostly offset* that incremental $20 million to $25 million of *tariff costs that we'll incur*."  However, these and other similar misstatements minimizing the impact of tariffs based on purportedly continued strong market demand for iRobot's products were false

and misleading because Defendants were aware of extensive internal market research belying these representations—namely, continually declining store shelf space, sales, and market share due to cheaper new competition.

26.     Moreover, according to former iRobot employees, Defendants knew, but failed to disclose, that competitors' lower-priced products were exerting significant price pressure on iRobot's demand and sales, particularly after the tariff-related price increases.  Defendants, thus, were concerned about and closely managed the impact of these tariff and competition issues on iRobot's business during the Class Period.  For example, CW 3 recalled that the impact of the tariffs on iRobot's sales was addressed by Defendant Angle in early 2019 at one of the Company's "All Hands Meetings."  CW 3 explained that it was known internally at iRobot that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that that competition was putting "price pressure" on iRobot.

27.     Further, on the February 7, 2019 earnings call, Defendant Angle told investors that, "[as to *market share*] *in the U.S.*, we continue to see new competitive products selling through Amazon marketplace, *but not on shelves of retailers,* where we still generate 60% of our domestic revenue."  This statement was demonstrably false based on internally available market intelligence, including the weekly Field Market Reports that Defendant Angle reviewed, demonstrating that iRobot had increasingly lost valuable store shelf space and market share to competitors in 2018,

28.     Later on the call, Defendant Angle also misrepresented iRobot's market share loss due to competition and falsely reassured investors that iRobot's competitive position remained strong:  "Our U.S. estimates for 2018 show a *3 point share loss overall,* but we firmly believe that with low household penetration providing an opportunity for substantial category growth, *we are well positioned to continue our growth trajectory in this market*."

29.     However, contrary to his statement, Defendant Angle knew of internal analyses showing that iRobot's actual U.S. market share loss by this time was *10%--more than triple* the figure he reported.  Moreover, his assurance that iRobot remained "well-positioned" to continue

its prior strong "growth trajectory" based on iRobot's anticipated ability to penetrate and thus grow the RVC market size was belied by iRobot's own market intelligence showing otherwise. In particular, according to CW 1, by early 2018, Defendants knew internally that the RVC market was saturated by increased competition and unlikely to grow for iRobot's products because many of its customers were repeat customers rather than new customers, such that the Company was not penetrating into other households.

30.     Analysts were reassured by Defendants' statements about continued strong demand for iRobot's premium-tier products and that the Company's full year 2019 ("FY2019") guidance was not impacted by increased competition or the overhang of tariffs.  For example, a February 7, 2019 PiperJaffray report commented that  its "previous concerns regarding tariffs and the implication to iRobot's 2019 guidance *ended up being a non-event with overall sector demand more than offsetting this headwind. iRobot's execution in this market with increasing competition speaks to the [C]ompany's superior brand*."

31.     However, over the course of the following eight months, the truth regarding iRobot's declining competitive position, which was exacerbated by the tariff-related product price increases that further diminished the waning demand for iRobot's expensive premium-focused products, began to gradually emerge through three partial corrective disclosures.

32.     First, on April 23-24, 2019, iRobot announced first quarter 2019 ("1Q19") revenues and revenue growth that were significantly below analyst expectations, which the Company linked to unsold excess inventory at retailers.  These disclosures partially revealed that increased competition, particularly in the wake of the tariffs, had been significantly impacting iRobot's business because it showed reduced demand for iRobot's products in 1Q19, when the Company first raised prices on its newest premium-tier products.  In response to this news, iRobot's stock price fell *23%*.

33.     But Defendants simultaneously reassured investors that, despite the tariff-related price increases at the beginning of the year, demand for iRobot's premium-tier products remained strong enough for the Company to reaffirm its prior bullish annual revenue guidance.

For example, on the April 24, 2019 earnings call, Defendant Angle insisted, *inter alia*, that **"despite the [tariff-related] higher prices, Q1 demand was ahead of plan for this product** [i7 and i7+]." As noted above, such statements were directly contradicted by internal sales data, including the weekly Field Marketing Reports reviewed by Angle, showing that the i7 line had sold poorly after its release in September 2018, and iRobot management, therefore, internally was "desperate" to sell these models.

34. Analysts again took Defendants at their word. For example, an April 24, 2019 J.P. Morgan report stated: "**Encouragingly, demand for the i7/i7+ was ahead of [C]ompany expectations**, *despite the pricing increase implemented during the quarter due to tariffs*."

35. However, On May 5, 2019, President Trump announced that the U.S. government was increasing the tariffs on Chinese imports from 10% to 25%, effective May 10, 2019. These tariff increases had been anticipated since at least September 2018, when the U.S. government announced that they would take effect on January 1, 2019; however, this rate hike was subsequently delayed as the U.S. and China continued their trade war negotiations. Notably, this increase in tariffs meant that iRobot would have to raise prices on its already expensive products yet again. Indeed, in July 2019, iRobot implemented increased prices for all of its products in order to mitigate the impact of the tariff increase. Defendants, however, had previously minimized this impact, assuring investors that such tariffs were less likely to impact iRobot (as opposed to its lower-end competition) given the Company's premium-tier strategy that was purportedly supported by their price elasticity research and continued strong product demand.

36. Then, on July 23-24, 2019, the true extent of the adverse impact of increased competition and the tariffs, particularly the failure of iRobot's premium-tier strategy as a way to mitigate the impact of tariffs, was further partially revealed. Specifically, on July 23, 2019, after the market closed, iRobot shocked the market when it issued its earnings release for the second quarter of 2019 ("2Q19"), which cut its full-year earnings forecast due to "the direct and indirect impacts of the ongoing U.S.-China trade war." During the following earnings call held on July 24, 2019, Defendant Angle further disclosed, in response to analysts' questions regarding "the

impact of tariffs on demand," that the downward revision to the Company's guidance was related to a decline in demand as a result of the tariff-related price increases. In particular, *he acknowledged that the "elasticity to demand associated with price" had not protected iRobot's premium-focused sales* from the tariff-related price increases, as Defendants had previously assured.

37.     In response, iRobot's stock price fell nearly *17%*. Likewise, analysts recognized these disclosures as signaling larger demand problems for iRobot due to increased competition, which they now suspected were significantly eroding iRobot's leading market share, contrary to Defendants' statements. For example, a July 24, 2019 Raymond James report noted that "*the [C]ompany citing demand softening due to tariffs* and guiding revenue lighter *are a beacon for questions surrounding market share erosion* (though this isn't the [C]ompany's view)."

38.     Despite these partial disclosures, Defendants on the same earnings call once again reassured investors about iRobot's premium-tier strategy, claiming that the continued "successful" demand for the Company's new s9 model Roomba, which was released in May 2019 and had "broken that $1000 price barrier" would enable the Company to maintain its leading competitive position. This statement was contradicted by internal sales data available to Defendants showing that this s9 model, like the prior premium-tier i7 line, sold poorly after its release due to its high price and performance issues, as CW 1 described.

39.     In particular, Defendants also falsely denied any significant impact on iRobot's market share. For example, Defendant Angle claimed that iRobot "had maintained our segment share in this [U.S.] region and *are not seeing any share erosion due to competition.*" Likewise, Defendant Dean represented that "*we've held our [market] share based on the data we are seeing*" as "*[t]he competition doesn't seem to have taken anything in the first half of the year*." These statements were demonstrably false given CW 1's statements that internal Company analyses had revealed a substantial (10%) market share loss due to competition by this time.

40.     However, on October 22-23, 2019, the full extent of the adverse impact that

increased competition and tariffs had on the Company's business, including the failure of iRobot's premium-tier strategy to mitigate this rising competition, was revealed. Specifically, in its earnings release for the third quarter of 2019 ("3Q19"), the Company slashed the high end of its revenue expectations for the year, and explained that iRobot had decided to roll back pricing to pre-tariff levels after a "*suboptimal*" customer response. During the related earnings call, Defendant Angle further admitted that, contrary to Defendants' prior statements, "*we experienced greater demand elasticity than we expected, which resulted in suboptimal sell-through in August and September*."

41.     In response to this news, iRobot's stock price decline over **9%**. Analysts also appreciated these disclosures as revealing the full extent of the Company's problems due to the combined effect of increased competition (notably, Shark) and tariffs, which exposed the Company's waning competitive position. For example, a PiperJaffray on October 22, 2019 explained that "*[t]he destruction in earnings is due to recent price increases related to tariff expenses, which are having a material impact on unit demand, especially at the high-end*" and noting "we believe iRobot will continue to struggle in their biggest market, making it a hard stock to own." Likewise, an October 23, 2019 Raymond James report noted iRobot's disclosures regarding "stalled demand, suboptimal sell-through, and accelerating share losses" and aptly concluded that "*[t]he combination of Shark and tariffs has upset the domestic RVC hegemony* and we aren't sure the status quo can be restored."

## II.     JURISDICTION AND VENUE

42.     These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

43.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

44.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the

alleged fraud or the effects of the fraud occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. iRobot maintains offices in this Judicial District, and at least one of the Individual Defendants is employed by iRobot in this Judicial District.

45.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

## III.   PARTIES

### A.     Lead Plaintiff

46.     On January 24, 2020, the Court appointed Northern California Carpenters to serve as Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Northern California Carpenters is a defined benefit pension plan that provides retirement benefits and other specified benefits to carpenters and other trade professionals within 46 northern California counties.  As of August 31, 2019, Northern California Carpenters managed over $4 billion in retirement and other assets on behalf of over 50,000 plan participants. As set forth in its PSLRA certification (*see* ECF No. 30-1), Northern California Carpenters purchased iRobot common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

### B.     Defendants

47.     iRobot is a consumer robot company based in Bedford, Massachusetts.  iRobot's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "IRBT."  According to iRobot's quarterly report filed on Form 10-Q with the SEC on August 1, 2019, 28,123,937 shares of iRobot common stock were issued and outstanding as of July 27, 2019.

48.     Defendant Colin Angle ("Angle") is, and was at all relevant times, the CEO of iRobot and Chairman of the Board of Directors.  Defendant Angle founded iRobot in 1990 and has been the Company's only CEO to date.  Angle was a direct and substantial participant in the fraud.  During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in iRobot's quarterly conference calls and events for analysts, investors, and the media.

49.     Defendant Alison Dean ("Dean") is, and was at all relevant times, the CFO, Executive Vice President, Treasurer and Principal Accounting Officer of iRobot.  On February 5, 2020, approximately three and a half months after the end of the Class Period, iRobot announced Dean's resignation from iRobot.  Dean was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, she made materially false and misleading statements/omissions in iRobot's quarterly conference calls , and events for analysts, investors, and the media.

50.     Defendant Christian Cerda ("Cerda") is, and was at all relevant times, the COO of iRobot. According to Defendant Cerda's public Linkedin profile, in his role as iRobot's COO, he was responsible for iRobot's Global Commercial and Supply Chain Operations, with direct responsibility over sales, marketing, product management, manufacturing, and supply chain.  On September 13, 2019, a little over a month before the end of the Class Period, iRobot announced that Cerda was resigning from the Company.  Cerda was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in iRobot's events for analysts, investors, and the media.

51.     During the Class Period, Defendants Angle, Dean, and Cerda (collectively, the "Individual Defendants," and together with iRobot, the "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of iRobot's SEC filings, press releases, public communications with its regulators, and other market communications. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance

and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that certain positive representations that were being made were therefore materially false and/or misleading.

### C.    Relevant Third Parties[3]

52.    CW 1 worked as a Marketing Development Manager for Creative Channel Services ("CCS"), a third party marketing agency contracted by iRobot, from January 2015 to July 2019. CW 1 was located in the greater Seattle, Washington area and was responsible for the Washington State and Western Canada region. In this role, CW 1 was required to wear an iRobot-branded shirt and was responsible for conducting market research on iRobot's robot vacuum competitors, gathering and relaying sales data to iRobot headquarters, training sales representatives on iRobot's products and related demonstrations ("demos") to consumers in retail stores such as Best Buy, Bed Bath & Beyond, Target, and Wal-Mart, as well as handling the product displays at those stores.

53.    CW 1  explained that she and other CCS employees in similar roles input the information that they gathered from their retail store field visits into CCS's Cognistix system, which was a database internal to CCS that kept track of all this market research data.[4] Per CW 1, in addition to numerous details about their field visits (*e.g.*, who at the store they talked to), this market research data in Cognistix included approximately 150 pre-determined questions (or fields), most of which focused on the competition market intelligence that iRobot was most interested in, including, for example, questions about its competitors' sales performance versus that of iRobot's products and when the competition's new product units would be delivered.

---

[3] All Confidential Witnesses ("CWs") are described in the feminine to protect their identity.

[4] Cognistix is a workforce management software that aides in the automation of labor scheduling, retail execution, and field data collection for merchandising and marketing.

According to CW 1, this market research data from Cognistix was then compiled by another CCS employee, Marilyn Lomax,[5] into weekly Field Marketing Reports that she sent to iRobot. Thus, per CW 1, these weekly Field Marketing Reports provided iRobot with CCS's key market research about iRobot's competition based on these field visits. In particular, CW 1 stated that these reports detailed iRobot's and its competitors' RVC sales, including key questions about competition that iRobot was focused on—*e.g.*, which competitors were selling the most products and similar details about competitors' performance, including information about the store shelf space dedicated to iRobot's products versus its competitors'.

54.     CW 1 reported to CCS's Regional Manager Kristy Lopez, for administrative and human resources-related issues, but for substantive issues related to iRobot products and sales, CW 1 dealt directly with iRobot personnel. CW 1's primary contact at iRobot was Michelle McGill, a Field Marketing and Training Specialist. According to CW 1, McGill worked alongside Dan Altieri, an Account Manager, and they both reported to Rob Driscoll, iRobot's Senior Manager – Field / Trade Marketing, Training & Consumer Activation.[6] In addition to McGill, Altieri and Driscoll were the two other primary iRobot sales and marketing personnel that CW 1 typically dealt with.

55.     CW 1 interacted directly with iRobot personnel much more frequently than with CCS employees, including through: weekly sales meetings/calls that were typically led by iRobot's Driscoll and included numerous other CCS and iRobot sales and marketing personnel to discuss iRobot sales figures and market intelligence on its and competitors' performance and trends; regular one-on-one telephone calls; and bi-annual, three-to-four day trips to iRobot's headquarters in Bedford, Massachusetts with CW 1's entire CCS team for meetings with personnel from various iRobot departments, including Defendants Angle and Dean. In addition,

---

[5] According to her Linkedin.com profile, Lomax is currently employed by CCS as a Regional Manager for iRobot.

[6] According to Driscoll's LinkedIn profile, during the Class Period, he was responsible for, *inter alia*, management of a team of 39 Field Marketing Representatives across North America.

CW 1 explained that iRobot sales personnel, primarily McGill, traveled to CW 1's Washington region (and to other regions on the entire West Coast), on a regular basis, typically every three months, to accompany CW 1 and other CCS employees on field visits to various retail stores where iRobot products were sold to provide sales training.

56.     CW 2 worked as a Field Marketer for CCS from May 2015 through February 2019 in the New Jersey/New York area.  In that role, CW 2 and approximately 23 others were responsible for going into retail stores (approximately six per day) throughout the United States to speak with their store contacts about the sales of iRobot's products versus those of its competition.  CW 2 explained that the store employees provided the CCS field marketers with market intelligence related to consumer behavior and specifics of how the stores representatives were conducting sales.  CW 2 (along with fellow field marketers) then wrote up a report of their findings based on each store visit.  According to CW 2, those reports were loaded onto CCS's Cognistix system on a weekly basis, and then a consolidated report of their findings was sent to iRobot corporate.

57.     CW 3 worked at iRobot as a Senior Manager, Enterprise Data Services from November 2017 to August 2019 at its Bedford, Massachusetts location. CW 3 worked in IT business analytics with a focus on ensuring the secure and accurate transmission of financial data and supply chain information to and from the necessary parties.  In that role, CW 3 also handled the integration of an Oracle enterprise resource planning system ("ERP"), which included product demand planning programs.  In her role, CW 3 also attended informal supply chain meetings as well as the Company's "All Hands" meetings, which were attended by Defendant Angle, where the topic of tariffs, *inter alia*, were discussed.

58.     CW 4 worked for iRobot from April 2014 until July 2019 in Woodstock, Ontario as a Country Manager for Canada. CW 4 was responsible for all aspects of iRobot business in Canada, including sales, marketing, supply chain, and advertising.  CW 4 reported to Jennifer Lichtenheim, Senior Vice President ("SVP") and General Manager of the Americas, who was based in iRobot's Bedford, Massachusetts headquarters.  CW 4 explained that Lichtenheim was

responsible for iRobot's operations in North, South, and Central America. In her role, CW 4 participated in weekly conference calls with sales teams and supply chain managers in the Americas, including Lichtenheim, where forecasting and inventory were discussed every week.

59.     CW 5 worked at iRobot as a Senior Talent Acquisition Advisor from January 2016 to March 2017 at its Bedford, Massachusetts headquarters. In that role, CW 5 was responsible for recruiting potential employees for marketing, product management, and other iRobot teams.

60.     CW 6 was employed by iRobot as a "Roboteer," which CW 6 explained is the equivalent of an engineer, from August 2016 through November 2019. Specifically, CW 6 worked as a Roboteer in iRobot's software department working with large motor controls and various sensors on iRobot's products. During the first half of her tenure with iRobot, CW 6 reported to Jeff Mammen, a Software Engineering Manager, and during the second half to Timothy Farlow, another Software Engineering Manager.

## IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS[7]

### A.     iRobot's Background

61.     Founded in 1990, iRobot is a global consumer robot company that primarily designs and builds robot vacuum cleaners ("RVCs") and other related products that autonomously clean consumers' homes. In 2002, after more than a decade of offering robots for primarily military use, iRobot effectively created the consumer category of home cleaning robots with the introduction of its flagship product, the "Roomba" vacuuming robot.[8] The Roomba uses cameras, sensors and other proprietary hardware and software to navigate, map, and clean customer's homes autonomously, with minimal (or in some cases, no) human interaction. The

---

[7] Unless otherwise noted, all references to iRobot's business and operations refer to events that occurred during the Class Period as defined herein.

[8] Although the Roomba was not the first RVC on the market, it was the first successful one. Specifically, the first RVC, the Electrolux Trilobite, was introduced in 1996 by Electrolux, a Swedish household and professional appliances manufacturer. Due to various performance issues, it failed in the market and was quickly discontinued.

Roomba was an immediate commercial success upon its launch, quickly becoming a household name as major specialty retailers, as well as numerous big box stores like Target, soon began to carry it.  By 2004, sales of the Roomba surpassed one million units, and by late 2016 that number had grown to over 14 million, with iRobot holding a 70% market share of the global RVC market as of that time.

62.     The Roomba was (and is) critical to iRobot's financial success.  Specifically, during the Class Period, the Roomba line accounted for approximately *90%* of iRobot's revenues, making it by far the Company's most important product.[9]

63.     During the Class Period, iRobot manufactured a variety of Roomba models that were sold in two distinct tiers: (1) less expensive, entry-level models that had fewer and more basic features and older, less-sophisticated technology; and (2) more expensive, premium-tier models that included more higher-end features and up-to-date technology. Sales of entry-level Roombas accounted for approximately 40% of iRobot's overall Roomba revenue annually during the Class Period, whereas the premium-tier accounted for the other 60%.   Further, because Roomba revenue accounted for 90% of iRobot's total revenues, sales of both the entry-level and premium-tier Roombas were critical to iRobot's financial success.

64.     At the beginning of the Class Period, iRobot's entry-level Roombas were referred to as the "600 series" and retailed for approximately $300 and up.  In September 2018, iRobot released a new entry-level Roomba, known as the "e5".  While it was supposed to be entry-level, the e5 was released with a substantially higher starting retail price of $449 (compared to the 600 series Roomba), making it effectively more of a mid-level product.

65.     At the beginning of the Class Period, iRobot's premium-tier Roomba models were

---

[9] During the Class Period, iRobot also manufactured a robot mop for wet applications called "Braava" and a pool cleaner known as "Mirra."   Towards the end of the Class Period, the Company also launched a robot lawn mower dubbed "Terra."   However, these three products, even taken collectively, never amounted to more than approximately 10% of iRobot's total revenues.

referred to as the "800" and "900 series," and they included extra features such as dual, multi-surface brushes, proprietary camera-based navigation technology, advanced mapping technology, and Wi-Fi and smartphone connectivity. The 800 and 900 series retailed for between $500 and $900, or more.

66.     Later in the Class Period, iRobot also introduced two new premium-tier Roomba models. Specifically, in September 2018, iRobot launched the i7 and i7+ Roombas, where the "+" referred to an additional feature of that model—*i.e.*, the customer also received a "Clean Base" receptacle into which the i7 Roomba would automatically empty the contents of its dust bin. When they were released, the i7 and i7+ retailed for $699 and $949, respectively. As further detailed below, in May 2019, iRobot introduced the most expensive model in its history, the premium s9 and s9+ models, which initially retailed for $999 and $1,299, respectively.

67.     Generally, as part of its competitive business strategy, iRobot released new premium-tier Roomba models every eighteen months to two years. After the release of these new premium-tier models, iRobot then implemented the technology from the older, premium-tier Roombas into its entry-level 600 series models.

68.     Prior to and during the Class Period, Defendants repeatedly told investors that this strategy was key to iRobot's ability to stave off competition from companies that charged significantly less for their robotic vacuums. For example, on February 8, 2018, during iRobot's fiscal year 2017 ("FY2017") and fourth quarter 2017 ("4Q17") earnings call, Defendant Angle explained that "we as aggressively as we can take our premium features and roll them down to ensure that our entry-level price points continue to be competitive and to ensure that we can hold off these lower tech entrants into the marketplace."

## B.     iRobot Touted Roomba's Dominant Market Share and Massive Growth

69.     Because iRobot was the first Company to successfully bring a robot vacuum to market, it, at least initially, held a significant market share advantage over its competitors. According to the Company's 2018 Analyst Day presentation on March 1, 2018, based on

"iRobot internal estimates," the Roomba accounted for over 60% of the global RVC market segment in calendar year 2017.[10]   According to the same iRobot estimates, the Roomba accounted for approximately 85% of the U.S. RVC market segment in calendar year 2017.  Thus, at the start of the Class Period, iRobot held a 60% RVC market share globally and an 85% RVC market share in the U.S.

70.     At the same time, Defendants also told investors that iRobot was experiencing rapid and substantial revenue growth across all of its primary global regions and that this growth would continue for years to come.  Specifically, during iRobot's 2018 Analyst Day on March 1, 2018, while presenting the growth chart depicted below, Defendant Angle told investors that iRobot was experiencing substantial compound annual growth rates ("CAGR")[11] across its three primary global regions, and that this growth would continue for years to come:

> Over the last 3 years, nearly a 40% CAGR in North America, a 24% CAGR in EMEA and a 14% CAGR in Asia-Pacific.  So on a global basis, the robot vacuuming segment is moving in a very exciting direction and we see that -- sort of on a global basis, we'll see continued strong momentum for years to come.

---

[10] iRobot operates in three primary global regions: (1) North America; (2) Europe, Middle East and Africa ("EMEA"); and (3) Asia Pacific ("APAC").

[11] CAGR is the average revenue growth rate measured over a period of time—here, years.  For example, if hypothetically the U.S. RVC category was expected to grow 30% in 2021 and 40% in 2022, the CAGR would be 35% (*i.e.*, the average growth rate over those two years).



71.     Because of the massive amount of revenue growth expected in the U.S. (39%), as compared to EMEA (24%) and APAC (14%), the U.S. market[12] was crucial to iRobot's continued financial success.  The U.S. market was also where, as discussed above, iRobot held the largest market share (85%), as compared to approximately 71% in EMEA, and only 31% in APAC, a market dominated by Asian RVC manufacturers that iRobot was still trying to break into.  Indeed, the U.S. market accounted for more than half (approximately 51%) of iRobot's total revenues at this time.  Accordingly, Defendants knew that the U.S. market represented iRobot's most important region and, thus, was essential to the Company's continued financial success.

**C.     Increasing New Competition Began to Flood the RVC Market**

72.     After years of enjoying a commanding market share advantage and massive global growth, starting soon before and during the Class Period, iRobot began to face mounting pressure from new competition entering the RVC market.  Specifically, as the RVC market grew from only a small fraction of the worldwide overall vacuum cleaner market in the early 2000s to

---

[12] While Defendant Angle stated that CAGR in "North America" was "40%" during the iRobot's 2018 Analyst Day, according to the above revenue growth chart in his presentation, it appears he was referring to the 39% CAGR in the United States.

approximately 20% by 2016, iRobot saw an increasing influx of many different new RVC competitors, in both the United States and globally, including: established manufacturers of regular vacuums, such as Dyson, Bissell and Hoover, which launched their own RVCs beginning in 2014, 2015 and 2016, respectively; established electronics manufacturers, such as Panasonic, LG, and Samsung, which released multiple different RVC models beginning in 2015 and 2016; and other new RVC specialists similar to iRobot, such as Neato Robotics, bObsweep, and ECOVACS Robotics.

73.     As to the latter category, Neato, for example, introduced its first robot vacuum in 2010 and has since released multiple different models, including of its most popular product line called the "Botvac," which include features such as Wi-Fi and internet-connectivity like the Roomba. Notably, in August 2017, Neato announced the launch of its new flagship robot vacuum, the Botvac D7 Connected, which was one of its highest-end RVCs.  bObsweep, a Canadian manufacturer, introduced its popular pet-hair focused RVC models, including the bObi and bObi Pet, in the U.S. in 2015.  Further, ECOVACS, a Chinese technology company, which historically held the majority of the RVC market share in China, began launching its models, including the Deebot series, in the U.S. in 2016.

74.     By the start of the Class Period in 2017, there were at least twenty different RVC manufacturers attempting to gain market share from iRobot in the United States.  In addition to those named above, a wide range of companies introduced competing robot vacuums before the end of 2017, including: Miele, Electrolux, Black & Decker, Sharp, Dirt Devil, Haier, iLife, Xaiomi, Bosch, Eufy, and Rollibot.  This increasing competitive field in the RVC market was helped along by the growing e-commerce industry, as the proliferation of internet retailers (notably, Amazon.com) helped reduce purchase costs of RVCs.

75.     Importantly, one of iRobot's biggest and newest competitors was SharkNinja (or "Shark"), the number one seller of traditional upright vacuums in the United States.  In 2017, as part of its expansion strategy into the RVC market, Shark sought to introduce its own robotic vacuums that competed directly with iRobot's premium-tier products, but at a significantly lower

cost.

76.     On September 12, 2017, one day before the start of the Class Period, Shark announced its entry into the RVC market with the launch of three models of robot vacuums, the Shark ION 750, 720, and 700.  The Shark ION 720 and 700 models provided comparable features and performance as the Roomba 600 series, but retailed for $279.99 and $199.99 respectively, considerably less than the $300 retail price for an entry-level Roomba 600 series.

77.     These Shark RVCs began selling online and in brick and mortar retail stores shortly thereafter in September 2017.  The Shark ION 750, the highest performing of the three Shark ION models, looked physically similar to a Roomba and also had the same or similar high-end features and performance as iRobot's premium-tier models, including Wi-Fi and Amazon Alexa connectivity, mobile-device application ("app") compatibility, scheduling, self-cleaning brushes, and advanced mapping technology.  Critically, however, the Shark ION 750 cost only *$349*, whereas similar Roomba premium-tier models cost at least *$500* or substantially more. Indeed, the Shark ION 750, despite having similar key features and technology as iRobot's premier-tier models, was priced closer to iRobot's entry-level 600 series Roomba, which cost approximately $300 and up.

78.     At the same time, other major competitors were also increasingly offering robot vacuum models with comparable compatibility, features, and performance as the premium-tier Roomba models, including the Neato Botvac, Samsung Powerbot, and bObsweep models, all of which sold their vacuums at price points well below the cost of iRobot's models.  For example, the Samsung Powerbot R7070, which launched in mid-2017, received better reviews from top consumer electronics publications than the Roomba 980 and cost only $599, versus the $900 price tag of the Roomba 980 at the time.

79.     The Shark ION and other major competitors' RVCs were also available for sale side-by-side with Roomba models at the largest online and brick and mortar retail stores, including Amazon.com, Best Buy, Target, Walmart, Home Depot and Bed, Bath & Beyond. Indeed, as further described below, multiple former iRobot employees explained that, during the

Class Period, these new Shark models and other competitors' robot vacuums increasingly began to take up more and more desirable shelf space at retail stores that was previously dedicated exclusively to the Roombas.

80.     Analysts recognized the competitive threat that the new Shark robot vacuums and other such competitors posed to iRobot's business.  For example, as J.P. Morgan wrote in a September 13, 2017 analyst report shortly after the Shark ION's announced launch: "Shark officially announced its entrance into the robotic vacuum category with features that appear to match capabilities of the iRobot Roomba 600 and 800 series, with a lower price. . . Shark ION robot will be available at an impressive list of US retail distribution partners, spanning online, specialty retail, and big box."

81.     A short-seller called Spruce Point Capital Management ("Spruce Point") voiced similar concerns.  For example, in a September 13, 2017 report, Spruce Point wrote

> SharkNinja has entered the robotic vacuum market with a '*functionality at a reasonable price' strategy* to compete directly with the Roomba. The RV700 series *has similar, and in many cases near identical product functionality, channel distribution and marketing as the Roomba*. Given Shark's historical success, we assume that their entry into the market will translate into sales and margin pressure for iRobot beginning with Q4 2017.

82.     Thus, during the Class Period, investors and analysts were highly focused on iRobot's continued ability to maintain its dominant competitive position and strong revenue growth from its flagship Roomba products in the face of this growing competition in the RVC market.

83.     However, as further detailed below, in response to such analyst and investor concerns of increased competition—including from SharkNinja specifically—Defendants consistently and misleadingly reassured the market that the new competition did not threaten the Company's market share advantage or impact iRobot's revenues and gross margins because Roombas were equipped with superior technology and features that differentiated them from the competition.  Thus, Defendants repeatedly downplayed the negative impact of this increased new

competition on iRobot's business.  As further set forth below, analysts were encouraged by Defendants' false and misleading reassurances, remaining confident of the Company's continued dominance in the RVC market despite this increased competitive environment.  For instance, a PiperJaffray analyst report on October 25, 2017, stated that, although they "have increasing concerns that competition is increasing," "*we remain upbeat about* the future of home robot adoption and *iRobot's position in this market*."

> **D.     Per Numerous Former Employees, Defendants Knew but Failed to Disclose That During the Class Period iRobot's Sales and Market Share Were Substantially Declining Due to Increased Competition**

84.     Multiple former iRobot employees confirmed that, beginning no later than September of 2017, when Shark entered the RVC market with its ION robots, Defendants became increasingly aware of and concerned about iRobot's sales and retail store shelf space (a key indicator of competitive performance that iRobot closely tracked internally through extensive market research), which were declining significantly due to an influx of new competition in the RVC market.  In particular, as detailed below, in the fall of 2017 through early 2018, the increase in competition began to significantly reduce iRobot's sales at the entry-level tier where the market was much more saturated with competition. Critically, Defendants knew that this rising competition had begun to significantly erode iRobot's market share by early 2018. Thus, Defendants knew, but failed to disclose to investors, these material, adverse competitive trends regarding iRobot's performance *vis-a-vis* its competitors. including iRobot's declining store shelf space and sales (which were apparent internally by September 2017) and decreasing market share (which was apparent internally by early 2018).  Defendants knew about these adverse competitive trends and their impact on iRobot's business because, among other things had access to: (1) weekly Field Marketing Reports detailing these competition issues (based on extensive market research across the U.S. conducted by CCS, whom iRobot contracted for this purpose, regarding iRobot's sales and competition at the retail stores where Roombas and other RVCs were sold; and (2) CCS weekly sales calls with iRobot sales and marketing personnel

where these competition issues (including, notably, iRobot's market share declines), were also regularly discussed.

85.     According to CW 1, whose responsibilities at CCS focused on market research and intelligence as to iRobot's competitors (*see supra* at ¶¶ 52-55), soon after the Shark ION was released in September 2017, the RVC market began to become saturated with cheaper alternatives that were similar to the Roomba in terms of product features and iRobot began losing shelf space in retail stores and sales to competitors such as SharkNinja, Dyson, Neato, and other competition.  Specifically, CW 1 explained that when she began working with iRobot in 2015, the Company had no significant competition in the RVC market and that iRobot, thus, routinely exceeded its sales projections at the time.

86.     However, this changed beginning no later than late 2017.  In particular, CW 1 recalled that it was soon after the SharkNinja ION robot, iRobot's biggest competitor according to CW 1, was released in the fall of 2017, that she first began to see iRobot's sales impacted by its competition and iRobot's concerns about competition became "pretty big."  CW 1 explained that starting at approximately this time, retail store displays that were once entirely dedicated to iRobot products were now shared by iRobot's competition, which put the competitors' comparatively lower prices directly in front of consumers.  For example, CW 1 stated that Best Buy, Lowe's, Wal-Mart, and Target all began to place iRobot products directly next to the competition.  In contrast, during her first two years with CCS (January 2015-January 2017), CW 1  could not remember iRobot ever being displayed next to the competition.  Thus, Defendants knew that iRobot's store shelf space, a key competitive indicator closely tracked by iRobot (as detailed below), was declining due to increasing competition, and thus affecting iRobot's sales, by September 2017.

87.     In particular, Defendants, including Angle specifically (as further set forth below), knew about these adverse competitive trends showing iRobot's declining performance vis-à-vis its competitors in retail stores, and the trends' adverse impact on iRobot's business, based on, *inter alia,* the weekly Field Marketing Reports that they received from CCS which

reflected CCS's key market research on iRobot's competition.  *See supra* at ¶ 53.  Importantly, as noted above, CW 1 stated that these weekly Field Marketing Reports detailed iRobot's and its competitors' RVC sales, including key questions about competition that iRobot was focused on—*e.g.*, which competitors were selling the most products and similar details about competitors' performance.  As explained above, these weekly Field Marketing Reports were compiled from market research data that CW 1 and others at CCS gathered in their field visits to retail stores and input into CCS's Cognistix system, including approximately 150 pre-determined questions (fields), most of which focused on the competition market intelligence that iRobot was most interested in, *e.g.,* questions about its competitors' sales performance versus that of iRobot's products and when the competition's new product units would be delivered, and the like.[13]

88.     Per CW 1, all of these issues with shelf space due to increased competition that she described were also reported to iRobot in these weekly Field Marketing Reports. Additionally, the shelf space issues were discussed on CCS weekly sales calls with iRobot that CW 1 participated in, where they also discussed sales figures and what she and her colleagues at CCS were seeing in the market for that week.  CW 1 explained that these weekly sales call were typically led by Rob Driscoll, iRobot's Senior Manager - Field / Trade Marketing, Training & Consumer Activation.

89.     Further, CW 1 stated that, in response to the increased competition, iRobot instructed CCS to conduct a "tremendous" amount of market research on its competitors, which included taking pictures of competitors' boxes, buying competitors' products to try out, and quizzing store sales representatives about competitors' performance (particularly, sales of the Shark robot vacuum) in comparison to iRobot.

---

[13]  As noted above, CW 2 corroborated CW 1's account, also stating that similar market intelligence information was compiled by CCS in the Cognistix system on a weekly basis and that CCS's findings were then provided to iRobot corporate in the form of a consolidated report. *See supra* at ¶ 56.

90.     With respect to in-store shelf displays, CW 1 explained that she personally and the 25 other CCS field representatives in her region were responsible for visiting approximately 30 different stores per week and would take 2-3 pictures of the store shelf displays at each store. Per CW 1, these pictures were then uploaded to Cognistix, the CCS database described above (*supra* at ¶ 53) that kept track of all this market research data.  CW 1 stated that iRobot had real-time access to these pictures and any accompanying captions submitted by CCS employees in Cognistix (as opposed to other data in Cognistix, which iRobot did not have access to).  CW 1 stated that the key highlights of the rest of the market research data about iRobot's sales and competition in Cognistix that iRobot did not have direct access to would be compiled by CCS and included in the weekly Field Marketing Reports that iRobot received.   Further, CW 1 commented that, given iRobot's real-time access to these store shelf display pictures in Cognistix, in addition to the weekly Field Marketing Reports that also reported on these declining shelf space issues due to competition, that iRobot was very "plugged in" and aware of these shelf space problems.

91.     Indeed, CW 1 alleges that at a large bi-annual meeting in iRobot's Boston headquarters that she attended, Defendant Angle told employees that he regularly reviewed these weekly Field Marketing Reports. Further, CW 1 recalled that CCS employees were regularly reminded by Rob Driscoll, on the weekly sales call that Driscoll typically led, that Defendant Angle read the weekly Field Marketing Reports.  CW 1 explained that, per Driscoll, Defendant Angle, for example, frequently acknowledged specific information from the Weekly Field Marketing Reports that he found relevant, thus showing that he had read them.

92.     Other CWs corroborated that internally iRobot was greatly concerned about increasing competition by the start of the Class Period in September 2017.  For example, CW 5 recalled that when she joined iRobot in January 2016, internally they were already "feeling the pressure" from increased competition in the robot vacuum market, citing Dyson as one early example given it was another premium vacuum manufacturer similar to iRobot.  According to CW 5, iRobot then became increasingly concerned about such competition leading up to the

holiday season in late 2016, when new competition flooded the market.  CW 5 explained that by the time of her departure in March 2017, iRobot was already aware of growing new competition that would be entering the robot vacuum market, including "some serious competition" from Asian manufacturers, such as Ecovacs, as well as Shark, which iRobot knew was developing its own robot vacuum.  According to CW 5, iRobot did not have adequate focus on this lower-priced competition space in the market.

93.     By early 2018, the growing loss of shelf space to competitors and iRobot's resultant internal concerns about increased competition began to materialize in the Company's declining sales figures and market share, causing those concerns to intensify.  Specifically, according to CW 1, it was soon after the holiday season in December 2017 (*i.e.*, early 2018) that iRobot saw the negative impact from increased competition on its sales, leading to heightened concerns about competition.  Per CW 1, this was a "common concern" within iRobot that was discussed widely.

94.     According to CW 1, CCS's market research revealed that iRobot's competitors' products were selling well and were "definitely" eating into iRobot's U.S. market share significantly. CW 1 clarified that this decline in iRobot's U.S. market share began to be visible internally beginning in early 2018 and that it was readily apparent internally by the summer of 2018.  Specifically, CW 1 explained that the three main competitors that iRobot was concerned about at the time were the Shark ION, the Neato, and the bObsweep, with the Shark being the primary focus.  CW 1 recalled that when she first joined CCS (in 2015), iRobot's U.S. market share was 92% and that it had fallen to 87% by the start of the Class Period.  According to CW 1, ***by the summer of 2018*** (within the year of Shark's launch, which was in September 2017***), iRobot's U.S. market share had fallen an additional 10%***, to 77%, which CW 1 characterized as a significant loss, due to the increased competition from Shark and the other competitors.  Further, CW 1 explained that the rate at which Shark, Neato, bObsweep and others were eroding iRobot's market share was much quicker than anticipated.  Per CW 1, these declining market share figures were discussed in detail on the weekly sales conference between iRobot and CCS,

which were typically led by iRobot's Rob Driscoll, as noted above.

95.    Moreover, in early 2018, iRobot learned of another negative competitive trend regarding Roomba sales.  Specifically, CW 1 stated that, as discussed on the weekly sales calls with iRobot described above, after the first earnings release of 2018, it became apparent internally that iRobot's sales were trending towards repeat customers, which showed that iRobot was having problems attracting new customers.  CW 1 explained that at this time iRobot realized that the market for its products was becoming saturated as its sales were trending towards additional purchases by repeat customers rather than gaining new customers and thereby expanding the size of the market.

96.    According to CW 1, iRobot's concerns about increased competition intensified later in 2018, particularly as iRobot continued to lose more and more shelf space to its competitors that year.  CW 1 stated that in the summer of 2018, she noticed that the store shelf space dedicated to iRobot products had substantially declined further.

97.    CW 1 explained that this adverse trend was particularly apparent in the premium or more desirable shelf space that iRobot products had long enjoyed, first at Best Buy and Bed Bath & Beyond and then later on at Lowe's.  CW 1 explained that every Bed Bath & Beyond had an "endcap"[14] dedicated to iRobot with four products, but once competition grew in 2018 that space was instead dedicated to competitors' products, such as the Neato and Shark RVCs, with iRobot relegated to the less visible side shelf.  As noted above, per CW 1, all of these issues with shelf space were reported to iRobot in the weekly Field Marketing Reports described above, in addition to being discussed on the weekly sales calls with iRobot (typically led by Driscoll) that CW 1 participated in.

98.    In addition, per CW 1, iRobot personnel knew about these issues with declining shelf space, because CW 1 stressed that she "couldn't imagine anyone knowing more" about these problems than CW 1's primary iRobot contact, Michelle McGill, who reported to Rob

---

[14] An endcap is a display for a product placed at the end of an aisle.

Driscoll, "or [McGill's] east coast counterpart." CW 1 explained that McGill, frequently (typically, every three months) accompanied CW 1 on her field visits to retail stores to conduct sales training on iRobot products and market research on the competition. Thus, McGill would have personally observed these declining shelf space and other competition issues. CW 1 further stated that McGill's knowledge regarding declining shelf space was passed along to their colleagues at iRobot corporate in Massachusetts.

99.    Other former employees also recounted that these internal concerns about competition and its increasing negative impact on iRobot's sales were discussed at town-hall style internal meetings with iRobot employees. For instance, CW 6 described these periodic meetings as a company status update presented by the executives—including the three Individual Defendants, all of whom CW 6 specifically recalled speaking at these meetings—to the less senior level employees. In particular, CW 6 recalled the issue of competition being addressed by either CEO Angle or another executive during one of the company's "All Hands Meetings." According to CW 6, the discussion of competition included charts and graphs detailing competitors and market share. CW 6 recalled competition as coming from major manufacturers such as Shark. CW 6 also noted that competition was increasing during the Class Period as more and more competitors released cheaper products similar to iRobot. CW 6 elaborated that concerns over competition were discussed internally throughout the time period from mid-2017 to the end of her tenure (in November 2019), and that it was clear from those All Hands Meetings that senior management (including the three Individual Defendants who spoke at those meetings) were well aware and concerned about the increased competition and how to respond.

100.    Likewise, CW 3 recounted that both before and after the announcement of tariffs (*i.e.*, in July 2018), it was known internally that competition was putting "price pressure" on iRobot. In particular, CW 3 recalled both Shark and Dyson being discussed internally, as well as certain features that competitors were introducing. According to CW 3, these features included floor mapping, which iRobot only made available on its higher end products, and the introduction of improved capabilities to clean up pet hair.

34

**E.** **Throughout the Class Period, Defendants Repeatedly Downplayed the Impact of Increased Competition on iRobot's Sales and Revenues**

101.    The Class Period begins on September 13, 2017, one day after Shark announced the release of its ION suite of robot vacuums in stores.  On that day, during a Morgan Stanley Laguna Conference with analysts, Defendant Dean discussed the new competition from Shark and others facing iRobot, noting "the buzz [] about SharkNinja coming into the market" in particular, but then proceeded to downplay the impact of such increased competition on iRobot's business. In response to a question about iRobot's "strategic response to the competition starting to emerge," Dean claimed that the Shark ION (and other competition in general) were lower-end and thus not a legitimate threat to iRobot's premium-tier Roombas.  In particular, in response to a question from an analyst asking, "[h]ow are you differentiating your product between some of the new competitors that are coming in, in the United States?" Defendant Dean downplayed the competitors' ability to compete with Roomba from a price and performance perspective, asserting that their products were ***"not resonating"*** with consumers:

> So our products, from a price and performance perspective, are really offering the best value proposition.  Again, we have multiple offerings on a premium scale. ***And what we found with the competitors to date is that the combination of the price point they're coming in at and the features, functionality and, ultimately, the quality of the experience for the consumers is not resonating. . . .*** And again, I think it's a combination of the price points and the functionality, the value, the quality that we offer the consumers and the experience.

102.    As the Class Period progressed, Defendants continued to minimize the impact of competition that iRobot were seeing at U.S retailers.  For example, on October 25, 2017, during iRobot's earnings call for the third quarter of 2017 ("3Q17"), Defendant Angle falsely assured investors that increased competition was not diminishing demand for Roombas or iRobot's competitive position: "***Demand from U.S. retailers for our robots increased during the last quarter***. ***We continue to gain space, exposure and momentum in the market***, driving higher full year U.S. revenue expectations for the second time this year, ***even with the availability of new competitive products***."

103.    Later on the call, Defendant Angle misleadingly downplayed the impact of competition, touting the purportedly continued strong demand for both iRobot's entry-level and premium-tier products and claiming that increased competition at the low-end was actually beneficial to iRobot's premium-tier strategy:

> *[O]ur brand strength and our customer promise is going to [] create a compelling reason for iRobot to maintain its success with our entry-level price points*, which in a more mature marketplace would be in the midrange. Although there is -- we have done some things where we've offered special SKUs to get people under the franchise from time to time. But that midrange entry point is something that you should imagine us continuing. *But with the higher price point premium products, the things that will, in total, be the larger percentage of our revenue.* So we're quite happy with [] this premium strategy, and we think it is resilient and *even benefits from this low-end emergence.*

104.    In fact, Defendant Angle later further minimized the emerging competition as "*not particularly material at this point in time because, to date, there really hasn't been much [competition] at least in the United States at the low-end*," adding that *"[w]e don't view it as cannibalistic of our growth*."

105.    However, these and other statements minimizing the impact of this adverse competitive trend on iRobot's business, as set forth in Section V *supra*, were all false and misleading.  Contrary to Defendants' statements, iRobot's was not  "*continu[ing] to gain space, exposure and momentum in the market . . . even with the availability of new competitive products,"* nor was the Company's premium-strategy "*benefit[ting] from th[e] low end emergence*" of increased competition, which was in fact "*material at this point in time*" and was "*cannibalistic of [iRobot's] growth*."  Instead, new competition was in fact "*resonating*" with consumers and diminishing, rather than increasing, demand for iRobot's products, both its entry-level and premium-tier models, in contrast to Defendants' positive assurances that they were not seeing any significant adverse competitive trends.

106.    As discussed in ¶¶ 52-56, 84-92 *supra*, several former employees confirmed that Defendants knew from iRobot's own market research, at that time these statements were made,

36

that new, increased competition from Shark and other competitors was already negatively impacting the Company's sales to a greater extent than the Company had expected as iRobot began to lose shelf space at retail stores to its competitors. Defendants knew that new competition with comparable technology and lower prices had saturated the market, and already began to significantly cut into iRobot's market share and sales.  Thus, by this time in the fall of 2017, as CW 1 reported, Defendants were already greatly concerned about this increased competition and the impact it was having on iRobot's sales, contrary to the above public statements reassuring investors that competition did not pose a significant threat to iRobot's business.

F.      **The Negative Impact of Competition on iRobot's Profitability Gradually Begins to Emerge**

107.    Contrary to Defendants' false and misleading statements minimizing the increasing competitive threat, investors soon began to understand that competition was negatively impacting iRobot's financial results.  On February 7, 2018, after the market closed, iRobot issued its annual guidance figures for fiscal year 2018 ("FY2018"), as well as three-year financial targets for 2018 through 2020.[15]   However, iRobot's bottom-line estimates (specifically, operating margin and Earnings Per Share ("EPS")) were below analysts' consensus estimates.  Further, during the related 4Q17 earnings call held the next morning, on February 8, 2018, in response to an analyst question regarding whether iRobot was seeing any "inflection in demand," "pricing pressure," or other such competitive trends in the U.S. RVC market compared to prior years, Defendant Angle acknowledged that "I think *there is absolutely an increased competitive pressure*."  Thus, Defendants revealed for the first time that, contrary to prior assurances that these new competitors did not pose a significant threat to its business, iRobot was already experiencing some adverse impact on its sales and revenues from increased competition

---

[15] iRobot issues guidance to investors for the upcoming Fiscal Year in February of each year. Every three years, iRobot also issues three-year guidance, which is updated in February of each year as those three years progress.

in the RVC market.

108.    In response, iRobot's stock price fell from its closing price of $88.04 on February 7, 2018 to a closing price of $59.80 on February 8, 2018, a drop of *over 32*%.

109.    Analysts were also surprised by Defendants' partial disclosure that iRobot was already experiencing some adverse effects from increased competition.  For example, a February 8, 2018 CFRA Research report noted that the "Company's comments on [the earnings call] indicate *that competition is indeed increasing*," and thus "*[v]alidates [CFRA's] concerns*" "*about iRobot's ability to stave off competitive entry*."  Similarly, J.P Morgan reported the next day that its "*concerns regarding increased competition are seemingly beginning to play out*." That same day, Raymond James also issued a report that acknowledged that Defendants' disclosures "*stoked the flames of concern surrounding the vicious cycle of competition.*"

110.    Analysts also attributed the disappointing operating margin and EPS estimates to unexpected increased operating expenditures ("OpEx") as a result of increased sales and marketing and Research and Development ("R&D") expenses—two expenses analysts understood were critical to iRobot's ability to maintain its market share and fend off competition. For example, in an analyst report published on February 8, 2018, PiperJaffray explained that "iRobot guided operating expenses well above expectations which are growing faster than revenues, impacting their bottom line.  Although we believe it is important for them to increase their brand strength through advertising, we are cautious on if the increased spending will drive high enough revenues to justify the operating expense increase."  Moreover, a J.P. Morgan analyst report issued on the same day noted that "operating margin and EPS guidance were lower than expected and the company's three-year financial targets indicate elevated opex for the foreseeable future." Accordingly, analysts recognized this disappointing guidance as partially revealing that increased competition was having an adverse impact on iRobot's business because the Company was telling the market that it had to incur significantly more sales, marketing, and advertising expenses to maintain its current market share and competitive position.

111.    However, although Defendants partially disclosed some negative impact from

increased competition on iRobot's business, they immediately downplayed that impact and reassured investors that, despite this growing competitive threat, iRobot was still well-positioned to maintain its dominant market share position and achieve its revised FY2018 guidance. In other words, Defendants assured that iRobot had taken into account these competitive pressures into that updated guidance and thus did not anticipate any further fallout on its financial performance. Specifically, during the same 4Q17 earnings call on February 8, 2018, Defendant Angle responded as follows to the analyst's question noted above about any changes in competitive trends—first acknowledging some impact from competition, but then immediately minimizing it:

> **Analyst**: And then just looking at the U.S., wondering whether or not you're seeing given that inflection in demand, any changes in the ASP [Average Sale Price] dynamics, any pricing pressure, anything that's shifting here in 2018 versus what you saw in 2016, 2017?

> **Angle:** Sure. I think that there is absolutely an increased competitive pressure. And we work to try to protect ourselves against us and given us – *giving ourselves some optionality as to how do we address competitive pressure that is embedded in the guidance that we've given.* We see the low end of the robot vacuum cleaning segment growing, where there are an increasing number of entrants down sort of below the 299 price points that we have traditionally played at. And iRobot certainly intends to continue to aggressively compete throughout the market.
> . . .

> So I think that *again in the guidance that we gave, we allowed ourselves some amount of ability to respond to competitive threats. And we think we are well equipped to win in 2018* as should be taken away from the confidence in our revenue growth rates.

112.    Such statements were false and misleading because, contrary to Defendants' false reassurances, Defendants knew at this time that these "competitive threats" were only intensifying and increasingly eroding iRobot's sales and market share in 2018, rather than being adequately factored into the Company's revised guidance.  Thus, Defendants knew that iRobot was *not "well equipped to win in 2018*" and "*continue to aggressively compete throughout the market*" based on its own internal market research and sales reports showing that it was increasingly losing store shelf space, sales, and market share to Shark and other competitors at

this time. Specifically, as CWs confirmed, Defendants internally were greatly concerned about increased competition trends starting no later than late 2017 after the Shark ION's launch, and these concerns only grew at this time in early 2018, when they falsely reassured investors that these competition threats were under control.

> **G.    According to Former Employees, as the Negative Impact of Increased Competition on iRobot's Business, Particularly Its Entry-Level Product Sales, Intensified in 2018, Defendants Pivoted iRobot's Focus to the Premium-Tier**

113.    By no later than the early 2018, iRobot's sales losses attributable to increased competition began to intensify as the Company was continuing to lose sales and market share to competitors such as Shark, Neato and bObsweep.  Critically, the increased competition, which was primarily at the cheaper lower-end of the RVC market, was having an outsized impact on iRobot's sales of its entry-level Roomba products.  However, rather than attempt to compete in this entry-level space, *e.g.,* by offering more, lower-priced Roomba options, iRobot chose to focus its sales and marketing strategy almost entirely on the premium-tier models.  In doing so, iRobot essentially gave up on this entry-level product income stream that represented 40% of the Company's Roomba revenues, while misleading investors that demand for and sales of both the entry-level and premium-tier models remained strong, unabated by increasing competition.  This shift in competitive strategy further jeopardized iRobot's ability to maintain its dominant competitive position and exacerbated the growing negative impact of increased competition on iRobot's sales and revenues.

114.    According to former employees, the impact from increased lower-cost competition was particularly damaging to sales of iRobot's entry-level products.  Specifically, according to CW 1, the increased competition from Shark, Neato, and other robot vacuums, which were lower-priced, had really hurt iRobot's sales of its lower-end products during the Class Period because that market had become more and more saturated with these cheaper product alternatives. CW 1 explained that the increase in competition and resultant poor sales caused iRobot to implement a "fundamental change" in its marketing strategy—the introduction

of the "Champion Program" in approximately October 2018. According to CW 1, the Champion Program was first announced internally on one of the weekly sales conference calls with iRobot that she participated in.  CW 1 further recalled that, in the subsequent week, she and her colleagues were in Boston attending an iRobot national training meeting where they received additional training on this new marketing strategy, which was in direct reaction to iRobot's declining sales due to increased competition.  CW 1 explained that the program was designed to sell the higher-end iRobot products and, thus, was heavily focused on training sales representatives about those higher-end products' features, including much more aggressive demos of these products in the stores.  However, according to CW 1, this Champion Program came at the expense of the lower-end Roombas, which CW 1 described as the "gas that made the engine go" in terms of being a revenue driver for iRobot.

115.    According to CW 1, iRobot pivoted to premium robots, such as the i7, i7+ and s9 models in order to move away from the saturated low-cost market—*i.e.*, by less expensive competition like the Shark and Neato robots that had many similar features to the Roombas. As noted above, the i7 and i7+ models were released in September 2018.

116.    CW 1 reiterated that this strategy shift was already in the works ***as early as summer 2018*** when she began supplying stores with i7 models to demo and the introduction of the Champion Program in early fall 2018.[16]  According to CW 1, all of these competition issues were discussed on the weekly sales calls with iRobot.

117.    Other former employees similarly recalled Defendants' focus shifting toward the premium-tier models at the expense of the entry-level models.  Indeed, CW 5 explained that iRobot and the decision makers at the Company stubbornly viewed the company as a "premium brand," and were determined to introduce a new $1,100 robot vacuum into a market when the

---

[16] CW 1 recalled that approximately in the summer of 2018, iRobot provided approximately 5,000 high-end i7 models to Bed, Bath & Beyond stores across the country to demo leading up to the holiday season.  According to CW 1, this was another sign iRobot was increasingly focusing more on trying to sell its more expensive, high-end models.

Company was already "having its lunch handed to it" by lower-priced competitors.

118.    Further, CW 1 stated that, unlike the lower-priced Roombas, iRobot's higher-end models could not "supply the gasoline to keep the engine running."  CW 1 explained that not only were consumers hesitant to pay for a premium version of a robot vacuum, but also that the product itself had software and other performance issues.  CW 1 elaborated that the premium Roombas relied on Wi-Fi, which caused performance inconsistencies or served as a barrier to entry for some consumers.  According to CW 1, the high-end models, such as the i7 and s9, were "pieces of junk." Indeed, CW 1 observed an extremely high return rate in the stores that she visited for these i7 and s9 models, adding that most of the returns were due to software problems encountered by the customers.

119.    Moreover, CW 1 recalled that she had to give many of these models away to store managers as free samples so that the stores would continue to sell them.  For example, CW 1 explained that around the time that iRobot was preparing to release the i7 (summer of 2018), the Company also gave away these high-end Roomba models to store managers of Bed Bath & Beyond  (and other key retail stores) in exchange for the store managers' agreement to display the models in store for 90 days.  This was an unprecedented step for iRobot because, according to CW 1, she did not recall the Company ever giving away even a "$0.98 pen" to store managers before this time.

120.    Given the i7's high price tag and the above performance issues, these models experienced weak sales after release in September 2018.  Specifically, per CW 1, after the i7 (and later the s9) were released, these models were selling poorly.  As a result, CW 1 stated that iRobot directed that CCS's sales and marketing efforts should be shifted  away from stores like Target, Wal-Mart, and Lowe's, which only sold iRobot's lower tier robots.  In particular, CW 1 noted that he and his CCS colleagues were instructed to not waste their time on promoting iRobot's lower-end models at those stores and that iRobot was "desperate" to sell the i7, and later, the s9 models.  Given that the i7 line was released in September 2018, Defendants thus knew in the fall of 2018 that sales of and demand for the Company's newest premium-tier line at

the time (the i7) were poor.

121.    Internally, Defendants knew that iRobot's shift in strategy to the premium-tier products, however, was failing. According to CW 1, lower-priced competition was still winning out, despite iRobot's introduction of three higher priced offerings (in 2018 and early 2019) and dedicated program to train sales representatives to sell these products more effectively.   CW 1 explained that she went around to stores to speak with their sales representatives about what iRobot and its competitors' products were selling well and what was driving those sales. According to CW 1's market research, it came down to features and price—*i.e.*, that iRobot's competitors were winning out over iRobot because their products included many similar features as the Roombas but at a much lower price point.   CW 1 recalled Costco stores as one particular example where she had full visibility into the inventory of iRobot's products as well as the competition, and CW 1 could see that iRobot was increasingly losing more and more sales to its competition and that such competition was thus eating into iRobot's market share starting in early 2018.

## H.    Later in 2018, Defendants Continued to Deny That Competition Was Significantly Impacting iRobot's Sales and Market Share

122.    As the Class Period progressed, despite knowledge of iRobot's declines in sales due to increased competition and resultant pivot towards the premium-tier products, Defendants publicly continued to downplay the impact of competition on iRobot's business and growth trajectory.   For example, during the Company's 2018 Analyst Day presentation on March 1, 2018, Defendant Cerda stated "we are holding to our [global] segment share position around 62%. The names, right, the size of the [market share] bars, they change from 1 year to the other, right, and they come up with different strengths for the marketplace, but we feel quite good ***that '17 was still another year where we maintained our segment position.***"

123.    Likewise, on April 25, 2018, during the Company's earnings call for the first quarter of 2018 ("1Q18") in response to a question about "how Roomba at the different price points is positioned versus the competition feature-wise," Defendant Angle again misleadingly

downplayed the impact of competition on iRobot's sales, stating: "These other robots are relatively new on the market and so, they try to go and copy some of our features as best they can. I think that in Q4, *we had tremendous success against the competition.* Our robots are designed with a system and many features working together to deliver superior performance."

124.    Defendants' statements that iRobot "*maintained [its] segment position*" and had "*tremendous success against the competition,*" however, were false and misleading because they omitted that iRobot's store shelf space, sales and market share were rapidly declining during this time as a result of increased competition.   Thus, Defendants' statements created an impression of a state of affairs at iRobot—that its dominant competitive position remained unaffected by these growing competitive threats—that differed in a material way from the internal reality.   As discussed in ¶¶ 84-99 *supra*, several former employees confirmed Defendants knew, at that time these statements were made, that increased competition from Shark and other manufacturers was significantly impacting the Company's sales, and that this adverse trend only intensified as 2018 progressed, with iRobot continuing to lose more store shelf space and, as a result, sales and market share in 2018.

125.    Moreover, Defendants knew that new competition with comparable technology and features but much lower prices had saturated the entry-level market significantly, cutting into iRobot's market share to such an extent that no later than October 2018, the Company decided to focus all of its sales and marketing efforts to the premium-tier models, effectively ceding the entry-level tier to its competitors, even though they knew, according to CW 1, customers were hesitant to pay the high prices for iRobot's premium tier products and many of the premium-tier Roombas had performance issues.

126.    Once again, market analysts were reassured by Defendants' statements minimizing the impact of increased competition.  For example, Loup Ventures stated that same day that "*we were encouraged to hear Management's commentary around continued strength* despite investor fears of increased competition."   Likewise, the same day PiperJaffray reported

that "[d]espite competitive headwinds ***iRobot remains head and shoulders above competition*** due to their strong brand recognition and technology competitive advantage."

I.      **Tariffs Further Eroded iRobot's Competitive Advantage, Crippling iRobot's Strategic Shift to the Premium-Tier Space**

127.    Soon after the Company began implementing its new strategy to focus primarily on selling and marketing its premium-tier Roombas in late 2018, iRobot's competition problems only grew worse with the implementation of trade tariffs on all products manufactured in and imported from China, including Roombas and other RVCs, beginning in the summer of 2018. Critically, these tariffs ultimately forced iRobot to further increase the prices of its already very expensive premium-tier products, thereby exacerbating iRobot's position vis-a-vis its lower-priced competitors.

128.    Specifically, in July of 2018, the U.S. government announced the upcoming implementation tariffs on a wide range of Chinese imports as part of an ongoing trade war initiated by President Donald Trump soon after he was elected in November 2016. Because 100% of iRobot's products were manufactured in China, iRobot was left with two options: (1) pass on the impact of the tariffs to iRobot's customers by increasing prices; or (2) absorb the additional costs, which would result in lower gross margins (*i.e.*, smaller profits for iRobot).

129.    Importantly, the trade war with China and the possibility of import tariffs on iRobot products was far from a surprise to the Company. As early as November 2016, when President Trump was elected, iRobot faced questions from analysts about tariffs on Chinese goods and how iRobot was planning on minimizing their impact on iRobot's sales and gross margins.

130.    However, the adverse impact of tariffs on iRobot's sales and gross margins became a reality in July 2018 when President Trump officially announced his plan to introduce 10% tariffs, which would take effect on September 24, 2018, followed by an increase to 25% effective January 1, 2019.

131.    According to iRobot's former employees, the Company decided to substantially

45

increase its imports of Roombas from China prior to the tariffs taking effect to avoid paying the upcoming tariffs on those products. However, this purported mitigation measure, which significantly increased iRobot's inventory in the U.S., only further harmed the Company's financial performance because iRobot was experiencing significantly less demand in the U.S. as a result of increased competition and thus struggled to sell this excess inventory.

132.    Specifically, CW 4 stated that iRobot started to increase its inventory beginning in the second quarter of 2018 ("2Q18") because of the impending tariffs on Chinese imports. CW 4 explained that iRobot bulked up on a lot of the inventory in advance so that it would arrive in the United States from China prior to the tariffs taking effect (in September 2018), in an effort to mitigate some of the financial impact from the tariffs. In other words, iRobot imported excess inventory from China before the tariff effective date to avoid paying the tariffs on those units.

133.    However, CW 4 also stated that at approximately the same time (2Q18), iRobot's Roomba sales began to soften in the Americas (and in Europe). CW 4 stated that iRobot saw increased competition, particularly from Shark, in the third quarter of 2018. CW 4 explained that Shark had introduced new products to the RVC market (that competed directly with iRobot's Roombas) and then followed-up with heavy television advertising. According to CW 4, this increased competition had a "huge impact" on iRobot's sales in the United States. Thus, CW 4 noted that as iRobot was building up its U.S. inventory in 2Q18—as a way of mitigating some of the financial impact from the tariffs, as described above—its sales were also softening (as a result of increased competition). Thus, CW 4 commented: "This was a double whammy, especially for the Americas."

134.    In other words, iRobot's efforts to mitigate the impact of the impending tariffs by accelerating the imports of inventory from China ahead of the tariff imposition deadline only exacerbated iRobot's sales troubles in 2018, as it struggled to sell this additional inventory in the face of increased competition, especially from Shark.

**J.      Defendants Publicly Downplayed the Impact of Tariffs on iRobot's Competitive Position and Financial Performance**

135.    On July 25, 2018, iRobot held an earnings call with analysts to discuss the Company's results for 2Q18.  During the call, analysts questioned Defendants about iRobot's plans to address the impact of tariffs and how potential price increases would impact iRobot's competitive position and demand for Roombas.  In response, Defendant Angle suggested that although iRobot had not yet made a decision, the Company may mitigate the costs of the tariffs by passing them through to consumers (*i.e.*, by raising Roomba prices): "I mean, there's a lot of remaining questions as to exactly what's going to happen and how we will react, and so that at this point we're looking at alternatives. Realistically, either we pass it through or find a way to mitigate the impact, and we have not determined our strategy at this time.  So it's getting a lot of attention."   Thus, Angle acknowledged that the impact of these impending tariffs on iRobot's business, and iRobot's mitigation strategy in response, was a priority internally at iRobot that was "getting a lot of attention" personally from Defendants at this time.

136.    During the question and answer segment, Defendant Angle also continued to mislead investors about iRobot's competitive position in the RVC market and ostensibly strong sales across both entry-level and premium-tier products by pointing the Company's performance on Amazon Prime Day,[17] stating: "I think, to put a little color, the Prime Day success demonstrated ***continued strength down at the entry-level price points***, which I think is very material in that we are ***not simply getting pushed into premium only, we continue to have strong performance across price points*** . . ."

---

[17] Amazon Prime Day is an annual shopping holiday held in July by online retailer Amazon.com. Available only to Amazon prime subscribers, Prime Day features special deals and discounts on certain products that Amazon negotiates with manufacturers.  iRobot participated in Prime Day each year during the Class Period. Notably, iRobot's sales performance on Prime Day was not representative of its typical sales because iRobot heavily discounted the prices of Roombas sold on Amazon.com that day as part of the Prime Day promotion, thereby generating numerous additional sales that did not occur in the ordinary course due to the normally high prices of these products. Accordingly, iRobot's sales performance on Prime Day was artificially inflated by these substantial price discounts.

137.    In response to a follow up question from an analyst, "[a]nd that, in fact, ***you can obviously be competitive at that low end*** and still maintain margins, right?" Defendant Angle responded, "***[c]orrect***." Thus, Defendants continued to represent at this time that their lower-end entry-level products remained competitive and selling well despite increasing cheaper competition, at the same time as iRobot was internally pivoting to focus their sales and marketing efforts almost exclusively on their premium-tier products.

138.    Later on this call, Defendants again minimized the impact of new competition on the Company's sales of both entry-level and premium-tier Roombas.  Specifically, in response to a question from an analyst pressing her why consumers would continue to buy its most expensive line of premium Roombas (the 900 series), Defendant Dean assured that the Company saw continued strong demand for both its premium-tier and entry-level products, as follows:

> **Analyst**: I can see why consumers would choose a 600 series given the price point, but why are you finding that consumers are going all the way up to the 900, given the price point? I mean, it's much more expensive than the middle series. What does your research say, that somebody will choose that 900 series over the 800 series? I know it's got more bells and whistles and stuff, but it seems like it's incrementally more to the consumer?

> **Dean**: [T]hat [product] mix between 900 and 600 really has been consistent with what we've seen the last several quarters, so as we've talked about for a while, ***we see a strong amount of demand at the 900 end and the 600 end,*** and that is -- been very consistent over the last couple of quarters, so there was nothing really new in how that revenue split between those two models.

139.    Defendant Angle then further elaborated on Defendant Dean's response, similarly downplaying the impact of "an influx of new competitors" on iRobot's sales, which he assured were not causing any significant "new disruptions" on iRobot's competitive landscape, as he touted its "strong performance" in both the premium and entry-level tiers:

> I think that we certainly saw an influx of new competitors in Q4, and it did change the dynamics in the marketplace somewhat. We've seen that stabilize through the first half, and I think that, again, you look at Prime Day as an exemplar of, okay, there is significant availability of these low-

end models. How much share did they take, how much did they disrupt, and what did they do in Prime Day. And *the results are very favorable relative to iRobot demonstrating its ability to maintain strong performance at the low end of the marketplace while we maintain our strong performance at the high end.* And so that I think that there's a very good indication that, yes, the market was somewhat disrupted at the end of Q4, that the market growth rates certainly allowed for them to enter *without substantially impacting the performance we had predicted* and laid out, and *the environment*, while certainly very competitive, *is not demonstrating new disruptions*.

140.    However, contrary to Defendants' statements, increased cheaper competition was already substantially, adversely impacting iRobot's sales and financial performance, causing significant "new disruptions" to its competitive position, and particularly diminishing demand for and sales of iRobot's entry-level products.   As described in ¶¶ 84-99, 113-21 above, Defendants knew that by this time, iRobot thus did not have "*continued strength down at the entry-level price points*," "*strong performance across price points,*" or "*strong performance at the low end of the marketplace while we maintain our strong performance at the high end.*" To the contrary, at this time in mid-2018, increased cheaper competition from Shark, Neato, and others, was saturating the lower-end market and increasingly chipping away at iRobot's store shelf space, sales, and market share, particularly hurting sales of iRobot's lower-end entry-level products. Indeed, as CW 1 stated, by this time in the summer of 2018, internally iRobot was already beginning to shift its sales and marketing efforts exclusively to the premium-tier, effectively ceding the entry-level market to its competition.   Yet publicly, Defendants continued to falsely tout iRobot's purportedly strong demand and sales at the entry-level tier as unaffected by this cheaper competition.

141.    Analysts continued to accept Defendants' positive statements downplaying the impact of competition.   For example, on July 25, 2018, J.P. Morgan reported that "[c]ommentary regarding competition seems more optimistic."   A Loup Ventures report on the same day similarly stated that these analysts remained convinced that "*concerns around competition continue to be overblown*, and the [C]ompany has established an *untouched niche in the high-*

*end* robovac category." Thus, the market was particularly misled by Defendants' statements about iRobot's supposedly "untouched" competitive position in the "high-end" RVC market—*i.e.*, the purported protection from competitive pressures (and related tariff issues) provided by the Company's premium-tier focus.

142.    On September 13, 2018, at the Morgan Stanley Laguna Conference, Defendant Dean similarly downplayed the impact of tariffs on iRobot's business and competitive position. In response to a question from a Morgan Stanley analyst about whether the "elephant in the room being trade"—*i.e.*, the tariffs on Chinese imports—was impacting iRobot's business, Defendant Dean reassured investors that ***"[i]t's not impacting our business to date***."

143.    Defendants' statements denying or minimizing the impact of tariffs were false and misleading because, contrary to these reassurances, the tariffs were ***not* "*manageable within the guidance [iRobot] had given***" and were ***already "impacting [iRobot's] business."*** As discussed in ¶¶ 132-33 above, CW 4 explained that iRobot bulked up on a lot of the inventory in advance so that it would arrive in the United States from China prior to the tariffs taking effect (in September 2018), in an effort to mitigate some of the financial impact from the tariffs.   In other words, per CW 4, "[t]his was a double whammy, especially for the Americas" for iRobot's sales and financial results.  Accordingly, because of the increased competition and declining sales, the increase in tariffs was already having an impact on iRobot's business at that time.  Furthermore, Defendants knew that tariffs would result in price increases on iRobot's already overpriced products, thereby further diminishing demand for iRobot's products, sales of which were already waning due to increased lower-cost competition.  Therefore, Defendants knew but concealed from investors that the tariffs would only exacerbate the adverse impact of competition on iRobot's business.

**K.      Shortly After the Tariffs Were Announced, iRobot Launched Two New, More Expensive Robots While Continuing to Tout Strong Demand for Its Premium-Tier Products**

144.    While the Company was deflecting on the potential impact of tariffs, iRobot was

also preparing to launch two new Roomba models—both of which were even more expensive than their previous equivalent models, consistent with the Company's new sales and marketing strategy focusing exclusively on premium-tier Roombas.

145.    Specifically, on September 6, 2018, shortly after reassuring investors that the newly implemented tariffs would not impact the Company's guidance or change the competitive landscape, iRobot launched two new Roomba models. The first, known as the i7 and i7+, was iRobot's new set of premium-tier offerings with a retail price of $949 for the i7+ (which, as noted above, included the Clean Base) and $699 for the i7 (without the Clean Base).  The second was iRobot's new, entry-level offering, called the e5, which, despite being lower-tier, retailed for $449—**$100 more** than Shark's highest-end model, the ION 750.   Accordingly, both new Roombas were priced significantly higher than iRobot's competitors' RVCs in that price range. For example, the Neato Botvac D4 Connected, which launched in September 2018 and had many of the same high-end features as iRobot's premium Roombas, enjoyed strong reviews from top consumer electronics publications and cost only $499.[18]

146.    Two weeks later, on September 24, 2018, the 10% tariffs went into effect.

147.    On October 23, 2018, iRobot released its earnings results for the third quarter of 2018 ("3Q18"), the first quarter after the 10% tariffs were implemented.  In its earnings release, iRobot announced that the Company now expected tariffs to have a negative impact of $5 million on the Company's full-year 2018 operating income expectation.  During the earnings call held on the morning of October 24, 2018, Defendant Angle explained to investors that "[t]he imposition of 10% tariffs went into effect on September 24 and we made the decision not to pass those additional costs to U.S. retailers or consumers in 2018."

148.    However, at the same time, Defendants reassured investors about iRobot's

---

[18] *See, e.g.*, Victoria Song , PCmag, *Neato BotvacD4 Connected Review*, September 13, 2018 ("You're basically getting the same features as you would with even pricier robots like the $700 iRobot Roomba 960. So if you're looking for top-of-the-line features at a midrange price, the D4 Connected is your best bet and earns our Editors' Choice."), *available at* https://www.pcmag.com/reviews/neato-botvac-d4-connected.

continued strong "competitive positioning" despite the tariffs—*i.e.*, that the tariffs would primarily hurt its competitors rather than iRobot, because RVC customers were more likely to be sensitive to price increases at the entry-level of the market as opposed to the premium-tier, where iRobot was positioned:

> Let me add another just sort of high-level color as we think about tariffs. The first is that, as evidenced by our continuing strong growth, this is a very healthy market so that many of our growth expectations, as we talked about them, are well below the market growth so that there is some ability to absorb an impact without putting us in a dangerous situation. And so, really *this is about competitive positioning within this growing market*. . . . iRobot is the premium player and that's very advantageous because *price sensitivity at the high end is much lower than at the bottom end. And so that we're well positioned as we think about whether or not what exactly the mix of margin and price increases will be our optimal strategy.*
>
> . . .
>
> A tariff would impact most directly price points below which we play, where if you're a value player, a price increase has a very material impact on growth. But further up, the value -- the price change, your premium customer is less price sensitive. . . . But again, this is not a world end kind of situation. This is something that will affect all competitors. And in a very real way, *we are better positioned than our major competitors [that] play at the low end to maintain an aggressive stance.*

149.    Critically, during the same call, Defendant Angle also assured investors that the Company performed "a lot of interim research" on price elasticity (*i.e.*, price sensitivity), which supposedly further confirmed that iRobot, given its focus on the premium-tier, was better positioned to avoid or weather the adverse impact of tariffs than its lower-end competition, despite knowing that iRobot's sales, both at the premium and entry-level tier, had already been diminished by increased competition:

> **Analyst:** And then one last question for me and kind of a follow-up on Mike's. Have you done any work on price elasticity? And a 5% or 10% increase on pricing, what do you think that will do to kind of the growth rates?
>
> **Angle:** Yes, we have done a lot of interim research on price elasticity. And I think that I tried to give as much color as we're able to give on the

call saying that the – *it's good to be a premium retailer or a premier manufacturer. There is certainly more flexibility at the top than at the bottom, and again, we've got very good models as to how to craft our strategy next year.*

150.   However, Defendants' statements above minimizing the impact of tariffs on iRobot's competitive position were false and misleading because they failed to tell investors that iRobot's so-called "*optimal strategy*" for dealing with tariffs included the Company effectively abandoning sales and marketing efforts for its entry-level products, which accounted for 40% of iRobot's Roomba revenue, due to increased competition.  Further, that strategy's success was contingent on consumers' willingness to pay even higher prices for iRobot's premium-tier products, which Defendants falsely insisted consumers would because purportedly "*price sensitivity at the high end is much lower than at the bottom end.*"   Critically, however, Defendants knew that demand for iRobot's lower-end and premium-tier products was only further declining at this time due to increased cheaper competition, and that consumers were in fact reluctant to pay even higher prices for iRobot's already over-priced premium-tier models, rendering these models cost-prohibitive.  Indeed, as set forth in ¶¶ 113-21, Defendants knew that because of the availability of competition with similar performance and features as iRobot's premium-tier Roombas, consumers were hesitant to pay the high prices for iRobot's premium tier products, many of which also had performance issues according to CWs.  In particular, according to CW 1, unlike the lower-priced entry-level products, iRobot's higher-end products could not "supply the gasoline to keep the engine running."

151.   Analysts were comforted by Defendants' false and misleading statements about the continued strong demand for iRobot's products, which would remain largely unaffected by the tariffs.  For example, an October 24, 2018 Sidoti & Company analyst report noted: "*Given what appears to be strong demand for IRBT products* and continued strength with the US dollar, *we think that the tariffs could be largely offset.*"   Likewise, an October 25, 2018 Dougherty & Company analyst report stated: "Management would offer that they have looked a[t] various scenarios and that 'a lot' of those scenarios include passing some of the tariff cost on

to consumers.  Additionally, ***management emphasized that as a premium brand they believe*** ***there will be less cost sensitivity vs. low end competitors***."

152.    Analysts were also still convinced by Defendants' continued statements discounting increased competition.  For example, an October 24, 2018 PiperJaffray report opined that "***increased competition has had minimal impact on iRobot's share*** and ***anticipate the*** ***strong demand trends will continue into 2019*** due to new product introductions and launching the Roomba i7/i7+ and e5 into international markets."

### L.      iRobot Raised Prices on the Premium Tier i7 Roombas in an Attempt to Mitigate the Impact of Competition and Tariffs

153.    On December 1, 2018, the United States and China agreed to a 90-day tariff "cease-fire," meaning that the neither country would implement any new tariffs or raise any tariffs that were currently in place.  Accordingly, the 10% tariff on Chinese imports, including Roombas, that had been implemented on September 24, 2018 remained in place and did not increase to 25% as had been previously expected.

154.    However, doubling-down on it supposed "optimal strategy" for dealing with tariffs, iRobot chose to try to mitigate the impact of the tariffs by increasing the pricing on its Roomba products—but only for its newest, premium-tier i7 and i7+ Roomba models.  Specifically, in January 2019 iRobot raised the price of these i7 and i7+ models by approximately 15%, thus increasing the cost of the i7+ to $1,099 and the i7 to $799.  iRobot kept the price of all of its other products roughly the same.  Accordingly, iRobot was essentially pinning its hopes of avoiding or minimizing the impact of tariffs on customers' willingness to buy its then-most expensive product.

155.    Critically, however, former iRobot employees stated that iRobot knew that competitors' products, such as the Shark ION, and Neato Botvac, which offered similar features and performance at lower prices, were exerting significant price pressure on iRobot to keep its prices in the same ballpark as the competition.  For example, CW 3 recalled that the impact of the tariffs on iRobot's sales was addressed by CEO Colin Angle in early 2019 at one of the

company's "All Hands Meetings."  CW 3 explained that it was known internally at iRobot that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that that competition was putting "price pressure" on iRobot.  Likewise, CW 2 stated that in early 2019, tariffs and competition (specifically, Shark) began to heavily impact sales of iRobot's products.

156.    Similarly, CW 6 recalled that tariffs were addressed by either Defendant Angle or another executive during the Company's "All Hands Meetings" on more than one occasion between late 2018 and late 2019.  CW 6 also explained that iRobot had been hopeful of obtaining an exemption from the tariffs and that executives (including CEO Angle personally) were working through political channels to try and achieve that.

157.    As a result, Defendants knew that such price increases posed a significant risk of declining demand for and sales of iRobot products because consumers would not be willing to pay an even higher price for the already expensive premium-tier Roombas.  This was especially true given that competitors' products provided many similar features and comparable performance at lower prices.  Critically, as the Company would acknowledge at the end of the Class Period, iRobot's competitors did not raise their prices in response to tariffs, further exacerbating the pricing pressures impacting the Company's declining sales and market share.

**M.     iRobot Issued Positive Guidance Despite Knowing that Its Ability to Mitigate Tariffs Hinged on Its Failing Premium-Tier Strategy**

158.    After announcing the tariff-related Roomba price increases in January 2019, Defendants continued to assure investors that this plan would offset the Company's tariff costs, based on supposedly continued strong demand for iRobot's products, including its premium-tier models.

159.    On February 6, 2019, after the market closed, iRobot issued its annual guidance for FY2019 and updated three-year financial targets "including tariff impact." The next morning, on February 7, 2019, during the earnings call with analysts, Defendant Dean explained that iRobot's guidance included an anticipated "$20 million to $25 million of tariff costs to be

incurred in 2019." Dean also elaborated that the recent price increases on the i7 and i7+ Roombas were done to offset the impact of the 10% tariff and that, if the tariffs were increased to 25% on March 1, 2019 (when the tariff "cease-fire" expired), iRobot would "likely increase our prices again to offset the incremental tariff costs incurred." Specifically, during the earnings call, Defendant Dean clarified that the $20 to 25 million was the "check we will write to pay for the tariffs," and that the "*price increases [on the i7 and i7+] mostly offset that incremental $20 million to $25 million of tariff costs that we'll incur*."

160.   Defendants' claims that price increases on the i7 and i7+ Roombas would mitigate the impact of tariffs were false and misleading because Defendants failed to tell investors that iRobot's strategy for dealing with tariffs included the Company effectively abandoning sales and marketing efforts for its entry-level products due to increased competition and that the strategy's success was contingent on consumers' willingness to pay even higher prices for iRobot's premium tier products. Critically, however, as discussed above in ¶¶ 113-21, 153-57, Defendants knew that consumers were reluctant to pay the already high prices for iRobot's premium-tier Roombas due to lower-priced competition, and that the tariff-related price increases only exacerbated this problem.

161.   Nonetheless, during the February 7, 2019 earnings call, Defendants continued to tout the Company's market share and sales of premium-tier Roombas to investors and downplay the impact of competition on the Company's sales. Specifically, Defendant Angle stated: "[As to *market share*] *in the U.S.,* we continue to see new competitive products selling through Amazon marketplace, *but not on shelves of retailers, where we still generate 60% of our domestic revenue*." Defendant Angle's assertion that increased new competition was not impacting iRobot's market share and shelf space at retail stores was patently false because in 2018 iRobot had increasingly lost more and more shelf space, including the more desirable "endcap" space, to competitors' products in some of its most important big box retail stores, including Best Buy, Bed Bath and Beyond, Walmart, Loew's and Target. *See supra* at ¶¶ 96-98,

162.   Further, during the call, while partially acknowledging that iRobot was losing

some market share to the competition, Defendant Angle falsely reassured investors that this market share loss was only 3% and that iRobot's competitive position and growth trajectory remained strong: "Our U.S. estimates for 2018 show a ***3 point share loss overall, but we firmly believe that with low household penetration providing an opportunity for substantial category growth, we are well positioned to continue our growth trajectory in this market.***"

163.    However, Defendant Angle's statement in ¶ 162 was false and misleading because it misrepresented the actual loss of market share iRobot was experiencing at that time. Specifically, per CW 1, by this time, iRobot had lost approximately 10% of its market share due to increased competition—***more than triple*** the 3% figure provided by Angle.  Moreover, per multiple CWs, iRobot's store shelf space, demand and sales continued to be eroded by increased cheaper competition, which had saturated the RVC market, at this time, such that iRobot was ***not*** "well-positioned to continue" its prior strong growth in this market given these undisclosed adverse competitive trends.  Further, Angle's assertion that the Company "remained well positioned" to maintain this strong growth based on the purported low household penetration in the RVC market was also false and misleading because, by this time in early 2019 Defendants knew that the RVC market was not in fact growing as Angle suggested here. Specifically, per CW 1, Defendants already knew in early 2018 that many Roomba consumers were repeat rather than new customers that would grow the size of the overall RVC market—thus, iRobot was not penetrating into new households, the sole basis for Angle's reassuring statement. Thus, Defendant Angle lacked a reasonable basis for and omitted these key material facts, which rendered his positive statement about iRobot's continued strong growth trajectory materially misleading.

164.    Analysts were reassured by Defendants' statements about the continued strong demand for iRobot's premium-tier products and that the Company's FY2019 guidance was not impacted by increased competition or the overhang of tariffs.  For example, PiperJaffray noted in an analyst report issued on February 7, 2019: "Our previous concerns regarding tariffs and the implication to iRobot's 2019 guidance ***ended up being a non-event with overall sector demand***

*more than offsetting this headwind. iRobot's execution in this market with increasing competition speaks to the company's superior brand.*"  Similarly, a J.P. Morgan analyst report published the same day stated that "[w]e believe the outlook is better than investors had feared, particularly given the uncertainty heading into the print regarding the impact from tariffs."

165.    On February 24, 2019, President Trump announced that the United States was planning on delaying the March 1, 2019 tariff increase from 10% to 25%.  Then, on March 5, 2019, the United States confirmed that it was indefinitely postponing the 25% increase in tariffs, leaving the tariffs at 10%.

### N.    The Truth About iRobot's Competitive Positioning in the Premium-Tier Begins to Emerge Through Partial Disclosures About the Impact of Tariffs on iRobot's Margins

166.    The negative impact of increased competition and the tariffs on iRobot's business, including the failure of its risky premium-tier-focused sales and marketing strategy as an adequate mitigation measure, began to reveal themselves on April 23, 2019.  Specifically, on that day, after the close of trading, iRobot surprised the market by announcing first quarter 2019 ("1Q19") revenues and revenue growth that were significantly below analyst expectations— revealing significantly decreased demand for iRobot's products during 1Q19.  In fact, iRobot's reported domestic revenue growth was only 7% for 1Q19—less than *one-third* of the equivalent figure (26%) for the first quarter of the prior year. During the earnings call the next morning, on April 24, 2019, prior to the market opening, Defendant Angle attributed the revenue miss to retailers in the United States, "exit[ing] 2018 with more inventory than prior years, likely driven in part by desire to obtain inventory ahead of tariff increases originally scheduled for January 1."

167.    iRobot's announcement of the revenue miss partially revealed that demand for iRobot's products had waned and its sales declined due to increased competition, contrary to Defendants' prior misleading statements minimizing competition. It also disclosed that tariffs had impacted iRobot's business worse than expected, contrary to Defendants prior misrepresentations that the Company's premium-tier strategy and the existence of greater price

elasticity in the premium-tier would mitigate the impact of tariffs.

168.    In response to this news, iRobot's stock price fell from $130.57 per share on April 23, 2019, to $100.42 per share on April 24, 2019 on unusually high trading volume—a decline of over *23%*.

169.    Analysts were also surprised by iRobot's disappointing financial performance and understood Defendants' disclosure as partially revealing that tariffs and increased competition were having at least some adverse impact on demand for iRobot's products and competitive position.  For example, J.P. Morgan noted in an April 24, 2019 analyst report: "*1Q marks the first revenue miss versus consensus estimates since 3Q15* and although we do not expect a significant change to consensus estimates, we believe the multiple contraction today (stock down 20% vs SP500 up 1%) is justified."  Echoing Defendants' disclosures, the report further explained that "[t]he company attributed the low US growth to high retail inventory at YE18 in anticipation of the previously scheduled step-up in US/China tariffs."

170.    Defendants, however, at the same time continued to falsely reassure investors that the tariff issue was not having a significant impact on demand for the Company's premium-tier products.  In fact, Defendant Angle touted the purportedly continuing strong sales of the Company's premium tier products, reaffirming the Company's bullish guidance set in February: "*Q1 sell-through [i.e. the percentage of a product that is sold by retailers after being shipped by iRobot] was good*, setting us up for the higher year-over-year Q2 2019 revenue growth rate we discussed last quarter. Given our Q1 results and our outlook for the rest of the year, *we are reaffirming our 2019 full year revenue* and operating income expectations then increasing our full year expectations for earnings per share."

171.    Further, during the earnings call, a Battle Road Research analyst asked Defendants about whether or not the Company's premium-tier products were seeing any lack of demand or if customers were moving toward cheaper robot vacuums.  Defendant Dean responded by assuring investors that iRobot's competitive positioning in the premium-tier remained strong:  "Yes. This quarter, we saw a little bit greater than 50% of our revenue coming

from the 900 series and above, with the remainder coming below that. ***So really good traction to-date with the higher-priced [models].***"

172.    Finally, Defendant Angle similarly comforted investors that iRobot's plan to increase pricing on the premium-tier i7 and i7+ in order to mitigate the impact of tariffs was working as demand for these products was "ahead of plan:" "[We] increased [prices] on the i7 and i7+ at the beginning of the year to partially offset the impact of tariffs. ***Despite the higher prices, Q1 demand was ahead of plan for this product***."

173.    Defendants' statements assuring continued strong sales of and demand for iRobot's premium-tier i7 Roombas despite the increased prices due to tariffs, were false and misleading because Defendants knew that tariffs, by forcing iRobot to further increase the prices of its already expensive products, had only exacerbated the Company's sales struggles due to increased competition, which had already exerted substantial price pressure on iRobot

174.    As noted above, analysts understood in part the Company's missed revenue guidance as revealing that the Company's strategy to mitigate the cost of tariffs was not working and that increased competition was in fact adversely affecting iRobot's sales and revenues, contrary to prior assurances.    But analysts were also encouraged by Defendants' false reassurances that the demand for the premium-tier Roomba models was "ahead of plan."   For example, on April 24, 2019, J.P. Morgan issued a report stating: "***Encouragingly, demand for the i7/i7+ was ahead of [C]ompany expectations***, ***despite the pricing increase implemented during the quarter due to tariffs***."   Similarly, Loup Ventures issued a report on April 30, 2019 that remained enthusiastic about iRobot's leading market position despite the competitive headwinds: "While we anticipate increased competition in all product categories, ***we believe iRobot's technology leadership and brand awareness will support continued market leadership***."   Further, this Loup Ventures report emphasized that although "[r]ising competition is a legitimate concern for iRobot, ***[] the company continues to maintain and extend its lead***."   Thus, the market remained largely misled about iRobot's continued strong competitive position despite increased competition and price increases due to tariffs.

175.     Around this time, Defendants recognized internally that iRobot's pivot in strategy to focus exclusively on the premium-tier at the expense of the entry-level due to increased competition was not mitigating the impact of tariffs.  However, rather than truthfully disclose that this strategy was not working and increased competition was significantly impacting its sales and market share, iRobot blamed the Company's poor financial performance solely on the impact of tariffs.  In fact, according to CW 1, during an internal conference call between iRobot and CCS after the poor holiday season performance in late 2018, CCS employees were instructed by iRobot that if customers asked about the reason for the decline in iRobot's stock price that occurred in 2019 that store sales representatives were to inform them that this was only due to the tariffs.  CW 1 knew this, because National Field Team Manager Tony LaPailo (employed by CCS) informed CW 1 and her counterparts about this instruction from iRobot.  CW 1 thus noted that blaming the tariffs for the stock price decline in 2019 was the "party line." In reality, CW 1 estimated that tariffs likely accounted for only 25% of iRobot's financial troubles, but that increased competition and saturation in the market accounted for the other 75%.  Defendants, however, continued to conceal this adverse impact of competition on iRobot's business in 2019.

O.     **The U.S. Government Increased Tariffs to 25% at the Same Time as iRobot Introduced a $1,300 Roomba, Further Exacerbating the Risks Associated With iRobot's Premium-Tier Strategy**

176.     On May 5, 2019, President Trump announced that the United States was increasing the tariffs on Chinese imports from 10% to 25%, effective May 10, 2019.  The increase in tariffs meant that iRobot would again have to raise prices on its already expensive products that customers were increasingly hesitant to purchase given increased competition from competitors such as Shark, Neato and bObsweep, which, as discussed above, were offering comparable RVC performance and features at significantly lower prices.

177.     Despite these known but undisclosed risks, on May 29, 2019, iRobot announced another new, and even more expensive, model of Roomba, the s9 and s9+ (which, like the i7+, included a clean base for automatic dust bin emptying).  The s9+ was priced at $1,299 and the s9

at $999.  Because the s9 and s9+ were marketed as technologically superior to the i7 and i7+ and, therefore, commanded an even higher price, that exorbitant price tag left little or no room for the Company to use price increases (as the Company did in the past with the 10% tariffs) to mitigate the impact of the recently increased 25% tariffs.

178.    Per CW 1, sales of the s9 model (like the i7 line that was released previously) were poor after it was released. Specifically, as noted above, CW 1 explained that not only were consumers hesitant to pay such a high price, but also that the product itself had software and other performance issues.  CW 1 described the s9 models as "pieces of junk," and noted that it had an extremely high return rate in the stores that she visited, due primarily to software problems encountered by the customers.

### P.    The Truth About iRobot's Declining Competitive Position and the Risks Associated with the Premium-Tier Strategy Continued to Emerge

179.    On July 23, 2019, iRobot's true declining competitive position and the failure of iRobot's premium-tier strategy as a way to mitigate the impact of tariffs on iRobot's business were further partially revealed.  On that day, after the market closed, iRobot shocked the market when it issued its earnings release for 2Q19, which cut its full-year earnings forecast due to "the direct and indirect impacts of the ongoing U.S.-China trade war."  Specifically, iRobot reduced FY2019 revenue guidance from between $1.28 billion - $1.31 billion, to between $1.2 billion - $1.25 billion.  The Company also considerably slashed its EPS guidance from between $3.15 and $3.40 to between $2.40 and $3.15.

180.    During the earnings call held the following morning, on July 24, 2019 prior to the market opening, in response to numerous questions from analysts, Defendant Angle acknowledged that the downward revision to the Company's guidance was due to a decline in demand as a result of the high prices iRobot was charging for its premium-tier products:

> **Analyst**: First question is just -- I am having a little hard time just in my head kind of rationalizing ***the impact of tariffs on demand***. I totally get how they affect your cost structure. But can you just explain just how tariffs have impacted the category? ***It sounds like more of a demand***

*issue*, I mean granted you're still getting a lot of growth here in the U.S. But how did that impact consumers' view on the category itself, I guess?

**Angle**: So there is an *elasticity to demand associated with price*. And the *tariffs have caused iRobot and others in the category to increase their pricing*. And that has slowed down the rate of growth in the industry. . . . And if not for tariffs, North America would be a much more healthy place.

181.    Accordingly, these disclosures partially revealed that, contrary to Defendants' prior misstatements, increased competition had a substantial adverse impact on iRobot's sales and financial results, particularly in light of the tariff-related Roomba price increases, which further eroded the already waning demand for iRobot's expensive products.  In other words, investors began to recognize that, in contrast to Defendants' prior representations about price elasticity and iRobot's focus on the premium-tier as opposed to its lower-end competition, iRobot was actually more vulnerable, rather than protected from, to these tariff-related headwinds compared to its lower-cost competitors as a result of its premium-focused strategy.  .

182.    In response to this news, iRobot's stock price fell from $89.63 per share on July 23, 2019, to $74.51 per share on July 24, 2019 on unusually high trading volume—a decline of nearly *17%* in one trading day.

183.    Likewise, analysts understood in part these disclosures to mean that iRobot's premium-tier offerings were not competitive at their increased price point in the wake of the tariffs given the growing competition offering similar, cheaper products, which raised doubts about iRobot's continued ability to maintain its leading market share.  For example, a Raymond James analyst report dated July 24, 2019 noted: "*[T]he [C]ompany citing demand softening due to tariffs* and guiding revenue lighter *are a beacon for questions surrounding market share erosion* (though this isn't he company's view)."  Thus, analysts recognized these disclosures as a sign that iRobot's competitive position was declining due to increased competition, as exacerbated by the tariff-related price increases.

184.    Similarly, an analyst from Sidoti & Company issued on the same day stated that "[w]e anticipated that tariffs would have an impact on IRBT's results. However, the *increase in*

*pricing to offset tariffs apparently curtailed consumers' spending on the company's products more than we expected*."   An analyst report from PiperJaffray also equated the impact from the tariffs to iRobot's inability to combat increased competition due to the high pricing of its premium-tier products:

> China tariffs finally caught up with IRBT and the company is lowering its 2019 revenue and earnings expectations**. We believe price elasticity and products now exceeding $1K have slowed growth in the premium RVC category. . . . Price elasticity has clearly impacted sales** with nearly all products experiencing tariff increases. *The tariffs have also forced ASPs above $1,000 and this was historically believed to be a ceiling [for] the company [to] avoid.*

185.   Despite these partial disclosures, Defendants continued to conceal and misrepresent the full extent of the competition and tariff issues' impact on iRobot's business, falsely denying that the Company was losing market share and sales.  Specifically, in response to questions from analysts regarding the continued viability of iRobot's premium-tier products, many of which were now over the $1,000 price "ceiling" for RVC consumers, Defendants again reiterated the continued strong demand for these premium-tier Roombas, despite increased tariff-related prices and surging RVC market competition:

> **Analyst**: Maybe a couple of quick ones here for Colin. So Colin, I think with -- to me, just with the tariffs here, it really forced the price of some of your vacuums above a $1,000, right? And I think that's been a threshold or a ceiling that you -- historically, you've may wanted to avoid. So I would just like to get your thought on just kind of growth in the industry in a sub $200 market? Are you still seeing that there with the -- obviously, there's been less price increases because of tariffs in the robot's category?
>
> **Angle:** So that -- I am certain that s9 will be doing very well despite the fact that they've broken that $1000 price barrier, which to me, is not that it's great to have higher prices, *but definitely the demand and the features of those products are being successful* and I could only dream and imagine what we'd be doing if we could have those robots below $1000.

186.   During the earnings call, Defendants also reassured investors that competition was not impacting the Company's market share.  Specifically, Defendant Angle told investors

that "[t]he U.S. segment did not accelerate in the second quarter as we had expected, but we had *maintained our segment share in this region and are not seeing any share erosion due to competition*."   Likewise, in response to a question from an analyst regarding iRobot's market share, Defendant Dean assured: "*[W]e've held our share based on the data we are seeing. The competition doesn't seem to have taken anything in the first half of the year.*"

187.   Analysts were again encouraged by Defendants' false denials that increased competition and higher tariff-related prices were not impacting iRobot's market share. For example, on July 24, 2019, J.P. Morgan reported that the *"[C]ompany believes it is not losing market share*, but rather the tariff-driven slowdown is impacting the overall [RVC] category."

188.   However, in order to defray the increased costs of the tariffs, iRobot was forced to increase its prices yet again.   This time, however, instead of just increasing the price of one model, the price increases would be made across the board to all Roombas, except the i7 and i7+, for which Defendants had already raised prices in January of 2019.   As Defendant Angle told investors during the July 24, 2019 earnings call, "[t]o mitigate the impact of lower-than-expected revenue and increasing gross margin pressure," iRobot announced that it had "raised prices on select products earlier this week to partially offset the impact of higher tariffs."

189.   On September 13, 2019, iRobot also announced that Defendant Cerda had resigned from the Company on September 10, 2019, effective immediately, in order to "pursue other career opportunities."

**Q.     The Full Extent of the Negative Impact of Increased Competition and Tariffs on iRobot's Business, Including the Failure of Its Premium-Tier Strategy as a Mitigation Measure, Was Finally Revealed**

190.   Finally, on October 22, 2019, the full extent of the adverse impact that increased competition and tariffs had on the Company's business, including the failure of iRobot's premium-tier strategy to mitigate this rising competition, was finally revealed.   On October 22, 2019, after the close of trading, iRobot issued a press release reporting third quarter 2019 ("3Q19") financial results.   Again, the Company cut the high end of its revenue expectations for

the year, from $1.25 billion to $1.21 billion and explained that iRobot had decided to roll back pricing to pre-tariff levels after a "suboptimal" customer response—*i.e.*, declining Roomba demand and sales due to the tariff-related price increases and intensified RVC competition.

191.   During the related earnings call, which was held the following morning on October 23, 2019, Defendant Angle further acknowledged that the Company's decision to increase prices significantly reduced demand for and sales of the Company's products as compared to its competitors, which, generally, did not increase product prices due to tariffs:

> To partially offset the higher costs associated with the 25% tariff rate, we raised prices at most of our RVC lineup in late July. Most competitors, however, opted to absorb the tariffs and keep prices static*. Subsequently, we experienced greater demand elasticity than we expected, which resulted in suboptimal sell-through in August and September*. To drive consumer demand and defend our category leadership, we rolled back prices to pre-tariff levels earlier this month on most of our SKUs [product models].

192.   In response to this news, iRobot's stock price fell from $54.03 per share on October 22, 2019, to $49.06 per share on October 23, 2019 on unusually high trading volume of over 12 million shares —a decline of over *9%* in one trading day.

193.   Analysts were shocked by Defendants' disclosures, which revealed the full extent of the Company's sales and profitability problems as a result of increased RVC competition and the tariff-related product price increases, particularly for its premium-tier Roombas, contrary to Defendants' prior statements minimizing the impact of such issues.  For example, an October 22, 2019 PiperJaffray analyst report, with the headline "Trade Tariffs Vacuum Up U.S. Growth Opportunity. . . ," explained that "*[t]he destruction in earnings is due to recent price increases related to tariff expenses, which are having a material impact on unit demand, especially at the high-end.* Given price increases haven't worked, iRobot will now be absorbing these expenses. . ." The report concluded that "we believe *iRobot will continue to struggle in their biggest market*, making it a hard stock to own."

194.   Likewise, an October 23, 2019 Raymond James analyst report entitled "Clean up

on Aisle 2020; Margin Concerns Come to Fruition," similarly attributed iRobot's recent stock declines to increased competition and the failure of iRobot's premium-tier strategy: "Decelerating growth in its biggest market (domestic), *increasing competition*, and declining gross margins are the three horsemen of the robot war apocalypse." The report further emphasized that *"[t]he combination of Shark and tariffs has upset the domestic RVC hegemony and we aren't sure the status quo can be restored*." The report continued: "[a]fter a series of price hikes to respond to tariffs it's clear that price increases are unwinding quickly and we feel iRobot will likely overshoot pre-tariff levels to stem *stalled demand, suboptimal sell-through, and accelerating share losses*."

195.    The financial press also provided similar analyses of Defendants' disclosures regarding iRobot's failed premium-tier strategy as a way to address the impact of tariffs. For example, on October 23, 2019 Bloomberg issued an article titled "iRobot Sinks After Abandoning Plan to Pass Along Tariff Costs," noting that the Company was "[r]oll[ing] back pricing on most products despite profit pressures" and that the Company's stock "slumped to a three-year low after casting aside its strategy to pass along some tariff-related costs to U.S. consumers after the price increase hampered growth."

196.    Likewise, a November 3, 2019, Motley Fool article with the headline "Here's Why iRobot Stock is Down Nearly 40% in a Year" explained how iRobot's premium-tier strategy failed in light of increased competition and tariffs. Indeed, under the subheading "What Went Wrong," the article elaborated: "There was one important change in management's perception during the period: It appears that iRobot's vacuum cleaners don't have the pricing power that management previously thought they might have" and "iRobot's dominant position in robot vacuum cleaners means it's susceptible to market share erosion. As such, when *the company raised its prices to offset the tariff increase, its competitors kept prices static, and customers decided to buy rival products*."

### R.    Post-Class Period Developments

197.    Shortly thereafter, on February 5, 2020, iRobot announced that Defendant Dean was resigning from her role as the Company's CFO immediately "to spend more time with her family before pursuing other personal and professional interests."  That same day, the Boston Business Journal published an article with the headline "iRobot's longtime CFO to step down just months after COO departure." The article highlighted the suspicious timing of the departure given its proximity to Defendant Cerda's similarly abrupt resignation, noting that iRobot "announced that its top financial executive is stepping down just a few months after another top executive left the [C]ompany."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

198.    Lead Plaintiff alleges that the statements highlighted in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or artificially maintained the price of iRobot's publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities from September 13, 2017 to October 22, 2019, inclusive.  Because Defendants chose to speak on the issues described below, they had a duty to not mislead investors or withhold material information.  As described below, Defendants' statements created an impression of a state of affairs at iRobot that differed in a material way from the one that actually existed.

199.    Specifically, throughout the Class Period, Defendants made a series of misrepresentations and omissions concerning: the impact of increased competition in the RVC market (and the extent of such impact) on iRobot's sales, store shelf space, market share, and overall financial performance; the Company's strategy to focus nearly all of its sales and marketing resources on its premium-tier Roombas at the expense of its entry-level models; and the impact of Chinese trade tariffs on its business, including the risks associated with the Company's premium-tier strategy in light of the tariffs and increasing price pressure from lower-

cost competition.

A.      **September 13, 2017 – Morgan Stanley Laguna Conference**

200.    On September 13, 2017, during the Morgan Stanley Laguna Conference, Defendant Dean answered analysts' questions about Roomba competition.  Defendant Dean acknowledged analysts' concerns regarding "the buzz [] about SharkNinja coming into the market," but downplayed the impact of this new competitor's launch on iRobot's business, likening it to the previous holiday season when Bissell, Hoover, and Black & Decker introduced new RVCs.  Specifically, in response to a question from an analyst in the following exchange, Defendant Dean minimized the competitors' ability to compete with Roomba from a price and performance perspective, based on iRobot's purported market research showing that these products were "***not resonating***" with consumers:

> **Analyst**: How are you differentiating your product between some of the new competitors that are coming in, in the United States?
>
> **Dean**: So our products, from a price and performance perspective, are really offering the best value proposition.  Again, we have multiple offerings on a premium scale. ***And what we found with the competitors to date is that the combination of the price point they're coming in at and the features, functionality and, ultimately, the quality of the experience for the consumers is not resonating***. As we went into the holiday season last year, again, we had the Hoovers, the Bissells, Black + Deckers that were making a big push. They did get onto retail shelves for the holiday season. But their performance was not very good, and we ended up seeing increased orders from our retailers because our products were doing so well versus those new entrants in the market. And again, I think it's a combination of the price points and the functionality, the value, the quality that we offer the consumers and the experience.

201.    Defendants' statement on September 13, 2017 at the Morgan Stanley Laguna Conference in the preceding paragraph was false and misleading or omitted material facts when made because, contrary to Defendants' statements, iRobot knew that increased cheaper competition, including notably Shark, was in fact "***resonating***" with consumers given these competitor products' similar "***features, functionality and, ultimately, the quality of the experience***" to that of the Roombas, but at a much lower "***price point***," as demonstrated by, *inter*

*alia*, internal market research and sales data accessible to and reviewed by the Defendants, which showed that at that time that iRobot was increasingly losing sales and store shelf space (a key indicator of competitive performance that the Company closely tracked) to its competitors. Indeed, as discussed in ¶¶ 84-92, multiple former iRobot employees confirmed that, beginning no later than September of 2017, when Shark entered the RVC market with its ION robots, Defendants became increasingly concerned that iRobot's sales were declining significantly due to an influx of new competition in the RVC market, which was selling well because of these products' similar features and comparable performance but at a much lower price point.   In particular, several former employees confirmed that Defendants knew from iRobot's own market research, at that time these statements were made, that new, increased competition from Shark and other competitors was already negatively impacting the Company's sales to a greater extent than iRobot expected as iRobot began to lose shelf space at retail stores to its competitors.  Thus, by this time in the fall of 2017, as CW 1 reported, Defendants were already greatly concerned about this increased competition and the impact it was having on iRobot's sales, contrary to the above public statement reassuring investors that competition did not pose a significant threat to iRobot's business as it was not "resonating" with consumers.

      **B.**     **October 25, 2017 – 3Q17 Earnings Call**

202.   On October 25, 2017, during iRobot's 3Q17 earnings call, Defendant Angle informed investors that "*[d]emand from U.S. retailers for our robots increased during the last quarter. We continue to gain space, exposure and momentum in the market*, *driving higher full year U.S. revenue expectations for the second time this year, even with the availability of new competitive products*."

203.   In response to an analyst's question concerning competition at different price points, Defendant Angle minimized emerging lower-end competition as "*not particularly material*" to iRobot's business and assured that it was not "*cannibalistic of*," *i.e.* diminishing, iRobot's Roomba sales and revenue growth. Indeed, he claimed that this growing lower-end

competition was actually a positive development for iRobot's business because it was purportedly increasing the RVC market without competing directly with, and thus taking sales away from, iRobot's higher-end products.  Specifically, he stated:

> **Analyst:** Colin, just curious in terms of you guys mentioning increased competition at the low-end in the U.S. Can you kind of just help us define your partition [of] low-end from high-end right now in terms of future sets or, as part of this, simply your more aggressive pricing strategy?

> **Angle:** [I]n a maturing market, you're going to have products that are lower gross margin, lower profit and, obviously, lower function start to be -- emerge at the bottom of the price points. . . . And given the remarkable growth we're seeing in the category, this is an inevitable occurrence. Above that, we still see tremendous growth that we've enjoyed thus far, having a bright future, won't give exact numbers yet because it's not February. But that's the area where we think the opportunity to generate the most gross margin dollars, the area where intellectual property and innovation are most strongly rewarded. And this is just a natural evolution. ***It's not particularly material at this point in time because, to date, there really hasn't been much [competition] at least in the United States at the low-end.*** But we expect it to develop over the next few years. ***We don't view it as cannibalistic of our growth.*** We actually see it as supportive of the overall category maturation. ***And when we talk about the -- our analysis of our market opportunity, a lot of this low-end product goes against areas and parts of the market that we were not targeting and thus does, in fact, in a noncannibalistic way, grow the marketplace.***

204.    Later on the call, Defendant Dean, in response to an analyst's question about the impact of competition on iRobot's different tiers of Roombas, indicated that the 600 series, iRobot's lower-end entry-level Roomba, globally represented approximately 35% of iRobot's overall Roomba revenue, with the 800 series and the 900 series, the higher-end premium-tier products, representing equally about 30% (*i.e.*, collectively 60% of Roomba revenues). Defendant Angle then assured that iRobot's revenue contribution percentages would continue, and insisted again that this increasing lower-end competition was actually ***beneficial*** to iRobot's business, as follows:

> [O]ur brand strength and our customer promise is going to [] create a compelling reason for iRobot to maintain its success with our entry-level price points, which in a more mature marketplace would be in the

midrange. Although there is -- we have done some things where we've offered special SKUs to get people under the franchise from time to time. But that midrange entry point is something that you should imagine us continuing. But with the higher price point premium products, the things that will, in total, be the larger percentage of our revenue. So we're quite happy with [] this premium strategy, and we think it is resilient **and even benefits from this low-end emergence.**

205.     In addition to the reasons set forth in ¶ 201, Defendant Angle and Dean's statements at the 3Q17 Earnings Call in ¶¶ 203-04 downplaying the impact of increasing competition on iRobot's business were knowingly false and materially misled investors because, Contrary to Defendants' statements, iRobot's was not, "**continu[ing] to gain space, exposure and momentum in the market . . . even with the availability of new competitive products,"** nor was the Company's premium-strategy "**benefit[ting] from the low end emergence**" of increased competition, which was in fact "**material at this point in time**" and was "**cannibalistic of [iRobot's] growth**."   Instead, as multiple CWs stated, this cheaper new competition in the low-end was in fact saturating the RVC market, resonating well with consumers, and thus materially impacting, *i.e.*, cannibalizing, iRobot's store shelf space and sales at this time in 2017. Therefore, this emerging lower-end competition was diminishing, rather than increasing, demand for iRobot's products, both its entry-level and premium-tier models, contrary to Defendants' positive assurances above that they were not seeing any significant adverse competitive trends.

206.     Further, Defendant Angle's statement that "**[d]emand from U.S. retailers for our robots increased during the last quarter**" and that Defendants "**continue to gain space, exposure and momentum in the market**, **driving higher full year U.S. revenue expectations for the second time this year, even with the availability of new competitive products**" was additionally false and misleading because even if iRobot did see increased demand from U.S. retailers in the prior quarter (3Q17), Defendant Angle knew by this time, but failed to disclose to investors, materially adverse competitive trends undermining these assurances, which were reported to iRobot, including in weekly Field Marketing reports and sales calls with CCS.   Specifically, Defendants knew at this time that iRobot was increasingly losing store shelf space and sales to

this increasing cheaper competition—omitted adverse facts that rendered his positive statement touting iRobot's increased demand and that iRobot "continue[d] [] gain[ing] [of] space" in this RVC market materially misleading.

207.    Analysts were encouraged by Defendants' statements assuring that iRobot's competitive position remained strong despite new competition entering the RVC market.  For instance, PiperJaffray reported on October 25, 2017 that, although they "have increasing concerns that competition is increasing," "*we remain upbeat about* the future of home robot adoption *and iRobot's position in this market*."  That same day, Sidoti & Company also noted that, "[d]espite an increasingly competitive environment, IRBT was able to increase its average selling price by 9% in 3Q:17 to $249 from $229 in 3Q:16, illustrating iRobot's consumer brand strength."

### C.    February 8, 2018 – 4Q17 / FY2017 Earnings Call and Partial Disclosure

208.    As discussed in ¶¶ 107-12 above, although iRobot acknowledged some impact from increased RVC competition on the February 8, 2018 4Q17 / FY2017 earnings call, Defendants immediately downplayed that impact by falsely reassuring investors that the this increased "competitive pressure" was not significant enough to alter the Company's aggressive guidance of increased growth rates.  Thus, Defendants implied that demand for iRobot's products remained strong, insisting that iRobot presently remained "well-equipped to win" against its competition.  Specifically, during this earnings call, Defendant Angle responded as follows to the analyst's follow-up question about any changes in competitive trends that iRobot was experiencing:

> **Analyst**: Great. And then just looking at the U.S., wondering whether or not you're seeing given that inflection in demand, any changes in the ASP [average sale price] dynamics, any pricing pressure, anything that's shifting here in 2018 versus what you saw in 2016, 2017?

> **Angle:** Sure. I think that there is absolutely an increased competitive pressure. And we work to try to protect ourselves against us and given us – giving ourselves some optionality as to how do we address *competitive pressure that is embedded in the guidance that we've given*. We see the

low end of the robot vacuum cleaning segment growing, where there are an increasing number of entrants down sort of below the 299 price points that we have traditionally played at. And iRobot certainly intends to continue to aggressively compete throughout the market.

. . .

So I think that *again in the guidance that we gave, we allowed ourselves some amount of ability to respond to competitive threats. And we think we are well equipped to win in 2018* as should be taken away from the confidence in our revenue growth rates.

209.    In addition to the reasons stated above in ¶¶ 201, 205 Defendant Angle's statements and reassurances at the 4Q17 / FY2017 Earnings Call in ¶ 208 downplaying then impact of competition on iRobot's sales, shelf space and market share were false and misleading because as set forth in ¶¶ 84-100 contrary to Defendants' false reassurances, Defendants knew at this time that these "competitive threats" were only intensifying and increasingly eroding iRobot's store shelf space, sales, and market share in 2018, rather than being adequately factored into the Company's revised guidance.  In particular, according to CW 1, Defendants knew by this time in early 2018 that iRobot's U.S. market share was declining significantly as a result of this increasing competition, as was discussed internally by iRobot sales and marketing personnel on weekly sales call with CCS that CW 1 participated in.  Accordingly, Defendants knew that iRobot was *not "well equipped to win in 2018"* based on its own internal market research, sales reports, and market share analyses showing that it was increasingly losing store shelf space, sales, and market share to Shark and other lower-priced competitors at this time.  Indeed, per CW 1, Defendants internally were greatly concerned about these adverse competition trends starting no later than late 2017 after the Shark ION's launch, and these concerns only grew at this time in early 2018, when they falsely reassured investors that these competition threats were under control.

210.    Likewise, Defendant Angle's reassurances that iRobot's increased "*competitive pressure [] is embedded in the guidance that we've given*" and "*in the guidance that we gave, we allowed ourselves some amount of ability to respond to competitive threats*" was additionally false and misleading because they created the false impression that such competitive

threats were at that time adequately factored into iRobot's financial guidance—*i.e.*, they were under control and would not further adversely impact iRobot's business. In reality, however, Defendants knew of, but failed to disclose, negative competitive trends (the declining store shelf space, sales, and market share, as described above) that were only getting worse at this time in early 2018, rather than improving—material facts that belied Angle's positive assurances that these competitive pressures would not further diminish iRobot's financial performance. In other words, this increased new competition created significant new risks to iRobot's ability to meet its guidance that Defendants failed to disclose or downplayed. Accordingly, Defendant Angle's statements above lacked a reasonable basis when made.

211. During the call, Defendants also reassured investors that iRobot was still seeing increasing demand for its premium-tier products that were critical to the Company's revenues and profitability. Specifically, in response to a question from a Dougherty & Company analyst, Defendant Angle falsely reassured investors that market pressure from increased competition was not negatively impacting iRobot's sales of its premium-tier Roombas such that the 60% premium-tier to 40% entry-level "mix" of Roomba sales would remain the same:

> **Analyst:** I mean, one of the drivers of growth this year has definitely been the mix up to your higher price point products and selling more in that category. Just wondering, when you look at the market, I think the mix has been running kind of 60% of your sales have been the 800 and the 900 SKUs and 40% in the lower SKUs. Just wondering when you look out next year and may be into 2019, do you think you can hold that 60-40 mix? Or do you think there is risk of giving some of that trade-up mix benefit that you've seen this year back?

> **Angle:** *I don't think that – I mean, the real market pressure isn't giving it back*. It's – we as aggressively as we can take our premium features and roll them down to ensure that our entry-level price points continue to be competitive and to ensure that *we can hold off these lower tech entrants into the marketplace*. And the – and so that – I think that the mix – we'll have to start to see how the year rolls out. It's – *we modeled it similar*. Although if there was going to be a deviation from prior year, it might actually be a shift up toward premium as the category continues to mature and the – and iRobot's strongest differentiation will always be at the premium level.

212.    Defendant Angle's statements and reassurances at the 4Q17 / FY2017 Earnings Call in ¶¶ 210-11 were materially false and misleading for the same reasons set forth in ¶¶ 201, 205, 209.   In particular, Defendants' assurance that iRobot "can hold off these lower tech entrants" falsely minimized the competitive threat that these new competitors represented to iRobot's business given Defendants' knowledge of internal contradictory market research and analyses. As noted above, by this time, Defendants knew of, but failed to disclose, negative competitive trends (the declining store shelf space, sales, and market share) that were only getting worse at this time in early 2018, rather than improving—material facts that belied Angle's positive assurances downplaying the impact of this new competition.   Accordingly, Defendant Angle's statements above lacked a reasonable basis when made.

213.    The market continued to adopt Defendants' reassurances that iRobot's dominant competitive position remained intact despite increased competition.   As PiperJaffray reported on February 8, 2018, "[a]lthough competition is creeping up, we believe the robotic vacuum market is beginning to inflect and *iRobot still has very strong market share and will be able to leverage their higher performing products to continue to ride the wave of this industry*."   Likewise, Loup Ventures issued a report that same day explaining that "we remain believers in the long-term iRobot story."   Likewise, Raymond James also upgraded iRobot's shares to "Outperform" the next day, expressing optimism in the Company's growth prospects "[d]espite competition."

### D.    March 1, 2018 – 2018 Analyst Day

214.    Defendants continued to downplay the impact of increased competition on iRobot's business and growth trajectory during the Company's 2018 Analyst Day presentation on March 1, 2018.

215.    For example, Defendant Cerda misleadingly assured that increased competition was not affecting iRobot's leading global market share:

> [W]e are holding to our [global] segment share position around 62%. The names, right, the size of the [market share] bars, they change from 1 year to the other, right, and they come up with different strengths for the marketplace, but we feel quite good that *'17 was still another year where we maintained our segment position*.

216.     Additionally, Defendant Cerda assured that increased competition would not impact iRobot's gross margins, such that the Company could maintain its strong growth rates and profitability:

> [D]espite a competitive environment, we are not expecting to see gross margin degradation. We have a stack of initiatives that cover already 2 years into the future on how we are going to be bringing more and more operational efficiencies and cost takeout. *That as competition comes in* and we have to react, right, we hopefully -- *that enables us to maintain both the growth and our profitability*.

217.     In addition to the reasons stated above in ¶¶ 201, 205, 209, 212, Defendant Cerda's statement at the 2018 Analyst Day "*that "'17 was still another year where we maintained our segment position*," even if literally true that iRobot did maintain its leading market share in the U.S. RVC segment, was nevertheless misleading, because Defendant Cerda knew, but failed to disclose, material adverse competitive trends, as demonstrated in iRobot's internal market research  at the time,–that iRobot's market share was significantly declining by this time due to increased competition.  Specifically, CW 1 stated that by this time in early 2018, the decline in iRobot's U.S. market share decline (due to the increased competition from Shark and the other competitors) began to be visible internally.   Thus, Defendant Cerda's statement created the false impression that iRobot's market share in the RVC segment remained unaffected by increasing competition, when in reality it was already significantly declining.

218.     Analysts reacted positively to Defendants' reassurances.  For example, an analyst report by Raymond James issued on the same day stated that, after attending iRobot's Analyst Day event, these analysts "came away impressed with the quality of the presentations, an appreciation for the company's longer term ambitions, and further reinforcement that 2018 could prove to be a banner year despite its inauspicious start"

219.     Similarly, PiperJaffray reported the next day that "*we are confident management is making important strategic decisions* in an increasingly competitive atmosphere to turn operating expenses *into significant revenue growth with expanded market exposure and maintaining market share*."   The PiperJaffray report further explained that the increasing

numbers of new competitors "should not stunt top line revenue growth" because "[these competitors] are in turn helping iRobot by increasing awareness of robotic vacuums to new market segments."

220.    Further, only a few days later, on March 6, 2018, Sidoti & Company issued a report that maintained its "BUY" rating, stating that despite new competition, "we think iRobot's premium brand status will allow the company to *maintain its market-leading position*."

### E.    April 25, 2018 – 1Q18 Earnings Call

221.    On April 25, 2018, during the Company's 1Q18 earnings call, in response to an analyst question about "how Roomba at the different price points is positioned versus the competition feature-wise," Defendant Angle again misleadingly downplayed the impact of competition on iRobot's sales: "These other robots are relatively new on the market and so, they try to go and copy some of our features as best they can. I think that *in Q4, we had tremendous success against the competition.* Our robots are designed with a system and many features working together to deliver superior performance."

222.    Defendant Angle's statements at the 1Q18 Earnings Call downplaying the impact of competition on iRobot's business were knowingly false and materially misled investors for the same reasons set forth in ¶¶ 201, 205, 209, 212, 217 herein.  In particular, Angle's statement that iRobot had "*tremendous success against the competition*" in the fourth quarter of 2017, was false and misleading because it omitted known adverse competitive trends that contradicted Angle's positive assertion (iRobot's declining store shelf space and sales as a result of increased competition) which were already readily apparent internally in the fall of 2017.  Accordingly, Defendant Angle's statement above lacked a reasonable basis when made.  Moreover, Defendants Angle's statement created an impression of a state of affairs at iRobot—that its dominant competitive position remained unaffected by these growing competitive threats—that differed in a material way from the internal reality.

223.    Market analysts were reassured by Defendants' statements regarding competition. In fact, Loup Ventures stated that same day that "*we were encouraged to hear Management's commentary around continued strength* despite investor fears of increased competition."  That same day, PiperJaffray similarly reported that "[d]espite competitive headwinds *iRobot remains head and shoulders above competition* due to their strong brand recognition and technology competitive advantage."

### F.    July 25, 2018 – 2Q18 Earnings Call

224.    On July 25, 2018, iRobot held an earnings call with analysts to discuss the Company's results for 2Q18.  As noted above, Defendants addressed the looming threat of tariffs and suggested that iRobot may need to increase product prices to offset the costs of tariffs. Defendants, however, continued to downplay the impact of competition on iRobot's business, particularly, at the entry-level tier.  Specifically, in response to analyst questions about the high price point of iRobot's products and the premium-tier 900 series Roombas in particular, Defendant Dean assured investors that increased lower-cost competition was not impacting iRobot's continued strong demand for both its premium and entry-level tier products:

> **Analyst**: I can see why consumers would choose a 600 series given the price point, but why are you finding that consumers are going all the way up to the 900, given the price point? I mean, it's much more expensive than the middle series. What does your research say, that somebody will choose that 900 series over the 800 series? I know it's got more bells and whistles and stuff, but it seems like it's incrementally more to the consumer.
>
> **Dean**: So Frank, in my comments, that mix between 900 and 600 really has been consistent with what we've seen the last several quarters, so as we've talked about for a while, *we see a strong amount of demand at the 900 end and the 600 end, and that is -- been very consistent over the last couple of quarters*, so there was nothing really new in how that revenue split between those two models.

225.    Defendant Angle then followed up on Defendant Dean's response, similarly representing that iRobot continued to see strong sales and demand for both its premium-tier and

entry-level products and that iRobot thus could stay competitive at the "low end" without sacrificing profits, despite this increased cheaper, lower-end competition:

> **Angle:** I think, to put a little color, the Prime Day success ***demonstrated continued strength down at the entry-level price points***, which I think is very material in that we are ***not simply getting pushed into premium only, we continue to have strong performance across price points***, and I think that that's a very material result and probably the most important message coming out of Prime Day.
>
> **Analyst**: Got it. And that, in fact, you can obviously be competitive at that low end and still maintain margins, right?
>
> **Angle**: ***Correct.***

226.   Later on this earnings call, Defendant Angle again downplayed the increased competition as not causing any significant "new disruptions" on iRobot's business, based on the Company's purportedly continued strong sales for both its premium-tier and entry-level products:

> **Analyst**: So Colin, on the last call you mentioned more Chinese competitors coming into the shelves in Europe, and mentioned that that could potentially happen in the U.S. this year. Reading your comments today, maybe I'm just reading too much into it, but when you talk about the competitive environment looking similar to last year, to me that sounds a bit more optimistic than last call. First of all, am I reading that right, and if so, can you just talk about what has changed?
>
> **Angle**: I think that we certainly saw an influx of new competitors in Q4, and it did change the dynamics in the marketplace somewhat. We've seen that stabilize through the first half, and I think that, again, you look at Prime Day as an exemplar of, okay, there is significant availability of these low-end models. How much share did they take, how much did they disrupt, and what did they do in Prime Day. And ***the results are very favorable relative to iRobot demonstrating its ability to maintain strong performance at the low end of the marketplace while we maintain our strong performance at the high end.*** And so that I think that there's a very good indication that, yes, the market was somewhat disrupted at the end of Q4, that the market growth rates certainly allowed for them to enter ***without substantially impacting the performance we had predicted and laid out,*** and ***the environment, while certainly very competitive, is not demonstrating new disruptions***.

227.    However, Defendants' statements during the 2Q18 Earnings Call in ¶¶ 224-26, were false and misleading because, increased cheaper competition was already substantially, adversely impacting iRobot's sales and financial performance, causing significant "*new disruptions*" to its competitive position, and particularly diminishing demand for and sales of iRobot's entry-level products.  As described in ¶¶ 84-100 above, Defendants knew that by this time, iRobot thus did not have "*continued strength down at the entry-level price points*," "*strong performance across price points,*" or "*strong performance at the low end of the marketplace while we maintain our strong performance at the high end.*"  To the contrary, at this time in mid-2018, increased cheaper competition from Shark, Neato, and others, was saturating the lower-end market and increasingly chipping away at iRobot's store shelf space, sales, and market share, particularly hurting sales of iRobot's lower-end entry-level products.  Indeed, as CW 1 stated, by this time in the summer of 2018, internally iRobot was already beginning to shift its sales and marketing efforts exclusively to the premium-tier, effectively ceding the entry-level market to its lower-end competition.  Yet publicly, Defendants continued to falsely tout iRobot's purportedly strong demand and sales at the entry-level tier as unaffected by this cheaper competition.

228.    Moreover, Defendant Angle's statements that iRobot saw "*a strong amount of demand at the 900 end and the 600 end, and that is -- been very consistent over the last couple of quarters*" and that "*iRobot [was] demonstrating its ability to maintain strong performance at the low end of the marketplace while we maintain our strong performance at the high end*" were additionally false and misleading because he was aware of, but failed to disclose, that increased lower-end competition had by this time significantly reduced iRobot's sales, particularly at the entry-level tier, where the market was significantly more saturated with competition, as demonstrated internally in the weekly Field Marketing Reports sent to iRobot corporate and discussed on weekly sales calls between iRobot sales personnel and CCS.  Critically, the entry-level product income stream represented 40% of the Company's Roomba revenues, and CW 1 described it as the "gas that made the engine go" as the key revenue driver

for iRobot.  But, as noted above, at this time in the summer of 2018, internally iRobot was already beginning to shift its sales and marketing efforts exclusively to the premium-tier, effectively ceding the entry-level market to its lower-end competition and thus giving up this crucial income stream.   Accordingly, contrary to Defendant Angle's statement, iRobot was in fact "***getting pushed into premium only***."

229.    In addition, Defendants' statements touting iRobot's performance on Amazon Prime Day were also false and misleading because they gave investors the false impression that iRobot's performance on Prime Day was representative of the Company's overall sales. In reality, iRobot heavily discounted the prices of Roombas sold on Amazon.com that day as part of the Prime Day promotion, thereby generating numerous additional sales that did not occur in the ordinary course due to the normally high prices of these products. Accordingly, iRobot's sales performance on Prime Day was artificially inflated by these substantial price discounts and not indicative of its typical sales.

230.    Analysts continued to rely on Defendants' positive statements minimizing the impact of competition, particularly highlighting the ostensible protection provided by iRobot's premium-tier strategy.  For example, that same day, J.P. Morgan reported that "[c]ommentary regarding competition seems more optimistic."  Similarly, Loup Ventures also issued a report on that day, stating that they remained convinced that "***concerns around competition continue to be overblown***, and the company has established an ***untouched niche in the high-end*** robovac category."

### G.       September 13, 2018 – Morgan Stanley Laguna Conference

231.    On September 13, 2018, at the Morgan Stanley Laguna Conference, Defendant Dean continued to downplay the impact of tariffs on iRobot's business and competitive position. Specifically, in response to a question from a Morgan Stanley analyst about whether the "elephant in the room being trade [*i.e.*, tariffs]" was impacting iRobot's business, Defendant Dean reassured investors that "***[i]t's not impacting our business to date.***"

232.     Defendant Angle's statement at the September 13, 2018 Morgan Stanley Laguna Conference that tariffs were "***not impacting our business to date***" was false and misleading or omitted material facts when made because, as discussed in ¶¶ 132-33 above, contrary to Angle's statements, CW 4 noted that as iRobot was building up its U.S. inventory in 2Q18—as a way of mitigating some of the financial impact from the tariffs, as described above—its sales were also softening (as a result of increased competition).  In other words, per CW 4, "[t]his was a double whammy, especially for the Americas" for iRobot's sales and financial results.  Accordingly, because of the increased competition and declining sales, the upcoming increase in tariffs was already having an impact on iRobot's business to date.  Furthermore, Defendants knew that tariffs would result in price increases on iRobot's already overpriced products, thereby further diminishing demand for the Company's products, sales of which were already waning due to increased lower-cost competition.  Therefore, Defendants knew, but concealed from investors, that the tariffs would only exacerbate the adverse impact of competition on iRobot's demand and sales.  In particular, CW 3 explained that it was known internally at iRobot during this time that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that competition was putting "price pressure" on iRobot.

### H.     October 24, 2018 – 3Q18 Earnings Call

233.     On October 24, 2018, after the 10% tariffs went into effect in September of 2018, iRobot held an earnings call to discuss iRobot's results for the 3Q18, announcing, *inter alia*, that the Company now expected the tariffs to have a negative impact of $5 million on the Company's full-year 2018 operating income expectation. During the call, Defendant Angle further explained that "[t]he imposition of 10% tariffs went into effect on September 24 and we made the decision not to pass those additional costs to U.S. retailers or consumers in 2018.  And as a result, we expect lower gross margin in Q4 resulting from the tariffs with full year gross margin of approximately 50%."

234.     During the call, Defendants further suggested that although at that point iRobot

was still absorbing the costs of the tariffs, rather than passing them on to consumers through product price increases, the latter option was nevertheless a possibility in 2019 to mitigate the impact of tariffs.  Defendant Angle then misleadingly reassured investors that any such future tariffs-related product price increases would not significantly affect iRobot's competitive position.  Specifically, he represented that the tariffs would impact its competitors much more than iRobot and would not continue to impact the Company in the long-term, because the low end of the market, as opposed to the high end where the Company was positioned due to its premium-tier strategy, was more likely to be sensitive to tariff-related product price increases:

> Let me add another just sort of high-level color as we think about tariffs. The first is that, as evidenced by our continuing strong growth, this is a very healthy market so that many of our growth expectations, as we talked about them, are well below the market growth so that there is some ability to absorb an impact without putting us in a dangerous situation. And so, ***really this is about competitive positioning within this growing market*. . . . *iRobot is the premium player and that's very advantageous because price sensitivity at the high end is much lower than at the bottom end. And so that we're well positioned as we think about whether or not what exactly the mix of margin and price increases will be our optimal strategy.***
>
> . . .
>
> ***A tariff would impact most directly price points below which we play, where if you're a value player, a price increase has a very material impact on growth. But further up, the value -- the price change, your premium customer is less price sensitive*. . . . But again, this is not a world end kind of situation. This is something that will affect all competitors. And in a very real way, *we are better positioned than our major competitors [that] play at the low end to maintain an aggressive stance.***

235.    Further, in response to follow-up questions from an analyst about potential tariff-related product price increases in the future, Defendant Angle reiterated that, based on the Company's supposedly extensive "interim research" on price elasticity (*i.e.*, price sensitivity), such tariff-related price increase would hurt its lower-end competitors more than iRobot given the Company's premium-tier focus:

**Analyst**: And then one last question for me and kind of a follow-up on Mike's. Have you done any work on price elasticity? And a 5% or 10% increase on pricing, what do you think that will do to kind of the growth rates?

**Angle**: Yes, we have done a lot of interim research on price elasticity. And I think that I tried to give as much color as we're able to give on the call saying that the – ***it's good to be a premium retailer or a premier manufacturer. There is certainly more flexibility at the top than at the bottom,*** and again, we've got very good models as to how to craft our strategy next year.

236.    However, in addition to the reasons set forth in ¶ 232 , Defendants' statements at the 3Q18 Earnings Call in ¶¶ 324-35 minimizing the impact of tariffs on iRobot's competitive position were false and misleading because they failed to tell investors that iRobot's so-called "***optimal strategy***" for dealing with tariffs included the Company effectively abandoning sales and marketing efforts for its entry-level products, which accounted for 40% of iRobot's Roomba revenue, due to increased competition.  Further, the optimal strategy's success was contingent on consumers' willingness to pay even higher prices for iRobot's premium-tier products, which Defendants falsely insisted consumers would because purportedly "***price sensitivity at the high end is much lower than at the bottom end.***"  Critically, however, Defendants knew that demand for iRobot's lower-end and premium-tier products was only further declining in 2018  due to increased cheaper competition, and that consumers were in fact reluctant to pay even higher prices for iRobot's already over-priced premium-tier models, rendering these models cost-prohibitive.

237.    Indeed, as set forth in ¶¶ 113-121, Defendants knew that because of the availability of competition with similar performance and features as iRobot's premium-tier Roombas, consumers were hesitant to pay the high prices for iRobot's premium tier products, many of which also had performance issues according to CWs.  In particular, according to CW 1, unlike the lower-priced entry-level products, iRobot's higher-end products could not "supply the gasoline to keep the engine running."  Indeed, per CW 1, at this time, iRobot's premium-tier Roombas, like the i7, were selling poorly following their release (in September 2018), due to

their high price point and numerous software and performance issues.  In fact, Defendants knew, but failed to disclose, that by this time iRobot's U.S. market share had declined substantially, by *10%*, from the fall of 2017, as a result of the increased new competition in the RVC market. Thus, Defendants' statements lacked a reasonable basis when made.

238.   Moreover, CW 3 explained that it was known internally at iRobot that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that competition was putting "price pressure" on iRobot.  Thus, Defendants' statements above misleadingly concealed that the tariffs, by forcing iRobot to increase product pricing, would only further compound iRobot's already substantial competition problem—*i.e.*, the Company's waning product demand and sales due to increased competition, which Defendants continued to downplay.

239.   Similarly, Defendants' statements that the Company was "***better positioned***" because it was a "***premium player***" and "***premium customer is less price sensitive***" were false and misleading because they gave the investors the false impression that demand iRobot's premium-tier products (such as the i7 and i7+) remained strong, when in fact Defendants knew that the i7 line was selling poorly at this time.   Indeed, as set forth in ¶¶ 113-121, per CW 1, at this time iRobot was becoming increasingly "desperate" to sell these models. Accordingly, Defendants lacked a reasonable basis for and omitted these key material facts, which rendered their positive statements about the purported benefits of iRobot's focus on the premium-tier given iRobot's price sensitivity false and misleading.

240.   Analysts accepted Defendants' false and misleading statements.  For instance, on October 24, 2018, Sidoti & Company reported: "***Given what appears to be strong demand for IRBT products*** and continued strength with the US dollar, ***we think that the tariffs could be largely offset***."   The next day, Dougherty & Company also noted Defendants' misstatements about price sensitivity favoring iRobot over its low-end competitors, writing that "management emphasized that as a premium brand ***they believe there will be less cost sensitivity vs. low end competitors***."

I.      **December 5, 2018 – Raymond James Technology Investors Conference**

241.    During the Raymond James Technology Investors Conference on December 5, 2018, Defendants continued to reassure investors of iRobot's strong competitive position despite increasing competition.  Specifically, while Defendant Dean acknowledged that "over the last several years, we've had more competition coming in from what we call our entry price points or the low end of our range," she then misleadingly downplayed the impact of such increased competition on iRobot's market share: "our innovations have really resonated with the consumer base and ***we've been able to maintain the share despite the fact that these new entrants are coming in***."

242.    In addition to the reasons stated in ¶¶ 201, 205, 209, 212, 217, 222 , Defendant Dean's statement at the December 5, 2018 Raymond James Technology Investors Conference in ¶¶ 241 downplaying the impact of competition on iRobot's market share was false and misleading because it created the false impression that iRobot's leading U.S. market share remained unaffected by increasing competition.  In reality, however, by this time, iRobot knew that its U.S. market share had declined substantially, as a result of increased competition.  ").  Indeed, according to CW 1, by the time the Champion Program was implemented in October 2018, iRobot's market share had fallen an additional 10%, to 77%, which she characterized as a significant loss, due to the increased competition from Shark and the other competitors.  Thus, even if Dean's statement that iRobot had "been able to maintain" its leading market share position were literally true, it was misleading by omitting these material adverse facts regarding iRobot's declining market share (and other adverse competitive trends, such as declining store shelf space and sales) and creating a false impression that increased competition was not negatively affecting iRobot's business.

J.      **February 7, 2019 – 4Q18 / FY2018 Earnings Call**

243.    On February 6, 2019, after the market closed, iRobot issued its annual guidance for FY2019 and updated three-year financial targets, "including tariff impact." The Company's revenue guidance, in particular, exceeded analyst expectations given increased tariff concerns.

244.    On February 7, 2019, during the 4Q18 / FY2018 earnings call with analysts, Defendant Dean stated that iRobot's newly issued FY2019 guidance included an anticipated "$20 million to $25 million of tariff costs to be incurred in 2019."  Dean also explained that the recent price increase on the i7 and i7+ were done to offset the impact of the 10% tariff and that if the tariffs were increased to 25% on March 1, 2019 (when the tariff "cease-fire" expired) iRobot would "likely increase our prices again to offset the incremental tariff costs incurred." Defendant Dean clarified that the $20 to 25 million was the "check we will write to pay for the tariffs." Defendant Dean, however, also asserted that the tariff-related "***price increases [on the i7 and i7+] mostly offset that incremental $20 million to $25 million of tariff costs that we'll incur***."

245.    In addition to the reasons stated in ¶¶ 232, 236-39, Defendants' statements at the 4Q18 / FY2018 Earnings Call  in ¶¶ 244 minimizing the impact of tariffs on iRobot's competitive position and claiming that price increases on the i7 and i7+ Roombas would mitigate the impact of tariffs were false and misleading because Defendants failed to tell investors that iRobot's strategy for dealing with tariffs included the Company effectively abandoning sales and marketing efforts for its entry-level products due to increased competition and that the strategy's success was contingent on consumers' willingness to pay even higher prices for iRobot's premium tier products.  Critically, however, as discussed above in  ¶¶ 113-21, 153-57, Defendants knew that consumers were reluctant to pay the already high prices for iRobot's premium-tier Roombas due to lower-priced competition, and that the tariff-related price increases only exacerbated this problem.

246.    During the February 7, 2019 earnings call, Defendants also continued to tout the Company's purportedly strong market share and sales of premium-tier Roombas to investors and downplay the impact of competition on the Company's business, even going so far as stating that the competition was not taking shelf space from the Company.  Specifically, Defendant Angle stated: "***In the U.S.*** we continue to see new competitive products selling through Amazon marketplace, ***but not on shelves of retailers,*** where we still generate 60% of our domestic revenue."

247.     In addition to the reasons stated above, Defendant Angle's statement in ¶¶ 246 that iRobot was not seeing "new competitive products selling*. . .on shelves of retailers*" was patently false and misleading because in 2018 iRobot was increasingly losing shelf space to competition in some of its most important big box retail stores, including Best Buy, Bed Bath and Beyond, Walmart, Loew's and Target.  Specifically, as set forth in ¶¶ 96-98, according to CW 1, in 2018 iRobot continued to lose increasingly more shelf space to its competitors than it already had in 2017.  Indeed, CW 1 stated that in the summer of 2018, she noticed that the store shelf space dedicated to iRobot products substantially declined further, including the more desirable "endcap" space at the end of a store aisle, with iRobot relegated to the less visible side shelf.

248.     Importantly, during the call, Defendant Angle also misrepresented iRobot's U.S. market share loss decline as of that time, asserting that it was only 3% and that this iRobot's competitive position remained strong: "Our U.S. estimates for 2018 show a *3 point share loss overall, but we firmly believe that with low household penetration providing an opportunity for substantial category growth, we are well positioned to continue our growth trajectory in this market.*"

249.     However, in addition to the reasons set forth in ¶¶ 248, Defendant Angle's statement in ¶ 248 was false and misleading because it misrepresented the actual loss of market share iRobot was experiencing at that time.  Specifically, per CW 1, by approximately this time, iRobot had lost approximately 10% of its market share due to increased competition—*more than triple* the 3% figure provided by Angle.  Moreover, per multiple CWs, iRobot's store shelf space, demand, and sales continued to be eroded by increased cheaper competition, which had saturated the RVC market, at this time, such that iRobot was *not* "well-positioned to continue" its prior strong growth in this market given these undisclosed adverse competitive trends.

250.     Further, Angle's assertion that the Company remained "*well positioned*" to maintain this strong growth based on the purported low household penetration in the RVC market was also false and misleading because, by this time , Defendants knew that the RVC

market was not in fact growing as Angle suggested here. Specifically, per CW 1, no later than early 2018, Defendants knew that many Roomba consumers were repeat rather than new customers that would grow the size of the overall RVC market—thus, iRobot was not penetrating into new households, the sole basis for Angle's reassuring statement.   Likewise, Thus, Defendant Angle lacked a reasonable basis for and omitted these key material facts, which rendered his positive statement about iRobot's continued strong growth trajectory materially misleading.

251.    Analysts were again reassured by Defendants' statements about the continued strong demand for iRobot's premium-tier products and that the Company's FY2019 guidance was not impacted by increased competition or the overhang of tariffs.  For example, a February 7, 2019 PiperJaffray report stated: "*Our previous concerns regarding tariffs and the implication to iRobot's 2019 guidance ended up being a non-event with overall sector demand more than offsetting this headwind.* iRobot's execution in this market with increasing competition speaks to the company's superior brand."  Likewise, that same day, J.P. Morgan wrote that "[w]e believe the outlook is better than investors had feared, particularly given the uncertainty heading into the print regarding the impact from tariffs."

## K.    April 24, 2019 – 1Q19 Earnings Call and Partial Disclosure

252.    The Company discussed its 1Q19 results on its earnings call on April 24, 2019. As discussed in ¶¶ 166-75, on that date, Defendants announced 1Q19 revenues and revenue growth that were significantly below analyst expectations, reflecting significantly decreased demand for iRobot's products.  At the same time, however, Defendant Angle reassured investors that sales remained sufficiently strong for the Company to achieve its prior full-year guidance issued in February 2019, which he reaffirmed: "*Q1 sell-through was good, setting us up for the higher year-over-year Q2 2019 revenue growth rate we discussed last quarter*. Given our Q1 results and our outlook for the rest of the year, *we are reaffirming our 2019 full year revenue and operating income expectations then increasing our full year expectations for earnings per*

*share.*"

253.    In response to a question from an analyst about whether iRobot's premium-tier products were experiencing any lack of demand or if customers were buying more of iRobot's entry-level products, Defendant Dean touted the purported success of the Company's premium-tier models:

> **Analyst**: Okay. And on the product mix this quarter, I know in past quarters you've had a bit of a barbell effect in terms of the 600 series and some of the newer models. Was that the case this quarter with the other end of the barbell being the newer models?
>
> **Dean**: Yes. This quarter, we saw a little bit greater than 50% of our revenue coming from the 900 series and above, with the remainder coming below that. ***So really good traction to-date with the higher-priced [models]***.

254.    Finally, Defendant Angle comforted investors that iRobot's tariff-related price increases on the premium-tier i7 and i7+ Roombas did not diminish demand for these products, which remained healthy: "[W]e increased on the i7 and i7+ at the beginning of the year to partially offset the impact of tariffs. ***Despite the higher prices, Q1 demand was ahead of plan for this product***."

255.    Defendants' statements in ¶¶ 252-54 were false and misleading or omitted material facts when made because Defendants' statements about the continued strong sales and demand for iRobot's premium Roombas, despite the tariff-related price increases, were false and misleading for the same reasons as set forth in  ¶¶ 232, 236-39, 245, 249 above.  Moreover, as set forth in ¶¶ 153-57, by the beginning of 2019, iRobot knew that iRobot's price increases were not mitigating the impact of tariffs and that the tariffs were in fact heavily impacting sale of iRobot products and market share in light of increased competition with comparable features at a lower price.  Specifically, CW 3 explained that it was known internally at iRobot that the additional pressure of tariffs was negatively impacting iRobot's sales and market share and that that competition was putting "price pressure" on iRobot.  Likewise, CW 2 stated that, in early 2019, tariffs and competition (specifically, Shark) began to heavily impact sales of iRobot's

products.

256.    In addition to the reasons stated in ¶¶ 232, 236-39, 245, 249, 255 above, Defendant Angle and Dean's reassurances of continued strong sales of and demand for iRobot's premium-tier i7 Roombas despite the increased prices due to tariffs, were false and misleading because Defendants knew that, by forcing iRobot to further increase the prices of its already expensive products, tariffs had only exacerbated the Company's sales struggles due to increased competition, which had already exerted substantial price pressure on iRobot.

257.    Defendants' reassurances continued to have their intended effect on analysts. For instance, in an April 24, 2019 report, J.P. Morgan was encouraged by Defendants' positive statements regarding continued strong demand for iRobot's products: "***Encouragingly, demand for the i7/i7+ was ahead of [C]ompany expectations, despite the pricing increase implemented during the quarter due to tariffs***."  The next day, a PiperJaffray report similarly stated that "[w]e remain confident in the [C]ompany's execution as we believe robotic vacuum demand will remain strong in 2019 and iRobot has a robust pipeline of new and soon to be launched products to leverage this industry uptick."  On April 30, 2019, Loup Ventures also reported that "[w]hile we anticipate increased competition in all product categories, we believe iRobot's technology leadership and brand awareness will support continued market leadership," and that "[r]ising competition is a legitimate concern for iRobot, ***but the company continues to maintain and extend its lead***."

**L.      July 23, 2019 – 2Q19 Earnings Call and Partial Disclosure**

258.    On July 23, 2019, iRobot's true declining competitive position and the failure of iRobot's premium-tier strategy as a way to mitigate the impact of tariffs on iRobot's business were further partially revealed.  On that day, after the market closed, iRobot surprised the market when it issued its earnings release for 2Q19, which cut its full-year earnings forecast due to "the direct and indirect impacts of the ongoing U.S.-China trade war."  Specifically, iRobot reduced FY2019 revenue guidance from between $1.28 billion - $1.31 billion, to between $1.2 billion -

$1.25 billion.  The Company also considerably slashed its EPS guidance from between $3.15 and $3.40 to between $2.40 and $3.15.

259.    However, Defendants continued to conceal and misrepresent the full extent of iRobot's problems as a result of increased lower-priced competition in the RVC market and the tariff-related product price increases, including expressly denying that such competition was eroding iRobot's leading market share.  Specifically, during the 2Q19 earnings call the next day, Defendant Angle reassured investors "[t]he U.S. segment did not accelerate in the second quarter as we had expected, but we had *maintained our segment share in this region and are not seeing any share erosion due to competition*."  Likewise, Defendant Dean assured investors: "*[W]e've held our share based on the data we are seeing. The competition doesn't seem to have taken anything in the first half of the year.*"

260.    Additionally, in response to questions from analysts regarding the continued viability of iRobot's premium-tier products, Defendants reiterated that iRobot's tariff-related price increases on its premium-tier Roombas were not adversely affecting demand for or sales of these products:

> **Analyst**: Maybe a couple of quick ones here for Colin. So Colin, I think with -- to me, just with the tariffs here, it really forced the price of some of your vacuums above a $1,000, right? And I think that's been a threshold or a ceiling that you -- historically, you've may wanted to avoid. So I would just like to get your thought on just kind of growth in the industry in a sub $200 market? Are you still seeing that there with the -- obviously, there's been less price increases because of tariffs in the robot's category?

> **Angle:** So that -- I am certain that s9 will be doing very well despite the fact that they've broken that $1000 price barrier, which to me, is not that it's great to have higher prices, *but definitely the demand and the features of those products are being successful* and I could only dream and imagine what we'd be doing if we could have those robots below $1000.

261.    In addition to the reasons set forth in ¶¶ 259-60, the statements and reassurances made at the 2Q19 Earnings Call referring to the s9 and stating that "*demand and the features of those products are being successful*" were false and misleading because Defendants knew that

demand for iRobot's lower-end and premium-tier products was only further declining in 2018 and early 2019 due to increased cheaper competition, and that consumers were in fact reluctant to pay even higher prices for iRobot's already over-priced premium-tier models, rendering these models cost-prohibitive.  Indeed, as set forth in ¶¶ 232, 236-39, 245, 249, 255, 256, Defendants knew that because of the availability of competition with similar performance and features as iRobot's premium-tier Roombas, consumers were hesitant to pay the high prices for iRobot's premium tier products, many of which also had performance issues according to CWs.  In particular, according to CW 1, unlike the lower-priced entry-level products, iRobot's higher-end products could not "supply the gasoline to keep the engine running.  Indeed, as set forth in ¶¶ 113-21, the premium-tier i7 and s9 models that the Company released in late 2018 and May 2019, respectively, sold poorly after their release. In fact, per CW 1, iRobot was "desperate" to sell these i7 and s9 models in 2018-2019.  Moreover, Defendants knew that upcoming price increases on all of iRobot's products following an increase of import tariffs to 25% would only exacerbate the impact of increased competition on iRobot's sales.  Specifically, CW 3 explained that it was known internally at iRobot that the additional pressure of tariffs would negatively impact iRobot's sales and market share and that that competition was putting "price pressure" on iRobot.  Likewise, CW 2 stated that, in early 2019, tariffs and competition (specifically, Shark) began to heavily impact sales of iRobot's products.

262.    Further, Defendant Angle's and Defendant Dean's statements above denying the negative impact of increased competition and tariffs on iRobot's market share (*i.e.*, that iRobot ***"maintained our segment share in this region and are not seeing any share erosion due to competition*** and that "***[W]e've held our share based on the data we are seeing. The competition doesn't seem to have taken anything in the first half of the year***.") were false and misleading for the reasons set forth in ¶¶ 249.

263.    Analysts were comforted by Defendants' false reassurances that iRobot's dominant competitive position remained unaffected by increased competition and tariff-related price increases.  For example, on July 24, 2019, J.P. Morgan reported that the "***[C]ompany***

*believes that it is not losing market share*, but rather the tariff-driven slowdown is impacting the overall [RVC] category."

## VI.    LOSS CAUSATION

264.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated or artificially maintained the price of iRobot's common stock and operated as a fraud or deceit on Class Period purchasers of iRobot common stock by failing to disclose and misrepresenting the adverse impact of increased competition in the RVC market and the Trump tariffs for Chinese imports on iRobot's sales and profitability.

265.    Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased iRobot common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased iRobot stock at the artificially inflated prices at which it traded during the Class Period.

266.    The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between February 7, 2018 and October 22, 2019.  During this corrective disclosure period, iRobot's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited iRobot's stock price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 22, 2019 that the full truth was known to the market, such that there was no longer any artificial inflation in iRobot's stock price attributable to the fraud.

267.    The declines in iRobot's stock price during the corrective disclosure period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

268.    As a result of their purchases of iRobot common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements and omissions

had the intended effect and caused iRobot common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $132.88 per share in intraday trading on March 5, 2019.

269.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of iRobot's business and prospects.  As the truth about the Company and the extent of the fraud were revealed to the market, the price of iRobot common stock fell significantly.  These declines removed the inflation from the price of iRobot common stock, causing significant economic loss to investors who had purchased iRobot common stock during the Class Period.

### A.    February 7-8, 2018 – First Partial Disclosure/Materialization of the Risk

270.    During the time between the market closed on February 7, 2018, and opened on February 8, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or materialized, in connection with iRobot's issuance of its annual guidance figures for FY2018 and disclosure that the Company was experiencing some adverse impact from increased competition in the RVC market.

271.    Specifically, on February 7, 2018 after the close of trading, iRobot issued a press release disclosing disappointing financial guidance, including operating income guidance of $86,000,000 to $96,000,000 and EPS of $2.10 to $2.35, below analysts' estimates, which the Company attributed to increased sales, marketing and R&D expenses. These increased sales, marketing and R&D expenses partially revealed the adverse impact of increasing competition on iRobot's business because they indicated that the Company needed to spend more money to promote its products and develop new features to combat rising competition.  In other words, investors began to understand that competition was in fact negatively impacting iRobot's Roomba sales and financial results because the Company now had to increase these expenses to combat the rising competition, contrary to Defendants' prior misstatements downplaying the

effects of such competition on iRobot's business.

272.    Further, on February 8, 2018, during the related 4Q17 earnings call, which took place prior to the market opening, Defendant Angle, in response to analysts' questions about whether iRobot was seeing any significant changes in the competitive trends, expressly acknowledged some impact from increased competition on iRobot's business:

> **Analyst**: And then just looking at the U.S., wondering whether or not you're seeing given that inflection in demand, any changes in the ASP [Average Sale Price] dynamics, any pricing pressure, anything that's shifting here in 2018 versus what you saw in 2016, 2017?
>
> **Angle**: Sure. I think that ***there is absolutely an increased competitive pressure.*** And we work to try to protect ourselves against us and given us – giving ourselves some optionality as to how do we address competitive pressure that is embedded in the guidance that we've given. We see the low end of the robot vacuum cleaning segment growing, where there are an increasing number of entrants down sort of below the 299 price points that we have traditionally played at. And iRobot certainly intends to continue to aggressively compete throughout the market.

273.    The February 7, 2018 and February 8, 2018 disclosures that iRobot was being adversely affected by "increased competitive pressure," and thus lowering operating income and EPS below analyst estimates, was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the true impact that increased competition in the RVC market had on the Company's business, including its Roomba market share advantage, revenue, and gross margins.  Moreover, the February 7, 2018 and February 8, 2018 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  This disclosure partially revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions downplaying the impact of increased competition on the Company's business, including that such lower-end, cheaper competition did not threaten the Company's Roomba sales, market share, revenues, and gross margins.

274.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of iRobot common stock declined from its closing price of $88.04 on February 7, 2018 to a closing price of $59.80 on February 8, 2018, a drop of ***over 32%*** on unusually high trading volume of over 10.2 million shares.

275.    Analysts recognized Defendants' disclosures of disappointing financial guidance and admissions of "increased competitive pressure" on February 7-8, 2018 as partially revealing the truth about the adverse impact of increasing competition on iRobot's business.  For example, a February 8, 2018 CFRA Research report explained that the "Company's comments on [the earnings call] indicate ***that competition is indeed increasing***," and thus "***[v]alidates [CFRA's] concerns***" "***about iRobot's ability to stave off competitive entry*** with its patents and its ITC investigation."   Similarly, on February 9, 2018, a Raymond James report acknowledged that Defendants' lower-than-expected guidance and other disclosures "***stoked the flames of concern surrounding the vicious cycle of competition.***" Likewise, on the same day, J.P Morgan reported that its "***concerns regarding increased competition are seemingly beginning to play out***."

276.    However, despite this partial disclosure of adverse news, which removed some of the artificial inflation in iRobot's stock price, its stock price remained artificially inflated after this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that increased competition from Shark and other competitors with comparable technology to iRobot's premium-tier models but at a much lower cost was increasingly reducing demand for Roombas and thereby eroding the Company's store shelf space, sales, and market share.  Instead, after acknowledging some impact from increased competition on the February 8, 2018 4Q17 earnings call, Defendants at the same time minimized that impact, falsely reassuring investors that iRobot was still well-positioned to maintain its dominant market share and achieve the previously-issued FY2018 guidance because the Company had adequately factored in these competitive threats into that guidance. Specifically, in response to the same analyst question noted above, Defendant Angle immediately followed up on his acknowledgement of some impact from increased

competition with the following false and misleading reassurances:

> **Angle**: Sure. I think that there is absolutely an increased competitive pressure. *And we work to try to protect ourselves against us and given us – giving ourselves some optionality as to how do we address competitive pressure that is embedded in the guidance that we've given*. We see the low end of the robot vacuum cleaning segment growing, where there are an increasing number of entrants down sort of below the 299 price points that we have traditionally played at. And iRobot certainly intends to continue to aggressively compete throughout the market. . . . *[A]gain in the guidance that we gave, we allowed ourselves some amount of ability to respond to competitive threats.* And we think *we are well equipped to win in 2018* as should be taken away from the confidence in our revenue growth rates.

277.    Defendants' false and misleading statements allayed analysts' concerns about increased competition.  For example, on February 8, 2018, PiperJaffray reported that "[a]lthough competition is creeping up, we believe *the robotic vacuum market is beginning to inflect and iRobot still has very strong market share and will be able to leverage their higher performing products to continue to ride the wave of this industry*."

278.    Likewise, Loup Ventures issued a report that same day that explained that "with the revenue outlook being inline with our expectations and the lower earnings forecast being largely attributed to increased marketing and R&D spend *(and not price erosion)*, *we remain believers in the long-term iRobot story*."  Similarly, although a Raymond James's analyst report on January 9, 2019 attributed Defendants' poor financial results in part to competition, as mentioned above, the report upgraded iRobot's shares to "Outperform," indicating that, "*[d]espite competition*, management expects revenue to accelerate to a 20% CAGR, GM [Gross Margin] hold steady, with EBIT [Earnings Before Income and Taxes, *i.e.*, a measure of the Company's profits] seeing little benefit from the growth."

**B.    April 23 -24, 2019 – Second Partial Disclosure/Materialization of the Risk**

279.    On April 23, 2019, after the close of trading, and on April 24, 2018 during the 1Q19 earnings call before the market opened, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period

were further partially revealed and/or materialized, in connection with iRobot's release of its financial results for the first quarter of 2019.  On that date, Defendants announced 1Q19 revenues and revenue growth that were significantly below analyst expectations.  Indeed, iRobot's reported domestic revenue growth for the first quarter of 2019 was only 7%—less than **one-third** of what it was (26%) for the same quarter of the prior year reflecting significantly decreased demand for iRobot's products during 1Q19.  Notably, 1Q19 was the first quarter that iRobot had raised Roomba prices to offset increased costs due to the 10% tariffs on Chinese imports, which had been imposed effective September 2018.  During the earnings call the next morning on April 24, 2019, Defendant Angle explained that these disappointing financial results were due to poor sales and lack of demand at retailers in the United States: "***In the United States, retailers exited 2018 with more inventory than prior years***, likely driven in part by desire to obtain inventory ahead of tariff increases originally scheduled for January 1."

280.    The April 23, 2019 and April 24, 2019 disclosures of disappointing revenue growth, which Defendants linked to retailers' increased inventory of unsold iRobot products compared to prior years, further partially revealed that demand for iRobot's products was declining due to increased competition, contrary to prior misstatements minimizing the impact of such competition on iRobot's business.  Moreover, these disclosures about declining growth in the first quarter that iRobot had raised product pricing to offset these tariffs costs also partially revealed that tariffs (and Defendants' related product price increases on its premium-tier products) had exacerbated iRobot's competition-related sales struggles. In other words, these announcements signaled to investors that demand for iRobot's products had waned as a result of the tariff-related price increases, contrary to Defendants prior misrepresentations that iRobot's focus on the premium-tier, which supposedly enjoyed greater price elasticity than the lower-end segment of the market in which iRobot's competition was positioned, would mitigate the impact of tariffs on the Company's business.

281.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of iRobot common

stock fell from $130.57 per share on April 23, 2019, to $100.42 per share on April 24, 2019, a decline of over 23% on unusually high trading volume of over 8.7 million shares.

282.    Analysts were also surprised by these disclosures, acknowledging that iRobot's disappointing U.S. financial results were linked to the Company's sales struggles due to the impact of tariffs.  For example, an April 24, 2019 J.P. Morgan report noted that the "[C]ompany attributed the low US growth to high retail inventory at YE18 in anticipation of the previously scheduled step-up in US/China tariffs."  Despite this partial disclosure of previously misrepresented and/or concealed material facts, which removed some of the inflation in iRobot's stock, the price of iRobot common stock remained artificially inflated due to Defendants' failure to fully disclose known, adverse material facts concerning the true impact of increased competition and the tariffs on iRobot's sales and financial results. Indeed, Defendants continued to make additional materially false and misleading statements on this date, which falsely reassured investors and analysts, thereby allowing Defendants' fraud to continue.  For example, during the 1Q19 earnings call, in response to a question from an analyst from a Battle Road Research analyst about whether or not the Company's premium tier products were seeing any lack of demand or if customers were moving toward cheaper robot vacuums, Defendant Dean reassured investors that iRobot's strong positioning in the premium-tier products remained intact: "This quarter, we saw a little bit greater than 50% of our revenue coming from the 900 series and above, with the remainder coming below that. ***So really good traction to-date with the higher-priced [models].***"

283.    Defendant Angle further reassured investors that iRobot's tariff-related product price increases on the premium-tier i7 and i7+ Roombas had not diminished its product demand: "[W]e increased [the price] on the i7 and i7+ at the beginning of the year to partially offset the impact of tariffs. ***Despite the higher prices, Q1 demand was ahead of plan for this product.***"

284.    Analysts continued to be misled by Defendants' false assurances that increased competition and the tariffs were not impacting iRobot's bottom line.  For example, on April 24, 2019, J.P. Morgan, despite noting the poor results due to the tariffs, was nevertheless encouraged

by Defendants' positive statements regarding continued strong demand for iRobot's products even in the face of increased pricing due to the tariffs: "***Encouragingly, demand for the i7/i7+ was ahead of [C]ompany expectations***, despite the pricing increase implemented during the quarter due to tariffs." PiperJaffray also remained a believer in iRobot's story, as demonstrated in the report it issued the next day, which stated: "We remain confident in the [C]ompany's execution ***as we believe robotic vacuum demand will remain strong in 2019*** and iRobot has a robust pipeline of new and soon to be launched products to leverage this industry uptick." Similarly, a Loup Ventures report on April 30, 2019 explained: "While we anticipate increased competition in all product categories, ***we believe iRobot's technology leadership and brand awareness will support continued market leadership***."  The report further noted that "[r]ising competition is a legitimate concern for iRobot, ***but the company continues to maintain and extend its lead***."

## C.    July 23-24, 2019 – Third Partial Disclosure/Materialization of the Risk

285.    On July 23, 2019, after the close of trading, and on July 24, 2019 prior to the market opening, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further partially revealed and/or materialized, as iRobot released its financial results for the second quarter of 2019.  On that date, the Company disclosed that iRobot was cutting its full-year earnings forecast.  The Company also announced that it reduced FY2019 revenue guidance from between $1.28 billion – $1.31 billion, to between $1.2 billion – $1.25 billion, reduced operating income from between $108 million – $118 million to between $75 million – $100 million, and significantly slashed EPS guidance from between $3.15 and $3.40 to between $2.40 and $3.15.

286.    During the earnings call held the following morning on July 24, 2019, prior to the market opening, in response to numerous questions from analysts, Defendant Angle further partially revealed that the downward revision to the Company's guidance was related to a decline in demand as a result of the high prices iRobot was charging for its premium-tier products due to

the increased 25% tariffs:

> **Analyst**: First question is just -- I am having a little hard time just in my head kind of rationalizing ***the impact of tariffs on demand***. I totally get how they affect your cost structure. But can you just explain just how tariffs have impacted the category? It sounds like more of a demand issue, I mean granted you're still getting a lot of growth here in the U.S. But how did that impact consumers' view on the category itself, I guess?

> **Angle**: ***So there is an elasticity to demand associated with price. And the tariffs have caused iRobot and others in the category to increase their pricing***. And that has slowed down the rate of growth in the industry. . . . And if not for tariffs, North America would be a much more healthy place.

287.    The July 23, 2019 and July 24, 2019 disclosures that iRobot was cutting its full-year revenue guidance was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the true impact that increased competition and the tariff-related price increases had on the Company's demand, sales, market share, and revenue.  The July 23, 2019 and July 24, 2019 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  Specifically, the disclosure partially revealed that increased competition and tariffs had substantially reduced iRobot's demand, sales and revenue, particularly given its premium-tier strategy taken together with tariff-related price increases on iRobot's premium-tier products, contrary to prior misstatements minimizing the impact of increased cheaper competition and the tariffs on iRobot's business.

288.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of iRobot common stock fell from $89.63 per share on July 23, 2019, to $74.51 per share on July 24, 2019, a decline of nearly 17% in one trading day on unusually high trading volume of over 9.7 million shares.

289.    Analysts understood Defendants' July 23-24, 2019 disclosures as partially revealing that demand for iRobot's products, particularly its premium-tier offerings, and its

previously dominant market share had declined as a result of increased competition offering similar products at much cheaper prices and the tariffs, which forced iRobot to further increase its prices and thereby rendered its products no longer competitive at that price point.  For example, a July 24, 2019 Raymond James analyst report noted Defendants' disclosures of lower guidance due to declining demand for iRobot's products in the wake of the increased tariffs raised investor concerns about the Company's ability to maintain its leading market share: "*[T]he [C]ompany citing demand softening due to tariffs and guiding revenue lighter are a beacon for questions surrounding market share erosion* (though this isn't the company's view)."

290.    Similarly, on the same day, an analyst from Sidoti & Company was surprised by Defendants' disclosures, explaining that the impact from the tariffs on iRobot's sales was greater than expected as the higher prices diminished demand for iRobot's products, contrary to Defendants' prior reassurances that, unlike its competitors, iRobot's higher-end products were less sensitive to such price increase: "We anticipated that tariffs would have an impact on IRBT's results.  However, the *increase in pricing to offset tariffs apparently curtailed consumers' spending on the [C]ompany's products more than we expected*."  Likewise, Canaccord Genuity acknowledged on July 24, 2019 that the "significant shortfall embedded in the new guidance range [was] attributed to tariffs."

291.    Notably, a July 24, 2019 PiperJaffray report also directly linked the adverse impact from the tariffs to iRobot's inability to combat increased lower-cost competition due to the high pricing of its premium-tier products:

> China tariffs finally caught up with IRBT and the [C]ompany is lowering its 2019 revenue and earnings expectations. *We believe price elasticity and products now exceeding $1K have slowed growth in the premium RVC category. . . . Price elasticity has clearly impacted sales with nearly all products experiencing tariff increases*. The tariffs have also forced ASPs above $1,000 and this was historically believed to be a ceiling [for] the [C]ompany [to] avoid.

292.    However, although this additional partial disclosure further removed some of the

artificial inflation in iRobot's stock price, that price remained artificially inflated after this announcement because Defendants continued to conceal the full extent of the adverse impact of increased competition and the tariffs on iRobot's business. Instead of revealing the true state of affairs internally, Defendants continued to reassure investors that iRobot was not losing market share and sales due to lower-priced competition. For example, in response to questions from analysts regarding the continued ability of iRobot's premium-tier products to stay competitive, many of which now cost over $1,000, Defendants again insisted that demand for iRobot's premium-tier products and its competitive position remained strong despite tariff-related price increases and more competition. Specifically, Defendant Angle reassured investors that "[t]he U.S. segment did not accelerate in the second quarter as we had expected, but we had *maintained our segment share in this region and are not seeing any share erosion due to competition*." Likewise, in response to a question from an analyst regarding iRobot's market share, Defendant Dean represented: "*[W]e've held our share based on the data we are seeing. The competition doesn't seem to have taken anything in the first half of the year."*

293. Likewise, Defendant Angle, *inter alia*, reassured investors that: "I am certain that s9 will be doing very well despite the fact that they've broken that $1000 price barrier, which to me, is not that it's great to have higher prices, *but definitely the demand and the features of those products are being successful* . . . ."

294. Analysts were again encouraged by Defendants' false denials that increased competition and higher tariff-related prices were not impacting iRobot's competitive position. In particular, they believed Defendants' statements blaming the tariffs as driving a market-wide sales slowdown, rather than a sign that these tariff-related price increases were disproportionately impacting demand for iRobot's products, and thus eroding its market share, due to their already high price points and increasing, lower-cost competition with similar features. For example, on July 24, 2019, J.P. Morgan reported that the *"[C]ompany believes that it is not losing market share*, but rather the tariff-driven slowdown is impacting the overall [RVC] category."

**D.     October 22-23, 2019 – Final Disclosure/Materialization of the Risk**

295.     On October 22, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized in connection with the Company's press release reporting third quarter of 2019 financial results.  On that date, after the close of trading, iRobot announced that it had cut the high end of its revenue expectations for the year, from $1.25 billion to $1.21 billion, and rolled back tariff-related price increases after a "suboptimal" customer response.

296.     During an earnings call the following morning (on October 23, 2019) that occurred before the market opened, Defendant Angle further disclosed that iRobot's tariff-related price increases had disproportionately diminished demand for the Company's products as compared to its competitors, which had generally opted to not raise prices to offset the tariffs:

> To partially offset the higher costs associated with the 25% tariff rate, we raised prices at most of our RVC lineup in late July. Most competitors, however, opted to absorb the tariffs and keep prices static. Subsequently, **_we experienced greater demand elasticity than we expected, which resulted in suboptimal sell-through in August and September_**. To drive consumer demand and defend our category leadership, we rolled back prices to pre-tariff levels earlier this month on most of our SKUs.

297.     The October 22, 2019 and October 23, 2019 disclosures of the true impact of increased competition and tariff-related price increases resulting in "suboptimal" demand for iRobot's products, particularly its already expensive premium-tier models, was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' Class Period misrepresentations and omissions concerning competition, tariffs and the Company's premium-tier strategy.  Specifically, investors now fully understood that increased competition and tariffs had impacted iRobot's demand and sales much greater than Defendants had represented, as iRobot's customers were not willing to pay the additional cost for iRobot's Roombas, particularly its already expensive premium-tier models, when increased competition with similar features and performance as iRobot's products was available for a fraction of the cost.

298.     As a direct and proximate result of this partial corrective disclosure and/or

materialization of foreseeable risks concealed by Defendants' fraud, the price of iRobot common stock declined by $4.97 per share, or 9%, to close at $49.06 per share on October 23, 2019 on unusually high trading volume of more than 12.2 million shares.

299.    Analysts understood iRobot's October 22, 2019 announcement as fully revealing the true scope of the impact that increased competition and tariffs had on iRobot's sales and growth prospects.  For example, PiperJaffray reported on October 22, 2019 that the  "*[t]he destruction in earnings is due to recent price increases related to tariff expenses, which are having a material impact on unit demand, especially at the high-end.* Given price increases haven't worked, iRobot will now be absorbing these expenses. . . ." The report concluded that "we believe *iRobot will continue to struggle in their biggest market*, making it a hard stock to own."  Likewise, an October 23, 2019 Raymond James analyst report, entitled "Clean up on Aisle 2020; Margin Concerns Come to Fruition," similarly attributed iRobot's recent stock declines to increased competition and the failure of iRobot's premium-tier strategy: "Decelerating growth in its biggest market (domestic), *increasing competition*, and declining gross margins are the three horsemen of the robot war apocalypse." The report further emphasized that *"[t]he combination of Shark and tariffs has upset the domestic RVC hegemony and we aren't sure the status quo can be restored*. . . ." The report continued: "After a series of price hikes to respond to tariffs it's clear that price increases are unwinding quickly and we feel iRobot will likely overshoot pre-tariff levels to stem *stalled demand, suboptimal sell-through, and accelerating share losses*."

300.    Each decline in the price of iRobot common stock, as detailed above, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and material omissions being revealed to investors and the market.  The timing and magnitude of the price declines in iRobot common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

301.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of iRobot common stock and the subsequent significant decline in the value of iRobot common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

302.    The market for iRobot common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 956,968 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, iRobot's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased iRobot common stock relying upon the integrity of the market relating to iRobot common stock and suffered economic losses as a result thereof.

303.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misrepresentations artificially inflating iRobot's stock price and the subsequent significant decline in the value of iRobot common stock when the truth was revealed after the markets closed on February 7-8, 2018, April 23-24, 2019, July 23-24, 2019, and October 22-23, 2019.

304.    The declines in iRobot's common stock price on, February 8, 2018, April 24, 2019, July 24, 2019, and October 23, 2019 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors  on February 7-8, 2018 April 23-24, 2019, July 23-24, 2019, and October 22-23, 2019.  The timing and magnitude of iRobot's stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct. Indeed, on the same day that iRobot's common stock share price closed down over 9%, the Standard & Poor's 500 Index and Dow Jones Industrial Index increased 0.28% and 0.17%, respectively.

## VII.    ADDITIONAL INDICIA OF SCIENTER

305.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over iRobot's and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section VI were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.    Core Operations Allegations: The Roomba Was Critical to iRobot's Business, and Its Sales and Competitive Position Were Closely Monitored by the Individual Defendants

306.    The Individual Defendants' knowledge of the negative impact of increased competition in the RVC market on iRobot's business—including declining Roomba store shelf space, sales, and market share—can be inferred because the Roomba was a core product critical to iRobot's business and was closely managed by the Individual Defendants.  The Individual Defendants were intimately knowledgeable about the Company's operations, including with respect to Roomba sales and competitive position, based on their senior positions with the Company and access to relevant internal information, including reports discussing Roomba sales and competitive trends.  Likewise, Defendants closely followed and repeatedly spoke in public about the impact of the Trump tariffs on iRobot's Roomba sales and financial performance. Thus, knowledge or reckless disregard of the falsity of Defendants' statements downplaying the impact of increased competition and the Trump tariffs on iRobot's business can be imputed to the Individual Defendants.

### 1.    The Roomba Was iRobot's Core Product

307.    The Individual Defendants' knowledge that new competition in the RVC  market was significantly eroding Roomba's store shelf space, sales, and market share can be inferred

because these facts were critical to iRobot's core operations. Specifically, the Roomba was iRobot's flagship product, accounting for approximately *90%* of iRobot's revenues during the Class Period. Thus, the Roomba was by far the Company's most important product.

308.   Indeed, during the Class Period, Defendants repeatedly touted the Roomba as iRobot's "flagship product" that was critical for the Company's financial success.  For example, Defendant Dean stated at a Morgan Stanley Laguna Conference on September 11, 2019 that "[o]ur flagship product is Roomba, the floor-vacuuming robot."  At a June 4, 2019 Robert W Baird Global Consumer, Technology & Services Conference, Defendant Dean similarly emphasized that the "Roomba itself . . . is our major priority" and the "*Roomba [is] the most important piece of our business today*."  Defendant Dean further explained during that same conference call: "We have many key initiatives that are helping us achieve our strategic goals and drive shareholder value. *The most important one of those is to continue our leadership with Roomba*."  Likewise, Defendant Angle stated on an October 24, 2018 3Q18 earnings call that the "most important event of the third quarter was the introduction of our i7 and i7+ Roomba" and that "[t]his is the product that we've been working towards for the past decade."

309.   Further, the U.S. RVC market that iRobot had long dominated represented the Company's most important region for Roomba sales and, thus, was essential to iRobot's continued financial success.  Specifically, during the Class Period, the U.S. market was where iRobot held the largest market share (85% in 2017, per iRobot's disclosures), as compared to approximately 71% in EMEA, and only 31% in APAC.  The U.S. market was also the region that iRobot expected to drive its largest revenue growth—CAGR of 39% in the U.S., as compared to 24% in EMEA and 14% in APAC.  In fact, the U.S. market accounted for more than half (approximately 51%) of iRobot's total revenues at this time.  Accordingly, Roomba sales in the U.S. market specifically were core to the Company's operations.

310.   That the Roomba was one of iRobot's core operations during the Class Period is further demonstrated by analysts' constant focus on sales of and demand for Roomba products, including any adverse effects from increased competition, particularly in the U.S. market.

Indeed, analysts routinely asked Defendants about these issues (and Defendants thus addressed them at length) on the Company's earnings calls—virtually on every earnings call during the Class Period.  Analysts also repeatedly reported on such topics in their analyst reports.  For example, on February 9, 2018, after the first alleged partial corrective disclosure, J.P. Morgan stated, that its "concerns regarding increased competition are seemingly beginning to play out." On February 8, 2018, PiperJaffray reported that "[a]lthough competition is creeping up, we believe the robotic vacuum market is beginning to inflect and iRobot still has very strong market share and will be able to leverage their higher performing products to continue to ride the wave of this industry."  PiperJaffray again discussed competition on October 24, 2018 when it reported that "*increased competition has had minimal impact on iRobot's share* and anticipate the strong demand trends will continue into 2019 due to new product introductions and launching the Roomba i7/i7+ and e5 into international markets."   Similarly, on April 30, 2019, Loup Ventures issued a report that explained that "[r]ising competition is a legitimate concern for iRobot, but the company continues to maintain and extend its lead."

311.    Accordingly, knowledge of the negative impact of increased competition on Roombas sales and iRobot's revenue—a "flagship product" that accounted for 90% of iRobot's revenue and was thus "*the most important piece of [iRobot's] business today*"—can be imputed to the Individual Defendants.

### 2.    The Individual Defendants Had Access to and Closely Monitored Roomba Sales and the Impact of Competition on iRobot's Business

312.    Throughout the Class Period, Defendant Angle served as iRobot's CEO and Chairman of the Board of Directors.  In fact, he was the Company's founder and only CEO to date.   During the Class Period, Defendant Dean was the CFO, Executive Vice President, Treasurer and Principal Accounting Officer of iRobot, and Defendant Dean was the Company's COO. Thus, based on these positions, they had intimate knowledge of the Company's business operations, including Roomba sales and competitive trends and effects. For example, according to Class Period iRobot proxy statements filed by the Company, Defendant "*Angle has first-hand*

***knowledge of our operations and the major issues facing us.***"   Notably, iRobot's proxy statements also explained that Defendant Angle has "***detailed knowledge*** of the Company, our employees, our client base, our prospects, ***the strategic marketplace and our competitors.***"

313.   Additionally, Defendants repeatedly represented that they were personally involved in monitoring and assessing iRobot's in-depth research and analyses regarding Roomba competitive trends, market share, demand, and pricing, which provided the basis for Defendants' positive statements minimizing impact of competition on iRobot.  For example, during the 2018 Analyst Day on March 1, 2018, Defendant Angle reassured investors that price ceilings that consumers were willing to pay for iRobot's expensive premium-tier Roombas were "***something that iRobot tests and explores continuously*** to ensure that we don't get ahead of our customers. . . ."  Likewise, during the 4Q17 earnings call on February 8, 2018, in response to a question from an analyst about whether iRobot could maintain the 60% to 40% "mix" of premium-tier versus entry-level products (as a percentage of total Roomba sales) in light of increasing market competition, Defendant Angle represented that "***we modeled it***" and that the Company was continuing to see strong demand for the premium-tier Roombas such that this product mix would remain "similar," and "might actually be ***a shift up toward premium*** as the category continues to mature."  Moreover, with respect to pricing issues and sales growth rates of the premium-tier Roombas, Defendant Angle also told investors during the 3Q18 earnings call on October 24, 2018 that "***we have done a lot of interim research on price elasticity***" and "***we've got very good models*** as to how to craft our strategy next year" in order to maintain strong sales growth of the premium-tier Roombas.

314.   Further, former iRobot employees confirm that, during the Class Period, the Individual Defendants had access to a variety of internal information sources that tracked Roomba sales and market research on iRobot's competition, including specifically adverse competitive trends and effects such as declining store shelf space, sales, and market share.  For example, per CW 1, all of the issues with store shelf space that CW 1 described were reported to iRobot in the weekly Field Marketing Reports, in addition to being discussed on weekly sales

calls with iRobot (typically led by Rob Driscoll) that CW 1 participated in where they discussed sales figures and what she and her colleagues at CCS were seeing in the market for that week.

315.    CW 1 also explained that the Field Marketing Reports contained information on the key questions about competition that iRobot was focused on, including which competitors were selling the most products and similar details about competitors' performance.  As discussed above, these Field Marketing Reports were compiled from detailed market research data, focused on competition questions, that CW 1 and other CCS employees in similar roles gathered in their field visits to retail stores and then input into CCS's Cognistix system, a database used to track this information.  In particular, per CW 1, this market research data included 150 pre-determined questions (fields), most of which focused on the competition market intelligence that iRobot was most interested in, including for example questions about its competitors' sales performance versus that of iRobot's products, when the competition's new product units would be delivered, and the like.  Thus, per CW 1, the Weekly Field Marketing Reports provided iRobot with CCS's key market research about iRobot's competition.

316.    Moreover, CW 2 similarly recalled that reports that contained market intelligence related to consumer behavior and specifics were loaded onto CCS's Cognistix system on a weekly basis, and then a consolidated report of their findings was sent to iRobot corporate.

317.    Notably, CW 1 stated that Defendant Angle regularly reviewed these Field Marketing Reports because Angle had told employees that he did so at one of the bi-annual large meetings in Boston headquarters that CW 1 attended. Further, per CW 1, CCS employees were regularly reminded by iRobot's sales and marketing manager, Rob Driscoll, on the  weekly sales calls with CCS that CW 1 participated in, that Defendant Angle read the weekly Field Marketing Reports because Angle, for example, frequently acknowledged specific information from the Weekly Field Marketing Reports that he found relevant. Moreover, CW 1 commented that everyone at iRobot, from "Colin [Angle] down," read the Weekly Field Marketing Report.  Thus, Defendants Dean and Cerda also had access to and reviewed these Field Marketing Reports, which discussed key adverse competitive trends affecting iRobot's business during the Class

Period.

318.    Further, Defendants had "real-time" access to pictures of retail store shelves with displays for iRobot's and competitors' products in CCS's Cognistix system, which depicted iRobot's increasingly declining shelf space during the Class Period, a key competitive trend that the Company closely followed.  Specifically, CW 1 explained that she personally and the 25 other CCS field representatives in her region were responsible for visiting approximately 30 different stores per week and would take 2-3 pictures of the store shelf displays at each store. Per CW 1, these pictures were then uploaded to Cognistix, the CCS database described above that kept track of all this market research data.  CW 1 stated that iRobot had real-time access to these pictures and any accompanying captions submitted by CCS employees in Cognistix. Further, CW 1 commented that, given iRobot's real-time access to these store shelf display pictures in Cognistix, in addition to the weekly Field Marketing Reports that also reported on these declining shelf space issues due to competition, that iRobot was very "plugged in" and aware of these shelf space problems.

319.    CWs confirmed that iRobot also sent its own employees into the field, *i.e.*, retail stores, to personally observe sales and marketing trends.  For example, CW 1 recalled that iRobot's Field Marketing and Training Specialist, Michelle McGill, who managed approximately 12-15 CCS employees (including CW 1's region), accompanied the CCS employees on field visits to retail stores across the entire West Coast region (including CW 1's Washington area) every three months.  CW 1 explained that McGill's regular field visits were examples of how iRobot had "boots on the ground" and thus was very aware of all the competition problems at the retail stores.

320.    Furthermore, according to CW 1, iRobot executives, including Defendants Dean and Angle, presented at the Company's bi-annual meetings with CCS employees.

321.    In addition, according to other former iRobot employees, competition and its increasing impact on iRobot's sales were discussed by the Individual Defendants and other senior executives at town-hall style, Company-wide meetings with iRobot employees during the

Class Period.  For example, CW 6 recalled the issue of competition being addressed by either Defendant Angle or another executive during one of the company's "All Hands Meetings," which were periodic meetings attended by Company executives (including all three Individual Defendants, who regularly spoke at these meetings) and less senior employees.  According to CW 6, the discussion of competition included charts and graphs detailing competitors and market share.

322.    Thus, during the Class Period the Individual Defendants had access to internal information regarding Roomba sales and competitive trends and effects that materially contradicted Defendants' misstatements minimizing the impact of competition on iRobot's business, which further supports a strong inference of scienter.

### 3.    The Individual Defendants Also Closely Followed the Impact of Tariffs on iRobot's Sales and Financial Performance

323.    Similarly, based on their positions at iRobot and access to internal information, the Individual Defendants were also intimately knowledgeable about the impact of the Trump Tariffs on iRobot's sales and financial performance.  Further, Defendants closely followed the tariff developments and their impact on iRobot's business since President Trump announced the imposition of tariffs in July 2018.  For example, on the July 25, 2018 2Q18 earnings call, Defendant Angle told investors that tariff concerns were "getting a lot of attention" at iRobot and "[w]e're currently exploring our options and the potential implications if [the third round of proposed tariffs announced a couple weeks ago] are enacted."  In fact, Defendant Angle assured that he was personally involved with iRobot's efforts on the tariffs front.  For example, as he explained on July 24, 2019 during the 2Q19 earnings call: "iRobot has formally applied for exclusion from the tariffs.  ***And I have appeared in Washington several times to present our case.***"  Former iRobot employees corroborate Defendant Angle's close personal management of the tariff issues.  For example, CW 6 explained that Angle was personally involved in the Company's initial efforts to obtain an exemption from the tariffs through political channels.

324.    The accounts of iRobot former employees further confirm that the Individual

Defendants closely managed the tariffs issue given it was of great concern to iRobot's financial performance. For example, CW 3 explained that the topic of tariffs was discussed at the Company's "All Hands" meetings, which CW 3 attended.  In particular, CW 3 recalled that tariffs were addressed by Defendant Angle in early 2019 at one of these "All Hands Meetings," and included discussion regarding iRobot's lobbying efforts in Washington and how the tariffs were going to increase costs.

325.    CW 6, who also attended the Company's "All Hands" meetings, corroborated CW 3's account.  Specifically, CW 6 also discussed such meetings, describing them as periodic meetings where iRobot provided company status updates, including on competition and tariff issues, by the executives to the employees.  Likewise, CW 6 recalled the concerns about tariffs being addressed by either Defendant Angle or another executive during one of the Company's "All Hands Meetings."

326.    Analysts' recurrent focus on and coverage of the tariffs and their impact on iRobot's business further supports that this was an important risk to the Company's business that the Individual Defendants closely managed.  In fact, analysts repeatedly asked Defendants about the tariffs and their impact on iRobot's sales and business (and Defendants thus addressed this issue at length) on the Company's earnings calls during the Class Period.

327.    Analysts also repeatedly reported on such topics in their analyst reports.  For example, on October 24, 2018, J.P. Morgan reported that "shares of IRBT are down ~13% today as investors are wary as to whether the [C]ompany will be able to pass on incurring tariff-related costs."

328.    On the same day, analyst Sidoti & Company reported: "Given what appears to be strong demand for IRBT products and continued strength with the US dollar, we think that the tariffs could be largely offset."  Similarly, on July 24, 2019, analyst Sidoti & Company stated "[w]e anticipated that tariffs would have an impact on IRBT's results. However, the increase in pricing to offset tariffs apparently curtailed consumers' spending on the [C]ompany's products more than we expected."  PiperJaffray likewise reported on October 22, 2019 that the

"destruction in earnings is due to recent price increases related to tariff expenses, which are having a material impact on unit demand, especially at the high-end."

329.     Accordingly, the Individual Defendants' close personal monitoring of the tariff issue and its effects on iRobot further shows that they knew or recklessly disregarded the falsity of their statements minimizing the impact of tariffs on Roomba's sales and iRobot's business.

### B.     Defendants' Statements Support a Strong Inference of Scienter

330.     Defendants' statements themselves raise a strong inference of scienter because they indicate that Defendants knew or were reckless in not knowing about, *inter alia*: the adverse impact of increased competition on iRobot's sales, market share, and revenues; waning demand for iRobot's premium-tier Roomba models in the wake of increased competition; and consumers' reluctance to pay the high prices iRobot charged for their premium-tier offerings both before and after raising prices to mitigate the impact of tariffs.

331.     During the Class Period, Defendants were the primary executives at iRobot who spoke at length about iRobot's market share and Roomba sales, and the impact of increased competition on that market share as well as the Company's sales, revenues and gross margins.  In particular, when analysts asked Defendants about increasing competitive pressures in the RVC market, Defendants repeatedly insisted that iRobot continued to maintain its dominant market share and strong sales and margin figures, thus remaining largely unaffected by the sudden influx of cheaper competitors.   For example, Defendants made numerous false and misleading statements during the Class Period assuring that, *inter alia*, the Company "***maintain[ed][its] market share***," and was "***not seeing any share erosion due to competition,***" as well as that Roomba "***demand was ahead of plan***" and "***continue[d] to have strong performance across price points***." These Class Period statements, and numerous others like them, indicated that Defendants either knew about the true state of iRobot's declining Roomba sales and market share due to increased competition and failed to disclose these problems, or were reckless in failing to ascertain this information before making these statements to investors.

332.     Defendants also assured investors that they were hands-on managers who performed the necessary research and analyses required to make the representations about market share, demand and pricing that they frequently did during the Class Period. For example, Defendant Angle reassured investors that iRobot performed analyses to determine what price thresholds customers were willing to pay for a premium-tier Roombas, many of which cost upward of $1,000.  Specifically, he told investors that price ceilings were "*something that iRobot tests and explores continuously* to ensure that we don't get ahead of our customers. . . ." Likewise, in response to a question from an analyst about the 60-40 percentage "mix" of premium-tier versus entry-level products the Company was seeing, Defendant Angle assured investors that "*we modeled it*" and that the Company was continuing to see strong demand for the premium-tier Roombas, with the product percentage mix remaining "similar" or actually increasing towards the premium-tier products.

333.     Notably, Defendants also represented to investors that the Company researched and modeled price elasticity to determine how sensitive the Roomba consumers were to the high prices iRobot charged for its products, as well as increases in prices of iRobot products.  Indeed, Defendant Angle himself acknowledged that Defendants "*have done a lot of interim research on price elasticity*."

334.     Similarly, Defendant Angle explained that tariffs would affect iRobot's competitors more than itself because the Company had determined that the low end of the market, *i.e.*, the entry-level tier, as opposed to the high end, *i.e.*, the premium-tier, was more likely to be sensitive to price increases.  Specifically, Defendant Angle explained that "iRobot is the premium player and that's very advantageous because *price sensitivity at the high end is much lower than at the bottom end*" and "*[a] tariff would impact most directly price points below which we play.*"  Defendant Angle thus touted that "*we are better positioned than our major competitors [who] play at the low end to maintain an aggressive stance.*"

335.     Taken together, these detailed statements on the very topics about which the market were misled raise a strong inference that Defendants knew or were reckless in not

knowing about the false and misleading nature of their statements when they made them.  By repeatedly insisting—in response to analysts' repeated questions raising concerns about these issues, that iRobot was not experiencing any significant adverse impact from increased competition or the Trump tariffs during the Class Period, while also assuring that these positive statements were based on Defendants' extensive, in-depth research, models, and analyses to determine the effects of competition and tariffs on the Company, Defendants either: (1) knew that the Company was losing market share and demand for its products due to increased competition and the Trump tariffs and made statements to the contrary; or (2) were reckless in not knowing or investigating that this was the case.  Under either scenario, there is a strong inference that Defendants made these statements with scienter.

### C.     The Timing and Circumstances of Defendants Dean's and Cerda's Resignations Support a Strong Inference of Scienter

336.     The timing and circumstances of the resignations of Defendants Dean and Cerda, key executives involved in monitoring Roomba sales and competition issues, as well the impact of the Trump tariffs during the Class Period, are highly suspicious.  That these resignations are temporally connected to the alleged corrective disclosures of the Company's fraud further supports that inference.

337.     Specifically, on September 13, 2019—only about a month before the end of the Class Period, when the full truth of Defendants' fraud was revealed—iRobot issued a press release announcing the abrupt resignation of Defendant Cerda from iRobot, effective immediately, ostensibly to "to pursue other career opportunities."  The press release further explained that "[w]ith the recent addition of a Chief Product Officer, the COO role will be eliminated."

338.     As discussed above, given Defendant Cerda's direct involvement with monitoring of iRobot's Roomba sales and demand, as well as related competition and tariff issues and their impact of the Company's business, his sudden departure at the end of the Class Period, supposedly "to pursue other career opportunities," supports a strong inference of scienter.

Furthermore, Cerda, who as COO was directly responsible for sales, marketing, and product management, also spoke at iRobot's town hall meetings according to CW 6. Thus, his departure, which occurred shortly before Defendants' fraud was fully revealed and after several partial disclosures showing that iRobot's Roomba sales were struggling due to increased competition and the tariff-related product price increases, contrary to his prior assurances, was highly suspicious and adds to a strong inference of scienter.

339. On February 5, 2020, the Company announced Defendant Dean's resignation with an effective date of May 4, 2020. According to the press release, Defendant Dean—who had worked for iRobot for 15 years—was resigning "to spend more time with her family before pursuing other personal and professional interests." This sudden announcement of Dean's resignation came only approximately three and a half months after the full truth of Defendants' fraud was finally revealed to investors, after multiple consecutive quarters of disappointing financial performance and other disclosures showing that increased competition and tariffs were impacting iRobot much more than Dean had represented. Dean's departure also closely followed Cerda's unexpected resignation. Indeed, a Boston Business Journal article with the headline "iRobot's longtime CFO to step down just months after COO departure," highlighted the suspicious timing of the departure given its proximity to Defendant Cerda's similarly abrupt resignation noting that iRobot "announced that its top financial executive is stepping down just a few months after another top executive left the company."

340. Given Defendant Dean's heavy involvement in and management over the impact of increased competition and tariffs, consistent with her role as CFO, the timing and circumstances of her departure after 15 years with the Company supports a strong inference of scienter. Indeed, Dean explained during an analyst conference call that "[w]e track the adoption of robotic vacuum cleaners against other disruptive household appliances and we are tracking those adoption curves very well and a lot of those things." She also repeatedly spoke on these topics of competition and tariffs to analysts and investors, which further demonstrates her knowledge of these problems.

## VIII.   CONTROL PERSON ALLEGATIONS

341.   Defendants Angle, Dean, and Cerda, by virtue of their high-level positions at iRobot, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

342.   Defendants Angle, Dean, and Cerda, as senior executive officers of iRobot, and Angle as a director of iRobot – a publicly held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws – each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of iRobot's publicly-traded common stock would be based on accurate information. Defendants Angle, Dean, and Cerda each violated these requirements and obligations during the Class Period.

343.   Defendants Angle, Dean, and Cerda, because of their positions of control and authority as senior executive officers of iRobot, and Angle as an iRobot director, were able to and did control the content of iRobot's SEC filings, press releases, and other public statements issued by or on behalf of iRobot during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Angle, Dean, and Cerda are responsible for the accuracy of the public statements alleged herein.

344.   Defendants Angle, Dean, and Cerda are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of iRobot common

stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding iRobot's business, operations, and management and execution of customer contracts, and the intrinsic value of iRobot's common stock; and caused Lead Plaintiff and members of the Class to purchase iRobot common stock at artificially inflated prices.

IX.    **CLASS ACTION ALLEGATIONS**

345.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased the publicly traded common stock of iRobot during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of iRobot during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) iRobot's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

346.    The members of the Class are so numerous that joinder of all members is impracticable. According to its quarterly and annual reports filed with the SEC, during the Class Period, iRobot had approximately 27,406,044 to 28,270,544 shares of common stock outstanding and was actively traded on the NASDAQ under the ticker symbol "IRBT." While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by iRobot and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

347.    Lead Plaintiff's claims are typical of the claims of the members of the Class. All

members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

348.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

349.    Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

A.    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

B.    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

C.    Whether, and to what extent, the market price of iRobot common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

D.    Whether Defendants acted with the requisite level of scienter;

E.    Whether Defendants Angle, Cerda, and Dean, were controlling persons of iRobot; and,

F.    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

350.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

X.    **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

351.    To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

A.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

B.    the omissions and misrepresentations were material;

C.    the Company's securities traded in an efficient market;

D.    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

E.    Lead Plaintiff and other members of the Class purchased iRobot's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

F.    iRobot stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

G.    as a regulated issuer, iRobot filed periodic public reports with the SEC and the NASDAQ;

H.    iRobot regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

I.    iRobot was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Canaccord Genuity, J.P. Morgan, PiperJaffray, Raymond James, Sidoti & Company, Dougherty & Company, and

CFRA Research, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

352.    As a result of the foregoing, the market for iRobot's securities promptly digested current information regarding iRobot from publicly available sources and reflected such information in iRobot's securities price(s).  Under these circumstances, all persons and entities who purchased iRobot's common stock during the Class Period suffered similar injuries through their purchase of iRobot at artificially inflated prices and thus, the presumption of reliance applies.

353.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of iRobot's common stock.

354.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of iRobot's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

355.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to iRobot's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.   NO SAFE HARBOR

356.    As further set forth below, the statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.  First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions, and are thus not forward-looking.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied

by meaningful cautionary language because the purported cautionary language did not identify important facts that could cause actual results to differ materially from those in the statements and the risks that Defendants warned of had already come to pass.  Indeed, as set forth above in detail, given the then-existing facts contradicting Defendants' statements, the boilerplate and generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements. Fourth, any forward-looking statements were made with actual knowledge of their falsity.

357.    Specifically, many of the statements alleged to be false and misleading herein are not forward-looking statements because they relate to current or historical facts.  For example, on October 25, 2017, Defendant Angle stated: "Demand from U.S. retailers for our robots *increased during the last quarter*. We *continue to gain* space, exposure and momentum in the market, . . . even with the availability of new competitive products**."**  Similarly, Defendant Angle told investors on April 25, 2018 that "in Q4, *we had tremendous success against the competition.*"  Likewise, on September 13, 2018, with respect to whether tariffs on Chinese imports were impacting iRobot's business, Defendant Dean reassured investors that *"[i]t's not impacting our business to date.*"  To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection – at least with respect to the part of the statement that refers to the present.

358.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

359.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ

materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.

360. Finally, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of iRobot who knew that the statement was false when made.

## XII.   CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

361. Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

362. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

363. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, and carried out a plan, scheme and course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of iRobot common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase iRobot common stock at artificially inflated prices.

364. The Individual Defendants were individually and collectively responsible for

making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

365.    As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased iRobot common stock during the Class Period.

366.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for iRobot common stock, Lead Plaintiff and other members of the Class purchased iRobot common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased iRobot common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of iRobot common stock declined precipitously and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of iRobot common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

367.    By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Violation of Section 20(a) of the Exchange Act Against All Individual Defendants**

368.    Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

369.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against all Individual Defendants.   The Individual Defendants had control over iRobot and made the material false and misleading statements and omissions on behalf of iRobot within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their executive leadership positions, as alleged above, The Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

370.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

371.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants Angle and Dean's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel for the Class;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV.   JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  April 3, 2020                                    Respectfully submitted,

*/s/ James W. Johnson*
LABATON SUCHAROW LLP
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
ivasilchenko@labaton.com
jchristie@labaton.com

*Counsel for Lead Plaintiff Carpenters Annuity Trust Fund for Northern California and Carpenters Pension Trust Fund for Northern California, and for the Class*

THORNTON LAW FIRM LLP
Guillaume Buell (BBO# 676566)
Madeline Korber (BBO# 704128)
One Lincoln Street
Boston, Massachusetts 02111
Telephone: (617) 531-3933
Facsimile: (617) 720-2445
gbuell@tenlaw.com
mkorber@tenlaw.com

*Liaison Counsel for Lead Plaintiff Carpenters Annuity Trust Fund for Northern California and Carpenters Pension Trust Fund for Northern California and the Class*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed through the ECF system on April 3, 2020 and accordingly will be served electronically upon all registered participants identified on the Notice of Electronic Filing.

                        */s/ James W. Johnson*
                        James W. Johnson