# Tab 1

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file no. 001-36414**

# iROBOT CORPORATION
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **77-0259 335** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8 Crosby Drive, Bedford, MA** | **01730** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(781) 430-3000**
**(Registrant's telephone number, including area code)**
_____

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

**Common Stock, $0.01 par value per share     The NASDAQ Stock Market LLC**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**
**None**

Indicate by check-mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check-mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of the Common Stock held by nonaffiliates of the registrant was approximately $918.3 million based on the last reported sale of the Common Stock on the NASDAQ Global Select Market on July 1, 2016, the last business day of the registrant's most recently completed second fiscal quarter.

As of February 14, 2017, there were 27,246,211 shares of the registrant's Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file a definitive Proxy Statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended December 31, 2016. Portions of such Proxy Statement are incorporated by reference into Part III of this Form 10-K.

Table of Contents

**iROBOT CORPORATION**
**ANNUAL REPORT ON FORM 10-K**
**Year Ended December 31, 2016**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 18 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 19 |
| Item 4. | Mine Safety Disclosures | 19 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6. | Selected Financial Data | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 37 |
| Item 8. | Financial Statements and Supplementary Data | 39 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 66 |
| Item 9A. | Controls and Procedures | 66 |
| Item 9B. | Other Information | 68 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 68 |
| Item 11. | Executive Compensation | 68 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 68 |
| Item 13. | Certain Relationships and Related Transactions, and Directors Independence | 68 |
| Item 14. | Principal Accounting Fees and Services | 68 |
| **Part IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 68 |

Table of Contents

**PART I**

**ITEM 1.   *BUSINESS***

*This Annual Report on Form 10-K contains forward-looking statements. All statements other than statements of historical facts contained in this Annual Report on Form 10-K, including statements regarding our future results of operations and financial position, business strategy, plans and objectives of management for future operations, and plans for product development and manufacturing are forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. We discuss certain of these risks in greater detail in the "Risk Factors" section and elsewhere in this Annual Report on Form 10-K. Also, these forward-looking statements speak only as of the date of this Annual Report on Form 10-K, and we have no plans to update our forward-looking statements to reflect events or circumstances occurring after the date of this Annual Report. We caution readers not to place undue reliance upon any such forward-looking statements.*

*iRobot and its stylized logo, Roomba, Ava,  Scooba, ViPR, NorthStar, Create, iAdapt, Aware, Home Base, Looj, Braava, AeroForce, Mirra, vSLAM and Virtual Wall are trademarks of iRobot Corporation.*

**Overview**

iRobot Corporation ("iRobot" or the "Company" or "we") designs and builds robots that empower people to do more. The Company's consumer robots help people find smarter ways to clean and accomplish more in their daily lives. iRobot's portfolio of solutions features proprietary technologies for the connected home and advanced concepts in mapping, navigation, mobility and artificial intelligence. For more than 25 years, we have been a pioneer in the robotics and consumer products industries. During 2016, we continued our transformation to a global consumer robotics company with the divestiture of our defense and security business and the decision to exit the remote presence business. Our consumer robots and accessories represented 99% of our revenue in 2016. We sell our robots through a variety of distribution channels, including chain stores and other national retailers, through our on-line store, and through value-added distributors and resellers worldwide.

Since our founding, we have developed expertise in all the disciplines necessary to design and build durable, high-performance and cost-effective robots through the close integration of software, electronics and hardware. Our core technologies serve as reusable building blocks that we adapt and expand to develop next generation and new products, reducing the time, cost and risk of product development. Our significant expertise in robot design and engineering positions us to capitalize on the growth we expect in the market for robot-based consumer products.

Over the past fifteen years, we have sold more than 18 million consumer robots worldwide. During 2016, we took several steps to become more focused on our well established consumer robots business to capitalize on the substantial opportunities available to us within consumer markets. First, we completed the sale of our defense and security business unit on April 4, 2016.  The final purchase price, including adjustments for working capital and indebtedness, was $24.5 million. Second, we reallocated all of the research and development resources from our remote presence business to opportunities in our consumer business during the first quarter of 2016, and decided to fully exit the remote presence business during the second quarter of 2016. These actions were taken to solidify our position as the leader in diversified consumer robots and to focus on key technologies, with an emphasis on software, that allow our robots to understand the homes in which they operate. It is our intent to continue investing in these critical technologies and the economic opportunities they unlock. Third, on November 21, 2016, we announced the signing of a definitive agreement to acquire the iRobot-related distribution business of privately-held Sales On Demand Corporation, or SODC, based in Tokyo, Japan. SODC has been iRobot's exclusive distribution partner in Japan since 2004 and is well respected by top channel partners. The purchase agreement provides that iRobot will acquire the business for a cash amount equal to the book value of the acquired assets at close, primarily inventory, currently estimated to be between $18.0 million and $20.0 million, subject to exchange rates in effect on the date of acquisition. The acquisition is expected to close in April 2017.

We also achieved a number of significant milestones in 2016 that we believe will assist us in continuing to generate profitable growth and enhance value for our shareholders. In particular, we successfully launched Roomba 960, our second 900 series Roomba, that extends mapping, visual navigation and cloud connectivity to a wider range of customers. We also launched the Braava jet mopping robot, with precision jet spray and vibrating cleaning head, focused on expanding our wet floor care business. Both the Roomba 900 series and Braava jet are significantly more complex products, delivering enhanced performance enabled by software. The iRobot HOME App, compatible with both the Roomba 900 series and Braava jet, helps users get the most out of their experience by allowing them to choose the appropriate cleaning options for their unique home. We also announced a relationship with Amazon Web Services, or AWS, that we believe will enable iRobot to address significant opportunities within our consumer business and the connected home. AWS Cloud is a managed cloud solution that enables connected devices to interact easily and securely with cloud applications and other devices. The AWS Cloud will

Table of Contents

enable iRobot to scale the number of connected robots it supports globally and allow for increased capabilities in the Smart Home. Additionally, we implemented new Roomba marketing programs in the United States that resulted in a significant return on our investment and which we plan to leverage as part of our strategy to accelerate growth in international markets.

In our continuing effort to return capital to our shareholders, we repurchased 2,641,122 shares of our common stock for an aggregate purchase price of $97.0 million during fiscal year 2016. Our program balanced our interest to return cash to shareholders while maintaining sufficient cash to operate and invest in our business.

Our total revenue for 2016 was $660.6 million, which represents a 7.1% increase from 2015 revenue of $616.8 million. This increase in revenue was largely attributable to an $84.2 million increase in revenue in our U.S. consumer robots. Domestic growth was primarily due to increased sales as a result of significant investments in advertising media and national promotions as well as the strength of the Roomba 900 series and Braava jet launch. International consumer robots revenue grew by $12.1 million in 2016 with increases in most markets, offset by a decline in China. Revenue from the defense and security business was $3.1 million in 2016 compared to $55.0 million in 2015 and was recognized in the first quarter of 2016, which was the quarter prior to the divestiture of the business. Our consumer robots revenue represented 99.3% of our total revenue for 2016 compared to 90.7% in 2015.

Our financial performance in 2017 will be driven by our continued transformation to a global consumer robot company. Our strategy is to maintain Roomba's leadership in the robotic vacuum cleaner segment while positioning the Company as a strategic player in the emerging Smart Home. We expect growth to be driven by:

- Accelerating worldwide consumer adoption of Roomba supported by targeted marketing programs to continue to drive demand generation;
- More direct control and execution in key international markets with the opening of a sales office in Shanghai servicing China and the announced acquisition of SODC, our Japan distribution channel;
- Building a second material revenue stream with our Braava wet floor care products; and
- Expanding the portfolio of robots with mapping capabilities and cloud connectivity at more accessible price points and positioning ourselves as an emerging player within the Smart Home.

**Strategy**

iRobot is a leading global consumer robot company. We design and build robots that empower people to do more both inside and outside of the home. In 2002, iRobot created the home robot cleaning category with the introduction of its Roomba vacuuming robot. Today, we are a global enterprise that has sold more than 18 million consumer robots worldwide. iRobot's success in driving adoption of connected Roomba robots has created a unique opportunity to extend consumer value in the home and expand our business. Our long term strategy is to increase the penetration of our products in existing markets, expand current products into new markets, and develop and launch new products into current and adjacent markets. As our customer base grows, iRobot plans to create an ecosystem of connected robots designed to integrate with other devices, create greater possibilities for new features and capacities and empower the Smart Home.

Global expansion is a key component of our strategy. Our relentless pursuit of product leadership, through targeted investment in key technologies and capabilities, coupled with our investments in furthering our global brand and targeted marketing initiatives, allows us to continue to maintain our leadership position in the robotic vacuum cleaner segment despite increasing competition. In the last six months, we launched iRobot China, and we expect to launch iRobot Japan in the second quarter of 2017 following the acquisition of our Japanese distributor's iRobot-related business. These two new offices of iRobot will add more than 100 new iRobot employees to our global employee base.

To successfully execute our 2017 plan and drive revenue diversification and accelerated growth beyond 2017, we will plan to make significant investments in our business during the year. These investments are expected to help iRobot achieve the following goals:

- Continue to strengthen our marketing capabilities globally and accelerate worldwide consumer adoption of Roomba to maintain our market-leading position in robotic vacuum cleaners;
- Better position ourselves in China to capture an even larger share of the rapidly growing market for robotic floor care;
- Develop our wet floor care business to generate a material, secondary revenue stream;
- Scale our infrastructure to support global operations and connected products;
- Explore, develop and grow adjacent non-floor care consumer robot products that can generate meaningful diversified revenue streams; and
- Make continued operational improvements that can reduce product and operating costs.

4

Table of Contents

Key pillars of our strategy include:

*Technology:* As a leading global consumer robotics company, iRobot must develop and maintain best-in-class technology in the areas of mapping and navigation, mobility and artificial intelligence. We are focused on advancing each of these areas through internal technology and product development initiatives, and by building strategic external partnerships.

*Brand:* In 2016, iRobot rolled out a new logo, mark and brand language to signify the partnership between man and machine and globalize the brand. To meet our goal of a consistent brand experience in every region, we plan to expand our presence globally by taking more direct control of marketing programs and the customer experience in key targeted markets.

*Portfolio:* Our strategy includes building a portfolio of investments to diversify across markets and delivering a steady progression of innovation over time. In 2016, we introduced the Roomba 960, extending mapping, visual navigation and cloud connectivity to a wider range of consumers. We also further diversified iRobot's consumer product lineup and introduced the Braava jet mopping robot. In the years ahead, we plan to add new product solutions for the home.

*Talent:* Our employees are the most important driver of who we are. Our success, diversity and reputation as developers of great talent make us an attractive employer to the top talent all over the world. We aim to be the first choice for the most talented people in all facets of our business, from product development to interacting with our global customers and operations.

**Technology**

In 2016, iRobot narrowed its focus to the consumer market and made increased, but disciplined investments in advancing mapping and navigation, user interaction including cloud and app development and cleaning efficacy. From the launch of Braava jet, to the introduction of a lower cost Visual Simultaneous Localization and Mapping, or vSLAM, solution in Roomba 960, these strategic investments in technology had an immediate impact on product diversification, performance and market expansion. In 2017, we will continue to develop solutions that advance our connected and digital product pipeline while leveraging and supporting our global scale.

In 2016, we improved and advanced our vSLAM solution, and have successfully introduced vSLAM at a lower price point in the Roomba 960. We plan to continue advancing our pipeline of follow-on capabilities that both increase functionality and expand the reach of our mapping and navigation solutions to lower-cost products and additional product lines. In 2017, we expect our mapping and navigation solutions will extend to more products globally and that we will see our robots' maps presented directly to our customers through the launch of post-mission cleaning maps. We believe the improved performance of our connected robots, and the data sourced from our maps, will accelerate new product development and digital partnerships for the Smart Home.

We plan to continue to leverage opportunities, enabled by our growing connected product portfolio, to invest in developing technologies and interfaces for our products to provide a convenient and personalized user experience. At the foundation of our effort in 2016 to drive enhanced user experience was the deployment of our new connectivity and cloud infrastructure through AWS. We made this investment to enable us to scale our connected products globally, with increased access to valuable cloud services and applications to support future product features, and connect to other devices in the Smart Home.

From robotic vacuum cleaning to mopping, we are dedicated to developing market-leading solutions which provide compelling value to customers worldwide. From our customer's perspective, the core value of our robots is the ability to efficiently and effectively perform a physical mission - the task that the robot was purchased for initially. In 2016, iRobot expanded its product portfolio with the launch of the Braava jet mopping robot. This new product category created additional international growth opportunities, especially in Asia. To maintain our leadership position in consumer robotics, it is important that we continue to design and produce high-quality robotic solutions, whether it is vacuuming, mopping or other new robotic solutions for the home.

**Products**

Historically, we have designed and marketed robots for both the consumer and defense and security markets. Following completion of the divestiture of our defense and security business unit on April 4, 2016, we are now focusing solely on the consumer market. With over two decades of leadership in the robot industry, we remain committed to creating robots that empower people to do more.

*Consumer Products*

We sell various products that are designed for use in and around the home. Our current consumer products are focused on both indoor and outdoor cleaning applications. We believe our consumer products provide value to our customers by delivering a better way to clean and by freeing people from repetitive home cleaning tasks. In order to ensure the continued acceptance of our robots we will continue to invest in technology necessary to further improve their capabilities.

5

Table of Contents

We currently offer multiple Roomba floor vacuuming robots with varying price points ranging from $375 to $899 based upon features and performance characteristics. Roomba's design allows it to clean under kick boards, beds and other furniture, resulting in cleaner floors since the Roomba can access more of the floor than standard upright vacuum cleaners. In addition, Roomba eliminates the need to manually vacuum -- it cleans automatically upon the push of a button or through scheduling.

In August 2016, we launched our newest robot in the 900 series, Roomba 960, which followed the launch of Roomba 980 in the fourth quarter of 2015. Roomba 960 helps keep floors cleaner throughout the entire home with intelligent visual navigation, iRobot HOME App control with wireless connectivity, and 5x the suction power over previous generation Roomba vacuum cleaners. In addition to these highest-feature products, our lineup also includes the 800 series, 700 series and 600 series robots. The Roomba 800 series robots offer our AEROForce technology which incorporates brushless, counter-rotating extractors that amplify suction for superior performance over bristle brushes, while requiring less maintenance than previous Roomba models. The Roomba 700 series robots offer improved debris pick up, a larger debris bin that vigorously pulls debris and hair off brushes into the bin, and dual air filters that capture dust particles as fine as 0.3 microns. The Roomba 600 series robots offer a three-stage cleaning system which thoroughly vacuums every section of the floor multiple times, as well as AeroVac technology and improved brush design enabling the robot to better handle fibers like hair, pet fur, lint and carpet fuzz.

We currently offer the Braava family of automatic floor mopping robots designed exclusively for hard surface floors. These robots provide a different cleaning approach than our Roomba products. The Braava robot, priced at $299, automatically dusts and damp mops hard surface floors using popular cleaning cloths or our specially designed reusable microfiber cloths, and includes a special reservoir that dispenses liquid throughout the cleaning cycle to keep the cloth damp. In March 2016, we launched the next generation mopping robot with the Braava jet, priced at $199. The Braava jet works with Braava jet Cleaning Pads to tackle a range of hard floor cleaning jobs, from wet mopping and damp sweeping to simple dusting. The iRobot HOME App is now also compatible with Braava jet and helps users get the most out of their experience by allowing them to choose the appropriate cleaning options for their unique home.

Our Mirra Pool Cleaning Robot is used to clean residential pools and removes debris as small as two microns from pool floors, walls and stairs. Mirra is brought to market under the iRobot brand through a relationship with Aquatron, Inc., which developed the pool cleaning robots. Our Looj Gutter Cleaning Robot was designed to simplify the difficult and dangerous job of gutter cleaning. The Looj cleans an entire stretch of gutter, reducing the number of times a ladder must be repositioned and climbed during gutter cleaning.

### Defense and Security Products

As noted above, we completed the divestiture of our defense and security business unit on April 4, 2016. Prior to this divestiture, we developed and delivered unmanned tactical ground robots in defense and security product markets. As of April 4, 2016, we no longer develop or sell defense and security products.

### Remote Presence Products

During the second quarter of 2016, we decided to fully exit the remote presence business. We had two products based upon our Ava mobile robotics platform. Our final shipment of these products occurred in the fourth quarter of 2016.

### Strategic Alliances

In addition to our internal technology development, we leverage relevant robotic technologies through licensing, acquisitions and/or other partnerships. These strategic alliances are an important part of our product development and distribution strategies. We rely on strategic alliances to provide technology, complementary product offerings and increased and quicker access to markets. We seek to form relationships with organizations that can provide best-in-class technology or market advantages for establishing iRobot technology in new market segments.

### Sales and Distribution Channels

We sell our consumer products through distributor and retail sales channels, as well as our on-line store. Prior to the divestiture of the defense and security business, we sold these products through distributors and directly to end users. For the fiscal years ended December 31, 2016, January 2, 2016, and December 27, 2014, sales to non-U.S. customers accounted for 51.2%, 56.0%, and 60.9% of total revenue, respectively. For the years ended December 31, 2016, January 2, 2016, and December 27, 2014, we generated an aggregate of 25.2%, 26.0%, and 29.8% of our revenue, respectively, from our consumer robots distributor in Japan (Sales on Demand Corporation) and a network of affiliated European distributors of our consumer robots (Robopolis SAS). For the year ended December 31, 2016, we generated 10.4% of total revenue from one of our domestic retailers (Amazon).

6

Table of Contents

*Consumer*

In the United States and Canada, we sell our consumer products primarily through a network of national retailers. In 2016, this network consisted of approximately 60 retailers which often sell either one or some combination of our products. Certain smaller domestic retail operations are supported by distributors to whom we sell our products directly. In support of sales in the United States and Canada, we maintain an in-house sales and product management team. Outside of the United States and Canada, our products have been sold in more than 50 countries, primarily through a network of in-country distributors who resell to retail stores in their respective countries. These distributors are supported by our international sales and product marketing team.

Our retail and distributor networks are our primary distribution channels for our consumer products. We also offer products direct-to-consumer through our domestic and international on-line stores, representing 5.1%, 6.1% and 6.1% of total consumer robots business unit revenue for fiscal 2016, 2015 and 2014, respectively. We have established valuable databases and customer lists that allow us to target directly those consumers most likely to purchase a new robot or upgrade. We believe we maintain a close connection with our customers in each of our markets, which provides an enhanced position from which to improve our distribution and product offerings.

*Defense and Security*

As noted above, we completed the divestiture of our defense and security business unit during the second quarter of 2016. We sold our defense and security products directly to end users and indirectly through prime contractors and distributors. While the majority of defense and security products were sold to various operations within the U.S. federal government, we also sold to state and local agencies as well as to international government organizations, research labs, nuclear and industrial companies and universities.

*Remote Presence*

As noted above, in the second quarter of 2016, we made the decision to fully exit our remote presence business. Our final shipment of these products occurred in the fourth quarter of 2016. The RP-VITA telemedicine robot, which was jointly developed with InTouch Health and incorporates our Ava mobile robotics platform, was sold to healthcare customers by InTouch Health. Our Ava 500 Video Collaboration robot, which incorporates our Ava mobile robotics platform and Cisco's TelePresence, was available from certified Cisco partners on a limited basis.

*Customer Service and Support*

We also provide ongoing customer service and support. Consumer customer service representatives, the majority of whom are employees of outsourced service organizations or our distribution partners, are extensively trained on the technical intricacies of our consumer products. Customer service for the RP-VITA product is provided by InTouch Health. Customer service for the Ava 500 is provided by a third party through an agreement with iRobot.

**Marketing and Brand**

We market our consumer robots to end-user customers through our sales and marketing teams as well as through our extensive network of retailers and in-country distributors. Our website is also playing an increasing role in supporting brand awareness, addressing customer questions and serving as a showcase for our products.

Our marketing strategy is to increase our brand awareness and associate the iRobot brand with innovation, reliability, safety and value. Our sales and marketing expenses represented 17.4%, 15.9% and 15.5% of our total revenue in 2016, 2015 and 2014, respectively. We expect to continue to invest in national advertising, consumer and industry trade shows, direct marketing and public relations to further build brand awareness.

We believe that we have built a trusted, recognized brand by providing high-quality robots. We believe that customer word-of-mouth has been a significant driver of our brand's success to date, which can work very well for products that inspire a high level of user loyalty because users are likely to share their positive experiences. Our grass-roots marketing efforts focus on feeding this word-of-mouth momentum and we use public relations as well as various forms of advertising to promote our products.

Our innovative robots and public relations campaigns have generated extensive press coverage, and iRobot and our consumer robots have won several awards. Through these efforts, we have been able to build our brand, and we expect that our reputation for innovative products and customer support will continue to play a significant role in our growth and success.

Table of Contents

**Manufacturing**

Our core competencies are the design, development and marketing of robots. Our manufacturing strategy is to outsource non-core competencies, such as the production of our robots, to third-party entities skilled in manufacturing. By relying on the outsourced manufacture of our robots, we can focus our engineering expertise on the design of robots.

Manufacturing a new product requires a close relationship between our product designers and the manufacturing organizations. Using multiple engineering techniques, our products are introduced to the selected production facility at an early-development stage and the feedback provided by manufacturing is incorporated into the design before tooling is finalized and mass production begins. As a result, we believe that we can significantly reduce the time required to move a product from its design phase to mass production deliveries, with improved quality and yields.

We outsource the manufacturing of our consumer products to four contract manufacturers, each of which manufactures our robots at a single plant in China.

**Research and Development**

We believe that our future success depends upon our ability to continue to develop new products and product accessories, and enhancements to and applications for our existing products. For the years ended December 31, 2016, January 2, 2016 and December 27, 2014, our research and development expenses were $79.8 million, $76.1 million and $69.4 million, or 12.1%, 12.3% and 12.5% of revenue, respectively. We intend to continue our investment in research and development to respond to and anticipate customer needs, and to enable us to introduce new products over the next few years that will continue to address our existing and adjacent market sectors.

Our research and development is conducted by teams dedicated to particular projects. Our research and development efforts are primarily located at our headquarters in Bedford, Massachusetts and our office in Pasadena, California.

**Competition**

The market for robots is highly competitive, rapidly evolving and subject to changing technologies, shifting customer needs and expectations and the likely increased introduction of new products. We believe that a number of established companies have developed or are developing robots that will compete directly with our product offerings, and many of our competitors have significantly more financial and other resources than we possess. Our competitors include developers of robot floor cleaning products.

While we believe many of our customers purchase our Roomba floor vacuuming robots and Braava mopping robots as a supplement to, rather than a replacement for, their traditional vacuum cleaners and wet floor cleaning methods, we do compete in some cases with providers of traditional cleaning products.

We believe that the principal competitive factors in the market for robots include product features, performance for the intended mission, cost of purchase, total cost of system operation, including maintenance and support, ease of use, integration with existing equipment, quality, reliability, customer support, brand and reputation.

Our ability to remain competitive will depend to a great extent upon our ongoing performance in the areas of product development and customer support. We cannot provide assurance that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering the markets in which we provide products.

**Intellectual Property**

We believe that our continued success depends in large part on our proprietary technology, the intellectual skills of our employees and the ability of our employees to continue to innovate. We rely on a combination of patent, copyright, trademark and trade secret laws, as well as confidentiality agreements, to establish and protect our proprietary rights. As part of the sale of our defense and security business, we transferred to the buyer ownership of certain of our intellectual property related to the defense and security business, including patents, patent applications and trademarks.

As of December 31, 2016, we held 368 U.S. patents, more than 550 foreign patents, additional design registrations, and more than 400 patent applications pending worldwide. Our U.S. patents will begin to expire in 2019. We will continue to file and prosecute patent (or design registration, as applicable) applications when and where appropriate to attempt to protect our rights in our proprietary technologies. We also encourage our employees to continue to invent and develop new technologies so as to maintain our competitiveness in the marketplace. It is possible that our current patents, or patents which we may later acquire, may be successfully challenged or invalidated in whole or in part. It is also possible that we may not obtain issued patents for our pending patent applications or other inventions we seek to protect. In that regard, we sometimes permit certain intellectual property to lapse or go abandoned under appropriate circumstances, and due to uncertainties inherent in prosecuting patent applications, sometimes patent applications are rejected and we subsequently abandon them. It is also possible that we

8

Table of Contents

may not develop proprietary products or technologies in the future that are patentable, or that any patent issued to us may not provide us with any competitive advantages, or that the patents of others will harm or altogether preclude our ability to do business.

Our registered U.S. trademarks include iRobot and its stylized logo, Roomba, Ava, Scooba, ViPR, NorthStar, Create, iAdapt, Aware, Home Base, Looj, Braava, AeroForce, Mirra, vSLAM and Virtual Wall. Our marks iRobot, Roomba, Braava, Virtual Wall, Scooba, and certain other trademarks, have also been registered in selected foreign countries.

Our means of protecting our proprietary rights may not be adequate, and our competitors may independently develop technology that is similar to ours. Legal protections afford only limited protection for our technology. The laws of many countries do not protect our proprietary rights to as great an extent as do the laws of the United States. Despite our efforts to protect our proprietary rights, unauthorized parties have in the past attempted, and may in the future attempt, to copy aspects of our products or to obtain and use information that we regard as proprietary. Third parties may also design around our proprietary rights, which may render our protected products less valuable, if the design around is favorably received in the marketplace. In addition, if any of our products or the technology underlying our products is covered by third-party patents or other intellectual property rights, we could be subject to various legal actions. We cannot assure you that our products do not infringe patents held by others or that they will not in the future. We have received in the past communications from third parties relating to technologies used in our various robot products that have alleged infringement of patents or violation of other intellectual property rights. In response to these communications, we have contacted these third parties to convey our good faith belief that we do not infringe the patents in question or otherwise violate those parties' rights. Although there have been no additional actions or communications with respect to these allegations, we cannot assure you that we will not receive further correspondence from these parties, or not be subject to additional allegations of infringement from others. Litigation may be necessary to enforce our intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity, misappropriation, or other claims. Any such litigation could result in substantial costs and diversion of our resources. Moreover, any settlement of or adverse judgment resulting from such litigation could require us to obtain a license to continue to use the technology that is the subject of the claim, or otherwise restrict or prohibit our use of the technology. Any required licenses may not be available to us on acceptable terms, if at all. If we attempt to design around the technology at issue or to find another provider of suitable alternative technology to permit us to continue offering applicable software or product solutions, our continued supply of software or product solutions could be disrupted or our introduction of new or enhanced software or products could be significantly delayed.

**Regulations**

Our business requires compliance with a variety of laws and regulations in the United States and abroad regarding privacy, data protection, and data security. In particular, we are subject to numerous U.S. federal, state, and local laws and regulations and foreign laws and regulations regarding privacy and the collection, sharing, use, processing, disclosure, and protection of personal information and other user data. In addition, the global nature of our business operations also creates various domestic and foreign regulatory challenges and subject us to laws and regulations such as the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act, and similar anti-bribery and anti-corruption laws in other jurisdictions, and our products are also subject to U.S. export controls, including the U.S. Department of Commerce's Export Administration Regulations and various economic and trade sanctions regulations established by the Treasury Department's Office of Foreign Assets Controls.

Prior to our divestiture of the defense and security business unit on April 4, 2016, we were subject to various government regulations, including various U.S. federal government regulations as a contractor and subcontractor to the U.S. federal government. We continue to remain subject to certain of these regulations only as they pertain to matters related to our operation of the defense and security business unit prior to our completion of the sale of this business.

**Employees**

As of December 31, 2016, we had 607 full-time employees located in the United States and abroad. We believe that we have a good relationship with our employees.

9

Table of Contents

**Available Information**

We were incorporated in California in August 1990 under the name IS Robotics, Inc. and reincorporated as IS Robotics Corporation in Massachusetts in June 1994. We reincorporated in Delaware as iRobot Corporation in December 2000. We conduct operations and maintain a number of subsidiaries in the United States and abroad, including operations in Hong Kong, the United Kingdom and China. We also maintain iRobot Securities Corporation, a Massachusetts securities corporation, to invest our cash balances on a short-term basis. Our website address is www.irobot.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge through the investor relations page of our internet website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission. Alternatively, these reports may be accessed at the SEC's website at www.sec.gov.

**ITEM 1A.    *RISK FACTORS***

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. This discussion highlights some of the risks which may affect future operating results. These are the risks and uncertainties we believe are most important for you to consider. Additional risks and uncertainties not presently known to us, which we currently deem immaterial or which are similar to those faced by other companies in our industry or business in general, may also impair our business operations. If any of the following risks or uncertainties actually occurs, our business, financial condition and operating results would likely suffer.

***We operate in an emerging market, which makes it difficult to evaluate our business and future prospects.***

Robots represent a new and emerging market. Accordingly, our business and future prospects are difficult to evaluate. We cannot accurately predict the extent to which demand for consumer robots will increase, if at all. You should consider the challenges, risks and uncertainties frequently encountered by companies using new and unproven business models in rapidly evolving markets. These challenges include our ability to:

- generate sufficient revenue and gross margin to maintain profitability;
- acquire and maintain market share in our consumer market;
- attract and retain customers of our consumer robots;
- attract and retain additional engineers and other highly-qualified personnel; and
- expand our product offerings beyond our existing robots.

If we fail to successfully address these and other challenges, risks and uncertainties, our business, results of operations and financial condition would be materially harmed.

***Our financial results often vary significantly from quarter-to-quarter due to a number of factors, which may lead to volatility in our stock price.***

Our quarterly revenue and other operating results have varied in the past and are likely to continue to vary significantly from quarter-to-quarter in the future. These fluctuations may be due to numerous factors including:

- the size, timing and mix of orders from retail stores and distributors for our consumer robots;
- the mix of products that we sell in the period;
- disruption of supply of our products from our manufacturers;
- disruptions to our supply chain due to inclement weather, labor disruptions or other factors beyond our control;
- seasonality in the sales of our products;
- the timing of new product introductions;
- unanticipated costs incurred in the introduction of new products;
- costs and availability of labor and raw materials;
- costs of freight;
- changes in our rate of returns for our consumer products;
- our ability to introduce new products and enhancements to our existing products on a timely basis; and
- warranty costs associated with our consumer products.

We cannot be certain that our revenues will grow at rates that will allow us to maintain profitability during every fiscal quarter, or even every fiscal year. We base our current and future expense levels on our internal operating plans and sales forecasts, including forecasts of holiday sales for our consumer products. A significant portion of our operating expenses, such as research and development expenses, certain marketing and promotional expenses and employee wages and salaries, do not vary directly with sales and are difficult to adjust in the short term. As a result, if sales for a quarter are below our expectations,

10

Table of Contents

we might not be able to reduce operating expenses for that quarter. Accordingly, a sales shortfall during a fiscal quarter, and in particular the fourth quarter of a fiscal year, could have a disproportionate effect on our operating results for that quarter or that year. Because of quarterly fluctuations, we believe that quarter-to-quarter comparisons of our operating results are not necessarily meaningful. Moreover, our operating results may not meet expectations of equity research analysts or investors. If this occurs, the trading price of our common stock could fall substantially either suddenly or over time.

*Global economic conditions and any associated impact on consumer spending could have a material adverse effect on our business, results of operations and financial condition.*

Continued economic uncertainty and reductions in consumer spending, particularly in certain international markets such as the European Union, China and Japan, may result in reductions in sales of our consumer robots. Additionally, disruptions in credit markets may materially limit consumer credit availability and restrict credit availability of our retail customers, which would also impact purchases of our consumer robots. Any reduction in sales of our consumer robots, resulting from reductions in consumer spending or continued disruption in the availability of credit to retailers or consumers, could materially and adversely affect our business, results of operations and financial condition.

In addition, on November 21, 2016, we entered into an agreement with Sales On Demand Corporation, or SODC, a privately-held corporation based in Tokyo, Japan, to acquire SODC's iRobot distribution business. This acquisition is expected to close in April 2017. As a result of our planned integration of distribution operations in Japan and the corresponding higher exit costs in the market, a significant decrease in demand for our products in Japan could have a detrimental impact on our financial condition.

Because we are a global business that in the years ended December 31, 2016, January 2, 2016 and December 27, 2014 generated approximately 51.2%, 56.0% and 60.9%, respectively, of our total revenue from sales to customers outside of the United States, we are subject to a number of additional risks including foreign currency fluctuations. These fluctuations may make our products more expensive to our distributors, which in turn may impact sales directly or the ability or willingness of our distribution partners to invest in growing product demand.

*Our business currently depends solely on our consumer robots, and our sales growth and operating results would be negatively impacted if we are unable to enhance our current consumer robots or develop new consumer robots at competitive prices or in a timely manner, or if the consumer robot market does not achieve broad market acceptance.*

For the years ended December 31, 2016, January 2, 2016, and December 27, 2014, we derived 99.3%, 90.7%, and 91.1% of our total revenue from our consumer robots, respectively. For the foreseeable future, we expect that our revenue will be derived solely from sales of consumer robots in general and home floor care products in particular. Accordingly, our future success depends upon our ability to further penetrate the consumer home care market, to enhance our current consumer products and develop and introduce new consumer products offering enhanced performance and functionality at competitive prices. The development and application of new technologies involve time, substantial costs and risks. Our inability to achieve significant sales of our newly introduced robots, or to enhance, develop and introduce other products in a timely manner, or at all, would materially harm our sales growth and operating results.

Even if consumer robots gain wide market acceptance, our robots may not adequately address market requirements and may not continue to gain market acceptance. If robots generally, or our robots specifically, do not gain wide market acceptance, we may not be able to achieve our anticipated level of growth, and our revenue and results of operations would suffer.

*We depend on single source manufacturers, and our reputation and results of operations would be harmed if these manufacturers fail to meet our requirements.*

We currently depend largely on several single source contract manufacturers for the manufacture of certain of our products. All contract manufacturers for our current robots are located in China. These manufacturers supply substantially all of the raw materials and provide all facilities and labor required to manufacture our products. If these companies were to terminate their arrangements with us or fail to provide the required capacity and quality on a timely basis, we would be unable to manufacture our products until replacement contract manufacturing services could be obtained or volume transferred to an alternative manufacturing partner, each of which is a costly and time-consuming process. We cannot assure you that we would be able to establish alternative manufacturing arrangements on acceptable terms or in a timely manner.

Our reliance on these contract manufacturers involves certain risks, including the following:

- lack of direct control over production capacity and delivery schedules;
- lack of direct control over quality assurance, manufacturing yields and production costs;
- lack of enforceable contractual provisions over the production and costs of consumer products;
- risk of loss of inventory while in transit;

11

Table of Contents

- risks associated with international commerce, including unexpected changes in legal and regulatory requirements, changes in tariffs and trade policies, risks associated with the protection of intellectual property and political and economic instability; and

- risks that our attempts to add additional manufacturing resources may be significantly delayed and thereby create disruptions in production of our products.

Any interruption in the manufacture of our products would be likely to result in delays in shipment, lost sales and revenue and damage to our reputation in the market, all of which would harm our business and results of operations. In addition, while our contract obligations with our contract manufacturers in China are typically denominated in U.S. dollars, changes in currency exchange rates could impact our suppliers and increase our prices.

### *If we fail to maintain or increase consumer robot sales through our distribution channels, our operating results would be negatively impacted.*

We do not have long-term contracts regarding purchase volumes with any of our retail partners. As a result, purchases generally occur on an order-by-order basis, and the relationships, as well as particular orders, can generally be terminated or otherwise materially changed at any time prior to delivery, by our retail partners. A decision by a major retail partner, whether motivated by competitive considerations, financial difficulties, economic conditions or otherwise, to decrease its purchases from us, to reduce the shelf space for our products or to change its manner of doing business with us could significantly damage our consumer product sales and negatively impact our business, financial condition and results of operations. In addition, during recent years, various retailers, including some of our partners, have experienced significant changes and difficulties, including consolidation of ownership, increased centralization of purchasing decisions, restructuring, bankruptcies and liquidations. These and other financial problems of some of our retailers increase the risk of extending credit to these retailers. A significant adverse change in a retail partner relationship with us or in a retail partner's financial position could cause us to limit or discontinue business with that partner, require us to assume more credit risk relating to that partner's receivables or limit our ability to collect amounts related to previous purchases by that partner, all of which could harm our business and financial condition. Disruption of the iRobot on-line store could also decrease our consumer robot sales.

### *We spend significant amounts on advertising and other marketing campaigns, which may not be successful or cost effective.*

We spend significant amounts on advertising and other marketing campaigns, such as television, print advertising, and social media, as well as increased promotional activities, to acquire new customers, and we expect our marketing expenses to increase in the future as we continue to spend significant amounts to increase awareness of our consumer robot products. For the years ended December 31, 2016, January 2, 2016, and December 27, 2014, sales and marketing expenses were $115.1 million, $97.8 million, and $86.1 million, respectively, representing approximately 17.4%, 15.9%, and 15.5% of our revenue, respectively. While we seek to structure our advertising campaigns in the manner that we believe is most likely to encourage people to purchase our products, we may fail to identify advertising opportunities that satisfy our anticipated return on advertising spend as we scale our investments in marketing or to fully understand or estimate the conditions and behaviors that drive customer behavior. If any of our advertising campaigns prove less successful than anticipated in attracting customers, we may not be able to recover our advertising spend, and our revenue may fail to meet market expectations, either of which could have an adverse effect on our business. There can be no assurance that our advertising and other marketing efforts will result in increased sales of our products.

### *We face intense competition from other providers of robots, including diversified technology providers, as well as competition from providers offering alternative products, which could negatively impact our results of operations and cause our market share to decline.*

A number of companies have developed or are developing robots that will compete directly with our product offerings. Many current and potential competitors have substantially greater financial, marketing, research and manufacturing resources than we possess, and there can be no assurance that our current and future competitors will not be more successful than us. Moreover, while we believe many of our customers purchase our floor vacuuming robots as a supplement to, rather than a replacement for, their traditional vacuum cleaners, we also compete in some cases with providers of traditional vacuum cleaners.

The global market for robots is highly competitive, rapidly evolving and subject to changing technologies, shifting customer needs and expectations and the likely increased introduction of new products. Our ability to remain competitive will depend to a great extent upon our ongoing performance in the areas of product development and customer support.

In the event that the robot market expands further, we expect that competition will intensify as additional competitors enter the market and current competitors expand their product lines. Companies competing with us may introduce products that are competitively priced, have increased performance or functionality, or incorporate technological advances that we have not yet developed or implemented. Increased competitive pressure could result in a loss of sales or market share or cause us to lower prices for our products, any of which would harm our business and operating results.

Table of Contents

We cannot assure you that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering the markets in which we provide products. Our failure to compete successfully could cause our revenue and market share to decline, which would negatively impact our results of operations and financial condition.

***If critical components of our products that we currently purchase from a small number of suppliers become unavailable, we may incur delays in shipment, which could damage our business.***

We and our outsourced manufacturers obtain hardware components, various subsystems, raw materials and batteries from a limited group of suppliers, some of which are sole suppliers. We do not have any long-term agreements with these suppliers obligating them to continue to sell components or products to us. If we or our outsourced manufacturers are unable to obtain components from third-party suppliers in the quantities and of the quality that we require, on a timely basis and at acceptable prices, we may not be able to deliver our products on a timely or cost-effective basis to our customers, which could cause customers to terminate their contracts with us, reduce our gross margin and seriously harm our business, results of operations and financial condition. Moreover, if any of our suppliers become financially unstable, we may have to find new suppliers. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We may experience significant delays in manufacturing and shipping our products to customers and incur additional development, manufacturing and other costs to establish alternative sources of supply if we lose any of these sources. We cannot predict if we will be able to obtain replacement components within the time frames that we require at an affordable cost, or at all.

***Our products are complex and could have unknown defects or errors, which may give rise to claims against us, diminish our brand or divert our resources from other purposes.***

Our robots rely on the interplay among behavior-based artificially intelligent systems, real-world dynamic sensors, user-friendly interfaces and tightly-integrated, electromechanical designs to accomplish their missions. Despite testing, our new or existing products have contained defects and errors and may in the future contain defects, errors or performance problems when first introduced, when new versions or enhancements are released, or even after these products have been used by our customers for a period of time. These problems could result in expensive and time-consuming design modifications or warranty charges, delays in the introduction of new products or enhancements, significant increases in our service and maintenance costs, exposure to liability for damages, mandatory or voluntary recall or product upgrades, damaged customer relationships and harm to our reputation, any of which could materially harm our results of operations and ability to achieve market acceptance. Our quality control procedures relating to the raw materials and components that it receives from third-party suppliers as well as our quality control procedures relating to its products after those products are designed, manufactured and packaged may not be sufficient. In addition, increased development and warranty costs, including the costs of any mandatory or voluntary recall, could be substantial and could reduce our operating margins. The existence of any defects, errors, or failures in our products could also lead to product liability claims or lawsuits against us. A successful product liability claim could result in substantial cost, diminish our brand and divert management's attention and resources, which could have a negative impact on our business, financial condition and results of operations.

***We collect, store, process, and use customer data, including certain personal and robot-specific information, which subjects us to governmental regulation and other legal obligations related to privacy, information security, and data protection, and any security breaches or our actual or perceived failure to comply with such legal obligations could harm our business.***

Our latest Roomba products, as well as additional products in development, collect, store, process, and use certain customer data, which subjects us to governmental regulation and other legal obligations related to privacy, information security, and data protection, and any security breaches or our actual or perceived failure to comply with such legal obligations could harm our business. We collect, store, process, and use personal information and other user data, and we rely on third parties that are not directly under our control to do so as well. If our security measures, some of which are managed by third parties, are breached or fail, unauthorized persons may be able to obtain access to or acquire sensitive user data, which may expose us to a risk of loss, litigation, or regulatory proceedings. Depending on the nature of the information compromised, in the event of a data breach or other unauthorized access to or acquisition of our user data, we may also have obligations to notify users about the incident, and we may need to provide some form of remedy, such as a subscription to a credit monitoring service, for the individuals affected by the incident. A growing number of legislative and regulatory bodies have adopted consumer notification requirements in the event of unauthorized access to or acquisition of certain types of personal data. Such breach notification laws continue to evolve and may be inconsistent from one jurisdiction to another. Complying with these obligations could cause us to incur substantial costs and could increase negative publicity surrounding any incident that compromises user data.

***If we are unable to attract and retain additional skilled personnel, we may be unable to grow our business.***

To execute our growth plan, we must attract and retain additional, highly-qualified personnel. Competition for hiring these employees is intense, especially with regard to engineers with high levels of experience in designing, developing and

13

Table of Contents

integrating robots and engineers with expertise in artificial intelligence, machine learning and cloud applications. Many of the companies with which we compete for hiring experienced employees have greater resources than we have. If we fail to attract new technical personnel or fail to retain and motivate our current employees, our business and future growth prospects could be severely harmed.

*If we fail to protect, or incur significant costs in defending, our intellectual property and other proprietary rights, our business and results of operations could be materially harmed.*

Our success depends on our ability to protect our intellectual property and other proprietary rights. We rely primarily on patents, trademarks, copyrights, trade secrets and unfair competition laws, as well as license agreements and other contractual provisions, to protect our intellectual property and other proprietary rights. Significant technology used in our products, however, is not the subject of any patent protection, and we may be unable to obtain patent protection on such technology in the future. Moreover, existing U.S. legal standards relating to the validity, enforceability and scope of protection of intellectual property rights offer only limited protection, may not provide us with any competitive advantages, and may be challenged by third parties. In addition, the laws of countries other than the United States in which we market our products may afford little or no effective protection of our intellectual property. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing upon or misappropriating our intellectual property or otherwise gaining access to our technology. Unauthorized third parties may try to copy or reverse engineer our products or portions of our products or otherwise obtain and use our intellectual property. If we fail to protect our intellectual property and other proprietary rights, our business, results of operations or financial condition could be materially harmed.

In addition, defending our intellectual property rights may entail significant expense. We believe that certain products in the marketplace may infringe our existing intellectual property rights. We have, from time to time, resorted to legal proceedings to protect our intellectual property and may continue to do so in the future. We may be required to expend significant resources to monitor and protect our intellectual property rights. Any of our intellectual property rights may be challenged by others or invalidated through administrative processes or litigation. If we resort to legal proceedings to enforce our intellectual property rights or to determine the validity and scope of the intellectual property or other proprietary rights of others, the proceedings could result in significant expense to us and divert the attention and efforts of our management and technical employees, even if we were to prevail.

*We may be sued by third parties for alleged infringement of their proprietary rights, which could be costly, time-consuming and limit our ability to use certain technologies in the future.*

If the size of our markets increases, we would be more likely to be subject to claims that our technologies infringe upon the intellectual property or other proprietary rights of third parties. In addition, the vendors from which we license technology used in our products could become subject to similar infringement claims. Our vendors, or we, may not be able to withstand third-party infringement claims. Any claims, with or without merit, could be time-consuming and expensive, and could divert our management's attention away from the execution of our business plan. Moreover, any settlement or adverse judgment resulting from the claim could require us to pay substantial amounts or obtain a license to continue to use the technology that is the subject of the claim, or otherwise restrict or prohibit our use of the technology. There can be no assurance that we would be able to obtain a license from the third party asserting the claim on commercially reasonable terms, if at all, that we would be able to develop alternative technology on a timely basis, if at all, or that we would be able to obtain a license to use a suitable alternative technology to permit us to continue offering, and our customers to continue using, our affected product. In addition, we may be required to indemnify our retail and distribution partners for third-party intellectual property infringement claims, which would increase the cost to us of an adverse ruling in such a claim. An adverse determination could also prevent us from offering our products to others. Infringement claims asserted against us or our vendors may have a material adverse effect on our business, results of operations or financial condition.

*If we fail to enhance our brand, our ability to expand our customer base will be impaired and our operating results may suffer.*

We believe that developing and maintaining awareness of the iRobot brand is critical to achieving widespread acceptance of our existing and future products and is an important element in attracting new customers. Furthermore, we expect the importance of global brand recognition to increase as competition develops. If customers do not perceive our products to be of high quality, our brand and reputation could be harmed, which could adversely impact our financial results. In addition, brand promotion efforts may not yield significant revenue or increased revenue sufficient to offset the additional expenses incurred in building our brand. Maintaining, protecting, and enhancing our brand may require us to make substantial investments, and these investments may not be successful. If we fail to successfully maintain, promote, and position our brand and protect our reputation, or if we incur significant expenses in this effort, our business, financial condition and operating results may be adversely affected.

14

Table of Contents

***Any efforts to expand our product offerings beyond our current markets may not succeed, which could negatively impact our operating results.***

Efforts to expand our product offerings beyond the consumer market, however, may divert management resources from existing operations and require us to commit significant financial resources to an unproven business, either of which could significantly impair our operating results. Moreover, efforts to expand beyond our existing markets may never result in new products that achieve market acceptance, create additional revenue or become profitable.

***We depend on the experience and expertise of our senior management team and key technical employees, and the loss of any key employee may impair our ability to operate effectively.***

Our success depends upon the continued services of our senior management team and key technical employees, such as our project management personnel and senior engineers. Each of our executive officers, key technical personnel and other employees could terminate his or her relationship with us at any time. The loss of any member of our senior management team might significantly delay or prevent the achievement of our business objectives and could materially harm our business and customer relationships. In addition, because of the highly technical nature of our robots, the loss of any significant number of our existing engineering and project management personnel could have a material adverse effect on our business and operating results.

***We are subject to a variety of U.S. and foreign laws and regulations that are central to our business; our failure to comply with these laws and regulations could harm our business or our operating results.***

We are or may become subject to a variety of laws and regulations in the United States and abroad that involve matters central to our business, including laws and regulations regarding consumer protection, advertising, electronic commerce, intellectual property, manufacturing, anti-bribery and anti-corruption, and economic or other trade prohibitions or sanctions.

The increasingly global nature of our business operations subjects us to domestic and foreign laws and regulations such as the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act, and similar anti-bribery and anti-corruption laws in other jurisdictions. Our products are also subject to U.S. export controls, including the U.S. Department of Commerce's Export Administration Regulations and various economic and trade sanctions regulations established by the Treasury Department's Office of Foreign Assets Controls. If we incur liability for noncompliance under these laws or regulations, we may be forced to implement new measures to reduce our exposure to this liability. This may require us to expend substantial resources or to discontinue certain products or services, which would negatively affect our business, financial condition, and operating results. In addition, any negative publicity directed to us as a result of lawsuits, regulatory proceedings, and legislative proposals could harm our brand or otherwise impact the growth of our business. Any costs incurred as a result of compliance efforts or other liabilities under these laws or regulations could harm our business and operating results.

***Acquisitions and potential future acquisitions could be difficult to integrate, divert the attention of key personnel, disrupt our business, dilute stockholder value and impair our financial results.***

As part of our business strategy, we have in the past acquired, and we intend to continue to consider additional acquisitions of companies, technologies and products that we believe could accelerate our ability to compete in our core markets or allow us to enter new markets. For example, on November 21, 2016, we entered into an agreement with Sales On Demand Corporation, a privately-held corporation based in Tokyo, Japan, to acquire its iRobot distribution business. This transaction is expected to close in April 2017.

Acquisitions and combinations are accompanied by a number of risks, including the difficulty of integrating the operations and personnel of the acquired companies, the potential disruption of our ongoing business, the potential distraction of management, expenses related to the acquisition and potential unknown liabilities associated with acquired businesses. Any inability to integrate completed acquisitions or combinations in an efficient and timely manner could have an adverse impact on our results of operations. In addition, we may not be able to recognize any expected synergies or benefits in connection with a future acquisition or combination. If we are not successful in completing acquisitions or combinations that we may pursue in the future, we may incur substantial expenses and devote significant management time and resources without a successful result. In addition, future acquisitions could require use of substantial portions of our available cash or result in dilutive issuances of securities.

In addition, charges to earnings as a result of acquisitions may adversely affect our operating results in the foreseeable future, which could have a material and adverse effect on the market value of our common stock.  In particular, we have allocated the cost of acquiring businesses to the individual assets acquired and liabilities assumed, including various identifiable intangible assets such as acquired technology, acquired trade names and acquired customer relationships based on their respective fair values. Our estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain. After we complete an acquisition, the following factors could result in material charges and adversely affect our operating results and may adversely affect our cash flows:

- costs incurred to combine the operations of businesses we acquire, such as transitional employee expenses and employee retention, redeployment or relocation expenses;

15

Table of Contents

- impairment of goodwill or intangible assets;
- amortization of intangible assets acquired;
- a reduction in the useful lives of intangible assets acquired;
- identification of or changes to assumed contingent liabilities, both income tax and non-income tax related after our final determination of the amounts for these contingencies or the conclusion of the measurement period (generally up to one year from the acquisition date), whichever comes first;
- charges to our operating results to eliminate certain duplicative pre-merger activities, to restructure our operations or to reduce our cost structure;
- charges to our operating results resulting from expenses incurred to effect the acquisition; and
- charges to our operating results due to the expensing of certain stock awards assumed in an acquisition.

***We may not be able to obtain capital when desired on favorable terms, if at all, or without dilution to our stockholders.***

We anticipate that our current cash, cash equivalents, cash provided by operating activities and funds available through our working capital line of credit, will be sufficient to meet our current and anticipated needs for general corporate purposes. We operate in an emerging technology market, however, which makes our prospects difficult to evaluate. It is possible that we may not generate sufficient cash flow from operations or otherwise have the capital resources to meet our future capital needs. In such cases we may need additional financing to execute on our current or future business strategies. If we raise additional funds through the issuance of equity or convertible debt securities, the percentage ownership of our stockholders could be significantly diluted, and these newly-issued securities may have rights, preferences or privileges senior to those of existing stockholders. We cannot assure you that additional financing will be available on terms favorable to us, or at all. If adequate funds are not available or are not available on acceptable terms, if and when needed, our ability to fund our operations, take advantage of unanticipated opportunities, develop or enhance our products, or otherwise respond to competitive pressures would be significantly limited. In addition, our access to credit through our working capital line of credit may be limited by the restrictive financial covenants contained in that agreement, which require us to maintain profitability.

***Cybersecurity risks could adversely affect our business and disrupt our operations.***

The threats to network and data security are increasingly diverse and sophisticated. Despite our efforts and processes to prevent breaches, our devices, as well as our servers, computer systems, and those of third parties that we use in our operations are vulnerable to cybersecurity risks, including cyber attacks such as viruses and worms, phishing attacks, denial-of-service attacks, and similar disruptions from unauthorized tampering with our servers and computer systems or those of third parties that we use in our operations, which could lead to interruptions, delays, loss of critical data, and loss of consumer confidence. In addition, we may be the target of email scams that attempt to acquire sensitive information or company assets. Despite our efforts to create security barriers to such threats, we may not be able to entirely mitigate these risks. Any cyber attack that attempts to obtain our data and assets, disrupt our service, or otherwise access our systems, or those of third parties we use, if successful, could adversely affect our business, operating results, and financial condition, be expensive to remedy, and damage our reputation.

***If we suffer data breaches involving the designs, schematics or source code for our products, our brand, business and financial results could be adversely affected.***

We attempt to securely store our designs, schematics and source code for our products as they are created. A breach, whether physical, electronic or otherwise, of the systems on which this sensitive data is stored could lead to damage or piracy of our products. If we or our partners are subject to data security breaches, we may have a loss in sales or increased costs arising from the restoration or implementation of additional security measures, either of which could materially and adversely affect our brand, business and financial results.

***Environmental laws and regulations and unforeseen costs could negatively impact our future earnings.***

The manufacture and sale of our products in certain states and countries may subject us to environmental and other regulations. We also face increasing complexity in our product design as we adjust to legal and regulatory requirements relating to our products. There is no assurance that such existing laws or future laws will not impair future earnings or results of operations.

***Business disruptions resulting from international uncertainties could negatively impact our profitability.***

We derive, and expect to continue to derive, a significant portion of our revenue from international sales in various European and Far East markets, and Canada. For the fiscal years ended December 31, 2016, January 2, 2016, and December 27, 2014, sales to non-U.S. customers accounted for 51.2%, 56.0% and 60.9% of total revenue, respectively. Our international revenue and operations are subject to a number of material risks, including, but not limited to:

- difficulties in staffing, managing and supporting operations in multiple countries;

16

Table of Contents

- difficulties in enforcing agreements and collecting receivables through foreign legal systems and other relevant legal issues;
- fewer legal protections for intellectual property;
- foreign and U.S. taxation issues, tariffs, and international trade barriers;
- difficulties in obtaining any necessary governmental authorizations for the export of our products to certain foreign jurisdictions;
- potential fluctuations in foreign economies;
- government currency control and restrictions on repatriation of earnings;
- fluctuations in the value of foreign currencies and interest rates;
- general economic and political conditions in the markets in which we operate;
- domestic and international economic or political changes, hostilities and other disruptions in regions where we currently operate or may operate in the future;
- changes in foreign currency exchange rates;
- different and changing legal and regulatory requirements in the jurisdictions in which we currently operate or may operate in the future; and
- outside of the United States, we primarily rely on a network of exclusive distributors, some of whom may be operating without written contracts.

Negative developments in any of these areas in one or more countries could result in a reduction in demand for our products, the cancellation or delay of orders already placed, threats to our intellectual property, difficulty in collecting receivables, and a higher cost of doing business, any of which could negatively impact our business, financial condition or results of operations. Moreover, our sales, including sales to customers outside the United States, are primarily denominated in U.S. dollars, and downward fluctuations in the value of foreign currencies relative to the U.S. dollar may make our products more expensive than other products, which could harm our business.

Moreover, the United Kingdom (UK) held a referendum on June 23, 2016 in which a majority of voters voted to exit the European Union (EU). Due to the unprecedented nature of the proposed withdrawal, significant uncertainty exists surrounding the timing and terms of the proposed exit. We have operations in the UK and business activities in several EU member states whose currencies, namely British Pound Sterling and Euro, economies, taxation, and trade regulation, among other factors, could be adversely impacted by the negotiations and outcomes of the UK's leaving the EU, which is likely to be a lengthy and complicated process.  While we do not anticipate near term adverse effects on business operations, these events could have a material adverse effect on our business operations, results of operations and financial condition over time.

***If we experience a disaster or other business continuity problem, we may not be able to recover successfully, which could cause material financial loss, loss of human capital, regulatory actions, reputational harm, or legal liability.***

If we experience a local or regional disaster or other business continuity problem, such as an earthquake, terrorist attack, pandemic or other natural or man-made disaster, our continued success will depend, in part, on the availability of our personnel, our office facilities, and the proper functioning of our computer, telecommunication and other related systems and operations. As we grow our operations in new geographic regions, the potential for particular types of natural or man-made disasters, political, economic or infrastructure instabilities, or other country- or region-specific business continuity risks increases.

***The effects of regulations relating to conflict minerals may adversely affect our business.***

On August 22, 2012, under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the SEC adopted new requirements for companies that use certain minerals and metals, known as conflict minerals, in their products, whether or not these products are manufactured by third parties. These requirements require companies to research, disclose and report whether or not such minerals originate from the Democratic Republic of Congo and adjoining countries. The implementation of these requirements could adversely affect the sourcing, availability and pricing of such minerals if they are found to be used in the manufacture of our products. In addition, we continue to incur additional costs to comply with the disclosure requirements, including costs related to determining the source of any of the relevant minerals and metals used in our products. Since our supply chain is complex, we may not be able to sufficiently verify the origins for these minerals and metals used in our products through the due diligence procedures that we implement, which may harm our reputation. In such event, we may also face difficulties in satisfying customers who require that all of the components of our products are certified as conflict mineral free.

***Our income tax provision and other tax liabilities may be insufficient if taxing authorities are successful in asserting tax positions that are contrary to our position. Additionally, there is no guarantee that we will realize our deferred tax assets.***

From time to time, we are audited by various federal, state, local and foreign authorities regarding income tax matters. Significant judgment is required to determine our provision for income taxes and our liabilities for federal, state, local and

17

Table of Contents

foreign taxes. Although we believe our approach to determining the appropriate tax treatment is supportable and in accordance with relevant authoritative guidance it is possible that a tax authority will take a final tax position that is materially different than that which is reflected in our income tax provision. Such differences could have a material adverse effect on our income tax provision or benefit, in the reporting period in which such determination is made and, consequently, on our results of operations, financial position and/or cash flows for such period.

The realization of our deferred tax assets ultimately depends on the existence of sufficient income in either the carryback or carryforward periods under the tax law. Due to significant estimates utilized in establishing a valuation allowance and the potential for changes in facts and circumstances, it is possible that we will be required to record a valuation allowance in future reporting periods. Our results of operations would be impacted negatively if we determine that a deferred tax asset valuation allowance is required in a future reporting period.

***Provisions in our certificate of incorporation and by-laws or Delaware law might discourage, delay or prevent a change of control of our company or changes in our management and, therefore, depress the trading price of our common stock.***

Provisions of our certificate of incorporation and by-laws and Delaware law may discourage, delay or prevent a merger, acquisition or other change in control that stockholders may consider favorable, including transactions in which you might otherwise receive a premium for your shares of our common stock. These provisions may also prevent or frustrate attempts by our stockholders to replace or remove our management. These provisions include:

- limitations on the removal of directors;
- a classified board of directors so that not all members of our board are elected at one time;
- advance notice requirements for stockholder proposals and nominations;
- the inability of stockholders to act by written consent or to call special meetings;
- the ability of our board of directors to make, alter or repeal our by-laws; and
- the ability of our board of directors to designate the terms of and issue new series of preferred stock without stockholder approval.

The affirmative vote of the holders of at least 75% of our shares of capital stock entitled to vote is necessary to amend or repeal the above provisions of our certificate of incorporation. In addition, absent approval of our board of directors, our by-laws may only be amended or repealed by the affirmative vote of the holders of at least 75% of our shares of capital stock entitled to vote.

In addition, Section 203 of the Delaware General Corporation Law prohibits a publicly-held Delaware corporation from engaging in a business combination with an interested stockholder, generally a person which together with its affiliates owns, or within the last three years has owned, 15% of our voting stock, for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner.

The existence of the foregoing provisions and anti-takeover measures could limit the price that investors might be willing to pay in the future for shares of our common stock. They could also deter potential acquirers of our company, thereby reducing the likelihood that you could receive a premium for your common stock in an acquisition.

***If significant tariffs or other restrictions are placed on Chinese imports or any related counter-measures are taken by China, our revenues and results of operations may be materially harmed.***

The current U.S. administration has signaled it may alter trade agreements and terms between China and the United States, including limiting trade with China and/or imposing a tariff on imports from China. If any such restrictions or tariffs are imposed on products that we import to our customers, we would be required to raise our prices which may result in the loss of customers and harm our business.

**ITEM 1B.**  *UNRESOLVED STAFF COMMENTS*

None.

**ITEM 2.**  *PROPERTIES*

Our corporate headquarters are located in Bedford, Massachusetts, where we lease approximately 203,000 square feet. This lease expires on May 1, 2020. We lease smaller facilities in Hong Kong; Guangzhou and Shanghai, China; London, England; and Pasadena, California. We do not own any real property. We believe that our leased facilities and additional or alternative space available to us will be adequate to meet our needs for the foreseeable future.

18

Table of Contents

**ITEM 3.  *LEGAL PROCEEDINGS***

From time to time and in the ordinary course of business, we are subject to various claims, charges and litigation. The outcome of litigation cannot be predicted with certainty and some lawsuits, claims or proceedings may be disposed of unfavorably to us, which could materially affect our financial condition or results of operations.

**ITEM 4.  *MINE SAFETY DISCLOSURES***

Not Applicable.

Table of Contents

**PART II**

**ITEM 5.**      ***MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES***

Our common stock is listed on the NASDAQ Global Select Market under the symbol "IRBT". The following table sets forth, for the periods indicated, the high and low sales prices per share for our common stock as reported on the NASDAQ Global Select Market.

|  | High | Low |
|---|---|---|
| **Fiscal 2015:** | | |
| First quarter | $ 35.27 | $ 28.05 |
| Second quarter | $ 34.93 | $ 31.61 |
| Third quarter | $ 33.27 | $ 27.55 |
| Fourth quarter | $ 37.71 | $ 28.27 |
| **Fiscal 2016:** | | |
| First quarter | $ 36.00 | $ 28.02 |
| Second quarter | $ 39.00 | $ 33.90 |
| Third quarter | $ 44.67 | $ 34.27 |
| Fourth quarter | $ 60.86 | $ 42.06 |

As of February 14, 2017, there were approximately 27,246,211 shares of our common stock outstanding held by approximately 143 stockholders of record and the last reported sale price of our common stock on the NASDAQ Global Select Market on February 14, 2017 was $54.87 per share.

**Issuer Purchases of Equity Securities**

The following is a summary of our repurchases of our common stock during the three months ended December 31, 2016:

| Period | (a) Total number of Shares Purchased (1) | (b) Average Price Paid per Share | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (2) | (d) Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Fiscal month beginning October 2, 2016 and ended October 29, 2016 | 7,542 $ | 37.49 | 7,542 $ | — |
| Fiscal month beginning October 30, 2016 and ended November 26, 2016 | — | — | — | — |
| Fiscal month beginning November 27, 2016 and ended December 31, 2016 | — | — | — | — |
| Total | 7,542 $ | 37.49 | 7,542 $ | — |

_____

(1)    Consists of shares of our common stock. All repurchases were made in open market transactions and pursuant to our previously-announced stock repurchase program.

(2)    On March 1, 2016, we entered into an accelerated share repurchase (ASR) agreement with J.P. Morgan Securities LLC, as agent for JPMorgan Chase Bank, National Association, London Branch (JPMorgan), to repurchase an aggregate of $85.0 million of our common stock. Pursuant to the ASR agreement, we paid JPMorgan $85.0 million in April 2016 and received an initial delivery of 1,900,862 shares of our common stock. In September 2016, the ASR reached its scheduled termination and we received an additional 359,000 shares with the final delivery of 7,542 in October 2016. Total shares received under the plan were 2,267,404.

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock. We currently expect to retain future earnings, if any, to finance the growth and development of our business and we do not anticipate paying any cash dividends in the foreseeable future.

Table of Contents

**ITEM 6.  *SELECTED FINANCIAL DATA***

The selected historical financial data set forth below as of December 31, 2016 and January 2, 2016 and for the years ended December 31, 2016, January 2, 2016 and December 27, 2014 are derived from financial statements, which have been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm. Consolidated balance sheets as of December 31, 2016 and January 2, 2016 and the related consolidated statements of income and of cash flows for each of the three years in the period ended December 31, 2016 and notes thereto appear elsewhere in this Annual Report on Form 10-K. The selected historical financial data as of December 27, 2014, December 28, 2013 and December 29, 2012 and for the years ended December 28, 2013 and December 29, 2012 are derived from our financial statements, which have been audited by PricewaterhouseCoopers LLP and which are not included elsewhere in this Annual Report.

In fiscal year 2012, we initiated a reorganization that resulted in, among other things, the centralization of all of our engineering and operations activities. This reorganization was completed at the beginning of fiscal year 2013. In conjunction with this reorganization, we reviewed the financial statement classification of our costs and expenses. As a result of this review, we decided to classify certain expenses differently than had been classified and presented in prior periods to provide a more clear understanding of our financial performance. Because the classification of certain expenses on the income statement changed in fiscal year 2013 as compared to prior periods, we recast the financial results of prior periods in a manner consistent with the fiscal year 2016, 2015, 2014 and 2013 presentation for comparability purposes. The following selected consolidated financial data reflects the reclassified amounts for the year ended December 29, 2012.

The following selected consolidated financial data should be read in conjunction with our consolidated financial statements, the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Annual Report on Form 10-K. The historical results are not necessarily indicative of the results to be expected for any future period.

| | Year Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2016 | January 2, 2016 | December 27, 2014 | December 28, 2013 | December 29, 2012 |
| | (In thousands, except earnings per share amounts) | | | | |
| **Consolidated Statements of Income:** | | | | | |
| Revenue | $ 660,604 | $ 616,778 | $ 556,846 | $ 487,401 | $ 436,244 |
| Cost of revenue | 341,289 | 327,852 | 298,791 | 266,247 | 241,896 |
| Gross margin | 319,315 | 288,926 | 258,055 | 221,154 | 194,348 |
| Operating expenses | | | | | |
| Research and development | 79,805 | 76,071 | 69,408 | 63,649 | 57,066 |
| Selling and marketing | 115,125 | 97,772 | 86,091 | 71,529 | 66,412 |
| General and administrative | 66,828 | 54,465 | 49,439 | 53,358 | 45,698 |
| Total operating expenses | 261,758 | 228,308 | 204,938 | 188,536 | 169,176 |
| Operating income | 57,557 | 60,618 | 53,117 | 32,618 | 25,172 |
| Net income | $ 41,939 | $ 44,130 | $ 37,803 | $ 27,641 | $ 17,297 |
| Net income per common share basic | $ 1.51 | $ 1.49 | $ 1.28 | $ 0.97 | $ 0.63 |
| Diluted | $ 1.48 | $ 1.47 | $ 1.25 | $ 0.94 | $ 0.61 |
| Shares used in per common share calculations | | | | | |
| Basic | 27,698 | 29,550 | 29,485 | 28,495 | 27,577 |
| Diluted | 28,292 | 30,107 | 30,210 | 29,354 | 28,301 |

21

Table of Contents

| | December 31, 2016 | January 2, 2016 | December 27, 2014 | December 28, 2013 | December 29, 2012 |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 214,523 | $ 179,915 | $ 185,957 | $ 165,404 | $ 126,770 |
| Short term investments | 39,930 | 33,124 | 36,166 | 21,954 | 12,430 |
| Total assets | 507,912 | 521,743 | 493,213 | 416,337 | 354,313 |
| Total liabilities | 118,956 | 104,332 | 102,777 | 85,648 | 78,496 |
| Total stockholders' equity | 388,956 | 417,411 | 390,436 | 330,689 | 275,817 |

**ITEM 7.**     ***MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS***

*The information contained in this section has been derived from our consolidated financial statements and should be read together with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities and Exchange Act of 1934, as amended, or the Exchange Act, and are subject to the "safe harbor" created by those sections. In particular, statements contained in this Annual Report on Form 10-K that are not historical facts, including, but not limited to statements concerning new product sales, product development and offerings, Roomba and Braava products, our consumer robots, our competition, our strategy, our market position, market acceptance of our products, seasonal factors, revenue recognition, our profits, growth of our revenues, composition of our revenues, our cost of revenues, units shipped, average selling prices, operating expenses, selling and marketing expenses, general and administrative expenses, research and development expenses, and compensation costs, our projected income tax rate, our credit and letter of credit facilities, our valuations of investments, valuation and composition of our stock-based awards, and liquidity, constitute forward-looking statements and are made under these safe harbor provisions. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "should," "could," "seek," "intends," "plans," "estimates," "anticipates," or other comparable terms. Forward-looking statements involve inherent risks and uncertainties, which could cause actual results to differ materially from those in the forward-looking statements. We urge you to consider the risks and uncertainties discussed in greater detail under the heading "Risk Factors" in evaluating our forward-looking statements. We have no plans to update our forward-looking statements to reflect events or circumstances after the date of this report. We caution readers not to place undue reliance upon any such forward-looking statements, which speak only as of the date made.*

**Overview**

iRobot designs and builds robots that empower people to do more. The company's consumer robots help people find smarter ways to clean and accomplish more in their daily lives. iRobot's portfolio of solutions features proprietary technologies for the connected home and advanced concepts in navigation, mobility, manipulation and artificial intelligence. For more than 25 years, we have been a pioneer in the robotics and consumer products industries. During 2016, we continued our transformation to a global consumer robotics company with the divestiture of our defense and security business and the decision to exit the remote presence business. Our consumer robots and accessories represented 99% of our revenue in 2016. We sell our robots through a variety of distribution channels, including chain stores and other national retailers, through our on-line store, and through value-added distributors and resellers worldwide.

Over the past fifteen years, we have sold more than 18 million consumer robots worldwide. During 2016, we took several steps to become more focused on our well established consumer robots business to capitalize on the substantial opportunities available to us within consumer markets. First, we completed the sale of our defense and security business unit on April 4, 2016. The final purchase price, including adjustments for working capital and indebtedness, was $24.5 million. Second, we reallocated all of the research and development resources from our remote presence business to opportunities in our consumer business during the first quarter of 2016, and decided to fully exit the remote presence business during the second quarter of 2016. These actions were taken to solidify our position as the leader in diversified consumer robots and to focus on key technologies, with an emphasis on software, that allow our robots to understand the homes in which they operate. It is our intent to continue investing in these critical technologies and the economic opportunities they unlock. Third, on November 21, 2016, we announced the signing of a definitive agreement to acquire the iRobot-related distribution business of privately-held Sales On Demand Corporation, or SODC, based in Tokyo, Japan. SODC has been iRobot's exclusive distribution partner in Japan since 2004 and is well respected by top channel partners. iRobot will acquire the business for a cash amount equal to the

22

Table of Contents

book value of the acquired assets at close, primarily inventory, currently estimated to be between $18.0 million and $20.0 million, subject to exchange rates in effect on the date of acquisition. The acquisition is expected to close in April 2017.

As of December 31, 2016, we had 607 full-time employees. We have developed expertise in the disciplines necessary to build durable, high-performance and cost-effective robots through the close integration of software, electronics and hardware. Our core technologies serve as reusable building blocks that we adapt and expand to develop next generation and new products, reducing the time, cost and risk of product development. Our significant expertise in robot design and engineering positions us to capitalize on the expected growth in the market for robot-based products.

Although we have successfully launched consumer products, our continued success depends upon our ability to respond to a number of future challenges. We believe the most significant of these challenges include increasing market competition, and our ability to successfully develop and introduce products and product enhancements into both new and existing markets.

During 2016, we launched Roomba 960, our second 900 series Roomba, that extends mapping, visual navigation and cloud connectivity to a wider range of customers. We also launched the Braava jet mopping robot, with precision jet spray and vibrating cleaning head, focused on expanding our wet floor care business. Both the Roomba 900 series and Braava jet are significantly more complex products, delivering enhanced performance enabled by software. The iRobot HOME App, compatible with both the Roomba 900 series and Braava jet, helps users get the most out of their experience by allowing them to choose the appropriate cleaning options for their unique home. We also announced a relationship with Amazon Web Services, or AWS, that we believe will enable iRobot to address significant opportunities within our consumer business and the connected home. AWS Cloud is a managed cloud solution that enables connected devices to interact easily and securely with cloud applications and other devices. The AWS Cloud will enable iRobot to scale the number of connected robots it supports globally and allow for increased capabilities in the Smart Home.

Our total revenue for 2016 was $660.6 million, which represents a 7.1% increase from 2015 revenue of $616.8 million. This increase in revenue was largely attributable to an $84.2 million increase in revenue in our U.S. consumer robots. Domestic growth was primarily due to increased sales as a result of significant investments in advertising media and national promotions as well as the strength of the Roomba 900 series and Braava jet launch. International consumer robots revenue grew by $12.0 million in 2016 with increases in most markets, offset by a decline in China. Revenue from the defense and security business was $3.1 million in 2016 compared to $55.0 million in 2015 and was isolated to the first quarter of 2016, which was the quarter prior to the divestiture of the business. Our consumer robots revenue represented 99.3% of our total revenue for 2016 compared to 90.7% in 2015. During 2016, we recorded a net benefit to revenue and income before income taxes of $3.5 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $6.9 million during fiscal 2015. The adjustments recorded in fiscal 2016 and 2015 resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods, resulting from continued improvements in product quality, especially in our most recently released products.

Our total revenue for 2015 was $616.8 million, which represents an 11% increase from 2014 revenue of $556.8 million. This increase in revenue was largely attributable to a $52.2 million increase in revenue in our consumer robots business as a direct result of growth in our domestic market. Domestic growth was primarily attributable to increased sales as a result of significant media investments as well as the launch of Roomba 980. International consumer robots revenue growth slowed compared to fiscal 2014 as a result of negative macroeconomic conditions, specifically in Japan and Russia, offset by a significant growth increase in China. Revenue increased $9.5 million in our defense and security business as compared to 2014, primarily attributable to increased sales of our SUGV robot. During 2015, we recorded a net benefit to revenue and income before income taxes of $6.9 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $4.3 million and $5.7 million during fiscal 2014. The adjustments recorded in each of these periods resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods, resulting from continued improvements in product quality, especially in our most recently released products. Our consumer robots revenue represented 91% of our total revenue for both 2015 and 2014.

### *Revenue*

We currently derive revenue from product sales. Until the divestiture of the defense and security business unit on April 4, 2016, we also generated minimal revenue from government and commercial research and development contracts.

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, product revenue accounted for 100.0%, 99.8% and 99.2% of total revenue, respectively.

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, approximately 72.8%, 76.6% and 75.7%, respectively, of our consumer robot revenue resulted from sales to 15 customers, which were comprised of both domestic retailers and international distributors. Direct-to-consumer revenue generated through our domestic and international on-line stores accounted for 5.1%, 6.1% and 6.1% of our consumer robot product revenue for the fiscal years ended

23

Table of Contents

December 31, 2016, January 2, 2016 and December 27, 2014, respectively. We typically sell our recently launched products direct on-line, and then subsequently offer these products through other channels of distribution.

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, sales to non-U.S. customers accounted for 51.2%, 56.0% and 60.9% of total revenue, respectively.

We sell products directly to customers and indirectly through resellers and distributors. We recognize revenue from sales of robots under the terms of the customer agreement upon transfer of title and risk of loss to the customer, net of estimated returns, provided that collection is determined to be reasonably assured and no significant obligations remain. During 2016, we recorded a net benefit to revenue and income before income taxes of $3.5 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $6.9 million during fiscal 2015. The net adjustments recorded in 2016 and 2015 resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods.

### Cost of Revenue

Cost of revenue includes the cost of raw materials and labor that go into the development and manufacture of our products as well as manufacturing overhead costs such as manufacturing engineering, quality assurance, logistics, warranty, third-party consulting, travel and associated direct material costs. Additionally, we include overhead expenses such as indirect engineering labor, occupancy costs associated with the project resources, engineering tools and supplies and program management expenses. For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, total cost of revenue was 51.7%, 53.2% and 53.7% of total revenue, respectively. Raw material costs, which are our most significant cost items, can fluctuate materially on a periodic basis, although many components have been historically stable. Additionally, unit costs can vary significantly depending on the mix of products sold. There can be no assurance that our costs of raw materials will not increase. Labor costs also comprise a significant portion of our cost of revenue. We outsource the manufacture of our consumer robots to contract manufacturers in China. While labor costs in China traditionally have been favorable compared to labor costs elsewhere in the world, including the United States, they have recently been increasing. In addition, fluctuations in currency exchange rates could increase the cost of labor. Consequently, the labor costs for our consumer robots could increase in the future.

### Gross Margin

Our gross margin as a percentage of revenue varies according to the mix of product and contract revenue, the mix of products sold, total sales volume, the level of defective product returns, and levels of other product costs such as warranty, scrap, re-work and manufacturing overhead. For the years ended December 31, 2016, January 2, 2016 and December 27, 2014, gross margin was 48.3%, 46.8% and 46.3% of total revenue, respectively.

### Research and Development Expenses

Research and development expenses consist primarily of:

- salaries and related costs for our engineers;
- costs for high technology components used in product and prototype development;
- costs of test equipment used during product development; and
- occupancy and other overhead costs.

We have significantly expanded our research and development capabilities and expect to continue to expand these capabilities in the future. We are committed to consistently maintaining the level of innovative design and development of new products as we strive to enhance our ability to serve our existing consumer markets as well as new markets for robots. We anticipate that research and development expenses will increase in absolute dollars but remain relatively consistent as a percentage of revenue in the foreseeable future.

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, research and development expense was $79.8 million, $76.1 million and $69.4 million, or 12.1%, 12.3% and 12.5% of total revenue, respectively.

### Selling, Marketing, General and Administrative Expenses

Our selling, marketing, general and administrative expenses consist primarily of:

- salaries and related costs for sales and marketing personnel;
- salaries and related costs for executives and administrative personnel;
- advertising, marketing and other brand-building costs;
- customer service costs;
- professional services costs;

24

Table of Contents

- information systems and infrastructure costs;
- travel and related costs; and
- occupancy and other overhead costs.

We anticipate that in 2017, selling, marketing, general and administrative expenses will increase in absolute dollars and as a percentage of revenue and will, for the foreseeable future thereafter, continue to increase in absolute dollars but remain relatively consistent, or decrease slightly, as a percentage of revenue, as we continue to build the iRobot brand.

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014 selling, marketing, general and administrative expense was $182.0 million, $152.2 million and $135.5 million, or 27.5%, 24.7% and 24.3% of total revenue, respectively.

### *Fiscal Periods*

We operate and report using a 52-53 week fiscal year ending on the Saturday closest to December 31. Accordingly, our fiscal quarters will end on the Saturday that falls closest to the last day of the third month of each quarter.

## Critical Accounting Policies and Estimates

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses, and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our actual results may differ from these estimates.

We believe that of our significant accounting policies, which are described in the notes to our consolidated financial statements, the following accounting policies involve a greater degree of judgment and complexity. Accordingly, we believe that the following accounting policies are the most critical to aid in fully understanding and evaluating our consolidated financial condition and results of operations.

### *Revenue Recognition*

We primarily derive our revenue from product sales. Until the divestiture of the defense and security business unit on April 4, 2016 (see Note 15), we also generated minimal revenue from government and commercial research and development contracts. We sell products directly to customers and indirectly through resellers and distributors. We recognize revenue from sales of robots under the terms of the customer agreement upon transfer of title and risk of loss to the customer, net of estimated returns and allowances, provided that collection is determined to be reasonably assured and no significant obligations remain.

Beginning in the third quarter of 2015, with the introduction of our first connected robot, each sale of a connected robot represents a multi-element arrangement containing the robot, an app and potential future unspecified software upgrades. Revenue is allocated to the deliverables based on their relative selling prices which have been determined using best estimate of selling price (BESP), as we have not been able to establish vendor specific objective evidence (VSOE) or obtain relevant third party evidence (TPE). Revenue allocated to the app and unspecified software upgrades is then deferred and recognized on a straight-line basis over the period in which we expect to provide the upgrades over the estimated life of the robot.

Sales to domestic and Canadian resellers of consumer robots are typically subject to agreements allowing for limited rights of return, rebates and price protection. We also provide limited rights of returns for direct-to-consumer sales generated through its on-line stores, one domestic distributor and one international distributor. Accordingly, we reduce revenue for our estimates of liabilities for these rights of return, rebates and price protection at the time the related sale is recorded. These estimates for rights of return are directly based on specific terms and conditions included in the customer agreements, historical returns experience and various other assumptions that we believe are reasonable under the circumstances. In the case of new product introductions, the estimates for returns applied to the new products are based upon the estimates for the most similar predecessor products until such time that we have enough actual returns experience for the new products, which is typically two holiday return cycles. At that time, we incorporate that data into the development of returns estimates for the new products. We update our analysis of returns on a quarterly basis. If actual returns differ significantly from our estimates, or if modifications to individual customer agreements are entered into that impact their rights of returns, such differences could result in an adjustment to previously established reserves and could have a material impact, either favorably or unfavorably, on our results of operations for the period in which the actual returns become known or the agreement is modified. Except for the one international distributor noted above, our international distributor agreements do not currently allow for product returns and, as a result, no reserve for returns is established for this group of customers. In 2016, we began selling to one domestic distributor under an agreement that provides product return privileges. As a result, we recognize revenue from sales to this distributor when the product is resold by the distributor. The estimates and reserve for rebates and price protection are based on specific programs, expected usage and historical experience. Actual results could differ from these estimates.

25

Table of Contents

Prior to our divestiture of the defense and security business unit on April 4, 2016 (see Note 15), we generated minimal revenue from government contracts. Under cost-plus-fixed-fee (CPFF) type contracts, we recognized revenue based on costs incurred plus a pro rata portion of the total fixed fee. Costs incurred included labor and material that were directly associated with individual CPFF contracts plus indirect overhead and general and administrative type costs based upon billing rates we submitted to the Defense Contract Management Agency (DCMA). Annually, we submit final indirect billing rates to DCMA based upon actual costs incurred throughout the year. In the situation where our final actual billing rates are greater than the estimated rates used, we record a cumulative revenue adjustment in the period in which the rate differential is collected from the customer. These final billing rates are subject to audit by the Defense Contract Audit Agency (DCAA), which can occur several years after the final billing rates are submitted and may result in material adjustments to revenue recognized based on estimated final billing rates. As of December 31, 2016, fiscal year 2015 is open for audit by DCAA. In the situation where our anticipated actual billing rates will be lower than the provisional rates used, we record a cumulative revenue adjustment in the period in which the rate differential is identified. Revenue on firm fixed price (FFP) contracts was recognized using the percentage-of-completion method. For government product FFP contracts, revenue was recognized as the product was shipped or in accordance with the contract terms. Costs and estimated gross margins on contracts were recorded as revenue as work was performed based on the percentage that incurred costs compared to estimated total costs utilizing the most recent estimates of costs and funding. Revenue earned in excess of billings, if any, was recorded as unbilled revenue. Billings in excess of revenue earned, if any, were recorded as deferred revenue.

### Accounting for Stock-Based Awards

We recognized $3.2 million of stock-based compensation expense during the fiscal year ended December 31, 2016 for stock options. The unamortized fair value as of December 31, 2016 associated with these grants was $6.8 million with a weighted-average remaining recognition period of 2.85 years.

The risk-free interest rate is derived from the average U.S. Treasury constant maturity rate, which approximates the rate in effect at the time of grant, commensurate with the expected life of the instrument. The dividend yield is zero based upon the fact that we have never paid and have no present intention to pay cash dividends. We utilize company-specific historical data for purposes of establishing expected volatility and expected term.

Based upon the above assumptions, the weighted average fair value of each stock option granted for the fiscal year ended December 31, 2016 was $12.88.

During the fiscal year ended December 31, 2016, we recognized $12.8 million of stock-based compensation associated with restricted stock units. Unamortized expense associated with restricted stock units at December 31, 2016, was $28.9 million with a weighted-average remaining recognition period of 2.44 years.

We have assumed a forfeiture rate for all stock options and restricted stock-based units based on our historical data. In the future, we will record incremental stock-based compensation expense if the actual forfeiture rates are lower than estimated and will record a recovery of prior stock-based compensation expense if the actual forfeitures are higher than estimated.

Accounting for stock-based awards requires significant judgment and the use of estimates, particularly surrounding assumptions such as stock price volatility and expected option lives to value equity-based compensation.

### Accounting for Income Taxes

We are subject to taxation in the United States and various states and foreign jurisdictions. The statute of limitations for examinations by the Internal Revenue Service is closed for fiscal years prior to 2013. The statute of limitations for examinations by state tax authorities is closed for fiscal years prior to 2012. Federal carryforward attributes that were generated prior to fiscal year 2013 and state carryforward attributes that were generated prior to fiscal year 2012 may still be adjusted upon examination by the federal or state tax authorities if they either have been or will be used in a period for which the statute of limitations is still open.

Deferred taxes are determined based on the difference between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect in the years in which the differences are expected to reverse. Valuation allowances are provided if, based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

We monitor the realization of our deferred tax assets based on changes in circumstances, for example, recurring periods of income for tax purposes following historical periods of cumulative losses, generation of tax credits compared to future utilization of credits, or changes in tax laws or regulations. Our income tax provision and our assessment of the ability to realize our deferred tax assets involve significant judgments and estimates. We are currently generating state tax credits that exceed the amount being utilized. As a result of this trend, a valuation allowance may be needed in the future related to these state tax credits.

As of December 28, 2013, we maintained a valuation allowance of $2.1 million related to certain state tax attributes from the Evolution Robotics, Inc. acquisition. During the year ended December 27, 2014, this valuation allowance was released

26

Table of Contents

when the realization of these state tax attributes became more likely than not. As of December 31, 2016, we did not record a valuation allowance as all deferred tax assets are considered realizable.

### Warranty

We typically provide a one-year warranty (with the exception of European consumer products which typically have a two-year warranty period, and our remote presence robots and defense and security spares, which historically had a warranty period of less than one year) against defects in materials and workmanship and will either repair the goods, provide replacement products at no charge to the customer or refund amounts to the customer for defective products. We record estimated warranty costs, based on historical experience by product, at the time we recognize product revenue. Actual results could differ from these estimates, which could cause increases or decreases to our warranty reserves in future periods.

### Inventory Valuation

We value our inventory at the lower of the actual cost of our inventory or its current estimated market value. We write down inventory for obsolescence or unmarketable inventories based upon assumptions about future demand and market conditions. Actual demand and market conditions may be lower than those that we project and this difference could have a material adverse effect on our gross margin if inventory write-downs beyond those initially recorded become necessary. Alternatively, if actual demand and market conditions are more favorable than those we estimated at the time of such a write-down, our gross margin could be favorably impacted in future periods.

### Long-Lived Assets, including Purchased Intangible Assets

We periodically evaluate the recoverability of long-lived assets, including other purchased intangible assets whenever events and changes in circumstances, such as reductions in demand or significant economic slowdowns in the industry, indicate that the carrying amount of an asset may not be fully recoverable. When indicators of impairment are present, the carrying values of the asset group are evaluated in relation to the future undiscounted cash flows of the underlying business. The net book value of the underlying asset is adjusted to fair value if the sum of the expected discounted cash flows is less than book value. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

### Goodwill

Goodwill is recorded as the difference, if any, between the aggregate consideration paid for an acquisition and the fair value of the net tangible and intangible assets acquired. We evaluate goodwill for impairment at the reporting unit level (operating segment or one level below an operating segment) annually or more frequently if we believe indicators of impairment exist. In accordance with guidance, we are permitted to first assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, then a two-step goodwill impairment test is performed.

The first step of the impairment test involves comparing the fair values of the applicable reporting units with their aggregate carrying values, including goodwill. If the carrying amount of a reporting unit exceeds the reporting unit's fair value, we perform the second step of the goodwill impairment test to determine the amount of impairment loss. The second step of the goodwill impairment test involves comparing the implied fair value of the affected reporting unit's goodwill with the carrying value of that goodwill. We complete the annual impairment evaluation during the fourth quarter each year.

Table of Contents

**Overview of Results of Operations**

The following table sets forth our results of operations for the periods shown:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | |
| | (In thousands) | | | | | |
| Revenue | $ | 660,604 | $ | 616,778 | $ | 556,846 |
| Cost of revenue (1) | | 341,289 | | 327,852 | | 298,791 |
| Gross margin | | 319,315 | | 288,926 | | 258,055 |
| Operating expenses | | | | | | |
| Research and development (1) | | 79,805 | | 76,071 | | 69,408 |
| Selling and marketing (1) | | 115,125 | | 97,772 | | 86,091 |
| General and administrative (1) | | 66,828 | | 54,465 | | 49,439 |
| Total operating expenses | | 261,758 | | 228,308 | | 204,938 |
| Operating income | | 57,557 | | 60,618 | | 53,117 |
| Other income (expense), net | | 3,804 | | 2,353 | | (708) |
| Income before income taxes | | 61,361 | | 62,971 | | 52,409 |
| Income tax expense | | 19,422 | | 18,841 | | 14,606 |
| Net income | $ | 41,939 | $ | 44,130 | $ | 37,803 |

_____

(1)     Stock-based compensation recorded in fiscal 2016, 2015 and 2014 breaks down by expense classification as follows.

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | |
| | (In thousands) | | | | | |
| Cost of revenue | $ | 760 | $ | 1,076 | $ | 865 |
| Research and development | | 3,646 | | 3,256 | | 3,359 |
| Selling and marketing | | 2,008 | | 1,457 | | 1,296 |
| General and administrative | | 9,581 | | 8,394 | | 8,258 |

The following table sets forth our results of operations as a percentage of revenue for the periods shown:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2016 | January 2, 2016 | December 27, 2014 |
| Revenue | 100.0% | 100.0% | 100.0 % |
| Cost of revenue | 51.7 | 53.2 | 53.7 |
| Gross margin | 48.3 | 46.8 | 46.3 |
| Operating expenses | | | |
| Research and development | 12.1 | 12.3 | 12.5 |
| Selling and marketing | 17.4 | 15.9 | 15.5 |
| General and administrative | 10.1 | 8.8 | 8.9 |
| Total operating expenses | 39.6 | 37.0 | 36.9 |
| Operating income | 8.7 | 9.8 | 9.4 |
| Other income (expense), net | 0.5 | 0.5 | (0.1) |
| Income before income taxes | 9.2 | 10.3 | 9.3 |
| Income tax expense | 2.9 | 3.1 | 2.6 |
| Net income | 6.3% | 7.2% | 6.7 % |

28

Table of Contents

***Comparison of Years Ended December 31, 2016 and January 2, 2016***

*Revenue*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Total Revenue | $ 660,604 | $ 616,778 | $ 43,826 | 7.1% |

Our revenue increased 7.1% to $660.6 million in fiscal 2016 from $616.8 million in fiscal 2015. Revenue increased approximately $96.2 million, or 17.2%, in our consumer business while revenue decreased $51.9 million in our defense and security business as a result of the sale of our defense and security business unit on April 4, 2016.

The $96.2 million increase in revenue from our consumer business was driven by a 20.8% increase in units shipped, partially offset by a 0.8% decrease in net average selling price. In fiscal 2016, domestic consumer revenue increased $84.2 million, or 35.8%, and international consumer revenue increased $12.0 million, or 3.7%, compared to fiscal 2015. Total consumer robots shipped in fiscal 2016 were approximately 2,943,000 units compared to approximately 2,436,000 units in fiscal 2015. The increase in domestic consumer robots revenue was primarily attributable to increased sales as a result of significant investments in advertising media and national promotions as well as increased sales of the Roomba 900 series robots. Roomba 980 launched in late 2015, with a full year of revenue included in fiscal 2016. Roomba 960 was introduced in the third quarter of 2016. International consumer robots revenue grew 3.7% primarily due to our execution of successful marketing programs in those markets, as well as stronger overseas economies. During 2016, we recorded a net benefit to revenue and income before income taxes of $3.5 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $6.9 million during fiscal 2015. The net adjustments recorded in each period resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods. Partially offsetting these items in 2016 was a net reduction to revenue and income before income taxes of $6.4 million for pricing support to customers in response to changing market conditions.

*Cost of Revenue*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Total cost of revenue | $ 341,289 | $ 327,852 | $ 13,437 | 4.1% |
| As a percentage of total revenue | 51.7% | 53.2% | | |

Total cost of revenue increased $13.4 million, or 4.1% to $341.3 million in fiscal 2016, compared to $327.9 million in fiscal 2015. The increase is primarily due to the 7.1% increase in revenue and increased costs associated with assuming warranty liability in China as part of our strategy in that market.

*Gross Margin*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Total gross margin | $ 319,315 | $ 288,926 | $ 30,389 | 10.5% |
| As a percentage of total revenue | 48.3% | 46.8% | | |

Gross margin increased $30.4 million, or 10.5%, to $319.3 million (48.3% of revenue) in fiscal 2016 from $288.9 million (46.8% of revenue) in fiscal 2015. The increase in gross margin as a percentage of revenue was primarily driven by favorable product and region mix in the consumer robots business as well as the success of the higher margin Roomba 900 series robots. These increases were partially offset by pricing support to customers in response to changing market conditions as well as increased warranty costs. During 2016, we recorded a net benefit to revenue and gross margin of $3.5 million related to adjustments to our product returns reserves compared to a net benefit to revenue and gross margin of $6.9 million during fiscal 2015.

Table of Contents

*Research and Development*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Total research and development | $ 79,805 | $ 76,071 | $ 3,734 | 4.9% |
| As a percentage of total revenue | 12.1% | 12.3% | | |

Research and development expenses increased $3.7 million, or 4.9%, to $79.8 million (12.1% of revenue) in fiscal 2016 from $76.1 million (12.3% of revenue) in fiscal 2015. This increase is attributable to increased efforts in product development and continued product enhancements. During 2016, people and program related costs increased $12.0 million compared to 2015. This increase was partially offset by decreases related to defense and security and remote presence headcount and program spend of approximately $6.2 million and $2.1 million, respectively, compared to 2015.

*Selling and Marketing*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Total selling and marketing | $ 115,125 | $ 97,772 | $ 17,353 | 17.7% |
| As a percentage of total revenue | 17.4% | 15.9% | | |

Selling and marketing expenses increased by $17.4 million, or 17.7%, to $115.1 million (17.4% of revenue) in fiscal 2016 from $97.8 million (15.9% of revenue) in fiscal 2015. This increase is primarily attributable to increases of $12.1 million in investments in advertising media, national promotions and other selling and marketing costs incurred to support our continued global marketing and branding efforts and approximately $5.1 million associated with the go-to market transition in China.

*General and Administrative*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| General and administrative | $ 66,828 | $ 54,465 | $ 12,363 | 22.7% |
| As a percentage of total revenue | 10.1% | 8.8% | | |

General and administrative expenses increased by $12.4 million, or 22.7%, to $66.8 million (10.1% of revenue) in fiscal 2016 from $54.5 million (8.8% of revenue) in fiscal 2015. This increase is primarily attributable to increases of $7.8 million in people-related costs, $2.7 million in legal, advisory and other consulting costs associated with the proxy contest initiated by Red Mountain Capital Partners, $1.1 million in legal costs related to patent litigation and $0.9 million related to investments in enterprise hardware and software maintenance, support, and services.

*Other Income, Net*

| | Fiscal Year Ended | | | |
| | December 31, 2016 | January 2, 2016 | Dollar Change | Percent Change |
|---|---|---|---|---|
| | (In thousands) | | | |
| Other income, net | $ 3,804 | $ 2,353 | $ 1,451 | 61.7% |
| As a percentage of total revenue | 0.5% | 0.5% | | |

Other income, net, amounted to $3.8 million and $2.4 million for fiscal 2016 and fiscal 2015, respectively. Other income, net, for fiscal 2016 consisted of income related to an equity method investment of approximately $1.4 million, defense and security business transition services income of $1.2 million, a gain on sale of a cost method investment of approximately $0.6 million, a gain on the sale of the defense and security business unit of $0.4 million, as well as interest income, partially offset by impairment on a cost method investment of approximately $0.1 million and foreign currency exchange losses. During fiscal

30

Table of Contents

2015, we recorded a gain of approximately $3.3 million related to the sale of a cost method investment, which was partially offset primarily by foreign currency exchange losses.

*Income Tax Provision*

| | Fiscal Year Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2016 | | January 2, 2016 | | Dollar Change | Percent Change |
| | (In thousands) | | | | | |
| Income tax provision | $ | 19,422 | $ | 18,841 | $      581 | 3.1% |
| As a percentage of pre-tax income | | 31.7% | | 29.9% | | |

We recorded an income tax provision of $19.4 million and $18.8 million for fiscal 2016 and fiscal 2015, respectively. The $19.4 million income tax provision for fiscal 2016 was based upon a 2016 effective income tax rate of 31.7%. The $18.8 million income tax provision for fiscal 2015 was based upon a 2015 effective income tax rate of 31.3% reduced by a net income tax benefit of $0.9 million primarily resulting from an increase in federal and state tax credits upon filing the 2014 tax returns during 2015.

The federal research and development tax credit expired at the end of 2014. In December 2015, legislation was enacted that included the permanent extension of the federal research and development tax credit. The legislation also retroactively reinstated the research and development tax credit for 2015.

**Comparison of Years Ended January 2, 2016 and December 27, 2014**

*Revenue*

| | Fiscal Year Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | January 2, 2016 | | December 27, 2014 | | Dollar Change | Percent Change |
| | (In thousands) | | | | | |
| Total Revenue | $ | 616,778 | $ | 556,846 | $      59,932 | 10.8% |

Our revenue increased 10.8% to $616.8 million in fiscal 2015 from $556.8 million in fiscal 2014. Revenue increased $52.2 million, or 10.3%, in our home robots business unit, and $9.5 million, or 20.9%, in our defense and security business unit.

The $52.2 million increase in revenue from our home robots business unit was driven by a 12.1% increase in units shipped, partially offset by a 1.5% decrease in net average selling price. In fiscal 2015, domestic home robots revenue increased $47.3 million, or 25.2%, and international home robots revenue increased $4.9 million, or 1.5%, compared to fiscal 2014. Total home robots shipped in fiscal 2015 were 2,436,000 units compared to 2,174,000 units in fiscal 2014. The increase in domestic home robots revenue was primarily attributable to increased sales as a result of significant investments in advertising media and national promotions as well as the launch of Roomba 980. International home robots revenue growth slowed compared to fiscal 2014 as a result of negative macroeconomic conditions, specifically in Japan and Russia, offset by a significant growth increase in China. The increase in revenue also includes a $1.6 million favorable adjustment associated with the release of marketing allowances to a former customer that went unused and for which the statute of limitations has lapsed. During 2015, we recorded a net benefit to revenue and income before income taxes of $6.9 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $4.3 million and $5.7 million during fiscal 2014. The net adjustments recorded in each period resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods.

The $9.5 million increase in revenue from our defense and security business unit was driven by a $7.7 million increase in defense and security robot revenue and a $4.1 million increase in product life cycle revenue (spare parts, accessories), partially offset by a $2.3 million decrease in recurring contract revenue generated under research and development contracts. Total defense and security robots shipped in fiscal 2015 were 294 units compared to 265 units in fiscal 2014, while the net average selling price of our defense and security robots increased from approximately $56 thousand in fiscal 2014 to approximately $77 thousand in fiscal 2015. The increase in the number of units shipped and the increase in average selling price resulted from increased sales of our higher-priced SUGV robot in fiscal 2015 as compared to fiscal 2014. The $2.3 million decrease in contract revenue was primarily due to our change in strategy to not pursue funded research. The $4.1 million increase in product life cycle revenue was driven primarily by the delivery of robots and spare parts under a contract with the Canadian Department of National Defense.

31

Table of Contents

*Cost of Revenue*

| | | Fiscal Year Ended | | | |
| | | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Total cost of revenue | $ | 327,852 | $ 298,791 | $ 29,061 | 9.7% |
| As a percentage of total revenue | | 53.2% | 53.7% | | |

   Total cost of revenue increased $29.1 million, or 9.7% to $327.9 million in fiscal 2015, compared to $298.8 million in fiscal 2014. The increase is primarily due to the 12.1% and 10.9% increase of units shipped in our home robots business unit and defense and security business unit, respectively. These increases are partially offset by a higher mix of lower margin products sold in the defense and security business unit.

*Gross Margin*

| | | Fiscal Year Ended | | | |
| | | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Total gross margin | $ | 288,926 | $ 258,055 | $ 30,871 | 12.0% |
| As a percentage of total revenue | | 46.8% | 46.3% | | |

   Gross margin increased $30.9 million, or 12.0%, to $288.9 million (46.8% of revenue) in fiscal 2015 from $258.1 million (46.3% of revenue) in fiscal 2014. The increase in gross margin as a percentage of revenue was the result of the home robots business unit gross margin increasing 0.4 percentage points, partially offset by the defense and security business unit gross margin decreasing 0.5 percentage points. The 0.4 percentage point increase in the home robots business unit was primarily driven by favorable product and customer mix, the introduction of the higher margin Roomba 980, a decrease in warranty costs, as well as the favorable impact of the $1.6 million adjustment to revenue related to the release of marketing allowances. During 2015, we recorded a net benefit to revenue and gross margin of $6.9 million related to adjustments to our product returns reserves compared to a net benefit to revenue and gross margin of $4.3 million and $5.7 million during fiscal 2014. The 0.5 percentage point decrease in the defense and security business unit is attributable to the increase in sales of our lower margin robots.

*Research and Development*

| | | Fiscal Year Ended | | | |
| | | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Total research and development | $ | 76,071 | $ 69,408 | $ 6,663 | 9.6% |
| As a percentage of total revenue | | 12.3% | 12.5% | | |

   Research and development expenses increased $6.7 million, or 9.6%, to $76.1 million (12.3% of revenue) in fiscal 2015 from $69.4 million (12.5% of revenue) in fiscal 2014. This increase is attributable to increased efforts in product development and continued product enhancements. People-related costs increased $7.0 million associated with an approximate 10% increase in headcount, especially related to software engineers, as well as a $0.7 million increase in materials. These increases were partially offset by decreased consulting expenses of $1.0 million in 2015 compared to 2014.

*Selling and Marketing*

| | | Fiscal Year Ended | | | |
| | | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Total selling and marketing | $ | 97,772 | $ 86,091 | $ 11,681 | 13.6% |
| As a percentage of total revenue | | 15.9% | 15.5% | | |

Table of Contents

Selling and marketing expenses increased by $11.7 million, or 13.6%, to $97.8 million (15.9% of revenue) in fiscal 2015 from $86.1 million (15.5% of revenue) in fiscal 2014. This increase is primarily attributable to an increase of $8.9 million in investments in advertising media, national promotions and other selling and marketing costs incurred to support the retail launch of the Roomba 980 series and our continued global marketing and branding efforts, as well as increases in people-related costs of $2.2 million driven by increased headcount in fiscal 2015 compared to fiscal 2014.

*General and Administrative*

| | Fiscal Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
| --- | --- | --- | --- | --- |
| | | (In thousands) | | |
| General and administrative | $ 54,465 | $ 49,439 | $ 5,026 | 10.2% |
| As a percentage of total revenue | 8.8% | 8.9% | | |

General and administrative expenses decreased by $5.0 million, or 10.2%, to $54.5 million (8.8% of revenue) in fiscal 2015 from $49.4 million (8.9% of revenue) in fiscal 2014. This increase is primarily attributable to increases of $2.6 million in consulting costs, $1.8 million in people-related costs and $0.7 million related to investments in enterprise hardware and software maintenance, support, and services.

*Other Income (Expense), Net*

| | Fiscal Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
| --- | --- | --- | --- | --- |
| | | (In thousands) | | |
| Other income (expense), net | $ 2,353 | $ (708) | $ 3,061 | (432.3)% |
| As a percentage of total revenue | 0.5% | (0.1)% | | |

Other income (expense), net, amounted to $2.4 million and $(0.7) million for fiscal 2015 and fiscal 2014, respectively. During fiscal 2015, we recorded a gain of approximately $3.3 million related to the sale of a cost method investment, which was offset primarily by foreign currency exchange losses resulting from foreign currency exchange rate fluctuations.

*Income Tax Provision*

| | Fiscal Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Dollar Change | Percent Change |
| --- | --- | --- | --- | --- |
| | | (In thousands) | | |
| Income tax provision | $ 18,841 | $ 14,606 | $ 4,235 | 29.0% |
| As a percentage of pre-tax income | 29.9% | 27.9% | | |

We recorded an income tax provision of $18.8 million and $14.6 million for fiscal 2015 and fiscal 2014, respectively. The $18.8 million income tax provision for fiscal 2015 was based upon a 2015 effective income tax rate of 31.3% reduced by a net income tax benefit of $0.9 million primarily resulting from an increase in federal and state tax credits upon filing the 2014 tax returns during 2015. The $14.6 million provision for fiscal 2014 was based upon a 2014 effective income tax rate of 31.5% reduced by a net income tax benefit of $1.9 million primarily resulting from the release of $2.1 million of valuation allowance related to certain state tax attributes of Evolution Robotics, Inc.

The federal research and development tax credit expired at the end of 2014. In December 2015, legislation was enacted that included the permanent extension of the federal research and development tax credit. The legislation also retroactively reinstated the research and development tax credit for 2015.

**Liquidity and Capital Resources**

At December 31, 2016, our principal sources of liquidity were cash and cash equivalents totaling $214.5 million, short-term investments of $39.9 million and accounts receivable of $72.9 million.

We manufacture and distribute our products through contract manufacturers and third-party logistics providers. We believe that this approach gives us the advantages of relatively low capital investment and significant flexibility in scheduling production and managing inventory levels. By leasing our office facilities, we also minimize the cash needed for expansion.

33

Table of Contents

Accordingly, our capital spending is generally limited to leasehold improvements, computers, office furniture, product-specific production tooling, internal use software and test equipment. In the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, we spent $10.8 million, $9.4 million and $13.8 million respectively, on capital equipment.

Our strategy for delivering consumer products to our distributors and retail customers gives us the flexibility to provide container shipments directly to the retailer from China and, alternatively, allows our distributors and retail partners to take possession of product on a domestic basis. Accordingly, our consumer product inventory consists of goods shipped to our third-party logistics providers for the fulfillment of distributor, retail and direct-to-consumer sales. Our contract manufacturers are also responsible for purchasing and stocking components required for the production of our products, and they typically invoice us when the finished goods are shipped.

As of December 31, 2016, we held cash, cash equivalents and short-term investments of $254.5 million, primarily the result of our increased profitability, as well as our on-going focus on managing working capital. Net cash provided by our operations for the fiscal year ended December 31, 2016 was $116.4 million, of which the principal components were our net income of $41.9 million and non-cash charges of $28.0 million and a net decrease in operating assets and liabilities of $46.5 million. The decrease in net operating assets and liabilities includes an increase in accounts receivable (including unbilled revenue) of $46.5 million primarily due to a decrease in accounts receivable (including unbilled revenue) of $25.7 million primarily due to the timing of billing in respective periods and a $16.5 million increase in accounts payable, accrued liabilities and accrued compensation primarily due to growth in the business and timing of payments to our suppliers. As of December 31, 2016, we did not have any borrowings outstanding under our working capital line of credit and had $1.0 million in letters of credit outstanding under our revolving letter of credit facility.

We received $23.5 million for the divestiture of our defense and security business unit, net of a $1.0 million payment to our financial adviser. We invested $10.8 million in the purchase of property and equipment in 2016, including tooling for new products. We purchased $20.1 million of marketable securities in 2016, while sales and maturities of marketable securities amounted to $13.0 million. We made strategic investments of $2.2 million in the form of preferred shares and notes receivable.

During 2016, we received $9.3 million from the exercise of stock options and $3.0 million from the excess tax benefit related to our stock-based compensation plans. In addition, we repurchased 2,641,122 shares of our common stock for an aggregate purchase price of $97.0 million. Shares issued upon vesting of restricted stock were net of 39,676 shares retained by us to cover employee tax withholdings of $1.3 million.

Net cash provided by our operations for the fiscal year ended January 2, 2016 was $26.7 million, of which the principal components were our net income of $44.1 million and non-cash charges of $23.9 million, partially offset by a net increase in operating assets and liabilities of $41.3 million. The increase in net operating assets and liabilities includes an increase in accounts receivable (including unbilled revenue) of $31.5 million primarily due to an increase in revenue and timing of billing in respective periods and a $14.0 million increase in inventory primarily to support increased domestic sales and the roll-out of Roomba 980. As of January 2, 2016, we did not have any borrowings outstanding under our working capital line of credit and had $1.5 million in letters of credit outstanding under our revolving letter of credit facility.

We invested $9.4 million in the purchase of property and equipment in 2015, including tooling for new products. We purchased $17.8 million of marketable securities in 2015, while sales and maturities of marketable securities amounted to $20.5 million. We received $5.6 million from sales of other assets. We made strategic investments of $1.0 million in the form of preferred shares and notes receivable.

During 2015, we received $6.5 million from the exercise of stock options and $1.5 million from the excess tax benefit related to our stock-based compensation plans. In addition, we repurchased 1,260,276 shares of our common stock for an aggregate purchase price of $37.4 million. Shares issued upon vesting of restricted stock were net of 37,969 shares retained by us to cover employee tax withholdings of $1.3 million.

### *Working Capital Facilities*

#### *Credit Facility*

We have an unsecured revolving credit facility with Bank of America, N.A., which is available to fund working capital and other corporate purposes. As of December 31, 2016, the total amount of our credit facility was $75.0 million and the full amount was available for borrowing. The interest on loans under our credit facility accrues, at our election, at either (1) LIBOR plus a margin, currently equal to 1.0%, based on our ratio of indebtedness to Adjusted EBITDA (the "Eurodollar Rate"), or (2) the lender's base rate. The lender's base rate is equal to the highest of (1) the federal funds rate plus 0.5%, (2) the lender's prime rate and (3) the Eurodollar Rate plus 1.0%. The credit facility will terminate and all amounts outstanding thereunder will be due and payable in full on December 20, 2018.

As of December 31, 2016, we had no outstanding borrowings under our revolving credit facility. This credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on our ability to incur or guaranty additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, our stock, and consolidate or merge with other entities.

34

Table of Contents

In addition, we are required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

This credit facility contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, our obligations under the credit facility may be accelerated.

As of December 31, 2016, we were in compliance with all covenants under the revolving credit facility.

*Letter of Credit Facility*

We have an unsecured revolving letter of credit facility with Bank of America, N.A. The credit facility is available to fund letters of credit on our behalf up to an aggregate outstanding amount of $5.0 million. We may terminate at any time, subject to proper notice, or from time to time permanently reduce the amount of the credit facility.

We pay a fee on outstanding letters of credit issued under the credit facility of up to 1.5% per annum of the outstanding letters of credit. The maturity date for letters of credit issued under the credit facility must be no later than 365 days following the maturity date of the credit facility.

As of December 31, 2016, we had letters of credit outstanding of $1.0 million under our revolving letter of credit facility. The credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on our ability to incur or guaranty additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, our stock, and consolidate or merge with other entities. In addition, we are required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

The credit facility also contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy, and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the lender may accelerate the obligations under the credit facility.

As of December 31, 2016, we were in compliance with all covenants under the revolving letter of credit facility.

***Working Capital and Capital Expenditure Needs***

We currently have no material cash commitments, except for normal recurring trade payables, expense accruals and operating leases, all of which we anticipate funding through working capital, funds provided by operating activities and our existing working capital line of credit. We do not currently anticipate significant investment in property, plant and equipment, and we believe that our outsourced approach to manufacturing provides us with flexibility in both managing inventory levels and financing our inventory. We believe our existing cash and cash equivalents, short-term investments, cash provided by operating activities, and funds available through our working capital line of credit will be sufficient to meet our working capital and capital expenditure needs over at least the next twelve months. In the event that our revenue plan does not meet our expectations, we may eliminate or curtail expenditures to mitigate the impact on our working capital. Our future capital requirements will depend on many factors, including our rate of revenue growth, the expansion of our marketing and sales activities, the timing and extent of spending to support product development efforts, the timing of introductions of new products and enhancements to existing products, the acquisition of new capabilities or technologies, and the continuing market acceptance of our products and services. Moreover, to the extent that existing cash and cash equivalents, short-term investments, cash from operations, and cash from short-term borrowing are insufficient to fund our future activities, we may need to raise additional funds through public or private equity or debt financing. As part of our business strategy, we may consider additional acquisitions of companies, technologies and products, which could also require us to seek additional equity or debt financing. Additional funds may not be available on terms favorable to us or at all.

**Contractual Obligations**

We generally do not enter into binding purchase commitments. Our principal commitments consist of obligations under our working capital line of credit, leases for office space and minimum contractual obligations. Other obligations consist primarily of software licensing arrangements. The following table describes our commitments to settle contractual obligations in cash as of December 31, 2016:

35

Table of Contents

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Less Than 1 Year | 1 to 3 Years | 3 to 5 Years | More Than 5 Years | Total |
| | (In thousands) | | | | |
| Operating leases | $ 4,773 | $ 8,647 | $ 3,308 | $ 2,046 | $ 18,774 |
| Minimum contractual payments | 1,066 | 1,390 | — | — | 2,456 |
| Other obligations | 1,324 | 429 | — | — | 1,753 |
| Total | $ 7,163 | $ 10,466 | $ 3,308 | $ 2,046 | $ 22,983 |

At December 31, 2016, we had outstanding purchase orders aggregating approximately $103.2 million. The purchase orders, the majority of which are with our contract manufacturers for the purchase of inventory in the normal course of business, are for manufacturing and non-manufacturing related goods and services, and are generally cancelable without penalty.  In circumstances where we determine that we have financial exposure associated with any of these commitments, we record a liability in the period in which that exposure is identified.

**Off-Balance Sheet Arrangements**

As of December 31, 2016, we had no off-balance sheet arrangements as defined in Item 303(a)(4) of Regulation S-K.

**Recently Issued Accounting Pronouncements**

In January 2017, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) FASB issued ASU No. 2017-04, "Intangibles - Goodwill and Other (Topic 350)." ASU No. 2017-04 eliminates step 2 from the goodwill impairment test, instead an entity should recognize an impairment charge for the amount by which the carrying amount of goodwill exceeds the reporting unit's fair value. ASU 2017-04 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, with early adoption permitted.  We do not believe that ASU 2017-04 will have a material effect on our consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-01, "Business Combinations (Topic 805) Clarifying the Definition of a Business". The Amendments in this Update is to clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for annual periods beginning after December 15, 2017, including interim periods within those periods. We are currently evaluating the impact of ASU 2017-01 on our consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-16, "Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other Than Inventory." ASU 2016-16 clarifies the accounting for the current and deferred income taxes for an intra-entity transfer of an asset other than inventory. ASU 2016-16 is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, with early adoption permitted.  We are currently evaluating the impact of ASU 2016-16 on our consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, "Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments."  ASU 2016-15 refines how companies classify certain aspects of the cash flow statement in regards to debt prepayment, settlement of debt instruments, contingent consideration payments, proceeds from insurance claims and life insurance policies, distribution from equity method investees, beneficial interests in securitization transactions and separately identifiable cash flows.  ASU 2016-15 is effective for annual periods beginning after December 15, 2017, and for interim periods within fiscal years beginning after December 15, 2018.  Early adoption is permitted.  We are currently evaluating the impact of ASU 2016-15 on our consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, "Improvements to Employee Share-Based Payment Accounting," which simplifies several aspects of the accounting for employee share-based payment transactions, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. We are currently evaluating the impact of ASU 2016-09 on our consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, "Leases." ASU 2016-02 requires lessees to recognize the assets and liabilities on their balance sheet for the rights and obligations created by most leases and continue to recognize expenses on their income statements over the lease term.  It will also require disclosures designed to give financial statement users information on the amount, timing, and uncertainty of cash flows arising from leases. The guidance is effective for annual reporting periods beginning after December 15, 2018 and interim periods within those fiscal years, with early adoption permitted. We are currently evaluating the impact of the standard on our consolidated financial statements.

In November 2015, the FASB issued ASU No. 2015-17, "Income Taxes: Balance Sheet Classification of Deferred Taxes." ASU 2015-17 requires that the presentation of deferred tax assets and liabilities be classified as noncurrent on the

36

Table of Contents

balance sheet instead of separating deferred taxes into current and noncurrent amounts. This standard will become effective for fiscal years, and the interim periods within those years, beginning after December 15, 2016, with early adoption allowed. We elected to prospectively adopt ASU 2015-17 as of January 2, 2016. The prior reporting period was not retrospectively adjusted. The adoption of this guidance had no impact on our Consolidated Statements of Income and Comprehensive Income.

In July 2015, the FASB issued ASU No. 2015-11, "Inventory: Simplifying the Measurement of Inventory." ASU 2015-11 applies only to inventory for which cost is determined by methods other than last-in, first-out and the retail inventory method, which includes inventory that is measured using first-in, first-out or average cost. Inventory within the scope of this standard is required to be measured at the lower of cost and net realizable value. Net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The new standard will be effective for us on January 1, 2017. We do not believe that ASU 2015-11 will have a material effect on our consolidated financial statements.

In April 2015, the FASB issued ASU No. 2015-05, "Intangibles - Goodwill and Other - Internal-Use Software: Customer's Accounting for Fees Paid in a Cloud Computing Arrangement." Under ASU 2015-05, if a cloud computing arrangement includes a software license, the software license element of the arrangement should be accounted for consistent with the acquisition of other software licenses. If a cloud computing arrangement does not include a software license, the arrangement should be accounted for as a service contract. The new standard became effective for us on January 3, 2016. The adoption of this standard did not have a material impact on our consolidated financial statements.

In February 2015, the FASB issued ASU No. 2015-02, "Consolidation - Amendments to the Consolidation Analysis." ASU 2015-02 reduces the number of consolidation models and changes the way reporting entities evaluate a variable interest entity. It is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2015. We adopted ASU 2015-02 effective January 3, 2016. The adoption of this standard did not have a material impact on our consolidated financial statements.

In June 2014, the FASB issued ASU No. 2014-12, "Accounting for Share-Based Payments When the Terms of an Award Provide That a Performance Target Could Be Achieved after the Requisite Service Period." ASU 2014-12 requires a reporting entity to treat a performance target that affects vesting and that could be achieved after the requisite service period as a performance condition. It is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2015. We adopted ASU 2014-12 effective January 3, 2016. The adoption of this standard did not have a material impact on our consolidated financial statements.

In May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers," which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The new guidance initially was effective for annual reporting periods beginning after December 15, 2016, including interim periods within those annual reporting periods. In July 2015, the FASB voted to defer the effective date of the new accounting guidance related to revenue recognition by one year to December 17, 2017 for annual reporting periods beginning after that date and permitted early adoption of the standard, but not before the original effective date of December 15, 2016. We are continuing to evaluate the impact that the adoption of the new revenue recognition standard will have on our consolidated financial statements, but anticipate that the additional disclosure requirements will represent a significant change from current guidance. We currently anticipate adopting the standard using the modified retrospective method.

From time to time, new accounting pronouncements are issued by FASB that we adopt as of the specified effective date. Unless otherwise discussed, we believe that recently issued standards, which are not yet effective, will not have a material impact on our consolidated financial statements upon adoption.

## ITEM 7A.    *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

### Foreign Currency Exchange Risk

We maintain sales and business operations in foreign countries. As such, we have exposure to adverse changes in exchange rates associated with operating expenses of our foreign operations, but we believe this exposure to be immaterial. Additionally, we accept orders for consumer robots products in currencies other than the U.S. dollar. We regularly monitor the level of non-U.S. dollar accounts receivable balances to determine if any actions, including possibly entering into foreign currency forward contracts or swaps, should be taken to minimize the impact of fluctuating exchange rates on our results of operations. Our international revenue is primarily denominated in U.S. dollars and therefore any fluctuations in the Euro or any other non-U.S. dollar currencies will have minimal direct impact on our international revenue. However, as the U.S. dollar strengthens or weakens against other currencies, our international distributors may be impacted, which could affect their profitability and our ability to maintain current pricing levels on our international consumer products.

Table of Contents

**Interest Rate Sensitivity**

At December 31, 2016, we had unrestricted cash and cash equivalents of $214.5 million and short term investments of $39.9 million. The unrestricted cash and cash equivalents are held for working capital purposes. We do not enter into investments for trading or speculative purposes. Some of the securities in which we invest, however, may be subject to market risk. This means that a change in prevailing interest rates may cause the fair market value of the investment to fluctuate. To minimize this risk in the future, we intend to maintain our portfolio of cash equivalents in a variety of securities, commercial paper, money market funds, debt securities and certificates of deposit. Due to the short-term nature of these investments, we believe that we do not have any material exposure to changes in the fair value of our investment portfolio as a result of changes in interest rates. As of December 31, 2016, all of our cash and cash equivalents were held in demand deposits and money market accounts.

Our exposure to market risk also relates to the increase or decrease in the amount of interest expense we must pay on any outstanding debt instruments, primarily certain borrowings under our working capital line of credit. The advances under the working capital line of credit bear a variable rate of interest determined at the time of the borrowing. At December 31, 2016, we had letters of credit outstanding of $1.0 million under our revolving letter of credit facility.

Table of Contents

**ITEM 8.** *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**iROBOT CORPORATION**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 40 |
| Consolidated Balance Sheets at December 31, 2016 and January 2, 2016 | 41 |
| Consolidated Statements of Income for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014 | 42 |
| Consolidated Statements of Comprehensive Income for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014 | 42 |
| Consolidated Statements of Stockholders' Equity for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014 | 44 |
| Consolidated Statements of Cash Flows for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014 | 45 |
| Notes to Consolidated Financial Statements | 46 |

39

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
iRobot Corporation:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows present fairly, in all material respects, the financial position of iRobot Corporation and its subsidiaries at December 31, 2016 and January 2, 2016, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Boston, Massachusetts
February 17, 2017

40

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2016 | | January 2, 2016 | |
|---|---|---|---|---|
| | (In thousands) | | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 214,523 | $ | 179,915 |
| Short term investments | | 39,930 | | 33,124 |
| Accounts receivable, net of allowance of $29 at December 31, 2016 and $33 at January 2, 2016 | | 72,909 | | 104,679 |
| Unbilled revenue | | 139 | | 452 |
| Inventory | | 50,578 | | 61,678 |
| Other current assets | | 5,591 | | 9,501 |
| Total current assets | | 383,670 | | 389,349 |
| Property and equipment, net | | 27,532 | | 26,850 |
| Deferred tax assets | | 30,585 | | 31,721 |
| Goodwill | | 41,041 | | 48,751 |
| Intangible assets, net | | 12,207 | | 15,664 |
| Other assets | | 12,877 | | 9,408 |
| Total assets | $ | 507,912 | $ | 521,743 |
| **LIABILITIES, REDEEMABLE CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 67,281 | $ | 61,655 |
| Accrued expenses | | 19,854 | | 15,954 |
| Accrued compensation | | 21,015 | | 15,752 |
| Deferred revenue and customer advances | | 4,486 | | 3,265 |
| Total current liabilities | | 112,636 | | 96,626 |
| Long term liabilities | | 6,320 | | 7,706 |
| Commitments and contingencies (Note 11): | | | | |
| Redeemable convertible preferred stock, 5,000,000 shares authorized and no shares issued or outstanding | | — | | — |
| Common stock, $0.01 par value, 100,000,000 shares authorized; and 27,237,870 and 29,091,806 shares issued and outstanding at December 31, 2016 and January 2, 2016, respectively | | 272 | | 291 |
| Additional paid-in capital | | 161,885 | | 232,345 |
| Retained earnings | | 226,950 | | 185,011 |
| Accumulated other comprehensive loss | | (151) | | (236) |
| Total stockholders' equity | | 388,956 | | 417,411 |
| Total liabilities, redeemable convertible preferred stock and stockholders' equity | $ | 507,912 | $ | 521,743 |

See accompanying Notes to Consolidated Financial Statements

41

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED STATEMENTS OF INCOME**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | |
| | (In thousands, except per share amounts) | | | | | |
| Revenue | $ | 660,604 | $ | 616,778 | $ | 556,846 |
| Cost of revenue(1) | | 341,289 | | 327,852 | | 298,791 |
| Gross margin | | 319,315 | | 288,926 | | 258,055 |
| Operating expenses: | | | | | | |
| Research and development(1) | | 79,805 | | 76,071 | | 69,408 |
| Selling and marketing(1) | | 115,125 | | 97,772 | | 86,091 |
| General and administrative(1) | | 66,828 | | 54,465 | | 49,439 |
| Total operating expenses | | 261,758 | | 228,308 | | 204,938 |
| Operating income | | 57,557 | | 60,618 | | 53,117 |
| Other income (expense), net | | 3,804 | | 2,353 | | (708) |
| Income before income taxes | | 61,361 | | 62,971 | | 52,409 |
| Income tax expense | | 19,422 | | 18,841 | | 14,606 |
| Net income | $ | 41,939 | $ | 44,130 | $ | 37,803 |
| Net income per share | | | | | | |
| Basic | $ | 1.51 | $ | 1.49 | $ | 1.28 |
| Diluted | $ | 1.48 | $ | 1.47 | $ | 1.25 |
| Number of weighted average common shares used in calculations per share | | | | | | |
| Basic | | 27,698 | | 29,550 | | 29,485 |
| Diluted | | 28,292 | | 30,107 | | 30,210 |

_____

(1)    Stock-based compensation recorded in fiscal 2016, 2015 and 2014 breaks down by expense classification as follows:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | |
| | (In thousands) | | | | | |
| Cost of revenue | $ | 760 | $ | 1,076 | $ | 865 |
| Research and development | | 3,646 | | 3,256 | | 3,359 |
| Selling and marketing | | 2,008 | | 1,457 | | 1,296 |
| General and administrative | | 9,581 | | 8,394 | | 8,258 |

See accompanying Notes to Consolidated Financial Statements

42

Table of Contents

**iROBOT CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | |
| | (In thousands) | | | | | |
| Net income | $ | 41,939 | $ | 44,130 | $ | 37,803 |
| Other comprehensive gain (loss), net of tax: | | | | | | |
| Unrealized gains (losses) on investments, net of tax | | 85 | | (85) | | (298) |
| Total comprehensive income | $ | 42,024 | $ | 44,045 | $ | 37,505 |

See accompanying Notes to Consolidated Financial Statements

43

Table of Contents

**iROBOT CORPORATION**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Value | | | | |
| | | | (In thousands, except share data) | | | |
| Balance at December 28, 2013 | 28,935,253 | $ 289 | $ 227,175 | $ 103,078 | $ 147 | $ 330,689 |
| Issuance of common stock for exercise of stock options | 486,252 | 5 | 8,938 | | | 8,943 |
| Vesting of restricted stock units | 318,367 | 3 | (3) | | | — |
| Tax benefit of excess stock based compensation deduction | | | 2,776 | | | 2,776 |
| Amortization of deferred compensation relating to stock options and restricted stock units | | | 13,778 | | | 13,778 |
| Stock withheld to cover tax withholdings requirements upon vesting of restricted stock units | (39,297) | | (1,626) | | | (1,626) |
| Unrealized loss on short term investment | | | | | (298) | (298) |
| Directors' deferred compensation | | | 49 | | | 49 |
| Stock repurchases | (55,973) | | (1,678) | | | (1,678) |
| Net income | | | | 37,803 | | 37,803 |
| Balance at December 27, 2014 | 29,644,602 | $ 297 | $ 249,409 | $ 140,881 | $ (151) | $ 390,436 |
| Issuance of common stock for exercise of stock options | 390,085 | 4 | 6,460 | | | 6,464 |
| Conversion of deferred compensation | 14,610 | — | — | | | — |
| Vesting of restricted stock units | 340,754 | 3 | (3) | | | — |
| Tax benefit of excess stock based compensation deduction | | | 822 | | | 822 |
| Amortization of deferred compensation relating to stock options and restricted stock units | | | 14,183 | | | 14,183 |
| Stock withheld to cover tax withholdings requirements upon vesting of restricted stock units | (37,969) | | (1,295) | | | (1,295) |
| Unrealized loss on short term investment | | | | | (85) | (85) |
| Directors' deferred compensation | | | 149 | | | 149 |
| Stock repurchases | (1,260,276) | (13) | (37,380) | | | (37,393) |
| Net income | | | | 44,130 | | 44,130 |
| Balance at January 2, 2016 | 29,091,806 | $ 291 | $ 232,345 | $ 185,011 | $ (236) | $ 417,411 |
| Issuance of common stock for exercise of stock options | 456,498 | 4 | 9,340 | | | 9,344 |
| Conversion of deferred compensation | 6,721 | — | — | | | — |
| Vesting of restricted stock units | 363,643 | 4 | (4) | | | — |
| Tax benefit of excess stock based compensation deduction | | | 2,421 | | | 2,421 |
| Amortization of deferred compensation relating to stock options and restricted stock units | | | 15,995 | | | 15,995 |
| Stock withheld to cover tax withholdings requirements upon vesting of restricted stock units | (39,676) | | (1,300) | | | (1,300) |
| Unrealized loss on short term investment | | | | | 85 | 85 |
| Directors' deferred compensation | | | 82 | | | 82 |
| Stock repurchases | (2,641,122) | (27) | (96,994) | | | (97,021) |
| Net income | | | | 41,939 | | 41,939 |
| Balance at December 31, 2016 | 27,237,870 | $ 272 | $ 161,885 | $ 226,950 | $ (151) | $ 388,956 |

See accompanying Notes to Consolidated Financial Statements

44

Table of Contents

**iROBOT CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2016 | | | January 2, 2016 | | December 27, 2014 |
| | (In thousands) | | | | | |
| **Cash flows from operating activities:** | | | | | | |
| Net income | $ | 41,939 | $ | 44,130 | $ | 37,803 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | | 13,606 | | 15,090 | | 13,049 |
| Loss on disposal of property and equipment | | 211 | | 214 | | 246 |
| Gain on sale of business unit | | (433) | | — | | — |
| Income on equity method investment | | (1,376) | | — | | — |
| Gain on sale of cost method investment | | (634) | | (3,287) | | — |
| Stock-based compensation | | 15,995 | | 14,183 | | 13,778 |
| Deferred income taxes, net | | 3,557 | | (985) | | 3,101 |
| Tax benefit of excess stock-based compensation deductions | | (2,971) | | (1,467) | | (3,051) |
| Non-cash director deferred compensation | | 82 | | 149 | | 49 |
| Changes in operating assets and liabilities — (use) source | | | | | | |
| Accounts receivable | | 25,484 | | (33,623) | | (31,708) |
| Unbilled revenue | | 198 | | 2,162 | | (1,758) |
| Inventory | | (981) | | (13,978) | | (2,387) |
| Other assets | | 3,187 | | 203 | | (2,856) |
| Accounts payable | | 6,502 | | 3,786 | | 16,249 |
| Accrued expenses | | 4,222 | | (2,768) | | 3,695 |
| Accrued compensation | | 5,748 | | (483) | | (3,371) |
| Deferred revenue and customer advances | | 2,996 | | (584) | | (1,236) |
| Long term liabilities | | (908) | | 3,970 | | (997) |
| Net cash provided by operating activities | | 116,424 | | 26,712 | | 40,606 |
| **Cash flows from investing activities:** | | | | | | |
| Additions of property and equipment | | (10,817) | | (9,372) | | (13,774) |
| Change in other assets | | (2,093) | | (1,015) | | (250) |
| Proceeds from sale of business unit | | 23,520 | | — | | — |
| Proceeds from sale of cost method investment | | 634 | | 5,645 | | — |
| Purchases of investments | | (16,554) | | (17,755) | | (31,219) |
| Sales and maturities of investments | | 9,500 | | 20,500 | | 16,500 |
| Net cash provided by (used in) investing activities | | 4,190 | | (1,997) | | (28,743) |
| **Cash flows from financing activities:** | | | | | | |
| Income tax withholding payment associated with restricted stock vesting | | (1,300) | | (1,295) | | (1,626) |
| Proceeds from stock option exercises | | 9,344 | | 6,464 | | 8,943 |
| Stock repurchases | | (97,021) | | (37,393) | | (1,678) |
| Tax benefit of excess stock-based compensation deductions | | 2,971 | | 1,467 | | 3,051 |
| Net cash provided by (used in) financing activities | | (86,006) | | (30,757) | | 8,690 |
| Net increase (decrease) in cash and cash equivalents | | 34,608 | | (6,042) | | 20,553 |
| Cash and cash equivalents, at beginning of period | | 179,915 | | 185,957 | | 165,404 |
| Cash and cash equivalents, at end of period | $ | 214,523 | $ | 179,915 | $ | 185,957 |
| **Supplemental disclosure of cash flow information** | | | | | | |
| Cash paid for income taxes | $ | 14,061 | $ | 14,341 | $ | 15,508 |
| Non-cash investing and financing activities: | | | | | | |
| Transfer of inventory to property and equipment | | 5 | | 157 | | 637 |
| Additions of property and equipment included in accounts payable | | 1,550 | | 848 | | 3,235 |
| Asset retirement obligation | $ | 115 | $ | — | $ | — |

See accompanying Notes to Consolidated Financial Statements

45

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.    Nature of the Business**

iRobot Corporation ("iRobot" or the "Company") develops robotics and applies this technology in producing and marketing robots. The Company's revenue is primarily generated from product sales.

**2.    Summary of Significant Accounting Policies**

*Basis of Presentation*

The accompanying consolidated financial statements include those of iRobot and its subsidiaries, after elimination of all intercompany accounts and transactions. iRobot has prepared the accompanying consolidated financial statements in conformity with accounting principles generally accepted in the United States of America.

*Use of Estimates*

The preparation of these financial statements in conformity with accounting principles generally accepted in the United States requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and disclosure of contingent assets and liabilities. On an ongoing basis, management evaluates these estimates and judgments, including those related to revenue recognition, sales returns, bad debts, warranty claims, inventory reserves, valuation of investments, valuation of goodwill and intangible assets, assumptions used in valuing stock-based compensation instruments and income taxes. The Company bases these estimates on historical and anticipated results, and trends and on various other assumptions that the Company believes are reasonable under the circumstances, including assumptions as to future events. These estimates form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. By their nature, estimates are subject to an inherent degree of uncertainty. Actual results may differ from the Company's estimates.

*Fiscal Year-End*

The Company operates and reports using a 52-53 week fiscal year ending on the Saturday closest to December 31. Accordingly, the Company's fiscal quarters end on the Saturday that falls closest to the last day of the third month of each quarter.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original or remaining maturity of three months or less at the time of purchase to be cash equivalents. The Company invests its excess cash primarily in money market funds or savings accounts of major financial institutions. Accordingly, its cash equivalents are subject to minimal credit and market risk. At December 31, 2016 and January 2, 2016, cash equivalents were comprised of money market funds totaling $157.0 million and $110.8 million, respectively. These cash equivalents are carried at cost, which approximates fair value.

*Short Term Investments*

The Company's investments are classified as available-for-sale and are recorded at fair value with any unrealized gain or loss recorded as an element of stockholders' equity. The fair value of investments is determined based on quoted market prices at the reporting date for those instruments. As of December 31, 2016 and January 2, 2016, investments consisted of:

| | December 31, 2016 | | January 2, 2016 | |
| --- | --- | --- | --- | --- |
| | Cost | Fair Market Value | Cost | Fair Market Value |
| | (In thousands) | | | |
| Corporate and government bonds | $    40,439 | $    39,930 | $    33,622 | $    33,124 |
| Total short term investments | $    40,439 | $    39,930 | $    33,622 | $    33,124 |

As of December 31, 2016, the Company's investments had maturity dates ranging from February 2017 to October 2019. The Company invests primarily in investment grade securities and limits the amount of investment in any single issuer.

46

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Revenue Recognition*

The Company primarily derives its revenue from product sales. Until the divestiture of the defense and security business unit on April 4, 2016 (see Note 15), the Company also generated minimal revenue from government and commercial research and development contracts. The Company sells products directly to customers and indirectly through resellers and distributors. The Company recognizes revenue from sales of robots under the terms of the customer agreement upon transfer of title and risk of loss to the customer, net of estimated returns and allowances, provided that collection is determined to be reasonably assured and no significant obligations remain.

Beginning in the third quarter of 2015, with the introduction of the Company's first connected robot, each sale of a connected robot represents a multi-element arrangement containing the robot, an app and potential future unspecified software upgrades. Revenue is allocated to the deliverables based on their relative selling prices which have been determined using best estimate of selling price (BESP), as the Company has not been able to establish vendor specific objective evidence (VSOE) or obtain relevant third party evidence (TPE). Revenue allocated to the app and unspecified software upgrades is then deferred and recognized on a straight-line basis over the period in which the Company expects to provide the upgrades over the estimated life of the robot.

Sales to domestic and Canadian resellers of consumer robots are typically subject to agreements allowing for limited rights of return, rebates and price protection. The Company also provides limited rights of returns for direct-to-consumer sales generated through its on-line stores, one domestic distributor and one international distributor. Accordingly, the Company reduces revenue for its estimates of liabilities for these rights of return, rebates and price protection at the time the related sale is recorded. These estimates for rights of return are directly based on specific terms and conditions included in the customer agreements, historical returns experience and various other assumptions that the Company believes are reasonable under the circumstances. In the case of new product introductions, the estimates for returns applied to the new products are based upon the estimates for the most similar predecessor products until such time that the Company has enough actual returns experience for the new products, which is typically two holiday return cycles. At that time, the Company incorporates that data into the development of returns estimates for the new products. The Company updates its analysis of returns on a quarterly basis. If actual returns differ significantly from the Company's estimates, or if modifications to individual customer agreements are entered into that impact their rights of returns, such differences could result in an adjustment to previously established reserves and could have a material impact, either favorably or unfavorably, on the Company's results of operations for the period in which the actual returns become known or the agreement is modified. Except for the one international distributor noted above, the Company's international distributor agreements do not currently allow for product returns and, as a result, no reserve for returns is established for this group of customers. In 2016, the Company began selling to one domestic distributor under an agreement that provides product return privileges. As a result, the Company recognizes revenue from sales to this distributor when the product is resold by the distributor. The estimates and reserve for rebates and price protection are based on specific programs, expected usage and historical experience. Actual results could differ from these estimates.

Prior to the Company's divestiture of the defense and security business unit on April 4, 2016 (see Note 15), the Company generated minimal revenue from government contracts. Under cost-plus-fixed-fee (CPFF) type contracts, the Company recognized revenue based on costs incurred plus a pro rata portion of the total fixed fee. Costs incurred included labor and material that were directly associated with individual CPFF contracts plus indirect overhead and general and administrative type costs based upon billing rates submitted by the Company to the Defense Contract Management Agency (DCMA). Annually, the Company submits final indirect billing rates to DCMA based upon actual costs incurred throughout the year. In the situation where the Company's final actual billing rates are greater than the estimated rates used, the Company records a cumulative revenue adjustment in the period in which the rate differential is collected from the customer. These final billing rates are subject to audit by the Defense Contract Audit Agency (DCAA), which can occur several years after the final billing rates are submitted and may result in material adjustments to revenue recognized based on estimated final billing rates. As of December 31, 2016, fiscal year 2015 is open for audit by DCAA. In the situation where the Company's anticipated actual billing rates will be lower than the provisional rates used, the Company records a cumulative revenue adjustment in the period in which the rate differential is identified. Revenue on firm fixed price (FFP) contracts was recognized using the percentage-of-completion method. For government product FFP contracts, revenue was recognized as the product was shipped or in accordance with the contract terms. Costs and estimated gross margins on contracts were recorded as revenue as work was performed based on the percentage that incurred costs compared to estimated total costs utilizing the most recent estimates of costs and funding. Revenue earned in excess of billings, if any, was recorded as unbilled revenue. Billings in excess of revenue earned, if any, were recorded as deferred revenue.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Allowance for Doubtful Accounts*

The Company maintains an allowance for doubtful accounts to provide for the estimated amount of accounts receivable that may not be collected. The allowance is based upon an assessment of customer creditworthiness, historical payment experience and the age of outstanding receivables.

Activity related to the allowance for doubtful accounts was as follows:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2016 | January 2, 2016 | December 27, 2014 |
| | (In thousands) | | |
| Balance at beginning of period | $ 33 | $ 67 | $ 67 |
| Provision | — | — | — |
| Deduction(*) | (4) | (34) | — |
| Balance at end of period | $ 29 | $ 33 | $ 67 |

_____
(*)     Deductions related to allowance for doubtful accounts represent amounts written off against the allowance, less recoveries.

*Inventory*

Inventory is stated at the lower of cost or net realizable value with cost being determined using the first-in, first-out (FIFO) method. The Company maintains a reserve for inventory items to provide for an estimated amount of excess or obsolete inventory.

*Property and Equipment*

Property and equipment are recorded at cost and consist primarily of computer equipment, leasehold improvements, business applications software and machinery. Depreciation is computed using the straight-line method over the estimated useful lives as follows:

| | Estimated Useful Life |
| --- | --- |
| Computer and research equipment | 2-5 years |
| Furniture | 5 |
| Machinery | 2-5 |
| Tooling | 2-5 |
| Business applications software | 5-7 |
| Capital leases and leasehold improvements | Lesser of economic benefit period or term of lease |

Expenditures for additions, renewals and betterments of plant and equipment are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. As assets are retired or sold, the related cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is credited or charged to operations.

*Long-Lived Assets, including Purchased Intangible Assets*

The Company periodically evaluates the recoverability of long-lived assets, including other purchased intangible assets whenever events and changes in circumstances, such as reductions in demand or significant economic slowdowns in the industry, indicate that the carrying amount of an asset may not be fully recoverable. When indicators of impairment are present, the carrying values of the asset group are evaluated in relation to the future undiscounted cash flows of the underlying business. The net book value of the underlying asset is adjusted to fair value if the sum of the expected discounted cash flows is less than book value. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

*Goodwill*

Goodwill is recorded as the difference, if any, between the aggregate consideration paid for an acquisition and the fair value of the net tangible and intangible assets acquired. The Company evaluates goodwill for impairment at the reporting unit level (operating segment or one level below an operating segment) annually or more frequently if the Company believes indicators of impairment exist. In accordance with the guidance, the Company is permitted to first assess qualitative factors to

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If the Company concludes that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, then a two-step goodwill impairment test is performed.

The first step of the impairment test involves comparing the fair values of the applicable reporting units with their aggregate carrying values, including goodwill. If the carrying amount of a reporting unit exceeds the reporting unit's fair value, the Company performs the second step of the goodwill impairment test to determine the amount of impairment loss. The second step of the goodwill impairment test involves comparing the implied fair value of the affected reporting unit's goodwill with the carrying value of that goodwill. The Company completes the annual impairment evaluation during the fourth quarter each year.

### Research and Development

Costs incurred in the research and development of the Company's products are expensed as incurred.

### Internal Use Software

The Company capitalizes costs associated with the development and implementation of software for internal use. At December 31, 2016, January 2, 2016 and December 27, 2014, the Company had $9.5 million, $8.6 million and $8.2 million, respectively, of costs related to enterprise-wide software included in fixed assets. Capitalized costs are being amortized over the assets' estimated useful lives. The Company has recorded $0.4 million, $0.7 million and $0.8 million of amortization expense for the years ended December 31, 2016, January 2, 2016 and December 27, 2014, respectively.

### Concentration of Credit Risk and Significant Customers

Financial instruments which potentially expose the Company to concentrations of credit risk consist of accounts receivable. Management believes its credit policies are prudent and reflect normal industry terms and business risk. At December 31, 2016, three customers accounted for a total of 43.9% of the Company's accounts receivable balance, each of which was greater than 10% of the balance and two of whom secured their balance with guaranteed letters of credit which together represents 32.5% of the balance. At January 2, 2016, two customers accounted for a total of 34.1% of the Company's accounts receivable balance, each of which was greater than 10% of the balance and each of whom secured their balance with guaranteed letters of credit. For the years ended December 31, 2016, January 2, 2016 and December 27, 2014, revenue from U.S. federal government orders, contracts and subcontracts, represented 0.2%, 5.1% and 4.3% of total revenue, respectively. For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, the Company generated an aggregate of 25.2%, 26.0% and 29.8%, respectively, of total revenue from its consumer robots distributor in Japan (Sales on Demand Corporation) and a network of affiliated European distributors of its consumer robots (Robopolis SAS). For the year ended December 31, 2016, the Company generated 10.4% of total revenue from one of the Company's domestic retailers (Amazon).

The Company maintains its cash in bank deposit accounts at high quality financial institutions. The individual balances, at times, may exceed federally insured limits.

### Stock-Based Compensation

The Company accounts for stock-based compensation through recognition of the fair value of the stock-based compensation as a charge against earnings. Stock-based compensation cost for stock options is estimated at the grant date based on each option's fair value as calculated by the Black-Scholes option-pricing model. Stock-based compensation cost for restricted stock awards, time-based restricted stock units and performance-based restricted stock units is measured based on the closing fair market value of the Company's common stock on the date of grant. For performance-based restricted stock units, the compensation costs will be subsequently adjusted for assumptions of achievement during the period in which the assumption of achievement changes, as applicable. The Company recognizes stock-based compensation cost as expense ratably on a straight-line basis over the requisite service period, net of estimated forfeitures.

### Advertising Expense

The Company expenses advertising costs as they are incurred. During the years ended December 31, 2016, January 2, 2016 and December 27, 2014 advertising expense totaled $64.4 million, $54.7 million and $46.1 million, respectively, and are recorded with the selling and marketing expenses line item.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### Net Income Per Share

The following table presents the calculation of both basic and diluted net income per share:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2016 | January 2, 2016 | December 27, 2014 |
| Net income | $ 41,939 | $ 44,130 | $ 37,803 |
| Weighted-average shares outstanding | 27,698 | 29,550 | 29,485 |
| Dilutive effect of employee stock options and restricted shares | 594 | 557 | 725 |
| Diluted weighted-average shares outstanding | 28,292 | 30,107 | 30,210 |
| Basic income per share | $ 1.51 | $ 1.49 | $ 1.28 |
| Diluted income per share | $ 1.48 | $ 1.47 | $ 1.25 |

Restricted stock units and stock options representing approximately 0.4 million, 0.5 million and 0.2 million shares of common stock for the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, respectively, were excluded from the computation of diluted earnings per share for these periods because their effect would have been antidilutive.

### Income Taxes

The Company is subject to taxation in the United States and various states and foreign jurisdictions. The statute of limitations for examinations by the Internal Revenue Service is closed for fiscal years prior to 2013. The statute of limitations for examinations by state tax authorities is closed for fiscal years prior to 2012. Federal carryforward attributes that were generated prior to fiscal year 2013 and state carryforward attributes that were generated prior to fiscal year 2012 may still be adjusted upon examination by the federal or state tax authorities if they either have been or will be used in a period for which the statute of limitations is still open.

Deferred taxes are determined based on the difference between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect in the years in which the differences are expected to reverse. Valuation allowances are provided if, based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

The Company monitors the realization of its deferred tax assets based on changes in circumstances, for example, recurring periods of income for tax purposes following historical periods of cumulative losses, generation of tax credits compared to future utilization of credits, or changes in tax laws or regulations. The Company's income tax provision and its assessment of the ability to realize its deferred tax assets involve significant judgments and estimates. The Company is currently generating state research credits that exceed the amount being utilized. As a result of this trend, a valuation allowance may be needed in the future related to these state tax credits.

As of December 28, 2013, the Company maintained a valuation allowance of $2.1 million related to certain state tax attributes from the Evolution Robotics, Inc. acquisition. During the year ended December 27, 2014, this valuation allowance was released when the realization of these state tax attributes became more likely than not. As of December 31, 2016, the Company did not record a valuation allowance as all deferred tax assets are considered realizable.

### Comprehensive Income

Accumulated other comprehensive income includes unrealized gains and losses on certain investments. The differences between net income and comprehensive income were related to unrealized gains (losses) on investments, net of tax.

### Fair Value Measurements

The authoritative guidance for fair value establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include: Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Financial Assets and Liabilities*

The Company's financial assets and liabilities measured at fair value on a recurring basis at December 31, 2016, were as follows:

| Description | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
| | **Fair Value Measurements as of December 31, 2016** | | |
| | (In thousands) | | |
| Assets: | | | |
| Cash and cash equivalents | | | |
| Money market funds | $ 156,980 | $ — | $ — |
| Short term investments | | | |
| Corporate and government bonds (1) | — | 39,930 | — |
| Other current assets | | | |
| Derivative instruments (Note 13) (2) | — | 180 | — |
| Total assets measured at fair value | $ 156,980 | $ 40,110 | $ — |
| | | | |
| Liabilities: | | | |
| Accrued expenses | | | |
| Derivative instruments (Note 13) (2) | $ — | $ 43 | $ — |
| Total liabilities measured at fair value | $ — | $ 43 | $ — |

The Company's financial assets and liabilities measured at fair value on a recurring basis at January 2, 2016, were as follows:

| Description | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
| | **Fair Value Measurements as of January 2, 2016** | | |
| | (In thousands) | | |
| Assets: | | | |
| Cash and cash equivalents | | | |
| Money market funds | $ 110,817 | $ — | $ — |
| Short term investments | | | |
| Corporate and government bonds (1) | — | 33,124 | — |
| Total assets measured at fair value | $ 110,817 | $ 33,124 | $ — |
| | | | |
| Liabilities: | | | |
| Accrued expenses | | | |
| Derivative instruments (Note 13) (2) | $ — | 28 | $ — |
| Total liabilities measured at fair value | $ — | $ 28 | $ — |

(1) The bond investments are valued based on observable market values as of the Company's reporting date. The bond investments are recorded at fair value and marked-to-market at the end of each reporting period. The realized and unrealized gains and losses are included in comprehensive income for that period.

(2) Derivative instruments are valued using an income approach based on the present value of the forward rate less the contract rate multiplied by the notional amount.

***Recent Accounting Pronouncements***

In January 2017, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) FASB issued ASU No. 2017-04, "Intangibles - Goodwill and Other (Topic 350)." ASU No. 2017-04 eliminates step 2 from the

51

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

goodwill impairment test, instead an entity should recognize an impairment charge for the amount by which the carrying amount of goodwill exceeds the reporting unit's fair value. ASU 2017-04 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, with early adoption permitted.  The Company does not believe that ASU 2017-04 will have a material effect on its consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-01, "Business Combinations (Topic 805) Clarifying the Definition of a Business". The Amendments in this Update is to clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The guidance is effective for annual periods beginning after December 15, 2017, including interim periods within those periods. The Company is currently evaluating the impact of ASU 2017-01 on its consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-16, "Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other Than Inventory." ASU 2016-16 clarifies the accounting for the current and deferred income taxes for an intra-entity transfer of an asset other than inventory. ASU 2016-16 is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, with early adoption permitted.  The Company is currently evaluating the impact of ASU 2016-16 on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, "Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments."  ASU 2016-15 refines how companies classify certain aspects of the cash flow statement in regards to debt prepayment, settlement of debt instruments, contingent consideration payments, proceeds from insurance claims and life insurance policies, distribution from equity method investees, beneficial interests in securitization transactions and separately identifiable cash flows.  ASU 2016-15 is effective for annual periods beginning after December 15, 2017, and for interim periods within fiscal years beginning after December 15, 2018.  Early adoption is permitted.  The Company is currently evaluating the impact of ASU 2016-15 on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, "Improvements to Employee Share-Based Payment Accounting," which simplifies several aspects of the accounting for employee share-based payment transactions, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. ASU 2016-09 is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. The Company is currently evaluating the impact of ASU 2016-09 on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, "Leases." ASU 2016-02 requires lessees to recognize the assets and liabilities on their balance sheet for the rights and obligations created by most leases and continue to recognize expenses on their income statements over the lease term.  It will also require disclosures designed to give financial statement users information on the amount, timing, and uncertainty of cash flows arising from leases. The guidance is effective for annual reporting periods beginning after December 15, 2018 and interim periods within those fiscal years, with early adoption permitted. The Company is currently evaluating the impact of the standard on its consolidated financial statements.

In November 2015, the FASB issued ASU No. 2015-17, "Income Taxes: Balance Sheet Classification of Deferred Taxes." ASU 2015-17 requires that the presentation of deferred tax assets and liabilities be classified as noncurrent on the balance sheet instead of separating deferred taxes into current and noncurrent amounts. This standard will become effective for fiscal years, and the interim periods within those years, beginning after December 15, 2016, with early adoption allowed. The Company elected to prospectively adopt ASU 2015-17 as of January 2, 2016. The prior reporting period was not retrospectively adjusted. The adoption of this guidance had no impact on the Company's Consolidated Statements of Income and Comprehensive Income.

In July 2015, the FASB issued ASU No. 2015-11, "Inventory: Simplifying the Measurement of Inventory." ASU 2015-11 applies only to inventory for which cost is determined by methods other than last-in, first-out and the retail inventory method, which includes inventory that is measured using first-in, first-out or average cost. Inventory within the scope of this standard is required to be measured at the lower of cost and net realizable value. Net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The new standard will be effective for the Company on January 1, 2017. The Company does not believe that the adoption of ASU 2015-11 will have a material effect on its financial condition or results of operations.

In April 2015, the FASB issued ASU No. 2015-05, "Intangibles - Goodwill and Other - Internal-Use Software: Customer's Accounting for Fees Paid in a Cloud Computing Arrangement." Under ASU 2015-05, if a cloud computing arrangement includes a software license, the software license element of the arrangement should be accounted for consistent with the acquisition of other software licenses. If a cloud computing arrangement does not include a software license, the arrangement should be accounted for as a service contract. The new standard became effective for the Company on January 3, 2016. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In February 2015, the FASB issued ASU No. 2015-02, "Consolidation - Amendments to the Consolidation Analysis." ASU 2015-02 reduces the number of consolidation models and changes the way reporting entities evaluate a variable interest

52

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

entity. It is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2015. The Company adopted ASU 2015-02 effective January 3, 2016. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In June 2014, the FASB issued ASU No. 2014-12, "Accounting for Share-Based Payments When the Terms of an Award Provide That a Performance Target Could Be Achieved after the Requisite Service Period." ASU 2014-12 requires a reporting entity to treat a performance target that affects vesting and that could be achieved after the requisite service period as a performance condition. It is effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2015. The Company adopted ASU 2014-12 effective January 3, 2016. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers," which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The new guidance initially was effective for annual reporting periods beginning after December 15, 2016, including interim periods within those annual reporting periods. In July 2015, the FASB voted to defer the effective date of the new accounting guidance related to revenue recognition by one year to December 17, 2017 for annual reporting periods beginning after that date and permitted early adoption of the standard, but not before the original effective date of December 15, 2016. The Company is continuing to evaluate the impact that the adoption of the new revenue recognition standard will have on its consolidated financial statements, but anticipates that the additional disclosure requirements will represent a significant change from current guidance. The Company currently anticipates adopting the standard using the modified retrospective method.

From time to time, new accounting pronouncements are issued by FASB that are adopted by the Company as of the specified effective date. Unless otherwise discussed, the Company believes that recently issued standards, which are not yet effective, will not have a material impact on the Company's consolidated financial statements upon adoption.

**3.    Inventory**

Inventory consists of the following at:

|  | December 31, 2016 | | January 2, 2016 | |
|---|---|---|---|---|
|  | (In thousands) | | | |
| Raw materials | $ | 4,717 | $ | 9,082 |
| Finished goods | | 45,861 | | 52,596 |
| | $ | 50,578 | $ | 61,678 |

**4.    Property and Equipment**

Property and equipment consists of the following at:

|  | December 31, 2016 | | January 2, 2016 | |
|---|---|---|---|---|
|  | (In thousands) | | | |
| Computer and equipment | $ | 7,378 | $ | 13,825 |
| Furniture | | 2,906 | | 2,441 |
| Machinery | | 9,154 | | 7,134 |
| Tooling | | 20,487 | | 16,599 |
| Leasehold improvements | | 21,383 | | 21,022 |
| Business applications software | | 9,471 | | 8,559 |
| | | 70,779 | | 69,580 |
| Less: accumulated depreciation | | 43,247 | | 42,730 |
| | $ | 27,532 | $ | 26,850 |

Depreciation expense for the years ended December 31, 2016, January 2, 2016 and December 27, 2014 was $10.0 million, $11.4 million, and $9.2 million, respectively.

53

Table of Contents

5.    **Other Assets**

At December 31, 2016, other assets consisted of eleven investments totaling $12.9 million. At January 2, 2016, other assets consisted of six investments totaling $9.4 million. At December 31, 2016, these investments consisted of cost method investments of $10.9 million, an equity method investment of $1.5 million and notes receivable of $0.5 million. The Company regularly monitors these investments to determine if facts and circumstances have changed in a manner that would require a change in accounting methodology. Additionally, the Company regularly evaluates whether or not these investments have been impaired by considering such factors as economic environment, market conditions, operational performance and other specific factors relating to the businesses underlying the investments. If any such impairment is identified, a reduction in the carrying value of the investments would be recorded at that time. During 2016, the Company recorded impairment on a cost method investment of approximately $0.1 million. Since the Company believes the fair value of its remaining investments is greater than the carrying value of its investments, it has not impaired these investments.

6.    **Accrued Expenses**

Accrued expenses consist of the following at:

| | December 31, 2016 | January 2, 2016 |
|---|---|---|
| | (In thousands) | |
| Accrued warranty | 8,464 | 6,907 |
| Accrued direct fulfillment costs | 1,722 | 2,030 |
| Accrued customer deposits | 1,171 | 788 |
| Accrued federal and state income taxes | 1,059 | — |
| Accrued accounting fees | 686 | 395 |
| Accrued sales tax | 422 | 625 |
| Accrued sales commissions | 404 | 465 |
| Accrued rent | 327 | 547 |
| Accrued other | 5,599 | 4,197 |
| | $ 19,854 | $ 15,954 |

Accrued compensation consists of the following at:

| | December 31, 2016 | January 2, 2016 |
|---|---|---|
| | (In thousands) | |
| Accrued bonus | $ 14,226 | $ 8,640 |
| Accrued other compensation | 6,789 | 7,112 |
| | $ 21,015 | $ 15,752 |

7.    **Working Capital Facilities**

*Credit Facility*

The Company has an unsecured revolving credit facility with Bank of America, N.A., which is available to fund working capital and other corporate purposes. As of December 31, 2016, the total amount of the credit facility was $75.0 million and the full amount was available for borrowing. The interest on loans under the credit facility will accrue, at the Company's election, at either (1) LIBOR plus a margin, currently equal to 1.0%, based on the Company's ratio of indebtedness to Adjusted EBITDA (the "Eurodollar Rate"), or (2) the lender's base rate. The lender's base rate is equal to the highest of (1) the federal funds rate plus 0.5%, (2) the lender's prime rate and (3) the Eurodollar Rate plus 1.0%. The credit facility will terminate and all amounts outstanding thereunder will be due and payable in full on December 20, 2018.

Table of Contents

As of December 31, 2016, the Company had no outstanding borrowings under its revolving credit facility. This credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on the Company's ability to incur or guaranty additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, the Company's stock, and consolidate or merge with other entities.

In addition, the Company is required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

This credit facility contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the Company's obligations under the credit facility may be accelerated.

As of December 31, 2016, the Company was in compliance with all covenants under its credit facility.

### Letter of Credit Facility

The Company has an unsecured revolving letter of credit facility with Bank of America, N.A. The credit facility is available to fund letters of credit on the Company's behalf up to an aggregate outstanding amount of $5 million. The Company may terminate at any time, subject to proper notice, or from time to time permanently reduce the amount of the credit facility.

The Company pays a fee on outstanding letters of credit issued under the credit facility of up to 1.5% per annum of the outstanding letters of credit. The maturity date for letters of credit issued under the credit facility must be no later than 365 days following the maturity date of the credit facility.

As of December 31, 2016, there were letters of credit outstanding of $1.0 million under the revolving letter of credit facility. The credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on the Company's ability to incur or guaranty additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase stock, and consolidate or merge with other entities. In addition, the Company is required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

The credit facility also contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy, and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the lender may accelerate the obligations under the credit facility.

As of December 31, 2016, the Company was in compliance with all covenants under the revolving letter of credit facility.

### 8.   Common Stock

Common stockholders are entitled to one vote for each share held and to receive dividends if and when declared by the Board of Directors and subject to and qualified by the rights of holders of the preferred stock. Upon dissolution or liquidation of the Company, holders of common stock will be entitled to receive all available assets subject to any preferential rights of any then outstanding preferred stock.

On April 2, 2014, the Company announced a stock repurchase program. Under the program, the Company could purchase up to $50 million of its common stock from May 1, 2014 to April 30, 2015. On March 19, 2015, the Company announced an additional stock repurchase program, which authorized the repurchase of $50 million of its common stock from May 1, 2015 to April 30, 2016. On December 28, 2015, the Company replaced the then-current stock repurchase program with a new stock repurchase program, effective January 4, 2016 and ending on December 31, 2016, pursuant to which the Company was authorized to purchase up to one million shares or $40 million of its common stock. On March 1, 2016, the Company replaced the then-current stock repurchase program and entered into an accelerated share repurchase (ASR) agreement to repurchase an aggregate of $85.0 million of common stock.

During 2016, 2015 and 2014, the Company repurchased 2,641,122 shares totaling $97.0 million, 1,260,276 shares totaling $37.4 million and 55,973 shares totaling $1.7 million, respectively, in the open market under these stock repurchase plans.

55

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**9.        Stock Option Plans and Stock-Based Compensation**

The Company has options outstanding under three stock incentive plans: the 2005 Stock Option and Incentive Plan (the "2005 Plan"), the Evolution Robotics, Inc. 2007 Stock Plan (the "2007 Plan") and the 2015 Stock Option and Incentive Plan (the "2015 Plan" and together with the 2005 Plan and the 2007 Plan, the "Plans"). All options that remained outstanding under the 2004 Stock Option and Incentive Plan as of December 27, 2014 were exercised during fiscal 2015. The 2015 Plan is the only one of the three plans under which new awards may currently be granted. Under the 2015 Plan, which became effective May 20, 2015, 3,100,000 shares were initially reserved for issuance in the form of incentive stock options, non-qualified stock options, stock appreciation rights, deferred stock awards, restricted stock units, unrestricted stock awards, cash-based awards, performance share awards and dividend equivalent rights. Stock awards returned to the Plans, with the exception of those issued under the 2007 Plan, as a result of their expiration, cancellation or termination are automatically made available for issuance under the 2015 Plan. Eligibility for incentive stock options is limited to those individuals whose employment status would qualify them for the tax treatment associated with incentive stock options in accordance with the Internal Revenue Code of 1986, as amended. As of December 31, 2016, there were 1,495,517 shares available for future grant under the 2015 Plan.

Options granted under the Plans are subject to terms and conditions as determined by the compensation committee of the board of directors, including vesting periods. Options granted under the Plans are exercisable in full at any time subsequent to vesting, generally vest over four years, and expire five or ten years from the date of grant or, if earlier, 90 days from employee termination. The exercise price of stock options is typically equal to the closing price on the NASDAQ Global Select Market on the date of grant. Other awards granted under the Plans generally vest over periods from three to four years.

In conjunction with the acquisition of Evolution Robotics, Inc. on October 1, 2012, each outstanding and unvested incentive stock option held by Evolution employees as of the acquisition date was automatically converted into stock options of the Company under the same terms and conditions as were applicable to the original Evolution grants. The number of replacement options granted and the associated exercise prices were determined utilizing a conversion ratio as defined in the merger agreement. There were 114,248 incentive stock options issued by the Company as a result of this automatic conversion with exercise prices ranging from $2.55 to $4.81. All of these options were granted from the 2007 Plan, which was assumed by the Company as a result of the acquisition.

The Company recognized $3.2 million of stock-based compensation expense during the fiscal year ended December 31, 2016 for stock options. The unamortized fair value as of December 31, 2016 associated with these grants was $6.8 million with a weighted-average remaining recognition period of 2.85 years. The Company expects to recognize associated stock-based compensation expense of $2.8 million, $2.1 million, $1.4 million and $0.5 million in 2017, 2018, 2019 and 2020, respectively.

The fair value of each option grant for the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014 was computed on the grant date using the Black-Scholes option-pricing model with the following assumptions:

|  | Fiscal Year Ended | | |
| --- | --- | --- | --- |
|  | December 31, 2016 | January 2, 2016 | December 27, 2014 |
| Risk-free interest rate | 1.17% — 1.89% | 1.47% — 1.75% | 1.65% — 1.69% |
| Expected dividend yield | — | — | — |
| Expected life | 4.01 — 4.03 years | 3.98 — 4.02 years | 3.91 — 4.00 years |
| Expected volatility | 38.9% — 42.1% | 46.5% — 52.4% | 52.8% — 56.0% |

The risk-free interest rate is derived from the average U.S. Treasury constant maturity rate, which approximates the rate in effect at the time of grant, commensurate with the expected life of the instrument. The dividend yield is zero based upon the fact the Company has never paid and has no present intention to pay cash dividends. The Company utilizes company specific historical data for purposes of establishing expected volatility and expected term.

Based upon the above assumptions, the weighted average fair value of each stock option granted for the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014 was $12.88, $13.21 and $15.87, respectively.

56

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The table below summarizes stock option plan activity:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value(1) |
|---|---|---|---|---|
| Outstanding at December 28, 2013 | 1,770,375 | $ 19.89 | | |
| Granted | 233,181 | 37.10 | | |
| Exercised | (486,252) | 18.39 | | |
| Canceled | (43,984) | 27.17 | | |
| Outstanding at December 27, 2014 | 1,473,320 | $ 22.89 | | |
| Granted | 323,104 | 32.58 | | |
| Exercised | (390,085) | 16.57 | | |
| Canceled | (118,789) | 28.41 | | |
| Outstanding at January 2, 2016 | 1,287,550 | $ 26.73 | | |
| Granted | 314,770 | 38.03 | | |
| Exercised | (456,498) | 20.47 | | |
| Canceled | (57,648) | 33.28 | | |
| Outstanding at December 31, 2016 | 1,088,174 | $ 32.27 | 4.63 years | $28.5 million |
| Vested and expected to vest at December 31, 2016 | 1,027,399 | $ 32.01 | 4.55 years | $27.2 million |
| Exercisable as of December 31, 2016 | 530,059 | $ 28.45 | 3.34 years | $15.9 million |
| Weighted average fair value of options granted during the fiscal year ended December 31, 2016 | | $ 12.88 | | |
| Options available for future grant at December 31, 2016 | 1,495,517 | | | |

_____

(1)    The aggregate intrinsic value on the table was calculated based upon the positive difference between the closing market value of the Company's stock on December 31, 2016 of $58.45 and the exercise price of the underlying option.

During fiscal years 2016, 2015, and 2014, the total intrinsic value of stock options exercised was $10.3 million, $5.9 million and $10.5 million, respectively. No amounts relating to stock-based compensation have been capitalized.

The following table summarizes information about stock options outstanding at December 31, 2016:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $ 3.54 - $ 21.23 | 37,580 | 4.21 years | $ 7.72 | 37,580 | $ 7.72 |
| 22.86 - 22.86 | 142,278 | 3.18 | 22.86 | 132,265 | 22.86 |
| 24.53 - 29.60 | 146,630 | 3.59 | 27.65 | 100,303 | 26.75 |
| 32.38 - 32.38 | 70,590 | 5.43 | 32.38 | 25,544 | 32.38 |
| 33.14 - 33.14 | 128,595 | 6.19 | 33.14 | — | — |
| 33.29 - 33.48 | 123,935 | 2.27 | 33.42 | 105,726 | 33.44 |
| 33.72 - 34.30 | 124,259 | 5.33 | 34.16 | 45,410 | 34.17 |
| 34.67 - 37.08 | 89,585 | 4.46 | 35.77 | 56,634 | 35.64 |
| 37.62 - 37.62 | 110,575 | 6.44 | 37.62 | — | — |
| 39.09 - 58.55 | 114,147 | 5.89 | 45.77 | 26,597 | 43.35 |
| $ 3.54 - $58.55 | 1,088,174 | 4.63 years | $ 32.27 | 530,059 | $ 28.45 |

During the fiscal year ended December 31, 2016, the Company recognized $12.8 million of stock-based compensation expense associated with restricted stock units. As of December 31, 2016, January 2, 2016 and December 27, 2014, the

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

unamortized fair value of all restricted stock units was $28.9 million, $24.3 million and $20.1 million, respectively. The Company expects to recognize associated stock-based compensation expense of $11.2 million, $8.9 million, $6.4 million and $2.4 million in 2017, 2018, 2019 and 2020, respectively.

The table below summarizes activity relating to restricted stock units:

| | Number of Shares Underlying Restricted Stock | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 28, 2013 | 927,654 | $ 25.50 |
| Granted | 372,159 | 38.25 |
| Vested | (318,367) | 25.38 |
| Forfeited | (71,591) | 28.42 |
| Outstanding at December 27, 2014 | 909,855 | $ 30.53 |
| Granted | 576,410 | 32.33 |
| Vested | (340,754) | 29.13 |
| Forfeited | (121,142) | 31.49 |
| Outstanding at January 2, 2016 | 1,024,369 | $ 31.90 |
| Granted | 458,237 | 37.93 |
| Vested | (363,643) | 30.42 |
| Forfeited | (98,917) | 32.13 |
| Outstanding at December 31, 2016 | 1,020,046 | $ 35.23 |

In 2014, 2015 and 2016 the Company granted performance-based restricted stock units (PSUs) to certain of its employees. The performance metric for these awards is operating income percent, with a threshold requirement for a minimum amount of revenue growth. These awards vest over a three year period. The number of shares actually earned at the end of the three year period will range from 0% to 100% of the target number of PSUs granted based on the Company's performance against three year operating income and revenue goals. In addition, while all vesting of earned PSUs occurs on the third anniversary of the date of grant, achievement of cumulative intermediate targets for each individual year will allow PSUs to be deemed earned but not yet vested for the intermediate periods. Achievement of the cumulative target will allow all shares subject to the PSUs to be earned regardless of the achievement of the intermediate individual year targets.

58

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

10.    **Income Taxes**

The components of income tax expense were as follows:

| | | Fiscal Year Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | December 31, 2016 | | January 2, 2016 | | December 27, 2014 |
| | | (In thousands) | | | | |
| Current | | | | | | |
| Federal | $ | 17,639 | $ | 20,033 | $ | 15,128 |
| State | | 1,054 | | 972 | | 129 |
| Foreign | | 310 | | 121 | | 91 |
| Total current tax provision | | 19,003 | | 21,126 | | 15,348 |
| Deferred | | | | | | |
| Federal | $ | 781 | $ | (1,657) | $ | 1,268 |
| State | | (95) | | (628) | | (2,010) |
| Foreign | | (267) | | — | | — |
| Total deferred tax provision | | 419 | | (2,285) | | (742) |
| Total income tax provision | $ | 19,422 | $ | 18,841 | $ | 14,606 |

As of December 31, 2016, a deferred tax liability has not been established for approximately $1.6 million of cumulative undistributed earnings of non-U.S. subsidiaries, as the Company plans to keep these amounts permanently reinvested overseas. The amount of any unrecognized deferred tax liability on these undistributed earnings would be immaterial.

The components of net deferred tax assets were as follows:

| | | December 31, 2016 | | January 2, 2016 |
| --- | --- | --- | --- | --- |
| | | (In thousands) | | |
| Net deferred tax assets | | | | |
| Non-current deferred tax assets | | | | |
| Accounts receivable | $ | 11,850 | $ | 7,924 |
| Accrued expenses | | 6,233 | | 9,110 |
| Stock-based compensation | | 6,150 | | 5,962 |
| Tax credits | | 5,999 | | 6,114 |
| Property and equipment | | 1,934 | | 1,308 |
| Inventory | | 1,318 | | 2,885 |
| Net operating loss carryforwards | | 1,010 | | 3,606 |
| Other | | 1,336 | | 1,625 |
| Total non-current deferred tax assets | | 35,830 | | 38,534 |
| Non-current deferred tax liabilities | | | | |
| Prepaids | | 715 | | 623 |
| Intangible assets | | 4,530 | | 6,190 |
| Total non-current deferred tax liabilities | | 5,245 | | 6,813 |
| Total net deferred tax assets | $ | 30,585 | $ | 31,721 |

In November 2015, the FASB issued ASU No. 2015-17, "Income Taxes: Balance Sheet Classification of Deferred Taxes." ASU 2015-17 requires that the presentation of deferred tax assets and liabilities be classified as noncurrent on the balance sheet instead of separating deferred taxes into current and non-current amounts. This standard became effective for fiscal years, and the interim periods within those years, beginning after December 15, 2016, with early adoption

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

allowed. The Company elected to prospectively early adopt ASU 2015-17 on the first day of the fourth quarter of the fiscal year ended January 2, 2016. The adoption of this guidance had no impact on the Company's Consolidated Statements of Income and Comprehensive Income.

As of December 28, 2013, the Company maintained a valuation allowance of $2.1 million related to certain state tax attributes from the Evolution Robotics, Inc. acquisition. During the year ended December 27, 2014, this valuation allowance was released when realization of these state tax attributes became more likely than not. As of December 31, 2016, the Company did not record a valuation allowance as all deferred tax assets are considered realizable.

The table below summarizes activity relating to the valuation allowance:

| Fiscal Year Ended | Balance at beginning of period | Additions Charged to Costs and Expenses | Additions Charged to Goodwill | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| December 27, 2014 | $    2,090 | — | — | 2,090 | $    — |
| January 2, 2016 | $    — | — | — | | $    — |
| December 31, 2016 | $    — | — | — | — | $    — |

The Company has federal net operating loss carryforwards of $1.0 million and $8.0 million as of December 31, 2016 and January 2, 2016, respectively, which expire in 2031. The Company has state net operating loss carryforwards of $8.9 million and $15.0 million as of December 31, 2016 and January 2, 2016, respectively, which expire from 2029 to 2031. The Company has federal research and development credit carryforwards of $1.0 million and $1.0 million as of December 31, 2016 and January 2, 2016, respectively, which expire from 2026 to 2031. The Company has state research and development credit carryforwards of $10.0 million and $9.3 million as of December 31, 2016 and January 2, 2016, respectively, which expire from 2023 to 2031. Under the Internal Revenue Code, certain substantial changes in the Company's ownership could result in an annual limitation on the amount of these tax carryforwards which can be utilized in future years. As of December 31, 2016, the Company has $9.9 million of federal and state net operating loss carryforwards and $2.2 million of federal and state research and development credits related to the acquisition of Evolution Robotics that are limited by Section 382 and Section 383, respectively, of the Internal Revenue Code. However, these limitations are not expected to cause any of these federal and state net operating loss carryforwards or federal and state research and development credits to expire prior to being utilized.

The reconciliation of the expected tax (benefit) expense (computed by applying the federal statutory rate to income before income taxes) to actual tax expense was as follows:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2016 | January 2, 2016 | December 27, 2014 |
| | (In thousands) | | |
| Expected federal income tax | $    21,476 | $    22,040 | $    18,344 |
| Miscellaneous permanent items | 516 | 608 | 691 |
| State taxes (net of federal benefit) | 1,360 | 982 | 1,058 |
| Federal and state credits | (2,233) | (2,767) | (1,487) |
| Change in valuation allowance | — | — | (2,090) |
| Domestic production activities deduction | (1,731) | (2,145) | (1,562) |
| Settlement of uncertain tax positions | (167) | (194) | (176) |
| Other | 201 | 317 | (172) |
| | $    19,422 | $    18,841 | $    14,606 |

60

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

A summary of the Company's adjustments to its gross unrecognized tax benefits in the current year is as follows:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2016 | January 2, 2016 | December 27, 2014 |
| | (in thousands) | | |
| Balance at beginning of period | $ 6,616 | $ 2,491 | $ 2,618 |
| Increase (decrease) for tax positions related to the current year | 2,851 | 786 | 252 |
| Increase (decrease) for tax positions related to prior years | (4,224) | 3,533 | (108) |
| Decreases for settlements with applicable taxing authorities | — | — | (271) |
| Decreases for lapses of statute of limitations | (97) | (194) | — |
| Balance at end of period | $ 5,146 | $ 6,616 | $ 2,491 |

The Company accrues interest and, if applicable, penalties for any uncertain tax positions. Interest and penalties are classified as a component of income tax expense. As of December 31, 2016, January 2, 2016 and December 27, 2014 there were no material accrued interest or penalties. Over the next twelve months, it is reasonably possible that the Company may recognize approximately $0.1 million of previously net unrecognized tax benefits related to U.S. federal, state and foreign tax audits and expiration of the statute of limitations. If all of our unrecognized tax benefits as of December 31, 2016 were to become recognizable in the future, we would record a $2.2 million benefit, inclusive of interest, to the income tax provision, reflective of federal benefit on state items.

Included in the Company's state tax credit carryforwards are unrecognized tax benefits related to stock-based compensation beginning from January 1, 2006 of $0.7 million and $0.6 million as of December 31, 2016 and January 2, 2016, respectively. Included in the Company's state net operating loss carryforwards are unrecognized tax benefits related to stock-based compensation beginning from January 1, 2006 of $1.8 million and $1.0 million as of December 31, 2016 and January 2, 2016, respectively. These unrecognized tax benefits will be credited to additional paid-in capital when they reduce income taxes payable. Therefore, these amounts were not included in the Company's gross or net deferred tax assets at December 31, 2016 and January 2, 2016.

The Company follows the with and without approach for direct and indirect effects of windfall tax deductions.

**11.    Commitments and Contingencies**

*Legal Proceedings*

From time to time and in the ordinary course of business, the Company is subject to various claims, charges and litigation. The outcome of litigation cannot be predicted with certainty and some lawsuits, claims or proceedings may be disposed of unfavorably to us, which could materially affect our financial condition or results of operations.

*Lease Obligations*

The Company leases its facilities. Rental expense under operating leases for fiscal 2016, 2015 and 2014 amounted to $6.0 million, $4.9 million, and $4.8 million, respectively. Future minimum rental payments under operating leases were as follows as of December 31, 2016:

| | Operating Leases |
|---|---|
| 2017 | $ 4,773 |
| 2018 | 4,438 |
| 2019 | 4,209 |
| 2020 | 2,126 |
| 2021 | 1,182 |
| Thereafter | 2,046 |
| Total minimum lease payments | $ 18,774 |

61

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Outstanding Purchase Orders*

At December 31, 2016, we had outstanding purchase orders aggregating approximately $103.2 million. The purchase orders, the majority of which are with our contract manufacturers for the purchase of inventory in the normal course of business, are for manufacturing and non-manufacturing related goods and services, and are generally cancelable without penalty. In circumstances where we determine that we have financial exposure associated with any of these commitments, we record a liability in the period in which that exposure is identified.

*Guarantees and Indemnification Obligations*

The Company enters into standard indemnification agreements in the ordinary course of business. Pursuant to these agreements, the Company indemnifies and agrees to reimburse the indemnified party for losses incurred by the indemnified party, generally the Company's customers, in connection with any patent, copyright, trade secret or other proprietary right infringement claim by any third party. The term of these indemnification agreements is generally perpetual any time after execution of the agreement. The maximum potential amount of future payments the Company could be required to make under these indemnification agreements is unlimited. The Company has never incurred costs to defend lawsuits or settle claims related to these indemnification agreements. As a result, the Company believes the estimated fair value of these agreements is minimal. Accordingly, the Company has no liabilities recorded for these agreements as of December 31, 2016 and January 2, 2016, respectively.

*Government Contract Contingencies*

Prior to the completion of the divestiture of our defense and security business unit during the second quarter of 2016, the Company had several prime contracts with the U.S. federal government which did not contain a limitation of liability provision, creating a risk of responsibility for direct and consequential damages. Several subcontracts with prime contractors hold the prime contractor harmless against liability that stems from our work and do not contain a limitation of liability. These provisions could cause substantial liability for the Company. In addition, the Company is subject to audits by the U.S. federal government as part of routine audits of government contracts. As part of an audit, these agencies may review the Company's performance on contracts, cost structures and compliance with applicable laws, regulations and standards. If any of its costs are found to be allocated improperly to a specific contract, the costs may not be reimbursed and any costs already reimbursed for such contract may have to be refunded. Accordingly, an audit could result in a material adjustment to our revenue and results of operations. Annually, the Company submits final indirect billing rates to DCMA based upon actual costs incurred throughout the year. These final billing rates are subject to audit by DCAA. As of December 31, 2016, fiscal years 2015 and 2016 are open for audit by DCAA.

*Warranty*

The Company provides warranties on most products and has established a reserve for warranty based on estimated warranty costs. The reserve is included as part of accrued expenses (Note 6) in the accompanying consolidated balance sheets.

Activity related to the warranty accrual was as follows:

|  | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
|  | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | |
|  | (In thousands) | | | | | |
| Balance at beginning of period | $ | 6,907 | $ | 7,769 | $ | 6,497 |
| Provision |  | 7,494 |  | 4,598 |  | 6,410 |
| Warranty usage (*) |  | (5,937) |  | (5,460) |  | (5,138) |
| Balance at end of period | $ | 8,464 | $ | 6,907 | $ | 7,769 |

_____

(*)    Warranty usage includes costs incurred for warranty obligations and the release of warranty liabilities associated with the divestiture of the defense and security business unit.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Sales Taxes*

The Company collects and remits sales tax in jurisdictions in which it has a physical presence or it believes nexus exists, which therefore obligates the Company to collect and remit sales tax. The Company continually evaluates whether it has established nexus in new jurisdictions with respect to sales tax. The Company has recorded a liability for potential exposure in states where there is uncertainty about the point in time at which the Company established a sufficient business connection to create nexus. The Company continues to analyze possible sales tax exposure, but does not currently believe that any individual claim or aggregate claims that might arise will ultimately have a material effect on its consolidated results of operations, financial position or cash flows.

**12.    Employee Benefits**

The Company sponsors a retirement plan under Section 401(k) of the Internal Revenue Code (the "Retirement Plan"). All Company employees, with the exception of temporary, contract and international employees are eligible to participate in the Retirement Plan after satisfying age and length of service requirements prescribed by the plan. Under the Retirement Plan, employees may make tax-deferred contributions, and the Company, at its sole discretion, and subject to the limits prescribed by the IRS, may make either a nonelective contribution on behalf of all eligible employees or a matching contribution on behalf of all plan participants.

The Company elected to make a matching contribution of approximately $1.7 million, $1.8 million and $1.7 million for the plan years ended December 31, 2016, January 2, 2016 and December 27, 2014 ("Plan-Year 2016," "Plan-Year 2015" and "Plan-Year 2014"), respectively. The employer contribution represents a matching contribution at a rate of 50% of each employee's first six percent contribution. Accordingly, each employee participating during Plan-Year 2016, Plan-Year 2015 and Plan-Year 2014 is entitled up to a maximum of three percent of his or her eligible annual payroll. The employer matching contribution for Plan-Year 2016 is included in accrued compensation in the accompanying consolidated balance sheet.

**13.    Derivative Instruments**

The Company is exposed to adverse changes in foreign currency exchange rates, primarily related to sales in the Canadian Dollar and the Euro. As a result, the Company periodically enters into foreign currency forward contracts to minimize the impact of fluctuating exchange rates on results of operations. These derivative instruments have maturities of two months or less and have not qualified for hedge accounting.

In addition, during 2016, the Company entered into a foreign currency option to hedge the Japanese Yen purchase price of a previously announced acquisition expected to close in the quarter ended July 1, 2017. The instrument has a maturity of four months and does not qualify for hedge accounting.

Notional amounts and fair values of derivative instruments are as follows:

| | | Notional amount | | Fair Value | |
| | Classification | December 31, 2016 | January 2, 2016 | December 31, 2016 | January 2, 2016 |
|---|---|---|---|---|---|
| | | (In thousands) | | | |
| Foreign currency option contracts | Other current assets | $    396 | $    — | $    180 | $    — |
| Foreign currency forward contracts | Accrued expenses | $    7,680 | $    6,773 | $    43 | $    28 |

Gains associated with derivative instruments are as follows:

| | | Twelve Months Ended | |
| | Classification | December 31, 2016 | January 2, 2016 |
|---|---|---|---|
| | | (In thousands) | |
| Derivatives not designated as hedging instruments | | | |
| Gain recognized in income | Other income, net | $    29 | $    368 |

63

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

14.    **Goodwill and other intangible assets**

The carrying amount of the goodwill as of December 31, 2016 is $41.1 million, which resulted from the acquisition of Evolution Robotics, Inc. in October 2012. The Company's goodwill balance as of January 2, 2016 was $48.8 million, which consisted of the $41.1 million from the acquisition of Evolution Robotics, Inc. and was assigned to the home robots reporting unit and $7.7 million related to the acquisition of Nekton Research, LLC completed in September 2008 and was assigned to the defense and security reporting unit. On April 4, 2016, the Company completed the sale of its defense and security business unit and therefore the goodwill balance assigned to the defense and security business unit was written off during the three months ended July 2, 2016. As a result of the divestiture, the Company now has one reporting unit, consumer robots.

In the fourth quarter of 2016, the Company completed its annual goodwill impairment test on the goodwill associated with the acquisition of Evolution Robotics, Inc. and did not identify any goodwill impairment.

Other intangible assets include the value assigned to completed technology, research contracts, and trade names. The estimated useful lives for all of these intangible assets are two to ten years. The intangible assets are being amortized on a straight-line basis, which is consistent with the pattern that the estimated economic benefits of the intangible assets are expected to be utilized.

Intangible assets at December 31, 2016 and January 2, 2016 consisted of the following:

| | December 31, 2016 | | | January 2, 2016 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net | Cost | Accumulated Amortization | Net |
| | (In thousands) | | | | | |
| Completed technology | $ 26,900 | $ 14,693 | $ 12,207 | $ 26,900 | $ 11,236 | $ 15,664 |
| Tradename | 100 | 100 | — | 100 | 100 | — |
| Total | $ 27,000 | $ 14,793 | $ 12,207 | $ 27,000 | $ 11,336 | $ 15,664 |

Amortization expense related to acquired intangible assets was $3.5 million for each of the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014. The estimated future amortization expense related to current intangible assets in each of the five succeeding fiscal years is expected to be as follows:

| | (In thousands) |
|---|---|
| 2017 | $ 3,457 |
| 2018 | 3,457 |
| 2019 | 2,818 |
| 2020 | 900 |
| 2021 | 900 |
| Thereafter | 675 |
| Total | $ 12,207 |

64

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**15.    Divestiture**

On April 4, 2016, the Company completed the sale of the defense and security business unit to iRobot Defense Holdings, Inc., a portfolio company of Arlington Capital Partners. The final purchase price, including adjustments for working capital and indebtedness, was $24.5 million. The Company recognized a gain of $0.4 million on the sale of assets, which is recorded as a component of other income (expense), net, for the year ended December 31, 2016. The sale of the defense and security business did not meet the criteria for discontinued operations presentation as it did not represent a strategic shift that had a major effect on the Company's operations and financial results.

The Company and iRobot Defense Holdings, Inc. have also entered into a Transition Services Agreement (TSA), pursuant to which the Company will continue to perform certain functions on iRobot Defense Holdings Inc.'s behalf during a transition period not to exceed 12 months. The TSA provides for the reimbursement of the Company for direct costs incurred in order to provide such functions and is recorded as a component of other income. For the year ended December 31, 2016 the Company recognized $1.2 million of TSA reimbursement.

**16.    Restructuring charges**

During the three months ended July 2, 2016, the Company decided to fully exit its remote presence business. As a result, the Company incurred restructuring charges of approximately $1.9 million related to the write-off of certain inventory, workforce reductions and the write-off of certain fixed assets. No restructuring charges were incurred in 2015. In 2014, the Company paid the remaining balance of the restructuring charges incurred in 2013.

The activity for the restructuring program is presented below:

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2016 | January 2, 2016 | December 27, 2014 |
|  | (In thousands) | | |
| Balance at beginning of period | $ — | $ — | $ 675 |
| Charges | 1,857 | — | — |
| Utilization | (1,669) | — | (675) |
| Balance at end of period | $ 188 | $ — | $ — |

**17.    Industry Segment, Geographic Information and Significant Customers**

Prior to completing the sale of the Company's defense and security business (see Note 15), the Company's reportable segments consisted of the home business unit and the defense and security business unit. Following this divestiture, which was completed on April 4, 2016, the Company now operates as one business segment, consumer robots, the results of which are included in the Company's consolidated statements of income and comprehensive income. The Company's consumer robots products are offered to consumers through a network of retail businesses throughout the United States, to various countries through international distributors and retailers, and through the Company's on-line store.

*Geographic Information*

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, sales to non-U.S. customers accounted for 51.2%, 56.0% and 60.9% of total revenue, respectively. For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, sales to the Company's consumer robots distributor in Japan accounted for 12.9%, 13.3%, and 17.0% of total revenue, respectively.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Significant Customers*

For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, U.S. federal government orders, contracts and subcontracts accounted for 0.2%, 5.1% and 4.3% of total revenue, respectively. For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014 approximately 72.8%, 76.6% and 75.7%, respectively, of consumer robot product revenue resulted from sales to 15 customers. For the fiscal years ended December 31, 2016, January 2, 2016 and December 27, 2014, the Company generated an aggregate of 25.2%, 26.0% and 29.8%, respectively, of its total revenue from its consumer robots distributor in Japan (Sales on Demand Corporation) and a network of affiliated European distributors of the Company's consumer robots (Robopolis SAS). For the year ended December 31, 2016, the Company generated 10.4% of total revenue from one of the Company's domestic retailers (Amazon).

**18.    Quarterly Information (Unaudited)**

| | Fiscal Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 31, 2016 | October 1, 2016 | July 2, 2016 | April 2, 2016 | January 2, 2016 | September 26, 2015 | June 27, 2015 | March 28, 2015 |
| | (In thousands, except per share amounts) | | | | | | | |
| Revenue | $ 212,494 | $ 168,610 | $ 148,696 | $ 130,804 | $ 206,420 | $ 143,609 | $ 148,788 | $ 117,961 |
| Gross margin | 106,642 | 81,060 | 69,652 | 61,961 | 95,327 | 69,858 | 70,033 | 53,708 |
| Net income | 13,681 | 19,512 | 4,814 | 3,932 | 19,331 | 12,793 | 7,252 | 4,754 |
| Diluted earnings per share | $ 0.49 | $ 0.70 | $ 0.17 | $ 0.13 | $ 0.65 | $ 0.42 | $ 0.24 | $ 0.16 |

During the third quarter of 2016, the Company identified immaterial errors to previously reported other income from an equity investee that was previously accounted for as a cost method investment. The amounts corrected out-of-period in other income resulted in a $1.4 million increase in the fourth quarter 2016 income before taxes. Of the $1.4 million adjustment, $1.2 million relates to prior years and $0.2 million relates to the first three quarters of 2016. The adjustment did not have a material impact on the reported financial positions or results of operations for the three and twelve months ended December 31, 2016. Additionally, had the errors been recorded in the prior period to which they relate, the impact would not have been material to the reported financial position or results of operations for those periods.

During the fourth quarter of 2015, the Company identified immaterial errors to previously reported revenue due to certain customer allowances recorded at an incorrect rate and a reserve calculation which was overstated. The recorded out of period adjustment to revenue resulted in a $1.5 million increase in fourth quarter 2015 income before taxes. Of the $1.5 million adjustment, $0.7 million relates to prior years and $0.8 million relates to the first three quarters of 2015. The adjustment did not have a material impact on the reported financial position or results of operations for the three and twelve months ended January 2, 2016. Additionally, had the errors been recorded in the prior periods to which they relate, the impact would not have been material to the reported financial position or results of operations for those periods.

**ITEM 9.    *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE***

None.

**ITEM 9A.    *CONTROLS AND PROCEDURES***

**Evaluation of disclosure controls and procedures.**

As required by Rule 13a-15(b) under the Exchange Act, we have carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer (CEO) and our Chief Financial Officer (CFO), of the effectiveness, as of the end of the period covered by this report, of the design and operation of our "disclosure controls and procedures" as defined in Rule 13a-15(e) promulgated by the SEC under the Exchange Act. Based upon that evaluation, our CEO and our CFO concluded that our disclosure controls and procedures, as of the end of such period, were adequate and effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information was accumulated and communicated to management, as appropriate, to allow timely decisions regarding required disclosure.

Table of Contents

**Management's Report on Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of management, including our principal executive and financial officers, we assessed the Company's internal control over financial reporting as of December 31, 2016, based on criteria for effective internal control over financial reporting established in *Internal Control — Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management concluded that the Company maintained effective internal control over financial reporting as of December 31, 2016 based on the specified criteria.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2016 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

**Changes in Internal Control Over Financial Reporting**

During the quarter ended December 31, 2016, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

**ITEM 9B.**    *OTHER INFORMATION*

Our policy governing transactions in our securities by our directors, officers, and employees permits our officers, directors, funds affiliated with our directors, and certain other persons to enter into trading plans complying with Rule 10b5-l under the Securities Exchange Act of 1934, as amended. We have been advised that certain of our officers and directors (including Colin Angle, Chief Executive Officer) of the Company have entered into trading plans (each a "Plan" and collectively, the "Plans") covering periods after the date of this Annual Report on Form 10-K in accordance with Rule 10b5-l and our policy governing transactions in our securities. Generally, under these trading plans, the individual relinquishes control over the transactions once the trading plan is put into place. Accordingly, sales under these plans may occur at any time, including possibly before, simultaneously with, or immediately after significant events involving our company.

We anticipate that, as permitted by Rule 10b5-l and our policy governing transactions in our securities, some or all of our officers, directors and employees may establish trading plans in the future. We intend to disclose the names of our executive officers and directors who establish a trading plan in compliance with Rule 10b5-l and the requirements of our policy governing transactions in our securities in our future quarterly and annual reports on Form 10-Q and 10-K filed with the Securities and Exchange Commission. We, however, undertake no obligation to update or revise the information provided herein, including for revision or termination of an established trading plan, other than in such quarterly and annual reports.

**PART  III**

**ITEM 10.**    *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 31, 2016.

**ITEM 11.**    *EXECUTIVE COMPENSATION*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 31, 2016.

**ITEM 12.**    *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 31, 2016.

**ITEM 13.**    *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 31, 2016.

**ITEM 14.**    *PRINCIPAL ACCOUNTING FEES AND SERVICES*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 31, 2016.

**PART IV**

**ITEM 15.**    *EXHIBITS, FINANCIAL STATEMENT SCHEDULES*

**(a)**    The following are filed as part of this Annual Report on Form 10-K:

**1.    Financial Statements**

The following consolidated financial statements are included in Item 8:

Report of Independent Registered Public Accounting Firm

Consolidated Balance Sheets at December 31, 2016 and January 2, 2016

68

Table of Contents

Consolidated Statements of Income for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014

Consolidated Statements of Comprehensive Income for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014

Consolidated Statements of Stockholders' Equity for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014

Consolidated Statements of Cash Flows for the Years ended December 31, 2016, January 2, 2016 and December 27, 2014

Notes to Consolidated Financial Statements

**2.    Financial Statement Schedules**

All other schedules have been omitted since the required information is not present, or not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements or the Notes thereto.

**3.    Exhibits — See item 15(b) of this report below**

**(b) Exhibits**

The following exhibits are filed as part of and incorporated by reference into this Annual Report:

| Exhibit Number | Description |
|---|---|
| 2.1 | Asset Purchase Agreement, dated as of February 2, 2016, by and between iRobot Corporation and iRobot Defense Holdings, Inc. (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on February 4, 2016 and incorporated by reference herein) |
| 3.1(1) | Form of Second Amended and Restated Certificate of Incorporation of the Registrant dated November 15, 2005 |
| 3.2 | Amended and Restated By-laws of the Registrant (filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on March 9, 2016 and incorporated by reference herein) |
| 4.1(1) | Specimen Stock Certificate for shares of the Registrant's Common Stock |
| 10.1†(1) | Form of Indemnification Agreement between the Registrant and its Directors and Executive Officers |
| 10.2† | Form of Executive Agreement between the Registrant and certain executive officers of the Registrant, as amended (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended October 2, 2010 and incorporated by reference herein) |
| 10.3†(1) | Employment Agreement between the Registrant and Colin Angle, dated as of January 1, 1997 |
| 10.4† | 2005 Stock Option and Incentive Plan, as amended, and forms of agreements thereunder (filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 2, 2009 and incorporated by reference herein) |
| 10.5#(1) | Manufacturing and Services Agreement between the Registrant and Gem City Engineering Corporation, dated as of July 27, 2004 |
| 10.6† | Non-Employee Directors' Deferred Compensation Program, as amended (filed as Exhibit 10.19 to the Registrant's Annual Report on Form 10-K for the year ended December 29, 2007 and incorporated by reference herein) |
| 10.7 | Lease Agreement between the Registrant and Boston Properties Limited Partnership for premises located at 4-18 Crosby Drive, Bedford, Massachusetts, dated as of February 22, 2007 (as amended to date) (filed as Exhibit 10.8 to the Registrant's Annual Report on Form 10-K for the year ended January 2, 2016 and incorporated by reference herein) |
| 10.8† | Senior Executive Incentive Compensation Plan (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 2, 2011 and incorporated by reference herein) |

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.9† | Form of Deferred Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.10† | Form of Restricted Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.11# | Manufacturing Services Agreement between the Registrant and Jabil Circuit, Inc., dated as of March 18, 2010 (filed as Exhibit 10.1 to Amendment No. 1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 3, 2010 and incorporated by reference herein) |
| 10.12 | Amended and Restated Credit Agreement between the Registrant and Bank of America N.A. dated December 20, 2013 (filed as Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.13 | Amended and Restated Reimbursement Agreement between the Registrant and Bank of America N.A. dated December 20, 2013 (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.14#* | Manufacturing Services Agreement between the Registrant and Kin Yat Industrial Company Limited, dated as of January 22, 2014 (as amended) |
| 10.15† | Evolution Robotics, Inc. 2007 Stock Plan and forms of agreements thereunder (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2014 and incorporated by reference herein) |
| 10.16† | 2015 Stock Option and Incentive Plan and forms of agreements thereunder (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 27, 2015 and incorporated by reference herein) |
| 10.17 | Separation Agreement by and between the Registrant and Paolo Pirjanian, dated as of July 2, 2015 (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 26, 2015 and incorporated by reference herein) |
| 10.18 | Master Confirmation - Uncollared Accelerated Share Repurchase by and between the Registrant and J.P. Morgan Securities LLC, dated March 1, 2016 (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| 10.19† | Form of Performance-Based Restricted Stock Unit Award Agreement under the 2015 Stock Option Incentive Plan (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| 21.1* | Subsidiaries of the Registrant |
| 23.1* | Consent of PricewaterhouseCoopers LLP |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this report on Form 10-K) |
| 31.1* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 31.2* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101* | The following materials from the Registrant's Annual Report on Form 10-K for the year ended December 31, 2016 formatted in XBRL (eXtensible Business Reporting Language): (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Income, (iii) the Consolidated Statements of Comprehensive Income, (iv) the Consolidated Statements of Stockholders' Equity, (v) the Consolidated Statements of Cash Flows, and (vi) related notes to these financial statements |

†      Indicates a management contract or any compensatory plan, contract or arrangement.

#      Confidential treatment requested for portions of this document.

(1)    Incorporated by reference herein to the exhibits to the Company's Registration Statement on Form S-1 (File No. 333-126907)

*       Filed herewith

70

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

iROBOT CORPORATION

By:    /s/   Colin M. Angle
       Colin M. Angle
       Chairman of the Board,
       Chief Executive Officer and Director

Date: February 17, 2017

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Colin M. Angle and Alison Dean, jointly and severally, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report on Form 10-K has been signed by the following persons in the capacities indicated on February 17, 2017.

| Signature | Title(s) |
| --- | --- |
| /s/   COLIN M. ANGLE<br>Colin M. Angle | Chairman of the Board, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/   ALISON DEAN<br>Alison Dean | Executive Vice President, Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) |
| /s/   RONALD CHWANG<br>Ronald Chwang | Director |
| /s/   MICHELLE V. STACY<br>Michelle V. Stacy | Director |
| /s/   GAIL DEEGAN<br>Gail Deegan | Director |
| /s/   ANDREA GEISSER<br>Andrea Geisser | Director |

71

Table of Contents

| | | |
|---|---|---|
| /s/  DEBORAH G. ELLINGER | | Director |
| Deborah G. Ellinger | | |
| | | |
| /s/  MOHAMAD ALI | | Director |
| Mohamad Ali | | |
| | | |
| /s/  ANDREW MILLER | | Director |
| Andrew Miller | | |
| | | |
| /s/  ELISHA FINNEY | | Director |
| Elisha Finney | | |
| | | |
| /s/  MICHAEL BELL | | Director |
| Michael Bell | | |

72

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Asset Purchase Agreement, dated as of February 2, 2016, by and between iRobot Corporation and iRobot Defense Holdings, Inc. (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on February 4, 2016 and incorporated by reference herein) |
| 3.1(1) | Form of Second Amended and Restated Certificate of Incorporation of the Registrant dated November 15, 2005 |
| 3.2 | Amended and Restated By-laws of the Registrant (filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on March 9, 2016 and incorporated by reference herein) |
| 4.1(1) | Specimen Stock Certificate for shares of the Registrant's Common Stock |
| 10.1†(1) | Form of Indemnification Agreement between the Registrant and its Directors and Executive Officers |
| 10.2† | Form of Executive Agreement between the Registrant and certain executive officers of the Registrant, as amended (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended October 2, 2010 and incorporated by reference herein) |
| 10.3†(1) | Employment Agreement between the Registrant and Colin Angle, dated as of January 1, 1997 |
| 10.4† | 2005 Stock Option and Incentive Plan, as amended, and forms of agreements thereunder (filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 2, 2009 and incorporated by reference herein) |
| 10.5#(1) | Manufacturing and Services Agreement between the Registrant and Gem City Engineering Corporation, dated as of July 27, 2004 |
| 10.6† | Non-Employee Directors' Deferred Compensation Program, as amended (filed as Exhibit 10.19 to the Registrant's Annual Report on Form 10-K for the year ended December 29, 2007 and incorporated by reference herein) |
| 10.7 | Lease Agreement between the Registrant and Boston Properties Limited Partnership for premises located at 4-18 Crosby Drive, Bedford, Massachusetts, dated as of February 22, 2007 (as amended to date) (filed as Exhibit 10.8 to the Registrant's Annual Report on Form 10-K for the year ended January 2, 2016 and incorporated by reference herein) |
| 10.8† | Senior Executive Incentive Compensation Plan (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 2, 2011 and incorporated by reference herein) |
| 10.9† | Form of Deferred Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.10† | Form of Restricted Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.11# | Manufacturing Services Agreement between the Registrant and Jabil Circuit, Inc., dated as of March 18, 2010 (filed as Exhibit 10.1 to Amendment No. 1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 3, 2010 and incorporated by reference herein) |
| 10.12 | Amended and Restated Credit Agreement between the Registrant and Bank of America N.A. dated December 20, 2013 (filed as Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.13 | Amended and Restated Reimbursement Agreement between the Registrant and Bank of America N.A. dated December 20, 2013 (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.14#* | Manufacturing Services Agreement between the Registrant and Kin Yat Industrial Company Limited, dated as of January 22, 2014 (as amended) |
| 10.15† | Evolution Robotics, Inc. 2007 Stock Plan and forms of agreements thereunder (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2014 and incorporated by reference herein) |
| 10.16† | 2015 Stock Option and Incentive Plan and forms of agreements thereunder (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 27, 2015 and incorporated by reference herein) |
| 10.17 | Separation Agreement by and between the Registrant and Paolo Pirjanian, dated as of July 2, 2015 (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended September 26, 2015 and incorporated by reference herein) |
| 10.18 | Master Confirmation - Uncollared Accelerated Share Repurchase by and between the Registrant and J.P. Morgan Securities LLC, dated March 1, 2016 (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |

Table of Contents

| 10.19† | Form of Performance-Based Restricted Stock Unit Award Agreement under the 2015 Stock Option Incentive Plan (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| --- | --- |
| 21.1* | Subsidiaries of the Registrant |
| 23.1* | Consent of PricewaterhouseCoopers LLP |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this report on Form 10-K) |
| 31.1* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 31.2* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101* | The following materials from the Registrant's Annual Report on Form 10-K for the year ended December 31, 2016 formatted in XBRL (eXtensible Business Reporting Language): (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Income, (iii) the Consolidated Statements of Comprehensive Income, (iv) the Consolidated Statements of Stockholders' Equity, (v) the Consolidated Statements of Cash Flows, and (vi) related notes to these financial statements |

†     Indicates a management contract or any compensatory plan, contract or arrangement.

\#     Confidential treatment requested for portions of this document.

(1)     Incorporated by reference herein to the exhibits to the Company's Registration Statement on Form S-1 (File No. 333-126907)

*     Filed herewith

74

**MANUFACTURING SERVICES AGREEMENT**

**between**

**KIN YAT INDUSTRIAL COMPANY LIMITED**

**and**

**IROBOT CORPORATION**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

## MANUFACTURING SERVICES AGREEMENT

This Non-Exclusive Manufacturing Agreement (this "**Agreement**") is entered into by and between Kin Yat Industrial Company Limited, ("**Kin Yat**"), having offices at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong, and iRobot Corporation, a Delaware corporation **("iRobot")**, having its principal place of business at 8 Crosby Drive, Bedford, MA 01730. Kin Yat and iRobot are referred to herein as "**Party**" or "**Parties**".

## RECITALS

A.    Kin Yat is in the business of providing sophisticated manufacturing services that are unique in kind and quality, including designing, developing, manufacturing, testing, configuring, assembling, packaging and shipping highly specialized electronic assemblies and systems.

B.    iRobot is in the business of designing, developing, distributing, marketing and selling products containing highly specialized electronic assemblies and systems.

C.    Whereas, the Parties desire that Kin Yat manufactures, tests, configures, assembles, packages and/or ships certain electronic assemblies and systems pursuant to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## TERMS

1    <u>Definitions.</u> In addition to terms defined elsewhere in this Agreement, the capitalized terms set forth below shall have the following meaning:

1.1    **"Additional Services"** means services such as, design for manufacturability, manufacturing design test support, computer assisted design for manufacturability, test development services, volume production and advanced packaging technologies all as specified and approved by iRobot and agreed to by Kin Yat.

1.2    **"Affiliate"** means with respect to a Person, any other Person which directly or indirectly controls, or is controlled by, or is under common control with, the specified Person. For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, 50% or more of the outstanding shares of any class of capital stock of such Person (or in the case of a Person that is not a corporation, 50% or more of any class of equity interest).

1.3    **"Assigned Components"** means the components or materials specifically identified in Schedule 1 as "assigned" and for which iRobot has identified the applicable supplier from whom Kin Yat is authorized to source such component or material for incorporation into the Product.

1.4    **"AVL"** means the confidential list of Suppliers Designated by iRobot from which Kin Yat is authorized to purchase the applicable Assigned Components and Generic Components, if any for use in the manufacture of Products.

1.5    **"Class Failure" "Class Failure"** means a defect caused by (i) Kin Yat's failure to manufacture the Product to conform to the Specifications or other requirements in this Agreement, or (ii) the failure of Kin Yat to comply with any applicable law, rule, regulation, court order or decree that is applicable to Kin Yat's performance of its obligations set forth in this Agreement, or (iii) the gross negligence or willful misconduct of Kin Yat's personnel performing Manufacturing Services for iRobot under this Agreement; wherein, such defect occurs in more than [***], attributable to the same root cause, of the total number of a particular Product (as identified by the applicable Product serial numbers) supplied under this Agreement over a rolling [***] period within the Warranty Period.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.6    **Kin Yat** shall be defined to include any Kin Yat Subsidiary. (if applicable).

1.7    **"Commercially Reasonable Efforts"** means those efforts that would be deemed both commercially practicable and reasonably financially prudent after having taken into account all relevant commercial considerations. **"Relevant commercial considerations"** shall be deemed to include, without limitation, (1) all pertinent facts and circumstances; (2) financial costs; (3) resource availability and impact; (4) probability of success; and (5) other commercial practicalities.

1.8    **"Components"** means those Assigned Components, Generic Components, and Consigned Components.

1.9    **"Consigned Components"** means those components or materials specifically identified in Schedule 1 as "consigned" and provided by or on behalf of iRobot to Kin Yat for assembly into Products.

1.10    **"Defect"** means Product that does not conform to Specifications within the warranty Period, resulting from, but not limited to, non-conforming Components, materials, processes, packaging, and transportation.

1.11    **"EDI"** shall mean electronic data interchange.

1.12    **"Effective Date"** shall mean the date upon which the terms and conditions of this Agreement shall become effective by and between the Parties. The Parties have agreed that the Effective Date of this Agreement shall be **September 23, 2013**.

1.13    **"Encumbrance"** means any encumbrance, lien, charge, hypothecation, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, right of set-off, any matter capable of registration against title, option, right of pre-emption, privilege or any contract to create any of the foregoing.

1.14    **"Fee and Price Schedule"** shall mean the prices and fees set forth in Schedule 2 for the applicable Product identified therein, and any future Fee and Price Schedule for new Product as added in writing from time to time upon mutual agreement of the Parties.

1.15    **"FCA"** means that Kin Yat must at its own expense and risk deliver the Product cleared for export into the custody of the designated carrier at the applicable Port of Origin.

1.16    **"Generic Components"** means the components or materials identified in Schedule 1 for incorporation into the Product and for which iRobot has not identified any specific supplier or source from whom Kin Yat is authorized to source such component or material.

1.17    **"including"** shall be defined to have the meaning "including, without limitation."

1.18    **"in writing"** shall mean written documents, EDI with phone confirmation, verified faxes and successfully transmitted e-mails.

1.19    **"Intellectual Property"** means any and all intellectual property and tangible embodiments thereof, including without limitation inventions, discoveries, designs, specifications, developments, methods, modifications, improvements, processes, know-how, show-how, techniques, algorithms, databases, computer software and code (including software and firmware listings, assemblers, applets, compilers, source code, object code, net lists, design tools, user interfaces, application programming interfaces, protocols, formats, documentation, annotations, comments, data, data structures, databases, data collections, system build software and instructions), mask works, formulae, techniques, supplier and customer lists, trade secrets, graphics or images, text, audio or visual works, materials that

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

2

document design or design processes, or that document research or testing, schematics, diagrams, product specifications and other works of authorship.

1.20   **"Intellectual Property – KIN YAT"** shall mean both Intellectual Property – Created by Kin Yat and Intellectual Property - Existing by Kin Yat, collectively.

1.21   **"Intellectual Property – Created by Kin Yat"** means any improvements to the Technical Manufacturing Information – KIN YAT that are newly created or developed, and reduced to practice by Kin Yat in (i) preparing any Product provided pursuant to this Agreement, or (ii) performing the Manufacturing Services or any other work provided pursuant to this Agreement; but shall not include any Intellectual Property - Existing by Kin Yat.

1.22   **"Intellectual Property – Existing by "Kin Yat"** means any Intellectual Property, including the Technical Manufacturing Information – KIN YAT, created or developed by Kin Yat outside the scope of this Agreement during the Term or owned or controlled by Kin Yat prior to the execution of this Agreement; and all improvements, modifications or enhancements to the foregoing made by or on behalf of Kin Yat.

1.23   **"Intellectual Property Rights"** means, collectively, all rights in, to and under patents, trade secret rights, copyrights, trademarks, service marks, trade dress and similar rights of any type under the laws of any governmental authority, including without limitation, all applications and registrations relating to the foregoing.

1.24   **"iRobot Intellectual Property"** means all Intellectual Property, tangible embodiments thereof and all other materials provided or made available to Kin Yat by iRobot, including, without limitation the Specifications.

1.25   **"iRobot Property"** means all property, including all Product and Consigned Components, other Components paid for my iRobot, inventories, work in process (WIP), Loaned Equipment, Specifications, test equipment, software and documentation, and support maintenance or design documentation, furnished to Kin Yat by iRobot or otherwise paid for by iRobot in connection with this Agreement for Kin Yat's use in performing its obligations hereunder.

1.26   **"iRobot Quarter End"** means iRobot's fiscal calendar which follows the 4-4-5 week format identified in Schedule 6, which Schedule shall be updated by iRobot on an annual basis on or before December 1st.

1.27   **"Lead-time"** means the mutually agreed upon minimum amount of time in advance of shipment that Kin Yat must receive a Purchase Order in order to deliver Product by the requested delivery date.

1.28   **"Loaned Equipment"** means capital equipment (including tools) which is loaned to Kin Yat by or on behalf of iRobot to be used by Kin Yat to perform the Manufacturing Services and includes all equipment, tools and fixtures purchased specifically for iRobot, by Kin Yat, to perform the Manufacturing Services and that are paid for in full by iRobot.

1.29   **"Manufacturing Services"** means the services performed by Kin Yat hereunder which shall include but not be limited to manufacturing, testing, configuring, assembling, packaging and/or shipping of the Product, and all Reasonable and Customary Support Services, and any Additional Services, all in accordance with the Specifications.

1.30   **"Marks"** means trademarks, service marks, trademark and service mark applications, trade dress, trade names, logos, insignia, symbols, designs or other marks identifying a Party or its products.

1.31   **"Materials Declaration Requirements"** means any requirements, obligations, standards, duties or responsibilities pursuant to any environmental, product composition and/or materials declaration laws, directives, or regulations, including international laws and treaties regarding such subject matter; and any regulations, interpretive guidance or enforcement policies related to any of the foregoing, including, but not limited to, the following examples: Directive 2002/95/EC of the European Parliament and of the Council of 27 January 2003 on the restriction of the use

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3

of certain hazardous substances in electrical and electronic equipment ("RoHS"), Directive 2002/96/EC of the European Parliament and of the Council of 27 January 2003 on waste electrical and electronic equipment ("WEEE"), and European Union Member State implementations of the foregoing; the People's Republic of China (PRC) Measures for the Administration of the Control of Pollution by Electronic Information Products (China RoHS) (电子信息产品污染控制管理办法) promulgated on February 28, 2006 (including any pre-market certification ("CCC mark") requirements thereunder and including relevant standards adopted by the PRC Ministry of Information Industry or other applicable PRC authority); PRC General Administration of Quality Supervision, Inspection and Quarantine's Circular 441 (2006); Japanese Industrial Standard C0950:2005(J-Moss Japan RoSH); the California Electronic Waste Recycling Act of 2003; Act on the Recycling of Electrical and Electronics Equipment and Automobiles (1.1.2008) (Korea RoHS), Waste Act (2004) and secondary legislation (based on EU directives ) (Croatia), Regulation (EC) No 1907/2006, Regulation concerning the Registration, Evaluation, Authorization and Restriction of Chemicals (REACH), establishing a European Chemicals Agency amending Directive 1999/45/EC and repealing Council Regulation (EEC) No 793/93 and Commission Regulation (EC) No 1488/94 as well as Council Directive 76/769/EEC and Commission Directives 91/155/EEC, 93/67/EEC, 93/105/EC and 2000/21/ECand/or other similar legislation. The Materials Declaration Requirements shall include compliance with Brazil RoHS, Mexico RoHS and Argentina RoHS as each of these countries promulgates their own legislation.

      1.32    **Conflict Minerals.**

Kin Yat represents and warrants that it is in full compliance with conflict minerals laws, including, without limitation, Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 as it may be amended from time to time and any regulations, rules, decisions or orders relating thereto adopted by the Securities and Exchange Commission or successor governmental agency responsible for adopting regulations relating thereto (collectively, "Dodd-Frank Section 1502"). Kin Yat must cooperate with iRobot to make available to iRobot and/or its agents, material declarations that identify the sources of and amount of all substances contained in the Products. Unless iRobot specifically agrees in writing that a particular Product may contain a particular material, Kin Yat will also provide a statement that the Products do not contain various materials at issue in applicable laws and regulations. Kin Yat must declare each Product's compliance to all applicable hazardous material legislation and identify any substances that are banned or must be declared under applicable laws. In addition, Kin Yat will use Commercially Reasonable Efforts to make available documentation that supports the declaration. Without limiting the generality of the foregoing, Kin Yat agrees to disclose to iRobot, upon iRobot's request, to the extent known or discoverable by Kin Yat following reasonable inquiry, the original source of all minerals contained in the Product. If Kin Yat does not know the original source of the minerals, Kin Yat agrees to cooperate with iRobot, including disclosing from whom Kin Yat purchased the minerals and urging others to disclose such information, so that the original source of minerals can be accurately determined and reported. Kin Yat shall comply with all laws regarding the sourcing of minerals, including, without limitation, laws prohibiting the sourcing of minerals from mines controlled by combatants and Dodd-Frank Section 1502. Without any further consideration, Kin Yat shall provide such further cooperation as iRobot may reasonably require in order to meet any obligations it may have under conflict minerals laws, including, without limitation, under Dodd-Frank Section 1502.

      1.33    **"Minimum Volume"** means the minimum volume, if any, set forth on Schedule 1 for a particular Product.

      1.34    **"Newly Created Intellectual Property"** means, other than the Kin Yat Intellectual Property, any and all Intellectual Property, tangible embodiments thereof and all other materials created, developed, reduced to practice, or otherwise resulting from any work, Manufacturing Services or other services performed by either or both Parties, including, but not limited to, by any of its or their employees, agents or contractors, under this Agreement.

      1.35    **"Non-Conforming Product"** means any Product that does not conform to the Specifications.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.36 **"Non-Disclosure Agreement"** means that certain Mutual Non-Disclosure Agreement between the Parties dated August 29, 2006, attached hereto as Schedule 4.

1.37 **"NRE Costs"** shall consist of expenses, excluding the Waived NRE Costs, incurred by Kin Yat under this Agreement, including design engineering services, testing, fixturing and tooling and other out-of-pocket costs, in each case for work performed by Kin Yat for iRobot pursuant to iRobot's prior written consent. For the avoidance of doubt, NRE Costs shall not include any costs or expenses incurred by Kin Yat for any Reasonable and Customary Support Services.

1.38 **"Port of Origin"** means [***] or another port designated by iRobot in writing.

1.39 **"Packaging and Shipping Specifications"** means the packaging and shipping specifications set forth in Schedule 1 and otherwise supplied and/or approved by iRobot.

1.40 **"Person"** means any corporation, business entity, natural person, firm, joint venture, limited or general partnership, limited liability entity, limited liability partnership, trust, unincorporated organization, association, government, or any department or agency of any government.

1.41 **"Product Specifications"** means the technical specifications and requirements provided by iRobot to Kin Yat for the manufacture and supply of Products or the provision of Manufacturing Services, including all manufacturing information, technical data and manuals, design information, drawings, documentation, packaging requirements, testing requirements, Specifications, or any other criteria written and provided to Kin Yat by iRobot, including the Quality and Test Procedures, the Packaging and Shipping Specifications, and the Materials Declaration Requirements.

1.42 **"Products"** means the products manufactured and assembled by Kin Yat on behalf of iRobot under this Agreement as identified in Schedule 1 (or any subsequent Schedule 1 prepared for any product to be manufactured hereunder) including any updates, renewals, modifications or amendments thereto.

1.43 **"Production Start Date"** means the first day immediately following the business week during which Kin Yat manufactures and delivers against the product quantities listed in Schedule 1

1.44 **"Proprietary Information and Technology"** means "Proprietary Information" as defined in the Non-Disclosure Agreement, as amended in Section 16 below.

1.45 **"Reasonable and Customary Support Services"** mean all services and activities related to reporting for iRobot and its customers, root cause analysis, testing, trials, inventory audits and reconciliation, development and delivery of samples, participation and support of any new Product introduction.

1.46 **"Product"** means any and all configurations of the "Product" SKUs manufactured and assembled by Kin Yat on behalf of iRobot under this Agreement as identified in the initial Schedule 1 to this Agreement.

1.47 **"Specifications"** means the technical specifications for manufacturing Products under this Agreement as set forth in Schedule 1, any bill of materials, designs, schematics, assembly drawings, process documentation, test specifications, current revision number, and Approved Vendor List, and other requirements otherwise supplied and/or approved by iRobot. Specifications may be amended from time to time by amendments in the form of written engineering change orders agreed to by the Parties.

1.48 **"SOW"** means the statement of work for each Product set forth in any Schedule 1 as amended in writing from time to time upon mutual agreement of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

5

1.49    **"Subsidiary(ies)"** means any corporation, partnership, joint venture, limited liability entity, trust, association or other business entity of which a Party or one or more of its Subsidiaries, owns or controls more than 50% of the voting power for the election of directors, managers, partners, trustees or similar parties.

1.50    **"Suppliers Designated by iRobot"** means suppliers designated, specified and/or approved by iRobot.

1.51    **"Technical Manufacturing Information – KIN YAT"** means the manufacturing information, process and technology used by Kin Yat or third parties under its control to design, develop, test or manufacture the Products including, but not limited to: (i) specifications, software, test software, schematics, drawings, designs, mask works, topography or other materials pertinent to the most current revision level of manufacturing of the Products; (ii) copies of all inspection, manufacturing, test and quality control procedures and any other work processes; (iii) jig, fixture and tooling designs; (iv) Kin Yat general knowledge and information relating to the Products; and (v) support documentation.

1.52    **"Term"** means the Initial Term and each Renewal Term, collectively.

1.53    **"Quality and Test Procedures"** means the testing specifications, quality requirements, standards, procedures and parameters supplied and/or approved by iRobot, including without limitation, the specifications and quality requirements plans for the Product and certain Components attached hereto as Schedule 3.

1.54    **"Waived NRE Costs"** means, collectively, [***].

**2**        List of Schedules. This Agreement includes the following Schedules for each Product to be manufactured hereunder, which are hereby incorporated herein and made a part of this Agreement:

        Schedule 1 – Statement of Work and Specifications
        Schedule 2 – Fee and Price Schedule (Final Kin Yat Quote)
        Schedule 3 – Quality and Test Procedures
        Schedule 4 – Non-Disclosure Agreement
        Schedule 5 – Trademark Usage Guidelines
        Schedule 6 – iRobot Quarter End

**3**        Manufacturing Services. Kin Yat will manufacture the Product in accordance with the Specifications and any applicable Purchase Order. When requested by iRobot, and subject to appropriate fee and cost adjustments, Kin Yat will provide Additional Services for existing or future Product manufactured by Kin Yat for iRobot. iRobot shall be solely responsible for the sufficiency and adequacy of the Specifications.

3.1    Quality and Test Procedures. All Products manufactured and supplied by Kin Yat shall, at minimum, adhere to this Agreement and the Specifications attached hereto. Kin Yat shall continuously perform the applicable quality tests and procedures and monitor such compliance at all times, including during the preparation for production as well as during production. In addition to the minimum required tests specified, Kin Yat shall employ its own internal quality system and apply the necessary tools, processes and procedures to ensure that the contracted Product covered by this Agreement complies with the Specifications. This may include, but not be limited to, process control for parts and assemblies, incoming inspection of fabricated or sourced parts, final inspections, subassembly inspections and testing, etc. iRobot shall be solely responsible for the sufficiency and adequacy of the Specifications. Kin Yat is responsible for designing and/or purchasing and maintaining all necessary test and fixture equipment to conduct such testing and procedures. Kin Yat is responsible for worker's training, worker's instructions, preventive and/or on-conditional (as needed) maintenance plans, and calibration plans.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.2    Packaging and Shipping. Kin Yat will package and ship the Product in accordance with the Packaging and Shipping Specifications. iRobot shall be solely responsible for the sufficiency and adequacy of the Packaging and Shipping Specifications. In the event Kin Yat fails to comply with the Packaging and Shipping Specifications, Kin Yat will reimburse iRobot for the cost of rework to the extent that such error can be rectified with rework.

3.3    Items to be Supplied by iRobot. iRobot shall supply to Kin Yat, according to the terms and conditions specified herein, iRobot Proprietary Information and Technology and, if applicable, the Loaned Equipment if any, and Consigned Components pursuant to Section 12.1. iRobot will also provide to Kin Yat all Specifications, Quality and Test Procedures, Packaging and Shipping Specifications, Product design drawings, approved vendor listings where applicable, material component descriptions (including approved substitutions), manufacturing process requirements, and any other specifications necessary for Kin Yat to perform the Manufacturing Services. iRobot shall be solely responsible for delay in delivery, defects and enforcement of warranties related to the Consigned Components.

3.4    Items to be Supplied by Kin Yat. Kin Yat will employ the Kin Yat Manufacturing Process, the Reasonable and Customary Support Services, any required manufacturing technology, manufacturing capacity, labor, manufacturing and quality related fixtures, design services in support of manufacturing process (to include fixture design), transportation logistics (as required by FCA Port of Origin), systems and facilities necessary for Kin Yat to perform the Manufacturing Services. It is expected that engineering support (at Kin Yat's expense) of product, packaging and process improvements will continue for the life of the Product, even after all requirements are met. Tooling that is designed and fabricated specific to manufacture, assembly, inspection or testing of iRobot Product is the sole property of iRobot, including related design documentation

3.5    Facilities Access. iRobot shall have the right, during normal business hours by appointment and at its expense to inspect, review, monitor and oversee the Manufacturing Services, provided that such inspection shall not disrupt Kin Yat's normal business operations. iRobot shall cause each of its employees, agents and representatives who have access to Kin Yat's facilities, to maintain, preserve and protect all Proprietary Information and Technology of Kin Yat and the confidential or proprietary information and technology of Kin Yat's other customers in accordance with the Non-Disclosure Agreement. iRobot shall further have the right to bring iRobot's customers to Kin Yat's facility, by appointment and under the same obligations to Kin Yat surrounding protection of Kin Yat's Proprietary Information and Technology and Kin Yat's customers' confidential or proprietary information and technology. iRobot's employees have the right to obtain relevant artifacts (such as reports, process tracking charts etc.) and take photographs and videos of iRobot related Products, Components, manufacturing processes, tests, fixtures, tools or items at any time during the inspection with the consent of Kin Yat whose consent shall not be unreasonably withheld.

3.6    Materials Procurement.

3.6.1    Kin Yat will use Commercially Reasonable Efforts to procure Assigned Components and Generic Components from the applicable designated supplier per iRobot's AVL, where applicable, and otherwise from suppliers chosen by Kin Yat and approved by iRobot, in amounts necessary to fulfill Purchase Orders against the Forecasts. Kin Yat will be responsible for the quality inspection of all Components (except for the Consigned Components) and all other parts and adherence to the Product Specifications in the assembly and manufacturing process. iRobot will be responsible for the part functionality set forth in the iRobot Specifications. Kin Yat is responsible for managing, and the performance of, the suppliers of the Assigned Components and Generic Components, including but not limited to purchasing, component inventory control, customs paperwork and Value Added Tax (VAT), and is ultimately responsible for verifying that all Components conform to the Product Specifications. iRobot will be responsible for managing the pipeline of iRobot controlled Consigned Components. Kin Yat will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Kin Yat. Kin Yat shall use Commercially Reasonable Efforts to obtain terms and conditions that from all suppliers that allow return privileges for Generic Components (subject to agreed upon reasonable minimum order quantities). iRobot may authorize Kin Yat to procure Generic Components and Assigned Components necessary, without a Purchase

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

7

Order, by issuing a written authorization to purchase such Components ("**Material Authorization**"), to meet specific Forecast or Purchase Order demand. In the event of schedule changes, Kin Yat shall use Commercially Reasonable Efforts to cancel all applicable material and parts purchase orders and reduce material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. iRobot shall be responsible for all liability for materials and parts Kin Yat cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Kin Yat acting on iRobot's Material Authorization or Purchase Order. Kin Yat's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components (except for the Consigned Components not controlled by Kin Yat) regardless of classification.

3.6.2    End of Life Component Reporting. Kin Yat is responsible for continuous monitoring of the AVL for end-of-life component condition. Kin Yat is responsible for periodic reporting, no less frequently than [***] of the market condition for each component of any currently in production by iRobot's product AVL.

3.6.3    Long-Lead Components. Kin Yat shall not purchase any Component designated in Schedule 2 as a "long lead" Component by iRobot without a Material Authorization. Kin Yat shall use Commercially Reasonable Efforts to continuously improve lead time for all Components. With iRobot's prior written consent, Kin Yat may pre-purchase Generic Components and Assigned Components, or pre-build sub assemblies, modules, core robots or even completed SKU quantities in order to meet Forecast volumes, or anticipated volumes under Purchase Orders.

3.6.4    Exclusive Components. With respect to any Assigned Components or Consigned Components (controlled by Kin Yat) that have been customized by a supplier or manufacturer specifically for any iRobot Product, Kin Yat shall require each such supplier not to sell or supply such custom Component to any other Person.

3.7    Materials Declaration.

3.7.1    iRobot shall notify Kin Yat in writing of the specific Materials Declaration Requirements that iRobot determines to be applicable to the Products and shall be solely liable for the adequacy and sufficiency of such determination and information. Kin Yat shall be responsible for collecting, and having available at all times, all third party supplier's documentation certifying compliance with such Materials Declaration Requirements with respect to any and all components, parts or material used in connection with the Manufacturing Services under this Agreement. Kin Yat shall utilize its supplier qualification process to ensure that each supplier, its Components and its documentation are trustworthy and in compliance with all such Materials Declaration Requirements. Upon written request of iRobot, Kin Yat shall provide to iRobot copies of such documents, including any compliance certificates.

3.7.2    Without limiting the foregoing Section 3.7.1, Kin Yat shall ensure that it has enforceable agreements with each of its suppliers under this Agreement, excluding suppliers of Consigned Components, so that Kin Yat may fulfill Kin Yat's obligations under this Section 3.7.1 and that iRobot is an intended third party beneficiary under such agreements.

3.8    Product Evaluation. Acceptance of the Product will occur upon iRobot's or its designee's receipt of the Product. Notwithstanding the foregoing, iRobot reserves the right to inspect or evaluate the Product to determine if it conforms, in all material respects, to the Specifications, either at Kin Yat's premise or third party location. Given reasonable and adequate advance notification to Kin Yat and by appointment, iRobot may, at its discretion, perform inspections of the Product at random or on a continual basis, on site at Kin Yat's premises. In the event that the Product does not meet the Specifications, such Product will be deemed Non-Conforming and iRobot will have all available remedies with respect to Non-Conforming Products as set forth in this Agreement. Acceptance, inspection or evaluation by iRobot does not relieve Kin Yat of its obligations to the services and warranties as set forth in this Agreement.

3.9    Purchase Order Performance.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

8

3.9.1    Kin Yat shall fill and deliver the Products purchased under a Purchase Order by the due date specified on such Purchase Order. Purchase Orders to Kin Yat will be launched at lead-times mutually agreed between Kin Yat and iRobot in advance of issuance of Purchase Orders.

3.9.2    Kin Yat agrees that time is of the essence with respect to all deliveries and performance. If Kin Yat fails to timely perform or deliver within [***] of the delivery requirements of any standalone Purchase Order from iRobot, for reasons under Kin Yat's direct control, Kin Yat is liable to iRobot for all direct, reasonable costs incurred as a result of such delay including expediting costs. In the event of a delay, Kin Yat shall use Commercially Reasonable Efforts to expedite delayed Products and/or performance, shall pay all reasonable expediting costs, including expedited delivery costs.

3.9.3    For purposes of this Agreement, "**On–time**" delivery means: delivery of 100% of the Products purchased under a Purchase Order are delivered by the due date indicated on iRobot's Purchase Order for such Products minus [***], plus [***]. Kin Yat will monitor and report to iRobot monthly "On-time" delivery per Purchase Order, and such report shall include the number of Purchase Orders placed by iRobot within the Lead Time versus number of Purchase Orders delivered On-time.

3.10    Assigned and Consigned Components.

3.10.1    iRobot may elect to assign a specific supplier and part number for any component or material, including for example; rechargeable batteries, battery chargers, masked IC components, motors, packaging material, and gears. In such case, Kin Yat shall source such Assigned Components from the applicable supplier and implement supply optimization inventory practices. Kin Yat will be responsible for all purchasing, quality control, component inventory control, [***] inventory management, customs paperwork and VAT for all Assigned and Generic Components. Kin Yat shall handle all Components as required by the Product Specification and as otherwise instructed by iRobot, and shall be responsible for any and all expenses related to its compliance with such material handling requirements. In the event that iRobot elects to transfer to Kin Yat the purchasing responsibility for any Consigned Component, Kin Yat shall assume such responsibility as soon as reasonably practicable. The Parties will work in good faith to identify and implement all reasonable measures to allow for Kin Yat to assume such purchasing responsibility for such Consigned Component. Except for any Consigned Components controlled by Kin Yat pursuant to this Section 3.10.1, iRobot shall be solely responsible for delay in delivery, defects and enforcement of warranties related to all Consigned Components.

3.10.2    Kin Yat will segregate, conspicuously identify and safeguard all iRobot owned and Consigned Components in such fashion to clearly identify the Consigned Components as the property of iRobot. Kin Yat shall maintain all Components, at its own expense, in efficient working order and good repair, and otherwise in accordance with the Product Specifications.

3.10.3    Upon placement of Consigned Components into Kin Yat's facility, title and possession of the materials shall transfer to iRobot as if it were an actual shipment of Product to iRobot. Insurance covering the Consigned Components will be the responsibility of iRobot. Such insurance includes a waiver of subrogation against Kin Yat. Kin Yat shall hold inventory on consignment for support of iRobot's Products and business at levels mutually agreed upon by iRobot and Kin Yat, but no less than an amount to satisfy Purchase Orders against the current Forecasts. Kin Yat will at all times utilize [***] inventory management for all Consigned Components. In the event that Kin Yat's failure to utilize [***] inventory management for all Consigned Components results in any such Component remaining in Kin Yat's inventory for more than [***], then Kin Yat shall, at its own expense, coordinate with the applicable supplier for the return and replacement of such Components for new or properly updated Components. If "iRobot" does not place Purchase Orders that consume Consigned Components consistent with applicable Forecast, the Parties will negotiate in good faith the disposition of Consigned Components held by Kin Yat. Kin Yat shall provide to iRobot upon request an accounting of all Consigned Components and all other Components, Products and materials of iRobot at Kin Yat's premises or otherwise under Kin Yat's control with reasonable details.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.10.4   Sales of Products and Components. Without iRobot's prior written consent, Kin Yat shall not, directly or indirectly, sell, supply or otherwise transfer any Product or Component to any Person other than iRobot or iRobot's designated customer or distributor.

**4      Quality**

4.1   Governing Quality documents.

4.1.1   General Quality Requirements. Kin Yat shall comply with the requirements stated therein for defining general iRobot supplier quality performance.

4.1.2   Production Line Test Specification (PLTS). The PLTS is provided to Kin Yat by iRobot in order for Kin Yat to establish a production line test process to verify and to demonstrate that the contracted product has been assembled and minimally tested to meet the product requirements as defined in the relevant product specifications

4.1.3   Design Validation Test Specification (DVTS). Suppliers who provide design services to iRobot shall demonstrate that the contracted product has been designed and qualification tested according to the DVTS to meet the performance requirements of its intended application as defined in the relevant product specifications.

4.2   Quality Management System. Kin Yat shall maintain a Quality System that is certified to an internationally recognized quality management system standard, such as ISO 9001 or equivalent.

4.3   Engineering Changes. Kin Yat shall not make any changes to product or design without receiving prior written approval from iRobot for the change request and for implementation of the change into production.

4.4.   Manufacturing Changes. Kin Yat shall not make any changes to the manufacturing process that may affect the product form, fit, function or safety without receiving prior written approval from iRobot.

4.5   Defects. Defects in product resulting in failure to meet iRobot product specifications, due to inadequate assembly procedures and production verification testing are the responsibility of the Kin Yat regardless of whether the defect occurred during manufacturing or after iRobot acceptance.

4.6   Corrective Action. In the event that defects are produced, Kin Yat shall notify iRobot and implement containment activities to prevent further defective product from affecting iRobot supply chain. For defective product within Kin Yat's supply chain, Kin Yat shall make necessary arrangements, at its sole expense, to screen, rework and / or replace. Kin Yat shall supply to iRobot a written corrective action plan of its root cause(s) investigation and actions to prevent recurrence of identified root cause(s)

4.7   Quality Control Plan (QCP). Kin Yat shall develop a Quality Control Plan (QCP), approved by iRobot, to define the necessary process controls and production testing and inspection methods to ensure the fabrication and assembly processes deliver products that meet the Specifications supplied by iRobot.

4.8   Subcontractor Qualification. Kin Yat shall be responsible for qualifying all subcontractors of all Assigned Components and Generic Components pursuant to Kin Yat's existing qualification methodology and process.

4.9   Serial Number identification and traceability. Kin Yat shall identify each unit of the contracted product produced with a unique identifier number. This serial number shall provide information relevant to the date of production, shift, line, and traceability to critical component lots/batches and processes. The format of this serial number shall be agreed upon between Kin Yat and iRobot prior to commencement of production.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

10

4.10  Certifications. Regulatory compliance certifications are required as a condition for the production, shipment, sale, and disposal of all iRobot products, and as such, iRobot is obligated to maintain a commitment to meeting all regulatory compliance requirements. As a condition of the compliance certification process, the Products and Kin Yat's manufacturing facility shall be subject to periodic audits and certification testing. Kin Yat shall provide objective evidence that it meets such requirements pertaining to all regulatory, quality, and compliance requirements and will provide such information upon request from iRobot. Objective evidence shall include, but is not limited to, existing certification documents and certification inspection reports from Kin Yat and each of its suppliers.

4.10.1 Product Specific Certifications. iRobot is responsible for maintaining all existing product certifications. Kin Yat shall comply, and shall cause its suppliers to comply, with any and all Product specific, certification-related requirements such as: informing iRobot of the source and manufacturing part number of every Component and validation that Kin Yat's processes are compliant to such certification requirements. Kin Yat shall support all recertification requirements for all Product certifications. All Product licenses and Product certifications shall be in iRobot's name. In the event that iRobot requires Product changes which result in Product recertification, iRobot will bear any licensing and external testing fees for all such Product certifications. In the event that Kin Yat requires Product changes which result in Product recertification, Kin Yat will notify iRobot immediately and bear any licensing and external testing fees for all product certifications.

4.10.2  Manufacturing Facility Specific Certifications. Kin Yat shall support and maintain any pre-requisite site specific requirements related to the Product certification requirements. Kin Yat shall bear any fees associated with these pre-requisite site specific certifications. All pre-requisite site specific certifications shall be maintained in Kin Yat's name. In the event that iRobot requires product or business changes which result in additional site specific certifications by Kin Yat, Kin Yat shall promptly take all actions necessary to comply with such requirements. In addition, Kin Yat shall promptly execute documents and take such further action as iRobot shall reasonably request in order to comply with any certification required by any customer or distributor of iRobot.

4.10.3  Records Retention. For a period of [***] from delivery of each Product (items produced under the [***] are considered Product), Kin Yat shall maintain accurate and complete records for all Products manufactured hereunder, including, but not limited to, all configuration and engineering records. This shall include all records relating to product traceability to ensure both forward and reverse traceability. Records shall contain, as a minimum, all information relating to the following:

[***]

4.10.4  Product specification and standards. All Products must conform in all respects to the Product Specifications provided by iRobot for the items stated on the bill of materials or Purchase Order. Any Kin Yat proposed change to Product requires mutual agreement in writing prior to implementing such change. Kin Yat shall notify iRobot in writing and receive approval of any changes to Components, other materials, parts or sources of supply, process chemistries, test procedures, quality reporting or other major processes, and to ensure that any such changes do not compromise the requirements under this Agreement or the Specifications, quality, or reliability of Products ordered, or which may affect form, fit or function.

4.10.5  Secure Testing Facility. Kin Yat shall provide intellectual property secure on-site facilities for iRobot's final inspection quality control team, as well as the necessary inspection technicians to assist during inspections.

4.11  Returned Products. Kin Yat shall establish a program for analyzing Product returns and for tracking Product return rates and failure types. Kin Yat will utilize iRobot provided Return product information in such analysis and tracking. Kin Yat shall provide objective evidence to demonstrate appropriate corrective actions, as needed, to address Product Returns root cause.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

11

4.12   Recalls. If iRobot reasonably decides to, or is required by any government authority or court of competent jurisdiction to, initiate a product recall, withdrawal or field correction with respect to, or if there is any governmental seizure of, any Product, iRobot will notify Kin Yat of the details regarding such action, including providing copies of all relevant documentation concerning such action. Kin Yat will assist iRobot in investigating any such situation and all regulatory contacts that are made and all activities concerning seizure, recall, withdrawal or field correction will be coordinated and made by iRobot, and all communications in connection with any recall, shall come solely from iRobot. If any such recall, withdrawal, field correction or seizure results from (i) failure of any Product to conform to the Specifications or any warranty or other requirement set forth in this Agreement, or (ii) the failure of Kin Yat to comply with any applicable law, rule, regulation, standard, court order or decree or (iii) the gross negligent or intentional wrongful act or omission of Kin Yat in connection with the production of Product hereunder, then, in addition to the rights, remedies and obligations under Section 5, Kin Yat shall be responsible for the full cost and expense of any such seizure, recall, withdrawal or field correction. For the purposes of this Agreement, the expenses of any recall, withdrawal, field correction or seizure shall include, without limitation, the out-of-pocket expenses of notification and destruction or return of the recalled Product and all other out-of-pocket costs incurred in connection with such recall, in addition to any lost profits of either Party under any circumstances or any administrative or overhead charge.

5       **Warranty & Remedy.**

5.1   Kin Yat Warranty. [***] warranty period.

5.1.1   Product Warranty. Kin Yat represents, warrants and covenants that: (i) it will perform the Manufacturing Services and manufacture the Product in accordance with IPC-A 610 Class 2 workmanship standard, the Product Specifications, applicable law, and the terms and conditions of this Agreement, (ii) the Products will be manufactured, processed and assembled by Kin Yat, and be free from defects in workmanship in accordance with the Product Specifications, (iii) the Products will conform, in all material respects, to the Product Specifications, be new or newly manufactured and include only new Components, and (iv) the Products will be free and clear of all Encumbrances. The foregoing warranty shall apply to any Product that is repaired or re-manufactured by or on behalf of Kin Yat under this Agreement. This Product warranty is extended to, and may only be enforced by, iRobot.

5.2   Components Warranty. Kin Yat will pass on to iRobot all warranties from Component suppliers to the extent that they are transferable. Kin Yat shall use Commercially Reasonable Efforts to ensure that all Assigned Components used in the Product are procured from suppliers on the AVL, unless otherwise agreed to by the Parties in writing.

5.3   Survival of Warranty. Product warranties will survive any inspection, delivery, acceptance or payment by iRobot and be in effect for the longer of (i) [***] from the date of invoice of the Product from Kin Yat to iRobot, (ii) for Products purchased by an end-user customer within [***] from the date such Product is initially delivered to iRobot or to iRobot's designated carrier, [***] of the warranty period from iRobot to such end-user customer for such Product, or (iii) such other term as agreed to by the Parties, following the date such Product is initially delivered to iRobot or to iRobot's designated carrier (such period, the "**Warranty Period**"). Should there be a breach of any of the warranties specified during the Warranty Period, Kin Yat will either (A) repair or replace the Product that contains a defect caused by a breach of the warranty set forth herein; or (B) issue a credit to iRobot in an amount equal to [***]. Product warranties will survive for the full term of the Warranty Period, regardless of whether such Product becomes obsolete or whether Kin Yat ceases to manufacture such Product or ceases to provide the Manufacturing Services.

5.4   Repair or Replacement of Defective Product. Kin Yat may elect, in its sole discretion, to repair or re-manufacture any Non-Conforming Products caused by a breach of the warranty set forth in this Section 5. Any such repair or re-manufacture shall be pursuant to Kin Yat's standard return material authorization process and procedure ("**RMA**"), pursuant to which iRobot will request an RMA number from Kin Yat for such Non-Conforming Product.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

12

iRobot shall then consign the Non-Conforming Products along with objective documentation of the applicable breach of warranty ("**Defect**"), FOB Kin Yat's repair facility in the same country and region as the Non-Conforming Products (or such other location as agreed to by the Parties in writing), and specify the Kin Yat assigned RMA number. Kin Yat will repair or re-manufacture the Non-Conforming Products within [***] of receipt by Kin Yat of such Non-Conforming Products, and in the event the Defect is confirmed, Kin Yat will reimburse iRobot for the reasonable cost of transporting the Non-Conforming Products to Kin Yat's designated facility and Kin Yat will deliver the repaired or re-manufactured Products, FCA iRobot's designated destination. If no such Defect is confirmed, iRobot shall reimburse Kin Yat for all fees, costs and expenses incurred to analyze and, if requested by iRobot, repair or re-manufacture the non-defective Products and iRobot shall bear responsibility for all transportation costs to and from Kin Yat's designated repair facility.

5.5    Class Failure. In the event that Kin Yat is notified (such notification being oral or otherwise) of a Class Failure, Kin Yat shall:

5.5.1    Within 24 hours of learning of such Class Failure, provide iRobot with a status report and details of a proposed interim solution; and

5.5.2    No later than [***] following notification of such Class Failure, provide iRobot with a root cause analysis and corrective action plan.

In each of the foregoing cases, iRobot will make available such information and assistance reasonably required to allow Kin Yat to conduct its root cause analysis and to provide its corrective action plan.

5.6    Component Failures. In the event that a Non-Conforming Product is the result of a Component, Kin Yat will pass on to iRobot all available warranty remedies pursuant to Section 5.2. In addition, Kin Yat will negotiate with the Component suppliers (save for the suppliers of Consigned Component not controlled by Kin Yat), at iRobot's discretion and with iRobot present or on iRobot's behalf, for additional remedies outside of the Component warranty pursuant to Section 5.2. Kin Yat shall not enter into any settlement with respect to Component failures that affects iRobot's rights or interests without iRobot's prior written approval, which shall not be unreasonably withheld. In the event that such negotiations do not resolve the matter to iRobot's reasonable satisfaction, and the available warranty remedies under Section 5.2 do not cover the full cost of Component repair or replacement, Kin Yat will provide iRobot with prior written notice regarding any additional costs required to repair or re-manufacture the affected Products. In the event that cost details are not readily available and iRobot requires immediate repair or replacement of the affected Products, iRobot may elect to authorize Kin Yat to proceed with repair or re-manufacture of the affected Products on a not to exceed basis. iRobot will be liable for any additional costs actually incurred by Kin Yat to repair or re-manufacture the affected Products, provided that iRobot has given Kin Yat written approval before such costs were incurred.

5.7    Refunds due to Class Failure or Recall. In the event any Class Failure or Recall of a Product results from a breach of any of the warranties under this Agreement during the Warranty Period, then Kin Yat shall promptly refund to iRobot the full purchase price paid for all Products subject to such Class Failure or Recall, and all other reasonable costs to cure the Class Failure or Recall (example: shipping costs, partner penalties etc).

5.8    Third Party Repair and Re-Manufacture; Other Defects. Notwithstanding anything to the contrary in this Agreement, iRobot may itself, or through a third party, and at its own expense, repair or re-manufacture any Product (whether or not such Product is defective) without any obligation or liability to Kin Yat. If iRobot wishes Kin Yat to undertake repair or re-manufacture of Products that are Non-Conforming due to reasons other than a breach by Kin Yat of its warranty obligations hereunder, the Parties will mutually agree on an allocation of costs for the repair and/or re-manufacture process prior to Kin Yat performing such work.

5.9    **Limitation of Warranty**.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

13

5.9.1    THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION  5 AND 16.3 ARE IN LIEU OF, AND EACH PARTY EXPRESSLY DISCLAIMS, AND EACH OTHER PARTY EXPRESSLY WAIVES, ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR MISAPPROPRIATION OF ANY RIGHT, TITLE OR INTEREST OF ANY PARTY OR ANY THIRD PARTY.   NO ORAL OR WRITTEN STATEMENT OR REPRESENTATION OUTSIDE OF THIS AGREEMENT BY EITHER  PARTY, ITS AGENTS OR EMPLOYEES SHALL CONSTITUTE OR CREATE A WARRANTY OR EXPAND THE SCOPE OF ANY WARRANTY HEREUNDER.

5.9.2    KIN YAT'S WARRANTY SHALL NOT APPLY TO ANY PRODUCT THAT HAS BEEN SUBJECTED TO TESTING FOR OTHER THAN SPECIFIED ELECTRICAL CHARACTERISTICS OR TO OPERATING AND/OR ENVIRONMENTAL CONDITIONS IN EXCESS OF THE MAXIMUM VALUES ESTABLISHED IN IROBOT'S APPLICABLE SPECIFICATIONS, OR TO HAVE BEEN THE SUBJECT OF ANYONE OTHER THAN KIN YAT OR ITS AGENTS OR CONTRACTORS MISHANDLING, ACCIDENT, MISUSE, NEGLECT, IMPROPER TESTING, IMPROPER OR UNAUTHORIZED REPAIR, ALTERATION, DAMAGE, ASSEMBLY, PROCESSING OR ANY OTHER INAPPROPRIATE OR UNAUTHORIZED ACTION OR INACTION THAT ALTERS PHYSICAL OR ELECTRICAL PROPERTIES. THIS WARRANTY SHALL NOT APPLY TO (a) ANY MATERIAL CONSIGNED OR SUPPLIED BY IROBOT TO KIN YAT INCLUDING BUT NOT LIMITED TO IROBOT INTELLECTUAL PROPERTY, IROBOT'S PROPRIETARY INFORMATION AND TECHNOLOGY AND IROBOT'S TOOLING, OR (b) ANY DEFECT IN THE PRODUCT  ARISING FROM ANY DRAWING, DESIGN, SPECIFICATION, PROCESS, TESTING OR OTHER PROCEDURE, ADJUSTMENT OR MODIFICATION SUPPLIED AND APPROVED BY IROBOT.

5.10    ECO Upgrade. RMA's for any engineering changes or upgrades under any ECR or ECN upgrades will also be subject to the RMA process. Kin Yat will analyze each ECR and ECN and provide a per unit upgrade/change cost and expected completion and delivery date.

5.11    The Liability of Kin Yat to iRobot for any one act of default by reason of the breach of the warranty under this Agreement shall be limited to the extent that all or any damages (if proven) together shall in no event greater than [***] affected by such breach which has/have been received and accepted by Kin Yat and paid for by iRobot.

**6        Limitation Of Liability; Specific Performance; Equitable Relief**

6.1    EXCEPT WITH REGARD TO ANY LIABILITY THAT ARISES FROM A PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 19 OR A BREACH BY EITHER PARTY OF ITS CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 16, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON OR ENTITY UNDER ANY CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR OTHER LEGAL OR EQUITABLE CLAIM OR THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, LOSS OF GOODWILL OR BUSINESS PROFITS, LOST REVENUE, WORK STOPPAGE, DATA LOSS, COMPUTER FAILURE OR MALFUNCTION, OR FOR ANY AND ALL OTHER EXEMPLARY OR PUNITIVE DAMAGES WHETHER SUCH PARTY WAS INFORMED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE FOREGOING SHALL NOT EXCLUDE OR LIMIT EITHER PARTY'S LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING FROM ITS NEGLIGENCE TO THE EXTENT THAT SUCH LIABILITY CANNOT BY LAW BE LIMITED OR EXCLUDED.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

14

6.2    Kin Yat acknowledges and agrees that a breach by it of its obligations to perform the Manufacturing Services, including the manufacture and/or supply Product under this Agreement, would cause irreparable harm to iRobot because the Manufacturing Services are unique in kind and quality and, moreover, suitable substitutes are unobtainable or unreasonably difficult or inconvenient for iRobot to procure and Kin Yat further acknowledges and agrees that iRobot could not be adequately compensated by money damages. Accordingly, in addition to any other remedies that may be available, in law, in equity or otherwise, in the case of any such actual or threatened breach, iRobot shall be entitled to obtain specific performance (including an order of a court requiring that Kin Yat manufacture and/or supply Product under this Agreement), without the necessity of posting a bond or proving actual damages. Finally, Kin Yat agrees that such equitable relief (including without limitation, specific performance), is a reasonable outcome of any actual or threatened breach contemplated by this Section 6.2, and Kin Yat hereby knowingly assumes the risk that a court or other tribunal may order specific performance. Kin Yat further acknowledges and agrees that any equitable relief ordered by a court or tribunal would not be a penalty.

6.3    iRobot retains all rights not expressly granted hereunder and any and all remedies herein expressly conferred upon iRobot will be deemed cumulative with, and not exclusive of, any other remedy conferred hereby, or by law or equity upon iRobot, and the exercise by iRobot of any one remedy will not preclude the exercise of any other remedy available under this Agreement or otherwise.

7    **Delivery, Risk of Loss and Payment Terms**. For purposes of this Agreement terms of sale for all Product shipments shall be FCA Port of Origin. (per Incoterms 2010). Risk of loss for Product shipments will pass to iRobot (or to iRobot's designee invoiced by Kin Yat) upon delivery to the Port of Origin and receipt by the freight partner responsible for delivering the goods to the appropriate destination. For any shipments where Kin Yat acts as an agent in completing the Shipper's Export Declaration and managing iRobot's exports on behalf of iRobot, where iRobot is the exporter of record (Principal Party in Interest - PPI), iRobot hereby grants Kin Yat a limited Power of Attorney to act on its behalf in managing its exports. Title for Product will pass to iRobot upon receipt of full payment for the purchase price by iRobot.

7.1    Payment. iRobot shall pay Kin Yat all monies when due, including all NRE Costs associated with this Agreement. Payment of all invoices shall be net [***] from date of iRobot's receipt of each such invoice. Payment to Kin Yat shall be in U.S. dollars and in immediately available funds. Any equipment, tooling, component, material or other goods or property, which is purchased by Kin Yat in order to perform its obligations under this Agreement, shall become the property of iRobot once Kin Yat is reimbursed for all NRE Costs, if any. Kin Yat shall be responsible for maintaining, segregating and CONSPICUOUSLY labeling the iRobot Property as " iRobot PROPERTY" and carrying out applicable repairs based on reasonable wear and use. Kin Yat shall invoice iRobot for actual outstanding NRE Costs and other monies due at [***] intervals (or such other intervals as deemed appropriate) during the term of this Agreement and upon cancellation, termination or expiration of this Agreement. Kin Yat agrees to request advance written approval from iRobot should resource requirements, and thereby NRE Costs, increase materially relative to estimated NRE Costs initially agreed by the Parties. Upon such request, Kin Yat shall provide to iRobot reasonably detailed supporting documentation and/or descriptions of the NRE Costs for which Kin Yat seeks reimbursement. iRobot is not obligated to accept any additional reimbursement request from Kin Yat. Unless otherwise agreed by iRobot, all prices are FCA, Port of Origin.

7.2    Taxes. iRobot shall be responsible for all federal, foreign, state and local sales, use, excise and other taxes (except taxes based on Kin Yat's income), all delivery, shipping, and transportation charges and all foreign agent or brokerage fees, document fees, custom charges and duties.

7.3    Disputed Invoices. If a Kin Yat invoice does not meet the invoicing requirements of this Agreement, or iRobot in good faith disputes any invoiced charges, iRobot will notify Kin Yat of the disputed items in writing on or before the payment due date and may withhold payment of the disputed charges pending resolution of the dispute.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

15

7.4    <u>Reservation of Rights</u>. Any payments made by iRobot under the Agreement, and any acceptance of Products, will be without prejudice to iRobot's right to subsequently claim or determine that it has overpaid Kin Yat or to require Kin Yat to remedy any deficiencies in KinYat's performance as provided in this Agreement.

8        **Import and Export.** iRobot shall be the importer of record for all Product shipments to iRobot facilities and shall be responsible for obtaining any required import licenses necessary for iRobot to import Product and/or receive shipments of Product from Kin Yat or its designated carrier, any U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under US or foreign law applicable to iRobot's obligations under this Agreement. Kin Yat shall be responsible for obtaining any required export licenses necessary for Kin Yat to ship Product, including certificates of origin, manufacturer's affidavits, and U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under US or foreign law applicable to Kin Yat's obligations under this Agreement. iRobot agrees that it shall not knowingly require Kin Yat to ship or deliver any Product, assembly, component or any technical data or software which violate any export controls or limitations imposed by the United States or any other governmental authority, or to any country for which an export license or other governmental approval is required at the time of export without first obtaining all necessary licenses and approvals and paying all duties and fees. Each Party shall be responsible for securing all applicable licenses, certifications, approvals and authorizations that are necessary for such Party to comply with applicable import and export laws, rules and regulations for the shipment and delivery of the Product under this Agreement. iRobot shall also be responsible for complying with any legislation or regulations governing the importation of the Product into the country of destination and for payment of any duties thereon.

9        <u>**Cost Management.**</u>

9.1    <u>Cost Summary and Management</u>. The cost summary included set forth on Schedule 2, prepared by Kin Yat, contains a detailed SKU-level (SKU as defined by iRobot) cost summary, Incoterm FCA Port of Origin, complete with all formulas and assumptions, to provide full access and visibility to all component, labor, assembly and mark-up costs. During each Renewal Term, the Parties shall meet from time to time on an executive level as required, but no less than on an [***], to identify cost reduction opportunities where each Party will share overall financial objectives of the on-going relationship between the Parties. Kin Yat shall at all times employ an Open Book Pricing approach to cost management and pricing of Components, Products and the Manufacturing Services to achieve Sustainable and Competitive Pricing for the Products and Manufacturing Services provided to iRobot under this Agreement. For purposes of this Agreement, the phrase **"Sustainable and Competitive Pricing"** means stable pricing over time for the Products and Manufacturing Services provided to iRobot under this Agreement that is favorable against that which could be reasonably attained from other contract manufacturers for comparable volumes of substantially similar products and comparable manufacturing services. For purposes of this Agreement, the term **"Open Book Pricing"** means providing detailed costing information to iRobot which includes; a fully-costed bill of materials, markups related to the sourcing and manufacturing of the Components and the Product and an explanation of all adders on material or value add (in place as of the Effective Date). In addition, Kin Yat shall provide detailed overviews of the relevant financial costing model to iRobot's representatives and professional advisors. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year.

9.2    <u>Price</u>. The Price for each Product is set forth in Schedule 2 (the "**Product Price**"), and includes the complete price for such Product, including the fully-costed bill of materials, Kin Yat's Gross Margin (as defined in Schedule 2), and any and all other added fees and costs related to the Manufacturing Services, Reasonable and Customary Support Services. The Product Price for each Product shall not be increased during the period beginning on the Effective Date and ending on [***], during such time Kin Yat shall manage its supply chain and absorb any and all increases. Pricing will be reviewed by the Parties on an [***] basis, on or before [***], and will be revised consistent with increases or decreases in materials, components, equipment and other costs and expenses applicable to the manufacture of the Product. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

16

9.3    Source Transparency. Kin Yat will submit a full list of suppliers to iRobot for each Product at the time of any cost summary submittal, along with the supplier part number (in case of Generic Components). Kin Yat will submit every supplier or part number change to iRobot for iRobot's approval before such change goes into effect, including a summary or certification that such proposed changed part conforms to the Product Specifications.

9.4    Cost Transparency. COGS (Cost of Goods Sold) is a key factor in iRobot engaging Kin Yat to produce and deliver the Product. So that iRobot has full visibility to the current and ongoing status of Kin Yat's COGS, Kin Yat will provide updated costing in the agreed upon format within [***] of any change submittal. If Kin Yat fails to provide cost impact information within [***] after any iRobot Specification changes, iRobot will consider the lack of response to mean that there is no cost impact. Any cost change would be considered valid only after iRobot's approval. No less frequently than [***], Kin Yat will, upon iRobot's request, provide a microeconomic report that includes all critical prices and costs included in the Product Price (such as labor, exchange rate or select material as required by iRobot).

**10        Tooling and fixtures.** iRobot shall own any and all tooling, fixtures, molds, equipment, software and firmware made available to Kin Yat by iRobot, developed for or on behalf of iRobot, or otherwise paid for by iRobot ("**iRobot Tooling**"). Kin Yat may manufacture, have manufactured, and use the iRobot Tooling only to perform the Manufacturing Services under the Agreement and shall use and treat the iRobot Tooling with a high degree of care, and in any case no less than the same degree of care it would for its own equipment, tooling, molds or supplies. Kin Yat shall attach an identifying label showing iRobot's ownership in a conspicuous place on each unit of iRobot Tooling, if possible, and shall secure and segregate the iRobot Tooling in such fashion to clearly identify the iRobot Tooling as the property of iRobot. Kin Yat shall maintain the iRobot Tooling, at its own expense, in efficient working order and good repair based on reasonable wear and use, and otherwise in accordance with iRobot's reasonable instructions. Kin Yat shall keep all iRobot Tooling free of any Encumbrances, and shall not transfer any iRobot Tooling, or any rights in the iRobot Tooling to any Person. Kin Yat shall deliver all iRobot Tooling to iRobot or iRobot's designee, or at iRobot's request, make available for pickup, upon the termination or expiration of this Agreement, or upon iRobot's earlier request. Kin Yat shall execute documents and take such further action as iRobot shall reasonably request to protect iRobot's interest in the iRobot Tooling. Kin Yat will at the expense of iRobot deliver to iRobot any of the above mentioned tooling within [***] upon iRobot's written request. Kin Yat will adhere to the record keeping of iRobot Tools in accordance with iRobot requirements set forth in Section 4.10.3 or as otherwise described Schedule 1. Kin Yat shall make such records available for inspection by iRobot or iRobot's designee Kin Yat upon iRobot's reasonable request.

**11        Forecast, Purchase Orders; Change Orders, Rescheduling and Cancellation**.

11.1    Forecast. iRobot will provide to Kin Yat, on a [***], a non-binding, rolling [***] planning forecasts at a core robot level and on a SKU based level, indicating iRobot's monthly Product requirements, as amended by iRobot from time to time (each, a "**Forecast**").

11.2    Purchase Orders. iRobot will issue orders for Products hereunder using its standard form of purchase order ("**Purchase Order**"). Each Purchase Order will identify the applicable Product by SKU, quantity, price denominated in US currency, delivery terms, and other customary terms. Except for the Product Price and delivery date contained in such Purchase Order, the terms and conditions in this Agreement shall prevail over any conflicting terms and conditions in any Purchase Order. Such Purchase Orders will be issued by iRobot at least [***] prior to the date of ex-factory for all Products on each such Purchase Order. For select SKUs and as defined in Schedule 1, iRobot and Kin Yat will develop strategies to achieve [***] lead time.

11.3    Purchase Order Acknowledgment. Kin Yat will notify iRobot electronically within [***] if it utilizes EDI, or if in writing, within [***] of receipt of a Purchase Order, and inform iRobot in writing of any reason Kin Yat is unable to meet a requested delivery date or any other Purchase Order requirements. The Purchase Order will not

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

17

constitute a binding obligation on Kin Yat until and unless Kin Yat accepts the Purchase Order in accordance with this Agreement.

11.4    Changes to Forecast: At any time, prior to the issue of a Purchase Order, iRobot may reschedule and/or cancel any forecast demand.

11.5    Changes to Manufacturing Services, Packaging and Shipping Specifications and Test Procedures. iRobot may, in writing, request a change to the Manufacturing Services, Packaging and Shipping Specifications and Test Procedures at any time. Within [***] after receipt of iRobot's written request Kin Yat will analyze the requested change and provide iRobot with an assessment of the effect that the requested change will have on cost, manufacturing, scheduling, delivery and implementation. iRobot will be responsible for all costs associated with any accepted changes. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules.

11.6    Production Increases, Rescheduling Delivery. iRobot may, in writing, request increases in production volume or acceleration of open Purchase Order at any time. If Kin Yat is unable to satisfy or comply with iRobot's requested increase in production volume within the requested time frame for delivery, Kin Yat will provide the reasons preventing Kin Yat from satisfying the requested increase within [***] after receipt of iRobot's request. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules. Kin Yat shall utilize its global supply network to assess availability of shared material across accounts to minimize instances in which Kin Yat is unable to meet an increase in a Purchase Order quantity requested by iRobot. It is further understood that iRobot will not incur additional chargers due to Kin Yat's decision to meet an accelerated delivery schedule or request for increased quantities by utilizing Generic Components from another account's material.

11.7    Product Configuration Changes and Engineering Changes. iRobot may request configuration or engineering changes to a Product in writing at any time. Kin Yat will analyze the request and determine if it can meet the requested changes within the required Lead-time. If Kin Yat can satisfy the requested change it will provide iRobot within [***] after receipt of the configuration or engineering request notice, a notice of acceptance of the requested changes. In the event that any requested change in the form, fit or function or Specification of any Product results in a significant increase in the cost of such Product, or in the length of time required for the manufacture or delivery thereof, then Kin Yat shall provide iRobot with a detailed cost analysis regarding such requested change using Open Book Pricing as contemplated under Section 9.1. Following iRobot's acknowledgment of such detailed cost analysis, the Parties will negotiate in good faith an equitable adjustment to the price of such Product and/or expected changes to the delivery schedule for such Product. If Kin Yat is unable to satisfy or comply with iRobot's requested changes within the requested time frame for delivery, Kin Yat will provide the reasons preventing Kin Yat from satisfying the requested increase within [***] after receipt of iRobot's request. Any such change shall be documented in writing and shall become effective only upon mutual written agreement of both Parties of the terms and conditions of such change, including changes in time required for performance, cost (including cost of materials on hand or on order in accordance with original Purchase Order) and applicable delivery schedules.

11.8    Treatment of Obsolete/End-of-Life Material. Upon receiving notice from iRobot of an engineering change or that any Product, component or assembly has become obsolete or has reached end-of-life, Kin Yat will, within a reasonable period after receiving such notice, provide iRobot with an analysis of iRobot's liability to Kin Yat for components and materials acquired or scheduled to be acquired to manufacture such Product. iRobot's liability shall include the price of finished Product and Kin Yat's costs (including cancellation fees and charges), plus applicable margin, of WIP, safety stock components and materials and components and materials on hand or on order within

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

18

applicable Lead-times. Kin Yat will use Commercially Reasonable Efforts to assist iRobot in minimizing iRobot's liability by taking the following steps:

- As soon as is commercially practical reduce or cancel Component and material orders to the extent contractually permitted.
- Return all Components and materials to the extent contractually permitted.
- Make all Commercially Reasonable Efforts to sell Components and materials to iRobot approved third parties.
- Assist iRobot to determine whether current WIP should be completed, scrapped or shipped to iRobot or its designee "as is".

11.9   Rescheduled Delivery out, reduction of quantity, and Cancellation of Orders. iRobot may request Kin Yat to reschedule the delivery date for any Product, decrease quantity on open Purchase Order, and cancel pending Purchase Orders in accordance with this Section. The charges to iRobot for deferring delivery of a Purchase Order, reducing quantity or cancellation of a Purchase Order are outlined below:

| Days Prior to Delivery Date | Reschedule Terms | Cancellation Liability |
|---|---|---|
| [***] Days | Kin Yat is not obligated to adhere to the request, but must consider each request in good faith. | iRobot may not cancel a Purchase Order to be delivered within [***] days of the applicable delivery date without payment to Kin Yat for the work incurred to date. |
| [***] Days from original delivery date | iRobot may reschedule out the delivery, reduce quantity or cancel the order. | Material on hand, non-cancelable and non-returnable materials, to the extent issued under a Material Authorization by iRobot, and applicable labor charges for WIP, provided, that such liability applies only to the extent that Kin Yat is unable to reallocate such material to any existing Purchase Order of iRobot, or, if authorized by iRobot, to a purchase order of another customer of Kin Yat. |

Notwithstanding anything to the contrary in this Agreement, any reschedule out of a delivery date, reduction of quantity and/or cancellation of a Purchase Order (in whole or in part) will not affect any Product Price.

**12**      **Logistics.** Kin Yat will maintain control over all Products while in Kin Yat's care, custody, and control. Kin Yats shall cooperate with iRobot and its suppliers and logistics services providers. Kin Yat will provide relevant and necessary information to iRobot relating to receipt, storing and shipment of Products. Kin Yat will coordinate with iRobot personnel, iRobot logistics services providers, and iRobot customers to execute the shipment of Products as instructed by iRobot.

12.1   Receiving**.** From time to time iRobot may ship Components, including batteries and Integrated Circuits (IC's, processors) directly to Kin Yat. Kin Yat will verify actual quantities and SKU's of such Components received as compared to the quantities and SKU's indicated on the shipping documents, process the Components into their inventory system, and notify iRobot of the quantity actually received by SKU. Kin Yat will also indicate any exceptions, at the time of reporting the receipt, as related to over, short or damage. The reporting of receipts and exceptions is made to iRobot.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

19

12.2    Storage and maintenance of inventory. All Products and Components will be stored in a manner to maintain inventory control and to prevent damage as instructed by iRobot reasonably. Kin Yat will maintain inventories and locations of iRobot Products and Components on their own perpetual inventory and/or warehouse management system. Kin Yat and iRobot will compare on a monthly basis all inventories, reconcile results and Kin Yat will cycle count the Components with the five highest variances.

12.3    Physical inventory audit.

12.3.1    On a [***] basis Kin Yat will arrange a cut-off date for and complete a physical inventory audit of all Consigned Components. Because the [***] Components contain valuable intellectual property of iRobot, there is no shrinkage allowance for such Components. Variances will be identified and reported to Kin Yat by iRobot within [***] of the physical inventory. Within [***] of being notified of any such variance, Kin Yat shall provide iRobot a written report that, in iRobot's sole discretion, explains the variance, or iRobot will charge or deduct from its next payment for the unexplained variance. All other Consigned Components are subject to a shrinkage allowance of [***]% of the volume of such Component or Product received during the [***] period immediately prior to the physical inventory audit.

12.3.2    On a [***] basis Kin Yat will arrange a cut-off date for and complete a physical inventory audit of all finished Products that have passed the applicable quality inspections, but remain unshipped and in Kin Yat's possession at the end of such quarter. Kin Yat shall deliver such audit report to iRobot by the second business day immediately following the end of each iRobot Quarter End.

12.4    Shipping to iRobot locations. Most of the Products are designed to withstand a maximum of two pallet high floor storage. Components, including chips and batteries must be single stacked on the floor or stored in pallet racks. iRobot may direct Kin Yat to ship to specific iRobot locations and distributions centers such as, but not limited to, [***]. Incoterms for sale to iRobot are FCA Port (or airport) of Origin. iRobot will select the freight forwarder and communicate local contacts to Kin Yat. Based on selection of forwarder or ocean carrier, iRobot will specify the Port of Origin. iRobot will be responsible for paying the transportation costs from the origin port or airport to the destination, Kin Yat will arrange empty container delivery in accordance with the shipping schedule communicated to Kin Yat by iRobot. Upon receipt of container, Kin Yat will inspect the container for any signs of damages to flooring, any holes in the roof or side of the containers, and any sign of tampering with the latching device (tampering to include drilling out rivets and replacing the rivets with bolts). If the container has holes, damages or signs of tampering Kin Yat will request a replacement container. Products will be loaded on the container, floor stacked, in a manner to prevent damage and to fully utilize the container. Kin Yat shall adhere to any specific pallet configuration requested and provided by iRobot. If there is a requirement to ship on wooden pallets, then the pallets must meet the guidelines of ISPM15 and be appropriately marked, indicating the pallets meet the standards. iRobot will be responsible for the costs associated with purchasing these pallets. Containers must be sealed with a cargo seal that meets or exceeds ISO/PAS 17712:2006.

12.5    Direct shipment to iRobot Customers. From time to time, iRobot may direct Kin Yat to arrange for shipping directly to iRobot's customers in accordance with specific Incoterms identified by iRobot at that time. The container inspection requirements and pallet requirements under Section 12.4 shall apply to any shipments directly to iRobot's customers.

12.6    Inventory losses and gains. As Kin Yat is responsible for the care, custody and control of iRobot's products, risk will be balanced with responsibility in the following way. Physical inventories and cycle counts will be conducted as indicated above. During the first month after the first anniversary date of the contract and each subsequent anniversary date, the losses and gains of inventory, based on iRobot's perpetual inventory will be netted and a final loss or gain identified.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

20

**13      Duty to Mitigate Costs.** Both Parties shall, in good faith, undertake Commercially Reasonable Efforts to mitigate the costs of termination, expiration or cancellation. Kin Yat shall make Commercially Reasonable Efforts to cancel all applicable component and material purchase orders and reduce component inventory through return for credit programs or allocate such components and materials for alternate iRobot programs if applicable, or other customer orders provided the same can be used within [***] of the termination date.

**14      Term.** Unless earlier terminated as provided in Section 15 below, the term of this Agreement shall commence on the Effective Date and shall continue until the second anniversary of the Production Start Date (the "**Initial Term**"), and shall automatically renew for successive two-year terms (each, a "**Renewal Term**") unless (a) following the first Renewal Term, Kin Yat provides written notice to iRobot of its intent not to renew this Agreement within twelve (12) months prior to the end of the then existing Renewal Term, or (b) iRobot provides written notice to Kin Yat of its intent not to renew this Agreement within [***] prior to the end of the then existing Term.

**15      Termination.** This Agreement may be terminated as follows:

15.1    Termination for Cause. Either Party may terminate this Agreement based on the material breach by the other Party of the terms of this Agreement, provided that the Party alleged to be in material breach receives written notice setting forth the nature of the breach at least [***] prior to the intended termination date. During such time the Party in material breach may cure the alleged breach and if such breach is cured within such [***] period, no termination will occur and this Agreement will continue in accordance with its terms. If such breach shall not have been cured, termination shall occur upon the termination date set forth in such notice.

15.2    Termination for Bankruptcy/Insolvency. Upon the happening of any of the following events with respect to a Party, except as otherwise prohibited by the United States bankruptcy laws, this Agreement may be terminated immediately:

15.2.1    The appointment of a receiver or custodian to take possession of any or all of the assets of a Party, or should a Party make an assignment for the benefit of creditors, or should there be an attachment, execution, or other judicial seizure of all or a substantial portion of a Party's assets, and such attachment, execution or seizure is not discharged within [***].

15.2.2    A Party becomes a debtor, either voluntarily or involuntarily, under Title 11 of the United States Code or any other similar law and, in the case of an involuntary proceeding, such proceeding is not dismissed within [***] of the date of filing.

15.2.3    The dissolution or termination of the existence of a Party whether voluntarily, by operation of law or otherwise.

15.3    Termination Consequences.

15.3.1    If this Agreement is terminated for any reason, iRobot shall not be excused from performing its obligations under this Agreement with respect to payment for all monies due to Kin Yat hereunder including fees, costs and expenses incurred by Kin Yat up to and including the effective date of such termination in accordance with Section 15.3.3. The following Sections 3.8, 3.10.4, 4.5, 4.11.3, 4.13, 5, 6, 7, 8, 10, 13, 15.3, 15.4, 15.5, 16, 17.1, 17.2, 17.3, 17.4, 18, 19, 23, 25 and Schedule 4 shall survive the expiration, cancellation or termination of this Agreement.

15.3.2    All Purchase Orders issued prior to the effective date of the termination or expiration will be fulfilled pursuant to and subject to the terms of this Agreement, even if the delivery dates of Products under such Purchase Orders are after such effective date of expiration or termination.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

21

15.3.3    Within [***] of the effective date of the expiration or termination of this Agreement for any reason other than Kin Yat's material uncured breach, iRobot shall purchase at Kin Yat's cost any raw materials (including packaging materials) that Kin Yat has purchased exclusively for the production of Products for iRobot, WIP and finished Product that have not been shipped previously to iRobot. At its option iRobot may, in lieu of purchasing such raw materials at cost, place Purchase Orders with Kin Yat for additional Product under the terms of this Agreement in order to extinguish existing stocks of such raw materials. In the event that the Agreement terminates as a result of a material uncured breach by Kin Yat, iRobot shall be under no obligation to purchase any unused raw materials from Kin Yat. In the event that the Agreement terminates for any other reason, iRobot shall purchase from Kin Yat all Product inventory (including WIP and finished Product). Kin Yat shall accommodate last buy order from iRobot

15.3.4    Return of Product and Materials Supplied by iRobot. Upon the effective date of expiration or termination of this Agreement for any reason whatsoever, Kin Yat shall immediately deliver to iRobot or its designee all Product, Specifications, Components, packaging materials and other materials purchased by or on behalf of iRobot and all other materials or supplies provided by iRobot. Kin Yat shall also deliver to iRobot or its designee all Product produced hereunder, and shall invoice iRobot in accordance with the terms of Section 7.1.

15.4    Manufacturing Rights upon Termination. If Kin Yat ceases to manufacture and/or supply any Product due to any termination of this Agreement by iRobot pursuant to Sections 15.1 or 24, or if Kin Yat elects not to renew the Term pursuant to Section 14, then Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, worldwide, transferable, perpetual irrevocable license to all of its Intellectual Property Rights under the Technical Manufacturing Information – KIN YAT to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make Products and other versions of the Products. iRobot may sublicense these rights to third parties, provided any such third party complies with the terms of this license and any associated obligations of confidentiality. Upon iRobot's exercise of its rights under this Section 15.4, Kin Yat shall promptly provide to iRobot all information, including manufacturing know-how and other materials required to enable iRobot to independently manufacture, test and repair the Products.

15.5    Transition Assistance. Upon expiration or earlier termination of this Agreement, Kin Yat will support iRobot in making an orderly transition to a successor third party manufacturer during a period lasting no longer than [***] (the "**Transition Period**") at the expense of iRobot. During such Transition Period, (a) Kin Yat shall provide, in a timely and professional manner, services reasonably necessary to transition the Manufacturing Services to a successor third party manufacturer; and (b) all of the terms and conditions of this Agreement shall continue to be in full force and effect, including Manufacturer's obligations to continue providing the Manufacturing Services. In addition, Kin Yat shall provide such technical assistance to iRobot or its designated third party manufacturer, as iRobot may reasonably request in connection with such transition. At the end of such Transition Period, or upon iRobot's earlier request, Kin Yat shall deliver to iRobot, or to iRobot's agent all tooling, fixtures, Components, Products (including WIP), tangible embodiments of iRobot's Proprietary Information and Technology and all documentation and materials related to the Products at the expense of iRobot.

## 16    **Confidentiality.**

16.1    Both parties acknowledge that, by reason of their relationship, they may have access to certain information and/or materials concerning the business, plans, products, services and clients (including, but not limited to, information and materials contained in technical data) and including information necessary for the Services ("Confidential Information"), which is confidential and of substantial value and which value would be impaired if such information were disclosed to third parties. The parties agree that the handling of confidential information shall be pursuant to the Non-Disclosure Agreement, which is incorporated herein by reference.

16.2 Kin Yat agrees that it will have any personnel of Kin Yat providing Services execute a written Non-Disclosure Agreement ("NDA") substantially similar in nature and scope to and no less protective of the Company than the Non-Disclosure Agreement.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

22

16.3 Each Party represents and warrants to the other that it has adopted policies and procedures with respect to the receipt and disclosure of confidential or proprietary information, such as the Proprietary Information and Technology with its employees, agents and representatives. Each Party represents and warrants to the other Party that it will cause each of its employees, agents and representatives to maintain and protect the confidentiality of the other Party's Proprietary Information and Technology pursuant to the terms and conditions of the Non-Disclosure Agreement.

**17      Intellectual Property Rights.**

17.1    Intellectual Property – Existing by Kin Yat.

17.1.5    Except for the license rights granted to iRobot under this section 17.1.1, Kin Yat shall retain all right, title and ownership to any and all Intellectual Property – Existing by Kin Yat and all Intellectual Property Rights therein.

17.1.6    Kin Yat shall not incorporate any Intellectual Property – Existing by Kin Yat into any Products without iRobot's prior written approval. To the extent any Intellectual Property – Existing by Kin Yat is incorporated by or on behalf of Kin Yat within or used by or on behalf of Kin Yat in connection with any Product, Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, license under all of its Intellectual Property Rights in or to the Intellectual Property – Existing by Kin Yat to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make other versions of, the Product and the right to sublicense third parties (including but not limited to manufactures, system integrators, value added resellers, distributors and other resellers) for iRobot to use, sell, test, improve, support and distribute the Products and to otherwise manufacture and support discontinued Products; provided however, that no license to the Technical Manufacturing Information – KIN YAT shall be granted under this Section 17.1.2.

17.2    Kin Yat Created Intellectual Property – Created by Kin Yat.

17.2.1    Except for the license rights granted to iRobot under 17.1.1, Kin Yat shall retain all right, title and ownership to any and all Intellectual Property – Created by Kin Yat and all Intellectual Property Rights therein.

17.2.2    Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, irrevocable license under all of its Intellectual Property Rights in or to the Technical Manufacturing Information – KIN YAT developed under this Agreement that is unique to the Products for iRobot's internal use and the use by third party suppliers or manufacturers on behalf of iRobot to develop, design, improve, test and support the Products.

17.2.3    Any such unique Technical Manufacturing Information – KIN YAT will be used by Kin Yat solely for the design, development, testing and manufacturing of Products for iRobot.

17.3    iRobot Intellectual Property. iRobot shall retain all right, title and ownership to any and all iRobot Intellectual Property and all Intellectual Property Rights therein.

17.4    Newly Created Intellectual Property.

17.4.1    The Newly Created Intellectual Property constitutes "works made for hire" for iRobot, and iRobot will be considered the author and will be the owner of the Newly Created Intellectual Property and all Intellectual Property Rights therein or related thereto. If any Newly Created Intellectual Property does not qualify for treatment as "works made for hire", or if Kin Yat retains any interest in any Newly Created Intellectual Property for any other reason, Kin Yat hereby grants, assigns and transfers, and will grant, assign and transfer, to iRobot all ownership and interest in such Newly Developed Intellectual Property, including without limitation any and all Intellectual Property Rights in and to any Newly Created Intellectual Property or that claim or cover any Newly Created Intellectual Property. Kin Yat acknowledges that all personnel performing Manufacturing Services for iRobot under this Agreement have

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

23

executed appropriate agreements with Kin Yat so that Kin Yat may fulfill Kin Yat's obligations under this Section 17. Kin Yat agrees to execute any documents of assignment or registration requested by iRobot relating to any and all Newly Created Intellectual Property. Kin Yat agrees to cooperate fully with iRobot, both during and after the engagement, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in or related to Newly Created Intellectual Property.

17.4.2    During the Term plus any period of support that may survive termination or expiration of this Agreement, Kin Yat agrees to inform iRobot of any Newly Created Intellectual Property.

17.5    Trademark Usage. Nothing in this Agreement gives either Party a right to use the other Party's Marks or implies the grant of any license from one Party to the other to use any Marks. Notwithstanding the foregoing, and subject to the terms and conditions of this Agreement, iRobot grants to Kin Yat a limited, non-exclusive, non-transferable, non-assignable, royalty-free license during the Term to reproduce any Mark set forth on Schedule 4, or otherwise designated in writing by iRobot (**"iRobot Marks"**) solely for the purpose placing such Marks on Products sold to iRobot and any applicable packaging, and for no other business or non-business purposes whatsoever and no other goods or services whatsoever, in accordance with the following:

17.5.1    All reproductions of iRobot Marks must be approved in writing by iRobot and must be in accordance with iRobot's then current Trademark Usage Guidelines (**"Mark Guidelines"**), a copy of which is included in Schedule 4;

17.5.2    Kin Yat may not combine any iRobot Marks with, or create a composite mark using any iRobot Mark with, a trademark of Kin Yat or any third party, or use any of the iRobot Marks or any part thereof as part of its corporate name, or use any name or mark confusingly similar to any of the iRobot Marks;

17.5.3    No other rights or licenses, except that expressed in this Section 17.5 are granted to Kin Yat in and to any iRobot Mark, whether expressly, by implication, by estoppel, or otherwise;

17.5.4    As between iRobot and Kin Yat, the iRobot Marks are and shall remain the sole and exclusive property of iRobot and Kin Yat shall not acquire any right, title or interest in or to any iRobot Mark as a result of this Agreement (other than the limited license expressly granted in this Section 17.5) and all use of the iRobot Marks by Kin Yat and all goodwill generated thereby shall inure solely to the benefit of iRobot;

17.5.5    Kin Yat admits the validity of, and agrees not to challenge the iRobot Marks;

17.5.6    If any application for registration is or has been filed in any country by Kin Yat which relates to any name or mark which, in the sole opinion of iRobot, is confusingly similar, deceptive or misleading with respect to any of the iRobot Marks, Kin Yat shall immediately abandon any such application or registration or at iRobot's sole discretion, assign it to iRobot, and reimburse iRobot for all costs and expenses of any opposition, cancellation or related legal proceedings, including attorney's fees, instigated by iRobot or its authorized representative, in connection with any such registration or application; and

17.5.7    Upon any notice from iRobot that Kin Yat's use of the iRobot's Marks fails to conform with the Mark Guidelines, or any other provision of this Section 17.5, Kin Yat shall cease use of the iRobot Marks, until such failure has been corrected to the satisfaction of iRobot.

17.6    Kin Yat Marks. Kin Yat agrees and warrants that it will not use any Kin Yat or third party Mark (excluding authorized Marks of the iRobot) on any Product, packaging materials or documentation without iRobot's prior written authorization.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

24

17.7  <u>Grant of License to iRobot Intellectual Property</u>. In addition to Clause 17.5, iRobot hereby grants to Kin Yat a limited, non-exclusive, non-transferable, non-assignable, non-sublicensable and royalty-free right and license to use iRobot Intellectual Property, Proprietary Information and Technology and specifications solely for the purpose of performing its obligations under this Agreement, including manufacturing Products pursuant to this Agreement and supplying such Products only to iRobot. Such limited right and license shall extend to no other materials or for any other purpose and shall terminate automatically upon expiration or termination of the relevant Purchase Order or this Agreement for any reason.

**18     Manufacturing Services for Competitive Products.** In order to protect the iRobot's Proprietary Information and Technology, during the Term of this Agreement and for a period of [***] following the termination of this Agreement for any reason, Kin Yat will not, without the iRobot's express written consent, engage in any design, development, manufacturing, testing, configuring, assembling, packaging, shipping and/or selling of any product that is or is intended to be, directly or indirectly competitive with any of the Products, including, without limitation, any robotic floor care product.

**19     Indemnification**.

19.1  <u>Kin Yat's Indemnity Obligations</u>. Kin Yat shall indemnify, defend and hold iRobot and its employees, Subsidiaries, Affiliates, successors and assigns ("**iRobot Indemnified Parties**") harmless from and against any and all losses, liabilities, damages (including consequential, special and/or punitive damages), claims, expenses, suits, recoveries, judgments and fines (including reasonable attorneys' fees and expenses) (collectively "**Losses**") that may be incurred by any iRobot Indemnified Party arising out of (a) any damage to property or injury or death occurring to any person arising out of any failure by Kin Yat to provide Product in conformance with the Specifications; (b) any injury to person or property or death occurring to any Kin Yat employees, subcontractors, agents or any other individuals on Kin Yat's premises, except to the extent such injury to person or property or death was caused by the presence of iRobot's employees or agents on Kin Yat's premises; (c) any claim, action or proceeding brought by any governmental authority arising out of or resulting from the Manufacturing Services for Product that does not conform to the Specifications; (d) any breach by Kin Yat of any of its respective obligations, representations or warranties under this Agreement, including a breach which results in a recall of Product as contemplated under Section 4; (e) any other grossly negligent or willful act or omission on the part of Kin Yat; (f) the operation, ownership or control of the facilities of Kin Yat, its Affiliates or its subcontractors or the manufacturing, generation, processing, storage, transportation, distribution, treatment, disposal or other handling of the Products or materials used in the manufacture and packaging of the Products, or associated by-product, raw materials, intermediates, wastes, hazardous materials, emissions, releases, spills, leaks or discharges, or returned Products, Kin Yat, Affiliates of Kin Yat, or subcontractors of Kin Yat or its Affiliates, or their officers, directors, employees, agents or contractors; (g) any claim relating to the infringement of patent or other intellectual property rights relating to the manufacturing process employed by Kin Yat in performing the Manufacturing Services for Products or that Kin Yat asserts as owning in connection with the manufacturing of the Product or (h) violation of any applicable law, regulation, or rule in connection with the Manufacturing Services for Products hereunder, provided that the indemnity under this Section 19.1 shall not apply if any Loss is caused by (1) Kin Yat's use of materials, trademarks and symbols supplied by iRobot, Kin Yat's reliance upon the Specifications, iRobot Intellectual Property, iRobot's Proprietary Information and Technology and/or the Packaging and Shipping Specifications in accordance with the terms of this Agreement, or (2) defects in design or product liability caused by iRobot or its agents, or (3) the gross negligence or willful misconduct of iRobot.

19.2  <u>iRobot's Indemnity Obligations</u>. Except to the extent subject to Kin Yat's indemnification of iRobot as provided in Section 19.1, iRobot shall indemnify, defend and hold Kin Yat and its employees, Subsidiaries, Affiliates, successors and assigns (" **Kin Yat Indemnified Parties**") harmless from and against any and all Losses, arising from any third party claims asserted against any Kin Yat Indemnified Party, to the extent based on any of the following: (a) making, using or selling the Product, proper and authorized use of the Specifications, iRobot Intellectual Property, Packaging and Shipping Specifications, Proprietary Information and Technology of iRobot, any Product, or any

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25

information, technology and processes supplied and/or approved by iRobot or otherwise required by iRobot of Kin Yat, in connection with Kin Yat's performance of its obligations under this Agreement; (b) any recall or actual noncompliance with Materials Declaration Requirements; (c) that Kin Yat's use of any item in subsection (a) in connection with performing its obligations under this Agreement infringes any patent, copyright or other intellectual property right of a third party, (d) performance of the Manufacturing Services in accordance with the Product Specifications, and (e) any other grossly negligent or willful act or omission on the part of iRobot.

19.3    Indemnification Procedures. Any Person that may be entitled to indemnification under this Agreement shall give the other Party prompt notice of any claim and cooperate with the indemnifying Party at its expense. The Indemnifying party shall have the right to assume the defense (at its own expense) of any such claim through counsel of its own choosing by so notifying the Party seeking indemnification within [***] of the first receipt of such notice. The Party seeking indemnification shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying party. The Indemnifying party shall not, without the prior written consent of the indemnified party, agree to the settlement, compromise or discharge claim.

**20        Relationship of Parties.** Kin Yat shall perform its obligations hereunder as an independent contractor. Nothing contained herein shall be construed to imply a partnership or joint venture relationship between the Parties. The Parties shall not be entitled to create any obligations on behalf of the other Party, except as expressly contemplated by this Agreement.  The Parties will not enter into any contracts with third parties in the name of the other Party without the prior written consent of the other Party.

**21        Insurance.** During the Term and at all times that Kin Yat performs work for iRobot, Kin Yat will maintain in full force and effect, at Kin Yat's own expense, for the benefit of both Kin Yat and iRobot, insurance coverage to include:

21.1 Kin Yat shall maintain for the term of this Agreement, at its own expense: a comprehensive or commercial general liability policy including contractual liability products/completed operation and broad form property damage coverage, affording protection on an occurrence basis for claims arising out of bodily injury, death, and property damage, and having limits of not less than; a combined single limit of $[***] per occurrence with a $[***] aggregate limit of liability and (ii) Worker's Compensation insurance as required by the laws of the state, province, country or similar authority(ies) where the services will be performed (iii) Commercial Automobile Liability Insurance - bodily injury and property damage combined single limit of RMB[***]. Such comprehensive or commercial general liability policy insurance shall name iRobot as an additional insured and may not be canceled or changed without at least [***] prior written notice to iRobot. Prior to the commencement of Services, Kin Yat shall provide a certificate of insurance to iRobot evidencing these requirements and shall provide updated certificates as applicable. Kin Yat shall also be liable to maintain, at its sole expense, travel insurance coverage and any legally mandated health insurance.

21.2 Additional Requirements. All deductibles on policies providing coverage will be paid by Kin Yat. In the event Kin Yat is self-insured for matters described above, Kin Yat agrees to respond to any claims or losses made against or incurred by iRobot in the same fashion as if insurance had been purchased. In no event will the coverage or limits of any insurance required under this Section 21, or the lack or unavailability of any other insurance, be deemed to limit or diminish either Party's obligations or liability to the other Party under this Agreement, including but not limited to, each Party's indemnification obligations as set forth in Section 19. Kin Yat will obtain the necessary insurance within [***] of the Effective Date.

**22  Business Continuity Plan.**

22.1    Risk Management and Continuity Plans. Kin Yat will develop and keep current a formal business continuity plan detailing Kin Yat's plans, procedures and designated resources for timely response to and recovery from potential civil, natural, and physical plant disasters that could reasonably be expected to disrupt production and delivery to iRobot ("**Business Continuity Plan**"). Upon request, Kin Yat will make such plan available to iRobot or its designated representative for review.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

22.2    Notification. Kin Yat agrees to notify iRobot as soon as possible in the event of a crisis that disrupts manufacturing or delivery of Products. Unless authorized in advance in writing by iRobot, Kin Yat will not refer to iRobot in public and media communications about the crisis and subsequent recovery.

22.3    Loss Control. Kin Yat will be responsible for maintaining its facilities and operations in accordance with applicable fire protection and loss control laws, regulations and industry standards.

23    **Publicity.** Without the written consent of the other Party, neither Party shall refer to this Agreement in any publicity or advertising or disclose to any third party any of the terms of this Agreement. Notwithstanding the foregoing, neither Party will be prevented from, at any time, furnishing any information to any governmental or regulatory authority, including the United States Securities and Exchange Commission or any other foreign stock exchange regulatory authority, that it is by law, regulation, rule or other legal process obligated to disclose, so long as the other Party is given advance written notice of such disclosure pursuant to Section 2.4 of the Non-Disclosure Agreement. In addition, a Party may disclose the existence of this Agreement and its terms to its attorneys and accountants, suppliers, customers and others only to the extent necessary to perform its obligations and enforce its rights hereunder, and to existing and prospective investors and/or acquirers that are contemplating a potential investment in or acquisition of such Party, provided, however, that any and all such suppliers, customers, investors, acquirers and advisers are bound by agreements or, in the case of professional advisers, ethical duties, to treat, hold and maintain such information in accordance with the terms and conditions of the Non-Disclosure Agreement.

24    **Force Majeure.**

24.1    Subject to Section 24.2.2 below, neither Party shall be liable for any failure or delay in the performance of its obligations under this Agreement to the extent such failure or delay is due to causes beyond such party's reasonable control, including but not limited to, acts of God, acts of civil or military authority, legal restrictions, fires, explosion, embargo, mobilization, riot, epidemics, and to the extent the following are on a national basis, strikes, industrial disturbances, shortage of material, electricity, oil or transport, or restriction in the use of power. Events set forth above are referred to individually and collectively as "Force Majeure Events." The Parties expressly acknowledge that Force Majeure Events do not include vandalism, or the non-performance of third parties or subcontractors relied on for the delivery of the Manufacturing Services, unless such failure or non-performance by a third party or subcontractor is itself caused by a Force Majeure Event, as defined above. Upon the occurrence of a Force Majeure Event, the non-performing Party shall be excused from any further performance or observance of the affected obligation(s) for as long as such circumstances prevail, and such Party continues to attempt to recommence performance or observance to the greatest extent possible without delay.

24.2    Notwithstanding any other provision of this Section 24, a Force Majeure Event shall obligate and require Kin Yat to commence and successfully implement all of the Manufacturing Services relating to disaster recovery set forth in its Business Continuity Plan within the time period described therein. If a Force Majeure Event causes a material failure or delay in the performance of any Manufacturing Services for more than [***] consecutive days, iRobot may, at its option, and in addition to any other rights iRobot may have, procure such Manufacturing Services from an alternate source until Kin Yat is again able to provide such Manufacturing Services. iRobot shall continue to pay Kin Yat the charges due and payable hereunder during such period, but Kin Yat shall not be entitled to any additional payments as a result of the Force Majeure Event. If a Force Majeure Event causes a material failure or delay in the performance of any Manufacturing Services under this Agreement for more than [***] consecutive days, iRobot may, at its option, and in addition to any other rights iRobot may have, immediately terminate this Agreement without liability to Kin Yat.

25    **Miscellaneous.**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.1    Notices. All notices, demands and other communications made hereunder shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), by facsimile or EDI (with telephone confirmation) addressed to the respective Parties at the following addresses:

|  |  |
|---|---|
| Notice to Kin Yat: | Kin Yat Industrial Company Limited<br>7th Floor Galaxy Factory Building<br>25-27 Luk Hop Street<br>San Po Kong, Kowloon<br>Hong Kong<br>Facsimile: (852) 2351 1867<br>Attn: Mr. Vincent Fung |
| with a copy to: | Kin Yat Holdings Limited<br>25-27 Luk Hop Street<br>San Po Kong, Kowloon<br>Hong Kong<br>Facsimile: (852) 2351 1867<br>Attn: General Counsel |
| Notice to iRobot: | iRobot Corporation<br>8 Crosby Drive<br>Bedford, MA 01730<br>Facsimile: (781) 430-3001<br>Attn: General Counsel |

25.2    Expenses and Costs. Each Party shall pay their own expenses in connection with the negotiation of this Agreement. All fees and expenses incurred in connection with the resolution of Disputes shall be allocated as further provided in Section 25.15 below.

25.3    Amendment. No course of dealing between the Parties hereto shall be effective to amend, modify, or change any provision of this Agreement. This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Party against whom such change is to be enforced. The Parties may, subject to the provisions of this Section 25.3, from time to time, enter into supplemental written agreements for the purpose of adding any provisions to this Agreement or changing in any manner the rights and obligations of the Parties under this Agreement or any Schedule hereto. Any such supplemental written agreement executed by the Parties shall be binding upon the Parties.

25.4    Partial Invalidity. Whenever possible, each provision of this Agreement shall be interpreted in such a way as to be effective and valid under applicable law. If a provision is prohibited by or invalid under applicable law, it shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

25.5    Monies. All references to monies in this Agreement shall be deemed to mean lawful monies of the United States of America.

25.6    Entire Agreement. This Agreement, the Schedules and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the Parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements and negotiations by and between the Parties. Each Party acknowledges and agrees that no agreements, representations, warranties or collateral promises or inducements have been made by any Party to this Agreement except as expressly set forth herein or in the Schedules and any addenda

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

28

attached hereto or referenced herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement. These acknowledgments and agreements are contractual and not mere recitals. In the event of any inconsistency between the provisions of this Agreement and any Schedule and any addenda attached hereto or referenced herein, the provisions of this Agreement shall prevail unless expressly stipulated otherwise, in writing executed by the Parties. Pre-printed language on each Party's forms, including purchase orders, that conflict with the terms and conditions of this Agreement, are shall not constitute part of this Agreement and shall be deemed unenforceable.

25.7   Binding Effect. This Agreement shall be binding on the Parties and their successors and assigns; provided, however, that Kin Yat shall not assign, delegate or transfer, in whole or in part, this Agreement or any of its rights or obligations arising hereunder, without the prior written consent of iRobot.  Any purported assignment without such consent shall be null and void.

25.8   Anti-Corruption Laws.  Kin Yat represents that it has a copy of, and is familiar with, the United States Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2 (the "FCPA"), and the purposes of the FCPA, including the FCPA's prohibition of the payment or the gift of any item of value, either directly or indirectly, by or on behalf of a company organized under the laws of the United States of America or any of its states to an official, employee, or officer of, or person acting in an official capacity for, a government or international organization for the purpose of influencing any action or decision, or inducing him to use his influence with the government or organization in a manner contrary to his position or creating an improper advantage to assist a company in obtaining or retaining business for, with, or in that country or organization or directing business to any person.  Kin Yat represents and warrants that it will take no action that would constitute a violation of the FCPA or any law.  Moreover, Kin Yat represents and warrants that no government official is a principal, owner, officer, employee or agent of any entity in which Kin Yat has an interest, and no government official has any material financial interest in the business of Kin Yat.  Further, Kin Yat represents and warrants that Kin Yat and its Affiliates do and shall comply with all applicable legal requirements and iRobot's policies against corrupt business practices, against money laundering and against facilitating or supporting persons who conspire to commit crimes or acts of terror against any person or government.  Kin Yat agrees that it will notify iRobot in writing immediately of the occurrence of any event, which renders the foregoing representations and warranties of this paragraph incorrect.

25.9   Child/Forced Prison Labor Laws. Kin Yat, by signing this agreement, represents and warrants that it and its subcontractors/suppliers will comply with all applicable local government regulations regarding minimum wage, living conditions, overtime, working conditions, child labor laws and the applicable labor and environmental laws. Kin Yat further represents and warrants that it and its subcontractors/suppliers do not use any form of forced prison labor and/or child labor under the age of 15 or the minimum age required by local government, whichever is older.

25.10   Waiver. Waiver by either Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any other provision of this Agreement.

25.11   Captions. The captions contained in this Agreement are inserted only as a matter of convenience or reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions.

25.12   Construction. Since both Parties have engaged in the drafting of this Agreement, no presumption of construction against any Party shall apply.

25.13   Section References. All references to Sections or Schedules shall be deemed to be references to Sections of this Agreement and Schedules attached to this Agreement, except to the extent that any such reference specifically refers to another document. All references to Sections shall be deemed to also refer to all subsections of such Sections, if any.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

29

25.14   Business Day. If any time period set forth in this Agreement expires upon a Saturday, Sunday or U.S. national, legal or bank holiday, such period shall be extended to and through the next succeeding business day.

25.15   Dispute Resolution.

25.15.1   Kin Yat and iRobot mutually agree to the settlement by arbitration of all claims or controversies each party may have against the other relating in any manner whatsoever to this Agreement or its terms. Except for the right to obtain provisional remedies or interim relief, which right is preserved without any waiver of the right to arbitration, arbitration under this Agreement shall be the exclusive remedy for all such arbitrable claims. Kin Yat and iRobot also agree that arbitration shall be held in Boston, Massachusetts if such arbitration is sought by Kin Yat and in Hong Kong if such arbitration is sought by iRobot, and shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitrator(s) shall have the authority to award or grant both legal, equitable and declaratory relief. Such arbitration shall be final and binding on the parties.

25.15.2 Kin Yat and iRobot agree that in the event that any action, either civil or arbitral is brought to enforce this Agreement by either Kin Yat or iRobot, the prevailing party shall be entitled to an award of all reasonable attorneys' fees and legal costs, in addition to other relief.

25.15.3 The Parties agree that the existence, conduct and content of any negotiation or arbitration pursuant to this Section 25.15 shall be kept confidential and no Party shall disclose to any Person any information about such negotiation or arbitration, except as set forth in Section 16 or 23.

25.15.4 IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES, WHETHER IT RESULTS IN PROCEEDINGS IN ANY COURT IN ANY JURISDICTION OR IN ARBITRATION, THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY, AND HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL, WAIVE ALL RIGHTS TO TRIAL BY JURY, AND AGREE THAT ANY AND ALL MATTERS SHALL BE DECIDED BY A JUDGE OR ARBITRATOR WITHOUT A JURY TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.

25.15.5 Notwithstanding anything contained in this Section 25.15 to the contrary, in the event that either Party is seeking temporary or preliminary injunctive relief, including any action for equitable relief, such Party may proceed in the Massachusetts Courts without prior negotiation or arbitration for the limited purpose of avoiding immediate and irreparable harm.

25.16   Insider Trading. Kin Yat will not, and will cause its Affiliates and Subsidiaries to not, transact in any securities of iRobot based on the manufacture of any Product under this Agreement or any Proprietary Information and Technology of the iRobot or from communicating any such information to any other Person in connection with the trading of such securities.

25.17   Other Documents. The Parties shall take all such actions and execute all such documents that may be necessary to carry out the purposes of this Agreement, whether or not specifically provided for in this Agreement.

25.18   Counterparts. This Agreement may be executed by facsimile and delivered in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one agreement.

25.19   Even-Handed Construction. The terms and conditions as set forth in this Agreement have been arrived at by sophisticated parties with equal bargaining power, each having an opportunity to consult with counsel, after mutual negotiation, and it is the intention of the Parties that its terms and conditions not be construed against any Party merely because it was prepared by one of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.20  <u>Governing Law and Jurisdiction</u>. All disputes, claims or controversies arising out of this Agreement, or the interpretation, negotiation, validity or performance of this Agreement, or the transactions contemplated hereby shall be governed by the laws of the State of New York, without application of conflicts of law principles. The provisions of the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

| **IROBOT CORPORATION** | | **KIN YAT INDUSTRIAL COMPANY LIMITED** | |
|---|---|---|---|
| By: | /s/ Alison Dean | By: | /s/ Vincent Fung |
| | Signature | | Signature |
| Name: | Alison Dean | Name: | Vincent Fung |
| | (Print) | | (Print) |
| Title: | CFO | Title: | Director |
| Date: | 1/22/14 * | Date: | Feb.10.2014 |
| | * agreed to be effective as of 9/23/13 | | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 1**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**STATEMENT OF WORK**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 2**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**

**FEE AND PRICE (FINAL QUOTE)**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 3**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**QUALITY AND TEST PROCEDURES**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 4**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**NON-DISCLOSURE AGREEMENT**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 5**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**TRADEMARK USAGE GUIDELINES**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 6**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND IROBOT**


**IROBOT QUARTER END**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Amendment # 1 to Manufacturing Services Agreement Between: iRobot Corporation and Kin Yat Industrial Co. Ltd

**PARTIES**

(1)     **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA ("Buyer").

(2)     **Kin Yat Industrial Co. Ltd.,** a Hong Kong Company having its place of business at 7/F Galaxy Factory Building, 25-27 Luk Hop Steet, San Po Kong, Kowloon, Hong Kong (hereinafter referred to as ("Seller")

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated 23rd September, 2013 (the "Agreement").

**WHEREAS,** pursuant to clause 25.3 of the Agreement, the Parties wish to amend the Agreement;

For good and valuable consideration, Effective as of **(6 August 2014),** the following amendments are hereby agreed:

*Clause 7.3 will be replaced in its entirety with the following:*

Disputed Invoices. If a Kin Yat invoice does not meet the invoicing requirements of this Agreement, or iRobot in good faith disputes any invoiced charges, iRobot will notify Kin Yat of the disputed items in writing on or before the payment due date and may withhold payment of the disputed charges pending resolution of the dispute. With the exclusion of events beyond Kin Yat's control, such as quality related issues, late delivery or short shipment, any lack of timely payment by Kin Yat to any Supplier listed in Schedule 7, attached, will result in a deduction of the identical amount to any outstanding receivable of Kin Yat under this agreement.

If any conflict or inconsistency occurs between this Amendment and the Agreement, the provisions of this Amendment shall prevail. The remainder of the Agreement shall remain in full force and effect, unamended.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat Industrial Co. Ltd

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Executive Director | /s/ Vincent Fung |

**SCHEDULE 7**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN KIN YAT AND IROBOT**


**SUPPLIERS**


**JABIL CIRCUIT, INC.**

Amendment #2 to Master Supplier Agreement Between:
iRobot Corporation and Kin Yat Industrial Company, Ltd.

**Parties**

**iRobot Corporation**, a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

**Kin Yat Industrial Company, Ltd.**, a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong.

**WHEREAS**, the Parties executed the Master Supplier Agreement dated September 23, 2013 ("the Agreement").

**WHEREAS**, pursuant to Section 25.3 of the Agreement, the Parties wish to amend the Agreement as follows:

For good and valuable consideration, Effective as of June 1, 2015, the following amendments are hereby agreed:

Section 3.6.1 in the Agreement will be replaced in its entirety with the following:

3.6.1 Kin Yat will use Commercially Reasonable Efforts to procure Assigned Components from the applicable designated supplier per iRobot's AVL and Generic Components per iRobot's BOM, where applicable, and otherwise from suppliers chosen by Kin Yat and approved by iRobot, in amounts necessary to fulfill Purchase Orders and to procure under Material Authorizations. Kin Yat will be responsible for adherence to the Product Specifications in the assembly and manufacturing process. iRobot will be responsible for managing the pipeline of iRobot controlled Consigned Components. Kin Yat will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Kin Yat to the extent empowered by Company through its Material Authorizations and Purchase Orders. Company authorizes Kin Yat to procure Generic Components and Assigned Components necessary, without a Purchase Order from agreed upon distributors/suppliers, by issuing a written authorization to purchase such Components ("Material Authorization"), to meet specific Forecast or Purchase Order demand as well as any coverage which may be needed for NCNR and Long-Lead Components. In the event of schedule changes, Kin Yat will use Commercially Reasonable Efforts to cancel all applicable material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. iRobot retains all liability for materials and parts Kin Yat cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Kin Yat acting on iRobot's Material Authorization or Purchase Order. Kin Yat's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components regardless of classification, except for non-cancel/nonreturnable (NCNR) Components.

If any conflict or inconsistency occurs between the Amendment and the Master Supplier Agreement, the provisions of this Amendment shall prevail. The remainder of the Master Supplier Agreement shall remain in full force and effect, unamended.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |
| *Date:* | | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat Industrial Co. Ltd

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | July 6, 2015 | |

**Amendment #3 to Manufacturing Services Agreement Between:**
**iRobot Corporation and Kin Yat Industrial Company Ltd.**

**Parties**

**(1)**      **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

**(2)**      **Kin Yat Industrial Company Ltd.,** a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated September 23, 2013 (the "Agreement").

**WHEREAS,** pursuant to section 25.3 of the Agreement, the Parties wish to amend the Agreement and update the Parties to the Agreement as follows:

**Parties:** The name of **iRobot Corporation** shall remain **iRobot Corporation** ("iRobot"). iRobot is a Delaware corporation having its principal office in 8 Crosby Drive Bedford MA. The name of **Kin Yat Industrial Company Ltd.** is hereby changed to **Kin Yat (HK) Holdings Limited ("Kin Yat"),** including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company Limited.** Kin Yat's principal office is located at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong.

All references to "iRobot" in Sections 3, 4.10, 4.12, 5, 7, 11, and 12 will also include Guangzhou iRobot Robot Technology Consulting Company Limited ("Guangzhou iRobot"). For avoidance of doubt, Guangzhou iRobot shall have the right and ability to purchase Product from Kin Yat, Kin Yat (Guizhou) Robot Company Limited, and from any Subsidiary of Kin Yat, issue Purchase Orders for Product under this Agreement, and enforce all related rights as if it were iRobot. Kin Yat agrees to indemnify, defend and hold harmless iRobot and its subsidiaries in accordance with the provisions under Section 19 of the Agreement. iRobot as the holding company of Guangzhou iRobot hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by Guangzhou iRobot of all of its obligations, and shall assume all liabilities of Guangzhou iRobot in accordance with the provisions of the Agreement set forth above. Kin Yat hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by its subsidiaries of all their obligations, and shall assume all liabilities of its subsidiaries, in accordance with the provisions of the Agreement with respect to its provision of manufacturing services and Additional Services under the Agreement.

If any conflict or inconsistency occurs between the Amendment and the Manufacturing Services Agreement, the provisions of this Amendment shall prevail. The remainder of the Manufacturing Services Agreement shall remain in full force and effect, unamended.

All parties below acknowledge and confirm the terms and conditions of the Agreement and this Amendment and agree to be bound by the terms and conditions of this Amendment.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

*Print full name:*       Oscar Zamorano                               *Signature:*

*Position:*              SVP Operations & Supply Chain             /s/ Oscar Zamorano

*Date:*                 Oct. 24, 2016

Signed by a duly authorised director or officer for and on behalf
of Guangzhou iRobot Robot Technology Consulting Company
Limited

| | | |
|---|---|---|
| *Print full name:* | Philip Li | *Signature:* |
| *Position:* | General Manager of Far East | /s/ Philip Li |
| *Date:* | Oct. 24, 2016 | |

Signed by a duly authorised director or officer for and on behalf
of Kin Yat Industrial Company Ltd.

| | | |
|---|---|---|
| *Print full name:* | FUNG Wah Cheong, Vincent | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | Oct. 20, 2016 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat (HK) Holdings Limited

| | | |
|---|---|---|
| *Print full name:* | FUNG Wah Cheong, Vincent | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | Oct. 20, 2016 | |

**iROBOT CORPORATION**
**SUBSIDIARIES OF THE REGISTRANT**

| Subsidiary Legal Name | Jurisdiction of Incorporation/Formation |
| --- | --- |
| iRobot Securities Corporation | Massachusetts |
| iRobot US Holdings Inc. | Delaware |
| iRobot Holdings LLC. | Delaware |
| iRobot (India) Private Limited | India |
| Guangzhou iRobot Technology Consulting Company Limited | China |
| Shanghai iRobot Robot Trading Co., Ltd. | China |
| iRobot (HK) Limited | Hong Kong |

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM.

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (File Nos. 333-204669, 333-193998, 333-186700, 333-184320, 333-179593, 333-172333, 333-164993, 333-157306, 333-149373, 333-140707, 333-129576) of iRobot Corporation of our report dated February 17, 2017 relating to the consolidated financial statements, and the effectiveness of internal control over financial reporting, which appears in this Form 10-K. We also consent to the reference to us under the heading "Selected Financial Data" in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Boston, Massachusetts
February 17, 2017

**Exhibit 31.1**

**Certifications**

I, Colin M. Angle, certify that:

1.  I have reviewed this Annual Report on Form 10-K of iRobot Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2017

/s/ Colin M. Angle
_____
Colin M. Angle
Chief Executive Officer

**Exhibit 31.2**

**Certifications**

I, Alison Dean, certify that:

1.  I have reviewed this Annual Report on Form 10-K of iRobot Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2017

/s/ ALISON DEAN
Alison Dean
Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of iRobot Corporation (the "Company") for the year ended December 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Colin M. Angle, the Chief Executive Officer of the Company and Alison Dean, the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to our knowledge, that:

(1)   the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

This certification is being provided pursuant to 18 U.S.C. 1350 and is not to be deemed a part of the Report, nor is it to be deemed to be "filed" for any purpose whatsoever.

Dated    February 17, 2017                                     /s/ COLIN M. ANGLE
                                                               Colin M. Angle
                                                               Chief Executive Officer


Dated    February 17, 2017                                     /s/ ALISON DEAN
                                                               Alison Dean
                                                               Chief Financial Officer