# Tab 6

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 30, 2017**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file no. 001-36414**

# iROBOT CORPORATION
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **77-0259 335** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8 Crosby Drive, Bedford, MA** | **01730** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(781) 430-3000**
**(Registrant's telephone number, including area code)**

_____

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

**Common Stock, $0.01 par value per share The Nasdaq Stock Market LLC**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**
**None**

Indicate by check-mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check-mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of the Common Stock held by nonaffiliates of the registrant was approximately $2.3 billion based on the last reported sale of the Common Stock on The Nasdaq Global Select Market on July 1, 2017, the last business day of the registrant's most recently completed second fiscal quarter.

As of February 12, 2018, there were 27,945,275 shares of the registrant's Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file a definitive Proxy Statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended December 30, 2017. Portions of such Proxy Statement are incorporated by reference into Part III of this Form 10-K.

Table of Contents

**iROBOT CORPORATION**
**ANNUAL REPORT ON FORM 10-K**
**Year Ended December 30, 2017**
**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 19 |
| Item 2. | Properties | 19 |
| Item 3. | Legal Proceedings | 19 |
| Item 4. | Mine Safety Disclosures | 19 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6. | Selected Financial Data | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 35 |
| Item 8. | Financial Statements and Supplementary Data | 36 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | 72 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 72 |
| Item 11. | Executive Compensation | 72 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 72 |
| Item 13. | Certain Relationships and Related Transactions, and Directors Independence | 72 |
| Item 14. | Principal Accounting Fees and Services | 72 |
| **Part IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 73 |
| Item 16. | Form 10-K Summary | 75 |

Table of Contents

**PART I**

**ITEM 1. *BUSINESS***

*This Annual Report on Form 10-K contains forward-looking statements. All statements other than statements of historical facts contained in this Annual Report on Form 10-K, including statements regarding our future results of operations and financial position, business strategy, plans and objectives of management for future operations, and plans for product development, launches and manufacturing are forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. We discuss certain of these risks in greater detail in the "Risk Factors" section and elsewhere in this Annual Report on Form 10-K. Also, these forward-looking statements speak only as of the date of this Annual Report on Form 10-K, and we have no plans to update our forward-looking statements to reflect events or circumstances occurring after the date of this Annual Report. We caution readers not to place undue reliance upon any such forward-looking statements.*

*iRobot and its stylized logo, Roomba, NorthStar, Create, iAdapt, Aware, Home Base, Looj, Braava, AeroForce, Mirra, vSLAM and Virtual Wall are trademarks of iRobot Corporation.*

**Overview**

iRobot Corporation ("iRobot" or the "Company" or "we") is a leading global consumer robot company that designs and builds robots that empower people to do more both inside and outside of the home. The Company's consumer robots help people find smarter ways to clean and accomplish more in their daily lives. iRobot's portfolio of solutions features proprietary technologies for the connected home and advanced concepts in cleaning, mapping and navigation, human-robot interaction, and physical solutions. For more than 25 years, we have been a pioneer in the robotics and consumer products industries.

Since our founding in 1990, we have developed expertise in all the disciplines necessary to design and build durable, high-performance and cost-effective robots through the close integration of software, electronics and hardware. Our core technologies serve as reusable building blocks that we adapt and expand to develop next-generation and new products, reducing the time, cost and risk of product development. Our significant expertise in robot design and engineering positions us to capitalize on the growth we expect in the market for robot-based consumer products.

Over the past sixteen years, we have sold more than 20 million consumer robots worldwide. During 2016, we took several steps to become more focused on our well-established consumer robots business and to capitalize on the substantial opportunities available to us within consumer markets. We completed the sale of our defense and security business unit in April 2016. In addition, we reallocated all the research and development resources from our remote presence business to our consumer business during the first quarter of 2016, and exited the remote presence business during the second quarter of 2016. These actions were taken to solidify our position as the leader in diversified consumer robots and to focus on key technologies, with an emphasis on software, that allow our robots to understand the homes in which they operate. It is our intent to continue investing in these critical technologies and the economic opportunities they unlock.

During 2017, we continued to expand our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC) based in Tokyo, Japan for approximately $16.6 million in cash. The acquisition of SODC will better enable us to maintain our leadership position and accelerate the growth of our business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. It also expands our presence and customer outreach opportunities in Japan. Additionally, on October 2, 2017, we closed the acquisition of our largest European distributor, Robopolis SAS, a French company (Robopolis), for approximately $170.1 million in cash, which was offset by acquired cash held by Robopolis and its subsidiaries, resulting in a net cash outlay of approximately $132.1 million. We anticipate that this acquisition will enhance our distribution network, ensure global brand consistency and help us better serve the needs of European consumers. We expect to drive continued growth in global markets through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service. Both acquisitions provide us with more direct control over the go-to-market execution in these key regions.

We also achieved a number of significant milestones in the past two years that we believe will assist us in continuing to generate profitable growth and enhance value for our shareholders. In particular, in 2016, we successfully launched Roomba 960, our second 900 series Roomba, that extends mapping, visual navigation and cloud connectivity to a wider range of customers. We also launched the Braava jet mopping robot, with precision jet spray and vibrating cleaning head, focused on expanding our wet floor care business. Both the Roomba 900 series and Braava jet are significantly more complex products, delivering enhanced performance enabled by software. The iRobot HOME App, compatible with both the Roomba 900 series and Braava jet, helps users get the most out of their experience by allowing them to choose the appropriate cleaning options for their unique home. We also announced a relationship with Amazon Web Services, or AWS, that we believe will enable iRobot

3

Table of Contents

to address significant opportunities within our consumer business and the connected home. AWS Cloud is a managed cloud solution that enables connected devices to interact easily and securely with cloud applications and other devices. The AWS Cloud will enable iRobot to scale the number of connected robots it supports globally and allow for increased capabilities in the Smart Home. We implemented new Roomba marketing programs in the United States that resulted in a significant return on our investment which we plan to leverage as part of our strategy to accelerate growth in international markets. In 2017, we launched Roomba 690 and 890, extending Wi-Fi connectivity to the entire Roomba line. And, we launched several connected product features, including push notifications, Clean Map Reports and integrations with Amazon Alexa, Google Assistant and IFTTT platform technology.

Our total revenue for 2017 was $883.9 million, which represents a 33.8% increase from 2016 revenue of $660.6 million. Domestic consumer robots revenue grew $133.2 million primarily due to increased sales as a result of significant investments in advertising media and national promotions as well as the strength of the Roomba 900 series and Roomba 600 series. International consumer robots revenue grew by $94.6 million in 2017 with increases in most markets, offset by a decline in China.

Our financial performance in 2018 will be driven by our continued transformation to a global consumer robots company. Our strategy is to maintain Roomba's leadership in the robotic vacuum cleaner segment while positioning the Company as a strategic player in the emerging Smart Home. We expect growth to be driven by:

- deeper household penetration of Roomba globally;
- continued investment in innovation to extend our technology and product leadership;
- increased gross margin due to our acquisitions of two of our foreign distributors, SODC and Robopolis, in 2017;
- adoption and awareness of Braava products through targeted marketing programs; and
- research and development of new products.

**Strategy**

In 2002, iRobot created the home robot cleaning category with the introduction of its Roomba vacuuming robot. Today, we are a global enterprise that has sold more than 20 million consumer robots worldwide. iRobot's success in driving adoption of connected Roomba robots has created a unique opportunity to extend consumer value in the home and expand our business. Our long-term strategy is to increase the penetration of our products in existing markets, expand current products into new markets, and develop and launch new products into current and adjacent markets. As our customer base grows, iRobot plans to create an ecosystem of connected robots designed to integrate with other devices. This ecosystem will create greater possibilities for new features and capacities as well as empowering the Smart Home.

Global expansion is a key component of our strategy. Our relentless pursuit of product leadership, through targeted investment in key technologies and capabilities, coupled with our investments in furthering our global brand and targeted marketing initiatives, allows us to continue to maintain our leadership position in the robotic vacuum cleaner segment despite increasing competition. Our recent acquisitions of distributors in Japan and Europe further this strategic objective.

To successfully execute our 2018 plan and drive revenue diversification and significant revenue growth beyond 2018, we plan to continue to make investments in our business during the year. These investments are expected to help iRobot achieve the following goals:

- Continue to strengthen our marketing capabilities globally and accelerate worldwide consumer adoption of Roomba to maintain our market-leading position in robotic vacuum cleaners;
- Continue to develop our wet floor care business to generate a material, secondary revenue stream;
- Scale our infrastructure to support global operations and connected products;
- Explore, develop and grow adjacent non-floor care consumer robot products that can generate meaningful diversified revenue streams; and
- Make continued operational improvements that can reduce product and operating costs.

Key pillars of our strategy include:

*Technology:* As a leading global consumer robotics company, iRobot must develop and maintain best-in-class technology in the areas of cleaning, mapping and navigation. In 2018, iRobot plans to take steps towards expanding its product lines with new products that will deliver innovative solutions to improve cleaning performance, efficiency and ease-of-use. Mapping and navigation continues to be the core focus for iRobot. Consumer robots that can map and are spatially aware creates a unique and differentiating opportunity to expand consumer value.

4

Table of Contents

*Brand:* In 2016, we rolled out a new logo, mark and brand language to signify the partnership between man and machine. In 2017, to meet our goal of a consistent brand experience in every region, we expanded our presence globally by taking more direct control of marketing programs and the customer experience in Japan and Europe by acquiring key regional distributors. We believe our expanded global presence will allow us to strengthen strategic retailer partnerships, minimize competitive pressures and increase our consumer activation field programs.

*Portfolio:* Our strategy includes building a portfolio of investments to diversify across markets and delivering a steady progression of innovation over time. In 2017, we introduced the Roomba 690 and 890, extending cloud connectivity to a wider range of consumers. We plan to continue to build a diverse portfolio of physical platforms and digital capabilities across international markets and deliver a steady progression of innovation and growth. To achieve this,we plan to focus on developing products with connectivity and mobile app-enabled features, including Wi-Fi home maps and advanced spatial intelligence and memory.

*Talent:* Our employees are the most important driver of who we are. Our success, diversity and reputation as developers of great talent make us an attractive employer to the top talent all over the world. Talent recruitment and retention continues to be at the core of what we accomplish as we map out our culture and work towards achieving our vision. We are also growing our company to meet organization needs by strategically investing in our employees around the globe.

## Technology

In 2016, iRobot narrowed its focus to the consumer market and made increased, but disciplined investments in advancing mapping and navigation, user interaction including cloud and app development and cleaning efficacy. From the launch of Braava jet, to the introduction of a lower cost Visual Simultaneous Localization and Mapping, or vSLAM, solution in Roomba 960, these strategic investments in technology had an immediate impact on product diversification, performance and market expansion. In 2017, we introduced two new connected products to the product portfolio bringing the advantages of cloud connectivity to more consumers. With the iRobot HOME App, we also delivered our robots' maps directly to our customers through the launch of post-mission cleaning maps. We believe the improved performance of our connected robots, and the data sourced from our maps, will accelerate new product development and digital partnerships for the Smart Home.

We plan to continue to leverage opportunities, enabled by our growing connected product portfolio, to invest in developing technologies and interfaces for our products to provide a convenient and personalized user experience. At the foundation of our effort to drive enhanced user experience has been the deployment of our new connectivity and cloud infrastructure through AWS. We made this investment to enable us to scale our connected products globally, with increased access to valuable cloud services and applications to support future product features, and connect to other devices in the Smart Home.

From robotic vacuum cleaning to mopping, we are dedicated to developing market-leading solutions which provide compelling value to customers worldwide. From our customer's perspective, the core value of our robots is the ability to efficiently and effectively perform a physical mission - the task for which that robot was initially purchased. In addition, we focus on features that allow the robots to perform longer, without consumer interaction. Our goal is to deliver maximum autonomy and effectiveness of the mission.

## Products

Historically, we have designed and marketed robots for both the consumer and defense and security markets. Following completion of the divestiture of our defense and security business unit in April 2016, we are now focusing solely on the consumer market. With more than two decades of leadership in the robot industry, we remain committed to creating robots that empower people to do more.

### Consumer Products

We sell various products that are designed for use in and around the home. Our current consumer products are focused on both indoor and outdoor cleaning applications. We believe our consumer products provide value to our customers by delivering a better way to clean and by freeing people from repetitive home cleaning tasks. To ensure the continued acceptance of our robots we will continue to invest in technology necessary to further improve their capabilities.

We currently offer multiple Roomba floor vacuuming robots at varying price points ranging from $299 to $899 based upon features and performance characteristics. Roomba's design allows it to clean under toe kicks, beds and other furniture, resulting in cleaner floors since the Roomba can access more of the floor than standard upright vacuum cleaners. In addition, Roomba eliminates the need to manually vacuum -- it cleans automatically upon the push of a button or through scheduling.

In 2017, we launched our newest connected robots, Roomba 690 and 890, bringing the advantages of connectivity to more consumers. Roomba 900 series robots help keep floors cleaner throughout the entire home with intelligent visual navigation, iRobot HOME App control with wireless connectivity, and 5x the suction power over previous generation Roomba vacuum cleaners. In addition to these highest-feature products, our lineup also includes the 800 series and 600 series robots.

5

Table of Contents

The Roomba 800 series robots offer our AEROForce technology which incorporates brushless, counter-rotating extractors that amplify suction for superior performance over bristle brushes, while requiring less maintenance than previous Roomba models. The Roomba 600 series robots offer a three-stage cleaning system which thoroughly vacuums every section of the floor multiple times, as well as AeroVac technology and improved brush design enabling the robot to better handle fibers like hair, pet fur, lint and carpet fuzz.

We currently offer the Braava family of automatic floor mopping robots designed exclusively for hard surface floors. These robots provide a different cleaning approach than our Roomba products. The Braava robots, priced at $199 and $299, automatically dust and damp mop hard surface floors using popular cleaning cloths or our specially designed reusable microfiber cloths, and include a special reservoir that dispenses liquid throughout the cleaning cycle to keep the cloth damp. Braava jet, launched in March 2016, works with Braava jet Cleaning Pads to tackle a range of hard floor cleaning jobs, from wet mopping and damp sweeping to simple dusting.

Our Mirra Pool Cleaning Robot is used to clean residential pools and removes debris as small as two microns from pool floors, walls and stairs. Mirra is brought to market under the iRobot brand through a relationship with Aquatron, Inc., which develops and manufactures the pool cleaning robots.

### Defense and Security Products

As noted above, we completed the divestiture of our defense and security business unit in April 2016. Prior to this divestiture, we developed and delivered unmanned tactical ground robots in defense and security product markets. Following this divestiture, we no longer develop or sell defense and security products.

### Strategic Alliances

In addition to our internal technology development, we leverage relevant robotic technologies through licensing, acquisitions and/or other partnerships. These strategic alliances are an important part of our product development and distribution strategies. We rely on strategic alliances to provide technology, complementary product offerings and increased and quicker access to markets. We seek to form relationships with organizations that can provide best-in-class technology or market advantages for establishing iRobot technology in new market segments.

### Sales and Distribution Channels

We sell our consumer products through distributor and retail sales channels, as well as our on-line store. For the fiscal years ended December 30, 2017, December 31, 2016, and January 2, 2016, sales to non-U.S. customers accounted for 48.8%, 51.2%, and 56.0% of total revenue, respectively. For the fiscal year ended December 30, 2017, the Company generated 13.5% of total revenue from one of its retailers (Amazon). For the fiscal year ended December 31, 2016, the Company generated 12.9%, 12.3% and 10.4% of total revenue from its distributor in Japan, Sales On Demand Corporation (SODC), Robopolis SAS, a network of affiliated European distributors (Robopolis) and Amazon, respectively. For the fiscal year ended January 2, 2016, the Company generated 13.3% and 12.7% of total revenue from SODC and Robopolis, respectively. In April 2017, the Company acquired the iRobot-related distribution business of SODC, and in October 2017, the Company acquired Robopolis.

### Consumer Products

Consumer product revenues were $883.7 million, $655.9 million and $559.6 million for fiscal year 2017, 2016 and 2015, respectively. In the United States and Canada, we sell our consumer products primarily through a network of national retailers. Certain smaller domestic retail operations are supported by distributors to whom we sell our products directly. With the acquisition of SODC and Robopolis, iRobot now directly services retailers in Japan and countries that were previously serviced by Robopolis, including Austria, Belgium, France, Germany, Netherlands, Portugal and Spain. In support of sales in the United States, Canada, Japan and the seven European countries previously serviced by Robopolis, we maintain in-house sales, marketing and product management teams. In China, retailers are serviced by two local distributors. Due to the special needs of this market, we maintain a local sales, marketing and product team to support the distributors, manage the local marketing plan and meet product needs. Throughout the rest of the world, our products are sold primarily through a network of in-country distributors who resell to retail stores in their respective countries. These distributors are supported by our international sales and product marketing team.

Our retail and distributor networks are our primary distribution channels for our consumer products. We also offer products direct-to-consumer through our domestic and international on-line stores, representing 4.1%, 5.1% and 6.1% of total consumer robots revenue for fiscal 2017, 2016 and 2015, respectively. We have established valuable databases and customer lists that allow us to target directly those consumers most likely to purchase a new robot or upgrade. With Wi-Fi connectivity implemented across Roomba 690 and higher models, iRobot can more directly provide customer support via the iRobot HOME App. In addition, connectivity enables us to provide direct marketing material and push new features/fixes to robots in the field. We believe we maintain a close connection with our customers in each of our markets, which provides an enhanced position from which to improve our distribution and product offerings.

6

Table of Contents

*Customer Service and Support*

We also provide ongoing customer service and support. Consumer customer service representatives, the majority of whom are employees of outsourced service organizations or our distribution partners, are extensively trained on the technical intricacies of our consumer products.

**Marketing and Brand**

We market our consumer robots to end-user customers through our sales and marketing teams as well as through our extensive network of retailers and in-country distributors. In addition, we sell directly to our consumers through our website. Our website is also playing an increasing role in supporting brand awareness, addressing customer questions and serving as a showcase for our products.

Our marketing strategy is to increase our brand awareness and associate the iRobot brand with innovation, reliability and value. Our sales and marketing expenses represented 18.3%, 17.4% and 15.9% of our total revenue in 2017, 2016 and 2015, respectively. We expect to continue to invest in national advertising, consumer and industry trade shows, direct marketing and public relations to further build brand awareness.

We have built a trusted, recognized brand by providing high-quality robots. Customer word-of-mouth has been a significant driver of our brand's success to date. iRobot owner loyalty encourages repurchase, and positive customer experiences inspire others to adopt our products. Our marketing efforts are focused on fueling this word-of-mouth momentum, and we use public relations as well as various forms of advertising to promote our products.

In April 2017, we acquired SODC, launching four new iRobot offices in Japan. In October 2017, we acquired our largest European distributor, Robopolis, launching new iRobot offices in seven countries, including Austria, Belgium, France, Germany, Netherlands, Portugal and Spain. These acquisitions allow us to drive continued growth in the region through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service. Our innovative robots and public relations campaigns have generated extensive press coverage, and iRobot and our consumer robots have won several awards. Through these efforts, we have been able to build our brand, and we expect that our reputation for innovative products and customer support will continue to play a significant role in our growth and success.

**Manufacturing**

Our core competencies are the design, development and marketing of robots. Our manufacturing strategy is to outsource non-core competencies, such as the production of our robots, to third-party entities skilled in manufacturing. By relying on the outsourced manufacture of our robots, we can focus our engineering expertise on the design of robots.

Manufacturing a new product requires a close relationship between our product designers and the manufacturing organizations. Using multiple engineering techniques, our products are introduced to the selected production facility at an early-development stage and the feedback provided by manufacturing is incorporated into the design before tooling is finalized and mass production begins. As a result, we believe that we can significantly reduce the time required to move a product from its design phase to mass production deliveries, with improved quality and yields.

We outsource the manufacturing of our consumer products to four contract manufacturers, each of which manufactures our robots at a single plant in China. Our production processes give us the capacity to produce up to 20,000 robots a day, helping us to meet demand for peak seasons.

**Research and Development**

We believe that our future success depends upon our ability to continue to develop new products and product accessories, and enhancements to and applications for our existing products. For the years ended December 30, 2017, December 31, 2016 and January 2, 2016, our research and development expenses were $113.1 million, $79.8 million and $76.1 million, or 12.8%, 12.1% and 12.3% of revenue, respectively. We intend to continue our investment in research and development to respond to and anticipate customer needs, and to enable us to introduce new products over the next few years that will continue to address our existing and adjacent market sectors.

Our research and development is conducted by teams dedicated to particular projects. Our research and development efforts are primarily located at our headquarters in Bedford, Massachusetts and our office in Pasadena, California.

**Competition**

The market for robots is highly competitive, rapidly evolving and subject to changing technologies, shifting customer needs and expectations and the likely increased introduction of new products. A number of established companies have developed or are developing robots that will compete directly with our product offerings, and many of our competitors have significantly more financial and other resources than we possess. Our competitors include consumer electronics companies such as Samsung, LG, Xiaomi and Shark, traditional floor cleaning brands with robotic offerings such as Dyson, Bissell and Hoover, as well as developers of robot floor cleaning products.

Table of Contents

While we believe many of our customers purchase our Roomba floor vacuuming robots and Braava mopping robots as a supplement to, rather than a replacement for, their traditional vacuum cleaners and wet floor cleaning methods, we do compete in some cases with providers of traditional cleaning products.

We believe that the principal competitive factors in the market for robots include product features, performance for the intended mission, cost of purchase, total cost of system operation, including maintenance and support, ease of use, integration with existing equipment, quality, reliability, customer support, brand and reputation.

Our ability to remain competitive will depend to a great extent upon our ongoing performance in the areas of product development and customer support. We cannot provide assurance that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering the markets in which we provide products.

**Intellectual Property**

We believe that our continued success depends in large part on our proprietary technology, the intellectual skills of our employees and the ability of our employees to continue to innovate. We rely on a combination of patent, copyright, trademark and trade secret laws, as well as confidentiality agreements, to establish and protect our proprietary rights. As part of the sale of our defense and security business, we transferred to the buyer ownership of certain of our intellectual property related to the defense and security business, including patents, patent applications and trademarks.

As of December 30, 2017, we held 403 U.S. patents, more than 650 foreign patents, additional design registrations, and more than 450 patent applications pending worldwide. Our U.S. patents will begin to expire in 2019. We will continue to file and prosecute patent (or design registration, as applicable) applications when and where appropriate to attempt to protect our rights in our proprietary technologies. We also encourage our employees to continue to invent and develop new technologies so as to maintain our competitiveness in the marketplace. It is possible that our current patents, or patents which we may later acquire, may be successfully challenged or invalidated in whole or in part. It is also possible that we may not obtain issued patents for our pending patent applications or other inventions we seek to protect. In that regard, we sometimes permit certain intellectual property to lapse or go abandoned under appropriate circumstances, and due to uncertainties inherent in prosecuting patent applications, sometimes patent applications are rejected and we subsequently abandon them. It is also possible that we may not develop proprietary products or technologies in the future that are patentable, or that any patent issued to us may not provide us with any competitive advantages, or that the patents of others will harm or altogether preclude our ability to do business.

Our registered U.S. trademarks include iRobot and its stylized logo, Roomba, NorthStar, Create, iAdapt, Aware, Home Base, Looj, Braava, AeroForce, Mirra, vSLAM and Virtual Wall. Our marks iRobot, Roomba, Braava, Virtual Wall, and certain other trademarks, have also been registered in selected foreign countries.

Our means of protecting our proprietary rights may not be adequate, and our competitors may independently develop technology that is similar to ours. Legal protections afford only limited protection for our technology. The laws of many countries do not protect our proprietary rights to as great an extent as do the laws of the United States. Despite our efforts to protect our proprietary rights, unauthorized parties have in the past attempted, and may in the future attempt, to copy aspects of our products or to obtain and use information that we regard as proprietary. In 2017, we initiated a multi-party litigation at the U.S. International Trade Commission as well as in federal district court in Massachusetts based on claims of patent infringement. There is no guarantee that we will prevail on these or other patent infringement claims against third parties. Third parties may also design around our proprietary rights, which may render our protected products less valuable, if the design around is favorably received in the marketplace. In addition, if any of our products or the technology underlying our products is covered by third-party patents or other intellectual property rights, we could be subject to various legal actions. We cannot assure you that our products do not infringe patents held by others or that they will not in the future. We have received in the past communications from third parties relating to technologies used in our various robot products that have alleged infringement of patents or violation of other intellectual property rights. In response to these communications, we have contacted these third parties to convey our good faith belief that we do not infringe the patents in question or otherwise violate those parties' rights. Although there have been no additional actions or communications with respect to these allegations, we cannot assure you that we will not receive further correspondence from these parties, or not be subject to additional allegations of infringement from others. Litigation may be necessary to enforce our intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity, misappropriation, or other claims. Any such litigation could result in substantial costs and diversion of our resources. Moreover, any settlement of or adverse judgment resulting from such litigation could require us to obtain a license to continue to use the technology that is the subject of the claim, or otherwise restrict or prohibit our use of the technology. Any required licenses may not be available to us on acceptable terms, if at all. If we attempt to design around the technology at issue or to find another provider of suitable alternative technology to permit us to continue offering applicable software or product solutions, our continued supply of software or product solutions could be disrupted or our introduction of new or enhanced software or products could be significantly delayed.

8

Table of Contents

**Seasonality**

Historically, we have experienced higher revenue in the second half of the year compared to the first half of the year due in large part to seasonal holiday demand. In 2017, 2016 and 2015, our second-half consumer product revenue represented 60.2%, 57.5% and 50.5% of our annual consumer product revenue, respectively.

**Regulations**

Our business requires compliance with a variety of laws and regulations in the United States and abroad regarding privacy, data protection, and data security. In particular, we are subject to numerous U.S. federal, state, and local laws and regulations and foreign laws and regulations regarding privacy and the collection, sharing, use, processing, disclosure, and protection of personal information and other user data. In addition, the global nature of our business operations also creates various domestic and foreign regulatory challenges and subject us to laws and regulations such as the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act, and similar anti-bribery and anti-corruption laws in other jurisdictions, and our products are also subject to U.S. export controls, including the U.S. Department of Commerce's Export Administration Regulations and various economic and trade sanctions regulations established by the Treasury Department's Office of Foreign Assets Controls.

We are also subject to international and U.S. federal, state, and local laws and regulations designed to protect the environment, regulate energy efficiency and to regulate the discharge of materials into the environment. We believe that our policies, practices, and procedures are properly designed to prevent unreasonable risk of environmental damage and associated financial liability. To date, environmental control regulations have not had a significant adverse effect on our overall operations.

Prior to our divestiture of the defense and security business unit in April 2016, we were subject to various government regulations, including various U.S. federal government regulations as a contractor and subcontractor to the U.S. federal government. We continue to remain subject to certain of these regulations only as they pertain to matters related to our operation of the defense and security business unit prior to our completion of the sale of this business.

**Employees**

As of December 30, 2017, we had 920 full-time employees. Approximately 31% of our employees are based outside of the United States. None of our employees in the United States are represented by a labor union. In certain foreign subsidiaries, labor unions or workers' councils represent some of our employees. We believe that we have a good relationship with our employees.

**Available Information**

We were incorporated in California in August 1990 under the name IS Robotics, Inc. and reincorporated as IS Robotics Corporation in Massachusetts in June 1994. We reincorporated in Delaware as iRobot Corporation in December 2000. We conduct operations and maintain a number of subsidiaries in the United States and abroad, including operations in Austria, Belgium, China, France, Germany, Hong Kong, Japan, Netherlands, Portugal, Spain, and the United Kingdom. We also maintain iRobot Securities Corporation, a Massachusetts securities corporation, to invest our cash balances on a short-term basis. Our website address is www.irobot.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge through the investor relations page of our internet website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission. Alternatively, these reports may be accessed at the SEC's website at www.sec.gov.

**ITEM 1A. *RISK FACTORS***

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. This discussion highlights some of the risks which may affect future operating results. These are the risks and uncertainties we believe are most important for you to consider. Additional risks and uncertainties not presently known to us, which we currently deem immaterial or which are similar to those faced by other companies in our industry or business in general, may also impair our business operations. If any of the following risks or uncertainties actually occurs, our business, financial condition and operating results would likely suffer.

***We operate in an emerging market, which makes it difficult to evaluate our business and future prospects.***

Robots represent a new and emerging market. Accordingly, our business and future prospects are difficult to evaluate. We cannot accurately predict the extent to which demand for consumer robots will increase, if at all. You should consider the challenges, risks and uncertainties frequently encountered by companies using new and unproven business models in rapidly evolving markets. These challenges include our ability to:

9

Table of Contents

- generate sufficient revenue and gross margin to maintain profitability;
- acquire and maintain market share in our consumer market;
- attract and retain customers of our consumer robots;
- attract and retain engineers and other highly-qualified personnel; and
- expand our product offerings beyond our existing robots.

If we fail to successfully address these and other challenges, risks and uncertainties, our business, results of operations and financial condition would be materially harmed.

***Our business currently depends solely on our consumer robots, and our sales growth and operating results would be negatively impacted if we are unable to enhance our current consumer robots or develop new consumer robots at competitive prices or in a timely manner, or if the consumer robot market does not achieve broad market acceptance.***

For the years ended December 30, 2017, December 31, 2016 and January 2, 2016, we derived 100.0%, 99.3%, and 90.7% of our total revenue from our consumer robots, respectively. For the foreseeable future, we expect that our revenue will be derived solely from sales of consumer robots in general, and home floor care products in particular. Accordingly, our future success depends upon our ability to further penetrate the consumer home care market, to enhance our current consumer products and to develop and introduce new consumer products offering enhanced performance and functionality at competitive prices. The development and application of new technologies involves time, substantial costs and risks. Our inability to achieve significant sales of our newly introduced robots, or to enhance, develop and introduce other products in a timely manner, or at all, would materially harm our sales growth and operating results.

Even if consumer robots gain wide market acceptance, our robots may not adequately address market requirements and may not continue to gain market acceptance. If robots generally, or our robots specifically, do not gain wide market acceptance, we may not be able to achieve our anticipated level of growth, and our revenue and results of operations would suffer.

***We face intense competition from other providers of robots, including diversified technology providers, as well as competition from providers offering alternative products, which could negatively impact our results of operations and cause our market share to decline.***

A number of companies have developed or are developing robots that will compete directly with our product offerings. Many current and potential competitors have substantially greater financial, marketing, research and manufacturing resources than we possess, and there can be no assurance that our current and future competitors will not be more successful than us. We also face competition from manufacturers of lower-cost devices, which may drive down the average selling price in the marketplace for floor cleaning products. Moreover, while we believe many of our customers purchase our floor vacuuming robots as a supplement to, rather than a replacement for, their traditional vacuum cleaners, we also compete in some cases with providers of traditional vacuum cleaners.

The global market for robots is highly competitive, rapidly evolving and subject to changing technologies, shifting customer needs and expectations and the likely increased introduction of new products. Our ability to remain competitive will depend to a great extent upon our ongoing performance in the areas of product development and customer support.

In the event that the robot market expands further, we expect that competition will intensify as additional competitors enter the market and current competitors expand their product lines. Companies competing with us may introduce products that are competitively priced, have increased performance or functionality, or incorporate technological advances that we have not yet developed or implemented. Increased competitive pressure could result in a loss of sales or market share or cause us to lower prices for our products, any of which would harm our business and operating results.

Some of our competitors may aggressively discount their products and services in order to gain market share, which could result in pricing pressures, reduced profit margins, lost market share, or a failure to grow market share for us. In addition, new products may have lower selling prices or higher costs than legacy products, which could negatively impact our gross margins and operating results.

We cannot assure you that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering the markets in which we provide products. Our failure to compete successfully could cause our revenue and market share to decline, which would negatively impact our results of operations and financial condition.

Table of Contents

*If we fail to enhance our brand, our ability to expand our customer base will be impaired and our operating results may suffer.*

We believe that developing and maintaining awareness of the iRobot brand is critical to achieving widespread acceptance of our existing and future products and is an important element in attracting new customers. Furthermore, we expect the importance of global brand recognition to increase as competition develops. If customers do not perceive our products to be of high quality, our brand and reputation could be harmed, which could adversely impact our financial results. In addition, brand promotion efforts may not yield significant revenue or increased revenue sufficient to offset the additional expenses incurred in building our brand. Maintaining, protecting, and enhancing our brand may require us to make substantial investments, and these investments may not be successful. If we fail to successfully maintain, promote, and position our brand and protect our reputation, or if we incur significant expenses in this effort, our business, financial condition and operating results may be adversely affected.

*Any efforts to expand our product offerings beyond our current markets may not succeed, which could negatively impact our operating results.*

Efforts to expand our product offerings beyond our current markets may not succeed and may divert management resources from existing operations and require us to commit significant financial resources to an unproven business, either of which could significantly impair our operating results. Moreover, efforts to expand beyond our existing markets may never result in new products that achieve market acceptance, create additional revenue or become profitable.

*Our financial results often vary significantly from quarter-to-quarter due to a number of factors, which may lead to volatility in our stock price.*

Our quarterly revenue and other operating results have varied in the past and are likely to continue to vary significantly from quarter-to-quarter in the future. These fluctuations may be due to numerous factors including:

- the size, timing and mix of orders from retail stores and distributors for our consumer robots;
- the mix of products that we sell in the period;
- disruption of supply of our products from our manufacturers;
- disruptions to our supply chain due to inclement weather, labor disruptions or other factors beyond our control;
- seasonality in the sales of our products;
- the timing of new product introductions;
- unanticipated costs incurred in the introduction of new products;
- costs and availability of labor and raw materials;
- costs of freight;
- changes in our rate of returns for our consumer products;
- our ability to introduce new products and enhancements to our existing products on a timely basis; and
- warranty costs associated with our consumer products.

We cannot be certain that our revenues will grow at rates that will allow us to maintain profitability during every fiscal quarter, or even every fiscal year. We base our current and future expense levels on our internal operating plans and sales forecasts, including forecasts of holiday sales for our consumer products. A significant portion of our operating expenses, such as research and development expenses, certain marketing and promotional expenses and employee wages and salaries, do not vary directly with sales and are difficult to adjust in the short term. As a result, if sales for a quarter are below our expectations, we might not be able to reduce operating expenses for that quarter. Accordingly, a sales shortfall during a fiscal quarter, and in particular the fourth quarter of a fiscal year, could have a disproportionate effect on our operating results for that quarter or that year. Because of quarterly fluctuations, we believe that quarter-to-quarter comparisons of our operating results are not necessarily meaningful. Moreover, our operating results may not meet expectations of equity research analysts or investors. If this occurs, the trading price of our common stock could fall substantially either suddenly or over time.

*We depend on single source manufacturers, and our reputation and results of operations would be harmed if these manufacturers fail to meet our requirements.*

We currently depend largely on several single source contract manufacturers for the manufacture of certain of our products. All contract manufacturers for our current robots are located in China. These manufacturers supply substantially all of the raw materials and provide all facilities and labor required to manufacture our products. If these companies were to terminate their arrangements with us or fail to provide the required capacity and quality on a timely basis, we would be unable to manufacture our products until replacement contract manufacturing services could be obtained or volume transferred to an

11

Table of Contents

alternative manufacturing partner, each of which is a costly and time-consuming process. We cannot assure you that we would be able to establish alternative manufacturing arrangements on acceptable terms or in a timely manner.

Our reliance on these contract manufacturers involves certain risks, including the following:

- lack of direct control over production capacity and delivery schedules;
- lack of direct control over quality assurance, manufacturing yields and production costs;
- lack of enforceable contractual provisions over the production and costs of consumer products;
- risk of loss of inventory while in transit;
- risks associated with international commerce, including unexpected changes in legal and regulatory requirements, changes in tariffs and trade policies, risks associated with the protection of intellectual property and political and economic instability; and
- risks that our attempts to add additional manufacturing resources may be significantly delayed and thereby create disruptions in production of our products.

Any interruption in the manufacture of our products would be likely to result in delays in shipment, lost sales and revenue and damage to our reputation in the market, all of which would harm our business and results of operations. In addition, while our contract obligations with our contract manufacturers in China are typically denominated in U.S. dollars, changes in currency exchange rates could impact our suppliers and increase our prices.

***If we fail to maintain or increase consumer robot sales through our distribution channels, our operating results would be negatively impacted.***

We do not have long-term contracts regarding purchase volumes with any of our retail partners. As a result, purchases generally occur on an order-by-order basis, and the relationships, as well as particular orders, can generally be terminated or otherwise materially changed at any time prior to delivery, by our retail partners. A decision by a major retail partner, whether motivated by competitive considerations, financial difficulties, economic conditions or otherwise, to decrease its purchases from us, to reduce the shelf space for our products or to change its manner of doing business with us could significantly damage our consumer product sales and negatively impact our business, financial condition and results of operations. In addition, during recent years, various retailers, including some of our partners, have experienced significant changes and difficulties, including consolidation of ownership, increased centralization of purchasing decisions, restructuring, bankruptcies and liquidations. These and other financial problems of some of our retailers increase the risk of extending credit to these retailers. A significant adverse change in a retail partner relationship with us or in a retail partner's financial position could cause us to limit or discontinue business with that partner, require us to assume more credit risk relating to that partner's receivables or limit our ability to collect amounts related to previous purchases by that partner, all of which could harm our business and financial condition. Disruption of the iRobot on-line store could also decrease our consumer robot sales.

***If critical components of our products that we currently purchase from a small number of suppliers become unavailable, we may incur delays in shipment, which could damage our business.***

We and our outsourced manufacturers obtain hardware components, various subsystems, raw materials and batteries from a limited group of suppliers, some of which are sole suppliers. We do not have any long-term agreements with these suppliers obligating them to continue to sell components or products to us. If we or our outsourced manufacturers are unable to obtain components from third-party suppliers in the quantities and of the quality that we require, on a timely basis and at acceptable prices, we may not be able to deliver our products on a timely or cost-effective basis to our customers, which could cause customers to terminate their contracts with us, reduce our gross margin and seriously harm our business, results of operations and financial condition. Moreover, if any of our suppliers become financially unstable, we may have to find new suppliers. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We may experience significant delays in manufacturing and shipping our products to customers and incur additional development, manufacturing and other costs to establish alternative sources of supply if we lose any of these sources. We cannot predict if we will be able to obtain replacement components within the time frames that we require at an affordable cost, or at all.

***Cybersecurity risks could adversely affect our business and disrupt our operations.***

The threats to network and data security are increasingly diverse and sophisticated. Despite our efforts and processes to prevent breaches, our devices, as well as our servers, computer systems, and those of third parties that we use in our operations are vulnerable to cybersecurity risks, including cyber attacks such as viruses and worms, phishing attacks, denial-of-service attacks, and similar disruptions from unauthorized tampering with our servers and computer systems or those of third parties that we use in our operations, which could lead to interruptions, delays, loss of critical data, and loss of consumer confidence. In addition, we may be the target of email scams that attempt to acquire sensitive information or company assets. Despite our

12

Table of Contents

efforts to create security barriers to such threats, we may not be able to entirely mitigate these risks. Any cyber attack that attempts to obtain our data and assets, disrupt our service, or otherwise access our systems, or those of third parties we use, if successful, could adversely affect our business, operating results, and financial condition, be expensive to remedy, and damage our reputation.

### *If we suffer data breaches involving the designs, schematics or source code for our products, our brand, business and financial results could be adversely affected.*

We attempt to securely store our designs, schematics and source code for our products as they are created. A breach, whether physical, electronic or otherwise, of the systems on which this sensitive data is stored could lead to damage or piracy of our products. If we or our partners are subject to data security breaches, we may have a loss in sales or increased costs arising from the restoration or implementation of additional security measures, either of which could materially and adversely affect our brand, business and financial results.

### *We collect, store, process, and use customer data, including certain personal and robot-specific information, which subjects us to governmental regulation and other legal obligations related to privacy, information security, and data protection, and any security breaches or our actual or perceived failure to comply with such legal obligations could harm our business.*

Our latest Roomba products, as well as additional products in development, collect, store, process, and use certain customer data, which subjects us to governmental regulation and other legal obligations related to privacy, information security, and data protection, and any security breaches or our actual or perceived failure to comply with such legal obligations could harm our business. We collect, store, process, and use personal information and other user data, and we rely on third parties that are not directly under our control to do so as well. If our security measures, some of which are managed by third parties, are breached or fail, unauthorized persons may be able to obtain access to or acquire sensitive user data, which may expose us to a risk of loss, litigation, or regulatory proceedings. Depending on the nature of the information compromised, in the event of a data breach or other unauthorized access to or acquisition of our user data, we may also have obligations to notify users about the incident, and we may need to provide some form of remedy, such as a subscription to a credit monitoring service, for the individuals affected by the incident. In addition, the regulatory environment surrounding information security and privacy is increasingly demanding, with frequent imposition of new and changing requirements. For example, the European Union's General Data Protection Regulation (GDPR), which will become effective in May 2018, imposes significant new requirements on how we collect, process and transfer personal data, as well as significant fines for non-compliance. Compliance with changes in privacy and information security laws and standards may result in significant expense due to increased investment in technology and the development of new operational processes. Moreover, a growing number of legislative and regulatory bodies have adopted consumer notification requirements in the event of unauthorized access to or acquisition of certain types of personal data. Such breach notification laws continue to evolve and may be inconsistent from one jurisdiction to another. Complying with these obligations could cause us to incur substantial costs and could increase negative publicity surrounding any incident that compromises user data.

### *Acquisitions and potential future acquisitions may be difficult to integrate, divert the attention of key personnel, disrupt our business, dilute stockholder value and impair our financial results.*

As part of our business strategy, we have recently acquired, and we intend to continue to consider additional acquisitions of companies, technologies and products that we believe could accelerate our ability to compete in our core markets or allow us to enter new markets. For example, in April 2017, we acquired the iRobot-related distribution business of Sales On Demand Corporation (SODC), a privately-held corporation based in Tokyo, Japan, and in October 2017, we acquired Robopolis SAS (Robopolis), a privately-held corporation distributing iRobot products in seven European countries.

Acquisitions and combinations are accompanied by a number of risks, including the difficulty of integrating the operations and personnel of the acquired companies, the potential disruption of our ongoing business, the potential distraction of management, potential difficulty in managing and maintaining key customer relationships, expenses related to the acquisition and potential unknown liabilities associated with acquired businesses. Any inability to integrate completed acquisitions or combinations in an efficient and timely manner could have an adverse impact on our results of operations. In addition, we may not be able to recognize any expected synergies or benefits in connection with our recently completed acquisitions of SODC or Robopolis or any future acquisitions or combinations. If we are not successful in completing acquisitions or combinations that we may pursue in the future, we may incur substantial expenses and devote significant management time and resources without a successful result. In addition, future acquisitions could require use of substantial portions of our available cash or result in dilutive issuances of securities.

Table of Contents

*Our service providers may experience business interruptions, delays, or quality control issues, which may negatively impact our business and operating results.*

As we expand our operations, we expect to use additional enterprise resource planning systems and account and technology service providers that may also be essential to managing our business. Our ability to manage our business would suffer if one or more of our providers suffer an interruption in their business, or experience delays, disruptions or quality control problems in their operations, or we have to change or add systems and services. While we conduct reasonable diligence on our service providers, we may not always be able to control the quality of the systems and services we receive from these providers, which could impair our ability to maintain appropriate internal controls over financial reporting and complete timely and accurate financial reporting, and may impact our business, operating results and financial condition.

*Our valuation estimates for our recently completed and future acquisitions are based upon assumptions that may differ from actual results.*

Charges to earnings as a result of acquisitions may adversely affect our operating results in the foreseeable future, which could have a material and adverse effect on the market value of our common stock. In particular, we have allocated the cost of acquiring businesses to the individual assets acquired and liabilities assumed, including various identifiable intangible assets such as acquired technology, acquired trade names and acquired customer relationships based on their respective fair values. Our estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain. After we complete an acquisition, the following factors could result in material charges and adversely affect our operating results and may adversely affect our cash flows:

- costs incurred to combine the operations of businesses we acquire, such as transitional employee expenses and employee retention, redeployment or relocation expenses;
- impairment of goodwill or intangible assets;
- amortization of intangible assets acquired;
- a reduction in the useful lives of intangible assets acquired;
- identification of or changes to assumed contingent liabilities, both income tax and non-income tax related after our final determination of the amounts for these contingencies or the conclusion of the measurement period (generally up to one year from the acquisition date), whichever comes first;
- charges to our operating results to eliminate certain duplicative pre-merger activities, to restructure our operations or to reduce our cost structure; and
- charges to our operating results resulting from expenses incurred to effect the acquisition.

*If we are unable to attract and retain additional skilled personnel, we may be unable to grow our business.*

To execute our growth plan, we must attract and retain additional, highly-qualified personnel. Competition for hiring these employees is intense, especially with regard to engineers with high levels of experience in designing, developing and integrating robots and engineers with expertise in artificial intelligence, machine learning and cloud applications. Many of the companies with which we compete for hiring experienced employees have greater resources than we have. If we fail to attract new technical personnel or fail to retain and motivate our current employees, our business and future growth prospects could be severely harmed.

*We depend on the experience and expertise of our senior management team and key technical employees, and the loss of any key employee may impair our ability to operate effectively.*

Our success depends upon the continued services of our senior management team and key technical employees, such as our project management personnel and senior engineers. Each of our executive officers, key technical personnel and other employees could terminate his or her relationship with us at any time. The loss of any member of our senior management team might significantly delay or prevent the achievement of our business objectives and could materially harm our business and customer relationships. In addition, because of the highly technical nature of our robots, the loss of any significant number of our existing engineering and project management personnel could have a material adverse effect on our business and operating results.

*If we fail to protect, or incur significant costs in defending, our intellectual property and other proprietary rights, our business and results of operations could be materially harmed.*

Our success depends on our ability to protect our intellectual property and other proprietary rights. We rely primarily on patents, trademarks, copyrights, trade secrets and unfair competition laws, as well as license agreements and other contractual provisions, to protect our intellectual property and other proprietary rights. Significant technology used in our products,

14

Table of Contents

however, is not the subject of any patent protection, and we may be unable to obtain patent protection on such technology in the future. Moreover, existing U.S. legal standards relating to the validity, enforceability and scope of protection of intellectual property rights offer only limited protection, may not provide us with any competitive advantages, and may be challenged by third parties. In addition, the laws of countries other than the United States in which we market our products may afford little or no effective protection of our intellectual property. Patents which may be granted to us in certain foreign countries may be subject to opposition proceedings brought by third parties or result in suits by us, which may be costly and result in adverse consequences for us. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing upon or misappropriating our intellectual property or otherwise gaining access to our technology. Unauthorized third parties may try to copy or reverse engineer our products or portions of our products or otherwise obtain and use our intellectual property. If we fail to protect our intellectual property and other proprietary rights, our business, results of operations or financial condition could be materially harmed.

In addition, defending our intellectual property rights may entail significant expense. We believe that certain products in the marketplace may infringe our existing intellectual property rights. We have, from time to time, resorted to legal proceedings to protect our intellectual property and may continue to do so in the future. For example, in 2017 we initiated a multi-party litigation at the U.S. International Trade Commission as well as in federal district court in Massachusetts based on claims of patent infringement. There is no guarantee that we will prevail on these or other patent infringement claims against third parties. We may be required to expend significant resources to monitor and protect our intellectual property rights. In addition, any of our intellectual property rights may be challenged by others or invalidated through administrative processes or litigation. If we resort to legal proceedings to enforce our intellectual property rights or to determine the validity and scope of the intellectual property or other proprietary rights of others, the proceedings could result in significant expense to us and divert the attention and efforts of our management and technical employees, even if we were to prevail.

### *We may be sued by third parties for alleged infringement of their proprietary rights, which could be costly, time-consuming and limit our ability to use certain technologies in the future.*

We are currently defending multiple lawsuits based on claims of patent infringement. If the size of our markets increases, we would be more likely to be subject to claims that our technologies infringe upon the intellectual property or other proprietary rights of third parties. In addition, the vendors from which we license technology used in our products could become subject to similar infringement claims. Our vendors, or we, may not be able to withstand third-party infringement claims. Any claims, with or without merit, could be time-consuming and expensive, and could divert our management's attention away from the execution of our business plan. Moreover, any settlement or adverse judgment resulting from the claim could require us to pay substantial amounts or obtain a license to continue to use the technology that is the subject of the claim, or otherwise restrict or prohibit our use of the technology. There can be no assurance that we would be able to obtain a license from the third party asserting the claim on commercially reasonable terms, if at all, that we would be able to develop alternative technology on a timely basis, if at all, or that we would be able to obtain a license to use a suitable alternative technology to permit us to continue offering, and our customers to continue using, our affected product. In addition, we may be required to indemnify our retail and distribution partners for third-party intellectual property infringement claims, which would increase the cost to us of an adverse ruling in such a claim. An adverse determination could also prevent us from offering our products to others. Infringement claims asserted against us or our vendors may have a material adverse effect on our business, results of operations or financial condition.

### *Global economic conditions and any associated impact on consumer spending could have a material adverse effect on our business, results of operations and financial condition.*

Continued economic uncertainty and reductions in consumer spending, particularly in certain international markets such as the European Union, China and Japan, may result in reductions in sales of our consumer robots. Additionally, disruptions in credit markets may materially limit consumer credit availability and restrict credit availability of our retail customers, which would also impact purchases of our consumer robots. Any reduction in sales of our consumer robots, resulting from reductions in consumer spending or continued disruption in the availability of credit to retailers or consumers, could materially and adversely affect our business, results of operations and financial condition.

Because we are an increasingly global business that in the years ended December 30, 2017, December 31, 2016 and January 2, 2016 generated approximately 48.8%, 51.2% and 56.0%, respectively, of our total revenue from sales to customers outside of the United States, we are subject to a number of additional risks including foreign currency fluctuations. These risks are magnified with our expanding global presence as a result of our recent acquisitions of SODC and Robopolis. These foreign currency fluctuations may make our products more expensive to our distributors, which in turn may impact sales directly or the ability or willingness of our distribution partners to invest in growing product demand.

Our primary exposure to movements in foreign currency exchange rates relates to non-U.S. dollar denominated sales and operating expenses worldwide. Weakening of foreign currencies relative to the U.S. dollar could adversely affect the U.S. dollar value of our foreign currency-denominated sales and earnings, and lead us to raise international pricing, which may reduce

15

Table of Contents

demand for our products. In some circumstances, for competitive or other reasons, we may decide not to raise local prices to fully offset the strengthening of the U.S. dollar, or for any other reason, which would adversely affect the U.S. dollar value of our foreign currency denominated sales and earnings. Conversely, a strengthening of foreign currencies relative to the U.S. dollar, while generally beneficial to our foreign currency-denominated sales and earnings, could cause us to reduce international pricing, incur losses on our foreign currency derivative instruments, and incur increased operating expenses, thereby limiting any benefit. Additionally, strengthening of foreign currencies may also increase our cost of product components denominated in those currencies, thus adversely affecting gross margins.

We use derivative instruments, such as foreign currency forward contracts, to hedge certain exposures to fluctuations in foreign currency exchange rates. The use of such hedging activities may not offset any, or more than a portion, of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place. In addition, our counterparties may be unable to meet the terms of the agreements. We seek to mitigate this risk by limiting counterparties to major financial institutions and by spreading the risk across several major financial institutions.

### *We are subject to a variety of U.S. and foreign laws and regulations that are central to our business; our failure to comply with these laws and regulations could harm our business or our operating results.*

We are or may become subject to a variety of laws and regulations in the United States and abroad that involve matters central to our business, including laws and regulations regarding consumer protection, advertising, electronic commerce, intellectual property, manufacturing, anti-bribery and anti-corruption, and economic or other trade prohibitions or sanctions.

The increasingly global nature of our business operations subjects us to domestic and foreign laws and regulations such as the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act, and similar anti-bribery and anti-corruption laws in other jurisdictions. Our products are also subject to U.S. export controls, including the U.S. Department of Commerce's Export Administration Regulations and various economic and trade sanctions regulations established by the Treasury Department's Office of Foreign Assets Controls. Given the increasing number of foreign laws to which we are subject and the high level of complexity of these laws, there is a risk that some provisions may be inadvertently breached by us or by our subsidiaries, for example through fraudulent or negligent behavior of individual employees, our failure to comply with certain formal documentation requirements, or otherwise. If we incur liability for noncompliance under these laws or regulations, we may be forced to implement new measures to reduce our exposure to this liability. This may require us to expend substantial resources or to discontinue certain products or services, which would negatively affect our business, financial condition, and operating results. In addition, any negative publicity directed to us as a result of lawsuits, regulatory proceedings, and legislative proposals could harm our brand or otherwise impact the growth of our business. Any costs incurred as a result of compliance efforts or other liabilities under these laws or regulations could harm our business and operating results.

### *Environmental laws and regulations and unforeseen costs could negatively impact our future earnings.*

The manufacture and sale of our products in certain states and countries may subject us to environmental and other regulations. We also face increasing complexity in our product design as we adjust to legal and regulatory requirements relating to our products. There is no assurance that such existing laws or future laws will not impair future earnings or results of operations.

### *Business disruptions resulting from international uncertainties could negatively impact our profitability.*

We derive, and expect to continue to derive, a significant portion of our revenue from international sales in various European and Far East markets, and Canada, particularly following our acquisitions of SODC and Robopolis. For the fiscal years ended December 30, 2017, December 31, 2016 and, January 2, 2016, sales to non-U.S. customers accounted for 48.8%, 51.2% and 56.0% of total revenue, respectively. We expect that international revenues will continue to account for a significant percentage of our revenues for the foreseeable future. Our international revenue and operations are subject to a number of material risks, including, but not limited to:

- difficulties in staffing, managing and supporting operations in multiple countries;
- difficulties in enforcing agreements and collecting receivables through foreign legal systems and other relevant legal issues;
- fewer legal protections for intellectual property;
- foreign and U.S. taxation issues, tariffs, and international trade barriers;
- difficulties in obtaining any necessary governmental authorizations for the export of our products to certain foreign jurisdictions;
- potential fluctuations in foreign economies;
- government currency control and restrictions on repatriation of earnings;

16

Table of Contents

- fluctuations in the value of foreign currencies and interest rates;
- general economic and political conditions in the markets in which we operate;
- domestic and international economic or political changes, hostilities and other disruptions in regions where we currently operate or may operate in the future;
- changes in foreign currency exchange rates;
- different and changing legal and regulatory requirements in the jurisdictions in which we currently operate or may operate in the future; and
- our relationships with international distributors, some of whom may be operating without written contracts.

Negative developments in any of these areas in one or more countries could result in a reduction in demand for our products, the cancellation or delay of orders already placed, threats to our intellectual property, difficulty in collecting receivables, and a higher cost of doing business, any of which could negatively impact our business, financial condition or results of operations. Moreover, our sales, including direct sales to customers outside the United States, are primarily denominated in U.S. dollars, and downward fluctuations in the value of foreign currencies relative to the U.S. dollar may make our products more expensive than other products, which could harm our business.

Moreover, the United Kingdom (UK) held a referendum on June 23, 2016 in which a majority of voters voted to exit the European Union (EU). Due to the unprecedented nature of the proposed withdrawal, significant uncertainty exists surrounding the timing and terms of the proposed exit. We have operations in the UK and business activities in several EU member states whose currencies, namely British Pound Sterling and Euro, economies, taxation, and trade regulation, among other factors, could be adversely impacted by the negotiations and outcomes of the UK's leaving the EU, which is likely to be a lengthy and complicated process. While we do not anticipate near term adverse effects on business operations, these events could have a material adverse effect on our business operations, results of operations and financial condition over time.

***If we experience a disaster or other business continuity problem, we may not be able to recover successfully, which could cause material financial loss, loss of human capital, regulatory actions, reputational harm, or legal liability.***

If we experience a local or regional disaster or other business continuity problem, such as an earthquake, terrorist attack, pandemic or other natural or man-made disaster, our continued success will depend, in part, on the availability of our personnel, our office facilities, and the proper functioning of our computer, telecommunication and other related systems and operations. As we grow our operations in new geographic regions, the potential for particular types of natural or man-made disasters, political, economic or infrastructure instabilities, or other country- or region-specific business continuity risks increases.

***The effects of regulations relating to conflict minerals may adversely affect our business.***

On August 22, 2012, under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the SEC adopted new requirements for companies that use certain minerals and metals, known as conflict minerals, in their products, whether or not these products are manufactured by third parties. These requirements require companies to research, disclose and report whether or not such minerals originate from the Democratic Republic of Congo and adjoining countries. The implementation of these requirements could adversely affect the sourcing, availability and pricing of such minerals if they are found to be used in the manufacture of our products. In addition, we continue to incur additional costs to comply with the disclosure requirements, including costs related to determining the source of any of the relevant minerals and metals used in our products. Since our supply chain is complex, we may not be able to sufficiently verify the origins for these minerals and metals used in our products through the due diligence procedures that we implement, which may harm our reputation. In such event, we may also face difficulties in satisfying customers who require that all of the components of our products are certified as conflict mineral free.

***Our income tax provision and other tax liabilities may be insufficient if taxing authorities are successful in asserting tax positions that are contrary to our position. Additionally, there is no guarantee that we will realize our deferred tax assets.***

From time to time, we are audited by various federal, state, local and foreign authorities regarding income tax matters. Significant judgment is required to determine our provision for income taxes and our liabilities for federal, state, local and foreign taxes. Although we believe our approach to determining the appropriate tax treatment is supportable and in accordance with relevant authoritative guidance it is possible that a tax authority will take a final tax position that is materially different than that which is reflected in our income tax provision. Such differences could have a material adverse effect on our income tax provision or benefit, in the reporting period in which such determination is made and, consequently, on our results of operations, financial position and/or cash flows for such period.

The realization of our deferred tax assets ultimately depends on the existence of sufficient income in either the carryback or carryforward periods under the tax law. Due to significant estimates utilized in establishing a valuation allowance and the potential for changes in facts and circumstances, it is possible that we will be required to record a valuation allowance in future

Table of Contents

reporting periods. Our results of operations would be impacted negatively if we determine that a deferred tax asset valuation allowance is required in a future reporting period.

### *The effect of comprehensive U.S. tax reform legislation on us, whether adverse or favorable, is uncertain.*

On December 22, 2017, President Trump signed into law H.R. 1, "An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018" (informally titled the "Tax Cuts and Jobs Act"). Among a number of significant changes to the U.S. federal income tax rules, the Tax Cuts and Jobs Act (the "Act") reduces the marginal U.S. corporate income tax rate from 35% to 21%, limits the deduction for net interest expense, limits the deduction for net operating losses and eliminates net operating loss carrybacks, modifies or repeals many business deductions and credits, shifts the United States toward a more territorial tax system, and imposes new taxes to combat erosion of the U.S. federal income tax base. Our net deferred tax assets and liabilities will be revalued at the newly enacted U.S. corporate rate, and the impact will be recognized in our tax expense in the year of enactment. We continue to examine the impact this tax reform legislation may have on our business. However, the effect of the Tax Cuts and Jobs Act on us and our affiliates, whether adverse or favorable, is uncertain, and may not become evident for some period of time.

### *Provisions in our certificate of incorporation and by-laws or Delaware law might discourage, delay or prevent a change of control of our company or changes in our management and, therefore, depress the trading price of our common stock.*

Provisions of our certificate of incorporation and by-laws and Delaware law may discourage, delay or prevent a merger, acquisition or other change in control that stockholders may consider favorable, including transactions in which you might otherwise receive a premium for your shares of our common stock. These provisions may also prevent or frustrate attempts by our stockholders to replace or remove our management. These provisions include:

- limitations on the removal of directors;
- a classified board of directors so that not all members of our board are elected at one time;
- advance notice requirements for stockholder proposals and nominations;
- the inability of stockholders to act by written consent or to call special meetings;
- the ability of our board of directors to make, alter or repeal our by-laws; and
- the ability of our board of directors to designate the terms of and issue new series of preferred stock without stockholder approval.

The affirmative vote of the holders of at least 75% of our shares of capital stock entitled to vote is necessary to amend or repeal the above provisions of our certificate of incorporation. In addition, absent approval of our board of directors, our by-laws may only be amended or repealed by the affirmative vote of the holders of at least 75% of our shares of capital stock entitled to vote.

In addition, Section 203 of the Delaware General Corporation Law prohibits a publicly-held Delaware corporation from engaging in a business combination with an interested stockholder, generally a person which together with its affiliates owns, or within the last three years has owned, 15% of our voting stock, for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner.

The existence of the foregoing provisions and anti-takeover measures could limit the price that investors might be willing to pay in the future for shares of our common stock. They could also deter potential acquirers of our company, thereby reducing the likelihood that you could receive a premium for your common stock in an acquisition.

### *If significant tariffs or other restrictions are placed on Chinese imports or any related counter-measures are taken by China, our revenues and results of operations may be materially harmed.*

The current U.S. administration has signaled it may alter trade agreements and terms between China and the United States, including limiting trade with China and/or imposing a tariff on imports from China. If any such restrictions or tariffs are imposed on products that we import to our customers, we would be required to raise our prices which may result in the loss of customers and harm our business.

### *Our products are complex and could have unknown defects or errors, which may give rise to claims against us, diminish our brand or divert our resources from other purposes.*

Our robots rely on the interplay among behavior-based artificially intelligent systems, real-world dynamic sensors, user-friendly interfaces and tightly-integrated, electromechanical designs to accomplish their missions. Despite testing, our new or existing products have contained defects and errors and may in the future contain defects, errors or performance problems when first introduced, when new versions or enhancements are released, or even after these products have been used by our customers

18

Table of Contents

for a period of time. These problems could result in expensive and time-consuming design modifications or warranty charges, delays in the introduction of new products or enhancements, significant increases in our service and maintenance costs, exposure to liability for damages, mandatory or voluntary recall or product upgrades, damaged customer relationships and harm to our reputation, any of which could materially harm our results of operations and ability to achieve market acceptance. Our quality control procedures relating to the raw materials and components that it receives from third-party suppliers as well as our quality control procedures relating to its products after those products are designed, manufactured and packaged may not be sufficient. In addition, increased development and warranty costs, including the costs of any mandatory or voluntary recall, could be substantial and could reduce our operating margins. The existence of any defects, errors, or failures in our products could also lead to product liability claims or lawsuits against us. A successful product liability claim could result in substantial cost, diminish our brand and divert management's attention and resources, which could have a negative impact on our business, financial condition and results of operations.

### *We spend significant amounts on advertising and other marketing campaigns, which may not be successful or cost effective.*

We spend significant amounts on advertising and other marketing campaigns, such as television, print advertising, and social media, as well as increased promotional activities, to acquire new customers, and we expect our marketing expenses to increase in the future as we continue to spend significant amounts to increase awareness of our consumer robot products. For the years ended December 30, 2017, December 31, 2016 and January 2, 2016, sales and marketing expenses were $162.1 million, $115.1 million and $97.8 million, respectively, representing approximately 18.3%, 17.4%, and 15.9% of our revenue, respectively. While we seek to structure our advertising campaigns in the manner that we believe is most likely to encourage people to purchase our products, we may fail to identify advertising opportunities that satisfy our anticipated return on advertising spend as we scale our investments in marketing or to fully understand or estimate the conditions and behaviors that drive customer behavior. If any of our advertising campaigns prove less successful than anticipated in attracting customers, we may not be able to recover our advertising spend, and our revenue may fail to meet market expectations, either of which could have an adverse effect on our business. There can be no assurance that our advertising and other marketing efforts will result in increased sales of our products.

### *We may not be able to obtain capital when desired on favorable terms, if at all, or without dilution to our stockholders.*

We anticipate that our current cash, cash equivalents, cash provided by operating activities and funds available through our working capital line of credit, will be sufficient to meet our current and anticipated needs for general corporate purposes. We operate in an emerging technology market, however, which makes our prospects difficult to evaluate. It is possible that we may not generate sufficient cash flow from operations or otherwise have the capital resources to meet our future capital needs. In such cases we may need additional financing to execute on our current or future business strategies. If we raise additional funds through the issuance of equity or convertible debt securities, the percentage ownership of our stockholders could be significantly diluted, and these newly-issued securities may have rights, preferences or privileges senior to those of existing stockholders. We cannot assure you that additional financing will be available on terms favorable to us, or at all. If adequate funds are not available or are not available on acceptable terms, if and when needed, our ability to fund our operations, take advantage of unanticipated opportunities, develop or enhance our products, or otherwise respond to competitive pressures would be significantly limited. In addition, our access to credit through our working capital line of credit may be limited by the restrictive financial covenants contained in that agreement, which require us to maintain profitability.

## ITEM 1B. *UNRESOLVED STAFF COMMENTS*

None.

## ITEM 2. *PROPERTIES*

Our corporate headquarters are located in Bedford, Massachusetts, where we lease approximately 209,000 square feet. This lease expires on April 30, 2030. We also lease smaller facilities around the world. We believe that our leased facilities and additional or alternative space available to us will be adequate to meet our needs for the foreseeable future.

## ITEM 3. *LEGAL PROCEEDINGS*

From time to time and in the ordinary course of business, we are subject to various claims, charges and litigation. The outcome of litigation cannot be predicted with certainty and some lawsuits, claims or proceedings may be disposed of unfavorably to us, which could materially affect our financial condition or results of operations.

## ITEM 4. *MINE SAFETY DISCLOSURES*

Not Applicable.

Table of Contents

**PART II**

**ITEM 5.**      *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

Our common stock is listed on The Nasdaq Global Select Market under the symbol "IRBT". The following table sets forth, for the periods indicated, the high and low sales prices per share for our common stock as reported on The Nasdaq Global Select Market.

|  | High | | Low | |
|---|---|---|---|---|
| **Fiscal 2016:** | | | | |
| First quarter | $ | 36.00 | $ | 28.02 |
| Second quarter | $ | 39.00 | $ | 33.90 |
| Third quarter | $ | 44.67 | $ | 34.27 |
| Fourth quarter | $ | 60.86 | $ | 42.06 |
| **Fiscal 2017:** | | | | |
| First quarter | $ | 66.24 | $ | 52.12 |
| Second quarter | $ | 104.61 | $ | 65.00 |
| Third quarter | $ | 109.78 | $ | 72.63 |
| Fourth quarter | $ | 81.93 | $ | 62.96 |

As of February 12, 2018, there were approximately 27,945,275 shares of our common stock outstanding held by approximately 150 stockholders of record and the last reported sale price of our common stock on The Nasdaq Global Select Market on February 12, 2018 was $61.58 per share.

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock. We currently expect to retain future earnings, if any, to finance the growth and development of our business and we do not anticipate paying any cash dividends in the foreseeable future.

20

Table of Contents

**ITEM 6.** *SELECTED FINANCIAL DATA*

The following selected consolidated financial data are derived from the audited financial statements of the Company, and should be read in conjunction with our consolidated financial statements, the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Annual Report on Form 10-K. The historical results are not necessarily indicative of the results of future operations.

| | Year Ended | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | | December 27, 2014 | | December 28, 2013 |
| | (In thousands, except earnings per share amounts) | | | | | | | | |
| **Consolidated Statements of Income:** | | | | | | | | | |
| Total revenue | $ | 883,911 | $ | 660,604 | $ | 616,778 | $ | 556,846 | $ 487,401 |
| Gross margin | | 433,159 | | 319,315 | | 288,926 | | 258,055 | 221,154 |
| Operating income | | 72,690 | | 57,557 | | 60,618 | | 53,117 | 32,618 |
| Income tax expense | | 25,402 | | 19,422 | | 18,841 | | 14,606 | 4,774 |
| Net income | | 50,964 | | 41,939 | | 44,130 | | 37,803 | 27,641 |
| **Net Income Per Share Data:** | | | | | | | | | |
| Basic | $ | 1.85 | $ | 1.51 | $ | 1.49 | $ | 1.28 | $ 0.97 |
| Diluted | $ | 1.77 | $ | 1.48 | $ | 1.47 | $ | 1.25 | $ 0.94 |
| **Shares Used In Per Common Share Calculations:** | | | | | | | | | |
| Basic | | 27,611 | | 27,698 | | 29,550 | | 29,485 | 28,495 |
| Diluted | | 28,753 | | 28,292 | | 30,107 | | 30,210 | 29,354 |
| **Consolidated Balance Sheet Data:** | | | | | | | | | |
| Cash and cash equivalents | $ | 128,635 | $ | 214,523 | $ | 179,915 | $ | 185,957 | $ 165,404 |
| Short term investments | | 37,225 | | 39,930 | | 33,124 | | 36,166 | 21,954 |
| Total assets | | 691,522 | | 507,912 | | 521,743 | | 493,213 | 416,337 |
| Total liabilities | | 221,195 | | 118,956 | | 104,332 | | 102,777 | 85,648 |
| Total stockholders' equity | | 470,327 | | 388,956 | | 417,411 | | 390,436 | 330,689 |

**ITEM 7.**       *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*The information contained in this section has been derived from our consolidated financial statements and should be read together with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities and Exchange Act of 1934, as amended, or the Exchange Act, and are subject to the "safe harbor" created by those sections. In particular, statements contained in this Annual Report on Form 10-K that are not historical facts, including, but not limited to statements concerning new product sales, product development and offerings, our consumer robots, our competition, our strategy, our market position, market acceptance of our products, seasonal factors, the impact of our recent acquisitions of SODC and Robopolis, revenue recognition, our profits, growth of our revenues, composition of our revenues, our cost of revenues, units shipped, average selling prices, operating expenses, selling and marketing expenses, general and administrative expenses, research and development expenses, and compensation costs, our projected income tax rate, our credit and letter of credit facilities, our valuations of investments, valuation and composition of our stock-based awards, and liquidity, constitute forward-looking statements and are made under these safe harbor provisions. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "should," "could," "seek," "intends," "plans," "estimates," "anticipates," or other comparable terms. Forward-looking statements involve inherent risks and uncertainties, which could cause actual results to differ materially from those in the forward-looking statements. We urge you to consider the risks and uncertainties discussed in greater detail under the heading "Risk Factors" in evaluating our forward-looking statements. We have no plans to update our forward-looking statements to reflect events or circumstances after the date of this report. We caution readers not to place undue reliance upon any such forward-looking statements, which speak only as of the date made.*

Table of Contents

**Overview**

iRobot designs and builds robots that empower people to do more both inside and outside of the home. The Company's consumer robots help people find smarter ways to clean and accomplish more in their daily lives. iRobot's portfolio of solutions features proprietary technologies for the connected home and advanced concepts in cleaning, mapping and navigation, human-robot interaction and physical solutions. For more than 25 years, we have been a pioneer in the robotics and consumer products industries. We sell our robots through a variety of distribution channels, including chain stores and other national retailers, through our on-line store, and through value-added distributors and resellers worldwide.

Over the past sixteen years, we have sold more than 20 million consumer robots worldwide. During 2016, we took several steps to become more focused on our well established consumer robots business and capitalize on the substantial opportunities available to us within consumer markets. We completed the sale of our defense and security business unit in April 2016. In addition, we reallocated all of the research and development resources from our remote presence business to our consumer business during the first quarter of 2016, and exited the remote presence business during the second quarter of 2016. These actions were taken to solidify our position as the leader in diversified consumer robots and to focus on key technologies, with an emphasis on software, that allow our robots to understand the homes in which they operate. It is our intent to continue investing in these critical technologies and the economic opportunities they unlock.

During 2017, we continued to expand our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC) based in Tokyo, Japan for approximately $16.6 million in cash. The acquisition of SODC will better enable us to maintain our leadership position and accelerate the growth of our business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. It also expands our presence and customer outreach opportunities in Japan. Additionally, on October 2, 2017, we acquired our largest European distributor, Robopolis SAS, a French company (Robopolis) for approximately $170.1 million in cash, which was offset by acquired cash held by Robopolis and its subsidiaries, resulting in a net cash outlay of approximately $132.1 million. We anticipate that this acquisition will enhance our distribution network, ensure global brand consistency and better serve the needs of European consumers. We expect to drive continued growth in global markets through a consistent approach to all market activities including sales, marketing, branding, channel relationships and customer service. Both acquisitions provide us with more direct control over the go-to-market execution in these key regions.

As of December 30, 2017, we had 920 full-time employees. We have developed expertise in the disciplines necessary to build durable, high-performance and cost-effective robots through the close integration of software, electronics and hardware. Our core technologies serve as reusable building blocks that we adapt and expand to develop next generation and new products, reducing the time, cost and risk of product development. Our significant expertise in robot design and engineering positions us to capitalize on the growth we expect in the market for robot-based consumer products.

Our continued success depends upon our ability to respond to a number of future challenges. We believe the most significant of these include increasing competition, and our ability to successfully develop and introduce products and product enhancements into both new and existing markets.

We also achieved a number of significant milestones over the past two years that we believe will assist us in continuing to generate profitable growth and enhance value for our shareholders. In particular, in 2016, we successfully launched Roomba 960, our second 900 series Roomba, that extends mapping, visual navigation and cloud connectivity to a wider range of customers. We also launched the Braava jet mopping robot, with precision jet spray and vibrating cleaning head, focused on expanding our wet floor care business. Both the Roomba 900 series and Braava jet are significantly more complex products, delivering enhanced performance enabled by software. The iRobot HOME App, compatible with both the Roomba 900 series and Braava jet, helps users get the most out of their experience by allowing them to choose the appropriate cleaning options for their unique home. We also announced a relationship with Amazon Web Services, or AWS, that we believe will enable iRobot to address significant opportunities within our consumer business and the connected home. AWS Cloud is a managed cloud solution that enables connected devices to interact easily and securely with cloud applications and other devices. The AWS Cloud will enable iRobot to scale the number of connected robots it supports globally and allow for increased capabilities in the Smart Home. Additionally, we implemented new Roomba marketing programs in the United States that resulted in a significant return on our investment and which we plan to leverage as part of our strategy to accelerate growth in international markets. In 2017, we launched Roomba 690 and 890, extending Wi-Fi connectivity to the entire Roomba line. In addition, we launched several connected product features, including push notifications, Clean Map Reports and integrations with Amazon Alexa, Google Assistant and IFTTT platform technology.

Our total revenue for 2017 was $883.9 million, which represents a 33.8% increase from 2016 revenue of $660.6 million. Domestic consumer robots revenue grew $133.2 million primarily due to increased sales as a result of significant investments in advertising media and national promotions as well as the strength of the Roomba 900 series and Roomba 600 series.

Table of Contents

International consumer robots revenue grew by $94.6 million in 2017 with increases in most markets, offset by a decline in China.

### *Fiscal Periods*

We operate and report using a 52-53 week fiscal year ending on the Saturday closest to December 31. Accordingly, our fiscal quarters will end on the Saturday that falls closest to the last day of the third month of each quarter.

### Critical Accounting Policies and Estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, revenue and expenses and the disclosure of contingent assets and liabilities in the consolidated financial statements. These estimates and judgments, include but are not limited to, revenue recognition (specifically sales returns and other allowances); valuation of goodwill and acquired intangible assets; accounting for business combinations; evaluating loss contingencies; and accounting for income taxes and related valuation allowances. We base these estimates and judgments on historical experience, market participant fair value considerations, projected future cash flows and various other factors that we believe are reasonable under the circumstances. Actual results may differ from our estimates.

We believe that of our significant accounting policies, which are described in the notes to our consolidated financial statements, the following accounting policies involve a greater degree of judgment and complexity. Accordingly, we believe that the following accounting policies are the most critical to aid in fully understanding and evaluating our consolidated financial condition and results of operations.

### *Revenue Recognition*

We primarily derive our revenue from product sales. Until the divestiture of the defense and security business unit in April 2016 (see Note 4), we also generated minimal revenue from government and commercial research and development contracts. We sell products directly to customers and indirectly through resellers and distributors. We recognize revenue from sales of robots under the terms of the customer agreement upon transfer of title and risk of loss to the customer, net of estimated returns and allowances, provided that collection is determined to be reasonably assured and no significant obligations remain.

Beginning in the third quarter of 2015, we introduced our first connected robot. Each sale of a connected robot represents a multiple-element arrangement containing the robot, an app and potential future unspecified software upgrades. Revenue is allocated to the deliverables based on their relative selling prices which have been determined using best estimate of selling price (BESP), as we have not been able to establish vendor specific objective evidence (VSOE) or obtain relevant third party evidence (TPE). Revenue allocated to the app and unspecified software upgrades is then deferred and recognized on a straight-line basis over the period in which we expect to provide the upgrades, which is the estimated life of the robot.

Sales to retailers of consumer robots are typically subject to agreements allowing for limited rights of return, rebates and price protection. We also provide limited rights of returns for direct-to-consumer sales generated through our on-line stores and certain international distributors. Accordingly, we reduce revenue for our estimates of liabilities for these rights of return, rebates and price protection, as well as discounts and promotions, at the time the related sale is recorded. The estimates for rights of return are directly based on specific terms and conditions included in the customer agreements, historical returns experience and various other assumptions that we believe are reasonable under the circumstances. In the case of new product introductions, the estimates for returns applied to the new products are based upon the estimates for the most similar predecessor products until such time that we have enough actual returns experience for the new products, which is typically two holiday return cycles. At that time, we incorporate that data into the development of returns estimates for the new products. We update our analysis of returns on a quarterly basis. If actual returns differ significantly from our estimates, or if modifications to individual customer agreements are entered into that impact their rights of returns, such differences could result in an adjustment to previously established reserves and could have a material impact, either favorably or unfavorably, on our results of operations for the period in which the actual returns become known or the agreement is modified. In 2016, we began selling to one domestic distributor under an agreement that provides product return privileges. As a result, we recognize revenue from sales to this distributor when the product is resold by the distributor. The estimates and adjustments for rebates and price protection are based on specific programs, expected usage and historical experience. Actual results could differ from these estimates. As of December 30, 2017, we have reserves for product returns of $42.7 million, discounts and promotions of $58.2 million and price protection of $3.1 million. As of December 31, 2016, we had reserves for product returns of $27.7 million, discounts and promotions of $22.1 million and price protection of $1.5 million.

Prior to our divestiture of the defense and security business unit in April 2016 (see Note 4), we generated minimal revenue from government contracts. Under cost-plus-fixed-fee (CPFF) type contracts, we recognized revenue based on costs incurred plus a pro rata portion of the total fixed fee. Costs incurred included labor and material that were directly associated with individual CPFF contracts plus indirect overhead and general and administrative type costs based upon billing rates we

23

Table of Contents

submitted to the Defense Contract Management Agency (DCMA). Annually, we submitted final indirect billing rates to DCMA based upon actual costs incurred throughout the year. In the situation where our final actual billing rates are greater than the estimated rates used, we record a cumulative revenue adjustment in the period in which the rate differential is collected from the customer. These final billing rates are subject to audit by the Defense Contract Audit Agency (DCAA), which can occur several years after the final billing rates are submitted and may result in material adjustments to revenue recognized based on estimated final billing rates. As of December 30, 2017, fiscal year 2016 is open for audit by DCAA. In the situation where our anticipated actual billing rates will be lower than the provisional rates used, we record a cumulative revenue adjustment in the period in which the rate differential is identified. Revenue on firm fixed price (FFP) contracts was recognized using the percentage-of-completion method. For government product FFP contracts, revenue was recognized as the product was shipped or in accordance with the contract terms. Costs and estimated gross margins on contracts were recorded as revenue as work was performed based on the percentage that incurred costs compared to estimated total costs utilizing the most recent estimates of costs and funding. Revenue earned in excess of billings, if any, was recorded as unbilled revenue. Billings in excess of revenue earned, if any, were recorded as deferred revenue.

### Business Combinations

We account for transactions that represent business combinations under the acquisition method of accounting. We allocate the total consideration paid for each acquisition to the assets we acquire and liabilities we assume based on their fair values as of the date of acquisition, including identifiable intangible assets. We base the fair value of identifiable intangible assets acquired in a business combination on valuations that use information and assumptions determined by us and which consider our best estimates of inputs and assumptions that a market participant would use. While we use our best estimates and assumptions as part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, our estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the measurement period, which is generally one year from the acquisition date, any adjustment to the assets acquired and liabilities assumed is recorded against goodwill in the period in which the amount is determined. Any adjustment identified subsequent to the measurement period is included in operating results in the period in which the amount is determined.

### Inventory

Inventory is stated at the lower of cost or net realizable value with cost being determined using the first-in, first-out (FIFO) method. We maintain a reserve for inventory items to provide for an estimated amount of excess or obsolete inventory.

### Warranty

We typically provide a one-year warranty (with the exception of European consumer products, which typically have a two-year warranty period) against defects in materials and workmanship and will either repair the goods, provide replacement products at no charge to the customer or refund amounts to the customer for defective products. We record estimated warranty costs, based on historical experience by product, at the time we recognize product revenue. Actual results could differ from these estimates, which could cause increases or decreases to our warranty reserves in future periods.

### Goodwill and Other Long-Lived Assets

Goodwill represents the excess of the purchase price in a business combination over the fair value of the net tangible and intangible assets acquired. Goodwill is not amortized but rather is assessed for impairment at the reporting unit level (operating segment or one level below an operating segment) annually or more frequently if we believe indicators of impairment exist. Goodwill impairment, if any, is determined by comparing the reporting unit's fair value to its carrying value. An impairment loss is recognized in an amount equal to the excess of the reporting unit's carrying value over its fair value, up to the amount of goodwill allocated to the reporting unit. We complete the annual impairment evaluation during the fourth quarter each year.

Other long-lived assets consist principally of completed technology, tradename, customer relationships, reacquired distribution rights and non-competition agreements. Reacquired distribution rights are amortized on an accelerated basis while all other intangible assets are amortized over their respective estimated useful lives on a straight-line basis, consistent with the pattern in which the economic benefits are being utilized.

We periodically evaluate the recoverability of other long-lived assets whenever events and changes in circumstances, such as reductions in demand or significant economic slowdowns in the industry, indicate that the carrying amount of an asset may not be fully recoverable. When indicators of impairment are present, the carrying values of the asset group are evaluated in relation to the future undiscounted cash flows of the underlying business. The net book value of the underlying asset is adjusted to fair value if the sum of the expected discounted cash flows is less than book value. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

The impairment assessment of goodwill and other long-lived assets involves significant estimates and assumptions, which may be unpredictable and inherently uncertain. These estimates and assumptions include identification of reporting units and

Table of Contents

asset groups, long-term growth rates, profitability, estimated useful lives, comparable market multiples, and discount rates. Any changes in these assumptions could impact the result of the impairment assessment.

***Stock-Based Compensation***

We account for stock-based compensation through recognition of the fair value of the stock-based compensation as a charge against earnings. The fair value of employee stock options is estimated at the grant date using the Black-Scholes option-pricing model. The fair value for restricted stock awards, time-based restricted stock units and performance-based restricted stock units is based on the closing share price of our common stock on the date of grant. For performance-based restricted stock units, the compensation cost is recognized based on the number of units expected to vest upon the achievement of the performance conditions. We recognize stock-based compensation as an expense over the requisite service period. We have elected to account for forfeitures as they occur, rather than applying an estimated forfeiture rate, following our adoption of ASU 2016-09 in the first quarter of 2017.

***Accounting for Income Taxes***

Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis using enacted tax rates in effect in the years in which those temporary differences are expected to be recovered or settled in each jurisdiction. A valuation allowance is provided if, based upon the weight of available evidence, it is more likely than not that the related benefits will not be realized. The Company regularly reviews the deferred tax assets for recoverability considering historical profitability, projected future taxable income, future reversals of existing taxable temporary differences, as well as feasible tax planning strategies in each jurisdiction. As of December 30, 2017, the Company recorded a valuation allowance of $0.8 million for certain foreign deferred tax assets for which the Company believes do not meet the "more likely than not" criteria for recognition.

The Company reports a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return. The Company recognizes interest and penalties, if any, related to unrecognized tax benefits in the income tax provision.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 (the "Act") was signed into law making significant changes to the Internal Revenue Code. Changes include, but are not limited to, a federal corporate tax rate decrease from 35% to 21% for tax years beginning after December 31, 2017, the transition of U.S. international taxation from a worldwide tax system to a territorial system and a one-time transition tax on the mandatory deemed repatriation of foreign earnings. We have estimated our provision for income taxes in accordance with the Act and guidance available as of the date of this filing and as a result have recorded a one-time income tax provision of $11.9 million in the fourth quarter of 2017, the period in which the legislation was enacted. The one-time income tax provision includes $8.9 million related to the remeasurement of certain deferred tax assets and liabilities based on the tax rates at which they are expected to reverse in the future. The one-time income tax expense also includes a provisional amount of $3.0 million related to the one-time transition tax on the mandatory deemed repatriation of foreign earnings.

On December 22, 2017, Staff Accounting Bulletin No. 118 (SAB 118) was issued to address the application of U.S. GAAP in situations when a registrant does not have the necessary information available, prepared, or analyzed (including computations) in reasonable detail to complete the accounting for certain income tax effects of the Act. In accordance with SAB 118, we have determined that the $3.0 million of current income tax provision recorded relating to the transition tax on the mandatory deemed repatriation of foreign earnings was a provisional amount and a reasonable estimate at December 30, 2017. Additional information and analysis is necessary to complete the calculation and accounting relating to the transition tax on the mandatory deemed repatriation of foreign earnings. Any subsequent adjustments to this amount will be recorded to current income tax provision during the measurement period which is not expected to extend beyond one year from the enactment date.

Table of Contents

**Overview of Results of Operations**

The following table sets forth our results of operations for the periods shown:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| | (In thousands) | | |
| Revenue | $ 883,911 | $ 660,604 | $ 616,778 |
| Cost of revenue: | | | |
| Cost of product revenue (1) | 438,114 | 337,832 | 325,295 |
| Amortization of intangible assets | 12,638 | 3,457 | 2,557 |
| Gross margin | 433,159 | 319,315 | 288,926 |
| Operating expenses: | | | |
| Research and development (1) | 113,149 | 79,805 | 76,071 |
| Selling and marketing (1) | 162,110 | 115,125 | 97,772 |
| General and administrative (1) | 84,771 | 66,828 | 53,540 |
| Amortization of intangible assets | 439 | - | 925 |
| Total operating expenses | 360,469 | 261,758 | 228,308 |
| Operating income | 72,690 | 57,557 | 60,618 |
| Other income, net | 3,676 | 3,804 | 2,353 |
| Income before income taxes | 76,366 | 61,361 | 62,971 |
| Income tax expense | 25,402 | 19,422 | 18,841 |
| Net income | $ 50,964 | $ 41,939 | $ 44,130 |

_____

(1)    Stock-based compensation recorded in fiscal 2017, 2016 and 2015 breaks down by expense classification as follows:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| | (In thousands) | | |
| Cost of revenue | $ 1,082 | $ 760 | $ 1,076 |
| Research and development | 5,009 | 3,646 | 3,256 |
| Selling and marketing | 2,571 | 2,008 | 1,457 |
| General and administrative | 11,089 | 9,581 | 8,394 |

26

Table of Contents

The following table sets forth our results of operations as a percentage of revenue for the periods shown:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| Revenue | 100.0% | 100.0% | 100.0% |
| Cost of revenue: | | | |
| Cost of product revenue | 49.6 | 51.1 | 52.7 |
| Amortization of intangible assets | 1.4 | 0.6 | 0.5 |
| Total cost of revenue | 51.0 | 51.7 | 53.2 |
| Gross margin | 49.0 | 48.3 | 46.8 |
| Operating expenses: | | | |
| Research and development | 12.8 | 12.1 | 12.3 |
| Selling and marketing | 18.3 | 17.4 | 15.9 |
| General and administrative | 9.6 | 10.1 | 8.7 |
| Amortization of intangible assets | 0.1 | - | 0.1 |
| Total operating expenses | 40.8 | 39.6 | 37.0 |
| Operating income | 8.2 | 8.7 | 9.8 |
| Other income, net | 0.5 | 0.5 | 0.5 |
| Income before income taxes | 8.7 | 9.2 | 10.3 |
| Income tax expense | 2.9 | 2.9 | 3.1 |
| Net income | 5.8% | 6.3% | 7.2% |

**Comparison of Years Ended December 30, 2017, December 31, 2016 and January 2, 2016**

**Revenue**

We currently derive revenue from product sales. Until the divestiture of the defense and security business unit in April 2016, we also generated minimal revenue from government and commercial research and development contracts.

For the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, approximately 62.7%, 72.8% and 76.6%, respectively, of our consumer robots revenue resulted from sales to 15 customers, which were comprised of both domestic retailers and international distributors. Direct-to-consumer revenue generated through our domestic and international on-line stores accounted for 4.1%, 5.1% and 6.1% of our consumer robots revenue for the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, respectively. We typically sell our recently launched products direct on-line, and then subsequently offer these products through other channels of distribution.

For the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, sales to non-U.S. customers accounted for 48.8%, 51.2% and 56.0% of total revenue, respectively.

We sell products directly to customers and indirectly through resellers and distributors. We recognize revenue from sales of robots under the terms of the customer agreement upon transfer of title and risk of loss to the customer, net of estimated returns, provided that collection is determined to be reasonably assured and no significant obligations remain.

The following table shows total revenue for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
| --- | --- | --- | --- | --- | --- |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | | |
| Total Revenue | $ 883,911 | $ 660,604 | $ 616,778 | $ 223,307 | $ 43,826 |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Revenue increased 33.8% to $883.9 million in fiscal 2017 from $660.6 million in fiscal 2016. Revenue increased approximately $227.8 million, or 34.7%, in our consumer business while revenue decreased $3.1 million in our defense and security business as a result of its sale in April 2016. The $227.8 million increase in revenue from our consumer business was driven by a 25.7% increase in units shipped and a 10.8% increase in average selling price. In fiscal 2017, domestic consumer revenue increased $133.2 million, or 41.8%, and international consumer revenue increased $94.6 million, or 28.1%, compared to fiscal 2016. Total consumer robots shipped in fiscal 2017 were approximately 3,698,000 units compared to approximately

27

Table of Contents

2,943,000 units in fiscal 2016. The increase in domestic consumer robot revenue was primarily attributable to increased sales as a result of investments in advertising media and national promotions and further adoption of our robots, particularly our Roomba 900 and Roomba 600 series robots. During 2017, we recorded a net benefit to revenue and income before income taxes of $2.2 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $3.5 million during fiscal 2016. The net adjustments recorded in each period resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

Revenue increased 7.1% to $660.6 million in fiscal 2016 from $616.8 million in fiscal 2015. Revenue increased approximately $96.2 million, or 17.2%, in our consumer business while revenue decreased $51.9 million in our defense and security business as a result of the sale of our defense and security business unit in April 2016. The $96.2 million increase in revenue from our consumer business was driven by a 20.8% increase in units shipped, partially offset by a 0.8% decrease in net average selling price. In fiscal 2016, domestic consumer revenue increased $84.2 million, or 35.8%, and international consumer revenue increased $12.0 million, or 3.7%, compared to fiscal 2015. Total consumer robots shipped in fiscal 2016 were approximately 2,943,000 units compared to approximately 2,436,000 units in fiscal 2015. The increase in domestic consumer robots revenue was primarily attributable to increased sales as a result of significant investments in advertising media and national promotions as well as increased sales of the Roomba 900 series robots. Roomba 980 launched in late 2015, with a full year of revenue included in fiscal 2016. Roomba 960 was introduced in the third quarter of 2016. International consumer robots revenue grew 3.7% primarily due to our execution of successful marketing programs in those markets, as well as stronger overseas economies. During 2016, we recorded a net benefit to revenue and income before income taxes of $3.5 million related to adjustments to our product returns reserves compared to a net benefit to revenue and income before income taxes of $6.9 million during fiscal 2015. The net adjustments recorded in each period resulted from lower product returns experience as compared to estimates used to establish reserves in prior periods. Partially offsetting these items in 2016 was a net reduction to revenue and income before income taxes of $6.4 million for pricing support to customers in response to changing market conditions.

### Cost of Product Revenue

Cost of product revenue includes the cost of raw materials and labor that go into the development and manufacture of our products as well as manufacturing overhead costs such as manufacturing engineering, quality assurance, logistics, warranty, third-party consulting, travel and associated direct material costs. Additionally, we include overhead expenses such as indirect engineering labor, occupancy costs associated with the project resources, engineering tools and supplies and program management expenses. Raw material costs, which are our most significant cost items, can fluctuate materially on a periodic basis, although many components have been historically stable. Additionally, unit costs can vary significantly depending on the mix of products sold. There can be no assurance that our costs of raw materials will not increase. Labor costs also comprise a significant portion of our cost of revenue. We outsource the manufacture of our consumer robots to contract manufacturers in China. While labor costs in China traditionally have been favorable compared to labor costs elsewhere in the world, including the United States, they have been increasing for the last few years. In addition, fluctuations in currency exchange rates could increase the cost of labor. Consequently, the labor costs for our consumer robots could increase in the future.

The following table shows cost of product revenue for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Cost of product revenue | $ 438,114 | $ 337,832 | $ 325,295 | $ 100,282 | $ 12,537 |
| As a percentage of total revenue | 49.6% | 51.1% | 52.7% | | |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Cost of product revenue increased $100.3 million, or 29.7% to $438.1 million in fiscal 2017, compared to $337.8 million in fiscal 2016. The increase is primarily due to the 33.8% increase in revenue as well as the impact from our acquisitions of the iRobot-related distribution business of SODC in April 2017 and Robopolis in October 2017.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

Cost of product revenue increased $12.5 million, or 3.9% to $337.8 million in fiscal 2016, compared to $325.3 million in fiscal 2015. The increase is primarily due to the 7.1% increase in revenue and increased costs associated with assuming warranty liability in China as part of our strategy in that market.

28

Table of Contents

### *Gross Margin*

Our gross margin as a percentage of revenue varies according to the mix of product and contract revenue, the mix of products sold, total sales volume, the level of defective product returns, and levels of other product costs such as warranty, scrap, re-work and manufacturing overhead.

The following table shows total gross margin for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Total gross margin | $ 433,159 | $ 319,315 | $ 288,926 | $ 113,844 | $ 30,389 |
| As a percentage of total revenue | 49.0% | 48.3% | 46.8% | | |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Gross margin increased $113.8 million, or 35.7%, to $433.2 million (49.0% of revenue) in fiscal 2017 from $319.3 million (48.3% of revenue) in fiscal 2016. The increase in gross margin as a percentage of revenue was primarily driven by favorable product and region mix, partially offset by an increase in promotional support to our customers as well as the impact from our acquisitions of the iRobot-related distribution business of SODC in April 2017 and Robopolis in October 2017. During 2017, we recorded a net benefit to revenue and gross margin of $2.2 million related to adjustments to our product returns reserves compared to a net benefit to revenue and gross margin of $3.5 million during fiscal 2016.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

Gross margin increased $30.4 million, or 10.5%, to $319.3 million (48.3% of revenue) in fiscal 2016 from $288.9 million (46.8% of revenue) in fiscal 2015. The increase in gross margin as a percentage of revenue was primarily driven by favorable product and region mix in the consumer robots business as well as the success of the higher margin Roomba 900 series robots. These increases were partially offset by pricing support to customers in response to changing market conditions as well as increased warranty costs. During 2016, we recorded a net benefit to revenue and gross margin of $3.5 million related to adjustments to our product returns reserves compared to a net benefit to revenue and gross margin of $6.9 million during fiscal 2015.

### *Research and Development*

Research and development expenses consist primarily of:

- salaries and related costs for our engineers;
- costs for high technology components used in product and prototype development;
- costs of test equipment used during product development; and
- occupancy and other overhead costs.

We have significantly expanded our research and development capabilities and expect to continue to expand these capabilities in the future. We are committed to consistently maintaining the level of innovative design and development of new products as we strive to enhance our ability to serve our existing consumer markets as well as new markets for robots. We anticipate that research and development expenses will increase in absolute dollars but remain relatively consistent as a percentage of revenue in the foreseeable future.

The following table shows total research and development costs for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Total research and development | $ 113,149 | $ 79,805 | $ 76,071 | $ 33,344 | 3,734 |
| As a percentage of total revenue | 12.8% | 12.1% | 12.3% | | |

29

Table of Contents

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Research and development expenses increased $33.3 million, or 41.8%, to $113.1 million (12.8% of revenue) in fiscal 2017 from $79.8 million (12.1% of revenue) in fiscal 2016. This increase is attributable to increased efforts in product development and continued product enhancements. During 2017, people and program related costs increased $19.7 million and $13.2 million, respectively, compared to fiscal 2016.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

Research and development expenses increased $3.7 million, or 4.9%, to $79.8 million (12.1% of revenue) in fiscal 2016 from $76.1 million (12.3% of revenue) in fiscal 2015. This increase is attributable to increased efforts in product development and continued product enhancements. During 2016, people and program related costs increased $12.0 million compared to 2015. This increase was partially offset by decreases related to defense and security and remote presence headcount and program spend of approximately $6.2 million and $2.1 million, respectively, compared to 2015.

### Selling and Marketing

Our selling and marketing expenses consist primarily of:

- salaries and related costs for sales and marketing personnel;
- advertising, marketing and other brand-building costs;
- customer service costs; and
- travel and related costs.

We anticipate that in 2018, selling and marketing expenses will increase in absolute dollars and as a percentage of revenue as we integrate our recent acquisitions, launch new products and continue to build awareness of our consumer robots products.

The following table shows total selling and marketing costs for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Total selling and marketing | $ 162,110 | $ 115,125 | $ 97,772 | $ 46,985 | 17,353 |
| As a percentage of total revenue | 18.3% | 17.4% | 15.9% | | |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Selling and marketing expenses increased by $47.0 million, or 40.8%, to $162.1 million (18.3% of revenue) in fiscal 2017 from $115.1 million (17.4% of revenue) in fiscal 2016. This increase is primarily attributable to increases of $35.3 million in investments in advertising media, national promotions and other selling and marketing costs incurred to support our continued global marketing and branding efforts and approximately $8.7 million in people-related costs including additional headcount related to our recent acquisitions of SODC and Robopolis.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

Selling and marketing expenses increased by $17.4 million, or 17.7%, to $115.1 million (17.4% of revenue) in fiscal 2016 from $97.8 million (15.9% of revenue) in fiscal 2015. This increase is primarily attributable to increases of $12.1 million in investments in advertising media, national promotions and other selling and marketing costs incurred to support our continued global marketing and branding efforts and approximately $5.1 million associated with the go-to market transition in China.

### General and Administrative

Our general and administrative expenses consist primarily of:

- salaries and related costs for executives and administrative personnel;
- professional services costs;
- information systems and infrastructure costs;
- travel and related costs; and
- occupancy and other overhead costs.

Table of Contents

The following table shows total general and administrative costs for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| General and administrative | $ 84,771 | $ 66,828 | $ 53,540 | $ 17,943 | 13,288 |
| As a percentage of total revenue | 9.6% | 10.1% | 8.7% | | |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

General and administrative expenses increased by $17.9 million, or 26.8%, to $84.8 million (9.6% of revenue) in fiscal 2017 from $66.8 million (10.1% of revenue) in fiscal 2016. This increase is primarily attributable to an increase of $7.6 million in legal and consulting costs mainly driven by acquisition expense and litigation expense where we continued to defend and protect our intellectual property, as well as increases of $7.0 million in people-related costs including additional headcount related to our recent acquisitions of SODC and Robopolis and $1.2 million related to investments in enterprise hardware and software maintenance, support and services.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

General and administrative expenses increased by $13.3 million, or 24.8%, to $66.8 million (10.1% of revenue) in fiscal 2016 from $53.5 million (8.7% of revenue) in fiscal 2015. This increase is primarily attributable to increases of $7.8 million in people-related costs, $2.7 million in legal, advisory and other consulting costs associated with the proxy contest initiated by Red Mountain Capital Partners, $1.1 million in legal costs related to patent litigation and $0.9 million related to investments in enterprise hardware and software maintenance, support, and services.

### *Amortization of Intangible Assets*

Amortization of acquired technology and reacquired distribution rights are recorded within cost of revenue whereas the amortization of acquired customer relationships, non-compete agreements and tradenames are recorded within operating expenses. All intangible assets, with the exception of the reacquired distribution rights, which are being amortized on an accelerated basis, are being amortized on a straight-line basis, which is consistent when the pattern in which the economic benefits are being utilized.

The following table shows total amortization expense for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Cost of revenue | $ 12,638 | $ 3,457 | $ 2,557 | $ 9,181 | 900 |
| Operating expense | 439 | - | 925 | 439 | (925) |
| Total amortization expense | 13,077 | 3,457 | 3,482 | 9,620 | (25) |
| As a percentage of total revenue | 1.5% | 0.5% | 0.6% | | |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

The increase in amortization of intangible assets during fiscal 2017, as compared to fiscal 2016, was related to our recent acquisitions of SODC and Robopolis.

### *Other Income, Net*

The following table shows other income, net for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Other income, net | $ 3,676 | $ 3,804 | $ 2,353 | $ (128) | $ 1,451 |
| As a percentage of total revenue | 0.5% | 0.5% | 0.5% | | |

Other income, net, amounted to $3.7 million, $3.8 million and $2.4 million for fiscal 2017, 2016 and 2015, respectively. Other income, net, for fiscal 2017 consisted primarily of a $2.2 million gain on business acquisition related to our acquisition of SODC, which represents the excess of the fair value of the net assets acquired over the purchase price, as well as a $1.3 million gain associated with the sale of a cost method investment. Other income, net, for fiscal 2016 consisted primarily of income

31

Table of Contents

related to an equity method investment of approximately $1.4 million, defense and security business transition services income of $1.2 million, a gain on sale of a cost method investment of approximately $0.6 million and a gain on the sale of the defense and security business unit of $0.4 million. During fiscal 2015, we recorded a gain of approximately $3.3 million related to the sale of a cost method investment, which was partially offset primarily by foreign currency exchange losses.

### *Income Tax Provision*

The following table shows income tax provision for fiscal years 2017, 2016 and 2015 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 | $ Change 2017 vs. 2016 | $ Change 2016 vs. 2015 |
|---|---|---|---|---|---|
| Income tax provision | $ 25,402 | $ 19,422 | $ 18,841 | $ 5,980 | $ 581 |
| As a percentage of pre-tax income | 33.3% | 31.7% | 29.9% | | |

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

We recorded an income tax provision of $25.4 million and $19.4 million for fiscal 2017 and fiscal 2016, respectively. The effective income tax rate was 33.3% in fiscal 2017, as compared to 31.7% in fiscal 2016. The increase in our effective tax rate is primarily due to jurisdictional mix of earnings and the one-time income tax provision of $11.9 million related to the enactment of the Act during the fourth quarter of 2017, partially offset by the excess tax benefits of $11.7 million related to ASU 2016-09.

*Year ended December 31, 2016 as compared to the year ended January 2, 2016*

We recorded an income tax provision of $19.4 million and $18.8 million for fiscal 2016 and fiscal 2015, respectively. The $19.4 million income tax provision for fiscal 2016 was based upon a 2016 effective income tax rate of 31.7%. The $18.8 million income tax provision for fiscal 2015 was based upon a 2015 effective income tax rate of 31.3% reduced by a net income tax benefit of $0.9 million primarily resulting from an increase in federal and state tax credits upon filing the 2014 tax returns during 2015.

The federal research and development tax credit expired at the end of 2014. In December 2015, legislation was enacted that included the permanent extension of the federal research and development tax credit. The legislation also retroactively reinstated the research and development tax credit for 2015.

### Liquidity and Capital Resources

At December 30, 2017, our principal sources of liquidity were cash and cash equivalents totaling $128.6 million, short-term investments of $37.2 million and accounts receivable of $142.8 million. Our working capital, which represents our total current assets less total current liabilities, was $237.0 million as of December 30, 2017, compared to $271.0 million as of December 31, 2016.

We manufacture and distribute our products through contract manufacturers and third-party logistics providers. We believe that this approach gives us the advantages of relatively low capital investment and significant flexibility in scheduling production and managing inventory levels. By leasing our office facilities, we also minimize the cash needed for expansion. Accordingly, our capital spending is generally limited to leasehold improvements, computers, office furniture, product-specific production tooling, internal use software and test equipment. In the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, we spent $23.4 million, $10.8 million and $9.4 million respectively, on capital equipment

Our strategy for delivering consumer products to our distributors and retail customers gives us the flexibility to provide container shipments directly to the retailer from China and, alternatively, allows our distributors and retail partners to take possession of product on a domestic basis. Accordingly, our consumer product inventory consists of goods shipped to our third-party logistics providers for the fulfillment of distributor, retail and direct-to-consumer sales. Our contract manufacturers are also responsible for purchasing and stocking components required for the production of our products, and they typically invoice us when the finished goods are shipped.

As of December 30, 2017, we held cash, cash equivalents and short-term investments of $165.9 million. Net cash provided by our operations for the fiscal year ended December 30, 2017 was $76.3 million, of which the principal components were our net income of $51.0 million and non-cash charges of $42.9 million, partially offset by a net increase in operating assets and liabilities of $17.5 million. The increase in net operating assets and liabilities includes an increase in accounts receivable of $53.3 million primarily due to increased sales, partially offset by a $40.9 million increase in accounts payable and accrued liabilities primarily due to growth in the business and timing of payments to our suppliers. As of December 30, 2017, we did not have any borrowings outstanding under our working capital line of credit and had $1.0 million in letters of credit outstanding under our revolving letter of credit facility.

32

Table of Contents

During the year ended December 30, 2017, we acquired SODC and Robopolis for a total of $148.8 million, net of cash acquired, and invested $23.4 million in the purchase of property and equipment, including machinery and tooling for new products. We also purchased $10.6 million of marketable securities, while sales and maturities of marketable securities amounted to $13.1 million. In addition, we received an earn-out payment of $1.3 million from a sold cost method investment.

During the year ended December 30, 2017, we received $10.6 million from the exercise of stock options. Shares issued upon vesting of restricted stock were net of 51,229 shares retained by us to cover employee tax withholdings of $3.0 million.

Net cash provided by our operations for the fiscal year ended December 31, 2016 was $116.4 million, of which the principal components were our net income of $41.9 million and non-cash charges of $28.0 million and a net decrease in operating assets and liabilities of $46.5 million. The decrease in net operating assets and liabilities includes a decrease in accounts receivable of $25.7 million primarily due to the timing of billing in respective periods and a $16.5 million increase in accounts payable and accrued liabilities primarily due to growth in the business and timing of payments to our suppliers. As of December 31, 2016, we did not have any borrowings outstanding under our working capital line of credit and had $1.0 million in letters of credit outstanding under our revolving letter of credit facility.

We received $23.5 million for the divestiture of our defense and security business unit, net of a $1.0 million payment to our financial adviser. We invested $10.8 million in the purchase of property and equipment in 2016, including tooling for new products. We purchased $16.6 million of marketable securities in 2016, while sales and maturities of marketable securities amounted to $9.5 million. We made strategic investments of $2.2 million in the form of preferred shares and notes receivable.

During 2016, we received $9.3 million from the exercise of stock options and $3.0 million from the excess tax benefit related to our stock-based compensation plans. In addition, we repurchased 2,641,122 shares of our common stock for an aggregate purchase price of $97.0 million. Shares issued upon vesting of restricted stock were net of 39,676 shares retained by us to cover employee tax withholdings of $1.3 million.

### *Working Capital Facilities*

#### *Credit Facility*

We have an unsecured revolving credit facility with Bank of America, N.A., which is available to fund working capital and other corporate purposes. As of December 30, 2017, the total amount of our credit facility was $75.0 million and the full amount was available for borrowing. The interest on loans under our credit facility accrues, at our election, at either (1) LIBOR plus a margin, currently equal to 1.0%, based on our ratio of indebtedness to Adjusted EBITDA (the "Eurodollar Rate"), or (2) the lender's base rate. The lender's base rate is equal to the highest of (1) the federal funds rate plus 0.5%, (2) the lender's prime rate and (3) the Eurodollar Rate plus 1.0%. The credit facility will terminate and all amounts outstanding thereunder will be due and payable in full on December 20, 2018.

As of December 30, 2017, we had no outstanding borrowings under our revolving credit facility. This credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on our ability to incur or guarantee additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, our stock, and consolidate or merge with other entities.

In addition, we are required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

This credit facility contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, our obligations under the credit facility may be accelerated.

As of December 30, 2017, we were in compliance with all covenants under the revolving credit facility.

#### *Letter of Credit Facility*

We have an unsecured revolving letter of credit facility with Bank of America, N.A. The credit facility is available to fund letters of credit on our behalf up to an aggregate outstanding amount of $5.0 million. We may terminate at any time, subject to proper notice, or from time to time permanently reduce the amount of the credit facility.

We pay a fee on outstanding letters of credit issued under the credit facility of up to 1.5% per annum of the outstanding letters of credit. The maturity date for letters of credit issued under the credit facility must be no later than 365 days following the maturity date of the credit facility.

As of December 30, 2017, we had letters of credit outstanding of $1.0 million under our revolving letter of credit facility. The credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on our ability to incur or guarantee additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, our stock, and consolidate or merge with other entities. In

33

Table of Contents

addition, we are required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

The credit facility also contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy, and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the lender may accelerate the obligations under the credit facility.

As of December 30, 2017, we were in compliance with all covenants under the revolving letter of credit facility.

### *Working Capital and Capital Expenditure Needs*

We currently have no material cash commitments, except for normal recurring trade payables, expense accruals and operating leases, all of which we anticipate funding through working capital, funds provided by operating activities and our existing working capital line of credit. We do not currently anticipate significant investment in property, plant and equipment, and we believe that our outsourced approach to manufacturing provides us with flexibility in both managing inventory levels and financing our inventory. We believe our existing cash and cash equivalents, short-term investments, cash provided by operating activities, and funds available through our working capital line of credit will be sufficient to meet our working capital and capital expenditure needs over at least the next twelve months. In the event that our revenue plan does not meet our expectations, we may eliminate or curtail expenditures to mitigate the impact on our working capital. Our future capital requirements will depend on many factors, including our rate of revenue growth, the expansion of our marketing and sales activities, the timing and extent of spending to support product development efforts, the timing of introductions of new products and enhancements to existing products, the acquisition of new capabilities or technologies, and the continuing market acceptance of our products and services. Moreover, to the extent that existing cash and cash equivalents, short-term investments, cash from operations, and cash from short-term borrowing are insufficient to fund our future activities, we may need to raise additional funds through public or private equity or debt financing. As part of our business strategy, we may consider additional acquisitions of companies, technologies and products, which could also require us to seek additional equity or debt financing. Additional funds may not be available on terms favorable to us or at all.

### Contractual Obligations

We generally do not enter into binding purchase commitments. Our principal commitments consist of obligations under our working capital line of credit, leases for office space and minimum contractual obligations. Other obligations consist primarily of software licensing arrangements. The following table describes our commitments to settle contractual obligations in cash as of December 30, 2017:

| | Less Than 1 Year | | 1 to 3 Years | | 3 to 5 Years | | More Than 5 Years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | | | |
| Operating leases | $ | 6,361 | $ | 13,407 | $ | 13,000 | $ | 39,839 | $ | 72,607 |
| Minimum contractual payments | | 897 | | 492 | | - | | - | | 1,389 |
| Other obligations | | 1,645 | | 926 | | - | | - | | 2,571 |
| Total | $ | 8,903 | $ | 14,825 | $ | 13,000 | $ | 39,839 | $ | 76,567 |

At December 30, 2017, we had outstanding purchase orders aggregating approximately $74.4 million. The purchase orders, the majority of which are with our contract manufacturers for the purchase of inventory in the normal course of business, are for manufacturing and non-manufacturing related goods and services, and are generally cancelable without penalty. In circumstances where we determine that we have financial exposure associated with any of these commitments, we record a liability in the period in which that exposure is identified.

### Off-Balance Sheet Arrangements

As of December 30, 2017, we had no off-balance sheet arrangements as defined in Item 303(a)(4) of Regulation S-K.

### Recently Adopted Accounting Pronouncements

See Note 2 to the accompanying consolidated financial statements for a description of recently adopted accounting standards.

34

Table of Contents

**Recently Issued Accounting Pronouncements**

See Note 2 to the accompanying consolidated financial statements for a description of certain recently issued accounting standards which may impact our financial statements in future reporting periods.

**ITEM 7A.** *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

**Exchange Rate Sensitivity**

Our international revenue and expenses are denominated in multiple currencies, including Japanese Yen, Canadian Dollars, Chinese Yuan Renminbi and Euros. As such, we have exposure to adverse changes in exchange rates associated with the revenue and operating expenses of our foreign operations. Any fluctuations in other currencies will have minimal direct impact on our international revenue.

In addition to international business conducted in foreign currencies, we have a significant amount of international revenue denominated in U.S. dollars. As the U.S. dollar strengthens or weakens against other currencies, our international distributors may be impacted, which could affect their profitability and our ability to maintain current pricing levels on our international consumer products.

We regularly monitor the forecast of non-U.S. dollar revenue and expenses and the level of non-U.S. dollar monetary asset and liability balances to determine if any actions, including possibly entering into foreign currency forward contracts or swaps, should be taken to minimize the impact of fluctuating exchange rates on our results of operations. Periodically, we enter into forward exchange contracts to hedge against foreign currency fluctuations. These contracts may or may not be designated as cash flow hedges for accounting purposes. We use cash flow hedges primarily to reduce the effects of foreign exchange rate changes on purchase and sales, primarily in Japanese Yen and Euros. At December 30, 2017 and December 31, 2016, we had outstanding cash flow hedges with a total notional value of $73.7 million and $0.0 million, respectively.

We also enter into economic hedges that are not designated as hedges from an accounting standpoint to reduce or eliminate the effects of foreign exchange rate changes typically related to short term trade receivables and payables. These contracts have maturities of two months or less. At December 30, 2017 and December 31, 2016, we had outstanding economic hedges with a total notional value of $36.6 million and $8.1 million, respectively.

A hypothetical change of 10% in exchange rates would not have a material impact on our financial results.

**Interest Rate Sensitivity**

At December 30, 2017, we had unrestricted cash and cash equivalents of $128.6 million and short term investments of $37.2 million. The unrestricted cash and cash equivalents are held for working capital purposes. We do not enter into investments for trading or speculative purposes. Some of the securities in which we invest, however, may be subject to market risk. This means that a change in prevailing interest rates may cause the fair market value of the investment to fluctuate. To minimize this risk in the future, we intend to maintain our portfolio of cash equivalents in a variety of securities, commercial paper, money market funds, debt securities and certificates of deposit. Due to the short-term nature of these investments, we believe that we do not have any material exposure to changes in the fair value of our investment portfolio as a result of changes in interest rates. As of December 30, 2017, all of our cash and cash equivalents were held in demand deposits, money market accounts, and government bonds.

Our exposure to market risk also relates to the increase or decrease in the amount of interest expense we must pay on any outstanding debt instruments, primarily certain borrowings under our working capital line of credit. The advances under the working capital line of credit bear a variable rate of interest determined at the time of the borrowing. At December 30, 2017, we had letters of credit outstanding of $1.0 million under our revolving letter of credit facility.

35

Table of Contents

**ITEM 8.** *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**iROBOT CORPORATION**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 37 |
| Consolidated Balance Sheets at December 30, 2017 and December 31, 2016 | 39 |
| Consolidated Statements of Income for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016 | 40 |
| Consolidated Statements of Comprehensive Income for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016 | 40 |
| Consolidated Statements of Stockholders' Equity for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016 | 42 |
| Consolidated Statements of Cash Flows for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016 | 43 |
| Notes to Consolidated Financial Statements | 44 |

36

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
iRobot Corporation:

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of iRobot Corporation and its subsidiaries as of December 30, 2017 and December 31, 2016, and the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 30, 2017, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 30, 2017, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 30, 2017 and December 31, 2016, and the results of their operations and their cash flows for each of the three years in the period ended December 30, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 30, 2017, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Management's Report on Internal Control over Financial Reporting, management has excluded iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS) from its assessment of internal control over financial reporting as of December 30, 2017, because they were acquired by the Company in purchase business combinations during fiscal 2017. We have also excluded iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS) from our audit of internal control over financial reporting. iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS) are wholly-owned subsidiaries whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting collectively represent approximately 8.3% and 23.9% of total assets, respectively and approximately 9.9% and 13.0% of total revenues, respectively, of the related consolidated financial statement amounts as of and for the year ended December 30, 2017.

Table of Contents

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Boston, Massachusetts
February 16, 2018

We have served as the Company's auditor since 1999.

38

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

|  | December 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
|  | (In thousands) | | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 128,635 | $ | 214,523 |
| Short term investments | | 37,225 | | 39,930 |
| Accounts receivable, net | | 142,829 | | 73,048 |
| Inventory | | 106,932 | | 50,578 |
| Other current assets | | 19,105 | | 5,591 |
| Total current assets | | 434,726 | | 383,670 |
| Property and equipment, net | | 44,579 | | 27,532 |
| Deferred tax assets | | 31,531 | | 30,585 |
| Goodwill | | 121,440 | | 41,041 |
| Intangible assets, net | | 44,712 | | 12,207 |
| Other assets | | 14,534 | | 12,877 |
| Total assets | $ | 691,522 | $ | 507,912 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 116,316 | $ | 67,281 |
| Accrued expenses | | 73,647 | | 40,869 |
| Deferred revenue and customer advances | | 7,761 | | 4,486 |
| Total current liabilities | | 197,724 | | 112,636 |
| Deferred tax liabilities | | 9,539 | | - |
| Other long term liabilities | | 13,932 | | 6,320 |
| Total long term liabilities | | 23,471 | | 6,320 |
| Total liabilities | | 221,195 | | 118,956 |
| Commitments and contingencies (Note 14): | | | | |
| Preferred stock, 5,000,000 shares authorized and none outstanding | | - | | - |
| Common stock, $0.01 par value, 100,000,000 shares authorized; 27,945,144 and 27,237,870 shares issued and outstanding at December 30, 2017 and December 31, 2016, respectively | | 279 | | 272 |
| Additional paid-in capital | | 190,067 | | 161,885 |
| Retained earnings | | 277,989 | | 226,950 |
| Accumulated other comprehensive income (loss) | | 1,992 | | (151) |
| Total stockholders' equity | | 470,327 | | 388,956 |
| Total liabilities and stockholders' equity | $ | 691,522 | $ | 507,912 |

See accompanying Notes to Consolidated Financial Statements

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED STATEMENTS OF INCOME**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | |
| | (In thousands, except per share amounts) | | | | | |
| Revenue | $ | 883,911 | $ | 660,604 | $ | 616,778 |
| Cost of revenue: | | | | | | |
| Cost of product revenue | | 438,114 | | 337,832 | | 325,295 |
| Amortization of intangible assets | | 12,638 | | 3,457 | | 2,557 |
| Total cost of revenue(1) | | 450,752 | | 341,289 | | 327,852 |
| Gross margin | | 433,159 | | 319,315 | | 288,926 |
| Operating expenses: | | | | | | |
| Research and development(1) | | 113,149 | | 79,805 | | 76,071 |
| Selling and marketing(1) | | 162,110 | | 115,125 | | 97,772 |
| General and administrative(1) | | 84,771 | | 66,828 | | 53,540 |
| Amortization of intangible assets | | 439 | | - | | 925 |
| Total operating expenses | | 360,469 | | 261,758 | | 228,308 |
| Operating income | | 72,690 | | 57,557 | | 60,618 |
| Other income, net | | 3,676 | | 3,804 | | 2,353 |
| Income before income taxes | | 76,366 | | 61,361 | | 62,971 |
| Income tax expense | | 25,402 | | 19,422 | | 18,841 |
| Net income | $ | 50,964 | $ | 41,939 | $ | 44,130 |
| Net income per share | | | | | | |
| Basic | $ | 1.85 | $ | 1.51 | $ | 1.49 |
| Diluted | $ | 1.77 | $ | 1.48 | $ | 1.47 |
| Number of weighted average common shares used in calculations per share | | | | | | |
| Basic | | 27,611 | | 27,698 | | 29,550 |
| Diluted | | 28,753 | | 28,292 | | 30,107 |

_____

(1)     Stock-based compensation recorded in fiscal 2017, 2016 and 2015 breaks down by expense classification as follows:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | |
| | (In thousands) | | | | | |
| Cost of revenue | $ | 1,082 | $ | 760 | $ | 1,076 |
| Research and development | | 5,009 | | 3,646 | | 3,256 |
| Selling and marketing | | 2,571 | | 2,008 | | 1,457 |
| General and administrative | | 11,089 | | 9,581 | | 8,394 |

See accompanying Notes to Consolidated Financial Statements

40

Table of Contents

**iROBOT CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | |
| | (In thousands) | | | | | |
| Net income | $ | 50,964 | $ | 41,939 | $ | 44,130 |
| Other comprehensive income (loss): | | | | | | |
| Net foreign currency translation adjustments | | 1,994 | | - | | - |
| Net unrealized gains on cash flow hedges, net of tax | | 490 | | - | | - |
| Net gains on cash flow hedge reclassified into earnings, net of tax | | (295) | | - | | - |
| Net unrealized gains (losses) on marketable securities, net of tax | | (46) | | 85 | | (85) |
| Total comprehensive income | $ | 53,107 | $ | 42,024 | $ | 44,045 |

See accompanying Notes to Consolidated Financial Statements

41

Table of Contents

**iROBOT CORPORATION**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Value | | | | |
| | (In thousands, except share data) | | | | | |
| Balance at December 27, 2014 | 29,644,602 | $ 297 | $ 249,409 | $ 140,881 | $ (151) | $ 390,436 |
| Issuance of common stock for exercise of stock options | 390,085 | 4 | 6,460 | | | 6,464 |
| Conversion of deferred compensation | 14,610 | - | - | | | - |
| Vesting of restricted stock units | 340,754 | 3 | (3) | | | - |
| Tax benefit of excess stock-based compensation deduction | | | 822 | | | 822 |
| Stock-based compensation | | | 14,183 | | | 14,183 |
| Stock withheld to cover tax withholdings requirements upon vesting of restricted stock units | (37,969) | | (1,295) | | | (1,295) |
| Other comprehensive loss | | | | | (85) | (85) |
| Directors' deferred compensation | | | 149 | | | 149 |
| Stock repurchases | (1,260,276) | (13) | (37,380) | | | (37,393) |
| Net income | | | | 44,130 | | 44,130 |
| Balance at January 2, 2016 | 29,091,806 | $ 291 | $ 232,345 | $ 185,011 | $ (236) | $ 417,411 |
| Issuance of common stock for exercise of stock options | 456,498 | 4 | 9,340 | | | 9,344 |
| Conversion of deferred compensation | 6,721 | - | - | | | - |
| Vesting of restricted stock units | 363,643 | 4 | (4) | | | - |
| Tax benefit of excess stock-based compensation deduction | | | 2,421 | | | 2,421 |
| Stock-based compensation | | | 15,995 | | | 15,995 |
| Stock withheld to cover tax withholdings requirements upon vesting of restricted stock units | (39,676) | | (1,300) | | | (1,300) |
| Other comprehensive income | | | | | 85 | 85 |
| Directors' deferred compensation | | | 82 | | | 82 |
| Stock repurchases | (2,641,122) | (27) | (96,994) | | | (97,021) |
| Net income | | | | 41,939 | | 41,939 |
| Balance at December 31, 2016 | 27,237,870 | $ 272 | $ 161,885 | $ 226,950 | $ (151) | $ 388,956 |
| Issuance of common stock for exercise of stock options | 367,267 | 4 | 10,569 | | | 10,573 |
| Conversion of deferred compensation | 14,901 | - | - | | | - |
| Vesting of restricted stock units | 376,335 | 4 | (4) | | | - |
| Stock-based compensation | | | 19,751 | | | 19,751 |
| Stock withheld to cover tax withholdings requirements upon vesting of restricted stock units | (51,229) | (1) | (2,982) | | | (2,983) |
| Other comprehensive income | | | | | 1,948 | 1,948 |
| Directors' deferred compensation | | | 65 | | | 65 |
| Unrealized net gain on derivative financial instruments | | | | | 195 | 195 |
| Cumulative effect of a change in accounting principle related to stock-based compensation | | | 783 | 75 | | 858 |
| Net income | | | | 50,964 | | 50,964 |
| Balance at December 30, 2017 | 27,945,144 | $ 279 | $ 190,067 | $ 277,989 | $ 1,992 | $ 470,327 |

See accompanying Notes to Consolidated Financial Statements

42

Table of Contents

**iROBOT CORPORATION**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| | (In thousands) | | |
| **Cash flows from operating activities:** | | | |
| Net income | $ 50,964 | $ 41,939 | $ 44,130 |
| Adjustments to reconcile net income to net cash provided by operating activities, net of the effects of acquisitions: | | | |
| Depreciation and amortization | 25,499 | 13,606 | 15,304 |
| Gain on sale of business unit and cost method investment | (1,267) | (1,067) | (3,287) |
| (Income) loss on equity method investment | 65 | (1,376) | - |
| Impairment on cost method investment | 155 | - | - |
| Gain on business acquisition | (2,243) | - | - |
| Stock-based compensation | 19,751 | 15,995 | 14,183 |
| Deferred income taxes, net | (999) | 3,557 | (985) |
| Tax benefit of excess stock-based compensation deductions | - | (2,971) | (1,467) |
| Non-cash director deferred compensation | 65 | 82 | 149 |
| Other | 1,846 | - | - |
| Changes in operating assets and liabilities - (use) source | | | |
| Accounts receivable | (53,251) | 25,682 | (31,461) |
| Inventory | (1,470) | (981) | (13,978) |
| Other assets | (10,562) | 3,187 | 203 |
| Accounts payable | 17,457 | 6,502 | 3,786 |
| Accrued liabilities | 23,447 | 10,181 | (3,251) |
| Deferred revenue and customer advances | 2,149 | 2,996 | (584) |
| Long term liabilities | 4,709 | (908) | 3,970 |
| Net cash provided by operating activities | 76,315 | 116,424 | 26,712 |
| **Cash flows from investing activities:** | | | |
| Additions of property and equipment | (23,371) | (10,817) | (9,372) |
| Change in other assets | (1,542) | (2,093) | (1,015) |
| Proceeds from sale of business unit and cost method investment | 1,267 | 24,154 | 5,645 |
| Cash paid for business acquisitions, net of cash acquired | (148,765) | - | - |
| Purchases of investments | (10,578) | (16,554) | (17,755) |
| Sales and maturities of investments | 13,066 | 9,500 | 20,500 |
| Net cash provided by (used in) investing activities | (169,923) | 4,190 | (1,997) |
| **Cash flows from financing activities:** | | | |
| Income tax withholding payment associated with restricted stock vesting | (2,983) | (1,300) | (1,295) |
| Proceeds from stock option exercises | 10,573 | 9,344 | 6,464 |
| Stock repurchases | - | (97,021) | (37,393) |
| Tax benefit of excess stock-based compensation deductions | - | 2,971 | 1,467 |
| Net cash provided by (used in) financing activities | 7,590 | (86,006) | (30,757) |
| Effect of exchange rate changes on cash and cash equivalents | 130 | - | - |
| Net increase (decrease) in cash and cash equivalents | (85,888) | 34,608 | (6,042) |
| Cash and cash equivalents, at beginning of period | 214,523 | 179,915 | 185,957 |
| Cash and cash equivalents, at end of period | $ 128,635 | $ 214,523 | $ 179,915 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid for income taxes | $ 25,879 | $ 14,061 | $ 14,341 |
| Non-cash investing and financing activities: | | | |
| Additions of property and equipment included in accounts payable | $ 5,001 | $ 1,550 | $ 848 |

See accompanying Notes to Consolidated Financial Statements

43

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1.    **Nature of the Business**

iRobot Corporation ("iRobot" or the "Company") designs and builds robots that empower people to do more. The Company develops robotic technology and applies it to produce and market consumer robots. The Company's revenue is primarily generated from product sales.

2.    **Summary of Significant Accounting Policies**

*Basis of Presentation and Foreign Currency Translation*

The accompanying consolidated financial statements include those of iRobot and its subsidiaries, after elimination of all intercompany balances and transactions. In addition, certain prior year amounts have been reclassified to conform to the current year presentation. iRobot has prepared the accompanying consolidated financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP).

For the Company's subsidiaries that transact in a functional currency other than the U.S. dollar, assets and liabilities are translated into U.S. dollars at period-end foreign exchange rates. Revenues and expenses are translated into U.S. dollars at the average foreign exchange rates for the period. Translation adjustments are excluded from the determination of net income and are recorded in accumulated other comprehensive income (loss), a separate component of stockholders' equity.

*Use of Estimates*

The preparation of these financial statements in conformity with GAAP requires the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities, revenue and expenses and the disclosure of contingent assets and liabilities in the consolidated financial statements. These estimates and judgments, include but are not limited to, revenue recognition (specifically sales returns and other allowances); valuation of goodwill and acquired intangible assets; accounting for business combinations; evaluating loss contingencies; and accounting for income taxes and related valuation allowances. The Company bases these estimates and judgments on historical experience, market participant fair value considerations, projected future cash flows and various other factors that the Company believes are reasonable under the circumstances. Actual results may differ from the Company's estimates.

*Fiscal Year-End*

The Company operates and reports using a 52-53 week fiscal year ending on the Saturday closest to December 31. Accordingly, the Company's fiscal quarters end on the Saturday that falls closest to the last day of the third month of each quarter.

*Revenue Recognition*

The Company primarily derives its revenue from product sales. Until the divestiture of the defense and security business unit in April 2016 (see Note 4), the Company also generated minimal revenue from government and commercial research and development contracts. The Company sells products directly to customers and indirectly through resellers and distributors. The Company recognizes revenue from sales of robots under the terms of the customer agreement upon transfer of title and risk of loss to the customer, net of estimated returns and allowances, provided that collection is determined to be reasonably assured and no significant obligations remain.

Beginning in the third quarter of 2015, the Company introduced its first connected robot. Each sale of a connected robot represents a multiple-element arrangement containing the robot, an app and potential future unspecified software upgrades. Revenue is allocated to the deliverables based on their relative selling prices which have been determined using best estimate of selling price (BESP), as the Company has not been able to establish vendor specific objective evidence (VSOE) or obtain relevant third party evidence (TPE). Revenue allocated to the app and unspecified software upgrades is then deferred and recognized on a straight-line basis over the period in which the Company expects to provide the upgrades, which is the estimated life of the robot.

Sales to retailers of consumer robots are typically subject to agreements allowing for limited rights of return, rebates and price protection. The Company also provides limited rights of returns for direct-to-consumer sales generated through its on-line stores and certain international distributors. Accordingly, the Company reduces revenue for its estimates of liabilities for these rights of return, rebates, and price protection, as well as discounts and promotions, at the time the related sale is recorded. The estimates for rights of return are directly based on specific terms and conditions included in the customer agreements,

44

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

historical returns experience and various other assumptions that the Company believes are reasonable under the circumstances. In the case of new product introductions, the estimates for returns applied to the new products are based upon the estimates for the most similar predecessor products until such time that the Company has enough actual returns experience for the new products, which is typically two holiday return cycles. At that time, the Company incorporates that data into the development of returns estimates for the new products. The Company updates its analysis of returns on a quarterly basis. If actual returns differ significantly from the Company's estimates, or if modifications to individual customer agreements are entered into that impact their rights of returns, such differences could result in an adjustment to previously established reserves and could have a material impact, either favorably or unfavorably, on the Company's results of operations for the period in which the actual returns become known or the agreement is modified. In 2016, the Company began selling to one domestic distributor under an agreement that provides product return privileges. As a result, the Company recognizes revenue from sales to this distributor when the product is resold by the distributor. The estimates and adjustments for rebates and price protection are based on specific programs, expected usage and historical experience. Actual results could differ from these estimates. As of December 30, 2017, the Company has reserves for product returns of $42.7 million, discounts and promotions of $58.2 million and price protection of $3.1 million. As of December 31, 2016, the Company had reserves for product returns of $27.7 million, discounts and promotions of $22.1 million and price protection of $1.5 million.

Prior to the Company's divestiture of the defense and security business unit in April 2016 (see Note 4), the Company generated minimal revenue from government contracts. Under cost-plus-fixed-fee (CPFF) type contracts, the Company recognized revenue based on costs incurred plus a pro rata portion of the total fixed fee. Costs incurred included labor and material that were directly associated with individual CPFF contracts plus indirect overhead and general and administrative type costs based upon billing rates submitted by the Company to the Defense Contract Management Agency (DCMA). Annually, the Company submitted final indirect billing rates to DCMA based upon actual costs incurred throughout the year. In the situation where the Company's final actual billing rates are greater than the estimated rates used, the Company records a cumulative revenue adjustment in the period in which the rate differential is collected from the customer. These final billing rates are subject to audit by the Defense Contract Audit Agency (DCAA), which can occur several years after the final billing rates are submitted and may result in material adjustments to revenue recognized based on estimated final billing rates. As of December 30, 2017, fiscal year 2016 is open for audit by DCAA. In the situation where the Company's anticipated actual billing rates will be lower than the provisional rates used, the Company records a cumulative revenue adjustment in the period in which the rate differential is identified. Revenue on firm fixed price (FFP) contracts was recognized using the percentage-of-completion method. For government product FFP contracts, revenue was recognized as the product was shipped or in accordance with the contract terms. Costs and estimated gross margins on contracts were recorded as revenue as work was performed based on the percentage that incurred costs compared to estimated total costs utilizing the most recent estimates of costs and funding. Revenue earned in excess of billings, if any, was recorded as unbilled revenue. Billings in excess of revenue earned, if any, were recorded as deferred revenue.

### Business Combinations

The Company accounts for transactions that represent business combinations under the acquisition method of accounting. The Company allocates the total consideration paid for each acquisition to the assets it acquires and liabilities it assumes based on their fair values as of the date of acquisition, including identifiable intangible assets. The Company bases the fair value of identifiable intangible assets acquired in a business combination on valuations that use information and assumptions determined by management and which consider management's best estimates of inputs and assumptions that a market participant would use. While the Company uses its best estimates and assumptions as part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, its estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the measurement period, which is generally one year from the acquisition date, any adjustment to the assets acquired and liabilities assumed is recorded against goodwill in the period in which the amount is determined. Any adjustment identified subsequent to the measurement period is included in operating results in the period in which the amount is determined.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with an original or remaining maturity of three months or less at the time of purchase to be cash equivalents. The Company invests its excess cash primarily in money market funds or savings accounts of major financial institutions. Accordingly, its cash equivalents are subject to minimal credit and market risk. At December 30, 2017 and December 31, 2016, cash equivalents were comprised of money market funds totaling $3.2 million and $157.0 million, respectively. These cash equivalents are carried at cost, which approximates fair value.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Short Term Investments*

The Company's investments are classified as available-for-sale and are recorded at fair value with any unrealized gain or loss recorded as an element of stockholders' equity. The fair value of investments is determined based on quoted market prices at the reporting date for those instruments. As of December 30, 2017 and December 31, 2016, investments consisted of:

| | December 30, 2017 | | December 31, 2016 | |
| --- | --- | --- | --- | --- |
| | Cost | Fair Market Value | Cost | Fair Market Value |
| | (In thousands) | | | |
| Corporate and government bonds | $ 37,767 | $ 37,225 | $ 40,439 | $ 39,930 |
| Total short term investments | $ 37,767 | $ 37,225 | $ 40,439 | $ 39,930 |

As of December 30, 2017, the Company's investments had maturity dates ranging from March 2018 to September 2020. The Company invests primarily in investment grade securities and limits the amount of investment in any single issuer.

*Accounts receivable allowances*

*Allowance for product returns*: The Company records an allowance for product returns for the estimated amount of product that may be returned. The allowance is based on specific terms and conditions included in the customer agreements, historical returns experience and various other assumptions that the Company believes are reasonable under the circumstances.

*Allowance for discounts and promotions*: The Company records an allowance for discounts and promotions related to promotional marketing support, contractual discounts, etc. The allowance is based on specific programs, expected usage and historical experience.

*Allowance for price protection*: The Company records an allowance for price protection for the estimated amount of support expected to be provided to customers for product transitions. The allowance is based on specific programs, expected usage and historical experience.

*Allowance for doubtful accounts*: The Company records an allowance for doubtful accounts for the estimated amount of accounts receivable that may not be collected. The allowance is based on an assessment of customer creditworthiness, historical payment experience and the age of outstanding receivables.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Activity related to accounts receivable allowances was as follows:

| | | Fiscal Year Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | December 30, 2017 | | December 31, 2016 | | January 2, 2016 |
| | | (In thousands) | | | | |
| **Allowance for product returns** | | | | | | |
| Balance at beginning of period | $ | 27,673 | $ | 25,992 | $ | 27,449 |
| Acquired balance | | 6,088 | | - | | - |
| Provision | | 54,981 | | 33,992 | | 27,432 |
| Deduction | | (43,831) | | (28,826) | | (21,979) |
| Other adjustments | | (2,218) | | (3,485) | | (6,910) |
| Balance at end of period | $ | 42,693 | $ | 27,673 | $ | 25,992 |
| | | | | | | |
| **Allowance for discounts and promotions** | | | | | | |
| Balance at beginning of period | $ | 22,108 | $ | 23,005 | $ | 10,749 |
| Acquired balance | | 11,932 | | - | | - |
| Provision | | 107,390 | | 45,869 | | 39,482 |
| Deduction | | (79,652) | | (46,610) | | (26,587) |
| Other adjustments | | (3,567) | | (156) | | (639) |
| Balance at end of period | $ | 58,211 | $ | 22,108 | $ | 23,005 |
| | | | | | | |
| **Allowance for price protection** | | | | | | |
| Balance at beginning of period | $ | 1,550 | $ | - | $ | - |
| Acquired balance | | - | | - | | - |
| Provision | | 3,215 | | 1,550 | | - |
| Deduction | | (1,617) | | - | | - |
| Other adjustments | | - | | - | | - |
| Balance at end of period | $ | 3,148 | $ | 1,550 | $ | - |
| | | | | | | |
| **Allowance for doubtful accounts** | | | | | | |
| Balance at beginning of period | $ | 29 | $ | 33 | $ | 67 |
| Acquired balance | | 248 | | - | | - |
| Provision | | 1 | | - | | - |
| Deduction | | (2) | | (4) | | (34) |
| Other adjustments | | - | | - | | - |
| Balance at end of period | $ | 276 | $ | 29 | $ | 33 |

*Inventory*

Inventory is stated at the lower of cost or net realizable value with cost being determined using the first-in, first-out (FIFO) method. The Company maintains a reserve for inventory items to provide for an estimated amount of excess or obsolete inventory.

*Warranty*

The Company typically provides a one-year warranty (with the exception of European consumer products, which typically have a two-year warranty period) against defects in materials and workmanship and will either repair the goods, provide replacement products at no charge to the customer or refund amounts to the customer for defective products. The Company records estimated warranty costs, based on historical experience by product, at the time revenue is recognized.

47

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Actual results could differ from these estimates, which could cause increases or decreases to the warranty reserves in future periods.

### Property and Equipment

Property and equipment are recorded at cost and consist primarily of computer equipment, leasehold improvements, business applications software and machinery. Depreciation is computed using the straight-line method over the estimated useful lives as follows:

|  | Estimated Useful Life |
|---|---|
| Computer and research equipment | 2-5 years |
| Furniture | 5 |
| Machinery | 2-5 |
| Tooling | 2-5 |
| Business applications software | 5-7 |
| Capital leases and leasehold improvements | Lesser of economic benefit period or term of lease |

Expenditures for additions, renewals and betterments of property and equipment are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. As assets are retired or sold, the related cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is credited or charged to operations.

### Goodwill and Other Long-Lived Assets

Goodwill represents the excess of the purchase price in a business combination over the fair value of the net tangible and intangible assets acquired. Goodwill is not amortized but rather is assessed for impairment at the reporting unit level (operating segment or one level below an operating segment) annually or more frequently if the Company believes indicators of impairment exist. Goodwill impairment, if any, is determined by comparing the reporting unit's fair value to its carrying value. An impairment loss is recognized in an amount equal to the excess of the reporting unit's carrying value over its fair value, up to the amount of goodwill allocated to the reporting unit. The Company completes the annual impairment evaluation during the fourth quarter each year.

Other long-lived assets consist principally of completed technology, tradename, customer relationships, reacquired distribution rights and non-competition agreements. Reacquired distribution rights are amortized on an accelerated basis while all other intangible assets are amortized over their respective estimated useful lives on a straight-line basis, consistent with the pattern in which the economic benefits are being utilized.

The Company periodically evaluates the recoverability of other long-lived assets whenever events and changes in circumstances, such as reductions in demand or significant economic slowdowns in the industry, indicate that the carrying amount of an asset may not be fully recoverable. When indicators of impairment are present, the carrying values of the asset group are evaluated in relation to the future undiscounted cash flows of the underlying business. The net book value of the underlying asset is adjusted to fair value if the sum of the expected discounted cash flows is less than book value. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

The impairment assessment of goodwill and other long-lived assets involves significant estimates and assumptions, which may be unpredictable and inherently uncertain. These estimates and assumptions include identification of reporting units and asset groups, long-term growth rates, profitability, estimated useful lives, comparable market multiples, and discount rates. Any changes in these assumptions could impact the result of the impairment assessment.

### Other Assets

At December 30, 2017 and December 31, 2016, other assets consisted primarily of cost and an equity method investment totaling $14.2 million and $12.9 million, respectively. The Company regularly monitors these investments to determine if facts and circumstances have changed in a manner that would require a change in accounting methodology. Additionally, the Company regularly evaluates whether or not these investments have been impaired by considering such factors as economic environment, market conditions, operational performance and other specific factors relating to the businesses underlying the investments. If any such impairment is identified, a reduction in the carrying value of the investments would be recorded at that time.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Financial Instruments and Hedging Activities*

The Company utilizes derivative instruments to hedge specific financial risks including foreign exchange risk. The Company does not engage in speculative hedging activity. In order to account for a derivative instrument as a hedge, specific criteria must be met, including: (i) ensuring at the inception of the hedge that formal documentation exists for both the hedging relationship and the entity's risk management objective and strategy for undertaking the hedge and (ii) at the inception of the hedge and on an ongoing basis, the hedging relationship is expected to be highly effective in achieving offsetting changes in fair value attributed to the hedged risk during the period that the hedge is designated. Further, an assessment of effectiveness is required whenever financial statements or earnings are reported. Absent meeting these criteria, changes in fair value are recognized in other income, net, in the consolidated statements of income. Once the underlying forecasted transaction is realized, the gain or loss from the derivative designated as a hedge of the transaction is reclassified from accumulated other comprehensive income (loss) to the statement of income, in revenue or cost of revenue. Any ineffective portion of the derivatives designated as cash flow hedges is recognized in current earnings.

*Fair Value Measurements*

The Company accounts for certain assets and liabilities at fair value. The fair value is established based on a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include:

- Level 1 - observable inputs such as quoted prices for identical instruments in active markets;
- Level 2 - inputs other than quoted prices in active markets that are either directly or indirectly observable; and
- Level 3 - unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

*Stock-Based Compensation*

The Company accounts for stock-based compensation through recognition of the fair value of the stock-based compensation as a charge against earnings. The fair value of employee stock options is estimated at the grant date using the Black-Scholes option-pricing model. The fair value for restricted stock awards, time-based restricted stock units and performance-based restricted stock units is based on the closing share price of the Company's common stock on the date of grant. For performance-based restricted stock units, the compensation cost is recognized based on the number of units expected to vest upon the achievement of the performance conditions. The Company recognizes stock-based compensation as expense over the requisite service period. The Company has elected to account for forfeitures as they occur, rather than applying an estimated forfeiture rate, following its adoption of ASU 2016-09 in the first quarter of 2017.

*Research and Development*

Costs incurred in the research and development of the Company's products are expensed as incurred.

*Internal Use Software*

The Company capitalizes costs associated with the development and implementation of software for internal use. At December 30, 2017 and December 31, 2016, the Company had $12.8 million and $9.5 million, respectively, of costs related to enterprise-wide software included in fixed assets. Capitalized costs are being amortized over the assets' estimated useful lives. The Company has recorded $1.5 million, $0.4 million and $0.7 million of amortization expense for the years ended December 30, 2017, December 31, 2016 and January 2, 2016, respectively.

*Advertising Expense*

The Company expenses advertising costs as they are incurred. During the years ended December 30, 2017, December 31, 2016 and January 2, 2016 advertising expense totaled $91.8 million, $64.4 million and $54.7 million, respectively, and are recorded within the selling and marketing expenses line item.

*Income Taxes*

Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis using enacted tax rates in effect in the years in which those temporary differences are expected to be recovered or settled in each jurisdiction. A valuation allowance is provided if, based upon the weight of available evidence, it is more likely than not that the related benefits will not be realized. The Company regularly reviews the deferred tax assets for recoverability considering historical profitability, projected future taxable income, future reversals of existing taxable temporary differences, as well as feasible tax planning strategies in each jurisdiction. As of December 30, 2017, the Company recorded a valuation allowance of $0.8 million for certain foreign deferred tax assets for which the Company believes do not meet the "more likely than not" criteria for recognition.

49

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The Company reports a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return. The Company recognizes interest and penalties, if any, related to unrecognized tax benefits in the income tax provision.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 (the "Act") was signed into law making significant changes to the Internal Revenue Code. Changes include, but are not limited to, a federal corporate tax rate decrease from 35% to 21% for tax years beginning after December 31, 2017, the transition of U.S. international taxation from a worldwide tax system to a territorial system and a one-time transition tax on the mandatory deemed repatriation of foreign earnings. We have estimated our provision for income taxes in accordance with the Act and guidance available as of the date of this filing and as a result have recorded a one-time income tax provision of $11.9 million in the fourth quarter of 2017, the period in which the legislation was enacted. The one-time income tax provision includes $8.9 million related to the remeasurement of certain deferred tax assets and liabilities based on the tax rates at which they are expected to reverse in the future. The one-time income tax expense also includes a provisional amount of $3.0 million related to the one-time transition tax on the mandatory deemed repatriation of foreign earnings.

On December 22, 2017, Staff Accounting Bulletin No. 118 (SAB 118) was issued to address the application of U.S. GAAP in situations when a registrant does not have the necessary information available, prepared, or analyzed (including computations) in reasonable detail to complete the accounting for certain income tax effects of the Act. In accordance with SAB 118, we have determined that the $3.0 million of current income tax provision recorded relating to the transition tax on the mandatory deemed repatriation of foreign earnings was a provisional amount and a reasonable estimate at December 30, 2017. Additional information and analysis is necessary to complete the calculation and accounting relating to the transition tax on the mandatory deemed repatriation of foreign earnings. Any subsequent adjustments to this amount will be recorded to current income tax provision during the measurement period which is not expected to extend beyond one year from the enactment date.

### Concentration of Credit Risk and Significant Customers

Financial instruments which potentially expose the Company to concentrations of credit risk consist of accounts receivable. Management believes its credit policies are prudent and reflect normal industry terms and business risk. At December 30, 2017, one customer accounted for a total of 11.5% of the Company's accounts receivable balance. At December 31, 2016, three customers accounted for a total of 43.9% of the Company's accounts receivable balance, each of which was greater than 10% of the balance and two of whom secured their balance with guaranteed letters of credit, which together represents 32.5% of the balance. For the fiscal year ended December 30, 2017, the Company generated 13.5% of total revenue from one of its retailers (Amazon). For the fiscal year ended December 31, 2016, the Company generated 12.9%, 12.3% and 10.4% of total revenue from its distributor in Japan, Sales On Demand Corporation (SODC), Robopolis SAS, a network of affiliated European distributors (Robopolis) and Amazon, respectively. For the fiscal year ended January 2, 2016, the Company generated 13.3% and 12.7% of total revenue from SODC and Robopolis, respectively. On April 3, 2017, the Company acquired the iRobot-related distribution business of SODC, and on October 2, 2017, the Company acquired Robopolis (see Note 3).

The Company maintains its cash in bank deposit accounts at high quality financial institutions. The individual balances, at times, may exceed federally insured limits.

### Net Income Per Share

Basic income per share is calculated using the Company's weighted-average outstanding common shares. Diluted income per share is calculated using the Company's weighted-average outstanding common shares including the dilutive effect of stock awards as determined under the treasury stock method. The following table presents the calculation of both basic and diluted net income per share:

|  | Fiscal Year Ended | | |
|  | December 30, 2017 | December 31, 2016 | January 2, 2016 |
|---|---|---|---|
| Net income | $ 50,964 | $ 41,939 | $ 44,130 |
| Weighted-average shares outstanding | 27,611 | 27,698 | 29,550 |
| Dilutive effect of employee stock options and restricted shares | 1,142 | 594 | 557 |
| Diluted weighted-average shares outstanding | 28,753 | 28,292 | 30,107 |
| Basic income per share | $ 1.85 | $ 1.51 | $ 1.49 |
| Diluted income per share | $ 1.77 | $ 1.48 | $ 1.47 |

50

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Restricted stock units and stock options representing approximately 0.0 million, 0.4 million and 0.5 million shares of common stock for the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, respectively, were excluded from the computation of diluted earnings per share as their effect would have been antidilutive.

*Recently Adopted Accounting Standards*

In May 2017, the Financial Accounting Standards Board (FASB) issued Accounting Standards update (ASU) No. 2017-09, "Stock Compensation - Scope of Modification Accounting," that clarifies that all changes to share-based payment awards are not necessarily accounted for as a modification. Under the new guidance, modification accounting is required only if the fair value, the vesting conditions, or the classification of the award changes as a result of the change in terms or conditions. This guidance is effective prospectively beginning January 1, 2018, with early adoption permitted. This guidance will apply to any future modifications. During the fourth quarter of 2017, the Company adopted this standard, which did not have an impact on the Company's consolidated financial statements and related disclosures.

In January 2017, the FASB issued ASU No. 2017-01, "Business Combinations; Clarifying the Definition of a Business." ASU 2017-01 clarifies the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. This guidance is effective for annual periods beginning after December 15, 2017, including interim periods within those periods. During the fourth quarter of 2017, the Company adopted this standard, which did not have an impact on the Company's consolidated financial statements and related disclosures.

In January 2017, the FASB issued ASU No. 2017-04, "Intangibles - Goodwill and Other." ASU 2017-04 eliminates step 2 from the goodwill impairment test, instead requiring that an entity recognize an impairment charge for the amount by which the carrying amount of goodwill exceeds the reporting unit's fair value. ASU 2017-04 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, with early adoption permitted. During the fourth quarter of 2017, the Company adopted this standard, which did not have a material impact on the Company's consolidated financial statements and related disclosures.

In August 2016, the FASB issued ASU No. 2016-15, "Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments." ASU 2016-15 refines how companies classify certain aspects of the cash flow statement in regards to debt prepayment, settlement of debt instruments, contingent consideration payments, proceeds from insurance claims and life insurance policies, distribution from equity method investees, beneficial interests in securitization transactions and separately identifiable cash flows. ASU 2016-15 is effective for annual periods beginning after December 15, 2017, and for interim periods within fiscal years beginning after December 15, 2018. Early adoption is permitted. During the fourth quarter of 2017, the Company adopted this standard, which did not have a material impact on the Company's consolidated financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-09, "Improvements to Employee Share-Based Payment Accounting," which simplifies several aspects of the accounting for share-based payment transactions, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. Under the new standard, all excess tax benefits and tax deficiencies are recorded as a component of the provision for income taxes in the reporting period in which they occur. Additionally, ASU 2016-09 requires that the Company present excess tax benefits on the Statement of Cash Flows as an operating activity. The Company adopted ASU 2016-09 effective January 1, 2017 and elected to apply this adoption prospectively. Upon the adoption, the Company elected to account for forfeitures of share-based payments as they occur prospectively. Prior periods have not been adjusted. As of the adoption date, this standard did not have a material impact on the Company's consolidated financial statements.

In July 2015, the FASB issued ASU No. 2015-11, "Inventory: Simplifying the Measurement of Inventory." ASU 2015-11 applies only to inventory for which cost is determined by methods other than last-in, first-out and the retail inventory method, which includes inventory that is measured using first-in, first-out or average cost. Inventory within the scope of this standard is required to be measured at the lower of cost and net realizable value. Net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The Company adopted ASU 2015-11 effective January 1, 2017. The adoption of this standard did not have a material impact on the Company's consolidated financial statements and related disclosures.

*Recently Issued Accounting Standards*

In August 2017, the FASB issued ASU No. 2017-12, "Derivatives and Hedging," that was created to better align accounting rules with a company's risk management activities, better reflect the economic results of hedging in the financial statements, and simplify hedge accounting treatment. The guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, with early adoption permitted. For cash flow hedges existing at the

51

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

adoption date, the standard requires adoption on a modified retrospective basis with a cumulative-effect adjustment to the consolidated balance sheet as of the beginning of the year of adoption. The amendments to presentation guidance and disclosure requirements are required to be adopted prospectively. The Company is currently evaluating the impact of the standard on its consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-16, "Income Taxes: Intra-Entity Transfers of Assets Other Than Inventory." ASU 2016-16 clarifies the accounting for the current and deferred income taxes for an intra-entity transfer of an asset other than inventory. ASU 2016-16 is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, with early adoption permitted. The Company does not believe the adoption of ASU 2016-16 will have a material impact on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, "Leases." ASU 2016-02 requires lessees to recognize the assets and liabilities on their balance sheet for the rights and obligations created by most leases and continue to recognize expenses on their income statements over the lease term. It will also require disclosures designed to give financial statement users information on the amount, timing, and uncertainty of cash flows arising from leases. The guidance is effective for annual reporting periods beginning after December 15, 2018 and interim periods within those fiscal years, with early adoption permitted. The Company is currently evaluating the impact of the pending adoption of ASU 2016-02 on its consolidated financial statements, and currently expects that most of its operating lease commitments will be subject to the new standard and recognized as operating lease liabilities and right-of-use assets upon its adoption of ASU 2016-02, which will increase the total assets and total liabilities that the Company reports relative to such amounts prior to adoption.

In May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers," which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The new guidance was originally effective for annual reporting periods beginning after December 15, 2016, including interim periods within those annual reporting periods. In July 2015, the FASB voted to defer the effective date of the new accounting guidance related to revenue recognition by one year to December 17, 2017 for annual reporting periods beginning after that date and permitted early adoption of the standard, but not before the original effective date of December 15, 2016. The standard will be effective for the Company beginning in the first quarter of 2018. The Company will adopt the standard using the modified retrospective method.

The Company primarily derives its revenue from product sales. The adoption is not expected to have a material effect on the timing of recognition or measurement of revenue from the Company's product sales. The Company also derives revenue from sales of connected robots, which represent arrangements with multiple performance obligations consisting of the robot, the iRobot Home app, potential future unspecified software upgrades and cloud services. ASU 2014-09 requires revenue to be allocated amongst material performance obligations based on stand-alone selling price and recognized based on the transfer of control of the material performance obligations. It is the Company's position that the app, upgrades and cloud services related to the current offerings constitute a single immaterial performance obligation and therefore, the revenue associated with the robot and services will be recognized upon transfer of control to the customer.

The Company's product sales are typically subject to limited rights of return, rebates, discounts and promotions and price protection. Accordingly, the Company reduces revenue for its estimates of allowances for these rights of return, rebates, discounts and promotions and price protection at the time the related sale is recorded based on contractual term, future expectation and historical experience. The Company does not expect that there will be material changes to the recognition of these allowances, and that these will continue to be recorded at the time the related revenue is recorded for the sales. The Company does expect that upon adoption of the standard, certain compliance-related charges will be estimated and recorded as a reduction of revenue at the time of sale, rather than upon resolution of the validity of the charges, but expects the impact of this to be immaterial to revenue.

The Company does not expect the provisions of the new standard to impact the manner in which it treats certain costs to fulfill contracts (i.e., shipping and handling costs) and costs to acquire new contracts (i.e., commissions). Under the new standard, the Company will elect the practical expedient on shipping and handling costs and continue to treat these costs as fulfillment costs and expense as incurred. Further, commissions will continue to be expensed as incurred as the impact to the consolidated financial statements is immaterial. The new standard will also result in enhanced revenue related disclosures.

From time to time, new accounting pronouncements are issued by FASB that are adopted by the Company as of the specified effective date. Unless otherwise discussed, the Company believes that recently issued standards, which are not yet effective, will not have a material impact on the Company's consolidated financial statements upon adoption.

52

Table of Contents

3.    **Business Combinations**

*Acquisition of Robopolis*

On October 2, 2017, the Company closed the acquisition of its largest European distributor, Robopolis SAS, a French company (Robopolis), subsequently renamed to iRobot France SAS. The initial purchase price was approximately $170.1 million in cash, net of acquired cash of $38.0 million, subject to the finalization of the working capital adjustment in accordance with the stock purchase agreement. The acquisition will better enable the Company to maintain its leadership position and grow its business in several Western European countries through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. The results of operations for this acquisition have been included in the Company's operating results since the acquisition date.

The estimated fair values of assets acquired and liabilities assumed are provisional and are based on the information that was available as of the acquisition date to estimate the fair value of assets acquired and liabilities assumed. Therefore, the provisional measurements of fair value reflected are subject to change and such changes could be significant. The Company is continuing to analyze certain pre-acquisition income tax filing positions of Robopolis in various taxing jurisdictions that will assist the Company in finalizing the amounts to record any assumed uncertain income tax positions. The Company expects to finalize the valuation and complete the purchase price allocation as soon as practicable, but no later than one year from the acquisition date.

The following table summarizes the preliminary allocation of the purchase price (in thousands):

| | | |
|---|---|---:|
| Cash | $ | 37,981 |
| Accounts receivable | | 21,426 |
| Inventory | | 36,304 |
| Goodwill | | 79,558 |
| Intangible assets | | 36,597 |
| Other assets | | 2,456 |
| Total assets | | 214,322 |
| | | |
| Accounts payable | | (29,391) |
| Accrued expenses | | (3,376) |
| Deferred tax liabilities | | (10,833) |
| Other liabilities | | (645) |
| Total liabilities assumed | | (44,245) |
| Net assets acquired | $ | 170,077 |

The following table reflects the fair value of the acquired identifiable intangible assets and related estimates of useful lives:

| | Useful Life | Fair Value | |
|---|:---:|---|---:|
| | | (in thousands) | |
| Reacquired distribution rights | 2.25 years | $ | 29,296 |
| Customer relationships | 14 years | | 7,029 |
| Non-competition agreements | 3 years | | 272 |
| Total | | $ | 36,597 |

The amount assigned to identifiable intangible assets acquired was based on their fair values determined as of the acquisition date, primarily using the income approach by discounting to present value the free cash flows expected to be generated by each asset over its remaining life. The discount rate used was approximately 14.5%. Reacquired distribution rights are amortized on an accelerated basis while all other intangible assets are amortized over their respective estimated useful lives on a straight-line basis, consistent with the pattern in which the economic benefits are being utilized.

53

Table of Contents

Goodwill represents the excess of the purchase price over the fair values of the net tangible and intangible assets acquired. In accordance with current accounting standards, the goodwill is not being amortized and will be tested for impairment at least annually. None of the goodwill associated with this transaction will be deductible for tax purposes.

***Acquisition of Sales On Demand Corporation***

On April 3, 2017, the Company closed its acquisition of the iRobot-related distribution business of Sales On Demand Corporation (SODC), iRobot Japan G.K., for approximately $16.6 million in cash, equal to the book value of the acquired assets. The acquisition will better enable the Company to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. It also expands the Company's presence and customer outreach opportunities in Japan. The acquisition was a stock purchase. The results of operations for this acquisition have been included in the Company's operating results since the acquisition date.

During the three months ended September 30, 2017, the Company finalized the purchase price allocation and made measurement period adjustments to the provisional amounts reported as the estimated fair values of assets acquired. These measurement period adjustments resulted in a $2.2 million non-taxable gain on business acquisition which represents the excess of the fair value of the net assets acquired over the purchase price. The gain on business acquisition was recorded within other income, net in the consolidated statements of income. The Company believes that the gain on business acquisition was due to the transaction not being subjected to a competitive bidding process and the purchase price being determined based on the net book value of the net assets acquired.

The following table summarizes the final allocation of the purchase price (in thousands):

| | | |
|---|---|---:|
| Cash | $ | 125 |
| Accounts receivable, net (1) | | (5,496) |
| Inventory | | 18,290 |
| Other assets | | 2,065 |
| Deferred tax assets, net | | 409 |
| Goodwill | | - |
| Intangible assets | | 8,640 |
| Total assets acquired | | 24,033 |
| | | |
| Accrued expenses and other current liabilities | | (4,450) |
| Other liabilities | | (691) |
| Total liabilities assumed | | (5,141) |
| Net assets acquired | $ | 18,892 |
| Gain on business acquisition | | (2,243) |
| Total purchase price | $ | 16,649 |

) The accounts receivable balance reflects reserves for product returns, discounts and promotions assumed as part of the acquisition.

54

Table of Contents

The following table reflects the fair value of the acquired identifiable intangible assets and related estimates of useful lives:

| | Useful Life | Fair Value |
| --- | --- | --- |
| | | (in thousands) |
| Customer relationships | 13 years | $ 4,490 |
| Reacquired distribution rights | 9 months | 4,150 |
| Total | | $ 8,640 |

*Pro Forma Results (Unaudited)*

The following table shows unaudited pro forma results of operations as if we had acquired Robopolis on January 3, 2016 (dollars in thousands, except per share amounts):

| | Fiscal Year Ended | |
| --- | --- | --- |
| | December 30, 2017 | December 31, 2016 |
| Revenue | $ 901,612 | $ 718,917 |
| Net income | $ 51,887 | $ 53,320 |
| Net income per share: | | |
| Basic income per share | $ 1.88 | $ 1.93 |
| Diluted income per share | $ 1.80 | $ 1.88 |

We have not furnished pro forma financial information relating to our other fiscal 2017 acquisition because such information is not material, individually or in the aggregate, to our financial results. The unaudited pro forma results of operations are not necessarily indicative of the actual results that would have occurred had the transactions taken place at the beginning of the periods indicated.

4.    **Divestiture**

In April 2016, the Company completed the sale of its defense and security business unit to iRobot Defense Holdings, Inc., a portfolio company of Arlington Capital Partners. The final purchase price, including adjustments for working capital and indebtedness, was $24.5 million. The Company recognized a gain of $0.4 million on the sale of assets. The sale of its defense and security business did not meet the criteria for discontinued operations presentation as it did not represent a strategic shift that had a major effect on the Company's operations and financial results.

The Company and iRobot Defense Holdings, Inc. also entered into a Transition Services Agreement (TSA), pursuant to which the Company continued to perform certain functions on iRobot Defense Holdings Inc.'s behalf during a transition period not to exceed 12 months. The TSA provided for the reimbursement to the Company for direct costs incurred in order to provide such functions and was recorded as a component of other income. The transition period was completed during the three months ended April 1, 2017.

5.    **Inventory**

Inventory consists of the following at:

| | December 30, 2017 | December 31, 2016 |
| --- | --- | --- |
| | (In thousands) | |
| Raw materials | $ 4,036 | $ 4,717 |
| Finished goods | 102,896 | 45,861 |
| | $ 106,932 | $ 50,578 |

55

Table of Contents

6.    **Property and Equipment**

Property and equipment consists of the following at:

| | December 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| | (In thousands) | | | |
| Computer and equipment | $ | 10,669 | $ | 7,378 |
| Furniture | | 4,120 | | 2,906 |
| Machinery | | 14,202 | | 9,154 |
| Tooling | | 31,783 | | 20,487 |
| Leasehold improvements | | 26,136 | | 21,383 |
| Business applications software | | 12,757 | | 9,471 |
| | | 99,667 | | 70,779 |
| Less: accumulated depreciation | | 55,088 | | 43,247 |
| | $ | 44,579 | $ | 27,532 |

Depreciation expense for the years ended December 30, 2017, December 31, 2016 and January 2, 2016 was $12.3 million, $10.0 million, and $11.4 million, respectively.

7.    **Goodwill and other intangible assets**

The following table summarizes the activity in the carrying amount of goodwill for fiscal years 2017 and 2016:

| | (In thousands) | |
|---|---|---|
| Balance as of January 2, 2016 | $ | 48,751 |
| Divestiture (1) | | (7,710) |
| Balance as of December 31, 2016 | | 41,041 |
| Acquisitions (Note 3) | | 79,558 |
| Effect of foreign currency translation | | 841 |
| Balance as of December 30, 2017 | $ | 121,440 |

(1)    In April 2016, the Company completed the sale of its defense and security business unit and therefore the goodwill balance assigned to the defense and security business unit was written off during the three months ended July 2, 2016.

Intangible assets at December 30, 2017 and December 31, 2016 consisted of the following:

| | December 30, 2017 | | | | | | December 31, 2016 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost | | Accumulated Amortization | | Net | | Cost | | Accumulated Amortization | | Net | |
| | (In thousands) | | | | | | | | | | | |
| Completed technology | $ | 26,900 | $ | 18,150 | $ | 8,750 | $ | 26,900 | $ | 14,693 | $ | 12,207 |
| Tradename | | 100 | | 100 | | - | | 100 | | 100 | | - |
| Customer relationships | | 11,594 | | 418 | | 11,176 | | - | | - | | - |
| Reacquired distribution rights | | 33,760 | | 9,226 | | 24,534 | | - | | - | | - |
| Non-competition agreements | | 275 | | 23 | | 252 | | - | | - | | - |
| Total | $ | 72,629 | $ | 27,917 | $ | 44,712 | $ | 27,000 | $ | 14,793 | $ | 12,207 |

56

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Amortization expense related to acquired intangible assets was $13.1 million, $3.5 million, and $3.5 million for the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, respectively. The estimated future amortization expense related to current intangible assets in each of the five succeeding fiscal years is expected to be as follows:

|  | (In thousands) |
|---|---|
| 2018 | $ 19,767 |
| 2019 | 13,188 |
| 2020 | 1,950 |
| 2021 | 1,714 |
| 2022 | 1,489 |
| Thereafter | 6,604 |
| Total | $ 44,712 |

57

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

8.    **Accrued Expenses**

Accrued expenses consist of the following at:

|  | December 30, 2017 | December 31, 2016 |
|---|---|---|
|  | (In thousands) | |
| Accrued bonus | 20,443 | 14,226 |
| Accrued warranty | 11,264 | 8,464 |
| Accrued other compensation | 9,071 | 6,789 |
| Accrued sales and other taxes | 7,256 | 422 |
| Accrued federal and state income taxes | 7,110 | 1,059 |
| Accrued sales and marketing | 3,299 | 404 |
| Accrued direct fulfillment costs | 1,885 | 1,722 |
| Accrued customer deposits | 1,324 | 1,171 |
| Accrued accounting fees | 1,221 | 686 |
| Accrued rent | - | 327 |
| Accrued other | 10,774 | 5,599 |
|  | $ 73,647 | $ 40,869 |

9.    **Working Capital Facilities**

*Credit Facility*

The Company has an unsecured revolving credit facility with Bank of America, N.A., which is available to fund working capital and other corporate purposes. As of December 30, 2017, the total amount of the credit facility was $75.0 million and the full amount was available for borrowing. The interest on loans under the credit facility will accrue, at the Company's election, at either (1) LIBOR plus a margin, currently equal to 1.0%, based on the Company's ratio of indebtedness to Adjusted EBITDA (the "Eurodollar Rate"), or (2) the lender's base rate. The lender's base rate is equal to the highest of (1) the federal funds rate plus 0.5%, (2) the lender's prime rate and (3) the Eurodollar Rate plus 1.0%. The credit facility will terminate and all amounts outstanding thereunder will be due and payable in full on December 20, 2018.

As of December 30, 2017, the Company had no outstanding borrowings under its revolving credit facility. This credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on the Company's ability to incur or guarantee additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, the Company's stock, and consolidate or merge with other entities.

In addition, the Company is required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

This credit facility contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the Company's obligations under the credit facility may be accelerated.

As of December 30, 2017, the Company was in compliance with all covenants under its credit facility.

*Letter of Credit Facility*

The Company has an unsecured revolving letter of credit facility with Bank of America, N.A. The credit facility is available to fund letters of credit on the Company's behalf up to an aggregate outstanding amount of $5 million. The Company may terminate at any time, subject to proper notice, or from time to time permanently reduce the amount of the credit facility.

The Company pays a fee on outstanding letters of credit issued under the credit facility of up to 1.5% per annum of the outstanding letters of credit. The maturity date for letters of credit issued under the credit facility must be no later than 365 days following the maturity date of the credit facility.

Table of Contents

As of December 30, 2017, there were letters of credit outstanding of $1.0 million under the revolving letter of credit facility. The credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on the Company's ability to incur or guarantee additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase stock, and consolidate or merge with other entities. In addition, the Company is required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

The credit facility also contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy, and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the lender may accelerate the obligations under the credit facility.

As of December 30, 2017, the Company was in compliance with all covenants under the revolving letter of credit facility.

### 10.    Derivative Instruments and Hedging Activities

The Company operates internationally and, in the normal course of business, is exposed to fluctuations in foreign currency exchange rates. The foreign currency exposures typically arise from transactions denominated in currencies other than the functional currency of the Company's operations, primarily the Japanese Yen, Canadian dollar and the Euro. The Company uses derivative instruments that are designated in cash flow hedge relationships to reduce or eliminate the effects of foreign exchange rate changes on purchases and sales. These contracts typically have maturities of fourteen months or less. At December 30, 2017 and December 31, 2016, the Company had outstanding cash flow hedges with a total notional value of $73.7 million and $0.0 million, respectively.

The Company also enters into economic hedges that are not designated as hedges from an accounting standpoint to reduce or eliminate the effects of foreign exchange rate changes typically related to short term trade receivables and payables. These contracts typically have maturities of two months or less. At December 30, 2017 and December 31, 2016, the Company had outstanding economic hedges with a total notional value of $36.6 million and $8.1 million, respectively.

The fair values of derivative instruments are as follows:

| | | Fair Value | |
| | Classification | December 30, 2017 | December 31, 2016 |
|---|---|---|---|
| | | (In thousands) | |
| **Derivatives not designated as hedging instruments:** | | | |
| Foreign currency option contracts | Other current assets | $ - | $ 180 |
| Foreign currency forward contracts | Other current assets | 413 | - |
| Foreign currency forward contracts | Accrued expenses | 221 | 43 |
| **Derivatives designated as cash flow hedges:** | | | |
| Foreign currency forward contracts | Other current assets | $ 488 | $ - |
| Foreign currency forward contracts | Other assets | 116 | - |
| Foreign currency forward contracts | Accrued expenses | 279 | - |

Gains (losses) associated with derivative instruments not designated as hedging instruments are as follows:

| | | Fiscal year ended | |
| | Classification | December 30, 2017 | December 31, 2016 |
|---|---|---|---|
| | | (In thousands) | |
| Gain (loss) recognized in income | Other income, net | $ (444) | $ 29 |

59

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following tables reflect the effect of foreign exchange forward contracts that are designated as cash flow hedging instruments for the years ended December 30, 2017 and December 31, 2016 (in thousands):

| | Effective Portion | | | | | | Ineffective Portion | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Gain (loss) recognized in OCI on Derivative (1) | | | Gain (loss) reclassified from accumulated OCI into income (2) | | | | Gain (loss) recognized in income (3) | |
| | Fiscal year ended | | | | Fiscal year ended | | | | Fiscal year ended | |
| | December 30, 2017 | December 31, 2016 | Classification | December 30, 2017 | December 31, 2016 | Classification | | December 30, 2017 | December 31, 2016 |
| Foreign currency forward contracts | $ 584 | $ - | Revenue | $ 320 | $ - | Other income, net | $ | (5) | $ - |
| | | | Cost of revenue | $ (63) | $ - | | | | |

(1)     The amount represents the change in fair value of derivative contracts due to changes in spot rates.
(2)     The amount represents reclassification from other comprehensive income to earnings that occurs when the hedged item affects earnings.
(3)     The amount represents the change in fair value of derivative contracts due to changes in the forward rates. No gains or losses were reclassified as a result of discontinuance of cash flow hedges.

**11.     Fair Value Measurements**

The Company's financial assets and liabilities measured at fair value on a recurring basis at December 30, 2017, were as follows:

| | Fair Value Measurements as of December 30, 2017 | | |
| --- | --- | --- | --- |
| **Description** | **Level 1** | **Level 2 (1)** | **Level 3** |
| | | (In thousands) | |
| Assets: | | | |
| Money market funds | $ 3,165 | $ - | $ - |
| Corporate and government bonds | - | 37,225 | - |
| Derivative instruments (Note 10) | - | 1,017 | - |
| Total assets measured at fair value | $ 3,165 | $ 38,242 | $ - |
| | | | |
| Liabilities: | | | |
| Derivative instruments (Note 10) | $ - | $ 500 | $ - |
| Total liabilities measured at fair value | $ - | $ 500 | $ - |

Table of Contents

The Company's financial assets and liabilities measured at fair value on a recurring basis at December 31, 2016, were as follows:

| Description | Level 1 | | Level 2 (1) | | Level 3 | |
|---|---|---|---|---|---|---|
| | **Fair Value Measurements as of December 31, 2016** | | | | | |
| | | | (In thousands) | | | |
| Assets: | | | | | | |
| Money market funds | $ | 156,980 | $ | - | $ | - |
| Corporate and government bonds | | - | | 39,930 | | - |
| Derivative instruments (Note 10) | | - | | 180 | | - |
| Total assets measured at fair value | $ | 156,980 | $ | 40,110 | $ | - |
| | | | | | | |
| Liabilities: | | | | | | |
| Derivative instruments (Note 10) | $ | - | $ | 43 | $ | - |
| Total liabilities measured at fair value | $ | - | $ | 43 | $ | - |

(1) Level 2 fair value estimates are based on observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

## 12.    Stockholders' Equity

### Preferred Stock

The Company has authorized 5,000,000 shares of undesignated preferred stock with a par value of $0.01 per share. None of the preferred shares were issued and outstanding at December 30, 2017 and December 31, 2016.

### Common Stock

Common stockholders are entitled to one vote for each share held and to receive dividends if and when declared by the Board of Directors and subject to and qualified by the rights of holders of the preferred stock. Upon dissolution or liquidation of the Company, holders of common stock will be entitled to receive all available assets subject to any preferential rights of any then outstanding preferred stock.

### Share Repurchase Activity

On April 2, 2014, the Company announced a stock repurchase program. Under the program, the Company could purchase up to $50 million of its common stock from May 1, 2014 to April 30, 2015. On March 19, 2015, the Company announced an additional stock repurchase program, which authorized the repurchase of $50 million of its common stock from May 1, 2015 to April 30, 2016. On December 28, 2015, the Company replaced the then-current stock repurchase program with a new stock repurchase program, effective January 4, 2016 and ending on December 31, 2016, pursuant to which the Company was authorized to purchase up to one million shares or $40 million of its common stock. On March 1, 2016, the Company replaced the then-current stock repurchase program and entered into an accelerated share repurchase (ASR) agreement to repurchase an aggregate of $85.0 million of common stock.

The Company did not repurchase any shares of common stock during fiscal year 2017. During fiscal year 2016 and 2015, the Company repurchased 2,641,122 shares totaling $97.0 million and 1,260,276 shares totaling $37.4 million, respectively, in the open market under these stock repurchase plans.

## 13.    Stock-Based Compensation

The Company has options outstanding under three stock incentive plans: the 2005 Stock Option and Incentive Plan (the "2005 Plan"), the Evolution Robotics, Inc. 2007 Stock Plan (the "2007 Plan") and the 2015 Stock Option and Incentive Plan (the "2015 Plan" and together with the 2005 Plan and the 2007 Plan, the "Plans"). All options that remained outstanding under the 2004 Stock Option and Incentive Plan as of December 27, 2014 were exercised during fiscal 2015. The 2015 Plan is the only one of the three plans under which new awards may currently be granted. Under the 2015 Plan, which became effective May 20, 2015, 3,100,000 shares were initially reserved for issuance in the form of incentive stock options, non-qualified stock options, stock appreciation rights, deferred stock awards, restricted stock units, unrestricted stock awards, cash-based awards, performance share awards and dividend equivalent rights. Stock awards returned to the Plans, with the exception of those

61

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

issued under the 2007 Plan, as a result of their expiration, cancellation or termination are automatically made available for issuance under the 2015 Plan. Eligibility for incentive stock options is limited to those individuals whose employment status would qualify them for the tax treatment associated with incentive stock options in accordance with the Internal Revenue Code of 1986, as amended. The grant of any full value award (e.g., restricted stock units) under the 2015 Plan is counted against the share reserve for future grants under the 2015 Plan as 1.61 shares for every one share actually subject to such award. As of December 30, 2017, there were 590,655 shares available for future grant under the 2015 Plan. The Company recognized $19.8 million, $16.0 million and $14.2 million of stock-based compensation expense during the fiscal years ended December 30, 2017, December 31, 2016, and January 2, 2016, respectively.

*Stock Options*

Options granted under the Plans are exercisable in full at any time subsequent to vesting, generally vest over four years, and expire five or ten years from the date of grant or, if earlier, 90 days from employee termination. The exercise price of stock options is typically equal to the closing price on The Nasdaq Global Select Market on the date of grant.

As of December 30, 2017, the unamortized compensation costs associated with stock options was $4.0 million with a weighted-average remaining recognition period of 2.07 years.

The following table summarizes stock option activity for fiscal years 2017, 2016 and 2015:

| | Number of Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value(1) |
|---|---|---|---|---|---|
| Outstanding at December 27, 2014 | 1,473,320 | $ | 22.89 | | |
| Granted | 323,104 | | 32.58 | | |
| Exercised | (390,085) | | 16.57 | | |
| Canceled | (118,789) | | 28.41 | | |
| Outstanding at January 2, 2016 | 1,287,550 | $ | 26.73 | | |
| Granted | 314,770 | | 38.03 | | |
| Exercised | (456,498) | | 20.47 | | |
| Canceled | (57,648) | | 33.28 | | |
| Outstanding at December 31, 2016 | 1,088,174 | $ | 32.27 | | |
| Granted | 10,975 | | 57.33 | | |
| Exercised | (367,267) | | 28.79 | | |
| Canceled | (18,928) | | 36.72 | | |
| Outstanding at December 30, 2017 | 712,954 | $ | 34.34 | 4.27 years | $30.2 million |
| Vested and expected to vest at December 30, 2017 | 712,954 | $ | 34.34 | 4.27 years | $30.2 million |
| Exercisable as of December 30, 2017 | 399,163 | $ | 32.10 | 3.62 years | $17.8 million |

_____

(1)    The aggregate intrinsic value on the table above represents the difference between the Company's closing stock price on December 30, 2017 of $76.70 and the exercise price of the underlying in-the-money option.

The fair value of each option grant for the fiscal years ended December 30, 2017, December 31, 2016, and January 2, 2016 was computed on the grant date using the Black-Scholes option-pricing model with the following assumptions:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| Risk-free interest rate | 2.11% | 1.17% - 1.89% | 1.47% - 1.75% |
| Expected dividend yield | - | - | - |
| Expected life | 4.01 years | 4.01 - 4.03 years | 3.98 - 4.02 years |
| Expected volatility | 38.0% | 38.9% - 42.1% | 46.5% - 52.4% |

62

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The risk-free interest rate is derived from the average U.S. Treasury constant maturity rate, which approximates the rate in effect at the time of grant, commensurate with the expected life of the instrument. The dividend yield is zero based upon the fact the Company has never paid and has no present intention to pay cash dividends. The Company utilizes company specific historical data for purposes of establishing expected volatility and expected term.

During fiscal years 2017, 2016, and 2015, the total intrinsic value of stock options exercised was $21.8 million, $10.3 million, and $5.9 million, respectively.

The following table summarizes information about stock options outstanding at December 30, 2017:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $ 3.54 - $ 26.59 | 113,447 | 1.90 years | $ 23.00 | 113,447 | $ 23.00 |
| 29.60 - 32.38 | 109,187 | 4.54 | 31.13 | 55,396 | 31.33 |
| 33.14 - 33.14 | 108,113 | 5.19 | 33.14 | 39,085 | 33.14 |
| 33.29 - 34.30 | 116,942 | 4.06 | 34.01 | 66,770 | 33.99 |
| 35.43 - 37.08 | 58,858 | 3.52 | 35.72 | 49,232 | 35.60 |
| 37.62 - 37.62 | 99,370 | 5.44 | 37.62 | 31,467 | 37.62 |
| 39.09 - 39.09 | 37,589 | 5.69 | 39.09 | 9,434 | 39.09 |
| 43.35 - 43.35 | 29,605 | 3.18 | 43.35 | 27,178 | 43.35 |
| 57.33 - 57.33 | 10,975 | 6.19 | 57.33 | - | - |
| 58.55 - 58.55 | 28,868 | 5.94 | 58.55 | 7,154 | 58.55 |
| $ 3.54 - $58.55 | 712,954 | 4.27 years | $ 34.34 | 399,163 | $ 32.10 |

***Restricted Stock Units***

Restricted stock units entitle the holder to a specific number of shares of common stock upon vesting, typically over a four-year period. As of December 30, 2017, the unamortized compensation costs associated with restricted stock units was $39.3 million with a weighted-average remaining recognition period of 2.52 years.

The following table summarizes the restricted stock unit activity for fiscal years 2017, 2016 and 2015:

| | Number of Shares Underlying Restricted Stock | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 27, 2014 | 880,138 | $ 30.10 |
| Granted | 505,277 | 36.88 |
| Vested | (340,754) | 29.13 |
| Forfeited | (110,784) | 30.82 |
| Outstanding at January 2, 2016 | 933,877 | $ 31.42 |
| Granted | 458,237 | 37.93 |
| Vested | (358,018) | 30.81 |
| Forfeited | (98,917) | 32.13 |
| Outstanding at December 31, 2016 | 935,179 | $ 35.07 |
| Granted | 396,164 | 72.63 |
| Vested | (351,543) | 33.73 |
| Forfeited | (41,347) | 39.52 |
| Outstanding at December 30, 2017 | 938,453 | $ 51.24 |

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The aggregate intrinsic value of outstanding restricted stock units at December 30, 2017 was $72.0 million based on the Company's closing stock price on December 30, 2017 of $76.70, with a weighted average remaining contractual term of 1.50 years.

*Performance Based Restricted Stock Units*

The Company grants performance-based restricted stock units (PSUs) to certain of its employees. The PSUs have performance metrics based on financial performance of the Company measured at the end of a three-year performance period. The performance metric for these awards is operating income percent, with a threshold requirement for a minimum amount of revenue growth. The number of shares actually earned at the end of the three year period will range from 0% to 200% of the target number of PSUs granted based on the Company's performance against the performance conditions.

The unamortized fair value as of December 30, 2017 associated with performance based restricted stock units was $5.6 million with a weighted-average remaining recognition period of 1.39 years.

The following table summarizes the performance based restricted stock unit activity for fiscal years 2017, 2016 and 2015:

| | Number of Shares Underlying PSU (1) | Weighted Average Grant Date Fair Value | |
|---|---|---|---|
| Outstanding at December 27, 2014 | 29,717 | $ | 43.35 |
| Granted | 71,133 | | 34.30 |
| Vested | - | | - |
| Forfeited | (10,358) | | 38.60 |
| Outstanding at January 2, 2016 | 90,492 | $ | 36.78 |
| Granted | 82,085 | | 33.36 |
| Vested | (5,625) | | 34.30 |
| Forfeited | (3,041) | | 34.30 |
| Outstanding at December 31, 2016 | 163,911 | $ | 35.03 |
| Granted | 105,650 | | 57.33 |
| Vested | (24,792) | | 43.35 |
| Forfeited | (2,708) | | 39.71 |
| Outstanding at December 30, 2017 | 242,061 | $ | 43.97 |

_____

(1) Includes the target number of PSUs.

The aggregate intrinsic value of outstanding PSUs was $18.6 million based on the Company's closing stock price on December 30, 2017 of $76.70 with a weighted average remaining contractual term of 1.39 years.

*Employee Stock Purchase Plan*

In May 2017, the Company's stockholders approved the 2017 Employee Stock Purchase Plan (ESPP). The Company reserved a total of 700,000 shares of common stock for issuance under this plan. The ESPP is administered over six-month offering periods beginning November 15 and May 15 of each year. Eligible employees can contribute 1% to 15% of their compensation each period up to $4,000, for the purchase of common stock not to exceed 1,000 shares per the six-month period. On the last business day of each period, shares of common stock are purchased at a purchase price of 85% of the lower of the fair market values of the stock as of the beginning and the end of the offering period. The first offering period began November 15, 2017, resulting in an immaterial stock-based compensation expense for the year ended December 30, 2017.

64

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**14.   Commitments and Contingencies**

*Legal Proceedings*

From time to time and in the ordinary course of business, the Company is subject to various claims, charges and litigation. The outcome of litigation cannot be predicted with certainty and some lawsuits, claims or proceedings may be disposed of unfavorably to us, which could materially affect our financial condition or results of operations.

*Lease Obligations*

The Company leases its facilities. Rental expense under operating leases for fiscal years 2017, 2016 and 2015 amounted to $8.9 million, $6.0 million, and $4.9 million, respectively. Future minimum rental payments under operating leases were as follows as of December 30, 2017:

|  | Operating Leases |
|---|---|
| 2018 | $ 6,361 |
| 2019 | 6,901 |
| 2020 | 6,506 |
| 2021 | 6,502 |
| 2022 | 6,498 |
| Thereafter | 39,839 |
| Total minimum lease payments | $ 72,607 |

*Outstanding Purchase Orders*

At December 30, 2017, we had outstanding purchase orders aggregating approximately $74.4 million. The purchase orders, the majority of which are with our contract manufacturers for the purchase of inventory in the normal course of business, are for manufacturing and non-manufacturing related goods and services, and are generally cancelable without penalty. In circumstances where we determine that we have financial exposure associated with any of these commitments, we record a liability in the period in which that exposure is identified.

*Guarantees and Indemnification Obligations*

The Company enters into standard indemnification agreements in the ordinary course of business. Pursuant to these agreements, the Company indemnifies and agrees to reimburse the indemnified party for losses incurred by the indemnified party, generally the Company's customers, in connection with any patent, copyright, trade secret or other proprietary right infringement claim by any third party. The term of these indemnification agreements is generally perpetual any time after execution of the agreement. The maximum potential amount of future payments the Company could be required to make under these indemnification agreements is unlimited. The Company has never incurred costs to defend lawsuits or settle claims related to these indemnification agreements. As a result, the Company believes the estimated fair value of these agreements is minimal. Accordingly, the Company has no liabilities recorded for these agreements as of December 30, 2017 and December 31, 2016, respectively.

*Government Contract Contingencies*

Prior to the completion of the divestiture of our defense and security business unit during the second quarter of 2016, the Company had several prime contracts with the U.S. federal government which did not contain a limitation of liability provision, creating a risk of responsibility for direct and consequential damages. Several subcontracts with prime contractors hold the prime contractor harmless against liability that stems from our work and do not contain a limitation of liability. These provisions could cause substantial liability for the Company. In addition, the Company is subject to audits by the U.S. federal government as part of routine audits of government contracts. As part of an audit, these agencies may review the Company's performance on contracts, cost structures and compliance with applicable laws, regulations and standards. If any of its costs are found to be allocated improperly to a specific contract, the costs may not be reimbursed and any costs already reimbursed for such contract may have to be refunded. Accordingly, an audit could result in a material adjustment to our revenue and results of operations. Annually, the Company submitted final indirect billing rates to DCMA based upon actual costs incurred throughout the year. These final billing rates are subject to audit by DCAA. As of December 30, 2017, fiscal year 2016 is open for audit by DCAA.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Warranty*

The Company provides warranties on most products and has established a reserve for warranty based on estimated warranty costs. The reserve is included as part of accrued expenses (Note 8) in the accompanying consolidated balance sheets.

Activity related to the warranty accrual was as follows:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| | (In thousands) | | |
| Balance at beginning of period | $ 8,464 | $ 6,907 | $ 7,769 |
| Liability assumed (1) | 2,186 | - | - |
| Provision | 8,591 | 7,494 | 4,598 |
| Warranty usage (2) | (7,977) | (5,937) | (5,460) |
| Balance at end of period | $ 11,264 | $ 8,464 | $ 6,907 |

_____
(1)    Warranty assumed as part of the acquisition of the iRobot-related distribution business of Sales On Demand Corporation (see Note 3).
(2)    Warranty usage includes costs incurred for warranty obligations and, for the twelve month period ended December 31, 2016, the release of warranty liabilities associated with the divestiture of the defense and security business unit.

**15.    Employee Benefits**

The Company sponsors a retirement plan under Section 401(k) of the Internal Revenue Code (the "Retirement Plan"). All Company employees, with the exception of temporary, contract and international employees are eligible to participate in the Retirement Plan after satisfying age and length of service requirements prescribed by the plan. Under the Retirement Plan, employees may make tax-deferred contributions, and the Company, at its sole discretion, and subject to the limits prescribed by the IRS, may make either a nonelective contribution on behalf of all eligible employees or a matching contribution on behalf of all plan participants.

The Company elected to make a matching contribution of approximately $2.4 million, $1.7 million and $1.8 million for the plan years ended December 30, 2017, December 31, 2016 and January 2, 2016 ("Plan-Year 2017," "Plan-Year 2016" and "Plan-Year 2015"), respectively. The employer contribution represents a matching contribution at a rate of 50% of each employee's first six percent contribution. Accordingly, each employee participating during Plan-Year 2017, Plan-Year 2016 and Plan-Year 2015 is entitled up to a maximum of three percent of his or her eligible annual payroll.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**16.    Income Taxes**

Income (loss) before provision for income taxes was as follows:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | |
| | (In thousands) | | | | | |
| Domestic | $ | 71,382 | $ | 61,706 | $ | 62,391 |
| Foreign | | 4,984 | | (345) | | 580 |
| Income before income taxes | $ | 76,366 | $ | 61,361 | $ | 62,971 |

The components of income tax expense were as follows:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | |
| | (In thousands) | | | | | |
| Current | | | | | | |
| Federal | $ | 17,555 | $ | 17,639 | $ | 20,033 |
| State | | 1,691 | | 1,054 | | 972 |
| Foreign | | 7,355 | | 310 | | 121 |
| Total current income tax provision | | 26,601 | | 19,003 | | 21,126 |
| Deferred | | | | | | |
| Federal | $ | 6,664 | $ | 781 | $ | (1,657) |
| State | | (2,470) | | (95) | | (628) |
| Foreign | | (5,393) | | (267) | | - |
| Total deferred income tax provision | | (1,199) | | 419 | | (2,285) |
| Total income tax provision | $ | 25,402 | $ | 19,422 | $ | 18,841 |

Due to the adoption of ASU 2016-09 in 2017, all excess tax benefits and deficiencies are recognized as income tax expense in the Company's consolidated statement of income. This will result in increased volatility in the Company's effective tax rate.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 (the "Act") was signed into law making significant changes to the Internal Revenue Code. Changes include, but are not limited to, a federal corporate tax rate decrease from 35% to 21% for tax years beginning after December 31, 2017, the transition of U.S. international taxation from a worldwide tax system to a territorial system and a one-time transition tax on the mandatory deemed repatriation of foreign earnings. The Company has estimated the provision for income taxes in accordance with the Act and guidance available as of the date of this filing and as a result have recorded a one-time income tax provision of $11.9 million as additional income tax provision in the fourth quarter of 2017, the period in which the legislation was enacted. The one-time income tax provision includes $8.9 million related to the remeasurement of certain deferred tax assets and liabilities based on the tax rates at which they are expected to reverse in the future. The one-time income tax expense also includes a provisional amount of $3.0 million related to the one-time transition tax on the mandatory deemed repatriation of foreign earnings.

On December 22, 2017, Staff Accounting Bulletin No. 118 (SAB 118) was issued to address the application of U.S. GAAP in situations when a registrant does not have the necessary information available, prepared, or analyzed (including computations) in reasonable detail to complete the accounting for certain income tax effects of the Act. In accordance with SAB 118, the Company has determined that the $3.0 million of current income tax provision recorded relating to the transition tax on the mandatory deemed repatriation of foreign earnings was a provisional amount and a reasonable estimate at December 30, 2017. Additional information and analysis is necessary to complete the calculation and accounting relating to the transition tax on the mandatory deemed repatriation of foreign earnings. Any subsequent adjustments to this amount will be recorded to current income tax provision during the measurement period which is not expected to extend beyond one year from the enactment date.

67

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

A reconciliation of the expected tax (benefit) expense computed by applying the federal statutory rate to income before income taxes to actual tax expense is as follows:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 30, 2017 | December 31, 2016 | January 2, 2016 |
| | (In thousands) | | |
| Expected federal income tax | $ 26,728 | $ 21,476 | $ 22,040 |
| Miscellaneous permanent items | 2,979 | 516 | 608 |
| State taxes (net of federal benefit) | 2,089 | 1,360 | 982 |
| Federal and state credits | (4,486) | (2,233) | (2,767) |
| Change in valuation allowance | 800 | - | - |
| Domestic production activities deduction | (1,528) | (1,731) | (2,145) |
| Statute of limitation expirations of uncertain tax positions | (106) | (167) | (194) |
| Excess tax benefits relating to stock-based compensation | (11,709) | - | - |
| Tax Cuts and Jobs Act of 2017 | 11,861 | - | - |
| Other | (1,226) | 201 | 317 |
| | $ 25,402 | $ 19,422 | $ 18,841 |

The components of net deferred tax assets were as follows:

| | December 30, 2017 | December 31, 2016 |
| --- | --- | --- |
| | (In thousands) | |
| Deferred tax assets | | |
| Reserves and accruals | $ 24,315 | $ 20,737 |
| Tax credits | 6,666 | 5,999 |
| Property and equipment | 1,382 | 1,934 |
| Stock-based compensation | 4,277 | 6,150 |
| Net operating loss carryforwards | 144 | 1,010 |
| Valuation allowance | (800) | - |
| Gross deferred tax assets | 35,984 | 35,830 |
| Deferred tax liabilities | | |
| Intangible assets | 13,419 | 4,530 |
| Other | 573 | 715 |
| Gross deferred tax liabilities | 13,992 | 5,245 |
| Net deferred tax assets | $ 21,992 | $ 30,585 |

The Act includes a mandatory one-time tax on accumulated earnings of foreign subsidiaries, and as a result, all previously unremitted earnings for which no U.S. deferred tax liability had been accrued have now been subject to U.S. tax. Notwithstanding the U.S. taxation of these amounts, the Company intends to continue to invest all of these earnings, as well as the capital in these subsidiaries, indefinitely outside of the U.S. The amount of any unrecognized deferred tax liability on these undistributed earnings would be immaterial.

The Company has fully utilized both the federal and state net operating loss carryforwards as of December 30, 2017. The Company had federal and state net operating loss carryforwards of $1.0 million and $8.9 million, respectively, as of December 31, 2016. The Company has fully utilized the federal research and development credit carryforwards as of December 30, 2017 and had $1.0 million of federal research and development credit carryforwards as of December 31, 2016. The Company has state research and development credit carryforwards of $10.1 million and $10.0 million as of December 30, 2017 and December 31, 2016, respectively, which expire from 2026 to 2032. Under the Internal Revenue Code and state law, certain substantial changes in the Company's ownership could result in an annual limitation on the amount of these tax carryforwards which can be utilized in future years. As of December 30, 2017, the Company has $1.0 million of state research and development credits related to the acquisition of Evolution Robotics that are limited by Section 382 and Section 383,

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

respectively, of the Internal Revenue Code. However, these limitations are not expected to cause any of these state research and development credits to expire prior to being utilized.

As of December 30, 2017, the Company recorded a valuation allowance of $0.8 million for certain foreign deferred tax assets for which the Company believes do not meet the "more likely than not" criteria for recognition.

A summary of the Company's adjustments to its gross unrecognized tax benefits in the current year is as follows:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | |
| | (in thousands) | | | | | |
| Balance at beginning of period | $ | 5,146 | $ | 6,616 | $ | 2,491 |
| Increase for tax positions related to the current year | | 580 | | 2,851 | | 786 |
| Increase (decrease) for tax positions related to prior years | | (523) | | (4,224) | | 3,533 |
| Decreases for settlements with applicable taxing authorities | | - | | - | | - |
| Decreases for lapses of statute of limitations | | (613) | | (97) | | (194) |
| Balance at end of period | $ | 4,590 | $ | 5,146 | $ | 6,616 |

The Company accrues interest and, if applicable, penalties for any uncertain tax positions as a component of income tax expense. As of December 30, 2017, December 31, 2016 and January 2, 2016 there were no material accrued interest or penalties.

The Company is subject to taxation in the United States (federal and state) and foreign jurisdictions. The statute of limitations for examinations by the Internal Revenue Service (the "IRS") is closed for fiscal years prior to 2014. The statute of limitations for examinations by state tax authorities is closed for fiscal years prior to 2013. Federal and state carryforward attributes that were generated prior to fiscal 2014 and 2013, respectively, may still be adjusted upon examination by the federal or state tax authorities if they either have been or will be used in a period for which the statute of limitations is still open. The Company is currently under examination by the IRS for the years 2014 and 2015. The Company does not expect a significant change in the amount of unrecognized tax benefits within the next 12 months. If all of the Company's unrecognized tax benefits as of December 30, 2017 were to become recognizable in the future, it would record a $2.0 million benefit, inclusive of interest, to the income tax provision.

**17.   Industry Segment, Geographic Information and Significant Customers**

Prior to completing the sale of the Company's defense and security business (see Note 4), the Company's reportable segments consisted of the home business unit and the defense and security business unit. Following this divestiture, which was completed in April 2016, the Company now operates as one operating segment, consumer robots, the results of which are included in the Company's consolidated statements of income and comprehensive income. The Company's consumer robots products are offered to consumers through a network of retail businesses throughout the United States, to various countries through international distributors and retailers, and through the Company's on-line store.

*Geographic Information*

For the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016, sales to non-U.S. customers accounted for 48.8%, 51.2% and 56.0% of total revenue, respectively.

*Significant Customers*

For the fiscal years ended December 30, 2017, December 31, 2016 and January 2, 2016 approximately 62.7%, 72.8% and 76.6%, respectively, of consumer robots revenue resulted from sales to 15 customers. For the fiscal year ended December 30, 2017, the Company generated 13.5% of total revenue from one of its retailers (Amazon). For the fiscal year ended December 31, 2016, the Company generated 12.9%, 12.3% and 10.4% of total revenue from its distributor in Japan (Sales On Demand Corporation), a network of affiliated European distributors (Robopolis SAS) and Amazon, respectively. For the fiscal year ended January 2, 2016, the Company generated 13.3% and 12.7% of total revenue from Sales on Demand Corporation and Robopolis SAS, respectively. On April 3, 2017, the Company acquired the iRobot-related distribution business of Sales On Demand Corporation, and on October 2, 2017, the Company acquired Robopolis SAS (see Note 3).

69

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### 18.    Quarterly Information (Unaudited)

The following information has been derived from unaudited consolidated financial statements that, in the opinion of management, include all recurring adjustments necessary for a fair statement of such information (dollars in thousands, except per share amounts):

| | Fiscal Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 30, 2017 | September 30, 2017 | July 1, 2017 | April 1, 2017 | December 31, 2016 | October 1, 2016 | July 2, 2016 | April 2, 2016 |
| | (In thousands, except per share amounts) | | | | | | | |
| Revenue | $  326,897 | $  205,399 | $  183,148 | $  168,467 | $  212,494 | $  168,610 | $  148,696 | $  130,804 |
| Gross margin | 153,542 | 102,383 | 89,891 | 87,343 | 106,642 | 81,060 | 69,652 | 61,961 |
| Net income | 4,620 | 22,082 | 7,903 | 16,359 | 13,681 | 19,512 | 4,814 | 3,932 |
| Diluted earnings per share | $  0.16 | $  0.76 | $  0.27 | $  0.58 | $  0.49 | $  0.70 | $  0.17 | $  0.13 |

### ITEM 9.    *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

None.

### ITEM 9A. *CONTROLS AND PROCEDURES*

**Evaluation of disclosure controls and procedures.**

As required by Rule 13a-15(b) under the Exchange Act, we have carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer (CEO) and our Chief Financial Officer (CFO), of the effectiveness, as of the end of the period covered by this report, of the design and operation of our "disclosure controls and procedures" as defined in Rule 13a-15(e) promulgated by the SEC under the Exchange Act. Based upon that evaluation, our CEO and our CFO concluded that our disclosure controls and procedures, as of the end of such period, were adequate and effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information was accumulated and communicated to management, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

*    Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

*    Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

*    Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of management, including our principal executive and financial officers, we assessed the Company's internal control over financial reporting as of December 30, 2017, based on criteria for effective internal control over financial reporting established in *Internal Control - Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We have excluded the business acquisitions

Table of Contents

completed during fiscal year 2017, including our acquisitions of iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS), from the assessment of the effectiveness of internal control over financial reporting as of December 30, 2017. iRobot Japan G.K. and iRobot France SAS (formerly known as Robopolis SAS) are wholly-owned subsidiaries whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting collectively represent approximately 8.3% and 23.9% of total assets, respectively and approximately 9.9% and 13.0% of total revenues, respectively, of the related consolidated financial statement amounts as of and for the year ended December 30, 2017. Based on this assessment, management concluded that the Company maintained effective internal control over financial reporting as of December 30, 2017 based on the specified criteria.

The effectiveness of the Company's internal control over financial reporting as of December 30, 2017 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

**Changes in Internal Control Over Financial Reporting**

During the quarter ended December 30, 2017, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

**ITEM 9B.** *OTHER INFORMATION*

*10b51-1 Trading Plans*

Our policy governing transactions in our securities by our directors, officers, and employees permits our officers, directors, funds affiliated with our directors, and certain other persons to enter into trading plans complying with Rule 10b5-l under the Securities Exchange Act of 1934, as amended. We have been advised that certain of our officers and directors (including Colin Angle, Chief Executive Officer, Glen Weinstein, EVP & Chief Legal Officer, as well as Deborah Ellinger and Andrew Miller, each a director) of the Company have entered into trading plans (each a "Plan" and collectively, the "Plans") covering periods after the date of this Annual Report on Form 10-K in accordance with Rule 10b5-l and our policy governing transactions in our securities. Generally, under these trading plans, the individual relinquishes control over the transactions once the trading plan is put into place. Accordingly, sales under these plans may occur at any time, including possibly before, simultaneously with, or immediately after significant events involving our company.

We anticipate that, as permitted by Rule 10b5-l and our policy governing transactions in our securities, some or all of our officers, directors and employees may establish trading plans in the future. We intend to disclose the names of our executive officers and directors who establish a trading plan in compliance with Rule 10b5-l and the requirements of our policy governing transactions in our securities in our future quarterly and annual reports on Form 10-Q and 10-K filed with the Securities and Exchange Commission. We, however, undertake no obligation to update or revise the information provided herein, including for revision or termination of an established trading plan, other than in such quarterly and annual reports.

*Amendment to Lease*

On February 14, 2018, we entered into an Eighth Amendment to Lease (the "Amendment"), with DIV Bedford, LLC, to amend certain provisions of our Lease Agreement for our corporate headquarters located at 4-18 Crosby Drive, Bedford, Massachusetts (the "Property"). The Amendment provides for, among other things, 34,752 square feet of additional leased space at the Property. The Amendment also adjusts the rent payable for the Property. The full text of the Amendment is filed with Exhibit 10.6 to this Annual Report on Form 10-K.

## PART III

**ITEM 10.** *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 30, 2017.

**ITEM 11.** *EXECUTIVE COMPENSATION*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 30, 2017.

**ITEM 12.**   *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 30, 2017.

**ITEM 13.** *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 30, 2017.

**ITEM 14.** *PRINCIPAL ACCOUNTING FEES AND SERVICES*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 30, 2017.

Table of Contents

**PART IV**

**ITEM 15.** *EXHIBITS, FINANCIAL STATEMENT SCHEDULES*

(a) The following are filed as part of this Annual Report on Form 10-K:

**1.          Financial Statements**

The following consolidated financial statements are included in Item 8:

Report of Independent Registered Public Accounting Firm

Consolidated Balance Sheets at December 30, 2017 and December 31, 2016

Consolidated Statements of Income for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016

Consolidated Statements of Comprehensive Income for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016

Consolidated Statements of Stockholders' Equity for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016

Consolidated Statements of Cash Flows for the Years ended December 30, 2017, December 31, 2016 and January 2, 2016

Notes to Consolidated Financial Statements

**2.          Financial Statement Schedules**

        All other schedules have been omitted since the required information is not present, or not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements or the Notes thereto.

**3.          Exhibits - See item 15(b) of this report below**

**(b)          Exhibits**

        The following exhibits are filed as part of and incorporated by reference into this Annual Report:

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Asset Purchase Agreement, dated as of February 2, 2016, by and between the Registrant and iRobot Defense Holdings, Inc. (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on February 4, 2016 and incorporated by reference herein) |
| 2.2 | Share Purchase Agreement, dated as of July 25, 2017, by and among the Registrant, iRobot UK Ltd., Robopolis SAS, the shareholders of Robopolis SAS named therein, and the Shareholders' Representative named therein (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on July 26, 2017 and incorporated by reference herein) |
| 3.1(1) | Form of Second Amended and Restated Certificate of Incorporation of the Registrant dated November 15, 2005 |
| 3.2 | Amended and Restated By-laws of the Registrant (filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on March 9, 2016 and incorporated by reference herein) |
| 4.1(1) | Specimen Stock Certificate for shares of the Registrant's Common Stock |
| 10.1†(1) | Form of Indemnification Agreement between the Registrant and its Directors and Executive Officers |
| 10.2† | Form of Executive Agreement between the Registrant and certain executive officers of the Registrant, as amended (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended October 2, 2010 and incorporated by reference herein) |
| 10.3†(1) | Employment Agreement between the Registrant and Colin Angle, dated as of January 1, 1997 |
| 10.4† | 2005 Stock Option and Incentive Plan, as amended, and forms of agreements thereunder (filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 2, 2009 and incorporated by reference herein) |
| 10.5† | Non-Employee Directors' Deferred Compensation Program, as amended (filed as Exhibit 10.19 to the Registrant's Annual Report on Form 10-K for the year ended December 29, 2007 and incorporated by reference herein) |

73

Table of Contents

| | |
|---|---|
| 10.6* | Lease Agreement between the Registrant and Boston Properties Limited Partnership for premises located at 4-18 Crosby Drive, Bedford, Massachusetts, dated as of February 22, 2007 (as amended to date) |
| 10.7† | Senior Executive Incentive Compensation Plan (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 2, 2011 and incorporated by reference herein) |
| 10.8† | Form of Deferred Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.9† | Form of Restricted Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.10#* | Manufacturing Services Agreement between the Registrant and Jabil Circuit, Inc., dated as of March 18, 2010 (as amended to date) |
| 10.11 | Amended and Restated Credit Agreement between the Registrant and Bank of America N.A., dated December 20, 2013 (filed as Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.12 | Amended and Restated Reimbursement Agreement between the Registrant and Bank of America N.A., dated December 20, 2013 (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.13#* | Manufacturing Services Agreement between the Registrant and Kin Yat Industrial Company Limited, dated as of January 22, 2014 (as amended to date) |
| 10.14† | Evolution Robotics, Inc. 2007 Stock Plan and forms of agreements thereunder (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2014 and incorporated by reference herein) |
| 10.15† | 2015 Stock Option and Incentive Plan and forms of agreements thereunder (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 27, 2015 and incorporated by reference herein) |
| 10.16 | Master Confirmation - Uncollared Accelerated Share Repurchase by and between the Registrant and J.P. Morgan Securities LLC, dated March 1, 2016 (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| 10.17† | Form of Performance-Based Restricted Stock Unit Award Agreement under the 2015 Stock Option Incentive Plan (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| 10.18†* | iRobot Corporation 2017 Employee Stock Purchase Plan |
| 21.1* | Subsidiaries of the Registrant |
| 23.1* | Consent of PricewaterhouseCoopers LLP |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this report on Form 10-K) |
| 31.1* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 31.2* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101* | The following materials from the Registrant's Annual Report on Form 10-K for the year ended December 30, 2017 formatted in XBRL (eXtensible Business Reporting Language): (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Income, (iii) the Consolidated Statements of Comprehensive Income, (iv) the Consolidated Statements of Stockholders' Equity, (v) the Consolidated Statements of Cash Flows, and (vi) related notes to these financial statements |

†      Indicates a management contract or any compensatory plan, contract or arrangement.

#      Confidential treatment requested for portions of this document.

(1)      Incorporated by reference herein to the exhibits to the Company's Registration Statement on Form S-1 (File No. 333-126907)

*      Filed herewith

Table of Contents

**ITEM 16.** *FORM 10-K SUMMARY*

Not applicable.

Table of Contents

**ITEM 16.** *FORM 10-K SUMMARY*

Not applicable.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

iROBOT CORPORATION

By:    /s/ Colin M. Angle

Colin M. Angle
Chairman of the Board,
Chief Executive Officer and Director

Date: February 16, 2018

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Colin M. Angle and Alison Dean, jointly and severally, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report on Form 10-K has been signed by the following persons in the capacities indicated on February 16, 2018.

| Signature | Title(s) |
| --- | --- |
| /s/ COLIN M. ANGLE<br>Colin M. Angle | Chairman of the Board, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ ALISON DEAN<br>Alison Dean | Executive Vice President, Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) |
| /s/ MOHAMAD ALI<br>Mohamad Ali | Director |
| /s/ MICHAEL BELL<br>Michael Bell | Director |
| /s/ RONALD CHWANG<br>Ronald Chwang | Director |
| /s/ DEBORAH G. ELLINGER<br>Deborah G. Ellinger | Director |
| /s/ ELISHA FINNEY<br>Elisha Finney | Director |

76

Table of Contents

/s/ ANDREW MILLER                                                 Director
Andrew Miller


/s/ MICHELLE V. STACY                                            Director
Michelle V. Stacy


77

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Asset Purchase Agreement, dated as of February 2, 2016, by and between the Registrant and iRobot Defense Holdings, Inc. (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on February 4, 2016 and incorporated by reference herein) |
| 2.2 | Share Purchase Agreement, dated as of July 25, 2017, by and among the Registrant, iRobot UK Ltd., Robopolis SAS, the shareholders of Robopolis SAS named therein, and the Shareholders' Representative named therein (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on July 26, 2017 and incorporated by reference herein) |
| 3.1(1) | Form of Second Amended and Restated Certificate of Incorporation of the Registrant dated November 15, 2005 |
| 3.2 | Amended and Restated By-laws of the Registrant (filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on March 9, 2016 and incorporated by reference herein) |
| 4.1(1) | Specimen Stock Certificate for shares of the Registrant's Common Stock |
| 10.1†(1) | Form of Indemnification Agreement between the Registrant and its Directors and Executive Officers |
| 10.2† | Form of Executive Agreement between the Registrant and certain executive officers of the Registrant, as amended (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended October 2, 2010 and incorporated by reference herein) |
| 10.3†(1) | Employment Agreement between the Registrant and Colin Angle, dated as of January 1, 1997 |
| 10.4† | 2005 Stock Option and Incentive Plan, as amended, and forms of agreements thereunder (filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 2, 2009 and incorporated by reference herein) |
| 10.5† | Non-Employee Directors' Deferred Compensation Program, as amended (filed as Exhibit 10.19 to the Registrant's Annual Report on Form 10-K for the year ended December 29, 2007 and incorporated by reference herein) |
| 10.6* | Lease Agreement between the Registrant and Boston Properties Limited Partnership for premises located at 4-18 Crosby Drive, Bedford, Massachusetts, dated as of February 22, 2007 (as amended to date) |
| 10.7† | Senior Executive Incentive Compensation Plan (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 2, 2011 and incorporated by reference herein) |
| 10.8† | Form of Deferred Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.9† | Form of Restricted Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.10#* | Manufacturing Services Agreement between the Registrant and Jabil Circuit, Inc., dated as of March 18, 2010 (as amended to date) |
| 10.11 | Amended and Restated Credit Agreement between the Registrant and Bank of America N.A., dated December 20, 2013 (filed as Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.12 | Amended and Restated Reimbursement Agreement between the Registrant and Bank of America N.A., dated December 20, 2013 (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.13#* | Manufacturing Services Agreement between the Registrant and Kin Yat Industrial Company Limited, dated as of January 22, 2014 (as amended to date) |
| 10.14† | Evolution Robotics, Inc. 2007 Stock Plan and forms of agreements thereunder (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2014 and incorporated by reference herein) |
| 10.15† | 2015 Stock Option and Incentive Plan and forms of agreements thereunder (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 27, 2015 and incorporated by reference herein) |
| 10.16 | Master Confirmation - Uncollared Accelerated Share Repurchase by and between the Registrant and J.P. Morgan Securities LLC, dated March 1, 2016 (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |

78

Table of Contents

| | |
|---|---|
| 10.17† | Form of Performance-Based Restricted Stock Unit Award Agreement under the 2015 Stock Option Incentive Plan (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| 10.18†* | iRobot Corporation 2017 Employee Stock Purchase Plan |
| 21.1* | Subsidiaries of the Registrant |
| 23.1* | Consent of PricewaterhouseCoopers LLP |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this report on Form 10-K) |
| 31.1* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 31.2* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 32.1* | Certification Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101* | The following materials from the Registrant's Annual Report on Form 10-K for the year ended December 30, 2017 formatted in XBRL (eXtensible Business Reporting Language): (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Income, (iii) the Consolidated Statements of Comprehensive Income, (iv) the Consolidated Statements of Stockholders' Equity, (v) the Consolidated Statements of Cash Flows, and (vi) related notes to these financial statements |

†      Indicates a management contract or any compensatory plan, contract or arrangement.

#      Confidential treatment requested for portions of this document.

(1)      Incorporated by reference herein to the exhibits to the Company's Registration Statement on Form S-1 (File No. 333-126907)

*      Filed herewith

**Exhibit 10.10**



**MANUFACTURING SERVICES AGREEMENT**

**between**

**JABIL CIRCUIT, INC.**

**and**

**IROBOT CORPORATION**

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions.**

## MANUFACTURING SERVICES AGREEMENT

This Manufacturing Agreement (this "**Agreement**") is entered into by and between Jabil Circuit, Inc., a Delaware corporation, having offices at 10560 Dr. M.L. King Jr. Street North St. Petersburg, Florida 33716, on behalf of Jabil and its Subsidiaries ("**Jabil**"), and iRobot Corporation, a Delaware corporation ("**Company**" or "**iRobot**"), having its principal place of business at 8 Crosby Drive, Bedford, MA 01730. Jabil and Company are referred to herein as "**Party**" or "**Parties**".

### RECITALS

**A.** Jabil is in the business of providing sophisticated manufacturing services that in some cases may be unique in kind and quality, including designing, developing, manufacturing, testing, configuring, assembling, packaging and shipping highly specialized electronic assemblies and systems.

**B.** Company is in the business of designing, developing, distributing, marketing and selling products containing highly specialized electronic assemblies and systems.

**C.** Whereas, the Parties desire that Jabil manufacture, test, configure, assemble, package and/or ship certain electronic assemblies and systems pursuant to the terms and conditions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### TERMS

**1** **Definitions**. In addition to terms defined elsewhere in this Agreement, the capitalized terms set forth below shall have the following meaning:

1.1 "**AAA**" shall have the meaning set forth in Section 25.13.2.

1.2 "**Additional Services**" means services such as, design for manufacturability, manufacturing design test support, computer assisted design for manufacturability, test development services, volume production and advanced packaging technologies all as specified and approved by Company and agreed to by Jabil.

1.3 "**Affiliate**" means with respect to a Person, any other Person which directly or indirectly controls, or is controlled by, or is under common control with, the specified Person. For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, 5% or more of the outstanding shares of any class of capital stock of such Person (or in the case of a Person that is not a corporation, 5% or more of any class of equity interest).

1.4 "**Assigned Components**" means the components or materials specifically identified in Schedule 1 as "assigned" and for which Company has identified the applicable supplier from whom Jabil is authorized to source such component or material for incorporation into the Product.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions.**

1.5 "**AVL**" means the confidential list of Suppliers Designated by Company from which Jabil is authorized to purchase the applicable Assigned Components and Generic Components for use in the manufacture of Products.

1.6 "**Business Continuity Plan**" shall have the meaning set forth in Section 21.1.

1.7 "**Class Failure**" means a defect solely caused by (i) Jabil's failure to manufacture any Product to conform to the Specifications or other requirements in this Agreement, (ii) the failure of Jabil to comply with any applicable law, rule, regulation, court order or decree that is applicable to Jabil's performance of its obligations set forth in this Agreement, or (iii) the gross negligence or willful misconduct of Jabil's personnel performing Manufacturing Services for Company under this Agreement; wherein, such defect occurs in **[*]** or more of the total number of a particular Product (as identified by the applicable Product serial numbers) supplied under this Agreement over a rolling **[*]** period within the Warranty Period.

1.8 "**Commercially Reasonable Efforts**" means those efforts that would be deemed both commercially practicable and reasonably financially prudent after having taken into account all relevant commercial considerations. "Relevant commercial considerations" shall be deemed to include, without limitation, (1) all pertinent facts and circumstances; (2) financial costs; (3) resource availability and impact; (4) probability of success; and (5) other commercial practicalities.

1.9 "**Company Indemnified Parties**" shall have the meaning set forth in Section 19.

1.10 "**Company Intellectual Property**" means all Intellectual Property, tangible embodiments thereof and all other materials provided or made available to Jabil by Company, including, without limitation the Specifications and Company Proprietary Information and Technology and Company Property.

1.11 "**Company Marks**" shall have the meaning set forth in Section 17.5.

1.12 "**Company Property**" means all property, including all Product and Consigned Components, other Components paid for by Company, inventories, work in process (WIP), Loaned Equipment, Specifications, test equipment, software and documentation, and support maintenance or design documentation, furnished to Jabil by Company or otherwise paid for by Company in connection with this Agreement for Jabil's use in performing its obligations hereunder.

1.13 "**Company Tooling**" shall have the meaning set forth in Section 10.1.

1.14 "**Company Quarter End**" means Company's fiscal calendar which follows the 4-4-5 week format identified in Schedule 6, which Schedule shall be updated by Company on an annual basis on or before December 1st.

1.15 "**Competitor Product**" shall have the meaning set forth in Section 18.

1.16 "**Compliance Certification**" shall have the meaning set forth in Section 3.7.1.

1.17 "**Components**" means those Assigned Components, Generic Components, and Consigned Components.

1.18 "**Consigned Components**" means those components that are provided by or on behalf of Company, to Jabil, at Company's expense for assembly into Products, including those Components or materials specifically identified in writing by Company as "consigned."

2

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions.**

1.19 "**Defect**" shall have the meaning set forth in Section 5.4.

1.20 "**Deliverable**" shall mean an item specified as a deliverable in a SOW corresponding to Additional Services provided by Jabil.

1.21 "**EDI**" shall mean electronic data interchange.

1.22 "**Effective Date**" shall mean the date upon which the terms and conditions of this Agreement shall become effective by and between the Parties. The Parties have agreed that the Effective Date of this Agreement shall be the late date of execution on the signature page to this Agreement.

1.23 "**Encumbrance**" means any encumbrance, lien, charge, hypothecation, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, right of set-off, any matter capable of registration against title, option, right of pre-emption, privilege or any contract to create any of the foregoing.

1.24 "**Fee and Price Schedule**" shall mean the prices and fees set forth in Schedule 2 for the applicable Product identified therein, and any future Fee and Price Schedule for new Product as added in writing from time to time upon mutual agreement of the Parties.

1.25 "**FCA**" means that Jabil must at its own expense and risk deliver the Product cleared for export into the custody of the designated carrier at the applicable Port of Origin.

1.26 "**Force Majeure Events**" shall have the meaning set forth in Section 24.1.

1.27 "**Forecast**" shall have the meaning set forth in Section 11.1.

1.28 "**Generic Components**" means the components or materials identified in Schedule 1 for incorporation into the Product and for which Company has not identified any specific supplier or source from whom Jabil is authorized to source such component or material.

1.29 "**including**" shall be defined to have the meaning "including, without limitation."

1.30 "**in writing**" shall mean written documents, EDI with phone confirmation, verified faxes and successfully transmitted e-mails.

1.31 "**Initial Term**" shall have the meaning set forth in Section 14.

1.32 "**Intellectual Property**" means any and all intellectual property and tangible embodiments thereof, including without limitation inventions, discoveries, designs, specifications, developments, methods, modifications, improvements, processes, know-how, show-how, techniques, algorithms, databases, computer software and code (including software and firmware listings, assemblers, applets, compilers, source code, object code, net lists, design tools, user interfaces, application programming interfaces, protocols, formats, documentation, annotations, comments, data, data structures, databases, data collections, system build software and instructions), mask works, formulae, techniques, supplier and customer lists, trade secrets, graphics or images, text, audio or visual works, materials that document design or design processes, or that document research or testing, schematics, diagrams, product specifications and other works of authorship.

1.33 "**Intellectual Property Rights**" means, collectively, all rights in, to and under patents, trade secret rights, copyrights, trademarks, service marks, trade dress and similar rights of any type under the laws of any governmental authority, including without limitation, all applications and registrations relating to the foregoing.

3

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions.**

1.34 "**Jabil Circuit**, **Inc**." **and** "**Jabil**" shall be defined to include any Jabil Subsidiary.

1.35 "**Jabil Created Intellectual Property**" means any improvements or modifications to the Jabil Technical Manufacturing Information that are newly created or developed, and reduced to practice by Jabil in (i) preparing any Product provided pursuant to this Agreement, or (ii) performing the Manufacturing Services or any other work provided pursuant to this Agreement; but shall not include any Jabil Existing Intellectual Property.

1.36 "**Jabil Existing Intellectual Property**" means any Intellectual Property, including the Jabil Technical Manufacturing Information, created or developed by Jabil outside the scope of this Agreement during the Term or owned or controlled by Jabil prior to the execution of this Agreement; and all improvements, modifications or enhancements to the foregoing made by or on behalf of Jabil.

1.37 "**Jabil Indemnified Parties**" shall have the meaning set forth in Section 19.2.

1.38 "**Jabil Intellectual Property**" shall mean both Jabil Created Intellectual Property and Jabil Existing Intellectual Property, collectively.

1.39 "**Jabil Technical Manufacturing Information**" means the manufacturing information, process (not including its manufacturing process) and technology used by Jabil or third parties under its control to design/develop (as described in Additional Services above), test or manufacture the Products including, but not limited to: (i) specifications, software, test software, schematics, drawings, designs, mask works, topography or other materials pertinent to the most current revision level of manufacturing of the Products; (ii) copies of all inspection, manufacturing, test and quality control procedures and any other work processes (except manufacturing); (iii) jig, fixture and tooling designs; (iv) Jabil general knowledge and information relating to the Products; and (v) support documentation.

1.40 "**Jabil Warranty**" shall have the meaning set forth in Section **5**.**1**.

1.41 "**Lead-time**" means the mutually agreed upon minimum amount of time in advance of shipment that Jabil must receive a Purchase Order in order to deliver Product by the requested delivery date.

1.42 "**Loaned Equipment**" means capital equipment (including tools) which is loaned to Jabil by or on behalf of Company to be used by Jabil to perform the Manufacturing Services and includes all equipment, tools and fixtures purchased specifically for Company, by Jabil, to perform the Manufacturing Services and that are paid for in full by Company.

1.43 "**Losses**" shall have the meaning set forth in Section 19.

1.44 "**Manufacturing Services**" means the services performed by Jabil hereunder which shall include but not be limited to manufacturing, testing, configuring, assembling, packaging and/or shipping of the Product, and all Reasonable and Customary Support Services, and any Additional Services, all in accordance with the Specifications.

1.45 "**Marks**" means trademarks, service marks, trademark and service mark applications, trade dress, trade names, logos, insignia, symbols, designs or other marks identifying a Party or its products.

1.46 "**Material Authorization**" shall have the meaning set forth in Section 3.6.1.

1.47 "**Materials Declaration Requirements**" means any requirements, obligations, standards, duties or responsibilities pursuant to any environmental, product composition and/or materials declaration laws, directives, or regulations, including international laws and treaties regarding such subject matter; and any regulations,

4

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions.**

interpretive guidance or enforcement policies related to any of the foregoing, including, but not limited to, the following examples: Directive 2002/95/EC of the European Parliament and of the Council of 27 January 2003 on the restriction of the use of certain hazardous substances in electrical and electronic equipment ("RoHS"), Directive 2002/96/EC of the European Parliament and of the Council of 27 January 2003 on waste electrical and electronic equipment ("WEEE"), and European Union Member State implementations of the foregoing; the People's Republic of China (PRC) Measures for the Administration of the Control of Pollution by Electronic Information Products (电子信息产品污染控制管理办法) promulgated on February 28, 2006 (including any pre-market certification ("CCC mark") requirements thereunder and including relevant standards adopted by the PRC Ministry of Information Industry or other applicable PRC authority); PRC General Administration of Quality Supervision, Inspection and Quarantine's Circular 441 (2006); Japanese Industrial Standard C0950:2005; the California Electronic Waste Recycling Act of 2003; Act on the Recycling of Electrical and Electronics Equipment and Automobiles (1.1.2008) (Korea), Waste Act (2004) and secondary legislation (based on EU directives ) (Croatia), Regulation (EC) No 1907/2006, Regulation concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH), establishing a European Chemicals Agency amending Directive 1999/45/EC and repealing Council Regulation (EEC) No 793/93 and Commission Regulation (EC) No 1488/94 as well as Council Directive 76/769/EEC and Commission Directives 91/155/EEC, 93/67/EEC, 93/105/EC and 2000/21/EC and/or other similar legislation.

1.48 "**Minimum Production Increase**" shall have the meaning set forth in Section 11.6.

1.49 "**Minimum Volume**" means the minimum volume, if any, set forth on Schedule 1 for a particular Product.

1.50 "**New York Courts**" shall have the meaning set forth in Section 25.18.

1.51 "**Newly Created Intellectual Property**" means, other than the Jabil Intellectual Property, any and all Intellectual Property, tangible embodiments thereof and all other materials newly created, developed, and reduced to practice, resulting from any work, Manufacturing Services or other services performed by either or both Parties, including, but not limited to, by any of its or their employees, agents or contractors, under this Agreement, that is incorporated by Jabil into any Product or otherwise in a Deliverable that Jabil prepares for Company.

1.52 "**Non-Conforming Product**" means any Product that does not conform to the Specifications.

1.53 "**Non-Disclosure Agreement**" means that certain Mutual Non-Disclosure Agreement between the Parties dated June 23, 2009, attached hereto as Schedule 4, as amended in Section 16 below.

1.54 "**NRE Costs**" shall consist of expenses, excluding the Waived NRE Costs, incurred by Jabil under this Agreement, including design engineering services, testing, fixturing and tooling and other out-of-pocket costs, in each case for work performed by Jabil for Company pursuant to Company's prior written consent. For the avoidance of doubt, NRE Costs shall not include any costs or expenses incurred by Jabil for any Reasonable and Customary Support Services.

1.55 "**On-time**" shall have the meaning set forth in Section 3.9.4.

1.56 [*]

1.57 "**Port of Origin**" means Hong Kong, China or Yantian, China or another port mutually agreed between Parties in writing.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions.**

1.58 "**Packaging and Shipping Specifications**" means the packaging and shipping specifications set forth in Schedule 1 and otherwise supplied and/or approved by Company.

1.59 "**Person**" means any corporation, business entity, natural person, firm, joint venture, limited or general partnership, limited liability entity, limited liability partnership, trust, unincorporated organization, association, government, or any department or agency of any government.

1.60 "**Product Price**" shall have the meaning set forth in Section 9.2.

1.61 "**Products**" means any and all the products manufactured and assembled by Jabil on behalf of Company under this Agreement as identified in Schedule 1 (or any subsequent Schedule 1 prepared for any product to be manufactured hereunder) including any updates, renewals, modifications or amendments thereto.

1.62 "**Production Start Date**" means the first day immediately following the business week during which Jabil manufactures and delivers at least **[*]** units of a Product.

1.63 "**Proprietary Information and Technology**" means "Proprietary Information" as defined in the Non‑Disclosure Agreement, as amended in Section 16 below.

1.64 "**Purchase Order**" shall have the meaning set forth in Section 11.2.

1.65 "**Purchase Order Acknowledgment**" shall have the meaning set forth in Section 11.3.

1.66 "**Quality and Test Procedures**" means the testing specifications, quality requirements, standards, procedures and parameters supplied and/or approved by Company, including without limitation, the specifications and quality requirements plans for the Product and certain Components attached hereto as Schedule 3.

1.67 "**R3 Product**" means any and all configurations of the Roomba® 3 product SKUs manufactured and assembled by Jabil on behalf of Company under this Agreement as identified in the initial Schedule 1 to this Agreement.

1.68 "**Reasonable and Customary Support Services**" mean all services and activities related to reporting for Company and its customers, root cause analysis, testing, trials, inventory audits and reconciliation, development and delivery of samples, participation and support of any new Product introduction, design, procurement and maintenance of all production related fixtures, and design, procurement and maintenance of all quality and test fixtures that may be necessary for Jabil to execute the Quality and Test Procedures (but excluding any PCBA NRE's and ICT fixtures and programming as these will be subject to volume based negotiations that may result in the costs being waived by Jabil).

1.69 "**RMA**" shall have the meaning set forth in Section 5.4.

1.70 "**Renewal Term**" shall have the meaning set forth in Section 14.

1.71 "**Specifications**" means the technical specifications for manufacturing Products under this Agreement as set forth in Schedule 1, any bill of materials, designs, schematics, assembly drawings, process documentation, test specifications, current revision number, and Approved Vendor List, and other technical requirements/specifications for manufacturing otherwise supplied and/or approved by Company. Specifications also include Packaging and Shipping Specifications. Specifications may be amended from time to time by amendments in the form of written engineering change orders agreed to by the Parties.

6

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions.**

1.72 "**SOW**" means the statement of work for each Product set forth in any Schedule 1 as amended in writing from time to time upon mutual agreement of the Parties.

1.73 "**Subsidiary(ies**)" means any corporation, partnership, joint venture, limited liability entity, trust, association or other business entity of which a Party or one or more of its Subsidiaries, owns or controls more than 50% of the voting power for the election of directors, managers, partners, trustees or similar parties.

1.74 "**Suppliers Designated by Company**" means suppliers designated, specified and/or approved by Company.

1.75 "**Sustainable and Competitive Pricing**" shall have the meaning set forth in Section 9.1.

1.76 "**Term**" means the Initial Term and each Renewal Term, collectively.

1.77 "**Termination Effective Date**" shall have the meaning set forth in Section 15.3.3.

1.78 "**Transition Period**" shall have the meaning set forth in Section 15.4.

1.79 "**Waived NRE Costs**" means, collectively, the total NRE Costs for the Metal Parts Tooling NRE, PCBA NRE, and the ICT NRE, each as set forth in Schedule 2.

1.80 "**Warranty Period**" shall have the meaning set forth in Section 5.3.

**2 List of Schedules**. This Agreement includes the following Schedules for each Product to be manufactured hereunder, which are hereby incorporated herein and made a part of this Agreement:

Schedule 1 - Statement of Work and Specifications

Schedule 2 - Fee and Price Schedule (Final Jabil Quote)

Schedule 3 - Quality and Test Procedures

Schedule 4 - Non‑Disclosure Agreement

Schedule 5 - Company Marks

Schedule 6 - Company Quarter End

**3 Manufacturing Services**. Jabil will manufacture the Product in accordance with the Specifications and any applicable Purchase Order. When requested by Company, and subject to appropriate fee and cost adjustments, Jabil will provide Additional Services for existing or future Product manufactured by Jabil for Company. Company shall be solely responsible for the sufficiency and adequacy of the Specifications and shall hold Jabil harmless for any claim arising therefrom pursuant to Section 19.2.

3.1 Quality and Test Procedures. All Products manufactured and supplied by Jabil shall adhere to the Quality and Test Procedures as set forth in this Agreement, including the Quality and Test Procedures attached as Schedule 3 hereto. Jabil shall continuously perform the applicable quality tests and procedures and monitor such compliance at all times, including during the preparation for production as well as during production. Company shall be solely responsible for the sufficiency and adequacy of the Quality and Test Procedures and will hold Jabil harmless from any claims arising therefrom pursuant to Section 19.2. Jabil is responsible for designing and/or

7

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions.

purchasing and maintaining necessary test and fixture equipment to conduct such testing and procedures at no charge in connection with performing the Reasonable and Customer Support Services. Where applicable, Company will provide detailed test fixture design/layout. Jabil is responsible for Jabil employee/worker's training, employee/worker's instructions, preventive and/or on-conditional (as needed) maintenance plans, and calibration plans unless otherwise specified by Company

3.2 <u>Packaging and Shipping</u>. Jabil will package and ship the Product in accordance with the Packaging and Shipping Specifications. Company shall be solely responsible for the sufficiency and adequacy of the Packaging and Shipping Specifications and shall hold Jabil harmless from any claims arising therefrom pursuant to Section 19.2. In the event Jabil fails to comply with the Packaging and Shipping Specifications and such results in a breach of the Jabil Warranty, the provisions of Section 5.4 shall apply.

3.3 <u>Items to be Supplied by Company</u>. Company shall supply to Jabil, according to the terms and conditions specified herein, Company Proprietary Information and Technology and, if applicable, the Loaned Equipment, and Consigned Components pursuant to Section 12.1. Company will also provide to Jabil all Specifications, Quality and Test Procedures, Packaging and Shipping Specifications, Product design drawings, approved vendor listings where applicable, material component descriptions (including approved substitutions), manufacturing process requirements, and any other specifications necessary for Jabil to perform the Manufacturing Services. Company shall be solely responsible for delay in delivery, defects and enforcement of warranties related to the Consigned Components, and Company shall hold Jabil harmless from any claims arising therefrom pursuant to Section 19.2. Any Loaned Equipment that Company requests Jabil to accept shall be subject to specific acceptance criteria (including maintenance and repair schedules) that are mutually created and mutually agreed upon. Once Jabil has accepted the Loaned Equipment, Jabil is responsible for adhering to the specifications describe in the acceptance criteria.

3.4 <u>Items to be Supplied by Jabil</u>. Jabil will employ the Jabil Manufacturing Process, and provide the Manufacturing Services, Reasonable and Customary Support Services, any required manufacturing technology, manufacturing capacity, design services in support of manufacturing process (to include fixture design) labor, manufacturing and quality related fixtures, transportation logistics (as required by FCA Port of Origin), systems and facilities necessary for Jabil to perform the Manufacturing Services. Jabil will provide Reasonable and Customary Support Services at no charge.

3.5 <u>Company Inspection</u>. Company shall have the right, upon reasonable advance notice, during normal business hours and at its expense to inspect, review, monitor and oversee the Manufacturing Services, provided that such inspection shall not disrupt Jabil's normal business operations. Company shall cause each of its employees, agents and representatives who have access to Jabil's facilities, to maintain, preserve and protect all Proprietary Information and Technology of Jabil and the confidential or proprietary information and technology of Jabil's other customers in accordance with the Non-Disclosure Agreement. Company shall further have the right to bring Company's customers to Jabil's facility, upon reasonable advance notice and under the same obligations to Jabil surrounding protection of Jabil's Proprietary Information and Technology and Jabil's customers' confidential or proprietary information and technology. Company's employees have the right to obtain relevant artifacts (such as reports, process tracking charts, etc.) and take photographs and videos of Company related Products, Components, manufacturing processes, tests, fixtures, tools or items at any time during the inspection, subject to Jabil's prior review and approval of said photographs and videos.

3.6 <u>Materials Procurement</u>.

3.6.1 Jabil will use Commercially Reasonable Efforts to procure Assigned Components from the applicable designated supplier per Company's AVL and Generic Components per Company's BOM, where applicable, and otherwise from suppliers chosen by Jabil and approved by Company, in amounts necessary to fulfill

8

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions**.

Purchase Orders and to procure under Material Authorizations. Jabil will be responsible for adherence to the Product Specifications in the assembly and manufacturing process. Company will be responsible for the part functionality set forth in the Company Specifications. Company will be responsible for managing the pipeline of Company controlled Consigned Components. Jabil will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Jabil to the extent empowered by Company through its Material Authorizations and Purchase Orders. Company may authorize Jabil to procure Generic Components and Assigned Components necessary, without a Purchase Order, by issuing a written authorization to purchase such Components ("**Material Authorization**"), to meet specific Forecast or Purchase Order demand as well as any coverage which may be needed for NCNR and Long‑Lead Components. In the event of schedule changes, Jabil shall use Commercially Reasonable Efforts to cancel all applicable material and parts purchase orders and reduce material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. Company retains all liability for materials and parts Jabil cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Jabil acting on Company's Material Authorization or Purchase Order. Jabil's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components regardless of classification, except for non‑cancel/nonreturnable (NCNR) Components.

3.6.2 <u>Long‑Lead Components</u>. Jabil shall not purchase any Component designated in Schedule 2 as a "long lead" Component by Company without a Material Authorization or Purchase Order. Jabil shall use Commercially Reasonable Efforts to continuously improve lead time for all Components. With Company's prior written consent (such as a Material Authorization), Jabil may pre‑purchase Generic Components and Assigned Components, or pre‑build sub assemblies, modules, core robots or even completed SKU quantities in order to meet Forecast volumes, or anticipated volumes under Purchase Orders and Material Authorizations.

3.7 <u>Materials Declaration</u>.

3.7.1 Company shall notify Jabil, in reasonable detail, with respect to each Product as of the Effective Date, whether or not such Product is exempt from Materials Declaration Requirements. Where Company notifies Jabil in writing that the Product is subject to Materials Declaration Requirements, Jabil will use Commercially Reasonable Efforts to procure, or assist Company in procuring (if applicable) Components and other parts and materials that are compliant with Materials Declaration Requirements. Upon Company's request, Jabil shall use commercially reasonable efforts to collect documentation from suppliers on the AVL as of the Effective Date, certifying compliance with Materials Declaration Requirements with respect to Components, the form of which certification has been provided, or approved, by Company ("**Compliance Certification**"). Jabil shall obtain such Compliance Certification from each suppliers added to the AVL after the Effective Date, and from each supplier chosen by Jabil pursuant to Section 3.6.1. Upon Company's request, Jabil shall promptly provide copies of all requested Compliance Certifications to Company. In the event that any supplier does not provide Compliance Certification, Jabil shall promptly notify Company and cooperate with Company to remove such supplier from the AVL or take such other action that the parties mutually agree upon in writing. In addition, Jabil shall fully cooperate and render all necessary assistance to Company in Company's efforts to recover on any claims against any suppliers related to Materials Declaration Requirements. In the event that a supplier fails to provide a Compliance Certification, Jabil has notified Company of such failure and Company has notified Jabil that Company still chooses to accept Components from such supplier, then Jabil shall bear no responsibility or liability for the lack of such Compliance Certification. However, Company understands and agrees that:

3.7.1.1. Company is responsible for notifying Jabil in writing of the specific Materials Declaration Requirements and any exemptions thereto that Company determines to be applicable to the Product and shall be solely liable for the adequacy and sufficiency of such determination and information;

9

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

3.7.1.2. Any information or certification regarding Materials Declaration Requirements compliance of parts, components, packaging or materials used in the Products shall come from the relevant supplier, which Jabil shall provide to Company promptly following receipt of any such information or certification. Jabil does not test, certify or otherwise warrant component, part, packaging or materials compliance, on a homogenous material level or any other level, with Materials Declaration Requirements; and

3.7.1.3. Company is ultimately and solely responsible for ensuring that any parts, components or materials used in the Products, and the Product itself, are compliant with applicable Materials Declaration Requirements.

3.7.1.4. In the event Jabil becomes aware of any Material Declaration Requirements that may be applicable to the Product or any Component thereof, Jabil will use Commercially Reasonable Efforts to notify Company of such Material Declaration Requirements.

Notwithstanding any other provision set forth in this Agreement, including amendments, attachments, or any other document incorporated herein (i) if any Products do not comply with the Jabil Warranty, then Company shall be entitled to the remedies provided in Section 5.4 below for such Non‑Conforming Products, this Section 3.7 sets forth Jabil's sole responsibility and liability and Company's entire remedy from Jabil with respect to Materials Declaration Requirements and any third party claims against Company related to the Materials Declaration Requirements, and that absent this provision, Jabil would not enter this Agreement.

3.8 <u>Product Evaluation</u>. Acceptance of the Product will occur upon Company's or its designee's receipt of the Product. Notwithstanding the foregoing, Company reserves the right to inspect or evaluate any Product to determine if it conforms, in all material respects, to the Specifications. In the event Company determines that the Product does not pass its acceptance test procedures or inspection procedures, (i) Company shall notify Jabil in writing that such Product is a Non‑Conforming Product, and (ii) Jabil will assume its obligations and Company will have the available remedy with respect to such Non‑Conforming Products as set forth in Section 5.4. For the avoidance of doubt, the Jabil Warranty in Section 5 will survive any acceptance, inspection, or evaluation by Company under this Section.

3.9 <u>Purchase Order Performance</u>.

3.9.1 Jabil shall fill and deliver 100% of the Products purchased under a Purchase Order by the due date specified in Jabil's Order Acknowledgment of such Purchase Order.

3.9.2 In the event that Jabil fails to fill and deliver "On‑time" as defined in Section 3.9.4, solely due to an act or omission by Jabil, then Jabil shall pay to Company commercially reasonable expedited shipping charges to deliver the affected order to Company.

3.9.3 Notwithstanding anything to the contrary, the following is hereby excluded from On‑time delivery calculations:

• Obsolete Parts. Components which are no longer actively being manufactured, but found through limited distribution supply, brokers and/or through a Company last‑time buy. Jabil is responsible for proactively monitoring threat to obsolescence and issuing advance notification to Company as soon as it becomes aware of same so that Company may have sufficient time to introduce alternate component.

10

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [\*] denotes omissions**.

•          Force Majeure event as provided in Section 24.

•          Company caused and/or controlled delays.

3.9.4 For purposes of this Agreement, "**On-time**" delivery means: delivery of **[*]** of the Products purchased under a Purchase Order are delivered by the due date indicated on Jabil's Acknowledgment to Company's Purchase Order for such Products, no later than the end of **[*]** thereafter; minus **[*]** for any portion of the order delivered early **[*]**. Jabil will monitor and report to Company monthly "On-time" delivery per Purchase Order and Order Acknowledgment, and such report shall include the number of Purchase Orders placed by Company within the Lead Time versus number of Purchase Orders delivered On-time.

3.10 <u>Assigned and Consigned Components</u>.

3.10.1 Company may elect to assign a specific supplier and part number for any component or material, including any rechargeable battery, battery charger, masked IC components, motors, packaging material, and gears. In such case, Jabil shall source such Assigned Components from the applicable supplier and implement supply optimization inventory practices. In the event that Company elects to transfer to Jabil the purchasing responsibility for any Consigned Component, Jabil shall assume such responsibility as soon as reasonably practicable. The Parties will work in good faith to identify and implement all reasonable measures to allow for Jabil to assume such purchasing responsibility for such Consigned Component.

3.10.2 Jabil will segregate, conspicuously identify and safeguard all Company owned and Consigned Components in such fashion to clearly identify the Consigned Components as the property of Company. Jabil shall maintain all Components at its own expense in accordance with the product requirements provided in writing to Jabil.

3.10.3 Title and possession of all Consigned Components placed into Jabil's facility shall remain with Company as if it were an actual shipment of Product to Company. Insurance covering the Consigned Components will be the responsibility of Company. Such insurance includes a waiver of subrogation against Jabil. Jabil shall hold inventory on consignment for support of Company's Products and business at levels mutually agreed upon by Company and Jabil, but no less than an amount to satisfy Purchase Orders against the current Material Authorizations, subject to Company providing (or authorizing procurement of) sufficient quantities. Jabil will at all times utilize FIFO inventory management for all Consigned Components. In the event that Jabil's failure to utilize FIFO inventory management for the battery Components results in any battery Component remaining in consigned inventory for more than six (6) months (subject to Company's sufficient consumption under Purchase Orders so that no Components will remain in consigned inventory for more than 6 months when FIFO is utilized), then Jabil shall, at its own expense, coordinate with the applicable supplier for the return and replacement of such battery Components for new or properly re-charged battery Components. If Company does not place Purchase Orders that consume Consigned Components consistent with applicable Forecast, the Parties will negotiate in good faith the disposition of Consigned Components held by Jabil. Jabil shall provide to Company upon request a detailed accounting of all Consigned Components and all other Components, Products and materials of Company at Jabil's premises or otherwise under Jabil's control.

3.10.4 <u>Sales of Products and Components</u>. Without Company's prior written consent, Jabil shall not, directly or indirectly, sell, supply or otherwise transfer any Product to any Person other than Company or Company's designated customer or distributer.

**4 Quality; Product Recalls**. -

4.1 <u>Governing Quality documents</u>. -

11

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

4.1.1 <u>Supplier Qualification</u>. Jabil shall be responsible for demonstrating that all Jabil recommended suppliers were qualified using Jabil's supplier qualification process.

4.1.2 <u>Incoming Quality Control</u>. Unless otherwise specified, incoming quality control (IQC) methodology for incoming materials shall be governed by existing process at Jabil, subject to Company's right to comment and suggest changes and improvements thereto. With respect to the Consigned Components, the R3 Battery Incoming Inspection quality requirements will be governed as per Production QC Plan - R3 Battery document, and the R3 Power Supply Incoming Inspection quality requirements will be governed as per Production QC Plan - R3 Power Supply, each as included in the Quality and Test Procedures.

4.1.3 <u>Tooling & Tooling Cavity</u>. Tooling & Tooling Cavity requirements shall be governed, at a minimum, as per the testing process outlined in the Production Quality Specification and Test Plan - General Requirements included in the Quality and Test Procedures. Jabil shall design, develop and deliver all tooling necessary to develop, manufacture, and assemble the parts identified in the engineering drawings (CAD files) and other specifications provided by Company to Jabil. Each cavity (if multiple cavities in one tool) shall be dimensionally identical. The quality of the molded part shall be governed, at a minimum, as per process outlined in Quality Specification and Test Plan - General Requirements included in the Quality and Test Procedures.

4.1.4 <u>Calibration Requirements</u>. Calibration requirements are outlined in the applicable Production QC Plan documents included in the Quality and Test Procedures. Jabil shall be responsible for development of implementation and maintenance plans to comply with all such calibration requirements.

4.1.5 <u>Preventive and/or On‑Conditional Maintenance</u>. Unless otherwise specified, Preventive and/or On‑Conditional Maintenance requirements shall be governed by existing process at Jabil, subject to Company's right to comment and suggest changes and improvements thereto.

4.1.6 <u>Environmental Control</u>. Environmental Control requirements shall be governed as per the QC General Requirements - Environmental Control Standards document included in the Quality and Test Procedures.

4.1.7 <u>Data Collection</u>. Quality related data collection and data transfer requirements shall be governed as per the Production Quality Data Collection and Data Transfer Requirements document included in the Quality and Test Procedures.

4.2 <u>Continuous Quality Improvement</u>. Jabil shall establish a program for continuous improvement demonstrated by annual improvement goals for a series of key quality objectives, which shall be subject to review and approval in writing by Company.

4.3 <u>Product Inspection and Traceability</u>. Jabil shall establish inspection points throughout its manufacturing process and shall be governed, at a minimum, by the Quality and Test Procedures. These points must be located in‑process as well as after Product has completed all manufacturing operations, to assure through visual, mechanical, or electro‑mechanical inspections, tests and with the use of statistically valid sampling plans or 100% inspection that Product conforms to the Specifications, standards of acceptable workmanship as well as any reasonable requirements of Company. Company reserves the right to review the additional verification points proposed by Jabil and make suggestions for improvement.

4.4 <u>Certifications</u>. Regulatory compliance certifications are required as a condition for the production, shipment, sale, and disposal of all Company products, and as such, Company is obligated to maintain a commitment to meeting all regulatory compliance requirements. As a condition of the compliance certification process, the Products and Jabil's manufacturing facility shall be subject to periodic audits and certification testing. Jabil shall

12

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions.**

provide objective evidence that it meets such requirements pertaining to all regulatory, quality, and compliance requirements and will provide such information upon request from Company. Objective evidence shall include, but is not limited to, existing certification documents and certification inspection reports from Jabil and each of its suppliers.

4.4.1 <u>Product Specific Certifications</u>. Company is responsible for maintaining all existing product certifications. Jabil shall comply, and shall flow such requirement to its suppliers to comply, with any and all Product specific, certification-related requirements such as: informing Company of the source and manufacturing part number of every Component and validation that Jabil's processes are compliant to such certification requirements. Jabil shall support all recertification requirements for all Product certifications. All Product licenses and Product certifications shall be in Company's name. In the event that Company requires Product changes which result in Product recertification, Company will bear any licensing and external testing fees for all such Product certifications. In the event that Jabil requires Product changes which result in Product recertification, Jabil will notify Company immediately and bear any licensing and external testing fees for all product certifications.

4.4.2 <u>Manufacturing Facility Specific Certifications</u>. Jabil shall support and maintain specific requirements related to the Product certification requirements. Jabil shall bear any reasonable fees associated with these pre-requisite site specific certifications. All pre-requisite site specific certifications shall be maintained in Jabil's name. In the event that Company requires product or business changes which result in additional site specific certifications by Jabil, Jabil shall promptly take all actions necessary to comply with such requirements. In addition, Jabil shall promptly execute documents and take such further action as Company shall reasonably request in order to comply with any certification required by any customer or distributor of Company.

4.4.3 <u>Records Retention</u>. For a period of seven (7) years from delivery of each Product (items produced under the engineering pilot (EP) cycles are considered Product), Jabil shall maintain accurate and complete records for all Products manufactured hereunder, including, but not limited to, all configuration and engineering records. This shall include all records relating to product traceability to ensure both forward and reverse traceability. Records shall contain, as a minimum, all information relating to the following:

- Component lot certificates

- Product (finished good) serial numbers and as built configuration

- Volume of Product units manufactured with each production run

- Location of each Product unit (for semi-finished and finished Product)

- Serial numbers for all Products associated with each Purchase Order

- All in-coming quality control (IQC), WIP, post-production, and quality inspection data of each Product shipped

- All life testing units (minimum of 1 year is required)

- All signed samples

4.4.4 <u>Articles Approval</u>. Jabil shall conduct first article inspection after any production stoppage and shall be governed by the Production Quality Specification and Test Plan - General Requirements document included in the Quality and Test Procedures. Company also requires first article inspection builds during each EP cycle. Company further requires first article inspection builds for all new engineering designs of Product, engineering changes of Product, and Jabil initiated changes. Results of first article inspections performed by Jabil

13

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions.**

shall be sent to Company quality representative within **[\*]** of completion. During the ramp up to production, Vendor will send to Company the samples identified on Schedule 3 in the frequency, amounts, formats set forth therein, and as amended from time to time by Company.

4.4.5 <u>Molding Parameter Instructions</u>. Before the start of production for each Product, Jabil and Company will jointly agree on molding parameter instructions for each tool to insure optimum performance and quality. This exercise shall be conducted in addition to Jabil's adherence to Quality and Test Procedures. Jabil shall coordinate with its molding team to insure the molds are run according to the agreed upon parameters. Jabil will identify any methods to improve the cost or efficiency for the molding process, but will seek Company's written approval before implementing any change in production. After it has been reviewed and agreed upon by the Parties, the quality requirements will be maintained and controlled through engineering change requests (ECR) and/or engineering change notices (ECN). Components with no regrind allowed will have that stated on the applicable part drawing.

4.4.6 <u>Product Precision</u>. The R3 Product requires repeatable precision to insure adequate overall system performance. Prior to Company's issuance of any Purchase Order for Jabil to build a tool for Company, Company will specify critical dimensions and acceptable tolerance bounds, which will account for the many complex factors that influence the final molded dimensions of the parts. Jabil shall be responsible for tuning the machines to compensate for these variations. To ensure that Components are conforming to the Specifications, as conditions evolve over time, Jabil will sample and measure, on a daily basis or at the frequency defined as per Production QC Plan - Roomba 3 Robot included in the Quality and Test Procedures, the key parts to insure dimensional compliance. If any batch of Components fails to comply with Specifications, the disposition of the molded parts and units made with such non-conforming molded parts shall be governed by the Production QC Plan - Roomba 3 Robot included in the Quality and Test Procedures. Company reserves the right to determine final disposition of all non-conforming material.

4.4.7 <u>Secure Testing Facility</u>. Jabil shall provide intellectual property secure on-site facilities for Company's final inspection quality control team, as well as the necessary inspection technicians to assist during inspections.

4.4.8 <u>Quality Test Plan Audits</u>. Company and Jabil shall coordinate with Jabil's quality team to generate an audit plan that complies with the detailed Quality and Test Procedures. Upon mutual agreement, this plan will serve as the gold standard. This plan will be under ECR/ECN control.

4.4.9 <u>Signed Samples</u>. Company will provide all necessary signed samples before production of each Product.

4.4.10 <u>Random Inspections</u>. Company, or its designated representative, will perform final random inspections on all shipments according to the sampling plan described in the Production Quality Specification and Test Plan - General Requirements included in the Quality and Test Procedures. Sections 3.8 and 5 shall apply to any breach of warranty by Jabil.

4.5 <u>Returned Products</u>. Jabil shall establish a program for analyzing Product returns and for tracking Product return rates and failure types. Jabil will utilize Company provided Return product information in such analysis and tracking. Jabil shall provide objective evidence to demonstrate appropriate corrective actions, as needed, to address Product Returns root cause.

4.6 <u>Recalls</u>. If Company reasonably decides to, or is required by any government authority or court of competent jurisdiction to, initiate a product recall, withdrawal or field correction with respect to, or if there is any governmental seizure of, any Product covered by the Jabil Warranty, Company will notify Jabil of the details

14

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions**.

regarding such action, including providing copies of all relevant documentation concerning such action. Jabil will assist Company in investigating any such situation. All regulatory contacts that are made and all activities concerning seizure, recall, withdrawal or field correction will be coordinated and made by Company, and all communications in connection with any recall, shall come solely from Company. If any such recall, withdrawal, field correction or seizure is due to a Class Failure (as defined above), then the rights, remedies and obligations under Sections 5.4 and 5.6 shall apply.

**5 Warranty & Remedy**. -

    5.1 Jabil Warranty. -

        5.1.1 Product Warranty. Jabil represents, warrants and covenants that: (i) it will manufacture the Product in accordance with IPC‑A 610 Class 2 workmanship standard, (ii) and that at the time of manufacture, the Product will conform, in all material respects, to the Specifications and (iii) the Products will be free and clear of all Encumbrances. The foregoing warranty (collectively, the "**Jabil Warranty**") shall apply to any Product that is repaired or re‑manufactured by or on behalf of Jabil under this Agreement during the Warranty Period. This Product warranty is extended to, and may only be enforced by, Company.

    5.2 Components Warranty. To the extent Jabil is permitted to do so under applicable third party agreements, with respect to defects in Components, Jabil's sole and exclusive obligation will be to pass on to Company all warranties from Component suppliers to the extent that they are transferable. Jabil shall use Commercially Reasonable Efforts to ensure that all Assigned Components used in the Product are procured from suppliers on the AVL, unless otherwise agreed to by the Parties in writing. If Jabil incurs any cost in assisting Company at Company's request in pursuing and/or utilizing on Company's behalf any transferable supplier warranty (including any analysis associated therewith), Jabil shall notify Company in writing in advance of incurring such costs and Company shall reimburse Jabil accordingly for any such approved cost.

    5.3 Survival of Warranty. Product warranties will survive any inspection, delivery, acceptance or payment by Company and be in effect for a period of **[*]** from the date a Product is initially delivered to Company or to Company's designated carrier (such period, the "**Warranty Period**").

    5.4 Repair or Replacement of Defective Product. Jabil shall elect, in its sole discretion, to repair, replace, or issue credit to Company in an amount equal to the price paid by Company under applicable Purchase Order for, any Non‑Conforming Products caused by a breach of the warranty set forth in this Section 5. Any such credit, repair or replacement shall be pursuant to Jabil's standard return material authorization process and procedure ("**RMA**"), pursuant to which Company will request an RMA number from Jabil for such Non‑Conforming Product during Warranty Period and Jabil shall issue such RMA number within one (1) business day following Company's request. Company shall then consign the Non‑Conforming Products along with objective documentation of the applicable breach of warranty and alleged defect ("**Defect**"), FOB Jabil's repair facility and specify the Jabil assigned RMA number. Jabil will promptly analyze such RMA Product and provide notice of Jabil's confirmation or rejection of the Defect to Company within ten (10) days of receipt of such Product. If such Defect is confirmed, then Jabil will repair, replace, or issue a credit to Company in an amount equal to the price paid by Company under applicable Purchase Order for, the Non‑Conforming Products within twenty (20) business days of receipt by Jabil of such Non‑Conforming Products, and in the event the Defect is confirmed, Jabil will reimburse Company for the reasonable cost of transporting the Non‑Conforming Products to Jabil's designated facility and Jabil will deliver the repaired or replacement Products FCA Company's designated destination. If no such Defect is confirmed by Jabil after seeking reasonable input from Company regarding the alleged Defect, Company shall reimburse Jabil for all fees, costs and expenses incurred to analyze and, if requested by Company, repair or replace the non‑defective Products and Company shall bear responsibility for all transportation costs to and from Jabil's designated repair facility.

15

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

5.5 <u>Class Failure</u>. In the event that Jabil is notified in writing of a detailed and complete description of Company's basis of a Class Failure, Jabil shall:

5.5.1 Within 24 working hours of receipt of such notice, Jabil will provide Company with a status report and details of a proposed interim solution (or if Jabil disputes the basis for Class Failure, it shall provide written notice to Company of same and any such dispute shall be resolved by the Parties in accordance with the provisions of Section 25.13); and

5.5.2 No later than five (5) business days following notification of such Class Failure, provide Company with a root cause analysis and corrective action plan (unless Jabil provides written notice of dispute of such Class Failure as noted above).

In each of the foregoing cases, Company will make available such information and assistance reasonably required to allow Jabil to conduct its root cause analysis and to provide its corrective action plan.

5.6 <u>Remedies Due to Class Failure or Recall</u>. In the event of a Class Failure or recall of a Product solely caused by a Class Failure, then, in addition to the rights, remedies and obligations under Section 5.4 with respect to such Product, the following costs and expenses incurred by Company as a direct result of the Class Failure or recall shall be borne by Jabil: (i) costs of transport of affected Products between the Jabil facility and Company facility; (ii) costs to re-inspect 100% of the rejected lots of batches/sorting costs; (iii) costs of repair in Company's production line; and (iv) **[*]** of the reasonable out of pocket costs and expenses incurred as a direct result of transporting the affected Products between Company and the end user or between the end user and Jabil. Company shall provide all supporting documentation of its incurred costs to Jabil before or along with its invoice for same and Jabil will remit payment by forty-five (45) days receipt of same. If Jabil in good faith disputes any such invoiced charges, Jabil will notify Company of the disputed items in writing within said forty-five days.

5.7 <u>Third Party Repair and Re-Manufacture; Other Defects</u>. Notwithstanding anything to the contrary in this Agreement, Company may itself, or through a third party, and at its own expense, repair or replace, or re-manufacture any Product (whether or not such Product is defective) without any obligation or liability to Jabil (such Company actions shall void the Jabil Product Warranty). If Company wishes Jabil to undertake repair or replace Products that are non-conforming due to reasons other than a breach by Jabil of its warranty obligations hereunder, and Jabil agrees to perform such work, Jabil will provide a quotation to Company for such work and the Parties will mutually agree on an allocation of costs for the repair, replace and/or re-manufacture process prior to Jabil performing such work.

5.8 <u>Limitation of Warranty</u>.

5.8.1 THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5 AND 16.2 ARE IN LIEU OF, AND JABIL EXPRESSLY DISCLAIMS AND WAIVES, ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, INCLUDING COMPLIANCE WITH MATERIALS DECLARATION REQUIREMENTS, ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR MISAPPROPRIATION OF ANY RIGHT, TITLE OR INTEREST OF ANY PARTY OR ANY THIRD PARTY. SECTIONS 5.4 AND 5.6 CONSTITUTE COMPANY'S SOLE AND EXCLUSIVE REMEDY FOR A BREACH MADE BY JABIL OF THE JABIL WARRANTY. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, COMPANY UNDERSTANDS AND AGREES THAT IT SHALL HAVE FULL AND EXCLUSIVE LIABILITY WITH RESPECT TO ANY PRODUCT, WHETHER FOR PRODUCT DESIGN LIABILITY, PRODUCT LIABILITY, DAMAGE TO PERSON OR PROPERTY AND/OR INFRINGEMENT OR

16

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

MISAPPROPRIATION OF THIRD PARTY RIGHTS. NO ORAL OR WRITTEN STATEMENT OR REPRESENTATION OUTSIDE OF THIS AGREEMENT BY EITHER PARTY, ITS AGENTS OR EMPLOYEES SHALL CONSTITUTE OR CREATE A WARRANTY OR EXPAND THE SCOPE OF ANY WARRANTY HEREUNDER.

5.8.2 AT THE TIME OF DELIVERY TO JABIL, COMPANY SHALL BE RESPONSIBLE FOR THE QUALITY OF CONSIGNED COMPONENTS. NOTWITHSTANDING THE FOREGOING, WITH RESPECT TO ANY LOANED EQUIPMENT OR CONSIGNED COMPONENTS, COMPANY HEREBY EXPRESSLY DISCLAIMS AND WAIVES ANY AND ALL OTHER WARRANTIES, OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM USAGE IN THE TRADE OR OTHERWISE INCLUDING ANY WARRANTY EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR MISAPPROPRIATION OF ANY RIGHT, TITLE OR INTEREST OF ANY PARTY OR ANY THIRD PARTY.

5.8.3 JABIL'S WARRANTY SHALL NOT APPLY TO ANY PRODUCT THAT HAS BEEN SUBJECTED TO TESTING FOR OTHER THAN SPECIFIED ELECTRICAL CHARACTERISTICS OR TO OPERATING AND/OR ENVIRONMENTAL CONDITIONS IN EXCESS OF THE MAXIMUM VALUES ESTABLISHED IN COMPANY'S APPLICABLE SPECIFICATIONS, OR TO HAVE BEEN THE SUBJECT OF ANYONE OTHER THAN JABIL OR ITS AGENTS OR CONTRACTORS MISHANDLING, ACCIDENT, MISUSE, NEGLECT, IMPROPER TESTING, IMPROPER OR UNAUTHORIZED REPAIR, ALTERATION, DAMAGE, ASSEMBLY, PROCESSING OR ANY OTHER INAPPROPRIATE OR UNAUTHORIZED ACTION OR INACTION THAT ALTERS PHYSICAL OR ELECTRICAL PROPERTIES. THIS WARRANTY SHALL NOT APPLY TO ANY DEFECT IN THE PRODUCT TO THE EXTENT ARISING FROM ANY DRAWING, DESIGN, SPECIFICATION, PROCESS, TESTING OR OTHER PROCEDURE, ADJUSTMENT OR MODIFICATION SUPPLIED AND APPROVED BY COMPANY.

5.9 ECO Upgrade. RMA's for any engineering changes or upgrades under any ECR or ECN upgrades will also be subject to the RMA process. Jabil will analyze each ECR and ECN and provide a per unit upgrade/change cost and expected completion and delivery date.

**6 Limitation Of Liability**.

6.1 EXCEPT WITH REGARD TO ANY LIABILITY THAT ARISES FROM A PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 19 OR A BREACH BY EITHER PARTY OF ITS CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 16, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON OR ENTITY UNDER ANY CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR OTHER LEGAL OR EQUITABLE CLAIM OR THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, LOSS OF GOODWILL OR BUSINESS PROFITS, LOST REVENUE, WORK STOPPAGE, DATA LOSS, COMPUTER FAILURE OR MALFUNCTION, OR FOR ANY AND ALL OTHER OR EXEMPLARY OR PUNITIVE DAMAGES WHETHER SUCH PARTY WAS INFORMED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE FOREGOING SHALL NOT EXCLUDE OR LIMIT EITHER PARTY'S LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING FROM ITS NEGLIGENCE TO THE EXTENT THAT SUCH LIABILITY CANNOT BY LAW BE LIMITED OR EXCLUDED. JABIL'S MAXIMUM, AGGREGATE LIABILITY TO COMPANY DURING ANY IROBOT FISCAL YEAR DURING THE TERM OF THIS AGREEMENT (PER SECTION 14) FOR CLASS FAILURES AND RECALLS SHALL NOT EXCEED [*]; PROVIDED, HOWEVER, THAT, THE FOREGOING [*] CAP FOR CLASS FAILURES AND RECALLS IS NOT APPLICABLE TO JABIL'S STANDARD WARRANTY REMEDY PROVIDED IN SECTION 5.4, INCLUDING WITH RESPECT TO ANY PRODUCT THAT IS THE SUBJECT OF ANY CLASS FAILURE OR RECALL.

17

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

FURTHER, JABIL'S MAXIMUM, AGGREGATE LIABILITY TO COMPANY DURING ANY IROBOT FISCAL YEAR DURING THE TERM OF THIS AGREEMENT (PER SECTION 14) FOR INDEMNIFICATION UNDER SECTION 19 SHALL NOT EXCEED **[*]**.

6.2 Without affecting the rights and remedies which are identified as sole and exclusive rights and remedies under this Agreement, Company retains all rights expressly granted hereunder and any and all remedies herein expressly conferred upon Company will be deemed cumulative with, and, except as expressly set forth in this Agreement, not exclusive of, any other remedy conferred hereby upon Company, and the exercise by Company of any one remedy will not preclude the exercise of any other remedy available under this Agreement.

**7 Delivery, Risk of Loss and Payment Terms**. For purposes of this Agreement all Product shipments shall be FCA Port of Origin (per Incoterms 2000). Title and risk of loss for a Product will pass to Company (or to Company's designee invoiced by Jabil) FCA Port of Origin. For any shipments where Jabil is an authorized agent of Company in completing the Shipper's Export Declaration and managing Company's exports on behalf of Company, where the Company is the exporter of record (Principal Party in Interest - PPI), the Company hereby grants Jabil a limited power of attorney for the sole purpose of acting on its behalf in managing such exports.

7.1 Payment. Company shall pay Jabil all monies when due, including all NRE Costs under this Agreement. Jabil shall invoice Company upon delivery FCA Port of Origin. Payment of all invoices shall be net **[*]** from date of Jabil's invoice. Payment to Jabil shall be in U.S. Dollars and in immediately available funds. In the event the invoice currency from a Jabil supplier is other than U.S. dollars, the Parties will meet and agree in writing as to how pricing and foreign currency would be handled. Such agreement will include provisions for any changes in pricing resulting from purchases outside of U.S. Dollars (to be reviewed in advance of each calendar quarter), a reconciliation process and formula for realized foreign currency gains and losses, as well as the process for obtaining and/or establishing applicable exchange rates, including the applicable publications, websites and dates for same. Any equipment, tooling, component, material or other goods or property, which is purchased by Jabil in order to perform its obligations under this Agreement, shall become the property of Company once Jabil is reimbursed for all NRE Costs, if any. Jabil shall invoice Company for actual outstanding NRE Costs and other monies due at monthly intervals (or such other intervals as deemed appropriate) during the term of this Agreement and upon cancellation, termination or expiration of this Agreement. Jabil agrees to request advance written approval from Company should resource requirements, and thereby NRE Costs, increase materially relative to estimated NRE Costs initially agreed by the Parties. Upon such request, Jabil shall provide to Company reasonably detailed supporting documentation and/or descriptions of the NRE Costs for which Jabil seeks reimbursement. Company is not obligated to accept any additional reimbursement request from Jabil. Tooling prices do not include FCA Port of Origin transportation cost. All pricing files provided by Jabil will be based on FCA Port of Origin.

7.2 Taxes. Company shall be responsible for all federal, foreign, state and local sales, use, excise and other taxes (except taxes based on Jabil's income), all delivery, shipping, and transportation charges and all foreign agent or brokerage fees, document fees, custom charges and duties.

7.3 Disputed Invoices. If Company in good faith disputes any invoiced charges, Company will notify Jabil of the disputed items in writing within **[*]** from date of invoice. A "good faith" invoice dispute is one under which the invoice contains an error on quantity, pricing or any line-item as compared to the Company Purchase Order accepted by Jabil.

7.4 Reservation of Rights. Any payments made by Company under the Agreement, and any acceptance of Products, will be without prejudice to Company's right (i) to subsequently claim that it has overpaid Jabil; no such claim to be made following three hundred sixty five (365) calendar days from the date of invoice payment, or (ii) to require Jabil to remedy any deficiencies during the Warranty Period in Jabil's performance as provided in Section 5 of this Agreement.

18

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

**8 Import and Export**. Company shall be the importer of record for all Product shipments and shall be responsible for obtaining any required import licenses necessary for Company to import Product and/or receive shipments of Product from Jabil or its designated carrier, any U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under U.S. or foreign law applicable to Company's obligations under this Agreement. Jabil shall be responsible for obtaining any required export licenses necessary for Jabil to ship Product, including certificates of origin, manufacturer's affidavits and any other licenses required under US or foreign law applicable to Jabil's under this Agreement. Company agrees that it shall not knowingly require Jabil to ship or deliver any Product, assembly, component or any technical data or software which violate any export controls or limitations imposed by the United States or any other governmental authority, or to any country for which an export license or other governmental approval is required at the time of export without first obtaining all necessary licenses and approvals and paying all duties and fees. Upon request, Company shall communicate to Jabil whether Product is controlled for export by the U.S. Department of State, or the U.S. Department of Commerce, and provide the appropriate corresponding export control number(s). Each Party shall be responsible for securing all applicable licenses, certifications, approvals and authorizations that are necessary for such Party to comply with applicable import and export laws, rules and regulations for the shipment and delivery of the Product under this Agreement. Company shall also be responsible for complying with any legislation or regulations governing the importation of the Product into the country of destination and for payment of any duties thereon. Jabil accepts responsibility for factory and container security until such time as the container/merchandise is delivered FCA Port. Jabil will immediately report container seal changes and reason for changes to the Company's destination Distribution Center Manager.

**9 Cost Management**.

9.1 Cost Summary and Management. The cost summary set forth on Schedule 2, prepared by Jabil, contains a detailed SKU‑level (SKU as defined by Company) cost summary, Incoterm FCA Port of Origin, complete with all formulas and assumptions, to provide full access and visibility to all component, labor, assembly and mark‑up costs. The cost agreed upon as of the Effective Date will be in effect until **[\*]** and will not increase during that time period, except as provided in Section 9.2. Each calendar year (starting with **[\*]**), the Parties shall meet from time to time on an executive level as required, but no less than on an annual basis, on or before **[\*]**, to identify cost reduction opportunities where each Party will share overall financial objectives of the on‑going relationship between the Parties. Prices agreed upon at that time will be based on a written, Company volume projection on a SKU based level of its Product requirements for each calendar year and will be in effect for 12 months, starting on the first day of the upcoming iRobot fiscal year, and ending on the last day of that iRobot fiscal year and will not increase during that time, except as provided in Section 9.2. In support of Company's annual operation plan (AOP) process, Jabil shall provide budgetary, non binding Product pricing to Company no later than **[\*]** of each year during the Term. Jabil shall at all times employ an **[\*]** approach to cost management and pricing of Components, Products and the Manufacturing Services to review Sustainable and Competitive Pricing opportunities for the Products and Manufacturing Services provided to Company under this Agreement. For purposes of this Agreement, the phrase "**Sustainable and Competitive Pricing**" means stable pricing over time for the Products and Manufacturing Services provided to Company under this Agreement that is favorable against that which could be reasonably attained from other contract manufacturers for comparable volumes of substantially similar products and comparable manufacturing services for customers similarly situated in similar markets taking into account all applicable state, local and federal regulations and licensing requirements. For purposes of this Agreement, the term **[\*]** means providing detailed Jabil **[\*]** to Company which includes; **[\*]** (in place as of the Effective Date).

9.2 Price. The Price for each Product is set forth in Schedule 2 or the price identified in Jabil's Purchase Order Acknowledgment where Schedule 2 has not yet been updated between the Parties despite the Parties' mutually agreement on price change (the "**Product Price**"), and includes the complete price for such Product, including the fully‑costed bill of materials, Jabil's Gross Margin (as defined in Schedule 2), and any and all other added fees and costs related to the Manufacturing Services. The initial price for each Product shall remain in effect

19

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [\*] denotes omissions.**

during the period beginning on the Effective Date and ending on **[\*]**. New **[\*]** pricing for each Product following **[\*]** shall remain in effect for **[\*]** from implementation of such new pricing. **[\*]**.

9.3 [\*]

9.4 <u>Cost Reduction Efforts</u>. Company and Jabil shall pursue continuous cost reduction initiatives to ensure that available Sustainable and Competitive Pricing opportunities are reviewed. Such initiatives may include supply chain redesign, review of available Component suppliers, improved logistics solutions, manufacturing processes and test efficiency/elimination improvements, and, if necessary, process(es) and any Company-product redesign. Commencing **[\*]**, the Parties will target **[\*]** total cost reduction on released and active Products per year for the first **[\*]** of the life of each new Product. Jabil will demonstrate cost reduction improvements and report such results to Company **[\*]** as part of a rolling cost management process with a **[\*]** outlook for each Product.

9.5 <u>Cost Reduction Sharing</u>. Any cost reductions gained through Jabil's suggestions, whether during a quarterly cost reduction effort review or during the interim thereof, shall be **[\*]**, starting from the date of implementation of such change, and ending at implementation of new pricing following the next annual cost review. Upon implementation of the new pricing, **[\*]**. Jabil is expected to make reasonable efforts to implement cost reduction changes (irrespective of who initiated changes) as early as possible. Jabil is expected to provide full account of change implementation, timeline for implementation and the rationale.

9.6 <u>Source Transparency</u>. Jabil will submit a full list of suppliers to Company for each Product at the time of any cost summary submittal, along with the supplier part number (in case of Generic Components). Jabil will submit every supplier or part number change to Company for Company's approval before such change goes into effect.

9.7 <u>Cost Transparency</u>. COGS (Cost Of Goods Sold) is a key factor in Company engaging Jabil to produce and deliver the Product. So that Company has full visibility to the current and ongoing status of Jabil's COGS, Jabil will provide updated costing in the agreed upon format within five (5) business days of any change submittal. If Jabil fails to provide cost impact information within five (5) business days after any Company Specification changes, Company will consider the lack of response to mean that there is no cost impact. Any cost change would be considered valid only after Company's approval. No less frequently then semi-annually, Jabil will, upon Company's request, provide a microeconomic report that includes status of all suppliers/vendors/components, along with Jabil risk mitigation plan addressing all identified microeconomic risks.

**10 <u>Tooling and fixtures</u>.**

10.1 Company shall own any and all tooling, fixtures, molds, equipment, software and firmware made available to Jabil by Company, developed for or on behalf of Company, or otherwise paid for by Company ("**Company Tooling**"). Jabil may manufacture, have manufactured, and use the Company Tooling only to perform the Manufacturing Services under the Agreement and shall use and treat the Company Tooling with a high degree of care, and in any case no less than the same degree of care it would for its own equipment, tooling, molds or supplies. Jabil shall attach an identifying label showing Company's ownership in a conspicuous place on each unit of Company Tooling, if possible, and shall secure and segregate the Company Tooling in such fashion to clearly identify the Company Tooling as the property of Company. Jabil shall maintain the Company Tooling, at its own expense, in efficient working order and good repair based on reasonable wear and use, and otherwise in accordance with Company's instructions. Jabil shall keep all Company Tooling free of any Encumbrances, and shall not transfer any Company Tooling, or any rights in the Company Tooling to any Person.

10.2 Jabil shall deliver all Company Tooling to Company or Company's designee, or at Company's request, make available for pickup, upon the termination or expiration of this Agreement, or upon Company's earlier

20

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions.**

request. Jabil shall execute documents and take such further action as Company shall reasonably request to protect Company's interest in the Company Tooling. Jabil will at Company's expense of Jabil deliver to Company any of the above mentioned tooling within fifteen (15) days upon Company's written request. Jabil will adhere to the record keeping of Company Tools in accordance with Company requirements set forth in Section 4.4.3 or as otherwise described on Schedule 1. Jabil shall make such records available for inspection by Company or Company's designee Jabil upon Company's reasonable request.

**11 Forecast, Purchase Orders; Change Orders, Rescheduling and Cancellation**.

11.1 Forecast. Company will provide to Jabil, on a monthly basis, a non-binding, rolling 180 day (6 months) planning forecasts at a core robot level and on a SKU based level, indicating Company's monthly Product requirements, as amended by Company from time to time (each, a "**Forecast**").

11.2 Purchase Orders. Company will issue orders for Products hereunder using its standard form of purchase order ("**Purchase Order**"). Each Purchase Order will identify the applicable Product by SKU, quantity, mutually agreed price denominated in US currency, delivery terms, and other customary terms. Such Purchase Orders will be issued by Company at least **[*]** prior to the requested delivery date set forth in each such Purchase Order.

11.3 Purchase Order Acknowledgment. Jabil will notify Company electronically within one (1) business day if it utilizes EDI, or if in writing, within two (2) business days of receipt of a Purchase Order (a "**Purchase Order Acknowledgment**"), and inform Company in writing of any reason Jabil is unable to meet a requested delivery date or any other Purchase Order requirements. All orders are subject to Jabil's acceptance and any rejection notice shall specify the basis for in such notice. The absence of Jabil's written notice of Purchase Order acceptance constitutes acceptance of the Purchase Order including Jabil's obligation to manufacture and supply to Company amounts of Product as set forth on the Purchase Order in accordance with the terms and conditions of this Agreement; provided however, Company has notified Jabil in writing or by electronic mail that Jabil has not yet provided its Purchase Order acceptance and Jabil has not responded to such notice within one (1) business day of receipt thereof.

11.4 Changes to Forecast: At any time, prior to the issue of a Purchase Order, Company may reschedule and/or cancel any forecast demand.

11.5 Changes to Manufacturing Services, Packaging and Shipping Specifications and Test Procedures. Company may, in writing, request a change to the Manufacturing Services, Packaging and Shipping Specifications and Test Procedures at any time. Jabil will analyze the requested change and provide Company with an assessment of the effect that the requested change will have on cost, manufacturing, scheduling, delivery and implementation. Company will be responsible for all costs associated with any accepted changes. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules.

11.6 Production Increases, Rescheduling Delivery. Company may, in writing, request increases in production volume or acceleration of open Purchase Order at any time. Jabil will analyze the request and determine if it can meet the requested increase within the required Lead-time, provided, however, that Jabil must meet any and all increases up to **[*]** of the production volume for a Purchase Order for requests that include at least **[*]** of the original Purchase Order Lead-Time; subject to quantities authorized by Company in Material Authorizations issued to Jabil (the "**Minimum Production Increase**"); (for example, if Purchase Order quantity is **[*]** and Company requests increase of **[*]**, the increased quantity shall equal **[*]** for a total quantity of **[*]** under the applicable Purchase Order). If Jabil is unable to satisfy or comply with Company's requested increase in production volume

21

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

within the requested time frame for delivery, Jabil will provide the reasons preventing Jabil from satisfying the requested increase within five (5) business days after receipt of Company's request. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules. Jabil shall utilize its global supply network to assess availability of shared material across accounts to minimize instances in which Jabil is unable to meet an increase in a Purchase Order quantity requested by Company. It is further understood that Company will not incur additional charges due to Jabil's decision to meet an accelerated delivery schedule or request for increased quantities by utilizing Generic Components from another account's material.

11.7 <u>Product Configuration Changes and Engineering Changes</u>. Company may request configuration or engineering changes to a Product in writing at any time. Jabil will analyze the request and determine if it can meet the requested changes within the required Lead-time. If Jabil can satisfy the requested change it will provide Company within five (5) business days after receipt of the configuration or engineering request notice, a notice of acceptance of the requested changes. In the event that any requested change in the form, fit or function or Specification of any Product results in a significant increase in the cost of such Product, or in the length of time required for the manufacture or delivery thereof, then Jabil shall provide Company with a detailed cost analysis regarding such requested change using **[*]** as contemplated under Section 9.1. Following Company's acknowledgment of such detailed cost analysis, the Parties will negotiate in good faith an equitable adjustment to the price of such Product and/or expected changes to the delivery schedule for such Product. If Jabil is unable to satisfy or comply with Company's requested changes within the requested time frame for delivery, Jabil will provide the reasons preventing Jabil from satisfying the requested increase within five (5) business days after receipt of Company's request. Any such change shall be documented in writing and shall become effective only upon mutual written agreement of both Parties of the terms and conditions of such change, including changes in time required for performance, cost (including cost of materials on hand or on order in accordance with original Purchase Order) and applicable delivery schedules.

11.8 <u>Treatment of Obsolete/End-of-Life Material</u>. Upon receiving notice from Company of an engineering change or that any Product, component or assembly has become obsolete or has reached end-of-life Jabil will, within a reasonable period after receiving such notice, provide Company with an analysis of Company's liability to Jabil for components and materials acquired or scheduled to be acquired to manufacture such Product. Company's liability shall include the price of finished Product and Jabil's costs (including cancellation fees and charges), plus applicable margin, of WIP, safety stock components and materials and components and materials on hand or on order within applicable Lead-times. Jabil will use Commercially Reasonable Efforts to assist Company in minimizing Company's liability by taking the following steps:

•    As soon as is commercially practical reduce or cancel Component and material orders to the extent contractually permitted.

•    Return all Components and materials to the extent contractually permitted.

•    Make all Commercially Reasonable Efforts to sell Components and materials to third parties; provided, however, that Company shall approve any such sale for Components and consigned items that Company identifies in writing as having "exclusive rights."

•    Assist Company to determine whether current WIP should be completed, scrapped or shipped to Company or its designee "AS-IS."

11.9 <u>Rescheduled Delivery out, reduction of quantity, and Cancellation of Orders</u>. Company may request Jabil to reschedule the delivery date for any Product, decrease quantity on open Purchase Order, and cancel

22

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

pending Purchase Orders in accordance with this Section. The charges to Company for deferring delivery of a Purchase Order, reducing quantity or cancellation of a Purchase Order are outlined below:

| Days Prior to Delivery Date | Reschedule Terms | Cancellation Liability |
|---|---|---|
| 0-30 Days | Jabil is not obligated to adhere to the request, but must consider each request in good faith. | Company may not cancel a Purchase Order to be delivered within 30 days of the applicable delivery date without full payment to Jabil for the Purchase Order; provided however, Company may cancel a Purchase Order in the event it simultaneously issues a new one for the same quantity, but a different part number and in such event Company will be liable for any material on hand or on order, non-cancelable and non-returnable materials (to the extent issued under a Material Authorization by Company or its Purchase Order ), and applicable labor charges for WIP, plus margin for any portion of the canceled Purchase Order that cannot be used to fulfill the new Purchase Order. |
| 31-56 Days from original delivery date | Company may reschedule out the delivery up to [*] of the original quantity, reduce quantity or cancel the order, provided such rescheduling is within thirty (30) days of the original delivery date. Company may only reschedule one time per each Purchase Order. Jabil will consider requests for rescheduling above said [*] on an individual basis. | Material on hand or on order, non-cancelable and non-returnable materials (to the extent issued under a Material Authorization by Company or its Purchase Order ), and applicable labor charges for WIP, plus margin, provided, that such liability applies only to the extent that Jabil is unable to reallocate such material to any existing Purchase Order of Company. |

Reschedules in excess of the maximum deferred quantity or period (set forth above) will be considered cancellations and subject to applicable cancellation charges. Except as provided in Section 9.2, any reschedule out of a delivery date, reduction of quantity and/or cancellation of a Purchase order (in whole or in part) will not affect the current [*] Product Price.

**12 Logistics**. Jabil will maintain control over all Products while in Jabil's care, custody, and control. Jabil shall cooperate with Company and its suppliers and logistics services providers. Jabil will provide relevant and necessary information to Company relating to receipt, storing and shipment of Products. Jabil will coordinate with Company personnel, Company logistics services providers, and Company customers to execute the shipment of Products as instructed by Company.

12.1 Receiving. From time to time Company may ship Components, including batteries and Integrated Circuits (IC's, processors) directly to Jabil. Jabil will verify actual quantities and SKU's of such Components received as compared to the quantities and SKU's indicated on the shipping documents, process the Components into their inventory system, and notify Company of the quantity actually received by SKU. Jabil will also indicate any exceptions, at the time of reporting the receipt, as related to over, short or damage. The reporting of receipts and exceptions is made to Company.

12.2 Storage and maintenance of inventory. All Products and Components will be stored in a manner to maintain inventory control and to prevent damage. Jabil will maintain inventories and locations of Company Products and Components on their own perpetual inventory and/or warehouse management system.

23

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

12.3 <u>Physical inventory audit</u>.

12.3.1 On a quarterly basis Jabil will arrange a cut-off date for and complete a physical inventory audit of all Consigned Components. Because the integrated circuit (IC) Components contain valuable intellectual property of Company, there is no shrinkage allowance for such Components. Variances will be identified and reported to Jabil by Company within 30 days of the physical inventory. Within 30 days of being notified of any such variance, Jabil shall provide Company with a written report that explains the variance and, if requested by Company, the Parties will meet to discuss same. Jabil will be responsible for reimbursement of any such verified variances reported and invoiced by Company. All other Consigned Components are subject to a shrinkage allowance of **[*]** of the volume of such Component or Product received during the three month period immediately prior to the physical inventory audit.

12.3.2 On a quarterly basis Jabil will arrange a cut-off date for and complete a physical inventory audit of all finished Products that have passed the applicable quality inspections, but remain unshipped and in Jabil's possession at the end of such quarter. Jabil shall deliver such audit report to Company by the fifth (5th)business day immediately following the end of each Company Quarter End.

12.4 <u>Shipping to Company locations</u>. Most of the Products are designed to withstand a maximum of two pallet high floor storage. Components, including chips and batteries must be single stacked on the floor or stored in pallet racks. Company may direct Jabil to ship to specific Company locations and distributions centers such as, but not limited to, Sumner, WA; Mississauga, ON, Canada; and Rotterdam, Netherlands. Incoterms for sale to Company are FCA Port (or airport) of Origin. Company will select the freight forwarder and communicate local contacts to Jabil. Based on selection of forwarder or ocean carrier, Company will specify the Port of Origin. Company will be responsible for paying the transportation costs from the origin port or airport to the destination, Jabil will arrange empty container delivery in accordance with the shipping schedule communicated to Jabil by Company. Upon receipt of container, Jabil will inspect the container for any signs of damages to flooring, any holes in the roof or side of the containers, and any sign of tampering with the latching device (tampering to include drilling out rivets and replacing the rivets with bolts). If the container has holes, damages or signs of tampering Jabil will request a replacement container. Products will be loaded on the container, floor stacked, in a manner to prevent damage and to fully utilize the container. Jabil shall adhere to any specific pallet configuration requested and provided by Company. If there is a requirement to ship on wooden pallets, then the pallets must meet the guidelines of ISPM15 and be appropriately marked, indicating the pallets meet the standards. Company will be responsible for the costs associated with purchasing these pallets. Containers must be sealed with a cargo seal that meets or exceeds ISO/PAS 17712:2006.

12.5 <u>Direct shipment to Company Customers</u>. From time to time, Company may direct Jabil to arrange for shipping directly to Company's customers in accordance with specific Incoterms identified by Company at that time. The container inspection requirements and pallet requirements under Section 12.4 shall apply to any shipments directly to Company's customers.

**13 <u>Duty to Mitigate Costs</u>**. Both Parties shall, in good faith, undertake Commercially Reasonable Efforts to mitigate the costs of termination, expiration or cancellation. Jabil shall make Commercially Reasonable Efforts to cancel all applicable component and material purchase orders and reduce component inventory through return for credit programs or allocate such components and materials for alternate Company programs if applicable, or other customer orders provided the same can be used within thirty (30) days of the termination date.

**14 <u>Term</u>**. Unless earlier terminated as provided in Section 15 below, the term of this Agreement shall commence on the Effective Date and shall continue until the third anniversary thereof (the "Initial Term"), and shall automatically renew for successive three-year term (each, a "Renewal Term") unless at anytime following the Initial

24

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions.**

Term Jabil or Company provide written notice to the other of its intent to terminate this Agreement at least fifteen (15) months prior to the termination date set forth in its notice.

**15 Termination**. This Agreement may be terminated as follows:

15.1 Termination for Cause. Either Party may terminate this Agreement based on the material breach by the other Party of the terms of this Agreement, provided that the Party alleged to be in material breach receives written notice setting forth the nature of the breach at least thirty (30) days prior to the intended termination date. During such time the Party in material breach may cure the alleged breach and if such breach is cured within such thirty (30) day period, no termination will occur and this Agreement will continue in accordance with its terms. If such breach shall not have been cured, termination shall occur upon the termination date set forth in such notice.

15.2 Termination for Bankruptcy/Insolvency. Upon the happening of any of the following events with respect to a Party, except as otherwise prohibited by the United States bankruptcy laws, this Agreement may be terminated immediately:

15.2.1 The appointment of a receiver or custodian to take possession of any or all of the assets of a Party, or should a Party make an assignment for the benefit of creditors, or should there be an attachment, execution, or other judicial seizure of all or a substantial portion of a Party's assets, and such attachment, execution or seizure is not discharged within thirty (30) days.

15.2.2 A Party becomes a debtor, either voluntarily or involuntarily, under Title 11 of the United States Code or any other similar law and, in the case of an involuntary proceeding, such proceeding is not dismissed within thirty (30) days of the date of filing.

15.2.3 The dissolution or termination of the existence of a Party whether voluntarily, by operation of law or otherwise.

15.3 Termination Consequences.

15.3.1 If this Agreement is terminated for any reason, Company shall not be excused from performing its obligations under this Agreement with respect to payment for all monies due Jabil hereunder in connection with activities occurring prior to termination or expiration of this Agreement including fees, costs and expenses incurred by Jabil up to and including the effective date of such termination or expiration in accordance with this Agreement. The following Sections 3.8, 3.10.4, 4.4.3, 4.6, 5.1, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 6, 7, 8, 10.2, 13, 15.3, 15.4, 16, 17.1, 17.2, 17.3, 17.4, 18, 19, 23 and 25 shall survive the expiration, cancellation or termination of this Agreement.

15.3.2 All Purchase Orders acknowledged by Jabil prior to the Termination Effective Date will be fulfilled pursuant to and subject to the terms of this Agreement, even if the delivery dates of Products under such Purchase Orders are after such Termination Effective Date, not to exceed ninety (90) days from said Termination Effective Date. The provisions of Section 3.9 shall not apply to deliveries made after the Termination Effective Date.

15.3.3 Termination Charges. Upon termination, expiration or cancellation of this Agreement for any reason, Jabil shall submit to Company within (a) 60 days from the effective date of such termination or expiration an invoice for all amounts properly due and payable as set forth in this Section 15.3.3. Jabil's invoice for such charges shall be based upon validated and actual costs incurred by Jabil up to the date of termination, expiration or cancellation (the "**Termination Effective Date**") and shall also include the following: (i) to the extent authorized in writing by Company, actual out‑of‑pocket costs incurred by Jabil accrued after the Termination

25

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [\*] denotes omissions.**

Effective Date and directly resulting from such termination; and (ii) applicable Gross Margin except for termination by Company for Jabil's breach pursuant to Section 15.1. Jabil will provide to Company all information reasonably necessary to confirm the costs, expenses and applicable margin. To the extent that Jabil cannot mitigate its costs as set forth in Section 11.8 above, upon termination, expiration or cancelation, for any reason, Company's obligation shall be to pay the following amounts:

- The applicable Product Price for the Product of which Jabil has completed manufacture prior to the Termination Effective Date pursuant to an issued Purchase Order or Material Authorization for which payment has not been made;

- Reimbursements for Components, subassemblies and work‑in‑process at the time of Termination Effective Date which were purchased, or ordered, or work had commenced, as applicable, pursuant to issued Purchase Orders or Material Authorizations, plus applicable Gross Margin; provided however, that no Gross Margin will apply if this Agreement is terminated by Company for Jabil's breach pursuant to Section 15.1;

- Jabil's reasonable cancellation costs incurred for Components and subcontracted services that Jabil had on order on behalf of Company on the Termination Effective Date (in each case) pursuant to issued Purchase Orders or Material Authorizations; and

- Jabil's cost of equipment or tooling purchased by Jabil specifically for the Manufacturing Services related to Product and, to the extent authorized in writing by Company under the terms and conditions of this Agreement, any costs incurred by Jabil under this Agreement. All goods, equipment or tooling for which Company shall have paid 100% of Jabil's incurred cost or more shall be held by Jabil for Company's account and Company may arrange for its acquisition of them on AS‑IS, WHERE‑IS basis.

15.3.4 Return of Product and Materials Supplied by Company. Except as needed subject to Section 15.4, upon the Termination Effective Date for whatever reason, Jabil shall immediately deliver to Company or its designee all Product, Specifications, Components, packaging materials and other materials purchased by or on behalf of Company and all other materials or supplies provided by Company. Jabil shall also deliver to Company or its designee all Product produced hereunder, and shall invoice Company in accordance with the terms of Section 7.1.

15.4 Transition Assistance. Upon Termination Effective Date, Jabil will reasonably support Company in making an orderly transition to a successor third party manufacturer during a period lasting no longer than six (6) months (the "**Transition Period**"). During such Transition Period, (a) Jabil shall provide, in a timely and professional manner, services reasonably necessary to transition the Manufacturing Services to a successor third party manufacturer; and (b) all of the terms and conditions of this Agreement shall continue to be in full force and effect, including Manufacturer's obligations to continue providing the Manufacturing Services (except for accepting any further Company Purchase Order). In addition, Jabil shall provide such technical assistance to Company or its designated third party manufacturer, as Company may reasonably request in connection with such transition. At the end of such Transition Period, or upon Company's earlier request, Jabil shall deliver to Company, or to Company's agent all tooling, fixtures, Components, Products (including WIP), tangible embodiments of Company's Proprietary Information and Technology and all documentation and materials related to the Products.

**16 Confidentiality**.

16.1 Confidentiality Obligations. The terms and conditions of the Non‑Disclosure Agreement, as amended in this Section 16, are hereby incorporated by reference into, and made a part of this Agreement. The Parties hereto agree to the following amendments and modifications of the Non‑Disclosure Agreement:

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions.**

16.1.1 The defined term "**Proprietary Information**" in Section 1.1 of the Non‑Disclosure Agreement is hereby amended as follows:

ding the following Section 1.1.3

"The AVL, Bill of Material, Specifications, Forecasts, Orders, Quality and Test Procedures, Fee and Price Schedule, software, firmware, hardware, technology and any documentation related to the foregoing or to any Product that is disclosed or made available by iRobot will be deemed the Proprietary Information of iRobot even if not so marked or identified."

By adding the following Section 1.1.4

"Any Jabil Technical Manufacturing Information that is disclosed or made available by Jabil will be deemed the Proprietary Information of Jabil even if not so marked or identified."

16.2 <u>Employees, Agents and Representatives</u>. Each Party represents and warrants to the other that it has adopted policies and procedures with respect to the receipt and disclosure of confidential or proprietary information, such as the Proprietary Information and Technology with its employees, agents and representatives.

Each Party represents and warrants to the other Party that it will cause each of its employees, agents and representatives to maintain and protect the confidentiality of the other Party's Proprietary Information and Technology pursuant to the terms and conditions of the Non‑Disclosure Agreement.

16.3 <u>Return of Proprietary Information and Technology</u>. Upon expiration or termination of this Agreement, or at any time upon written request by the other Party, each Party shall return to the other Party all Proprietary Information and Technology received from the other Party, including all copies thereof, to the other Party or, with such other Party's written consent, destroy all such Proprietary Information and Technology. All use of such Proprietary Information and Technology by a Party shall cease on such termination or request for return. At the disclosing Party's option, receiving Party shall also provide written certification of its compliance with this Section 16.3.

16.4 Company retains all rights and all remedies with respect to its Proprietary Information as provided in the Non‑Disclosure Agreement (as amended herein) and under Section 25.13 below expressly conferred upon Company, and such rights and remedies will be deemed cumulative with, and, except as expressly set forth in the Non‑Disclosure Agreement and Section 25.13, not exclusive of, any other remedy conferred hereby, or by law or equity upon Company, and the exercise by Company of any one remedy will not preclude the exercise of any other remedy available under the Non‑Disclosure Agreement or Section 25.13.

**17 <u>Intellectual Property Rights</u>**.

17.1 <u>Jabil Existing Intellectual Property</u>.

17.1.1 Except for the license rights granted to Company under this Section 17.1.1, Jabil shall retain all right, title and ownership to any and all Jabil Existing Intellectual Property and all Intellectual Property Rights therein.

27

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [\*] denotes omissions**.

17.1.2 Jabil shall not incorporate any Jabil Existing Intellectual Property into any Products or Deliverables without Company's prior written approval. Upon full payment of all monies due and owing for applicable Products and Deliverables, to the extent any Jabil Existing Intellectual Property is incorporated by or on behalf of Jabil within or used by or on behalf of Jabil in connection with any Product or Deliverable, Jabil hereby grants to Company a non-exclusive, royalty-free, fully paid up, worldwide, transferable, perpetual, license under all of its Intellectual Property Rights in or to the Jabil Existing Intellectual Property for Company to use, sell, test, improve, support and distribute the Products or Deliverables provided by Jabil hereunder, and to the extent Jabil incorporated any Jabil Existing Intellectual Property into any Product or Deliverable without Company's written approval, to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make the Product; provided however, that no license to the Jabil Technical Manufacturing Information shall be granted under this Section 17.1.2.

17.2 <u>Jabil Created Intellectual Property</u>.

17.2.1 Except for the license rights granted to Company under Section 17.1.1, Jabil shall retain all right, title and ownership to any and all Jabil Created Intellectual Property and all Intellectual Property Rights therein.

17.2.2 Upon full payment of all monies due and owing for applicable Products, Jabil hereby grants to Company a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, irrevocable license under all of its Intellectual Property Rights in or to the Jabil Technical Manufacturing Information developed under this Agreement that is unique to the Products for Company's internal use and the use by third party suppliers or manufacturers on behalf of Company to develop, design, improve, test and support the Products.

17.2.3 Any such unique Jabil Technical Manufacturing Information will be used by Jabil solely for the design, development, testing and manufacturing of Products for Company.

17.3 <u>Company Intellectual Property</u>. Company shall retain all right, title and ownership to any and all Company Intellectual Property and all Intellectual Property Rights therein.

17.4 <u>Newly Created Intellectual Property</u>.

17.4.1 The Newly Created Intellectual Property constitutes "works made for hire" for Company, and Company will be considered the author and will be the owner of the Newly Created Intellectual Property and all Intellectual Property Rights therein or related thereto. If any Newly Created Intellectual Property does not qualify for treatment as "works made for hire," or if Jabil retains any interest in any Newly Created Intellectual Property for any other reason, Jabil hereby grants, assigns and transfers, and will grant, assign and transfer, to Company all ownership and interest in such Newly Developed Intellectual Property, including without limitation any and all Intellectual Property Rights in and to any Newly Created Intellectual Property or that claim or cover any Newly Created Intellectual Property. Jabil acknowledges that all personnel performing Manufacturing Services for Company under this Agreement have executed appropriate agreements with Jabil so that Jabil may fulfill Jabil's obligations under this Section 17. Jabil agrees to execute any documents of assignment or registration requested by Company relating to any and all Newly Created Intellectual Property. Jabil agrees to cooperate fully with Company, both during and after the engagement, with respect to the procurement and maintenance of Intellectual Property Rights in or related to Newly Created Intellectual Property.

17.4.2 During the Term plus any period of support that may survive termination or expiration of this Agreement, Jabil agrees to inform Company of any Newly Created Intellectual Property.

28

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

17.5 <u>Trademark Usage</u>. Nothing in this Agreement gives either Party a right to use the other Party's Marks or implies the grant of any license from one Party to the other to use any Marks. Notwithstanding the foregoing, and subject to the terms and conditions of this Agreement, Company grants to Jabil a limited, non‑exclusive, non‑transferable, non‑assignable, royalty‑free license during the Term to reproduce any Mark set forth on Schedule 5 as may be amended from time to time in a writing authorized by both Parties ("**Company Marks**") solely for the purpose placing such Marks on Products sold to Company and any applicable packaging, and for no other business or non‑business purposes whatsoever and no other goods or services whatsoever, in accordance with the following:

17.5.1 All reproductions of Company Marks must be approved in writing by Company;

17.5.2 Jabil may not combine any Company Marks with, or create a composite mark using any Company Mark with, a trademark of Jabil or any third party, or use any of the Company Marks or any part thereof as part of its corporate name, or use any name or mark confusingly similar to any of the Company Marks;

17.5.3 No other rights or licenses, except that expressed in this Section 17.5 are granted to Jabil in and to any Company Mark, whether expressly, by implication, by estoppel, or otherwise;

17.5.4 As between Company and Jabil, the Company Marks are and shall remain the sole and exclusive property of Company and Jabil shall not acquire any right, title or interest in or to any Company Mark as a result of this Agreement (other than the limited license expressly granted in this Section 17.5) and all use of the Company Marks by Jabil and all goodwill generated thereby shall inure solely to the benefit of Company;

17.5.5 Jabil admits the validity of, and agrees not to challenge the Company Marks; and

17.5.6 Jabil represents that to the best of its knowledge, Jabil has not, nor does it have plans to, file trademarks (or register any domain names) that are confusingly similar to any Company trademark listed in Schedule 5. Should Company identify any such filing or registration by Jabil, Company shall provide prompt notification to Jabil, and the Parties shall mutually agree on procedures to implement a resolution. If any application for registration is filed by Jabil after the Effective Date of this Agreement that is the same as or that contains any of the Company trademarks listed in Schedule 5, then upon written request from the Company, Jabil shall immediately abandon any such application or registration.

17.5.7 Upon any notice from Company that Jabil's use of the Company's Marks fails to conform to any provision of this Section 17.5, Jabil shall cease use of the Company Marks, until such failure has been corrected to the satisfaction of Company.

17.6 <u>Jabil Marks</u>. Jabil agrees and warrants that it will not use any Jabil or third party Mark (excluding authorized Marks of the Company) on any Product, packaging materials or documentation without Company's prior written authorization.

**18 [*]**

**19 <u>Indemnification</u>**.

19.1 <u>Jabil's Indemnity Obligations</u>. Jabil shall indemnify, defend and hold Company and its employees, Subsidiaries, Affiliates, successors and assigns ("**Company Indemnified Parties**") harmless from and against any and all losses, liabilities, damages (including consequential, special and/or punitive damages), claims, expenses, suits, recoveries, judgments and fines (including reasonable attorneys' fees and expenses) recovered by third parties (collectively "**Losses**") that may be incurred by any Company Indemnified Party to the extent based on (a) third party claims for any damage to tangible property or injury or death occurring to any person arising out of

29

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

manufacturing defect solely and proximately caused by Jabil's gross negligence or willful misconduct that constitutes a material breach of Jabil's obligation to comply with IPC‑A‑610 Class 2 workmanship standard and was not necessary to comply with the Specifications or otherwise approved or required by Company; (b) any third party claims for injury to person or tangible property or death occurring to any Jabil employees, subcontractors, agents or any other individuals on Jabil's premises, except to the extent such injury to person or property or death was caused by the presence of Company's employees or agents on Jabil's premises; or (c) any claim relating to the infringement of patent or other intellectual property rights of a third party to the extent based on the unique manufacturing process employed by Jabil in performing the Manufacturing Services for Products that was not necessary to comply with the Specifications or otherwise approved or required by Company. Jabil shall have no liability under this Section for Losses resulting from Company's Specifications, Company Intellectual Property, Product or design, or Company's willful misconduct or gross negligence, or Company's modification, alteration or combination of the Products. Jabil's maximum, aggregate liability to Company for all third party claims under this Agreement shall not exceed the amount specified in Section 6.1. This Section 19.1 states Company's exclusive remedy and Jabil's total liability (in accordance with Section 6.1) to Company regarding a third party claim.

19.2 <u>Company's Indemnity Obligations</u>. Except to the extent subject to Jabil's indemnification of Company as provided in Section 19.1, Company shall indemnify, defend and hold Jabil and its employees, Subsidiaries, Affiliates, successors and assigns ("**Jabil Indemnified Parties**") harmless from and against any and all Losses that may be incurred by Jabil Indemnified Party, to the extent based on any of the following: (a) proper and authorized use of the Specifications, Proprietary Information and Technology of the Company, Company Intellectual Property, Company Property, or any information, technology and processes supplied and/or approved by Company or otherwise required by Company of Jabil, in connection with Jabil's performance of its obligations under this Agreement; (b) any Product, including any recall or actual noncompliance with Materials Declaration Requirements; (c) a claim that Jabil's use of any item in subsection (a) in connection with performing its obligations under this Agreement infringes any patent, copyright or other intellectual property right of a third party, and (d) performance of the Manufacturing Services in accordance with the Specifications.

19.3 <u>Indemnification Procedures</u>. Any Person that may be entitled to indemnification under this Agreement shall give the other Party prompt notice of any claim and cooperate with the indemnifying Party at its expense. The Indemnifying party shall have the right to assume the defense (at its own expense) of any such claim through counsel of its own choosing by so notifying the Party seeking indemnification within thirty (30) calendar days of the first receipt of such notice. The Party seeking indemnification shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying party. The Indemnifying party shall not, without the prior written consent of the indemnified party, agree to the settlement, compromise or discharge claim.

**20 <u>Relationship of Parties</u>**. Jabil shall perform its obligations hereunder as an independent contractor. Nothing contained herein shall be construed to imply a partnership or joint venture relationship between the Parties.

The Parties shall not be entitled to create any obligations on behalf of the other Party, except as expressly contemplated by this Agreement. The Parties will not enter into any contracts with third parties in the name of the other Party without the prior written consent of the other Party.

**21 <u>Insurance</u>**. During the Term, any Warranty Period and at all times that Jabil performs work for Company, Jabil will maintain in full force and effect, at Jabil's own expense; insurance coverage to include:

21.1 <u>Workers' Compensation and Employer's Liability</u>. Workers' Compensation insurance will be provided as required by law or regulation where work under this Agreement is performed. Employer's Liability insurance will be provided in amounts not less than **[*]** per accident for bodily injury by accident, **[*]** policy limit by

30

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

disease, and **[*]** per employee for bodily injury by disease. Where permitted by law, such policies will contain waivers by the insurer's subrogation rights against Company.

21.2 <u>Insurance Coverage</u>. Jabil will maintain Commercial General Liability Insurance on an occurrence basis, (including but not limited to premises and operations, products and completed operations, broad form contractual liability, broad form property damage and personal injury liability). Commercial General Liability (Occurrence) policy limits shall be not less than **[*]** per occurrence (combined single limit for bodily injury and property damage) and **[*]** Annual Aggregate. Such policies will include Company as an additional insured for liability to the extent injury or damage is caused by Jabil's negligence. Jabil hereby waives, on its own behalf and on behalf of its insurers, any rights of subrogation against Company. Jabil will inform its insurers of such waiver of subrogation, and will endeavor to obtain written acknowledgment of same. Such insurance policies will be written with appropriately licensed and financially responsible insurers, and will provide for a minimum of thirty (30) days written notice to Company of any cancellation or reduction in coverage.

21.3 <u>Certificates of Insurance</u>. Certificates of insurance evidencing the required coverage and limits as set forth in Sections 21.1 and 21.2 above will be furnished to Company before any work is commenced under this Agreement.

21.4 <u>Additional Requirements</u>. All deductibles on policies providing coverage will be paid by Jabil. In the event Jabil is self insured for matters described above, Jabil agrees to respond to any claims or losses made against or incurred by Company in the same fashion as if insurance had been purchased. In no event will the coverages or limits of any insurance required under this Section 21, or the lack or unavailability of any other insurance, be deemed to limit or diminish either Party's obligations or liability to the other Party under this Agreement, including but not limited to, each Party's indemnification obligations as set forth in Section 19.

**22 <u>Business Continuity Plan</u>.**

22.1 <u>Risk Management and Continuity Plans</u>. Jabil will develop and keep current a formal business continuity plan detailing Jabil's plans, procedures and designated resources for timely response to and recovery from potential civil, natural, and physical plant disasters that could reasonably be expected to disrupt production and delivery to Company ("**Business Continuity Plan**"). Upon request, Jabil will make such plan available to Company or its designated representative for review.

22.2 <u>Notification</u>. Jabil agrees to notify Company as soon as possible in the event of a crisis that disrupts manufacturing or delivery of Products. Unless authorized in advance in writing by Company, Jabil will not refer to Company in public and media communications about the crisis and subsequent recovery.

22.3 <u>Loss Control</u>. Jabil will be responsible for maintaining its facilities and operations in accordance with applicable fire protection and loss control laws, regulations and industry standards.

**23 <u>Publicity</u>**. Without the consent of the other Party, neither Party shall refer to this Agreement in any publicity or advertising or disclose to any third party any of the terms of this Agreement. Notwithstanding the foregoing, neither Party will be prevented from, at any time, furnishing any information to any governmental or regulatory authority, including the United States Securities and Exchange Commission or any other foreign stock exchange regulatory authority, that it is by law, regulation, rule or other legal process obligated to disclose, so long as the other Party is given advance written notice of such disclosure pursuant to Section 2.4 of the Non-Disclosure Agreement. In addition, a Party may disclose the existence of this Agreement and its terms to its attorneys and accountants, suppliers, customers and others only to the extent necessary to perform its obligations and enforce its rights hereunder, and to existing and prospective investors and/or acquirers that are contemplating a potential investment in or acquisition of such Party, provided, however, that any and all such suppliers, customers, investors,

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

acquirers and advisers are bound by agreements or, in the case of professional advisers, ethical duties, to treat, hold and maintain such information in accordance with the terms and conditions of the Non‑Disclosure Agreement.

**24 Force Majeure.**

24.1 Subject to Section 24.2 below, neither Party shall be liable for any failure or delay in the performance of its obligations under this Agreement (other than the payment of money) to the extent such failure or delay both: (i) is caused by any of the following: acts of war, terrorism, civil riots or rebellions; quarantines, embargoes and other governmental action (including changes in law that materially and adversely impact the non‑performing Party); and U.S. Government priority orders or contracts; extraordinary elements of nature or acts of God (such as earthquake, localized fire, typhoon, hurricane, tornado or flood); blackouts; power failures; epidemics; strikes; work stoppages; labor, component or material shortages; slow‑downs; industrial disputes; sabotage; accidents; destruction of production facilities; and (ii) could not have been prevented by the non‑performing Party's reasonable precautions or commercially accepted processes, or could not reasonably be circumvented by the non‑performing Party through the use of substitute services, alternate sources, work‑around plans or other means by which the requirements of a buyer of services substantively similar to the Manufacturing Services hereunder would be satisfied, or are outside the reasonable control of the non‑performing Party; provided the non‑performing Party promptly notifies the other Party (in no event more than ten (10) business days of discovery of the event). Events meeting both of the criteria set forth in clauses (i) and (ii) above are referred to individually and collectively as "**Force Majeure Events**." The Parties expressly acknowledge that Force Majeure Events do not include vandalism or labor strikes by Jabil's employees. Upon the occurrence of a Force Majeure Event, the non‑performing Party shall be excused from any further performance or observance of the affected obligation(s) for as long as such circumstances prevail, and such Party continues to attempt to recommence performance or observance to the greatest extent possible without delay.

24.2 Notwithstanding any other provision of this Section 24, a Force Majeure Event shall obligate and require Jabil to commence and successfully implement all of the Manufacturing Services relating to disaster recovery set forth in its Business Continuity Plan within the time period described therein. In the event that a Party's material obligations hereunder are suspended or delayed due to a Force Majeure Event for more than sixty (60) consecutive days, then the other Party may immediately terminate this Agreement, subject to charges set forth in Section 15.3.3. Termination pursuant to this Section shall not affect Company's obligation to pay Jabil as provided herein. Company may, at its option, and in addition to any other rights Company may have as provided herein, procure such Manufacturing Services from an alternate source until Jabil is again able to provide such Manufacturing Services. If Jabil's material obligations hereunder are suspended or delayed due to a Force Majeure Event for more than ten (10) consecutive days, to the extent reasonably practicable under said Force Majeure circumstances, Jabil agrees to provide reasonable Transition Assistance as provided in Section 15.4.

**25 Miscellaneous.**

25.1 _Notices_. All notices, demands and other communications made hereunder shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), by facsimile or EDI (with telephone confirmation) addressed to the respective Parties at the following addresses:

Notice to Jabil:

Jabil Circuit, Inc.
10560 Dr. M.L. King Jr. Street North
St. Petersburg, FL 33716
Facsimile: [*]
Attn: Attention, Controller Huangpu Plant

32

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions.**

<table>
<tr><td>with a copy to:</td><td>Jabil Circuit, Inc.<br>10560 Dr. M.L. King Jr. Street North<br>St. Petersburg, FL 33716<br>Facsimile: [*]<br>Attn: General Counsel</td></tr>
<tr><td>Notice to Company:</td><td>iRobot Corporation<br>8 Crosby Drive<br>Bedford, MA 01730<br>Facsimile: [*]<br>Attn: General Counsel</td></tr>
<tr><td>with a copy to:</td><td>Goodwin Procter LLP<br>Exchange Place<br>53 State Street<br>Boston, MA 02109<br>Fax: [*]<br>Attn: Mark T. Bettencourt, Esq.</td></tr>
</table>

25.2 Expenses and Costs. Each Party shall pay their own expenses in connection with the negotiation of this Agreement and in connection with the resolution of Disputes pursuant to Section 25.13 below.

25.3 Amendment. No course of dealing between the Parties hereto shall be effective to amend, modify, or change any provision of this Agreement. This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Party against whom such change is to be enforced. The Parties may, subject to the provisions of this Section 25.3, from time to time, enter into supplemental written agreements for the purpose of adding any provisions to this Agreement or changing in any manner the rights and obligations of the Parties under this Agreement or any Schedule hereto. Any such supplemental written agreement executed by the Parties shall be binding upon the Parties.

25.4 Partial Invalidity. Whenever possible, each provision of this Agreement shall be interpreted in such a way as to be effective and valid under applicable law. If a provision is prohibited by or invalid under applicable law, it shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

25.5 Monies. All references to monies in this Agreement shall be deemed to mean lawful monies of the United States of America.

25.6 Entire Agreement. This Agreement, the Schedules and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the Parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements, including the Letter of Intent between the Parties dated November 16, 2009, and negotiations by and between the Parties, provided, however, that each Party acknowledges that the Manufacturing Services Agreement between iRobot Corporation and Jabil Defense & Aerospace Services, LLC, dated June 4, 2007 is a separate agreement between the Parties regarding separate subject matter and is not terminated or otherwise amended by this Agreement. Each Party acknowledges and agrees that no agreements, representations, warranties or collateral promises or inducements have been made by any Party to this Agreement except as expressly set forth herein or in the Schedules and any addenda attached hereto or referenced

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.

herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement. These acknowledgments and agreements are contractual and not mere recitals. In the event of any inconsistency between the provisions of this Agreement and any Schedule and any addenda attached hereto or referenced herein, the provisions of this Agreement shall prevail unless expressly stipulated otherwise, in writing executed by the Parties. Pre-printed language on each Party's forms, including purchase orders shall not constitute part of this Agreement and shall be deemed unenforceable.

25.7 <u>Binding Effect</u>. This Agreement shall be binding on the Parties and their successors and assigns; provided, however, that neither Party shall assign, delegate or transfer, in whole or in part, this Agreement or any of its rights or obligations arising hereunder without the prior written consent of the other Party. Any purported assignment without such consent shall be null and void. Notwithstanding the foregoing, Jabil shall have the right to assign its rights to receive monies hereunder without the prior written consent of Company.

25.8 <u>Waiver</u>. Waiver by either Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any other provision of this Agreement.

25.9 <u>Captions</u>. The captions contained in this Agreement are inserted only as a matter of convenience or reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions.

25.10 <u>Construction</u>. Since both Parties have engaged in the drafting of this Agreement, no presumption of construction against any Party shall apply.

25.11 <u>Section References</u>. All references to Sections or Schedules shall be deemed to be references to Sections of this Agreement and Schedules attached to this Agreement, except to the extent that any such reference specifically refers to another document. All references to Sections shall be deemed to also refer to all subsections of such Sections, if any.

25.12 <u>Business Day</u>. If any time period set forth in this Agreement expires upon a Saturday, Sunday or U.S. national, legal or bank holiday, such period shall be extended to and through the next succeeding business day.

25.13 <u>Dispute Resolution</u>.

25.13.1 The Parties shall use good faith efforts to resolve disputes, within twenty (20) business days of notice of such dispute. Such efforts shall include escalation of such dispute to the corporate officer level of each Party.

25.13.2 If the Parties cannot resolve any such dispute within said twenty (20) business day period, the matter shall be submitted to arbitration for resolution. Arbitration will be initiated by filing a demand at the New York, New York regional office of the American Arbitration Association ("**AAA**"). Any judicial proceeding arising out of or relating to this Agreement or the relationship of the Parties, including without limitation any proceeding to enforce this Section 25.13, to review or confirm the award in arbitration, or for specific performance and/or preliminary injunctive relief (for any alleged violations of the Parties' Non-Disclosure Agreement, as amended by Section 16 above), shall be brought exclusively in a court of competent jurisdiction in the New York Courts.

25.13.3 Disputes will be heard and determined by a panel of three arbitrators. Each Party will appoint one arbitrator to serve on the panel. A neutral arbitrator will be appointed by the AAA. All arbitrators must have significant experience in resolving disputes involving electronic manufacturing and design services.

34

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions.**

25.13.4 Within fifteen (15) business days following the selection of the arbitrator, the Parties shall present their claims to the arbitrator for determination. Within ten (10) business days of the presentation of the claims of the Parties to the arbitrator, the arbitrator shall issue a written opinion. To the extent the matters in dispute are provided for in whole or in part in this Agreement, the arbitrator shall be bound to follow such provisions to the extent applicable. In the absence of fraud, gross misconduct or an error in law appearing on the face of the determination, order or award issued by the arbitrator, the written decision of the arbitrator shall be final and binding upon the Parties.

25.13.5 The Parties agree that the existence, conduct and content of any negotiation or arbitration pursuant to this Section 25.13 shall be kept confidential and no Party shall disclose to any Person any information about such negotiation or arbitration, except as set forth in Section 16 or 23.

25.13.6 IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES, WHETHER IT RESULTS IN PROCEEDINGS IN ANY COURT IN ANY JURISDICTION OR IN ARBITRATION, THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY, AND HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL, WAIVE ALL RIGHTS TO TRIAL BY JURY, AND AGREE THAT ANY AND ALL MATTERS SHALL BE DECIDED BY A JUDGE OR ARBITRATOR WITHOUT A JURY TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.

25.13.7 Notwithstanding anything contained in this Section 25.13 to the contrary, in the event that either Party is seeking temporary or preliminary injunctive relief, including any action for equitable relief, such Party may proceed in the New York Courts without prior negotiation or arbitration for the limited purpose of avoiding immediate and irreparable harm.

25.14 Insider Trading. Neither Party will, and will cause its Affiliates, Subsidiaries, and its and their employees and subcontractors to not, transact in any securities of the other Party based on the manufacture of any Product under this Agreement or any Proprietary Information and Technology of such other Party or from communicating any such information to any other Person in connection with the trading of such securities.

25.15 Other Documents. The Parties shall take all such actions and execute all such documents that may be necessary to carry out the purposes of this Agreement, whether or not specifically provided for in this Agreement.

25.16 Counterparts. This Agreement may be executed by facsimile and delivered in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one agreement.

25.17 Even-Handed Construction. The terms and conditions as set forth in this Agreement have been arrived at by sophisticated parties with equal bargaining power, each having an opportunity to consult with counsel, after mutual negotiation, and it is the intention of the Parties that its terms and conditions not be construed against any Party merely because it was prepared by one of the Parties.

25.18 Governing Law and Jurisdiction. All disputes, claims or controversies arising out of this Agreement, or the interpretation, negotiation, validity or performance of this Agreement, or the transactions contemplated hereby shall be governed by the laws of the State of New York, without application of conflicts of law principles. The provisions of the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. Each of the Parties hereto hereby irrevocably and unconditionally consents to submit to the sole and exclusive jurisdiction of the courts of the State of New York and of the United States of America located in the State of New York (the "**New York Courts**") for any litigation between the Parties hereto arising out of or relating to this Agreement, or the negotiation, validity or performance of this Agreement, waives any objection to the laying of venue of any such litigation in the New York Courts and agrees not to plead or claim in any New

35

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [\*] denotes omissions.**

York Court that such litigation brought therein has been brought in any inconvenient forum or that there are indispensable parties to such litigation that are not subject to the jurisdiction of the New York Courts.

25.19 Design or Repair Services; and U.S. Government Contracts. In the event that the Parties agree that Jabil will provide design or repair (i.e., out of warranty) services for Company, or U.S. government subcontract services for Company, the terms and conditions of such services shall be set forth in a separate mutually agreed upon agreement prior to the commencement of any such services. No FAR, DFAR, or any other FAR Supplement clauses shall be applicable to this Agreement. If Company requires, and authorizes in writing, Jabil to perform any of the foregoing services prior to execution of a separate agreement, such Jabil's services will be provided "AS-IS" and Company shall be fully responsible for any claims or liability arising from such services and corresponding deliverables or products.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

| **IROBOT CORPORATION** | **JABIL CIRCUIT**, INC. |
|---|---|
| ʹ Jeffrey A. Beck | By: /s/ A. Parimbelli |
| Signature | Signature |
| : Jeffrey A. Beck | Name: A. Parimbelli |
| (Print) | (Print) |
| Title: President HRD | Title: VP Business Development |
| Date: March 18, 2010 | Date: March 17, 2010 |

**SCHEDULE 1**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN JABIL AND COMPANY**

**STATEMENT OF WORK**

This Statement of Work ("**SOW**") is subject to, and governed by, the Manufacturing Services Agreement, dated _____ ____, 20__ (the "**Agreement**"), by and between Jabil Circuit, Inc. ("**Jabil**"), and iRobot Corporation, ("**Company**" or "**iRobot**"). This SOW and the documents referenced herein set forth a description of certain Products (as defined in the Agreement) and certain obligations of Jabil in connection with the services to be performed by Jabil under the Agreement. This SOW shall be effective upon the Effective Date of the Agreement. All capitalized terms used herein without definition shall have the meanings set forth in the Agreement.

• **Product Description**:
**Product Specifications** - The "**Product Specifications**" for the [*] shall include, without limitation, the technical and product specifications included in the complete engineering database, SKU portfolio and governing quality documents provided by Company to Jabil on November 17, 2009, which are hereby incorporated by reference.

[*] - Any and all configurations of the finished product SKUs included in the Product Specifications above.

[*]

• **NRE Costs**:
**(Parties to insert here the latest quote for the NRE cost as it becomes available**)

• **Packaging and Shipping Specifications**:
**Packaging and Shipping Specifications**- The "**Packaging and Shipping Specifications**" for the [*] shall include, without limitation, the complete packaging and shipping specifications included in the engineering database and SKU portfolio provided by Company to Jabil on November 17, 2009, which are hereby incorporated by reference.

• **Suppliers Designated by Company**:
**(iRobot to insert here list of assigned and consigned components**)

• **Tools**: See Tool in Jabil - Asset management.xls

- **Long lead time list**: **See JBL iROBOT MSA**, **Schedule 1**, **Long Lead time list**.xls

- **[*]**

- **Project management**:

Jabil agrees to assign appropriate person(s) to manage Company's business under this Agreement and to act as advocate of Company within Jabil's operations. This will include a dedicated Business Unit Manager and a dedicated Program manager, who will be responsible for execution of the project, as well as successful transition between project centric (to Production Start) and continuous improvement (post Production Start).

It is expected of Program Manager to assume following responsibilities:

- Execution of the project as scoped

- Compliance with the Agreement

- Interface with Company NGCM team Program Manager through at least weekly meetings, providing status updates and publish any deviations from the plan. It is assumed that any deviation from the plan would be communicated immediately, without waiting for next scheduled update.

- Call management exception meeting if necessary. The events which would lead to such meeting could be: need for increase in capacity, sustained poor quality, cost or timeline change, to name a few. Both parties have a right and obligation to call such meeting.

- [*]

- **Team**

- Jabil agrees to assign appropriate team to execute Company's production of the [*] at Jabil, as well to participate in continuous improvement of both product and its production processes. As [*] database is created in Wildfire/PCAD/Altium and maintained in Windchill, it is necessary that the resources assigned to the project are fluent in engineering tools used to create and maintain the database. This is critical not only for the design understanding, tooling management, and participation in design and process change management, but also for all production and quality related fixtures. Jabil [*] engineering resources are expected to be qualified and trained engineers, fully capable in handling following CAD tools:

- -Mechanical: ProE/Wildfire, Windchill

- Electrical: PCAD, Altium, Windchill

Jabil will ensure that the engineering resources are periodically and properly trained in CAD tool upgrades, so as not to be out of step with iRobot. Jabil will do so at Jabil's expense and proactively.

Jabil is expected to provide appropriate team dedicated to supporting New Product Introduction(s), as required by iRobot.

- **System requirements**

At iRobot's discretion, Jabil may be given access to the following iRobot or iRobot third party internal systems, which Jabil agrees to work off of, including training Jabil employees on these systems at no cost to iRobot or its third party. The systems include but are not limited to:

**a) Windchill**

Windchill is a Web browser enabled, real time data management tool, which enables manufacturers to control product development activities and collaborate with the global partner in secure way. Windchill is a complex tool which poses certain hardware requirements and certain training requirements on the user. For this reason, Company has developed an Company Vendor Requirement Document. This document describes:

- -Windchill Software Requirements

- -Hardware Requirements

- -Education Requirements

- -Local Windchill Support Personnel

- -Network Security Requirements

Jabil is expected to adhere to the requirements listed in this document, which may mean purchasing software upgrades, hardware

upgrades and arranging and supporting training of their staff, at no cost to Company. All of this is necessary for the future real time global collaboration.

Part of this process is the bandwidth test, which is a test performed by Company personnel at Jabil's site, with the purpose of assessing real life bandwidth capability of Jabil's facility.

[*] Jabil is responsible for providing a secure area in the facility, for storing the server and other associated hardware.

## Skill level

After all of the requirements of the Company Vendor Requirements documents have been met, and the bandwidth test has been satisfactorily performed, Jabil's personnel will be subject to the Proficiency Test Script, which will aid in the proficiency assessment of Jabil's personnel. Passing this test would mean that Windchill skill level requirement has been met.

Following this activity, Company and Jabil will engage in limited, scripted and controlled data exchange through Windchill. This step will ensure that everyone understands their role and responsibility and will increase confidence level with the tool, without jeopardizing main database. This step will also expose any issue Jabil might face with their network infrastructure, hardware setup, etc. and give an opportunity to optimize system performance.

The foregoing activities must occur within the agreed upon timeframes included in the integrated Company/Jabil project plan.

### b) Oracle

Oracle MRP system is used in Company HRD organization for management of forecast, net requirement calculations, item master maintenance, inventory management and customer order management and fulfillment. In the interest of robust and timely information sharing with Jabil, it is expected that both Companies will go through the level of work required to enable automated transactions between Oracle and SAP. Jabil is expected to support this work through ensuring that Jabil resources are available according to the agreed upon project timeline, at Jabil's expense.

It is envisioned that enabling limited set of EDI transactions will be necessary threshold requirement in order to successfully complete the Production Start. It is expected that Jabil's resources will be available on an ongoing basis to support ongoing continuous improvement efforts past Production Start, such as expanded set of EDI transactions, CIS access, to name a few, at Jabil's expense.

**Database change management**. The important objective of the [*] project is to track any and all changes to the files (electrical or mechanical), tools, fixtures, parts, quality specifications or manufacturing processes. To facilitate meeting this objective, Company has developed ECR/ECN process and adopted a database management tool, Windchill. It is necessary that Jabil also acquire working Windchill knowledge, and adopt Company's ECR/ECN process. Windchill as a tool supports this system very well. Company will communicate ECR/ECN process to Jabil through Company documents, and Jabil is expected to understand the process and be prepared to participate in it and use it for any and all changes to controlled activities, such as: changes to the files (electrical or mechanical), tools, fixtures, parts or manufacturing processes. There are many activities and responsibilities under CM II change process. Company will assume most of them. Jabil will be expected to understand overall process, and know how to initiate change through problem report, and then know how to view change after it has been routed through the system. This particular aspect of collaboration will also be practiced by Jabil and Company through scripted and controlled data exchange through Windchill. Jabil is expected to ask permission for any and all changes to database, to include both engineering and quality related documentation and processes. All Jabil input is encouraged but it must be reviewed and approved by Company before it takes effect. Jabil will utilize variety of resources outside of [*] and core [*] team dedicated to Company account, such as tooling/molding resources. It is expected that Jabil will manage all its external relationships, and it is Jabil's responsibility to ensure that all parties acting on Company's account on Jabil's behalf utilize the latest released instance of the database. Failure to do so (resulting in production of outdated parts, or incorrect fixtures, etc.) will be Jabil's responsibility and Jabil will correct any errors that may arise at their own expense and within acceptable timelines. It is expected that Jabil's resources will be available on an ongoing basis to support continuous improvement efforts past Production Start, such as active participation in ECR/ECN process through proposing changes through Windchill, redlining documents and models, and in some instances even performing edits directly in a database. The augmented participation will be discussed with Jabil well in advance of expected implementation.

Jabil shall maintain its hardware and software setups in support of Company's business under this Agreement to ensure compatibility with Company's future system upgrades. Company shall use Commercially Reasonable Efforts to notify Jabil in advance of any system upgrades applicable to the Products under this Agreement.

**SCHEDULE 2**
**TO MANUFACTURING SERVICES AGREEMENT**

**BETWEEN JABIL AND COMPANY**

[*]

***SCHEDULE 3***
***TO MANUFACTURING SERVICES AGREEMENT***
**BETWEEN JABIL AND COMPANY**

[*]

**SCHEDULE 4**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN JABIL AND COMPANY**

**MUTUAL NON-DISCLOSURE AGREEMENT**

This MUTUAL NON-DISCLOSURE AGREEMENT (this "Agreement"), effective as of the date set forth last below, is made by and between the undersigned counter party (the "Counter Party") and iROBOT CORPORATION ("iROBOT"). In consideration of the mutual agreements and other provisions of this Agreement, the parties hereto agree as follows:

**1 Scope of Proprietary Information**.

1.1 "Proprietary Information" means, subject to the exceptions set forth in Section 1.2 hereof, any information or data, regardless of whether it is in tangible form, that is disclosed by a party (the "Disclosing Party") to the other party (the "Receiving Party") and that (a) the Disclosing Party has marked as confidential or proprietary, or (b) the Disclosing Party identifies as confidential or proprietary at the time of disclosure with written confirmation within thirty (30) days of disclosure to the Receiving Party, provided, however, that:

1.1.1 Reports and/or information related to or regarding the Disclosing Party's business plans, business methodologies, strategies, specifications, development plans, customers, and/or billing records will be deemed Proprietary Information of the Disclosing Party even if not so marked or identified.

1.1.2 Prototypes, mockups, models, designs, project deliverables, and/or depictions thereof, observed within or upon the Disclosing Party's business premises will be deemed Proprietary Information of the Disclosing Party even if not so marked or identified.

1.2 "Proprietary Information" shall not include any information which: (a) the Receiving Party can show by written record was in its possession prior to disclosure by the Disclosing Party hereunder, provided that the Receiving Party must promptly notify the Disclosing Party of any prior knowledge in the manner provided in Section 5 below; (b) appears in a patent or publication, or which otherwise is or becomes generally known in the trade other than through the Receiving Party's failure to observe any or all terms and conditions hereof; provided that the foregoing shall not be interpreted to create any express or implied license, or the right to obtain a license, to any patents which may be issued to the Disclosing Party; or (c) subsequent to disclosure to the Receiving Party by the Disclosing Party, is obtained by the Receiving Party from a third person who is lawfully in possession of such information, and who is not in violation of any contractual, legal or fiduciary obligations to the Disclosing Party in making such disclosure to the Receiving Party and does not require the Receiving Party to refrain from disclosing such information to others.

**2 Use and Disclosure of Proprietary Information**.

2.1 The Receiving Party may only use the Proprietary Information for the purpose of evaluating or operating pursuant to a business relationship or potential business relationship between the Receiving Party and the Disclosing Party (the "Permitted Purpose"). The Receiving Party must keep secret and shall not disclose, publish, divulge, furnish or make accessible to anyone any of the Proprietary Information of the Disclosing Party, other than furnishing such Proprietary Information to the Receiving Party's employees, agents, representatives, consultants and contractors who are required to have access to such Proprietary Information in connection with the Permitted Purpose during the time that the Receiving Party is permitted to retain such Proprietary Information hereunder; provided that such persons are bound by written agreements respecting the Proprietary Information in the manner set forth in this Agreement.

2.2 The Receiving Party shall not embody any of the Proprietary Information of the Disclosing Party in any of the Receiving Party's products, processes or services, or duplicate, copy or exploit any of such Proprietary Information in the Receiving Party's business, or otherwise use any of the Proprietary Information for any purpose other than for the Permitted Purpose.

2.3 The Receiving Party shall use the equivalent of measures that the Receiving Party uses to protect the Receiving Party's own proprietary information, but in no event less than reasonable care and adequate measures, to protect the security of the Proprietary Information of the Disclosing Party and to ensure that any Proprietary Information of the Disclosing Party is not disclosed or otherwise made available to other persons or used in violation of this Agreement.

2.4 In the event that the Receiving Party is required by law to make any disclosure of any of the Proprietary Information of the Disclosing Party, by subpoena, judicial or administrative order or otherwise, the Receiving Party shall first give written notice of such requirement to the Disclosing Party, and shall permit the Disclosing Party to intervene in any relevant proceedings to protect its interests in the Proprietary Information, and provide full cooperation and assistance to the Disclosing Party in seeking to obtain such protection.

**3 Certain Rights and Limitations**.

3.1 The Receiving Party will provide upon the Disclosing Party's request a certification that access and use is being controlled in accordance with this Agreement.

3.2 The provision of Proprietary Information hereunder shall not transfer any right, title or interest in such information to Receiving Party. Disclosing Party does not grant any express or implied right to Receiving Party to or under Disclosing Party's patents, copyrights, trademarks, trade secret information or other proprietary rights.

3.3 All tangible embodiments of the Proprietary Information of the Disclosing Party (e.g., drawings, memoranda and notes) and all copies thereof, whether in hard-copy or machine-readable form and whether supplied by the Disclosing Party or made by or for the Receiving Party (collectively, the "Tangible Embodiments"), shall at all times be and remain the property of the Disclosing Party.

3.4 The Receiving Party shall not reverse-engineer, decompile, or disassemble any software or firmware disclosed or provided to it under this Agreement and shall not remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from any originals or copies of Proprietary Information it obtains from the Disclosing Party.

**4 Remedies**. Receiving Party acknowledges that a breach by it of any of the terms of this Agreement would cause irreparable harm to the Disclosing Party for which Disclosing Party could not be adequately compensated by money damages. Accordingly, Receiving Party agrees that, in addition to all other remedies available to Disclosing Party in an action at law, in the event of any breach or threatened breach by the Receiving Party of the terms of this Agreement, the Disclosing Party shall, without the necessity of proving actual damages or posting any bond or other security, be entitled to temporary and permanent injunctive relief, including, but not limited to, specific performance of the terms of this Agreement.

**5 Notice of Independent Knowledge or Breach**. The Receiving Party agrees to notify the Disclosing Party promptly in writing if (a) upon disclosure of Proprietary Information by the Disclosing Party, the Receiving Party has prior knowledge of the same; or (b) subsequent to disclosure of any Proprietary Information by the Disclosing Party, information is disclosed to the Receiving Party in a manner described in Section 1.2 or (c) the Receiving Party becomes aware of any breach of this Agreement with respect to the Proprietary Information of the Disclosing Party in the Receiving Party's possession.

**6 Termination**.

6.1 Notice and Effect of Termination. This Agreement shall remain in effect until it is terminated by either party with thirty (30) days prior written notice. The terms and conditions of this Agreement shall survive any such termination with respect to Proprietary Information that is disclosed prior to the effective date of such termination for a period of [*] from the date of termination.

6.2 Return of Proprietary Information. Upon the earlier of (a) the termination of this Agreement, (b) Disclosing Party's written request or (c) such time as the Receiving Party no longer requires the Proprietary Information for the Permitted Purpose, Receiving Party agrees to promptly return to Disclosing Party or destroy all Proprietary Information and any Tangible Embodiments that are in the possession of Receiving Party and to certify the return or destruction of all such Proprietary Information and embodiments.

**7 Warranty**. Disclosing Party warrants that it has the right to make the disclosures under this Agreement. NO OTHER WARRANTY IS MADE BY EITHER PARTY UNDER THIS AGREEMENT. ANY INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS."

**8 United States Government Regulations**. The parties shall adhere to any applicable U.S. and foreign export control laws and regulations and shall not export or reexport any technical data or products received or the direct product of such technical data except in compliance with the applicable export control laws and regulations of the U.S. and any applicable foreign country.

**9 Miscellaneous**. This Agreement does not create any joint venture, pooling arrangement, agency or partnership relationship

between the parties hereto, nor does it create any obligation or commitment on the part of either party to submit a proposal from or perform any contract or services with the other party. Nothing herein shall be construed as providing for the sharing of profits or losses arising out of the parties efforts. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts governing such agreements, without regard to conflicts‑of‑law principles. The sole and exclusive jurisdiction and venue for any litigation arising out of this Agreement shall be an appropriate federal or state court located in the Commonwealth of Massachusetts, and the parties agree not to raise, and waive, any objections or defenses based upon venue or forum non conveniens. This Agreement contains the complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings whether written or oral, express or implied. If any provision of this Agreement is held invalid, illegal or unenforceable by a court of competent jurisdiction, such shall not affect any other provision of this Agreement, which shall remain in full force and effect. No amendment or alteration of the terms of this Agreement shall be effective unless made in writing and executed by both parties hereto. A failure or delay in exercising any right in respect to this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right will not be presumed to preclude any subsequent or further exercise of that right or the exercise of any other right. Any modification or waiver of any provision of this Agreement shall not be effective unless made in writing. Any such waiver shall be effective only in the specific instance and for the purpose given.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed below by their duly authorized signatories.

JABIL, INC.

By: /s/ Arthur W. Hook_____ (Counter Party)
Name: Arthur W. Hook
Title: Director of Sales
Date: June 23rd, 2009

IROBOT CORPORATION

By: /s/ Oscar Zamorano_____
Name: Oscar Zamorano
Title VP Operations & Supply Chain
Date June 23rd, 2009

Address for notices to Counter Party:

Jabil, Inc.
Attn: Legal Dept.
10560 Rev. Martin Luther King Jr. Street North
St. Petersburg, FL 33716

Address for notices to iROBOT CORPORATION:

iRobot Corporation
Attn: Legal Department
8 Crosby Drive
Bedford. MA 01730

**SCHEDULE 5**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN JABIL AND COMPANY**

**COMPANY MARKS**

IROBOT
ROOMBA
SCOOBA
VIRTUAL VISITING
LOOJ
VERRO
PACKBOT
SUGV
SEAGLIDER
VIRTUAL WALL

**SCHEDULE 6**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN JABIL AND COMPANY**

**COMPANY QUARTER END**

| Q1-10 | | Q3-10 | |
|---|---|---|---|
| | | | |
| JANUARY | | JULY | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**FEBRUARY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |

**AUGUST**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |

**MARCH**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 28 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |

**SEPTEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 1 | 2 |

CONFIDENTIAL

| Q2-10 | Q4-10 |
|---|---|

**APRIL**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |

**OCTOBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**MAY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |

**NOVEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |

**JUNE**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 1 | 2 | 3 |

**DECEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |

| Jan | 3-Jan-2010 | 30-Jan-2010 |
|---|---|---|
| Feb | 31-Jan-2010 | 27-Feb-2010 |
| Mar | 28-Feb-2010 | 3-Apr-2010 |
| Apr | 4-Apr-2010 | 1-May-2010 |
| May | 2-May-2010 | 29-May-2010 |
| Jun | 30-May-2010 | 3-Jul-2010 |
| Jul | 4-Jul-2010 | 31-Jul-2010 |

| | | |
|---|---|---|
| Aug | 1-Aug-2010 | 28-Aug-2010 |
| Sep | 29-Aug-2010 | 2-Oct-2010 |
| Oct | 3-Oct-2010 | 30-Oct-2010 |
| Nov | 31-Oct-2010 | 27-Nov-2010 |
| Dec | 28-Nov-2010 | 1-Jan-2011 |



Amendment # 1 to Manufacturing Services Agreement Between: iRobot Corporation and Jabil Circuit, Inc.

**PARTIES**

(1)      **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA ("iRobot").

(2)      **Jabil Circuit, Inc.,** a Delaware corporation, having offices at 10560 Dr. M.L. King Jr. Street North St. Petersburg, Florida 33716 ("Jabil")

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated 18th March 2010 (the Agreement").

**WHEREAS,** pursuant to clause 25.3 of the Agreement, the Parties wish to amend the Agreement;

For good and valuable consideration, Effective as of_____, the following amendment is hereby agreed:

**Clause 25.20 will be added to the Agreement:**

Child/Forced Prison Labor Laws. Jabil, by signing this agreement, represents and warrants that it will comply and use commercially reasonable efforts to ensure that its subcontractors/suppliers will comply with all applicable local government regulations regarding minimum wage, living conditions, overtime, working conditions, child labor laws and the applicable labor and environmental laws. Jabil further represents and warrants that it does not use any form of forced prison labor and/or child labor under the age of 15 or the minimum age required by local government, whichever is older and shall use commercially reasonable efforts to ensure that its subcontractors/suppliers do not use any form of forced prison labor and/or child labor under the age of 15 or the minimum age required by local government, whichever is older.

If any conflict or inconsistency occurs between this Amendment and the Agreement, the provisions of this Amendment shall prevail. The remainder of the Agreement shall remain in full force and effect, unamended.

| **iRobot Corporation** | | **Jabil Circuit, Inc.** | |
|---|---|---|---|
| Signature: | /s/ Oscar Zamorano | Signature: | /s/ Brent Tompkins |
| Print Name: | Oscar Zamorano | Print Name: | Brent Tompkins |
| Title: | SVP Operations | Title: | Sr. Business Unit Director |
| Date: | 4/13/2015 | Date: | April 10, 2015 |



**Amendment # 2 to Manufacturing Services Agreement**

Between: iRobot Corporation and Jabil Circuit, Inc.

**PARTIES**

(1)      **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA

("iRobot").

(2)    **Guangzhou iRobot Robot Technology Consulting Company Limited,** a wholly owned subsidiary of iRobot Corporation with its principal place of business at Center Plaza, No.161 Linhe Xi Road, Tianhe District, Guangzhou Unit 05/13F, Tower A ("iRobot Guangzhou").

(3)    **Jabil Circuit, Inc.,** a Delaware corporation having its place of business at 10560 Dr. M.L. Jing Jr. Street, North St. Petersburg, Florida 33716 (hereinafter referred to as "Jabil") (collectively the "Parties").

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated March 18, 2010 as amended by Amendment No.I to the Manufacturing Services Agreement dated April 13, 2015 (the "Agreement").

**WHEREAS,** pursuant to clause 25.3 of the Agreement, the Parties wish to amend the Agreement;

For good and valuable consideration, Effective as of **August 2, 2016,** the following amendment(s) are hereby agreed:

All references to "iRobot" in Sections 3, 4.4, 4.6, 5, 7, 11, and 12 will also include iRobot Guangzhou. For avoidance of doubt, iRobot Guangzhou shall have the right and ability to purchase Product from Jabil, issue Purchase Orders for Product under this Agreement, and enforce all related rights as if it were iRobot.

Signed by a duly authorised director or officer for and on behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |

Signed by a duly authorised director or officer for and on behalf of Jabil Circuit, Inc

| | | |
|---|---|---|
| *Print full name:* | Mark Chin | *Signature:* |
| *Position:* | Business Director | /s/ Mark Chin |

Signed by a duly authorised director or officer for and on behalf of Guangzhou iRobot Robot Technology Consulting Company Limited

| | | |
|---|---|---|
| *Print full name:* | Li Yuan Nan | *Signature:* |
| *Position:* | General Manager | /s/ Li Yuan Nan |

36

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [*] denotes omissions**.



**Amendment # 3 to Manufacturing Services Agreement**

Between: iRobot Corporation and Jabil Circuit, Inc.

**PARTIES**

(1)      **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA ("iRobot").

(2)      **Jabil Circuit, Inc.,** a Delaware corporation having its place of business at 10560 Dr. M.L. Jing Jr. Street, North St. Petersburg, Florida 33716 (hereinafter referred to as "Jabil") (collectively the "Parties").

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated March 18, 2010 as amended by Amendment No. 1 to the Manufacturing Services Agreement dated April 13, 2015, and the Amendment No. 2 to the Manufacturing Services Agreement dated August 1, 2016 (the "Agreement").

**WHEREAS,** pursuant to clause 25.3 of the Agreement, the Parties wish to amend the Agreement;

For good and valuable consideration, Effective as of **February 10, 2017,** the following amendment(s) are hereby agreed:

iRobot as the holding company of Guangzhou iRobot Robot Technology Consulting Company Limited hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by Guangzhou iRobot Robot Technology Consulting Company Limited of all of its obligations under the Agreement, and shall assume all liabilities of Guangzhou iRobot Robot Technology Consulting Company Limited arising from and/or in connection with the Agreement ("Guarantee").

This Guarantee shall be held by iRobot as a continuing security notwithstanding any intermediate payment or settlement or satisfaction of the whole or any part of any sum or sums of money due or owing as aforesaid or otherwise.

**WHEREAS,** pursuant to clause 9.2 of the Agreement, the Parties wish to amend the Agreement for any Products transacted in RMB only with the addition of clause 9.2a as the following:

Base on the exchange rate used in the first quote, if the fluctuation threshold between the fixed exchange rate and the published exchange rate exceeds +/-3%, re-quote will be needed on the last working day of every month. *Published exchange rate: shall

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

be used as the reference to measure the difference against the fixed exchange rate. Suggest to use the "Middle Rate" as a measuring reference for both parties.

Reference link: (http://www.boc.cn/sourcedb/whpj/enindex.html)

|  |  |  |
|---|---|---|
| Signed by a duly authorised director or officer for and on behalf of iRobot Corporation |  |  |
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |

|  |  |  |
|---|---|---|
| Signed by a duly authorised director or officer for and on behalf of Jabil Circuit, Inc |  |  |
| *Print full name:* | Mark Chin | *Signature:* |
| *Position:* | Business Director | /s/ Mark Chin |

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b‑2 of the Exchange Act - [*] denotes omissions**.

**Exhibit 10.13**

**MANUFACTURING SERVICES AGREEMENT**

**between**

**KIN YAT INDUSTRIAL COMPANY LIMITED**

**and**

**IROBOT CORPORATION**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**MANUFACTURING SERVICES AGREEMENT**

This Non-Exclusive Manufacturing Agreement (this "**Agreement**") is entered into by and between Kin Yat Industrial Company Limited, ("**Kin Yat**"), having offices at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong, and iRobot Corporation, a Delaware corporation **("iRobot")**, having its principal place of business at 8 Crosby Drive, Bedford, MA 01730. Kin Yat and iRobot are referred to herein as "**Party**" or "**Parties**".

**RECITALS**

**A.** Kin Yat is in the business of providing sophisticated manufacturing services that are unique in kind and quality, including designing, developing, manufacturing, testing, configuring, assembling, packaging and shipping highly specialized electronic assemblies and systems.

**B.** iRobot is in the business of designing, developing, distributing, marketing and selling products containing highly specialized electronic assemblies and systems.

**C.** Whereas, the Parties desire that Kin Yat manufactures, tests, configures, assembles, packages and/or ships certain electronic assemblies and systems pursuant to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**TERMS**

1    **Definitions.** In addition to terms defined elsewhere in this Agreement, the capitalized terms set forth below shall have the following meaning:

1.1 **"Additional Services"** means services such as, design for manufacturability, manufacturing design test support, computer assisted design for manufacturability, test development services, volume production and advanced packaging technologies all as specified and approved by iRobot and agreed to by Kin Yat.

1.2 **"Affiliate"** means with respect to a Person, any other Person which directly or indirectly controls, or is controlled by, or is under common control with, the specified Person. For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, 50% or more of the outstanding shares of any class of capital stock of such Person (or in the case of a Person that is not a corporation, 50% or more of any class of equity interest).

1.3 **"Assigned Components"** means the components or materials specifically identified in Schedule 1 as "assigned" and for which iRobot has identified the applicable supplier from whom Kin Yat is authorized to source such component or material for incorporation into the Product.

1.4 **"AVL"** means the confidential list of Suppliers Designated by iRobot from which Kin Yat is authorized to purchase the applicable Assigned Components and Generic Components, if any for use in the manufacture of Products.

1.5 **"Class Failure" "Class Failure"** means a defect caused by (i) Kin Yat's failure to manufacture the Product to conform to the Specifications or other requirements in this Agreement, or (ii) the failure of Kin Yat to comply with any applicable law, rule, regulation, court order or decree that is applicable to Kin Yat's performance of its obligations set forth in this Agreement, or (iii) the gross negligence or willful misconduct of Kin Yat's personnel performing Manufacturing Services for iRobot under this Agreement; wherein, such defect occurs in more than [***], attributable to the same root cause, of the total number of a particular Product (as identified by the applicable Product serial numbers) supplied under this Agreement over a rolling [***] period within the Warranty Period.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.6 **Kin Yat** shall be defined to include any Kin Yat Subsidiary. (if applicable).

1.7 **"Commercially Reasonable Efforts"** means those efforts that would be deemed both commercially practicable and reasonably financially prudent after having taken into account all relevant commercial considerations. **"Relevant commercial considerations"** shall be deemed to include, without limitation, (1) all pertinent facts and circumstances; (2) financial costs; (3) resource availability and impact; (4) probability of success; and (5) other commercial practicalities.

1.8 **"Components"** means those Assigned Components, Generic Components, and Consigned Components.

1.9 **"Consigned Components"** means those components or materials specifically identified in Schedule 1 as "consigned" and provided by or on behalf of iRobot to Kin Yat for assembly into Products.

1.10 **"Defect"** means Product that does not conform to Specifications within the warranty Period, resulting from, but not limited to, non-conforming Components, materials, processes, packaging, and transportation.

1.11 **"EDI"** shall mean electronic data interchange.

1.12 **"Effective Date"** shall mean the date upon which the terms and conditions of this Agreement shall become effective by and between the Parties. The Parties have agreed that the Effective Date of this Agreement shall be **September 23, 2013**.

1.13 **"Encumbrance"** means any encumbrance, lien, charge, hypothecation, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, right of set-off, any matter capable of registration against title, option, right of pre-emption, privilege or any contract to create any of the foregoing.

1.14 **"Fee and Price Schedule"** shall mean the prices and fees set forth in Schedule 2 for the applicable Product identified therein, and any future Fee and Price Schedule for new Product as added in writing from time to time upon mutual agreement of the Parties.

1.15 **"FCA"** means that Kin Yat must at its own expense and risk deliver the Product cleared for export into the custody of the designated carrier at the applicable Port of Origin.

1.16 **"Generic Components"** means the components or materials identified in Schedule 1 for incorporation into the Product and for which iRobot has not identified any specific supplier or source from whom Kin Yat is authorized to source such component or material.

1.17 **"including"** shall be defined to have the meaning "including, without limitation."

1.18 **"in writing"** shall mean written documents, EDI with phone confirmation, verified faxes and successfully transmitted e-mails.

1.19 **"Intellectual Property"** means any and all intellectual property and tangible embodiments thereof, including without limitation inventions, discoveries, designs, specifications, developments, methods, modifications, improvements, processes, know-how, show-how, techniques, algorithms, databases, computer software and code (including software and firmware listings, assemblers, applets, compilers, source code, object code, net lists, design tools, user interfaces, application programming interfaces, protocols, formats, documentation, annotations, comments, data, data structures, databases, data collections, system build software and instructions), mask works, formulae, techniques, supplier and customer lists, trade secrets, graphics or images, text, audio or visual works, materials that

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

2

document design or design processes, or that document research or testing, schematics, diagrams, product specifications and other works of authorship.

1.20 **"Intellectual Property - KIN YAT"** shall mean both Intellectual Property - Created by Kin Yat and Intellectual Property - Existing by Kin Yat, collectively.

1.21 **"Intellectual Property - Created by Kin Yat"** means any improvements to the Technical Manufacturing Information - KIN YAT that are newly created or developed, and reduced to practice by Kin Yat in (i) preparing any Product provided pursuant to this Agreement, or (ii) performing the Manufacturing Services or any other work provided pursuant to this Agreement; but shall not include any Intellectual Property - Existing by Kin Yat.

1.22 **"Intellectual Property - Existing by "Kin Yat"** means any Intellectual Property, including the Technical Manufacturing Information - KIN YAT, created or developed by Kin Yat outside the scope of this Agreement during the Term or owned or controlled by Kin Yat prior to the execution of this Agreement; and all improvements, modifications or enhancements to the foregoing made by or on behalf of Kin Yat.

1.23 **"Intellectual Property Rights"** means, collectively, all rights in, to and under patents, trade secret rights, copyrights, trademarks, service marks, trade dress and similar rights of any type under the laws of any governmental authority, including without limitation, all applications and registrations relating to the foregoing.

1.24 **"iRobot Intellectual Property"** means all Intellectual Property, tangible embodiments thereof and all other materials provided or made available to Kin Yat by iRobot, including, without limitation the Specifications.

1.25 **"iRobot Property"** means all property, including all Product and Consigned Components, other Components paid for my iRobot, inventories, work in process (WIP), Loaned Equipment, Specifications, test equipment, software and documentation, and support maintenance or design documentation, furnished to Kin Yat by iRobot or otherwise paid for by iRobot in connection with this Agreement for Kin Yat's use in performing its obligations hereunder.

1.26 **"iRobot Quarter End"** means iRobot's fiscal calendar which follows the 4-4-5 week format identified in Schedule 6, which Schedule shall be updated by iRobot on an annual basis on or before December 1st.

1.27 **"Lead-time"** means the mutually agreed upon minimum amount of time in advance of shipment that Kin Yat must receive a Purchase Order in order to deliver Product by the requested delivery date.

1.28 **"Loaned Equipment"** means capital equipment (including tools) which is loaned to Kin Yat by or on behalf of iRobot to be used by Kin Yat to perform the Manufacturing Services and includes all equipment, tools and fixtures purchased specifically for iRobot, by Kin Yat, to perform the Manufacturing Services and that are paid for in full by iRobot.

1.29 **"Manufacturing Services"** means the services performed by Kin Yat hereunder which shall include but not be limited to manufacturing, testing, configuring, assembling, packaging and/or shipping of the Product, and all Reasonable and Customary Support Services, and any Additional Services, all in accordance with the Specifications.

1.30 **"Marks"** means trademarks, service marks, trademark and service mark applications, trade dress, trade names, logos, insignia, symbols, designs or other marks identifying a Party or its products.

1.31 **"Materials Declaration Requirements"** means any requirements, obligations, standards, duties or responsibilities pursuant to any environmental, product composition and/or materials declaration laws, directives, or regulations, including international laws and treaties regarding such subject matter; and any regulations, interpretive guidance or enforcement policies related to any of the foregoing, including, but not limited to, the following examples: Directive 2002/95/EC of the European Parliament and of the Council of 27 January 2003 on the restriction of the use

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3

of certain hazardous substances in electrical and electronic equipment ("RoHS"), Directive 2002/96/EC of the European Parliament and of the Council of 27 January 2003 on waste electrical and electronic equipment ("WEEE"), and European Union Member State implementations of the foregoing; the People's Republic of China (PRC) Measures for the Administration of the Control of Pollution by Electronic Information Products (China RoHS) (电子信息产品污染控制管理办法) promulgated on February 28, 2006 (including any pre-market certification ("CCC mark") requirements thereunder and including relevant standards adopted by the PRC Ministry of Information Industry or other applicable PRC authority); PRC General Administration of Quality Supervision, Inspection and Quarantine's Circular 441 (2006); Japanese Industrial Standard C0950:2005(J-Moss Japan RoSH); the California Electronic Waste Recycling Act of 2003; Act on the Recycling of Electrical and Electronics Equipment and Automobiles (1.1.2008) (Korea RoHS), Waste Act (2004) and secondary legislation (based on EU directives ) (Croatia), Regulation (EC) No 1907/2006, Regulation concerning the Registration, Evaluation, Authorization and Restriction of Chemicals (REACH), establishing a European Chemicals Agency amending Directive 1999/45/EC and repealing Council Regulation (EEC) No 793/93 and Commission Regulation (EC) No 1488/94 as well as Council Directive 76/769/EEC and Commission Directives 91/155/EEC, 93/67/EEC, 93/105/EC and 2000/21/ECand/or other similar legislation. The Materials Declaration Requirements shall include compliance with Brazil RoHS, Mexico RoHS and Argentina RoHS as each of these countries promulgates their own legislation.

1.32 **Conflict Minerals.**

Kin Yat represents and warrants that it is in full compliance with conflict minerals laws, including, without limitation, Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 as it may be amended from time to time and any regulations, rules, decisions or orders relating thereto adopted by the Securities and Exchange Commission or successor governmental agency responsible for adopting regulations relating thereto (collectively, "Dodd-Frank Section 1502"). Kin Yat must cooperate with iRobot to make available to iRobot and/or its agents, material declarations that identify the sources of and amount of all substances contained in the Products. Unless iRobot specifically agrees in writing that a particular Product may contain a particular material, Kin Yat will also provide a statement that the Products do not contain various materials at issue in applicable laws and regulations. Kin Yat must declare each Product's compliance to all applicable hazardous material legislation and identify any substances that are banned or must be declared under applicable laws. In addition, Kin Yat will use Commercially Reasonable Efforts to make available documentation that supports the declaration. Without limiting the generality of the foregoing, Kin Yat agrees to disclose to iRobot, upon iRobot's request, to the extent known or discoverable by Kin Yat following reasonable inquiry, the original source of all minerals contained in the Product. If Kin Yat does not know the original source of the minerals, Kin Yat agrees to cooperate with iRobot, including disclosing from whom Kin Yat purchased the minerals and urging others to disclose such information, so that the original source of minerals can be accurately determined and reported. Kin Yat shall comply with all laws regarding the sourcing of minerals, including, without limitation, laws prohibiting the sourcing of minerals from mines controlled by combatants and Dodd-Frank Section 1502. Without any further consideration, Kin Yat shall provide such further cooperation as iRobot may reasonably require in order to meet any obligations it may have under conflict minerals laws, including, without limitation, under Dodd-Frank Section 1502.

1.33 **"Minimum Volume"** means the minimum volume**,** if any, set forth on Schedule 1 for a particular Product.

1.34 **"Newly Created Intellectual Property"** means, other than the Kin Yat Intellectual Property, any and all Intellectual Property, tangible embodiments thereof and all other materials created, developed, reduced to practice, or otherwise resulting from any work, Manufacturing Services or other services performed by either or both Parties, including, but not limited to, by any of its or their employees, agents or contractors, under this Agreement.

1.35 **"Non-Conforming Product"** means any Product that does not conform to the Specifications.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

4

1.36 **"Non-Disclosure Agreement"** means that certain Mutual Non-Disclosure Agreement between the Parties dated August 29, 2006, attached hereto as Schedule 4.

1.37 **"NRE Costs"** shall consist of expenses, excluding the Waived NRE Costs, incurred by Kin Yat under this Agreement, including design engineering services, testing, fixturing and tooling and other out-of-pocket costs, in each case for work performed by Kin Yat for iRobot pursuant to iRobot's prior written consent. For the avoidance of doubt, NRE Costs shall not include any costs or expenses incurred by Kin Yat for any Reasonable and Customary Support Services.

1.38 **"Port of Origin"** means [***] or another port designated by iRobot in writing.

1.39 **"Packaging and Shipping Specifications"** means the packaging and shipping specifications set forth in Schedule 1 and otherwise supplied and/or approved by iRobot.

1.40 **"Person"** means any corporation, business entity, natural person, firm, joint venture, limited or general partnership, limited liability entity, limited liability partnership, trust, unincorporated organization, association, government, or any department or agency of any government.

1.41 **"Product Specifications"** means the technical specifications and requirements provided by iRobot to Kin Yat for the manufacture and supply of Products or the provision of Manufacturing Services, including all manufacturing information, technical data and manuals, design information, drawings, documentation, packaging requirements, testing requirements, Specifications, or any other criteria written and provided to Kin Yat by iRobot, including the Quality and Test Procedures, the Packaging and Shipping Specifications, and the Materials Declaration Requirements.

1.42 **"Products"** means the products manufactured and assembled by Kin Yat on behalf of iRobot under this Agreement as identified in Schedule 1 (or any subsequent Schedule 1 prepared for any product to be manufactured hereunder) including any updates, renewals, modifications or amendments thereto.

1.43 "**Production Start Date**" means the first day immediately following the business week during which Kin Yat manufactures and delivers against the product quantities listed in Schedule 1

1.44 **"Proprietary Information and Technology"** means "Proprietary Information" as defined in the Non-Disclosure Agreement, as amended in Section 16 below.

1.45 **"Reasonable and Customary Support Services"** mean all services and activities related to reporting for iRobot and its customers, root cause analysis, testing, trials, inventory audits and reconciliation, development and delivery of samples, participation and support of any new Product introduction.

1.46 **"Product"** means any and all configurations of the "Product" SKUs manufactured and assembled by Kin Yat on behalf of iRobot under this Agreement as identified in the initial Schedule 1 to this Agreement.

1.47 **"Specifications"** means the technical specifications for manufacturing Products under this Agreement as set forth in Schedule 1, any bill of materials, designs, schematics, assembly drawings, process documentation, test specifications, current revision number, and Approved Vendor List, and other requirements otherwise supplied and/or approved by iRobot. Specifications may be amended from time to time by amendments in the form of written engineering change orders agreed to by the Parties.

1.48 **"SOW"** means the statement of work for each Product set forth in any Schedule 1 as amended in writing from time to time upon mutual agreement of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.49 **"Subsidiary(ies)"** means any corporation, partnership, joint venture, limited liability entity, trust, association or other business entity of which a Party or one or more of its Subsidiaries, owns or controls more than 50% of the voting power for the election of directors, managers, partners, trustees or similar parties.

1.50 **"Suppliers Designated by iRobot"** means suppliers designated, specified and/or approved by iRobot.

1.51 **"Technical Manufacturing Information - KIN YAT"** means the manufacturing information, process and technology used by Kin Yat or third parties under its control to design, develop, test or manufacture the Products including, but not limited to: (i) specifications, software, test software, schematics, drawings, designs, mask works, topography or other materials pertinent to the most current revision level of manufacturing of the Products; (ii) copies of all inspection, manufacturing, test and quality control procedures and any other work processes; (iii) jig, fixture and tooling designs; (iv) Kin Yat general knowledge and information relating to the Products; and (v) support documentation.

1.52 **"Term"** means the Initial Term and each Renewal Term, collectively.

1.53 **"Quality and Test Procedures"** means the testing specifications, quality requirements, standards, procedures and parameters supplied and/or approved by iRobot, including without limitation, the specifications and quality requirements plans for the Product and certain Components attached hereto as Schedule 3.

1.54 **"Waived NRE Costs"** means, collectively, [***].

**2** List of Schedules. This Agreement includes the following Schedules for each Product to be manufactured hereunder, which are hereby incorporated herein and made a part of this Agreement:

Schedule 1 - Statement of Work and Specifications
Schedule 2 - Fee and Price Schedule (Final Kin Yat Quote)
Schedule 3 - Quality and Test Procedures
Schedule 4 - Non-Disclosure Agreement
Schedule 5 - Trademark Usage Guidelines
Schedule 6 - iRobot Quarter End

**3** Manufacturing Services. Kin Yat will manufacture the Product in accordance with the Specifications and any applicable Purchase Order. When requested by iRobot, and subject to appropriate fee and cost adjustments, Kin Yat will provide Additional Services for existing or future Product manufactured by Kin Yat for iRobot. iRobot shall be solely responsible for the sufficiency and adequacy of the Specifications.

3.1 Quality and Test Procedures. All Products manufactured and supplied by Kin Yat shall, at minimum, adhere to this Agreement and the Specifications attached hereto. Kin Yat shall continuously perform the applicable quality tests and procedures and monitor such compliance at all times, including during the preparation for production as well as during production. In addition to the minimum required tests specified, Kin Yat shall employ its own internal quality system and apply the necessary tools, processes and procedures to ensure that the contracted Product covered by this Agreement complies with the Specifications. This may include, but not be limited to, process control for parts and assemblies, incoming inspection of fabricated or sourced parts, final inspections, subassembly inspections and testing, etc. iRobot shall be solely responsible for the sufficiency and adequacy of the Specifications. Kin Yat is responsible for designing and/or purchasing and maintaining all necessary test and fixture equipment to conduct such testing and procedures. Kin Yat is responsible for worker's training, worker's instructions, preventive and/or on-conditional (as needed) maintenance plans, and calibration plans.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.2 <u>Packaging and Shipping.</u> Kin Yat will package and ship the Product in accordance with the Packaging and Shipping Specifications. iRobot shall be solely responsible for the sufficiency and adequacy of the Packaging and Shipping Specifications. In the event Kin Yat fails to comply with the Packaging and Shipping Specifications, Kin Yat will reimburse iRobot for the cost of rework to the extent that such error can be rectified with rework.

3.3 <u>Items to be Supplied by iRobot</u>. iRobot shall supply to Kin Yat, according to the terms and conditions specified herein, iRobot Proprietary Information and Technology and, if applicable, the Loaned Equipment if any, and Consigned Components pursuant to Section 12.1. iRobot will also provide to Kin Yat all Specifications, Quality and Test Procedures, Packaging and Shipping Specifications, Product design drawings, approved vendor listings where applicable, material component descriptions (including approved substitutions), manufacturing process requirements, and any other specifications necessary for Kin Yat to perform the Manufacturing Services. iRobot shall be solely responsible for delay in delivery, defects and enforcement of warranties related to the Consigned Components.

3.4 <u>Items to be Supplied by Kin Yat</u>. Kin Yat will employ the Kin Yat Manufacturing Process, the Reasonable and Customary Support Services, any required manufacturing technology, manufacturing capacity, labor, manufacturing and quality related fixtures, design services in support of manufacturing process (to include fixture design), transportation logistics (as required by FCA Port of Origin), systems and facilities necessary for Kin Yat to perform the Manufacturing Services. It is expected that engineering support (at Kin Yat's expense) of product, packaging and process improvements will continue for the life of the Product, even after all requirements are met. Tooling that is designed and fabricated specific to manufacture, assembly, inspection or testing of iRobot Product is the sole property of iRobot, including related design documentation

3.5 <u>Facilities Access</u>. iRobot shall have the right, during normal business hours by appointment and at its expense to inspect, review, monitor and oversee the Manufacturing Services, provided that such inspection shall not disrupt Kin Yat's normal business operations. iRobot shall cause each of its employees, agents and representatives who have access to Kin Yat's facilities, to maintain, preserve and protect all Proprietary Information and Technology of Kin Yat and the confidential or proprietary information and technology of Kin Yat's other customers in accordance with the Non-Disclosure Agreement. iRobot shall further have the right to bring iRobot's customers to Kin Yat's facility, by appointment and under the same obligations to Kin Yat surrounding protection of Kin Yat's Proprietary Information and Technology and Kin Yat's customers' confidential or proprietary information and technology. iRobot's employees have the right to obtain relevant artifacts (such as reports, process tracking charts etc.) and take photographs and videos of iRobot related Products, Components, manufacturing processes, tests, fixtures, tools or items at any time during the inspection with the consent of Kin Yat whose consent shall not be unreasonably withheld.

3.6 <u>Materials Procurement</u>.

3.6.1 Kin Yat will use Commercially Reasonable Efforts to procure Assigned Components and Generic Components from the applicable designated supplier per iRobot's AVL, where applicable, and otherwise from suppliers chosen by Kin Yat and approved by iRobot, in amounts necessary to fulfill Purchase Orders against the Forecasts. Kin Yat will be responsible for the quality inspection of all Components (except for the Consigned Components) and all other parts and adherence to the Product Specifications in the assembly and manufacturing process. iRobot will be responsible for the part functionality set forth in the iRobot Specifications. Kin Yat is responsible for managing, and the performance of, the suppliers of the Assigned Components and Generic Components, including but not limited to purchasing, component inventory control, customs paperwork and Value Added Tax (VAT), and is ultimately responsible for verifying that all Components conform to the Product Specifications. iRobot will be responsible for managing the pipeline of iRobot controlled Consigned Components. Kin Yat will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Kin Yat. Kin Yat shall use Commercially Reasonable Efforts to obtain terms and conditions that from all suppliers that allow return privileges for Generic Components (subject to agreed upon reasonable minimum order quantities). iRobot may authorize Kin Yat to procure Generic Components and Assigned Components necessary, without a Purchase

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

7

Order, by issuing a written authorization to purchase such Components ("**Material Authorization**"), to meet specific Forecast or Purchase Order demand. In the event of schedule changes, Kin Yat shall use Commercially Reasonable Efforts to cancel all applicable material and parts purchase orders and reduce material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. iRobot shall be responsible for all liability for materials and parts Kin Yat cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Kin Yat acting on iRobot's Material Authorization or Purchase Order. Kin Yat's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components (except for the Consigned Components not controlled by Kin Yat) regardless of classification.

3.6.2 <u>End of Life Component Reporting.</u> Kin Yat is responsible for continuous monitoring of the AVL for end-of-life component condition. Kin Yat is responsible for periodic reporting, no less frequently than [***] of the market condition for each component of any currently in production by iRobot's product AVL.

3.6.3 <u>Long-Lead Components</u>. Kin Yat shall not purchase any Component designated in Schedule 2 as a "long lead" Component by iRobot without a Material Authorization. Kin Yat shall use Commercially Reasonable Efforts to continuously improve lead time for all Components. With iRobot's prior written consent, Kin Yat may pre-purchase Generic Components and Assigned Components, or pre-build sub assemblies, modules, core robots or even completed SKU quantities in order to meet Forecast volumes, or anticipated volumes under Purchase Orders.

3.6.4 <u>Exclusive Components</u>. With respect to any Assigned Components or Consigned Components (controlled by Kin Yat) that have been customized by a supplier or manufacturer specifically for any iRobot Product, Kin Yat shall require each such supplier not to sell or supply such custom Component to any other Person.

3.7 <u>Materials Declaration</u>.

3.7.1 iRobot shall notify Kin Yat in writing of the specific Materials Declaration Requirements that iRobot determines to be applicable to the Products and shall be solely liable for the adequacy and sufficiency of such determination and information. Kin Yat shall be responsible for collecting, and having available at all times, all third party supplier's documentation certifying compliance with such Materials Declaration Requirements with respect to any and all components, parts or material used in connection with the Manufacturing Services under this Agreement. Kin Yat shall utilize its supplier qualification process to ensure that each supplier, its Components and its documentation are trustworthy and in compliance with all such Materials Declaration Requirements. Upon written request of iRobot, Kin Yat shall provide to iRobot copies of such documents, including any compliance certificates.

3.7.2 Without limiting the foregoing Section 3.7.1, Kin Yat shall ensure that it has enforceable agreements with each of its suppliers under this Agreement, excluding suppliers of Consigned Components, so that Kin Yat may fulfill Kin Yat's obligations under this Section 3.7.1 and that iRobot is an intended third party beneficiary under such agreements.

3.8 <u>Product Evaluation.</u> Acceptance of the Product will occur upon iRobot's or its designee's receipt of the Product. Notwithstanding the foregoing, iRobot reserves the right to inspect or evaluate the Product to determine if it conforms, in all material respects, to the Specifications, either at Kin Yat's premise or third party location. Given reasonable and adequate advance notification to Kin Yat and by appointment, iRobot may, at its discretion, perform inspections of the Product at random or on a continual basis, on site at Kin Yat's premises. In the event that the Product does not meet the Specifications, such Product will be deemed Non-Conforming and iRobot will have all available remedies with respect to Non-Conforming Products as set forth in this Agreement. Acceptance, inspection or evaluation by iRobot does not relieve Kin Yat of its obligations to the services and warranties as set forth in this Agreement.

3.9 <u>Purchase Order Performance</u>.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.9.1 Kin Yat shall fill and deliver the Products purchased under a Purchase Order by the due date specified on such Purchase Order. Purchase Orders to Kin Yat will be launched at lead-times mutually agreed between Kin Yat and iRobot in advance of issuance of Purchase Orders.

3.9.2 Kin Yat agrees that time is of the essence with respect to all deliveries and performance. If Kin Yat fails to timely perform or deliver within [***] of the delivery requirements of any standalone Purchase Order from iRobot, for reasons under Kin Yat's direct control, Kin Yat is liable to iRobot for all direct, reasonable costs incurred as a result of such delay including expediting costs. In the event of a delay, Kin Yat shall use Commercially Reasonable Efforts to expedite delayed Products and/or performance, shall pay all reasonable expediting costs, including expedited delivery costs.

3.9.3 For purposes of this Agreement, "**On-time**" delivery means: delivery of 100% of the Products purchased under a Purchase Order are delivered by the due date indicated on iRobot's Purchase Order for such Products minus [***], plus [***]. Kin Yat will monitor and report to iRobot monthly "On-time" delivery per Purchase Order, and such report shall include the number of Purchase Orders placed by iRobot within the Lead Time versus number of Purchase Orders delivered On-time.

3.10 Assigned and Consigned Components.

3.10.1 iRobot may elect to assign a specific supplier and part number for any component or material, including for example; rechargeable batteries, battery chargers, masked IC components, motors, packaging material, and gears. In such case, Kin Yat shall source such Assigned Components from the applicable supplier and implement supply optimization inventory practices. Kin Yat will be responsible for all purchasing, quality control, component inventory control, [***] inventory management, customs paperwork and VAT for all Assigned and Generic Components. Kin Yat shall handle all Components as required by the Product Specification and as otherwise instructed by iRobot, and shall be responsible for any and all expenses related to its compliance with such material handling requirements. In the event that iRobot elects to transfer to Kin Yat the purchasing responsibility for any Consigned Component, Kin Yat shall assume such responsibility as soon as reasonably practicable. The Parties will work in good faith to identify and implement all reasonable measures to allow for Kin Yat to assume such purchasing responsibility for such Consigned Component. Except for any Consigned Components controlled by Kin Yat pursuant to this Section 3.10.1, iRobot shall be solely responsible for delay in delivery, defects and enforcement of warranties related to all Consigned Components.

3.10.2 Kin Yat will segregate, conspicuously identify and safeguard all iRobot owned and Consigned Components in such fashion to clearly identify the Consigned Components as the property of iRobot. Kin Yat shall maintain all Components, at its own expense, in efficient working order and good repair, and otherwise in accordance with the Product Specifications.

3.10.3 Upon placement of Consigned Components into Kin Yat's facility, title and possession of the materials shall transfer to iRobot as if it were an actual shipment of Product to iRobot. Insurance covering the Consigned Components will be the responsibility of iRobot. Such insurance includes a waiver of subrogation against Kin Yat. Kin Yat shall hold inventory on consignment for support of iRobot's Products and business at levels mutually agreed upon by iRobot and Kin Yat, but no less than an amount to satisfy Purchase Orders against the current Forecasts. Kin Yat will at all times utilize [***] inventory management for all Consigned Components. In the event that Kin Yat's failure to utilize [***] inventory management for all Consigned Components results in any such Component remaining in Kin Yat's inventory for more than [***], then Kin Yat shall, at its own expense, coordinate with the applicable supplier for the return and replacement of such Components for new or properly updated Components. If "iRobot" does not place Purchase Orders that consume Consigned Components consistent with applicable Forecast, the Parties will negotiate in good faith the disposition of Consigned Components held by Kin Yat. Kin Yat shall provide to iRobot upon request an accounting of all Consigned Components and all other Components, Products and materials of iRobot at Kin Yat's premises or otherwise under Kin Yat's control with reasonable details.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

9

3.10.4 <u>Sales of Products and Components</u>. Without iRobot's prior written consent, Kin Yat shall not, directly or indirectly, sell, supply or otherwise transfer any Product or Component to any Person other than iRobot or iRobot's designated customer or distributor.

**4 <u>Quality</u>**

4.1 <u>Governing Quality documents</u>.

4.1.1 <u>General Quality Requirements</u>. Kin Yat shall comply with the requirements stated therein for defining general iRobot supplier quality performance.

4.1.2 <u>Production Line Test Specification (PLTS)</u>. The PLTS is provided to Kin Yat by iRobot in order for Kin Yat to establish a production line test process to verify and to demonstrate that the contracted product has been assembled and minimally tested to meet the product requirements as defined in the relevant product specifications

4.1.3 <u>Design Validation Test Specification (DVTS)</u>. Suppliers who provide design services to iRobot shall demonstrate that the contracted product has been designed and qualification tested according to the DVTS to meet the performance requirements of its intended application as defined in the relevant product specifications.

4.2 Quality Management System. Kin Yat shall maintain a Quality System that is certified to an internationally recognized quality management system standard, such as ISO 9001 or equivalent.

4.3 Engineering Changes. Kin Yat shall not make any changes to product or design without receiving prior written approval from iRobot for the change request and for implementation of the change into production.

4.4. Manufacturing Changes. Kin Yat shall not make any changes to the manufacturing process that may affect the product form, fit, function or safety without receiving prior written approval from iRobot.

4.5 Defects. Defects in product resulting in failure to meet iRobot product specifications, due to inadequate assembly procedures and production verification testing are the responsibility of the Kin Yat regardless of whether the defect occurred during manufacturing or after iRobot acceptance.

4.6 Corrective Action. In the event that defects are produced, Kin Yat shall notify iRobot and implement containment activities to prevent further defective product from affecting iRobot supply chain. For defective product within Kin Yat's supply chain, Kin Yat shall make necessary arrangements, at its sole expense, to screen, rework and / or replace. Kin Yat shall supply to iRobot a written corrective action plan of its root cause(s) investigation and actions to prevent recurrence of identified root cause(s)

4.7 <u>Quality Control Plan (QCP)</u>. Kin Yat shall develop a Quality Control Plan (QCP), approved by iRobot, to define the necessary process controls and production testing and inspection methods to ensure the fabrication and assembly processes deliver products that meet the Specifications supplied by iRobot.

4.8 <u>Subcontractor Qualification</u>. Kin Yat shall be responsible for qualifying all subcontractors of all Assigned Components and Generic Components pursuant to Kin Yat's existing qualification methodology and process.

4.9 <u>Serial Number identification and traceability</u>. Kin Yat shall identify each unit of the contracted product produced with a unique identifier number. This serial number shall provide information relevant to the date of production, shift, line, and traceability to critical component lots/batches and processes. The format of this serial number shall be agreed upon between Kin Yat and iRobot prior to commencement of production.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

10

4.10 <u>Certifications</u>. Regulatory compliance certifications are required as a condition for the production, shipment, sale, and disposal of all iRobot products, and as such, iRobot is obligated to maintain a commitment to meeting all regulatory compliance requirements. As a condition of the compliance certification process, the Products and Kin Yat's manufacturing facility shall be subject to periodic audits and certification testing. Kin Yat shall provide objective evidence that it meets such requirements pertaining to all regulatory, quality, and compliance requirements and will provide such information upon request from iRobot. Objective evidence shall include, but is not limited to, existing certification documents and certification inspection reports from Kin Yat and each of its suppliers.

4.10.1 <u>Product Specific Certifications</u>. iRobot is responsible for maintaining all existing product certifications. Kin Yat shall comply, and shall cause its suppliers to comply, with any and all Product specific, certification-related requirements such as: informing iRobot of the source and manufacturing part number of every Component and validation that Kin Yat's processes are compliant to such certification requirements. Kin Yat shall support all recertification requirements for all Product certifications. All Product licenses and Product certifications shall be in iRobot's name. In the event that iRobot requires Product changes which result in Product recertification, iRobot will bear any licensing and external testing fees for all such Product certifications. In the event that Kin Yat requires Product changes which result in Product recertification, Kin Yat will notify iRobot immediately and bear any licensing and external testing fees for all product certifications.

4.10.2 <u>Manufacturing Facility Specific Certifications</u>. Kin Yat shall support and maintain any pre-requisite site specific requirements related to the Product certification requirements. Kin Yat shall bear any fees associated with these pre-requisite site specific certifications. All pre-requisite site specific certifications shall be maintained in Kin Yat's name. In the event that iRobot requires product or business changes which result in additional site specific certifications by Kin Yat, Kin Yat shall promptly take all actions necessary to comply with such requirements. In addition, Kin Yat shall promptly execute documents and take such further action as iRobot shall reasonably request in order to comply with any certification required by any customer or distributor of iRobot.

4.10.3 <u>Records Retention</u>. For a period of [***] from delivery of each Product (items produced under the [***] are considered Product), Kin Yat shall maintain accurate and complete records for all Products manufactured hereunder, including, but not limited to, all configuration and engineering records. This shall include all records relating to product traceability to ensure both forward and reverse traceability. Records shall contain, as a minimum, all information relating to the following:

[***]

4.10.4 <u>Product specification and standards</u>. All Products must conform in all respects to the Product Specifications provided by iRobot for the items stated on the bill of materials or Purchase Order. Any Kin Yat proposed change to Product requires mutual agreement in writing prior to implementing such change. Kin Yat shall notify iRobot in writing and receive approval of any changes to Components, other materials, parts or sources of supply, process chemistries, test procedures, quality reporting or other major processes, and to ensure that any such changes do not compromise the requirements under this Agreement or the Specifications, quality, or reliability of Products ordered, or which may affect form, fit or function.

4.10.5 <u>Secure Testing Facility</u>. Kin Yat shall provide intellectual property secure on-site facilities for iRobot's final inspection quality control team, as well as the necessary inspection technicians to assist during inspections.

4.11 <u>Returned Products</u>. Kin Yat shall establish a program for analyzing Product returns and for tracking Product return rates and failure types. Kin Yat will utilize iRobot provided Return product information in such analysis and tracking. Kin Yat shall provide objective evidence to demonstrate appropriate corrective actions, as needed, to address Product Returns root cause.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

11

4.12 <u>Recalls</u>. If iRobot reasonably decides to, or is required by any government authority or court of competent jurisdiction to, initiate a product recall, withdrawal or field correction with respect to, or if there is any governmental seizure of, any Product, iRobot will notify Kin Yat of the details regarding such action, including providing copies of all relevant documentation concerning such action. Kin Yat will assist iRobot in investigating any such situation and all regulatory contacts that are made and all activities concerning seizure, recall, withdrawal or field correction will be coordinated and made by iRobot, and all communications in connection with any recall, shall come solely from iRobot. If any such recall, withdrawal, field correction or seizure results from (i) failure of any Product to conform to the Specifications or any warranty or other requirement set forth in this Agreement, or (ii) the failure of Kin Yat to comply with any applicable law, rule, regulation, standard, court order or decree or (iii) the gross negligent or intentional wrongful act or omission of Kin Yat in connection with the production of Product hereunder, then, in addition to the rights, remedies and obligations under Section 5, Kin Yat shall be responsible for the full cost and expense of any such seizure, recall, withdrawal or field correction. For the purposes of this Agreement, the expenses of any recall, withdrawal, field correction or seizure shall include, without limitation, the out-of-pocket expenses of notification and destruction or return of the recalled Product and all other out-of-pocket costs incurred in connection with such recall, in addition to any lost profits of either Party under any circumstances or any administrative or overhead charge.

5    **Warranty & Remedy.**

5.1 <u>Kin Yat Warranty</u>. [***] warranty period.

5.1.1 <u>Product Warranty</u>. Kin Yat represents, warrants and covenants that: (i) it will perform the Manufacturing Services and manufacture the Product in accordance with IPC-A 610 Class 2 workmanship standard, the Product Specifications, applicable law, and the terms and conditions of this Agreement, (ii) the Products will be manufactured, processed and assembled by Kin Yat, and be free from defects in workmanship in accordance with the Product Specifications, (iii) the Products will conform, in all material respects, to the Product Specifications, be new or newly manufactured and include only new Components, and (iv) the Products will be free and clear of all Encumbrances. The foregoing warranty shall apply to any Product that is repaired or re-manufactured by or on behalf of Kin Yat under this Agreement. This Product warranty is extended to, and may only be enforced by, iRobot.

5.2 <u>Components Warranty</u>. Kin Yat will pass on to iRobot all warranties from Component suppliers to the extent that they are transferable. Kin Yat shall use Commercially Reasonable Efforts to ensure that all Assigned Components used in the Product are procured from suppliers on the AVL, unless otherwise agreed to by the Parties in writing.

5.3 <u>Survival of Warranty</u>. Product warranties will survive any inspection, delivery, acceptance or payment by iRobot and be in effect for the longer of (i) [***] from the date of invoice of the Product from Kin Yat to iRobot, (ii) for Products purchased by an end-user customer within [***] from the date such Product is initially delivered to iRobot or to iRobot's designated carrier, [***] of the warranty period from iRobot to such end-user customer for such Product, or (iii) such other term as agreed to by the Parties, following the date such Product is initially delivered to iRobot or to iRobot's designated carrier (such period, the "**Warranty Period**"). Should there be a breach of any of the warranties specified during the Warranty Period, Kin Yat will either (A) repair or replace the Product that contains a defect caused by a breach of the warranty set forth herein; or (B) issue a credit to iRobot in an amount equal to [***]. Product warranties will survive for the full term of the Warranty Period, regardless of whether such Product becomes obsolete or whether Kin Yat ceases to manufacture such Product or ceases to provide the Manufacturing Services.

5.4 <u>Repair or Replacement of Defective Product</u>. Kin Yat may elect, in its sole discretion, to repair or re-manufacture any Non-Conforming Products caused by a breach of the warranty set forth in this Section 5. Any such repair or re-manufacture shall be pursuant to Kin Yat's standard return material authorization process and procedure ("**RMA**"), pursuant to which iRobot will request an RMA number from Kin Yat for such Non-Conforming Product.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

iRobot shall then consign the Non-Conforming Products along with objective documentation of the applicable breach of warranty ("**Defect**"), FOB Kin Yat's repair facility in the same country and region as the Non-Conforming Products (or such other location as agreed to by the Parties in writing), and specify the Kin Yat assigned RMA number. Kin Yat will repair or re-manufacture the Non-Conforming Products within [***] of receipt by Kin Yat of such Non-Conforming Products, and in the event the Defect is confirmed, Kin Yat will reimburse iRobot for the reasonable cost of transporting the Non-Conforming Products to Kin Yat's designated facility and Kin Yat will deliver the repaired or re-manufactured Products, FCA iRobot's designated destination. If no such Defect is confirmed, iRobot shall reimburse Kin Yat for all fees, costs and expenses incurred to analyze and, if requested by iRobot, repair or re-manufacture the non-defective Products and iRobot shall bear responsibility for all transportation costs to and from Kin Yat's designated repair facility.

     5.5 <u>Class Failure</u>. In the event that Kin Yat is notified (such notification being oral or otherwise) of a Class Failure, Kin Yat shall:

          5.5.1 Within 24 hours of learning of such Class Failure, provide iRobot with a status report and details of a proposed interim solution; and

          5.5.2 No later than [***] following notification of such Class Failure, provide iRobot with a root cause analysis and corrective action plan.

In each of the foregoing cases, iRobot will make available such information and assistance reasonably required to allow Kin Yat to conduct its root cause analysis and to provide its corrective action plan.

     5.6 <u>Component Failures</u>. In the event that a Non-Conforming Product is the result of a Component, Kin Yat will pass on to iRobot all available warranty remedies pursuant to Section 5.2. In addition, Kin Yat will negotiate with the Component suppliers (save for the suppliers of Consigned Component not controlled by Kin Yat), at iRobot's discretion and with iRobot present or on iRobot's behalf, for additional remedies outside of the Component warranty pursuant to Section 5.2. Kin Yat shall not enter into any settlement with respect to Component failures that affects iRobot's rights or interests without iRobot's prior written approval, which shall not be unreasonably withheld. In the event that such negotiations do not resolve the matter to iRobot's reasonable satisfaction, and the available warranty remedies under Section 5.2 do not cover the full cost of Component repair or replacement, Kin Yat will provide iRobot with prior written notice regarding any additional costs required to repair or re-manufacture the affected Products. In the event that cost details are not readily available and iRobot requires immediate repair or replacement of the affected Products, iRobot may elect to authorize Kin Yat to proceed with repair or re-manufacture of the affected Products on a not to exceed basis. iRobot will be liable for any additional costs actually incurred by Kin Yat to repair or re-manufacture the affected Products, provided that iRobot has given Kin Yat written approval before such costs were incurred.

     5.7 <u>Refunds due to Class Failure or Recall</u>. In the event any Class Failure or Recall of a Product results from a breach of any of the warranties under this Agreement during the Warranty Period, then Kin Yat shall promptly refund to iRobot the full purchase price paid for all Products subject to such Class Failure or Recall, and all other reasonable costs to cure the Class Failure or Recall (example: shipping costs, partner penalties etc).

     5.8 <u>Third Party Repair and Re-Manufacture; Other Defects</u>. Notwithstanding anything to the contrary in this Agreement, iRobot may itself, or through a third party, and at its own expense, repair or re-manufacture any Product (whether or not such Product is defective) without any obligation or liability to Kin Yat. If iRobot wishes Kin Yat to undertake repair or re-manufacture of Products that are Non-Conforming due to reasons other than a breach by Kin Yat of its warranty obligations hereunder, the Parties will mutually agree on an allocation of costs for the repair and/or re-manufacture process prior to Kin Yat performing such work.

     5.9 **Limitation of Warranty**.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

13

5.9.1 THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5 AND 16.3 ARE IN LIEU OF, AND EACH PARTY EXPRESSLY DISCLAIMS, AND EACH OTHER PARTY EXPRESSLY WAIVES, ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR MISAPPROPRIATION OF ANY RIGHT, TITLE OR INTEREST OF ANY PARTY OR ANY THIRD PARTY. NO ORAL OR WRITTEN STATEMENT OR REPRESENTATION OUTSIDE OF THIS AGREEMENT BY EITHER PARTY, ITS AGENTS OR EMPLOYEES SHALL CONSTITUTE OR CREATE A WARRANTY OR EXPAND THE SCOPE OF ANY WARRANTY HEREUNDER.

5.9.2 KIN YAT'S WARRANTY SHALL NOT APPLY TO ANY PRODUCT THAT HAS BEEN SUBJECTED TO TESTING FOR OTHER THAN SPECIFIED ELECTRICAL CHARACTERISTICS OR TO OPERATING AND/OR ENVIRONMENTAL CONDITIONS IN EXCESS OF THE MAXIMUM VALUES ESTABLISHED IN IROBOT'S APPLICABLE SPECIFICATIONS, OR TO HAVE BEEN THE SUBJECT OF ANYONE OTHER THAN KIN YAT OR ITS AGENTS OR CONTRACTORS MISHANDLING, ACCIDENT, MISUSE, NEGLECT, IMPROPER TESTING, IMPROPER OR UNAUTHORIZED REPAIR, ALTERATION, DAMAGE, ASSEMBLY, PROCESSING OR ANY OTHER INAPPROPRIATE OR UNAUTHORIZED ACTION OR INACTION THAT ALTERS PHYSICAL OR ELECTRICAL PROPERTIES. THIS WARRANTY SHALL NOT APPLY TO (a) ANY MATERIAL CONSIGNED OR SUPPLIED BY IROBOT TO KIN YAT INCLUDING BUT NOT LIMITED TO IROBOT INTELLECTUAL PROPERTY, IROBOT'S PROPRIETARY INFORMATION AND TECHNOLOGY AND IROBOT'S TOOLING, OR (b) ANY DEFECT IN THE PRODUCT ARISING FROM ANY DRAWING, DESIGN, SPECIFICATION, PROCESS, TESTING OR OTHER PROCEDURE, ADJUSTMENT OR MODIFICATION SUPPLIED AND APPROVED BY IROBOT.

5.10 ECO Upgrade. RMA's for any engineering changes or upgrades under any ECR or ECN upgrades will also be subject to the RMA process. Kin Yat will analyze each ECR and ECN and provide a per unit upgrade/change cost and expected completion and delivery date.

5.11 The Liability of Kin Yat to iRobot for any one act of default by reason of the breach of the warranty under this Agreement shall be limited to the extent that all or any damages (if proven) together shall in no event greater than [***] affected by such breach which has/have been received and accepted by Kin Yat and paid for by iRobot.

## 6 Limitation Of Liability; Specific Performance; Equitable Relief

6.1 EXCEPT WITH REGARD TO ANY LIABILITY THAT ARISES FROM A PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 19 OR A BREACH BY EITHER PARTY OF ITS CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 16, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON OR ENTITY UNDER ANY CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR OTHER LEGAL OR EQUITABLE CLAIM OR THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, LOSS OF GOODWILL OR BUSINESS PROFITS, LOST REVENUE, WORK STOPPAGE, DATA LOSS, COMPUTER FAILURE OR MALFUNCTION, OR FOR ANY AND ALL OTHER EXEMPLARY OR PUNITIVE DAMAGES WHETHER SUCH PARTY WAS INFORMED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE FOREGOING SHALL NOT EXCLUDE OR LIMIT EITHER PARTY'S LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING FROM ITS NEGLIGENCE TO THE EXTENT THAT SUCH LIABILITY CANNOT BY LAW BE LIMITED OR EXCLUDED.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

6.2  Kin Yat acknowledges and agrees that a breach by it of its obligations to perform the Manufacturing Services, including the manufacture and/or supply Product under this Agreement, would cause irreparable harm to iRobot because the Manufacturing Services are unique in kind and quality and, moreover, suitable substitutes are unobtainable or unreasonably difficult or inconvenient for iRobot to procure and Kin Yat further acknowledges and agrees that iRobot could not be adequately compensated by money damages. Accordingly, in addition to any other remedies that may be available, in law, in equity or otherwise, in the case of any such actual or threatened breach, iRobot shall be entitled to obtain specific performance (including an order of a court requiring that Kin Yat manufacture and/or supply Product under this Agreement), without the necessity of posting a bond or proving actual damages.  Finally, Kin Yat agrees that such equitable relief (including without limitation, specific performance), is a reasonable outcome of any actual or threatened breach contemplated by this Section 6.2, and Kin Yat hereby knowingly assumes the risk that a court or other tribunal may order specific performance. Kin Yat further acknowledges and agrees that any equitable relief ordered by a court or tribunal would not be a penalty.

6.3  iRobot retains all rights not expressly granted hereunder and any and all remedies herein expressly conferred upon iRobot will be deemed cumulative with, and not exclusive of, any other remedy conferred hereby, or by law or equity upon iRobot, and the exercise by iRobot of any one remedy will not preclude the exercise of any other remedy available under this Agreement or otherwise.

7 **Delivery, Risk of Loss and Payment Terms.** For purposes of this Agreement terms of sale for all Product shipments shall be FCA Port of Origin. (per Incoterms 2010). Risk of loss for Product shipments will pass to iRobot (or to iRobot's designee invoiced by Kin Yat) upon delivery to the Port of Origin and receipt by the freight partner responsible for delivering the goods to the appropriate destination. For any shipments where Kin Yat acts as an agent in completing the Shipper's Export Declaration and managing iRobot's exports on behalf of iRobot, where iRobot is the exporter of record (Principal Party in Interest - PPI), iRobot hereby grants Kin Yat a limited Power of Attorney to act on its behalf in managing its exports. Title for Product will pass to iRobot upon receipt of full payment for the purchase price by iRobot.

7.1  <u>Payment</u>. iRobot shall pay Kin Yat all monies when due, including all NRE Costs associated with this Agreement.  Payment of all invoices shall be net [***] from date of iRobot's receipt of each such invoice.  Payment to Kin Yat shall be in U.S. dollars and in immediately available funds. Any equipment, tooling, component, material or other goods or property, which is purchased by Kin Yat in order to perform its obligations under this Agreement, shall become the property of iRobot once Kin Yat is reimbursed for all NRE Costs, if any.  Kin Yat shall be responsible for maintaining, segregating and CONSPICUOUSLY labeling the iRobot Property as " iRobot PROPERTY" and carrying out applicable repairs based on reasonable wear and use. Kin Yat shall invoice iRobot for actual outstanding NRE Costs and other monies due at [***] intervals (or such other intervals as deemed appropriate) during the term of this Agreement and upon cancellation, termination or expiration of this Agreement. Kin Yat agrees to request advance written approval from iRobot should resource requirements, and thereby NRE Costs, increase materially relative to estimated NRE Costs initially agreed by the Parties. Upon such request, Kin Yat shall provide to iRobot reasonably detailed supporting documentation and/or descriptions of the NRE Costs for which Kin Yat seeks reimbursement. iRobot is not obligated to accept any additional reimbursement request from Kin Yat. Unless otherwise agreed by iRobot, all prices are FCA, Port of Origin.

7.2  <u>Taxes.</u> iRobot shall be responsible for all federal, foreign, state and local sales, use, excise and other taxes (except taxes based on Kin Yat's income), all delivery, shipping, and transportation charges and all foreign agent or brokerage fees, document fees, custom charges and duties.

7.3  <u>Disputed Invoices</u>. If a Kin Yat invoice does not meet the invoicing requirements of this Agreement, or iRobot in good faith disputes any invoiced charges, iRobot will notify Kin Yat of the disputed items in writing on or before the payment due date and may withhold payment of the disputed charges pending resolution of the dispute.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

7.4 <u>Reservation of Rights</u>. Any payments made by iRobot under the Agreement, and any acceptance of Products, will be without prejudice to iRobot's right to subsequently claim or determine that it has overpaid Kin Yat or to require Kin Yat to remedy any deficiencies in KinYat's performance as provided in this Agreement.

8 **Import and Export.** iRobot shall be the importer of record for all Product shipments to iRobot facilities and shall be responsible for obtaining any required import licenses necessary for iRobot to import Product and/or receive shipments of Product from Kin Yat or its designated carrier, any U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under US or foreign law applicable to iRobot's obligations under this Agreement. Kin Yat shall be responsible for obtaining any required export licenses necessary for Kin Yat to ship Product, including certificates of origin, manufacturer's affidavits, and U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under US or foreign law applicable to Kin Yat's obligations under this Agreement. iRobot agrees that it shall not knowingly require Kin Yat to ship or deliver any Product, assembly, component or any technical data or software which violate any export controls or limitations imposed by the United States or any other governmental authority, or to any country for which an export license or other governmental approval is required at the time of export without first obtaining all necessary licenses and approvals and paying all duties and fees. Each Party shall be responsible for securing all applicable licenses, certifications, approvals and authorizations that are necessary for such Party to comply with applicable import and export laws, rules and regulations for the shipment and delivery of the Product under this Agreement. iRobot shall also be responsible for complying with any legislation or regulations governing the importation of the Product into the country of destination and for payment of any duties thereon.

9 **Cost Management.**

9.1 <u>Cost Summary and Management</u>. The cost summary included set forth on Schedule 2, prepared by Kin Yat, contains a detailed SKU-level (SKU as defined by iRobot) cost summary, Incoterm FCA Port of Origin, complete with all formulas and assumptions, to provide full access and visibility to all component, labor, assembly and mark-up costs. During each Renewal Term, the Parties shall meet from time to time on an executive level as required, but no less than on an [***], to identify cost reduction opportunities where each Party will share overall financial objectives of the on-going relationship between the Parties. Kin Yat shall at all times employ an Open Book Pricing approach to cost management and pricing of Components, Products and the Manufacturing Services to achieve Sustainable and Competitive Pricing for the Products and Manufacturing Services provided to iRobot under this Agreement. For purposes of this Agreement, the phrase **"Sustainable and Competitive Pricing"** means stable pricing over time for the Products and Manufacturing Services provided to iRobot under this Agreement that is favorable against that which could be reasonably attained from other contract manufacturers for comparable volumes of substantially similar products and comparable manufacturing services. For purposes of this Agreement, the term **"Open Book Pricing"** means providing detailed costing information to iRobot which includes; a fully-costed bill of materials, markups related to the sourcing and manufacturing of the Components and the Product and an explanation of all adders on material or value add (in place as of the Effective Date). In addition, Kin Yat shall provide detailed overviews of the relevant financial costing model to iRobot's representatives and professional advisors. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year.

9.2 <u>Price</u>. The Price for each Product is set forth in Schedule 2 (the "**Product Price**"), and includes the complete price for such Product, including the fully-costed bill of materials, Kin Yat's Gross Margin (as defined in Schedule 2), and any and all other added fees and costs related to the Manufacturing Services, Reasonable and Customary Support Services. The Product Price for each Product shall not be increased during the period beginning on the Effective Date and ending on [***], during such time Kin Yat shall manage its supply chain and absorb any and all increases. Pricing will be reviewed by the Parties on an [***] basis, on or before [***], and will be revised consistent with increases or decreases in materials, components, equipment and other costs and expenses applicable to the manufacture of the Product. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

16

9.3 <u>Source Transparency</u>. Kin Yat will submit a full list of suppliers to iRobot for each Product at the time of any cost summary submittal, along with the supplier part number (in case of Generic Components).  Kin Yat will submit every supplier or part number change to iRobot for iRobot's approval before such change goes into effect, including a summary or certification that such proposed changed part conforms to the Product Specifications.

9.4 <u>Cost Transparency</u>. COGS (Cost of Goods Sold) is a key factor in iRobot engaging Kin Yat to produce and deliver the Product. So that iRobot has full visibility to the current and ongoing status of Kin Yat's COGS, Kin Yat will provide updated costing in the agreed upon format within [***] of any change submittal. If Kin Yat fails to provide cost impact information within [***] after any iRobot Specification changes, iRobot will consider the lack of response to mean that there is no cost impact. Any cost change would be considered valid only after iRobot's approval. No less frequently than [***], Kin Yat will, upon iRobot's request, provide a microeconomic report that includes all critical prices and costs included in the Product Price (such as labor, exchange rate or select material as required by iRobot).

**10 Tooling and fixtures.** iRobot shall own any and all tooling, fixtures, molds, equipment, software and firmware made available to Kin Yat by iRobot, developed for or on behalf of iRobot, or otherwise paid for by iRobot ("**iRobot Tooling**"). Kin Yat may manufacture, have manufactured, and use the iRobot Tooling only to perform the Manufacturing Services under the Agreement and shall use and treat the iRobot Tooling with a high degree of care, and in any case no less than the same degree of care it would for its own equipment, tooling, molds or supplies. Kin Yat shall attach an identifying label showing iRobot's ownership in a conspicuous place on each unit of iRobot Tooling, if possible, and shall secure and segregate the iRobot Tooling in such fashion to clearly identify the iRobot Tooling as the property of iRobot. Kin Yat shall maintain the iRobot Tooling, at its own expense, in efficient working order and good repair based on reasonable wear and use, and otherwise in accordance with iRobot's reasonable instructions. Kin Yat shall keep all iRobot Tooling free of any Encumbrances, and shall not transfer any iRobot Tooling, or any rights in the iRobot Tooling to any Person. Kin Yat shall deliver all iRobot Tooling to iRobot or iRobot's designee, or at iRobot's request, make available for pickup, upon the termination or expiration of this Agreement, or upon iRobot's earlier request. Kin Yat shall execute documents and take such further action as iRobot shall reasonably request to protect iRobot's interest in the iRobot Tooling. Kin Yat will at the expense of iRobot deliver to iRobot any of the above mentioned tooling within [***] upon iRobot's written request. Kin Yat will adhere to the record keeping of iRobot Tools in accordance with iRobot requirements set forth in Section 4.10.3 or as otherwise described Schedule 1. Kin Yat shall make such records available for inspection by iRobot or iRobot's designee Kin Yat upon iRobot's reasonable request.

**11      Forecast, Purchase Orders; Change Orders, Rescheduling and Cancellation**.

11.1 <u>Forecast</u>. iRobot will provide to Kin Yat, on a [***], a non-binding, rolling [***] planning forecasts at a core robot level and on a SKU based level, indicating iRobot's monthly Product requirements, as amended by iRobot from time to time (each, a "**Forecast**").

11.2 <u>Purchase Orders</u>. iRobot will issue orders for Products hereunder using its standard form of purchase order ("**Purchase Order**"). Each Purchase Order will identify the applicable Product by SKU, quantity, price denominated in US currency, delivery terms, and other customary terms. Except for the Product Price and delivery date contained in such Purchase Order, the terms and conditions in this Agreement shall prevail over any conflicting terms and conditions in any Purchase Order. Such Purchase Orders will be issued by iRobot at least [***] prior to the date of ex-factory for all Products on each such Purchase Order. For select SKUs and as defined in Schedule 1, iRobot and Kin Yat will develop strategies to achieve [***] lead time.

11.3 <u>Purchase Order Acknowledgment</u>. Kin Yat will notify iRobot electronically within [***] if it utilizes EDI, or if in writing, within [***] of receipt of a Purchase Order, and inform iRobot in writing of any reason Kin Yat is unable to meet a requested delivery date or any other Purchase Order requirements. The Purchase Order will not

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

constitute a binding obligation on Kin Yat until and unless Kin Yat accepts the Purchase Order in accordance with this Agreement.

11.4 <u>Changes to Forecast</u>: At any time, prior to the issue of a Purchase Order, iRobot may reschedule and/or cancel any forecast demand.

11.5 <u>Changes to Manufacturing Services, Packaging and Shipping Specifications and Test Procedures</u>. iRobot may, in writing, request a change to the Manufacturing Services, Packaging and Shipping Specifications and Test Procedures at any time. Within [***] after receipt of iRobot's written request Kin Yat will analyze the requested change and provide iRobot with an assessment of the effect that the requested change will have on cost, manufacturing, scheduling, delivery and implementation. iRobot will be responsible for all costs associated with any accepted changes. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules.

11.6 <u>Production Increases, Rescheduling Delivery</u>. iRobot may, in writing, request increases in production volume or acceleration of open Purchase Order at any time. If Kin Yat is unable to satisfy or comply with iRobot's requested increase in production volume within the requested time frame for delivery, Kin Yat will provide the reasons preventing Kin Yat from satisfying the requested increase within [***] after receipt of iRobot's request. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules. Kin Yat shall utilize its global supply network to assess availability of shared material across accounts to minimize instances in which Kin Yat is unable to meet an increase in a Purchase Order quantity requested by iRobot. It is further understood that iRobot will not incur additional chargers due to Kin Yat's decision to meet an accelerated delivery schedule or request for increased quantities by utilizing Generic Components from another account's material.

11.7 <u>Product Configuration Changes and Engineering Changes</u>. iRobot may request configuration or engineering changes to a Product in writing at any time. Kin Yat will analyze the request and determine if it can meet the requested changes within the required Lead-time. If Kin Yat can satisfy the requested change it will provide iRobot within [***] after receipt of the configuration or engineering request notice, a notice of acceptance of the requested changes. In the event that any requested change in the form, fit or function or Specification of any Product results in a significant increase in the cost of such Product, or in the length of time required for the manufacture or delivery thereof, then Kin Yat shall provide iRobot with a detailed cost analysis regarding such requested change using Open Book Pricing as contemplated under Section 9.1. Following iRobot's acknowledgment of such detailed cost analysis, the Parties will negotiate in good faith an equitable adjustment to the price of such Product and/or expected changes to the delivery schedule for such Product. If Kin Yat is unable to satisfy or comply with iRobot's requested changes within the requested time frame for delivery, Kin Yat will provide the reasons preventing Kin Yat from satisfying the requested increase within [***] after receipt of iRobot's request. Any such change shall be documented in writing and shall become effective only upon mutual written agreement of both Parties of the terms and conditions of such change, including changes in time required for performance, cost (including cost of materials on hand or on order in accordance with original Purchase Order) and applicable delivery schedules.

11.8 <u>Treatment of Obsolete/End-of-Life Material</u>. Upon receiving notice from iRobot of an engineering change or that any Product, component or assembly has become obsolete or has reached end-of-life, Kin Yat will, within a reasonable period after receiving such notice, provide iRobot with an analysis of iRobot's liability to Kin Yat for components and materials acquired or scheduled to be acquired to manufacture such Product. iRobot's liability shall include the price of finished Product and Kin Yat's costs (including cancellation fees and charges), plus applicable margin, of WIP, safety stock components and materials and components and materials on hand or on order within

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

18

applicable Lead-times. Kin Yat will use Commercially Reasonable Efforts to assist iRobot in minimizing iRobot's liability by taking the following steps:

• As soon as is commercially practical reduce or cancel Component and material orders to the extent contractually permitted.
• Return all Components and materials to the extent contractually permitted.
• Make all Commercially Reasonable Efforts to sell Components and materials to iRobot approved third parties.
• Assist iRobot to determine whether current WIP should be completed, scrapped or shipped to iRobot or its designee "as is".

11.9 Rescheduled Delivery out, reduction of quantity, and Cancellation of Orders. iRobot may request Kin Yat to reschedule the delivery date for any Product, decrease quantity on open Purchase Order, and cancel pending Purchase Orders in accordance with this Section. The charges to iRobot for deferring delivery of a Purchase Order, reducing quantity or cancellation of a Purchase Order are outlined below:

| Days Prior to Delivery Date | Reschedule Terms | Cancellation Liability |
|---|---|---|
| [***] Days | Kin Yat is not obligated to adhere to the request, but must consider each request in good faith. | iRobot may not cancel a Purchase Order to be delivered within [***] days of the applicable delivery date without payment to Kin Yat for the work incurred to date. |
| [***] Days from original delivery date | iRobot may reschedule out the delivery, reduce quantity or cancel the order. | Material on hand, non-cancelable and non-returnable materials, to the extent issued under a Material Authorization by iRobot, and applicable labor charges for WIP, provided, that such liability applies only to the extent that Kin Yat is unable to reallocate such material to any existing Purchase Order of iRobot, or, if authorized by iRobot, to a purchase order of another customer of Kin Yat. |

Notwithstanding anything to the contrary in this Agreement, any reschedule out of a delivery date, reduction of quantity and/or cancellation of a Purchase Order (in whole or in part) will not affect any Product Price.

**12 Logistics.** Kin Yat will maintain control over all Products while in Kin Yat's care, custody, and control. Kin Yats shall cooperate with iRobot and its suppliers and logistics services providers. Kin Yat will provide relevant and necessary information to iRobot relating to receipt, storing and shipment of Products. Kin Yat will coordinate with iRobot personnel, iRobot logistics services providers, and iRobot customers to execute the shipment of Products as instructed by iRobot.

12.1 Receiving. From time to time iRobot may ship Components, including batteries and Integrated Circuits (IC's, processors) directly to Kin Yat. Kin Yat will verify actual quantities and SKU's of such Components received as compared to the quantities and SKU's indicated on the shipping documents, process the Components into their inventory system, and notify iRobot of the quantity actually received by SKU. Kin Yat will also indicate any exceptions, at the time of reporting the receipt, as related to over, short or damage. The reporting of receipts and exceptions is made to iRobot.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

19

12.2 <u>Storage and maintenance of inventory</u>. All Products and Components will be stored in a manner to maintain inventory control and to prevent damage as instructed by iRobot reasonably. Kin Yat will maintain inventories and locations of iRobot Products and Components on their own perpetual inventory and/or warehouse management system. Kin Yat and iRobot will compare on a monthly basis all inventories, reconcile results and Kin Yat will cycle count the Components with the five highest variances.

12.3 <u>Physical inventory audit</u>.

12.3.1 On a [***] basis Kin Yat will arrange a cut-off date for and complete a physical inventory audit of all Consigned Components.  Because the [***] Components contain valuable intellectual property of iRobot, there is no shrinkage allowance for such Components. Variances will be identified and reported to Kin Yat by iRobot within [***] of the physical inventory. Within [***] of being notified of any such variance, Kin Yat shall provide iRobot a written report that, in iRobot's sole discretion, explains the variance, or iRobot will charge or deduct from its next payment for the unexplained variance. All other Consigned Components are subject to a shrinkage allowance of [***]% of the volume of such Component or Product received during the [***] period immediately prior to the physical inventory audit.

12.3.2 On a [***] basis Kin Yat will arrange a cut-off date for and complete a physical inventory audit of all finished Products that have passed the applicable quality inspections, but remain unshipped and in Kin Yat's possession at the end of such quarter. Kin Yat shall deliver such audit report to iRobot by the second business day immediately following the end of each iRobot Quarter End.

12.4 <u>Shipping to iRobot locations</u>. Most of the Products are designed to withstand a maximum of two pallet high floor storage. Components, including chips and batteries must be single stacked on the floor or stored in pallet racks. iRobot may direct Kin Yat to ship to specific iRobot locations and distributions centers such as, but not limited to, [***]. Incoterms for sale to iRobot are FCA Port (or airport) of Origin. iRobot will select the freight forwarder and communicate local contacts to Kin Yat. Based on selection of forwarder or ocean carrier, iRobot will specify the Port of Origin. iRobot will be responsible for paying the transportation costs from the origin port or airport to the destination, Kin Yat will arrange empty container delivery in accordance with the shipping schedule communicated to Kin Yat by iRobot. Upon receipt of container, Kin Yat will inspect the container for any signs of damages to flooring, any holes in the roof or side of the containers, and any sign of tampering with the latching device (tampering to include drilling out rivets and replacing the rivets with bolts). If the container has holes, damages or signs of tampering Kin Yat will request a replacement container. Products will be loaded on the container, floor stacked, in a manner to prevent damage and to fully utilize the container. Kin Yat shall adhere to any specific pallet configuration requested and provided by iRobot. If there is a requirement to ship on wooden pallets, then the pallets must meet the guidelines of ISPM15 and be appropriately marked, indicating the pallets meet the standards. iRobot will be responsible for the costs associated with purchasing these pallets. Containers must be sealed with a cargo seal that meets or exceeds ISO/PAS 17712:2006.

12.5 <u>Direct shipment to iRobot Customers</u>. From time to time, iRobot may direct Kin Yat to arrange for shipping directly to iRobot's customers in accordance with specific Incoterms identified by iRobot at that time. The container inspection requirements and pallet requirements under Section 12.4 shall apply to any shipments directly to iRobot's customers.

12.6 <u>Inventory losses and gains</u>. As Kin Yat is responsible for the care, custody and control of iRobot's products, risk will be balanced with responsibility in the following way. Physical inventories and cycle counts will be conducted as indicated above. During the first month after the first anniversary date of the contract and each subsequent anniversary date, the losses and gains of inventory, based on iRobot's perpetual inventory will be netted and a final loss or gain identified.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

20

**13 Duty to Mitigate Costs.** Both Parties shall, in good faith, undertake Commercially Reasonable Efforts to mitigate the costs of termination, expiration or cancellation. Kin Yat shall make Commercially Reasonable Efforts to cancel all applicable component and material purchase orders and reduce component inventory through return for credit programs or allocate such components and materials for alternate iRobot programs if applicable, or other customer orders provided the same can be used within [***] of the termination date.

**14 Term.** Unless earlier terminated as provided in Section 15 below, the term of this Agreement shall commence on the Effective Date and shall continue until the second anniversary of the Production Start Date (the "**Initial Term**"), and shall automatically renew for successive two-year terms (each, a "**Renewal Term**") unless (a) following the first Renewal Term, Kin Yat provides written notice to iRobot of its intent not to renew this Agreement within twelve (12) months prior to the end of the then existing Renewal Term, or (b) iRobot provides written notice to Kin Yat of its intent not to renew this Agreement within [***] prior to the end of the then existing Term.

**15 Termination.** This Agreement may be terminated as follows:

15.1 Termination for Cause. Either Party may terminate this Agreement based on the material breach by the other Party of the terms of this Agreement, provided that the Party alleged to be in material breach receives written notice setting forth the nature of the breach at least [***] prior to the intended termination date. During such time the Party in material breach may cure the alleged breach and if such breach is cured within such [***] period, no termination will occur and this Agreement will continue in accordance with its terms. If such breach shall not have been cured, termination shall occur upon the termination date set forth in such notice.

15.2 Termination for Bankruptcy/Insolvency. Upon the happening of any of the following events with respect to a Party, except as otherwise prohibited by the United States bankruptcy laws, this Agreement may be terminated immediately:

15.2.1 The appointment of a receiver or custodian to take possession of any or all of the assets of a Party, or should a Party make an assignment for the benefit of creditors, or should there be an attachment, execution, or other judicial seizure of all or a substantial portion of a Party's assets, and such attachment, execution or seizure is not discharged within [***].

15.2.2 A Party becomes a debtor, either voluntarily or involuntarily, under Title 11 of the United States Code or any other similar law and, in the case of an involuntary proceeding, such proceeding is not dismissed within [***] of the date of filing.

15.2.3 The dissolution or termination of the existence of a Party whether voluntarily, by operation of law or otherwise.

15.3 Termination Consequences.

15.3.1 If this Agreement is terminated for any reason, iRobot shall not be excused from performing its obligations under this Agreement with respect to payment for all monies due to Kin Yat hereunder including fees, costs and expenses incurred by Kin Yat up to and including the effective date of such termination in accordance with Section 15.3.3. The following Sections 3.8, 3.10.4, 4.5, 4.11.3, 4.13, 5, 6, 7, 8, 10, 13, 15.3, 15.4, 15.5, 16, 17.1, 17.2, 17.3, 17.4, 18, 19, 23, 25 and Schedule 4 shall survive the expiration, cancellation or termination of this Agreement.

15.3.2 All Purchase Orders issued prior to the effective date of the termination or expiration will be fulfilled pursuant to and subject to the terms of this Agreement, even if the delivery dates of Products under such Purchase Orders are after such effective date of expiration or termination.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

21

15.3.3 Within [***] of the effective date of the expiration or termination of this Agreement for any reason other than Kin Yat's material uncured breach, iRobot shall purchase at Kin Yat's cost any raw materials (including packaging materials) that Kin Yat has purchased exclusively for the production of Products for iRobot, WIP and finished Product that have not been shipped previously to iRobot. At its option iRobot may, in lieu of purchasing such raw materials at cost, place Purchase Orders with Kin Yat for additional Product under the terms of this Agreement in order to extinguish existing stocks of such raw materials. In the event that the Agreement terminates as a result of a material uncured breach by Kin Yat, iRobot shall be under no obligation to purchase any unused raw materials from Kin Yat. In the event that the Agreement terminates for any other reason, iRobot shall purchase from Kin Yat all Product inventory (including WIP and finished Product). Kin Yat shall accommodate last buy order from iRobot

15.3.4 Return of Product and Materials Supplied by iRobot. Upon the effective date of expiration or termination of this Agreement for any reason whatsoever, Kin Yat shall immediately deliver to iRobot or its designee all Product, Specifications, Components, packaging materials and other materials purchased by or on behalf of iRobot and all other materials or supplies provided by iRobot. Kin Yat shall also deliver to iRobot or its designee all Product produced hereunder, and shall invoice iRobot in accordance with the terms of Section 7.1.

15.4 Manufacturing Rights upon Termination. If Kin Yat ceases to manufacture and/or supply any Product due to any termination of this Agreement by iRobot pursuant to Sections 15.1 or 24, or if Kin Yat elects not to renew the Term pursuant to Section 14, then Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, worldwide, transferable, perpetual irrevocable license to all of its Intellectual Property Rights under the Technical Manufacturing Information - KIN YAT to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make Products and other versions of the Products. iRobot may sublicense these rights to third parties, provided any such third party complies with the terms of this license and any associated obligations of confidentiality. Upon iRobot's exercise of its rights under this Section 15.4, Kin Yat shall promptly provide to iRobot all information, including manufacturing know-how and other materials required to enable iRobot to independently manufacture, test and repair the Products.

15.5 Transition Assistance. Upon expiration or earlier termination of this Agreement, Kin Yat will support iRobot in making an orderly transition to a successor third party manufacturer during a period lasting no longer than [***] (the "**Transition Period**") at the expense of iRobot. During such Transition Period, (a) Kin Yat shall provide, in a timely and professional manner, services reasonably necessary to transition the Manufacturing Services to a successor third party manufacturer; and (b) all of the terms and conditions of this Agreement shall continue to be in full force and effect, including Manufacturer's obligations to continue providing the Manufacturing Services. In addition, Kin Yat shall provide such technical assistance to iRobot or its designated third party manufacturer, as iRobot may reasonably request in connection with such transition. At the end of such Transition Period, or upon iRobot's earlier request, Kin Yat shall deliver to iRobot, or to iRobot's agent all tooling, fixtures, Components, Products (including WIP), tangible embodiments of iRobot's Proprietary Information and Technology and all documentation and materials related to the Products at the expense of iRobot.

## 16    Confidentiality.

16.1  Both parties acknowledge that, by reason of their relationship, they may have access to certain information and/or materials concerning the business, plans, products, services and clients (including, but not limited to, information and materials contained in technical data) and including information necessary for the Services ("Confidential Information"), which is confidential and of substantial value and which value would be impaired if such information were disclosed to third parties. The parties agree that the handling of confidential information shall be pursuant to the Non-Disclosure Agreement, which is incorporated herein by reference.

16.2 Kin Yat agrees that it will have any personnel of Kin Yat providing Services execute a written Non-Disclosure Agreement ("NDA") substantially similar in nature and scope to and no less protective of the Company than the Non-Disclosure Agreement.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

16.3 Each Party represents and warrants to the other that it has adopted policies and procedures with respect to the receipt and disclosure of confidential or proprietary information, such as the Proprietary Information and Technology with its employees, agents and representatives. Each Party represents and warrants to the other Party that it will cause each of its employees, agents and representatives to maintain and protect the confidentiality of the other Party's Proprietary Information and Technology pursuant to the terms and conditions of the Non-Disclosure Agreement.

**17      Intellectual Property Rights.**

17.1 Intellectual Property - Existing by Kin Yat.

17.1.5 Except for the license rights granted to iRobot under this section 17.1.1, Kin Yat shall retain all right, title and ownership to any and all Intellectual Property - Existing by Kin Yat and all Intellectual Property Rights therein.

17.1.6 Kin Yat shall not incorporate any Intellectual Property - Existing by Kin Yat into any Products without iRobot's prior written approval. To the extent any Intellectual Property - Existing by Kin Yat is incorporated by or on behalf of Kin Yat within or used by or on behalf of Kin Yat in connection with any Product, Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, license under all of its Intellectual Property Rights in or to the Intellectual Property - Existing by Kin Yat to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make other versions of, the Product and the right to sublicense third parties (including but not limited to manufactures, system integrators, value added resellers, distributors and other resellers) for iRobot to use, sell, test, improve, support and distribute the Products and to otherwise manufacture and support discontinued Products; provided however, that no license to the Technical Manufacturing Information - KIN YAT shall be granted under this Section 17.1.2.

17.2 Kin Yat Created Intellectual Property - Created by Kin Yat.

17.2.1 Except for the license rights granted to iRobot under 17.1.1, Kin Yat shall retain all right, title and ownership to any and all Intellectual Property - Created by Kin Yat and all Intellectual Property Rights therein.

17.2.2 Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, irrevocable license under all of its Intellectual Property Rights in or to the Technical Manufacturing Information - KIN YAT developed under this Agreement that is unique to the Products for iRobot's internal use and the use by third party suppliers or manufacturers on behalf of iRobot to develop, design, improve, test and support the Products.
17.2.3  Any such unique Technical Manufacturing Information - KIN YAT will be used by Kin Yat solely for the design, development, testing and manufacturing of Products for iRobot.

17.3 iRobot Intellectual Property.  iRobot shall retain all right, title and ownership to any and all iRobot Intellectual Property and all Intellectual Property Rights therein.

17.4 Newly Created Intellectual Property.

17.4.1 The Newly Created Intellectual Property constitutes "works made for hire" for iRobot, and iRobot will be considered the author and will be the owner of the Newly Created Intellectual Property and all Intellectual Property Rights therein or related thereto. If any Newly Created Intellectual Property does not qualify for treatment as "works made for hire", or if Kin Yat retains any interest in any Newly Created Intellectual Property for any other reason, Kin Yat hereby grants, assigns and transfers, and will grant, assign and transfer, to iRobot all ownership and interest in such Newly Developed Intellectual Property, including without limitation any and all Intellectual Property Rights in and to any Newly Created Intellectual Property or that claim or cover any Newly Created Intellectual Property.  Kin Yat acknowledges that all personnel performing Manufacturing Services for iRobot under this Agreement have

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

executed appropriate agreements with Kin Yat so that Kin Yat may fulfill Kin Yat's obligations under this Section 17. Kin Yat agrees to execute any documents of assignment or registration requested by iRobot relating to any and all Newly Created Intellectual Property.  Kin Yat agrees to cooperate fully with iRobot, both during and after the engagement, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in or related to Newly Created Intellectual Property.

17.4.2 During the Term plus any period of support that may survive termination or expiration of this Agreement, Kin Yat agrees to inform iRobot of any Newly Created Intellectual Property.

17.5 <u>Trademark Usage</u>. Nothing in this Agreement gives either Party a right to use the other Party's Marks or implies the grant of any license from one Party to the other to use any Marks. Notwithstanding the foregoing, and subject to the terms and conditions of this Agreement, iRobot grants to Kin Yat a limited, non-exclusive, non-transferable, non-assignable, royalty-free license during the Term to reproduce any Mark set forth on Schedule 4, or otherwise designated in writing by iRobot (**"iRobot Marks"**) solely for the purpose placing such Marks on Products sold to iRobot and any applicable packaging, and for no other business or non-business purposes whatsoever and no other goods or services whatsoever, in accordance with the following:

17.5.1 All reproductions of iRobot Marks must be approved in writing by iRobot and must be in accordance with iRobot's then current Trademark Usage Guidelines (**"Mark Guidelines"**), a copy of which is included in Schedule 4;

17.5.2 Kin Yat may not combine any iRobot Marks with, or create a composite mark using any iRobot Mark with, a trademark of Kin Yat or any third party, or use any of the iRobot Marks or any part thereof as part of its corporate name, or use any name or mark confusingly similar to any of the iRobot Marks;

17.5.3 No other rights or licenses, except that expressed in this Section 17.5 are granted to Kin Yat in and to any iRobot Mark, whether expressly, by implication, by estoppel, or otherwise;

17.5.4 As between iRobot and Kin Yat, the iRobot Marks are and shall remain the sole and exclusive property of iRobot and Kin Yat shall not acquire any right, title or interest in or to any iRobot Mark as a result of this Agreement (other than the limited license expressly granted in this Section 17.5) and all use of the iRobot Marks by Kin Yat and all goodwill generated thereby shall inure solely to the benefit of iRobot;

17.5.5 Kin Yat admits the validity of, and agrees not to challenge the iRobot Marks;

17.5.6 If any application for registration is or has been filed in any country by Kin Yat which relates to any name or mark which, in the sole opinion of iRobot, is confusingly similar, deceptive or misleading with respect to any of the iRobot Marks, Kin Yat shall immediately abandon any such application or registration or at iRobot's sole discretion, assign it to iRobot, and reimburse iRobot for all costs and expenses of any opposition, cancellation or related legal proceedings, including attorney's fees, instigated by iRobot or its authorized representative, in connection with any such registration or application; and

17.5.7 Upon any notice from iRobot that Kin Yat's use of the iRobot's Marks fails to conform with the Mark Guidelines, or any other provision of this Section 17.5, Kin Yat shall cease use of the iRobot Marks, until such failure has been corrected to the satisfaction of iRobot.

17.6 <u>Kin Yat Marks</u>. Kin Yat agrees and warrants that it will not use any Kin Yat or third party Mark (excluding authorized Marks of the iRobot) on any Product, packaging materials or documentation without iRobot's prior written authorization.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

17.7 <u>Grant of License to iRobot Intellectual Property</u>. In addition to Clause 17.5, iRobot hereby grants to Kin Yat a limited, non-exclusive, non-transferable, non-assignable, non-sublicensable and royalty-free right and license to use iRobot Intellectual Property, Proprietary Information and Technology and specifications solely for the purpose of performing its obligations under this Agreement, including manufacturing Products pursuant to this Agreement and supplying such Products only to iRobot. Such limited right and license shall extend to no other materials or for any other purpose and shall terminate automatically upon expiration or termination of the relevant Purchase Order or this Agreement for any reason.

**18 Manufacturing Services for Competitive Products.** In order to protect the iRobot's Proprietary Information and Technology, during the Term of this Agreement and for a period of [***] following the termination of this Agreement for any reason, Kin Yat will not, without the iRobot's express written consent, engage in any design, development, manufacturing, testing, configuring, assembling, packaging, shipping and/or selling of any product that is or is intended to be, directly or indirectly competitive with any of the Products, including, without limitation, any robotic floor care product.

**19 Indemnification**.

19.1 <u>Kin Yat's Indemnity Obligations</u>. Kin Yat shall indemnify, defend and hold iRobot and its employees, Subsidiaries, Affiliates, successors and assigns ("**iRobot Indemnified Parties**") harmless from and against any and all losses, liabilities, damages (including consequential, special and/or punitive damages), claims, expenses, suits, recoveries, judgments and fines (including reasonable attorneys' fees and expenses) (collectively "**Losses**") that may be incurred by any iRobot Indemnified Party arising out of (a) any damage to property or injury or death occurring to any person arising out of any failure by Kin Yat to provide Product in conformance with the Specifications; (b) any injury to person or property or death occurring to any Kin Yat employees, subcontractors, agents or any other individuals on Kin Yat's premises, except to the extent such injury to person or property or death was caused by the presence of iRobot's employees or agents on Kin Yat's premises; (c) any claim, action or proceeding brought by any governmental authority arising out of or resulting from the Manufacturing Services for Product that does not conform to the Specifications; (d) any breach by Kin Yat of any of its respective obligations, representations or warranties under this Agreement, including a breach which results in a recall of Product as contemplated under Section 4; (e) any other grossly negligent or willful act or omission on the part of Kin Yat; (f) the operation, ownership or control of the facilities of Kin Yat, its Affiliates or its subcontractors or the manufacturing, generation, processing, storage, transportation, distribution, treatment, disposal or other handling of the Products or materials used in the manufacture and packaging of the Products, or associated by-product, raw materials, intermediates, wastes, hazardous materials, emissions, releases, spills, leaks or discharges, or returned Products, Kin Yat, Affiliates of Kin Yat, or subcontractors of Kin Yat or its Affiliates, or their officers, directors, employees, agents or contractors; (g) any claim relating to the infringement of patent or other intellectual property rights relating to the manufacturing process employed by Kin Yat in performing the Manufacturing Services for Products or that Kin Yat asserts as owning in connection with the manufacturing of the Product or (h) violation of any applicable law, regulation, or rule in connection with the Manufacturing Services for Products hereunder, provided that the indemnity under this Section 19.1 shall not apply if any Loss is caused by (1) Kin Yat's use of materials, trademarks and symbols supplied by iRobot, Kin Yat's reliance upon the Specifications, iRobot Intellectual Property, iRobot's Proprietary Information and Technology and/or the Packaging and Shipping Specifications in accordance with the terms of this Agreement, or (2) defects in design or product liability caused by iRobot or its agents, or (3) the gross negligence or willful misconduct of iRobot.

19.2 <u>iRobot's Indemnity Obligations</u>. Except to the extent subject to Kin Yat's indemnification of iRobot as provided in Section 19.1, iRobot shall indemnify, defend and hold Kin Yat and its employees, Subsidiaries, Affiliates, successors and assigns ("**Kin Yat Indemnified Parties**") harmless from and against any and all Losses, arising from any third party claims asserted against any Kin Yat Indemnified Party, to the extent based on any of the following: (a) making, using or selling the Product, proper and authorized use of the Specifications, iRobot Intellectual Property, Packaging and Shipping Specifications, Proprietary Information and Technology of iRobot, any Product, or any

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25

information, technology and processes supplied and/or approved by iRobot or otherwise required by iRobot of Kin Yat, in connection with Kin Yat's performance of its obligations under this Agreement; (b) any recall or actual noncompliance with Materials Declaration Requirements; (c) that Kin Yat's use of any item in subsection (a) in connection with performing its obligations under this Agreement infringes any patent, copyright or other intellectual property right of a third party, (d) performance of the Manufacturing Services in accordance with the Product Specifications, and (e) any other grossly negligent or willful act or omission on the part of iRobot.

19.3 <u>Indemnification Procedures</u>. Any Person that may be entitled to indemnification under this Agreement shall give the other Party prompt notice of any claim and cooperate with the indemnifying Party at its expense. The Indemnifying party shall have the right to assume the defense (at its own expense) of any such claim through counsel of its own choosing by so notifying the Party seeking indemnification within [***] of the first receipt of such notice. The Party seeking indemnification shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying party. The Indemnifying party shall not, without the prior written consent of the indemnified party, agree to the settlement, compromise or discharge claim.

**20** **Relationship of Parties.** Kin Yat shall perform its obligations hereunder as an independent contractor. Nothing contained herein shall be construed to imply a partnership or joint venture relationship between the Parties. The Parties shall not be entitled to create any obligations on behalf of the other Party, except as expressly contemplated by this Agreement. The Parties will not enter into any contracts with third parties in the name of the other Party without the prior written consent of the other Party.

**21** **Insurance.** During the Term and at all times that Kin Yat performs work for iRobot, Kin Yat will maintain in full force and effect, at Kin Yat's own expense, for the benefit of both Kin Yat and iRobot, insurance coverage to include:

21.1 Kin Yat shall maintain for the term of this Agreement, at its own expense: a comprehensive or commercial general liability policy including contractual liability products/completed operation and broad form property damage coverage, affording protection on an occurrence basis for claims arising out of bodily injury, death, and property damage, and having limits of not less than; a combined single limit of $[***] per occurrence with a $[***] aggregate limit of liability and (ii) Worker's Compensation insurance as required by the laws of the state, province, country or similar authority(ies) where the services will be performed (iii) Commercial Automobile Liability Insurance - bodily injury and property damage combined single limit of RMB[***]. Such comprehensive or commercial general liability policy insurance shall name iRobot as an additional insured and may not be canceled or changed without at least [***] prior written notice to iRobot. Prior to the commencement of Services, Kin Yat shall provide a certificate of insurance to iRobot evidencing these requirements and shall provide updated certificates as applicable. Kin Yat shall also be liable to maintain, at its sole expense, travel insurance coverage and any legally mandated health insurance.

21.2 <u>Additional Requirements</u>. All deductibles on policies providing coverage will be paid by Kin Yat. In the event Kin Yat is self-insured for matters described above, Kin Yat agrees to respond to any claims or losses made against or incurred by iRobot in the same fashion as if insurance had been purchased. In no event will the coverage or limits of any insurance required under this Section 21, or the lack or unavailability of any other insurance, be deemed to limit or diminish either Party's obligations or liability to the other Party under this Agreement, including but not limited to, each Party's indemnification obligations as set forth in Section 19. Kin Yat will obtain the necessary insurance within [***] of the Effective Date.

**22** **Business Continuity Plan.**

22.1 <u>Risk Management and Continuity Plans</u>. Kin Yat will develop and keep current a formal business continuity plan detailing Kin Yat's plans, procedures and designated resources for timely response to and recovery from potential civil, natural, and physical plant disasters that could reasonably be expected to disrupt production and delivery to iRobot ("**Business Continuity Plan**"). Upon request, Kin Yat will make such plan available to iRobot or its designated representative for review.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

22.2 <u>Notification</u>. Kin Yat agrees to notify iRobot as soon as possible in the event of a crisis that disrupts manufacturing or delivery of Products. Unless authorized in advance in writing by iRobot, Kin Yat will not refer to iRobot in public and media communications about the crisis and subsequent recovery.

22.3 <u>Loss Control</u>. Kin Yat will be responsible for maintaining its facilities and operations in accordance with applicable fire protection and loss control laws, regulations and industry standards.

23 **Publicity.** Without the written consent of the other Party, neither Party shall refer to this Agreement in any publicity or advertising or disclose to any third party any of the terms of this Agreement. Notwithstanding the foregoing, neither Party will be prevented from, at any time, furnishing any information to any governmental or regulatory authority, including the United States Securities and Exchange Commission or any other foreign stock exchange regulatory authority, that it is by law, regulation, rule or other legal process obligated to disclose, so long as the other Party is given advance written notice of such disclosure pursuant to Section 2.4 of the Non-Disclosure Agreement. In addition, a Party may disclose the existence of this Agreement and its terms to its attorneys and accountants, suppliers, customers and others only to the extent necessary to perform its obligations and enforce its rights hereunder, and to existing and prospective investors and/or acquirers that are contemplating a potential investment in or acquisition of such Party, provided, however, that any and all such suppliers, customers, investors, acquirers and advisers are bound by agreements or, in the case of professional advisers, ethical duties, to treat, hold and maintain such information in accordance with the terms and conditions of the Non-Disclosure Agreement.

24 **Force Majeure.**

24.1 Subject to Section 24.2.2 below, neither Party shall be liable for any failure or delay in the performance of its obligations under this Agreement to the extent such failure or delay is due to causes beyond such party's reasonable control, including but not limited to, acts of God, acts of civil or military authority, legal restrictions, fires, explosion, embargo, mobilization, riot, epidemics, and to the extent the following are on a national basis, strikes, industrial disturbances, shortage of material, electricity, oil or transport, or restriction in the use of power. Events set forth above are referred to individually and collectively as "<u>Force Majeure Events</u>." The Parties expressly acknowledge that Force Majeure Events do not include vandalism, or the non-performance of third parties or subcontractors relied on for the delivery of the Manufacturing Services, unless such failure or non-performance by a third party or subcontractor is itself caused by a Force Majeure Event, as defined above. Upon the occurrence of a Force Majeure Event, the non-performing Party shall be excused from any further performance or observance of the affected obligation(s) for as long as such circumstances prevail, and such Party continues to attempt to recommence performance or observance to the greatest extent possible without delay.

24.2 Notwithstanding any other provision of this Section 24, a Force Majeure Event shall obligate and require Kin Yat to commence and successfully implement all of the Manufacturing Services relating to disaster recovery set forth in its Business Continuity Plan within the time period described therein. If a Force Majeure Event causes a material failure or delay in the performance of any Manufacturing Services for more than [***] consecutive days, iRobot may, at its option, and in addition to any other rights iRobot may have, procure such Manufacturing Services from an alternate source until Kin Yat is again able to provide such Manufacturing Services. iRobot shall continue to pay Kin Yat the charges due and payable hereunder during such period, but Kin Yat shall not be entitled to any additional payments as a result of the Force Majeure Event. If a Force Majeure Event causes a material failure or delay in the performance of any Manufacturing Services under this Agreement for more than [***] consecutive days, iRobot may, at its option, and in addition to any other rights iRobot may have, immediately terminate this Agreement without liability to Kin Yat.

25 **Miscellaneous.**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.1 <u>Notices</u>. All notices, demands and other communications made hereunder shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), by facsimile or EDI (with telephone confirmation) addressed to the respective Parties at the following addresses:

|  |  |
|---|---|
| Notice to Kin Yat: | Kin Yat Industrial Company Limited<br>7th Floor Galaxy Factory Building<br>25-27 Luk Hop Street<br>San Po Kong, Kowloon<br>Hong Kong<br>Facsimile: (852) 2351 1867<br>Attn: Mr. Vincent Fung |
| <u>with a copy to:</u> | Kin Yat Holdings Limited<br>25-27 Luk Hop Street<br>San Po Kong, Kowloon<br>Hong Kong<br>Facsimile: (852) 2351 1867<br>Attn: General Counsel |
| Notice to iRobot: | iRobot Corporation<br>8 Crosby Drive<br>Bedford, MA 01730<br>Facsimile: (781) 430-3001<br>Attn: General Counsel |

25.2 <u>Expenses and Costs</u>. Each Party shall pay their own expenses in connection with the negotiation of this Agreement. All fees and expenses incurred in connection with the resolution of Disputes shall be allocated as further provided in Section 25.15 below.

25.3 <u>Amendment</u>. No course of dealing between the Parties hereto shall be effective to amend, modify, or change any provision of this Agreement. This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Party against whom such change is to be enforced. The Parties may, subject to the provisions of this Section 25.3, from time to time, enter into supplemental written agreements for the purpose of adding any provisions to this Agreement or changing in any manner the rights and obligations of the Parties under this Agreement or any Schedule hereto. Any such supplemental written agreement executed by the Parties shall be binding upon the Parties.

25.4 <u>Partial Invalidity</u>. Whenever possible, each provision of this Agreement shall be interpreted in such a way as to be effective and valid under applicable law. If a provision is prohibited by or invalid under applicable law, it shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

25.5 <u>Monies</u>. All references to monies in this Agreement shall be deemed to mean lawful monies of the United States of America.

25.6 <u>Entire Agreement</u>. This Agreement, the Schedules and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the Parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements and negotiations by and between the Parties. Each Party acknowledges and agrees that no agreements, representations, warranties or collateral promises or inducements have been made by any Party to this Agreement except as expressly set forth herein or in the Schedules and any addenda

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

28

attached hereto or referenced herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement. These acknowledgments and agreements are contractual and not mere recitals. In the event of any inconsistency between the provisions of this Agreement and any Schedule and any addenda attached hereto or referenced herein, the provisions of this Agreement shall prevail unless expressly stipulated otherwise, in writing executed by the Parties. Pre-printed language on each Party's forms, including purchase orders, that conflict with the terms and conditions of this Agreement, are shall not constitute part of this Agreement and shall be deemed unenforceable.

25.7 <u>Binding Effect</u>. This Agreement shall be binding on the Parties and their successors and assigns; provided, however, that Kin Yat shall not assign, delegate or transfer, in whole or in part, this Agreement or any of its rights or obligations arising hereunder, without the prior written consent of iRobot. Any purported assignment without such consent shall be null and void.

25.8 <u>Anti-Corruption Laws.</u> Kin Yat represents that it has a copy of, and is familiar with, the United States Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2 (the "<u>FCPA</u>"), and the purposes of the FCPA, including the FCPA's prohibition of the payment or the gift of any item of value, either directly or indirectly, by or on behalf of a company organized under the laws of the United States of America or any of its states to an official, employee, or officer of, or person acting in an official capacity for, a government or international organization for the purpose of influencing any action or decision, or inducing him to use his influence with the government or organization in a manner contrary to his position or creating an improper advantage to assist a company in obtaining or retaining business for, with, or in that country or organization or directing business to any person. Kin Yat represents and warrants that it will take no action that would constitute a violation of the FCPA or any law. Moreover, Kin Yat represents and warrants that no government official is a principal, owner, officer, employee or agent of any entity in which Kin Yat has an interest, and no government official has any material financial interest in the business of Kin Yat. Further, Kin Yat represents and warrants that Kin Yat and its Affiliates do and shall comply with all applicable legal requirements and iRobot's policies against corrupt business practices, against money laundering and against facilitating or supporting persons who conspire to commit crimes or acts of terror against any person or government. Kin Yat agrees that it will notify iRobot in writing immediately of the occurrence of any event, which renders the foregoing representations and warranties of this paragraph incorrect.

25.9 <u>Child/Forced Prison Labor Laws</u>. Kin Yat, by signing this agreement, represents and warrants that it and its subcontractors/suppliers will comply with all applicable local government regulations regarding minimum wage, living conditions, overtime, working conditions, child labor laws and the applicable labor and environmental laws. Kin Yat further represents and warrants that it and its subcontractors/suppliers do not use any form of forced prison labor and/or child labor under the age of 15 or the minimum age required by local government, whichever is older.

25.10 <u>Waiver</u>. Waiver by either Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any other provision of this Agreement.

25.11 <u>Captions</u>. The captions contained in this Agreement are inserted only as a matter of convenience or reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions.

25.12 <u>Construction</u>. Since both Parties have engaged in the drafting of this Agreement, no presumption of construction against any Party shall apply.

25.13 <u>Section References</u>. All references to Sections or Schedules shall be deemed to be references to Sections of this Agreement and Schedules attached to this Agreement, except to the extent that any such reference specifically refers to another document. All references to Sections shall be deemed to also refer to all subsections of such Sections, if any.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

29

25.14 <u>Business Day</u>. If any time period set forth in this Agreement expires upon a Saturday, Sunday or U.S. national, legal or bank holiday, such period shall be extended to and through the next succeeding business day.

25.15 <u>Dispute Resolution</u>.

25.15.1 Kin Yat and iRobot mutually agree to the settlement by arbitration of all claims or controversies each party may have against the other relating in any manner whatsoever to this Agreement or its terms. Except for the right to obtain provisional remedies or interim relief, which right is preserved without any waiver of the right to arbitration, arbitration under this Agreement shall be the exclusive remedy for all such arbitrable claims. Kin Yat and iRobot also agree that arbitration shall be held in Boston, Massachusetts if such arbitration is sought by Kin Yat and in Hong Kong if such arbitration is sought by iRobot, and shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitrator(s) shall have the authority to award or grant both legal, equitable and declaratory relief. Such arbitration shall be final and binding on the parties.

25.15.2 Kin Yat and iRobot agree that in the event that any action, either civil or arbitral is brought to enforce this Agreement by either Kin Yat or iRobot, the prevailing party shall be entitled to an award of all reasonable attorneys' fees and legal costs, in addition to other relief.

25.15.3 The Parties agree that the existence, conduct and content of any negotiation or arbitration pursuant to this Section 25.15 shall be kept confidential and no Party shall disclose to any Person any information about such negotiation or arbitration, except as set forth in Section 16 or 23.

25.15.4 IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES, WHETHER IT RESULTS IN PROCEEDINGS IN ANY COURT IN ANY JURISDICTION OR IN ARBITRATION, THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY, AND HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL, WAIVE ALL RIGHTS TO TRIAL BY JURY, AND AGREE THAT ANY AND ALL MATTERS SHALL BE DECIDED BY A JUDGE OR ARBITRATOR WITHOUT A JURY TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.

25.15.5 Notwithstanding anything contained in this Section 25.15 to the contrary, in the event that either Party is seeking temporary or preliminary injunctive relief, including any action for equitable relief, such Party may proceed in the Massachusetts Courts without prior negotiation or arbitration for the limited purpose of avoiding immediate and irreparable harm.

25.16 <u>Insider Trading</u>. Kin Yat will not, and will cause its Affiliates and Subsidiaries to not, transact in any securities of iRobot based on the manufacture of any Product under this Agreement or any Proprietary Information and Technology of the iRobot or from communicating any such information to any other Person in connection with the trading of such securities.

25.17 <u>Other Documents</u>. The Parties shall take all such actions and execute all such documents that may be necessary to carry out the purposes of this Agreement, whether or not specifically provided for in this Agreement.

25.18 <u>Counterparts</u>. This Agreement may be executed by facsimile and delivered in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one agreement.

25.19 <u>Even-Handed Construction</u>. The terms and conditions as set forth in this Agreement have been arrived at by sophisticated parties with equal bargaining power, each having an opportunity to consult with counsel, after mutual negotiation, and it is the intention of the Parties that its terms and conditions not be construed against any Party merely because it was prepared by one of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.20 <u>Governing Law and Jurisdiction</u>. All disputes, claims or controversies arising out of this Agreement, or the interpretation, negotiation, validity or performance of this Agreement, or the transactions contemplated hereby shall be governed by the laws of the State of New York, without application of conflicts of law principles. The provisions of the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

**IROBOT CORPORATION**                                    **KIN YAT INDUSTRIAL COMPANY LIMITED**

By:     /s/ Alison Dean                                    By:     /s/ Vincent Fung
        Signature                                                  Signature

Name:   Alison Dean                                        Name:   Vincent Fung
        (Print)                                                    (Print)

Title:  CFO                                                Title:  Director

Date:   1/22/14 *                                          Date:   Feb.10.2014
        * agreed to be effective as of 9/23/13

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 1**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**STATEMENT OF WORK**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 2**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**

**FEE AND PRICE (FINAL QUOTE)**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 3**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**QUALITY AND TEST PROCEDURES**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 4**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**NON-DISCLOSURE AGREEMENT**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 5**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**TRADEMARK USAGE GUIDELINES**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 6**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND IROBOT**


**IROBOT QUARTER END**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Amendment # 1 to Manufacturing Services Agreement Between: iRobot Corporation and Kin Yat Industrial Co. Ltd

**PARTIES**

(1)     **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA ("Buyer").

(2)     **Kin Yat Industrial Co. Ltd.,** a Hong Kong Company having its place of business at 7/F Galaxy Factory Building, 25-27 Luk Hop Steet, San Po Kong, Kowloon, Hong Kong (hereinafter referred to as ("Seller")

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated 23rd September, 2013 (the "Agreement").

**WHEREAS,** pursuant to clause 25.3 of the Agreement, the Parties wish to amend the Agreement;

For good and valuable consideration, Effective as of **(6 August 2014),** the following amendments are hereby agreed:

*Clause 7.3 will be replaced in its entirety with the following:*

Disputed Invoices. If a Kin Yat invoice does not meet the invoicing requirements of this Agreement, or iRobot in good faith disputes any invoiced charges, iRobot will notify Kin Yat of the disputed items in writing on or before the payment due date and may withhold payment of the disputed charges pending resolution of the dispute. With the exclusion of events beyond Kin Yat's control, such as quality related issues, late delivery or short shipment, any lack of timely payment by Kin Yat to any Supplier listed in Schedule 7, attached, will result in a deduction of the identical amount to any outstanding receivable of Kin Yat under this agreement.

If any conflict or inconsistency occurs between this Amendment and the Agreement, the provisions of this Amendment shall prevail. The remainder of the Agreement shall remain in full force and effect, unamended.

Signed by a duly authorised director or officer for and on behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |

Signed by a duly authorised director or officer for and on behalf of Kin Yat Industrial Co. Ltd

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Executive Director | /s/ Vincent Fung |

**SCHEDULE 7**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN KIN YAT AND IROBOT**


**SUPPLIERS**


**JABIL CIRCUIT, INC.**

Amendment #2 to Master Supplier Agreement Between:
iRobot Corporation and Kin Yat Industrial Company, Ltd.

**Parties**

**iRobot Corporation**, a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

**Kin Yat Industrial Company, Ltd.**, a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong.

**WHEREAS**, the Parties executed the Master Supplier Agreement dated September 23, 2013 ("the Agreement").

**WHEREAS**, pursuant to Section 25.3 of the Agreement, the Parties wish to amend the Agreement as follows:

For good and valuable consideration, Effective as of June 1, 2015, the following amendments are hereby agreed:

Section 3.6.1 in the Agreement will be replaced in its entirety with the following:

3.6.1 Kin Yat will use Commercially Reasonable Efforts to procure Assigned Components from the applicable designated supplier per iRobot's AVL and Generic Components per iRobot's BOM, where applicable, and otherwise from suppliers chosen by Kin Yat and approved by iRobot, in amounts necessary to fulfill Purchase Orders and to procure under Material Authorizations. Kin Yat will be responsible for adherence to the Product Specifications in the assembly and manufacturing process. iRobot will be responsible for managing the pipeline of iRobot controlled Consigned Components. Kin Yat will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Kin Yat to the extent empowered by Company through its Material Authorizations and Purchase Orders. Company authorizes Kin Yat to procure Generic Components and Assigned Components necessary, without a Purchase Order from agreed upon distributors/suppliers, by issuing a written authorization to purchase such Components ("Material Authorization"), to meet specific Forecast or Purchase Order demand as well as any coverage which may be needed for NCNR and Long-Lead Components. In the event of schedule changes, Kin Yat will use Commercially Reasonable Efforts to cancel all applicable material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. iRobot retains all liability for materials and parts Kin Yat cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Kin Yat acting on iRobot's Material Authorization or Purchase Order. Kin Yat's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components regardless of classification, except for non-cancel/nonreturnable (NCNR) Components.

If any conflict or inconsistency occurs between the Amendment and the Master Supplier Agreement, the provisions of this Amendment shall prevail. The remainder of the Master Supplier Agreement shall remain in full force and effect, unamended.

Signed by a duly authorised director or officer for and on behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |
| *Date:* | | |

Signed by a duly authorised director or officer for and on behalf of Kin Yat Industrial Co. Ltd

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | July 6, 2015 | |

**Amendment #3 to Manufacturing Services Agreement Between:**
**iRobot Corporation and Kin Yat Industrial Company Ltd.**

**Parties**

(1)    **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

(2)    **Kin Yat Industrial Company Ltd.,** a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated September 23, 2013 (the "Agreement").

**WHEREAS,** pursuant to section 25.3 of the Agreement, the Parties wish to amend the Agreement and update the Parties to the Agreement as follows:

**Parties:** The name of **iRobot Corporation** shall remain **iRobot Corporation** ("iRobot"). iRobot is a Delaware corporation having its principal office in 8 Crosby Drive Bedford MA. The name of **Kin Yat Industrial Company Ltd.** is hereby changed to **Kin Yat (HK) Holdings Limited ("Kin Yat"),** including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company Limited.** Kin Yat's principal office is located at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong.

All references to "iRobot" in Sections 3, 4.10, 4.12, 5, 7, 11, and 12 will also include Guangzhou iRobot Robot Technology Consulting Company Limited ("Guangzhou iRobot"). For avoidance of doubt, Guangzhou iRobot shall have the right and ability to purchase Product from Kin Yat, Kin Yat (Guizhou) Robot Company Limited, and from any Subsidiary of Kin Yat, issue Purchase Orders for Product under this Agreement, and enforce all related rights as if it were iRobot. Kin Yat agrees to indemnify, defend and hold harmless iRobot and its subsidiaries in accordance with the provisions under Section 19 of the Agreement. iRobot as the holding company of Guangzhou iRobot hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by Guangzhou iRobot of all of its obligations, and shall assume all liabilities of Guangzhou iRobot in accordance with the provisions of the Agreement set forth above. Kin Yat hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by its subsidiaries of all their obligations, and shall assume all liabilities of its subsidiaries, in accordance with the provisions of the Agreement with respect to its provision of manufacturing services and Additional Services under the Agreement.

If any conflict or inconsistency occurs between the Amendment and the Manufacturing Services Agreement, the provisions of this Amendment shall prevail. The remainder of the Manufacturing Services Agreement shall remain in full force and effect, unamended.

All parties below acknowledge and confirm the terms and conditions of the Agreement and this Amendment and agree to be bound by the terms and conditions of this Amendment.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

*Print full name:*      Oscar Zamorano                          *Signature:*

*Position:*             SVP Operations & Supply Chain           /s/ Oscar Zamorano

*Date:*                 Oct. 24, 2016

Signed by a duly authorised director or officer for and on
behalf of Guangzhou iRobot Robot Technology Consulting
Company Limited

| | | |
|---|---|---|
| *Print full name:* | Philip Li | *Signature:* |
| *Position:* | General Manager of Far East | /s/ Philip Li |
| *Date:* | Oct. 24, 2016 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat Industrial Company Ltd.

| | | |
|---|---|---|
| *Print full name:* | FUNG Wah Cheong, Vincent | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | Oct. 20, 2016 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat (HK) Holdings Limited

| | | |
|---|---|---|
| *Print full name:* | FUNG Wah Cheong, Vincent | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | Oct. 20, 2016 | |

**Amendment #4 to Manufacturing Services Agreement Between: iRobot Corporation and Kin Yat Industrial Company, Limited n/k/a Kin Yat (HK) Holdings Limited**

**Parties:**

(1)     **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

(2)     **Kin Yat (HK) Holdings Limited,** including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company limited ("Kin Yat"),** a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated September 23, 2013 as amendment by Amendment No. 1 dated August 6, 2014 and as amended by Amendment No. 2 dated June 1, 2015 and as amended by Amendment No. 3 dated October 20, 2016 (the "Agreement").

**WHEREAS,** for good and valuable consideration, the Parties hereby acknowledge and agree effective as of March 24, 2017, that pursuant to section 25.3 of the Agreement, the Parties wish to amend the Agreement as follows:

Replace Section 7 Delivery. Risk of Loss and Payment Terms as follows:

**7 Delivery, Risk of Loss and Payment Terms.** For purposes of this Agreement terms of sale for Product shipments shall be:

For export shipments title and risk of loss for Product will pass to iRobot (or to iRobot's designee invoiced by Kin Yat) FCA Port of Origin (per Intercoms 2010). For any shipments where Kin Yat acts as an agent in completing the Shipper's Export Declaration and managing iRobot's exports on behalf of iRobot, where iRobot is the exporter of record (Principal Party in Interest - PPI), iRobot hereby grants Kin Yat a limited Power of Attorney to act on its behalf in managing its exports.

For domestic (mainland China) shipments, ownership of Product, delivery cost, and guarantee rests with Kin Yat until delivery at iRobot's distributor's assigned warehouse. Delivery for domestic shipments is DAP-iRobot distributor assigned warehouses. Said iRobot distributor assigned warehouse will be outlined on each individual P.O. issued. Once Product is delivered to iRobot's distributor's assigned warehouse, ownership of Product, delivery cost, and guarantee all transfer to iRobot's distributor.

For clarity, sections 7.1- 7.4 remain as written.

If any conflict or inconsistency occurs between this Amendment and the Manufacturing Services Agreement, the provisions of this Amendment shall prevail. The remainder of the Manufacturing Services Agreement shall remain in full force and effect, unamended.

All parties below acknowledge and confirm the terms and conditions of the Agreement and this

Amendment and agree to be bound by the terms and conditions of this Amendment.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamarano |
| *Date:* | March 23, 2017 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat (HK) Holdings Limited

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | March 23, 2017 | |

**Exhibit 10.18**

# IROBOT CORPORATION

# 2017 EMPLOYEE STOCK PURCHASE PLAN

The purpose of the iRobot Corporation 2017 Employee Stock Purchase Plan ("the Plan") is to provide eligible employees of iRobot Corporation (the "Company") and each Designated Subsidiary (as defined in Section 11) with opportunities to purchase shares of the Company's common stock, par value $0.01 per share (the "Common Stock"). An aggregate of 700,000 shares of Common Stock have been approved and reserved for this purpose.

The Plan includes two components: a Code Section 423 Component (the "423 Component") and a non-Code Section 423 Component (the "Non-423 Component"). It is intended for the 423 Component to constitute an "employee stock purchase plan" within the meaning of Section 423(b) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") and the 423 Component shall be interpreted in accordance with that intent (although the Company makes no undertaking or representation to maintain such qualification). In addition, this Plan authorizes the grant of options under the Non-423 Component that does not qualify as an "employee stock purchase plan" under Section 423 of the Code. Except as otherwise provided herein, the Non-423 Component will operate and be administered in the same manner as the 423 Component.

1. <u>Administration</u>. The Plan will be administered by the person or persons (the "Administrator") appointed by the Company's Board of Directors (the "Board") for such purpose. The Administrator has authority at any time to: (i) adopt, alter and repeal such rules, guidelines and practices for the administration of the Plan and for its own acts and proceedings as it shall deem advisable; (ii) interpret the terms and provisions of the Plan; (iii) make all

1

determinations it deems advisable for the administration of the Plan; (iv) decide all disputes arising in connection with the Plan; and (v) otherwise supervise the administration of the Plan. All interpretations and decisions of the Administrator shall be binding on all persons, including the Company and the Participants. No member of the Board or individual exercising administrative authority with respect to the Plan shall be liable for any action or determination made in good faith with respect to the Plan or any option granted hereunder.

2. Offerings. The Company will make one or more offerings to eligible employees to purchase Common Stock under the Plan ("Offerings"). Unless otherwise determined by the Administrator, the initial Offering will begin on June 15, 2017 and will end on the following November 14th (the "Initial Offering"). Thereafter, unless otherwise determined by the Administrator, an Offering will begin on the first business day occurring on or after each November 15th and May 15th and will end on the last business day occurring on or before the following May 14th and November 14th, respectively. The Administrator may, in its discretion, designate a different period for any Offering, provided that no Offering shall exceed six months in duration or overlap any other Offering.

3. Eligibility. All individuals classified as employees on the payroll records of the Company and each Designated Subsidiary are eligible to participate in any one or more of the Offerings under the Plan, provided that as of the first day of the applicable Offering (the "Offering Date") they are employed by the Company or a Designated Subsidiary and have completed at least 30 days of employment. Notwithstanding any other provision herein, individuals who are not contemporaneously classified as employees of the Company or a Designated Subsidiary for purposes of the Company's or applicable Designated Subsidiary's payroll system are not considered to be eligible employees of the Company or any Designated

2

Subsidiary and shall not be eligible to participate in the Plan. In the event any such individuals are reclassified as employees of the Company or a Designated Subsidiary for any purpose, including, without limitation, common law or statutory employees, by any action of any third party, including, without limitation, any government agency, or as a result of any private lawsuit, action or administrative proceeding, such individuals shall, notwithstanding such reclassification, remain ineligible for participation. Notwithstanding the foregoing, the exclusive means for individuals who are not contemporaneously classified as employees of the Company or a Designated Subsidiary on the Company's or Designated Subsidiary's payroll system to become eligible to participate in this Plan is through an amendment to this Plan, duly executed by the Company, which specifically renders such individuals eligible to participate herein.

4. Participation.

(a) An eligible employee who is not a Participant in any prior Offering may participate in a subsequent Offering by submitting an enrollment form to his or her appropriate payroll location at least 15 business days before the Offering Date (or by such other deadline as shall be established by the Administrator for the Offering).

(b) Enrollment. The enrollment form will (a) state a whole percentage to be deducted from an eligible employee's Compensation (as defined in Section 11) per pay period, (b) authorize the purchase of Common Stock in each Offering in accordance with the terms of the Plan and (c) specify the exact name or names in which shares of Common Stock purchased for such individual are to be issued pursuant to Section 10. An employee who does not enroll in accordance with these procedures will be deemed to have waived the right to participate. Unless a Participant files a new enrollment form or withdraws from the Plan, such Participant's

3

deductions and purchases will continue at the same percentage of Compensation for future Offerings, provided he or she remains eligible.

(c) Notwithstanding the foregoing, participation in the Plan will neither be permitted nor be denied contrary to the requirements of the Code.

5. Employee Contributions. Each eligible employee may authorize payroll deductions at a minimum of one percent up to a maximum of 15 percent of such employee's Compensation for each pay period. The Company will maintain book accounts showing the amount of payroll deductions made by each Participant for each Offering. No interest will accrue or be paid on payroll deductions.

6. Deduction Changes. Except as may be determined by the Administrator in advance of an Offering, a Participant may not increase or decrease his or her payroll deduction during any Offering, but may increase or decrease his or her payroll deduction with respect to the next Offering (subject to the limitations of Section 5) by filing a new enrollment form at least 15 business days before the next Offering Date (or by such other deadline as shall be established by the Administrator for the Offering). The Administrator may, in advance of any Offering, establish rules permitting a Participant to increase, decrease or terminate his or her payroll deduction during an Offering.

7. Withdrawal. A Participant may withdraw from participation in the Plan by delivering a written notice of withdrawal to his or her appropriate payroll location. The Participant's withdrawal will be effective as of the next business day. Following a Participant's withdrawal, the Company will promptly refund such individual's entire account balance under the Plan to him or her (after payment for any Common Stock purchased before the effective date of withdrawal). Partial withdrawals are not permitted. Such an employee may not begin

4

participation again during the remainder of the Offering, but may enroll in a subsequent Offering in accordance with Section 4.

8. <u>Grant of Options</u>. On each Offering Date, the Company will grant to each eligible employee who is then a Participant in the Plan an option ("Option") to purchase on the last day of such Offering (the "Exercise Date"), at the Option Price hereinafter provided for, the lowest of (a) a number of shares of Common Stock determined by dividing such Participant's accumulated payroll deductions on such Exercise Date by the Option Price (as defined herein), (b) 1,000 shares; or (c) such other lesser maximum number of shares as shall have been established by the Administrator in advance of the Offering; provided, however, that such Option shall be subject to the limitations set forth below. Each Participant's Option shall be exercisable only to the extent of such Participant's accumulated payroll deductions on the Exercise Date. The purchase price for each share purchased under each Option (the "Option Price") will be 85 percent of the Fair Market Value of the Common Stock on the Offering Date or the Exercise Date, whichever is less.

Notwithstanding the foregoing, no Participant may be granted an option hereunder if such Participant, immediately after the option was granted, would be treated as owning stock possessing five percent or more of the total combined voting power or value of all classes of stock of the Company or any Parent or Subsidiary (as defined in Section 11). For purposes of the preceding sentence, the attribution rules of Section 424(d) of the Code shall apply in determining the stock ownership of a Participant, and all stock which the Participant has a contractual right to purchase shall be treated as stock owned by the Participant. In addition, no Participant may be granted an Option which permits his or her rights to purchase stock under the Plan, and any other employee stock purchase plan of the Company and its Parents and Subsidiaries, to accrue at a rate which exceeds $25,000 of the fair market value of such stock (determined on the option

5

grant date or dates) for each calendar year in which the Option is outstanding at any time. The purpose of the limitation in the preceding sentence is to comply with Section 423(b)(8) of the Code and shall be applied taking Options into account in the order in which they were granted.

9. <u>Exercise of Option and Purchase of Shares</u>. Each employee who continues to be a Participant in the Plan on the Exercise Date shall be deemed to have exercised his or her Option on such date and shall acquire from the Company such number of whole shares of Common Stock reserved for the purpose of the Plan as his or her accumulated payroll deductions on such date will purchase at the Option Price, subject to any other limitations contained in the Plan. Any amount remaining in a Participant's account at the end of an Offering solely by reason of the inability to purchase a fractional share will be carried forward to the next Offering; any other balance remaining in a Participant's account at the end of an Offering will be refunded to the Participant promptly.

10. <u>Issuance of Certificates</u>. Certificates representing shares of Common Stock purchased under the Plan may be issued only in the name of the employee, in the name of the employee and another person of legal age as joint tenants with rights of survivorship, or in the name of a broker authorized by the employee to be his, her or their, nominee for such purpose.

11. <u>Definitions</u>.

The term "Compensation" means the amount of base pay, prior to salary reduction pursuant to Sections 125, 132(f) or 401(k) of the Code, but excluding overtime, commissions, incentive or bonus awards, allowances and reimbursements for expenses such as relocation allowances or travel expenses, income or gains on the exercise of Company stock options, and similar items.

The term "Designated Subsidiary" means any present or future Subsidiary (as defined below) that has been designated by the Board to participate in the Plan. The Board may so designate any Subsidiary, or revoke any such designation, at any time and from time to time, either before or after the Plan is approved by the stockholders and may further designate such Subsidiaries as participating in the 423 Component or the Non-423 Component. The current list of Designated Subsidiaries is attached hereto as Appendix A.

The term "Fair Market Value of the Common Stock" on any given date means the fair market value of the Common Stock determined in good faith by the Administrator; provided, however, that if the Common Stock is admitted to quotation on the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), NASDAQ Global Select Market or another national securities exchange, the determination shall be made by reference to the closing price on such date. If there is no closing price for such date, the determination shall be made by reference to the last date preceding such date for which there is a closing price.

The term "Parent" means a "parent corporation" with respect to the Company, as defined in Section 424(e) of the Code.

The term "Participant" means an individual who is eligible as determined in Section 3 and who has complied with the provisions of Section 4.

The term "Subsidiary" means a "subsidiary corporation" with respect to the Company, as defined in Section 424(f) of the Code.

12. <u>Rights on Termination of Employment</u>. If a Participant's employment terminates for any reason before the Exercise Date for any Offering, no payroll deduction will be taken from any pay due and owing to the Participant and the balance in the Participant's account will be paid to such Participant or, in the case of such Participant's death, to his or her designated beneficiary

7

as if such Participant had withdrawn from the Plan under Section 7. An employee will be deemed to have terminated employment, for this purpose, if the corporation that employs him or her, having been a Designated Subsidiary, ceases to be a Subsidiary, or if the employee is transferred to any corporation other than the Company or a Designated Subsidiary. An employee will not be deemed to have terminated employment for this purpose, if the employee is on an approved leave of absence for military service or sickness or for any other purpose approved by the Company, if the employee's right to reemployment is guaranteed either by a statute or by contract or under the policy pursuant to which the leave of absence was granted or if the Administrator otherwise provides in writing.

13. Special Rules. Notwithstanding anything herein to the contrary, the Administrator may adopt special rules applicable to the employees of a particular Designated Subsidiary, whenever the Administrator determines that such rules are necessary or appropriate for the implementation of the Plan in a jurisdiction where such Designated Subsidiary has employees; provided that if such rules are inconsistent with the requirements of Section 423(b) of the Code, these employees will participate in the Non-423 Component. Any special rules established pursuant to this Section 13 shall, to the extent possible, result in the employees subject to such rules having substantially the same rights as other Participants in the Plan.

14. Optionees Not Stockholders. Neither the granting of an Option to a Participant nor the deductions from his or her pay shall constitute such Participant a holder of the shares of Common Stock covered by an Option under the Plan until such shares have been purchased by and issued to him or her.

8

15. <u>Rights Not Transferable</u>. Rights under the Plan are not transferable by a Participant other than by will or the laws of descent and distribution, and are exercisable during the Participant's lifetime only by the Participant.

16. <u>Application of Funds</u>. All funds received or held by the Company under the Plan may be combined with other corporate funds and may be used for any corporate purpose.

17. <u>Adjustment in Case of Changes Affecting Common Stock</u>. In the event of a subdivision of outstanding shares of Common Stock, the payment of a dividend in Common Stock or any other change affecting the Common Stock, the number of shares approved for the Plan and the share limitation set forth in Section 8 shall be equitably or proportionately adjusted to give proper effect to such event.

18. <u>Amendment of the Plan</u>. The Board may at any time and from time to time amend the Plan in any respect, except that without the approval within 12 months of such Board action by the stockholders, no amendment shall be made increasing the number of shares approved for the Plan or making any other change that would require stockholder approval in order for the Plan, as amended, to qualify as an "employee stock purchase plan" under Section 423(b) of the Code.

19. <u>Insufficient Shares</u>. If the total number of shares of Common Stock that would otherwise be purchased on any Exercise Date plus the number of shares purchased under previous Offerings under the Plan exceeds the maximum number of shares issuable under the Plan, the shares then available shall be apportioned among Participants in proportion to the amount of payroll deductions accumulated on behalf of each Participant that would otherwise be used to purchase Common Stock on such Exercise Date.

20. <u>Termination of the Plan</u>. The Plan may be terminated at any time by the Board. Upon termination of the Plan, all amounts in the accounts of Participants shall be promptly refunded.

21. <u>Governmental Regulations</u>. The Company's obligation to sell and deliver Common Stock under the Plan is subject to obtaining all governmental approvals required in connection with the authorization, issuance, or sale of such stock.

22. <u>Governing Law</u>. This Plan and all Options and actions taken thereunder shall be governed by, and construed in accordance with, the laws of the State of Delaware, applied without regard to conflict of law principles.

23. <u>Issuance of Shares</u>. Shares may be issued upon exercise of an Option from authorized but unissued Common Stock, from shares held in the treasury of the Company, or from any other proper source.

24. <u>Tax Withholding</u>. Participation in the Plan is subject to any minimum required tax withholding on income of the Participant in connection with the Plan. Each Participant agrees, by entering the Plan, that the Company and its Subsidiaries shall have the right to deduct any such taxes from any payment of any kind otherwise due to the Participant, including shares issuable under the Plan.

25. <u>Notification Upon Sale of Shares</u>. Each Participant agrees, by entering the Plan, to give the Company prompt notice of any disposition of shares purchased under the Plan where such disposition occurs within two years after the date of grant of the Option pursuant to which such shares were purchased or within one year after the date such shares were purchased.

26. <u>Effective Date and Approval of Shareholders</u>. The Plan shall take effect on the later of the date it is adopted by the Board and the date it is approved by the holders of a majority

10

of the votes cast at a meeting of stockholders at which a quorum is present or by written consent of the stockholders.

11

**APPENDIX A**

**Designated Subsidiaries**

iRobot Securities Corporation
iRobot US Holdings Inc.
iRobot Holdings LLC

12

**Exhibit 10.6**

BEDFORD BUSINESS PARK
4-18 CROSBY DRIVE BEDFORD, MASSACHUSETTS

Lease Dated February 22,  2007

THIS INSTRUMENT IS AN INDENTURE OF LEASE in which the Landlord and the Tenant are the parties

hereinafter named, and which relates to space in a certain complex (the "Complex") known as Bedford Business Park, and with an

address at, 4-18 Crosby Drive, Bedford, Massachusetts.

The parties to this Indenture of Lease hereby agree with each other as follows:

ARTICLE I Reference Data

1.1 Subjects Referred To

Each reference in this Lease to any of the following subjects shall be construed to incorporate the data stated for that subject in this
Article:

| | |
|---|---|
| Landlord: | Boston Properties Limited Partnership, a Delaware limited partnership |
| Landlord's Original Address: | c/o Boston Properties, Inc.111 Huntington Avenue, Suite 300 Boston, Massachusetts 02199-7610 |
| Landlord's Construction Representative: | Ben Lavery/Richard Monopoli |
| Tenant: | iRobot Corporation, a Delaware corporation |
| Tenant's Original Address: | 63 South Avenue Burlington, Massachusetts 01803 |
| Tenant's Construction Representative: | Tom Isley/Mark A. Urbanek, P.E. |
| Commencement Date: | As defined in Sections 2.4 and 3.4. |
| Term (Sometimes Called | One hundred forty-four (144) calendar months (plus |

| | |
|---|---|
| Original Term): | the partial month, if any, immediately following the Commencement Date), unless extended or sooner terminated as provided in this Lease. |
| Extension Option: | Two (2) periods of five (5) years each, as provided in and on the terms set forth in Section 8.20 hereof. |
| The Site: | That certain parcel of land known as and numbered 4-18 Crosby Drive, Bedford, Middlesex County, Massachusetts, being more particularly described in Exhibit A attached hereto |
| Building C: | The building in the "Complex" (as hereinafter defined in this Section 1.1) presently known as Building C and appropriately labeled on Exhibit A-I attached hereto and incorporated herein by reference. |
| Building D: | The building in the Complex presently known as Building D and appropriately labeled on Exhibit A-I attached hereto and incorporated herein by reference. |
| Building E: | The building in the Complex presently known as Building E and appropriately labeled on Exhibit A-I attached hereto and incorporated herein by reference. |
| The Building: | Building C, Building D or Building E, as may apply to the context. |
| The Buildings: | Building C, Building D and Building E, collectively. |
| The Additional Buildings: | The other buildings in the Complex and presently numbered Buildings A, B, F, G and H, as shown on Exhibit A-I attached hereto and incorporated herein by reference. |
| The Complex: | The Buildings and the Additional Buildings together with all parking areas and the Site |
| Premises (Sometimes also Referred to as "Tenant's Space"): | The entirety of Buildings C, D and E in accordance with the floor plans annexed hereto as Exhibit D and incorporated herein by reference (subject to the exclusions described in Section 2.1 below). |
| Number of Parking Privileges: | Three (3) parking privileges for each 1,000 square feet of rentable floor area leased by Tenant, subject to and in accordance with the provisions of Section 2.2.1 below. |

Annual Fixed Rent:

(a) During the period commencing on the Commencement Date and ending on the last day of the thirty-sixth (36th) full calendar month immediately following the Commencement Date, at the annual rate of $2,008,488.48 (being the product of (i) $12.73 and (ii) the "Rentable Floor Area of the Premises" (hereinafter defined in this Section 1.1)).

(b) During the period commencing on the first day of the thirty-seventh (37th) full calendar month immediately following the Commencement Date and ending on the last day of the Original Term, at the annual rate of $2,087,376.48 (being the product of (i) $13.23 and (ii) the Rentable Floor Area of the Premises).

(c) During each extension option period (if exercised), as determined pursuant to Section

Additional Rent:

All charges and other sums payable by Tenant to Landlord as set forth in this Lease, in addition to Annual Fixed Rent.

Rentable Floor Area of Building C:

51,123 square feet.

Rentable Floor Area of Building D:

54,507 square feet.

Rentable Floor Area of Building E:

52,126 square feet.

Rentable Floor Area of the Premises (Sometimes also Called "Rentable Floor Area of Tenant's Space"):

157,776 square feet, being the sum of (i) the Rentable Floor Area of Building C, (ii) the Rentable Floor Area of Building D and (iii) the Rentable Floor Area of Building E.

Total Rentable Floor Area of the Buildings:

157,776 square feet

Total Rentable Floor Area Of The Additional Buildings:

315,928 square feet.

| | |
|---|---|
| Total Rentable Floor Area of the Complex: | 473,704 square feet |
| Permitted Uses: | Collectively, the Permitted Use of the Buildings and the Permitted Use of the Additional Land Areas (as that term is defined in Section 8.27 below). |
| Permitted Use of the Buildings: | Research, design, engineering, prototyping and development of the products and equipment from time to time of Tenant, light manufacturing (including installation and operation of machine shops) and testing of such products and equipment, and general administrative and executive office uses, as each of the same may from time to time be permitted by the Zoning By-Law for the Town of Bedford. |
| Permitted Use of Additional Land Areas: | Testing of Tenant's products and equipment (including testing robot-controlled vehicles), as the same may from time to time be permitted by the Zoning By-Law for the Town of Bedford. |
| Initial Minimum Limits of Tenant's Commercial General Liability Insurance: | $6,000,000.00 combined single limit per occurrence, which can be achieved through a combination of primary and umbrella liability coverage. |
| Broker: | Richards, Barry, Joyce & Partners<br>53 State Street<br>Boston, Massachusetts 02109 |
| Security Deposit: | $2,000,000.00, to be held and disposed of (including any reductions in the amount thereof) pursuant to the provisions of Section 8.21 of this Lease. |

## 1.2 Exhibits

There are incorporated as part of this Lease:

Exhibit A Description of Site Exhibit A-I Site Plan of Complex

Exhibit A-2 Tenant's Visitor Parking Area

Exhibit B-1 Landlord's Base Building Work

Exhibit B-2 Preliminary Schematic Plans for Tenant Improvement Work

Exhibit C Landlord's Services

Exhibit D Floor Plans

Exhibit E Form of Commencement Date Agreement

Exhibit F-l Form of Lien Waivers

Exhibit F-2 Construction Rules and Regulations

Exhibit G Broker Determination of Prevailing Market Rent

Exhibit H Form of Letter of Credit Exhibit I-I Land Recreation Area A Exhibit 1-2 Land Recreation Area B Exhibit J MHD

Lease

Exhibit K Lease Audit Confidentiality Agreement

Exhibit L Notice of Lease

Exhibit M Current Lender's Standard Form SNDA Exhibit N Form of Landlord's Lien Waiver

Exhibit 0 Existing Leases

1.3 Table of Articles and Sections

ARTICLE 1                                                                    1

Reference Data                                                               1

1.1 Subjects Referred To                                                     1

1.2 Exhibits                                                                  4

1.3 Table of Articles and Sections                                          6

ARTICLE 11                                                                   9

Building, Premises, Term and Rent                                           9

2.1 The Premises                                                             9

2.2 Rights to Use Site Facilities                                           8

2.3 Landlord's Reservations                                                 11

2.4 Habendum                                                                12

2.5 Fixed Rent Payments                                                     12

2.6 Operating Expenses                                                      13

2.7 Real Estate Taxes                                                       20

2.8 Tenant Electricity                                                      22

ARTICLE 111                                                                 22

Condition of Premises; Alterations                                          22

3.1 Base Building Work                                                      23

3.2 Tenant Improvement Work                                                 24

3.3 Tenant Allowances                                                       25

3.4 Substantial Completion                                                  28

3.5 Force Majeure and Other Delays                                          31

3.6 Quality and Performance of Work                                         19

3.7 Arbitration                                                             21

3.8 Escrow of Funds                                                         21

ARTICLE IV                                                                  23

Landlord's Covenants; Interruptions and Delays                              23

4.1 Landlord Covenants                                                      23

4.2 Interruptions and Delays in Services and Repairs, Etc.                  24

4.3 Landlord's Insurance                                                    25

4.4 Landlord's Indemnity                                                    26

4.5 Compliance with Laws                                                    26

4.6 Leasing Restrictions                                                    33

ARTICLE V                                                                   35

Tenant's Covenants                                                          35

5.1 Payments                                                                35

5.2 Repair and Yield Up                                                     35

5.3 Use                                                                     37

5.4 Obstructions; Items Visible From Exterior; Rules and Regulations        39

5.5 Safety Appliances                                                       39

5.6 Assignment; Sublease                                                    39

5.7 Indemnity; Insurance                                                    46

5.8 Personal Property at Tenant's Risk   47

5.9 Right of Entry   48

5.10 Floor Load; Prevention of Vibration and Noise   48

5.11 Personal Property Taxes   48

5.12 Compliance with Laws   54

5.13 Payment of Litigation Expenses   55

5.14 Alterations   56

5.15 Vendors   59

5.16 Patriot Act   60

5.17 Signage   61

ARTICLE VI   64

Casualty and Taking   64

6.0 Landlord's Restoration Estimate   64

6.1 Damage Resulting from Casualty   64

6.2 Uninsured Casualty   66

6.3 Rights of Termination for Taking   66

6.4 Award   67

6.5 Damage to Parking Areas and Land Recreation Area A   67

6.6 Allocation of Proceeds Following Termination   68

ARTICLE VII   71

Default   71

7.1 Tenant's Default   71

7.2 Landlord's Default   74

ARTICLE VIII   74

Miscellaneous Provisions   74

8.1 Extra Hazardous Use   74

8.2 Waiver   74

8.3 Cumulative Remedies   74

8.4 Quiet Enjoyment   77

8.5 Notice to Mortgagee and Ground Lessor   78

8.6 Assignment of Rents   79

8.7 Surrender   80

8.8 Brokerage   80

8.9 Invalidity of Particular Provisions   80

8.10 Provisions Binding, Etc   81

8.11 Recording; Confidentiality   81

8.12 Notices   81

8.13 When Lease Becomes Binding   82

8.14 Section Headings   82

8.15 Rights of Mortgagee   82

8.16 Status Reports and Financial Statements   83

8.17 Self-Help   84

8.18 Holding Over   85

8.19 Non-Subrogation   85

8.20 Extension Option   85

8.21 Security Deposit.   86

8.22 Late Payment   89

8.23 Tenant's Payments — 89

8.24 Waiver of Trial By Jury — 90

8.25 Governing Law — 90

8.26 Tenant's Equipment. — 90

8.27 Land Recreation Space — 92

8.28 Tenant's Expansion Rights: Buildings F, G and H — 95

8.29 Tenant's Expansion Rights: Buildings A and B — 98

8.30 Waiver of Landlord's Lien — 100

8.31 Arbitration — 100

8.32 Temporary Space — 101

ARTICLE II

Building, Premises, Term and Rent

2.1 The Premises

Landlord hereby demises and leases to Tenant, and Tenant hereby hires and accepts from Landlord, Tenant's Space in the Building excluding the roof and exterior faces of exterior walls, elevator wells and pipes, ducts, conduits, wires and appurtenant fixtures serving exclusively or in common other parts of the Buildings or the Complex. Notwithstanding the foregoing, for so long as Tenant leases the entire rentable square footage of any of the Buildings (or the entire rentable floor area of any of the Additional Buildings in the event Tenant shall exercise any expansion rights under Sections 8.28 or 8.29 below), Tenant shall have the exclusive right to use the loading areas, fan rooms, janitorial, electrical, telephone and telecommunications closets, conduits, risers, plenum spaces and elevators exclusively serving such Building or Buildings (or Additional Building(s) if applicable), subject, however, to Landlord's right to control access to such spaces. In the event that Tenant leases less than the entirety of a Building or Additional Building, Tenant's rights to use the foregoing areas shall be in common with the rights of other occupants of such Building or Additional Building.

Tenant's Space with such exclusions is hereinafter referred to as the "Premises." The term "Buildings" means the Buildings identified in Section 1.1, and which are the subject of this Lease; the term "Additional Buildings" means the Additional Buildings identified in Section 1.1; the term "Site" means all, and also any part of the Land described in Exhibit A, plus any additions or reductions thereto resulting from the acquisition of adjacent property by Landlord or from the change of any abutting street line and all parking areas and structures. The term "Complex" means the Buildings, the Additional Buildings and the Site.

Landlord shall use commercially reasonable efforts to cause the Town of Bedford to modify the existing numerical/alphabetical address system for the Complex in a manner reasonable acceptable to Tenant prior to the Commencement Date; provided, however, that Landlord shall not be deemed to be in default of its obligations hereunder in the event that the Town of Bedford fails to authorize such modifications, so long as Landlord has used commercially reasonable efforts as aforesaid. If the existing address system is thus modified, Landlord and Tenant shall within a reasonable time thereafter execute a letter agreement confirming the new building designations within the Complex.

2.2 Rights to Use Site Facilities

Subject to Landlord's right to change or alter any of the following in Landlord's discretion as expressly herein provided, Tenant shall have, as appurtenant to the Premises, the non-exclusive right to use in common with others, subject to reasonable rules of general applicability to tenants of the Complex from time to time made by Landlord of which Tenant is given notice (a) any common lobbies, corridors, stairways, restrooms, elevators, loading platforms, janitor's closets, electrical and telephone closets of the Buildings and the pipes, ducts, conduits, wires and appurtenant meters and equipment serving the Buildings or the Premises, (b) common walkways and driveways necessary for access to the Buildings and parking areas serving the Complex and (c) the cafeteria and fitness center located or to be located in Building A of the Complex and the common corridors in Buildings A,

Band G providing access thereto (the foregoing collectively referred to as the "Common Areas"). So long as Tenant leases the entirety of Building E, Tenant shall have the exclusive right, at no additional charge, to use the loading areas and bays in or at Building E. Notwithstanding anything to the contrary herein, Landlord hasno obligation to allow any particular telecommunication service provider to have accessto the Premises except as may be required by applicable law and except that Landlord agrees to permit Verizon to have telecommunications access to the Premises and the Complex at no additional charge for the purpose of providing telecommunications service to Tenant. Except as otherwise expressly provided above, if Landlord permits such access, Landlord may condition such access upon the payment to Landlord by the service provider of fees assessed by Landlord in its reasonable discretion. Notwithstanding the foregoing, Landlord will not unreasonably withhold, condition or delay its approval of any telecommunications provider designated by Tenant to service the Premises, so long as such provider is not utilizing the Site to provide service to third parties other than Tenant. Landlord hereby represents and warrants to Tenant that Verizon presently provides telecommunications services to the Complex.

2.2.1 Tenant's Parking

(A) In addition, Tenant shall have the right, at no additional charge to Tenant, to use the Number of Parking Spaces (referred to in Section 1.1) in the parking areas of the Complex for the parking of automobiles, in common with use by other tenants from time to time of the Complex, provided, however, that Landlord shall not be obligated to furnish stalls or spaces on the Site specifically designated for Tenant's use. Notwithstanding the foregoing, for so long as Tenant shall be directly leasing Buildings C and D in their entirety, Tenant shall have the exclusive right to use the area designated as "Tenant's Visitor Parking Area" on Exhibit A-2 attached hereto for parking by Tenant and its visitors (it being understood and agreed that in the event Tenant shall cease to directly lease Buildings C and D in their entirety, the number of spaces which Tenant shall be entitled to use shall be reduced proportionately based upon the square footage Tenant continues to directly lease in Buildings C and D). Landlord will use reasonable efforts, by the use of signs and markings, to designate the spaces as being intended for the use of Tenant's visitors, but shall not be obligated to police the use of such spaces, which Tenant recognizes are to be operated on a self parking basis. Tenant's visitor parking shall not be subject to or affected by any Managed Parking Program instituted by Landlord under this Section 2.2.1.

In the event that the Rentable Floor Area of the Premises increases or decreases at any time during the Lease Term, the Number of Parking Spaces provided to Tenant hereunder shall be increased or reduced proportionately based upon the ratio set forth in Section 1.1.

(B) In the event that during the Lease Term, Landlord executes leases for premises within the Complex (including this Lease) that result in the commitment of more than One Thousand One Hundred (1,100) parking spaces in the aggregate, Landlord shall, at its sole cost and expense, commence the process of obtaining the necessary permits and approvals to construct a structured parking facility on the Site. In the event that during the Lease Term, Landlord executes leases for premises within the Complex (including this Lease) that result in the commitment of more than One Thousand Two Hundred Thirty (1,230) parking spaces in the aggregate and such commitments result in the existence of a "Parking Shortage" (as

hereinafter defined), Landlord shall, at its sole cost and expense, use commercially reasonable best efforts to at Landlord's election either (x) endeavor

to negotiate with adjacent landowners for the right to use land adjacent to the Site as a satellite parking area serving the Complex or (y) endeavor to construct a structured parking facility on the Site (either of the options described in subsections (x) or (y) being hereinafter referred to as the "Alternative Parking"). During Landlord's pursuit of the Alternative Parking, Landlord shall, at its sole cost and expense, institute a managed parking program for the parking areas on the Site (the "Managed Parking Program"). Tenant acknowledges and agrees that there may be a temporary disruption in parking in connection with the conversion to a Managed Parking Program and/or the construction of a new parking facility, and Tenant shall reasonably cooperate with Landlord at no cost to Tenant during such conversion and/or construction (Landlord hereby agreeing to use commercially reasonable efforts to minimize such disruption). Tenant further acknowledges that, despite its use of commercially reasonable best efforts, Landlord may be unable to obtain rights to use additional land or to secure the permits and approvals to construct a new parking facility, and accordingly that in no event shall Landlord be in default of its obligations hereunder so long as (x) Landlord has used commercially reasonable best efforts as aforesaid and (y) Landlord has implemented the Managed Parking Program in order to address the Parking Shortage.

For the purposes hereof, a "Parking Shortage" shall be defined as an overuse of the parking areas of the Site such that Tenant is unable to utilize the Number of Parking Spaces provided to Tenant hereunder, as determined in accordance with the following procedure:

(i)     In the event that Landlord receives four (4) complaints from tenants of the Complex over a period of two (2) weeks indicating that they are unable to find parking spaces at the Complex, Landlord shall perform and complete a parking survey of the Complex within two (2) weeks of its receipt of the last such complaint.

(ii)    If the parking survey indicates that less than ninety-eight percent (98%) of the total number of parking spaces on the Site are available for tenant parking over a period of two (2) weeks, then Landlord shall attempt to ascertain whether the cause of the problem is a particular tenant's overuse of the number of parking spaces provided to such tenant under the terms of its lease and shall take reasonable measures to enforce the terms of such lease and rectify the situation.

(iii)   In the event that the overuse cannot be readily addressed by Landlord, then a Parking Shortage shall be deemed to exist and shall trigger Landlord's obligations under this Section 2.2.1 to implement the Managed Parking Program and endeavor to obtain the Alternative Parking.

Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that Landlord shall be under no obligation whatsoever (under this subsection (B) or otherwise) to address a Parking Shortage at the Site to the extent such Parking Shortage is caused by the use of parking spaces by any subtenant of Tenant's in a ratio greater than three (3) parking privileges for each 1,000 square feet of rentable floor area of the subleased premises. In addition, under no circumstances shall Landlord be required to endeavor to obtain the Alternative Parking in the event of a Parking Shortage that occurs during the last

three (3) years of the Lease Term unless and until Tenant shall validly exercise its then-current extension option under Section 8.20 below (it being understood and agreed in connection with the foregoing that (x) Landlord shall have no obligation to endeavor to obtain the Alternative Parking in the event that Tenant shall have no further rights to extend the Lease Term and (y) Landlord shall nonetheless be required to implement the Managed Parking Program to address the Parking Shortage irrespective of the amount of time remaining in the Lease Term).

(C) Subject to the provisions of Section 8.27 below and for so long as Tenant has the exclusive right to use the Additional Land Areas (as defined in said Section 8.27), in no event shall the Additional Land Areas be used by Landlord to provide additional parking facilities or parking spaces for the Site or to satisfy the Number of Parking Spaces to which Tenant is entitled hereunder unless (a) Tenant shall request the same, (b) such spaces are approved by applicable government authorities and (c) such spaces are designated for Tenant's exclusive use.

(D) Tenant covenants and agrees that it and all persons claiming by, through and under it, shall at all times abide by all reasonable rules and regulations promulgated by Landlord with respect to the use of the parking areas on the Site (including, without limitation, those relating to the Managed Parking Program, if implemented) provided such rules and regulations are not inconsistent with Tenant's rights under this Lease and are of general applicability to the occupants of the Complex. The parking privileges granted herein are non-transferable except to an assignee or subtenant permitted or consented to pursuant to Section 5.6 through Section 5.6.5 or to a permitted occupant under Section 5.6.6 below. Further, except to the extent of Landlord's gross negligence or willful misconduct, Landlord assumes no responsibility whatsoever for loss or damage due to fire, theft or otherwise to any automobile(s) parked on the Site or to any personal property therein, however caused, and Tenant covenants and agrees, upon request from Landlord from time to time, to notify its officers, employees, agents and invitees of such limitation of liability. Tenant acknowledges and agrees that a license only is hereby granted, and no bailment is intended or shall be created.

2.3 Landlord's Reservations

Landlord reserves the right from time to time, without unreasonable interference with Tenant's use and upon reasonable prior notice to Tenant (except in the event of an emergency): (a) to install, use, maintain, repair, replace and relocate for service to the Premises and other parts of the Buildings or either, pipes, ducts, conduits, wires and appurtenant fixtures, wherever located in the Premises or Buildings, and (b) to alter or relocate any other common facility, provided that substitutions are substantially equivalent or better. Installations, replacements and relocations referred to in clause (a) above shall be located to the extent practicable in the central core area of the Buildings, above ceiling surfaces, below floor surfaces or within perimeter walls of the Premises. Landlord shall use commercially reasonable efforts to schedule any such work contemplated by this Section 2.3 during Tenant's non-business hours.

2.4 Habendum

Tenant shall have and hold the Premises for a period commencing on the earlier of (a) the Substantial Completion Date (as determined in accordance with Section 3.4(D) below), or (b) that date on which Tenant commences occupancy of any portion of the Premises for the Permitted Uses, and continuing for the Term unless sooner terminated as provided in Article VI or Article VII or unless extended as provided in Section 8.20.

As soon as may be convenient after the date has been determined on which the Term commences as aforesaid, Landlord and Tenant agree to join with each other in the execution of a written Declaration, in the form of Exhibit E, in which the date on which the Term commences as aforesaid and the Term of this Lease shall be stated. If Tenant fails to execute or state objections to such Declaration within thirty (30) days after such Declaration is submitted by Landlord to Tenant, the Commencement Date and Lease Term shall be as originally set forth in the Declaration delivered by Landlord.

2.5 Fixed Rent Payments

Tenant agrees to pay to Landlord, or as directed by Landlord, at the place(s) specified below, or at such other place as Landlord shall from time to time designate by notice, (1) on the Commencement Date (defined in Section 1.1 hereof) and thereafter monthly, in advance, on the first day of each and every calendar month during the Original Term, a sum equal to one twelfth (1/12th) of the then-applicable Annual Fixed Rent for the Premises and (2) on the first day of each and every calendar month during each extension option period (if exercised), a sum equal to one twelfth (1/12th) of the annual fixed rent as determined in Section 8.20 for the extension option period. Until notice of some other designation is given, Annual Fixed Rent and all other charges for which provision is herein made shall be paid by remittance to or for the order of Boston Properties Limited Partnership either (i) by mail to P.O. Box 3557, Boston, Massachusetts 02241-3557, (ii) by wire transfer to Bank of America in Dallas, Texas, Bank Routing # 0260-0959-3 or (iii) by ACH transfer to Bank of America in Dallas, Texas, Bank Routing Number 111 000 112, and in case of (ii) or (iii) referencing Account Number 3756454460, Account Name of Boston Properties, LP, Tenant's name and the Property address. All remittances received by Boston Properties Limited Partnership or by any subsequently designated recipient, shall be treated as payment to Landlord.

Annual Fixed Rent and Additional Rent for any partial month shall be paid by Tenant to Landlord at such rate on a pro rata basis, and, if the Commencement Date is a day other than the first day of a calendar month, the first payment of Annual Fixed Rent and Additional Rent which Tenant shall make to Landlord shall be a payment equal to a proportionate part of such monthly Annual Fixed Rent for the partial month from the Commencement Date to the first day of the succeeding calendar month.

The Annual Fixed Rent and all other charges for which provision is herein made shall be paid by Tenant to Landlord, without offset, deduction or abatement except as otherwise specifically set forth in this Lease.

2.6 Operating Expenses

"Landlord's Operating Expenses" means the cost of operation of the Buildings and the Site which shall exclude costs of special services rendered to tenants (including Tenant) for which a separate

charge is made, but shall include, without limitation, the following: premiums for insurance carried with respect to the Buildings and the Site (including, without limitation, liability insurance, insurance against loss in case of fire or casualty and insurance of monthly installments of fixed rent and any Additional Rent which may be due under this Lease for not more than 12 months in the case of both fixed rent and Additional Rent and if there be any first mortgage of the Property, including such insurance as may be required by the holder of such first mortgage), subject in all events to the provisions of Section 4.3 below; compensation and all fringe benefits, worker's compensation insurance premiums and payroll taxes paid to, for or with respect to all persons engaged in the operating, maintaining or cleaning of the Buildings or Site (but in the case of persons who are also providing services to other properties outside of the Complex, excluding any portion of such compensation which is not reasonably allocable to services performed for the Complex); water, sewer, gas, electric and oil charges (excluding utility charges (i) separately payable by Tenant under Section 2.8 below, (ii) separately chargeable to tenants for additional or special services, or (iii) for the supply of applicable utilities to leaseable areas of the Complex to the extent Tenant's entire use of any such utility is separately metered and/or submetered and Tenant pays separately therefor); cost of building supplies and equipment; cost of maintenance, cleaning and repairs (other than repairs not properly chargeable against income or reimbursed from contractors under guarantees); cost of snow removal and care of landscaping; payments under service contracts with independent contractors; management fees at reasonable rates for self-managed buildings consistent with the type of occupancy and the service rendered, not to exceed three percent (3%) of the "gross rents" for the Premises ("gross rents" for the purposes hereof being defined as all annual fixed rent, Landlord's Operating Expenses and Landlord's Tax Expenses, as defined in Section 2.7 below, scheduled for the Premises), which such management fees shall for the purposes of this Section 2.6 be deemed to be part of Landlord's Operating Expenses allocable to the Buildings rather than to the Site; the fair market rental value of the space in the Complex or at another property owned by Landlord or an affiliate of Landlord and used as the management office, provided that if the management office services more than one building or properties, the rent for such management office shall be equitably prorated and apportioned between the Complex and the other building or properties; cost of operating, cleaning and maintaining the shared cafeteria and fitness center facilities to be constructed in the Complex as part of Landlord's Base Building Work under Section 3.0 below (net of any revenue collected from the operation of such cafeteria and fitness center); costs of maintaining and insuring Land Recreation Area A and Land Recreation Area B (as those terms are defined in Section 8.26 below) and any real estate taxes required to be paid by Landlord as tenant under the MHD Lease (as that term is defined in said Section 8.26) (all of which such costs shall for the purposes of this Section 2.6 be deemed to be part of Landlord's Operating Expenses allocable to the Buildings rather than to the Site); and all other reasonable and necessary expenses paid in connection with the operation, cleaning and maintenance of the Buildings and the Site and properly chargeable against income in accordance with generally acceptable accounting practices consistently applied, provided, however, that if during the Term of this Lease, Landlord shall make a capital expenditure (i) to reduce Landlord's Operating Expenses if Landlord shall have reasonably determined that the annual reduction in Landlord's Operating Expenses shall exceed the annual charge-off therefor or (ii) to comply with applicable laws, rules, regulations, requirements, statutes, ordinances, by-laws and court decisions of all public authorities which first became applicable to the Complex after the Commencement Date (the foregoing categories of capital expenditures in (i) and (ii) being referred to as "Permitted Capital Expenditures"), Landlord may include in the calculation of Landlord's

Operating Expenses for the year in which it was made and in Landlord's Operating Expenses for each succeeding year wholly or partly falling in the Term until fully amortized, the annual charge off of such Permitted Capital Expenditures. Annual charge off shall be determined by dividing the original capital expenditure plus an interest factor, reasonably determined by Landlord as being the interest rate then being charged for long term mortgages by institutional lenders on like properties within the locality in which the Complex is located, by the number of years of useful life of the improvement made with the capital expenditure; and the useful life shall be determined reasonably by Landlord in accordance with generally accepted accounting principles and practices in effect at the time of making such expenditure.

Notwithstanding anything in this Lease to the contrary, the following shall be excluded from Landlord's Operating Expenses Allocable to the Premises:

(A) All capital expenditures and depreciation, except as otherwise explicitly provided in this Section 2.6;

(B) interest on indebtedness, debt amortization, ground rent, and refinancing costs for any mortgage or ground lease of the Buildings or the Complex;

(C) legal, auditing, consulting and professional fees and other costs (other than those legal, auditing, consulting and professional fees and other costs incurred in connection with the normal and routine maintenance and operation of the Complex), including, without limitation, those: (i) paid or incurred in connection with financings, refinancings or sales of any Landlord's interest in the Buildings or the Complex; (ii) relating to any special reporting required by securities laws; (iii) relating to negotiations or disputes with, or leasing to, tenants or prospective tenants; (iv) relating to litigation (including costs of settlement judgments and payments in lieu thereof); (v) the interpretation of leases or other occupancy agreements; (vi) the enforcement of the provisions of any lease or other occupancy agreement affecting the Complex including without limitation this Lease; (vii) the initial construction of the improvements on the Property; (viii) the review, approval or other actions in connection with the sublease or assignment of tenant leases (provided, however, that Tenant shall nonetheless be responsible under Section 5.6.5(B) for any such costs relative to its own requests for consent to a sublease or assignment); (ix) any action against a present or former tenant or occupant under a lease or other occupancy agreement, including, without limitation, eviction, distraint, levy and collection actions; and (x) costs incurred as a result of the violation by Landlord or any tenant of the terms and conditions of any lease;

(D) The cost of any item or service to the extent reimbursed or reimbursable to Landlord by insurance required to be maintained under the Lease or by any third party;

(N) The cost of repairs or replacements incurred by reason of fire or other casualty or condemnation other than costs not in excess of a commercially reasonable deductible (currently $25,000.00) on any insurance maintained by Landlord which provides a recovery for such repair or replacement;

(vi) Any advertising, promotional or marketing expenses for the Buildings;

(vii) The cost of any service or materials provided by any party related to Landlord (other than the management fee), to the extent such costs exceed the reasonable cost for such service or materials absent such relationship in buildings similar to the Buildings in the vicinity of the Buildings;

(viii) Payments for rented equipment, the cost of which equipment would constitute a capital expenditure if the equipment were purchased to the extent that such payments exceed the amount which could have been included in Landlord's Operating Expenses had Landlord purchased such equipment rather than leasing such equipment;

(ix) Penalties, damages, and interest for late payment or violations of any obligations of Landlord, including, without limitation, taxes, Legal Requirements, insurance, equipment leases and other past due amounts;

(x) Contributions to charitable or political organizations, and any entertainment, dining or travel expenses of Landlord's employees for any purpose;

(xi) The cost of testing, remediation or removal of "Hazardous Materials" (as defined in Section 5.3) in the Buildings or on the Site required by "Hazardous Materials Laws" (as defined in Section 5.3);

(xii) Wages, salaries, or other compensation (including benefits) paid to any executive employees above the grade of Building manager;

(xiii) The net (i.e. net of the reasonable costs of collection) amount recovered by Landlord under any warranty or service agreement from any contractor or service provider shall be credited against Landlord's Operating Expenses;

(xiii) Costs in connection with leasing space in the Complex or to retain existing tenants, including brokerage commissions, lease concessions, lease assumptions, rental abatements, construction allowances granted to specific tenants and alteration work performed by Landlord to prepare space for tenants, including any utilities or services incurred in connection with performing such work;

(xiii) The cost of any work or service performed or rendered exclusively for any tenant, including Tenant, or for which Tenant pays directly to any third party (i.e. costs of cleaning tenant spaces if Tenant provides its own janitorial services for the Premises) and costs incurred in connection with the making of repairs which are the obligations of another tenant of the Complex;

(xiv) The cost of acquisition of any sculpture, paintings or other objects of art; (xv) Any amounts billed or billable to Tenant or any other tenant for any services furnished to Tenant or any other tenant by Landlord or Landlord's agents or contractors for which a separate charge is made, including, without limitation, the supply of overtime air-conditioning, ventilation and heating, and above-standard cleaning services;

(xvi) costs of maintenance, repairs or replacements required because of the negligent or willful act or omission of Landlord, its officers, directors, servants, agents, employees or contractors;

(xvii) expenses to design and construct (including permitting fees, costs of insurance and bonds, and costs of equipment and materials) the Base Building Work, and any costs to correct any defects, latent or patent, in any of the equipment or improvements which are a part of the Base Building Work (except to the extent caused by Tenant's use of the Premises for other than general office use);

(xviii) Reserves for bad debts or for future improvements, repairs or additions;

(xix) above-standard cleaning (which shall include trash collection and removal), including, but not limited to construction cleanup or special cleanings associated with parties/events and specific tenant requirements in excess of service provided to Tenant;

(xx) the costs of new services or substantial increases in existing services to the extent such new or increased level of services are required solely as the result of the presence of a particular occupant at the Complex, such as for example, the cost of providing additional security services due to threats against a particular occupant;

(xxi) costs in connection with acquiring additional land or development rights or of constructing any additional buildings within the Complex; and

(xxii) costs of installing any new shared building amenities within the Complex after the Commencement Date and the cost to renovate the existing cafeteria and to construct the new fitness facility in Building A.

"Operating Expenses Allocable to the Premises" shall mean the same proportion of Landlord's Operating Expenses for and pertaining to the Complex as the Rentable Floor Area of the Premises bears to the Total Rentable Floor Area of the Complex; provided, however, that to the extent that any components of Landlord's Operating Expenses relate to services that are provided solely to a single Building or Buildings, "Operating Expenses Allocable to the Premises" for any such services shall mean the same proportion of Landlord's Operating Expenses for and pertaining solely to such services as the rentable floor area of that portion of the Premises located within such Building or Buildings to which the services are being exclusively provided bears to the total rentable floor area of such Building or Buildings (it being understood and agreed that to the extent any components of Landlord's Operating Expenses relate to services that are provided solely to a single Additional Building or Buildings in which Tenant does not lease any space, the cost of such services would not be included within Landlord's Operating Expenses billable to Tenant under this Lease).

For each calendar year falling within the Term, Tenant shall pay to Landlord, as Additional Rent, the Operating Expenses Allocable to the Premises for such corresponding full calendar year, and for each fraction of a calendar year falling within the Term at the beginning or end thereof, Tenant shall pay to Landlord, as Additional Rent, the product of (i) such applicable fraction of a calendar year and (ii) the Operating Expenses Allocable to the Premises for the calendar year in which said fraction occurs.

Not later than one hundred and twenty (120) days after the end of the first calendar year or fraction

thereof ending December 31 and of each succeeding calendar year during the Term or fraction thereof at the end of the Term, Landlord shall render Tenant a statement in reasonable detail and according to usual accounting practices certified by a representative of Landlord, showing for the preceding calendar year or fraction thereof, as the case may be, Landlord's Operating Expenses and Operating Expenses Allocable to the Premises. Said statement to be rendered to Tenant shall also show for the preceding year or fraction thereof as the case may be the amounts of operating expenses already paid by Tenant as Additional Rent, and the amount of operating expenses remaining due from, or overpaid by, Tenant for the year or other period covered by the statement. Within thirty (30) days after the date of delivery of such statement, Tenant shall pay to Landlord the balance of the amounts, if any, required to be paid pursuant to the above provisions of this Section 2.6 with respect to the preceding year or fraction thereof, or Landlord shall credit any amounts due from it to Tenant pursuant to the above provisions of this Section 2.6 against (i) monthly installments of fixed rent next thereafter coming due or (ii) any sums then due from Tenant to Landlord under this Lease (or refund such portion of the overpayment as aforesaid if the Term has ended and Tenant has no further obligation to Landlord).

In addition, Tenant shall make payments monthly on account of Operating Expenses Allocable to the Premises anticipated for the then current year at the time and in the fashion herein provided for the payment of fixed rent. The amount to be paid to Landlord shall be an amount reasonably estimated annually by Landlord to be sufficient to cover, in the aggregate, a sum equal to Operating Expenses Allocable to the Premises for each calendar year during the Term. Notwithstanding the foregoing, in determining the amount of Landlord's Operating Expenses for any calendar year or portion thereof falling within the Lease Term, if less than ninety-five percent (95%) of the Total Rentable Floor Area of the Buildings with respect to Landlord's Operating Expenses for and pertaining to the Buildings and/or less than ninety-five percent (95%) of the Total Rentable Floor Area of the Complex with respect to Landlord's Operating Expenses for and pertaining to the Site shall have been occupied by tenants at any time during the period in question, then, at Landlord's election, those components of Landlord's Operating Expenses that vary based on occupancy for such period shall be adjusted to equal the amount such components of Landlord's Operating Expenses would have been for such period had occupancy been ninety-five percent (95%) throughout such period.

2.6.1 Tenant's Audit Right

Subject to the provisions of this paragraph, Tenant shall have the right, at Tenant's cost and expense, to examine all documentation and calculations prepared in the determination of Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises (as defined in Section 2.7 below) (Collectively, the "Total Expenses"):

(1)        Such documentation and calculation shall be made available to Tenant at the offices where Landlord keeps such records during normal business hours within a reasonable time after Landlord receives a written request from Tenant to make such examination.

(2)        Having previously made such examination in respect of any period for which Landlord has given Tenant a statement of the actual amount of Landlord's Operating Expenses or Landlord's Tax Expenses, Tenant may not thereafter make a subsequent examination of Landlord's Operating Expenses or Landlord's Tax Expenses, as the case may be, for that same period.

(3)        Any request for examination in respect of any calendar year may be made no more than one (1) year after Landlord advises Tenant of the actual amount of Landlord's Operating Expenses or Landlord's Tax Expenses, as the case may be, in respect of

such calendar year or fiscal year and provides to Tenant the applicable year-end statement required under Section 2.6 or Section 2.7.

(4)        Such examination may be made only by Tenant's employees, internal accounting department, outside accountants or other professional auditing company, provided any such outside accountants and/or auditing company are not being paid by Tenant on a contingent fee basis.

(5)        As a condition to performing any such examination, Tenant and its examiners shall be required to execute and deliver to Landlord an agreement, in form attached hereto as Exhibit K, agreeing to keep confidential any information which it discovers about Landlord or the Buildings in connection with such examination; provided, however, that Tenant may disclose such information (i) to Tenant's employees, counsel and advisors who have the need to know such information in order to provide Tenant with advice in connection with such audit, (ii) actual or proposed successors, assigns, subtenants, lenders or purchasers of Tenant and (iii) to the extent required by applicable law or reporting requirements or by administrative, governmental or judicial proceeding.

(6)        If, after the audit by Tenant of Landlord's books and records pursuant to this Section 2.6.1 with respect to any calendar year or fiscal year, as applicable, it is finally determined that: (i) Tenant has made an overpayment on account of Operating Expenses Allocable to the Premises or Landlord's Tax Expenses Allocable to the Premises, as the case may be, Landlord shall credit such overpayment against the next installment(s) of Annual Fixed Rent thereafter payable by Tenant, except that if such overpayment is determined after the termination or expiration of the term of this Lease, Landlord shall promptly refund to Tenant the amount of such overpayment less any amounts then due from Tenant to Landlord; and (ii) Tenant has made an underpayment on account of Operating Expenses Allocable to the Premises or Landlord's Tax Expenses Allocable to the Premises, as the case may be, Tenant shall, within thirty (30) days of such determination, pay such underpayment to Landlord.

(7)        If, Tenant performs any such audit, it is determined that Landlord has overcharged Tenant on account of Operating Expenses Allocable to the Premises or Landlord's Tax Expenses Allocable to the Premises, as the case may be, by more than five percent (5%) in the aggregate, then Landlord shall reimburse Tenant for the reasonable out-of-pocket costs incurred by Tenant in performing such audit not to exceed Five Thousand and 00/100 Dollars ($5,000.00).

(8)        Any disputes under this Section 2.6.1 relating to amounts in excess of One Hundred Thousand and 00/100 Dollars ($100,000.00) may be resolved by arbitration under Section 8.31 below.

2.6.2 Tenant's Right to Provide Specified Services

So long as there shall be no lease of space in any of the Buildings then in effect between Landlord and a third party, Tenant shall have the right to require Landlord to terminate all of the "Specified Services" (hereinafter defined), which termination shall take effect on the sixtieth (60th) day following the date of Landlord's receipt of such termination notice (the "Service Termination Date"). Commencing at 12:01 AM on the Service Termination Date and continuing for the balance of the Lease Term as it may be extended, Tenant

shall perform or cause to be performed by contractors first reasonably approved by Landlord the Specified Services (hereinafter called "Tenant's Performance of the Specified Services") and the costs of the Specified Services shall no longer be included in Operating Expenses Allocable to the Premises. Tenant's Performance of the Specified Services shall be done in a manner consistent with the requirements of Exhibit C hereof and otherwise consistent with the operation of the Buildings and Site, as applicable, in a similar manner as operated by Landlord and in conformity with applicable Legal Requirements and the requirements of the insurers of the Complex. Tenant's indemnity as set forth in Section 5.7 shall include any and all loss, cost, expense and damage (including, without limitation, any damage to the Buildings, the Site or the Complex) arising or claimed to have arisen from Tenant or any other person, firm or entity providing or failing to provide the Specified Services. The "Specified Services" shall consist of, and be limited to, all of the interior cleaning and janitorial services for the Buildings (including replacement of all bulbs and ballasts). In any event, Landlord shall continue to provide all other services required to be provided by Landlord under this Lease with the exception of the Specified Services following Tenant's election to perform said Specified Services.

No later than ninety (90) days after the Service Termination Date, Landlord shall render Tenant a statement in reasonable detail and according to usual accounting practices certified by a representative of Landlord, showing for the "Subject Period" (hereinafter defined) Landlord's Operating Expenses respecting the Terminated Services. Such statement to be rendered to Tenant also shall show for the Subject Period, the amounts already paid by Tenant on account of Tenant's payments respecting the Terminated Services and the amount of payments remaining due from, or overpaid by, Tenant respecting the Terminated Services. If such statement shows a balance remaining due to Landlord, Tenant shall pay same to Landlord on or before the thirtieth (30th) day following receipt by Tenant of said statement. Any balance shown as due to Tenant shall be credited against Annual Fixed Rent next due, or refunded to Tenant if the Lease Term has then expired and Tenant has no further obligation to Landlord. The "Subject Period" is the period beginning on January 1st of the calendar year in which the Termination Date occurs and ending on the Service Termination Date.

The termination right of Tenant set forth in this Section 2.6.3 shall only apply to the Specified Services.

2.7 Real Estate Taxes

For each Tax Year falling within the Term, Tenant shall pay to Landlord, as Additional Rent, the Landlord's Tax Expenses Allocable to the Premises for such corresponding Tax Year, and for each fraction of a Tax Year falling within the Term at the beginning or end thereof, Tenant shall pay to Landlord, as Additional Rent, the product of (i) such Applicable fraction of a Tax Year and (ii) the Landlord's Tax Expenses Allocable to the Premises for the Tax Year in which said fraction occurs. Not later than ninety (90) days after Landlord's Tax Expenses Allocable to the Premises are determined for the first such Tax Year or fraction thereof and for each succeeding Tax Year or fraction thereof during the Term, Landlord shall render Tenant a statement in reasonable detail certified by a representative of Landlord showing for the preceding year or fraction thereof, as the case may be, real estate taxes on the Buildings and the Site and abatements and refunds of any taxes and assessments. Expenditures for legal fees and for other expenses incurred in seeking the tax refund or abatement may be charged against the tax refund or abatement before the adjustments are made for the Tax Year. Said statement to be rendered to Tenant shall also show for the preceding Tax Year or fraction thereof as the case may be the amounts of real estate taxes already paid by Tenant as

Additional Rent, and the amount of real estate taxes remaining due from, or overpaid by, Tenant for the year or other period covered by the statement. Within thirty (30) days after the date of delivery of the foregoing statement, Tenant shall pay to Landlord the balance of the amounts, if any, required to be paid pursuant to the above provisions of this Section 2.7 with respect to the preceding Tax Year or fraction thereof, or Landlord shall credit any amounts due from it to Tenant pursuant to the provisions of this Section 2.7 against (x) monthly installments of fixed rent next thereafter coming due or (y) any sums then due from Tenant to Landlord under this Lease (or refund such portion of the over-payment as aforesaid if the Term has ended and Tenant has no further obligation to Landlord). In the event Landlord succeeds in obtaining a reduction of such real estate taxes, rates or assessments with respect to a real estate tax fiscal year as to which Tenant contributed Tenant's share of Landlord's Tax Expenses, then, Tenant shall be entitled to receive its proportionate share of the net amount of any refund received or reduction obtained by Landlord to the extent allocable to the Term of this Lease. Tenant's entitlement to such refund amount shall survive the expiration of the Term.

Landlord will, upon the written request of Tenant, who together with other tenants lease at least fifty (50%) of the Total Rentable Floor Area of the Complex, at Landlord's election either (i) apply for an abatement of real estate taxes or (ii) allow such tenants to apply for abatements in their own name, or in Landlord's name, at their own cost (subject to such tenants' right to recover such costs on a first dollar basis from the abatement proceeds, if any). If such tenants apply for an abatement of real estate taxes, then Landlord shall have the right to be involved in each step of the abatement process, including, without limitation, Landlord's right to approve all filings in connection with such abatement proceedings (such approval not to be unreasonably withheld) and the right to attend all meetings between Tenant and its representatives and the representatives of the Town of Bedford.

In addition, payments by Tenant on account of Landlord's Tax Expenses Allocable to the Premises anticipated for the then current year shall be made monthly at the time and in the fashion herein provided for the payment of fixed rent. The amount so to be paid to Landlord shall be an amount reasonably estimated by Landlord to be sufficient to provide Landlord, in the aggregate, a sum equal to Landlord's Tax Expenses Allocable to the Premises, at least ten (10) days before the day on which such payments by Landlord would become delinquent.

To the extent that real estate taxes shall be payable to the taxing authority in installments with respect to periods less than a Tax Year, the foregoing statement shall be rendered and payments made on account of such installments.

Terms used herein are defined as follows:

(i)          "Tax Year" means the twelve-month period beginning July 1 each year during the Term or if the appropriate governmental tax fiscal period shall begin on any date other than July 1, such other date.

(ii)         "Landlord's Tax Expenses Allocable to the Premises" shall mean the same proportion of Landlord's Tax Expenses as the Rentable Floor Area of the Premises bears to the Total Rentable Floor Area of the Complex.

(iii)        "Landlord's Tax Expenses" with respect to any Tax Year means the aggregate real estate taxes on the Complex with respect to that Tax Year, reduced by any abatement receipts with respect to that Tax Year.

(iv)        "Real estate taxes" means all taxes and special assessments of every kind and

nature and user fees and other like fees assessed by any governmental authority on the Buildings or Site which the Landlord shall become obligated to pay because of or in connection with the ownership, leasing and operation of the Site, the Building and the Property and reasonable expenses of and fees for any formal or informal proceedings for negotiation or abatement of taxes (collectively, "Abatement Expenses"). The amount of special taxes or special assessments to be included shall be limited to the amount of the installment (plus any interest, other than penalty interest, payable thereon) of such special tax or special assessment required to be paid during the year in respect of which such taxes are being determined. There shall be excluded from such taxes (1) any income, estate, succession, inheritance and transfer taxes, (2) any increased real estate taxes attributable to any leasehold improvements made by other tenants of the Complex and (3) any tax penalties incurred as a result of Landlord's failure to make payments and/or to file any tax or informational returns when due. Notwithstanding the foregoing, if at any time during the Term the present system of ad valorem taxation of real property shall be changed so that in lieu of the whole or any part of the ad valorem tax on real property there shall be assessed on Landlord a capital levy or other tax on the gross rents received with respect to the Site or Buildings or Property, or a federal, state, county, municipal, or other local income, franchise, excise or similar tax, assessment, levy or charge distinct from any now in effect in the jurisdiction in which the Property is located is assessed and which is measured solely by, or based (in whole or in part) upon, any such gross rents, then any and all of such taxes, assessments, levies or charges, to the extent so measured or based, shall be deemed to be included within the term "real estate taxes" but only to the extent that the same would be payable if the Site and Buildings were the only property of Landlord. Landlord represents that the Complex constitutes one tax parcel which does not currently include any real estate or improvements other than the Site, the Buildings and the Additional Buildings.

2.8 Tenant Electricity

Landlord shall, at Landlord's sole cost and expense, install and deliver possession of the Premises to Tenant with separate meters installed to measure the electrical consumption in each of the Buildings comprising the Premises. Effective as of the Commencement Date and continuing throughout the Term, for so long as Tenant shall be directly leasing any of the Buildings in their entirety, Tenant covenants and agrees to make application to the appropriate utility company or utility provider for electrical service to any such Building or Buildings being directly leased in its or their entirety by Tenant and to make any deposit (including but not limited to, such letters of credit) as such utility company or provider shall require. Tenant covenants and agrees to pay, punctually as and when due, all electricity charges and rates for and relating to the Buildings and from time-to-time if requested by Landlord to provide Landlord with evidence of payment to, and good standing with, such utility company or provider as Landlord may reasonably require. Tenant further covenants and agrees to defend, save harmless and, indemnify Landlord against all liability, cost and damage arising out of or in any way connected to the payment, nonpayment or late payment of any and all charges or deposits to such utility company or provider.  The provisions of this Section 2.8 shall survive the expiration or termination of this Lease for a period of twelve (12) full calendar months.

ARTICLE III

Condition of Premises; Alterations

3.1 Base Building Work

(A) Definition of Base Building Work. The "Base Building Work" shall be all labor, materials and other work necessary to design, permit and perform the renovation of the Buildings and other portions of the Complex, as described in the Base Building Plans and Specifications described in subsection (B) below and shown in Exhibit B-1 attached hereto.

(B) Plans and Specifications. Attached hereto as Exhibit B-1 is a description of the scope of the Base Building Work, and as further reflected in the schematic plans and outline specifications dated January 25,2007 describing certain renovations to Buildings A, B, C, D, E and G of the Complex (the "Base Building Plans and Specifications") prepared on behalf of Landlord by Landlord's architect, ADD, Inc. ("Landlord's Architect"). Tenant hereby acknowledges its approval of the Base Building Plans and Specifications.

(C) Finish Allowances. It is acknowledged and agreed that Exhibit B-1 contemplates that Landlord shall be renovating the lobby of Building D as part of the Base Building Work. In connection therewith, Landlord shall submit its final construction documents showing the Building D lobby area to Tenant and, to the extent that Tenant desires to use different finishes on the lobby floors than the finishes shown on such final construction documents, Tenant shall submit to Landlord a list in reasonable specificity (including schematic plans and details where appropriate) of the finishes selected by Tenant for the lobby floors within fifteen (15) days after Tenant's receipt of the final construction documents from Landlord (such submission by Tenant being hereinafter referred to as "Tenant's Finish Selection Notice"). As soon as reasonably practicable but no later than fifteen (15) business days (unless Landlord has previously advised Tenant that a longer time period is reasonably necessary due to the nature and scope of Tenant's Finish Selection Notice or the fact that the information provided by Tenant in Tenant's Finish Selection Notice is insufficient for the purpose of enabling Landlord to make the determination set forth herein) after Landlord's receipt of Tenant's Finish Selection Notice, Landlord shall advise Tenant of any pricing, budgetary, scheduling or other matters, issues and/or problems reflected in or on Tenant's Finish Selection Notice which are inconsistent with the design, cost and construction schedule for the Base Building Work. In its response to Tenant's Finish Selection Notice, Landlord shall provide Tenant with available documentation from Landlord's general contractor substantiating the determination that an item or items will impact the current pricing of or schedule for the Base Building Work. Landlord shall have the right to approve all matters reflected in or on Tenant's Finish Selection Notice (which such approval shall not be unreasonably withheld, conditioned or delayed) and Landlord shall not be obligated to approve any portion of Tenant's Finish Selection Notice which (i) is likely to increase the cost of the Base Building Work for which Tenant does not agree to pay, (ii) extends or increases Landlord's estimated time to substantially complete the Base Building Work unless Tenant agrees that any delay caused by such portion of Tenant's Finish Selection Notice shall constitute a Tenant Delay (as defined in Section 3.5(C) below) for the purposes of this Article III. Such portion of Tenant's Finish Selection Notice as is approved by Landlord in accordance with the foregoing is hereinafter called the "Approved Tenant Lobby Finishes."

In connection with the foregoing, it is specifically understood and agreed that the cost of any portions of the Approved Tenant Lobby Finishes that exceed the allowances set forth on Exhibit B-1 relative thereto shall, at Tenant's option, either be (x) paid in full by Tenant prior to the commencement by Landlord of the Base Building Work or (y) paid by Tenant using the Tenant Allowance, subject to and in accordance with the provisions of Section 4.3 below. To the extent that the cost of the Approved Tenant Lobby Finishes are less than the allowances set forth on Exhibit B-1 relative thereto, Tenant shall not be entitled to any credit nor shall Tenant be entitled to apply any such savings against the other costs of the Tenant Improvement Work.

(D) Performance of Base Building Work. Landlord, at its sole cost and expense, shall promptly and with all due diligence perform the Base Building Work in a good and workmanlike manner and as set forth in the Base Building Plans and Specifications, and, in connection therewith, Landlord shall obtain all necessary governmental permits and approvals necessary for the construction of the Base Building Work.

3.2 Tenant Improvement Work

(A) Definition of Tenant Improvement Work. Tenant shall perform all work set forth in the Approved Tenant Improvement Construction Documents (as defined below) necessary to prepare the Premises for Tenant's use and occupancy (such work being hereinafter called the "Tenant Improvement Work"). It is expressly understood and
agreed that Tenant shall be liable, at its sole cost and expense, for the payment of all costs of the Tenant Improvement Work (subject to the provisions of Section 3.3 below).

(B) Tenant Improvement Construction Documents. On or before June 1,2007, Tenant shall cause its architect to prepare construction documents for the Tenant Improvement Work based on the preliminary schematic plans attached to this Lease as Exhibit B-2 (such construction drawings being hereinafter called the "Tenant Improvement Construction Documents") and shall submit the same to Landlord for its approval as set forth herein. Landlord shall review the Tenant Improvement Construction Documents and within fifteen (15) business days after receipt thereof Landlord shall provide Tenant with written notice of either (i) its approval of the Tenant Improvement Construction Documents or (ii) the need for additional information in order to review and approve the same. In its approval of the Tenant Improvement Construction Documents, Landlord shall specify those alterations, additions and improvements that must be removed by Tenant at the expiration or earlier termination of the Term. Landlord's failure to so respond within said fifteen (15) business day period shall be deemed to constitute Landlord's approval of the Tenant Improvement Construction Documents and determination that the alterations, additions and improvements shown thereon do not need to be removed by Tenant at the expiration or earlier termination of the Term. Notwithstanding the foregoing, it is understood and agreed that Tenant may apply for a building permit from the appropriate municipal officials prior to Landlord's final approval of the Tenant Improvement Construction Documents; provided that if Landlord shall disapprove any element of the Tenant Improvement Construction Documents, Tenant shall promptly revise the Tenant Improvement Construction Documents accordingly and (if required) resubmit the same to the municipal authorities. The Tenant Improvement Construction Documents, once approved or deemed approved, shall be referred to as the "Approved Tenant Improvement Construction Documents."

(C) Performance of Tenant Improvement Work. Upon the completion of the Approved Tenant Improvement Construction Documents, Tenant may enter the Premises (subject to and in accordance with the terms and provisions of Sections 3.4(A) and 3.6(A) below) to perform the Tenant Improvement Work as set forth in the Approved Tenant Improvement Construction Documents, and, in connection therewith, Tenant shall obtain all necessary governmental permits and approvals and submit any notifications required in connection with any Legal Requirements necessary for the construction of the Tenant Improvement Work (the "Tenant's Permits"). All of the Tenant Improvement Work shall be performed in accordance with the Approved Tenant Improvement Construction Documents and in accordance with applicable Legal Requirements and Insurance Requirements. Tenant shall have the Tenant Improvement Work performed by contractors, reasonably approved by Landlord (Landlord hereby approving J. Calnan & Associates, Inc. as Tenant's general contractor), which contractors shall provide to Landlord such insurance as Landlord may reasonably require (consistent with the size and scope of the Tenant Improvement Work project). Notwithstanding anything contained herein to the

contrary, it is understood and agreed that Tenant may retain contractors and subcontractors that use union or non-union labor in connection with the construction of the Tenant Improvement Work. In addition, during such time as Tenant is performing the Tenant Improvement Work under this Article III, Tenant, at Tenant's expense, or Tenant's general contractor shall also maintain builder's risk insurance for the full insurable value of such Tenant Improvement Work. It shall be Tenant's obligation to obtain a certificate of occupancy for the Tenant Improvement Work (except that Tenant shall not be in default hereunder to the extent that Tenant is unable to obtain the same due to the status of completion of the Base Building Work), and Tenant shall not occupy the Premises for the conduct of business until and unless such certificate of occupancy has been authorized for issuance by the applicable governmental authority (Tenant hereby agreeing to deliver a copy of the final certificate of occupancy for the Tenant Improvement Work to Landlord promptly after the issuance thereof). Tenant shall also prepare and submit to Landlord within two (2) months after the Tenant Improvement Work is substantially complete a set of as-built plans in both print and electronic forms showing the work performed by Tenant to the Premises including, without limitation, a schematic plan of any wiring or cabling installed by Tenant or Tenant's contractor for Tenant's computer, telephone and other communication systems.

(D) Change Orders. Tenant shall have the right, in accordance herewith, to submit for Landlord's approval change proposals subsequent to the completion of the Approved Tenant Improvement Construction Documents (each, a "Tenant Improvement Work Change Proposal"). Landlord agrees to respond to any such Tenant Improvement Work Change Proposal within such time as is reasonably necessary, but no more than five (5) business days, after the submission thereof by Tenant (unless Landlord has previously advised Tenant that a longer time period is reasonably necessary due to the nature and scope of the Tenant Improvement Work Change Proposal, together with Landlord's good faith estimate as to the amount of additional time that will be necessary, or the fact that the information provided by Tenant in the Tenant Improvement Work Change Proposal is insufficient for the purposes of enabling Landlord to make the determination set forth herein), advising Tenant of any items which Landlord in good faith reasonably believes are inconsistent with the design, cost and construction schedule for the Base Building Work, as well as specifying (subject to the terms of Section 5.2 below) whether any alterations, additions or improvements shown in the Tenant Improvement Work Change Proposal must be removed by Tenant upon the expiration or earlier termination of the Term ("Landlord's Tenant Improvement Work Change Order Response") (it being understood and agreed that Landlord's failure to respond within said five (5) business day period shall be deemed to constitute Landlord's approval of the Tenant Improvement Work Change Proposal and determination that none of the items shown thereon are to be removed by Tenant at the expiration or earlier termination of the Term). Tenant shall have the right to then proceed with or withdraw such Tenant Improvement Work Change Proposal within five (5) business days after receipt of Landlord's Tenant Improvement Work Change Order Response. If Tenant fails to respond to Landlord's Tenant Improvement Work Change Order Response within such five (5) business day period, such Tenant Improvement Work Change Proposal shall be deemed withdrawn. If Tenant proceeds with such Tenant Improvement Work Change Proposal, then such Tenant Improvement Work Change Proposal shall be deemed to be a part of the Approved Tenant Improvement Construction Documents for the purposes of this Article III.

3.3 Tenant Allowances

(A) Landlord shall provide to Tenant an allowance equal to the product of (i) $28.00 and (ii) the Total Rentable Floor Area of the Premises (the "Tenant Improvement Allowance"). The Tenant Improvement Allowance shall be used and applied by Tenant solely on account of the cost of the Tenant Improvement Work. For the purposes hereof, the costs to which the Tenant Improvement Allowance may be applied hereunder shall include the cost of leasehold improvements but not the cost of any of Tenant's personal property, trade fixtures or trade equipment or any so-called soft costs; provided, however, that a portion of the Tenant Improvement Allowance in an amount not to exceed the product of (x) $5.00 and (y) the Rentable Floor Area of the Premises may be applied towards the costs incurred by Tenant (as evidenced by paid invoices or receipts submitted by Tenant

to Landlord) in preparing architectural and engineering plans in connection with the Tenant Improvement Work and in installing wiring and cabling for Tenant's telecommunications equipment in the Premises.

In addition, Landlord shall provide to Tenant (i) an allowance of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (the "Restroom Allowance") to be used solely towards the costs of upgrades (including, without limitation, upgrades necessary to comply with the applicable provisions of the Americans With Disabilities Act (the "ADA")) to the existing restrooms in the Premises and the construction of a new restroom on the first floor of Building C (the "Restroom Work") as part of the Tenant Improvement Work and (ii) an allowance of Fifty Thousand and 00/100Dollars ($50,000.00) (the "Water Fountain and Fire Alarm Allowance") to be used solely towards the costs of installing ADA-compliant water fountains and fire alarm strobes in the Premises (the "Water Fountain and Fire Alarm Work") as part of the Tenant Improvement Work. In connection therewith, it is understood and agreed that (x) the Restroom Allowance may be applied solely towards the cost of the Restroom Work and the Water Fountain and Fire Alarm Allowance may be applied solely towards the cost of the Water Fountain and Fire Alarm Work, and (y) to the extent Tenant does not fully utilize the Restroom Allowance and/or the Water Fountain and Fire Alarm Allowance, as the case may be, Tenant shall not be entitled to apply any unused portions of the applicable allowance towards the costs of any other portion of the Tenant Improvement Work nor shall Tenant be entitled to any credit on account thereof; provided, however, that notwithstanding the foregoing, Tenant shall be entitled to apply any unused portions of the Water Fountain and Fire Alarm Allowance towards the cost of the Restroom Work.

The Tenant Improvement Allowance, the Restroom Allowance and the Water Fountain and Fire Alarm Allowance are hereinafter referred to collectively as the "Tenant Allowances."

(B) Landlord shall pay within thirty (30) days after receipt of a complete requisition (as hereinafter defined) submitted by Tenant to Landlord the requested portion(s) of the Tenant Allowances as set forth on such requisition either to Tenant or, at Tenant's election, directly to the contractors, vendors and other service providers performing the Tenant Improvement Work as Tenant may designate or request, until the entirety of Tenant Allowances have been applied towards the appropriate components of the Tenant Improvement Work as set forth in subsection (A) above. For the purposes hereof, a "requisition" shall mean written documentation, together with (i) an AlA requisition form with respect to work performed pursuant to Tenant's construction contract with its general contractor, (ii) invoices from Tenant's service providers, showing in reasonable detail the cost of the item in question or of the improvements installed to date in the Premises, (iii) lien waivers in the form attached hereto as Exhibit F-1 (provided that Tenant shall not be required to deliver any lien waivers with respect to any items of work covered by Tenant's first requisition for the Tenant Allowances to the extent Tenant had not paid the service provider(s) at issue prior to the date of such requisition, but Tenant shall deliver the lien waivers and evidence of payment in full of the items of work covered by such first requisition within twenty-one (21) days following the disbursement of the Tenant Allowances with respect to such first requisition) and (iv) certifications from Tenant that the amount of the requisition in question does not exceed the cost of the items, services and work covered by such certification. In the event that any portions of the Tenant Allowances reflected on a particular requisition are to be funded directly to Tenant, as Tenant may designate or request, such requisition shall be accompanied by evidence reasonably satisfactory to Landlord that the items, services and work covered by such requisition have been fully paid by Tenant. Landlord shall have the right, upon reasonable advance notice to Tenant, to inspect Tenant's books and records relating to each requisition in order to verify the amount thereof. Tenant shall submit requisition(s) no more often than monthly.

Notwithstanding anything contained herein to the contrary:

(i)          Landlord shall have no obligation to advance funds on account of the Tenant Allowances unless and until Landlord has received the requisition in question, together with the certifications required above.

(ii)         Except with respect to work and/or materials previously paid by Tenant (as evidenced by paid invoices and written lien waivers provided to Landlord), Tenant shall have the right to have portions of the Tenant Allowances paid directly to Tenant's contractors, consultants, service providers and vendors.

(iii)        Tenant shall not be entitled to any portion of the Tenant Allowances, and Landlord shall have no obligation to pay the Tenant Allowances, in respect of any requisition submitted after the date which is two (2) years from the Commencement Date (it being understood and agreed that irrespective of said time period, Tenant shall not be entitled to any payment or credit on account of any unused portions of the Tenant Allowances nor shall there be any application of the same toward Annual Fixed Rent or Additional Rent owed by Tenant under this Lease).

(iv)        Landlord shall have no obligation to fund any portion of the Tenant Allowances to the extent that (a) at the time of the requisition Tenant is in default under this Lease beyond the expiration of any notice and cure period (it being understood and agreed that if Tenant cures a default prior to the expiration of the applicable cure period, or if Tenant cures a default thereafter and Landlord has not terminated this Lease, Tenant shall be entitled to such payment from Landlord) or (b) there are any liens (unless bonded to the reasonable satisfaction of Landlord) filed against Tenant's interest in this Lease or against the Building or the Site arising solely out of the Tenant Improvement Work (specifically excluding the Base Building Work) or any litigation in which Tenant is a party relating to the Tenant Improvement Work.

(v)         For each requisition submitted by Tenant hereunder, Landlord shall only be required to disburse a portion of the applicable Tenant Allowance towards the total costs set forth on each such requisition in an amount equal to the same proportion as the total component of the Tenant Allowance at issue bears to the total costs of the Tenant Improvement Work towards which such component of the Tenant Allowances may be applied (with Tenant being fully and solely responsible for the remainder of the amount shown in the requisition). By way of example, if the total Tenant Improvement Allowance equals $4,200,000.00 and the total costs of the Tenant Improvement Work equal $6,300,000.00, then the ratio of the total Tenant Improvement Allowance to the total costs of the Tenant Improvement Work would be 2:3 and if Tenant submitted a requisition for $300,000.00, Landlord would be required to disburse $200,000.00 of the Tenant Improvement Allowance on account of such requisition and Tenant would be responsible for the remaining $100,000.00.

(vi)        In no event shall Landlord be deemed to have assumed any obligations, in whole or in part, of Tenant to any contractors, subcontractors, suppliers, workers or materialmen on account of the Tenant Improvement Work (specifically excluding the Base Building Work).

3.4 Substantial Completion

(A) Delivery Dates. It is understood and agreed that Landlord shall deliver the Premises to Tenant in phases in accordance with the following schedule so that Tenant may commence its construction of the Tenant Improvement Work:

| Phase | Delivery Conditions | Estimated Delivery Date |
|---|---|---|
| Building C | ● all replacement exterior glass has been installed<br>● new windows have been installed on the first floor level<br>● roof replacement work has been completed | September 14, 2007 |
| Building D | ● all replacement exterior glass has been installed<br>● the perimeter wall of the elevator shaft for the new elevator has been substantially completed<br>● asbestos abatement work to remove the vinyl asbestos floor tile and mastic has been substantially completed<br>● new electrical panel has been installed | September 28, 2007 |
| Building E | ● all replacement exterior glass has been installed<br>● modifications to freight elevator door have been completed | October 12, 2007 |

For the purposes hereof, the "Delivery Date" for each Building shall be deemed to have occurred on the date on which all of the applicable Delivery Conditions for such Building have been satisfied. Landlord shall use commercially reasonable efforts to cause the Delivery Date for each Building to occur on or before the respective dates set forth above for such Building (it being understood and agreed that the failure by Landlord to satisfy the applicable Delivery Conditions for any Building on or before the applicable Delivery Date for such Building as set forth above shall constitute a Landlord Delay under Section 3.5(A) below, except to the extent that such failure is the result of Tenant Delays or, subject to the limitations set forth in Section 3.5(B) below, Landlord's Force Majeure).

Notwithstanding the foregoing, upon the completion of the Approved Tenant Improvement Construction Documents, Tenant shall have the right to enter portions of the Premises prior to the date on which the applicable Delivery Conditions related to such portion of the Premises have been satisfied in order to perform specific components of the Tenant Improvement Work as set forth below, provided that such work can be performed safely and without unreasonable interference with the Base Building Work then being undertaken by Landlord in such portions of the Premises:

| Portion of Premises | Permissible Items of Tenant Improvement Work |
|---|---|
| Buildings C, D and E Second Floor | ● mechanical, electrical and plumbing coordination process<br>● electrical makesafe/temporary lighting<br>● mechanical, electrical and plumbing cut/cap/drop<br>● demolition<br>● metal stud framing/door frames (excluding the last fifteen (15) feet of any wall where it meets a window frame)<br>● rough overhead mechanical, electrical and plumbing work<br>● in wall rough (excluding the last fifteen (15) feet of any wall where it meets a window frame) |
| Buildings C, D and E First Floor | ● mechanical, electrical and plumbing coordination process<br>● electrical makesafe/temporary lighting<br>● mechanical, electrical and plumbing cut/cap/drop |

Notwithstanding the foregoing, Tenant shall not have the right to enter the second (2nd) floor of Building D prior to the completion of Landlord's asbestos abatement work in that portion of the Premises, which is estimated to be finished on or about June 15,2007.

Further, Tenant shall have the right to request Landlord's permission to enter portions of the Premises prior to the date on which the applicable Delivery Conditions related to such portion of the Premises have been satisfied in order to perform other components of the Tenant Improvement Work provided that the same can be performed safely and without unreasonable interference with the Base Building Work then being undertaken by Landlord, and Landlord shall evaluate any such requests in good faith and advise Tenant within five (5) business days after any request on a case-by-case basis whether or not such items of work may be performed by Tenant without Tenant's having been deemed to have begun its construction of the Tenant Improvement Work for the purpose of triggering the applicable Delivery Date hereunder.

Landlord shall provide Tenant with at least ten (10) days' advance notice of the date upon which Landlord estimates that the Delivery Conditions related to each of the Delivery Dates will be completed and the applicable Delivery Date will occur.

From and after the Delivery Date for a Building, Tenant shall have free and unimpeded access to such Building for purposes of performing the Tenant Improvement Work; provided, however, that Landlord shall continue to have access to such Building to perform the remaining portions of the Base Building Work therein, so long as such work can be performed safely and without unreasonable interference to the Tenant Improvement Work then being undertaken by Tenant.

(B) Base Building Work. The Base Building Work shall be deemed to be substantially completed on the date on which the work described in the Base Building Plans and Specifications has been completed except for so-called "punch-list" items of work and

adjustment of equipment and fixtures which can be completed after occupancy has been taken without causing substantial interference with Tenant's use and enjoyment of the Premises or the right to legally occupy the entire Premises.

(C) Delays in Completion of the Base Building Work. Landlord shall exercise commercially reasonable efforts to complete the Base Building Work within the Premises on or before March 31, 2008 and to complete the remainder of the Base Building Work outside of the Premises on or before May 1,2008 (in both cases, subject to Tenant Delays and, subject to the limitations set forth in Section 3.5(B) below, Landlord's Force Majeure). Notwithstanding anything contained in this Lease to the contrary, if Landlord shall fail to substantially complete the Base Building Work on or before June 1,2008 (which date shall be extended automatically for such periods of time as Landlord is prevented in delivering the same by reason of Landlord's Force Majeure or any Tenant Delay), the Annual Fixed Rent and payments on account of Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be abated by one (1) day for each day from and after June 1,2008 (as so extended) to the date of substantial completion of the Base Building Work.

If Landlord shall fail to substantially complete the Base Building Work by August 1,2008 (which date shall be extended automatically for such periods of time as Landlord is prevented in delivering the same by reason of Landlord's Force Majeure or any Tenant Delay), Tenant shall have the right to terminate this Lease effective as of the thirtieth (30th) day after receipt by Landlord of a notice from Tenant given on or after August 1, 2008 (as so extended) indicating Tenant's desire to so terminate and upon the giving of such notice, the Term of this Lease shall cease and come to an end without further liability or obligation on the part of either party as of the expiration of the aforesaid thirty (30) day period, unless the Base Building Work shall in fact be substantially completed as determined pursuant to Section 3.4(B) above on or before the expiration of such thirty (30) Day period.

The foregoing abatement and termination rights shall be Tenant's sole and exclusive remedies at law or in equity or otherwise for the failure of Landlord to substantially complete the Base Building Work within the time periods set forth above.

(D) Tenant Improvement Work. The Premises shall be deemed to be substantially completed, notwithstanding that the Tenant Improvement Work may not be complete and notwithstanding that a certificate of occupancy for the Tenant Improvement Work may not then have been approved for issuance or actually issued, on the date (the "Substantial Completion Date") which is the later to occur of (x) that date which is Two Hundred Ten (210) days after the Building C Delivery Date and (y) May 1, 2008, subject in the case of (x) and (y) to Tenant's Force Majeure (subject to the limitations of Section 3.5(D) below) and Landlord Delays; provided, however, that under no circumstances shall the Substantial Completion Date be deemed to have occurred hereunder until such time as the Base Building Work has been substantially completed (or deemed substantially completed) in accordance with the terms and conditions of Section 3.4(B) above.

3.5 Force Majeure and Other Delays

(A) Landlord Delays. A "Landlord Delay" shall be defined as any delay in the design, permitting or performance of the Tenant Improvement Work and/or the authorization for issuance of a certificate of occupancy to the extent that such delay is actually caused by any act or, where there is a duty to act under this Lease, any failure to act by Landlord or Landlord's contractors, architects, engineers, or anyone else engaged by or on behalf of Landlord in connection with the construction of the Base Building Work as set forth in this Article III (including, without limitation, any failure by Landlord to meet any of the Delivery Conditions for any of the Buildings by the applicable date set forth in Section 3.4(A) above, except to the extent such failure is the result of Tenant Delays or, subject to the limitations of subsection (B) below, Landlord's Force Majeure) and disclosed to Landlord as hereinafter provided. Notwithstanding the foregoing, in no event shall any delays in the completion of the Tenant Improvement Work caused by Landlord's use of non-union labor constitute a Landlord Delay hereunder.

Notwithstanding the foregoing, no event shall be deemed a Landlord Delay unless and until Tenant has given Landlord written notice (the "Landlord Delay Notice") advising Landlord: (x) that a Landlord Delay is occurring and setting forth Tenant's good faith estimate as to the likely length of such Landlord Delay; (y) of the basis on which Tenant has determined that a Landlord Delay is occurring; and (z) the actions which Tenant believes that Landlord must take to eliminate such Landlord Delay; provided, however, no Landlord Delay Notice shall be required with respect to any failure of Landlord to satisfy the Delivery Conditions for a Building as of the Delivery Date applicable to such Building set forth in Section 3.4(A) above. No event shall be deemed to be a Landlord Delay unless and until Landlord has failed to rectify the situation causing the Landlord Delay within forty-eight (48) hours after Landlord's receipt of the Landlord Delay Notice (which for the purposes of determining receipt may be delivered by hand to Landlord's Construction Representative, with copies to follow to Landlord at the notice address set forth in Section 1.1 of this Lease within five (5) days thereafter); provided, however, that if Landlord shall fail to eliminate the Landlord Delay within the aforesaid 48-hour period, then the 48-hour cure period shall be included in the period of time charged to Landlord pursuant to such Landlord Delay Notice (it being understood and agreed that if Landlord shall in fact eliminate the delay within the 48-hour cure period, no Landlord Delay shall be deemed to have occurred for the purposes of this Article III). In addition, any delay to the extent caused by (i) Tenant Delay (as defined in subsection (C) below) or (ii) subject to the limitations set forth in subsection (B) below, Landlord's Force Majeure (as defined in said subsection (B» shall not constitute Landlord Delay.

(B) Landlord's Force Majeure. For the purposes of this Article III, "Landlord's Force Majeure" shall mean delays due to unusual scarcity of or inability to obtain labor or materials (to the extent that such scarcity or inability is the result of conditions not prevalent in the market, and otherwise unforeseen, as of the date of this Lease), unusual or unforeseen labor difficulties (with the exception of strikes or other labor difficulties caused by or resulting from the use by either Landlord or Tenant of non-union labor at the Site), casualty or other causes beyond Landlord's reasonable control. Landlord shall provide Tenant with written notice within forty-eight (48) hours after the occurrence of any Landlord's Force Majeure event hereunder (together with Landlord's good faith estimate of the projected duration of such Landlord's Force Majeure event), and shall also notify Tenant as soon as such Landlord's Force Majeure event has ended. In no event shall any Landlord's Force Majeure under this Section 3.5(B) exceed a total of ninety (90) days in the aggregate. In addition, it is expressly understood and agreed that any casualty or Taking (as defined in Article VI below) that occurs prior to the Commencement Date of this Lease shall be deemed to be an event of Landlord's Force Majeure and/or Tenant's Force Majeure (as applicable) and shall be governed by the provisions of this Article III related thereto and not by the provisions of said Article VI.

(C) Tenant Delays. A "Tenant Delay" shall be defined as any delay in the design, permitting or performance of the Base Building Work to the extent that such delay is actually caused by any act or, where there is a duty to act under this Lease, any failure to act by Tenant or Tenant's contractors, architects, engineers, or anyone else engaged by or on behalf of Tenant in connection with the construction of the Tenant Improvement Work as set forth in this Article III (including, without limitation, any delays resulting from the Approved Tenant Finishes under Section 3.l(C) above) and disclosed to Tenant as hereinafter provided. Notwithstanding the foregoing, in no event shall any delays in the completion of the Base Building Work caused by Tenant's use of non-union labor constitute a Tenant Delay hereunder.

Notwithstanding the foregoing, no event shall be deemed a Tenant Delay unless and until Landlord has given Tenant written notice (the "Tenant Delay Notice") advising Tenant: (x) that a Tenant Delay is occurring and setting forth Landlord's good faith estimate as to the likely length of such Tenant Delay; (y) of the basis on which Landlord has determined that a Tenant Delay is occurring; and (z) the actions which Landlord believes that Tenant must take to eliminate such Tenant Delay. No event shall be deemed to be a Tenant Delay unless and until Tenant has failed to rectify the situation causing the Tenant Delay within forty-eight (48) hours after Tenant's receipt of the Tenant Delay Notice (which for the purposes of determining receipt may be delivered by hand to Tenant's Construction Representative, with copies to follow to Tenant at the notice address set forth in Section 1.2 of this Lease within five (5) days thereafter); provided, however, that if Tenant shall fail to eliminate the delay within the aforesaid 48-hour period, then the 48-hour cure period shall be included in the period of time charged to Tenant pursuant to such Tenant Delay Notice (it being understood and agreed that if Tenant shall in fact eliminate the Tenant Delay within the 48-hour cure period, no Tenant Delay shall be deemed to have occurred for the purposes of this Article III). In addition, any delay to the extent caused by (i) Landlord Delay or (ii) subject to the limitations of subsection (D) below, Tenant's Force Majeure (as defined in said subsection (D)) shall not constitute Tenant Delay.

Tenant covenants that no Tenant Delay shall delay commencement of the Term or the obligation to pay Annual Fixed Rent or Additional Rent. The Delivery Dates and/or the date of substantial completion of the Base Building Work, as applicable, shall be deemed to have occurred as of the date when such Delivery Dates and/or date of substantial completion of the Base Building Work, as applicable, would have occurred but for any Tenant Delays, as determined by Landlord in the exercise of its good faith business judgment (it being understood and agreed that the foregoing shall not be construed so as to relieve Landlord of its obligation to actually complete the Base Building Work, notwithstanding the fact that substantial completion may have been deemed to have occurred prior to actual completion as the result of Tenant Delays).

(D) Tenant's Force Majeure. For the purposes of this Article III, "Tenant's Force Majeure" shall mean delays due to unusual scarcity of or inability to obtain labor or materials (to the extent that such scarcity or inability is the result of conditions not prevalent in the market, and otherwise unforeseen, as of the date of this Lease), unusual or unforeseen labor difficulties (with the exception of strikes or other labor difficulties caused by or resulting from the use by either Landlord or Tenant of non-union labor at the Site), casualty or other causes beyond Tenant's reasonable control. Tenant shall provide Landlord with written notice within forty-eight (48) hours after the occurrence of any Tenant's Force Majeure event hereunder (together with Tenant's good faith estimate of the projected duration of such Tenant's Force Majeure event), and shall also notify Landlord as soon as such Tenant's Force Majeure event has ended. In no event shall any Tenant's Force Majeure under this Section 3.5(D) exceed a total of ninety (90) days in the aggregate. In addition, it is expressly understood and agreed that any casualty or Taking (as defined in Article VI below) that occurs prior to the Commencement Date of this Lease shall be deemed to be an event of Landlord's Force Majeure and/or Tenant's Force Majeure (as applicable) and shall be governed by the provisions of

this Article III related thereto and not by the provisions of said Article VI.

3.6 Quality and Performance of Work

(A) Quality; Cooperation. All construction work required or permitted by this Lease shall be done in a good and workmanlike manner and in compliance with all applicable laws, ordinances, rules, regulations, statutes, by-laws, court decisions, and orders and requirements of all public authorities ("Legal Requirements") and all Insurance Requirements. Landlord and Tenant acknowledge and agree that, notwithstanding the phasing of the Delivery Dates as set forth in Section 3.4 above, components of the Base Building Work and Tenant Improvement Work will be performed simultaneously, and accordingly agree to work cooperatively in order to coordinate the performance of the Base Building Work and the Tenant Improvement Work so that neither party unreasonably interferes with or delays the efforts of the other to complete its respective portion of the work within the time periods set forth herein; provided, however, that notwithstanding anything contained in Section 3.4(A) to the contrary, (i) prior to the occurrence of a Delivery Date for a particular Building, Landlord's performance of the Base Building Work in such Building shall have priority in terms of access, scheduling and other aspects requiring coordination between Landlord and Tenant and (ii) from and, after the occurrence of a Delivery Date for a particular Building, Tenant's performance of the Tenant Improvement Work in such Building shall have priority in terms of access, scheduling and other aspects requiring coordination between Landlord and Tenant. Each party may inspect the work of the other at reasonable times and shall promptly give notice of observed defects. Each party authorizes the other to rely upon the approval and other actions on the party's behalf by any Construction Representative of the party named in Section 1.1 or any person hereafter designated in substitution or addition by notice to the party relying.

In connection with the foregoing, Landlord and Tenant (together with their respective contractors and representatives, as appropriate) agree to hold periodic job meetings to discuss the performance and scheduling of the Base Building Work and the Tenant Improvement Work. In addition, from time to time during the performance of the Base Building Work and the Tenant Improvement Work under this Article III, either party may request construction information from the other party's Construction Representative to

the extent reasonably necessary in connection with the performance by the requesting party of the work for which it is responsible hereunder.

In the event of any casualty during the performance of the Base Building Work and the Tenant Improvement Work under this Article III, it is understood and agreed that each party shall be solely responsible for the restoration of their respective components of work.

(B) Correction of Defects.

(i) Landlord warrants to Tenant that: (a) the materials and equipment furnished in the performance of the Base Building Work will be of good quality (except to the extent used by any of the Tenant Parties, as hereinafter defined, in the performance of the Tenant Improvement Work); (b) the Base Building Work will be free from defects not inherent in the quality described in the Base Building Plans and Specifications; and (c) the Base Building Work and all components thereof shall be weather-tight (except to the extent resulting from particular components of the Tenant Improvement Work, such as rooftop penetrations) and otherwise in good working order and condition and shall comply with all Legal Requirements as of the completion of the Base Building Work. Any portion of the Base Building Work not conforming to the foregoing requirements may be considered defective. Landlord's warranty hereunder shall not

apply to the extent of damage or defect caused by (1) the negligent acts or omissions or the willful misconduct of Tenant, its employees, agents, contractors, sublessees or permitted occupants under Section 5.6.6 below (hereinafter, the "Tenant Parties"), (2) improper operation by any of the Tenant Parties, or (3) normal wear and tear and normal usage.

(ii) The warranty contained in the foregoing subsection (i) shall commence on the date on which Landlord has completed the Base Building Work under Section 3.4(B) above (the "Completion Date") and shall expire on the day immediately preceding the first (1st) anniversary of the Completion Date, provided that Tenant is required to deliver notice to Landlord of any defects within three hundred twenty (320) days of the Completion Date (the "Warranty Notice Period") in order to permit Landlord to take action to enforce Landlord's warranty rights with respect to the Base Building Work. In the event that the Completion Date is delayed as the result of any Tenant Delay, the Warranty Notice Period shall commence on the date that the Base Building Work would have been completed but for the Tenant Delay.

(iii) Landlord agrees that it shall, without cost to Tenant, correct any portion of the Base Building Work which during the Warranty Period is found not to be in accordance with the warranties set forth in subsection (i) above. All defective items shall, subject to Tenant Delays and provided that Tenant has afforded Landlord with reasonable access to the Premises subject to the terms and provisions of Section 5.9 below in order to undertake the work described herein, be completed by Landlord within a reasonable period of time to be mutually agreed upon by Landlord and Tenant given the nature of the defect at issue after Landlord's receipt of a written notice from Tenant setting forth in reasonable detail the nature of the defect and Tenant's assessment of why it believes such defect is covered by the warranties set forth herein (Landlord hereby agreeing to use reasonable efforts to minimize interference with Tenant's use and enjoyment of the Premises, consistent with the fact that Landlord is undertaking to remedy the defective work).

(iv) Except to the extent to which Tenant shall have given notice to Landlord within the Warranty Notice Period of the respects in which the Base Building Work is not in conformance with the warranties set forth in subsection (i) above, Tenant shall be deemed conclusively to have approved Landlord's construction of the Base Building Work and shall have no claim that Landlord has failed to perform any of its obligations under this Article III. Notwithstanding the foregoing, Landlord agrees that upon and after the expiration of the Warranty Notice Period, Landlord shall, at Tenant's request and at Tenant's sole cost and expense, enforce and exercise on behalf of Tenant any and all construction and manufacturers' warranties and guaranties with respect to the Base Building Work to the extent still in force and effect at the time of Tenant's request.

(D) Time of Essence. Time is of the essence with respect to all of the time periods set forth in this Article III. Where no specific time period is specified herein for any review, approval, consent, or similar action required to be performed by Landlord under this Article III, Landlord shall respond to any request from Tenant, and/or Tenant's Construction Representative for approvals or information in connection with the work contemplated by this Article III within five (5) business days after Landlord's receipt of such request. Where no specific time period is specified herein for any review, approval, consent, or similar action required to be performed by Tenant under this Article III, Tenant shall respond to any request from Landlord and/or Landlord's Construction Representative for approvals or information in connection with the work contemplated by this Article III within five (5) business days after Tenant's receipt of such request.

3.7 Arbitration

Any disputes relating to provisions or obligations in this Article III or arising from the performance of the parties under this Article III shall be resolved by arbitration, under the Construction Industry Rules of the American Arbitration Association (the "AAA"), and subject to the provisions of Mass. General Laws, c. 251, with hearings conducted as expeditiously as practicable and with no undue delay, and in no event later than sixty (60) days after the date of demand, in Boston, Massachusetts. Prior written notice of application by either party for arbitration shall be given to the other at least ten (10) days before filing of any demand for arbitration hereunder. Any award of an arbitrator rendered hereunder shall be subject to confirmation and entry of judgment thereon in any court of competent jurisdiction sitting in Suffolk or Middlesex Counties, Massachusetts, and the parties hereby consent to the jurisdiction of such court. The costs and administration expenses of each arbitration hereunder and their apportionment between the parties shall be borne equally by the parties, and each party shall be responsible for its own attorneys' fees and expert witness fees. In connection with the foregoing, it is expressly understood and agreed that the parties shall continue to perform their respective obligations under this Lease during the pending of any such arbitration proceeding hereunder (with any adjustments or reallocations to be made on account of such continued performance as determined by the arbitrator in his or her award).

3.8 Escrow of Funds

In the event that the Landlord originally named herein transfers, sells, assigns or otherwise conveys its interest in the Complex (a "Landlord Transfer") prior to the earlier of (i) the date that the Tenant Allowances have been fully disbursed by Landlord, and (ii) that date which is thirty (30) days from the first anniversary of the Commencement Date (the later of (i) and (ii) being referred to as the "Outside TI Date"), then prior to or at the time of such Landlord Transfer, the Landlord originally named herein shall, at its election, (a) deposit into an escrow account in form and substance, and with an escrow agent, reasonably satisfactory to Landlord and Tenant, cash in the amount of the undisbursed portions of the Tenant Allowances, such escrow account to be used to fund the remaining allowance obligations of Landlord under this Lease, or (b) provide Tenant with a letter of credit, in form and substance, and from an issuing bank, reasonably satisfactory to Tenant in the amount of the undisbursed portions of the Tenant Allowances, such letter of credit to be held by Tenant as security for the remaining allowance obligations of Landlord under this Lease. Any funds remaining in the escrow account, or the letter of credit, as the case may be, shall be returned to the Landlord named herein promptly after the later of (i) the Outside TI Date and (ii) the repayment of all reimbursable amounts of the Tenant Allowances properly and timely requested by Tenant in accordance with the provisions of this Lease.

ARTICLE IV

Landlord's Covenants; Interruptions and Delays

4.1 Landlord Covenants

Landlord covenants and agrees to the following during the Term

4.1.1 Services Furnished by Landlord

To furnish services, utilities, facilities and supplies set forth in Exhibit C attached hereto to the Premises and the Complex in a manner equal to that customarily provided by landlords in comparable, first-class office/research and development multi-building complexes in the Boston Northwest Suburban Market subject to reimbursement in accordance with, and as limited by, the provisions of Section 2.6.

4.1.2 Additional Services Available to Tenant

To furnish, at Tenant's expense, reasonable additional Building operation services which are usual and customary in comparable, first-class office/research and development complexes in the Boston Northwest Suburban Market upon reasonable advance request of Tenant at reasonable and equitable rates from time to time established by Landlord. Tenant agrees to pay to Landlord, as Additional Rent, the cost of any such additional Building services requested by Tenant and for the cost of any additions, alterations, improvements or other work performed by Landlord in the Premises at the request of Tenant within thirty (30) days after being billed therefor.

4.1.3 Roof, Exterior Wall, Floor Slab and Common Facility Repairs

Except for damage caused by fire and casualty and by eminent domain, and except as otherwise provided in Article VI and subject to reimbursement in accordance with, and as limited by, the provisions of Section 2.6, (i) to make such repairs and/or replacements (as appropriate) to all structural and non-structural portions and components of the roof systems (including roof membranes) and the mechanical, electrical, plumbing, sprinkler, fire/life safety and the heating, ventilating and air conditioning ("HV AC") systems serving the Premises (but exclusive of any specialty installations installed or requested by Tenant that exclusively serve the Premises which shall be maintained at Tenant's sole cost and expense), the Common Areas and the Structural Elements (as hereafter defined) as may be necessary to keep them in good and operable condition consistent with the level of maintenance and repair customary for comparable, first-class office/research and development properties in the Boston Northwest Suburban Market, and (ii) to maintain the Complex (exclusive of Tenant's responsibilities under this Lease) in a first class manner comparable to the maintenance of similar first-class office/research and development complexes in the Boston Northwest Suburban Market. The term "Structural Elements" shall mean the structural components of the Buildings, including without limitation the roofs, foundations, exterior structural walls, floor/ceiling slabs, exterior glass and mullions, columns, beams, shafts, elevator cabs and other load-bearing elements of the Buildings.

Within six (6) months following the substantial completion of the Base Building Work (but not as a condition of substantial completion), Landlord agrees to perform, at its sole cost and expense, an infrared scan of the roofs of Buildings C, D and E and to provide Tenant with a

copy of the results of such scan. In the event that such scan revels that the roof systems are not weather-tight (except to the extent resulting from particular components of the Tenant Improvement Work), Landlord agrees, at Landlord's sole cost and expense and without inclusion in Landlord's Operating Expenses, to promptly and diligently repair any such problem areas in accordance with good and sound construction standards in the commercial roofing industry.

4.2 Interruptions and Delays in Services and Repairs, Etc.

(A) Except as specifically provided in Section 4.2(C) below, Landlord shall not be liable to Tenant for any compensation or reduction of rent by reason of inconvenience or annoyance or for loss of business arising from the necessity of Landlord or its agents entering the Premises in accordance with, and as limited by, the provisions of Section 5.9 below for any of the purposes in this Lease authorized, or for repairing the Premises or any portion of the Buildings however the necessity may occur. In case Landlord is prevented or delayed from making any repairs, alterations or improvements, or furnishing any services or performing any other covenant or duty to be performed on Landlord's part, by reason of any cause reasonably beyond Landlord's control, Landlord shall not be liable to Tenant therefor, nor, except as expressly otherwise provided in Section 4.2(C) or in Article VI, shall Tenant be entitled to any abatement or reduction of rent by reason thereof, or right to terminate this Lease, nor shall the same give rise to a claim in Tenant's favor that such failure constitutes actual or constructive, total or partial, eviction from the Premises.

(B) Landlord reserves the right to stop any service or utility system, when necessary by reason of accident or emergency, or until necessary repairs have been completed; provided, however, that in each instance of stoppage, Landlord shall exercise reasonable diligence to eliminate the cause thereof. Except in case of emergency repairs, Landlord will give Tenant reasonable advance notice of any contemplated stoppage and will use reasonable efforts to avoid unnecessary inconvenience to Tenant by reason thereof, including, without limitation, scheduling such stoppage during Tenant's non-business hours to the extent commercially practicable under the circumstances.

(C) Notwithstanding anything to the contrary in this Lease contained, if due to (i) any repairs, alterations, replacements, or improvements made by Landlord, (ii) Landlord's failure to make any repairs, alterations, or improvements required to be made by Landlord hereunder, or to provide any service required to be provided by Landlord hereunder, or to remediate any Hazardous Materials (as that term is defined in Section 5.3 below) required to be remediated by Landlord hereunder, or (iii) failure of electric supply, water and/or sewer service, or HVAC service to the Premises, any portion of the Premises becomes untenantable so that for the Premises Untenantability Cure Period, as hereinafter defined, the continued operation in the ordinary course of Tenant's business is materially adversely affected (including, without limitation, as the result of the Premises being rendered inaccessible as the result of any of the circumstances described in subsections (i), (ii) or (iii) above), then, provided that Tenant ceases to use the affected portion of the Premises during the entirety of the Premises Untenantability Cure Period by reason of such untenantability, and that such untenantability and Landlord's inability to cure such condition is not caused by the fault or neglect of Tenant or Tenant's agents, employees or contractors, Annual Fixed Rent, Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall from and after the expiration of the Premises Untenantability Cure Period be abated in proportion to such untenantability and its impact on the continued operation in the ordinary course of Tenant's business until the day such condition is completely corrected, For the purposes hereof, the "Premises Untenantability Cure Period" shall be defined as five (5) consecutive business days after Landlord's receipt of written notice from Tenant of the condition causing untenantability in the Premises, provided however, that the Premises Untenantability Cure Period shall be ten (10) consecutive business days after Landlord's

receipt of written notice from Tenant of such condition causing untenantability in the Premises if either the condition was caused by causes beyond Landlord's control or Landlord is unable to cure such condition as the result of causes beyond Landlord's control.

In addition, if due to (a) any repairs, alterations, replacements, or improvements made by Landlord, (b) Landlord's failure to make any repairs, alterations, or improvements required to be made by Landlord hereunder or to provide any service required to be provided by Landlord hereunder, (c) Landlord's Failure to remediate any Hazardous Materials required to be remediated by Landlord under this Lease, or (d) the failure of electric supply, water and/or sewer service, or HV AC service to the Premises, the operation of Tenant's business in the Premises in the normal course is materially adversely affected (including, without limitation, as the result of the Premises being rendered inaccessible as the result of any of the circumstances described in clauses (a), (b), (c) or (d) above) for a period of five (5) consecutive months after Landlord's receipt of written notice of such condition from Tenant, then, provided that Tenant ceases to use the affected portion of the Premises for the period of such untenantability and such untenantability and Landlord's inability to cure such condition is not caused by the fault or neglect of Tenant, or Tenant's agents, employees or contractors, then Tenant may terminate this Lease by giving Landlord written notice as follows:

(i) Said notice shall be given after said five (5) month period.

(ii)         Said notice shall set forth an effective date which is not earlier than thirty (30) days after Landlord receives said notice.

(iii)        If said condition is remedied on or before the date thirty (30) days after the receipt of such notice, said notice shall have no further force and effect.

(iv)        If said condition is not remedied on or before the date thirty (30) days after the receipt of such notice for any reason other then Tenant's fault, as aforesaid, the Lease shall terminate as of said effective date, and the Annual Fixed Rent and Additional Rent due under the Lease shall be apportioned (to the extent not abated) as of said effective date.

The remedies set forth in this Section 4.2(C) shall be Tenant's sole remedies for the events described herein. The provisions of this subsection shall not apply in the event of untenantability caused by fire or other casualty, or taking (which shall be subject to the terms and conditions of Article VI below).

4.3 Landlord's Insurance

Landlord shall carry at all times during the Term of this Lease (i) commercial general liability insurance with respect to the Buildings in an amount not less than $10,000,000.00 combined single limit per occurrence, (ii) insurance against loss or damage with respect to the Complex covered by the so-called "all risk" type insurance coverage with customary exceptions in an amount equal to one hundred percent (100%) of the replacement value of all improvements within the Complex and (iii) loss of "rental value" insurance in an amount equal to not less than the Annual Fixed Rent and payments on account of Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises payable by Tenant under this Lease for not less than a one (1) year period (with a customary deductible). Landlord may also maintain such other insurance as may from time to time be required by a mortgagee holding a mortgage lien on the Buildings. Further, Landlord may also maintain such insurance against loss of annual fixed rent and additional rent and such other risks and perils as Landlord deems proper. Any and all such insurance (x) may be maintained under a blanket policy affecting other properties of Landlord and/or its affiliated business organizations, (y) may be written with

deductibles as reasonably determined by Landlord (which such deductible is currently $25,000.00) and (z) shall be subject to reimbursement in accordance with Section 2.6.

Nothing contained herein shall be construed so as to require Landlord to maintain terrorism or environmental pollution liability insurance (it being acknowledged, however, that Landlord does in fact maintain such coverages as of the date of this Lease); provided, however, that in the event the Landlord originally named herein shall sell, transfer, assign, conveyor ground lease its interest in the Complex to an unaffiliated third party, such new owner and any subsequent party succeeding to the original Landlord's interest as Landlord under this Lease shall not be entitled to charge to Tenant at any time during the Term as part of Operating Expenses Allocable to the Premises any costs of terrorism or environmental pollution liability insurance in excess of one hundred ten percent (110%) of the costs being paid by Tenant on account of such coverages during the last full calendar year immediately prior to the conveyance by the original named Landlord.

4.4 Landlord's Indemnity

Subject to the limitations of Section 8.4 below and to the provisions of Section 8.19 below, to the maximum extent this agreement is effective according to law and to the extent not resulting from any act, omission, fault, negligence or misconduct of Tenant or its contractors, agents, licensees, invitees, servants or employees, Landlord agrees to defend with counsel first approved by Tenant (counsel appointed by Landlord's insurance carrier shall be deemed approved by Tenant and for any other circumstances such approval shall not be unreasonably withheld or delayed) indemnify and save harmless Tenant and Tenant's beneficiaries, partners, subsidiaries, officers, directors, agents, trustees and employees (collectively, the "Tenant Parties") from and against any claim arisin from any injury to any person occurring in the Premises, in the Buildings or on the Site after the date that possession of the Premises is first delivered to Tenant and until the expiration or earlier termination of the Lease Term, to the extent such injury results from the negligence or willful misconduct of Landlord or Landlord's agents, employees or contractors provided, however that in no event shall the aforesaid indemnity render Landlord responsible or liable for any loss or damage to fixtures or personal property of Tenant and Landlord shall in no event be liable for any indirect or consequential damages; and provided, further, that the provisions of this Section 4.4 shall not be applicable to the holder of any mortgage now or hereafter on the Site or the Buildings (whether or not such holder shall be a mortgagee in possession of or shall have exercised any rights under a conditional, collateral or other assignment of leases and/or rents respecting, the Site and/or Buildings) except to the extent otherwise agreed by such holder in any Subordination, Non-Disturbance and Attornment Agreement by and between Tenant and such holder.

4.5 Compliance with Laws

To the best of Landlord's actual knowledge, the Buildings were constructed in accordance with the provisions of the Zoning Bylaw for the Town of Bedford and other laws, ordinances, rules and regulations applicable to the Buildings as of the construction thereof.

4.6 Leasing Restrictions

Provided that, on the condition that and only so long as (i) Tenant directly leases from Landlord at least 75,000 square feet of rentable floor area and its Government and Industrial Division is still in occupancy of portions of the Premises, (ii) no Event of Default of Tenant exists, (iii) this Lease is still in full force and effect, and (iv) Tenant has neither assigned this Lease nor sublet the Premises in its entirety (except for an assignment or sublease under Section 5.6.1 above or a permitted occupancy under Section 5.6.6 below), (a) Landlord shall not hereafter directly enter into a lease of other space

in the Complex with any of the "Named Companies" (as hereinafter defined), and (b) Landlord agrees to include in all "Future Leases" (as hereinafter defined) the same clause as is contained in Section 5.6.2(i) below (the "Assignment and Subletting Restriction Clause") which would allow Landlord to withhold its consent (and Landlord shall so withhold its consent) to a proposed assignment or sublease that would be in violation of the restrictions of this Section 4.6. Landlord shall use commercially reasonable efforts to enforce the terms of the Assignment and Subletting Restriction Clauses in its Future Leases, but in no event shall Landlord be liable to Tenant (x) for the failure of other occupants of the Complex to comply with the Assignment and Subletting Restriction Clause so long as Landlord has withheld its consent and used commercially reasonable efforts to enforce the same as aforesaid or (y) to the extent that a court of competent jurisdiction determines that the Assignment and Subletting Restriction Clause is invalid and/or unenforceable.

Notwithstanding the foregoing, the provisions of this Section 4.6 shall not apply to the Existing Leases set forth in Exhibit 0 hereto or to any business operations or other activities of the holders of the tenant(s) interest(s) in the Existing Leases or, to the extent such Existing Leases do not contain the Assignment and Subletting Restriction Clause, of the subtenants or assignees under the Existing Leases.

For the purposes hereof:

(i)          The "Named Companies" are Samsung, LG, Yujin, Foster-Miller, Qinetiq, Allen-Vanguard, Northrop Grummann's Remotec division, General Dynamics Robotic Systems, and any successor-in-interest to the foregoing entities and/or divisions, as the case may be, who is engaged in whole or in part in the business of developing or manufacturing robotic devices. Landlord agrees during the term to reasonably consider requests by tenant to include additional or substitute entities to the list of Named Companies provided that Tenant can demonstrate to Landlord's reasonable satisfaction that such proposed entities are direct and substantial competitors of Tenant (provided that in no event shall there be more than eight (8) Named Companies at any time).

(ii)         A "Future Lease" shall be a lease entered into after the date of this Lease for space in the Complex between Landlord, as landlord, and a person or entity (other than Tenant), as tenant, but excluding, to the extent herein provided, the Existing Leases and the implementation of the provisions of the Existing Leases.

ARTICLE V

Tenant's Covenants

Tenant covenants and agrees to the following during the Term and such further time as Tenant occupies any part of the Premises:

5.1 Payments

To pay when due all fixed rent and Additional Rent and all charges for utility services rendered to the Premises (except as otherwise provided in Exhibit C) and, as further Additional Rent, all charges for additional services rendered pursuant to Section 4.1.2.

5.2 Repair and Yield Up

Except as otherwise provided in Article VI and Section 4.1.3 to keep the Premises in good order, repair and condition, excepting only reasonable wear and tear and damage by fire or taking under the power of eminent domain, and all interior glass in windows (except glass in exterior walls unless the damage thereto is attributable to Tenant's negligence or misuse) and doors of the Premises whole and in good condition with glass of the same type and quality as that injured or broken, and at the expiration or termination of this Lease peaceably to yield up the Premises with all construction, work, improvements, and all alterations and additions thereto in good order, repair and condition, reasonable wear and tear and damage by fire or taking under the power of eminent domain only excepted, first removing all goods and effects of Tenant and (x) to the extent specified by Landlord by notice to Tenant given at least sixty (60) days prior to such expiration or termination, the wiring for Tenant's computer, telephone and other communication systems and equipment whether located in the Premises or in any other portion of the Buildings (including all risers) and (y) to the extent specified for removal by Landlord at the time Landlord approves of the same under Article III above or Section 5.14 below, all alterations and additions made by Tenant, and repairing any damage caused by such removal and restoring the Premises and leaving them clean and neat. Tenant shall not permit or commit any waste, and Tenant shall be responsible for the cost of repairs which may be made necessary by reason of damage to the Buildings or to the Site or to the Additional Buildings caused by Tenant, Tenant's agents, contractors, employees, sublessees, licensees, concessionaires or invitees.

5.3 Use

To use and occupy the Premises for the Permitted Uses only, and not to injure or deface the Premises, Buildings, the Additional Buildings, the Site or any other part of the Complex nor to permit in the Premises or on the Site any auction sale or inflammable fluids or chemicals, or nuisance, or the emission from the Premises of any objectionable noise or odor, nor to operate in the Premises in such a way as to result in the leakage of fluid, and not to use or devote the Premises or any part thereof for any purpose other than the Permitted Uses, nor any use thereof which is inconsistent with the maintenance of the Buildings as office/research and development buildings of the first class in the quality of its maintenance, use and occupancy, or which is improper, offensive, contrary to law or ordinance or liable to invalidate or increase the premiums for any insurance on the Buildings (Landlord hereby representing that to the best of its actual knowledge as of the date of this Lease, the Permitted Uses will not invalidate or increase the insurance premiums for the Complex) or its contents or liable to render necessary any alteration or addition to the Buildings. Further, except as otherwise set forth in this Lease (i) Tenant shall not, nor shall Tenant permit its employees, invitees, agents, independent contractors, contractors, assignees or subtenants to, keep, maintain, store or

dispose of (into the sewage or waste disposal system or otherwise) or engage in any activity which might produce or generate any substance which is or may hereafter be classified as a hazardous material, waste or substance (collectively "Hazardous Materials"), under federal, state or local laws, rules and regulations, including, without limitation, 42 U.S.C. Section 6901 et seq., 42 U.S.C. Section 9601 et seq., 42 U.S.C. Section 2601 et seq., 49 U.S.C. Section 1802 et seq. and Massachusetts General Laws, Chapter 21E and the rules and regulations promulgated under any of the foregoing, as such laws, rules and regulations may be amended from time to time (collectively "Hazardous Materials Laws"), (ii) Tenant shall immediately notify Landlord of any incident in, on or about the Premises, the Buildings or the Site that would require the filing of a notice under any Hazardous Materials Laws, (iii) Tenant shall comply and shall cause its employees, invitees, agents, independent contractors, contractors, assignees and subtenants to comply with each of the foregoing and (iv) Landlord shall have the right, at Landlord's sole cost and expense, to make such inspections (including testing) as Landlord shall elect from time to time to determine that Tenant is complying with the foregoing (provided that Landlord shall promptly restore any portions of the Premises that may have been disturbed by such inspections).

Notwithstanding the foregoing, Tenant may use Hazardous Materials and other substances typically used by Tenant for the conduct of the Permitted Uses, including, without limitation, diesel fuel in such amounts as are appropriate for the testing of Tenant's existing and prototype products, provided that Tenant uses, stores and disposes of such Hazardous Materials and other substances in the manner which they are normally used, and in compliance with all Hazardous Materials Laws and other applicable laws, ordinances, bylaws, rules and regulations, and Tenant obtains and complies with all permits required by Hazardous Materials Laws or any other laws, ordinances, bylaws, rules or regulations prior to the use or presence of any such substances in the Premises.

Landlord represents and warrants to Tenant that, except as set forth in those certain reports entitled (x) "Report on Phase I Environmental Site Assessment Update, 2 to 14 Crosby Drive, Bedford, Massachusetts" prepared by Haley & Aldrich, Inc. and dated March 21, 1997 and (y) "Phase IV Inspection and Monitoring Report No.3, 4D Crosby Drive, Bedford, Massachusetts" prepared by Sanborn, Head & Associates, Inc and dated May 17, 2006 (copies of which have been provided to Tenant), to the best of Landlord's actual knowledge as of the date of this Lease there are no Hazardous Materials in the Buildings or on the Site which are or would be required to be removed or otherwise abated in accordance with applicable Hazardous Materials Laws. Subject to the limitations of Section 8.4 hereof, Landlord shall use reasonable efforts to remove or abate, as required by applicable Hazardous Materials Laws, Hazardous Materials on the Site or in the Common Areas, the Structural Elements or the base building systems of the Complex, provided that the foregoing shall not apply to (i) requirements of Hazardous Materials Laws resulting from the use of, or additions, alterations or improvements in the Premises, or (ii) Hazardous Materials which are in the Buildings or on the Site because of the action or inaction of any tenant or occupant in the Complex, including Tenant, or any employee, agent or contractor thereof, or (iii) any tenant space in the Complex, including the Premises, and any additions, alterations and improvements therein. In connection with the foregoing, Landlord hereby agrees to use best efforts to enforce the terms of its leases with other tenants of the Complex in the event of a violation of Hazardous Materials Laws resulting from the action or inaction of any tenant or occupant of the Complex or any employee, agent or contractor thereof; provided, however, that in no event shall Landlord be liable to Tenant for any violation of Hazardous Materials Laws by any tenant or occupant of the Complex. Subject to the limitations of Section 8.4 hereof, Landlord agrees to defend with counsel first approved by Tenant (counsel appointed by Landlord's insurance carrier shall be deemed approved by Tenant and for any other circumstances such approval shall not be unreasonably withheld or delayed), indemnify and save Tenant harmless from liability, loss and damage to persons or property and from any claims, actions, proceedings and expenses in connection therewith resulting from the failure of Landlord to fulfill its obligations under this Section 5.3; provided, however, that in no event shall the foregoing indemnity

render Landlord liable for any loss or damage to Tenant's Property and Landlord shall in no event be liable for indirect or consequential damages.

5.4 Obstructions; Items Visible From Exterior; Rules and Regulations

Not to obstruct in any manner any portion of the Additional Buildings not hereby leased or any portions of the Site used by Tenant in common with others; not without prior consent of Landlord, except as otherwise expressly set forth in this Lease, to permit the painting or placing of any signs, awnings, aerials or flagpoles, visible from outside the Premises; and to comply with all reasonable Rules and Regulations of general applicability to tenants of the Complex now or hereafter made by Landlord, of which Tenant has been given notice and which are not inconsistent with any of Tenant's rights under this Lease, for the care and use of the Buildings and Site and their facilities and approaches. Landlord agrees to enforce such Rules and Regulations in a uniform and non-discriminatory manner, but in no event shall Landlord be liable to Tenant for the failure of other occupants of the Complex to conform to such Rules and Regulations.

5.5 Safety Appliances

Subject to Landlord's obligations under this Lease, to keep the Premises equipped with all safety appliances (including, without limitation, the sprinkler and fire suppression systems serving the Premises) required by any public authority because of any use made by Tenant other than normal office use, and to procure all licenses and permits so required because of such use and, if requested by Landlord, to do any work so required because of such use, it being understood that the foregoing provisions shall not be construed to broaden in any way the Permitted Uses.

5.6 Assignment; Sublease

Except as otherwise expressly provided herein, Tenant covenants and agrees that it shall not assign, mortgage, pledge, hypothecate or otherwise transfer this Lease and/or Tenant's interest in this Lease or sublet (which term, without limitation, shall include granting of concessions, licenses or the like) the whole or any part of the Premises without first obtaining Landlord's prior written consent, which consent will be governed by the terms and provisions of Section 5.6.2 below if Landlord does not exercise its rights under Section 5.6.1.1 below. Any assignment, mortgage, pledge, hypothecation, transfer or subletting not expressly permitted in or consented to by Landlord under Sections 5.6.1-5.6.7 shall be void, ab initio; shall be of no force and effect; and shall confer no rights on or in favor of third parties. In addition, Landlord shall be entitled to seek specific performance of or other equitable relief with respect to the provisions hereof.

5.6.1    Notwithstanding the foregoing provisions of Section 5.6 above and the provisions of Sections 5.6.1.1, 5.6.2 and 5.6.4 below, but subject to the provisions of the first paragraph of Sections 5.6.3 (the first paragraph only) and 5.6.5 below, Tenant shall have the right to assign this Lease or to sublet the Premises in whole or in part, without Landlord's consent, to any other entity (the "Successor Entity") (i) which controls or is controlled by Tenant or Tenant's parent corporation, or (ii) which is under common control with Tenant, or (iii) which purchases all or substantially all of the assets of Ten ant, or (iv) which purchases all or substantially all of the stock of (or other membership interests in) Tenant or (v) which merges or combines with Tenant; *provided,* that to the extent Tenant does not remain in existence after an assignment to or other transaction with a Successor Entity, the Successor Entity has a net worth (on a pro forma basis using generally accepted accounting principles consistently applied after giving effect to the merger, consolidation or purchase of assets,

stock or other membership interests) reasonably sufficient to perform the obligations of the tenant under this Lease. Except in cases of statutory merger, in which case the surviving entity in the merger shall be liable as the Tenant under this Lease, Tenant shall continue to remain fully liable under this Lease, on a joint and several basis with the Successor Entity and, following such sublease or assignment, Tenant or such Successor Entity, as the case may be, shall continue to comply with all of its obligations under this Lease, including with respect to the Permitted Uses of the Premises. If any affiliate, parent or subsidiary entity of Tenant to which this Lease is assigned or the Premises sublet (in whole or in part) without Landlord's consent pursuant to this Section 5.6.1 shall cease to be such an affiliate, parent or subsidiary entity, such cessation shall be considered an assignment or subletting requiring Landlord's consent. Landlord agrees that the offer and sale by Tenant (or any stockholder of Tenant) of any stock or other membership interests pursuant to an effective registration statement filed pursuant to the Securities Act of 1933 or pursuant to and in accordance with the securities laws of the United States or any foreign country governing publicly traded companies and not in violation of U.S. law, shall not constitute an assignment of this Lease, and shall not require the consent or approval of Landlord. To the extent Tenant remains in existence after the assignment or sublease to a Successor Entity, the continued economic viability of Tenant and the amount of the Security Deposit then being held under this Lease shall be taken into account when evaluating the ability of the assignee or subtenant to perform the obligations of the tenant under this Lease as set forth above.

5.6.1.1    Notwithstanding the provisions of Section 5.6 above, in the event Tenant desires to assign this Lease or to sublet the Premises and this Section 5.6.1.1 is applicable to the proposed transfer, Tenant shall give Landlord a Proposed Transfer Notice (as defined in Section 5.6.3 hereof) and in the event of (x) a proposed assignment of this Lease or (y) a proposed sublease of fifty percent (50%) or more of the Rentable Floor Area of the Premises or (z) a proposed sublease of less than fifty percent (50%) of the Rentable Floor Area of the Premises for all or substantially all of the then remaining Lease Term (which for the purposes hereof shall be defined as any sublease expiring within the last eighteen (18) months of the Term of this Lease), then Landlord shall have the right at its sole option, to be exercised within fifteen (15) business days after receipt of Tenant's Proposed Transfer Notice (the "Acceptance Period"), to terminate this Lease as of a date specified in a notice to Tenant, which date shall not be earlier than the proposed possession date under Tenant's proposed sublease or assignment, as applicable; provided, however, that (i) upon the termination date as set forth in Landlord's notice, all obligations relating to the period after such termination date (but not those relating to the period before such termination date) shall cease and promptly upon being billed therefor by Landlord, Tenant shall make final payment of all Annual Fixed Rent and Additional Rent due from Tenant through the termination date and (ii) Landlord shall, at Landlord's sole cost and expense, remove or close off and secure, in compliance with applicable laws, any internal stairways, doors, or corridors which connect the terminated portion of the Premises from the remainder of the Premises and shall, if applicable, install any separate utility meters, corridors and/or demising walls required to separate and demise the terminated portion of the Premises from the remaining portion of the Premises. In the event Landlord exercises its option to terminate this Lease as to the portion or, if applicable, the entire Premises as and to the extent permitted under this Section 5.6.1.1, then Tenant may rescind its request for Landlord's consent to such transfer by notice to Landlord within ten (10) business days following receipt of Landlord's election to terminate whereupon Landlord's election to terminate this

Lease as to the applicable portion of the Premises proposed to be transferred shall be null and void.

Notwithstanding the foregoing, in the event that Tenant shall only propose to sublease a portion of the Premises, Landlord shall only have the right to so terminate this Lease with respect to the portion of the Premises and for the proposed term of the sublease therefor (if such sublease was for less than all or substantially all of the remainder of the Term) for which Landlord's rights under this Section 5.6.1.1 are or would be triggered (the "Terminated Portion of the Premises") and from and after such termination date the Rentable Floor Area of the Premises shall be reduced to the rentable floor area of the remainder of the Premises and the definition of Rentable Floor Area of the Premises shall be so amended and after such termination all (and until the proposed expiration date of the proposed sublease if such sublease was for less than all or substantially all of the remainder of the Term) references in this Lease to the "Premises" or the "Rentable Floor Area of the Premises" shall be deemed to be references to the remainder of the Premises and accordingly Tenant's payments for Annual Fixed Rent and its share of operating costs, real estate taxes and electricity shall be reduced on a pro rata basis to reflect the size of the remainder of the Premises. In the case of an assignment or partial subletting where Landlord has exercised its termination right pursuant to this Section 5.6.1.1, Tenant shall pay to Landlord, as Additional Rent, within thirty (30) days after demand therefor, the reasonable costs which Tenant had agreed to pay or perform in connection with Tenant's proposed sublease to separately physically demise that portion of the Premises which are being terminated from the remainder of the Premises.

In the event that Landlord shall exercise its termination right hereunder and thereafter relets the portion of the Premises thus recaptured from Tenant (the "Recapture Premises") for all or part of the then-remaining Lease Term (exclusive of any extension options not exercised as of the date of the recapture), Landlord shall pay to Tenant, within fifteen (15) days after receipt by Landlord, an amount equal to fifty percent (50%) of the excess of (i) the fixed rent, additional rent and all other charges and sums actually received by Landlord pursuant to such reletting, after deducting (x) Landlord's architectural, legal and brokerage fees in connection with such reletting and (y) any construction expenses incurred by Landlord in connection with such reletting and the fair market rental value of the Recapture Premises for any period after the recapture and prior to such reletting, over (ii) the Annual Fixed Rent, Additional Rent and other charges that would have been payable by Tenant for the Recapture Premises over the portion of the term of the reletting that falls within the then-remaining Lease Term (exclusive of any extension options not exercised as of the date of the recapture). Landlord shall certify the amounts set forth in subsections (i) and (ii) above to Tenant from time to time (but not more often than monthly) upon written request. Notwithstanding anything contained herein to the contrary, Tenant not be entitled to any sums due under this Section 5.6.1.1 until Landlord has fully recovered or been credited its costs in connection with the reletting at issue and the amount of any excess costs of Landlord may be carried over to a subsequent year(s) and deducted from the reletting revenues for such year(s) until a profit is received. In addition, the terms and provisions of this subparagraph shall not apply (and Tenant shall not be entitled to received any sums hereunder) in the event that the reletting is to a tenant with a significantly different use than the Permitted Uses and/or who is making significant alterations, additions or improvements to the Premises.

In the event that Landlord shall not exercise its termination rights as aforesaid, or shall fail to give any or timely notice pursuant to this Section 5.6.1.1 the provisions of Sections 5.6.2 - 5.6.5 shall be applicable. This Section 5.6.1.1 shall not be applicable to an assignment or sublease pursuant to Section 5.6.1 or an occupancy permitted pursuant to Section 5.6.6.

5.6.2      Notwithstanding the provisions of Section 5.6 above, but subject to the provisions of this Section 5.6.2 and the provisions of Sections 5.6.3, 5.6.4 and 5.6.5 below, in the event that Landlord shall not have exercised the termination right as set forth in Section 5.6.1.1, or shall have failed to give any or timely notice under Section 5.6.1.1, then for a period of one hundred twenty (120) days (i) after the receipt of Landlord's notice stating that Landlord does not elect the termination right, or (ii) after the expiration of the Acceptance Period, in the event Landlord shall not give any or timely notice under Section 5.6.1.1 as the case may be, Tenant shall have the right to assign this Lease or sublet the Premises in accordance with the Proposed Transfer Notice provided that, in each instance, Tenant first obtains the express prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. It is understood and agreed that Landlord's consent shall be deemed given hereunder in the event that Landlord shall fail to respond to a Proposed Transfer Notice meeting all of the requirements of Section 5.6.3 below within fifteen (15) business days after receipt of a request therefor from Tenant.

Without limiting the foregoing standard, Landlord shall not be deemed to be unreasonably withholding its consent to such a proposed assignment or subleasing if:

(a)      the proposed assignee or subtenant is a tenant elsewhere in the Complex or is or has been in active negotiation with Landlord for premises elsewhere in the Complex within the six (6) month period prior to the proposed effective date of the assignment or sublease (provided, however, that Landlord may not withhold its consent on this basis if Landlord is unable to satisfy such existing or proposed tenant's need as to size of premises and/or length of term in the Complex), or

(b)      the proposed assignee or subtenant is not of a character consistent with the operation of a first-class office/research and development building (by way of example Landlord shall not be deemed to be unreasonably withholding its consent to an assignment or subleasing to any governmental or quasi-governmental agency, unless such agency is currently in occupancy of any portion of the Complex at the time of Tenant' s proposed request for consent), or

(c)      the proposed assignee does not possess adequate financial capability to perform the Tenant obligations as and when due or required or the proposed subtenant does not possess adequate financial capability to perform the obligations of the subtenant under the sublease as and when due or required (taking into account in both cases the continued liability of Tenant notwithstanding such transfer), or

(d)      the assignee or subtenant proposes to use the Premises (or part thereof) for a purpose other than the purpose for which the Premises may be used as stated in Section 1.1 hereof, or

(e) the character of the business to be conducted or the proposed use of the Premises by the proposed subtenant or assignee shall (i) be likely to materially increase Landlord's Operating Expenses beyond that which Landlord now incurs for use by Tenant (unless Tenant or the proposed assignee or subtenant agrees to pay the excess costs attributable thereto); (ii) be likely to materially increase the burden on elevators or other Building systems or equipment over the burden prior to such proposed subletting or assignment (unless Tenant or the proposed assignee or subtenant agrees to pay the excess costs attributable thereto); or (iii) violate or be likely to violate any provisions or restrictions contained herein relating to the use or occupancy of the Premises, or

(f) there shall be an existing Event of Default (defined in Section 7.1) or there have been three (3) or more Event of Default occurrences of a material nature during the Term, or

(g) if any proposed assignment or sublease shall potentially have any adverse effect on the real estate investment trust qualification requirements applicable to Landlord and its affiliates, or

(h) the holder of any mortgage or ground lease on property which includes the Premises does not approve of the proposed assignment or sublease (where such holder has approval rights pursuant to the terms of the mortgage or ground lease), or

(i) due to the identity or business of a proposed assignee or subtenant, such approval would cause Landlord to be in violation of any covenant or restriction contained in another lease or other agreement affecting space elsewhere in the Complex.

5.6.3 Tenant shall give Landlord notice (the "Proposed Transfer Notice") of any proposed sublease or assignment, and said notice shall specify the provisions of the proposed assignment or subletting (or a draft of the proposed assignment or sublease document in close-to-final form), including (a) the name and address of the proposed assignee or subtenant, (b) in the case of a proposed assignment or subletting pursuant to Section 5.6.2, such information as to the proposed assignee's or proposed subtenant's net worth and financial capability and standing as may reasonably be required for Landlord to make the determination referred to in Section 5.6.2 above (provided, however, that Landlord shall hold such information confidential having the right to release same to its officers, accountants, attorneys and mortgage lenders on a confidential basis), (c) in the case of a proposed assignment or subletting pursuant to Section 5.6.2, all other information necessary to make the determination referred to in Section 5.6.2 above and (d) in the case of a proposed assignment or subletting pursuant to Section 5.6.1 above, such information as may be reasonably required by Landlord to determine that such proposed assignment or subletting complies with the requirements of said Section 5.6.1. In the event that Tenant's Proposed Transfer Notice does not contain the information required hereunder, Landlord shall provide Tenant with written notice setting forth the additional information to be provided by Tenant within five (5) business days after Landlord's receipt of such Proposed Transfer Notice.

If Landlord shall consent to the proposed assignment or subletting, as the case may be, then, in such event, Tenant may thereafter sublease or assign pursuant to Tenant's notice, as given hereunder; provided, however, that if such assignment or sublease shall not be executed and delivered to Landlord within one hundred twenty (120) days after the date of Landlord's consent, the consent shall be deemed null and void and the provisions of Section 5.6.1.1 shall be applicable.

5.6.4        In addition, in the case of any assignment or subleasing as to which Landlord may consent (other than an assignment or subletting permitted under Section 5.6.1 hereof or an occupancy permitted pursuant to Section 5.6.6 hereof) such consent shall be upon the express and further condition, covenant and agreement, and Tenant hereby covenants and agrees that, in addition to the Annual Fixed Rent, Additional Rent and other charges to be paid pursuant to this Lease, fifty percent (50%) of the "Assignment/Sublease Profits" (hereinafter defined actually received by Tenant), if any, shall be paid to Landlord. The "Assignment/Sublease Profits" shall be the excess, if any, of (a) the "Assignment/Sublease Net Revenues" as hereinafter defined over (b) the Annual Fixed Rent and Additional Rent and other charges provided in this Lease (provided, however, that for the purpose of calculating the Assignment/Sublease Profits in the case of a sublease, appropriate proportions in the applicable Annual Fixed Rent, Additional Rent and other charges under this Lease shall be made based on the percentage of the Premises subleased and on the terms of the sublease). The "Assignment/Sublease Net Revenues" shall be the fixed rent, additional rent and all other charges and sums actually received by Tenant either initially or over the term of the sublease or assignment plus all other profits and increases actually received by Tenant as a result of such subletting or assignment, exclusive of amounts paid to Tenant for the purchase or lease of personal property or equipment of Tenant (except to the extent such amounts exceed the fair market value or rental value of the same), after deducting the reasonable costs of Tenant incurred in such subleasing or assignment (the definition of which shall be limited to rent concessions, architectural fees, attorneys' fees, moving expenses, brokerage commissions and alteration allowances associated with the subleasing or assignment at issue, in each case actually paid), as set forth in a statement certified by an appropriate officer of Tenant and delivered to Landlord within thirty (30) days of the full execution of the sublease or assignment document. Notwithstanding anything contained herein to the contrary, Landlord shall not be entitled to any sums due under this Section 5.6.4 until Tenant has fully recovered or been credited its costs in connection with the transfer at issue and the amount of any excess costs of Tenant may be carried over to a subsequent year(s) and deducted from the Assignment/Sublease Net Revenues for such year(s) until a profit is received.

All payments of the Assignment/Sublease Profits due Landlord shall be made within fifteen (15) days of receipt of same by Tenant.

5.6.5        (A) It shall be a condition of the validity of any assignment or subletting of right under Section 5.6.1 above, or consented to under Section 5.6.2 above, that both Tenant and the assignee or sublessee enter into a separate written instrument directly with Landlord in a form and containing terms and provisions reasonably required by Landlord, including, without limitation, the agreement of the assignee or sublessee to be bound directly to Landlord for all the obligations of the Tenant hereunder, including, without limitation, the obligation (a) to pay the rent and other amounts provided for under this Lease (but in the

case of a partial subletting pursuant to Section 5.6.1, such subtenant shall agree on a pro rata basis to be so bound) and (b) to comply with the provisions of Sections 5.6 through 5.6.5 hereof. Such assignment or subletting shall not relieve the Tenant named herein of any of the obligations of the Tenant hereunder and Tenant shall remain fully and primarily liable therefor and the liability of Tenant and such assignee (or subtenant, as the case may be) shall be joint and several. Further, and notwithstanding the foregoing, the provisions hereof shall not constitute a recognition of the sublease or the subtenant thereunder, and at Landlord's option, upon the termination or expiration of the Lease (whether such termination is based upon a cause beyond Tenant's control, a default of Tenant, the agreement of Tenant and Landlord or any other reason), the sublease shall be terminated.

(B) Tenant shall pay to Landlord as a fee for Landlord's review of any proposed assignment or sublease requested by Tenant and the preparation of any associated documentation, within thirty (30) days after receipt of an invoice from Landlord, as Additional Rent, an amount equal to the sum of (i) $150.00 per hour for in-house staff and/or (ii) reasonable out of pocket legal fees or other expenses incurred by Landlord in connection with such request (any such legal fees under subsections (i) or (ii) above in no event to exceed $5,000.00 in connection with any given request for consent).

(C) If this Lease is assigned, or if the Premises or any part thereof be sublet or occupied by anyone other than Tenant, Landlord may upon prior notice to Tenant, at any time and from time to time, collect rent and other charges from the assignee, sublessee or occupant and apply the net amount collected to the rent and other charges herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this covenant, or a waiver of the provisions of Sections 5.6 through 5.6.5 hereof, or the acceptance of the assignee, sublessee or occupant as a tenant or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained, the Tenant herein named to remain primarily liable under this Lease.

(D) The consent by Landlord to an assignment or subletting under any of the provisions of Sections 5.6.1 or 5.6.3 shall in no way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or subletting.

(E) On or after the occurrence of an "Event of Default" (defined in Section 7.1), Landlord shall be entitled to one hundred percent (100%) of any Assignment/Sublease Profits.

(F) Without limiting Tenant's obligations under Section 5.14, Tenant shall be responsible, at Tenant's sole cost and expense, for performing all work necessary to comply with Legal Requirements and Insurance Requirements in connection with any assignment or subletting hereunder including, without limitation, any work in connection with such assignment or subletting.

(G) In addition to the other requirements set forth in this Lease and notwithstanding any other provision of this Lease, partial sublettings of the Premises shall only be permitted under the following terms and conditions: (i) the configuration of both the subleased premises and the remainder of the Premises must comply with applicable Legal Requirements and be approved by Landlord, including, without limitation, all requirements concerning access and egress; (ii) in the event the subleased premises are separately physically demised from the remainder of the Premises, Tenant shall pay all costs (if any) of physically demising the subleased premises (including, without limitation, construction and design costs); and (iii) there shall be no more than three (3) subleases in effect in any single

Building at any given time.

5.6.6    Tenant shall have the right, without the consent of Landlord (but upon reasonable prior notice to Landlord), to permit the use or occupancy of space in the Premises by any affiliate, subsidiary or other related entity of Tenant or, with respect to a portion of the Premises that is not separately demised and consists of not more than 25,000 rentable square feet of the Premises in the aggregate for periods of less than one (1) year at a time, by persons who have an ongoing contractual or other business relationship with Tenant providing for cooperative or collaborative research and development such that such occupants have a reasonable need to work in proximity with Tenant (such persons who shall be permitted to occupy portions of the Premises pursuant to this Section 5.6.6 being referred to individually as a "Permitted Occupant", or collectively as the "Permitted Occupants"); provided that (x) the Permitted Occupants shall use the Premises in conformity with all applicable provisions of this Lease, (y) such occupancy will terminate automatically upon the expiration or earlier termination of this Lease and (z) Tenant shall remain fully liable for the acts or omissions of the Permitted Occupants in the Premises, within the Complex and/or on the Additional Land Areas (as defined in Section 8.27 below).

5.6.7    At the written request of Tenant, Landlord will approve or disapprove of a proposed transferee prior to receiving a final, executed copy of the proposed assignment, sublease and other contractual documents, provided that (i) Landlord has been provided with sufficient information to make such decision, and (ii) any approval by Landlord of a proposed transferee shall be conditioned upon Landlord's subsequent approval of the actual signed assignment, sublease or other contractual documents that are entered into to effectuate the proposed Transfer. Notwithstanding the foregoing, Landlord's approval shall be null and void and deemed withdrawn if Tenant does not, within one hundred twenty (120) days of Tenant's initial request for Landlord's approval, enter into an assignment or sublease upon substantially the same economic and other material terms as were set forth in the documentation previously delivered to Landlord.

5.7 Indemnity; Insurance

(A) Indemnity. Subject to the limitations of Section 8.4 below and to the provisions of Section 8.19 below, to the maximum extent this agreement is effective according to law and to the extent not resulting from the negligence or willful misconduct of Landlord or its employees, agents or contractors, Tenant agrees to defend with counsel first approved by Landlord (counsel appointed by Tenant's insurance carrier shall be deemed approved by Landlord and for any other circumstances such approval shall not be unreasonably withheld or delayed), save harmless, and indemnify Landlord and Landlord's managing agent, beneficiaries, partners, subsidiaries, officers, directors, agents, trustees and employees (collectively, the "Landlord Parties") from any liability for injury, loss, accident or damage to any person or property, and from any claims, actions, proceedings and expenses and costs in connection therewith (including without limitation reasonable counsel fees) (i) arising from or claimed to have arisen from (a) the omission, fault, willful act, negligence or other misconduct of Tenant or Tenant's contractors, licensees, invitees, agents, servants, independent contractors or employees or (b) any use made or thing done or occurring on the Premises not due to the omission, fault, willful act, negligence or other misconduct of Landlord, or (ii) resulting from the failure of Tenant to perform and discharge its covenants and obligations under this Lease.

(B) Insurance. To maintain in full force from the date upon which Tenant first enters the Premises for any reason, throughout the Term of this Lease, and thereafter, so long as Tenant is in occupancy of any part of the Premises, commercial general liability insurance or comprehensive general liability insurance written on an occurrence basis with a broad form comprehensive liability endorsement under which Tenant is the named insured and Landlord and Landlord's managing agent (and such persons as are in privity of estate with Landlord and Landlord's managing agent as may be set out in notice from time to time) are named as additional insureds with limits which shall, at the commencement of the Term, be at least equal to those stated in Section 1.1 and from time to time during the Term shall be for such higher limits, if any, as Landlord may reasonably require provided such higher limits are customarily carried by tenants leasing premises in comparable, first-class office/research and development complexes in the Boston Northwest Suburban Market, and worker's compensation insurance with statutory limits covering all of Tenant's employees working in the Premises. Tenant shall deposit with Landlord on or before the earlier of the date Tenant enters the Premises or the Commencement Date and concurrent with all renewals thereof, certificates for any insurance Tenant is required to maintain under this Lease, in a form reasonably acceptable to Landlord and bearing the endorsement that the insurer will endeavor to provide Landlord with thirty (30) days' written notice prior to cancellation of the policies. In addition, in the event Tenant hosts a function in the Premises, Tenant agrees to obtain and maintain, and cause any persons or parties providing services for such function to obtain, the appropriate insurance coverages as determined by Landlord (including liquor liability, if applicable) and, upon request, provide Landlord with evidence of the same. All insurance required to be maintained by Tenant pursuant to this Lease shall be maintained with responsible companies qualified to do business, and in good standing, in the Commonwealth of Massachusetts and which have a rating of at least "A-" and are within a financial size category of not less than "Class VIII" in the most current Best's Key Rating Guide or such similar rating as may be reasonably selected by Landlord if such Guide is no longer published.

5.8 Personal Property at Tenant's Risk

That all of the furnishings, fixtures, equipment, effects and property of every kind, nature and description of Tenant and of all persons claiming by, through or under Tenant which, during the continuance of this Lease or any occupancy of the Premises by Tenant or anyone claiming under Tenant, may be on the Premises or elsewhere in the Buildings or on the Site, shall be at the sole risk and hazard of Tenant, and if the whole or any part thereof shall be destroyed or damaged by fire, water or otherwise, or by the leakage or bursting of water pipes, steam pipes, or other pipes, by theft or from any other cause, no part of said loss or damage is to be charged to or be borne by Landlord, except to the extent caused by the gross negligence or willful misconduct of Landlord and except that Landlord shall in no event be indemnified or held harmless or exonerated from any liability to Tenant or to any other person, for any injury, loss, damage or liability to the extent such indemnity, hold harmless or exoneration is prohibited by law. Further, Tenant, at Tenant's expense, shall maintain at all times during the Term of this Lease business interruption insurance and insurance against loss or damage covered by so-called "all risk" type insurance coverage with respect to Tenant's fixtures, equipment, goods, wares and merchandise, tenant improvements made by or paid for by Tenant which are removable by Tenant at the end of the Term of this Lease, and other property of Tenant (including, without limitation, the Tenant's Equipment as that term is defined in Section 8.26 below) (collectively "Tenant's Property"). Such insurance shall be in an amount at least equal to the full replacement cost of Tenant's Property. Tenant shall maintain all of its equipment, furniture and furnishings in good order and repair. In addition, during such time as Tenant is performing work in or to the Premises, Tenant, at Tenant's expense, shall also maintain builder's risk insurance for the full insurable value of such work.

5.9 Right of Entry

To permit Landlord and its agents at reasonable times and upon reasonable prior notice (except in the event of an emergency) (i) to examine the Premises and if Landlord shall be entitled and shall so elect, to make any repairs or replacements Landlord may deem necessary; (ii) to remove, at Tenant's expense, any alterations, additions, signs, curtains, blinds, shades, awnings, aerials, flagpoles, or the like not consented to in writing; and (iii) to show the Premises to prospective tenants during the twelve (12) months preceding expiration of the Term and to prospective purchasers and mortgagees at all reasonable times. Landlord agrees to use commercially reasonable efforts to conduct any such entry under this Section 5.9 in such a manner and at such times so as to minimize any unreasonable interference with Tenant's business operations in the Premises, consistent with the reasons for such entry (Landlord hereby agreeing to use commercially reasonable efforts to schedule any such access hereunder during Tenant's normal business hours and in the presence of a representative of Tenant when feasible, except in the event of an emergency) .

Notwithstanding anything to the contrary set forth above, Tenant may designate certain areas of the Premises as "Secured Areas" should Tenant require such areas for the purpose of securing certain valuable property or confidential information. Landlord may not enter such Secured Areas except in the case of an emergency or in the event of a Landlord inspection (it being understood and agreed that prior to commencing any non emergency inspection of the Secured Areas, Landlord shall be required to demonstrate reasonable grounds therefor), in which latter case Landlord shall provide Tenant with two (2) business days' prior written notice of the specific date and time of such Landlord inspection. If Tenant does designate any such Secured Areas as aforesaid, Landlord shall have no responsibility under this Lease for the provision of any services (other than utility services for which Landlord is responsible under this Lease) to such Secured Areas (including, without limitation, the non-utility services described in Section 4.1 above).

5.10 Floor Load; Prevention of Vibration and Noise

Not to place a load on any floor of the Premises above the ground floor exceeding an average rate of 100 pounds of live load per square foot of floor area (partitions shall be considered as part of the live load); and not to move any safe, vault or other heavy equipment in, about or out of the Premises except in such manner and at such time as Landlord shall in each instance authorize; Tenant's business machines and mechanical equipment which cause vibration or noise that may be transmitted to the Building structure or to any other space in the Buildings shall be so installed, maintained and used by Tenant so as to eliminate such vibration or noise.

5.11 Personal Property Taxes

To pay promptly when due all taxes which may be imposed upon Tenant's Property in the Premises to whomever assessed.

5.12 Compliance with Laws

To comply with all applicable Legal Requirements now or hereafter in force which shall impose a duty on Landlord or Tenant relating to or as a result of the use or occupancy of the Premises; provided that Tenant shall not be required to make any alterations, additions, upgrades or improvements (i) to the Premises, unless the same are required by Legal Requirements that first become applicable to the Complex after the completion of the Base Building Work and the Tenant Improvement Work as a result of or in connection with Tenant's use or occupancy of the Premises for a use other than general office use, (ii) to the Common Areas, the Structural Elements (as defined in Section 4.1.3) or any of

the base building systems serving the Complex unless the same are required by Legal Requirements that first become applicable to the Complex after the completion of the Base Building Work and the Tenant Improvement Work as a result of or in connection with Tenant's use or occupancy of the Premises for a use other than general office use or (iii) to the Premises or any component of the Buildings or the Complex, in order to bring the Buildings and/or the Complex into compliance with Legal Requirements of general applicability to the Buildings and/or the Complex that first become applicable to the Complex after the completion of the Base Building Work and the Tenant Improvement Work except to the extent that the non-compliance is triggered by either (x) any alterations, additions or improvements being done by or on behalf of Tenant in the Buildings or on the Site (other than the Tenant Improvement Work) or (y) by Tenant's specific and unique use of the Buildings and/or the Site for other than general office use. Tenant shall promptly pay all fines, penalties and damages that may arise out of or be imposed because of its failure to comply with the provisions of this Section 5.12.

5.13 Payment of Litigation Expenses

As Additional Rent, to pay all reasonable costs, counsel and other fees incurred by Landlord in connection with the successful enforcement by Landlord of any obligations of Tenant under this Lease or in connection with any bankruptcy case involving Tenant or any guarantor (Landlord hereby similarly agreeing to pay all reasonable costs, counsel and other fees incurred by Tenant in connection with the successful enforcement by Tenant of any obligations of Landlord under this Lease or in connection with any bankruptcy case involving Landlord).

5.14 Alterations

Tenant shall not make alterations and additions to the Premises (including, without limitation, the Additional Land Areas as that term is defined in Section 8.27 below) except in accordance with plans and specifications therefor first approved by Landlord, which approval shall not be unreasonably withheld or delayed. However, Landlord's determination of matters relating to aesthetic issues relating to alterations, additions or improvements which are visible outside the Premises shall be in Landlord's sole discretion. Without limiting such standard Landlord shall not be deemed unreasonable for withholding approval of any alterations or additions (including, without limitation, any alterations or additions to be performed by Tenant under Article III) which (a) in Landlord's opinion might adversely affect any structural or exterior element of the Buildings, any area or element outside of the Premises, or any facility or base building mechanical or electrical system serving any area of the Buildings outside of the Premises, or (b) involve or affect the exterior design, size, height, or other exterior dimensions of the Buildings or (c) will require unusual expense to readapt the Premises to normal office use on Lease termination or expiration or increase the cost of construction or of insurance or taxes on the Buildings or of the services called for by Section 4.1 unless Tenant first gives assurance acceptable to Landlord for payment of such increased cost and that such readaptation will be made prior to such termination or expiration without expense to Landlord, (d) enlarge the Rentable Floor Area of the Premises, or (e) except with respect to the Tenant Improvement Work, are inconsistent, in Landlord's judgment, with alterations satisfying Landlord's standards for new alterations in the Buildings. Landlord's review and approval of any such plans and specifications and consent to perform work described therein shall not be deemed an agreement by Landlord that such plans, specifications and work conform with applicable Legal Requirements and requirements of insurers of the Buildings and the other requirements of this Lease with respect to Tenant's insurance obligations (herein called "Insurance Requirements") nor deemed a waiver of Tenant's obligations under this Lease with respect to applicable Legal Requirements and Insurance Requirements nor impose any liability or obligation upon Landlord with respect to the completeness, design sufficiency or compliance of such plans, specifications and work with

applicable Legal Requirements and Insurance Requirements nor give right to any other parties. Further, Tenant acknowledges that Tenant is acting for its own benefit and account, and that Tenant shall not be acting as Landlord's agent in performing any work in the Premises, accordingly, no contractor, subcontractor or supplier shall have a right to lien Landlord's interest in the Property in connection with any such work. Within thirty (30) days after receipt of an invoice from Landlord, Tenant shall pay to Landlord as a fee for Landlord's review of any work or plans (excluding any review respecting initial improvements performed pursuant to Article III hereof but including any review of plans or work relating to any assignment or subletting), as Additional Rent, an amount equal to the sum of: (i) $ 150.00 per hour for time spent by Landlord's in-house personnel, plus (ii) third party expenses incurred by Landlord to review Tenant's plans and Tenant's work (provided such third party expenses are reasonable and within market rates, and are accompanied by receipts and invoices). All alterations and additions shall be part of the Building unless and until Landlord shall timely specify the same for removal at the time Landlord approves of such alteration or additions under this Section 5.14 or under Section 3.2(B) above with respect to the Tenant Improvement Work (it being understood and agreed that the removal of any alterations or additions that do no require Landlord's approval shall be subject to the terms of Section 5.14.1 below). All of Tenant's alterations and additions and installation of furnishings shall be coordinated with any work being performed by Landlord and, except as otherwise expressly permitted under Article III above with respect to the Tenant Improvement Work, in such manner as to maintain harmonious labor relations and not to damage the Buildings or Site or interfere with construction or operation of the Buildings and other improvements to the Site and, except for installation of furnishings, shall be performed by Landlord's general contractor or by contractors or workers first approved by Landlord, which approval will not be unreasonably withheld, conditioned or delayed. Except for work by Landlord's general contractor, Tenant, before its work is started, shall secure all licenses and permits necessary therefor; deliver to Landlord a statement of the names of all its contractors and subcontractors and the estimated cost of all labor and material to be furnished by them and security satisfactory to Landlord protecting Landlord against liens arising out of the furnishing of such labor and material (it being understood and agreed that no such security shall be required to be posted for contracts of less than $50,000.00); and cause each contractor to carry worker's compensation insurance in statutory amounts covering all the contractor's and subcontractor's employees and commercial general liability insurance or comprehensive general liability insurance with a broad form comprehensive liability endorsement with such limits as Landlord may reasonably require, but in no event less than $2,000,000.00 combined single limit per occurrence on a per location basis (all such insurance to be written in companies approved by Landlord and naming and insuring Landlord and Landlord's managing agent as additional insureds and insuring Tenant as well as the contractors), and to deliver to Landlord certificates of all such insurance. Tenant shall also prepare and submit to Landlord a set of as-built plans, in both print and electronic forms, showing such work performed by Tenant to the Premises promptly after any such alterations, improvements or installations are substantially complete and a set of schematic plans, in both print and electronic forms, promptly after any wiring or cabling for Tenant's computer, telephone and other communications systems is installed by Tenant or Tenant's contractor; provided, however, that if the work is not of a nature where as-built plans would customarily be prepared, Tenant shall only be required to prepare and submit the type of plans that would customarily be prepared in connection with such work. Without limiting any of Tenant's obligations hereunder, Tenant shall be responsible, as Additional Rent, for the costs of any alterations, additions or improvements in or to the Building that are required in order to comply with Legal Requirements as a result of any work performed by Tenant (expressly including the Tenant Improvement Work being performed by Tenant under Article III above). Landlord shall have the right to provide such rules and regulations relative to the performance of any alterations, additions, improvements and installations by Tenant hereunder and Tenant shall abide by all such reasonable rules and regulations and shall cause all of its contractors to so abide including,

without limitation; payment for the costs of using Building services (a copy of Landlord's current rules and regulations for construction being attached hereto as Exhibit F-2). Tenant agrees to pay promptly when due the entire cost of any work done on the Premises by Tenant, its agents, employees, or independent contractors, and not to cause or permit any liens for labor or materials performed or furnished in connection therewith to attach to the Premises or the Buildings or the Site and promptly (in no event to exceed thirty (30) days) to discharge any such liens which may so attach. Tenant shall pay, as Additional Rent, 100% of any real estate taxes on the Complex which shall, at any time after commencement of the Term, result from any alteration, addition or improvement to the Premises made by Tenant. Tenant acknowledges and agrees that Landlord shall be the owner of any additions, alterations and improvements in the Premises or the Buildings to the extent paid for by Landlord.

5.14.1        Permitted Alterations

Notwithstanding the terms of Section 5.14, Tenant shall have the right, without obtaining the prior consent of Landlord but upon notice to Landlord given ten (10) days prior to the commencement of any work (which notice shall specify the nature of the work in reasonable detail), to make alterations, additions or improvements to the Premises where:

(i) the same are within the interior of the Buildings (or the interior of the Premises from time to time leased by Tenant, if any in the Additional Buildings), and do not affect the exterior of the Buildings (including no signs on windows);

(ii) the same do not affect the Structural Elements or the base building mechanical, electrical, plumbing, heating, ventilating, air-conditioning and fire protection systems of the Buildings;

(iii) the cost of any individual alteration, addition or improvement shall not exceed $25,000.00 and the aggregate cost of said alterations, additions or improvements made by Tenant during the Lease Term shall not exceed $250,000.00 in cost; and

(iv) Tenant shall comply with the provisions of this Lease and if such work increases the cost of insurance or taxes or of services, Tenant shall pay for any such increase in cost;

provided, however, that Tenant shall, within fifteen (15) days after the making of such changes, send to Landlord plans and specifications describing the same in reasonable detail and provided further that Landlord, by notice to Tenant given within thirty (30) days after Landlord's receipt of such plans and specifications, may require Tenant to restore the Premises to its condition prior to such alteration, addition or improvement at the expiration or earlier termination of the Lease Term.

In addition, Tenant shall have the right, without obtaining the prior consent of Landlord to from time to time modify the topography of the Additional Land Areas (as defined in Section 8.27 below) and erect temporary structures thereon in order to simulate user environments. This may include, without limitation, bringing sand, dirt, pavement, rubble and rocks to the Additional Land Areas, as well as creating water features, stairs, levels and obstacles on the Additional Land Areas; provided, however, that under no circumstances may Tenant excavate or otherwise dig up any portions of the Additional Land Areas without Landlord's prior written consent (which Landlord may condition on Tenant's expressly acknowledging that it is solely responsible for any Hazardous Materials that are disturbed

by Tenant's activities). Tenant's obligation to restore the Additional Land Areas upon the expiration or earlier termination of this Lease shall be as set forth in Section 8.27.

5.14.2 Tenant's Security System

Tenant may install a security system within the Premises, provided such system and its installation (i) shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld, conditioned or delayed (provided Landlord may deny consent to any system which is not compatible with the Complex's overall security and fire safety and life safety systems), (ii) shall be in accordance with all applicable Legal Requirements, and (iii) shall be performed at Tenant's sole expense, and shall otherwise be installed in accordance with the provisions governing alterations under this Lease. Tenant shall have the right, at Tenant's sole cost and expense, to hire and have a security guard stationed at the security desk in the lobby of any Building directly leased by Tenant in its entirety at such times as Tenant shall elect in Tenant's reasonable discretion. Neither party shall have any liability to the other party on account of the failure or neglect of any security guard hired by Tenant to stop or prevent any theft, damage, crime or other intentional wrongdoing of any person in, on or at the Complex.

5.15 Vendors

Any vendors engaged by Tenant to perform services in or to the Premises including, without limitation, janitorial contractors and moving contractors shall be coordinated with any work being performed by or for Landlord and, except as expressly provided in Article III above with respect to the Tenant Improvement Work, in such manner as to maintain harmonious labor relations and not to damage the Buildings or the Property or interfere with Building construction or operation and shall be performed by vendors first approved by Landlord, which approval will not be unreasonably withheld, conditioned of delayed.

5.16 Patriot Act

(A) As an inducement to Landlord to enter into this Lease, Tenant hereby represents and warrants that: (i) Tenant is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 or any similar list or any law, order, rule or regulation or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity or nation being hereinafter referred to as a "Prohibited Person"); (ii) Tenant is not (nor is it owned, controlled, directly or indirectly, by any person, group, entity or nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) from and after the effective date of the above-referenced Executive Order, Tenant (and any person, group, entity or nation which owns or controls Tenant, directly or indirectly) has not conducted nor will knowingly conduct business or has not engaged nor will knowingly engage in any transaction or dealing with any Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation, including without limitation any assignment of this Lease or any subletting of all or any portion of the Premises or the making or receiving of any contribution or funds, goods or services to or for the benefit of a Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation. In connection with the foregoing, it is expressly understood and agreed that (x) any breach by Tenant of the foregoing representations and warranties shall be deemed an Event of Default by Tenant under Section 7.1 (a) (iv) of this Lease and shall be covered by the indemnity provisions of Section 5.7 above, and (y) the representations and warranties contained in this subsection shall be continuing in nature and shall survive the expiration or earlier termination of this Lease. Notwithstanding anything contained herein to the

contrary, for the purposes of this subsection (A) the phrase "owned or controlled directly or indirectly by any person, group, entity or nation" and all similar such phrases shall not include any holder of a direct or indirect interest in a publicly traded company whose shares are listed and traded on a nationally recognized stock exchange.

(B) As an inducement to Tenant to enter into this Lease, Landlord hereby represents and warrants that: (i) Landlord is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OF AC") pursuant to Executive Order 13224 or any similar list or by any law, order, rule or regulation or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity or nation being hereinafter referred to as a "Prohibited Person"); (ii) Landlord is not (nor is it owned or controlled, directly or indirectly, by any person, group, entity or nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) from and after the effective date of the above-referenced Executive Order, Landlord (and any person, group, or entity which Landlord controls, directly or indirectly) has not conducted nor will knowingly conduct business nor has engaged nor will knowingly engage in any transaction or dealing with any Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation, including without limitation, the making or receiving of any contribution of funds, good or services to or for the benefit of a Prohibited Person in violation of the U.S. Patriot Act or any OFAC rule or regulation. In connection with the foregoing, is expressly understood and agreed that (x) any breach by Landlord of the foregoing representatives and warranties shall be covered by the indemnity provisions of Section 4.4 above and (y) the representations and warranties contained in this subsection shall be continuing in nature and shall survive the expiration or earlier termination of this Lease. Notwithstanding anything contained herein to the contrary, for the purposes of this subsection (B) the phrase "owned or controlled directly or indirectly by any person, group, entity or nation" and all similar such phrases shall not include (1) any shareholder of Boston Properties, Inc., (2) any holder of a direct or indirect interest in a publicly traded company whose shares are listed and traded on a nationally recognized stock exchange or (3) any limited partner, unit holder or shareholder owning an interest of five percent (5%) or less in Boston Properties Limited Partnership or the holder of any direct or indirect interest in Boston Properties Limited Partnership.

5.17 Signage

(A) For so long as Tenant directly leases from Landlord a minimum of one (1) full floor in any of the Buildings, Tenant may, at its sole cost and expense (subject to the . payment of the Signage Allowance described in subsection (D) below), install and maintain signage containing Tenant's name and corporate logo in one (1) area to be reasonably agreed upon by the parties in the main lobby of any such Building where Tenant satisfies the minimum leasing requirement described above. In addition, the design, proportions and color of such signage shall be subject to the prior approval of Landlord, which approval will not be unreasonably withheld, conditioned or delayed. Tenant's rights to lobby signage in each of the Buildings under this subsection (A) shall be exclusive for so long as Tenant leases the entire rentable floor area of the applicable Building in its entirety, including in any Additional Buildings leased in their entirety by Tenant and, if not leasing the entirety, Tenant's shall have the non-exclusive right to building-standard lobby and elevator directory signage and suite entry signage.

(B) (1) In the event at the time Tenant exercises its right under this Section 5.17(B)(1), (i) Tenant leases from Landlord a minimum of 100,000 square feet of rentable floor area in the Complex (including the entirety of Building D) and (ii) Tenant has neither assigned this Lease

nor sublet more than thirty-three percent (33%) of the Rentable Floor Area of the Premises (except for an assignment or subletting permitted pursuant to Section 5.6.1 or an occupancy permitted under Section 5.6.6), Tenant shall be permitted, at Tenant's sole cost and expense (subject to the payment of the Signage Allowance described in subsection (D) below), to erect one (l) sign on the exterior facade above the roofline of Building D (the "Route 3 Impact Signage"), which such signage shall contain Tenant's name and logo and shall be in a location first reasonably approved by Landlord. Tenant's right to erect the Route 3 Impact Signage shall be exclusive for so long as Tenant meets the occupancy requirements of this Section 5.17(B)(1).

(2) In the event that Tenant shall cease to meet the occupancy requirements set forth in subsection (l) above with respect to the Route 3 Impact Signage but shall directly lease from Landlord any of the Buildings or Additional Buildings in their entirety, in lieu of the Route 3 Impact Signage, Tenant shall be permitted, at its sole cost and expense, to erect one (1) sign on a panel to be located on the exterior facade of any of the Buildings or Additional Buildings leased by Tenant in their entirety (the "Panel Signage"), which signage shall contain Tenant's name and logo and shall be in a location first reasonably approved by Landlord. Tenant's right to erect the Panel Signage shall be exclusive with respect to any Building or Additional Building directly leased by Tenant in its entirety.

(3) In addition to the Route 3 Impact Signage or the Panel Signage, as the case may be, and for so long as Tenant shall directly lease from Landlord the entirety of Building D, Tenant shall be permitted, at its sole cost and expense (subject to the payment of the Signage Allowance described in subsection (D) below), to erect one (1) monument sign at the entrance to Building D (the "Monument Signage"), which signage shall contain Tenant's name and logo and shall be in a location first reasonably approved by Landlord. Tenant's right to erect the Monument Signage shall be exclusive for so long as Tenant directly leases Building D in its entirety.

(4) The design, proportions and color of all such signage described in this subsection *(B)* shall be subject to the prior approval (which approval shall not be unreasonably withheld, conditioned or delayed) of Landlord and shall be further subject to the requirements of the Zoning By-Law of the Town of Bedford and any other applicable laws and to Tenant obtaining all necessary permits and approvals therefor. Tenant acknowledges and agrees that, except as otherwise provided in this subsection *(B)* Tenant's right to corporate signage on the Site pursuant to this subsection *(B)* is not on an exclusive basis and that Landlord may grant other tenants in the Complex the right to maintain signage on the Site; provided, however, that Landlord shall never permit or grant any other tenant or occupant of the Complex the right to install any exterior signage on any of the Buildings or Additional Buildings which are leased entirely to Tenant or to install any exclusive monument signage at the entrance to any of the Buildings or Additional Buildings which are leased entirely to Tenant.

(C) In the event that at any time during the Lease Term Tenant ceases to meet the applicable occupancy thresholds described in subsections (A) and *(B)* above, Tenant shall, upon Landlord's written request and at Tenant's sole cost and expense, remove all or any portion of the Tenant's signage described in this Section 5.17 and designated by Landlord for removal and restore any areas of the Buildings affected by the installation and subsequent removal of Tenant's signage. Notwithstanding the foregoing, in the event that Tenant ceases to meet the occupancy threshold under subsection *(B)(1)* above and Landlord requires that the Route 3 Impact Signage be removed from Building D, Landlord shall perform such removal and restoration work at Landlord's sole cost and expense. In addition, Tenant shall be required at its sole cost and expense to remove all of the Tenant's signage described in this Section 5.17 and restore any areas of the Buildings affected by the installation and subsequent removal of Tenant's signage upon the expiration or earlier termination of the Lease Term.

(D) Landlord shall provide to Tenant a special allowance of Fifteen Thousand and 00/100 Dollars ($15,000.00) (the "Signage Allowance"). The Signage Allowance shall be used and applied by Tenant solely on account of the purchase and installation of the exterior signage described in subsections (A) and *(B)* above (the "Signage Work"). Provided that the Tenant (i) has completed all of such Signage Work in accordance with the terms of this Lease, has paid for all of such Signage Work in full, (ii) has delivered to Landlord lien waivers from all persons who might have a lien as a result of such work, in the recordable forms attached hereto as Exhibit F, (iii) has delivered to Landlord its certificate specifying the cost of such Signage Work and all contractors, subcontractors and supplies involved with Signage Work, together with evidence of such cost in the form of paid invoices, receipts and the like, (iv) has satisfied the requirements of (i) through (iii) above and made request for such payment on or before the Commencement Date, (v) there exists no Event of Default under this Lease, and (vi) there are no liens (unless bonded to the reasonable satisfaction of Landlord) against Tenant's interest in this Lease or against the Buildings or the Site arising *out* of Signage Work or any litigation in which Tenant is a party relating to the Signage Work, then within thirty (30) days after the satisfaction of the foregoing conditions, Landlord shall pay to Tenant the lesser of the amount of such costs so certified or the amount of the Signage Allowance. Notwithstanding the foregoing, Landlord shall be under no obligation to apply any portion of the Signage Allowance for any purposes other than as provided in this subsection (D), nor shall Landlord be deemed to have assumed any obligations, in whole or in part, of Tenant to any contractors, subcontractors, suppliers, workers or materialmen. Further, in no event shall Landlord be required to make application of any portion of the Signage Allowance on account of any supervisory fees, overhead, management fees or other payments to Tenant, or any partner or affiliate of Tenant. In the event that such cost of Signage Work is less than the Signage Allowance, Tenant shall not be entitled to any payment or credit nor shall there be any application of the same toward Annual Fixed Rent or Additional Rent owed by Tenant under this Lease. Landlord shall use reasonable efforts to cooperate with Tenant in obtaining the proper governmental approvals and permits for Tenant's signage rights under any provisions of this Section 5.17 which require Tenant to seek the necessary governmental approvals and permits for such signage; provided, however that Landlord shall be put to no cost or expense in connection therewith.

(E) Landlord presently maintains monument signs at the Complex identifying the tenants or occupants thereof and Tenant shall have the non-exclusive right to a listing on each such monument sign (other than those that relate solely to buildings within the Complex in which Tenant does not lease any space), subject to the terms and provisions of this Section 5.17 and subject to Landlord's approval of the final details of such listing, which approval will not be unreasonably withheld, conditioned or delayed.

(F) Landlord shall not grant any other tenant or occupant of the Complex the right to erect exterior or interior signage on or in any Building or Additional Building directly leased by Tenant in its entirety.

ARTICLE VI

Casualty and Taking

6.0 Landlord's Restoration Estimate

In case during the Lease Term the Buildings or Site (which for the purposes of this Article VI shall expressly include the parking areas of the Complex and Land Recreation Area A, as that term is defined in Section 8.27 below) are damaged by fire or other casualty, Landlord shall within sixty (60) days after the occurrence thereof notify Tenant in writing of Landlord's reasonable estimate of the length of time necessary to repair or restore such fire or casualty damage from the time that repair work would commence ("Landlord's Restoration Estimate").

6.1 Damage Resulting from Casualty

In case during the Lease Term, the Premises or the Site are damaged by fire or other casualty and, if according to Landlord's Restoration Estimate, such fire or casualty damage cannot, in the ordinary course, reasonably be expected to be repaired within two hundred forty (240) days from the time that repair work would commence, either party may, at its election, terminate this Lease by notice given to the other within thirty (30) days after the date of Landlord's Restoration Estimate, specifying the effective date of termination; provided, however, that (x) Landlord shall only be permitted to terminate this Lease on account of such damage if Landlord terminates the leases of all other tenants in the Complex similarly affected by the casualty (where Landlord has a termination right thereunder) and (y) in the event of damage to a single Building which would in and of itself trigger any termination right under this Section 6.1, this Lease may be terminated by either party (to the extent such party has a termination right hereunder) with respect solely to such damaged Building but not with respect to the other Buildings not similarly affected by the casualty (provided, however, that if Tenant reasonably determines that Tenant is unable to continue to operate its business economically and efficiently within the undamaged portion of the Premises, Tenant may terminate this Lease as to the entire Premises so long as the casualty is of such a magnitude as to trigger a termination right hereunder). The effective date of termination specified by either party hereunder shall not be less than thirty (30) days nor more than forty-five (45) days after the date of notice of such termination.

In case during the last eighteen (18) months of the Lease Term, the Premises are damaged by fire or casualty and such fire or casualty damage cannot, in the ordinary course, reasonably be expected to be repaired within one hundred fifty (150) days (and/or as to special work or work which requires long lead time then if such work cannot reasonably be expected to be repaired within such additional time as is reasonable under the circumstances given the nature of the work) from the time that repair work would commence, Tenant may, at its election, terminate this Lease by notice given to Landlord within sixty (60) days after the date of such fire or other casualty, specifying the effective date of termination. The effective date of termination specified by Tenant shall be not less than thirty (30) days nor more than forty-five (45) days after the date of notice of such termination.

Unless terminated pursuant to the foregoing provisions, this Lease shall remain in full force and effect following any such damage subject, however, to the following provisions.

If the Buildings or the Site or any part thereof are damaged by fire or other casualty and this Lease is not so terminated, or Landlord or Tenant have no right to terminate this Lease, and in any such case the holder of any mortgage which includes the Buildings as a part of the mortgaged premises or any ground lessor of any ground lease which includes the Site as part of the demised premises

allows the net insurance proceeds to be applied to the restoration of the Buildings (and/or the Site), Landlord promptly after such damage and the determination of the net amount of insurance proceeds available shall use due diligence to restore the Premises and the Buildings in the event of damage thereto (excluding Tenant's Property) into substantially the same condition as existed prior to the damage and a just proportion of the Annual Fixed Rent, Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises according to the nature and extent of the injury to the Premises shall be abated until the earlier to occur of (i) the date the Premises is substantially restored to the extent required under this Lease and Tenant has had a period of time (in no event to exceed thirty (30) days after Landlord has completed its restoration obligations as aforesaid) to install its furniture, fixtures and equipment, which Tenant agrees to undertake in a reasonably expeditious manner, and (iii) the date Tenant commences business operations in the Premises. Notwithstanding anything herein contained to the contrary, Landlord shall not be obligated to expend for such repair and restoration any amount in excess of the net insurance proceeds (provided, however, that if Landlord elects not to expend any sums in excess of the net insurance proceeds, Tenant shall have the right to terminate this Lease as set forth in the immediately following sentence). If such net insurance proceeds are not allowed by such mortgagee or ground lessor to be applied to, or are otherwise insufficient for, the restoration of the Buildings (and/or the Site) and if Landlord does not otherwise elect to spend the additional funds necessary to fully restore the Buildings (and/or the Site), then Landlord shall give notice ("Landlord's Proceeds Notice") to Tenant within thirty (30) days after the final determination by such mortgagee or ground lessor as to the disbursement of proceeds that Landlord does not elect to fund the amount of deficiency and Tenant shall thereafter have the right to terminate this Lease by providing Landlord with a notice of termination within thirty (30) days after Tenant's receipt of Landlord's Proceeds Notice (the effective date of which termination shall not be less than sixty (60) days after the date of notice of such termination).

Unless such restoration is (x) commenced within six (6) months from the date of the casualty or taking (except to the extent such restoration work could be completed within the one (1) year period described in subsection (y) below, notwithstanding the fact that it did not commence within six (6) months from the date of the casualty or taking), such period to be subject, however, to extension where the delay in commencement of such work is due to Force Majeure, as defined hereinbelow (but in no event beyond ten (10) months from the date of the casualty or taking) and (y) completed within one (1) year from the date of the casualty or taking, such one (1) year period to be subject, however, to extension where the delay in completion of such work is due to Force Majeure, as defined hereinbelow, (but in no event beyond eighteen (18) months from the date of the casualty or taking), Tenant, as its sole and exclusive remedy, shall have the right to terminate this Lease at any time after the expiration of such six-month or one-year (as extended) period, as the case may be, until the restoration is substantially completed, such termination to take effect as of the thirtieth (30th) day after the date of receipt by Landlord of Tenant's notice, with the same force and effect as if such date were the date originally established as the expiration date hereof unless, within thirty (30) days after Landlord's receipt of Tenant's notice, such restoration is commenced or substantially completed, as the case may be, in which case Tenant's notice of termination shall be of no force and effect and this Lease and the Lease Term shall continue in full force and effect. When used in this Article VI, "Force Majeure" shall mean any prevention, delay or stoppage due to governmental regulation, strikes, lockouts, acts of God, acts of war, terrorists acts, civil commotions, unusual scarcity of or inability to obtain labor or materials, labor difficulties, casualty or other causes reasonably beyond Landlord's control or attributable to Tenant's action or inaction; provided, however, that (1) in no event shall Landlord's financial inability constitute a cause beyond Landlord's reasonable control and (2) in order for Landlord to claim the benefit of any delay due to Force Majeure, Landlord shall be required to use reasonable efforts to minimize the extent and duration of such delay and to notify Tenant of the existence and nature of the cause of such delay within a reasonable time after the delay first commences.

6.2 Uninsured Casualty

Notwithstanding anything to the contrary contained in this Lease, if the Buildings or the Premises shall be substantially damaged by fire or casualty as the result of a risk not covered by the forms of casualty insurance at the time maintained by Landlord and such fire or casualty damage cannot, in the ordinary course, reasonably be expected to be repaired within ninety (90) days from the time that repair work would commence, either party may, at its election, terminate the Term of this Lease by notice to the other party given within sixty (60) days after such loss; provided, however that Landlord may not terminate this Lease on account of an uninsured casualty and shall restore the Premises, the Common Areas and the Complex in accordance with the terms of this Lease, if and to the extent such damage would have been covered by the insurance coverages required to be carried by Landlord under this Lease. If either party shall give such notice, then this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the expiration date hereof.

6.3 Rights of Termination for Taking

If (i) the entire Premises, or such portion thereof as to render the balance (if reconstructed to the maximum extent practicable in the circumstances) unsuitable for Tenant's purposes, or (ii) twenty-five percent (25%) or more of the parking areas serving the Complex shall be taken by condemnation or right of eminent domain, Landlord or Tenant shall have the right to terminate this Lease by notice to the other of its desire to do so, provided that such notice is given not later than thirty (30) days after Tenant has been deprived of possession. In the event of a taking of a single Building which would in and of itself trigger any termination right under this Section 6.3, this Lease may be terminated by either party (to the extent such party has a termination right hereunder) solely with respect to the Building that was the subject of the taking but not with respect to the other Buildings not similarly affected by the taking (provided, however, that if Tenant reasonably determines that Tenant is unable to continue to operate its business economically and efficiently with the undamaged portion of the Premises, Tenant may terminate this Lease as to the entire Premises so long as the taking is of such a magnitude as to trigger a termination right hereunder). In addition, Tenant may terminate this Lease if fifty percent (50%) or more of Land Recreation Area A shall be taken and the remaining portion of Land Area Recreation A is insufficient for the Permitted Uses of the Additional Land Areas, as determined by Tenant in its reasonable discretion (taking into account the continued availability of Land Recreation Area B for such purposes). If either party shall give such notice, then this Lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the expiration date hereof. For the purposes hereof, the work "taking" shall mean and refer to the acquisition or taking of property (or any right, title or interest therein) by any governmental or quasi-governmental authority acting under power of condemnation or eminent domain, and shall encompass contested as well as uncontested takings as long as initiated by the applicable governmental or quasi-governmental authority and any conveyances in lieu of an initiated taking.

Should any part of the Premises be so taken or condemned during the Lease Term hereof, and should this Lease not be terminated in accordance with the foregoing provisions, and the holder of any mortgage which includes the Premises as part of the mortgaged premises or any ground lessor of any ground lease which includes the Site as part of the demised premises allows the net condemnation proceeds to be applied to the restoration of the Buildings, Landlord agrees that after the determination of the net amount of condemnation proceeds available to Landlord, Landlord shall use due diligence to put what may remain of the Premises into proper condition for use and occupation as nearly like the condition of the Premises prior to such taking as shall be practicable (excluding Tenant's Property).  Notwithstanding the foregoing, Landlord shall not be obligated to expend for such repair and restoration

any amount in excess of the net condemnation proceeds made available to it (provided, however, that if Landlord elects not to expend any sums in excess of the net condemnation proceeds, Tenant shall have the right to terminate this Lease as set forth in the immediately following sentence). If such net condemnation proceeds are not allowed by such mortgagee or ground lessor to be applied to, or are otherwise insufficient for, the restoration of the Buildings (and/or the Site) and if Landlord does not otherwise elect to spend the additional funds necessary to fully restore the Buildings (and/or the Site), then Landlord shall give notice ("Landlord's Award Notice") to Tenant within thirty (30) days after the final determination by such mortgagee or ground lessor as to the disbursement of proceeds that Landlord does not elect to fund the amount of the insufficiency and Tenant shall thereafter have the right to terminate this Lease by providing Landlord with a notice of termination within thirty (30) days after Tenant's receipt of Landlord's Award Notice (the effective date of which termination shall not be less than sixty (60) days after the date of notice of such termination) .

If the Premises shall be affected by any exercise of the power of eminent domain, then the Annual Fixed Rent, Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be justly and equitably abated and reduced according to the nature and extent of the loss of use thereof suffered by Tenant; and in case of a taking which permanently reduces the Rentable Floor Area of the Premises, a just proportion of the Annual Fixed Rent, Tenant's share of operating costs and Tenant's share of real estate taxes shall be abated for the remainder of the Lease Term.

6.4 Award

Landlord shall have and hereby reserves to itself any and all rights to receive awards made for damages to the Premises, the Building, the Additional Buildings, the Complex and the Site and the leasehold hereby created, or anyone or more of them, accruing by reason of exercise of eminent domain or by reason of anything lawfully done in pursuance of public or other authority. Tenant hereby grants, releases and assigns to Landlord all Tenant's rights to such awards, and covenants to execute and deliver such further assignments and assurances thereof as Landlord may from time to time request, and if Tenant shall fail to execute and deliver the same within fifteen (15) days after notice from Landlord, Tenant hereby covenants and agrees that Landlord shall be irrevocably designated and appointed as its attorney-in-fact to execute and deliver in Tenant's name and behalf all such further assignments thereof which conform with the provisions hereof.

Nothing contained herein shall be construed to prevent Tenant from prosecuting in any condemnation proceeding a claim for the value of any of Tenant's usual trade fixtures installed in the Premises by Tenant at Tenant's expense and for relocation and moving expenses, provided that such action and any resulting award shall not affect or diminish the amount of compensation otherwise recoverable by Landlord from the taking authority.

6.5 Damage to Parking Areas and Land Recreation Area A

Notwithstanding anything contained in this Article VI to the contrary, Tenant shall have no right to terminate this Lease on account of a casualty or taking affecting the parking areas of the Complex unless or until such casualty or taking results in a Parking Shortage (as that term is defined in Section 2.2.1 above). In addition, if such casualty or taking does result in a Parking Shortage, Tenant shall have no right to terminate this Lease under this Article VI notwithstanding that Landlord has been unable to restore such parking areas and eliminate the Parking Shortage within the applicable time periods set forth in this Article VI, if from and after the date on which Tenant's termination right would otherwise have been exercisable Landlord is able to provide Tenant with Alternative Parking in an amount which (together with any parking spaces remaining on the Site

after the casualty or taking) would enable Tenant to fully utilize the Number of Parking Spaces provided to it under Section 1.1.

In addition, Tenant shall not have the right to terminate this Lease on account of any casualty or taking affecting Land Recreation Area A to the extent that Tenant no longer had the exclusive right to use Land Recreation Area A under the terms of Section 8.27(A) above at the time of such casualty or taking.

6.6 Allocation of Proceeds Following Termination

In the event that this Lease is terminated (x) by Landlord under Section 6.1 or 6.3 above or (y) by Tenant under the provisions of the fourth (4th) paragraph of Section 6.1 or the second (2nd) paragraph of Section 6.3 above (i.e. on account of Landlord's election not to fund an insufficiency in the insurance proceeds or condemnation award necessary to fully restore the Buildings and/or the Site), Tenant shall be entitled to receive out of the Proceeds or Award Balance (as hereinafter defined) the Book Value of the Tenant Improvement Work (as hereinafter defined); provided, however, that if the sum of the Book Value of the Tenant Improvement Work and the Book Value of the Tenant Allowances (as hereinafter defined) exceed the Proceeds or Award Balance, then the Book Value of the Tenant Improvement Work and the Book Value of the Tenant Allowances shall be proportionately reduced to an amount which, when added together, shall equal the Proceeds or Award Balance and in such event Tenant shall be entitled to receive out of the Proceeds or Award Balance the amount of the Book Value of the Tenant Improvement Work as so reduced. To the extent that the sum of the Book Value of the Tenant Improvement Work and the Book Value of the Tenant Allowances is less than the Proceeds or A ward Balance, Landlord shall be entitled to the entire residual balance thereof.

For the purposes hereof:

(i)         The "Proceeds or Award Balance" shall be the amount, if any, by which the net insurance proceeds or net condemnation award (as applicable) exceeds the total of (x) the portion of the proceeds or award allocable to the Site (i.e. as if the land were unimproved), plus (y) the replacement cost of the Buildings and the Additional Buildings (exclusive of the Tenant Improvement Work), plus (z) all amounts payable to Landlord's mortgagee or ground lessor on account of such casualty or taking.

(ii)        The "Book Value of the Tenant Improvement Work" shall be the then unamortized portion of all costs of construction of the Tenant Improvement Work under Article III above (less the Tenant Allowances), calculated on a straight-line basis over the Original Lease Term and determined as of the date of the casualty or taking.

(iii)       The "Book Value of the Tenant Allowances" shall be the then unamortized portion of the Tenant Allowances, calculated on a straight line basis over the Original Lease Term and determined as of the date of the

ARTICLE VII

Default

7.1 Tenant's Default

(a)    If at any time subsequent to the date of this Lease anyone or more of the following events (herein sometimes called an "Event of Default") shall occur:

(i)    Tenant shall fail to pay the fixed rent, Additional Rent or other charges for which provision is made herein on or before the date on which the same become due and payable, and the same continues for five (5) business days after written notice from Landlord thereof; or

(ii)    Landlord having rightfully given the notice specified in subsection(a)(i) above twice in any calendar year, Tenant shall thereafter in the same calendar year fail to pay the fixed rent, Additional Rent or other charges on or before the date on which the same become due and payable; or

(iii)    Tenant shall assign its interest in this Lease or sublet any portion of the Premises in violation of the requirements of Sections 5.6through 5.6.5 of this Lease and the same continues for fifteen (15)business days after written notice from Landlord thereof; or

(iv)    Tenant shall neglect or fail to perform or observe any other covenant herein contained on Tenant's part to be performed or observed and Tenant shall fail to remedy the same within thirty (30) days after notice to Tenant specifying such neglect or failure, or if such failure is of such a nature that Tenant cannot reasonably remedy the same within such thirty (30) day period, Tenant shall fail to commence promptly to remedy the same and to prosecute such remedy to completion with diligence and continuity; or

(v)    Tenant's leasehold interest in the Premises shall be taken on execution or by other process of law directed against Tenant; or

(vi)    Tenant shall make an assignment for the benefit of creditors or shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future Federal, State or other statute, law or regulation for the relief of debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Tenant or of all or any substantial part of its properties, or shall admit in writing its inability to pay its debts generally as they become due, in all cases which is not dismissed within sixty (60) days after filing; or

(v)    A petition shall be filed against Tenant in bankruptcy or under any other law seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future Federal, State or other statute, law or regulation and shall remain undismissed or unstayed for an aggregate of sixty (60) days (whether or not consecutive), or if any debtor in

possession (whether or not Tenant) trustee, receiver or liquidator of Tenant or of all or any substantial part of its properties or of the Premises shall be appointed without the consent or acquiescence of Tenant and such appointment shall remain unvacated or unstayed for an aggregate of sixty (60) days (whether or not consecutive) - - then, and in any of said cases (notwithstanding any license of a former breach of covenant or waiver of the benefit hereof or consent in a former instance), Landlord lawfully may, immediately or at any time thereafter, terminate this Lease by notice to Tenant, specifying a date not less than ten (10) days after the giving of such notice on which this Lease shall terminate, and this Lease shall come to an end on the date specified therein as fully and completely as if such date were the date herein originally fixed for the expiration of the Lease Term (Tenant hereby waiving any rights of redemption), and Tenant will then quit and surrender the Premises to Landlord, but Tenant shall remain liable as hereinafter provided.

(b)        If this Lease shall have been terminated as provided in this Article, then Landlord may, without notice, re- enter the Premises, either by force, summary proceedings, ejectment or otherwise, and remove and dispossess Tenant and all other persons and any and all property from the same, as if this Lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

(c)        In the event that this Lease is terminated under any of the provisions contained in Section 7.1 (a) or shall be otherwise terminated by breach of any obligation of Tenant, Tenant covenants and agrees forthwith to pay and be liable for, on the days originally fixed herein for the payment thereof, amounts equal to the several installments of rent and other charges reserved as they would, under the terms of this Lease, become due if this Lease had not been terminated or if Landlord had not entered or re-entered, as aforesaid, and whether the Premises be relet or remain vacant, in whole or in part, or for a period less than the remainder of the Term, and for the whole thereof, but in the event the Premises be relet by Landlord, Tenant shall be entitled to a credit in the net amount of rent and other charges received by Landlord in reletting, after deduction of all expenses incurred in reletting the Premises (including, without limitation, remodeling costs, brokerage fees and the like), and in collecting the rent in connection therewith, in the following manner:

Amounts received by Landlord after reletting shall first be applied against such Landlord's expenses, until the same are recovered, and until such recovery, Tenant shall pay, as of each day when a payment would fall due under this Lease, the amount which Tenant is obligated to pay under the terms of this Lease (Tenant's liability prior to any such reletting and such recovery not in any way to be diminished as a result of the fact that such reletting might be for a rent higher than the rent provided for in this Lease); when and if such expenses have been completely recovered, the amounts received from reletting by Landlord as have not previously been applied shall be credited against Tenant's obligations as of each day when a payment would fall due under this Lease, and only the net amount thereof shall be payable by Tenant. Further, amounts received by Landlord from such reletting for any period shall be credited only against obligations of Tenant allocable to such period, and shall not be credited against obligations of Tenant hereunder accruing subsequent or prior to such period; nor shall any credit of any kind be due for any period after the date when the term of this Lease is scheduled to expire according to its terms.

Landlord agrees to use reasonable efforts to relet the Premises after Tenant vacates the

same in the event this Lease is terminated based upon an Event of Default by Tenant hereunder. The marketing of the Premises in a manner similar to the manner in which Landlord markets other premises within Landlord's control within the Complex shall be deemed to have satisfied Landlord's obligation to use "reasonable efforts" hereunder. In no event shall Landlord be required to (i) solicit or entertain negotiations with any other prospective tenant for the Premises until Landlord obtains full and complete possession of the Premises (including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant), (ii) relet the Premises before leasing other vacant space in the Complex, or (iii) lease the Premises for a rental less than the current fair market rent rate then prevailing for similar space in the Complex.

(d)        (i) Landlord may elect, as an alternative, to have Tenant pay liquidated damages, which election may be made by notice given to Tenant at any time after such termination and whether or not Landlord shall have collected any damages as aforesaid, as liquidated final damages and in lieu of all other damages beyond the date of such notice. Upon such notice, Tenant shall promptly pay to Landlord, as liquidated damages, in addition to any damages collected or due from Tenant for any period prior to such notice and all expenses which Landlord may have incurred with respect to the collection of such damages, such a sum as at the time ofthe giving of such notice represents the amount of the excess, if any, of (x) the

discounted present value, at a discount rate of six percent (6%) of the total rent and other benefits which would have accrued to Landlord under this Lease from the date of such notice for what would be the then unexpired Lease Term if the Lease terms had been fully complied with by Tenant over and above (y) the discounted present value, at a discount rate of six percent (6%), of the then cash rental value (in advance) of the Premises for the balance of the Lease Term.

(ii) For the purposes of this Article, if Landlord elects to require Tenant to pay damages in accordance with the immediately preceding paragraph, the total rent shall be computed by assuming that Tenant's share of excess taxes, Tenant's share of excess operating costs and Tenant's share of excess electrical costs would be, for the balance of the unexpired Term from the date of such notice, the amount thereof (if any) for the immediately preceding annual period payable by Tenant to Landlord.

(e)        In case of any Event of Default, re-entry, dispossession by summary proceedings or otherwise, Landlord may (i) re-let the Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms which may at Landlord's option be equal to or less than or exceed the period which would otherwise have constituted the balance of the Term of this Lease and may grant concessions, abatements or free rent to the extent that Landlord considers advisable or necessary to re-let the same and (ii) may make such alterations, repairs and decorations in the Premises as Landlord in its sole judgment considers advisable or necessary for the purpose of reletting the Premises; and the making of such alterations, repairs and decorations shall not operate or be construed to release Tenant from liability hereunder as aforesaid. Landlord shall in no event be liable in any way whatsoever for failure to re-let the Premises, or, in the event that the Premises are re-let, for failure to collect the rent under re-letting, Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed, or in the event of Landlord obtaining possession of the Premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease.

(f)    The specified remedies to which Landlord may resort hereunder are not intended to be exclusive of any remedies or means of redress to which Landlord may at any time be entitled lawfully, and Landlord may invoke any remedy (including the remedy of specific performance) allowed at law or in equity as if specific remedies were not herein provided for. Further, nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain in proceedings for bankruptcy or insolvency by reason of the termination of this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

(g)    In lieu of any other damages or indemnity and in lieu of the recovery by Landlord of all sums payable under all the foregoing provisions of this Section 7.1, Landlord may elect to collect from Tenant, by notice to Tenant, at any time after this Lease is terminated under any of the provisions contained in this Article VII or otherwise terminated by breach of any obligation of Tenant and before full recovery under such foregoing provisions, and Tenant shall thereupon pay, as liquidated damages, an amount equal to the sum of (x) the Annual Fixed Rent and all Additional Rent payable for the lesser of (i) the twelve (12) months ended next prior to such termination or (ii) the number of months then remaining in the Term of this Lease at the time of such termination, plus (y) the amount of Annual Fixed Rent and Additional Rent of any kind accrued and unpaid at the time of such election plus any and all expenses which the Landlord may have incurred for and with respect of the collection of any of such rent.

7.2 Landlord's Default

Landlord shall in no event be in default in the performance of any of Landlord's obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days after notice by Tenant to Landlord properly specifying wherein Landlord has failed to perform any such obligation; provided that (i) if the alleged breach is of such a nature that it cannot reasonably be cured within such thirty (30) day period, then Landlord shall not be in default if Landlord commences a cure within such thirty (30) day period and diligently thereafter prosecutes such cure to completion, and (ii) in the event of an Emergency (as hereinafter defined), such grace or cure period shall be shortened as reasonably necessary given the scope and nature of the Emergency, provided that such shortened grace or cure period shall only apply to permit the exercise of Tenant's self-help rights under Section 8.17 below (as opposed to determining whether Tenant shall be entitled to exercise any other rights and remedies on account of such failure of performance by Landlord). In the event of a default by Landlord after expiration of applicable notice and cure periods, Tenant shall be entitled to pursue all rights and remedies available at law or in equity except as limited by this Lease, and in all events excluding indirect or consequential damages. Tenant shall use commercially reasonable efforts to mitigate its damages in the event of any default by Landlord hereunder. The term "Emergency" shall mean and refer to any situation or circumstance where there is an immediate or imminent risk of injury or death to persons or material damage to property unless immediate action is taken to address such situation or circumstances, as determined by the party invoking such term in good faith. Notwithstanding anything contained herein to the contrary, except to the extent expressly provided in Section 8.17(B) below, Tenant shall not assert any right to deduct the cost of repairs or any monetary claim against Landlord from rent thereafter due and payable, but shall look solely to the Landlord for satisfaction of such claim.

ARTICLE VIII

Miscellaneous Provisions

8.1 Extra Hazardous Use

Tenant covenants and agrees that Tenant will not do or permit anything to be done in or upon the Premises, or bring in anything or keep anything therein, which shall increase the rate of insurance on the Premises or on the Buildings above the standard rate applicable to premises being occupied for the Permitted Uses; and Tenant further agrees that, in the event that Tenant shall do any of the foregoing, Tenant will promptly pay to Landlord, on demand, any such increase resulting therefrom, which shall be due and payable as Additional Rent thereunder.

8.2 Waiver

Failure on the part of Landlord or Tenant to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be a waiver by Tenant or Landlord, respectively, of any of its rights hereunder. Further, no waiver at any time of any of the provisions hereof by Landlord or Tenant shall be construed as a waiver of any of the other provisions hereof, and a waiver at any time of any of the provisions hereof shall not be construed as a waiver at any subsequent time of the same provisions. The consent or approval of Landlord or Tenant to or of any action by the other requiring such consent or approval shall not be construed to waive or render unnecessary Landlord's or Tenant's consent or approval to or of subsequent similar act by the other.

No payment by Tenant, or acceptance by Landlord, of a lesser amount than shall be due from Tenant to Landlord shall be treated otherwise than as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant.

8.3 Cumulative Remedies

Except as expressly provided in this Lease, the specific remedies to which Landlord or Tenant may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress to which such party may be lawfully entitled in case of any breach or threatened breach by the other party of any provisions of this Lease. In addition to the other remedies provided in this Lease, Landlord and Tenant shall be entitled to the restraint by injunction of the violation or attempted or threatened violation of any of the covenants, conditions or provisions of this Lease or to a decree compelling specific performance of any such covenants, conditions or provisions.

8.4 Quiet Enjoyment

This Lease is subject and subordinate to all matters of record as of the date of this Lease. So long as an Event of Default by Tenant is not in existence under this Lease, Tenant shall lawfully, peaceably and quietly have, hold, occupy and enjoy the Premises during the Term (exclusive of any period during which Tenant is holding over after the expiration or termination of this Lease without the consent of Landlord), without interference, disturbance, hindrance or ejection by any person claiming by, through or under Landlord, subject, however, to the terms of this Lease; the foregoing covenant of quiet enjoyment is in lieu of any other covenant, express or implied; and it is

understood and agreed that this covenant and any and all other covenants of Landlord contained in this Lease shall be binding upon Landlord and Landlord's successors, including ground or master lessees, only with respect to breaches occurring during Landlord's or Landlord's successors' respective ownership of Landlord's interest hereunder, as the case may be.

Further, Tenant specifically agrees to look solely to Landlord's then equity interest in the Complex (including the rents and other income, insurance proceeds and condemnation awards therefrom) at the time owned, or in which Landlord holds an interest as ground lessee, for recovery of any judgment from Landlord; it being specifically agreed that neither Landlord (original or successor), nor any beneficiary of any trust of which any person holding Landlord's interest is trustee, nor any member, manager, partner, director or stockholder, nor Landlord's managing agent, shall ever be personally liable for any such judgment, or for the payment of any monetary obligation to Tenant. The provision contained in the foregoing sentence is not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any action not involving the personal liability of Landlord (original or successor), any successor trustee to the persons named herein as Landlord, or any beneficiary of any trust of which any person holding Landlord's interest is trustee, or of any manager, member, partner, director or stockholder of Landlord or of Landlord's managing agent to respond in monetary damages from Landlord's assets other than Landlord's equity interest aforesaid in the Building, but except as expressly provided in this Lease to the contrary, in no event shall Tenant have the right to terminate or cancel this Lease or to withhold rent or to set-off any claim or damages against rent as a result of any default by Landlord or breach by Landlord of its covenants or any warranties or promises hereunder, except in the case ofa wrongful eviction of Tenant from the demised premises (constructive or actual) by Landlord continuing after notice to Landlord thereof and a reasonable opportunity for Landlord to cure the same.

In no event shall Landlord or Tenant ever be liable to the other party for any indirect or consequential damages suffered from whatever cause; provided that the foregoing shall not limit or alter any procedural right or remedy of Landlord or Tenant under this Lease nor shall the same apply to the obligations of Tenant with respect to any hold over by Tenant after the expiration or earlier termination of this Lease.

8.5 Notice to Mortgagee and Ground Lessor

After receiving notice (together with an address for notices to be sent) from any person, firm or other entity that it holds a mortgage which includes the Premises as part of the mortgaged premises, or that it is the ground lessor under a lease with Landlord, as ground lessee, which includes the Premises as a part of the demised premises, no notice from Tenant to Landlord shall be effective unless and until a copy of the same is given to such holder or ground lessor, and the curing of any of Landlord's defaults by such holder or ground lessor within the time periods permitted for a cure by Landlord under this Lease shall be treated as performance by Landlord. For the purposes of this Section 8.5 or Section 8.15, the term "mortgage" includes a mortgage on a leasehold interest of Landlord (but not one on Tenant's leasehold interest).

8.6 Assignment of Rents

With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a mortgage or ground lease on property which includes the Premises, Tenant agrees that the execution thereof by Landlord, and the acceptance thereof by the holder of such mortgage or the ground lessor, shall never be treated as an assumption by such holder or ground lessor of any of the obligations of Landlord

hereunder, unless such holder, or ground lessor, shall, by notice sent to Tenant, specifically otherwise elect, or upon foreclosure of such holder's mortgage and the taking of possession of the Premises, or, in the case of a ground lessor, the assumption of Landlord's position hereunder by such ground lessor.

In no event shall the acquisition of title to the Buildings and the land on which the same is located by a purchaser which, simultaneously therewith, leases the entire Buildings or such land back to the seller thereof be treated as an assumption by such purchaser-lessor, by operation of law or otherwise, of Landlord's obligations hereunder, but Tenant shall look solely to such seller-lessee, and its successors from time to time in title, for performance of Landlord's obligations hereunder subject to the provisions of Section 8.4 hereof. In any such event, this Lease shall be subject and subordinate to the lease to such purchaser provided that such purchaser agrees to recognize the rights of Tenant under this Lease upon the payment of rent and other charges payable by Tenant under this Lease and the performance by Tenant of Tenant's obligations hereunder and provided that Tenant agrees to attorn to such purchaser. For all purposes, such seller-lessee, and its successors in title, shall be the landlord hereunder unless and until Landlord's position shall have been assumed by such purchaser-lessor by notice sent to Tenant or by termination of the lease by such purchaser-lessor.

8.7 Surrender

No act or thing done by Landlord during the Lease Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid, unless in writing signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease. The delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of the Lease or a surrender of the Premises.

8.8 Brokerage

(A) Tenant warrants and represents that Tenant has not dealt with any broker in connection with the consummation of this Lease other than the broker, person or firm, if any, designated in Section 1.1 hereof; and in the event any claim is made against the Landlord relative to dealings by Tenant with brokers including the Brokers, if any, designated in Section 1.1 hereof, Tenant shall defend the claim against Landlord with counsel of Tenant's selection first approved by Landlord (which approval will not be unreasonably withheld) and save harmless and indemnify Landlord on account of loss, cost or damage which may arise by reason of such claim.

(B) Landlord warrants and represents that Landlord has not dealt with any broker in connection with the consummation of this Lease other than the broker, person or firm, if any, designated in Section 1.1 hereof; and in the event any claim is made against the Tenant relative to dealings by Landlord with brokers including the Brokers, if any, designated in Section 1.1 hereof, Landlord shall defend the claim against Tenant with counsel of Landlord's selection and save harmless and indemnify Tenant on account of loss, cost or damage which may arise by reason of such claim. Landlord agrees that it shall be solely responsible for the payment of brokerage commissions to the Broker for the Original Term of this Lease, if any, designated in Section 1.1 hereof.

8.9 Invalidity of Particular Provisions

If any term or provision of this Lease, or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this

Lease shall be valid and be enforced to the fullest extent permitted by law.

8.10 Provisions Binding, Etc

The obligations of this Lease shall run with the land, and except as herein otherwise provided, the terms hereof shall be binding upon and shall inure to the benefit of the successors and assigns, respectively, of Landlord and Tenant and, if Tenant shall be an individual, upon and to his heirs, executors, administrators, successors and assigns. Each term and each provision of this Lease to be performed by Tenant shall be construed to be both a covenant and a condition. The reference contained to successors and assigns of Tenant is not intended to constitute a consent to subletting or assignment by Tenant.

8.11 Recording; Confidentiality

Landlord and Tenant agree, not to record the within Lease, but simultaneously with their execution and delivery of this Lease to execute and deliver a Notice of Lease in the form attached hereto as Exhibit L. In no event shall such document set forth rent or other charges payable by Tenant under this Lease; and any such document shall expressly state that it is executed pursuant to the provisions contained in this Lease, and is not intended to vary the terms and conditions of this Lease.

Tenant agrees that this Lease and the terms contained herein will be treated as strictly confidential and except as required by law (or except with the written consent of Landlord) Tenant shall not disclose the same to any third party except for Tenant's employees, brokers, agents, partners, lenders, accountants and attorneys and like parties who have been advised of the confidentiality provisions contained herein and agree to be bound by the same. In the event Tenant is required by law to provide this Lease or disclose any of its terms, Tenant shall give Landlord prompt notice of such requirement prior to making disclosure so that Landlord may seek an appropriate protective order. If failing the entry of a protective order Tenant is compelled to make disclosure, Tenant shall only disclose portions of the Lease which Tenant is required to disclose and will exercise reasonable efforts to obtain assurance that confidential treatment will be accorded to the information so disclosed. In connection with the foregoing, it is acknowledged and agreed that Tenant will be required by applicable governmental regulations to disclose this Lease in its public filings with the United States Securities and Exchange Commission.

8.12 Notices

Whenever, by the terms of this Lease, notice shall or may be given either to Landlord or to Tenant, such notice shall be in writing and shall be sent by overnight commercial courier or by registered or certified mail postage or delivery charges prepaid, as the case maybe:

If intended for Landlord, addressed to Landlord at the address set forth in Article I of this Lease, with a copy to Landlord, Attention: General Counsel at the same address (or to such other address or addresses as may from time to time hereafter be designated by Landlord by like notice).

If intended for Tenant, addressed to Tenant at the address set forth in Article I of this Lease except that from and after the Commencement Date the address of Tenant shall be the Premises, with a copy to Tenant, Attention: General Counsel at the same address (or to such other address or addresses as may from time to time hereafter be designated by Tenant by like notice).

Except as otherwise provided herein, all such notices shall be effective when received; provided, that (i) if receipt is refused, notice shall be effective upon the first occasion that such receipt is refused, (ii) if the notice is unable to be delivered due to a change of address of which no notice was given, notice shall be effective upon the date such delivery was attempted, (iii) if the notice address is a post office box number, notice shall be effective the day after such notice is sent as provided hereinabove or (iv) if the notice is to a foreign address, notice shall be effective two (2) days after such notice is sent as provided hereinabove.

Where provision is made for the attention of an individual or department, the notice shall be effective only if the wrapper in which such notice is sent is addressed to the attention of such individual or department.

Any notice given by an attorney on behalf of Landlord or by Landlord's managing agent shall be considered as given by Landlord and shall be fully effective. Any notice given by an attorney by or on behalf of Tenant shall be considered as given by Tenant and shall be fully effective.

Time is of the essence with respect to any and all notices and periods for giving notice or taking any action thereto under this Lease.

8.13 When Lease Becomes Binding

Employees or agents of Landlord have no authority to make or agree to make a lease or any other agreement or undertaking in connection herewith. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document shall become effective and binding only upon the execution and delivery hereof by both Landlord and Tenant. All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by written agreement between Landlord and Tenant, and no act or omission of any employee or agent of Landlord shall alter, change or modify any of the provisions hereof.

8.14 Section Headings

The titles of the Articles throughout this Lease are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Lease.

8.15 Rights of Mortgagee

This Lease shall be subject and subordinate to any mortgage now or hereafter on the Site, the Buildings, or the Complex, and to each advance made or hereafter to be made under any mortgage, and to all renewals, modifications, consolidations, replacements and extensions thereof and all substitutions therefor provided, however, that in consideration of and as a condition precedent to Tenant's agreement to subordinate this Lease with respect to mortgages hereafter placed on the Site shall be the receipt of a commercially reasonable non-disturbance agreement from and wherein the applicable mortgagee expressly recognizes the rights of Tenant under this Lease (including the right to use and occupy the Premises and to lease additional premises at the Complex) upon the payment of rent and other charges payable by Tenant under this Lease and the performance by Tenant of Tenant's obligations hereunder. In confirmation of such subordination and recognition, Tenant shall execute and deliver promptly such instruments of subordination and recognition as such mortgagee may reasonably request subject to receipt of such instruments of recognition from such mortgagee

as Tenant may reasonably request. Tenant hereby appoints such mortgagee (from time to time) as Tenant's attorney-in-fact to execute such subordination upon default of Tenant in complying with such mortgagee's (from time to time) request. In the event that any mortgagee or its respective successor in title shall succeed to the interest of Landlord, then, this Lease shall nevertheless continue in full force and effect and, provided Tenant has received the non-disturbance agreement required under this Section 8.15, Tenant shall and does hereby agree to attorn to such mortgagee or successor and to recognize such mortgagee or successor as its landlord. If any holder of a mortgage which includes the Premises, executed and recorded prior to the date of this Lease, shall so elect, this Lease and the rights of Tenant hereunder, shall be superior in right to the rights of such holder, with the same force and effect as if this Lease had been executed, delivered and recorded, or a statutory notice hereof recorded, prior to the execution, delivery and recording of any such mortgage. The election of any such holder shall become effective upon either notice from such holder to Tenant in the same fashion as notices from Landlord to Tenant are to be given hereunder or by the recording in the appropriate registry or recorder's office of an instrument in which such holder subordinates its rights under such mortgage to this Lease.

Landlord shall obtain and deliver to Tenant, as a condition of the effectiveness of this Lease, a non-disturbance agreement from the current mortgagee of the Premises and/or the Complex as of the date of this Lease, which said non-disturbance agreement shall be in the form attached hereto as Exhibit M (as the same may be modified by such changes as Tenant may request and such mortgagee may approve).

Landlord represents and warrants to Tenant that Landlord is the fee simple owner of the Complex and, as of the date hereof, the Complex is not subject to any ground lease or overlease.

8.16 Status Reports and Financial Statements

Recognizing that Landlord may find it necessary to establish to third parties, such as accountants, banks, potential or existing mortgagees, potential purchasers or the like, the then current status of performance hereunder, Tenant, on the request of Landlord made from time to time, will within fifteen (15) business days after such request furnish to Landlord, or any existing or potential holder of any mortgage encumbering the Premises, the Buildings, the Site and/or the Complex or any potential purchaser of the Premises, the Buildings, the Site and/or the Complex, (each an "Interested Party"), a statement of the status of any matter pertaining to this Lease, including, without limitation, acknowledgments that (or the extent to which) each party is in compliance with its obligations under the terms of this Lease. At Tenant's request, Landlord shall similarly

within fifteen (15) business days after Tenant's request, furnish to Tenant a commercially reasonable statement with similar types of information as set forth above, which statement may be relied upon by any actual or prospective assignee, subtenant, lender or purchaser of Tenant.

In addition, Tenant shall deliver to Landlord, or any Interested Party designated by Landlord, financial statements of Tenant and any guarantor of Tenant's obligations under this Lease, as reasonably requested by Landlord, including, but not limited to financial statements for the past three (3) years to the extent available and maintained by Tenant, except that so long as Tenant's stock is publicly traded on a national exchange that requires its financial statements to be publicly disclosed, Tenant shall have no obligation to deliver any financial statements to Landlord.

Landlord shall keep any non-public information provided by Tenant pursuant to this Section 8.16 confidential, and shall not disclose the same other than (i) to Landlord's officers, employees and consultants (or to any of the Interested Parties) or (ii) to the extent required by applicable law or by any administrative, governmental or judicial proceeding.

Any such status statement or financial statement delivered by Tenant pursuant to this Section 8.16 may be relied upon by any Interested Party.

8.17 Self-Help

(A) If an Event of Default of Tenant is in existence and continuing, Landlord shall have the right, but shall not be obligated, to enter upon the Premises and to perform such obligation notwithstanding the fact that no specific provision for such substituted performance by Landlord is made in this Lease with respect to such default. In performing such obligation, Landlord may make any payment of money or perform any other act as is reasonably deemed necessary. All sums so paid by Landlord (together with interest at the Default Rate (as defined in Section 8.22 below) and all costs and expenses in connection with the performance of any such act by Landlord, shall be deemed to be Additional Rent under this Lease and shall be payable to Landlord immediately on demand. Landlord may exercise the foregoing rights without waiving any other of its rights or releasing Tenant from any of its obligations under this Lease.

(B) In the event that Landlord shall be in default in the performance of any of Landlord's obligations under this Lease beyond the expiration of the applicable notice and cure periods provided in Section 7.2 above, then if Landlord or the holder of any such mortgage (at the option of such mortgagee) fails to (i) commence to cure such default within the time periods specified in said Section 7.2 and (ii) thereafter prosecute such cure to completion with due diligence given the nature thereof, then thereafter at any time prior to Landlord's or such mortgagee's commencing such cure or subsequent to Landlord or such mortgagee commencing such cure if Landlord or such mortgagee has not prosecuted such cure to completion with due diligence given the nature of such cure,

Tenant may, but need not (and without limitation of any other rights and remedies to which Tenant may be entitled under this Lease, at law or in equity on account of such default of Landlord), perform such obligation and charge the reasonable cost thereof to Landlord; provided, however, that in the case of emergency repairs (i) such notice by Tenant to Landlord and such mortgagee need not be in writing, and (ii) Tenant may make such emergency repairs and charge the reasonable cost thereof to Landlord if either Landlord or such mortgagee has not made such emergency repairs within a reasonable time after such notice. All sums so paid by Tenant (together with interest at the Default Rate) and all costs and expenses in connection with the performance of any such act by Tenant shall be payable to Tenant immediately on demand. If Landlord fails to reimburse Tenant for the sums paid by Tenant within thirty (30) days of Tenant's demand therefor (such demand to include reasonable evidence of the costs so incurred by Tenant), and Landlord has not, within ten (10) business days of its receipt of Tenant's demand, given written notice to Tenant objecting to such demand and submitting the same to arbitration under Section 8.31 below (or if Landlord has timely disputed Tenant's demand, has submitted such dispute to arbitration in accordance with said Section 8.31 and has thereafter failed to pay Tenant the amount of any final, unappealable arbitration award against Landlord within thirty (30) days after the issuance thereof) then subject to the last sentence of this paragraph, Tenant shall have the right to offset the amount of such sums demanded by Tenant against the Annual Fixed Rent and Additional Rent payable under this Lease until offset in full. Notwithstanding the foregoing, Tenant shall have no right to reduce any monthly installment of Annual Fixed Rent by more than ten percent (10%) of the amount of Annual Fixed Rent which would otherwise have been due and payable by Tenant to Landlord, unless the aggregate amount of such deductions over the remainder of the Lease Term (as the same may have been extended) will be insufficient to fully reimburse Tenant for the amount demanded by Tenant, in which event Tenant may effect such offset by making deductions from each monthly installment of Annual Fixed Rent in equal monthly amounts over the balance of the remainder of the Lease Term.

8.18 Holding Over

Any holding over by Tenant after the expiration of the term of this Lease shall be treated as a tenancy at sufferance and shall be on the terms and conditions as set forth in this Lease, as far as applicable except that Tenant shall pay as a use and occupancy charge an amount equal to the greater of (x) 150% of the Annual Fixed Rent and Additional Rent calculated (on a daily basis) at the highest rate payable under the terms of this Lease, or (y) the fair market rental value of the Premises, in each case for the period measured from the day on which Tenant's hold-over commences and terminating on the day on which Tenant vacates the Premises. In addition, Tenant shall save Landlord, its agents and employees harmless and will exonerate, defend and indemnify Landlord, its agents and employees from and against any and all damages which Landlord may suffer on account of Tenant's hold-over in the Premises after the expiration or prior termination of the term of this Lease. Nothing in the foregoing nor any other term or provision of this Lease shall be deemed to permit Tenant to retain possession of the Premises or hold over in the Premises after the expiration or earlier termination of the Lease Term. All property which remains in the Buildings or the Premises after the expiration or termination of this Lease shall be conclusively deemed to be abandoned and may either be retained by Landlord as its property or sold or otherwise disposed of in such manner as Landlord may see fit. If any part thereof shall be sold, then Landlord may receive the proceeds of such sale and apply the same, at its option against the expenses of the sale, the cost of moving and storage, any arrears of rent or other charges payable hereunder by Tenant to Landlord and any damages to which Landlord may be entitled under this Lease and at law and in equity.

8.19 Non-Subrogation

Any insurance carried by either party with respect to the Premises or property therein or occurrences thereon shall include a clause or endorsement denying to the insurer rights of subrogation against the other party to the extent rights have been waived by the insured prior to occurrence of injury or loss. Each party, notwithstanding any provisions of this Lease to the contrary, hereby waives any rights of recovery against the other for injury or loss due to hazards covered by such insurance (or which would have been covered had such party carried the insurance required to be carried by it under the Lease) to the extent of the indemnification received under such insurance policy and to the extent of any deductible maintained by such party in excess of $25,000.00. In addition, this waiver of rights by the parties shall apply to, and be for the benefit of, the Landlord Parties and the Tenant Parties, as applicable.

8.20 Extension Option

(A) On the conditions (which conditions Landlord may waive by written notice to Tenant) that both at the time of exercise of the herein described applicable option to extend and as of the commencement of the Extended Term in question (i) there exists no monetary or other material Event of Default (defined in Section 7.1), (ii) this Lease is still in full force and effect, and (iii) Tenant has not sublet more than fifty percent (50%) of the Rentable Floor Area of the Premises (except for a subletting permitted without Landlord's consent under Section 5.6.1 hereof or any occupancy permitted under Section 5.6.6 hereof), Tenant shall have the right to extend the Term hereof upon all the same terms, conditions, covenants and agreements herein contained (except for the Annual Fixed Rent which shall be adjusted during the option periods as hereinbelow set forth) for two (2) periods of five (5) years each as hereinafter set forth. Each option period is sometimes herein referred to as an "Extended Term." Notwithstanding any implication to the contrary Landlord has no obligation to make any additional payment to Tenant in respect of any construction allowance or the like or to perform any work to the Premises as a result of the exercise by Tenant of any such option (although the absence of any construction or other refurbishment allowance from Landlord for the Extended Term shall be a factor considered by all parties in determining the

Prevailing Market Rent under this Section 8.20 and Exhibit H).

(B) If Tenant desires to exercise its applicable option to extend the Term, then Tenant shall give notice to Landlord, not earlier than sixteen (16) months nor later than twelve (12) months prior to the expiration of the Lease Term (as it may have been previously extended hereunder) of Tenant's request for Landlord's quotation to Tenant of a proposed Annual Fixed Rent for the applicable Extended Term, which quotation Landlord shall deliver to Tenant in writing within fifteen (15) business days after receipt of Tenant's request. If at the expiration of thirty (30) days after the date when Tenant receives Landlord's quotation of the proposed Annual Fixed Rent as aforesaid (the "Negotiation Period"), Landlord and Tenant have not reached agreement on a determination of an Annual Fixed Rent for the applicable Extended Term and executed a written instrument extending the Term of this Lease pursuant to such agreement, then Tenant shall have the right, for thirty (30) days following the expiration of the Negotiation Period, to make a request to Landlord for a broker determination (the "Broker Determination") of the Prevailing Market Rent (as defined in Exhibit H) for the applicable Extended Term, which Broker Determination shall be made in the manner set forth in Exhibit H. If Tenant timely shall have requested the Broker Determination, then the Annual Fixed Rent for the applicable Extended Term shall be the greater of (a) ninety-five percent (95%) of the Prevailing Market Rent (as defined in Exhibit H) as determined by the Broker Determination or (b) the Annual Fixed Rent in effect during the last twelve (12) month period of the Lease Term immediately prior to such Extended Term. If Tenant shall have failed to timely request the Broker Determination, then the Annual Fixed Rent for the applicable Extended Term shall be as set forth in Landlord's original quotation.

(C) Upon the giving of notice by Tenant to Landlord exercising Tenant's option to extend the Lease Term in accordance with the provisions of Section 8.20(B) above, then this Lease and the Lease Term hereof shall automatically be deemed extended, for the applicable Extended Term, without the necessity for the execution of any additional documents, except that Landlord and Tenant agree to enter into an instrument in writing setting forth the Annual Fixed Rent for the applicable Extended Term as determined in the relevant manner set forth in this Section 8.20; and in such event all references herein to the Lease Term or the Term of this Lease shall be construed as referring to the Lease Term, as so extended, unless the context clearly otherwise requires. Notwithstanding anything contained herein to the contrary, in no event shall Tenant have the right to exercise more than one extension option at a time and further, Tenant shall not have the right to exercise its second extension option unless it has duly exercised its first extension option, and in no event shall the Lease Term hereof be extended for more than ten (10) years after the expiration of the Original Term hereof

8.21 Security Deposit

(A) Concurrently with the execution of this Lease, Tenant shall pay to Landlord a security deposit in the amount of Two Million and 001100 Dollars ($2,000,000.00) and Landlord shall hold the same, throughout the Term of this Lease (including the Extended Term, if applicable), unless sooner returned to Tenant as provided in this Section 8.21 and subject to the provisions of subsection (B) below, as security for the performance by Tenant of all obligations on the part of Tenant to be performed under this Lease. Such deposit shall be in the form of an irrevocable, unconditional, negotiable letter of credit (the "Letter of Credit"). The Letter of Credit shall (i) be issued by and drawn on a bank reasonably approved by Landlord and at a minimum having a corporate credit rating from Standard and Poor's Professional Rating Service of BBB- or a comparable minimum rating from Moody's Professional Rating Service, (ii) be substantially in the form attached hereto as Exhibit G, (iii) permit one or more draws thereunder to be made accompanied only by certification by Landlord or Landlord's managing agent that pursuant to the terms of this Lease, Landlord is entitled to draw upon such Letter of Credit, (iv) permit transfers at

any time without charge, and (v) provide that any notices to Landlord be sent to the notice address provided for Landlord in this Lease. If the credit rating for the issuer of such Letter of Credit falls below the standard set forth in (i) above or if the financial condition of such issuer changes in any other material adverse way, Landlord shall have the right to require that Tenant provide a substitute letter of credit that complies in all respects with the requirements of this Section, and Tenant's failure to provide the same within ten (10) business days following Landlord's written demand therefor shall entitle Landlord to immediately draw upon the Letter of Credit and hold the proceeds as a cash security deposit under this Lease. Any such Letter of Credit shall be for a term of two (2) years (or for one (1) year if the issuer thereof regularly and customarily only issues letters of credit for a maximum term of one (1) year) and shall in either case provide for automatic one (1) year renewals through the date which is ninety (90) days subsequent to the scheduled expiration of this Lease (as the same may be extended) or if the issuer will not grant automatic renewals, the Letter of Credit shall be renewed by Tenant each year and each such renewal shall be delivered to and received by Landlord not later than thirty (30) days before the expiration of the then current Letter of Credit (herein called a "Renewal Presentation Date"). In the event of a failure to so deliver any such renewal Letter of Credit on or before the applicable Renewal Presentation Date, Landlord shall be entitled to present the then existing Letter of Credit for payment and to receive the proceeds thereof, which proceeds shall be held as Tenant's security deposit, subject to the terms of this Section 8.21. Any failure or refusal of the issuer to honor the Letter of Credit shall be at Tenant's sole risk and shall not relieve Tenant of its obligations hereunder with regard to the security deposit. Upon the occurrence of any Event of Default, Landlord shall have the right from time to time without prejudice to any other remedy Landlord may have on account thereof, to draw on all or any portion of such deposit held as a Letter of Credit and to apply the proceeds of such Letter of Credit or any cash held as such deposit, or any part thereof, to Landlord's damages arising from such Event of Default on the part of Tenant under the terms of this Lease. If Landlord so applies all or any portion of such deposit, Tenant shall within seven (7) days after notice from Landlord deposit cash with Landlord in an amount sufficient to restore such deposit to the full amount stated in this Section 8.21. While Landlord holds any cash deposit Landlord shall have no obligation to pay interest on the same and shall have the right to commingle the same with Landlord's other funds. Neither the holder of a mortgage nor the Landlord in a ground lease on property which includes the Premises shall ever be responsible to Tenant for the return or application of any such deposit, whether or not it succeeds to the position of Landlord hereunder, unless such deposit shall have been received in hand by such holder or ground Landlord.

(B) Landlord shall return the security deposit to Tenant in accordance with the schedule set forth below (or if such deposit is in the form of a Letter of Credit, Landlord shall either exchange the Letter of Credit for a Letter of Credit delivered by Tenant which reduces the amount secured by the Letter of Credit by the amount stated below and otherwise in strict conformity with the requirements herein or accept and consent to an amendment to the existing Letter of Credit which reduces the amount thereof to the amount required below) if as of each Scheduled Reduction Date set forth below (i) Tenant has met the corresponding Total Stockholder Equity Threshold and Prior Twelve Month Total Revenue Threshold, (ii) Tenant is not then in default under the terms of this Lease without the benefit of notice or grace (provided that such return or reduction shall be made upon the curing of any such default), and (iii) there have been no more than four (4) monetary and other material Event of Default occurrences during the Term (subsections (i), (ii) and (iii) being hereinafter referred to as the "Reduction Conditions").

| Scheduled Reduction Date | Reduction Amount | Remaining Security Deposit | Total Stockholder Equity Threshold | Prior Twelve Month Total Revenue Threshold |
|---|---|---|---|---|
| 3/1/10 | $250,000.00 | $1,750,000.00 | $99,800,000.00 | $250,000,000.00 |
| 3/1/11 | $250,000.00 | $1,500,000.00 | $104,800,000.00 | $250,000,000.00 |
| 3/1/12 | $250,000.00 | $1,250,000.00 | $110,000,000.00 | $275,000,000.00 |
| 3/1/13 | $250,000.00 | $1,000,000.00 | $115,500,000.00 | $275,000,000.00 |
| 3/1/14 | $250,000.00 | $750,000.00 | $121,300,000.00 | $300,000,000.00 |
| 3/1/15 | $250,000.00 | $500,000.00 | $127,400,000.00 | $300,000,000.00 |

If Tenant believes that it has satisfied all of the Reduction Conditions, then it shall
request such reduction in writing to Landlord, which request shall certify to Landlord that all such Reduction Conditions have been satisfied and shall be accompanied by appropriate documentation evidencing the same. If Landlord determines that all of the Reduction Conditions are met, the security deposit shall be so reduced in accordance with this Section 8.21(B). No Letter of Credit shall automatically reduce, but any reduction in the amount thereof shall require Landlord's prior written notice or consent to the issuer of the Letter of Credit of the reduced amount. Promptly after Landlord's receipt of Tenant's request for a reduction as described above, Landlord shall determine whether such a reduction is permitted in accordance with this Section 8.21(B), and if it is, Landlord shall notify the issuer of the Letter of Credit of the amount to which the Letter of Credit shall
be reduced.

In connection with the foregoing, it is understood and agreed that:

(i)         The Total Stockholder Equity and Prior Twelve Month Total Revenue shall be determined based on the information contained in the audited annual financial statements set forth in Tenant's Form 10-K Annual Report filed with the Securities and Exchange Commission for the most recent fiscal year immediately preceding the Scheduled Reduction Date at issue (it being understood and agreed that if Tenant ceases to be a publicly-held company whose shares are traded on a national stock exchange, Tenant shall provide Landlord with a certified copy of its most recent audited annual financials statements at the time it submits its request for reduction as set forth above, and the foregoing thresholds or their reasonable equivalents shall be determined based on such audited annual financial statements).

(ii)        To the extent that Tenant fails to meet the applicable Total Stockholder Equity Threshold and/or Prior Twelve Month Total Revenue Threshold for a given Scheduled Reduction Date, such Scheduled Reduction Date and all of the Scheduled Reduction Dates thereafter shall be postponed for one (1) year. By way of example, if on March 1, 2010 Tenant does not have $99,800,000.00 in Total Stockholder Equity and $250,000,000.00 in Prior Twelve Month Total Revenue, Tenant shall not be entitled to a return of a $250,000.00 portion of the security

deposit until March 1,2011 (assuming the foregoing thresholds have been met) and on March 1,2012 Tenant shall be entitled to a return of another $250,000.00 portion of the security deposit only ifit has $104,800,000.00 in Total Stockholder Equity and $250,000,000.00 in Prior Twelve Month Total Revenue.

Any disputes under this Section 8.21(B) as to whether or not the Reduction Conditions have been satisfied may be resolved by arbitration under Section 8.31 below.

(C) Tenant not then being in default and having performed all of its obligations under this Lease, including the payment of all Annual Fixed Rent, Landlord shall return the deposit, or so much thereof as shall not have theretofore been applied in accordance with the terms of this Section 8.21, to Tenant on the expiration or earlier termination of the term of this Lease (as the same may have been extended) and surrender possession of the Premises by Tenant to Landlord in the condition required in the Lease at such time.

## 8.22 Late Payment

If Landlord shall not have received any payment or installment of Annual Fixed Rent or Additional Rent (the "Outstanding Amount") on or before the date on which the same first becomes payable under this Lease (the "Due Date"), the amount of such payment or installment shall incur a late charge equal to the sum of: (a) three percent (3%) of the Outstanding Amount for administration and bookkeeping costs associated with the late payment and (b) interest on the Outstanding Amount from the Due Date through and including the date such payment or installment is received by Landlord, at a rate (the "Default Rate") equal to the lesser of (i) the rate announced by Bank of America, N .A. (or its successor) from time to time as its prime or base rate (or if such rate is no longer available, a comparable rate reasonably selected by Landlord), plus two percent (2%), or (ii) the maximum applicable legal rate, if any. Such interest shall be deemed Additional Rent and shall be paid by Tenant to Landlord upon demand. Landlord agrees to waive the late charge due hereunder for the first late payment by Tenant under this Lease per calendar year provided that Landlord receives such payment from Tenant within five (5) business days after the Due Date.

## 8.23 Tenant's Payments

Each and every payment and expenditure, other than Annual Fixed Rent, shall be deemed to be Additional Rent or additional rent hereunder, whether or not the provisions requiring payment of such amounts specifically so state, and shall be payable, unless otherwise provided in this Lease, within ten (l0) days after written demand by Landlord, and in the case of the non-payment of any such amount, Landlord shall have, in addition to all of its other rights and remedies, all the rights and remedies available to Landlord hereunder or by law in the case of non-payment of Annual Fixed Rent. Unless expressly otherwise provided in this Lease, the performance and observance by Tenant of all the terms, covenants and conditions of this Lease to be performed and observed by Tenant shall be at Tenant's sole cost and expense. If Tenant has not objected to any statement of Additional Rent which is rendered by Landlord to Tenant within ninety (90) days after Landlord has rendered the same to Tenant (or such longer period of time as provided to Tenant under Section 2.6.1 above to the extent that the item of Additional Rent in question is covered by Tenant's audit rights as set forth in said Section 2.6.1), then the same shall be deemed to be a final account between Landlord and Tenant not subject to any further dispute. In the event that Tenant shall seek Landlord's consent or approval under this Lease, then Tenant shall reimburse Landlord, upon demand, as Additional Rent, for all reasonable costs and expenses, including legal and architectural costs and expenses, incurred by Landlord in processing such request, whether or not such consent or approval shall be given.

8.24 Waiver of Trial By Jury

Landlord and Tenant each hereby waive any right to trial by jury in any action, proceeding or counterclaim brought by either Landlord or Tenant on any matters whatsoever arising out of or any way connected with this Lease, the relationship of the Landlord and the Tenant, the Tenant's use or occupancy of the Premises and/or any claim of injury or damage, including but not limited to, any summary process eviction action.

8.25 Governing Law

This Lease shall be governed exclusively by the provisions hereof and by the law of the Commonwealth of Massachusetts without regard to conflict of law principles, as the same may from time to time exist.

8.26 Tenant's Equipment

(A) Subject to the terms and provisions of this Section 8.26, Tenant shall be permitted to install (x) telecommunications equipment, television antennas, related receiving equipment, related cable connections and other related telecommunications equipment (collectively, the "Telecom Equipment") and (y) HVAC equipment and any and all related equipment to accommodate Tenant's excess HVAC requirements (collectively, the "HVAC Unit") in a location or locations on the rooftop of any of the Buildings in which Tenant directly leases Premises from Landlord in an area to be mutually agreed upon the parties, provided that (i) such installation and the operation thereof shall not cause any measurable interference with any existing communication equipment in the Complex, and (ii) such installation does not adversely affect the structural elements or the visual aesthetic of the Buildings as determined by Landlord in its sole discretion. In addition, Landlord shall have the option upon notice to Tenant to relocate the Telecom Equipment and/or the HVAC Unit to other areas on the rooftop of the Buildings at Landlord's sole cost and expense and so long as such relocation does not materially adversely affect Tenant's use of the Premises. Tenant shall have no right to license, sublease, assign or otherwise transfer its rights to install and use Telecom Equipment and the HVAC Unit on the Buildings and/or the Site (other than to an assignee or subtenant permitted or consented to under this Lease). Landlord hereby reserves the right (at its sole discretion) to install and to permit others to install, use and maintain telecommunications equipment, antennas and similar installations on the rooftop of the Buildings and elsewhere on the Site provided that any agreement with a third party granting the right to install telecommunications equipment subsequent to the Commencement Date hereof shall contain language prohibiting interference with Tenant's Telecom Equipment then existing and shall provide Landlord with a termination right if such interference is not remedied after a reasonable period of time. If measurable interference shall occur, Tenant shall provide notice thereof to Landlord and Landlord shall use reasonable efforts to cause the same to be remedied, however, if despite such efforts the same are not remedied within a period reasonably necessary to cure such interference, Landlord shall exercise the termination right set forth in its agreement with such interfering party.

(B) Subject to the provisions of this Section 8.26, Tenant shall have the right to install a generator, related connections and a diesel fuel tank or similar fuel storage compartment (collectively, the "Generator") in an area on the Site to be mutually agreed upon by Landlord and Tenant (it being understood and agreed that the Generator may not be installed on the roof of any of the Buildings or on Land Recreation Area B, as that term is defined in Section 8.27 below).

(C) Tenant's use of the Telecom Equipment, the HVAC Unit and the Generator (collectively, the "Tenant's Equipment") shall be upon all of the conditions of the Lease, except as modified below:

(i)  It is understood and agreed that Tenant shall be responsible, at its sole cost and expense, for installing the Tenant's Equipment. **In** addition to complying with the applicable construction provisions of this Lease, Tenant shall not install or operate any portion of the Tenant's Equipment until Tenant shall have obtained Landlord's prior written approval, which approval will not be unreasonably withheld or delayed, of Tenant's plans and specifications therefor. Landlord shall inform Tenant at the time of its review of the plans and specifications for the Generator whether Landlord will require the same to be removed by Tenant upon the expiration or earlier termination of this Lease.

(ii)  Landlord shall have no obligation to provide any services to the Tenant's Equipment, provided Tenant shall have the right to connect Tenant's Equipment to existing base building utility systems, subject to Landlord's right to reasonably approve such connections. Tenant shall, at its sole cost and expense and otherwise in accordance with the provisions of this Section 8.26, arrange for all utility services required for the operation of the Tenant's Equipment.

(iii)  Tenant shall have no right to make any changes, alterations or other improvements to the Tenant's Equipment without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Tenant shall have the right to maintain and make repairs to the Tenant's Equipment.

(iv)  Tenant shall be responsible for the cost of repairing any damage to the Complex caused by the installation, use and removal of the Tenant's Equipment.

(v)  Except for assignees of this Lease or subtenants of all or a portion of the Premises, no other person, firm or entity (including, without limitation, other tenants, licensees or occupants of the Complex) shall have the right to connect to the Tenant's Equipment other than Tenant.

(vi)  To the maximum extent permitted by law, Tenant's use of the Tenant's Equipment shall be at the sole risk of Tenant, and Landlord shall have no liability to Tenant in the event that the Tenant's Equipment is damaged for any reason.

(vii)  Landlord shall have the right, upon no less than ninety (90) days notice to Tenant and at Landlord's sole cost and expense, to relocate portions of the Tenant's Equipment to another area within the Complex reasonably acceptable to Tenant. Landlord and Tenant shall cooperate with each other in good faith to schedule such relocation work on nights and weekends so as to minimize interference with Tenant's business operations. Any such relocation by Landlord shall not independently (i.e., in the absence of another cause) be deemed to constitute a failure of electric supply under Section 4.2(C) above.

(viii)  In addition to the indemnification provisions set forth in this Lease (which shall be applicable to the Tenant's Equipment), Tenant shall, to the maximum extent permitted by law, indemnify, defend, and hold Landlord, its agents, contractors and employees harmless from any and all claims, losses, demands, actions or causes of actions suffered by any person, firm, corporation, or other entity arising from the installation, use or removal of the Tenant's Equipment.

(C) Tenant shall, at its sole cost and expense, secure the approvals of all governmental authorities and all permits required by governmental authorities having jurisdiction over such approvals for the Tenant's Equipment, and shall provide Landlord with copies of such approvals and

permits prior to commencing any work with respect thereto. In addition, Tenant shall be solely responsible for all costs and expenses in connection with the installation, maintenance, use and removal of the Tenant's Equipment, except that Tenant will not be obligated to pay Landlord any rental for that portion of the Buildings and/or the Site on which the Tenant's Equipment is located. In connection therewith, Tenant shall provide Landlord with evidence on an annual basis of the existence of a maintenance contract for the Generator with a service provider reasonably acceptable to Landlord. Tenant shall have access to those portions of the Buildings and/or the Site on which the Tenant's Equipment is located for the purposes of inspecting, repairing, maintaining and replacing the same, subject in all events to Landlord's reasonable rules and regulations regarding such access (it being understood and agreed, without limiting the generality of the foregoing, that access to the rooftops of the Buildings is controlled by Landlord).

8.27 Land Recreation Space

(A) For so long as (i) Tenant directly leases from Landlord at least 150,000 square feet of rentable floor area, (ii) there have been no more than four (4) monetary or other material Event of Default occurrences during the Term, (iii) this Lease is still in full force and effect, and (iv) Tenant has not assigned this Lease (except for an assignment under Section 5.6.1 above or any occupancy permitted under Section 5.6.6 above), Tenant shall have the exclusive right to use the portion of the Site shown on Exhibit I-I attached hereto (such area being hereinafter referred to as "Land Recreation Area A") for the Permitted Uses of the Additional Land Areas set forth in Section 1.1. Landlord agrees, at its sole cost and expense, to construct a fence and gate in the areas shown on Exhibit I-I to segregate Land Recreation Area A from the remainder of the parking area in that portion of the Complex.

Notwithstanding the foregoing, in the event that Tenant shall cease to directly lease Building E in its entirety but shall continue to directly lease Buildings C and D in their entirety, Tenant shall have the right to use only that portion of Land Recreation Area A as shown on Exhibit I-I attached hereto as the "Reduced Land Recreation Area A" for the purposes described in this Section 8.27 (it being understood and agreed that (x) the remainder of Land Recreation Area A may be used by Landlord for any purpose so long as Tenant is still provided with access to the Reduced Land Recreation Area A and (y) Landlord shall at its sole cost and expense construct or relocate a fence and gate to segregate Reduced Land Recreation Area A from the remainder of Land Recreation Area

A).

(B) (1) For so long as (i) Tenant directly leases from Landlord at least 75,000 square feet of rentable floor area, (ii) there have been no more than four (4) monetary or other material Event of Default occurrences during the Term, (iii) this Lease is still in full force and effect, and (iv) Tenant has not assigned this Lease (except for an assignment under Section 5.6.1 above or a permitted occupancy under Section 5.6.6 above), Tenant shall have the exclusive right to use the area adjacent to the Site shown on Exhibit 1-2 attached hereto (such area being hereinafter referred to as "Land Recreation Area B" and collectively with Land Recreation Area A as the "Additional Land Areas") for the Permitted Uses of the Additional Land Areas set forth in Section 1.1. Notwithstanding the foregoing, in the event that Tenant shall meet the requirements of subsections (ii) - (iv) above but shall directly lease from Landlord less than 75,000 square feet of rentable floor area, Tenant shall still have the right to use Land Recreation Area B on an exclusive basis but Tenant shall be required to pay to Landlord, as Additional Rent, its pro rata share of the rent payable to MHD under the MHD Lease (as those terms are defined in subsection (B)(2) below) in the inverse proportion that the rentable floor area of the remainder of the Premises then leased by Tenant bears to the

Rentable Floor Area of the Premises originally set forth in Section 1.1 above (e.g., if Tenant is directly leasing 50,000 square feet of rentable floor area, then Tenant shall pay two-thirds of the rent associated with the MHD Lease).

(2) In connection with the foregoing, it is understood and agreed that Land Recreation Area B is located on property owned by the Massachusetts Highway Department ("MHD") and is the subject of a lease (the "MHD Lease") between MHD and Landlord, a copy of which is attached hereto as Exhibit J. On or before the Commencement Date, Landlord shall, at Landlord's sole cost and expense, install a fence around Land Recreation Area B of a type, quality and in a location selected by Landlord (it being understood and agreed that if Tenant wants to install additional screening, it shall be done at Tenant's sole cost and expense and shall be undertaken in accordance with the terms and provisions of the MHD Lease). Tenant acknowledges and agrees that the MHD Lease provides, among other things, for a term of five (5) years with one (1) five (5) year renewal option, and accordingly that the term of the MHD Lease will expire prior to the expiration of the Original Term of this Lease (Landlord making no representation about its ability to negotiate for any further extension of the MHD Lease beyond the original 5- year term and 5-year extension option period). Tenant shall have the right to direct Landlord to exercise or not exercise the renewal option available to Landlord under the MHD Lease; provided, however, that if Tenant directs Landlord not to exercise the renewal option, Landlord shall nonetheless have the right to exercise the same, in which event (x) Tenant shall have no right to use Land Recreation Area B under this Section 8.28 from and after the expiration of the initial lease term under the MHD Lease and (y) Tenant shall not be required to pay any costs and expenses associated with Land Recreation Area B as part of Landlord's Operating Expenses Allocable to the Premises or otherwise (unless and only to the extent that Land Recreation Area B is used as a parking area serving the tenants of the Complex and the costs of maintaining the same are chargeable to the tenants of the Complex as a part of Landlord's Operating Expenses under Section 2.6 above). For so long as Tenant shall have the right to use Land Recreation Area B and shall actually be using the same in accordance with the terms and provisions of this Section 8.27 (B), Landlord covenants and agrees: (i) to comply with all of the terms and obligations of Landlord, as tenant, under the MHD Lease; (ii) not to act or omit to act in any manner that would result in a default of Landlord, as tenant, under the MHD Lease; and (iii) not to voluntarily terminate or surrender the MHD Lease without Tenant's prior written consent, which consent shall be in Tenant's sole and unfettered discretion. Tenant covenants and agrees not to use Land Recreation Area Bin any manner that would be in violation of the terms and provisions of the MHD Lease or would cause Landlord to be in default of its obligations thereunder (it being understood and agreed that Landlord shall in no way be liable to Tenant for any breach of the covenants of Landlord set forth in the immediately preceding sentence or in the event that the MHD Lease is terminated as the result of any failure by Tenant to comply with the terms and provisions of the MHD Lease as applicable to Tenant's use of Land Recreation Area B).

(3) In the event that Tenant is prevented from using (and in fact ceases to use) Land Recreation Area B as the result of either (x) a default by MHD under the MHD Lease or (y) a casualty or taking affecting Land Recreation Area B, Landlord shall use commercially reasonable efforts to enforce the terms of the MHD Lease. To the extent that the foregoing condition continues for a period of more than thirty (30) days and that Landlord is no longer required to make payments to MHD under the MHD Lease on account thereof, Landlord shall pay to Tenant an amount equal to the monthly payment Landlord would have otherwise been required to pay under the MHD Lease for each month for the period from and after the thirty-first (31st) day that Tenant is unable to use Land Recreation Area B as aforesaid until the first to occur of such time as (1) the condition causing the same has been cured, (2) Landlord has obtained rights to an alternative parcel of land to be substituted for Land Recreation Area B (as set forth below) or (3) Tenant has terminated this Lease (as set forth below).

In addition, if Tenant is prevented from using (and in fact ceases to use) Land Recreation Area B as the result of the circumstances described in subsections (x) or (y) of the immediately preceding paragraph for a period of eleven (11) consecutive months after Landlord's receipt of written notice of such condition from Tenant, then Tenant may terminate this Lease by giving Landlord written notice as follows:

(i) Said notice shall be given after said eleven (11) month period.

(ii) Said notice shall set forth an effective date which is not earlier than thirty (30) days after Landlord receives said notice.

(iii) If said condition is remedied on or before the date thirty (30) days after the receipt of such notice, said notice shall have no further force and effect.

(iv) If said condition is not remedied on or before the date thirty (30) days after the receipt of such notice, this Lease shall terminate as of said effective date, and the Annual Fixed Rent and Additional Rent due under this Lease shall be apportioned as of said effective date.

Notwithstanding the foregoing, Tenant shall have no right to terminate this Lease in the event that Landlord has made available to Tenant another parcel of land consisting of one and one-half (1 Y2)acres or more and located within a ten (10) mile radius of the Complex, which may be used by Tenant for all of the same purposes as Land Recreation Area B hereunder (Landlord hereby acknowledging that Landlord shall be solely responsible for all costs associated with obtaining the rights to such alternative parcel, notwithstanding that such costs may exceed what would have been payable under the MHD Lease, provided that Tenant shall still be responsible for any costs that Landlord is otherwise entitled to pass through to Tenant on account of Land Recreation Area B in accordance with Section 2.6 above). In the event any zoning relief or changes need to be obtained for such alternate land in order to permit Tenant's use of the same for the same purposes as Land Recreation Area B, Landlord shall be responsible, at Landlord's sole cost and expense, for obtaining any and all of such necessary zoning relief and/or changes.

The remedies set forth in this Section 8.27(B)(3) shall be Tenant's sole remedies for the events described herein.

(C) Landlord shall deliver possession of the Additional Land Areas in the condition required under this Lease to Tenant in the condition required by this Lease on or before the Commencement Date. Except as expressly provided in subsection (B) above, Tenant shall not be required to pay any rent or use and occupancy charge with respect to the Additional Land Areas (provided, however, that Tenant shall be required to pay all maintenance costs and real estate taxes associated therewith as part of Operating Expenses Allocable to the Premises under Section 2.6 above). The Additional Land Areas shall be deemed to be a part of the Premises for the purposes of the covenants and agreements of Tenant under Article V of this Lease; provided, however, that Tenant shall not have the right to assign its rights under this Section 8.27 or to sublease all or any portion of the Additional Land Areas, other than in connection with an assignment or sublease under Section 5.6.1 above or a permitted occupancy under Section 5.6.6 above. Without limiting the generality of the foregoing, it is expressly understood and agreed that the indemnification provisions of Section 5.7 of this Lease shall be deemed to include any claims, liabilities, damages and expenses, including reasonable attorney's fees, relating to, or claimed to relate to, Tenant's use of the Additional Land Areas (including, without limitation, any claims that may arise under the MHD Lease). In addition, in the event that Tenant shall cease to meet the respective requirements set forth in subsections (A)

and (B) above, Landlord shall have the right to require Tenant to discontinue its use of Land Recreation Area A and/or Land Recreation Area B, as applicable, and to yield up such area to Landlord in the condition required by Section 5.2 above (provided, however, that Tenant shall not have any obligation to remove any pavement or fences installed by or on behalf of Tenant in either of the Additional Land Areas, so long as Tenant delivers such areas to Landlord in a level condition).

8.28 Tenant's Expansion Rights: Buildings F, G and H

(A) On the conditions (which conditions Landlord may waive by written notice to Tenant at any time), that as of both the time that any portion of the RFO Premises (as hereinafter defined) becomes available for reletting (as hereinafter defined) and as of the commencement date of Tenant's leasing of such portion of the RFO Premises: (i) Tenant directly leases from Landlord at least 75,000 square feet of rentable floor area, (ii) no monetary or other material Event of Default of Tenant exists and there have been no more than two (2) monetary or other material Event of Default occurrences during the Lease Term, (iii) this Lease is still in full force and effect, and (iv) Tenant has neither assigned this Lease nor sublet more than fifty percent (50%) of the Total Rentable Floor Area of the Buildings (except for an assignment or sublease under Section 5.6.1 above or an occupancy permitted pursuant to Section 5.6.6 above), Tenant shall have a right of first offer ("Right of First Offer") to lease the RFO Premises, as hereinafter defined.

For the purposes hereof, the "RFO Premises" shall be defined as any and all space in Buildings F, G and H of the Complex as and when such space becomes available for reletting (as hereinafter defined); provided, however, that Landlord shall have the right to reconfigure portions of the RFO Premises (e.g. to subdivide an existing space or to combine several spaces to create one larger space) prior to offering the same to Tenant hereunder if in Landlord's reasonable judgment such reconfiguration is necessary or desirable to create a commercially rentable layout.

(B) When any portion of the RFO Premises becomes available for reletting, as hereinafter defined, Landlord shall notify Tenant ("Landlord's RFO Premises Notice") of the availability of such space, which notice shall contain the size, configuration, location and date of availability of such RFO Premises, the Annual Market Rent, and the other business terms upon which Landlord is willing to so lease such space. The net effective rental rate set forth in Landlord's RFO Premises Notice expressed by the (i) Annual Market Rent for the RFO Premises quoted by Landlord, (ii) amount of Base Taxes and Base Operating Expenses, (iii) free rent or "build-out" period, if any, after the commencement of the lease term, (iv) tenant improvement allowance, if any, and (v) length of the lease term, shall hereinafter be referred to as "Landlord's Offered Rental Terms."

For the purposes hereof:

(1)         The "Annual Market Rent" shall be the annual fair market rent for such space as of the date when the same becomes available for reletting, based upon the use of such space as first class office/research and development space utilizing properties of similar character within the Boston Northwest Suburban Market.

(2)         RFO Premises shall be deemed "available for reletting" when Landlord, in its sole judgment, determines that the then current tenant of the RFO Premises will vacate the RFO Premises at the expiration or earlier termination of such tenant's lease.

In connection with the foregoing, it is understood and agreed that Tenant's rights under this Section 8.28 shall be subject and subordinate to the rights of the existing tenants in Buildings F, G and H as of the date of this Lease (the "Existing Tenants") as set forth on Exhibit 0 attached hereto (the terms

of any leases with the Existing Tenants, including, but not limited to, the original terms thereof and options to extend the terms thereof contained in lease documents executed prior to the date hereof are hereinafter individually and collectively called the "Existing Leases").

(C) If Tenant wishes to exercise Tenant's Right of First Offer, Tenant shall do so, if at all, by giving Landlord notice ("Tenant's RFO Exercise Notice") of Tenant's desire to lease either:

(i)                    the entire amount of space designated in Landlord's RFO Premises Notice;

(ii)                    in the case of Building F only, a portion of the space designated in Landlord's RFO Premises Notice containing not less than 10,000 contiguous rentable square feet of floor area of the RFO Premises; or

(iii)                    in the event that Landlord designates the entirety of Building G, a portion thereof consisting of one (1) full floor of the Building; or

(iv)                    in the event that Landlord designates the entirety of Building H, a portion thereof consisting of one (1) full floor of the Building.

within ten (10) business days after receipt of Landlord's RFO Premises Notice, time being of the essence. Tenant shall in Tenant's RFO Exercise Notice specify whether it shall be leasing the applicable portion of the RFO Premises for (1) the lease term specified in Landlord's RFO Premises Notice or (2) a lease term that is coterminous with the Term of this Lease with respect to the original Premises (it being understood and agreed that if less than thirty-six (36) months then remain in the Lease Term at the time Tenant delivers the Tenant's RFO Exercise Notice and Tenant desires that the lease term with respect to the RFO Premises be coterminous with the Lease Term with respect to the original Premises and if such period is shorter than the lease term offered in Landlord's RFO Premises Notice, Tenant must simultaneously exercise its extension option under Section 8.20 with its exercise of its rights under this Section 8.28 and that if no such extension option is then available to Tenant then the term with respect to the RFO Premises shall automatically be as specified in Landlord's RFO Premises Notice) (the lease term as determined under subsection (1) or (2) being hereinafter referred to as the

"Designated RFO Lease Term"). In the event that Tenant shall elect to lease less than the entirety of the space designated in Landlord's RFO Notice in accordance with subsections (ii), (iii) and/or (iv) above, (x) the part of the RFO Premises not accepted by Tenant shall be in a commercially rentable configuration, (y) Tenant shall pay all costs and expenses associated with subdividing and separately physically demising the portion of the RFO Premises accepted by Tenant from the remainder of the RFO Premises and (z) Tenant acknowledges that the rentable floor area of the portion of the RFO Premises accepted by it and other economic terms associated therewith may be reasonably adjusted based on the conversion of the Building from a single-tenant to a multi-tenant building. In addition to the requirements set forth in the immediately preceding sentence, in the event that Landlord has offered the entirety of Building H to Tenant and Tenant exercises its rights hereunder only with respect to one (1) full floor of Building H in accordance with subsection (iv) above, Landlord shall have a period of ninety (90) days from the date of Tenant's RFO Exercise Notice to negotiate with prospective third-party tenants for a lease of the entirety of Building H and if Landlord shall sign a letter of intent with a third-party tenant for the entirety of Building H within said ninety (90) day period, then Tenant's RFO Exercise Notice shall be deemed null and void and of no further force or effect (it being understood and agreed that if Landlord shall not sign a letter of intent with a third party tenant for the entirety of Building H within said ninety (90) day period, then Tenant shall

proceed to lease the portion of Building H designated in Tenant's RFO Exercise Notice in accordance with the terms and provisions of this Section 8.28).

If Tenant shall give a Tenant's RFO Exercise Notice the same shall constitute an agreement to enter into an instrument in writing to lease the RFO Premises identified in Tenant's RFO Exercise Notice within a reasonable time period after receipt of a first draft of such amendment to this Lease adding the RFO Premises to the Premises upon all of the same terms and conditions in this Lease, except to the extent inconsistent with the provisions of this Section and except that (x) the Annual Fixed Rent shall be equal to the Annual Market Rent as quoted by Landlord, (y) the lease term with respect to the RFO Premises shall be the Designated RFO Lease Term, and (z) the lease amendment shall also reflect such other business terms as were set forth in Landlord's RFO Premises Notice.

(D) If Tenant shall not timely exercise its rights under this Section 8.28 within such period (or if Tenant shall timely exercise such right to lease only with respect to a portion of the RFO Premises in accordance with the provisions of subsections (C)(ii), (iii) and (iv) above), time being of the essence in respect to such exercise, Landlord shall be free to lease the RFO Premises (or that portion of the RFO Premises not accepted by Tenant in Tenant's RFO Exercise Notice in accordance with the provisions of subsections (C)(ii), (iii) and (iv) above) for two hundred seventy (270) days after the date of Landlord's RFO Premises Notice for a net effective rental rate which is not less than 90% of Landlord's Offered Rental Terms contained in Landlord's RFO Premises Notice without again offering such space to Tenant for lease; provided, however, that (i) Landlord shall reoffer the applicable RFO Premises to Tenant in accordance with the terms and provisions of this Section 8.28 if (a) Landlord does not so lease such space during such two hundred seventy (270) day period, or (b) if Landlord proposes to lease such space in larger or smaller increments, or (c) if Landlord proposes to lease such space during such two hundred seventy (270) day period for a net effective rental rate which is less than 90% of Landlord's Offered Rental Terms contained in Landlord's RFO Premises Notice, and (ii) the terms of this Section 8.28 shall continue to apply to the remainder of the RFO Premises, if any, not included in Landlord's RFO Premises Notice and to RFO Premises included in Landlord's RFO Premises Notice and not leased by Tenant which is subsequently leased to another tenant in accordance with this Section 8.28 and thereafter becomes available for reletting.

(E) If Tenant shall exercise any such Right of First Offer and if, thereafter, the then occupant of the RFO Premises with respect to which Tenant shall have so exercised such right wrongfully fails to deliver possession of such premises at the time when its tenancy is scheduled to expire, Landlord shall use reasonable efforts and due diligence (which shall be limited to the commencement and prosecution of eviction proceeding within sixty (60) days after the date on which the hold-over commences, but shall not require the taking of any appeal) to evict such occupant from such space and to recover from such occupant any Hold-Over Premium (as defined below) payable by such occupant. In such event, the commencement of the term of Tenant's occupancy and lease of such additional space shall, in the event of such holding over by such occupant, be deferred until possession of the additional space is delivered to Tenant. The failure of the then occupant of such premises to so vacate shall not constitute a default or breach by Landlord and shall not give Tenant any right to terminate this Lease or to deduct from, offset against or withhold Annual Fixed Rent or Additional Rent (or any portions thereof); except that if such hold over exceeds sixty (60) days, then Tenant may cancel the exercise of its option to lease such portion of the RFO Premises by giving to Landlord a written cancellation notice (provided, however, that if Landlord delivers such RFO Premises to Tenant on or before the date thirty (30) days after Landlord receives such cancellation notice, such cancellation notice shall be void and without further force or effect).

Alternatively, in lieu of canceling the exercise of such option, Tenant shall have the right to require

Landlord to pay to Tenant the net (i.e. net of the costs and expenses, including, attorneys' fees, incurred by Landlord in obtaining such Hold-Over Premium) amount of any Hold-Over Premium received by Landlord from such hold-over occupant relative to periods from and after the sixty-first (61st) day of any hold-over, when and if Landlord receives any such payment. For the purposes hereof, the term "Hold-Over Premium" shall be defined as the amount (if any) which a hold-over occupant of any portion of the RFO Premises is required to pay to Landlord in respect of its hold-over in the premises (whether characterized as rent, damages, or use and occupation) in excess of the amount of fixed rent and other charges which the tenant under whom such occupant claims would have been required to pay to Landlord had the term of such tenant's lease been extended throughout the period of such hold-over at the same rental rate as such tenant was required to pay during the last month of its tenancy.

In the event that Tenant elects to cancel its exercise of its option hereunder as the result of a holding over by the existing occupant of the applicable portion of the RFO Premises, Landlord shall reoffer the space to Tenant at such time as the hold-over tenant is evicted from the space upon the same terms and conditions as set forth in Tenant's RFO Exercise Notice with respect to such space (and otherwise in accordance with the terms and provisions of this Section 8.28).

(F) Landlord shall use reasonable efforts to keep Tenant informed with semi-annual written updates of the expected availability of the leaseable areas in Buildings F, G and H; provided, however, that Landlord's failure to provide such updates shall in no way be deemed to be a default of Landlord under this Lease or otherwise give rise to any liability on Landlord's part.

8.29 Tenant's Expansion Rights: Buildings A and B

(A) As long as (i) Tenant directly leases from Landlord at least 150,000 square feet of rentable floor area, (ii) no monetary or other material Event of Default of Tenant exists and there have been no more than two (2) monetary or other material Event of Default occurrences during the Lease Term, (iii) this Lease is still in full force and effect, and (iv) Tenant has neither assigned this Lease nor sublet all or any portion of the Premises (except for an assignment or sublease under Section 5.6.1 above or any occupancy permitted pursuant to Section 5.6.6 above), Landlord agrees not to enter into a lease or letter of intent with a third party to lease all or any portion of Building B during the period commencing on the date of this Lease and expiring on March 31, 2008 (the "Lock Out Period").

(B) Landlord agrees that if at any time during the Term of this Lease from and after (i) the date hereof with respect to Building A and (ii) the expiration of the Lock-Out Period with respect to Building B, Landlord estimates that it will be entering into a letter of intent with a third party within fifteen (15) business days to lease all or any portion of Buildings A or B (the "First Refusal Space") then, provided that, (i) Tenant directly leases from Landlord at least 150,000 square feet of rentable floor area, (ii) there exists no monetary or other material Event of Default and there have been no more than two (2) monetary or other material Event of Default occurrences during the Term, (iii) this Lease is still in full force and effect and (iv) Tenant has neither assigned this Lease nor sublet more than twenty-five percent (25%) of the Total Rentable Floor Area of the Buildings of the Premises (except for an assignment or sublease permitted under Section 5.6.1 above or an occupancy permitted pursuant to Section 5.6.6 above), Landlord shall give notice of the availability of such space to Tenant and the business terms which Landlord is willing to lease such space to said third party tenant ("Landlord's Submitted Offer").

(C) Tenant shall have the right to accept Landlord's Submitted Offer by giving Landlord notice ("Tenant's RFR Exercise Notice") of Tenant's acceptance within ten (10) business days after its receipt of Landlord's Submitted Offer and, if so accepted, Landlord and Tenant shall endeavor to execute, within thirty (30) days after Tenant's RFR Exercise Notice, an amendment to this Lease incorporating the First Refusal Space into the

Premises upon the terms contained in Landlord's Submitted Offer and otherwise as substantially the same terms and conditions as contained in this Lease; provided, however, that the failure of the parties to so enter into such amendment with the aforesaid 30-day period shall not negate the exercise by Tenant of its rights under this Section 8.29 and Tenant shall be deemed to be leasing the applicable First Refusal Space on the terms and provisions set forth in Landlord's Submitted Offer.

(D) If at the expiration often (10) business days after Tenant's receipt of Landlord's Submitted Offer, Tenant shall not have accepted Landlord's Submitted Offer by timely delivering Tenant RFR Exercise Notice, time being of the essence in respect to all of the same, Landlord shall be free for one hundred eighty (180) days after the date of Landlord's Submitted Offer to consummate a lease for the First Refusal Space subject to Landlord's Submitted Offer upon terms no less favorable to the Landlord than contained in Landlord's Submitted Offer without again offering such space to Tenant for lease, it being agreed that if Landlord does not so lease such First Refusal Space during such one hundred eighty (180) day period or if Landlord proposes to lease such First Refusal Space upon terms less favorable to Landlord than contained in Landlord's Submitted Offer during such one hundred eighty (180) day period, the terms of this Section shall continue to apply to such First Refusal Space subject to Landlord's Submitted Offer. The right under this Section 8.29 is granted to Tenant to become effective from time to time as and when Landlord anticipates leasing any First Refusal Space, and said right may become effective more than once during the Lease Term, as it may be extended.

(E) If Tenant shall accept Landlord's Submitted Offer as provided above and if, thereafter, the then occupant of the space with respect to which Tenant shall have so accepted Landlord's Submitted Offer wrongfully fails to deliver possession of such space at the time when its tenancy is scheduled to expire, Landlord shall use reasonable efforts and due diligence (which shall be limited to the commencement and prosecution thereafter of eviction proceedings within sixty (60) days after the date on which the hold over commences, but which shall not require the taking of any appeal) to evict such occupant from such additional space and to recover from such occupant any Hold-Over Premiums payable by such occupant. In such event, commencement of the term of Tenant's occupancy and lease of such additional space shall, in the event of such holding over by such occupant, be deferred until possession of such additional space is delivered to Tenant. The failure of the then occupant of such space to so vacate shall not give Tenant any right to terminate this Lease or to deduct from, offset against or withhold Annual Fixed Rent or Additional Rent (or any portions thereof); except that if such hold over exceeds sixty (60) days, then Tenant may cancel the exercise of its option to lease such portion of the First Refusal Space by giving to Landlord a written cancellation notice (provided, however, that if Landlord delivers such First Refusal Space to Tenant on or before the date thirty (30) days after

Landlord receives such cancellation notice, such cancellation notice shall be void and without further force or effect).

Alternatively, in lieu of canceling the exercise of such option, Tenant shall have the right to require Landlord to pay to Tenant the net (i.e. net of the costs and expenses, including,attorneys' fees, incurred by Landlord in obtaining such Hold-Over Premium) amount of any Hold-Over Premium received by Landlord from such hold-over occupant relative to periods from and after the sixty-first (61 st) day of any hold-over, when and if Landlord receives any such payment.

In the event that Tenant elects to cancel its exercise of its option hereunder as the result of a holding over by the existing occupant of the applicable portion of the First Refusal Space, Landlord shall reoffer the space to Tenant at such time as the hold-over tenant is evicted from the space upon the same terms and conditions as set forth in Landlord's Submitted Offer with respect to such space (and otherwise in accordance with the terms and provisions of this Section 8.29).

(F) Landlord shall use reasonable efforts to keep Tenant informed with semi-annual written updates of the expected dates of availability of the leaseable areas in Buildings A and B; provided, however, that the failure of Landlord to provide such updates shall in no way be deemed to be a default of Landlord under this Lease or otherwise give rise to any liability on Landlord's part.

(G) Notwithstanding anything contained in this Section 8.29 or in Section 8.28 above to the contrary, in the event that Tenant directly leases from Landlord less than 150,000 square feet of rentable floor area but more than 100,000 square feet of rentable floor area, Tenant shall no longer have a right of first refusal under this Section 8.29 with respect to Buildings A and B but such space shall thereafter become part of the RFO Premises under Section 8.28 above; provided, however, that in the event the entirety of Building A is offered to Tenant under Section 8.28, Tenant shall have the right to either accept Building A in its entirety or to accept only one full floor of Building A.

8.30 Waiver of Landlord' s Lien

From time to time upon Tenant's reasonable written request, Landlord agrees to furnish Tenant or any vendor or other supplier under any conditional sale, chattel mortgage or other security arrangement, any consignor, any holder of reserved title or any holder of a security interest, with a waiver of Landlord's lien upon Tenant's trade fixtures, furnishings, signs, equipment, machinery, inventory and personal property in or on the Premises, which such lien waiver shall be in the form attached hereto as Exhibit N.

8.31 Arbitration

Any disputes (i) under Section 2.6.1 above as to whether Tenant has overpaid or underpaid Operating Expenses Allocable to the Premises and/or Landlord's Tax Expenses Allocable to the Premises relating to matters in excess of One Hundred Thousand and 00/100 Dollars ($100,000.00), (ii) under Section 8.17(B) above as to whether Landlord is required to reimburse Tenant for costs incurred by Tenant in connection with the exercise of its self-help rights and/or (iii) under Section 8.21(B) above as to whether or not the Reduction Conditions have

been satisfied, shall be submitted to arbitration in accordance with the provisions of applicable Massachusetts state law, as from time to time amended.

Arbitration proceedings, including the selection of an arbitrator, shall be conducted pursuant to the rules, regulations and procedures from time to time in effect as promulgated by the American Arbitration Association. Prior written notice of application by either party for arbitration shall be given to the other at least ten (10) days before submission of the application to the said Association's office in Boston, Massachusetts. Any award of an arbitrator rendered hereunder shall be subject to confirmation and entry of judgment thereon in any court of competent jurisdiction sitting in Suffolk or Middlesex Counties, Massachusetts, and the parties hereby consent to the jurisdiction of such court. The costs and administration expenses of each arbitration hereunder and their apportionment between the parties shall be borne equally by the parties, and each party shall be responsible for its own attorneys' fees and expert witness fees. In connection

with the foregoing, it is expressly understood and agreed that the parties shall continue to perform their respective obligations under this Lease during the pending of any such arbitration proceeding hereunder (with any adjustments or reallocations to be made on account of such continued performance as determined by the arbitrator in his or her award).

8.32 Temporary Space

Upon reasonable prior notice from Tenant to Landlord, Landlord agrees to provide Tenant with temporary space (the "Temporary Space") on either the second floor of Building A or the second floor of Building B of a size and in a location to be mutually agreed upon by Landlord and Tenant for a period of time commencing no earlier than sixty (60) days from the date of Tenant's notice requesting that the Temporary Space be made available and expiring on the Commencement Date of this Lease. Tenant's occupancy of the Temporary Space shall be subject to all of the terms and conditions of this Lease to the extent appropriate, except that (i) Annual Fixed Rent for the Temporary Space shall be payable at the annual rate equal to the product of (x) $4.00 and (y) the rentable floor area of the Temporary Space, (ii) for the purposes of determining Tenant's payments on account of Landlord's Operating Expenses under Section 2.6 above and Landlord's Tax Expenses under Section 2.7 with respect to the Temporary Space, the "Rentable Floor Area of the Premises" shall be deemed to be the rentable floor area of the Temporary Space and (iii) the Temporary Space shall be delivered to Tenant in its "as is" condition and no improvement allowance or brokerage commission shall be payable with respect thereto. In addition, it is acknowledged and agreed that if Tenant shall elect to lease any Temporary Space hereunder, Tenant shall be occupying such Temporary Space while Landlord is proceeding with components of the Base Building Work in Buildings A and B and accordingly that Tenant shall use and occupy the Temporary Space in such as manner as to minimize any unreasonable interference with Landlord's performance of the Base Building Work.

(signatures on next page)

EXECUTED as a sealed instrument in two or more counterparts each of which shall be deemed to be an original.

WITNESS:

LANDLORD:

BOSTON PROPERTIES LIMITED PARTNERSHIP

By:       Boston Properties, Inc., its general partner
          By: --/s/ James Rosen
          Name: James Rosen
          Title: Senior Vice President, Development

TENANT

ATTEST:

By:                                          By:       /s/ Colin Angle
Name:                                        Name:     Colin Angle
Title:       Secretary or Assistant Secretary   Title:    President or Vice President


                                                       Hereto duly authorized
                                             By:
                                             Name:
                                             Title:     Treasurer or Assistant Treasurer
                                                       Hereto duly authorized

EXHIBIT A

DESCRIPTION OF SITE

Those certain parcels of land (with the buildings thereon) situated in Bedford, Middlesex County, Massachusetts bounded and described as follows:

PARCELS 1 and 2

Two certain parcels of land situated in Bedford, Middlesex County, Massachusetts, shown as Lot 1 and 2 on a plan entitled "Plan of Land in Bedford, Mass." dated March 1, 1962 by Raymond C. Pressey, Inc., recorded with Middlesex South District Deeds as Plan No. 487 of 1962 in Book 10022, Page 278, and together bound and described as follows:

| | |
|---|---|
| SOUTHWESTERLY | by Crosby Road by three lines measuring respectively two hundred eighty-three and 011100 (283.01) feet, twenty-one and 271100 (21.27) feet and four hundred eighty-three and 43/100 (483.43) feet; thence |
| SOUTHERLY | by said Crosby Road by a curved line, one hundred nineteen and 361100 (119.36) feet; thence |
| SOUTHEASTERLY SOUTHERLY and SOUTHWESTERLY | by said Crosby Road by several lines measuring respectively two hundred ninety-three and *04/100* (293.04) feet, three hundred fifty three and 041100 (353.04) feet and two hundred twenty and *97/100* (220.97) feet; thence |
| NORTHEASTERLY | by the parcel marked "Reserved for Town of Bedford" on said plan, sixteen hundred forty-six and *81/100* (1646.81) feet; and thence |
| NORTHWESTERLY | by land now or late of The Worcester Corp., by two lines measuring respectively 305.23 feet and 294.24 feet and by land now or late of Douglas by two lines measuring respectively 170.33 feet and 64.34 feet, to the place of beginning. |

For Title see Deed recorded with the Middlesex South District Registry of Deeds in Book 12926, Page 233.

PARCEL 3

A certain parcel of land situated in said Bedford, shown on a plan of land in Bedford, Mass.Dated June 5, 1961 by Raymond C. Pressey, Inc., Registered Land Surveyors, recorded with Middlesex South District Registry of Deeds at the end of Book 9844, bounded and described as follow:

| SOUTHWESTERLY | by Crosby Road, two hundred ninety-eight and 63/100 (298.63) feet; |
| NORTHWESTERLY | by land now or formerly of the Worcester Corporation, two hundred nine and *95/100* (209.95) feet; |
| NORTHEASTERLY | by land now or formerly of the Worcester Corporation, two hundred fifty and 57/100 (250.57) feet; and |
| SOUTHEASTERLY | by land now or formerly of Sinbad Realty Corporation by two lines respectively measuring one hundred seventy and 33/100 (170.33) feet and sixty-four and 341100(64.34) feet. |

Containing approximately 60,951 square feet of 1.4 acres according to said plan.

For Title see Deed from Cecil N. Douglas and Priscilla M. Douglas recorded with the Middlesex South District Registry of Deeds in Book 13539, Page 732.

PARCEL 4

All right, title and interest in and to (i) that portion of Crosby Road described in that certain Deed (a) recorded with the Middlesex South District Registry of Deeds in Book 14013, Page 486 and (b) filed with the Middlesex South Registry District of the Land Court as Document No. 599584 as to which Certificate of Title No. 161163 in Registration Book 936, Page 13 was issued; and (ii) such other applicable portions of Crosby Road abutting the westerly boundaries of Parcels 1, 2 and 3.

Parcels 1, 2, 3 and 4 are subject to and together with the benefit of easements, agreements restrictions, rights of way and takings of record at said Registry of Deeds and Registry District if and to the extent in force and applicable.

EXHIBIT B-1

LANDLORD'S BASE BUILDING WORK

**A. Building Exterior**

(1)     All existing bronze colored insulated glass units at Buildings A, B, C, D, E & G will be removed and replaced with new, Low-E, insulated glass units. Caulking and glazing gaskets will be replaced as required.

(2)     Existing 36" high x 68" wide windows located at the first floor of Building C & D will be replaced with full-height, inoperable, aluminum-framed, insulated windows. Windows at sensitive locations such as restrooms or water main equipment locations will be frosted. The number and location of first floor windows is as follows:

| Location | Number of Windows |
|---|---|
| Building C - North Elevation | 13 |
| Building C - South Elevation | 22 |
| Building D - North Elevation | 1 |
| Building D - West Elevation | 21 |
| Building D - South Elevation | 12 |

(3)     All exterior metal elements including window frames and existing storefront entrances will be painted.

**B. Building D Entrance Lobby**

Landlord will renovate the main entrance at the southwest comer of Building D as illustrated schematically in the attached renderings. Interior elements included in the renovation are as follows:

(1)     Existing stair railing to be replaced with painted metal and glass railing of a similar finish to that designed by ADD Inc. at 14 Crosby Drive and installed in 2005. The gypsum enclosure below the stair is to be removed and the structure revealed. The stair tread is to be covered with new carpet.

(2)     The brick planter between the upper and lower lobby is to be removed and replaced with painted metal and glass railing of similar design to the stair rail.

(3)     Floor finishes in the lower lobby are to be a ceramic tile mutually agreed upon by Boston Properties and iRobot (Allowance: $30psfInstalled).

(4)     Floor finishes in the upper lobby and on the stair are to be carpet mutually agreed upon by Boston Properties and iRobot (Allowance: $30per yard Installed).

(5)     Remaining dry-wall elements (i.e. the lower lobby east wall) are to be painted a mutually agreeable color.

(6)     New recessed ceiling lighting is to be provided at the upper and lower level lobby. Junction boxes will be provided at the drop ceiling area in the center of the lower lobby and above the reception desk.

(7)     The two-story, north wall of the upper lobby is to be drywall with standard latex painted finish (two-coats).

(8)     iRobot is responsible for interior furniture, millwork, reception desk, etc.

**C. Landscaping**

The landscaping and sidewalks at the entrance to Building D (Southwest corner) will be replaced to allow for integrated pedestrian access from the visitor parking and employee parking areas.

**D. Elevators**

A new two-stop hydraulic elevator will be installed in the southern end of Building D in a location mutually agreed upon by Boston Properties and iRobot and located generally adjacent to the renovated entrance lobby and iRobot reception area. The elevator will have a standard cab and be manufactured by Otis, Thyssen Krup, or equal.

Existing freight elevator at Building E will be upgraded to include an automated door opener.

**E. Roofing**

(1) A new EPDM roofing system with a 10-year warranty is to be installed at Building C.
(2)         Six months after installation of the new roof top units, Boston Properties will conduct an infrared test on roofs at D and E to confirm roofing performance on these buildings and repair any potential defects.

**F. Heating, Ventilation, and Air Conditioning**

(1)         Two new rooftop units are to be provided at Building C and one new rooftop unit at Building D. Rooftop units to be Mammoth, AAON, or equal. Rooftop units will be sized to service one floor in each building at a ratio of 300SF/ton.
(2)         Control units for the existing building management system will be expanded to incorporate the building rooftop units.
(3)         Duct work for new units will be stubbed into the respective ceiling plenums of the first and second floor to allow for iRobot to connect their distribution ductwork. No more than 5 feet of horizontal duct will be provided.

**G: Electrical Systems**

New electrical panel will be provided at Building D.

**H. Common Area Amenities**

(1)         Boston Properties will construct a common interior corridor from Building C to A for access to new common area amenities in Building A.
(2)         A new fitness center will be built within Building A including restrooms, showers, and a locker-room area. The finishes and equipment will be of similar quality to other fitness centers built and managed by Boston Properties in our suburban assets (i.e. Prospect Place, Waltham-Weston Corporate Center).
(3)         The existing cafeteria facility in Building A will painted and new carpet will be installed in the seating area.

EXHIBIT C

LANDLORD'S SERVICES

## I.        CLEANING

Cleaning and janitorial services shall be provided as needed Monday through Friday (starting at or after 6pm), exclusive of holidays, Saturdays and Sundays.

### A. OFFICE AREAS

Cleaning and janitorial services to be provided in the office areas shall include:

1. Vacuuming, damp mopping of resilient floors and trash removal (nightly M-F).

2. Dusting of horizontal surfaces within normal reach (tenant equipment to remain
in place). Hand dust all horizontal surfaces with treated cloths to include exposed furniture, office equipment, window sills, door ledges, chair rails, baseboards, convector tops, etc. within normal reach (minimum 1 x week).

3. High dusting and dusting of vertical blinds to be rendered as needed (minimum 1 x year).

### B. LAVATORIES

Cleaning and janitorial services to be provided in the common area lavatories of the building shall include:

1. Dusting, damp mopping of resilient floors, trash removal, sanitizing of basins, bowls and urinals as well as cleaning of mirrors and bright work (nightly M-F).

2. Refilling of soap, towel, tissue and sanitary dispensers to be rendered as necessary (nightly M-F).

3. High dusting to be rendered as needed (minimum 1 x year).

4. Wash down interior walls and partitions (monthly).

### C. WINDOW CLEANING
All exterior windows shall be washed on the inside and outside surfaces at a frequency necessary to maintain a first class appearance (minimum 1 x year).

### D. PUBLIC AREAS

- Spot clean entrance doors/all glass at interior doors (nightly).
- Vacuum all carpets and walk-off mats (nightly).
- Damp mop all resilient floors (nightly).
- Clean & sanitize all drinking fountains (nightly).
- Spray Buff or high-speed burnish all resilient floors if required by manufacturer specifications (weekly).
- Vacuum passenger elevator in Building D and wipe down all surfaces

ery other night).

-                  Sweep all stairways (weekly).
-                  Police Tenant designated smoking area every other day or night.

### E. GENERAL

Landlord shall provide the following special services, for which Tenant shall pay all costs and a fee equal to fifteen (15%) of such costs:

-                  Strip and wax all resilient tile floors (one time per year).
-                  Shampoo all carpeting (one time per year).
-                  Wash down and sanitize Coffee Station(s) and Breakroom counters and sinks

(weekly).

## II.        HVAC

A.         Heating, ventilating and air conditioning equipment will be provided with sufficient capacity to accommodate a maximum population density of one (1) person per one hundred fifty (150) square feet of useable floor area served, and a combined lighting and standard electrical load of 3.0 watts per square foot of useable floor area. In the event Tenant introduces into the Premises personnel or equipment which overloads the system's ability to adequately perform its proper functions, Landlord shall so notify Tenant in writing and supplementary system(s) may be required and installed by Landlord at Tenant's expense, if within fifteen (15) days Tenant has not modified its use so as not to cause such overload.

Operating criteria of the basic system shall not be less than the following:

1.         Cooling season indoor temperature of not in excess of 73 - 79 degrees Fahrenheit when outdoor temperature is 91 degrees Fahrenheit ambient.

11.         Heating season minimum room temperature of 68 - 75 degrees Fahrenheit when outdoor temperature is 6 degrees Fahrenheit ambient.

B.         Landlord shall provide heating, ventilating and air conditioning as normal seasonal charges may require during the hours of 7am to 9pm Monday through Friday (legal holidays in all cases excepted) at Tenant's expense.

If Tenant shall require air conditioning (during the air conditioning season) or heating or ventilating during any other time period, Landlord shall use landlord's best efforts to furnish such services for the area or areas specified by written request of Tenant delivered to the Building Superintendent or the Landlord before 3:00 p.m. of the business day preceding the extra usage.

## III.        ELECTRICAL SERVICES

A.         Landlord shall provide electrical power for a combined load of 3.0 watts per square foot of useable area for lighting and for office machines through standard receptacle for the typical office space.

B.         Landlord will furnish and install at Tenant's expense, all replacement lighting tubes, lamps and ballasts required by Tenant. Landlord will clean lighting fixtures on a regularly scheduled

basis at the Tenant's expense.

**IV.        ELEVATORS**

Landlord will provide passenger elevator service in Building D and freight elevator service in Building D and E.

**V.        WATER**

Landlord will provide hot water for lavatory purposes and cold water for drinking, lavatory, and toilet purposes.

**VI.        SECURITY**

Landlord will provide, through a third party security services contactor, random security patrols of the building perimeter and parking areas during non-business hours.

EXHIBIT E

FORM OF COMMENCEMENT DATE AGREEMENT


DEC LARA TION AFFIXING THE COMMENCEMENT DATE OF LEASE


THIS AGREEMENT made this _ day of                    200_, by and between                                    _
(hereinafter "Landlord") and                         (hereinafter "Tenant").


1.    This Agreement is made pursuant to Section of that certain Lease dated , between the parties aforenamed as Landlord and
      Tenant (the "Lease").

2.    It is hereby stipulated that the Lease Term commenced on , (being the
        "Commencement Date" under the Lease), and shall end and expire on ___unless sooner terminated or extended, as provided
for in the Lease.

WITNESS the execution hereof under seal by persons hereunto duly authorized, the date first above written.

LANDLORD:


By: Name: Title:

TENANT: ATTEST:


By:                                        By:
Name:                                      Name:
Title:                                     Title:
                                                        Hereunto duly authorized
                                           (CORPORATE SEAL)

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF SUFFOLK

On this day of , 200_, before me, the undersigned notary public, personally appeared , proved to me through satisfactory evidence of identification, which were , to be the person whose name is signed on the preceding or attached document in my presence.


NOTARY PUBLIC
My Commission Expires:


COMMONWEALTH OF MASSACHUSETTS

COUNTY OF

On this _ day of , 200_, before me, the undersigned notary public, personally appeared proved to me through satisfactory evidence of identification, which were .~to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the documents are truthful and accurate to the best of [his ] [her] knowledge and belief.


NOTARY PUBLIC
My Commission Expires:

EXHIBIT F-l

FORMS OF LIEN WAIVERS

CONTRACTOR'S PARTIAL WAIVER AND SUBORDINATION OF LIEN

STATE OF                                          Date:

COUNTY                                           Application for Payment No.:

OWNER:

CONTRACTOR:

LENDER / MORTGAGEE:                    None

| | |
|---|---|
| 1. Original Contract Amount: | $ |
| 2. Approved Change Orders: | $ |
| Adjusted Contract Amount: | $ |
| (line 1 plus line 2) | |
| 4. Completed to Date: | $ |
| 5. Less Retainage: | $ |
| Total Payable to Date: | $ |
| (line 4 less line 5) | |
| 7. Less Previous Payments: | $ |
| 8. Current Amount Due: | $ |
| (line 6 less line 7) | |
| 9. Pending Change Orders: | $ |
| 10. Disputed Claims: | $ |

The undersigned who has a contract with _____ for furnishing labor or materials or both labor and materials or rental equipment, appliances or tools for the erection, alteration, repair or removal of a building or structure or other improvement of real property known and identified as located in _____ (city or town), _____ County, and owned by _____ upon receipt of $ _____ in payment of an invoice/requisition/application for payment dated _____ does hereby:

(a)        waive any and all liens and right of lien on such real property for labor or materials, or both labor and materials, or rental equipment, appliances or tools, performed or furnished through the following date (payment period), except for retainage, unpaid agreed or

pending change orders, and disputed claims as stated above;

(b)         subordinate any and all liens and right of lien to secure payment for such unpaid, agreed or pending change orders and disputed claims, and such further labor or materials, or both labor and materials, or rental equipment, appliances or tools, except for retainage, performed or furnished at any time through the twenty-fifth day after the end of the above payment period, to the extent of the amount actually advanced by the above lender/mortgagee through such twenty-fifth day.

Signed under the penalties of perjury this _____ day of _____ , 20___.

WITNESS:                                                    CONTRACTOR:


Name:                                                          Name:
Title:                                                           Title:

SUBCONTRACTOR'S LIEN WAIVER

General Contractor:

Subcontractor:

Owner:

Project:

Total Amount Previously Paid:              $

Amount Paid This Date:                     $

Retainage (Including This Payment) Held to Date:      $

**In** consideration of the receipt of the amount of payment set forth above and any and all past payments received from the Contractor in connection with the Project, the undersigned acknowledges and agrees that it has been paid all sums due for all labor, materials and/or equipment furnished by the undersigned to or in connection with the Project and the undersigned hereby releases, discharges, relinquishes and waives any and all claims, suits, liens and rights under any Notice of Identification, Notice of Contract or statement of account with respect to the Owner, the Project and/or against the Contractor on account of any labor, materials and/or equipment furnished through the date hereof.

The undersigned individual represents and warrants that he is the duly authorized representative of the undersigned, empowered and authorized to execute and deliver this document on behalf of the undersigned and that this document binds the undersigned to the extent that the payment referred to herein is received.

The undersigned represents and warrants that it has paid in full each and every sub-subcontractor, laborer and labor and/or material supplier with whom undersigned has dealt in connection with the Project and the undersigned agrees at its sole cost and expense to defend, indemnify and hold harmless the Contractor against any claims, demands, suits, disputes, damages, costs, expenses (including attorneys' fees), liens and/or claims oflien made by such sub-subcontractors, laborers and labor and/or material suppliers arising out of or in any way related to the Project. This document is to take effect as a sealed instrument.

Signed under the penalties of perjury as of this _____ day of _____ , 20__.


SUBCONTRACTOR:                                        Signature and Printed N arne of Individual
                                                     Signing this Lien Waiver



WITNESS:



Name:
Title:


Dated:

MS AGAINST OWNER AND ACKNOWLEDGMENT OF FINAL PAYMENT

Commonwealth of Massachusetts          Date:

COUNTY OF                              Invoice No.:

OWNER:
CONTRACTOR:
PROJECT:                              None

1. Original Contract Amount:                    $
2. Approved Change Orders:                      $
djusted Contract Amount:                        $
4. Sums Paid on Account of Contract Amount      $
5. Less Final Payment Due:                      $

The undersigned being duly sworn hereby attests that when the Final Payment Due as set forth above is paid in full by Owner, such payment shall constitute payment in full for all labor, materials, equipment and work in place furnished by the undersigned in connection with the aforesaid contract and that no further payment is or will be due to the undersigned.

The undersigned hereby attests that it has satisfied all claims against it for items, including by way of illustration but not by way of limitation, items of: labor, materials, insurance, taxes, union benefits, equipment, etc. employed in the prosecution of the work of said contract, and acknowledges that satisfaction of such claims serves as an inducement for the Owner to release the Final Payment Due.

The undersigned hereby agrees to indemnify and hold harmless the Owner from and against all claims arising in connection with its Contract with respect to claims for the furnishing of labor, materials and equipment by others. Said indemnification and hold harmless shall include the reimbursement of all actual attorney's fees and all costs and expenses of every nature, and shall be to the fullest extent permitted by law.

The undersigned hereby irrevocably waives and releases any and all liens and right of lien on such real property and other property of the Owner for labor or materials, or both labor and materials, or rental equipment, appliances or tools, performed or furnished by the undersigned, and anyone claiming by, through, or under the undersigned, in connection with the Project.

The undersigned hereby releases, remises and discharges the Owner, any agent of the Owner and their respective predecessors, successors, assigns, employees, officers, shareholders, directors, and principals, whether disclosed or undisclosed (collectively "Releasees") from and against any and all claims, losses, damages, actions and causes of action (collectively "Claims") which the undersigned and anyone claiming

by, through or under the undersigned has or may have against the Releasees, including, without limitation, any claims arising in connection with the Contract and the work performed thereunder.

Notwithstanding anything to the contrary herein, payment to the undersigned of the Final Payment Due sum as set forth above, shall not constitute a waiver by the Owner of any of its rights under the contract including by way of illustration but not by way of limitation guarantees and/or warranties. Payment will not be made until a signed waiver is returned to Owner.

The undersigned individual represents and warrants that he/she is the duly authorized representative of the undersigned, empowered and authorized to execute and deliver this document on behalf of the undersigned.

Signed under the penalties of perjury as a sealed instrument as of this _____ day of _____.

Corporation

By:

Name:

Title:

Hereunto duly authorized

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF SUFFOLK

On this \_\_\_\_ day of _____, 20\_\_, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it as _____ for _____, a corporation/partnership voluntarily for its stated purpose,

NOTARY PUBLIC

My Commission Expires:

EXHIBIT F-2

CONSTRUCTION RULES AND REGULATIONS

**Boston Properties**

**Suburban**

# Building Rules and Regulations
# For
# Renovation / Construction Projects

Regulations for Building Improvements and Renovations

## INTRODUCTION

The following regulations have been developed to ensure that modifications or improvements to the buildings and/or building systems and equipment are completed to Boston Properties quality standards while maintaining a level of safety consistent with industry standards.

These regulations are not intended to be all inclusive with regard to the design and renovation of any building, or installation of any building systems and equipment, nor are they intended to replace and/or reduce any national, state or local code or regulations that may be in effect at the time of design, construction and/or installation. The purpose of this document is to provide standard operating procedures for contractors while working in Boston Properties Buildings, and in some cases to clarify some issues regarding optional design methods.

In addition to the codes, standards, regulations and other design considerations referenced in this document, the designer/engineer of record and/or the applicable contractor is expected and responsible to ensure that all code and regulatory requirements are met. If there is a conflict between this document and any national, state or local code or regulatory requirements, it is the responsibility of the applicable contractor and/or the designer/engineer of record to bring them to the attention of Boston Properties Management.

These regulations apply to all modifications and improvements within any building, or to building systems and equipment, at all Boston Properties facilities and all contractors working therein.

**PREREQUISITES**

PLAN SUBMITTAL & REVIEW

A **full** set of plans (wet signed/stamped) is to be submitted to Boston Properties, Inc. for review and written approval to proceed prior to start of work. Plan review may take approximately two to four weeks depending upon project scope. A complete set of as-builts, and an electronic CAD Disk is to be submitted to the management office upon projection completion.

Boston Properties specifically denies any liability in connection with the approval of plans. The review of plans and/or specifications by Boston Properties and/or their insurers, consultants or other representatives, does not imply that any plans so reviewed comply with applicable laws, ordinances, codes, standards or regulations.

CITY PERMITS/CERTIFICATES

Copies of all relevant permits (demolition, building, electrical, plumbing, etc ... ) must be submitted to Boston Properties, Inc. prior to start of work. Note that the city or town requires a separate permit for both low and high voltage wiring. Upon completion of project, copies of all completed permits as well as certificate of occupancy (if applicable) are to be submitted to Boston Properties, Inc.

INSURANCE REQUIREMENTS

- Certificates of insurance, as detailed below, must be submitted to Boston Properties before any work is started.

- All policies (except for workers' compensation coverage) shall be endorsed to name the entities listed on Attachment A "Owner Entities", their subsidiaries, officers, agents and employees and any owner entity specified by Owner, as additional insured as respects to the work being performed at the property. The endorsement shall further provide that additional insureds shall not be affected by any breach by the Contractor of any provision of said policy.

- All policies of insurance shall be with an insurance company with a current A.M. Best Rating of A-VIII or better; and licensed to do business in the Commonwealth of Massachusetts.

- All policies shall contain a minimum of 30 days notice of cancellation.

- Contractor shall furnish certificates of insurance prior to the start of the work and provide renewal certificates within 60 days prior to the expiration of the policies.

- All insurance policies shall include a clause stating that each underwriter will waive all rights of recovery, under subrogation or otherwise, against the Owner Entities.

- Listed below are the required standard policy coverages and limits (provided, however, should these coverages differ from the coverages required in any contract you have with Owner, the amounts in such contract shall prevail).

| | | |
|---|---|---|
| A. | Workers' Compensation | Statutory limits |
| B. | Employers' Liability | $1,000,000 |
| C. | Commercial General Liability including Contractual Liability: | |
| | General Aggregate | $2,000,000 |
| | Products/Completed Operations Aggregate | $2,000,000 |
| | Each Occurrence | $1,000,000 |
| | Personal & Advertising Injury | $1,000,000 |
| | Medical Payments (per person) | $5,000 |
| | Evidence of Products/Completed Operations coverage must be shown for a minimum of two years following completion of work | |
| D. | Automobile Liability | $1,000,000 |
| | Umbrella/Excess Liability: | |
| E. | General Aggregate | $5,000,000 |
| | Each Occurrence | $5,000,000 |

- Contractor shall ensure that all sub-contractors and sub-sub-contractors also maintain the same insurance requirements and coverage's as required in any contract with Owner or otherwise as referenced above, including naming the additional insured on their respective liability policies.

- List of additional insureds is per specific locations and can be identified on Attachment "A" attached.

LICENSES

Licensed trades must provide copies of current licenses.

OWNER APPROVAL

Municipality may require written owner approval. Such applications must be submitted to the management office before start of work. Allow five days for processing owner approval applications.

WRITTEN SCHEDULE/PROJECT COORDINATION

General contractor must submit a written schedule to the Construction Management or Property Management office to accommodate staff/tenant notification. Any schedule modifications must be brought to the attention of the management office as soon as possible. Project coordination must be accomplished in conjunction with Boston Properties' Construction Management office at 781-530-1900 or the Property Management offices in Waltham at 781-530-1900. Emergency assistance may be coordinated through Boston Properties' Tenant Control Center at 877-297-4411.

**ON-SITE REQUIREMENTS**

BUILDING ACCESS

Access to the building is gained via the main entrance twenty-four hours per day seven days per week with prior written approval from Boston Properties, Inc. Access information is to be provided to Boston Properties, Inc. by the tenant. Written access approval will be posted at the security desk. Access to building will be denied if Boston Properties' written approval is not posted. (If applicable)

Vendor will be required to sign into the building log upon arrival. In Cambridge, Security will issue "contractor" badge to vendor. "Contractor" badge must be worn on the vendor's person while on site. Security

will direct vendor to appropriate floor/location and provide access as needed. Upon departure, vendor will be required to sign out of the building log and return the "contractor" badge to security personnel. In all other suburban facilities contractors are required to have their own form of visible identification i.e. card or shirt.

## LOADING DOCK ACCESS

The loading dock is open weekdays between 7:00 a.m. and 5:30 p.m. Access to the building is gained with prior written approval from Boston Properties, Inc. Access information is to be provided to Boston Properties, Inc. by the tenant. Written access approval will be posted at the security desk. Access to building will be denied if Boston Properties' written approval is not posted. (If applicable)

## AFTER-HOURS LOADING DOCK ACCESS

Loading dock access outside of weekday timeframe must be scheduled twenty-four hours in advance to coordinate security coverage. Security details are required for access to the loading dock "after-hours". The tenant on a work order basis schedules security details through the property management office. (If applicable).

Written access approval will be posted at the security desk. Access to building will be denied if Boston Properties' written approval is not posted. (If applicable)

Use of the freight elevator on weeknights after 6:00 p.m. must be coordinated to accommodate waste removal from the building from approximately 7:00 p.m. through 8:30 p.m. Security personnel will be required after hours, and must be approved by the Tenant via a work order.

## FLOOR- TO-FLOOR ACCESS & EGRESS

Floor-to-floor access and egress via stairwells is prohibited excluding emergency egress. Elevator access may be restricted at the discretion of the management office.

## BASE BUILDING AREA ACCESS

Boston Properties, Inc. maintenance staff or security staff, will provide access to base building areas outside of tenant office space with prior notice by vendor. These base building areas include, but are not limited to the mechanical closets, electrical closets, main telephone closet and roof.

## MATERIALS/EQUIPMENT DELIVERY & REMOVAL

All wheeled deliveries are prohibited through the main entry. Delivery of tools and materials must be made through the loading dock and into the building via the freight elevator.

Materials loading for large projects may be accomplished via crane; however, this must be coordinated two weeks in advance with the management office. Contractor will be responsible
for all required permitting. If applicable, copies of permits are required in advance of work being
performed.

Contractor must remove all materials and/or equipment from base building areas. Tenant will be charged on a work order basis for any materials and/or equipment removal not accomplished by contractor.

## TENANT OFFICE SPACE ACCESS

Access to tenant office space outside of work area will be provided by Boston Properties, Inc. maintenance staff or security staff with prior notice by vendor. A security detail may be necessary to accompany vendor while inside tenant office space. The tenant on a work order basis schedules security details through the property management office.

RESTROOM/SLOP SINK ACCESS

If restroom/slop sink access is required, cleaning requirements will be applicable. Material disposal via the slop sink/restrooms is prohibited. If necessary, any related drain

cleaning/clearing costs will be billed to the tenant on a work order basis.

NO SMOKING POLICY

Per city and state ordinances, smoking is prohibited inside the office building. In addition, Boston Properties, Inc. prohibits smoking at the main entry to the property and within the construction work area this shall be enforced at all times.

WASTE REMOVAL

Materials and/or equipment cannot be stored at the loading dock or in any area outside the work area. All packing materials including pallets must be removed from the loading dock. Any materials left at the dock will be removed at the tenant's and/or contractor's cost on a work order basis.

Open top containers may be maintained at the property if scheduled in advance with the property management office. It may be necessary to coordinate location, delivery and pick-up of open top containers after hours, and on a daily basis.

PARKING

On-site parking may be available. There are no available discount rates. Building management cannot validate parking. Parking is prohibited in the building's loading dock and loading dock ramp areas. Any vehicles parking in unauthorized areas will be towed from the site at the cost of the vehicle owner. The use of on grade parking is available at some locations but contractors must use the parking stalls that are furthest from the building.

Most cities do not allow on street parking and will tow vehicles from the site at the cost of the vehicle owner.

**BUILDING** SYSTEMS

Safety **and** Loss **Control** Procedures

GENERAL

Contractors shall comply with all safety standards that include, but are not limited to, federal, state, local, OSHA, NFPA regulations or codes.

- Contractor shall take all necessary precautions to safeguard all contractor personnel and the public

from accident and to preserve all private and public property.

- Contractor will perform no overhead work where, as a result of that work, there is a possibility of objects falling, striking and/or causing injury to any person. Where necessary or required, Contractor shall provide nets, tarpaulins, scaffolds, and warning signs for the protection of personnel and equipment. Contractor may be required to schedule such work to avoid work disruptions and minimize risks of injury.

- Where tarpaulins are required for protection against hot slag, dust, paint drippings, or as temporary barriers, they shall be furnished by Contractor, be flame resistant, and in good condition. Contractor shall be responsible for the installation of scaffolds where necessary or required to the performance of the work. Contractor shall ensure compliance with all appropriate safety regulations.

- Contractor shall furnish all necessary or required safety warning signs, barriers, or barricades.

**Exits and Evacuation Guidelines**

- Exits should be provided, as required by code, from the construction area.

- Exits should be clearly marked and maintained unobstructed and accessible at all times.

- All Contractor personnel must evacuate the work area immediately upon activation of the fire alarm, evacuation announcement, or instructions from Security. (Fire evacuation drills also apply.) Contractor personnel should use the most direct route to reach the designated relocation areas. Elevators are not to be used during emergency evacuations.

**Temporary Lighting**

- Where temporary lighting is utilized, installation should closely follow construction and be provided in stairwells and other exit ways, where necessary. Provisions for night lighting should be provided. All wiring should be installed in accordance with The National Fire Protection Association's National Electrical Code, NFPA70-1999.

- All temporary lighting and receptacles should be removed at the end of the construction period.

**Fire Protection Safeguards**

- A minimum of two (2) portable multi-purpose Type A-B-C dry chemical fire extinguishers shall be provided in all work areas. Re-deployment of any existing building fire extinguishers to meet this requirement is prohibited.

- Ready access to all construction work areas shall be maintained for the Local Fire Department. Fire hose connections and extinguishers shall be clearly visible, never blocked and maintained accessible at all times.

- All fire alarm communication devices shall remain visible and uncovered at all times.

- All penetrations through fire-rated walls and floors shall be temporarily packed during construction and then sealed permanently in a manner that will restore the fire rating. Contractor is solely responsible for providing approved firestopping material, as specified by Boston Properties Management, and having it installed by a certified installer where necessary, especially in any penetrations or openings that may

have occurred, or that are discovered, during construction.

- Hot applications of mastics or insulating materials should be avoided inside of the building. Where this type of application is necessary in the building interior, adequate ventilation should be provided to prevent the build-up of flammable vapor concentrations. Appropriate fire extinguishing equipment should be maintained in the area during the entire operation.

- The building's fire alarm system will be left operational, wherever feasible, during construction to offer a maximum amount of protection. See "Fire Alarm System Impairments" below and Attachment B "Regulations for Hot Work Operations" for more information regarding all required deactivations.

- Life Safety equipment such as emergency generators, fire pumps, fire pump controllers and the fire alarm system shall not be taken out of service during normal building hours.

LIFE SAFETY/FIRE ALARM SYSTEMS

Disconnects from the main city box must be scheduled with a minimum of 24 hours notice by the tenant on a work order basis. Same day reconnects are required. All related dis/reconnect charges are to be billed back to the tenant on a work order basis.

Disconnects from the main city box and fire alarm panel operation adjustments may be necessary to accommodate hot work (brazing, soldering, etc.)

Hot work/impairment/lock-out/tag-out procedures are to be followed. Applicable paperwork is to be completed in conjunction with management office.

- Contractor must adhere to the Boston Properties Hot Works Program, attached as Attachment C, whenever any welding, cutting, burning, spark producing work is being done. Hot Works permits can be obtained from on site engineer. Schedule work for early morning because you are required to:

1.      Provide a fire watch one hour after the hot works has been completed to insure that no fire exists.
2.      You must also monitor the area four hours beyond the fire watch.

Fire watch requirements must be met with approved personnel.

Any fire alarm system work must be reviewed and approved by Boston Properties, Inc. A vendor authorized by Boston Properties, Inc must complete all related fire alarm system work. It is the responsibility of the vendor to confirm that existing fire alarm system can support any additional alarm notification/suppression system devices.

Sprinkler system drain downs must follow Boston Properties Impairment procedures and be coordinated with management office at least twenty-four hours in advance. Same day refills are required. Any associated labor costs will be billed back to tenant on a work order basis.

Any life safety/fire alarm system testing must be conducted after hours. Any associated charges will be billed back to tenant on a work order basis.

The local Fire Department may require verification of hydraulic calculations for the building's sprinkler system pursuant as well as a copy of the most recent fire pump test report (performance curve and written report). Boston Properties, Inc. will provide, if available, original hydraulic calculation information as well as fire pump test reports upon request.

ELECTRICAL SYSTEM

Any partial or full power shutdowns must be scheduled in advance (a minimum of two weeks). Full power shutdowns required coordination with the utility, City and electrician approved by Boston Properties, Inc. as well as Boston Properties, Inc. maintenance staff.

Lock-outltag-out procedures are to be followed. Applicable paperwork is to be completed in conjunction with management office.

MECHANICAL SYSTEM

Any work that may affect the operation of the mechanical system must be coordinated in advance with the management office. Such work may be scheduled to take place after hours at the discretion of the management office.

Vendor is required to balance the system and submit a written report to the management office. Diffuser and thermostat operation is to be verified and documented as well.

Construction filters are to be removed and replaced post-construction.

KEYING/ACCESS/HARDWARE SYSTEMS

All keying/hardware systems must match existing building standards. Keying system must incorporate building grand master/master. Vendor must provide management office with one copy of each changed key.

Tenant access systems must be tied into the life safety/fire alarm system of the building. Work to be coordinated with management office. All associated expenses will be billed back to tenant on a work order basis.

DEMOLITION/CONSTRUCTION

Controlled demolition is allowed during business hours if it does not impact business operations outside the work area. Management office may require suspension of demolition.

Any excessively noisy work (coring, track shooting, etc.) must be completed before 8:00 a.m. on weekdays, after 6:00 p.m. on weeknights or weekends. Weeknight or weekend access must be scheduled in advance.

Dust protection is required throughout the demolition/construction period and may include, but is not limited to construction air filters at all mechanical/air conditioning units and intakes, poly protection at all egress points, and walk-off mats at each elevator entrance area.

Any second/third shift work will require security details and, at the discretion of the management office, building personnel details. Associated costs will be billed to the tenant on a work order basis.

Any exposed glass entries must be covered with brown paper during construction and maintained throughout the project.

Any water infiltration must be handled in a manner to prevent mold, mildew and the like and in a manner satisfactory to Boston Properties. If there shall occur water infiltration of any type (Including, but not limited to, water from storms or piping or spillage) Contractor and/or Tenant shall immediately notify Boston Properties and shall immediately rectify the problem.

GENERAL

All on-site contractor/subcontractor personnel are expected to behave in a professional manner commensurate with a business environment. Courteous and polite interaction with building staff and occupants is required at all times.

## CONSTRUCTION DOCUMENTS

At the completion of any office building construction project construction drawings shall be provided to Boston Properties. The requirements are as follows:

- Drawings will be provided in electronic and paper formats.

Note: Drawings should incorporate all sketches, revisions, addendums, bulletins, etc.

- Paper copies of drawings shall be half size.

- Electronic versions shall be provided in AutoCAD dwg (preferred) or dxf.

If possible, do not bind x-refs,

- Please provide all of the following that apply:

Software & Version

Base Drawings (specify scale if not 1:1)

Layer Standards (Color, Linetypes, Lineweights, etc.) Title Sheet

Fonts (if not standard provided by program)

Plot configuration files (CTB or STB)

Logos or any bitmap images associated

**ATTACHMENT A**

**Owner Entities**

| Location | Named Insureds (Owners and Management) |
|---|---|
| Bedford Office Park | Boston Properties Limited Partnership, a Delaware limited partnership |
| | Boston Properties, Inc., a Delaware Corporation |
| | BP Management, L.P., a Delaware limited partnership |

**ATTACHMENT B**

Regulation for Hot Work Operations

## I. HOT WORK PROJECT PLANNING

Hot work may be conducted as a repair measure or on larger scale during construction or tenant buildouts. Historically, hot work operations have contributed significantly in large loss fires. In order to prevent losses, the following guidelines are provided for your consideration in managing hot work projects:

1.  If possible, hot work should be scheduled for periods when the building is unoccupied.

2.  Plan all work to minimize the exposure to fire. If possible, remove and relocate system/equipment component(s) to be worked on to an exterior area or an area designed for hot work.

3.  Hot work should not take place until all personnel, material and equipment are at the work location and all approvals have been provided.

4.  Do not conduct hot work in an area where the sprinkler system is impaired. If the hot work must be conducted in an area of sprinkler impairment or if sprinklers are not installed, hose lines and/or other special arrangements should be made in addition to these operational guidelines.

5.  Smoke detection devices should be reviewed in area of hot work. Steps to prevent activation of the fire alarm system due to hot work should be taken. Smoke detection devices sharing sprinkler waterflow alarm zones should not be zoned out.

6.  Special attention to the transfer of flying sparks to adjacent areas should be evaluated and controlled. Consideration should be given to floor and wall openings and air transfer systems.

7.  Building furnishings and interior finishes may have flammability characteristics that are unknown and should be covered with fire resistant materials.

8.  The products of combustion from hot work may become a problem if large concentrations are accumulated in an area without proper ventilation.

9.  The products of combustion from hot work may become a problem if they are transferred into occupied tenant areas by the air handling equipment or other building ventilation systems. All systems should be arranged to prevent transfer of products of combustion.

10. Hot work in or near air handling units should be conducted when building is not occupied and the unit should be shut off.

11. Spare fire extinguishers should be used to support fire watch operations. Relocation of existing building fire extinguishers may cause a delay in others trying to retrieve extra units from known locations. The proper class of fire extinguisher should be selected based on combustibles in area

and building construction.

12.    Communication systems for reporting fire emergencies should be available to the fire watch and tested prior to the start of the job.

| Step | Responsibility | Action |
|---|---|---|
| **1.** | Hot Work **Coordinator (HWC)** | manages all hot work projects as follows: |
| | | - coordinates hot work with property management. |
| | | - reviews scope of work. |
| | | - reviews hot work permit. |
| | | - reviews contractor's hot work program and monitors activities related to meeting Boston Properties' requirements. |
| | | - secures/reviews permits required by local authority having jurisdiction. |
| | | directs staff in monitoring of project. |
| | | completes all items on yellow Hot Work Permit tag (Part A) - [contact risk management for additional tags] |
| | | inspects area where hot work will be performed prior to the start of the work. |
| | | inspects condition of equipment to be used to perform hot work to determine that it is in good condition. |
| | | verifies that fire watch personnel are trained in: |
| | | - preparing the area for hot work. |
| | | - following emergency guidelines for Fire/Explosion. |
| | | - operating portable fire extinguishers. |
| | | - implementing fire watch responsibilities. |
| | | verifies that the sprinkler system in the area is not impaired and that additional portable fire extinguishers are brought to the area for use by the fire watch. |
| | | posts yellow Hot Work Permit work tag(s) in area. |
| | | implements Impairment Guidelines as required. (See Section 3 of this Manual.) |
| **2.** | **Property Manager** | coordinates with the HWC, engineering staff, contractors and tenants as necessary. |
| | | notifies tenants of the project if it will affect their operations. |
| | | terminates or suspends any operations that threatens the safety of the occupants of the building or could cause damage to the property. |
| **3.** | **Chief Building Engineer** | reviews scope of work and supports project as required. |

## II. FIRE WATCH

**Note:** If contractor fire watches are being provided, they must meet the minimum standards as outlined below.

| Step | Responsibility | Action |
|---|---|---|
| 1. | Fire Watch | verifies that the HWC has inspected area and that yellow Hot Work |
| | | maintains area free of combustible material as indicated on yellow |
| | | verifies that all floor openings and communicative openings to adjacent areas are covered/closed. |
| | | maintains portable fire extinguisher ready for use and has, at a minimum, one back-up extinguisher. |
| | | maintains a two-way radio, telephone or other means of quickly reporting a fire emergency. Emergency telephone numbers should be in possession of fire watch. |
| | | conducts visual surveillance of the hot work area for possible sparks or fires during work. |
| | | conducts inspections of the work area at the completion of work. |
| 2. | HWC | inspects work area at least once during the work day. |
| | | implements corrective actions as necessary. |
| | | suspends work if sprinkler system in area becomes impaired. |

## III. POST -JOB INSPECTION AND REVIEW

| Step | Responsibility | Action |
|---|---|---|
| 1. | Fire Watch | verifies that all equipment used to perform hot work has been properly secured and/or removed from area. |
| | | conducts inspection of work area and adjacent areas at conclusion of hot work to look for sparks or smoldering fires. |
| | | restores all fire protection and building systems to normal operation and notifies Impairment Coordinator of system(s) status. |
| | | conducts follow-up inspection of area for four hours after the completion of work. |
| | | removes yellow Hot Work Permit tag at conclusion of final inspection (four hours). |
| | | completes yellow Hot Work Permit tag (Part B). |
| | | notifies the HWC. |
| 2. | HWC | inspects area. |
| | | reviews completed yellow Hot Work Permit tag (Part B). |
| | | completes Impairment Guidelines as necessary. |
| | | notifies Property Manager and Chief Engineer of job completion. |
| | | maintains completed yellow Hot Work Permit tag(s) in file. |

ATTACHMENT C

Contractor's Informational Data Form and Pre-Construction Checklist

This form shall be completed and returned to Boston Properties Management Office, including an attachments as indicated in the Pre-Construction checklist, prior to the start of any work.

Location and Tenant Name:

Name of Contractor:

Contractor's 24-Hour Phone Number:

Name of Contractor's Foreman:

Building Permit Number:

Scheduled Start Date:

Scheduled Completion Date:

Pre-Construction Checklist

  Full Set of Plans.

  Original Building Permit.

  Fire Department Permit (where applicable) upon issuance.

  Certificate of Insurance.

  Schedule of Work.

  List of Subcontractors and Phone Numbers.

  Two (2) Keys for Construction Locks.

  MSDS log.

I certify that I have read and thoroughly understand the attached Regulations for Building Improvements and Renovations and agree to comply with all the terms and conditions.

  Signature Date

  Contractor Name

  Local Address

  City/State/Zip

ATTACHMENT D

Post-Construction Checklist

This form shall be completed and returned to Boston Properties Management Office; including all attachments as indicated in the Post-Construction checklist, prior to the contractor leaving the premises.

Location and Tenant Name:-------------------------------------------------_

Name of Contractor's Foreman:------------------------------------------------
Actual Start Date:-----------------------------------------------------------

Post-Construction Checklist

 Boston Properties Management Punch List Completed.

 Certificate of Occupancy (Temporary approval from the City )

 Certified Air Balance Report.

 Hydrostatic Sprinkler System Test Certificate.

 Fire Alarm System Test.
 Hard Copy of As-Built Drawing as well as CAD Electronic Files of Both Mechanical and

 Architectural. Operating Manuals.

 Copies of Applicable Warranties.

 Signed affidavit for Sprinkler System from Design Engineer of record.

 Approved firestopping material installed for all vertical and horizontal penetrations.

Contractor agrees to be responsible for assuring that any and all lien claims (filed or unfiled) pursuant to Chapter 254 of the Massachusetts General Laws as amended arising as a result of Contractor and/or Contractor's sub-contractors and supplier's activities are released, terminated, or otherwise disposed of without cost or expense to the Owner (Boston Properties), and Contractor agrees to indemnify and hold the Owner(Boston Properties) harmless from all such lien claims except those arising from the actions or inactions of the Owner( Boston Properties).


 Signature Date

 Contractor Name

 Local Address

 City/State/Zip

                              ATTACHMENT E

                              Fee Schedule


All rates listed below are maximum numbers to be used for budgetary purposes. Actual charges may vary based upon project size.

\#        Exclusive Use of Freight Elevators:                                                    $25.00 per hour

\#        Oversized Deliveris Requiring Elevator Technicians:

| | | |
|---|---|---|
| Foreman: | Regular Time $219.49 | Premium Time $353.39 |
| Mechanic: | Regular Time $ 195.12 | Premium Time $314.15 |
| Helper: | Regular Time $156.04 | Premium Time $251.32 |

mechanic is required to run the elevator with the hatch opened. To rig items on top or under the car requires a minimum of one mechanic and one helper.

| | |
|---|---|
| Removal, Cleaning and Storage of Blinds | $10 per blind |
| Construction Debris Clean-up | Time and Material |
| Building Access Fee | |
| Vendors (ie. telephone, Data, Furniture) | $500.00 per project |
| General Contractor | |
| Project Cost less than $500,000 | $1,000 per project |
| Project Cost greater than $500,000 | $2,500 per project |
| Electric Shutdown Fee (If Required) | Building Electrician Time |

EXHIBIT G

BROKER DETERMINATION OF PREVAILING MARKET RENT

Where in this Lease to which this Exhibit is attached provision is made for a Broker Determination of Prevailing Market Rent, the following procedures and requirements shall apply:

1.    Tenant's Request. Tenant shall send a notice to Landlord by the time set for such notice in the applicable section of this Lease, requesting a Broker Determination of the Prevailing Market Rent, which notice to be effective must (i) make explicit reference to this Lease and to the specific section of this Lease pursuant to which said request is being made, (ii) include the name of a broker selected by Tenant to act for Tenant ("Tenant's Broker"), which broker shall be affiliated with a major Boston commercial real estate brokerage firm selected by Tenant and which broker shall have at least ten (10) years experience dealing in properties of a nature and type generally similar to the Building located in the Boston Northwest Suburban Market, and (iii) explicitly state that Landlord is required to notify Tenant within ten (10) days of an additional broker selected by Landlord.

2.    Landlord's Response. Within ten (10) days after Landlord's receipt of Tenant's notice requesting the Broker Determination and stating the name of the broker selected by Tenant, Landlord shall give written notice to Tenant of Landlord's selection of a broker having at least the affiliation and experience referred to above ("Landlord's Broker").

3.    Selection of Third Broker. Within ten (10) days thereafter the two (2) brokers so selected shall select a third such broker also having at least the affiliation and experience referred to above (the "Third Broker").

4.    Rental Value Determination. Within thirty (30) days after the selection of the third broker, Landlord's Broker and Tenant's Broker shall each make a determination of the annual fair market rental value in as-is condition of the applicable space for the applicable period of time under this Lease. Such annual fair market rental value determination (i) may include provision for annual increases in rent during said term if so determined, (ii) shall take into account the as-is condition and location in the Building of the applicable space; (iii) shall take account of, and be expressed in relation to, the tax and operating cost bases and provisions for paying for so-called tenant electricity as contained in this Lease and (iv) shall take into account all other relevant factors.

Landlord's Broker and Tenant's Broker shall each submit their individual determinations in writing to the Third Broker, and within thirty (30) days after its receipt of the two determinations, the Third Broker shall determine whether the proposed annual fair market rental value submitted by Landlord's Broker or by Tenant's Broker is closer to the actual prevailing market rent for the Premises (taking into account the requirements of Section 8.20 and this Exhibit H), and the individual determination thus selected by the Third Broker shall thereafter be referred to as the Prevailing Market Rent.

5.    Costs. Each party shall pay the costs and expenses of the broker selected by it and each shall pay one half *(112)* of the costs and expenses of the Third Broker.

6.    Failure to Select Broker or Failure of Broker to Serve. If Tenant shall have requested a Broker

Exhibit G
Page 1 of 2

Determination and Landlord shall not have designated a broker within the time period provided therefor above, then Tenant's Broker shall request the Greater Boston Real Estate Board to designate Landlord's Broker. If Tenant's and Landlord's Brokers have been designated but the two brokers so designated do not, within a period of fifteen (15) days after the appointment of the second broker, agree upon and designate the Third Broker willing so to act, the Tenant, the Landlord or either broker previously designated may request the Greater Boston Real Estate Board, Inc. to designate the Third Broker willing so to act. In case of the inability or refusal to serve of any person designated as a broker, or in case any broker for any reason ceases to be such, a broker to fill such vacancy shall be appointed by the Tenant, the Landlord, the brokers first appointed or the said Greater Boston Real Estate Board, Inc., as the case may be, whichever made the original appointment, or if the person who made the original appointment fails to fill such vacancy, upon application of any broker who continues to act or by the Landlord or Tenant, such vacancy may be filled by the said Greater Boston Real Estate Board, Inc. Any broker appointed by the Greater Boston Real Estate Board, Inc., pursuant to the provisions hereof shall, for all purposes, have the same standing and powers as though he had been originally appointed by the party originally designated to make such appointment by the terms hereof.

Exhibit G
Page 2 of 2

EXHIBIT H

FORM OF LETTER OF CREDIT

| BENEFICIARY: | ISSUANCE DATE: |
| | |
| | 200 |
| | IRREVOCABLE STANDBY LETTER OF CREDIT NO. |
| | |
| | MAXIMUM/AGGREGATE CREDIT |
| ACCOUNTEE/APPLICANT | AMOUNT: US$ |
| | |
| | USD: |

LADIES AND GENTLEMEN:

We hereby establish our irrevocable letter of credit in your favor for account of the applicant up to an aggregate amount not to exceed and /100 US Dollars (US $ available by your draft(s) drawn on ourselves at sight accompanied by:

Your statement, signed by a purportedly authorized officer/official certifying that the Beneficiary is entitled to draw upon this Letter of Credit (in the amount of the draft submitted herewith) pursuant to the Lease (the "Lease") dated by and between , as Landlord, and , as Tenant, together with the original copy of this Letter of Credit and any amendments thereto which have been accepted by you.

Draft(s) must indicate name and issuing bank and credit number and must be presented at this office.

You shall have the right to make partial draws against this Letter of Credit, from time to time.

This Letter of Credit is transferable at any time and from time to time without cost to Beneficiary.

Except as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and practice for Documentary Credits, International Chamber of Commerce, Publication No. 500 (1993 Revision)."

This Letter of Credit shall expire at our office on , 200_ (the "Stated Expiration Date"). It is a condition of this Letter of Credit that the Stated Expiration Date shall be deemed automatically extended without amendment for successive one (1) year periods from such Stated Expiration Date, unless at least forty-five (45) days prior to such Stated Expiration Date) (or any anniversary thereof) we shall notify you at the address specified in this Letter of Credit (or at such other address of which you may have notified us in writing) and the Accountee/Applicant in writing by registered mail (return receipt) that we elect not to consider this Letter of Credit extended for any such additional one (1) year period.

Exhibit H
Page 2 of 2

EXHIBIT J

MHD LEASE

**[to be attached once finalized with MHD]**

EXHIBIT K

LEASE AUDIT CONFIDENTIALITY AGREEMENT

_____,20_

Re: Lease dated _(the "Lease") between ("Landlord") and_____("Tenant") respecting certain premises located at (the "Property") asmore particularly described in the Lease.

To whom it may concern:

You have been engaged by Tenant to review the books and records of Landlord respecting operating expenses for the Property for calendar years and/or_____ real estate taxes for fiscal years ------

Landlord is willing to allow you to review such books and records subject to and in consideration of the terms and conditions set forth below:

1.        All information made available to you pursuant to this letter, whether oral or written, shall be hereinafter referred to as the "Evaluation Material." All Evaluation Material provided to you shall remain the property of the Landlord. The Evaluation Material shall be handled by you in a confidential manner. You shall establish procedures that assure that such Evaluation Material shall remain confidential while in your possession.

2.        The review of such books and records shall take place at Landlord's offices in Boston, Massachusetts during normal business hours. In no event shall any such audit be conducted on a contingency fee basis paid to you but shall be contracted and paid for on a fixed-fee basis.

3.        The Evaluation Material shall be used only for the purpose of reviewing the operating expense charges and/or real estate taxes paid by Tenant pursuant to the Lease. To this end, you may disclose same to your partners, officers, directors and employees, provided, however, that you inform each partner, officer, director and employee who has access to the Evaluation Material of your obligations under this letter. The Evaluation Material may not be disclosed to any third party including, without limitation, any other tenant at the Property.

4.        It is understood and agreed that money damages would not be sufficient remedy for any breach of this agreement and that Landlord shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach and you further agree to waive any requirement for the security or posting of any bond in connection with such remedy. Such remedy shall not be deemed to

be the exclusive remedy for breach of this agreement but shall be in addition to all other remedies available at law or equity to the Landlord.

5.        In the event of litigation relating to this agreement, if a court of competent jurisdiction determines in a final, non-appealable order that a party has breached this agreement, then such party shall be liable and pay to the non-breaching party the reasonable legal fees such

non-breaching party has incurred in connection with such litigation, including any appeal therefrom.

6.          You agree to indemnify, defend and hold the Landlord, its affiliates and agents (including Boston Properties, Inc. and its principals and affiliates), and their respective officers, directors, employees and representatives harmless, from and against any and all claims, causes of action, expenses, fees (including attorney's fees) arising out of your actual breach of the provisions of this letter as determined in appropriate legal proceedings. The Landlord's and Boston Properties, Inc. 's affiliates who have not executed this letter are acknowledged to be third party beneficiaries of the provisions hereof.

7.          This letter sets forth the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior understandings (whether written, verbal, implied or otherwise) with respect thereto. No term or condition of this letter may be waived or otherwise modified except by a writing executed by both parties.

8. This letter shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

Very truly yours,

AGREED TO BY: [Audit Company]
By: _
Name:_____
Dme:
[Landlord] By: Name:~,
Its:_____

AGREED TO BY: [Tenant]
By: _
'Name:_,
Its: Date:

EXHIBIT L

NOTICE OF LEASE

Notice is hereby given, pursuant to the provisions of Massachusetts General Laws Chapter 183, Section 4, of the following Lease:

| | |
|---|---|
| LANDLORD: | Boston Properties Limited Partnership, a Delaware limited partnership |
| TENANT: | iRobot Corporation, a Delaware corporation |
| DATE OF EXECUTION: | February _, 2007 |
| ORIGINAL TERM COMMENCEMENT DATE: | The earlier of (a) the Substantial Completion Date (as determined in accordance with Section 3.4(D) of the Lease), and (b) that date that Tenant commences occupancy of any portion of the Premises for the Permitted Uses. |
| DESCRIPTION OF LEASED PREMISES: | 157,776 rentable square feet in the buildings designated as Building C, Building D and Building E situated at 4-18 Crosby Drive, Bedford, MA and more particularly shown on Exhibit A to the Lease. For legal description of the property, see Exhibit A attached to this Notice of Lease. |
| ORIGINAL TERM: | One Hundred Forty-Four (144) calendar months plus the partial month, if any, immediately following the Commencement Date. |
| EXTENSION RIGHTS: | Two (2) consecutive options to extend the Original Term for an additional five (5) years each. |
| EXPANSION RIGHTS: BUILDINGS F, G AND H: | Tenant has certain rights of first offer to lease any available space in Buildings F, G and H at the Property, all as more particularly described in Section 8.28 of the Lease. |
| EXPANSION RIGHTS: BUILDINGS A AND B: | Tenant has certain rights of first refusal to lease any available space in Buildings A and B at the Property, all as more particularly described in Section 8.29 of the Lease. |
| RIGHTS TO USE LAND RECREATION SPACE: | Tenant has certain rights to use certain areas ofthe land and a portion of land adjacent to the Property, all as more particularly described in Section 8.27 of the Lease. |

The foregoing is a summary of certain terms of the Lease for purposes of giving notice thereof, and shall not be deemed to modify or amend the terms of the Lease. For Landlord's title to the Property, see deeds recorded with the Middlesex South District Registry of Deeds in Book 12926, Page 233 and in Book 13539, Page 732.

Exhibit L
Page 1 of 5

Executed as a sealed instrument on this .                    day of February, 2007.

**LANDLORD:**

BOSTON PROPERTIES LIMITED PARTNERSHIP

By: ~

Name:

Title:

**TENANT:**

iROBOT CORPORATION

By: ~

Name:

Title:

Exhibit L

Page 2 of 5

COMMONWEALTH OF MASSACHUSETTS)

)

COUNTY OF )


On this _ day of February, 2007, before me, the undersigned notary public, personally appeared , proved to me through satisfactory evidence of identification, which were , to be the person whose name is signed on the preceding or attached document and acknowledged to me that (he)(she) signed it voluntarily for its stated purpose, as for Boston Properties Limited Partnership,


(Official Signature and Seal of Notary) My Commission Expires:


COMMONWEALTH OF MASSACHUSETTS)

)

COUNTY OF )


On this _ day of February, 2007, before me, the undersigned notary public, personally appeared  ,proved to me through satisfactory evidence of identification, which were , to be the person whose name is signed on the preceding or attached document and acknowledged to me that (he)(she) signed it voluntarily for its stated purpose, as for iRobot Corporation,


(Official Signature and Seal of Notary) My Commission Expires:


1572495.1

Exhibit L
Page 3 of 5

**EXHIBIT A**
**LEGAL DESCRIPTION OF PROPERTY**

Those certain parcels of land (with the buildings thereon) situated in Bedford, Middlesex County, Massachusetts bounded and described as follows:

PARCELS 1 and 2

Two certain parcels of land situated in Bedford, Middlesex County, Massachusetts, shown as Lot
1 and 2 on a plan entitled "Plan of Land in Bedford, Mass." dated March 1, 1962 by Raymond C. Pressey, Inc., recorded with Middlesex South District Deeds as Plan No. 487 of 1962 in Book
10022, Page 278, and together bound and described as follows:

| | |
|---|---|
| SOUTHWESTERLY | by Crosby Road by three lines measuring respectively two hundred eighty-three and 01/100(283.01) feet, twenty-one and *27/100* (21.27) feet and four hundred eighty-three and 43/100(483.43) feet; thence |
| SOUTHERLY | by said Crosby Road by a curved line, one hundred nineteen and *36/100* (119.36) feet; thence |
| SOUTHEASTERLY SOUTHERLY and SOUTHWESTERLY | by said Crosby Road by several lines measuring respectively two hundred ninety-three and 04/100 (293.04) feet, three hundred fifty three and 04/100 (353.04) feet and two hundred twenty and 97/100 (220.97) feet; thence |
| NORTHEASTERLY | by the parcel marked "Reserved for Town of Bedford" on said plan, sixteen hundred forty-six and 81/100(1646.81) feet; and thence |
| NORTHWESTERLY | by land now or late of The Worcester Corp., by two lines measuring respectively 305.23 feet and 294.24 feet and by land now or late of Douglas by two lines measuring respectively 170.33 feet and 64.34 feet, to the place of beginning. |

For Title see Deed recorded with the Middlesex South District Registry of Deeds in Book 12926, Page 233.

PARCEL 3

A certain parcel of land situated in said Bedford, shown on a plan of land in Bedford, Mass. Dated June 5, 1961 by Raymond C. Pressey, Inc., Registered Land Surveyors, recorded with Middlesex South District Registry of Deeds at the end of Book 9844, bounded and described as follows:

Exhibit L
Page 4 of 5

| SOUTHWESTERLY | by Crosby Road, two hundred ninety-eight and 63/100 (298.63) feet; |
|---|---|
| NORTHWESTERLY | by land now or formerly of the Worcester Corporation, two hundred nine and *95/100* (209.95) feet; |
| NORTHEASTERLY | by land now or formerly of the Worcester Corporation, two hundred fifty and 57/100(250.57) feet; and |
| SOUTHEASTERLY | by land now or formerly of Sinbad Realty Corporation by two lines respectively measuring one hundred seventy and *33/100 (170.33)* feet and sixty-four and 34/100(64.34) feet. |

Containing approximately 60,951 square feet of 1.4 acres according to said plan.

For Title see Deed from Cecil N. Douglas and Priscilla M. Douglas recorded with the Middlesex South District Registry of Deeds in Book 13539, Page 732.

PARCEL 4

All right, title and interest in and to (i) that portion of Crosby Road described in that certain Deed (a) recorded with the Middlesex South District Registry of Deeds in Book 14013, Page 486 and (b) filed with the Middlesex South Registry District of the Land Court as Document No. 599584 as to which Certificate of Title No. 161163 in Registration Book 936, Page 13 was issued; and (ii) such other applicable portions of Crosby Road abutting the westerly boundaries of Parcels 1, 2 and 3.

Parcels 1,2,3 and 4 are subject to and together with the benefit of easements, agreements restrictions, rights of way and takings of record at said Registry of Deeds and Registry District if and to the extent in force and applicable.

Exhibit L
Page 5 of 5

EXHIBIT M

CURRENT MORTGAGEE'S FORM OF SNDA

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

**THIS AGREEMENT** is made and entered into as of the day of 2007, by and among **iROBOT CORPORATION,** a Delaware corporation ("Tenant"), whose principal address is 63 South Avenue, Burlington, Massachusetts 01803, and **NEW YORK LIFE INSURANCE COMPANY,** a New York mutual insurance company ("Lender"), whose principal address is 51 Madison Avenue, New York, New York 10010, and **BOSTON PROPERTIES LIMITED PARTNERSHIP,** a Delaware limited partnership ("Borrower"), whose address is 111 Huntington Avenue, Suite 300, Boston, Massachusetts 02199.

**RECITALS:**

A. Lender has agreed to make a mortgage loan (the "Loan") to Borrower in the amount of $ to be secured by, among other things, a mortgage [or deed of trust] (the "Mortgage") on the real property legally described in Exhibit "A" attached hereto (the "Premises");

B. Tenant is the present lessee under a lease dated , 2007 made by Boston Properties Limited Partnership, ("Landlord"), demising a portion of the Premises (said lease and all amendments now or hereafter executed with respect thereto being referred to as the "Lease");

C. The Loan terms require that Tenant subordinate the Lease and its interest in the Premises in all respects to the lien of the Mortgage and that Tenant attorn to Lender; and

D. In return, Lender is agreeable to not disturbing Tenant's possession of the portion of the Premises covered by the Lease (the "Demised Premises"), so long as Tenant is not in default under the Lease.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**AGREEMENTS:**

1. Subordination. The Lease, and the rights of Tenant in, to and under the Lease and the Demised Premises are hereby subjected and subordinated to the lien of the Mortgage and to any modification, reinstatement, extension, renewal, supplement, consolidation or replacement thereof as well as any advances or re-advances with interest thereon and to any other mortgages or deeds of trust on the Premises which may hereafter be held by Lender.

2. Tenant Not to Be Disturbed. In the event it should become necessary to foreclose the

Mortgage or Lender should otherwise come into possession of title to the Premises, Lender will not join Tenant in summary or foreclosure proceedings unless required by law in order to obtain jurisdiction, but in such event no judgment foreclosing the Lease will be sought, and Lender will not disturb the use and occupancy of Tenant under the Lease so long as Tenant is not in default under the Lease beyond applicable notice and cure periods provided for therein, and the sale of the Premises in any such action or proceeding

shall be made subject to all rights of Tenant set forth in the Lease.

3. Tenant to Attorn to Lender. Tenant agrees that in the event of a foreclosure of the Mortgage or upon a transfer of the Premises pursuant to a deed in lieu of foreclosure, it will attorn to the purchaser (including Lender) as the landlord under the Lease. The purchaser by virtue of such foreclosure or deed in lieu of foreclosure shall be deemed to have assumed and agreed to be bound, as substitute landlord, by the terms and conditions of the Lease until the resale or other disposition of its interest by such purchaser, except that such assumption shall not be deemed of itself an acknowledgment by such purchaser of the validity of any then existing claims of Tenant against any prior landlord (including Landlord). All rights and obligations under the Lease shall continue as though such foreclosure proceedings had not been brought, except as aforesaid. Tenant agrees to execute and deliver to any such purchaser such further assurance and other documents, including a new lease upon the same terms and conditions of the Lease, confirming the foregoing as such purchaser may reasonably request. Tenant waives the provisions (i) contained in the Lease or any other agreement relating thereto and (ii) of any statute or rule of law now or hereafter in effect which may give or purport to give it any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder by reason of any foreclosure proceeding.

4. Limitations. Notwithstanding the foregoing, neither Lender nor such other purchaser shall in any event be:

(a)       liable for any act or omission of any prior landlord (including Landlord), except to the extent any such act or omission of which Tenant has notified Lender or purchaser constitutes a continuing default under the Lease after Lender or purchaser has accepted title to the Premises;

(b)       obligated to cure any defaults of any prior landlord (including Landlord) which occurred prior to the time that Lender or such other purchaser succeeded to the interest of such prior landlord under the Lease, except to the extent Tenant has notified Lender or purchaser of such default and the same constitutes a continuing default under the Lease after Lender or purchaser has accepted title to the Premises;

(c)       subject to any offsets or defenses which Tenant may be entitled to assert against any prior landlord (including Landlord), except to the extent such offsets or defenses arise out of any breach of the Lease to the extent such breach continues after the date Lender or such purchaser has accepted title to the Premises and Lender has been notified of the same;

(d) bound by any payment of rent or additional rent by Tenant to any prior landlord (including Landlord) for more than one month in advance;

(e)       bound by any amendment or modification of the Lease made without the written consent of Lender or such other purchaser, provided, however, Lender's or purchaser's consent shall not be required for amendments or modifications that are made in connection with Tenant's exercise of its rights under Section 8.20, Section 8.28 and/or Section 8.29 of the Lease; or

(f)       liable or responsible for, or with respect to, the retention, application and/or return to Tenant of any security deposit paid to any prior landlord (including Landlord), whether or not still held by such prior landlord, unless and until Lender or such other purchaser has actually received for its own account as landlord the full amount of such security deposit.

5. Acknowledgment of Assignment of Lease and Rent. Tenant acknowledges that it has notice that the Lease and the rent and all other sums due thereunder have been assigned or are to be assigned to Lender as security for the Loan secured by the Mortgage. In the event that Lender notifies Tenant of a default

under the Mortgage and demands that Tenant pay its rent and all other sums due under the Lease to Lender, Tenant agrees that it will honor such demand and pay its rent and all other sums due under the Lease directly to Lender or as otherwise required pursuant to such notice. By its execution hereof, Borrower expressly consents to the foregoing.

6. Limited Liability. Tenant acknowledges that in all events, the liability of Lender and any purchaser shall be limited and restricted to their interest in the Premises (including the rents, proceeds and other income therefrom) and shall in no event exceed such interest.

7. Lender's Right to Notice of Default and Option to Cure. Tenant will give written notice to Lender of any default by Landlord under the Lease by mailing a copy of the same by certified mail, postage prepaid, addressed as follows (or to such other address as may be specified from time to time by Lender to Tenant):

To Lender:        NEW YORK LIFE INSURANCE COMPANY
c/o New York Life Investment Management LLC
51 Madison Avenue
New York, New York 10010-1603
Attn: Real Estate Group
Director - Loan Administration Division
Loan No.: 372-0055

Upon such notice, Lender shall be permitted and shall have the option, in its sole and absolute discretion, to cure any such default during the period of time during which the Landlord would be permitted to cure such default, but in any event Lender shall have a period of thirty (30) days after the receipt of such notification to cure such default; provided, however, that if such default does not prevent the continued operation of Tenant's business at the Demised Premises, Lender may have a period of not more than one hundred eighty (180) days to effectuate such cure. Notices to Tenant shall be sent to Tenant pursuant to the terms of the Lease.

8. Successors and Assigns. The provisions of this Agreement are binding upon and shall inure to the benefit of the heirs, successors and assigns of the parties hereof.

9. Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

10. Governing Law. This Agreement shall be construed and enforced according to the law of the state in which the Premises are located, other than such law with respect to conflicts of law.

**IN WITNESS WHEREOF,** the parties hereto have executed these presents as of the day and year first above written.

**[SIGNATURE PAGES TO FOLLOW]**

**TENANT**

**IROBOT CORPORATION**
(Printed Name of Tenant)
a Delaware corporation

By: _

(Signature)

(Printed Name of Signatory)

Its:

(Title)

COMMONWEALTH OF MASSACHUSETTS)

)

COUNTY OF )

On this _ day of 200_, before me, the undersigned notary public, personally appeared , proved to me through satisfactory evidence of identification, consisting of , to be the person whose name is signed on the preceding or attached document and acknowledged to me that (he)(she) signed it voluntarily for its stated purpose, as for

(Official Signature and Seal of Notary) My Commission Expires:

**LENDER**

NEW YORK LIFE INSURANCE COMPANY, a
New York mutual insurance company


By: _
*(Signature)*


*(Printed Name)*

Its:

*(Title)*


STATE OF ------ )

                                                     ) 5S:

COUNTY OF ----- )


**[ADD STATE APPROPRIATE ACKNOWLEDGMENT]**

The terms of the above Agreement are hereby consented, agreed to and acknowledged.

**BORROWER**

*(Printed Name a/Borrower)*
a ~

By: _
*(Signature)*

*(Printed Name of Signatory)*

*Its:*

*(Title)*

COMMONWEALTH OF MASSACHUSETTS)

)

COUNTY OF )

On this ~ day of , 200_, before me, the undersigned notary public, personally appeared , proved to me through satisfactory evidence of identification, consisting of , to be the person whose name is signed on the preceding or attached document and acknowledged to me that (he)(she) signed it voluntarily for its stated purpose, as for

(Official Signature and Seal of Notary) My Commission Expires:

This instrument was prepared by and when recorded should be returned to:

, Esq.
New York Life Insurance Company Office of the General Counsel
51 Madison Avenue
New York, New York 10010

EXHIBIT N

FORM OF LANDLORD'S LIEN WAIVER

Re:     Lease dated _' 20_ by and between ,as landlord ("Landlord") and , as tenant ("Tenant") respecting certain premises (the "Premises") containing approximately square feet of rentable floor area in the building known as and numbered _ (the "Lease").

_____

FOR VALUABLE CONSIDERATION, the Landlord hereby waives all claims against or liens upon the personal property owned by Tenant and the proceeds therefrom (and replacements, substitutions and additions for or to the foregoing) installed or to be installed in the Premises in which (the "Bank"), its successors or assigns now or hereafter holds a security interest other than additions, alterations or improvements which are the property of the Landlord or shall remain in the Premises upon the expiration or earlier termination of the Lease term pursuant to the terms of the Lease (the "Collateral"), until such time as the earlier of the following occurs: (i) all moneys due the Bank by the Tenant shall have been paid in full or (ii) fourteen (14) days after Tenant is no longer in lawful possession of the Premises. Notwithstanding the foregoing, Landlord does not waive, relinquish or modify (i) any and all claims for rent and additional rent under the Lease or (ii) any obligations on the part of the Tenant to be performed under the Lease.

Until the date which is fourteen (14) days after Tenant is no longer in lawful possession of the Premises, Landlord agrees to interpose no objections to the entry by the Bank, its successors and assigns, upon the Premises for the purpose of removing and/or liquidating the Collateral in the event of default by the Tenant in its obligations to the Bank, provided that (a) the Bank restores any walls, windows, doors, partitions, roofs, floors or other parts of the Premises damaged by it in the course of removal, to their condition at the time of the Bank's entry into the Premises, (b) said entry is made during normal business hours with prior written notice to Landlord and (c) no sale or viewing of the Collateral shall take place on the Premises.

SIGNED and SEALED on behalf of the successors and assigns of the undersigned this day of ,1997.

LANDLORD:

By: _

Tenant hereby consents to and agrees to be bound by the terms set forth herein.

By: _
Name:_ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Title:_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ~
Date: _

EXHIBIT a

EXISTING LEASES

Tenant:                          Latran Technologies

Building:                        Building H
                                 6 Crosby Drive
                                 Bedford, Massachusetts

Premises:                        50,000 RSF on two (2) floors

Lease Expiration:                August 31, 2007, subject to earlier termination based on Tenant default.

Renewal Option:                  None, based on Tenant's default status.

Expansion Option:                None.

Permitted Use:                   General office purposes, research and development, light manufacturing (including assembly
                                 and testing) and warehousing, together with all uses ancillary thereto.

Special Rights:                  None.

Tenant:                          Boston Communications Group Inc. (BCGI)

Building:                        Building F
                                 14 Crosby Drive
                                 Bedford, Massachusetts

Premises:                        Approximately 45,000 to 50,000 RSF

Lease Expiration:                Approximately June 30, 2014.

Renewal Option:                  One (1) five (5) year option.

Expansion Option:                None.

Termination Option:              BCGI has a right to terminate a portion of their premises on the third anniversary of the
                                 Lease.

| | |
|---|---|
| Use: | General office. |
| Special Rights: | None. |
| Tenant: | Diagnostic Laboratory Medicine |
| Building: | Building F<br>14 Crosby Drive<br>Bedford, Massachusetts |
| Premises: | 14,632 RSF on the first floor |
| Lease Expiration: | April 30, 2015 |
| Renewal Option: | None. |
| Expansion Option: | None. |
| Permitted Uses: | General office purposes and diagnostic medical laboratory for the testing of human blood, urine and other bodily fluids. |
| Restriction(s): | In no event shall the premises (or any portion thereof) be used for developing or manufacturing home or office diabetes monitoring devises. |
| Special Rights: | None. |
| Tenant: | Affymetrix, Inc. |
| Building: | Building G<br>4 Crosby Drive<br>Bedford, Massachusetts |
| Premises: | 80,000 RSF* on two (2) floors<br>* RSF will be reduced marginally to create a common corridor to access the cafe and fitness area proposed in Building A. |
| Lease Expiration: | July 31, 2013 |
| Renewal Option: | One (1) three (3) year option. (This right will be void if Tenant subleases more than fifty percent (50%) of their premises which is currently being contemplated.) |
| Expansion Option: | None. |

Permitted Uses:                    General office, light manufacturing, warehouse and research and
                                   development purposes, together with all uses ancillary thereto.

Special Rights:                    None.

**SIXTH AMENDMENT TO LEASE**

This Sixth Amendment to Lease (this "Amendment") is made as of the 12th day of September, 2008, between Burlington Crossing LLC and Burlington Crossing Office LLC, both a Massachusetts limited liability company, having its offices at c/o The Gutierrez Company, One Wall Street, Burlington, Massachusetts 01803 (hereinafter collectively referred to as "Landlord") and iRobot Corporation, a Delaware corporation, having its offices located at 63 South Avenue, Burlington, Massachusetts 01803 (hereinafter referred to as the "Tenant").

WITNESSETH THAT:

WHEREAS, by instrument dated October 29, 2002, as amended by a First Amendment to Lease dated April 23, 2003, by a Second Amendment to Lease dated February 22, 2005, by a Third Amendment to Lease dated April 26, 2007, by a Fourth Amendment to Lease dated April 28,2008, by a Fifth Amendment to Lease dated May 29,2008, and as affected by a Termination of Lease (collectively, the "Lease") Landlord demised to Tenant certain premises consisting of 43,334 rentable square feet of tenant space (the "Original Premises"), located at 63 South Avenue, Burlington, Massachusetts, and as more particularly described in the Lease (the "Building"); and

WHEREAS, Landlord and Tenant desire to amend the Lease to provide for Tenant's use of certain premises known as 33 South Avenue, Burlington, MA (the "Additional Space") on an "at will" basis, and to address certain other matters as set forth herein as a result thereof.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the mutual covenants and agreements herein contained, Landlord and Tenant hereby agree as follows:

1. Initial capitalized terms used herein, but not defined herein, shall have the meanings ascribed to them in the Lease.

2. Section 1.1 of the Lease shall be, and hereby is, amended by (i) replacing the term "Total Rentable Floor Area of Tenant's Space" with approximately 43,334 square feet located at 63 South Avenue and approximately 6,150 square feet located at the Additional Space", and (ii) adding to the current definition of "Term Expiration Date" the following: "As to the Additional Space only - September 30, 2009, unless the parties agree to continue to allow Tenant to use the Additional Space, on an "at will" basis, in which event the Term Expiration Date applicable to the Additional Space only shall be such later date set forth in a written notice to the other which such notice shall specify a Term Expiration Date of at least ninety (90) days following the date of such notice and in no event shall such notice be given by any party earlier than June 30, 2009." The term "Premises" shall, for all purposes set forth in the Lease, hereafter include the Additional Space, except as otherwise expressly provided (i.e. 49,484 square feet, in the aggregate).

3. Landlord and Tenant hereby further agree to amend Section 1.1 of the Lease by adding in the "Fixed Rent" definition, the following: "Additional Space - *$10.00/RSF,* on a triple net basis (i.e. Tenant shall be solely responsible to pay for all electricity, utilities, water, sewer, taxes and other operating expenses incurred in maintaining the Additional Space, the parties hereby agreeing that Tenant shall be solely responsible to maintain and repair the Additional Space, such that such space shall remain in good and operating condition, substantially similar to the condition as existed at the commencement of use thereof."

Further, in addition to the Fixed Rent payable under this Lease as set forth above, Tenant shall pay an additional $5,545.00 per month as Fixed Rent, reflecting the amortization on the tenant improvement work outlined in Sections 2.1.1A and 2.1.1 of said Second Amendment to Lease, as hereafter provided in Paragraph 4 of this Amendment.

4.  Notwithstanding any language to the contrary set forth in this Amendment or Lease, Landlord and Tenant hereby acknowledge and agree that Tenant's obligations sct forth in Sections 2.1.1A and 2.1.1 of the Second Amendment to Lease, relating to reimbursement associated with the Additional Space, shall survive and continue as more particularly set forth therein. In the event that the lease for the Additional Space, including occupancy on an "at will" basis as aforesaid, is terminated prior to May 31, 2010, then Tenant shall pay to Landlord a lump sum equal to the then unamortized balance of the tenant improvement for 33 South Ave, as originally contemplated in said Sections.

5. Except as modified by this Amendment, the Lease 1S hereby ratified and confirmed.

6. This Amendment may be signed in any number of counterparts and each thereof shall be deemed to be an original, and all such counterparts shall be but one and the same agreement. The parties agree that facsimile copies of this Amendment, bearing their respective signatures, shall be enforceable as originals.

*Remainder of Page Intentionally Left Blank*

*Signature Page to Follow*

2

EXECUTED as an instrument under seal as of the date first written above.

TENANT:                                LANDLORD:

iRobot Corporation                     Burlington Crossing LLC
                                       Burlington Crossing Office LLC

                                       By:            The Gutierrez Company, Managing Member

By: /s/ John J. Leahy                  By:

                                                      /s/ Arthur J. Gutierrez, Jr.
Name: John J. Leahy                                   Arthur 1. Gutierrez, Jr. President
                                                      Title: EVP & CFO

Title: EVP & CFO

---

TENANT:                                LANDLORD:

iRobot Corporation                     Burlington Crossing LLC
                                       Burlington Crossing Office LLC

FIRST AMENDMENT TO LEASE

FIRST AMENDMENT TO LEASE (the "First Amendment") dated as of this 16th day of September, 2010 by and between BOSTON PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership ("Landlord") and IROBOT CORPORATION, a Delaware corporation ("Tenant").

RECITALS

By Lease dated February 22, 2007 (the "Lease"), Landlord did lease to Tenant and Tenant did hire and lease from Landlord certain premises containing 157,776 square feet of rentable floor area (the "Rentable Floor Area of the Initial Premises") comprised of the entirety of Buildings C, D and E (the "Buildings") located within the complex (the "Complex") known as Bedford Business Park, Bedford, Massachusetts (referred to in the Lease as the "Premises" or "Tenant's Space" and hereinafter sometimes referred to as the "Initial Premises").

Tenant has agreed to lease from Landlord and Landlord has agreed to lease to Tenant an additional 25,710 square feet of rentable floor area (the "Rentable Floor Area of the Additional Premises") located on the second (2nd) floor of Building B within the Complex, which space is shown on Exhibit A attached hereto and made a part hereof (the "Additional Premises").

Landlord and Tenant are entering into this instrument to set forth the terms and conditions of said leasing of the Additional Premises, to integrate the Additional Premises into the Premises and to amend the Lease as hereinafter set forth.

NOW THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration in hand this date paid by each of the parties to the other, the receipt and sufficiency of which are hereby severally acknowledged, and in further consideration of the mutual promises herein contained, Landlord and Tenant hereby agree to and with each other as follows:

1.    Effective as of the date hereof (the "Additional Premises Commencement Date"), the Additional Premises shall constitute a part of the "Premises" and "Tenant's Space" demised to Tenant under the Lease, so that the Premises (as defined in Section 1.1 of the Lease) shall include both the Initial Premises and the Additional Premises. Tenant's lease of the Additional Premises shall be upon all of the same terms and conditions of the Lease for the Initial Premises except as provided otherwise in this First Amendment. By way of example, the option to extend the Term of the Lease provided in Section 8.20 of the Lease shall apply to both the Initial Premises and the Additional Premises collectively but not to either space independently.

From and after the Additional Premises Commencement Date, the "Rentable Floor Area of the Premises" as used in the Lease shall mean 183,486 square feet, being the sum of (i) the Rentable Floor Area of Building C, (ii) the Rentable Floor Area of Building D, (iii) the Rentable Floor Area of Building E and (iv) the Rentable Floor Area of the Additional Premises. For purposes of the Lease, the "Rentable Floor Area of Building B" shall be 49,224 square feet.

From and after the Additional Premises Commencement Date, Building B shall be deemed to be a "Building" and one of the "Buildings" as defined in Section 1.1 of the Lease, and Tenant shall have, as appurtenant to the Premises, the non-exclusive right to use in common with others any Common Areas (as defined in the Lease) located in or necessary for access to Building B.

2.    The parties acknowledge and agree that the Commencement Date for the Initial Premises was April 28, 2008 (hereinafter sometimes called the "Initial Premises Commencement Date").

3.    The Term of the Lease for both the Initial Premises and the Additional Premises shall hereinafter be coterminous. Accordingly, the definition of he "Term" as set forth in Section 1.1 of the Lease is hereby amended by deleting the definition therein set forth and substituting therefor the following:

Term (sometimes called Original Term):    (i) As to the Initial Premises, a period beginning on the Initial Premises Commencement Date and ending on April 30, 2020, unless extended or sooner terminated as provided in the Lease.

(ii) As to the Additional Premises, a period beginning on the Additional Premises Commencement Date and ending on April 30, 2020, unless extended or sooner terminated as provided in the Lease.

4.    (A) Annual Fixed Rent for the Initial Premises shall continue to be payable as set forth in the Lease.

(B) Commencing on the Additional Premises Rent Commencement Date (as hereinafter defined) and continuing through the expiration or earlier termination of the Original Term, Annual Fixed Rent for the Additional Premises shall be payable at the annual rate of $295,665.00 (being the product of (i) $11.50 and (ii) the Rentable Floor Area ofthe Additional Premises (being 25,710 square feet), and otherwise in accordance with the terms of Section 2.5 of the Lease.

(C) Annual Fixed Rent for the Premises during any extension option period (if exercised) shall be determined and payable as set forth in Section 8.20 of the Lease.

(D) The "Additional Premises Rent Commencement Date" shall be that date which is three (3) months following the Additional Premises Interim Payment Date, as defined in Section 5 below. Notwithstanding that Tenant's obligation to pay Annual Fixed Rentwith respect to the Additional Premises shall not commence until the Additional Premises Rent Commencement Date and Tenant's obligation to pay Additional Rent pursuant to Sections 2.6 and 2.7 of the Lease with respect to the Additional Premises shall not commence until the Additional Premises Interim Payment Date, Tenant shall be subject to, and shall comply with, all other provisions of the Lease (as herein amended) applicable to the Additional Premises as and at the times provided in the Lease (as herein amended) from and after the Additional Premises Commencement Date.

5.  For the purposes of computing Tenant's payments for Operating Expenses Allocable to the Premises pursuant to Section 2.6 of the Lease and Tenant's payments for Landlord's Tax Expenses Allocable to the Premises pursuant to Section 2.7 of the Lease, for the portion of the Term on and after the Additional Premises Interim Payment Date (as hereinafter defined), the "Rentable Floor Area of the Premises" shall consist of 183,486 square feet including both the Rentable Floor Area of the Initial Premises (being 157,776 square feet) and the Rentable Floor Area of the Additional Premises (being 25,710 square feet) and for the portion of the Lease Term prior to the Additional Premises Interim Payment Date, the "Rentable Floor Area of the Premises" shall consist only of the Rentable Floor Area of the Initial Premises for such purposes. Except as expressly provided in Section 6 below, Tenant shall have no obligation to pay amounts due under Sections 2.6 and 2.7 of the Lease with respect to the Additional Premises until the Additional Premises Interim Payment Date.

For the purposes of this First Amendment, the "Additional Premises Interim Payment Date" shall be the date which is the later of (i) four (4) months following the Additional Premises Commencement Date, subject to extension on account of any Landlord Delays (as defined in Section 8(C) below) and Tenant's Force Majeure (as defined in and subject to the limitations set forth in Section 3.5(D) of the Lease), and (ii) the date on which the 2010 Base Building Work (as defined in Section 9(A) below) has been substantially completed or deemed substantially completed in accordance with the terms and provisions of Section 9(B) below. Notwithstanding the foregoing, in the event that Tenant commences occupancy of the Additional Premises for the conduct of business at any time after the date which is four (4) months from the Additional Premises Commencement Date, then the Additional Premises Interim Payment Date shall be the date on which Tenant thus commences occupancy of the Additional Premises for the conduct of business, irrespective of Landlord Delays, Tenant's Force Majeure and/or the status of completion of the 2010 Base Building Work at such time.

As soon as may be' convenient after the Additional Premises Interim Payment Date has been determined as aforesaid, Landlord and Tenant agree to join with each other in the execution of a written Declaration, substantially in the form of Exhibit E to the Lease (as modified to be consistent with this paragraph), in which the Additional Premises Commencement Date, the Additional Premises Interim Payment Date and the Additional Premises Rent Commencement Date shall be stated. If Tenant fails to execute or state objections to such Declaration within thirty (30) days after such Declaration is submitted by Landlord to Tenant, the Additional Premises Commencement Date, the Additional Premises Interim Payment Date and the Additional Premises Rent Commencement Date shall be as originally set forth in the Declaration submitted by Landlord.

6.  (A) It is understood and agreed that electricity usage in Building B for both heating, ventilation and air conditioning ("HVAC") and tenant electricity ("Tenant Electricity") is currently measured by a single meter serving the entire Building (the "Building Meter"). Landlord will be installing a check meter to measure HVAC consumption in the Additional Premises (the "Additional Premises HVAC Meter") as part of the 2010 Base Building Work,

and Tenant will be installing check meters to measure Tenant Electricity consumption in the Additional Premises (the "TE Meter") as part of the Additional Premises Tenant Improvement Work (as defined in Section 8(B) below).

(B) As Tenant will initially be the only occupant of Building B, the majority of the costs for both HVAC and Tenant Electricity in Building B will be attributable to Tenant's operations within the Additional Premises and the performance of the Additional Premises Tenant Improvement Work. Accordingly, commencing on October 1, 2010 and until such time as the Additional Premises HVAC Meter and the TE Meter have been installed, the costs of HVAC and Tenant Electricity will be payable by Tenant as follows:

(i)        For the period prior to the installation of either the Additional Premises HVAC Meter or the TE Meter, Tenant shall pay, as Additional Rent, an amount equal to Two Thousand and *00/100* Dollars ($2,000.00) per month (prorated on a daily basis for any partial month) for the costs of furnishing HVAC and Tenant Electricity to the Additional Premises.

(ii)       For the period from and after the installation of either the Additional Premises HVAC Meter or the TE Meter but prior to the installation of both the Additional Premises HVAC Meter and the TE Meter, Tenant shall pay, as Additional Rent, an amount equal to One Thousand and 00/100 Dollars ($1,000.00) per month (prorated on a daily basis for any partial month) for the costs of furnishing either HVAC or Tenant Electricity (i.e., whichever service has not been separately metered) to the Additional Premises. Notwithstanding the foregoing, if Tenant has installed the TE Meter and Landlord fails to install the Additional Premises HVAC Meter within six (6) months following the Additional Premises Commencement Date, Tenant will have no further obligation to pay the foregoing monthly payment of $1,000.00 per month for the cost of furnishing HVAC to the Additional Premises.

(C) From and after such time as the Additional Premises HVAC Meter has been installed, and continuing thereafter monthly, in advance, on the first day of each and every calendar month during the Term at the time and in the fashion herein provided for the payment of Annual Fixed Rent, an amount estimated by Landlord from time to time by written notice to Tenant to cover Tenant's monthly payments for HVAC to the Additional Premises under this Section 6(C) based upon actual rates charged by the utility provider and without any mark-up by Landlord of such utility rates. If with respect to any calendar year falling within the Term or fraction of a calendar year falling within the Term at the beginning or end thereof, the cost of furnishing HVAC to the Additional Premises as measured by the Additional Premises HVAC Meter for a full calendar year exceeds the estimated payments for HVAC paid by Tenant pursuant to the first sentence hereof, or for any such fraction of a calendar year exceeds the corresponding fraction of such estimated payments, then Tenant

shall pay to Landlord, as Additional Rent, on or before the thirtieth (30th) day following receipt by Tenant of the statement referred to below in this Section 6(C), the amount of such excess. If based upon Landlord's readings of the Additional Premises HVAC Meter, Landlord shall reasonably determine that the cost of the HVAC furnished to Tenant at the Additional Premises exceeds the amount being paid hereunder, then the Landlord may charge the Tenant for such excess and the Tenant shall promptly pay the same upon billing therefor.

Not later than ninety (90) days after the end of the first calendar year or fraction thereof ending December 31 and of each succeeding calendar year during the Term or fraction thereof at the end of the Term, Landlord shall render Tenant a reasonably detailed accounting certified by a representative of Landlord showing for the preceding calendar year, or fraction thereof, as the case may be, the costs of furnishing HVAC to the Additional Premises as measured by the Additional Premises HVAC Meter based upon actual rates charged by the utility provider and without any mark-up by Landlord of such utility rates. Said statement to be rendered to Tenant also shall show for the preceding year or fraction thereof, as the case may be, the amount already paid by Tenant on account of HVAC, and the amount remaining due from, or overpaid by, Tenant for the year or other period covered by the statement. Within thirty (30) days after the date of delivery of such statement, Tenant shall pay to Landlord the balance of the amounts, if any, required to be paid pursuant to the above provisions of this Section 6(C) with respect to the preceding year or fraction thereof, or Landlord shall credit any amounts due from it to Tenant pursuant to the above provisions of this Section 6(C) against (i) monthly installments of Annual Fixed Rent next thereafter coming due or (ii) any sums then due from Tenant to Landlord under the Lease (or refund such portion of the overpayment as aforesaid if the Term has ended and Tenant has no further obligation to Landlord).

(D) From and after such time as the TE Meter has been installed, and continuing thereafter monthly, in advance, on the first day of each and every calendar month during the Term at the time and in the fashion herein provided for the payment of Annual Fixed Rent, an amount estimated by Landlord from time to time by written notice to Tenant to cover Tenant's monthly payments for Tenant Electricity at the Additional Premises under this Section 6(D) based upon actual rates charged by the utility provider and without any mark-up by Landlord of such utility rates. If with respect to any calendar year falling within the Term or fraction of a calendar year falling within the Term at the beginning or end thereof, the cost of furnishing Tenant Electricity to the Additional Premises as measured by the TE Meter for a full calendar year exceeds the estimated payments for Tenant Electricity payable pursuant to the first sentence hereof, or for any such fraction of a calendar year exceeds the corresponding fraction of such estimated payments, then Tenant shall pay to Landlord, as Additional Rent, on or before the thirtieth (30th) day following receipt by Tenant of the statement referred to below in this Section 6(D), the amount of such excess. If Landlord shall reasonably determine that the cost of the Tenant Electricity furnished to Tenant at the Additional Premises exceeds the amount being paid hereunder, then Landlord may charge Tenant for such excess and Tenant shall promptly pay the same upon billing therefor.

Not later than ninety (90) days after the end of the first calendar year or fraction thereof ending December 31 and of each succeeding calendar year during the Term or fraction thereof at the end of the Term, Landlord shall render Tenant a reasonably detailed accounting certified by a

representative of Landlord showing for the preceding calendar year, or fraction thereof, as the case may be, the costs of furnishing Tenant Electricity to the Additional Premises as measured by the TE Meter based upon actual rates charged by the utility provider and without any mark-up by Landlord of such utility rates. Said statement to be rendered to Tenant also shall show for the preceding year or fraction thereof, as the case may be, the amount already paid by Tenant on account of Ten ant Electricity, and the amount remaining due from, or overpaid by, Tenant for the year or other period covered by the statement. Within thirty (30) days after the date of delivery of such statement, Tenant shall pay to Landlord the balance of the amounts, if any, required to be paid pursuant to the above provisions of this Section 6(D) with respect to the preceding year or fraction thereof, or Landlord shall credit any amounts due from it to Tenant pursuant to the above provisions of this Section 6(D) against (i) monthly installments of Annual Fixed Rent next thereafter coming due or (ii) any sums then due from Tenant to Landlord under the Lease (or refund such portion of the overpayment as aforesaid if the Term has ended and Tenant has no further obligation to Landlord).

(E) All other utilities provided to Building B (other than HVAC measured by the Additional Premises HVAC Meter and Tenant Electricity measured by the TE Meter, which will not be included in Landlord's Operating Expenses) shall be payable by Tenant as part of Operating Expenses Allocable to the Premises under Section 2.6 of the Lease (as amended hereby).

7.    Effective as of the Additional Premises Commencement Date, the Number of Parking Privileges (also referred to in Section 2.2.1 of the Lease as the "Number of Parking Spaces") provided to Tenant under the Lease shall be increased by an additional seventy seven (77) parking privileges, subject to and in accordance with the terms of Section 2.2.1 of the Lease.

8.    (A) Subject to Landlord's obligations in Section 9 below to complete the 2010 Base Building Work and Landlord's obligations applicable to the Additional Premises under the Lease, Tenant agrees to accept the Additional Premises in "as is" condition and Landlord shall have no obligation to perform any additions, alterations or demolition in the Additional Premises and Landlord shall have no responsibility for the installation or connection of Tenant's security, telephone or other communications equipment or systems, provided, however, Landlord shall deliver possession of the Additional Premises to Tenant on the Additional Premises Commencement Date vacant, broom clean, free of all occupants and debris and free of any right or claim of right of use or occupancy by any other party.

(B) Landlord shall provide to Tenant an allowance equal to the product of (i) $22.00 and (ii) the Rentable Floor Area of the Additional Premises (the "Additional Premises Tenant Allowance"). The Additional Premises Tenant Allowance shall be used and applied by Tenant solely on account of the cost of the work to be performed by Tenant in order to prepare the Additional Premises for Tenant's use and occupancy (the "Additional Premises Tenant Improvement Work"), which such Additional Premises Tenant Improvement Work shall be performed in accordance with the terms and provisions of the Lease applicable to alterations except as otherwise set forth in this First Amendment. It is understood and agreed that Tenant may retain contractors and subcontractors that use union or non-union labor in connection with the construction of the Additional Premises Tenant Improvement Work, and in no event will

Tenant have any obligation to pay any fees to Landlord under Section 5.14 of the Lease in connection with Landlord's review of the Additional Premises Tenant Improvement Work and plans related thereto. For the purposes hereof, the costs to which the Additional Premises Tenant Allowance may be applied hereunder shall include the cost of leasehold improvements but not the cost of any of Tenant's personal property, trade fixtures or trade equipment or any so-called soft costs; provided, however, that a portion of the Additional Premises Tenant Allowance in an amount not to exceed the product of (x) $5.00 and (y) the Rentable Floor Area of the Additional Premises may be applied towards the costs incurred by Tenant (as evidenced by paid invoices or receipts submitted by Tenant to Landlord) in preparing architectural and engineering plans in connection with the Additional Premises Tenant Improvement Work and in installing wiring and cabling for Tenant's telecommunications equipment in the Additional Premises.

In addition, Landlord shall provide to Tenant an allowance of Three Thousand and 00/100 Dollars ($3,000.00) (the "Access Work Allowance") to be used solely towards the costs of installing, at Tenant's option, double-doors and a card reader on the first (lst) floor of Building B andlor a card access system in the elevators accessing the Additional Premises (the "Access Work") as part of the Additional Premises Tenant Improvement Work. In connection therewith, it is understood and agreed that (x) the Access Work Allowance may be applied solely towards the cost of the Access Work, and (y) to the extent Tenant does not fully utilize the Access Work Allowance, Tenant shall not be entitled to apply any unused portions of the Access Work Allowance towards the costs of any other portion of the Additional Premises Tenant Improvement Work nor shall Tenant be entitled to any credit on account thereof.

Landlord shall also provide to Tenant an allowance of One Thousand Five Hundred and 00/100 Dollars ($1,500.00) (the "TE Meter Allowance") to be used solely towards the costs of installing the TE Meter described in Section 6 above (the "TE Meter Work") as part of the Additional Premises Tenant Improvement Work. In connection therewith, it is understood and agreed that (x) the TE Meter Allowance may be applied solely towards the cost of the TE Meter Work, and (y) to the extent Tenant does not fully utilize the TE Meter Allowance, Tenant shall not be entitled to apply any unused portions of the TE Meter Allowance towards the costs of any other portion of the Additional Premises Tenant Improvement Work nor shall Tenant be entitled to any credit on account thereof.

The Additional Premises Tenant Allowance, the Access Work Allowance and the TE Meter Allowance are hereinafter referred to collectively as the "Tenant Allowances."

Landlord shall pay within thirty (30) days after receipt of a complete requisition (as hereinafter defined) submitted by Tenant to Landlord the requested portiones) of the Tenant Allowances as set forth on such requisition either to Tenant or, at Tenant's election, directly to the contractors, vendors and other service providers performing the Additional Premises Tenant Improvement Work as Tenant may designate or request, until the entirety of Tenant Allowances has been applied towards the appropriate components of the Additional Premises Tenant Improvement Work as set forth above, For the purposes hereof, a "requisition" shall mean written documentation, together with (i) an AlA requisition form with respect to work performed pursuant to Tenant's construction contract with its general contractor, (ii) invoices from Tenant's service providers, showing in reasonable detail the cost of the item in question or of

the improvements installed to date in the Premises, (iii) lien waivers in the form attached as Exhibit F -1 to the Lease (provided that Tenant shall not be required to deliver any lien waivers with respect to any items of work covered by Tenant's first requisition for the Tenant Allowances to the extent Tenant had not paid the service provider(s) at issue prior to the date of such requisition, but Tenant shall deliver the lien waivers and evidence of payment in full of the items of work covered by such first requisition within twenty-one (21) days following the disbursement of the Tenant Allowances with respect to such first requisition) and (iv) certifications from Tenant that the amount of the requisition in question does not exceed the cost of the items, services and work covered by such certification. In the event that any portions of the Tenant Allowances reflected on a particular requisition are to be funded directly to Tenant, as Tenant may designate or request, such requisition shall be accompanied by evidence reasonably satisfactory to Landlord that the items, services and work covered by such requisition have been fully paid by Tenant. Landlord shall have the right, upon reasonable advance notice to Tenant, to inspect Tenant's books and records relating to each requisition in order to verify the amount thereof. Tenant shall submit requisition(s) no more often than monthly.

Notwithstanding anything contained herein to the contrary:

(i)          Landlord shall have no obligation to advance funds on account of the Tenant Allowances unless and until Landlord has received the requisition in question, together with the certifications required above.

(ii)         Except with respect to work and/or materials previously paid by Tenant (as evidenced by paid invoices and written lien waivers provided to Landlord), Tenant shall have the right to have portions of the Tenant Allowances paid directly to Tenant's contractors, consultants, service providers and vendors.

(iii)        Tenant shall not be entitled to any portion of the Tenant Allowances, and Landlord shall have no obligation to pay the Tenant Allowances, in respect of any requisition submitted after the date which is two (2) years from the Additional Premises Commencement Date (it being understood and agreed that irrespective of said time period, Tenant shall not be entitled to any payment or credit on account of any unused portions of the Tenant Allowances nor shall there be any application of the same toward Annual Fixed Rent or Additional Rent owed by Tenant under the Lease).

(iv)         Landlord shall have no obligation to fund any portion of the Tenant Allowances to the extent that (a) at the time of the requisition Tenant is in default under this Lease beyond the expiration of any notice and cure period (it being understood and agreed that if Tenant cures a default prior to the expiration of the applicable cure period, or if Tenant cures a default

thereafter and Landlord has not terminated this Lease, Tenant shall be entitled to such payment from Landlord) or (b) there are any liens (unless bonded to the reasonable satisfaction of Landlord) filed against Tenant's interest in this Lease or against the Building or the Site arising solely out of the Additional Premises Tenant Improvement Work (specifically excluding the 2010 Base Building Work) or any litigation in which Tenant is a party relating to the Additional Premises Tenant Improvement Work.

(v)	For each requisition submitted by Tenant hereunder, Landlord shall only be required to disburse a portion of the applicable Tenant Allowance towards the total costs set forth on each such requisition in an amount equal to the same proportion as the total component of the Tenant Allowance at issue bears to the total costs of the Additional Premises Tenant Improvement Work towards which such component of the Tenant Allowances may be applied (with Tenant being fully and solely responsible for the remainder of the amount shown in the requisition). By way of example, if the total Additional Premises Tenant Allowance equals $565,620.00 and the total costs of the Additional Premises Tenant Improvement Work (less the Access Work and the TE Meter Work) equal $1,131,240.00, then the ratio of the total Additional Premises Tenant Allowance to the total costs of the Additional Premises Tenant Improvement Work (less the Access Work and the TE Meter Work) would be 1:2 and if Tenant submitted a requisition for $300,000.00, Landlord would be required to disburse $150,000.00 of the Tenant Allowance on account of such requisition and Tenant would be responsible for the remaining $150,000.00.

(vi)	In no event shall Landlord be deemed to have assumed any obligations, in whole or in part, of Tenant to any contractors, subcontractors, suppliers, workers or material men on account of the Additional Premises Tenant Improvement Work (specifically excluding the 2010 Base Building Work).\

(C) For the purposes of this First Amendment, a "Landlord Delay" shall be defined as any delay in the design, permitting or performance of the Additional Premises Tenant Improvement Work and/or the authorization for issuance of a certificate of occupancy for the Additional Premises to the extent that such delay is actually caused by any act or, where there is a duty to act under the Lease (as herein amended), any failure to act by Landlord or Landlord's contractors, architects, engineers, or anyone else engaged by or on behalf of Landlord in connection with the construction of the 2010 Base Building Work as set forth in this First Amendment, except to the extent such failure is the result of Tenant Delays or Landlord's Force Majeure (as defined in, and subject to the terms and limitations of, Section 3.5(B) of the Lease) and disclosed to Landlord as hereinafter provided. Notwithstanding the foregoing, in no event shall any delays in the completion of the Additional Premises Tenant

Improvement Work caused by Landlord's use of non union labor constitute a Landlord Delay hereunder.

Notwithstanding the foregoing, no event shall be deemed a Landlord Delay unless and until Tenant has given Landlord written notice (the "Landlord Delay Notice") advising Landlord: (x) that a Landlord Delay is occurring and setting forth Tenant's good faith estimate as to the likely length of such Landlord Delay; (y) of the basis on which Tenant has determined that a Landlord Delay is occurring; and (z) the actions which Tenant believes that Landlord must take to eliminate such Landlord Delay. No event shall be deemed to be a Landlord Delay unless and until Landlord has failed to rectify the situation causing the Landlord Delay within forty-eight (48) hours after Landlord's receipt of the Landlord Delay Notice (which for the purposes of determining receipt may be delivered by hand to Michael Bowers, Landlord's Construction Representative, at Boston Properties, Inc., 800 Boylston Street, Suite 1900, Boston, Massachusetts 02199); provided, however, that if Landlord shall fail to eliminate the Landlord Delay within the aforesaid 48-hour period, then the 48-hour cure period shall be included in the period of time charged to Landlord pursuant to such Landlord Delay Notice (it being understood and agreed that if Landlord shall in fact eliminate the delay within the 48-hour cure period, no Landlord Delay shall be deemed to have occurred for the purposes of this First Amendment). In addition, any delay to the extent caused by (i) Tenant Delay (as defined in subsection 9(C) below) or (ii) Landlord's Force Majeure (subject to the terms and limitations set forth in Section 3.5(B) of the Lease), shall not constitute a Landlord Delay.

9.    (A) The "2010 Base Building Work" shall mean all labor, materials and other work necessary to design, permit and perform the alterations and improvements to Building B described on Exhibit B attached hereto. Landlord, at its sole cost and expense and without inclusion in Operating Expenses Allocable to the Premises, shall promptly and with all due diligence perform the 2010 Base Building Work in a good and workmanlike manner, and in connection therewith, Landlord shall obtain all necessary governmental permits and approvals necessary for the construction of the 2010 Base Building Work.

(B) Landlord shall use commercially reasonable efforts to substantially complete the 2010 Base Building Work on or before the date which is four (4) months following the Additional Premises Commencement Date (subject to Tenant Delays, as hereinafter defined, and Landlord's Force Majeure, as defined in Section 3.5(B) of the Lease), but Landlord shall have no liability to Tenant for the failure to substantially complete the 2010 Base Building Work by any particular date other than the corresponding extension of the Additional Premises Interim Payment Date and the Additional Premises Rent Commencement Date pursuant to Sections 4 and 5 above. For the purposes hereof, the 2010 Base Building Work shall be deemed to be substantially completed on the date on which the work described on Exhibit B has been completed except for so-called "punch list" items of work and adjustment of equipment and fixtures which can be completed after occupancy has been taken without causing substantial interference with Tenant's use and enjoyment of the Additional Premises or the right to legally occupy the Additional Premises.

In connection therewith, it is understood and agreed that Landlord may be performing the 2010 Base Building Work at the same time Tenant is performing the Additional Premises Tenant Improvement Work, and accordingly Landlord and Tenant agree to cooperate with each other in good faith to minimize any unreasonable interference in the performance of their respective items of work (consistent with the nature of the work being performed) and the provisions of Section 3.6(A) shall be applicable to the performance by Landlord and Tenant of the 2010 Base Building Work and the Additional Premises Tenant Improvement Work, respectively. It is further understood and agreed that portions of the Additional Premises may not be served by heating, ventilating and air conditioning as Landlord is completing the installation of the HVAC system as part of the 2010 Base Building Work, and that the foregoing shall not in any way be deemed to be an interruption in services or Landlord Delay.

All new materials provided as part of the 2010 Base Building Work shall be subject to the same warranties applicable to the Base Building Work set forth in Section 3.6(B) of the Lease, which warranties are expressly incorporated herein by reference, except that, for purposes of such incorporation, references therein to the "Base Building Work" shall be deemed references to the "2010 Base Building Work", references to the "Tenant Improvement Work" shall be deemed references to the "Additional Premises Tenant Improvement Work" and references to the "Completion Date" shall be deemed references to the date Landlord substantially completes the 2010 Base Building Work pursuant to this First Amendment. In addition, the terms of Section 3.7 of the Lease are hereby incorporated by reference into this Section 9, except that for purposes of such incorporation, references to "Article III" shall be deemed references to Sections 8 and 9 of this First Amendment.

(C) For the purposes of this First Amendment, a "Tenant Delay" shall be defined as any delay in the design, permitting or performance of the 2010 Base Building Work to the extent that such delay is actually caused by any act or, where there is a duty to act under the Lease (as herein amended), any failure to act by Tenant or Tenant's contractors, architects, engineers, or anyone else engaged by or on behalf of Tenant in connection with the construction of the Additional Premises Tenant Improvement Work and disclosed to Tenant as hereinafter provided. Notwithstanding the foregoing, in no event shall any delays in the completion of the 2010 Base Building Work caused by Tenant's use of non-union labor constitute a Tenant Delay hereunder.

Notwithstanding the foregoing, no event shall be deemed a Tenant Delay unless and until Landlord has given Tenant written notice (the "Tenant Delay Notice") advising Tenant: (x) that a Tenant Delay is occurring and setting forth Landlord's good faith estimate as to the likely length of such Tenant Delay; (y) of the basis on which Landlord has determined that a Tenant Delay is occurring; and (z) the actions which Landlord believes that Tenant must take to eliminate such Tenant Delay. No event shall be deemed to be a Tenant Delay unless and until Tenant has failed to rectify the situation causing the Tenant Delay within forty-eight (48) hours after Tenant's receipt of the Tenant Delay Notice (which for the purposes of determining receipt may be delivered by hand to Molly Gates at J. Calnan & Associates and Jim Finco, Tenant's Construction Representatives); provided, however, that if Tenant shall fail to eliminate the delay within the aforesaid 48- hour period, then the 48-hour cure period shall be included in the period of time charged to Tenant pursuant to such Tenant Delay Notice (it being understood and agreed that if Tenant shall in fact eliminate the Tenant Delay within the 48-hour cure

period, no Tenant Delay shall be deemed to have occurred for the purposes of this First Amendment). In addition, any delay to the extent caused by (i) Landlord Delay or (ii) Tenant's Force Majeure (as defined in, and subject to the terms and limitations of, Section 3.5(D) of the Lease) shall not constitute a Tenant Delay.

The date of substantial completion of the 2010 Base Building Work shall be deemed to have occurred as of the date when substantial completion of the 2010 Base Building Work would have occurred but for any Tenant Delays, as determined by Landlord in the exercise of its good faith business judgment (it being understood and agreed that the foregoing shall not be construed so as to relieve Landlord of its obligation to actually complete the 2010 Base Building Work, notwithstanding the fact that substantial completion may have been deemed to have occurred prior to actual completion as the result of Tenant Delays). Tenant covenants that no Tenant Delay shall delay the obligation to pay Annual Fixed Rent or Additional Rent and the determination of the Additional Premises Interim Payment Date and the Additional Premises Rent Commencement Date.

10.  Notwithstanding anything in the Lease to the contrary, for purposes of the Additional Premises only, Tenant's obligations under Section 5.12 of the Lease shall not apply until following the Additional Premises Commencement Date and references in Section 5.12 to the "Base Building Work" and the "Tenant Improvement Work" shall be deemed references to the "2010 Base Building Work" and the "Additional Premises Tenant Improvement Work", respectively, with respect to the Additional Premises.

11.  (A) Tenant warrants and represents that Tenant has not dealt with any broker in connection with the consummation of this First Amendment other than Richards Barry Joyce & Partners (the "Broker") and in the event any claim is made against Landlord relative to dealings by Tenant with brokers other than the Broker, Tenant shall defend the claim against Landlord with counsel of Tenant's selection first approved by Landlord (which approval will not be unreasonably withheld) and save harmless and indemnify Landlord on account of loss, cost or damage which may arise by reason of such claim.

(B) Landlord warrants and represents that Landlord has not dealt with any broker in connection with the consummation of this First Amendment other than the Broker, and in the event any claim is made against Tenant relative to dealings by Landlord with brokers other than the Broker, Landlord shall defend the claim against Tenant with counsel of Landlord's selection first approved by Tenant (which approval will not be unreasonably withheld) and save harmless and indemnify Tenant on account of loss, cost or damage which may arise by reason of such claim. Landlord shall pay the commission and fees due to the Broker on account of this First Amendment.

12.  Tenant's expansion rights set forth in Section 8.28 and Section 8.29 shall remain in full force and effect, except for Tenant's rights under Section 8.29(A) which have expired.

13.  Landlord hereby represents and warrants to Tenant that Landlord is the fee simple owner of the Complex and, as of the date hereof, the Complex is not subject to any mortgage, ground lease or overlease.

14. Except as otherwise expressly provided herein, all capitalized terms used herein without definition shall have the same meanings as are set forth in the Lease.

13. Except as herein amended the Lease shall remain unchanged and in full force and effect. All references to the "Lease" shall be deemed to be references to the Lease as herein amended.

[page ends here]

EXECUTED as a sealed instrument as of the date and year first above written.

LANDLORD:

BOSTON PROPERTIES                LIMITED PARTNERSHIP

By: Boston general partner

By: /s/ David C Provost

Name: David C Provost

Title: Senior Vice President

Boston Properties

TENANT:

ATTEST: IROBOT CORPORATION

By: /s/ Glen D Weinstein

Name: Glen D Weinstein

Title: Secretary, SVP ,General Counsel

By: /s/ John J. Leahy

Name: John J. Leahy

Title: Executive Vice President, CFO

Hereto duly authorized

By: /s/ Paul Tavalone

Name: Paul Tavalone

Title: Assistant Treasurer

Hereto duly authorized

**EXHIBIT A**

**Additional Premises**

**See Attached**

EXHIBIT B

2010 Base Building Work

The following represents the base building scope of work associated with the iRobot expansion into Building B:

Partitions and Openings:

- Remove and replace existing openings between Building B and A with fire rated gypsum drywall assembly on the second floor only.
- Provide full height two (2) hour rated drywall assembly to wall separating Building A and B including all columns, doors openings on the first and second floors.
- Provide a fire rated wall enclosure on first and second floors at the stairwell in the south east corner.
- Confirm existing enclosure is fire rated wall on first and second floors at the stairwell on the north east corner, revised existing handrails to meet ADA Compliance and provide finish upgrades similar to Building C, D, and E including new floor coverings, painting of stairwell walls and new lighting.
- Provide an allowance of $3,000.00 for tenant to install double doors and card reader at first floor or card access within the elevator for security as noted in Section 8 (B) of the Lease Amendment.
- Provide a new single unisex ADA compliance restroom adjacent to the existing toilet rooms on the second floor and provide finishes to match upgrades similar to Building C, D and E toilet rooms.

Existing 2nd Floor Restroom Upgraded - Furnish upgrades similar to Building C, D, and E restrooms, new tile floors and walls, with finishes and materials to be selected by Landlord:

- New tile flooring and walls
- New mirrors
- New hard surfaced counters
- New fixtures, faucets and valves
- New privacy partitions
- New accessories including grab bars, sanitary napkin, paper and soap dispensers, paper towel and sanitary napkin disposal
- Soffits and lighting over lavatories
- Paint remaining drywall walls and ceiling

HVAC:

- Landlord will install a packaged rooftop AC unit sized for 300 - 400 square foot per ton maximum of air conditioning for the second floor premises. Duct work from the new unit will be stubbed into the

second floor ceiling plenum to allow for iRobot to connect their distribution ductwork. Up to five (5) feet of horizontal duct will be provided.
- Roof exhaust fans complete with associated ductwork will be provided for the second floor toilet rooms

Electrical:

- New smoke and duct smoke detectors will be installed in mechanical/electrical space and roof top mechanical equipment to meet all code and local fire department requirements for the base building only, other necessary installations will be part of the Tenant Work. Landlord will provide iRobot with an allowance in the amount of $1,500.00 to be used for the installation of the meter for the tenant electricity on the second floor) , as noted in Section 8 (B) of the Lease Amendment.

Roof:

- A new EPDM roofing system with a warranty is to be installed at Building B

SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO OFFICE LEASE (the or this "Amendment") is made as of this 20th day of May, 2014 (the "Effective Date") by and between DIV BEDFORD, LLC, a Massachusetts limited liability company ("Landlord"), having a place of business at c/o The Davis Companies, 125 High Street, 21st Floor, Boston, MA 02110 and IROBOT CORPORATION., a Delaware corporation ("Tenant"), having a place of business at 4-18 Crosby Drive, Bedford, MA 01730.

WITNESSETH:

WHEREAS, Landlord's predecessor-in-interest and Tenant are parties to that certain Lease dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease dated September 16, 2010 (as amended, the "Original Lease"), whereby Tenant leases approximately 183,486 rentable square feet of rentable floor area located within the complex (the "Complex") known as Bedford Business Park, Bedford, Massachusetts.

WHEREAS, Landlord and Tenant desire to amend the Original Lease as specified herein in and as described hereby.

WHEREAS, Tenant has initiated a building transformation and upgrade project (the "Facilities Transformation") for certain interior renovations and upgrades, and Landlord has reviewed and conceptually approved the Facilities Transformation, subject to final approval of the plans in accordance with the Lease (such final approval not to be unreasonably delayed, withheld or conditioned).

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, Landlord and Tenant hereby agree that:

1. Defined Terms. Unless otherwise defined herein, all capitalized terms used in this Amendment shall have the meanings ascribed to them in the Original Lease. From and after the Effective Date hereof, the term "Lease" as used in the Original Lease shall mean and refer to the Original Lease as amended by this Amendment.

2. Land Recreation Area A. Exhibit I-I of the Original Lease shall be and hereby is deleted in its entirety and shall be and hereby is replaced with Exhibit I-I captioned "Revised Land Recreation Area A" attached hereto and incorporated herein by reference.

3. Conversion of a Portion of Additional Premises to Common Area. Within thirty (30) days of receiving notice from Landlord (which notice shall be given l}-olater than the first anniversary of the Effective Date) and approval by Landlord's lenders as provided for in Section 13, below, Tenant shall surrender to Landlord certain area situated within the Additional Premises, as shown on Exhibit A-3 attached hereto and incorporated herein by reference. Such surrendered premises shall be converted to common area for use by Tenant and others in common at Landlord's sole cost and expense.

4.  Entry Facade Improvements. Attached hereto as Exhibit B-3, and incorporated herein by reference is Landlord's current conceptual plan for certain facade improvements, which plan is subject to such changes as Landlord, in consultation with Tenant, determines are necessary or appropriate (the "Entry Facade Improvements"). The Entry Facade Improvements do not include replacement of windows. Landlord, at its sole cost and expense shall perform the Entry Facade Improvements in a good and workmanlike manner, and in connection therewith, Landlord shall obtain all necessary governmental permits and approvals necessary for the construction of the Facade Improvements.

5.  Building and Property Upgrades. Tenant acknowledges that Landlord may undertake a plan to alter, renovate and/or upgrade various building facades and perform other interior and exterior renovations and upgrades and site improvements, and that any such work may cause temporary noise, dust or dirt, vibration, or other disruption, including the need to temporarily vacate certain areas of the Premises.

6.  Construction Logistics. Before commencing any of the work referenced in Sections 2 - 5, Landlord will prepare a Construction Logistics Plan and obtain Tenant's approval thereto, which approval shall not unreasonably be delayed, conditioned or withheld, which plan shall detail the impact of such work. Tenant will cooperate with Landlord to permit Landlord access to the Premises if necessary to perform the work, and Landlord shall use commercially reasonable efforts to minimize all such disruption, but rent shall not abate and Landlord shall not be liable to Tenant for any such noise, dust or dirt, vibration or other disruption arising from or related to the work. Notwithstanding the above, Landlord reasonably will cooperate with Tenant to minimize any disruption to the Facilities Transformation, including but not limited to adjusting the proposed Construction Logistics Plan to reasonably accommodate Tenant's timing related to the Facilities Transformation, provided same is commercially reasonable and does not result in any loss, cost or material expense to Landlord.

7. Broker. Landlord and Tenant represent and warrant to each other that they have not had any dealings with any broker, agent or finder in connection with the transaction evidenced by this Amendment. Each party agrees to protect, indemnify, defend and hold the other harmless from and against any and all expenses with respect to any compensation, commissions and charges claimed by any broker, agent or finder, with respect to this Amendment and the negotiation thereof that is made by reason of any action or agreement by such party.

8. Lease Ratification. This instrument and all of the terms and provisions hereof shall be considered for all purposes to be incorporated into and made part of the Original Lease. The Original Lease and each provision, covenant, condition, obligation, right and power contained therein is hereby ratified and confirmed, and, as modified hereby, shall continue in full force and effect. All references appearing in the Original Lease and in any related instruments shall be amended and read hereafter to be references to the Original Lease as amended by this Amendment. In the event of any inconsistencies or conflicts between other provisions of the Original Lease and the provisions of this Amendment, the provisions hereof shall govern and control. Except as specifically amended in this Amendment, the Original Lease is and shall remain in full force and effect and has not been amended, modified, terminated or assigned.

9. Authority. Landlord represents and warrants to Tenant that Landlord and the person signing on its behalf are duly authorized to execute and deliver this Amendment and that this Amendment constitutes its legal, valid and binding obligation. Tenant hereby represents and warrants to Landlord that Tenant and each person signing on its behalf are duly authorized to execute and deliver this Amendment, and that this Amendment constitutes the legal, valid and binding obligation of Tenant.

10. Execution by Facsimile or Electronic Mail. The parties agree that this Amendment may be transmitted between them by facsimile machine or electronic mail and the parties intend that a faxed or emailed Amendment containing either the original and/or copies of the signature of all parties shall constitute a binding Amendment.

11. Governing Law/Binding Effect. The Lease and this Amendment and the rights and obligations of both parties thereunder and hereunder shall be governed by the laws of the Commonwealth of Massachusetts and shall be binding upon and inure to the benefit of the Landlord and Tenant and their respective legal representatives, successors and assigns.

12. General Provisions. This Amendment may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument. Tenant represents and warrants to Landlord that no portion of the Premises has been assigned, sublet or licensed for use by any other occupant.

13. Effective Date. This Amendment shall become effective and binding only upon execution and delivery of this Amendment by all of the parties hereto and approval by Landlord's lenders. Landlord shall use its commercially reasonable efforts to obtain its lender's approval to this Amendment. If Landlord does not obtain its lender's approval within sixty (60) days of Tenant's and Landlord's mutual execution and delivery of this Amendment, then this Amendment shall be null and void and the Original Lease shall remain in full force and effect and shall not be amended by the terms of this Amendment.

[Remainder of Page Intentionally Blank; Signature Page Follows]

IN WITNESS WHEREOF, the under have executed this Amendment to Lease as an instrument under seal as of the Effective Date written above.

**LANDLORD:**

**DIV Bedford, LLC,** a Massachusetts limited liability company

By: Bedford Manager Corp., its manager

By: /s/ Richard McCready
Name: Richard McCready
Title: President

**TENANT.**

**iRobot Corporation.,** a Delaware corporation

By: /s/ Alison Dean
Name: Alison Dean
Title: CFO

SECRETARY'S CERTIFICATE

I, Glen Weinstein, Secretary of iRobot Corporation, a Delaware corporation (the "Corporation"), hereby certify that all requisite corporate approval was given for the Corporation, as Tenant, to enter into a Second Amendment to Lease with DIV Bedford, LLC, as Landlord, concerning Tenant's lease at the building located at, known as and numbered 4-18 Crosby Drive, Bedford, Massachusetts, a copy of which Second Amendment to Lease is attached hereto and made a part hereof.

I further certify that Alison Dean, as CFO of the Corporation has authority to execute and deliver to the Landlord said Second Amendment to Lease on behalf of the Corporation upon the terms contained therein.

Witness my hand and seal of the Corporation this 20th day of May, 2014.


/s/ Glen Weinstein
Name: Glen Weinstein
Title: Secretary

## THIRD AMENDMENT TO LEASE

**THIS THIRD AMENDMENT TO LEASE** (this "**Amendment**") is entered into as of April 10, 2015, by and between **DIV BEDFORD, LLC**, a Massachusetts limited partnership ("**Landlord**"), and **IROBOT CORPORATION**, a Delaware corporation ("**Tenant**").

### R E C I T A L S:

A. Landlord and Tenant are parties to that certain Lease dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease (the "**First Amendment**") dated September 16, 2010, as further amended by a Second Amendment to Lease dated as of May 20, 2014 (as amended, the "**Lease**") for certain premises containing 183,486 rentable square feet located within the complex ("**Complex**") known as XChange at Bedford (formerly known as Bedford Business Park), Bedford, Massachusetts (the "**Original Premises**").

B. Tenant and Landlord have agreed to expand the Premises to include an additional 19,555 rentable square feet on the first floor of Building B (aka 6 Crosby Drive) as further shown on Exhibit A, attached (the "**Additional Building B Space**")

C. Landlord and Tenant desire to amend the Lease as set forth below.

### A G R E E M E N T:

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree to amend the Lease as follows:

1. **Additional Space Commencement Date**.  Effective as of the Additional Space Commencement Date (hereinafter defined), the Additional Building B Space shall be added to the Original Premises (the Original Premises and the Additional Building B Space shall be collectively referred to as the "**Premises**") upon all of the terms and conditions of the Lease as modified herein.  The lease of the Additional Space shall terminate on the date (the "**Additional Space Expiration Date**") of the termination of the lease for the Original Premises, subject to extension in accordance with Section 4, below.  As used herein, the term "**Additional Space Commencement Date**" shall mean the later to occur of (a) November 1, 2015 (the "**Target Delivery Date**"), and (b) the date upon which Landlord delivers possession of the Additional Space to Tenant with Landlord's Work (hereinafter defined) Substantially Complete (hereinafter defined), subject to adjustment due to Tenant Delay (hereinafter defined).  Landlord anticipates delivering possession of the Additional Space to Tenant with Landlord's Work Substantially Complete on November 1, 2015; provided that Landlord's failure to deliver possession of the Additional Space to Tenant by such date for reasons outside Landlord's reasonable control shall not affect the enforceability of this Amendment, or subject Landlord to any liability to Tenant for damages or be deemed a default by Landlord of its obligations under the Lease.

2. **Annual Fixed Rent**.  Tenant shall pay to Landlord Annual Fixed Rent with respect to the Additional Space in the manner and at the times set forth in Section 2.5 of the Lease and in the amounts set forth below, without demand, deduction or setoff, except as expressly provided in the Lease.

| Period | Annual Fixed Rent per Rentable Square Foot | Annual Fixed Rent | Monthly Installments of Annual Fixed Rent |
|---|---|---|---|
| Lease Year 1 | $26.15 | $511,363.25 | $42,613.60 |
| Lease Year 2 | $26.65 | $521,140.75 | $43,428.40 |
| Lease Year 3 | $27.15 | $530,918.25 | $44,243.19 |
| Lease Year 4 | $27.65 | $540,695.75 | $45,057.98 |
| Lease Year 5 | $28.15 | $550,473.25 | $45,872.77 |

"**Lease Year**" shall mean the twelve (12) month period commencing on the Additional Space Commencement Date, and on each anniversary of the Additional Space Commencement Date thereafter (or portion thereof ending on the Additional Space Expiration Date).

3. **Additional Rent**.  Commencing on the Additional Space Commencement Date, Tenant shall pay Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises with respect to the Additional Building B Space, and the "Rentable Floor Area of the Premises" shall consist of 203,041 square feet including both the Rentable Floor Area of the Original Premises (being 183,486 square feet) and the Rentable Floor Area of the Additional Building B Space (being 19,555 square feet).  Notwithstanding the foregoing or anything to the contrary in the Lease, to the extent allocable to the Additional Building B Space, payments of Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be limited to amounts in excess of those incurred by Landlord and allocable to the Additional Building B Premises with respect to calendar year 2016 for Operating Expenses and the Town of Bedford fiscal year 2016 (e.g. currently July 1, 2015 through June 30, 2016) for Taxes. For the Original Premises, Tenant shall continue to pay its Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Original Premises without regard for such base years.

4. **Extension Options**. Tenant shall have the right to extend the term of the Lease for two additional periods of five years with respect to the Additional Building B Space on the same terms and conditions applicable to the Original Premises under Section 8.20 of the Lease. The parties acknowledge and agree that Tenant may only exercise its extension options under Section 8.20, as affected by this Section 4, with respect to the entire Premises (including the Additional Building B Space); e.g. the exercise of an extension option under Section 8.20 serves to extend the term of the Lease for the Original Premises in addition to the Additional Building B Space.

5. **Condition of Premises**.  Subject to Landlord's obligations to perform certain alterations and improvements to the Additional Building B Space ("Landlord's Work") as further described on Exhibit B, attached, Tenant acknowledges that it is leasing the Additional Space in its "as is" condition, and that no agreements to alter, remodel, decorate, clean or improve the Additional Building B Space or the Building have been made by Landlord or any party acting on Landlord's behalf, provided, however, Landlord shall deliver possession of the Additional Building B Space on the Additional Premises Commencement Date vacant, broom clean, free of all occupants and debris and free of any right or claim of right of use or occupancy by any other party. Notwithstanding the foregoing, Landlord agrees to perform certain alterations and improvements to the Additional Building B Space ("**Landlord's Work**") as further described on Exhibit B, attached.

6. **Electricity and HVAC**. Tenant agrees to pay, or cause to be paid, all charges for electricity consumed in the Additional Building B Space for Tenant's lights, plugs and VAV fan

circulation (but expressly excluding the Building B rooftop HVAC unit) in the manner applicable to electricity charges for the Additional Space as provided in Section 6(D) of the First Amendment from and after the date that the Additional Space TE Meter (as defined therein) was installed. If Tenant installs any specialty equipment serving the Additional Building B Space, such as supplemental HVAC, it shall be check-metered by Tenant at Tenant's expense and shall be paid for in the same manner. In connection with the Landlord's Work, Landlord shall install a check-meter serving the Additional Building B Space at Landlord's sole cost and expense.  For purposes of clarification, HVAC services provided to Tenant by Landlord beyond the hours designated on Exhibit C to the Lease are charged to Tenant as additional services under Section 4.1.2 of the Lease.

7. **Parking**.  From and after the Additional Space Commencement Date, Tenant's Number of Parking Privileges, as described in Section 1.1 of the Lease, is hereby increased by 3.0 parking privileges for each 1,000 square feet of rentable floor area of the Additional Building B Space.

8. **Brokers**.  Landlord and Tenant each represent and warrant to the other that the only brokers they have dealt with in connection with this Amendment are CBRE, Inc. and Transwestern / RBJ, whose commissions and fees shall be paid by Landlord pursuant to a separate written agreement. Landlord and Tenant each agree to defend, indemnify and hold the other harmless from and against all claims by any other broker for fees, commissions or other compensation to the extent such broker alleges to have been retained by the indemnifying party in connection with the execution of this Amendment. The provisions of this paragraph shall survive the expiration or sooner termination of the Lease.

9. **Miscellaneous**.  Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written. In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control.  All terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease.  The Recitals set forth above in this Amendment are hereby incorporated by this reference.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting the matters set forth in this Amendment and this Amendment constitutes the parties' entire agreement with respect to the leasing of the Additional Building B Space and supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto or with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Amendment.

10. **Counterparts**. This Amendment may be executed in any number of counterparts and by each of the undersigned on separate counterparts, which counterparts taken together shall constitute one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the day and year first written above.


**LANDLORD:**

**DIV Bedford, LLC,** a Massachusetts limited liability company


By: Bedford Manager Corp., a Massachusetts Corporation


By: /s/ Richard McCready
Name: Richard McCready
Title: President




**TENANT.**

**iRobot Corporation.,** a Delaware corporation


By: /s/ Paul Tavalone
Name: Paul Tavalone
Title: VP, Assistant Treasurer


By: /s/ Alison Dean
Name: Alison Dean
Title: CFO

Case 1:19-cv-12536-DJC   Document 79-6   Filed 05/19/20   Page 367 of 496

**EXHIBIT A**

**ADDITIONAL BUILDING B SPACE**

Case 1:19-cv-12536-DJC    Document 79-6    Filed 05/19/20    Page 368 of 496



# EXHIBIT 1
## FIRST FLOOR - iROBOT PREMISES
6 CROSBY DRIVE
BEDFORD BUSINESS PARK
BEDFORD, MASSACHUSETTS
2015_0165LE1    5/4/2015

LIMIT OF
TENANT
PREMISES

FIRST FLOOR KEY PLAN

EXHIBIT B

**WORK LETTER**

1. Design and Construction of Landlord's Work. Tenant shall provide a fit plan for the Landlord's Work based on a scope of work that is consistent with the Building standard set forth on Schedule 1, attached, using Building standard materials, and capable of being completed within a fifteen (15) week construction schedule (the "**Fit Plan**"). Tenant shall finalize the Fit Plan and deliver the same to Landlord no later than May 8, 2015, which Fit Plan shall be subject to Landlord's reasonable approval in accordance with the Lease (to be granted or denied within three (3) business days after submission to Landlord). No later than May 15, 2015, Landlord and Tenant shall cooperate to identify all finishes (which shall be Building standard by default, if not selected by Tenant by the aforementioned deadline) for the improvements shown on the final Fit Plan and identify any items that are long lead items. Any long lead items that would, in the opinion of Landlord's general contractor, delay Substantial Completion beyond the Target Delivery Date shall be excluded from the requirement from Substantial Completion and shall be completed as Final Punchlist items.

Following approval of the Fit Plan, Landlord shall cause its architect, Walsh /Cochis Associates Inc. ("**Landlord's Architect**"), to prepare construction documents for the Landlord's Work (such construction documents, as they may be modified in accordance with this Exhibit B, being referred to herein as the "**Construction Plans**"). The Construction Plans shall be consistent with the final Schematic Plans. Prior to commencing the Landlord's Work, Landlord shall provide Tenant with a copy of the Construction Plans for Tenant review and comment and to confirm that the Construction Plans are substantially consistent with the final Schematic Plans. Landlord shall endeavor to provide the Construction Plans to Tenant no later than five (5) weeks following the completion of the Fit Plan (subject to extension for Tenant Delay and Force Majeure). Tenant shall provide any comments to the Construction Plans to Landlord within three (3) business days following delivery by Landlord. Landlord shall respond to such comments by the date that is three (3) business days after the giving of such comments. In any event, Tenant shall authorize Landlord to proceed with Landlord's Work no later than July 10, 2015.

The improvements to be performed by Landlord in accordance with the Construction Plans are hereinafter referred to as the "**Landlord's Work**." It is agreed that construction of the Landlord's Work is intended to be "**turnkey**" and will be completed at Landlord's sole cost and expense, subject to the Allowance (as defined below) and except as otherwise expressly set forth in this Exhibit B, using Building standard methods, materials and finishes, except as otherwise expressly provided in this Exhibit B. Landlord shall enter into a direct contract for the Landlord's Work with a general contractor selected by Landlord, and Landlord shall have the right to select and/or approve of any subcontractors used in connection with the Landlord's Work. Landlord's supervision or performance of any work for or on behalf of Tenant shall not be deemed a representation by Landlord that such Construction Plans or the revisions thereto will be adequate for Tenant's use. A preliminary, estimated schedule for the Landlord's Work is attached as Schedule 2 hereto, with the understanding that the schedule is subject to delays due to Tenant Delay and Force Majeure, and that Landlord's failure to perform any task within the time period set forth on Schedule 2 shall not be deemed a default under the Lease.

Tenant understands that time is of the essence to Landlord in causing the date of Substantial Completion to occur on or before the Target Delivery Date. At all times, Tenant will act promptly (and in any case within three business days unless a longer period of time is specified herein) on any construction-related questions or matters, including color approvals. If Tenant shall fail to act in a timely fashion as required hereunder on any construction-related question or matter, then Tenant's failure shall constitute a Tenant Delay (as defined in Section 10, below) and, as set forth in Section 10, below, Substantial Completion shall be deemed to have occurred earlier than the actual date thereof by the number of days by which Tenant's action is delayed.

2. Tenant Work for Certificate of Occupancy. Tenant shall substantially complete, at Tenant's expense, in a timely manner pursuant to Landlord's construction schedule (the "**Construction Schedule**") as initially provided to Tenant, as the Construction Schedule may subsequently be revised from time to time by Landlord, the installation of the FF&E (as defined below) necessary to obtain a certificate of occupancy from the Town of Bedford for the Additional Building B Space at Tenant's sole cost and expense. If Tenant does not perform such work in a timely manner, then Landlord shall have the right, upon prior written notice to Tenant and a reasonable opportunity to cure, to do such work as is necessary to obtain the certificate of occupancy at Tenant's expense. Tenant shall retain the vendors performing the work necessary to install its FF&E no later than May 15, 2015, for the purpose of enabling Landlord to cooperate with Tenant regarding the FF&E installation.

3. Substantial Completion of the Landlord's Work. The Landlord's Work shall be deemed "**Substantially Completed**", and the Landlord's Work shall be "**Substantially Complete**", when Landlord's contractor or Landlord's Architect certifies to Landlord and Tenant in writing that: (a) the Landlord's Work has been completed in accordance with the Construction Plans, subject only to the Final Punchlist (defined below) and other uncompleted elements of construction, decoration, painting, millwork or other work and mechanical adjustment that will not interfere materially with occupancy by Tenant; and (b) Landlord has obtained a certificate of occupancy (or its equivalent) from the municipality permitting the lawful use and occupancy of the Additional Building B Space for the purposes specified in this Lease; provided, however, that if Landlord is unable to obtain such certificate of occupancy (or its reasonable equivalent) by virtue of the fact that Tenant has not yet completed the installation of its FF&E (defined hereinafter) or for any other reason beyond the reasonable control of Landlord, then the Landlord's Work shall be deemed substantially complete upon the certification of Landlord's Architect or contractor as stated in subsection (a), above, notwithstanding anything to the contrary in the foregoing.

4. Punchlist. On a date or dates reasonably specified by Landlord, Landlord's Architect shall inspect the Landlord's Work and shall prepare a list of the customary punchlist type items, and any items of a seasonal nature, then remaining to be completed (the "**Final Punchlist**"). Landlord shall cause such items to be completed in a diligent manner during regular business hours, but in a manner that will seek to minimize interruption of Tenant's use and occupancy of the Additional Building B Space. In any event, Landlord shall use commercially reasonable efforts to complete all punch list work within sixty (60) days (or such longer period as is reasonably required with respect to applicable items), other than matters that cannot be completed owing to their seasonal nature, and subject to extension for Force Majeure and Tenant Delays.

5. Final Completion; Acceptance by Tenant. Except for latent defects and uncompleted items of Landlord's Work specified in the Final Punchlist, Tenant shall be deemed to have accepted

all elements of Landlord's Work on the Additional Space Commencement Date. In the case of a dispute concerning the completion of items of Landlord's Work specified in the Final Punchlist, such items shall be deemed completed and accepted by Tenant upon the delivery to Tenant of a certificate of Landlord's Architect or contractor certifying that such items have been completed. In the case of latent defects in Landlord's Work appearing after the Additional Space Commencement Date, Tenant shall be deemed to have waived any claim for correction or cure thereof on the date that is eleven (11) months following the Additional Space Commencement Date if Tenant has not then given written notice of such defect to Landlord. For the purposes of this Lease, "latent defects" shall mean defects in the construction of the Landlord's Work that are not observable by visible inspection at the time the Final Punchlist is prepared. Landlord shall cause Landlord's contractor so to remedy, repair or replace any such latent defects identified by Tenant within such eleven (11) month period, such action to occur as soon as practicable during normal working hours and so as to avoid any unreasonable interruption of Tenant's use of the Additional Building B Space. The foregoing shall constitute Landlord's entire obligation with respect to all latent defects in the Landlord's Work.

6. Authorized Representative. Chad Haskell, Tenant's Authorized Representative, shall have full power and authority to act on behalf of Tenant on any matters relating to Landlord's Work. Tenant may name a replacement Authorized Representative from time to time by written notice to Landlord making reference to this Exhibit B. Chris Chandor, Landlord's Authorized Representative, shall have full power and authority to act on behalf of Landlord on any matters relating to Landlord's Work. Landlord may name a replacement Authorized Representative from time to time by written notice to Tenant making reference to this Exhibit B.

7. Entry Prior to Commencement. If and as long as Tenant does not interfere in any way with the construction process (by causing disharmony of labor relations at the Property, scheduling or coordination difficulties, etc.), Tenant may, on a reasonable schedule prepared by Landlord and incorporated into the Construction Schedule, and at Tenant's sole risk and expense, enter the Additional Building B Space (each, an "**Early Access Date**") twenty (20) days prior to the then anticipated Additional Space Commencement Date for the purpose of installing Tenant's furniture, fixtures, and equipment (collectively, the "**FF&E**"). In no event shall the Landlord's Work include any FF&E, the responsibility of which shall be Tenant's. The provisions of this Section 7 shall apply only during the period prior to the Additional Space Commencement Date. Tenant acknowledges that Landlord's ability to obtain a certificate of occupancy for the Additional Building B Space depends upon the completion of certain FF&E. The installation of the FF&E necessary for Landlord to obtain a certificate of occupancy shall be completed by Tenant no later than the date that is required for Landlord to Substantially Complete the Landlord's Work on or before the Target Delivery Date. Prior to the Additional Space Commencement Date Tenant shall comply with and perform, and shall cause its employees, agents, contractors, subcontractors, material suppliers and laborers to comply with and perform, all of Tenant's obligations under this Lease except the obligations to pay Annual Fixed Rent and additional charges and other charges and other obligations the performance of which would be clearly incompatible with the installation of the FF&E. Any independent contractor of Tenant (or any employee or agent of Tenant) performing any work in the Additional Building B Space prior to the Additional Space Commencement Date shall be subject to all of the terms, conditions and requirements contained herein. Neither Tenant nor any Tenant contractor shall interfere in any way with construction of, nor damage, the Landlord's Work or the common areas or other parts of the Building, and each shall do all things reasonably requested by Landlord to expedite construction of the Landlord's Work. Without limitation, Tenant shall require each Tenant contractor to adjust and coordinate any work or installation in or to the Additional

Building B Space to meet the schedule or requirements of other work being performed by or for Landlord throughout the Building. In all events, Tenant shall indemnify Landlord in the manner provided in the Lease against any claim, loss or cost arising out of any interference with, or damage to, the Landlord's Work or any other work in the Building, or any delay thereto, or any increase in the cost thereof on account in whole or in part of any act, omission, neglect or default by Tenant or any Tenant contractor. Without limiting the generality of the foregoing, to the extent that the commencement or performance of Landlord's Work is delayed on account in whole or in part of any act, omission, neglect, or default by Tenant or any Tenant contractor, then such delay shall constitute a Tenant Delay as provided herein. Any requirements of any such Tenant contractor for services from Landlord or Landlord's contractor, such as hoisting, electrical or mechanical needs, shall be paid for by Tenant and arranged between such Tenant contractor and Landlord or Landlord's contractor; notwithstanding the foregoing to the contrary, there shall be no fee to Tenant for hoisting, loading dock or freight elevator use or electrical consumption during tenant's move into the Additional Building B Space. Should the work of any Tenant contractor depend on the installed field conditions of any item of Landlord's Work, such Tenant contractor shall ascertain such field conditions after installation of such item of Landlord's Work. Neither Landlord nor Landlord's contractor shall ever be required or obliged to alter the method, time or manner for performing Landlord's Work or work elsewhere in the Building, on account of the work of any such Tenant contractor. Tenant shall cause each Tenant contractor performing work on the Additional Building B Space to clean up regularly and remove its debris from the Premises and Building.

8. Allowance. Landlord shall provide Tenant with an allowance for the costs (the "**Allowance Costs**") of preparing the Additional Building B Space for Tenant's initial occupancy (including the costs of constructing the Landlord's Work (the "**Hard Costs**") and architectural and engineering fees incurred in the design of the Landlord's Work) in an amount not to exceed Six Hundred Twenty-Five Thousand, Seven Hundred Sixty and 00/100 ($625,760.00) Dollars (i.e., $32.00 per rentable square foot of the Additional Building B Space initially leased hereunder, hereinafter, (the "**Allowance")**. At least eighty percent (80%) of the Allowance must be spent on Tenant's Hard Costs for the Landlord's Work; the remainder shall be used for Soft Costs. All construction and design costs for the Additional Building B Space in excess of the Allowance shall be paid for entirely by Tenant as provided in Section 9, below. As used herein, "**Soft Costs**" means the out-of-pocket costs incurred by Landlord for (i) architectural and engineering fees in preparing the Construction Plans, (ii) the construction management fee described in Section 9 below, and (iii) other charges by architects, engineers, design professionals and other consultants in connection with the design of the Landlord's Work. Allowance Costs shall be expended by Landlord for the Direct Costs (as defined below) of the Landlord's Work as such work progresses.

9. Tenant Payments For Excess Costs. As used herein, "**Excess Costs**" means any increase in the cost to design and construct the Landlord's Work resulting from (i) Tenant Delay and/or (ii) costs to design and construct the Landlord's Work in excess of the Allowance. Landlord shall invoice Tenant for Excess Costs as incurred, and Tenant shall pay Landlord for Excess Costs in monthly progress payments, within 20 days after invoice. The price for any Excess Costs shall be equal to Landlord's Direct Costs incurred in connection with performing the Landlord's Work giving rise to the Excess Costs. "**Direct Costs**" shall mean the total cost payable by Landlord (or its general contractor) for Landlord's Work to contractors, subcontractors, materialmen, laborers, etc. (including any portions of such reasonable amounts designated subcontractor's or materialmen's

profit, fee, overhead, and the like), all architect and design fees, life safety testing, additions and modifications, improvements to the structure and building base systems required to build out the Landlord's Work (excluding structural improvements to support FF&E above and beyond normal and customary office use, which shall be performed as alterations subject to the provisions of Section 5.14 of the Lease by Tenant if required) plus all costs of insuring the Landlord's Work in question and all costs of obtaining permits and inspections required by governmental authorities in connection with the Landlord's Work in question. Landlord's invoices on account of Excess Costs may include any materials and equipment purchased to be part of Landlord's Work and stored at Building B or some other location approved by Landlord and all deposits made on the purchase of such materials and equipment. Direct Costs shall include a three percent (3%) fee on all Direct Costs incurred by Landlord for construction management or supervision by Landlord.

10. <u>Tenant Delay</u>.

(a) The period for performance of the Landlord's Work shall be extended by the number of days of actual construction delay in achieving Substantial Completion resulting from any "**Tenant Delay**", meaning any delay in the design or construction of the Landlord's Work resulting from:

(i) Tenant's failure to comply with any of the delivery dates or comment dates contained in the Lease relative to the design, planning, selection of finishes and pricing for the Landlord's Work;

(ii) Tenant's failure to provide response to requests for information, approvals or disapprovals regarding the Landlord's Work within three (3) business days after written request by Landlord or its contractors;

(iii) Tenant's requests for the inclusion of materials or installations in the construction of the Landlord's Work other than building standard items or items with delivery requirements that may have the effect of delaying the Substantial Completion of the Landlord's Work beyond the Target Delivery Date, provided that Landlord gives Tenant written notice that such inclusion of materials or installations or such items, as applicable, will result in Tenant Delay (and any such Tenant Delay shall be measured from the date of such notice);

(iv) any acts, omissions, non-payment, defaults or misconduct of Tenant (or its agents, employees, design professionals, contractors, licensees or invitees) with respect to the construction of the Landlord's Work, provided that Landlord gives Tenant written notice of such Tenant Delay (and any such Tenant Delay shall be measured from the date of such notice);

(v) any request by Tenant that Landlord delay the commencement of, or suspend the performance of, any Landlord's Work;

(vi) failure of Tenant to complete the installation of the FF&E necessary for Landlord to obtain a certificate of occupancy in accordance with Landlord's Construction Schedule; or

(vii) any interference with Landlord's construction of the Landlord's Work caused by Tenant or its contractors, subcontractors or suppliers Work, provided that Landlord gives Tenant written notice of such interference (and any such Tenant Delay shall be measured from the date of such notice).

(b) <u>Adjustment of Additional Space Commencement Date</u>. If Landlord is unable to Substantially Complete the Landlord's Work and deliver possession of the Additional Building B Space to Tenant on or before the Target Delivery Date as a result of any Tenant Delay, the Additional Space Commencement Date shall be advanced by the number of days of Tenant Delay experienced by Landlord in order to substantially complete the Landlord's Work and deliver the Additional Building B Space to Tenant. The length of any Tenant Delay shall be the actual number of days that the Landlord's Work is delayed, unless such Tenant Delay shall result from Tenant's failure to act within the time periods expressly set forth in this Work Letter, in which case such Tenant Delay shall be deemed to be one day for each day measured from the date that Tenant was required to act as set forth herein until Tenant takes the required action. If claiming an acceleration of the Additional Space Commencement Date hereunder on account of any Tenant Delay, Landlord shall notify Tenant in writing of Landlord's claimed length of such Tenant Delay(s). Unless Tenant disputes Landlord's estimate by written notice delivered to Landlord within such two (2) business day period, Landlord's estimate shall be deemed the conclusive determination of the length of such Tenant Delay.

11. All disputes between the parties regarding Tenant Delays and other matters expressly referencing this Section 11 shall be resolved in accordance with this Section 11. Any arbitration decision under this Section 11 shall be enforceable in accordance with applicable law in any court of proper jurisdiction. A party may not initiate arbitration under this Section 11 without notifying the other party and requesting a meeting of senior representatives to resolve the dispute. Within three (3) business days following such notice, senior representatives of Landlord and Tenant that have authority to resolve the dispute shall meet in order to seek a resolution by agreement prior to the arbitration. If the dispute is not so resolved at the meeting (or if one party does not attend) then either party may initiate arbitration. Any arbitration conducted pursuant to this Section 11 shall be conducted in expeditious manner as possible to avoid delays in the construction of the Landlord's Work. Within five (5) days after either party or its affiliates requests arbitration by notice to the other, Landlord and Tenant shall seek to agree to a single arbitrator who is an independent third party real estate professional with at least twenty (20) years of experience in construction disputes involving multi-tenant, first-class, office developments that has not worked for either party for the prior five (5) years (a "**Qualified Arbitrator**") and, if they are unable to agree, then a Qualified Arbitrator shall, upon request by wither party, be appointed by the Boston office of the AAA or successor organization. The arbitrator shall decide the dispute by written decision. The arbitration shall be conducted in the Boston office of the AAA in accordance with the Fast Track Procedures (regardless of the amount in dispute) of the Construction Industry Arbitration Rules of the AAA, as modified and/or supplemented by this Section (or any successor organization) on an expedited basis and shall be concluded, with a decision issued, no later than seven (7) days after the date that such dispute is submitted for arbitration. The decision of the arbitrator shall be final and binding on the parties. The parties shall comply with any orders of the arbitrator establishing deadlines for any such proceeding. The fee of the arbitrator shall be paid equally by the parties. Each party shall pay all other costs incurred by it in connection with the arbitration.

12. This Exhibit shall not be deemed applicable to any additional space added to the Additional Building B Space at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the Original Premises or any additions to the Premises in the event of a renewal or extension of the original Term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease.

Schedule 1

Building Standards

**Base Building Construction**
**For Tenant Improvements**
**6 Crosby Drive, Bedford, MA**
**Revised 3/18/15**

1. Demolition:
As required per plan.

2. Interior Partitions:
New interior walls shall be constructed of 3-5/8" x 26 Ga. metal studs at 16" O/C with 1/2" gypsum wallboard on both sides. Walls shall extend to 6" above the ceiling grid.

Walls surrounding conference rooms shall be constructed of 3-5/8" x 25 Ga. metal studs at 16' O/C with one layer of 1/2" gypsum board on each side. Walls to extend to underside of deck above. Provide acoustical insulation between studs.

3. Doors, Frames and Hardware:
Provide new units as required by new layout. Exterior, egress, demising, mechanical and stairwell doors to remain. New interior doors shall consist of hollow metal frames and 3'0" x 7'0" paint grade wooden-veneer doors with passage-set cylindrical hardware.

One 2' glass side light per office, small conference room, meeting room; excluding storage, server and other rooms. Glass side lights will have a 1" aluminum channel on the floor 82" recessed channel at the header.

4. Ceilings:
Provide new Armstrong Cortega Second Look II 2'x4' ceiling tiles in 15/16" grid throughout all areas not specified as open ceiling.

5. Floor Finishes:
Provide new carpet at all open office areas, private offices and conference rooms, at a cost not to exceed $28 per square yard installed.

Provide Armstrong Standard Excelon vinyl floor tile at coffee areas, break rooms, storage rooms, server rooms and labs.

Provide new 4" vinyl base on all walls, except where hydronic baseboard heat exists.

6. Paint:
Gypsum board walls throughout all areas shall be painted, and shall receive one primer and two finish coats of latex eggshell finish paint.

All doors and frames shall receive a primer and two finish coats of latex acrylic semi gloss paint.

Specialty paint or finishes shall be at Tenant cost.

7. Lighting:
Provide new recessed 2x4 direct/indirect Lightolier Alter Classic, or equal light fixtures with T8 lamps and electronic ballast in all areas in ceiling grid.

Provide new industrial lighting in specified open ceiling areas.

Each room and area shall be individually switched. Provide dual technology occupancy sensor switches at all private offices, storage rooms and conference rooms. provide ceiling mounted dual technology sensors to control open office lighting with wall switch over ride. Provide standard toggle switches at all other areas.

8. Power:
Provide dedicated 20A circuits for tenant's open office work stations. Allow 6 work stations per 20 A circuit. Power shall be brought down existing columns or via a "power pole."

Provide 2 duplex receptacles at each private office.

Provide 4 duplex receptacles at each conference room. One floor box for main conference room only.

9. HVAC:
Existing system diffusers and ductwork will be relocated, with new ductwork, diffusers, controls & equipment as required by new layouts. VAV and FPT count shall be approximately 1 per every 1,200 USF.

Existing baseboard hydronic heat to remain.

10. Plumbing:
Provide an ADA compliant stainless steel sink for one kitchen or breakroom.

Provide electric hot water heater in ceiling for one kitchen or breakroom.

Plumbing for appliances and water purification systems shall be at Tenant's cost.

11. Fire Protection:
Existing sprinkler system is to be modified as required by new layouts.

12. Life Safety:
Modify and add to existing emergency lighting (wall hung), exit signs, fire extinguishers and fire Alarm horn/strobe units as required by new layouts.

13. Misc:
Provide up to 10' linear plastic laminate clad base and wall cabinets and counter for one kitchen or breakroom.

Landlord will provide blocking and electric outlet box for main conference room.

Blinds will be repaired, cleaned or replaced as necessary.

14. Work not included:
Installation of telephone and computer wiring, tel/data outlets.

Supplemental HVAC system for any special room (e.g. server room).

Furnishings including desks, chairs and open office work stations, folding partition walls, and custom millwork.

Security equipment and systems.

Tenant Signage

Appliances

Projection screens or monitors

| Category | Description | Lessor Cost | Lessee Cost |
|---|---|---|---|
| | Insulation above ceiling | | X |
| | Drywall ceilings in offices, reception area, conference rooms | | X |
| Flooring | Provide carpet at all open office areas, private offices, and conference rooms, at a cost not to exceed $28 per square yard installed. | X | |
| | VCT in kitchen area, utility room(s) including storage, copy and IT rooms | X | |
| | Vinyl base | X | |
| | Wood base | | X |
| | Special Flooring | | X |
| Wall Finishes | Paint walls 2 coat latex eggshell | X | |
| | Paint doors and frames 2 coats latex semi-gloss | X | |
| | Paint soffits/ceilings | X | |
| | Wallcovering, specialty paint or other finish | | X |
| | Wood paneling | | X |
| Equipment/Specialties | Purchase and installation of projection screens | | X |
| | Purchase and installation of "white boards" | | X |
| | Purchase and installation of appliances | | X |
| | Fire extinguishers | X | |
| Misc. Metals | UPS/Structural Support | | X |
| Finish Carpentry | Cabinets and counters in kitchen | X | |
| | Reception desk | | X |
| | Adjustable wall shelving | | X |
| | All other millwork | | X |
| Doors/Frames | Building standard lessee entry | X | |
| | Hollow metal frame and 3'0" x 7'0" paint grade wooden-veneer doors | X | |
| | Welded metal frame | X | |
| | Stain grade doors | | X |
| | Interior glass doors | | X |
| | Glass sidelights | X | |
| Hardware | Passage leversets | X | |
| | Locking leversets, interior | | X |
| | Locking lever sets, lessee entry | X | |
| Drywall | Interior/office partitions to 6" above ceiling grid | X | |
| | Conference room partitions to deck above | X | |
| | Demising wall to underside of deck above | X | |
| | Drywall ceilings | | X |
| | Drywall soffits | | X |
| Acoustic Ceilings | Building standard Armstrong Cortega Second Look II 2'x4' ceiling tiles specialty rooms. | X | |

| Category | Description | Lessor Cost | Lessee Cost |
|---|---|:---:|:---:|
| Security | Keying of Lessee entries | X | |
| | Card access for tenant entry | | X |
| | Interior keying of space | | X |
| | CCTV | | X |
| Telecommunications | Furniture connections | | X |
| | Tele/Data/Furniture design | | X |
| | Hire telephone and data vendor and installation of all Tele/Data equipment | | X |
| | Cable TV | | X |
| Design Services | Architectural and engineering services for Lessor Scope by Lessor's architect | X | |
| Glass wall | Glass wall for main conference room only | X | |
| Plumbing | Supply or re-use and relocate stainless steel single-bowl sink in one kitchen or breakroom | X | |
| | Interior Lessee signage/Logo | | X |
| | Appliances | | X |
| | Folding Partition Walls | | X |
| Fire Protection | Sprinkler loop | X | |
| | Pre-Action System | | X |
| | Relocating and adding sprinkler heads | X | |
| Electrical | Recessed office and open area lighting | X | |
| | Accent lighting | | X |
| | One light switch per room/2 per conference room | X | |
| | Emergency and exit lighting | X | |
| | Standard fire alarm devices | X | |
| | Two duplex receptacles per office | X | |
| | Four duplex receptacles in conference room(s) | X | |
| | One quad receptacle in kitchenette data closet and copy room | X | |
| | One GFI receptacle in kitchenette | X | |
| | Dedicated outlets for printers and copiers. | X | |
| | Furniture connections (whip) | X | |
| HVAC | Re-use, relocate existing ductwork and diffusers. | X | |
| | Install additional ductwork/distribution, VAVs and FPTs as appropriate for the new layout. 1 per 1,200 USF | X | |
| | Provide independent units for server or | | X |

Schedule 2

Preliminary Landlord's Work Schedule

- 05/08/15 iRobot finalizes and delivers Fit Plan.

- 05/13/15 Landlord reasonable approval due

- 05/15/15 iRobot and Landlord identify all finishes and long lead items

- 06/17/15 Landlord delivers Construction Documents. Landlord to solicit bids from list of approved GC's

- 07/03/15 Bids due from GC's. Landlord to apply for building permit during bid process

- 07/10/15 iRobot authorization to proceed

- 07/17/15 Building Permit from Town of Bedford

- 07/24/15 Construction Start Date

- 10/23/15 Substantial Completion

- 11/01/15 Additional Space Commencement

## FOURTH AMENDMENT TO LEASE

**THIS FOURTH AMENDMENT TO LEASE** (this "**Amendment**") is entered into as of October 23, 2015, by and between **DIV BEDFORD, LLC**, a Massachusetts limited partnership ("**Landlord**"), and **IROBOT CORPORATION**, a Delaware corporation ("**Tenant**").

## R E C I T A L S:

A. Landlord and Tenant are parties to that certain Lease dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease dated September 16, 2010, as further amended by a Second Amendment to Lease dated as of May 20, 2014, as further amended by a Third Amendment to Lease (the "Third Amendment") dated as of April 10, 2015 (as amended, the "**Lease**") for certain premises within the complex ("**Complex**") known as XChange at Bedford (formerly known as Bedford Business Park), Bedford, Massachusetts.

B. Pursuant to the Third Amendment, Tenant agreed to expand the Premises to include an additional 19,555 rentable square feet on the first floor of Building B (aka 6 Crosby Drive) (the "**Additional Building B Space**")

C. Tenant has agreed to memorialize the Additional Space Commencement Date (as defined in the Third Amendment) in consideration for Landlord' granting Tenant additional time to finalize the plans for the construction of Tenant's initial improvements in such space.

D. Landlord and Tenant desire to amend the Lease as set forth below.

## A G R EE M E N T:

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree to amend the Lease as follows:

1. **Additional Space Commencement Date**. The definition of "Additional Space Commencement Date", set forth in Section 1 of the Third Amendment, is hereby amended and restated in its entirety to mean November 1, 2015, regardless of when the Landlord Substantially Completes the Landlord Work. Nothing in this Section 1, however, shall relieve Landlord of its obligation to Substantially Complete the Landlord's Work. Section 2 of the Third Amendment is hereby modified to provide that Landlord shall delivery possession of the Additional Building B Space to Tenant on the date that Landlord Substantially Completes the Landlord Work.

2. **Work Letter**.

(a) For purposes of the Work Letter attached to the Third Amendment, all references to the "Target Delivery Date" are hereby deleted.

(b) Tenant shall submit all requisitions for Allowance Costs on or before June 30, 2017. Following June 30, 2017, Landlord shall have no further obligation to provide the Allowance to the extent that Tenant has not previously submitted requisitions for the same.

(c) Schedule 2 to the Work Letter is hereby replaced with the revised Schedule 2, attached.

3. **Miscellaneous**.  Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written. In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control. All terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease. The Recitals set forth above in this Amendment are hereby incorporated by this reference. This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting the matters set forth in this Amendment and this Amendment constitutes the parties' entire agreement with respect to the leasing of the Additional Building B Space and supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto or with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Amendment.

4. **Counterparts**.  This Amendment may be executed in any number of counterparts and by each of the undersigned on separate counterparts, which counterparts taken together shall constitute one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the day and year first written above.

**LANDLORD:**

**DIV Bedford, LLC,** a Massachusetts limited liability company

    By: Bedford Manager Corp., a Massachusetts Corporation

    By: /s/ Richard McCready
    Name: Richard McCready
    Title: President

**TENANT.**

**iRobot Corporation.,** a Delaware corporation

    By: /s/ Alison Dean
    Name: Alison Dean
    Title: CFO

    By: /s/ Paul Tavalone
    Name: Paul Tavalone
    Title: VP, Assistant Treasurer

Schedule 2

None

## FIFTH AMENDMENT TO LEASE

**THIS FIFTH AMENDMENT TO LEASE** (this "**Amendment**") is entered into as of May 4, 2016, by and between **DIV BEDFORD, LLC**, a Massachusetts limited liability company ("**Landlord**"), and  **IROBOT CORPORATION**,  a Delaware corporation ("**Tenant**").

### R E C I T A L S:

A. Landlord and Tenant are parties to that certain Lease dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease dated September 16, 2010, as further amended by a Second Amendment to Lease dated as of May 20, 2014, as further amended by a Third Amendment to Lease dated as of April 10, 2015, and as further amended by that certain Fourth Amendment to Lease dated as of October 23, 2015 (as amended, the "**Lease**") for certain premises containing 203,041 rentable square feet located within the complex ("**Complex**") known as XChange at Bedford (formerly known as Bedford Business Park), Bedford, Massachusetts (the "**Premises**").

B. Landlord and Tenant desire to enter into this Amendment to, among other things, set forth certain design and construction approvals and obligations in connection with Landlord's redevelopment of a surface parking lot in an area proximate to the Premises.

### A G R EE M EN T:

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree to amend the Lease as follows:

1. **Defined Terms; Recitals**. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Lease. The term "**Lease**" as used herein and in the Lease shall mean and refer to the original Lease, as amended. The recitals set forth above are incorporated into and made a part of this Amendment.

2. **Land Recreation Area B**. Exhibit I-2 (Land Recreation Area B) attached to the Lease is hereby removed and Exhibit I-2 (Land Recreation Area B) attached to this Amendment is substituted therefor. All references in the Lease to Land Recreation Area B shall mean the area depicted on Exhibit I-2 attached to this Amendment.

3. **Privacy Fence**.  In connection with Landlord's development of the surface parking lot set forth on Exhibit 1 attached hereto, Landlord shall at its expense have the obligation to install a fence between the surface parking lot and Land Recreation Area B in the area depicted on Exhibit 1.  Such fence shall be approximately six (6) feet in height above grade and consist of fencing or other screening materials of a type and quality as selected by Landlord. Landlord must provide visual screening materials on the fence equivalent to the existing screening material or a better quality but similar opaqueness, all in its sole discretion. Landlord shall complete or cause the completion of the privacy fence in a good and workmanlike manner.

4. **HDPE Conduit Approval**.  Tenant hereby consents and agrees to Landlord's installation of a twelve (12) inch high-density polyethylene pipe in the area depicted on Exhibit 2 attached hereto (the "**HDPE Pipe**"). Landlord shall have access upon reasonable prior notice to Tenant to enter onto Land Recreation Area B to perform the work necessary to install the HDPE Pipe. Upon completion of the installation of the HDPE Pipe, Landlord shall restore the area disturbed by the installation to substantially the same condition as existed prior to the HDPE Pipe installation.

5. **Tenant's Fence Around Land Recreation Area B**. Landlord and Tenant shall work cooperatively in the modification of the privacy screening along Land Recreation Area B in the area adjacent to Crosby Road and Route 3. The privacy screening should be visual screening material consistent with that required in Section 3. Such privacy screening shall consist of fencing or other screening materials of a type and quality as selected by Landlord, in its sole discretion. Landlord shall be responsible for the cost of the materials and labor for the installation of the privacy screening; provided, however, upon the completion of the fence upgrades, any further installation of additional screening shall be subject to Landlord's prior written approval and at Tenant's sole cost and expense. Landlord shall have the right at its sole discretion and at its sole cost and expense to install images, signage, branding or messaging on fencing surrounding the Land Recreation Area B. The images or signage on the screening should (a) only be on the outside of the fence and (b) be on portions of the screening that do not face areas leased to Tenant.

6. **Bathroom Renovation**.  Landlord has agreed to make certain renovations to the bathrooms located within the Premises, at Landlord's sole cost and expense, as more specifically set forth in Exhibit 3 attached thereto (the "**Bathroom Renovations**").  All finishes and product selections for the Bathroom Renovations shall be similar in quality to the existing bathroom at 16-1 café, as determined by Landlord, in its sole discretion. Landlord complete the Bathroom Renovations in a good and workmanlike manner and shall endeavor to substantially complete the Bathroom Renovations by November 1, 2016, subject to force majeure, delays caused by Tenant or delays outside of Landlord's reasonable control. Since Tenant is currently a Tenant at the Premises, Tenant may remain in the Premises and continue operating its business during the Bathroom Renovations. Landlord and Tenant shall coordinate Landlord's completion of the Bathroom Renovations in order to facilitate the timely completion of the same while minimizing the impact on Tenant's business operations to the extent reasonably possible, including agreeing upon a construction schedule for the Bathroom Renovations (which may change from time to time); provided, however, in the event Landlord is required to perform work after normal business hours or on weekends or incur overtime charges from its contractors based on scheduling requests from Tenant, Tenant shall be responsible for all costs and expenses in connection therewith. In connection with Landlord's performance of the Bathroom Renovations, Tenant and its employees, invitees, guests, licensees, agents, contractors and suppliers must: (i) comply with all terms, covenants, conditions and provisions of the Lease; and (ii) work in harmony with Landlord and its employees, agents, contractors and suppliers in the performance of the Bathroom Renovations by Landlord. Tenant further agrees that Landlord shall not be liable in any way for injury, loss or damage which may occur to any of Tenant's work or installations made in such Premises, or to any personal property placed therein, except if such is directly caused by Landlord's and Landlord's contractors' gross negligence or willful misconduct.

7. **Brokers**.  Landlord and Tenant each agree to defend, indemnify and hold the other harmless from and against all claims by any other broker for fees, commissions or other compensation to the extent such broker alleges to have been retained by the indemnifying party in connection with the execution of this Amendment.  The provisions of this paragraph shall survive the expiration or sooner termination of the Lease.

8. **Miscellaneous**.  Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written.  In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control.  All terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease.  The Recitals set forth above in this Amendment are hereby incorporated by this reference.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting the matters set forth in this Amendment and this Amendment constitutes the parties' entire agreement with respect to the subject matter thereof, and no previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto or with respect to shall be used to interpret or construe this Amendment.

9. **Counterparts**.  This Amendment may be executed in any number of counterparts and by each of the undersigned on separate counterparts, which counterparts taken together shall constitute one and the same instrument. The parties agree that this Amendment may be transmitted between them by facsimile machine or electronic mail and the parties intend that a faxed or emailed Amendment containing either the original and/or copies of the signature of all parties shall constitute a binding Amendment.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the undersigned have executed this Amendment as of the day and year first above written.

**LANDLORD:**

DIV BEDFORD, LLC, a Massachusetts limited liability company

By: Bedford Manager Corp., a Massachusetts corporation

By: /s/ Richard McCready
Name: Richard McCready
Title: President

**TENANT:**

IROBOT CORPORATION,
a Delaware corporation

By: /s/ Alison Dean
Name: Alison Dean
Title: CFO

**ACKNOWLEDGED AND AGREED SOLELY WITH RESPECT TO SECTION 2:**

**LICENSEE:**

iRobot Defense Holdings, Inc.,
a Delaware corporation

By:_____
Name:
Title:

**Exhibit I-2**

**Land Recreation Area B**



**EXHIBIT 1**

**LOCATION OF PRIVACY FENCE RESTORATION**



**EXHIBIT 2**

**HDPE PIPE INSTALLATION AREA**



**EXHIBIT 3**

**BATHROOM RENOVATION**

**iRobot Bathroom Renovation Scope**

10-2 (men's and women's)
New vanity and sinks
New ceiling tiles
New 2'X4' light fixtures (direct/indirect building standard)
New paint (including partitions)
New wall tile to existing height (5'+/-)
Add HD coating or similar product to existing floor tile

10-2 Mother's Room
Bring demising wall to ceiling
Add sprinkler head per code
New paint
New VCT at vestibule
New 2'X2' light fixtures (direct/indirect building standard)

10-2 Handicap Bathrooms (men's and women's)
Add exhaust fan or other solution

12-2 (men's and women's)
New vanity and sinks
New 2'X2' light fixtures (direct/indirect building standard)
New paint (including partitions and ceiling)
New wall tile to lower height (5'+/-)
Add HD coating or similar product to existing floor tile

Existing to remain:
Floor and base tile
Mirrors
Hands-free faucets
All specialties
All partitions

**All finishes and product selections shall be similar in quality to the existing bathroom at 16-1 café**

EAST\141300457.11

**EXECUTION**

## SIXTH AMENDMENT TO LEASE

**THIS SIXTH AMENDMENT TO LEASE** (this "**Sixth Amendment**") is entered into as of July 5, 2017 (the "**Effective Date**"), by and between **DIV BEDFORD, LLC**, a Massachusetts limited liability company ("**Landlord**"), and **IROBOT CORPORATION**, a Delaware corporation ("**Tenant**").

**R E C I T A L S**:

A. Landlord and Tenant are parties to that certain Lease (the "**Original Lease**") dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease dated September 16, 2010, as further amended by a certain Declaration dated June 16, 2011, as further amended by a Second Amendment to Lease dated as of May 20, 2014, as further amended by a certain letter dated October 8, 2014, as further amended by a Third Amendment to Lease (the "**Third Amendment**") dated as of April 10, 2015, as further amended by a Fourth Amendment to Lease dated as of October 23, 2015, as further amended by a Fifth Amendment to Lease dated as of May 4, 2016 (as amended, the "**Lease**") for certain premises (the "**Existing Premises**") consisting of approximately 203,041 rentable square feet of space located within the Complex (as defined in the Lease) and now known as XChange at Bedford (formerly known as Bedford Business Park) in Bedford Massachusetts. The Site is described in Exhibit A hereto and the Complex is depicted on Exhibit A-1 attached hereto.

B. Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord an additional 5,645 rentable square feet of space (the "**Sixth Amendment Additional Premises**") located on the second floor of Building 4 at the Complex (also known as 4 Crosby Drive and formerly known as Building A), which space is shown on Exhibit B attached hereto.

C. The Term is currently scheduled to expire on April 30, 2020. Landlord and Tenant have also agreed, among other things, to extend the Term of the Lease, and provide for certain improvements to the Premises.

D. Pursuant to Section 2.1 of the Lease, the numerical/alphabetical address system for the Complex has been modified and the Buildings and the Additional Buildings are now referred to as follows: (i) Building A is now known as Building 4 and 4 Crosby Drive; (ii) Building B is now known as Building 6 and 6 Crosby Drive; (iii) Building C is now known as Building 8 and 8 Crosby Drive; (iv) Building D is now known as Building 10 and 10 Crosby Drive; (v) Building E is now known as Building 12 and 12 Crosby Drive; (vi) Building F is now known as Building 14 and 14 Crosby Drive; (vii) Building G is now known as Building 16 and 16 Crosby Drive; and (viii) and Building H is now known as Building 18 and 18 Crosby Drive.

E. Landlord and Tenant therefore desire to enter into this Sixth Amendment to set forth the terms and conditions for the leasing of the Sixth Amendment Additional Premises, the extension of the Term, and to amend the Lease as hereinafter set forth.

**A G R E E M E N T**:

NOW, **THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree to amend the Lease as follows:

1. **Expansion of Premises**.

(a)  Effective as of the Sixth Amendment Additional Premises Commencement Date (as hereinafter defined), the Sixth Amendment Additional Premises shall be added to the Existing Premises so that the Premises shall include the Existing Premises and the Sixth Amendment Additional Premises upon all of the terms and conditions of the Lease except as modified herein. The lease of the Sixth Amendment Additional Premises shall terminate on the Lease Expiration Date (as defined herein), unless extended or sooner terminated as provided in the Lease. As used herein, the term "**Sixth Amendment Additional Premises Commencement Date**" shall mean the Effective Date. As of the Sixth Amendment Additional Premises Commencement Date, the Sixth Amendment Additional Premises have been delivered to Tenant, and Tenant has accepted the Sixth Amendment Additional Premises in their as-is condition.

(b) From and after the Sixth Amendment Additional Premises Commencement Date, Building 4 shall be deemed to be a "Building" and one of the "Buildings" as defined in Section 1.1 of the Lease (including, without limitation, for purposes of Section 5.17 of the Lease) and Tenant shall have, as appurtenant to the Premises, the non-exclusive right to use in common with others any Common Areas (as defined in the Lease) located in or necessary for access to Building 4.

(c)  From and after the Sixth Amendment Additional Premises Commencement Date, the "Rentable Floor Area of the Premises" as used in the Lease shall mean 208,686 square feet, being the sum of (i) the Rentable Floor Area of the Existing Premises containing 203,041 rentable square feet, and (ii) the Rentable Floor Area of the Sixth Amendment Additional Premises containing 5,645 rentable square feet.

2. Fixed Rent and Additional Rent for Early Rent Commencement of Sixth Amendment Additional Premises. With respect to the Sixth Amendment Additional Premises, Tenant shall pay Fixed Rent and Additional Rent beginning on the date (the "**Sixth Amendment Additional Premises Rent Commencement Date**") which is the earlier of (a) the date on which a certificate of occupancy is issued for the Sixth Amendment Additional Premises following substantial completion of the Sixth Amendment Tenant Alterations (defined in Exhibit D hereto) and (b) January 1, 2018.  If the Sixth Amendment Additional Premises Rent Commencement Date occurs prior to January 1, 2018, Rent shall be due for the Sixth Amendment Additional Premises as follows. Annual Fixed Rent shall be $95,965.00, payable in monthly installments of $7,997.00 per month.  Tenant shall pay Operating Expenses Allocable to the Sixth Amendment Additional Premises and Landlord's Tax Expenses Allocable to the Sixth Amendment Additional Premises as Additional Rent, in accordance with the terms of the Original Lease without regard to any base year (i.e., net of Tenant's share of Operating Expense and Taxes).  Annual Fixed Rent and Additional Rent for any partial month for which Rent is due shall be paid at the rates set forth above on a pro rata basis.

3. **Landlord's Work**.  Landlord shall perform the work described in Exhibit C attached hereto (the "**Landlord Work Letter**"). Tenant acknowledges that (a) it is fully familiar with the

condition of the Premises and agrees to take the same in its condition "as is" as of the First Extension Term Commencement Date (as hereinafter defined) and (b) Landlord shall have no obligation to alter, repair or otherwise prepare the Premises for Tenant's occupancy or to pay for or construct any improvements to the Premises to prepare the same for Tenant's occupancy during the First Extension Term, except as set forth in the Landlord Work Letter and subject to Landlord's express obligations under the Lease.

4. **Tenant's Work**. If Tenant elects to perform the Sixth Amendment Tenant Alterations, such alterations shall be performed in accordance with the terms of Exhibit D. For ease of reference, Exhibit D includes the definition of "**Sixth Amendment Tenant Alterations**" and sets forth the "**Sixth Amendment Construction Allowance**."

5. **First Extension Term**. Notwithstanding anything to the contrary contained in the Lease, the Term of the Lease for the Premises (as the same is expanded by this Sixth Amendment to include the Sixth Amendment Additional Premises) is hereby extended for an additional ten (10) years (the "**First Extension Term**") commencing on May 1, 2020 and expiring on April 30, 2030 (the "**Lease Expiration Date**"), unless extended as provided in Section 7 of this Sixth Amendment or sooner terminated in accordance with the terms of the Lease.

6. **Rent**.

(a) Annual Fixed Rent. From and after January 1, 2018, the Annual Fixed Rent for the Premises shall be as follows:

| Calendar Year | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| 2018 | $17.00 | $3,547,662.00 | $295,638.50 |
| 2019 | $17.51 | $3,654,091.86 | $304,507.66 |
| 2020 | $18.04 | $3,763,714.62 | $313,642.88 |
| 2021 | $18.58 | $3,876,626.05 | $323,052.17 |
| 2022 | $19.13 | $3,992,924.84 | $332,743.74 |
| 2023 | $19.71 | $4,112,712.58 | $342,726.05 |
| 2024 | $20.30 | $4,236,093.96 | $353,007.83 |
| 2025 | $20.91 | $4,363,176.78 | $363,598.06 |
| 2026 | $21.54 | $4,494,072.08 | $374,506.01 |
| 2027 | $22.18 | $4,628,894.24 | $385,741.19 |
| 2028 | $22.85 | $4,767,761.07 | $397,313.42 |
| 2029 | $23.53 | $4,910,793.90 | $409,232.83 |
| 2030 | $24.24 | $5,058,117.72 | $421,509.81 |

(b) Additional Rent. Effective as of January 1, 2018, notwithstanding anything to the contrary contained in the Lease (including Section 3 of the Third Amendment), Tenant shall pay Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises in accordance with the terms of the Original Lease without regard to any base year.

(c) Annual Fixed Rent and Additional Rent for Existing Premises. Prior to January 1, 2018, Tenant shall continue to pay Annual Fixed Rent and Additional Rent with respect to the Existing Premises in accordance with the terms of the Lease and without regard to the terms of this Sixth Amendment.

(d) Electricity. During the remainder of the Original Term and during the First Extension Term, Tenant shall continue to pay all charges for electricity consumed in the Existing Premises in accordance with the terms of the Lease, as heretofore amended. Landlord has installed and rendered operational a check meter to measure electricity usage solely in the Sixth Amendment Additional Premises. Beginning on the Sixth Amendment Additional Premises Commencement Date and

continuing through the expiration or earlier termination of the Term (as it may have been extended), Tenant shall pay all charges for electricity consumed in the Sixth Amendment Additional Premises based upon the check meter readings for the Sixth Amendment Additional Premises at the actual rates charged by the utility provider, without any markup by Landlord of such utility rates. Notwithstanding the foregoing, if any check meter for measuring Tenant's electricity usage malfunctions or is otherwise not operating properly (other than due to a Landlord default), Landlord may charge Tenant for electricity consumed in the applicable portion of the Premises during the period of malfunction (plus a period of ten (10) days after being made aware of such malfunction) based on reasonable industry-standard methods to reasonably estimate use and Tenant's past usage. At Landlord's option and at Landlord's sole expense, Landlord may install direct meters for measuring Tenant's consumption of electricity in any area of the Premises which is not directly metered, and, in such event, Tenant shall thereafter pay all costs and expenses for such separately-metered electricity directly to the utility provider. The costs of electricity supplied to other leasable areas of Building 4 shall be excluded from Landlord's Operating Expenses.

7. **Extension Option**.

(a) Right to Extend. On the conditions (which conditions Landlord may waive by written notice to Tenant) that both at the time of exercise of the Sixth Amendment Extension Option (as hereinafter defined) and as of the commencement of the Second Extension Term (as hereinafter defined) (i) there exists no monetary or other material Event of Default ("Event of Default" being defined in Section 7.1 of the Original Lease), and (ii) the Lease is still in full force and effect, Landlord grants Tenant the option (the "**Sixth Amendment Extension Option**") to extend the Term of the Lease with respect to the entire Premises for one (1) additional period of ten (10) years (the "**Second Extension Term**") subject to each and all of the terms and conditions set forth in this Section 7. All other extension options under the Lease (including Section 8.20 of the Original Lease and Section 4 of the Third Amendment) are hereby extinguished, and no option to extend the term of the Lease exists except as set forth in this Section 7.

i. Effect of Assignment or Sublease. The Sixth Amendment Extension Option may not be exercised by, assigned or otherwise transferred to any person or entity voluntarily or involuntarily, except the Tenant named in the Lease (or a Successor Entity that succeeds to the interest of Tenant by assignment in accordance with Section 5.6 of the Original Lease). The parties hereto agree that if Tenant assigns any of its interest in the Lease or subleases more than 50% of the rentable square area of the Premises to any person or persons, in the aggregate, for all or substantially all of the remaining Term (meaning that less than twenty-one (21) months will remain in the then-Term of this Lease when the sublease expires) other than pursuant to a Successor Entity (as that term is defined in the Original Lease), this Sixth Amendment Extension Option shall terminate immediately without the need for any act or notice by either party to be effective.

ii. Manner of Notice. In order to exercise the Sixth Amendment Extension Option, Tenant shall deliver to Landlord written notice (the "**Extension Notice**") of the exercise of the Sixth Amendment Extension Option not later than July 31, 2028 and not sooner than April 30, 2028, time being of the essence. If an Extension Notice is not so delivered, Tenant's Sixth Amendment Extension Option shall automatically expire. The giving of an Extension Notice shall be deemed to be a binding exercise of Tenant's extension option, subject only to the right to rescind the same as expressly provided below.

iii. Effect of Default. Tenant's right to exercise the Sixth Amendment Extension Option shall be suspended at the election of Landlord during any period in which a monetary or other material Event of Default has occurred and is continuing, but the period of time within which

the Sixth Amendment Extension Option may be exercised shall not be extended. Notwithstanding Tenant's due and timely exercise of the Sixth Amendment Extension Option, if, after such exercise and prior to the effective date of the Second Extension Term a monetary or other material Event of Default occurs under this Lease that is not cured within the applicable grace period, if any, and Landlord terminates this Lease, then Tenant's exercise of the Sixth Amendment Extension Option shall be of no force and effect and its rights hereunder shall terminate.

 iv. Rent. The Annual Fixed Rent for the Second Extension Term shall be equal to the then-prevailing fair market fixed annual rental rate (such prevailing fair market rental rate, the "**Market Rent**") for the Premises on an "as is" basis, taking into account market increases during the Term and all other market concessions for tenant renewals in comparable office and R&D complexes as well as quality of office and R&D complex product with comparable amenities to the Complex in the Route 128 North Submarket and all other then relevant factors. During the Second Extension Term, the Additional Rent for the Premises shall continue to be payable as provided in the Lease and all of the terms, conditions and covenants of the Lease shall apply.

(b) Market Rent Notice. If Tenant properly exercises its Sixth Amendment Extension Option, Landlord shall provide Tenant with written notice (the "**Market Rent Notice**") of the Landlord's good faith determination of the Market Rent for the entire Second Extension Term within fifteen (15) business days of Landlord's receipt of the Extension Notice. Tenant shall respond in writing to Landlord's Market Rent Notice within thirty (30) days following the Market Rent Notice (the "**Tenant Response Period**") stating that (a) Tenant agrees with the Market Rent determined by Landlord, (b) Tenant elects to rescind its Extension Notice (in which case Tenant's rights under this Section 7 shall terminate and be of no further force and effect), or (c) Tenant elects to dispute Landlord's determination of Market Rent pursuant to Section 7(c), below. If the parties agree on the Base Rent for the Second Extension Term during the Tenant Response Period or Tenant gives the notice described in clause (a) of the immediately preceding sentence, Landlord and Tenant shall exercise reasonable efforts to execute an amendment to the Lease within twenty (20) business days following Landlord's submission of a proposed amendment to Tenant and stating the Second Extension Term, the Base Rent and any related terms and conditions. Notwithstanding the foregoing, failure to execute such an amendment shall not impact the binding nature of Tenant's exercise of the Sixth Amendment Extension Option. If Tenant gives the notice described in clause (c) of this Section 7(b), above, then the Market Rent shall be determined in accordance with Section 7(c).

(c) Dispute. If the determination of Market Rent is to be made pursuant to this Section 7(c), then the Market Rent shall be determined by arbitration as set forth below in order to establish the Base Rent for the Second Extension Term and Landlord and Tenant shall be bound by the results of the arbitration. Notwithstanding the submission of the issue of Market Rent to arbitration, if such Base Rent has not been established pursuant to Section 7(d) below prior to the commencement of the Second Extension Term, Base Rent for the next ensuing Lease Year of the Term shall be paid at the Base Rent established by Landlord in its Market Rent Notice until the arbitration is completed. If, upon completion of the arbitration, it is determined that Market Rent is less or more than that set by Landlord, then an adjustment based upon such lower or greater rent shall be made based on the number of months therefor paid by Tenant. In no event shall the extension of the Term be affected by the determination of the Base Rent, such exercise of the Sixth Amendment Extension Option being fixed at the time at which Tenant delivers the Extension Notice, subject only to Tenant's rescission right under Section 7(b) above.

(d) Arbitration. When the terms of this Sixth Amendment provide that Market Rent shall be determined by arbitration, the following arbitration procedures shall apply:

i. <u>Selection of Arbitrators</u>. Within five (5) business days following the end of the Tenant Response Period, each of Tenant and Landlord shall choose a licensed commercial real estate broker who has at least twelve (12) years' full-time experience in commercial leasing in the Route 128 North submarket and shall notify the other party in writing of its selection. If a party does not appoint an arbitrator within such five (5) business day period and such failure is not cured within five (5) business days following a written request for such appointment by the other party, then the single broker appointed shall be the sole arbitrator and shall establish the Market Rent for the Extension Term;

ii. <u>Selection of Third Arbitrator</u>. If the two (2) arbitrators are appointed by the parties as stated above, they shall meet within five (5) business days following their appointment in accordance with <u>Subsection 7(d)(i)</u> above, and the arbitrators selected shall select a third arbitrator meeting the qualifications as set forth in <u>Subsection 7(d)(i)</u> above; if the two (2) arbitrators fail to select the third arbitrator within such time period, such third arbitrator shall be appointed by the President of the Greater Boston Real Estate Board or, if it ceases to exist, a similar organization reasonably selected by Landlord. The third arbitrator, however selected, shall be a person who has not previously acted in any capacity for either party;

iii. <u>Decision by Arbitrators</u>. Within fifteen (15) business days after their appointment, the three (3) arbitrators selected pursuant to the terms hereof shall determine the Market Rent for the Premises for the Second Extension Term, and shall notify Tenant and Landlord of such determination within three (3) days thereafter, which determination shall be final and binding upon Tenant and Landlord. If the arbitrators are unable to agree upon the Market Rent, the Market Rent will be deemed to be the average of the Market Rents proposed by the arbitrators, except that (i) if the lowest proposed Market Rent is less than ninety percent (90%) of the second to lowest proposed Market Rent, the lowest proposed Market Rent will automatically be deemed to be ninety percent (90%) of the second to lowest proposed Market Rent and (ii) if the highest proposed Market Rent is greater than one hundred ten percent (110%) of the second to highest proposed Market Rent, the highest proposed Market Rent will automatically be deemed to be one hundred ten percent (110%) of the second to highest proposed Market Rent;

iv. <u>Allocation of Expenses</u>. Landlord and Tenant shall each pay one-half (1/2) of the expense of the third arbitrator's fees and each shall pay 100% of the fees of the arbitrator appointed by each respective party.

v. <u>Guidelines for Arbitration</u>. For the avoidance of doubt, for the purpose of determining Market Rent pursuant to arbitration, the parties shall use the definition of Market Rent set forth in Section 7(a)(iv).

8. **Expansion Rights in Buildings 4, 16 and 18**.

Section 8.28 of the Original Lease is hereby amended and restated in its entirety as follows:

**Section 8.28. Right of First Offer**

(A) On the conditions (which conditions Landlord may waive by written notice to Tenant at any time), that as of both the time that any portion of the RFO Premises (as hereinafter defined) becomes available for reletting (as hereinafter defined) and as of the commencement date of Tenant's leasing of such portion of the RFO Premises: (i) Tenant directly leases from Landlord at least 100,000 square feet of rentable floor area, (ii) no monetary or other material Event of Default of Tenant exists and there have been no more than two (2) monetary or other material Event of Default occurrences during the Lease Term, (iii) the Lease is still in full force and effect, and (iv) Tenant has neither assigned the Lease nor sublet more than fifty percent (50%) of the Total Rentable Floor Area of the Buildings (except for an assignment or sublease under Section 5.6.1 of the Lease or an occupancy permitted pursuant to Section 5.6.6 of the Lease),

Tenant shall have a right of first offer ("**Right of First Offer**") to lease the RFO Premises, as hereinafter defined.

For the purposes hereof, the "**RFO Premises**" shall be defined as any and all space in Building 4 (also known as 4 Crosby Drive), Building 16 (also known as 16 Crosby Drive), and Building 18 (also known as 18 Crosby Drive) of the Complex as and when such space becomes available for reletting (as hereinafter defined).

(B) When any portion of the RFO Premises becomes available for reletting (as hereinafter defined), Landlord shall notify Tenant ("**Landlord's RFO Premises Notice**") of the availability of such space, which notice shall contain the size, configuration, location and date of availability of such portion of the RFO Premises, the Annual Market Rent, and the other business terms upon which Landlord is willing to so lease such space. The "net effective rental rate" set forth in Landlord's RFO Premises Notice shall mean and be expressed in terms of (i) the Annual Market Rent for the applicable portion of the RFO Premises quoted by Landlord, (ii) the triple-net basis of this Lease for Operating Expenses and Taxes, (iii) the free rent or "build-out" period, if any, after the commencement of the lease term, (iv) the tenant improvement allowance, if any, and (v) the length of the lease term, which shall hereinafter be referred to as "**Landlord's Offered Rental Terms**."

For the purposes hereof:

(1) The "**Annual Market Rent**" shall be the annual fair market rent for the applicable portion of the RFO Premises as of the date when the same becomes available for reletting, based upon the use of such space as first class office/research and development space utilizing properties of similar character within the Boston Northwest Suburban Market and based on the Market Rate (as defined in Section 7 above of this Sixth Amendment) for such portion of the RFO Premises.

(2) A portion of the RFO Premises shall be deemed "**available for reletting**" when Landlord, in its sole judgment, determines that the then current tenant of such portion of the RFO Premises will vacate the applicable portion of the RFO Premises at the expiration or earlier termination of such tenant's lease, provided that with respect to 4 Crosby Drive and 18 Crosby Drive the applicable portion of the RFO Premises shall also be deemed to be "available for lease" when the then-current tenant's right to extend or renew, if any, contained within its lease expires in accordance with the terms of the applicable lease agreement without having been exercised or such right otherwise has been waived in writing by such tenant.

In connection with the foregoing, it is understood and agreed that Tenant's rights under this Section 8 shall be subject and subordinate to the rights of the existing tenants in 4 Crosby Drive, 16 Crosby Drive and 18 Crosby Drive as of the date of this Sixth Amendment (the "**Existing Tenants**") as set forth on Exhibit O attached to the Sixth Amendment (the terms of any leases with the Existing Tenants, including, but not limited to, the original terms thereof and options to extend the terms thereof contained in lease documents executed prior to the date hereof are hereinafter individually and collectively called the "**Existing Leases**").

(C) If Tenant wishes to exercise Tenant's Right of First Offer, Tenant shall do so, if at all, by giving Landlord notice ("**Tenant's RFO Exercise Notice**") within five (5) business days after receipt of Landlord's RFO Premises Notice, time being of the essence, of Tenant's desire to lease all (but not less than all) of the space designated in Landlord's RFO Premises Notice. Tenant shall, in Tenant's RFO Exercise Notice, specify whether it shall be leasing the applicable

portion of the RFO Premises for (1) the lease term specified in Landlord's RFO Premises Notice or (2) a lease term that is coterminous with the Term of the Lease with respect to the Existing Premises (it being understood and agreed that if less than sixty (60) months then remain in the Lease Term at the time Tenant delivers the Tenant's RFO Exercise Notice electing to lease the applicable portion of the RFO Premises for a term to be coterminous with the Lease Term with respect to the Existing Premises and if such period is shorter than the lease term offered in Landlord's RFO Premises Notice, Tenant must simultaneously exercise its extension option under Section 7 of this Sixth Amendment with its exercise of its rights under this Section 8 and if no such extension option is then available to Tenant then the term with respect to the applicable portion of the RFO Premises shall automatically be as specified in Landlord's RFO Premises Notice) (the lease term as determined under subsection (1) or (2) being hereinafter referred to as the "**Designated RFO Lease Term**").

If Tenant shall give a Tenant's RFO Exercise Notice the same shall constitute an agreement to enter into an instrument in writing to lease the portion of the RFO Premises identified in Landlord's RFO Premises Notice and Landlord and Tenant will exercise reasonable efforts to enter into an amendment to the Lease memorializing the expansion of the Premises within thirty (30) days after receipt of a first draft of such amendment from Landlord adding the applicable portion of the RFO Premises to the Premises upon all of the same terms and conditions in this Lease, except to the extent inconsistent with the provisions of this Section 8 and except that (x) the Annual Fixed Rent shall be equal to the Annual Market Rent as quoted by Landlord, (y) the lease term with respect to the applicable portion of the RFO Premises shall be the Designated RFO Lease Term, and (z) the lease amendment shall also reflect such other business terms as were set forth in Landlord's RFO Premises Notice. For the avoidance of doubt, Tenant's RFO Exercise Notice shall be binding regardless of whether the written instrument contemplated in the previous sentence is executed.

(D) If Tenant shall not timely exercise its rights under this Section 8 within such period, time being of the essence in respect to such exercise, Landlord shall be free to lease such portion of the RFO Premises for two hundred seventy (270) days after the date of Landlord's RFO Premises Notice for a net effective rental rate which is not less than 90% of Landlord's Offered Rental Terms contained in Landlord's RFO Premises Notice without again offering such space to Tenant for lease; provided, however, that (i) Landlord shall reoffer the applicable RFO Premises to Tenant in accordance with the terms and provisions of this Section 8 if (a) Landlord does not so lease such space during such two hundred seventy (270) day period, or (b) if Landlord proposes to lease such space in larger or smaller increments, or (c) if Landlord proposes to lease such space during such two hundred seventy (270) day period for a net effective rental rate which is less than 90% of Landlord's Offered Rental Terms contained in Landlord's RFO Premises Notice, and (ii) the terms of this Section 8 shall continue to apply to the remainder of the RFO Premises, if any, not included in Landlord's RFO Premises Notice and to RFO Premises included in Landlord's RFO Premises Notice and not leased by Tenant which is subsequently leased to another tenant in accordance with this Section 8 and thereafter becomes available for reletting (i.e. this is a continuous Right of First Offer).

(E) If Tenant shall exercise any such Right of First Offer and if, thereafter, the then occupant of the portion of the RFO Premises with respect to which Tenant shall have so exercised such right wrongfully fails to deliver possession of such premises at the time when its tenancy is scheduled to expire, Landlord shall use reasonable efforts and due diligence (which shall be limited to the commencement and prosecution of eviction proceeding within sixty (60) days after the date on which the hold-over commences, but shall not require the taking of any appeal) to evict such occupant from such space and to recover from such occupant any Hold-Over Premium (as defined below) payable by such occupant. In such event, the commencement of

the term of Tenant's occupancy and lease of such additional space shall, in the event of such holding over by such occupant, be deferred until possession of the additional space is delivered to Tenant.  The failure of the then occupant of such premises to so vacate shall not constitute a default or breach by Landlord and shall not give Tenant any right to terminate the Lease or to deduct from, offset against or withhold Annual Fixed Rent or Additional Rent (or any portions thereof); except that if such holdover exceeds one hundred eighty (180) days, then Tenant may cancel the exercise of its option to lease the applicable portion of the RFO Premises by giving to Landlord a written cancellation notice (provided, however, that if Landlord delivers such portion of the RFO Premises to Tenant on or before the date thirty (30) days after Landlord receives such cancellation notice, such cancellation notice shall be void and without further force or effect).

Alternatively, in lieu of canceling the exercise of such option, Tenant shall have the right to require Landlord to pay to Tenant the net (i.e. net of the costs and expenses, including, attorneys' fees, incurred by Landlord in obtaining such Hold-Over Premium) amount of any Hold-Over Premium received by Landlord from such hold-over occupant relative to periods from and after the sixty-first (61st) day of any hold-over, when and if Landlord receives any such payment. For the purposes hereof, the term "**Hold-Over Premium**" shall be defined as the amount (if any) which a hold-over occupant of any portion of the RFO Premises is required to pay to Landlord in respect of its hold-over in the premises (whether characterized as rent, damages, or use and occupation) in excess of the amount of fixed rent and other charges which the tenant under whom such occupant claims would have been required to pay to Landlord had the term of such tenant's lease been extended throughout the period of such hold-over at the same rental rate as such tenant was required to pay during the last month of its tenancy.

In the event that Tenant elects to cancel its exercise of its option hereunder as the result of a holding over by the existing occupant of the applicable portion of the RFO Premises, Landlord shall reoffer the space to Tenant at such time as the hold-over tenant is evicted from the space upon the same terms and conditions as set forth in Tenant's RFO Exercise Notice with respect to such space (and otherwise in accordance with the terms and provisions of this Section 8).

(F) Landlord shall use reasonable efforts to keep Tenant informed with semi-annual written updates of the expected availability of the leaseable areas in the RFO Premises; provided, however, that Landlord's failure to provide such updates shall in no way be deemed to be a default of Landlord under this Lease or otherwise give rise to any liability on Landlord's part.

9. **Leasing Notice Right**. Section 8.29 of the Original Lease is hereby amended and restated in its entirety to read as follows:

Landlord agrees that for so long as DIV Bedford, LLC or any affiliate (i.e., an entity controlled by, under common control with, or controlling DIV Bedford, LLC) of DIV Bedford, LLC is the Landlord, hereunder, if at any time during the eighteen (18) months following the Effective Date of the Sixth Amendment, Landlord intends to enter into a lease with a third party for all or any portion of the currently vacant space in 14 Crosby Drive (the "**14 Crosby Vacant Space**"), then provided that (i) Tenant directly leases from Landlord at least 208,686 square feet of rentable floor area, (ii) there exists no monetary or other material Event of Default and there have been no more than two (2) monetary or other material Event of Default occurrences during the Term, (iii) the Lease as amended is still in full force and effect and (iv) Tenant has neither assigned the Lease nor sublet more than twenty-five percent (25%) of the Total Rentable Floor Area of the Buildings of the Premises (except for an assignment or sublease permitted under Section 5.6.1 of the Original Lease or an occupancy permitted pursuant to Section 5.6.6 of the Original Lease), then Landlord shall give Tenant at least five (5) business days' written notice ("**Landlord's 14 Crosby Leasing Notice**") of the intent to enter into a letter of intent for such space. Beyond delivery of Landlord's 14 Crosby Leasing Notice, Landlord shall have no further obligation to

Tenant with respect to the 14 Crosby Vacant Space, and the rights of Tenant set forth in this Section 8.29 shall not constitute rights in real property. Except as amended and restated in this Section 8 of the Sixth Amendment, the provisions of Section 8.29 of the Original Lease are deleted and are of no further force or effect.

10. **Site**. Exhibit A to the Original Lease is hereby deleted in its entirety and replaced with the Description of Site attached hereto as Exhibit A. Exhibit A-1 to the Original Lease is hereby deleted in its entirety and replaced with the Site Plan of Complex attached hereto as Exhibit A-1.

11. **Parking.** In accordance with the ratio set forth in Section 1.1 of the Lease (i.e. three (3) parking privileges for each 1,000 square feet of rentable floor area leased by Tenant), as of the Sixth Amendment Additional Premises Commencement Date, the Number of Parking Privileges Tenant is entitled to use at the Complex shall be 625 parking spaces, subject to increase or decrease in accordance with the terms of Section 2.2.1 of the Lease (as amended). Section 2.2.1 of the Original Lease is hereby modified by: (a) deleting subsection 2.2.1(B) in its entirety and (b) deleting from subsection 2.2.1(D) the text "(including, without limitation, those relating to the Managed Parking program, if implemented)".

12. **Signage.**

(a) Exterior Signage. Section 5.17(B)(1) of the Original Lease is hereby modified by deleting the text "one (1) sign on the exterior façade" and inserting in its place the text "two (2) signs on the exterior façade."

(b) Directory Signage. In connection with the lease of the Sixth Amendment Additional Premises as described herein, Tenant shall be entitled to building-standard directory signage in the lobby of Building 4 and to no other additional signage.

13. **Security Deposit.** The Security Deposit held by Landlord pursuant to the Lease has heretofore been reduced in accordance with Section 8.21 of the Lease and the amount of the Security Deposit is now Five Hundred Thousand Dollars ($500,000.00). Accordingly, Section 8.21(B) of the Lease is hereby deleted, and the definition of "Security Deposit" in Section 1.1 of the Lease is hereby deleted and replaced with the following: "$500,000, to be held and disposed of pursuant to the provisions of Section 8.21 of this Lease."

14. **Land Recreation Space**. Tenant's right to use the Additional Land Areas shall remain in effect for the Term, subject to the provisions of Section 8.27 of the Original Lease (as amended by the provisions of the Fifth Amendment and this Sixth Amendment).

a. The Land Recreation Area B is no longer the subject of the MHD Lease and is now owned by Landlord and so Tenant's right to use Land Recreation Area B shall no longer be subject to or conditioned on the MHD Lease. Subsections 8.27(B)(2) and 8.27(B)(3) and the last sentence of Section 8.27(B)(1) are hereby deleted and of no further force or effect. In the event that Tenant is prevented from using (and in fact ceases to use) Land Recreation Area B as the result a casualty or taking affecting Land Recreation Area B for a period of eleven (11) consecutive months after Landlord's receipt of written notice of such condition from Tenant, then Tenant may terminate this Lease by giving Landlord written notice as follows:

(i)        Said notice shall be given after said eleven (11) month period.

(ii)       Said notice shall set forth an effective date which is not earlier than thirty (30) days after Landlord receives said notice.

(iii)    If said condition is remedied on or before the date thirty (30) days after the receipt of such notice, said notice shall have no further force and effect.

(iv)    If said condition is not remedied on or before the date thirty (30) days after the receipt of such notice, this Lease shall terminate as of said effective date, and the Annual Fixed Rent and Additional Rent due under this Lease shall be apportioned as of said effective date.

Notwithstanding the foregoing, Tenant shall have no right to terminate this Lease in the event that Landlord has made available to Tenant another parcel of land consisting of one and one-half (1 ½) acres or more and located within a ten (10) mile radius of the Complex, which may be used by Tenant for all of the same purposes as Land Recreation Area B hereunder (Landlord hereby acknowledging that Landlord shall be solely responsible for all costs associated with obtaining the rights to such alternative parcel provided that Tenant shall still be responsible for any costs that Landlord is otherwise entitled to pass through to Tenant on account of Land Recreation Area B in accordance with Section 2.6 of the Original Lease). In the event any zoning relief or changes need to be obtained for such alternate land in order to permit Tenant's use of the same for the same purposes as Land Recreation Area B, Landlord shall be responsible, at Landlord's sole cost and expense, for obtaining any and all of such necessary zoning relief and/or change.

b. Intentionally Omitted.

c. At Landlord's expense, Landlord may remove all or any portion of the existing fencing around Land Recreation Area B and replace it with a uniform fence that is at least eight feet (8') high (and, thereafter, Tenant shall have no right to fencing or other surroundings around Land Recreation Area B taller than eight feet (8') high). Landlord shall perform such work in a reasonably expeditious manner such that no material portion of the fence is absent for more than two weeks, and shall advise Tenant of its intention to perform such work at least ten (10) business days prior to the commencement of such work. Landlord shall cooperate with Tenant to schedule any work under this Section 14(c) in a manner that will not coincide with any confidential activities of Tenant taking place within Land Recreation Area B, such as the testing of Tenant's proprietary robot prototypes.

15. **Timing for Requisitions of Additional Building 6 Space Allowance Costs**. Section 2(b) of the Third Amendment is hereby modified by deleting the two instances of the text "June 30, 2017", and inserting in their stead the text "October 31, 2017".

16. **Intentionally Omitted.**

17. **Environmental Laws**. Notwithstanding anything to the contrary contained in the Lease either expressed or implied, Landlord covenants to Tenant that the Sixth Amendment Additional Premises shall be delivered to Tenant in its then "as is" condition, and free of all Hazardous Materials (as defined in Section 5.3 of the Lease) in violation of Hazardous Materials Laws.

18. **Brokers**. Tenant hereby represents to Landlord that it has dealt directly with and only with Transwestern|RBJ and Jones Lang Lasalle New England, LLC (the "**Brokers**") as a broker in connection with this Sixth Amendment. Landlord and Tenant hereby indemnify and hold each other harmless against any loss, claim, expense or liability with respect to any commissions or brokerage

fees claimed by any broker or finder other than the Brokers on account of the execution and/or renewal of this Lease due to any action of the indemnifying party.

19. **Miscellaneous**.  Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written. Landlord shall continue to hold the Security Deposit, and Tenant shall maintain the Security Deposit, in accordance with the terms of the Lease. In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control.  All terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease.  The Recitals set forth above in this Amendment are hereby incorporated by this reference.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting the matters set forth in this Amendment and this Amendment constitutes the parties' entire agreement with respect to the matters described herein and supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto or with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Amendment.

20. **Counterparts**.  This Amendment may be executed in any number of counterparts and by each of the undersigned on separate counterparts, which counterparts taken together shall constitute one and the same instrument.


**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the undersigned have executed this Amendment as of the day and year first above written.


**LANDLORD:**

DIV BEDFORD, LLC, a Massachusetts limited liability company


By: Bedford Manager Corp., a Massachusetts corporation


By: /s/ Richard McCready
Name: Richard McCready
Title: President


**TENANT:**

IROBOT CORPORATION,
a Delaware corporation

By: /s/ Alison Dean
Name: Alison Dean
Title: CFO


By: /s/ Glen D. Weinstein
Name: Glen D. Weinstein
Title: EVP & Chief Legal Officer


EAST\141300457.11

## Exhibit A

## Description of Site
### Legal Description

Real property at 4-18 Crosby Drive, in the Town of Bedford, County of Middlesex, Commonwealth of Massachusetts, described as follows:

### Parcels 1 & 2

A certain parcel of land situated on the westerly side of Crosby Drive in the Town of Bedford, in the County of Middlesex, Commonwealth of Massachusetts, bounded and described as follows:

Beginning at a point in the westerly line of Crosby Drive at the most northerly corner of the granted premises at land now or formerly of Beacon Properties Limited Partnership, thence

| | |
|---|---|
| S 16° 24' 24" E | a distance of Nine Hundred Ninety-Two and Fifty-Four Hundredths feet (992.54') to a point; thence |
| S 15° 54' 05" E | a distance of Two Hundred Twenty-Six and Eight Hundredths feet (226.08') to a point; thence |
| S 74° 05' 55" W | a distance of Twenty-Two and No Hundredths feet (22.00') to a point; thence |
| S 15° 54' 05" E | a distance of Four and Three Hundredths feet (4.03') to a point; thence |
| SOUTHERLY | and curving to the left along the arc of a curve having a radius of Nine Hundred Seventy and Seventy-Three Hundredths feet (970.73'), a length on One Hundred Fifty-Nine and Sixty-Nine Hundredths feet (159.69') to a point; thence |
| SOUTHERLY | and curving to the right along the arc of a curve having a radius of Twenty and No Hundredths feet (20.00'), a length of Thirty-One and Four Hundredths feet (31.04') to a point; the previous six (6) courses being along the westerly line of Crosby Drive; thence |
| S 63° 35' 55" W | a distance of Sixty-Five and Ninety Hundredths feet (65.90') to a point; thence |
| | and curving to the right along the arc of a curve having a radius of Thirty and No Hundredths Feet (30.00'), a length of Thirty-Five and Fifty-Five Hundredths feet (35.55') to a point; thence |
| WESTERLY | And curving to the left along the arc of a curve having a radius of Four Hundred Twenty and no hundredths feet (420.00'), a length of Three Hundred Two and Eighty Hundredths feet (302.80') to a point; thence |
| N 89°49' 15" W | a distance of Two Hundred Ninety-Three and Four Hundredths feet (293.04') to a point; thence |
| NORTHWESTERLY | and curving to the right along the arc of a curve having a radius of One Hundred and No Hundredths feet (100.00'), a length of One Hundred Nineteen and Thirty-Six Hundredths feet (119.36') to a point at a Parcel 4; the previous five (5) courses being along the northerly line of Crosby Road; thence |
| N 21° 25' 56" W | a distance of Five Hundred Four and Seventy Hundredths feet (504.70') to a point; thence |
| N 21° 56' 20" W | a distance of Two Hundred Eighty-Three and One Hundredth feet (283.01') to a point at Parcel 3; the previous two (2) courses by Parcel 4; thence |
| N 64°00' 04" E | a distance of Sixty-Four and Forty-Three Hundredths feet (63.43') to a point; thence |
| N 41°27' 31" E | a distance of One Hundred Seventy and Thirty-Three Hundredths feet (170.33') to a point at land now or formerly of Beacon Properties Limited Partnership, the previous two (2) courses by Parcel 3; thence |
| N 57° 00'14" E | a distance of Two Hundred Ninety-Two and Thirty-Four Hundredths feet (292.34') to a drill hole; thence |
| N 58° 05' 16" E | a distance of Ninety-One and Ten Hundredths feet (91.10') to a drill hole; thence |
| N 57° 40' 22" E | a distance of Two Hundred Fifteen and Ninety-Nine Hundredths feet (215.99') to the Point of Beginning. |

The above described Parcel of land contains an area of 838,376 square feet, more or less or 19.2465 acres, more or less, and is more particularly shown as Parcel 1 & 2 on a plan entitled "Plan of Land at 2-14 Crosby Drive, Bedford, Mass (Middlesex County) prepared for Bedford Business Park Limited Partnership, Scale: 50 feet to an inch, dated Nov. 1, 1996, by the BSC Group, Inc.," recorded with the Middlesex South District Registry of Deeds as Plan No. 1246 of 1996.

### Parcel 3

A certain parcel of land situated off the northwesterly end of Crosby Road in the Town of Bedford, in the County of Middlesex, Commonwealth of Massachusetts bounded and described as follows:

Beginning at a point in the most southerly corner of the granted premises at the most westerly corner of Parcel 1 & 2 at Parcel 4; said point being Seven Hundred Eighty-seven and Seventy-One Hundredths feet (787.71') along the line separating Parcel 1 & 2 and Parcel 4 from the most northwesterly end of Crosby Road, thence

| | |
|---|---|
| N 23° 06' 22" W | by Parcel 4, a distance of Two Hundred Ninety-Nine and Fifty-One Hundredths feet (299.51') to a point at land now or formerly of Beacon Properties Limited Partnership; thence |
| N 59° 22' 33" E | a distance of Two Hundred Nine and Ninety-Five Hundredths feet (200.95') to a point; thence |
| S 25° 23' 47" E | a distance of Two Hundred Fifty and Seventy-Seven Hundredths feet (250.77') to a point at Parcel 1 & 2; the previous two (2) courses by land now or formerly of Beacon Properties Limited Partnership; thence |
| S 41° 27' 31" W | a distance of One Hundred Seventy and Thirty-Three Hundredths feet (170.33') to a point; thence |
| S 64°00' 04" W | a distance of Sixty-Four and Forty-Three Hundredths feet (64.43') to the Point of Beginning; the previous two (2) courses by Parcel 1 & 2. |

The above described Parcel of land contains an area of 60,990 square feet, more or less, or 1.4001 acres, more or less, and is more particularly shown as Parcel 3 on a plan entitled "Plan of Land at 2-14 Crosby Drive, Bedford, Mass. (Middlesex County) prepared for Bedford Business Park Limited Partnership, scale 50 feet to an inch, dated Nov. 1, 1996 by the BSC Group, Inc." recorded with the Middlesex South District Registry of Deeds as Plan No. 1246 of 1996.

**Parcel 4**

All of Bedford Business Park Limited Partnership's Right, Title and Interest in and to the following described Parcel of Land:

A certain Parcel of land situated on the northwesterly end of Crosby Road in the Town of Bedford, in the County of Middlesex, Commonwealth of Massachusetts, bounded and described as follows:

Beginning at a point in the most westerly end of Crosby Road at the most southerly corner of the granted premises at the easterly line of Route 3; thence

| | |
|---|---|
| N 21°25; 56" W | by the easterly line of Route 3, a distance of Four Hundred Fifty-Three and Seven Hundredths feet (453.07') to a stone bound at land now or formerly of Beacon Properties of Limited Partnership; thence |
| N 21°48' 17" W | a distance of Three Hundred Ninety-One and Ninety-One Hundredths feet (391.91') to a point; thence |
| N 23° 01'27"W | a distance of One Hundred seventeen and Eighty-two Hundredths feet (117.82') to a point; thence |
| N 05° 17' 44" W | a distance of Forty-One and Thirty-Two Hundredths feet (41.32') to a point; thence |
| N 22° 50'28" W | a distance of One Hundred Seven and Nine Hundredths feet (107.09') to a point; thence |
| N 00° 22' 29" W | a distance of Fourteen and Ninety-Six Hundredths feet (14.96') to a point; thence |
| N 59° 22' 23" E | a distance to Twenty-Four and Fourteen Hundredths feet (24.14') to a point at Parcel 3; the previous six courses by land now or formerly of Beacon Properties Limited Partnership; thence |
| S 23° 06' 22" E | by Parcel 3, a distance of Two Hundred Ninety-Nine and Fifty-One Hundredths feet (299.51') to a point at Parcel 1 & 2; thence |
| S 21° 56' 20" E | a distance of Two Hundred Eighty-Three and One Hundredth feet (283.01') to a point; thence |
| S 21° 25' 56" E | a distance of Five Hundred Four and Seventy Hundredths feet (504.70') to a point in the northwesterly end of Crosby Road; the previous two (2) courses by Parcel 1 & 2; thence |
| S 25°47' 26" W | along the northwesterly end of Crosby Road, a distance of Fifty-Nine and Twenty-Five Hundredths feet (59.25') to the Point of Beginning. |

The above described Parcel of land contains an area of 46,110 square feet, more or less, or 1.0585 acres, more or less, and is more particularly shown as Parcel 4 on a plan entitled "Plan of Land at 2-14 Crosby Drive, Bedford, Mass. (Middlesex County) prepared for Bedford Business Park Limited Partnership, scale 50 feet to an inch, dated Nov. 1, 1996 by the BSC Group, Inc." recorded with the Middlesex South District Registry of Deeds as Plan No. 1246 of 1996.

LESS AND EXCEPT so much of Parcel 4 as was taken by virtue of Layout No. 7652 and Order of Taking by the Massachusetts Department of Highways, for the alteration of Route 3, dated September 11, 2002, recorded in Book 36449, Page 166, as shown on Plan No. 998 of 2002, recorded therewith.

**A portion of Parcel 4 is Registered Land as follows:**

One-half Crosby Road opposite Lot 2, but not opposite Lot 1, as shown on a subdivision plan, as approved by the Court, filed in the Land Registration Office for the South Registry District of the Middlesex County in Registration Book 855, Page 41, with Certificate No. 144991 (Plan No. 31882B).

Together with benefit of that certain appurtenant easement as set forth in Easement Agreement by and between MA-Crosby Corporate Center, L.L.C. as Grantor, and Boston Properties Limited Partnership, as Grantee, dated as of May 7, 2004, recorded in Book 43035, Page 303 and filed as Document No. 1337304.

**Parcel 5**

A parcel of land in the Town of Bedford, County of Middlesex, comprising a portion of the January 29, 1952 (Layout No. 3933) State highway layout of Route 3, the December 1, 1953 (Layout No. 4102) State highway alteration of Crosby Road, the September 11, 2002 (Layout No. 7652) State highway alteration of Crosby Drive, and the October 18, 2006 (Layout No. 7977) State highway alteration of Route 3 and bounded by the line described as follows:

| | |
|---|---|
| Beginning | at a point on the northerly location line of Section 3 of the aforesaid September 11, 2002 (Layout No. 7652) State highway alteration of Crosby Drive, said point bearing N 48°20'25" E and being 107.94 feet distant from station 4+70.51 of Auxiliary baseline "A" of said 1953 layout and extends thence, leaving said location line by a curve to the right of 490.00 feet radius and 217.79 feet with a chord bearing of S 3°01'34" W and a chord length of 216.00 feet; |
| thence | by a curve to the right 165.00 feet radius 256.52 feet with a chord bearing S 60°17'48" W and a chord length of 231.45 feet; |
| thence | N 75°09'57" W 50.62 feet; |
| thence | N 54°13'39" W 302.73 feet; |
| thence | N 45°43'32" W 268.93 feet; |
| thence | N 44°15'11" W 79.75 feet to a point on the northerly location line of the aforesaid October 18, 2006 (Layout No. 7977) State highway alteration, said point bearing N 53°11 '34" E and being 169.21 feet distant from station 157+08.65 of the Main baseline of said 1952 layout; |
| thence | following the location line of said 2006 (Layout No. 7977) State highway alteration in four courses easterly and southeasterly about 14 feet, 14 feet, 13 feet, and 25 feet, respectively; |
| thence | following the location line of said December 1, 1953 (Layout No. 4102) State highway alteration in two courses easterly and southeasterly about 274 feet and 330 feet respectively; |
| thence | following said 2002 State highway layout in two courses northeasterly and southeasterly about 118 feet and 30 feet respectively to the point of beginning. |

Being shown as **Parcel 4-L5-1** on a plan entitled: "Massachusetts Department of Transportation Plan of Road in the Town of Bedford Middlesex County Altered and Laid Out as a State Highway by the Massachusetts Department of Transportation Highway Division Scale: 40 Feet to the Inch". Plan prepared by: BSC Group, Inc. 15 Elkins Street, Boston MA 02127, and recorded as Plan No. 512 of 2015.

**Exhibit A-1**

**Site Plan of Complex**



**Exhibit B**
**Sixth Amendment Additional Premises**



THIS SPACE

BUILDING 4

BUILDING 16

BUILDING 6

0'  5'    25'    50'
1'    10'

## SECOND FLOOR
4 CROSBY DRIVE
BEDFORD, MASSACHUSETTS
2017_0155LE1    03/31/2017

SECOND FLOOR KEY PLAN

**Exhibit C**
**Landlord Work Letter**

1. Landlord shall perform improvements to the Premises and the Building in accordance with the work list attached hereto as Attachment #1 (the "**Worklist**") in a good and workmanlike manner, using new and quality materials and in compliance with all applicable Legal Requirements. The improvements to be performed by Landlord in accordance with the Worklist are hereinafter referred to as "**Landlord's Work**". Landlord shall enter into a direct contract for Landlord's Work with a general contractor selected by Landlord. In addition, Landlord shall have the right to select and approve of any subcontractors used in connection with Landlord's Work.

2. This Work Letter shall not be deemed applicable to any additional space added to the Premises at any time following the execution of the Sixth Amendment or from time to time, whether by any options under the Lease or otherwise, or to any portion of the Premises or any additions to the Premises in the event of a renewal or extension of the Lease Term subsequent to the Sixth Amendment, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease. All capitalized terms used in this Work Letter but not defined herein shall have the same meanings ascribed to such terms in the Sixth Amendment, or if none, the Lease.

Attachment #1 to Exhibit C

Worklist - Landlord's Work

1. Install a Building Management System to control the HVAC system in the Existing Premises including installation of new controls as needed for RTUs, VAVs, and FTPs tied into a Building Management System throughout the Premises (except for the portion of the Premises on the first floor of 6 Crosby Drive), which Building Management System shall be an Automated Logic Web CTRL System (the "**Landlord's BMS Work**"). Landlord shall perform the Landlord's BMS Work in a good and workmanlike manner and shall use commercially reasonable efforts to Substantially Complete the Landlord's BMS Work by January 1, 2018, subject to Tenant SA Delays and delays resulting from labor disputes (to the extent affecting the area, generally), civil commotion, war, war like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, enactment of new governmental regulations or controls not in effect as of the Effective Date, fire or other casualty, inability to obtain any material or services (to the extent affecting the area, generally), acts of God, adverse weather not reasonably anticipatable, or similar matters beyond Landlord's reasonable control ("**Force Majeure**").

2. Install a new glass curtainwall at specified locations of the first floors of 8, 10, and 12 Crosby Drive similar to the existing glass curtainwall on the first floor of 6 Crosby Drive as described in the attached exhibit (the "**Curtainwall Work**"), subject to final construction drawings (the "**Curtainwall Work Plans**") and permitting approved by Tenant, which approval will not be unreasonably withheld, conditioned or delayed and shall not be withheld if the Curtainwall Work Plans reflect Curtainwall Work consistent with the curtainwall installation performed to Building 6. If Landlord's request for approval indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND TENANT MAY BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND WITHIN FIFTEEN (15) BUSINESS DAYS AFTER RECEIPT," within fifteen (15) business days after receipt thereof Tenant shall provide Landlord with written notice of either (i) its approval of the Curtainwall Work Plans, (ii) its disapproval of the same with an explanation therefor, or (iii) the need for additional information in order to review and approve the same. If Tenant fails to respond within the aforementioned 15 business day period, then Landlord may send Tenant a second request that indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND TENANT SHALL BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT", and Tenant's failure to so respond within said five (5) business day period shall be deemed to constitute Tenant's approval of the Curtainwall Work Plans.

Landlord shall perform the Curtainwall Work in accordance with a construction and phasing schedule to be mutually agreed to by Landlord and Tenant, and Tenant will cooperate with Landlord in the agreed-upon phased construction process as reasonably required to minimize Tenant SA Delay and achieve completion of the Curtainwall Work in accordance with the construction and phasing schedule agreed to by the parties. Landlord shall perform the Curtainwall Work in a good and workmanlike manner, using new and quality materials and shall use reasonable efforts to minimize unreasonable interference with Tenant's use of the Premises and the conduct of business therein, including using reasonable efforts to perform any

unreasonably noisy work or work generating unreasonable vibrations into the Premises outside of Tenant's normal business hours. Landlord shall use all reasonable efforts to Substantially Complete the Curtainwall Work by March 31, 2018, subject to Force Majeure and any Tenant SA Delay (as hereinafter defined). Landlord and Tenant agree and acknowledge that the Curtainwall Work is to be completed in two phases (one phase for Curtainwall Work in Building 8, and a second for Curtainwall Work in Buildings 10 and 12), and that during the completion of each phase (which phases are anticipated to last between 1 and 3 months each), Tenant shall be required to relocate all furniture, equipment, and employees within 15 feet of the exterior walls of the first and second floors of the affected Premises (the "**Protected Area of the Premises**").

For purposes of this Exhibit C, "**Tenant SA Delay**" shall mean any delay in the design, permitting or performance of the Landlord's BMS Work or the Curtainwall Work to the extent that such delay is actually caused by any act or, where there is a duty to act under this Lease, any failure to act by Tenant or Tenant's contractors, architects, engineers, or anyone else engaged by or on behalf of Tenant as hereinafter provided. Tenant SA Delay shall expressly include (without the need for any further notice to Tenant) Tenant's failure to comply with the dates set forth in the construction and phasing schedule for the Curtainwall Work agreed to by Landlord and Tenant or any subsequent changes to such phasing schedule mutually agreed to by Landlord and Tenant or the period for providing any response to a request by landlord expressly set forth in this Attachment #1 ("**Deemed Delays**"). Notwithstanding the foregoing, except for failure to act in a timely manner (including in accordance with the dates set forth in the construction and phasing schedule for the Curtainwall Work) by Tenant or Tenant's contractors, architects, engineers, or anyone else engaged by or on behalf of Tenant, in no event shall any act or occurrence giving rise to a delay be deemed a Tenant SA Delay as herein provided unless and until Landlord has given Tenant written notice (the "**Tenant SA Delay Notice**") advising Tenant: (x) that a Tenant SA Delay is occurring and setting forth Landlord's good faith estimate as to the likely length of such Tenant SA Delay; (y) of the basis on which Landlord has determined that a Tenant SA Delay is occurring; and (z) the actions which Landlord believes that Tenant must take to eliminate such Tenant SA Delay. Except with respect to Deemed Delays, no event shall be deemed to be a Tenant SA Delay if Tenant rectifies the situation causing the Tenant SA Delay within forty-eight (48) hours after delivery of the Tenant SA Delay Notice (which for the purposes of determining receipt may be delivered by hand or by email to Tenant's Construction Representative (as defined in Section 7 of Exhibit D), with copies to follow to Tenant within five (5) days thereafter in accordance with the notice provisions of the Lease); provided, however, that if Tenant shall fail to eliminate the delay within the aforesaid 48-hour period, then the 48-hour cure period shall be included in the period of time charged to Tenant pursuant to such Tenant SA Delay Notice (it being understood and agreed that if Tenant shall in fact eliminate the Tenant SA Delay within the 48-hour cure period, no Tenant SA Delay shall be deemed to have occurred for the purposes of this Exhibit C for the first three (3) instances of Tenant SA Delay). In connection with the foregoing, Landlord and Tenant (together with their respective contractors and representatives, as appropriate) agree to hold periodic job meetings to discuss the performance and scheduling of the Curtainwall Work and any changes to the construction and phasing schedule for the Curtainwall Work that are reasonably necessary. Upon substantial completion of the Curtainwall Work, Tenant's Construction Representative shall accompany Landlord's Construction Representative and Landlord's architect on a walkthrough to inspect the Curtainwall Work on a date within 10 business days of a date reasonably designated by

Landlord. Upon Tenant's request, Landlord shall provide Tenant with confirmation of the date of substantial completion for purposes of measuring the 345 day period referenced in the immediately following paragraph.

Landlord shall cause the Contractor to provide a customary one-year construction warranty for the Curtainwall Work, which shall provide that the Curtainwall Work will conform to the requirements of the Curtainwall Work Plans and will be free from defects. The Contractor's warranty shall not include remedies for damage or defect caused by Tenant or anyone claiming by, through or under Tenant, alterations to the Curtainwall Work performed by or on behalf of Tenant, or normal wear and tear under normal usage. In the case of defects under the Contractor's warranty, Tenant shall be deemed to have waived any claim for correction or cure for such defect on the date that is 345 days following the completion of such work as determined by Landlord's architect if Tenant has not then given written notice of such defect to Landlord. Landlord shall cause Landlord's contractor to remedy, repair or replace any such defects identified by Tenant within such 345-day period, such action to occur as soon as practicable during normal working hours (unless such work will adversely affect Tenant's operations in the affected portions of the Premises, in which case the parties shall cooperate to permit such work to be performed after-hours) and so as to avoid any unreasonable interruption of Tenant's use of the affected portions of the Premises. If timely and adequate notice has been given and if Landlord has other guarantees, contract rights, or other claims against contractors, materialmen or architects, Landlord shall, with regard to any such defects, exercise all reasonable efforts to enforce such guarantees or contract rights. The foregoing shall constitute Landlord's entire obligation with respect to all defects in the Landlord Work (provided, however, that nothing in this paragraph shall relieve the Landlord of its repair and maintenance obligations under Section 4.1 of the Lease). During the period for correction of the Curtainwall Work in accordance with this paragraph, if the Tenant fails to notify the Owner and give the Owner an opportunity to cause the contractor to make the correction, the Tenant waives the rights to require correction by the contractor and to make a claim for breach of Landlord's obligations under this paragraph for such nonconforming item of Curtainwall Work (nothing in this sentence being deemed to relieve Landlord of its repair and maintenance obligations under the Lease, however).

3. Notwithstanding anything contained in this Lease to the contrary, if Landlord shall fail to substantially complete (y) the Landlord's BMS Work on or before June 1, 2018 (which date shall be extended automatically for Tenant SA Delay and for such periods of time as Landlord is prevented from completing the same by reason of Force Majeure), or (iii) the Curtainwall Work by November 1, 2018 (which date shall be extended automatically for Tenant SA Delay and for such periods of time as Landlord is prevented from completing the same by reason of Force Majeure), then, in either such event, Tenant, as its sole remedy at law, equity, or under this Lease, shall be entitled to a credit against the Annual Fixed Rent payable under this Lease in an amount equal to Five Hundred Dollars ($500.00) per day for each day from and after the applicable completion date set forth above (i.e., June 1, 2018 (as it may be extended) with respect to Landlord's BMS Work or November 1, 2018 (as it may be extended) with respect to the Curtainwall Work) to the date of completion of the Landlord's BMS Work or the Curtainwall Work, as applicable. Additionally, if Landlord's performance of any portion of the Curtainwall Work requires Tenant to vacate and not use a portion of the Protected Area of the Premises for in excess of six (6) months, subject to extension for Tenant SA Delay and Force Majeure, then the Annual Fixed Rent for the applicable portion of the Protected Area of the Premises plus an

additional ten percent (10%) of the Premises as measured in rentable square feet shall abate from and after the expiration of such six (6) month period (as so extended) until such time as Tenant is reasonably able to reoccupy and conduct business in such affected areas of the Premises.  In the event that Landlord disputes Tenant's right to a rent abatement pursuant to this paragraph, such dispute may be submitted to arbitration by either party pursuant to Section 8 of Exhibit D to this Sixth Amendment.



Case 1:19-cv-12536-DJC    Document 79-6    Filed 05/19/20    Page 417 of 496



**FIGURE 3:** BUILDING 10 WEST ELEVATION

**FIGURE 4:** BUILDING 12 WEST ELEVATION

LEGEND & NOTES

NEW FACADE AREA

1. EXISTING WINDOWS TO REMAIN
2. NEW BRICK INFILL AS REQUIRED ABOVE NEW CURTAINWALL
3. NEW ALUMINUM FRAMED CURTAINWALL WITH 1" INSULATED GLAZING. OVERALL HEIGHT APPROXIMATELY 13'-0"
4. ALUMINUM COLUMN COVER (TYPICAL)

KEYPLAN (not to scale)

The Davis Companies

Xchange at Bedford
iRobot Facade Improvements

Gensler

**EXHIBIT D**

**WORK LETTER - sixth amendment tenant ALTERATIONS**

1.  Following the Effective Date, Tenant shall have the right to perform alterations and improvements in the Premises (the "**Sixth Amendment Tenant Alterations**"). Notwithstanding the foregoing, Tenant and its contractors shall not have the right to perform the Sixth Amendment Tenant Alterations in the Premises unless and until Tenant has complied with all of the terms and conditions of Section 5.14 of the Lease, including Landlord's right to approve (a) the final plans for the Sixth Amendment Tenant Alterations, and (b) the insurance coverage obtained by Tenant and its contractors in connection with the Sixth Amendment Tenant Alterations. In addition, Landlord shall have the right to approve, in its reasonable discretion, the contractors (each, a "**Contractor**") to be retained by Tenant to perform the Sixth Amendment Tenant Alterations. Tenant shall be responsible for all elements of the plans for the Sixth Amendment Tenant Alterations (including, without limitation, compliance with law, functionality of design, the structural integrity of the design, the configuration of the premises and the placement of Tenant's furniture, appliances and equipment), and Landlord's approval of such plans shall in no event relieve Tenant of the responsibility therefor. Landlord's approval of the contractors to perform the Sixth Amendment Tenant Alterations shall not be unreasonably withheld. Landlord's approval of the general contractor to perform the Sixth Amendment Tenant Alterations shall not be considered to be unreasonably withheld if any such general contractor (i) does not have trade references reasonably acceptable to Landlord, (ii) does not maintain insurance as required by Landlord, (iii) does not have the ability to be bonded for the work in an amount satisfactory to Landlord, (iv) does not provide current financial statements reasonably acceptable to Landlord, or (v) is not licensed as a contractor in the state and municipality in which the Premises is located. Tenant acknowledges the foregoing is not intended to be an exclusive list of the reasons why Landlord may reasonably withhold its consent to a general contractor.

With respect to Sixth Amendment Tenant Alterations constructed within the two years after the Effective Date, Landlord shall review Tenant's plans and specifications for the Sixth Amendment Tenant Alterations (the "**Tenant's Plans**") and, if Tenant's request for approval indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND LANDLORD MAY BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIFTEEN (15) BUSINESS DAYS AFTER RECEIPT," within fifteen (15) business days after receipt thereof Landlord shall provide Tenant with written notice of either (i) its approval of the Tenant's Plans, (ii) its disapproval of the same with an explanation therefor, or (iii) the need for additional information in order to review and approve the same. In its approval of the Tenant's Plans, Landlord shall specify those alterations, additions and improvements that must be removed by Tenant at the expiration or earlier termination of the Term, if any, unless Landlord subsequently elects to waive such obligation to remove such alterations, additions and improvements. If Landlord fails to respond within the aforementioned 15 business day period, then Tenant may send Landlord a second request that indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND LANDLORD SHALL BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT". Landlord's failure to so respond within said five (5) business day period shall be deemed to constitute Landlord's approval of the Tenant's Plans and determination that the alterations, additions and improvements shown thereon do not need to be removed by Tenant

at the expiration or earlier termination of the Term (except to the extent that such removal would be required pursuant to clause (x) of Section 5.2 of the Lease with respect to Tenant's computer, telephone and other communications systems and equipment). Notwithstanding the foregoing or anything in the Lease to the contrary, Tenant shall be required in all events to remove any internal stairwells, raised floors, supplemental HVAC, specialized fire suppression systems, kitchens, bathrooms and showers, and any structural improvements made by Tenant as part of the Sixth Amendment Tenant Alterations.

Notwithstanding anything contained herein to the contrary, it is understood and agreed that Tenant may retain contractors and subcontractors that use union or non-union labor in connection with the construction of the Sixth Amendment Tenant Alterations. Tenant shall be responsible for maintaining labor harmony among its contractors and subcontractors and other contractors and subcontractors performing work at the Building, if any. For Sixth Amendment Tenant Alterations costing $3,000,0000 or less in or one or more related projects and undertaken within two years after the Effective Date, no bonds or other security shall be required in connection with Tenant's performance of such Sixth Amendment Tenant Alterations.

2.      Tenant shall pay to Landlord, within ten (10) days after Landlord's written demand, a construction management fee equal to one percent (1%) of the hard cost of the Sixth Amendment Tenant Alterations to compensate Landlord for reviewing the plans for the Sixth Amendment Tenant Alterations and for costs incurred by Landlord in facilitating completion of the Sixth Amendment Tenant Alterations. No other plan review or other fees shall be charged by Landlord with respect to the Sixth Amendment Tenant Alterations notwithstanding anything in the Lease to the contrary, including Section 5.14 of the Lease. Landlord reserves the right to deduct such fee from the Sixth Amendment Construction Allowance (defined below). The construction management fee set forth in this section shall supersede any contrary provision of the Lease in so far as concerns the Sixth Amendment Tenant Alterations.

3.      Provided there is no monetary or material non-monetary Event of Default in existence and continuing under the Lease, Landlord agrees to provide Tenant with an allowance of up to Eight Million Three Hundred Forty Seven Thousand Four Hundred Forty Dollars ($8,347,440.00) (the "**Sixth Amendment Construction Allowance**") toward the cost of performing the Sixth Amendment Tenant Alterations. The Sixth Amendment Construction Allowance may only be used for "**Eligible Costs**," which are: (a) the cost of preparing design and construction documents and mechanical and electrical plans for the Sixth Amendment Tenant Alterations (which may not exceed 25% of the Sixth Amendment Construction Allowance), and (b) hard costs in connection with the Sixth Amendment Tenant Alterations.

The Sixth Amendment Construction Allowance may be advanced to fund Eligible Costs. In no event, however, shall the Sixth Amendment Construction Allowance be used for (x) payments to Tenant or any affiliates of Tenant, (y) the purchase of any movable furniture equipment or personal property, or (z) costs resulting from any default by Tenant of its obligations under this Lease. Landlord shall, subject to compliance with all of the other terms, conditions and provisions of the Lease, make disbursements of the Sixth Amendment Construction Allowance (hereinafter, each a "**Disbursement**") to Tenant in installments in accordance with the following terms and conditions:

(i)  Disbursements shall be made, at Tenant's request to Landlord, either to Tenant or, at Tenant's election,  to the applicable contractors, vendors and other service providers performing the Sixth Amendment Tenant Alterations as Tenant may designate or request (provided that any such payment made directly to a contractor, vendor, or other service provider shall be conditioned upon the contractor, vendor or other provider entering into a letter agreement reasonably satisfactory to Landlord confirming that such payments are being made as a matter of convenience and do not create any obligation of Landlord to pay such sums to such contractor, vendor or other service provider), no more frequently than once per month, in minimum increments of $75,000.00 (except for the final Disbursement), on the basis of written requests made in accordance with the method described below, and Landlord shall act upon such requests within thirty (30) days following the receipt of a written request for a Disbursement, which action shall be either (A) funding the requested Disbursement, or (B) specifying the basis for not funding (provided, however, that Landlord shall fund any undisputed portion of the requested Disbursement) and, when applicable, requesting reasonable additional information and reasonable supporting documentation.

(ii) Disbursements shall require the following requisitions, certifications and waivers: (1) an appropriate AIA requisition form reasonably approved by Landlord with respect to work performed pursuant to Tenant's construction contract with its general contractor; (2) invoices from Tenant's service providers, showing in reasonable detail the cost of the item in question or of the improvements installed to date in the Premises and, where applicable evidence of prior payments; (3) lien waivers in the form attached as Addendum #1 to this Work Letter; (4) evidence reasonably acceptable to Landlord of prior payments for amounts previously disbursed out of the Sixth Amendment Construction Allowance (to the extent not previously provided to Landlord); and (5) certifications from Tenant that the amount of the requisition in question does not exceed the cost of the items, services and work covered by such certification. In the event that any portions of the Sixth Amendment Construction Allowance reflected on a particular requisition are to be funded directly to Tenant, as Tenant may designate or request, such requisition shall be accompanied by evidence reasonably satisfactory to Landlord that the items, services and work covered by such requisition have been fully paid by Tenant. Landlord shall have the right, upon reasonable advance notice to Tenant, to inspect Tenant's books and records relating to each requisition in order to verify the amount thereof.

(iii) Each Disbursement shall be made in an amount equal to the product of (x) Landlord's Percentage (as hereinafter defined) multiplied by (y) the lesser of: (A) the amount requested, or (B) the amount actually payable to, as applicable, the Contractor or subcontractor(s) or other third party, in each case including any applicable retainage to be released in respect of work and materials satisfactorily completed and in place with respect to that particular request for a Disbursement (exclusive of work and materials to the extent included in any prior funded requests for a Disbursement), but in all cases subject to a five percent (5%) retention until all conditions to the final Disbursement are satisfied as set forth below.  "**Landlord's Percentage**" shall mean a fraction expressed as a percentage, the numerator of which is the total amount of the Sixth Amendment Construction Allowance and the denominator of which is the total cost of all Eligible Costs. Tenant shall fund the remainder in each instance.

(iv) Landlord may withhold or refuse to pay any Disbursement hereunder if (i) a Notice of Contract has been filed under Section 4 of Chapter 254 of the Massachusetts General

Laws, as amended (the "**Mechanic's Lien Law**"), unless with respect to the subject requisition, an accurately completed and valid Lien Form has been provided to Landlord and is deemed reasonably acceptable to Landlord and otherwise complies with applicable Laws, or if any other statutory lien has been filed or established relating to claims for labor, materials, or supplies, whether under the Mechanic's Lien Law or otherwise.

(v) No Disbursements will be made for materials prior to the incorporation of the materials into the Premises.

(vi) Any disputes under this Exhibit D, Section 3 shall be submitted to arbitration in accordance with the terms of Section 8, below.

(vii) The requisition for the final Disbursement to pay the retainage, shall also require: (A) a certificate from Tenant and Tenant's architect that the Sixth Amendment Tenant Alterations have been completed in accordance with Tenant's Plans; (B) receipt of a permanent certificate of occupancy for the Premises (if applicable); (C) delivery of the record set of as-built plans maintained by Tenant's Contractor; (D) satisfaction of all conditions for final payment under the applicable construction contract, (E) final lien waivers from the Contractor (which may be conditioned upon receipt of payment), in the form required hereunder; (E) final lien waivers in the form required hereunder (which may be conditioned upon receipt of payment) from each sub-contractor, supplier, and any other party entitled to claim a lien with respect to the Sixth Amendment Tenant Alterations (other than the Contractor) who performs work in excess of $10,000; and (F) to the extent a lien waiver has not been provided as to the remaining amounts due under the applicable construction contract, the expiration of all statutory lien periods with no lien having been filed with respect to the Premises, the Building, or the Complex which remain outstanding.

4.      Notwithstanding anything herein to the contrary, Landlord shall not be obligated to disburse any portion of the Sixth Amendment Construction Allowance, if applicable, during the continuance of an uncured Event of Default under the Lease, and Landlord's obligation to disburse shall only resume when and if such default is cured. If (a)Tenant's request for disbursement contains, in bold and prominent print, a legend stating that "FAILURE TO RESPOND WITHIN THIRTY (30) DAYS MAY RESULT IN AN OFFSET AGAINST RENT DUE PURSUANT TO EXHIBIT D OF THE SIXTH AMENDMENT TO THE LEASE," and Landlord fails to respond within such thirty (30) day period, and Landlord thereafter fails to respond to such request within two (2) business days of a second notice from Tenant containing such legend, or (b) Landlord has timely disputed Tenant's demand and has thereafter failed to pay Tenant the amount of any final, unappealable judgement against Landlord within thirty (30) days after the issuance thereof, then Tenant may offset the amounts due from Landlord to Tenant under this Section 2 of Exhibit D against Fixed Rent payable under this Lease until Tenant is paid in full. Notwithstanding the foregoing, Tenant shall have no right to reduce any monthly installment of Fixed Rent by more than twenty percent (20%) of the amount of Annual Fixed Rent that would otherwise have been due and payable by Tenant to Landlord, unless the aggregate amount of such deductions over the remainder of the Term of the Lease (as the same may have been extended) will be insufficient to fully reimburse Tenant for the amount demanded by Tenant, in which event Tenant may effect such offset by making deductions from each monthly

installment of Fixed Rent in equal monthly amounts over the balance of the remainder of the Term.

5. In no event shall the Sixth Amendment Construction Allowance be used for the purchase of equipment, furniture or other items of personal property of Tenant. In the event Tenant does not submit to Landlord a written request for payment of the entire Sixth Amendment Construction Allowance (together with all of the documents and certificates required for such payment) by February 28, 2021, any portion of the Sixth Amendment Construction Allowance not disbursed to Tenant shall accrue to the sole benefit of Landlord, it being understood that Tenant shall not be entitled to any credit, abatement or other concession in connection therewith. Tenant shall be responsible for all applicable state sales or use taxes, if any, payable in connection with the Sixth Amendment Tenant Alterations and/or the Sixth Amendment Construction Allowance.

6. Tenant agrees to accept the Premises in its "as-is" condition and configuration, without representation or warranty by Landlord or anyone acting on Landlord's behalf, it being agreed that Landlord shall not be required to perform any work (except the Landlord Work set forth in Exhibit C to the Sixth Amendment) or incur any costs in connection with the construction or demolition of any improvements in the Premises (except as provided above with respect to the Sixth Amendment Construction Allowance). The foregoing shall not limit or waive Landlord's express obligations under the Lease with respect to the Premises, the Building or the Complex.

7. Chad Haskell (phone no._____, email _____) shall be Tenant's Construction Representative, and shall have full power and authority to act on behalf of Tenant on any matters relating to the Landlord Work or Tenant's Sixth Amendment Tenant Alterations. Tenant may name a replacement Tenant Construction Representative from time to time by written notice to Landlord making reference to this Section 7. _____ (phone no. _____, email _____) shall be Landlord's Construction Representative, shall have full power and authority to act on behalf of Landlord on any matters relating to the Landlord Work or Tenant's Sixth Amendment Tenant Alterations. Landlord may name a replacement Landlord Construction Representative from time to time by written notice to Tenant making reference to this Section 7.

8. All disputes between the parties regarding Tenant SA Delays and other matters expressly referencing this Section 8 shall be resolved in accordance with this Section 8. Any arbitration decision under this Section 8 shall be enforceable in accordance with applicable law in any court of proper jurisdiction. A party may not initiate arbitration under this Section 8 without notifying the other party and requesting a meeting of senior representatives to resolve the dispute. Within five (5) business days following such notice, senior representatives of Landlord and Tenant who have authority to resolve the dispute shall meet in order to seek a resolution by agreement prior to the arbitration. If the dispute is not so resolved at the meeting (or if one party does not attend) then either party may initiate arbitration.

Any arbitration conducted pursuant to this Section 8 shall be conducted in as expeditious a manner as possible to avoid delays in the construction of the Landlord's Work and the Sixth Amendment Tenant Alterations and shall be resolved by a single arbitrator, who shall be agreed to by the parties within ten (10) days after either party requests arbitration under this Section 8 by notice to the other. Landlord and Tenant shall seek to agree upon a single arbitrator who is

an independent third party real estate professional with at least twenty (20) years of experience in construction disputes involving multi-tenant, first-class office developments that has not worked for either party for the prior five (5) years (a "**Qualified Arbitrator**") and, if they are unable to agree, then a Qualified Arbitrator shall, upon request by either party, be appointed by the office of the American Arbitration Association ("**AAA**") or successor organization administering arbitrations held in Boston, Massachusetts.  The arbitrator shall decide the dispute by written decision.  The arbitration shall be conducted in Boston Massachusetts or another location agreed to by the parties in accordance with the Fast Track Procedures (regardless of the amount in dispute) of the Construction Industry Arbitration Rules of the AAA (or any successor organization), as modified and/or supplemented by this Section on an expedited basis and shall be concluded, with a decision issued, no later than thirty (30) days after the date that such dispute is submitted for arbitration. The decision of the arbitrator shall be final and binding on the parties. The parties shall comply with any orders of the arbitrator establishing deadlines for any such proceeding. The fee of the arbitrator shall be paid equally by the parties. Each party shall pay all other costs incurred by it in connection with the arbitration.

9.      This Work Letter shall not be deemed applicable to any additional space added to the Premises at any time following the execution of the Sixth Amendment or from time to time, whether by any options under the Lease or otherwise, or to any portion of the Premises or any additions to the Premises in the event of a renewal or extension of the Lease Term subsequent to the Sixth Amendment, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease. All capitalized terms used in this Work Letter but not defined herein shall have the same meanings ascribed to such terms in the Sixth Amendment, or if none, the Lease.

**[END OF EXHIBIT D]**

EAST\141300457.11

**ADDENDUM #1 TO EXHIBIT D TO SIXTH AMENDMENT TO LEASE**

**FORMS OF LIEN WAIVER**

[FORM OF ARCHITECT'S LIEN WAIVER]

**Payment Receipt and Affidavit**

To:  ("**Owner**")

Project:

Application for Payment No.:

Period Ending:

Progress Payment: _____ Final Payment:_____ (check one or the other)

| | |
|---|---|
| A. Original Contract Amount | $_____ |
| B. Total Additional Services Amounts, if any | $_____ |
| C. Adjusted Contract Amount (Add A & B) | $_____ |
| D. Amount Paid to Date Before this Application | $_____ |
| E. Retainage Held on Amount Paid to Date, if any | $_____ |
| F. Amount Owing on this Application | $_____ |
| G. Retainage to be Held on this Application, if any | $_____ |
| H. Total Owing on this Application (F minus G) | $_____ |

1. Except for any Disputed Claims Amount set forth below, Retainage Held and to be Held and Total Owing on this Application set forth above, Undersigned, on its behalf and on behalf of anyone directly or indirectly employed by or claiming under it, hereby fully and forever releases, acquits and discharges Owner, its general and limited Owner, agents, attorneys, employees, officers, directors, trustees, stockholders, managers, members, lenders, and their respective successors and assigns, whether disclosed or undisclosed (individually and collectively hereinafter referred to as the "**Releasees**"), from all manner of action and causes of action, claims, suits, debts, sums of money, commissions, compensation for services rendered, liens of any type, trust fund claims, judgments, executions, damages, demands and rights whatsoever, at law or in equity, now existing or which may hereafter accrue in favor of Undersigned by reason of or in connection with any and all claims arising out of its contract, and for all work, labor and services furnished, performed and provided pursuant thereto including without limitation all claims for additional services, reimbursable expenses, charges, credits, contract amendments thereto and all other services with regard to the Project through the Period Ending set forth above. The foregoing shall be with respect to all matters arising through the Period Ending set forth above if this Affidavit is given in connection with a Progress Payment; and if given in connection with Final Payment it shall be with respect to all matters existing or arising through the date hereof or hereafter at any time existing or arising.

2. Undersigned certifies, warrants and represents that (a) it has paid in full and in accordance with all applicable obligations, laws and regulations, for all labor and services performed and furnished in connection with the services under its contract, all social security withholding, unemployment insurance, sales, use and other taxes applicable thereto and for all premiums for insurance carried with respect thereto; (b) it owes no one for any of the foregoing or any other item of cost or expense in connection with the performance or furnishing of the services under its contract; and that (c) no claims have been made against Undersigned for any unpaid labor, services or any other item of cost and expense arising out of or relating to the services under its contract that are not currently paid and satisfied.

3. Undersigned certifies, warrants and represents (i) that the "Amount Owing on this Application" set forth above constitutes the entire value of all services rendered by or under the undersigned for which payment is due through the Period, (ii) that all other amounts set forth above are accurate and complete, and (iii) that the Undersigned has no other claims except as set forth in the maximum aggregate amount as "**Disputed Claims Amount**" below and described in detail on Exhibit A attached (any such description must include a detailed statement of the kind and nature of the claim and must have attached a copy of the notice given of such claim).

4. If, after the Owner's payment of the Total Owing on this Application, any claims or liens are made or filed against any of the Releasees or the Project by Undersigned, or by any employee, other design professional, subcontractor or supplier of Undersigned or by anyone directly or indirectly employed or engaged by any of the foregoing with respect to the Project, or if any certification, warranty or representation herein or otherwise given in connection herewith shall not be true in all material respects, Undersigned agrees to satisfy and discharge such claim or lien and indemnify the Releasees, hold the Releasees harmless and defend the Releasees, at Undersigned's sole cost and expense, from and against such claim or lien or any such certification, warranty or representation not being true, and to pay all costs and expenses related thereto, including, but not limited to, the cost of discharging any liens and all legal fees, disbursements and costs of litigation in connection with any of the foregoing. To the fullest extent permitted by law, the Undersigned discharges, releases and waives all liens and right to lien expressly including such rights with respect to the Amount Paid to Date Before this Application and, when paid, with respect to the Total Owing on this Application.

5. Undersigned makes this Affidavit freely and voluntarily, without duress or coercion, after Undersigned has either consulted with or been given the opportunity to consult with legal counsel, and Undersigned has carefully and completely read all of the terms and provisions of this Affidavit and has agreed to be bound hereby.

6. Undersigned acknowledges that the foregoing statements, representations, warranties and agreements are made as an affidavit under applicable law and otherwise to induce the Owner to make the payment requested and its lender to provide funds under its loan, and that the Releasees are relying upon the truth of the statements, representations and warranties contained herein.

7. Undersigned acknowledges that this Affidavit shall inure to the benefit of the Releasees and their respective successors and assigns and shall be binding on Undersigned and its successors and assigns. If any part or provision hereof is unenforceable, the remainder shall not be affected.

In witness whereof, Undersigned has caused this instrument to be sworn to executed under seal as of the _____ day of _____, 20___.

Disputed Claims Amount, if any $_____ (see attached Exhibit A)

Design Professional:

(Type Name)

By: _

      (Duly Authorized)

STATE OF _____

_____ County, ss.

On this ____ day of _____, 200_, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification of a driver's license to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.

(official signature and seal of notary)

My commission expires _____

[FORM OF CONTRACTOR'S LIEN WAIVER]

PARTIAL WAIVER AND SUBORDINATION OF LIEN
M.G.L. c. 254, §32

COMMONWEALTH OF MASSACHUSETTS: Date: _____, ___ 200__
MIDDLESEX COUNTY Application for Payment No. ____

OWNER: _____

CONTRACTOR: _____

LENDER/MORTGAGEE: _____

      1. Original Contract Amount: $_____

      2. Approved Change Orders: $_____

      3. Adjusted Contract Amount: $_____

      4. Completed to Date: $_____

      5. Less Retainage: $_____

      6. Total Payable to Date: $_____
          (line 4 less line 5)

      7. Less Previous Payments: $_____

      8. Current Amount Due: $_____
          (line 6 less line 7)

      9. Pending Change Orders: $_____

      10. Disputed Claims: $_____

The undersigned who has a contract with Owner, for furnishing labor or materials or both labor and materials or rental equipment, appliances or tools for the erection, alteration, repair or removal of a building or structure or other improvement of real property with a street address of _____, _____, Massachusetts, and owned by Owner, upon receipt of _____ ($_____) in payment of an invoice/requisition/application for payment dated _____ does hereby:

(a)        waive any and all liens and right of lien on such real property for labor or materials, or both labor and materials, or rental equipment, appliances or tools, performed or furnished through the following date:

      _____ (payment period), except for retainage, unpaid agreed or pending change orders, and disputed claims as stated above; and

(b)        subordinate any and all liens and right of lien to secure payment for such unpaid, agreed or pending change orders and disputed claims, and such further labor or materials, or both labor and materials, or rental equipment, appliances or tools, except for retainage, performed or furnished at any time through the twenty-fifth day after the end of the above payment period, to the extent of the amount actually advanced by the above lender/mortgagee through such twenty-fifth day.

Signed under the penalties of perjury this _____ day of _____, _____.

Contractor:

By: _____

Its: _____

COMMONWEALTH OF MASSACHUSETTS

_____ County, ss.

On this _____ day of _____, 200_, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification, which was _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose, as _____ of _____, a _____.

_____
(official signature and seal of notary)
Name: _____
My commission expires: _____

CONTRACTOR'S CONDITIONAL WAIVER AND
RELEASE UPON FINAL PAYMENT
(Submitted with final application for payment)

OWNER: _____

CONTRACTOR: _____

PROJECT: _____

Contract Sum: $_____

Total Amount Previously Paid: $_____

Final Payment Amount: $_____

In consideration of all past payments received from the Owner in connection with the Project, the undersigned acknowledges and agrees that, except for the Final Payment Amount (as set forth above), it has received full and final payment of all sums due, including all sums due under its Contract with Owner, for labor, materials and/or equipment furnished by the undersigned to or in connection with the Project. The undersigned further acknowledges and agrees that upon receipt of a check in the Final Payment Amount and payment of such check by the bank upon which it is drawn, the undersigned will release, discharge, relinquish and waive any and all claims, suits, liens, and rights under the statutes of the Commonwealth of Massachusetts with respect to the Owner, the Project and/or against the Owner on account of any labor, materials and/or equipment furnished in connection with the Project.

The undersigned individual represents and warrants that he/she is the duly authorized representative of the undersigned, empowered and authorized to execute and deliver this document on behalf of the undersigned and that this document shall be binding upon the undersigned.

This document is to take effect as a sealed instrument.

Signed under the penalties of perjury as of this _____ day of _____, _____.

CONTRACTOR:

_____
Signature of Authorized Individual

_____
Printed Name and Title of Above Individual

[FORM OF SUBCONTRACTOR'S LIEN WAIVER]

**SUBCONTRACTOR'S**
**RELEASE AND PARTIAL LIEN WAIVER**

**I. Reference Data:**

**Owner:**


**Tenant:**


**Project:**


**Subcontractor:**

**Subcontract Work:**


**Subcontract Date:**


**Current Subcontract Financial Status Summary:**

1. Original Subcontract Amount $_____

2. Approved Change Order(s) $_____

3. Adjusted Total Subcontract Amount (Item No. 1 plus 2) $_____

4. Total Amount of Subcontract Work Completed to Date
   (including Current Requisition and Retainage) $_____

5. Total Payments Received by Subcontractor through the
   Date of Release and Waiver (as defined below) $_____

6. Retainage Held on Account of Payments Received by
   Subcontractor (Item No. 5) $_____

7. Amount Currently Requisitioned, including Retainage
   (Item No. 4 less Items No. 5 and 6) $_____

8. Retainage to be Held on Account of Current Requisition $_____

9. Balance Currently Due (Item No. 7 less Item No. 8) $_____

Outstanding Claims and Pending Change Orders, if any, must be set forth on **Schedule A**.

## II. Release and Partial Lien Waiver

For the period ending on the last day of the month of _____, 200_ (the "Date of Release and Waiver") the undersigned Subcontractor hereby acknowledges receipt of payments on account of the Subcontract Work in the amount of the Total Payments Received by Subcontractor through the Date of Release and Waiver (Item No. 5, above). This amount represents payment in full through and including the Date of Release and Waiver.

The undersigned hereby swears and certifies that the Reference Data set forth above is true and correct and acknowledges that there are no additional costs or claims for any extras, additions or changes for labor or materials or otherwise on the Project, other than those listed on **Schedule A**. To the extent permitted by applicable law, the undersigned hereby waives and releases any and all claims, laborer's, mechanic's or materialmen's liens, and claims of right to a laborer's, mechanic's or materialmen's lien on or against the Project under the laws of Massachusetts, on account of labor or materials or both furnished by the undersigned to or on account of the Subcontract Work through the Date of this Release and Waiver, except for matters set forth on **Schedule A**.

The undersigned hereby swears and certifies that all persons, firms or other entities, regardless of tier, who have supplied work, labor, materials, services and other items to the undersigned in connection with the Project have been paid in full through the Date of Release and Waiver, except for amounts included in the Current Requisition (Item No. 7, above); and agrees that the General Contractor, the Owner, any lender of the Owner, the Tenant or any other person or entity having an interest in the Project may rely on the accuracy of this instrument.

Duly authorized and executed under the pains and penalties of perjury as of this _____ day of _____, 200_.

**SUBCONTRACTOR:** _____

By: _____

Title: _____
Hereunto duly authorized

**SCHEDULE A**

**Outstanding Claims and Pending Change Orders**

                                                      **Amount of Claim**

**1. Nature of Claim or Requested Change**

**2. Pending Change Orders**

_____

Except for those matters listed above, the Subcontractor acknowledges by the submission of this Release and Partial Lien Waiver that, as of the Date of Release and Waiver, no such claims or pending change orders exist.

**EXHIBIT O**

**EXISTING LEASES**

That certain lease between DIV BEDFORD, LLC, as Landlord, and MULTIPLAN, INC., as Tenant, dated on or about February 23, 2015, for certain premises in the building known as 16 Crosby Drive.

**Execution**

<u>**SEVENTH AMENDMENT TO LEASE**</u>

    **THIS SEVENTH AMENDMENT TO LEASE** (this "**Seventh Amendment**") is entered into as of November 21, 2017 (the "**Effective Date**"), by and between **DIV BEDFORD, LLC**, a Massachusetts limited liability company ("**Landlord**"), and **IROBOT CORPORATION**, a Delaware corporation ("**Tenant**").

**R E C I T A L S**:

    A. Landlord and Tenant are parties to that certain Lease (the "**Original Lease**") dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease dated September 16, 2010, as further amended by a certain Declaration dated June 16, 2011, as further amended by a Second Amendment to Lease dated as of May 20, 2014, as further amended by a certain letter dated October 8, 2014, as further amended by a Third Amendment to Lease dated as of April 10, 2015 (the "**Third Amendment**"), as further amended by a Fourth Amendment to Lease dated as of October 23, 2015, as further amended by a Fifth Amendment to Lease dated as of May 4, 2016, as further amended by a Sixth Amendment to Lease dated as of July 5, 2017 (the "**Sixth Amendment**") (as amended, the "**Lease**") for certain premises (the "**Existing Premises**") consisting of approximately 208,686 rentable square feet of space located within the Complex (as defined in the Lease) and now known as XChange at Bedford (formerly known as Bedford Business Park) in Bedford Massachusetts.

    B. Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord an additional 1,002 rentable square feet of space (the "**Corridor Space**") on the first floor of Building 6 at the Complex, which space is shown on <u>Exhibit A</u> attached hereto.

    C. Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord an additional 10,921 rentable square feet of space (the "**Seventh Amendment Phase I Additional Premises**") located on the first floor of Building 4 at the Complex (also known as 4 Crosby Drive and formerly known as Building A), which space is shown on <u>Exhibit B</u> attached hereto.

    D. Landlord has further agreed to lease to Tenant and Tenant has agreed to lease from Landlord an additional 17,006 rentable square feet of space (the "**Seventh Amendment Phase II Additional Premises**"), located on the first floors of Buildings 4 and 6 at the Complex (also known as 4 and 6 Crosby Drive and formerly known as Buildings A and B), which space contiguous and is shown on <u>Exhibit B</u> attached hereto. Together, the Seventh Amendment Phase I Additional Premises and the Seventh Amendment Phase II Additional Premises are referred to herein as the "**Seventh Amendment Additional Premises**."

    E. Landlord and Tenant therefore desire to enter into this Seventh Amendment to set forth the terms and conditions for the leasing of the Seventh Amendment Additional Premises and to amend the Lease as hereinafter set forth.

**A G R E E M E N T**:

    **NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree to amend the Lease as follows:

1. **Addition of Corridor Space.**

(a) Effective as of September 15, 2017 (the "**Corridor Space Commencement Date**"), the Corridor Space shall be added to the Existing Premises so that the Premises shall include the Existing Premises and the Corridor Space upon all of the terms and conditions of the Lease except as modified herein. The lease of the Corridor Space shall terminate on the sooner of (i) the Lease Expiration Date (as defined in the Sixth Amendment), unless extended or sooner terminated as provided in the Lease, and (ii) the date specified by Landlord in notice to Tenant that Landlord has determined (which determination shall be made by Landlord in its sole discretion) that the Corridor Space should be returned the configuration immediately preceding integration into the Premises (the "**Original Corridor Configuration**") in order to accommodate multi-tenant use of any portion of Building 6. In the event that the lease of the Corridor Space is terminated in accordance with clause (ii) above, Tenant shall return the Corridor Space to the Original Corridor Configuration at Tenant's expense prior to the termination of the lease of the Corridor Space. Landlord shall endeavor to give Tenant thirty (30) days' notice that the lease of the Corridor Space is being terminated in accordance with clause (ii) above, but shall not be required to violate or tolerate any violation of any laws, ordinances, or rules and regulations (as determined by Landlord in the exercise of its sole discretion) in order to provide such notice.

(b) From and after the Corridor Space Commencement Date, the "**Rentable Floor Area of the Premises**" as used in the Lease shall mean 209,688 square feet, being the sum of (i) the Rentable Floor Area of the Existing Premises containing 208,686 rentable square feet, and (ii) the Rentable Floor Area of the Corridor Space containing 1,002 rentable square feet. Notwithstanding the addition of the Corridor Space to the Premises (and resultant impact on the calculation of Additional Rent as described in Section 6(c) of this Seventh Amendment), the Fixed Rent applicable to the Premises shall be calculated without regard to the square footage of the Corridor Space. In the event that the Lease is terminated with respect to the Corridor Space before the termination of the Lease, the Rentable Floor Area of the Premises shall be reduced accordingly, and the number of Parking Privileges allocated to the Premises shall be reduced by three (3).

2. **Expansion of Premises**.

(a) Effective as of the Seventh Amendment Phase I Additional Premises Commencement Date (as hereinafter defined), the Seventh Amendment Phase I Additional Premises shall be added to the Premises so that the Premises shall include the Existing Premises, the Corridor Space, and the Seventh Amendment Phase I Additional Premises upon all of the terms and conditions of the Lease except as modified herein. Effective as of the Seventh Amendment Phase II Additional Premises Commencement Date (as hereinafter defined), the Seventh Amendment Phase II Additional Premises shall be added to the Premises so that the Premises shall include the Existing Premises, the Corridor Space, the Seventh Amendment Phase I Additional Premises, and the Seventh Amendment Phase II Additional Premises upon all of the terms and conditions of the Lease except as modified herein. The lease of the Seventh Amendment Additional Premises shall terminate on the Lease Expiration Date (as defined in the Sixth Amendment), unless extended or sooner terminated as provided in the Lease. As used herein, the term "**Seventh Amendment Phase I Additional Premises Commencement Date**" shall mean the date upon which Landlord delivers possession of the Seventh Amendment Phase I Additional Premises to Tenant vacant and broom clean (except as reasonably necessary in connection with the completion of the Landlord Work). Landlord anticipates delivering

possession of the Seventh Amendment Phase I Additional Premises to Tenant on January 1, 2018.  The term "**Seventh Amendment Phase II Additional Premises Commencement Date**" shall mean the date upon which Landlord delivers possession of the Seventh Amendment Phase II Additional Premises to Tenant vacant and broom clean (except as reasonably necessary in connection with the completion of the Landlord Work).  Landlord anticipates delivering possession of the Seventh Amendment Phase II Additional Premises to Tenant on August 1, 2018.  Notwithstanding anything to the contrary contained herein, Landlord's failure to deliver possession of either the Seventh Amendment Phase I Additional Premises or the Seventh Amendment Phase II Additional Premises to Tenant by the applicable anticipated delivery date set forth in this section 2(a), where such failure to deliver is for reasons outside Landlord's reasonable control (including holdover by a party in possession), shall not affect the enforceability of this Seventh Amendment, or subject Landlord to any liability to Tenant for damages or be deemed a default by Landlord of its obligations under the Lease.

(b)  From and after the Seventh Amendment Phase I Additional Premises Commencement Date, the "**Rentable Floor Area of the Premises**" as used in the Lease shall mean 220,609 square feet, being the sum of (i) the Rentable Floor Area of the Existing Premises containing 208,686 rentable square feet, (ii) the Rentable Floor Area of the Corridor Space, and (iii) the Rentable Floor Area of the Seventh Amendment Phase I Additional Premises containing 10,921 rentable square feet.

(c)  From and after the Seventh Amendment Phase II Additional Premises Commencement Date, the "**Rentable Floor Area of the Premises**" as used in the Lease shall mean 237,615 square feet, being the sum of (i) the Rentable Floor Area of the Existing Premises containing 208,686 rentable square feet, (ii) the Rentable Floor Area of the Corridor Space, (iii) the Rentable Floor Area of the Seventh Amendment Phase I Additional Premises containing 10,921 rentable square feet, and (iv) the Rentable Floor Area of the Seventh Amendment Phase II Additional Premises containing 17,006 rentable square feet.

3. **Fixed Rent and Additional Rent for Early Rent Commencement of Seventh Amendment Additional Premises.**  With respect to the Seventh Amendment Phase I Additional Premises, Tenant shall pay Fixed Rent and Additional Rent beginning on May 1, 2018 (the "**Seventh Amendment Phase I Additional Premises Rent Commencement Date**"), unless the Seventh Amendment Phase I Additional Premises Commencement Date shall occur after January 1, 2018, in which case the Seventh Amendment Phase I Additional Premises Commencement Date shall be the date which is four (4) months after the Seventh Amendment Phase I Commencement Date.  With respect to the Seventh Amendment Phase II Additional Premises, Tenant shall pay Fixed Rent and Additional Rent beginning on the date which is four (4) months after the Seventh Amendment Phase II Commencement Date (the "**Seventh Amendment Phase II Additional Premises Rent Commencement Date**").

4. **Landlord's Work**.  Landlord shall perform the work described in Exhibit C attached hereto (the "**Landlord Work Letter**").  Tenant acknowledges that (a) it is fully familiar with the condition of the Seventh Amendment Phase I Expansion Premises and agrees to take the same on the Seventh Amendment Phase I Additional Premises Commencement Date in its "as-is" condition as of the Effective Date, subject to Landlord's delivery obligations pursuant to Section 2(a) of this Seventh Amendment; (b) it is fully familiar with the condition of the Seventh Amendment Phase II Expansion Premises and agrees to take the same on the Seventh Amendment Phase II Additional Premises Commencement Date in its "as-is" condition as of the Effective Date subject to Landlord's delivery

obligations pursuant to Section 2(a) of this Seventh Amendment; and (c) Landlord shall have no obligation to alter, repair or otherwise prepare the Seventh Amendment Expansion Premises for Tenant's occupancy or to pay for or construct any improvements to the Seventh Amendment Additional Premises to prepare the same for Tenant's occupancy, except as set forth in the Landlord Work Letter and subject to Landlord's express obligations under the Lease.

5. **Tenant's Work**.  If Tenant elects to perform the Seventh Amendment Tenant Alterations, such alterations shall be performed in accordance with the terms of  Exhibit D.  For ease of reference,  Exhibit D includes the definition of "**Seventh Amendment Tenant Alterations**" and sets forth the "**Seventh Amendment Construction Allowance**.

6. **Rent**.

(a) Annual Fixed Rent: Seventh Amendment Phase I Additional Premises.  The Annual Fixed Rent for the Seventh Amendment Phase I Additional Premises shall be as follows:

| Calendar Year | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| 2018 | $17.00 | $ 185,657.00 | $ 15,471.42 |
| 2019 | $17.51 | $ 191,226.71 | $ 15,935.56 |
| 2020 | $18.04 | $ 196,963.51 | $ 16,413.63 |
| 2021 | $18.58 | $ 202,872.42 | $ 16,906.03 |
| 2022 | $19.13 | $ 208,958.59 | $ 17,413.22 |
| 2023 | $19.71 | $ 215,227.35 | $ 17,935.61 |
| 2024 | $20.30 | $ 221,684.17 | $ 18,473.68 |
| 2025 | $20.91 | $ 228,334.69 | $ 19,027.89 |
| 2026 | $21.54 | $ 235,184.73 | $ 19,598.73 |
| 2027 | $22.18 | $ 242,240.27 | $ 20,186.69 |
| 2028 | $22.85 | $ 249,507.48 | $ 20,792.29 |
| 2029 | $23.53 | $ 256,992.71 | $ 21,416.06 |
| 2030 | $24.24 | $ 264,702.49 | $ 22,058.54 |

(b) Annual Fixed Rent: Seventh Amendment Phase II Additional Premises.  The Annual Fixed Rent for the Seventh Amendment Phase II Additional Premises shall be as set forth in the table below, provided that if any period for which Annual Fixed Rent is due hereunder is shorter than one full calendar month, Annual Fixed Rent for such period shall be calculated by multiplying the number of days in such period by a fraction, the numerator of which shall the Annual Fixed Rent applicable to such period, and the denominator of which shall be 365.

| Calendar Year | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| 2018 | $17.00 | $ 289,102.00 | $ 24,091.83 |
| 2019 | $17.51 | $ 297,775.06 | $ 24,814.59 |
| 2020 | $18.04 | $ 306,708.31 | $ 25,559.03 |
| 2021 | $18.58 | $ 315,909.56 | $ 26,325.80 |
| 2022 | $19.13 | $ 325,386.85 | $ 27,115.57 |
| 2023 | $19.71 | $ 335,148.45 | $ 27,929.04 |
| 2024 | $20.30 | $ 345,202.91 | $ 28,766.91 |
| 2025 | $20.91 | $ 355,558.99 | $ 29,629.92 |
| 2026 | $21.54 | $ 366,225.76 | $ 30,518.81 |
| 2027 | $22.18 | $ 377,212.54 | $ 31,434.38 |
| 2028 | $22.85 | $ 388,528.91 | $ 32,377.41 |
| 2029 | $23.53 | $ 400,184.78 | $ 33,348.73 |
| 2030 | $24.24 | $ 412,190.32 | $ 34,349.19 |

(c) Additional Rent. Effective as of the Corridor Space Commencement Date, notwithstanding anything to the contrary contained in the Lease, the Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be calculated in accordance with the terms of the Original Lease, using the "**Rentable Floor Area of the Premises**" as set forth in Section 1(b) of this Seventh Amendment, without regard to any base year. Effective as of the Seventh Amendment Phase I Additional Premises Rent Commencement Date, notwithstanding anything to the contrary contained in the Lease, the Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be calculated in accordance with the terms of the Original Lease, using the "**Rentable Floor Area of the Premises**" as set forth in Section 2(b) of this Seventh Amendment, without regard to any base year. Effective as of the Seventh Amendment Phase II Additional Premises Rent Commencement Date, notwithstanding anything to the contrary contained in the Lease, Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be calculated in accordance with the terms of the Original Lease using the "**Rentable Floor Area of the Premises**" as set forth in Section 2(c) of this Seventh Amendment, without regard to any base year.

(d) Annual Fixed Rent and Additional Rent for Existing Premises. For the avoidance of doubt, Tenant shall continue to pay Annual Fixed Rent and Additional Rent with respect to the Existing Premises in accordance with the terms of the Lease and without regard to the terms of this Seventh Amendment.

(e) Electricity. Tenant shall continue to pay all charges for electricity consumed in the Existing Premises in accordance with the terms of the Lease, as heretofore amended. Landlord has installed and rendered operational check meters to measure electricity usage in each of the Seventh Amendment Phase I Additional Premises and the Seventh Amendment Phase II Additional Premises. Beginning on the Seventh Amendment Phase I Additional Premises Commencement Date with respect to the Seventh Amendment Phase I Additional Premises and on the Seventh Amendment Phase II Additional Premises Commencement Date with respect to the Seventh Amendment Phase II Additional Premises, and continuing through the expiration or earlier termination of the Term (as it may have been extended), Tenant shall pay all charges for electricity consumed in the Seventh Amendment Phase I Additional Premises and the Seventh Amendment Phase II Additional Premises based upon the check

meter readings for the applicable premises at the actual rates charged by the utility provider, without any markup by Landlord of such utility rates. For the avoidance of doubt: (i) if any check meter for measuring Tenant's electricity usage malfunctions or is otherwise not operating properly (other than due to a Landlord default), Landlord may charge Tenant for electricity consumed in the applicable portion of the Premises during the period of malfunction (plus a period of ten (10) days after being made aware of such malfunction) based on reasonable industry-standard methods to reasonably estimate use and Tenant's past usage, and (ii) at Landlord's option and at Landlord's sole expense, Landlord may install direct meters for measuring Tenant's consumption of electricity in any area of the Premises which is not directly metered, and, in such event, Tenant shall thereafter pay all costs and expenses for such separately-metered electricity directly to the utility provider.

7. **Parking.** In accordance with the ratio set forth in Section 1.1 of the Lease (i.e. three (3) parking privileges for each 1,000 square feet of rentable floor area leased by Tenant): (a) as of the Corridor Space Commencement Date, the number of Parking Privileges Tenant is entitled to use at the Complex shall be 628 parking spaces, (b) as of the Seventh Amendment Phase I Additional Premises Commencement Date, the Number of Parking Privileges Tenant is entitled to use at the Complex shall be 662 parking spaces, and (c) of the Seventh Amendment Phase II Additional Premises Commencement Date, the Number of Parking Privileges Tenant is entitled to use at the Complex shall be 713 parking spaces, all subject to increase or decrease in accordance with the terms of Section 2.2.1 of the Lease (as amended).

8. **Fencing**. Section 14.c of the Sixth Amendment is hereby deleted in its entirety.

9. **Environmental Laws**. Notwithstanding anything to the contrary contained in the Lease either expressed or implied, Landlord covenants to Tenant that the Seventh Amendment Additional Premises shall be delivered to Tenant in its then "as is" condition, and free of all Hazardous Materials (as defined in Section 5.3 of the Lease) in violation of Hazardous Materials Laws.

10. **Brokers**. Tenant hereby represents to Landlord that it has dealt directly with and only with Transwestern Consulting Group and Jones Lang Lasalle New England, LLC (the "**Brokers**") as a broker in connection with this Seventh Amendment. Landlord and Tenant hereby indemnify and hold each other harmless against any loss, claim, expense or liability with respect to any commissions or brokerage fees claimed by any broker or finder other than the Brokers on account of the execution and/or renewal of this Lease due to any action of the indemnifying party.

11. **Miscellaneous**. Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written. Landlord shall continue to hold the Security Deposit, and Tenant shall maintain the Security Deposit, in accordance with the terms of the Lease. In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control. All terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease. The Recitals set forth above in this Amendment are hereby incorporated by this reference. This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting the matters set forth in this Amendment and this Amendment constitutes the parties' entire agreement with respect to the matters described herein and supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto or with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Amendment.

12. **Counterparts**. This Amendment may be executed in any number of counterparts and by each of the undersigned on separate counterparts, which counterparts taken together shall constitute one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the undersigned have executed this Amendment as of the day and year first above written.


**LANDLORD:**

DIV BEDFORD, LLC, a Massachusetts limited liability company


By: Bedford Manager Corp., a Massachusetts corporation


By: /s/ Richard McCready
Name: Richard McCready
Title: President


**TENANT:**

IROBOT CORPORATION,
a Delaware corporation


By: /s/ Alison Dean
Name: Alison Dean
Title: CFO


By: /s/ Glen D. Weinstein
Name: Glen D. Weinstein
Title: EVP & Chief Legal Officer

**Exhibit A**



EXHIBIT **A**
iROBOT - FIRST FLOOR
6 CROSBY DRIVE
BEDFORD BUSINESS PARK
BEDFORD, MASSACHUSETTS

FIRST FLOOR KEY PLAN

**Exhibit B**
**Seventh Amendment Phase II Additional Premises**



EXHIBIT "B"
iROBOT - FIRST FLOOR
4 CROSBY DRIVE
BEDFORD BUSINESS PARK
BEDFORD, MASSACHUSETTS
2017_0117LE2    9/21/2017

FIRST FLOOR KEY PLAN

**Exhibit C**
**Landlord Work Letter**

1.   Landlord shall perform improvements to the Premises and the Building in accordance with the work list attached hereto as Attachment #1 (the "**Worklist**") in a good and workmanlike manner, using new and quality materials and in compliance with all applicable Legal Requirements.  The improvements to be performed by Landlord in accordance with the Worklist are hereinafter referred to as "**Landlord's Work**".  Landlord shall enter into a direct contract for Landlord's Work with a general contractor selected by Landlord.  In addition, Landlord shall have the right to select and approve of any subcontractors used in connection with Landlord's Work.

2.   This Work Letter shall not be deemed applicable to any additional space added to the Premises at any time following the execution of the Seventh Amendment or from time to time, whether by any options under the Lease or otherwise, or to any portion of the Premises or any additions to the Premises in the event of a renewal or extension of the Lease Term subsequent to the Seventh Amendment, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease. All capitalized terms used in this Work Letter but not defined herein shall have the same meanings ascribed to such terms in the Seventh Amendment, or if none, the Lease.

Attachment #1 to Exhibit C

Worklist - Landlord's Work

1. Tie the Seventh Amendment Additional Premises into the existing Automated Logic Web CTRL Building Management System so as to control the HVAC system in the Seventh Amendment Additional Premises, including installation of new controls as needed for RTUs, VAVs, and FTPs (the "**Landlord's BMS Work**"). Landlord shall perform the Landlord's BMS Work in a good and workmanlike manner and shall use commercially reasonable efforts to Substantially Complete the Landlord's BMS Work in the Seventh Amendment Additional Premises within sixty (60) days following notice from Tenant that the Seventh Amendment Tenant Alterations are complete (provided that such Seventh Amendment Tenant Alterations are indeed complete), subject to Tenant SA Delays and delays resulting from labor disputes (to the extent affecting the area, generally), civil commotion, war, war like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, enactment of new governmental regulations or controls not in effect as of the Effective Date, fire or other casualty, inability to obtain any material or services (to the extent affecting the area, generally), acts of God, adverse weather not reasonably anticipatable, or similar matters beyond Landlord's reasonable control ("**Force Majeure**").

2. Install a new glass curtainwall at specified locations of the first floors of 4 Crosby Drive Crosby Drive similar to the existing glass curtainwall on the first floor of 6 Crosby Drive as described in the attached exhibit (the "**Seventh Amendment Curtainwall Work**"), subject to final construction drawings (the "**Seventh Amendment Curtainwall Work Plans**") and permitting approved by Tenant, which approval will not be unreasonably withheld, conditioned or delayed and shall not be withheld if the Seventh Amendment Curtainwall Work Plans reflect work consistent with the curtainwall installation heretofore performed to Building 6. For the avoidance of doubt, the Seventh Amendment Curtainwall Work is in addition to the Curtainwall Work described in the Sixth Amendment. If Landlord's request for approval indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND TENANT MAY BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND WITHIN FIFTEEN (15) BUSINESS DAYS AFTER RECEIPT," within fifteen (15) business days after receipt thereof Tenant shall provide Landlord with written notice of either (i) its approval of the Seventh Amendment Curtainwall Work Plans, (ii) its disapproval of the same with an explanation therefor, or (iii) the need for additional information in order to review and approve the same. If Tenant fails to respond within the aforementioned 15 business day period, then Landlord may send Tenant a second request that indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND TENANT SHALL BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT", and Tenant's failure to so respond within said five (5) business day period shall be deemed to constitute Tenant's approval of the Seventh Amendment Curtainwall Work Plans.

Landlord shall perform the Seventh Amendment Curtainwall Work in accordance with a construction and phasing schedule to be mutually agreed to by Landlord and Tenant, and Tenant will cooperate with Landlord in the agreed-upon phased construction process as reasonably required to minimize Tenant SA Delay and achieve completion of the Seventh Amendment Curtainwall Work in accordance with the construction and phasing schedule agreed to by the parties. Landlord shall perform the Seventh Amendment Curtainwall Work in a good and workmanlike manner, using new and quality materials and shall use reasonable efforts to

minimize unreasonable interference with Tenant's use of the Premises and the conduct of business therein, including using reasonable efforts to perform any unreasonably noisy work or work generating unreasonable vibrations into the Premises outside of Tenant's normal business hours. Landlord shall use all reasonable efforts to Substantially Complete the Seventh Amendment Curtainwall Work by November 1, 2018, subject to Force Majeure and any Tenant SA Delay (as hereinafter defined). Landlord and Tenant agree and acknowledge that during the completion of the Seventh Amendment Curtainwall Work (which is anticipated to last between 1 and 3 months), Tenant shall be required to relocate all furniture, equipment, and employees to areas at least 15 feet away from the exterior walls of the affected portions of the Seventh Amendment Additional Premises (the "**Protected Area of the Premises**").

For purposes of this Exhibit C, "**Tenant SA Delay**" shall mean any delay in the design, permitting or performance of the Landlord's BMS Work or the Seventh Amendment Curtainwall Work to the extent that such delay is actually caused by any act or, where there is a duty to act under this Lease, any failure to act by Tenant or Tenant's contractors, architects, engineers, or anyone else engaged by or on behalf of Tenant as hereinafter provided. Tenant SA Delay shall expressly include (without the need for any further notice to Tenant) Tenant's failure to comply with the dates set forth in the construction and phasing schedule for the Seventh Amendment Curtainwall Work agreed to by Landlord and Tenant or any subsequent changes to such phasing schedule mutually agreed to by Landlord and Tenant or the period for providing any response to a request by landlord expressly set forth in this Attachment #1 ("**Deemed Delays**"). Notwithstanding the foregoing, except for failure to act in a timely manner (including in accordance with the dates set forth in the construction and phasing schedule for the Seventh Amendment Curtainwall Work) by Tenant or Tenant's contractors, architects, engineers, or anyone else engaged by or on behalf of Tenant, in no event shall any act or occurrence giving rise to a delay be deemed a Tenant SA Delay as herein provided unless and until Landlord has given Tenant written notice (the "**Tenant SA Delay Notice**") advising Tenant: (x) that a Tenant SA Delay is occurring and setting forth Landlord's good faith estimate as to the likely length of such Tenant SA Delay; (y) of the basis on which Landlord has determined that a Tenant SA Delay is occurring; and (z) the actions which Landlord believes that Tenant must take to eliminate such Tenant SA Delay. Except with respect to Deemed Delays, no event shall be deemed to be a Tenant SA Delay if Tenant rectifies the situation causing the Tenant SA Delay within forty-eight (48) hours after delivery of the Tenant SA Delay Notice (which for the purposes of determining receipt may be delivered by hand or by email to Tenant's Construction Representative (as defined in Section 7 of Exhibit D), with copies to follow to Tenant within five (5) days thereafter in accordance with the notice provisions of the Lease); provided, however, that if Tenant shall fail to eliminate the delay within the aforesaid 48-hour period, then the 48-hour cure period shall be included in the period of time charged to Tenant pursuant to such Tenant SA Delay Notice (it being understood and agreed that if Tenant shall in fact eliminate the Tenant SA Delay within the 48-hour cure period, no Tenant SA Delay shall be deemed to have occurred for the purposes of this Exhibit C for the first three (3) instances of Tenant SA Delay). In connection with the foregoing, Landlord and Tenant (together with their respective contractors and representatives, as appropriate) agree to hold periodic job meetings to discuss the performance and scheduling of the Seventh Amendment Curtainwall Work and any changes to the construction and phasing schedule for the Seventh Amendment Curtainwall Work that are reasonably necessary. Upon substantial completion of the Seventh Amendment Curtainwall Work, Tenant's Construction Representative shall accompany Landlord's Construction Representative and Landlord's

architect on a walkthrough to inspect the Seventh Amendment Curtainwall Work on a date within 10 business days of a date reasonably designated by Landlord. Upon Tenant's request, Landlord shall provide Tenant with confirmation of the date of substantial completion for purposes of measuring the 345 day period referenced in the immediately following paragraph.

Landlord shall cause the Contractor to provide a customary one-year construction warranty for the Seventh Amendment Curtainwall Work, which shall provide that the Seventh Amendment Curtainwall Work will conform to the requirements of the Seventh Amendment Curtainwall Work Plans and will be free from defects. The Contractor's warranty shall not include remedies for damage or defect caused by Tenant or anyone claiming by, through or under Tenant, alterations to the Seventh Amendment Curtainwall Work performed by or on behalf of Tenant, or normal wear and tear under normal usage. In the case of defects under the Contractor's warranty, Tenant shall be deemed to have waived any claim for correction or cure for such defect on the date that is 345 days following the completion of such work as determined by Landlord's architect if Tenant has not then given written notice of such defect to Landlord.  Landlord shall cause Landlord's contractor to remedy, repair or replace any such defects identified by Tenant within such 345-day period, such action to occur as soon as practicable during normal working hours (unless such work will adversely affect Tenant's operations in the affected portions of the Premises, in which case the parties shall cooperate to permit such work to be performed after-hours) and so as to avoid any unreasonable interruption of Tenant's use of the affected portions of the Premises. If timely and adequate notice has been given and if Landlord has other guarantees, contract rights, or other claims against contractors, materialmen or architects, Landlord shall, with regard to any such defects, exercise all reasonable efforts to enforce such guarantees or contract rights.  The foregoing shall constitute Landlord's entire obligation with respect to all defects in the Landlord Work (provided, however, that nothing in this paragraph shall relieve the Landlord of its repair and maintenance obligations under Section 4.1 of the Lease).  During the period for correction of the Seventh Amendment Curtainwall Work in accordance with this paragraph, if the Tenant fails to notify the Owner and give the Owner an opportunity to cause the contractor to make the correction, the Tenant waives the rights to require correction by the contractor and to make a claim for breach of Landlord's obligations under this paragraph for such nonconforming item of Seventh Amendment Curtainwall Work (nothing in this sentence being deemed to relieve Landlord of its repair and maintenance obligations under the Lease, however).

3.   Notwithstanding anything contained in this Lease to the contrary, if Landlord shall fail to substantially complete (a) the Landlord's BMS Work on or before the date which is two hundred forty (240) days following notice from Tenant to Landlord that the Seventh Amendment Tenant Alterations are complete (provided that such Seventh Amendment Tenant Alterations are indeed complete) (which date shall be extended automatically for Tenant SA Delay and for such periods of time as Landlord is prevented from completing the same by reason of Force Majeure), or (b) the Seventh Amendment Curtainwall Work by April 1, 2019 (which date shall be extended automatically for Tenant SA Delay and for such periods of time as Landlord is prevented from completing the same by reason of Force Majeure), then, in either such event, Tenant, as its sole remedy at law, equity, or under this Lease, shall be entitled to a credit against the Annual Fixed Rent payable under this Lease in an amount equal to Seventy-Five Dollars ($75.00) per day for each day from and after the applicable completion date (as set forth in the first sentence of this Section 3 of Attachment #1 to Exhibit C) to the date of completion of the Landlord's BMS Work

or the Seventh Amendment Curtainwall Work, as applicable. Additionally, if Landlord's performance of any portion of the Seventh Amendment Curtainwall Work requires Tenant to vacate and not use a portion of the Protected Area of the Seventh Amendment Additional Premises for in excess of six (6) months, subject to extension for Tenant SA Delay and Force Majeure, then the Annual Fixed Rent for the applicable portion of the Protected Area of the Premises plus an additional ten percent (10%) of the Seventh Amendment Additional Premises as measured in rentable square feet shall abate from and after the expiration of such six (6) month period (as so extended) until such time as Tenant is reasonably able to reoccupy and conduct business in such affected areas of the Seventh Amendment Additional Premises. In the event that Landlord disputes Tenant's right to a rent abatement pursuant to this paragraph, such dispute may be submitted to arbitration by either party pursuant to Section 8 of Exhibit D to this Seventh Amendment.

**EXHIBIT D**

**WORK LETTER - Seventh amendment tenant ALTERATIONS**

1.      Following the Seventh Amendment Phase I Additional Premises Commencement Date, Tenant shall have the right to perform alterations and improvements in the Seventh Amendment Phase I Additional Premises, and following the Seventh Amendment Phase II Additional Premises Commencement Date, Tenant shall have the right to perform alterations and improvements in the Seventh Amendment Phase II Additional Premises (all such alterations being referred to herein as the "**Seventh Amendment Tenant Alterations**"). Notwithstanding the foregoing, Tenant and its contractors shall not have the right to perform the Seventh Amendment Tenant Alterations in the Seventh Amendment Additional Premises unless and until Tenant has complied with all of the terms and conditions of Section 5.14 of the Lease, including Landlord's right to approve (a) the final plans for the Seventh Amendment Tenant Alterations, and (b) the insurance coverage obtained by Tenant and its contractors in connection with the Seventh Amendment Tenant Alterations. In addition, Landlord shall have the right to approve, in its reasonable discretion, the contractors (each, a "**Contractor**") to be retained by Tenant to perform the Seventh Amendment Tenant Alterations.  Tenant shall be responsible for all elements of the plans for the Seventh Amendment Tenant Alterations (including, without limitation, compliance with law, functionality of design, the structural integrity of the design, the configuration of the premises and the placement of Tenant's furniture, appliances and equipment), and Landlord's approval of such plans shall in no event relieve Tenant of the responsibility therefor. Landlord's approval of the contractors to perform the Seventh Amendment Tenant Alterations shall not be unreasonably withheld. Landlord's approval of the general contractor to perform the Seventh Amendment Tenant Alterations shall not be considered to be unreasonably withheld if any such general contractor (i) does not have trade references reasonably acceptable to Landlord, (ii) does not maintain insurance as required by Landlord, (iii) does not have the ability to be bonded for the work in an amount satisfactory to Landlord, (iv) does not provide current financial statements reasonably acceptable to Landlord, or (v) is not licensed as a contractor in the state and municipality in which the Premises is located. Tenant acknowledges the foregoing is not intended to be an exclusive list of the reasons why Landlord may reasonably withhold its consent to a general contractor.

 With respect to Seventh Amendment Tenant Alterations constructed within the two years after the Seventh Amendment Phase II Additional Premises Commencement Date, Landlord shall review Tenant's plans and specifications for the Seventh Amendment Tenant Alterations (the "Tenant's Plans") and, if Tenant's request for approval indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND LANDLORD MAY BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIFTEEN (15) BUSINESS DAYS AFTER RECEIPT," within fifteen (15) business days after receipt thereof Landlord shall provide Tenant with written notice of either (i) its approval of the Tenant's Plans, (ii) its disapproval of the same with an explanation therefor, or (iii) the need for additional information in order to review and approve the same. In its approval of the Tenant's Plans, Landlord shall specify those alterations, additions and improvements that must be removed by Tenant at the expiration or earlier termination of the Term, if any, unless Landlord subsequently elects to waive such obligation to remove such alterations, additions and improvements.  If Landlord fails to respond within the aforementioned 15 business day period, then Tenant may send Landlord a second request that indicates in bold, capitalized text that states "THIS IS A TIME

SENSITIVE REQUEST AND LANDLORD SHALL BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT". Landlord's failure to so respond within said five (5) business day period shall be deemed to constitute Landlord's approval of the Tenant's Plans and determination that the alterations, additions and improvements shown thereon do not need to be removed by Tenant at the expiration or earlier termination of the Term (except to the extent that such removal would be required pursuant to clause (x) of Section 5.2 of the Lease with respect to Tenant's computer, telephone and other communications systems and equipment). Notwithstanding the foregoing or anything in the Lease to the contrary, Tenant shall be required in all events to remove any internal stairwells, raised floors, supplemental HVAC, specialized fire suppression systems, kitchens, bathrooms and showers, and any structural improvements made by Tenant as part of the Seventh Amendment Tenant Alterations.

Notwithstanding anything contained herein to the contrary, it is understood and agreed that Tenant may retain contractors and subcontractors that use union or non-union labor in connection with the construction of the Seventh Amendment Tenant Alterations. Tenant shall be responsible for maintaining labor harmony among its contractors and subcontractors and other contractors and subcontractors performing work at the Building, if any. For Seventh Amendment Tenant Alterations costing $3,000,0000 or less in or one or more related projects and undertaken within the two years after the Seventh Amendment Phase II Additional Premises Commencement Date, no bonds or other security shall be required in connection with Tenant's performance of such Seventh Amendment Tenant Alterations.

2. Tenant shall pay to Landlord, within ten (10) days after Landlord's written demand, a construction management fee equal to one percent (1%) of the hard costs of the Seventh Amendment Tenant Alterations to compensate Landlord for reviewing the plans for the Seventh Amendment Tenant Alterations and for costs incurred by Landlord in facilitating completion of the Seventh Amendment Tenant Alterations. No other plan review or other fees shall be charged by Landlord with respect to the Seventh Amendment Tenant Alterations notwithstanding anything in the Lease to the contrary, including Section 5.14 of the Lease. Landlord reserves the right to deduct such fee from the Seventh Amendment Construction Allowance (defined below). The construction management fee set forth in this section shall supersede any contrary provision of the Lease in so far as concerns the Seventh Amendment Tenant Alterations.

3. Provided there is no monetary or material non-monetary Event of Default in existence and continuing under the Lease, Landlord agrees to provide Tenant with an allowance of up to One Million One Hundred Seventeen Thousand Eighty Dollars ($1,117,080.00) (the "Seventh Amendment Construction Allowance") toward the cost of performing the Seventh Amendment Tenant Alterations. The Seventh Amendment Construction Allowance may only be used for "Eligible Costs," which are: (a) the cost of preparing design and construction documents and mechanical and electrical plans for the Seventh Amendment Tenant Alterations (which may not exceed 25% of the Seventh Amendment Construction Allowance), and (b) hard costs in connection with the Seventh Amendment Tenant Alterations.

The Seventh Amendment Construction Allowance may be advanced to fund Eligible Costs. In no event, however, shall the Seventh Amendment Construction Allowance be used for (x) payments to Tenant or any affiliates of Tenant, (y) the purchase of any movable furniture

equipment or personal property, or (z) costs resulting from any default by Tenant of its obligations under this Lease.  Landlord shall, subject to compliance with all of the other terms, conditions and provisions of the Lease, make disbursements of the Seventh Amendment Construction Allowance (hereinafter, each a "Disbursement") to Tenant in installments in accordance with the following terms and conditions:

(i)  Disbursements shall be made, at Tenant's request to Landlord, either to Tenant or, at Tenant's election,  to the applicable contractors, vendors and other service providers performing the Seventh Amendment Tenant Alterations as Tenant may designate or request (provided that any such payment made directly to a contractor, vendor, or other service provider shall be conditioned upon the contractor, vendor or other provider entering into a letter agreement reasonably satisfactory to Landlord confirming that such payments are being made as a matter of convenience and do not create any obligation of Landlord to pay such sums to such contractor, vendor or other service provider), no more frequently than once per month, in minimum increments of $75,000.00 (except for the final Disbursement), on the basis of written requests made in accordance with the method described below, and Landlord shall act upon such requests within thirty (30) days following the receipt of a written request for a Disbursement, which action shall be either (A) funding the requested Disbursement, or (B) specifying the basis for not funding (provided, however, that Landlord shall fund any undisputed portion of the requested Disbursement) and, when applicable, requesting reasonable additional information and reasonable supporting documentation.

(ii) Disbursements shall require the following requisitions, certifications and waivers:  (1) an appropriate AIA requisition form reasonably approved by Landlord with respect to work performed pursuant to Tenant's construction contract with its general contractor; (2) invoices from Tenant's service providers, showing in reasonable detail the cost of the item in question or of the improvements installed to date in the Premises and, where applicable evidence of prior payments; (3) lien waivers in the form attached as Addendum #1 to this Work Letter; (4) evidence reasonably acceptable to Landlord of prior payments for amounts previously disbursed out of the Seventh Amendment Construction Allowance (to the extent not previously provided to Landlord); and (5) certifications from Tenant that the amount of the requisition in question does not exceed the cost of the items, services and work covered by such certification. In the event that any portions of the Seventh Amendment Construction Allowance reflected on a particular requisition are to be funded directly to Tenant, as Tenant may designate or request, such requisition shall be accompanied by evidence reasonably satisfactory to Landlord that the items, services and work covered by such requisition have been fully paid by Tenant. Landlord shall have the right, upon reasonable advance notice to Tenant, to inspect Tenant's books and records relating to each requisition in order to verify the amount thereof.

(iii) Each Disbursement shall be made in an amount equal to the product of (x) Landlord's Percentage (as hereinafter defined) multiplied by (y) the lesser of:  (A) the amount requested, or (B) the amount actually payable to, as applicable, the Contractor or subcontractor(s) or other third party, in each case including any applicable retainage to be released in respect of work and materials satisfactorily completed and in place with respect to that particular request for a Disbursement (exclusive of work and materials to the extent included in any prior funded requests for a Disbursement), but in all cases subject to a five percent (5%) retention until all conditions to the final Disbursement are satisfied as set forth below. "**Landlord's Percentage**"

shall mean a fraction expressed as a percentage, the numerator of which is the total amount of the Seventh Amendment Construction Allowance and the denominator of which is the total cost of all Eligible Costs. Tenant shall fund the remainder in each instance.

(iv) Landlord may withhold or refuse to pay any Disbursement hereunder if (i) a Notice of Contract has been filed under Section 4 of Chapter 254 of the Massachusetts General Laws, as amended (the "**Mechanic's Lien Law**"), unless with respect to the subject requisition, an accurately completed and valid Lien Form has been provided to Landlord and is deemed reasonably acceptable to Landlord and otherwise complies with applicable Laws, or if any other statutory lien has been filed or established relating to claims for labor, materials, or supplies, whether under the Mechanic's Lien Law or otherwise.

(v) No Disbursements will be made for materials prior to the incorporation of the materials into the Premises.

(vi) Any disputes under this Exhibit D, Section 3 shall be submitted to arbitration in accordance with the terms of Section 8, below.

(vii) The requisition for the final Disbursement to pay the retainage, shall also require: (A) a certificate from Tenant and Tenant's architect that the Seventh Amendment Tenant Alterations have been completed in accordance with Tenant's Plans; (B) receipt of a permanent certificate of occupancy for the Premises (if applicable); (C) delivery of the record set of as-built plans maintained by Tenant's Contractor; (D) satisfaction of all conditions for final payment under the applicable construction contract, (E) final lien waivers from the Contractor (which may be conditioned upon receipt of payment), in the form required hereunder; (E) final lien waivers in the form required hereunder (which may be conditioned upon receipt of payment) from each sub-contractor, supplier, and any other party entitled to claim a lien with respect to the Seventh Amendment Tenant Alterations (other than the Contractor) who performs work in excess of $10,000; and (F) to the extent a lien waiver has not been provided as to the remaining amounts due under the applicable construction contract, the expiration of all statutory lien periods with no lien having been filed with respect to the Premises, the Building, or the Complex which remain outstanding.

4. Notwithstanding anything herein to the contrary, Landlord shall not be obligated to disburse any portion of the Seventh Amendment Construction Allowance, if applicable, during the continuance of an uncured Event of Default under the Lease, and Landlord's obligation to disburse shall only resume when and if such default is cured. If (a)Tenant's request for disbursement contains, in bold and prominent print, a legend stating that "FAILURE TO RESPOND WITHIN THIRTY (30) DAYS MAY RESULT IN AN OFFSET AGAINST RENT DUE PURSUANT TO EXHIBIT D OF THE SEVENTH AMENDMENT TO THE LEASE," and Landlord fails to respond within such thirty (30) day period, and Landlord thereafter fails to respond to such request within two (2) business days of a second notice from Tenant containing such legend, or (b) Landlord has timely disputed Tenant's demand and has thereafter failed to pay Tenant the amount of any final, unappealable judgement against Landlord within thirty (30) days after the issuance thereof, then Tenant may offset the amounts due from Landlord to Tenant under this Section 2 of Exhibit D against Fixed Rent payable under this Lease until Tenant is paid in full. Notwithstanding the foregoing, Tenant shall have no right to reduce any monthly

installment of Fixed Rent by more than twenty percent (20%) of the amount of Annual Fixed Rent that would otherwise have been due and payable by Tenant to Landlord, unless the aggregate amount of such deductions over the remainder of the Term of the Lease (as the same may have been extended) will be insufficient to fully reimburse Tenant for the amount demanded by Tenant, in which event Tenant may effect such offset by making deductions from each monthly installment of Fixed Rent in equal monthly amounts over the balance of the remainder of the Term.

5.    In no event shall the Seventh Amendment Construction Allowance be used for the purchase of equipment, furniture or other items of personal property of Tenant. In the event Tenant does not submit to Landlord a written request for payment of the entire Seventh Amendment Construction Allowance (together with all of the documents and certificates required for such payment) by February 28, 2021, any portion of the Seventh Amendment Construction Allowance not disbursed to Tenant shall accrue to the sole benefit of Landlord, it being understood that Tenant shall not be entitled to any credit, abatement or other concession in connection therewith. Tenant shall be responsible for all applicable state sales or use taxes, if any, payable in connection with the Seventh Amendment Tenant Alterations and/or the Seventh Amendment Construction Allowance.

6.    Tenant agrees to accept the Premises in its "as-is" condition and configuration, without representation or warranty by Landlord or anyone acting on Landlord's behalf, it being agreed that Landlord shall not be required to perform any work (except the Landlord Work set forth in Exhibit C to the Seventh Amendment) or incur any costs in connection with the construction or demolition of any improvements in the Premises (except as provided above with respect to the Seventh Amendment Construction Allowance). The foregoing shall not limit or waive Landlord's express obligations under the Lease with respect to the Premises, the Building or the Complex.

7.    Chad Haskell (phone no. 781-430-3210, email chaskell@irobot.com) shall be Tenant's Construction Representative, and shall have full power and authority to act on behalf of Tenant on any matters relating to the Landlord Work or Tenant's Seventh Amendment Tenant Alterations. Tenant may name a replacement Tenant Construction Representative from time to time by written notice to Landlord making reference to this Section 7. _____ (phone no. _____, email _____) shall be Landlord's Construction Representative, shall have full power and authority to act on behalf of Landlord on any matters relating to the Landlord Work or Tenant's Seventh Amendment Tenant Alterations. Landlord may name a replacement Landlord Construction Representative from time to time by written notice to Tenant making reference to this Section 7.

8.    All disputes between the parties regarding Tenant SA Delays and other matters expressly referencing this Section 8 shall be resolved in accordance with this Section 8. Any arbitration decision under this Section 8 shall be enforceable in accordance with applicable law in any court of proper jurisdiction. A party may not initiate arbitration under this Section 8 without notifying the other party and requesting a meeting of senior representatives to resolve the dispute. Within five (5) business days following such notice, senior representatives of Landlord and Tenant who have authority to resolve the dispute shall meet in order to seek a resolution by agreement prior

to the arbitration. If the dispute is not so resolved at the meeting (or if one party does not attend) then either party may initiate arbitration.

Any arbitration conducted pursuant to this Section 8 shall be conducted in as expeditious a manner as possible to avoid delays in the construction of the Landlord's Work and the Seventh Amendment Tenant Alterations and shall be resolved by a single arbitrator, who shall be agreed to by the parties within ten (10) days after either party requests arbitration under this Section 8 by notice to the other. Landlord and Tenant shall seek to agree upon a single arbitrator who is an independent third party real estate professional with at least twenty (20) years of experience in construction disputes involving multi-tenant, first-class office developments that has not worked for either party for the prior five (5) years (a "**Qualified Arbitrator**") and, if they are unable to agree, then a Qualified Arbitrator shall, upon request by either party, be appointed by the  office of the American Arbitration Association ("**AAA**") or successor organization administering arbitrations held in Boston, Massachusetts.  The arbitrator shall decide the dispute by written decision. The arbitration shall be conducted in Boston Massachusetts or another location agreed to by the parties in accordance with the Fast Track Procedures (regardless of the amount in dispute) of the Construction Industry Arbitration Rules of the AAA (or any successor organization), as modified and/or supplemented by this Section on an expedited basis and shall be concluded, with a decision issued, no later than thirty (30) days after the date that such dispute is submitted for arbitration. The decision of the arbitrator shall be final and binding on the parties. The parties shall comply with any orders of the arbitrator establishing deadlines for any such proceeding. The fee of the arbitrator shall be paid equally by the parties. Each party shall pay all other costs incurred by it in connection with the arbitration.

9.     This Work Letter shall not be deemed applicable to any additional space added to the Premises at any time following the execution of the Seventh Amendment or from time to time, whether by any options under the Lease or otherwise, or to any portion of the Premises or any additions to the Premises in the event of a renewal or extension of the Lease Term subsequent to the Seventh Amendment, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease. All capitalized terms used in this Work Letter but not defined herein shall have the same meanings ascribed to such terms in the Seventh Amendment, or if none, the Lease.

**[END OF EXHIBIT D]**

**ADDENDUM #1 TO EXHIBIT D TO SEVENTH AMENDMENT TO LEASE**

**FORMS OF LIEN WAIVER**

[FORM OF ARCHITECT'S LIEN WAIVER]

**Payment Receipt and Affidavit**

To:   ("**Owner**")

Project:

Application for Payment No.:

Period Ending:

Progress Payment: _____  Final Payment:_____  (check one or the other)

| | |
|---|---|
| A. Original Contract Amount | $_____ |
| B. Total Additional Services Amounts, if any | $_____ |
| C. Adjusted Contract Amount (Add A & B) | $_____ |
| D. Amount Paid to Date Before this Application | $_____ |
| E. Retainage Held on Amount Paid to Date, if any | $_____ |
| F. Amount Owing on this Application | $_____ |
| G. Retainage to be Held on this Application, if any | $_____ |
| H. Total Owing on this Application (F minus G) | $_____ |

1. Except for any Disputed Claims Amount set forth below, Retainage Held and to be Held and Total Owing on this Application set forth above, Undersigned, on its behalf and on behalf of anyone directly or indirectly employed by or claiming under it, hereby fully and forever releases, acquits and discharges Owner, its general and limited Owner, agents, attorneys, employees, officers, directors, trustees, stockholders, managers, members, lenders, and their respective successors and assigns, whether disclosed or undisclosed (individually and collectively hereinafter referred to as the "**Releasees**"), from all manner of action and causes of action, claims, suits, debts, sums of money, commissions, compensation for services rendered, liens of any type, trust fund claims, judgments, executions, damages, demands and rights whatsoever, at law or in equity, now existing or which may hereafter accrue in favor of Undersigned by reason of or in connection with any and all claims arising out of its contract, and for all work, labor and services furnished, performed and provided pursuant thereto including without limitation all claims for additional services, reimbursable expenses, charges, credits, contract amendments thereto and all other services with regard to the Project through the Period Ending set forth above. The foregoing shall be with respect to all matters arising through the Period Ending set forth above if this Affidavit is given in connection with a Progress Payment; and if given in connection with Final Payment it shall be with respect to all matters existing or arising through the date hereof or hereafter at any time existing or arising.

2. Undersigned certifies, warrants and represents that (a) it has paid in full and in accordance with all applicable obligations, laws and regulations, for all labor and services performed and furnished in connection with the services under its contract, all social security withholding, unemployment insurance, sales, use and other taxes applicable thereto and for all premiums for insurance carried with respect thereto; (b) it owes no one for any of the foregoing or any other item of cost or expense in connection with the performance or furnishing of the services under its contract; and that (c) no claims have been made against Undersigned for any unpaid labor, services or any other item of cost and expense arising out of or relating to the services under its contract that are not currently paid and satisfied.

3. Undersigned certifies, warrants and represents (i) that the "Amount Owing on this Application" set forth above constitutes the entire value of all services rendered by or under the undersigned for which payment is due through the Period, (ii) that all other amounts set forth above are accurate and complete, and (iii) that the Undersigned has no other claims except as set forth in the maximum aggregate amount as "**Disputed Claims Amount**" below and described in detail on Exhibit A attached (any such description must include a detailed statement of the kind and nature of the claim and must have attached a copy of the notice given of such claim).

4. If, after the Owner's payment of the Total Owing on this Application, any claims or liens are made or filed against any of the Releasees or the Project by Undersigned, or by any employee, other design professional, subcontractor or supplier of Undersigned or by anyone directly or indirectly employed or engaged by any of the foregoing with respect to the Project, or if any certification, warranty or representation herein or otherwise given in connection herewith shall not be true in all material respects, Undersigned agrees to satisfy and discharge such claim or lien and indemnify the Releasees, hold the Releasees harmless and defend the Releasees, at Undersigned's sole cost and expense, from and against such claim or lien or any such certification, warranty or representation not being true, and to pay all costs and expenses related thereto, including, but not limited to, the cost of discharging any liens and all legal fees, disbursements and costs of litigation in connection with any of the foregoing. To the fullest extent permitted by law, the Undersigned discharges, releases and waives all liens and right to lien expressly including such rights with respect to the Amount Paid to Date Before this Application and, when paid, with respect to the Total Owing on this Application.

5. Undersigned makes this Affidavit freely and voluntarily, without duress or coercion, after Undersigned has either consulted with or been given the opportunity to consult with legal counsel, and Undersigned has carefully and completely read all of the terms and provisions of this Affidavit and has agreed to be bound hereby.

6. Undersigned acknowledges that the foregoing statements, representations, warranties and agreements are made as an affidavit under applicable law and otherwise to induce the Owner to make the payment requested and its lender to provide funds under its loan, and that the Releasees are relying upon the truth of the statements, representations and warranties contained herein.

7. Undersigned acknowledges that this Affidavit shall inure to the benefit of the Releasees and their respective successors and assigns and shall be binding on Undersigned and its successors and assigns. If any part or provision hereof is unenforceable, the remainder shall not be affected.

In witness whereof, Undersigned has caused this instrument to be sworn to executed under seal as of the _____ day of _____, 20___.

Disputed Claims Amount, if any $_____ (see attached Exhibit A)

Design Professional:

(Type Name)

By: _

(Duly Authorized)

STATE OF _____

_____ County, ss.

On this ____ day of _____, 20__, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification of a driver's license to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.

(official signature and seal of notary)

My commission expires _____

[FORM OF CONTRACTOR'S LIEN WAIVER]

PARTIAL WAIVER AND SUBORDINATION OF LIEN
M.G.L. c. 254, §32

COMMONWEALTH OF MASSACHUSETTS: Date: _____, ___ 20__
MIDDLESEX COUNTY Application for Payment No. ____

OWNER: _____

CONTRACTOR: _____

LENDER/MORTGAGEE: _____

     1. Original Contract Amount: $_____

     2. Approved Change Orders: $_____

     3. Adjusted Contract Amount: $_____

     4. Completed to Date: $_____

     5. Less Retainage: $_____

     6. Total Payable to Date: $_____
        (line 4 less line 5)

     7. Less Previous Payments: $_____

     8. Current Amount Due: $_____
        (line 6 less line 7)

     9. Pending Change Orders: $_____

     10. Disputed Claims: $_____

The undersigned who has a contract with Owner, for furnishing labor or materials or both labor and materials or rental equipment, appliances or tools for the erection, alteration, repair or removal of a building or structure or other improvement of real property with a street address of _____, _____, Massachusetts, and owned by Owner, upon receipt of _____ ($_____) in payment of an invoice/requisition/application for payment dated _____ does hereby:

(a)        waive any and all liens and right of lien on such real property for labor or materials, or both labor and materials, or rental equipment, appliances or tools, performed or furnished through the following date:

     _____ (payment period), except for retainage, unpaid agreed or pending change orders, and disputed claims as stated above; and

(b)        subordinate any and all liens and right of lien to secure payment for such unpaid, agreed or pending change orders and disputed claims, and such further labor or materials, or both labor and materials, or rental equipment, appliances or tools, except for retainage, performed or furnished at any time through the twenty-fifth day after the end of the above payment period, to the extent of the amount actually advanced by the above lender/mortgagee through such twenty-fifth day.

Signed under the penalties of perjury this _____ day of _____, _____.

Contractor:

By: _____

Its: _____

## COMMONWEALTH OF MASSACHUSETTS

_____ County, ss.

On this ____ day of _____, 20__, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification, which was _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose, as _____ of _____, a _____.


_____
(official signature and seal of notary)
Name: _____
My commission expires: _____

CONTRACTOR'S CONDITIONAL WAIVER AND
RELEASE UPON FINAL PAYMENT
(Submitted with final application for payment)

OWNER: _____

CONTRACTOR: _____

PROJECT: _____

Contract Sum: $_____

Total Amount Previously Paid: $_____

Final Payment Amount: $_____

In consideration of all past payments received from the Owner in connection with the Project, the undersigned acknowledges and agrees that, except for the Final Payment Amount (as set forth above), it has received full and final payment of all sums due, including all sums due under its Contract with Owner, for labor, materials and/or equipment furnished by the undersigned to or in connection with the Project. The undersigned further acknowledges and agrees that upon receipt of a check in the Final Payment Amount and payment of such check by the bank upon which it is drawn, the undersigned will release, discharge, relinquish and waive any and all claims, suits, liens, and rights under the statutes of the Commonwealth of Massachusetts with respect to the Owner, the Project and/or against the Owner on account of any labor, materials and/or equipment furnished in connection with the Project.

The undersigned individual represents and warrants that he/she is the duly authorized representative of the undersigned, empowered and authorized to execute and deliver this document on behalf of the undersigned and that this document shall be binding upon the undersigned.

This document is to take effect as a sealed instrument.

Signed under the penalties of perjury as of this _____ day of _____, _____.

      CONTRACTOR:

      _____
      Signature of Authorized Individual

      _____
      Printed Name and Title of Above Individual

[FORM OF SUBCONTRACTOR'S LIEN WAIVER]

**SUBCONTRACTOR'S**
**RELEASE AND PARTIAL LIEN WAIVER**

**I. Reference Data:**

**Owner:**

**Tenant:**

**Project:**

**Subcontractor:**

**Subcontract Work:**

**Subcontract Date:**

**Current Subcontract Financial Status Summary:**

1. Original Subcontract Amount $_____

2. Approved Change Order(s) $_____

3. Adjusted Total Subcontract Amount (Item No. 1 plus 2) $_____

4. Total Amount of Subcontract Work Completed to Date
   (including Current Requisition and Retainage) $_____

5. Total Payments Received by Subcontractor through the
   Date of Release and Waiver (as defined below) $_____

6. Retainage Held on Account of Payments Received by
   Subcontractor (Item No. 5) $_____

7. Amount Currently Requisitioned, including Retainage
   (Item No. 4 less Items No. 5 and 6) $_____

8. Retainage to be Held on Account of Current Requisition $_____

9. Balance Currently Due (Item No. 7 less Item No. 8) $_____

Outstanding Claims and Pending Change Orders, if any, must be set forth on **Schedule A**.

## II. Release and Partial Lien Waiver

For the period ending on the last day of the month of _____, 20__ (the "Date of Release and Waiver") the undersigned Subcontractor hereby acknowledges receipt of payments on account of the Subcontract Work in the amount of the Total Payments Received by Subcontractor through the Date of Release and Waiver (Item No. 5, above). This amount represents payment in full through and including the Date of Release and Waiver.

The undersigned hereby swears and certifies that the Reference Data set forth above is true and correct and acknowledges that there are no additional costs or claims for any extras, additions or changes for labor or materials or otherwise on the Project, other than those listed on **Schedule A**. To the extent permitted by applicable law, the undersigned hereby waives and releases any and all claims, laborer's, mechanic's or materialmen's liens, and claims of right to a laborer's, mechanic's or materialmen's lien on or against the Project under the laws of Massachusetts, on account of labor or materials or both furnished by the undersigned to or on account of the Subcontract Work through the Date of this Release and Waiver, except for matters set forth on **Schedule A**.

The undersigned hereby swears and certifies that all persons, firms or other entities, regardless of tier, who have supplied work, labor, materials, services and other items to the undersigned in connection with the Project have been paid in full through the Date of Release and Waiver, except for amounts included in the Current Requisition (Item No. 7, above); and agrees that the General Contractor, the Owner, any lender of the Owner, the Tenant or any other person or entity having an interest in the Project may rely on the accuracy of this instrument.

Duly authorized and executed under the pains and penalties of perjury as of this _____ day of _____, 20__.

SUBCONTRACTOR: _____

By: _____

Title: _____
Hereunto duly authorized

**SCHEDULE A**

**Outstanding Claims and Pending Change Orders**

**Amount of Claim**

**1. Nature of Claim or Requested Change**

**2. Pending Change Orders**

_____

Except for those matters listed above, the Subcontractor acknowledges by the submission of this Release and Partial Lien Waiver that, as of the Date of Release and Waiver, no such claims or pending change orders exist.

Execution

## EIGHTH AMENDMENT TO LEASE

**THIS EIGHTH AMENDMENT TO LEASE** (this "**Eighth Amendment**") is entered into as of February 14, 2018 (the "**Effective Date**"), by and between **DIV BEDFORD, LLC**, a Massachusetts limited liability company ("**Landlord**"), and **IROBOT CORPORATION**, a Delaware corporation ("**Tenant**").

### R E C I T A L S:

A. Landlord and Tenant are parties to that certain Lease (the "**Original Lease**") dated as of February 22, 2007, as amended by that certain Letter Agreement dated as of May 4, 2007, as further amended by that certain Letter Agreement dated August 15, 2007, as further amended by a First Amendment to Lease dated September 16, 2010, as further amended by a certain Declaration dated June 16, 2011, as further amended by a Second Amendment to Lease dated as of May 20, 2014, as further amended by a certain letter dated October 8, 2014, as further amended by a Third Amendment to Lease dated as of April 10, 2015 (the "**Third Amendment**"), as further amended by a Fourth Amendment to Lease dated as of October 23, 2015, as further amended by a Fifth Amendment to Lease dated as of May 4, 2016, as further amended by a Sixth Amendment to Lease dated as of July 5, 2017 (the "**Sixth Amendment**"), as further amended by a Seventh Amendment to Lease dated as of November 21, 2017 (the "**Seventh Amendment**") for certain premises (the "**Existing Premises**") consisting of approximately 237,615 rentable square feet of space located within the Complex (as defined in the Lease) and now known as XChange at Bedford (formerly known as Bedford Business Park) in Bedford Massachusetts. As used herein, the term "**Lease**" shall mean the Original Lease as amended by this Eighth Amendment and the amendments described in the preceding sentence.

B. Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord an additional 32,770 rentable square feet of space (the "**Eighth Amendment Additional Premises**") consisting of the entire third floor of Building 14 at the Complex (also known as 14 Crosby Drive and formerly known as Building F), which space is shown on Exhibit A attached hereto.

C. Landlord has further agreed to construct an amenity space (the "**Additional Amenity Space**") for use as a fitness facility, including men's and women's shower facilities, which shall initially be located on the first floor of Building 14 as shown on Exhibit B attached hereto.

D. Landlord and Tenant therefore desire to enter into this Eighth Amendment to set forth the terms and conditions for the leasing of the Eighth Amendment Additional Premises and to amend the Lease as hereinafter set forth.

### A G R E E M E N T:

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree to further amend the Lease as follows:

1. **Additional Amenity Space**.

(a) Construction of Additional Amenity Space. Landlord shall construct the Additional Amenity Space on the first floor of Building 14 in the location shown on the space plan attached hereto

as Exhibit B. The Additional Amenity Space shall contain two (2) new men's and two (2) new women's changing and shower facilities and Landlord shall continue to operate and maintain two (2) showers in a common area on the first (1st) floor of Building 14. Upon completion of the Additional Amenity Space, the Additional Amenity Space shall be a "Common Area" as that term is used in the Original Lease and Tenant shall have the right to use the Additional Amenity Space in common with other tenants of the Complex, subject to Landlord's reasonable scheduling protocols and reasonable rules of general applicability to tenants of the Complex.

(b) Delivery Schedule. Landlord anticipates that the Additional Amenity Space will be substantially completed and available for tenant use by the later of: (i) September 30, 2018 and (ii) six (6) months following the date the current tenant vacates the space shown on Exhibit B (such date, the "**Anticipated Additional Amenity Space Availability Date**"). In the event of a delay in substantial completion and opening for use of the Additional Amenity Space, Tenant shall be entitled to a rent credit equal to $833 per day for each day beyond the date 60 days after the Anticipated Additional Amenity Space Availability Date that the Additional Amenity Space has not been completed. If the Additional Amenity Space has not been substantially completed by the date that is 90 days following the Anticipated Additional Amenity Space Availability Date, the rent credit shall be increased to a total of $1,667.00 per day for each day beyond the date 90 days after the Anticipated Additional Amenity Space Availability Date that the Additional Amenity Space has not been substantially completed. The Additional Amenity Space shall be deemed to be "substantially complete" when it is available for use for its intended purpose, subject only to normal and customary punchlist items. The Landlord's architect's determination of substantial completion shall be deemed conclusive.

(c) Effect on Rentable Square Footage of the Premises. On account of the addition of Additional Amenity Space to the Common Areas of the Complex, effective as of the Effective Date of this Eighth Amendment, the rentable square footage of the Existing Premises (as defined in the Recitals to this Eighth Amendment) shall be 239,597 rentable square feet for all purposes under the Lease, including without limitation the calculation of Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises.

(d) Effective as of the Effective Date, Section 6(a) of the Sixth Amendment shall be deemed deleted and replaced with the following:

"(a) Annual Fixed Rent. From and after January 1, 2018, the Annual Fixed Rent for the Premises (as defined in the Sixth Amendment) shall be as follows:

| Calendar Year | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| 2018 | $17.00 | $ 3,594,429.00 | $ 299,535.75 |
| 2019 | $17.51 | $ 3,702,261.87 | $ 308,521.82 |
| 2020 | $18.04 | $ 3,813,329.73 | $ 317,777.48 |
| 2021 | $18.58 | $ 3,927,729.62 | $ 327,310.80 |
| 2022 | $19.13 | $ 4,045,561.51 | $ 337,130.13 |
| 2023 | $19.71 | $ 4,166,928.35 | $ 347,244.03 |
| 2024 | $20.30 | $ 4,291,936.20 | $ 357,661.35 |
| 2025 | $20.91 | $ 4,420,694.29 | $ 368,391.19 |
| 2026 | $21.54 | $ 4,553,315.12 | $ 379,442.93 |
| 2027 | $22.18 | $ 4,689,914.57 | $ 390,826.21 |
| 2028 | $22.85 | $ 4,830,612.01 | $ 402,551.00 |
| 2029 | $23.53 | $ 4,975,530.37 | $ 414,627.53 |
| 2030 | $24.24 | $ 5,124,796.28 | $ 427,066.36 |

(e) Effective as of the Effective Date, Section 6(a) of the Seventh Amendment shall be deemed deleted and replaced with the following:

"(a) Annual Fixed Rent: Seventh Amendment Phase I Additional Premises. The Annual Fixed Rent for the Seventh Amendment Phase I Additional Premises shall be as follows:

| Calendar Year | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| 2018 | $17.00 | $ 187,204.00 | $ 15,600.33 |
| 2019 | $17.51 | $ 192,820.12 | $ 16,068.34 |
| 2020 | $18.04 | $ 198,604.72 | $ 16,550.39 |
| 2021 | $18.58 | $ 204,562.87 | $ 17,046.91 |
| 2022 | $19.13 | $ 210,699.75 | $ 17,558.31 |
| 2023 | $19.71 | $ 217,020.74 | $ 18,085.06 |
| 2024 | $20.30 | $ 223,531.37 | $ 18,627.61 |
| 2025 | $20.91 | $ 230,237.31 | $ 19,186.44 |
| 2026 | $21.54 | $ 237,144.43 | $ 19,762.04 |
| 2027 | $22.18 | $ 244,258.76 | $ 20,354.90 |
| 2028 | $22.85 | $ 251,586.52 | $ 20,965.54 |
| 2029 | $23.53 | $ 259,134.12 | $ 21,594.51 |
| 2030 | $24.24 | $ 266,908.14 | $ 22,242.35 |

(f) Effective as of the Effective Date, Section 6(b) of the Seventh Amendment shall be deemed deleted and replaced with the following:

"(b) Annual Fixed Rent: Seventh Amendment Phase II Additional Premises. The Annual Fixed Rent for the Seventh Amendment Phase II Additional Premises shall be as set forth in the table below, provided that if any period for which Annual Fixed Rent is due hereunder is shorter than one full calendar month, Annual Fixed Rent for such period shall be calculated by multiplying the number of days in such period by a fraction, the numerator of which shall the Annual Fixed Rent applicable to such period, and the denominator of which shall be 365.

| Calendar Year | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| 2018 | $17.00 | $ 291,516.00 | $ 24,293.00 |
| 2019 | $17.51 | $ 300,261.48 | $ 25,021.79 |
| 2020 | $18.04 | $ 309,269.32 | $ 25,772.44 |
| 2021 | $18.58 | $ 318,547.40 | $ 26,545.62 |
| 2022 | $19.13 | $ 328,103.83 | $ 27,341.99 |
| 2023 | $19.71 | $ 337,946.94 | $ 28,162.25 |
| 2024 | $20.30 | $ 348,085.35 | $ 29,007.11 |
| 2025 | $20.91 | $ 358,527.91 | $ 29,877.33 |
| 2026 | $21.54 | $ 369,283.75 | $ 30,773.65 |
| 2027 | $22.18 | $ 380,362.26 | $ 31,696.85 |
| 2028 | $22.85 | $ 391,773.13 | $ 32,647.76 |
| 2029 | $23.53 | $ 403,526.32 | $ 33,627.19 |
| 2030 | $24.24 | $ 415,632.11 | $ 34,636.01 |

2. **Expansion of Premises**.

(a)  Effective as of the Eighth Amendment Additional Premises Commencement Date (as hereinafter defined), the Eighth Amendment Additional Premises shall be added to the Premises so that the Premises shall include the Existing Premises and the Eighth Amendment Additional Premises upon all of the terms and conditions of the Lease except as modified herein.  The lease of the Eighth Amendment Additional Premises shall terminate on the day preceding the seventh anniversary of the Eighth Amendment Additional Premises Commencement Date (the "**Eighth Amendment Additional Premises Termination Date**"), unless extended or sooner terminated as provided in the Lease.  As used herein, the term "**Eighth Amendment Additional Premises Commencement Date**" shall mean the date upon which Landlord delivers possession of the Eighth Amendment Additional Premises to Tenant vacant and broom clean.  Landlord anticipates delivering possession of the Eighth Amendment Additional Premises to Tenant on the Effective Date.  Notwithstanding anything to the contrary contained herein, Landlord's failure to deliver possession of the Eighth Amendment Additional Premises to Tenant by the applicable anticipated delivery date set forth in this section, where such failure to deliver is for reasons outside Landlord's reasonable control (including holdover by a party in possession), shall not affect the enforceability of this Eighth Amendment, or subject Landlord to any liability to Tenant for damages or be deemed a default by Landlord of its obligations under the Lease.

(b)  From and after the Eighth Amendment Additional Premises Commencement Date through the Eighth Amendment Additional Premises Termination Date, the "**Rentable Floor Area of the Premises**" as used in the Lease shall mean 272,367 square feet.

3. **Condition of Eighth Amendment Additional Premises**.  Tenant acknowledges that (a) it is fully familiar with the condition of the Eighth Amendment Additional Premises and agrees to take the same on the Eighth Amendment Additional Premises Commencement Date in its "as-is" condition as of the Effective Date, subject to Landlord's delivery obligations pursuant to Section 1(a) of this Eighth Amendment; and (b) Landlord shall have no obligation to alter, repair or otherwise prepare the Eighth Amendment Additional Premises for Tenant's occupancy or to pay for or construct any improvements to the Eighth Amendment Additional Premises to prepare the same for Tenant's occupancy, subject to Landlord's express obligations under the Lease and subject to Landlord's obligations set forth on Exhibit C attached hereto.

4. **Tenant's Work**.  If Tenant elects to perform the Eighth Amendment Tenant Alterations, such alterations shall be performed in accordance with the terms of Exhibit C.  For ease of reference, Exhibit C includes the definition of "**Eighth Amendment Tenant Alterations**" and sets forth the "**Eighth  Amendment Construction Allowance**."  Notwithstanding anything to the contrary contained in the Sixth Amendment or the Seventh Amendment, Tenant may apply all or a portion of either or both of the Sixth Amendment Construction Allowance and the Seventh Amendment Construction Allowance toward the Eighth Amendment Tenant Alterations, all in accordance with the procedures set forth in Exhibit C.

5. **Rent**.

(a) Annual Fixed Rent: Eighth Amendment Additional Premises.  The Annual Fixed Rent for the Eighth Amendment Additional Premises shall be as follows:

| Time Period | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| Eighth Amendment Additional Premises Lease Year 1 | $ 18.50 | $ 606,245.00 | $ 50,520.42 |
| Eighth Amendment Additional Premises Lease Year 2 | $ 19.25 | $ 630,822.50 | $ 52,568.54 |
| Eighth Amendment Additional Premises Lease Year 3 | $ 20.00 | $ 655,400.00 | $ 54,616.67 |
| Eighth Amendment Additional Premises Lease Year 4 | $ 20.75 | $ 679,977.50 | $ 56,664.79 |
| Eighth Amendment Additional Premises Lease Year 5 | $ 21.50 | $ 704,555.00 | $ 58,712.92 |
| Eighth Amendment Additional Premises Lease Year 6 | $ 22.25 | $ 729,132.50 | $ 60,761.04 |
| Eighth Amendment Additional Premises Lease Year 7 | $ 23.00 | $ 753,710.00 | $ 62,809.17 |

For purposes of this Amendment, the term "**Eighth Amendment Additional Premises Lease Year**" shall mean a period of twelve (12) consecutive months, commencing on the Eighth Amendment Additional Premises Commencement Date and each successive twelve (12) month period.

(b) Additional Rent. Effective as of the Eighth Amendment Additional Premises Commencement Date, notwithstanding anything to the contrary contained in the Lease, the Operating Expenses Allocable to the Premises and Landlord's Tax Expenses Allocable to the Premises shall be calculated in accordance with the terms of the Original Lease, using the new "Rentable Floor Area of the Premises" as set forth in Section 2(b) of this Eighth Amendment, without regard to any base year.

(c) Abatement of Annual Fixed Rent. Notwithstanding anything to the contrary contained herein, so long as there is no Event of Default under the Lease, monthly installments of Annual Fixed Rent for the Eighth Amendment Additional Premises shall abate for the first twelve (12) full calendar months following the Eighth Amendment Additional Premises Commencement Date (such period, the "**Rent Abatement Period**"). The total amount of monthly Fixed Rent abated during the Rent Abatement Period shall be referred to herein as the "**Abated Rent**." During the Rent Abatement Period all other costs and charges specified in the Lease (other than the Abated Rent) shall remain as due and payable pursuant to the provisions of the Lease. Notwithstanding anything herein to the contrary, if a monetary or material non-monetary Event of Default by Tenant shall occur while the foregoing Rent Abatement Period is still in effect, the Rent Abatement Period shall be suspended during the period that such monetary or material non-monetary Event of Default is continuing and Tenant shall immediately commence paying the full amount otherwise required under the Lease for such period. Upon Tenant's cure of such Event of Default of Tenant, the Rent Abatement Period shall resume and continue provided that in no event shall the amount of Abated Rent increase as a result of any such suspension of the Rent Abatement Period.

(d) Annual Fixed Rent for Existing Premises and Additional Rent During Rent Abatement Period. For the avoidance of doubt, during the Rent Abatement Period, Tenant shall pay Annual Fixed Rent with respect to the Existing Premises and Additional Rent with respect to the Eighth Amendment Additional Premises and the Existing Premises in accordance with the terms of the Lease.

(e) Electricity. Tenant shall continue to pay all charges for electricity consumed in the Existing Premises in accordance with the terms of the Lease.  Landlord has installed and rendered operational check meters to measure electricity usage in the Eighth Amendment Additional Premises.  Beginning on the Eighth Amendment Additional Premises Commencement Date and continuing through the expiration or earlier termination of the Term (as it may have been extended), Tenant shall pay all charges for electricity consumed in the Eighth Amendment Additional Premises based upon the check meter readings for the Eighth Amendment Additional Premises at the actual rates charged by the utility provider, without any markup by Landlord of such utility rates.  For the avoidance of doubt: (i) if any check meter for measuring Tenant's electricity usage malfunctions or is otherwise not operating properly (other than due to a Landlord default), Landlord may charge Tenant for electricity consumed in the applicable portion of the Premises during the period of malfunction (plus a period of ten (10) days after being made aware of such malfunction) based on reasonable industry-standard methods to reasonably estimate use and Tenant's past usage, and (ii) at Landlord's option and at Landlord's sole expense, Landlord may install direct meters for measuring Tenant's consumption of electricity in any area of the Premises which is not directly metered, and, in such event, Tenant shall thereafter pay all costs and expenses for such separately-metered electricity directly to the utility provider.

6. **Parking**.  In accordance with the ratio set forth in Section 1.1 of the Original Lease (i.e., three (3) parking privileges for each 1,000 square feet of rentable floor area leased by Tenant): as of the Eighth Amendment Additional Premises Commencement Date, the Number of Parking Privileges Tenant is entitled to use at the Complex shall be 817 parking spaces, all subject to increase or decrease in accordance with the terms of Section 2.2.1 of the Original Lease (as amended).  Any parking spaces serviced by electric vehicle charging stations installed by Tenant in connection with the Eighth Amendment Tenant Alterations ("**Electric Vehicle Charging Stations**") shall be included in, and not added to, the Number of Parking Privileges Tenant is entitled to use at the Complex.  Tenant shall be responsible, at its sole cost and expense, for the repair, maintenance, operation, monitoring, and utility charges of the Electric Vehicle Charging Stations, including compliance with all applicable Legal Requirements, and the Electric Vehicle Charging Stations shall be exclusively for the benefit of Tenant.

7. **Extension Option**.

(a) Right to Extend.  On the conditions (which conditions Landlord may waive by written notice to Tenant) that both at the time of exercise of the Eighth Amendment Extension Option (as hereinafter defined) and as of the commencement of the Eighth Amendment Additional Premises Extension Term (as hereinafter defined) (i) there exists no monetary or other material Event of Default ("Event of Default" being defined in Section 7.1 of the Original Lease), and (ii) the Lease is still in full force and effect, Landlord grants Tenant the option (the "**Eighth Amendment Extension Option**") to extend the Term of the Lease with respect to the entire Eighth Amendment Additional Premises for the Eighth Amendment Additional Premises Extension Term, subject to each and all of the terms and conditions set forth in this Section 7.  As used herein, "**Eighth Amendment Additional Premises Extension Term**" shall mean the period beginning on the first day of the eighth (8th) Eighth Amendment Additional Premises Lease Year and ending on April 30, 2030.

(b) Effect of Assignment or Sublease.  The Eighth Amendment Extension Option may not be exercised by, assigned or otherwise transferred to any person or entity voluntarily or involuntarily, except the Tenant named in the Lease (or a Successor Entity that succeeds to the interest of Tenant by assignment in accordance with Section 5.6 of the Original Lease).  The parties hereto agree that if Tenant assigns any of its interest in the Lease or subleases more than 50% of the rentable square area of the Eighth Amendment Additional Premises to any person or persons, in the aggregate, for all or

substantially all of the remaining Term (meaning that less than twenty-one (21) months will remain in the then-Term of the Lease when the sublease expires) other than pursuant to a Successor Entity (as that term is defined in the Original Lease), this Eighth Amendment Extension Option shall terminate immediately without the need for any act or notice by either party to be effective.

(c) Manner of Notice.  In order to exercise the Eighth Amendment Extension Option, Tenant shall deliver to Landlord written notice (the "**Extension Notice**") of the exercise of the Eighth Amendment Extension Option not later than October 31, 2023 and not sooner than July 31, 2023, time being of the essence. If an Extension Notice is not so delivered, Tenant's Eighth Amendment Extension Option shall automatically expire.  The giving of an Extension Notice shall be deemed to be a binding exercise of Tenant's Eighth Amendment Extension Option, subject only to the right to rescind the same as expressly provided below.

(d) Effect of Default.  Tenant's right to exercise the Eighth Amendment Extension Option shall be suspended at the election of Landlord during any period in which a monetary or other material Event of Default has occurred and is continuing, but the period of time within which the Eighth Amendment Extension Option may be exercised shall not be extended. Notwithstanding Tenant's due and timely exercise of the Eighth Amendment Extension Option, if, after such exercise and prior to the effective date of the Eighth Amendment Additional Premises Extension Term a monetary or other material Event of Default occurs under the Lease that is not cured within the applicable grace period, if any, and Landlord terminates the Lease, then Tenant's exercise of the Eighth Amendment Extension Option shall be of no force and effect and its rights hereunder shall terminate.

(e) Further Extension Rights.  Upon the proper exercise of the Eighth Amendment Extension Option and commencement of the Eighth Amendment Additional Premises Extension Term, the Eighth Amendment Additional Premises shall be considered a portion of the "entire Premises" as that term is used in Section 7 of the Sixth Amendment (titled "Extension Option") for purposes of exercise of the Sixth Amendment Extension Option.

(f) Rent.  The Annual Fixed Rent for the Eighth Amendment Additional Premises during the Eighth Amendment Additional Premises Extension Term shall be as follows:

| Time Period | Annual Fixed Rent per square foot | Annual Fixed Rent | Monthly Installments of Fixed Rent |
|---|---|---|---|
| Eighth Amendment Additional Premises Lease Year 8 | $ 23.75 | $ 778,287.50 | $ 64,857.29 |
| Eighth Amendment Additional Premises Lease Year 9 | $ 24.50 | $ 802,865.00 | $ 66,905.42 |
| Eighth Amendment Additional Premises Lease Year 10 | $ 25.25 | $ 827,442.50 | $ 68,953.54 |
| Eighth Amendment Additional Premises Lease Year 11 | $ 26.00 | $ 852,020.00 | $ 71,001.67 |
| Eighth Amendment Additional Premises Lease Year 12 | $ 26.75 | $ 876,597.50 | $ 73,049.79 |
| eleventh anniversary of Eighth Amendment Additional Premises Commencement Date to April 30, 2030 | $ 27.50 | $ 901,175.00 | $ 75,097.92 |

8. **Signage.**

(a) Directory Signage. In connection with the lease of the Eighth Amendment Additional Premises as described herein, (a) Landlord shall install building-standard directory signage in the lobby of Building 14, and (b) Tenant may install signage containing Tenant's name and/or corporate logo on the entry door to the Eighth Amendment Additional Premises, subject to the prior approval of Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed. No other additional signage shall be installed with respect to the Eighth Amendment Additional Premises, except as expressly set forth in this Section 8.

(b) Exterior Signage. In addition to and without limitation of Tenant's rights under Section 5.17(B) of the Original Lease to install the Route 3 Impact Signage or the Panel Signage, Subsection 5.17(B)(2) of the Original Lease is hereby amended by adding the following text at the end of the subsection: "Regardless of the occupancy requirements with respect to the Route 3 Impact Signage, Tenant shall be permitted, at its sole cost and expense, to install Panel Signage on the exterior façade of Building 14 if the following criteria are met: (a) Tenant is in full occupancy of the Eighth Amendment Additional Premises, and (b) Tenant has leased 50% or more of the rentable square footage of Building 14." No other tenant or other entity shall, following the Effective Date, be permitted Panel Signage on Building 14 unless such tenant leases at least 50% or more of the rentable square footage of Building 14.

9. **Environmental Laws**. Notwithstanding anything to the contrary contained in the Lease either expressed or implied, Landlord covenants to Tenant that the Eighth Amendment Additional Premises shall be delivered to Tenant in its then "as is" condition, and free of all Hazardous Materials (as defined in Section 5.3 of the Original Lease) in violation of Hazardous Materials Laws.

10. **Brokers**. Tenant hereby represents to Landlord that it has dealt directly with and only with Transwestern Consulting Group and Jones Lang Lasalle New England, LLC (the "**Brokers**") as a broker in connection with this Eighth Amendment. Landlord and Tenant hereby indemnify and hold each other harmless against any loss, claim, expense or liability with respect to any commissions or brokerage fees claimed by any broker or finder other than the Brokers on account of the execution and/or renewal of the Lease due to any action of the indemnifying party.

11. **Miscellaneous**. Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified and in full force and effect as originally written. Landlord shall continue to hold the Security Deposit, and Tenant shall maintain the Security Deposit, in accordance with the terms of the Lease. In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Eighth Amendment, the provisions of this Eighth Amendment shall control. All terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease. The Recitals set forth above in this Eighth Amendment are hereby incorporated by this reference. This Eighth Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting the matters set forth in this Eighth Amendment and this Eighth Amendment constitutes the parties' entire agreement with respect to the matters described herein and supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto or with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Eighth Amendment.

12. **Counterparts**.  This Eighth Amendment may be executed in any number of counterparts and by each of the undersigned on separate counterparts, which counterparts taken together shall constitute one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the undersigned have executed this Eighth Amendment as of the day and year first above written.

**LANDLORD:**

DIV BEDFORD, LLC, a Massachusetts limited liability company

By: Bedford Manager Corp., a Massachusetts corporation

By: /s/ Richard McCready
Name: Richard McCready
Title: President

**TENANT:**

IROBOT CORPORATION,
a Delaware corporation

By: /s/ Alison Dean
Name: Alison Dean
Title: CFO

By: /s/ Glen D. Weinstein
Name: Glen D. Weinstein
Title: EVP & Chief Legal Officer

**Exhibit A**
**Eighth Amendment Additional Premises**



THIRD FLOOR PREMISE EXHIBIT
① SCALE: 1/32" = 1'-0"

**Exhibit B**
**Additional Amenity Space**



**Exhibit C**

**WORK LETTER - EIGHTH amendment tenant ALTERATIONS**

1. Following the Eighth Amendment Additional Premises Commencement Date, Tenant shall have the right: (a) to perform alterations and improvements in the Eighth Amendment Additional Premises and (b) to install up to twelve (12) Electric Vehicle Charging Stations in the location shown on Exhibit D to this Eighth Amendment (all such alterations and improvements being referred to herein as the "**Eighth Amendment Tenant Alterations**"). The Electric Vehicle Charging Stations shall not exceed 43 inches in height and shall be installed in accordance with all applicable Legal Requirements. Notwithstanding the foregoing, Tenant and its contractors shall not have the right to perform the Eighth Amendment Tenant Alterations in the Eighth Amendment Additional Premises unless and until Tenant has complied with all of the terms and conditions of Section 5.14 of the Original Lease, including Landlord's right to approve (a) the final plans for the Eighth Amendment Tenant Alterations, and (b) the insurance coverage obtained by Tenant and its contractors in connection with the Eighth Amendment Tenant Alterations. In addition, Landlord shall have the right to approve, in its reasonable discretion, the contractors (each, a "**Contractor**") to be retained by Tenant to perform the Eighth Amendment Tenant Alterations. Tenant shall be responsible for all elements of the plans for the Eighth Amendment Tenant Alterations (including, without limitation, compliance with law, functionality of design, the structural integrity of the design, the configuration of the premises and the placement of Tenant's furniture, appliances and equipment), and Landlord's approval of such plans shall in no event relieve Tenant of the responsibility therefor. Landlord's approval of the contractors to perform the Eighth Amendment Tenant Alterations shall not be unreasonably withheld. Landlord's approval of the general contractor to perform the Eighth Amendment Tenant Alterations shall not be considered to be unreasonably withheld if any such general contractor (i) does not have trade references reasonably acceptable to Landlord, (ii) does not maintain insurance as required by Landlord, (iii) does not have the ability to be bonded for the work in an amount satisfactory to Landlord, (iv) does not provide current financial statements reasonably acceptable to Landlord, or (v) is not licensed as a contractor in the state and municipality in which the Premises is located. Tenant acknowledges the foregoing is not intended to be an exclusive list of the reasons why Landlord may reasonably withhold its consent to a general contractor.

With respect to Eighth Amendment Tenant Alterations constructed within the two years after the Eighth Amendment Additional Premises Commencement Date, Landlord shall review Tenant's plans and specifications for the Eighth Amendment Tenant Alterations (the "**Tenant's Plans**") and, if Tenant's request for approval indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND LANDLORD MAY BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIFTEEN (15) BUSINESS DAYS AFTER RECEIPT," within fifteen (15) business days after receipt thereof Landlord shall provide Tenant with written notice of either (i) its approval of the Tenant's Plans, (ii) its disapproval of the same with an explanation therefor, or (iii) the need for additional information in order to review and approve the same. In its approval of the Tenant's Plans, Landlord shall specify those alterations, additions and improvements that must be removed by Tenant at the expiration or earlier termination of the Term, if any, unless Landlord subsequently elects to waive such obligation to remove such alterations, additions and improvements. If Landlord fails to respond within the aforementioned 15 business day period, then Tenant may send Landlord a second request that indicates in bold, capitalized text that states "THIS IS A TIME SENSITIVE REQUEST AND LANDLORD SHALL BE DEEMED TO APPROVE THE SAME IF IT FAILS TO RESPOND TO WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT." Landlord's failure to so respond within

said five (5) business day period shall be deemed to constitute Landlord's approval of the Tenant's Plans and determination that the alterations, additions and improvements shown thereon do not need to be removed by Tenant at the expiration or earlier termination of the Term (except to the extent that such removal would be required pursuant to clause (x) of Section 5.2 of the Original Lease with respect to Tenant's computer, telephone and other communications systems and equipment). Notwithstanding the foregoing or anything in the Lease to the contrary, Tenant shall be required in all events to remove any internal stairwells, raised floors, supplemental HVAC, specialized fire suppression systems, kitchens, bathrooms and showers, and any structural improvements made by Tenant as part of the Eighth Amendment Tenant Alterations.

Notwithstanding anything contained herein to the contrary, it is understood and agreed that Tenant may retain contractors and subcontractors that use union or non-union labor in connection with the construction of the Eighth Amendment Tenant Alterations. Tenant shall be responsible for maintaining labor harmony among its contractors and subcontractors and other contractors and subcontractors performing work at the Building, if any. For Eighth Amendment Tenant Alterations costing $3,000,0000 or less in or one or more related projects and undertaken within the two years after the Eighth Amendment Additional Premises Commencement Date, no bonds or other security shall be required in connection with Tenant's performance of such Eighth Amendment Tenant Alterations.

2. Tenant shall pay to Landlord, within ten (10) days after Landlord's written demand, a construction management fee equal to one percent (1%) of the hard costs of the Eighth Amendment Tenant Alterations to compensate Landlord for reviewing the plans for the Eighth Amendment Tenant Alterations and for costs incurred by Landlord in facilitating completion of the Eighth Amendment Tenant Alterations. No other plan review or other fees shall be charged by Landlord with respect to the Eighth Amendment Tenant Alterations notwithstanding anything in the Lease to the contrary, including Section 5.14 of the Original Lease. Landlord reserves the right to deduct such fee from the Eighth Amendment Construction Allowance (defined below). The construction management fee set forth in this section shall supersede any contrary provision of the Lease in so far as concerns the Eighth Amendment Tenant Alterations.

3. Provided there is no monetary or material non-monetary Event of Default in existence and continuing under the Lease, Landlord agrees to provide Tenant with an allowance of up to One Hundred Sixty-Three Thousand Eight Hundred Fifty Dollars ($163,850.00) (the "**Eighth Amendment Construction Allowance**") toward the cost of performing the Eighth Amendment Tenant Alterations. If Tenant opts to apply a portion of either or both of the Sixth Amendment Construction Allowance and the Seventh Amendment Construction Allowance to the costs of performing the Eighth Amendment Tenant Alterations, any such amounts shall be deemed added to the Eighth Amendment Construction Allowance and subtracted from the Sixth Amendment Construction Allowance or the Seventh Amendment Construction Allowance, or both, as applicable, and all draws of any such allowance shall be subject to all of the terms of this Work Letter. The Eighth Amendment Construction Allowance may only be used for "**Eligible Costs**," which are: (a) the cost of preparing design and construction documents and mechanical and electrical plans for the Eighth Amendment Tenant Alterations (which may not exceed 15% of the Eighth Amendment Construction Allowance), and (b) hard costs in connection with the Eighth Amendment Tenant Alterations.

The Eighth Amendment Construction Allowance may be advanced to fund Eligible Costs. In no event, however, shall the Eighth Amendment Construction Allowance be used for (x) payments to Tenant or any affiliates of Tenant, (y) the purchase of any movable furniture equipment or personal property, or (z) costs resulting from any default by Tenant of its obligations under the Lease. Landlord shall, subject

to compliance with all of the other terms, conditions and provisions of the Lease, make disbursements of the Eighth Amendment Construction Allowance (hereinafter, each a "**Disbursement**") to Tenant in installments in accordance with the following terms and conditions:

(i) Disbursements shall be made, at Tenant's request to Landlord, either to Tenant or, at Tenant's election, to the applicable contractors, vendors and other service providers performing the Eighth Amendment Tenant Alterations as Tenant may designate or request (provided that any such payment made directly to a contractor, vendor, or other service provider shall be conditioned upon the contractor, vendor or other provider entering into a letter agreement reasonably satisfactory to Landlord confirming that such payments are being made as a matter of convenience and do not create any obligation of Landlord to pay such sums to such contractor, vendor or other service provider), no more frequently than once per month, in minimum increments of $75,000.00 (except for the final Disbursement), on the basis of written requests made in accordance with the method described below, and Landlord shall act upon such requests within thirty (30) days following the receipt of a written request for a Disbursement, which action shall be either (A) funding the requested Disbursement, or (B) specifying the basis for not funding (provided, however, that Landlord shall fund any undisputed portion of the requested Disbursement) and, when applicable, requesting reasonable additional information and reasonable supporting documentation.

(ii) Disbursements shall require the following requisitions, certifications and waivers: (1) an appropriate AIA requisition form reasonably approved by Landlord with respect to work performed pursuant to Tenant's construction contract with its general contractor; (2) invoices from Tenant's service providers, showing in reasonable detail the cost of the item in question or of the improvements installed to date in the Premises and, where applicable evidence of prior payments; (3) lien waivers in the form attached as Addendum #1 to this Work Letter; (4) evidence reasonably acceptable to Landlord of prior payments for amounts previously disbursed out of the Eighth Amendment Construction Allowance (to the extent not previously provided to Landlord); and (5) certifications from Tenant that the amount of the requisition in question does not exceed the cost of the items, services and work covered by such certification. In the event that any portions of the Eighth Amendment Construction Allowance reflected on a particular requisition are to be funded directly to Tenant, as Tenant may designate or request, such requisition shall be accompanied by evidence reasonably satisfactory to Landlord that the items, services and work covered by such requisition have been fully paid by Tenant. Landlord shall have the right, upon reasonable advance notice to Tenant, to inspect Tenant's books and records relating to each requisition in order to verify the amount thereof.

(iii) Each Disbursement shall be made in an amount equal to the product of (x) Landlord's Percentage (as hereinafter defined) multiplied by (y) the lesser of: (A) the amount requested, or (B) the amount actually payable to, as applicable, the Contractor or subcontractor(s) or other third party, in each case including any applicable retainage to be released in respect of work and materials satisfactorily completed and in place with respect to that particular request for a Disbursement (exclusive of work and materials to the extent included in any prior funded requests for a Disbursement), but in all cases subject to a five percent (5%) retention until all conditions to the final Disbursement are satisfied as set forth below. "**Landlord's Percentage**" shall mean a fraction expressed as a percentage, the numerator of which is the total amount of the Eighth Amendment Construction Allowance and the denominator of which is the total cost of all Eligible Costs. Tenant shall fund the remainder in each instance.

(iv) Landlord may withhold or refuse to pay any Disbursement hereunder if (i) a Notice of Contract has been filed under Section 4 of Chapter 254 of the Massachusetts General Laws, as amended (the "**Mechanic's Lien Law**"), unless with respect to the subject requisition, an accurately completed and valid Lien Form has been provided to Landlord and is deemed reasonably acceptable to Landlord and otherwise complies with applicable Laws, or if any other statutory lien has been filed or established relating to claims for labor, materials, or supplies, whether under the Mechanic's Lien Law or otherwise.

(v) No Disbursements will be made for materials prior to the incorporation of the materials into the Premises.

(vi) Any disputes under this Exhibit C, Section 3 shall be submitted to arbitration in accordance with the terms of Section 8, below.

(vii) The requisition for the final Disbursement to pay the retainage, shall also require: (A) a certificate from Tenant and Tenant's architect that the Eighth Amendment Tenant Alterations have been completed in accordance with Tenant's Plans; (B) receipt of a permanent certificate of occupancy for the Premises (if applicable); (C) delivery of the record set of as-built plans maintained by Tenant's Contractor; (D) satisfaction of all conditions for final payment under the applicable construction contract, (E) final lien waivers from the Contractor (which may be conditioned upon receipt of payment), in the form required hereunder; (E) final lien waivers in the form required hereunder (which may be conditioned upon receipt of payment) from each sub-contractor, supplier, and any other party entitled to claim a lien with respect to the Eighth Amendment Tenant Alterations (other than the Contractor) who performs work in excess of $10,000; and (F) to the extent a lien waiver has not been provided as to the remaining amounts due under the applicable construction contract, the expiration of all statutory lien periods with no lien having been filed with respect to the Premises, the Building, or the Complex which remain outstanding.

4. Notwithstanding anything herein to the contrary, Landlord shall not be obligated to disburse any portion of the Eighth Amendment Construction Allowance, if applicable, during the continuance of an uncured Event of Default under the Lease, and Landlord's obligation to disburse shall only resume when and if such default is cured. If (a)Tenant's request for disbursement contains, in bold and prominent print, a legend stating that "FAILURE TO RESPOND WITHIN THIRTY (30) DAYS MAY RESULT IN AN OFFSET AGAINST RENT DUE PURSUANT TO EXHIBIT C OF THE EIGHTH AMENDMENT TO THE LEASE," and Landlord fails to respond within such thirty (30) day period, and Landlord thereafter fails to respond to such request within two (2) business days of a second notice from Tenant containing such legend, or (b) Landlord has timely disputed Tenant's demand and has thereafter failed to pay Tenant the amount of any final, unappealable judgement against Landlord within thirty (30) days after the issuance thereof, then Tenant may offset the amounts due from Landlord to Tenant under this Section 4 of Exhibit C against Fixed Rent payable under the Lease until Tenant is paid in full. Notwithstanding the foregoing, Tenant shall have no right to reduce any monthly installment of Fixed Rent by more than twenty percent (20%) of the amount of Annual Fixed Rent that would otherwise have been due and payable by Tenant to Landlord, unless the aggregate amount of such deductions over the remainder of the Term of the Lease (as the same may have been extended) will be insufficient to fully reimburse Tenant for the amount demanded by Tenant, in which event Tenant may effect such offset by making deductions from each monthly installment of Fixed Rent in equal monthly amounts over the balance of the remainder of the Term.

5. In no event shall the Eighth Amendment Construction Allowance be used for the purchase of equipment, furniture or other items of personal property of Tenant. In the event Tenant does not submit to Landlord a written request for payment of the entire Eighth Amendment Construction Allowance (together with all of the documents and certificates required for such payment) by February 28, 2021, any portion of the Eighth Amendment Construction Allowance not disbursed to Tenant shall accrue to the sole benefit of Landlord, it being understood that Tenant shall not be entitled to any credit, abatement or other concession in connection therewith. Tenant shall be responsible for all applicable state sales or use taxes, if any, payable in connection with the Eighth Amendment Tenant Alterations and/or the Eighth Amendment Construction Allowance.

6. Tenant agrees to accept the Premises in its "as-is" condition and configuration, without representation or warranty by Landlord or anyone acting on Landlord's behalf, it being agreed that Landlord shall not be required to perform any work or incur any costs in connection with the construction or demolition of any improvements in the Premises (except as provided above with respect to the Eighth Amendment Construction Allowance). The foregoing shall not limit or waive Landlord's express obligations under the Lease with respect to the Premises, the Building or the Complex.

7. Chad Haskell (phone no. 781-430-3210, email chaskell@irobot.com) shall be Tenant's Construction Representative, and shall have full power and authority to act on behalf of Tenant on any matters relating to the Landlord Work or Tenant's Eighth Amendment Tenant Alterations. Tenant may name a replacement Tenant Construction Representative from time to time by written notice to Landlord making reference to this Section 7. _____ (phone no. _____, email _____) shall be Landlord's Construction Representative, shall have full power and authority to act on behalf of Landlord on any matters relating to the Landlord Work or Tenant's Eighth Amendment Tenant Alterations. Landlord may name a replacement Landlord Construction Representative from time to time by written notice to Tenant making reference to this Section 7.

8. All disputes between the parties regarding this Work Letter and other matters expressly referencing this Section 8 shall be resolved in accordance with this Section 8. Any arbitration decision under this Section 8 shall be enforceable in accordance with applicable law in any court of proper jurisdiction. A party may not initiate arbitration under this Section 8 without notifying the other party and requesting a meeting of senior representatives to resolve the dispute. Within five (5) business days following such notice, senior representatives of Landlord and Tenant who have authority to resolve the dispute shall meet in order to seek a resolution by agreement prior to the arbitration. If the dispute is not so resolved at the meeting (or if one party does not attend) then either party may initiate arbitration.

Any arbitration conducted pursuant to this Section 8 shall be conducted in as expeditious a manner as possible to avoid delays in the construction of the Landlord's Work and the Eighth Amendment Tenant Alterations and shall be resolved by a single arbitrator, who shall be agreed to by the parties within ten (10) days after either party requests arbitration under this Section 8 by notice to the other. Landlord and Tenant shall seek to agree upon a single arbitrator who is an independent third party real estate professional with at least twenty (20) years of experience in construction disputes involving multi-tenant, first-class office developments that has not worked for either party for the prior five (5) years (a "**Qualified Arbitrator**") and, if they are unable to agree, then a Qualified Arbitrator shall, upon request by either party, be appointed by the office of the American Arbitration Association ("**AAA**") or successor organization administering arbitrations held in Boston, Massachusetts. The arbitrator shall decide the dispute by written decision. The arbitration shall be conducted in Boston Massachusetts or

another location agreed to by the parties in accordance with the Fast Track Procedures (regardless of the amount in dispute) of the Construction Industry Arbitration Rules of the AAA (or any successor organization), as modified and/or supplemented by this Section on an expedited basis and shall be concluded, with a decision issued, no later than thirty (30) days after the date that such dispute is submitted for arbitration. The decision of the arbitrator shall be final and binding on the parties. The parties shall comply with any orders of the arbitrator establishing deadlines for any such proceeding. The fee of the arbitrator shall be paid equally by the parties. Each party shall pay all other costs incurred by it in connection with the arbitration.

9. This Work Letter shall not be deemed applicable to any additional space added to the Premises at any time following the execution of the Eighth Amendment or from time to time, whether by any options under the Lease or otherwise, or to any portion of the Premises or any additions to the Premises in the event of a renewal or extension of the Lease Term subsequent to the Eighth Amendment, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement to the Lease. All capitalized terms used in this Work Letter but not defined herein shall have the same meanings ascribed to such terms in the Eighth Amendment, or if none, the Lease.

**[END OF EXHIBIT C]**

**ADDENDUM #1 TO EXHIBIT C TO EIGHTH AMENDMENT TO LEASE**

**FORMS OF LIEN WAIVER**

[FORM OF ARCHITECT'S LIEN WAIVER]

**Payment Receipt and Affidavit**

To:   ("**Owner**")

Project:

Application for Payment No.:

Period Ending:

Progress Payment: _____ Final Payment:_____ (check one or the other)

| | |
|---|---|
| A. Original Contract Amount | $_____ |
| B. Total Additional Services Amounts, if any | $_____ |
| C. Adjusted Contract Amount (Add A & B) | $_____ |
| D. Amount Paid to Date Before this Application | $_____ |
| E. Retainage Held on Amount Paid to Date, if any | $_____ |
| F. Amount Owing on this Application | $_____ |
| G. Retainage to be Held on this Application, if any | $_____ |
| H. Total Owing on this Application (F minus G) | $_____ |

1. Except for any Disputed Claims Amount set forth below, Retainage Held and to be Held and Total Owing on this Application set forth above, Undersigned, on its behalf and on behalf of anyone directly or indirectly employed by or claiming under it, hereby fully and forever releases, acquits and discharges Owner, its general and limited Owner, agents, attorneys, employees, officers, directors, trustees, stockholders, managers, members, lenders, and their respective successors and assigns, whether disclosed or undisclosed (individually and collectively hereinafter referred to as the "**Releasees**"), from all manner of action and causes of action, claims, suits, debts, sums of money, commissions, compensation for services rendered, liens of any type, trust fund claims, judgments, executions, damages, demands and rights whatsoever, at law or in equity, now existing or which may hereafter accrue in favor of

Undersigned by reason of or in connection with any and all claims arising out of its contract, and for all work, labor and services furnished, performed and provided pursuant thereto including without limitation all claims for additional services, reimbursable expenses, charges, credits, contract amendments thereto and all other services with regard to the Project through the Period Ending set forth above. The foregoing shall be with respect to all matters arising through the Period Ending set forth above if this Affidavit is given in connection with a Progress Payment; and if given in connection with Final Payment it shall be with respect to all matters existing or arising through the date hereof or hereafter at any time existing or arising.

2. Undersigned certifies, warrants and represents that (a) it has paid in full and in accordance with all applicable obligations, laws and regulations, for all labor and services performed and furnished in connection with the services under its contract, all social security withholding, unemployment insurance, sales, use and other taxes applicable thereto and for all premiums for insurance carried with respect thereto; (b) it owes no one for any of the foregoing or any other item of cost or expense in connection with the performance or furnishing of the services under its contract; and that (c) no claims have been made against Undersigned for any unpaid labor, services or any other item of cost and expense arising out of or relating to the services under its contract that are not currently paid and satisfied.

3. Undersigned certifies, warrants and represents (i) that the "Amount Owing on this Application" set forth above constitutes the entire value of all services rendered by or under the undersigned for which payment is due through the Period, (ii) that all other amounts set forth above are accurate and complete, and (iii) that the Undersigned has no other claims except as set forth in the maximum aggregate amount as "**Disputed Claims Amount**" below and described in detail on Exhibit A attached (any such description must include a detailed statement of the kind and nature of the claim and must have attached a copy of the notice given of such claim).

4. If, after the Owner's payment of the Total Owing on this Application, any claims or liens are made or filed against any of the Releasees or the Project by Undersigned, or by any employee, other design professional, subcontractor or supplier of Undersigned or by anyone directly or indirectly employed or engaged by any of the foregoing with respect to the Project, or if any certification, warranty or representation herein or otherwise given in connection herewith shall not be true in all material respects, Undersigned agrees to satisfy and discharge such claim or lien and indemnify the Releasees, hold the Releasees harmless and defend the Releasees, at Undersigned's sole cost and expense, from and against such claim or lien or any such certification, warranty or representation not being true, and to pay all costs and expenses related thereto, including, but not limited to, the cost of discharging any liens and all legal fees, disbursements and costs of litigation in connection with any of the foregoing. To the fullest extent permitted by law, the Undersigned discharges, releases and waives all liens and right to lien expressly including such rights with respect to the Amount Paid to Date Before this Application and, when paid, with respect to the Total Owing on this Application.

5. Undersigned makes this Affidavit freely and voluntarily, without duress or coercion, after Undersigned has either consulted with or been given the opportunity to consult with legal counsel, and Undersigned has carefully and completely read all of the terms and provisions of this Affidavit and has agreed to be bound hereby.

6. Undersigned acknowledges that the foregoing statements, representations, warranties and agreements are made as an affidavit under applicable law and otherwise to induce the Owner to make the payment requested and its lender to provide funds under its loan, and that the Releasees are relying upon the truth of the statements, representations and warranties contained herein.

7. Undersigned acknowledges that this Affidavit shall inure to the benefit of the Releasees and their respective successors and assigns and shall be binding on Undersigned and its successors and assigns. If any part or provision hereof is unenforceable, the remainder shall not be affected.

In witness whereof, Undersigned has caused this instrument to be sworn to executed under seal as of the _____ day of _____, 20___.

Disputed Claims Amount, if any $_____ (see attached Schedule A)

Design Professional:

(Type Name)

By: _

(Duly Authorized)

STATE OF _____

_____ County, ss.

On this ____ day of _____, 20__, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification of a driver's license to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.

(official signature and seal of notary)

My commission expires _____

[FORM OF CONTRACTOR'S LIEN WAIVER]

PARTIAL WAIVER AND SUBORDINATION OF LIEN
M.G.L. c. 254, §32

COMMONWEALTH OF MASSACHUSETTS: Date: _____, ___ 20__
MIDDLESEX COUNTY Application for Payment No. ____

OWNER: _____

CONTRACTOR: _____

LENDER/MORTGAGEE: _____

     1. Original Contract Amount: $_____

     2. Approved Change Orders: $_____

     3. Adjusted Contract Amount: $_____

     4. Completed to Date: $_____

     5. Less Retainage: $_____

     6. Total Payable to Date: $_____
        (line 4 less line 5)

     7. Less Previous Payments: $_____

     8. Current Amount Due: $_____
        (line 6 less line 7)

     9. Pending Change Orders: $_____

     10. Disputed Claims: $_____

The undersigned who has a contract with Owner, for furnishing labor or materials or both labor and materials or rental equipment, appliances or tools for the erection, alteration, repair or removal of a building or structure or other improvement of real property with a street address of _____, _____, Massachusetts, and owned by Owner, upon receipt of _____ ($_____) in payment of an invoice/requisition/application for payment dated _____ does hereby:

(a)      waive any and all liens and right of lien on such real property for labor or materials, or both labor and materials, or rental equipment, appliances or tools, performed or furnished through the following date:

_____ (payment period), except for retainage, unpaid agreed or pending change orders, and disputed claims as stated above; and

(b)        subordinate any and all liens and right of lien to secure payment for such unpaid, agreed or pending change orders and disputed claims, and such further labor or materials, or both labor and materials, or rental equipment, appliances or tools, except for retainage, performed or furnished at any time through the twenty-fifth day after the end of the above payment period, to the extent of the amount actually advanced by the above lender/mortgagee through such twenty-fifth day.

Signed under the penalties of perjury this _____ day of _____, _____.

Contractor:

By: _____

Its: _____


COMMONWEALTH OF MASSACHUSETTS

_____ County, ss.


On this _____ day of _____, 20___, before me, the undersigned notary public, personally appeared _____, proved to me through satisfactory evidence of identification, which was _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose, as _____ of _____, a _____.


_____
(official signature and seal of notary)
Name: _____
My commission expires: _____

CONTRACTOR'S CONDITIONAL WAIVER AND
RELEASE UPON FINAL PAYMENT
(Submitted with final application for payment)

OWNER: _____

CONTRACTOR: _____

PROJECT: _____

Contract Sum: $_____

Total Amount Previously Paid: $_____

Final Payment Amount: $_____

In consideration of all past payments received from the Owner in connection with the Project, the undersigned acknowledges and agrees that, except for the Final Payment Amount (as set forth above), it has received full and final payment of all sums due, including all sums due under its Contract with Owner, for labor, materials and/or equipment furnished by the undersigned to or in connection with the Project. The undersigned further acknowledges and agrees that upon receipt of a check in the Final Payment Amount and payment of such check by the bank upon which it is drawn, the undersigned will release, discharge, relinquish and waive any and all claims, suits, liens, and rights under the statutes of the Commonwealth of Massachusetts with respect to the Owner, the Project and/or against the Owner on account of any labor, materials and/or equipment furnished in connection with the Project.

The undersigned individual represents and warrants that he/she is the duly authorized representative of the undersigned, empowered and authorized to execute and deliver this document on behalf of the undersigned and that this document shall be binding upon the undersigned.

This document is to take effect as a sealed instrument.

Signed under the penalties of perjury as of this _____ day of _____, _____.

CONTRACTOR:

_____
Signature of Authorized Individual

_____
Printed Name and Title of Above Individual

[FORM OF SUBCONTRACTOR'S LIEN WAIVER]

**SUBCONTRACTOR'S**
**RELEASE AND PARTIAL LIEN WAIVER**

**I. Reference Data:**

**Owner:**

**Tenant:**

**Project:**

**Subcontractor:**

**Subcontract Work:**

**Subcontract Date:**

**Current Subcontract Financial Status Summary:**

1. Original Subcontract Amount $_____

2. Approved Change Order(s) $_____

3. Adjusted Total Subcontract Amount (Item No. 1 plus 2) $_____

4. Total Amount of Subcontract Work Completed to Date
   (including Current Requisition and Retainage) $_____

5. Total Payments Received by Subcontractor through the
   Date of Release and Waiver (as defined below) $_____

6. Retainage Held on Account of Payments Received by
   Subcontractor (Item No. 5) $_____

7. Amount Currently Requisitioned, including Retainage
   (Item No. 4 less Items No. 5 and 6) $_____

8. Retainage to be Held on Account of Current Requisition $_____

9. Balance Currently Due (Item No. 7 less Item No. 8) $_____

Outstanding Claims and Pending Change Orders, if any, must be set forth on **Schedule A**.

## II. Release and Partial Lien Waiver

For the period ending on the last day of the month of _____, 20__ (the "Date of Release and Waiver") the undersigned Subcontractor hereby acknowledges receipt of payments on account of the Subcontract Work in the amount of the Total Payments Received by Subcontractor through the Date of Release and Waiver (Item No. 5, above). This amount represents payment in full through and including the Date of Release and Waiver.

The undersigned hereby swears and certifies that the Reference Data set forth above is true and correct and acknowledges that there are no additional costs or claims for any extras, additions or changes for labor or materials or otherwise on the Project, other than those listed on **Schedule A**. To the extent permitted by applicable law, the undersigned hereby waives and releases any and all claims, laborer's, mechanic's or materialmen's liens, and claims of right to a laborer's, mechanic's or materialmen's lien on or against the Project under the laws of Massachusetts, on account of labor or materials or both furnished by the undersigned to or on account of the Subcontract Work through the Date of this Release and Waiver, except for matters set forth on **Schedule A**.

The undersigned hereby swears and certifies that all persons, firms or other entities, regardless of tier, who have supplied work, labor, materials, services and other items to the undersigned in connection with the Project have been paid in full through the Date of Release and Waiver, except for amounts included in the Current Requisition (Item No. 7, above); and agrees that the General Contractor, the Owner, any lender of the Owner, the Tenant or any other person or entity having an interest in the Project may rely on the accuracy of this instrument.

Duly authorized and executed under the pains and penalties of perjury as of this _____ day of _____, 20__.

**SUBCONTRACTOR:** _____

By: _____

Title: _____
Hereunto duly authorized

**SCHEDULE A**

**Outstanding Claims and Pending Change Orders**

**Amount of Claim**

**1. Nature of Claim or Requested Change**

**2. Pending Change Orders**

---

Except for those matters listed above, the Subcontractor acknowledges by the submission of this Release and Partial Lien Waiver that, as of the Date of Release and Waiver, no such claims or pending change orders exist.

**EXHIBIT D**

**Electric Vehicle Charging Station Locations**



**Exhibit 21.1**

**iROBOT CORPORATION**
**SUBSIDIARIES OF THE REGISTRANT**

| Subsidiary Legal Name | Jurisdiction of Incorporation/Formation |
| --- | --- |
| iRobot Securities Corporation | Massachusetts |
| iRobot US Holdings Inc. | Delaware |
| iRobot Holdings LLC. | Delaware |
| iRobot (India) Private Limited | India |
| Guangzhou iRobot Technology Consulting Company Limited | China |
| Shanghai iRobot Robot Trading Co., Ltd. | China |
| iRobot (HK) Limited | Hong Kong |
| iRobot Japan G.K. | Japan |
| iRobot UK Ltd. | United Kingdom |
| iRobot France SAS | France |
| iRobot Belgium SPRL | Belgium |
| iRobot Portugal, Unipessoal Lda | Portugal |
| iRobot Austria GmbH | Austria |
| iRobot Germany GmbH | Germany |
| iRobot Netherlands B.V. | Netherlands |
| iRobot Iberia SL | Spain |

**Exhibit 23.1**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in the Registration Statement on Form S‑8 (File Nos. 333-219686, 333-204669, 333-193998, 333-186700, 333-184320, 333-179593, 333-172333, 333-164993, 333-157306, 333-149373, 333-140707, 333-129576) of iRobot Corporation of our report dated February 16, 2018 relating to the consolidated financial statements, and the effectiveness of internal control over financial reporting, which appears in this Form 10‑K.

/s/ PricewaterhouseCoopers LLP
Boston, Massachusetts
February 16, 2018

**Exhibit 31.1**

**Certifications**

I, Colin M. Angle, certify that:

1.  I have reviewed this Annual Report on Form 10-K of iRobot Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2018

/s/ COLIN M. ANGLE
_____

Colin M. Angle
Chief Executive Officer

**Exhibit 31.2**

**Certifications**

I, Alison Dean, certify that:

1.  I have reviewed this Annual Report on Form 10-K of iRobot Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 16, 2018

/s/ ALISON DEAN
_____
Alison Dean
Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of iRobot Corporation (the "Company") for the year ended December 30, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Colin M. Angle, the Chief Executive Officer of the Company and Alison Dean, the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to our knowledge, that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

This certification is being provided pursuant to 18 U.S.C. 1350 and is not to be deemed a part of the Report, nor is it to be deemed to be "filed" for any purpose whatsoever.

Dated    February 16, 2018                          /s/ COLIN M. ANGLE

                                                    Colin M. Angle
                                                    Chief Executive Officer


Dated    February 16, 2018                          /s/ ALISON DEAN

                                                    Alison Dean
                                                    Chief Financial Officer