# Tab 23

Table of Contents

---

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 29, 2018**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file no. 001-36414**

# iROBOT CORPORATION
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **77-0259 335** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8 Crosby Drive, Bedford, MA** | **01730** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(781) 430-3000**
**(Registrant's telephone number, including area code)**
_____

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

**Common Stock, $0.01 par value per share The Nasdaq Stock Market LLC**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**
**None**

Indicate by check-mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check-mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

The aggregate market value of the Common Stock held by nonaffiliates of the registrant was approximately $2.0 billion based on the last reported sale of the Common Stock on The Nasdaq Global Select Market on June 29, 2018, the last business day of the registrant's most recently completed second fiscal quarter.

As of January 31, 2019, there were 27,796,614 shares of the registrant's Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file a definitive Proxy Statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended December 29, 2018. Portions of such Proxy Statement are incorporated by reference into Part III of this Form 10-K.

Table of Contents

**iROBOT CORPORATION**
**ANNUAL REPORT ON FORM 10-K**
**Year Ended December 29, 2018**
**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 20 |
| Item 2. | Properties | 20 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Mine Safety Disclosures | 20 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| Item 6. | Selected Financial Data | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 34 |
| Item 8. | Financial Statements and Supplementary Data | 36 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 68 |
| Item 9A. | Controls and Procedures | 68 |
| Item 9B. | Other Information | 69 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 69 |
| Item 11. | Executive Compensation | 69 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 69 |
| Item 13. | Certain Relationships and Related Transactions, and Directors Independence | 69 |
| Item 14. | Principal Accounting Fees and Services | 69 |
| **Part IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 70 |
| Item 16. | Form 10-K Summary | 73 |

Table of Contents

**PART I**

## ITEM 1. *BUSINESS*

*This Annual Report on Form 10-K contains forward-looking statements. All statements other than statements of historical facts contained in this Annual Report on Form 10-K, including statements regarding our future results of operations and financial position, business strategy, plans and objectives of management for future operations, and plans for product development, launches and manufacturing are forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. We discuss certain of these risks in greater detail in the "Risk Factors" section and elsewhere in this Annual Report on Form 10-K. Also, these forward-looking statements speak only as of the date of this Annual Report on Form 10-K, and we have no plans to update our forward-looking statements to reflect events or circumstances occurring after the date of this Annual Report. We caution readers not to place undue reliance upon any such forward-looking statements.*

*iRobot and its stylized logo, Roomba, NorthStar, Create, iAdapt, Aware, Home Base, Looj, Braava, Braava jet, AeroForce, Better Together, Mirra, vSLAM and Virtual Wall are trademarks of iRobot Corporation.*

### Overview

iRobot Corporation ("iRobot" or the "Company" or "we") is a leading global consumer robot company that designs and builds robots that empower people to do more both inside and outside of the home. The Company's consumer robots help people find smarter ways to clean and accomplish more in their daily lives. iRobot's portfolio of solutions features proprietary technologies for the connected home and advanced concepts in cleaning, mapping and navigation, human-robot interaction, and physical solutions. Leveraging this portfolio, iRobot's engineers are building an ecosystem of robots to empower the smart home. For more than 25 years, we have been a pioneer in the robotics and consumer products industries.

Since our founding in 1990, we have developed expertise in the disciplines necessary to design and build durable, high-performance and cost-effective robots through the close integration of software, electronics and hardware. Our core technologies serve as reusable building blocks that we adapt and expand to develop next-generation and new products, reducing the time, cost and risk associated with product development. Our significant expertise in consumer needs, robot design, engineering and smart home technologies and trends positions us to capitalize on the growth we expect in the market for robot-based consumer products.

Over the past seventeen years, we have sold more than 25 million consumer robots worldwide. During 2016, we took several steps to become more focused on our well-established consumer robot business in order to capitalize on the substantial opportunities available to us within consumer markets. 2016 was a pivotal year for iRobot as we exited our non-consumer businesses to focus solely on products for the home. In the second quarter of 2016, we completed the sale of our defense and security business and exited the remote presence business. These actions were taken to solidify our position as the leader in diversified consumer robots and to focus on key technologies, with an emphasis on software, that allow our robots to more effectively understand the homes in which they operate.

During 2017, we expanded our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation ("SODC") based in Tokyo, Japan for approximately $16.6 million in cash. On October 2, 2017, we closed the acquisition of our largest European distributor, Robopolis SAS ("Robopolis"), a French company, for a final purchase price, following adjustments for working capital pursuant to the agreement with Robopolis, of $169.4 million in cash, net of acquired cash of $38.0 million. This provided us more direct control of 75% of our global revenue through a direct presence in countries including Austria, Belgium, France, Germany, Japan, the Netherlands, Portugal and Spain.

In 2018, iRobot sold more than $1 billion in consumer robots. The Company capitalized on incremental investments in research and development made and introduced new products in 2018. In the third quarter of 2018, iRobot introduced the Roomba i7 and i7+ in the U.S., robot vacuums that remember a home's floor plan and clean specific rooms by name. Ushering in a new era of consumer robots, the Roomba i7+ allows customers to clean specific rooms in the home. Using Imprint™ Smart Mapping, the Roomba i7+ learns the home's floor plan, giving customers total control to choose which rooms to clean and when. When the Roomba i7+ robot vacuum is finished cleaning, it empties its own dust bin into the Clean Base™, which holds 30 bins of dirt, allowing customers to forget about vacuuming for weeks at a time.

The Roomba i7 and i7+ further extend our product ecosystem, bringing a new level of intelligence and automation to robotic vacuum cleaners with the ability to learn, map and adapt to a home's floor plan. In the third quarter of 2018, we also introduced the Roomba e5 in the U.S., a highly-featured product at a more accessible price, to our lineup. In the fourth quarter of 2018, we also introduced the Roomba e5 in markets outside of the U.S. in advance of the holiday season.

3

Table of Contents

Our total revenue for 2018 was $1,092.6 million, which represents a 23.6% increase from 2017 revenue of $883.9 million. Domestic revenue grew $108.4 million, primarily as a result of strong sales of the Roomba 900 and 600 series robots, as well as the significant investments in advertising media and national promotions. International revenue grew by $100.2 million in 2018 with increases in most markets.

Our financial performance in 2019 will be driven by our continued focus as a leading global consumer robots company. Our strategy is to maintain Roomba's leadership in the robotic vacuum cleaner segment while positioning the Company as a strategic player in the emerging smart home. We expect growth to be driven by:

- deeper household penetration of Roomba globally;

- broader roll out of the Roomba i7 and i7+ which were launched in the U.S. in 2018;

- continued investment in innovation to extend our technology and product leadership;

- further adoption of Braava products through targeted marketing programs; and

- introduction of additional new products mid-year in 2019.

**Strategy**

In 2002, iRobot created the home robot cleaning category with the introduction of its Roomba vacuuming robot. Today, we are a global enterprise that has sold more than 25 million consumer robots worldwide. iRobot's success in driving adoption of connected Roomba robots has created a unique opportunity to extend consumer value in the home and expand our business. Our long-term strategy is to increase the penetration of our products in existing markets, expand current products into new markets, and develop and launch new products into current and new markets. We estimate household penetration of iRobot products to be 11% in the U.S. and in the single digits globally. We believe that the current trend towards smart home and product integration provides us with a significant opportunity for product revenue growth. As our customer base grows, iRobot plans to create an ecosystem of connected robots designed to integrate with other devices. This ecosystem will create greater possibilities for new features and capacities and empower the smart home.

Global expansion is a key component of our strategy. Our relentless pursuit of product leadership, through targeted investment in key technologies and capabilities, coupled with our investments in furthering our global brand and targeted marketing initiatives, allows us to continue to maintain our leadership position in the robotic vacuum cleaner segment despite increasing competition. Our acquisitions of distributors in Japan and Europe furthered this strategic objective.

To successfully execute our 2019 plan and drive revenue diversification and significant revenue growth beyond 2019, we plan to continue to make investments in our business during the year. These investments are expected to help iRobot achieve the following goals:

- Continue to strengthen our marketing capabilities globally and accelerate worldwide consumer adoption of Roomba to maintain our market-leading position in robotic vacuum cleaners;

- Continue to develop our wet floor care business to generate a material, secondary revenue stream;

- Launch iRobot Terra, an autonomous robotic lawn mower that will re-invent the robotic lawnmower category with state-of-the-art mapping and navigation technology. In 2019, iRobot plans to make Terra available for purchase in limited quantities in Germany and for beta testing in the U.S.;

- Scale our infrastructure to support global operations and connected products;

- Explore, develop and grow adjacent non-floor care consumer robot products that can generate meaningful diversified revenue streams; and

- Make continued operational improvements that can reduce product and operating costs.

Key pillars of our strategy include:

*Technology:* As a leading global consumer robotics company, iRobot must develop and maintain best-in-class technology in the areas of cleaning, mapping and navigation. In 2019, iRobot plans to take steps towards expanding its product lines with new products that will deliver innovative solutions to improve cleaning performance, efficiency and ease-of-use. Mapping and navigation continues to be the core focus for iRobot. Consumer robots that can map and are spatially aware create a unique and differentiating opportunity to grow consumer value.

*Brand:* iRobot enjoys consistently high brand awareness and high purchase intent in major markets around the world. Along with high awareness, consumers consider the iRobot brand and our products to be premium, innovative and of high quality. These favorable impressions come as a result of the millions of consumers around the world who own iRobot products and an even greater number who are aware of the brand through advertising and the positive word-of-mouth from existing owners.

4

Table of Contents

*Portfolio:* Our strategy includes building a portfolio of investments, including physical platforms, digital and data capabilities, to diversify across domestic and foreign markets and delivering a steady progression of innovation and growth over time. To achieve this, we plan to focus on developing digital, data and physical products that continue to leverage connectivity and spatial intelligence to deliver meaningful benefits to users. In 2018, we launched Roomba i7 and i7+, introducing Imprint™ Smart Mapping, a smart mapping technology that allows users to control which rooms are cleaned and when. This new intelligence platform enables rapid-paced innovation to continuously deliver new intelligence-based features sets to iRobot consumers. The initial set of features enables the connected robots to communicate with consumers to help optimize their personal cleaning experience. The intelligence platform is focused on personalization, learning and prediction. Customers can now be informed when specific maintenance is needed, make suggestions on personalized cleaning schedules and optimize charging.

*Talent:* Our employees are the most important driver of who we are. Our success, diversity and reputation as developers of great talent make us an attractive employer to the top talent all over the world. Talent recruitment and retention continues to be at the core of what we accomplish as we map out our culture and work towards achieving our vision. We are also growing our company to meet organization needs by strategically investing in our employees around the globe.

**Technology**

In 2016, iRobot narrowed its focus to the consumer market and made increased, but disciplined investments in advancing mapping and navigation, and user interaction including cloud and app development and cleaning efficacy. From the launch of Braava jet, to the introduction of a lower cost Visual Simultaneous Localization and Mapping, or vSLAM, solution in Roomba 960, these strategic investments in technology had an immediate impact on product diversification, performance and market expansion. In 2017, we introduced two new connected products to the product portfolio bringing the advantages of cloud connectivity to more consumers. With the iRobot HOME App, we also delivered our robots' maps directly to our customers through the launch of post-mission cleaning maps. In 2018, we introduced three new connected products including a new intelligence platform with the ability to learn, map and adapt to a home's floor plan, as well as empty its own dust bin into the Clean Base. We believe the improved performance of our connected robots, and the data sourced from our maps, will accelerate new product development and digital partnerships for the smart home.

We plan to continue to leverage opportunities, enabled by our growing connected product portfolio, to invest in developing technologies and interfaces for our products to provide a convenient and personalized user experience. At the foundation of our effort to drive enhanced user experience has been the deployment of our new connectivity and cloud infrastructure through AWS. We made this investment to enable us to scale our connected products globally, with increased access to valuable cloud services and applications to support future product features, and to integrate with other devices in the smart home. iRobot plans to continue to identify additional ways to advance the smart home experience by enabling a broader understanding of the home's space, enabled through Roomba's spatial awareness of the home.

From robotic vacuum cleaning to mopping and lawn care, we are dedicated to developing market-leading solutions that provide compelling value to customers worldwide. From our customers' perspective, the core value of our robots is the ability to efficiently and effectively perform a physical mission - the task for which that robot was initially purchased. In addition, we focus on features that allow the robots to perform longer, without consumer interaction. Our goal is to deliver maximum autonomy and effectiveness of the mission.

**Products**

We sell various products that are designed for use in and around the home. Our current consumer products are focused on both indoor and outdoor cleaning applications. We believe our consumer products provide value to our customers by delivering a better way to clean and by freeing people from repetitive home cleaning tasks. To ensure the continued acceptance of our robots, we will continue to invest in technology necessary to further improve their capabilities.

The opportunity for robots working together to accomplish multiple tasks with little intervention from the user is expected to be a significant step forward. Consumers can already use third party integration software to operate Roomba. We believe the mapping and spatial awareness capabilities of our consumer robots will play an important role in allowing other smart devices in the home to more seamlessly work together and advance the next-generation smart home.

We currently offer multiple Roomba floor vacuuming robots at varying price points ranging from approximately $299 to $1,099 based upon features and performance characteristics. Roomba's design allows it to clean under toe kicks, beds and other furniture, resulting in cleaner floors since the Roomba can access more of the floor than standard upright vacuum cleaners. In addition, Roomba eliminates the need to manually vacuum for many users - it cleans automatically upon the push of a button or through scheduling.

In 2018, we launched several new robotic vacuum cleaners:

- Roomba i7 brings a new level of intelligence and automation to robotic vacuum cleaners with the ability to learn, map and adapt to a home's floor plan;

5

Table of Contents

- Roomba i7+ includes all the features of i7 plus the ability for the robot to empty its own bin into the Clean Base with Automatic Dirt Disposal. This brings a level of automation that allows users to forget about vacuuming for weeks at a time; and

- Roomba e5 is an affordable, highly-featured product which includes WiFi connectivity, intelligent navigation with Dirt Detect technologies and iRobot's dual multi-surface rubber brushes.

In addition to the newly launched products, we continue to offer an assortment of other robotic vacuum cleaner offerings. Roomba 900 series robots help keep floors cleaner throughout the entire home with intelligent visual navigation and iRobot HOME App control with wireless connectivity. The Roomba 800 series robots offer our AEROForce technology which incorporates brushless, counter-rotating extractors that amplify suction for superior performance over bristle brushes, while requiring less maintenance than previous Roomba models. The Roomba 600 series robots offer a three-stage cleaning system which thoroughly vacuums every section of the floor multiple times, as well as an improved brush design enabling the robot to better handle fibers like hair, pet fur, lint and carpet fuzz.

We currently offer the Braava family of automatic floor mopping robots designed exclusively for hard-surface floors. These robots provide a different cleaning approach than our Roomba products. The Braava robots, priced at $199 and $299, automatically dust and damp mop hard-surface floors using popular cleaning cloths or our specially designed reusable microfiber cloths, and include a special reservoir that dispenses liquid throughout the cleaning cycle to keep the cloth damp. Braava jet works with Braava jet Cleaning Pads to tackle a range of hard-floor cleaning jobs, from wet mopping and damp sweeping to simple dusting.

Our Mirra Pool Cleaning Robot is used to clean residential pools and removes debris as small as two microns from pool floors, walls and stairs. Mirra is brought to market under the iRobot brand through a relationship with Aquatron, Inc., which develops and manufactures the pool cleaning robots.

In 2019, we plan to capitalize on the incremental investments we made in 2017 and 2018 with the introduction of Terra, and additional new products midyear 2019. In January 2019, we announced Terra, an autonomous robotic lawn mower that we believe will revolutionize the robotic lawnmower category with state-of-the-art mapping and navigation technology. Terra mows like people do, intelligently navigating the yard and cutting efficiently in systematic rows. We plan to make Terra available in limited quantities for purchase in Germany and for beta testing in the U.S. in 2019.

**Strategic Alliances**

In addition to our internal technology development, we leverage relevant robotic technologies through licensing, acquisitions, venture investments and/or other partnerships. These strategic alliances are an important part of our product development, advanced research and distribution strategies. We rely on strategic alliances to provide technology and complementary product offerings to drive market adoption of our robotic products.

We seek to form relationships with organizations that can provide best-in-class technology or market advantages for establishing iRobot technology. This includes expanded collaborations with other smart home technologies that may leverage spatial understanding from our products to provide end users with a more intuitive and personalized smart home experience.

**Sales and Distribution Channels**

We sell our consumer products through distributor and retail sales channels, as well as our online store. For the fiscal years ended December 29, 2018, December 30, 2017, and December 31, 2016, sales to non-U.S. customers accounted for 48.7%, 48.8%, and 51.2% of total revenue, respectively. For the fiscal years ended December 29, 2018 and December 30, 2017, the Company generated 17.3% and 13.5% of total revenue from one of its retailers (Amazon), respectively. For the fiscal year ended December 31, 2016, the Company generated 12.9%, 12.3% and 10.4% of total revenue from SODC, Robopolis, and Amazon, respectively. In April 2017, the Company acquired the iRobot-related distribution business of SODC, and in October 2017, the Company acquired Robopolis.

In the United States and Canada, we sell our consumer products primarily through a network of national retailers. Certain smaller domestic retail operations are supported by distributors to whom we sell our products directly. With the acquisition of SODC and Robopolis, iRobot now directly services retailers in Japan and countries that were previously serviced by Robopolis, including Austria, Belgium, France, Germany, Netherlands, Portugal and Spain. In support of sales in the United States, Canada, Japan and the seven European countries previously serviced by Robopolis, we maintain in-house sales, marketing and product management teams. In China, retailers are serviced by two local distributors. Due to the special needs of this market, we maintain a local sales, marketing and product team to support the distributors, manage the local marketing plan and meet product needs. Throughout the rest of the world, our products are sold primarily through a network of in-country distributors who resell to retail stores in their respective countries. These distributors are supported by our international sales and product marketing team.

6

Table of Contents

Our retail and distributor networks are our primary distribution channels for our products. We have established valuable databases and customer lists that allow us to target directly those consumers most likely to purchase a new robot or upgrade. With Wi-Fi connectivity implemented across Roomba 690 and higher models, iRobot can more directly provide customer support via the iRobot HOME App. In addition, connectivity enables us to provide direct marketing material and push new features/fixes to robots in the field. We believe we maintain a close connection with our customers in each of our markets, which provides an enhanced position from which to improve our distribution and product offerings.

### Customer Service and Support

We also provide ongoing customer service and support. Consumer customer service representatives, the majority of whom are employees of outsourced service organizations or our distribution partners, are extensively trained on the technical intricacies of our consumer products. Because of the connected nature of our new robot technology, our customer service representatives are able to access robot information remotely to identify issues and behaviors relevant in troubleshooting and address customer questions and concerns.

## Marketing and Brand

We market our consumer robots to end-user customers through our extensive network of retail partners with the support of our sales and marketing teams as well as in collaborations with in-country distributors. In addition, we sell directly to consumers through iRobot's e-commerce channels around the world. For consumers seeking information about our products, the iRobot website showcases our brand, allows consumers to learn more about our Roomba and Braava products, including the latest product innovations, and enables direct-to-consumer sales. The website also plays an important after-sales role for owners seeking spare parts and accessories, as well as a location for useful FAQ's and trouble-shooting solutions.

Our marketing strategy is to drive consumer awareness and interest in Roomba robot vacuums and Braava robot mops. Our sales and marketing expenses represented 19.3%, 18.3% and 17.4% of our total revenue in 2018, 2017 and 2016, respectively. We expect to continue to invest in national advertising, consumer and industry trade shows, direct marketing and public relations to further build brand awareness.

In 2017, iRobot launched our first ever Braava national television advertising campaign in the U.S., and category revenue grew 65% in 2017 over full-year 2016. In 2018, the momentum generated by this campaign continued driving U.S. revenue growth. We have built a trusted, recognized brand by providing high-quality robots. Customer word-of-mouth has been a significant driver of our brand's success to date. iRobot owner loyalty encourages repurchase, and positive customer experiences inspire others to adopt our products. Our marketing, public relations and consumer service efforts fuel this word-of-mouth momentum.

In April 2017, we acquired SODC, launching four new iRobot offices in Japan. In October 2017, we acquired our largest European distributor, Robopolis, launching new iRobot offices in seven countries, including Austria, Belgium, France, Germany, Netherlands, Portugal and Spain. These acquisitions afford us greater control and consistency in our approach to all market activities including sales, marketing, branding, channel relationships and customer service.

## Manufacturing

Our core competencies are the design, development and marketing of robots. Our manufacturing strategy is to outsource non-core competencies, such as the production of our robots, to third-party entities skilled in manufacturing. By relying on the outsourced manufacture of our robots, we can focus our engineering expertise on the design of robots and associated technologies.

Manufacturing a new product requires a close relationship between our product designers and the manufacturing organizations. Using multiple engineering techniques, our products are introduced to the selected production facility at an early-development stage and the feedback provided by manufacturing is incorporated into the design before tooling is finalized and mass production begins. As a result, we believe that we can significantly reduce the time required to move a product from its design phase to mass production deliveries, with improved quality and yields.

We outsource the manufacturing of our consumer products to three contract manufacturers, each of which manufactures our robots at a single plant in Southern China. In addition, one of our contract manufactures plans to begin partial production outside of China beginning in 2019. Our production processes give us the capacity to produce up to 20,000 robots a day, helping us to meet demand for peak seasons.

Under our agreements with our contract manufacturers, manufacturers supply us with specified quantities of products that align with demand forecasts that we establish based upon historical trends and analysis from our sales and product management functions.

Table of Contents

**Research and Development**

We believe that our future success depends upon our ability to continue to develop new products and product accessories, and enhancements to and applications for our existing products. For the years ended December 29, 2018, December 30, 2017 and December 31, 2016, our research and development expenses were $140.6 million, $113.1 million and $79.8 million, or 12.9%, 12.8% and 12.1% of revenue, respectively. We intend to continue our investment in research and development to respond to and anticipate customer needs, and to enable us to introduce new products over the next few years that will continue to address our existing and adjacent market sectors.

Our research and development is conducted by teams dedicated to particular projects. Our research and development efforts are primarily located at our headquarters in Bedford, Massachusetts and our office in Pasadena, California.

**Competition**

The market for robots is highly competitive, rapidly evolving and subject to changing technologies, shifting customer needs and expectations and the likely increased introduction of new products. A number of established companies have developed or are developing robots that will compete directly with our product offerings, and many of our competitors have significantly more financial and other resources than we possess. Our competitors include consumer electronics companies such as Samsung, LG, Xiaomi, Cecotec and Shark, traditional floor cleaning brands with robotic offerings such as Dyson, Bissell and Hoover; and firms primarily focused on robotic cleaning such as Ecovacs and iLife.

While we believe many of our customers purchase our Roomba floor vacuuming robots and Braava mopping robots as a supplement to, rather than a replacement for, their traditional vacuum cleaners and wet floor cleaning methods, we do compete in some cases with providers of traditional cleaning products.

We believe that the principal competitive factors in the market for robots include product features, performance for the intended mission, cost of purchase, total cost of system operation, including maintenance and support, ease of use, integration with existing equipment, quality, reliability, customer support, brand and reputation.

Our ability to remain competitive will depend to a great extent upon our ongoing performance in the areas of product development and customer support. We cannot provide assurance that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering the markets in which we provide products.

**Intellectual Property**

We believe that our continued success depends in large part on our proprietary technology, the technical competence and ability of our employees to continue to innovate. The ownership of intellectual property rights is an important factor in our business. This includes patents, copyrights, trademarks, service marks, trade dress and other forms of intellectual property rights in the U.S. and a number of foreign countries. The Company currently holds a significant number of patents and has filed numerous additional patent applications. As of December 29, 2018, we held 460 U.S. patents, more than 800 foreign patents, additional design registrations, and more than 500 patent applications pending worldwide. While our U.S. patents will begin to expire in 2022, no single intellectual property right is solely responsible for protecting our products. We will continue to file and prosecute patent (or design registration, as applicable) applications when and where appropriate to attempt to protect our rights in our proprietary technologies. We also encourage our employees to continue to invent and develop new technologies so as to maintain our competitiveness in the marketplace. It is possible that our current patents, or patents which we may later acquire, may be successfully challenged or invalidated in whole or in part. It is also possible that we may not obtain issued patents for our pending patent applications or other inventions we seek to protect. In that regard, we sometimes permit certain intellectual property to lapse or go abandoned under appropriate circumstances. It is also possible that we may not develop proprietary products or technologies in the future that are patentable, or that any patent issued to us may not provide us with any competitive advantages, or that the patents of others will harm or altogether preclude our ability to do business.

Our registered U.S. trademarks include iRobot and its stylized logo, Roomba, NorthStar, Create, iAdapt, Aware, Home Base, Looj, Braava, Braava jet, AeroForce, Better Together, Mirra, vSLAM and Virtual Wall. Our marks iRobot, Roomba, Braava, Braava jet, Virtual Wall, and certain other trademarks, have also been registered in selected foreign countries.

Our means of protecting our proprietary rights may not be adequate, and our competitors may independently develop technology that is similar to ours. Legal protections afford only limited protection for our technology. The laws of many countries do not protect our proprietary rights to as great an extent as do the laws of the United States. Despite our efforts to protect our proprietary rights, unauthorized parties have in the past attempted, and may in the future attempt, to copy aspects of our products or to obtain and use information that we regard as proprietary. Some of our competitors seek to compete primarily through aggressive pricing and low-cost structures while infringing on our intellectual property. In 2017, we initiated a multi-party litigation at the U.S. International Trade Commission ("ITC") as well as in federal district court in Massachusetts based on claims of patent infringement. In November 2018, the ITC issued a Notice of Final Determination confirming that U.S. Patent No. 9,038,233 is valid and infringed, and that the infringing products for bObsweep, Inc., bObsweep USA, Hoover, and

8

Table of Contents

Shenzhen Silver Star Intelligent Technology Co., Ltd. should be barred from importation into the United States. Prior to the issuance of the Final Determination, iRobot entered into confidential settlements with Shenzhen Zhiyi Technology Co. Ltd. d/b/a iLife, Micro-Star International, Black & Decker, and Matsutek. There is no guarantee that we will prevail on other patent infringement claims against third parties. Third parties may also design around our proprietary rights, which may render our protected products less valuable, if the design around is favorably received in the marketplace. In addition, if any of our products or the technology underlying our products is covered by third-party patents or other intellectual property rights, we could be subject to various legal actions. We cannot assure you that our products do not infringe patents held by others or that they will not in the future. We have received in the past communications from third parties relating to technologies used in our various robot products that have alleged infringement of patents or violation of other intellectual property rights. Some of these allegations have resulted in actions filed against iRobot in foreign jurisdictions. In response to these communications, we have contacted these third parties to convey our good faith belief that we do not infringe the patents in question or otherwise violate those parties' rights. Where an action has been filed, we will defend iRobot against the allegations. We cannot assure you that we will not receive further correspondence from these parties, not be subject to additional allegations of infringement from others, and cannot assure you that iRobot will prevail in any ongoing or subsequently filed actions. Litigation may be necessary to enforce our intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity, misappropriation, or other claims. Any such litigation could result in substantial costs and diversion of our resources. Moreover, any settlement of or adverse judgment resulting from such litigation could require us to obtain a license to continue to use the technology that is the subject of the claim, or otherwise restrict or prohibit our use of the technology. Any required licenses may not be available to us on acceptable terms, if at all. If we attempt to design around the technology at issue or to find another provider of suitable alternative technology to permit us to continue offering applicable software or product solutions, our continued supply of software or product solutions could be disrupted or our introduction of new or enhanced software or products could be significantly delayed.

### Seasonality

Historically, we have experienced higher revenue in the second half of the year compared to the first half of the year due in large part to seasonal holiday demand. In 2018, 2017 and 2016, our second-half consumer product revenue represented 59.4%, 60.2% and 57.5% of our annual consumer product revenue, respectively. We have also experienced higher selling and marketing expenses in the second half of the year compared to the first half of the year due to increase marketing campaigns to support seasonal holiday demand. In 2018, 2017 and 2016, our second-half selling and marketing expense represented 63.3%, 61.3% and 57.4% of our annual selling and marketing expense, respectively.

### Regulations

Our business requires compliance with a variety of laws and regulations in the United States and abroad regarding privacy, data protection, and data security. In particular, we are subject to numerous U.S. federal, state, and local laws and regulations and foreign laws and regulations regarding privacy and the collection, sharing, use, processing, disclosure, and protection of personal information and other user data. In addition, the global nature of our business operations also creates various domestic and foreign regulatory challenges and subject us to laws and regulations such as the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act, and similar anti-bribery and anti-corruption laws in other jurisdictions. Our products are also subject to U.S. export controls, including the U.S. Department of Commerce's Export Administration Regulations and various economic and trade sanctions regulations established by the Treasury Department's Office of Foreign Assets Controls.

The laws in each of these areas - in particular those related to data privacy - are continually changing and evolving in unpredictable ways. New laws and regulations in any of these areas, as well as compliance with these laws (and their derivatives) may have an adverse effect on our business. If we fail to comply with these laws, we may be subject to significant liabilities and other penalties.

We are also subject to international and U.S. federal, state, and local laws and regulations designed to protect the environment, regulate energy efficiency and to regulate the discharge of materials into the environment. We believe that our policies, practices, and procedures are properly designed to prevent unreasonable risk of environmental damage and associated financial liability. To date, environmental control regulations have not had a significant adverse effect on our overall operations.

Prior to our divestiture of the defense and security business unit in April 2016, we were subject to various government regulations, including various U.S. federal government regulations as a contractor and subcontractor to the U.S. federal government. We continue to remain subject to certain of these regulations only as they pertain to matters related to our operation of the defense and security business unit prior to our completion of the sale of this business.

### Employees

As of December 29, 2018, we had 1,032 full-time employees. Approximately 31% of our employees are based outside of the United States. None of our employees in the United States are represented by a labor union. In certain foreign subsidiaries,

9

Table of Contents

labor unions or workers' councils represent some of our employees. We believe that we have a good relationship with our employees.

**Available Information**

We were incorporated in California in August 1990 under the name IS Robotics, Inc. and reincorporated as IS Robotics Corporation in Massachusetts in June 1994. We reincorporated in Delaware as iRobot Corporation in December 2000. We conduct operations and maintain a number of subsidiaries in the United States and abroad, including operations in Austria, Belgium, China, France, Germany, Hong Kong, Japan, Netherlands, Portugal, Spain, and the United Kingdom. We also maintain iRobot Securities Corporation, a Massachusetts securities corporation, to invest our cash balances on a short-term basis. Our website address is www.irobot.com. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge through the investor relations page of our website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission. Alternatively, these reports may be accessed at the SEC's website at www.sec.gov.

**ITEM 1A.** *RISK FACTORS*

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. This discussion highlights some of the risks which may affect future operating results. These are the risks and uncertainties we believe are most important for you to consider. Additional risks and uncertainties not presently known to us, which we currently deem immaterial or which are similar to those faced by other companies in our industry or business in general, may also impair our business operations. If any of the following risks or uncertainties actually occurs, our business, financial condition and operating results would likely suffer.

> *We operate in an emerging market, which makes it difficult to evaluate our business and future prospects.*

Robots represent a new and emerging market. Accordingly, our business and future prospects are difficult to evaluate. We cannot accurately predict the extent to which demand for consumer robots will increase, if at all. You should consider the challenges, risks and uncertainties frequently encountered by companies using new and unproven business models in rapidly evolving markets. These challenges include our ability to:

- generate sufficient revenue and gross margin to maintain profitability;
- acquire and maintain market share in our consumer market;
- attract and retain customers of our consumer robots;
- attract and retain engineers and other highly-qualified personnel; and
- expand our product offerings beyond our existing robots.

If we fail to successfully address these and other challenges, risks and uncertainties, our business, results of operations and financial condition would be materially harmed.

> *Our business currently depends solely on our consumer robots, and our sales growth and operating results would be negatively impacted if we are unable to enhance our current consumer robots or develop new consumer robots at competitive prices or in a timely manner, or if the consumer robot market does not achieve broad market acceptance.*

We primarily derive our revenue from consumer robot sales. For the foreseeable future, we expect that our revenue will be derived solely from sales of consumer robots in general, and home floor care products in particular. Accordingly, our future success depends upon our ability to further penetrate the consumer home care market, to enhance our current consumer products and to develop and introduce new consumer products offering enhanced performance and functionality at competitive prices. The development and application of new technologies involves time, substantial costs and risks. Our inability to achieve significant sales of our newly introduced robots, or to enhance, develop and introduce other products in a timely manner, or at all, would materially harm our sales growth and operating results.

Even if consumer robots gain wide market acceptance, our robots may not adequately address market requirements and may not continue to gain market acceptance. If robots generally, or our robots specifically, do not gain wide market acceptance, we may not be able to achieve our anticipated level of growth, and our revenue and results of operations would suffer.

Table of Contents

***We face intense competition from other providers of robots, including diversified technology providers, as well as competition from providers offering alternative products, which could negatively impact our results of operations and cause our market share to decline.***

A number of companies have developed or are developing robots that will compete directly with our product offerings. Many current and potential competitors have substantially greater financial, marketing, research and manufacturing resources than we possess, and there can be no assurance that our current and future competitors will not be more successful than us. We also face competition from manufacturers of lower-cost devices, which may further drive down the average selling price in the marketplace for floor cleaning products. Moreover, while we believe many of our customers purchase our floor vacuuming robots as a supplement to, rather than a replacement for, their traditional vacuum cleaners, we also compete in some cases with providers of traditional vacuum cleaners.

The global market for robots is highly competitive, rapidly evolving and subject to changing technologies, shifting customer needs and expectations and the likely increased introduction of new products. Our ability to remain competitive will depend to a great extent upon our ongoing performance in the areas of product development and customer support.

In the event that the robot market expands further, we expect that competition will intensify as additional competitors enter the market and current competitors expand their product lines. Companies competing with us may introduce products that are competitively priced, have increased performance or functionality, or incorporate technological advances that we have not yet developed or implemented. Increased competitive pressure could result in a loss of sales or market share or cause us to lower prices for our products, any of which would harm our business and operating results.

Some of our competitors may aggressively discount their products and services in order to gain market share, which could result in pricing pressures, reduced profit margins, lost market share, or a failure to grow market share for us. In addition, new products may have lower selling prices or higher costs than legacy products, which could negatively impact our gross margins and operating results.

We cannot assure you that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering the markets in which we provide products. Our failure to compete successfully could cause our revenue and market share to decline, which would negatively impact our results of operations and financial condition.

***If we fail to enhance our brand, our ability to expand our customer base will be impaired and our operating results may suffer.***

We believe that developing and maintaining awareness of the iRobot brand is critical to achieving widespread acceptance of our existing and future products and is an important element in attracting new customers. Furthermore, we expect the importance of global brand recognition to increase as competition develops. If customers do not perceive our products to be of high quality, our brand and reputation could be harmed, which could adversely impact our financial results. In addition, brand promotion efforts may not yield significant revenue or increased revenue sufficient to offset the additional expenses incurred in building our brand. Maintaining, protecting, and enhancing our brand may require us to make substantial investments, and these investments may not be successful. If we fail to successfully maintain, promote, and position our brand and protect our reputation, or if we incur significant expenses in this effort, our business, financial condition and operating results may be adversely affected.

***Any efforts to expand our product offerings beyond our current markets may not succeed, which could negatively impact our operating results.***

Efforts to expand our product offerings beyond our current markets may not succeed and may divert management resources from existing operations and require us to commit significant financial resources to an unproven business, either of which could significantly impair our operating results. Moreover, efforts to expand beyond our existing markets may never result in new products that achieve market acceptance, create additional revenue or become profitable.

***Our financial results often vary significantly from quarter-to-quarter due to a number of factors, which may lead to volatility in our stock price.***

Our quarterly revenue and other operating results have varied in the past and are likely to continue to vary significantly from quarter-to-quarter in the future. These fluctuations may be due to numerous factors including:

- the size, timing and mix of orders from retail stores and distributors for our consumer robots;
- the mix of products that we sell in the period;
- disruption of supply of our products from our manufacturers;
- disruptions to our supply chain due to inclement weather, labor disruptions or other factors beyond our control;

11

Table of Contents

- seasonality in the sales of our products;
- the timing of new product introductions;
- unanticipated costs incurred in the introduction of new products;
- costs and availability of labor and raw materials;
- costs of freight;
- changes in our rate of returns for our consumer products;
- our ability to introduce new products and enhancements to our existing products on a timely basis; and
- warranty costs associated with our consumer products.

We cannot be certain that our revenues will grow at rates that will allow us to maintain profitability during every fiscal quarter, or even every fiscal year. We base our current and future expense levels on our internal operating plans and sales forecasts, including forecasts of holiday sales for our consumer products. A significant portion of our operating expenses, such as research and development expenses, certain marketing and promotional expenses and employee wages and salaries, do not vary directly with sales and are difficult to adjust in the short term. As a result, if sales for a quarter are below our expectations, we might not be able to reduce operating expenses for that quarter. Accordingly, a sales shortfall during a fiscal quarter, and in particular the fourth quarter of a fiscal year, could have a disproportionate effect on our operating results for that quarter or that year. Because of quarterly fluctuations, we believe that quarter-to-quarter comparisons of our operating results are not necessarily meaningful. Moreover, our operating results may not meet expectations of equity research analysts or investors. If this occurs, the trading price of our common stock could fall substantially either suddenly or over time.

*We depend on single source manufacturers, and our reputation and results of operations would be harmed if these manufacturers fail to meet our requirements.*

We currently depend largely on several single source contract manufacturers for the manufacture of certain of our products. All contract manufacturers for our current robots are currently located in China. These manufacturers supply substantially all of the raw materials and provide all facilities and labor required to manufacture our products. If these companies were to terminate their arrangements with us or fail to provide the required capacity and quality on a timely basis, we would be unable to manufacture our products until replacement contract manufacturing services could be obtained or volume transferred to an alternative manufacturing partner, each of which is a costly and time-consuming process. We cannot assure you that we would be able to establish alternative manufacturing arrangements on acceptable terms or in a timely manner.

Our reliance on these contract manufacturers involves certain risks, including the following:

- lack of direct control over production capacity and delivery schedules;
- lack of direct control over quality assurance, manufacturing yields and production costs;
- lack of enforceable contractual provisions over the production and costs of consumer products;
- risk of loss of inventory while in transit;
- risks associated with international commerce, including unexpected changes in legal and regulatory requirements, changes in tariffs and trade policies, risks associated with the protection of intellectual property and political and economic instability; and
- risks that our attempts to add additional manufacturing resources may be significantly delayed and thereby create disruptions in production of our products.

Any interruption in the manufacture of our products would be likely to result in delays in shipment, lost sales and revenue and damage to our reputation in the market, all of which would harm our business and results of operations. In addition, while our contract obligations with our contract manufacturers in China are typically denominated in U.S. dollars, changes in currency exchange rates could impact our suppliers and increase our prices.

*If we fail to maintain or increase consumer robot sales through our distribution channels, our operating results would be negatively impacted.*

We do not have long-term contracts regarding purchase volumes with any of our retail partners. As a result, purchases generally occur on an order-by-order basis, and the relationships, as well as particular orders, can generally be terminated or otherwise materially changed at any time prior to delivery, by our retail partners. A decision by a major retail partner, whether motivated by competitive considerations, financial difficulties, economic conditions or otherwise, to decrease its purchases from us, to reduce the shelf space for our products or to change its manner of doing business with us could significantly damage our consumer product sales and negatively impact our business, financial condition and results of operations. In addition, during recent years, various retailers, including some of our partners, have experienced significant changes and difficulties, including consolidation of ownership, increased centralization of purchasing decisions, restructuring, bankruptcies and liquidations. These

12

Table of Contents

and other financial problems of some of our retailers increase the risk of extending credit to these retailers. A significant adverse change in a retail partner relationship with us or in a retail partner's financial position could cause us to limit or discontinue business with that partner, require us to assume more credit risk relating to that partner's receivables or limit our ability to collect amounts related to previous purchases by that partner, all of which could harm our business and financial condition. Disruption of the iRobot on-line store could also decrease our consumer robot sales.

### *If critical components of our products that we currently purchase from a small number of suppliers become unavailable, we may incur delays in shipment, which could damage our business.*

We and our outsourced manufacturers obtain hardware components, various subsystems, raw materials and batteries from a limited group of suppliers, some of which are sole suppliers. We do not have any long-term agreements with these suppliers obligating them to continue to sell components or products to us. If we or our outsourced manufacturers are unable to obtain components from third-party suppliers in the quantities and of the quality that we require, on a timely basis and at acceptable prices, we may not be able to deliver our products on a timely or cost-effective basis to our customers, which could cause customers to terminate their contracts with us, reduce our gross margin and seriously harm our business, results of operations and financial condition. Moreover, if any of our suppliers become financially unstable, we may have to find new suppliers. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We may experience significant delays in manufacturing and shipping our products to customers and incur additional development, manufacturing and other costs to establish alternative sources of supply if we lose any of these sources. We cannot predict if we will be able to obtain replacement components within the time frames that we require at an affordable cost, or at all.

### *Cybersecurity risks could adversely affect our business and disrupt our operations.*

The threats to network and data security are increasingly diverse and sophisticated. Despite our efforts and processes to prevent breaches, our devices, as well as our servers, computer systems, and those of third parties that we use in our operations are vulnerable to cybersecurity risks, including cyber attacks such as viruses and worms, phishing attacks, denial-of-service attacks, and similar disruptions from unauthorized tampering with our servers and computer systems or those of third parties that we use in our operations, which could lead to interruptions, delays, loss of critical data, and loss of consumer confidence. In addition, we may be the target of email scams that attempt to acquire sensitive information or company assets. Despite our efforts to create security barriers to such threats, we may not be able to entirely mitigate these risks. Any cyber attack that attempts to obtain our data and assets, disrupt our service, or otherwise access our systems, or those of third parties we use, if successful, could adversely affect our business, operating results, and financial condition, be expensive to remedy, and damage our reputation.

### *If we suffer data breaches involving the designs, schematics or source code for our products, our brand, business and financial results could be adversely affected.*

We attempt to securely store our designs, schematics and source code for our products as they are created. A breach, whether physical, electronic or otherwise, of the systems on which this sensitive data is stored could lead to damage or piracy of our products. If we or our partners are subject to data security breaches, we may have a loss in sales or increased costs arising from the restoration or implementation of additional security measures, either of which could materially and adversely affect our brand, business and financial results.

### *We collect, store, process, and use customer data, including certain personal and robot-specific information, which subjects us to governmental regulation and other legal obligations related to privacy, information security, and data protection, and any security breaches or our actual or perceived failure to comply with such legal obligations could harm our business.*

Our latest Roomba products, as well as additional products in development, collect, store, process, and use certain customer data, which subjects us to governmental regulation and other legal obligations related to privacy, information security, and data protection, and any security breaches or our actual or perceived failure to comply with such legal obligations could harm our business. We collect, store, process, and use personal information and other user data, and we rely on third parties that are not directly under our control to do so as well. If our security measures, some of which are managed by third parties, are breached or fail, unauthorized persons may be able to obtain access to or acquire sensitive user data, which may expose us to a risk of loss, litigation, or regulatory proceedings. Depending on the nature of the information compromised, in the event of a data breach or other unauthorized access to or acquisition of our user data, we may also have obligations to notify users about the incident, and we may need to provide some form of remedy, such as a subscription to a credit monitoring service, for the individuals affected by the incident. In addition, the regulatory environment surrounding information security and privacy is increasingly demanding, with frequent imposition of new and changing requirements. For example, the European Union's General Data Protection Regulation ("GDPR"), which became effective in May 2018, imposes significant new requirements on

13

Table of Contents

how we collect, process and transfer personal data, as well as significant fines for non-compliance. Compliance with changes in privacy and information security laws and standards may result in significant expense due to increased investment in technology and the development of new operational processes. Moreover, a growing number of legislative and regulatory bodies have adopted consumer notification requirements in the event of unauthorized access to or acquisition of certain types of personal data. Such breach notification laws continue to evolve and may be inconsistent from one jurisdiction to another. Complying with these obligations could cause us to incur substantial costs and could increase negative publicity surrounding any incident that compromises user data.

Further, we may be or become subject to data localization laws mandating that data collected in a foreign country be processed and stored only within that country. Russia adopted such a law in 2014, and it is expected that China will do so as well. If China or another country in which we have customers were to adopt a data localization law, we could be required to expand our data storage facilities there or build new ones in order to comply. The expenditure this would require, as well as costs of compliance generally, could harm our financial condition.

***Acquisitions and potential future acquisitions may be difficult to integrate, divert the attention of key personnel, disrupt our business, dilute stockholder value and impair our financial results.***

As part of our business strategy, we have recently acquired, and we intend to continue to consider additional acquisitions of companies, technologies and products that we believe could accelerate our ability to compete in our core markets or allow us to enter new markets. For example, in April 2017, we acquired the iRobot-related distribution business of Sales On Demand Corporation ("SODC"), a privately-held corporation based in Tokyo, Japan, and in October 2017, we acquired Robopolis SAS ("Robopolis"), a privately-held corporation distributing iRobot products from offices in seven European countries.

Acquisitions and combinations are accompanied by a number of risks, including the difficulty of integrating the operations and personnel of the acquired companies, the potential disruption of our ongoing business, the potential distraction of management, potential difficulty in managing and maintaining key customer relationships, expenses related to the acquisition and potential unknown liabilities associated with acquired businesses. Any inability to integrate completed acquisitions or combinations in an efficient and timely manner could have an adverse impact on our results of operations. In addition, we may not be able to recognize any expected synergies or benefits in connection with our recently completed acquisitions of SODC or Robopolis or any future acquisitions or combinations. If we are not successful in completing acquisitions or combinations that we may pursue in the future, we may incur substantial expenses and devote significant management time and resources without a successful result. In addition, future acquisitions could require use of substantial portions of our available cash or result in dilutive issuances of securities.

Our service providers may experience business interruptions, delays, or quality control issues, which may negatively impact our business and operating results.

As we expand our operations, we expect to use additional enterprise resource planning systems and account and technology service providers that may also be essential to managing our business. Our ability to manage our business would suffer if one or more of our providers suffer an interruption in their business, or experience delays, disruptions or quality control problems in their operations, or we have to change or add systems and services. While we conduct reasonable diligence on our service providers, we may not always be able to control the quality of the systems and services we receive from these providers, which could impair our ability to maintain appropriate internal controls over financial reporting and complete timely and accurate financial reporting, and may impact our business, operating results and financial condition.

***Our valuation estimates for our recently completed and future acquisitions are based upon assumptions that may differ from actual results.***

Charges to earnings as a result of acquisitions may adversely affect our operating results in the foreseeable future, which could have a material and adverse effect on the market value of our common stock. In particular, we have allocated the cost of acquiring businesses to the individual assets acquired and liabilities assumed, including various identifiable intangible assets such as acquired technology, acquired trade names and acquired customer relationships based on their respective fair values. Our estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain. After we complete an acquisition, the following factors could result in material charges and adversely affect our operating results and may adversely affect our cash flows:

- costs incurred to combine the operations of businesses we acquire, such as transitional employee expenses and employee retention, redeployment or relocation expenses;
- impairment of goodwill or intangible assets;
- amortization of intangible assets acquired;
- a reduction in the useful lives of intangible assets acquired;

14

Table of Contents

- identification of or changes to assumed contingent liabilities, both income tax and non-income tax related after our final determination of the amounts for these contingencies or the conclusion of the measurement period (generally up to one year from the acquisition date), whichever comes first;
- charges to our operating results to eliminate certain duplicative pre-merger activities, to restructure our operations or to reduce our cost structure; and
- charges to our operating results resulting from expenses incurred to effect the acquisition.

### *If we are unable to attract and retain additional skilled personnel, we may be unable to grow our business.*

To execute our growth plan, we must attract and retain additional, highly-qualified personnel. Competition for hiring these employees is intense, especially with regard to engineers with high levels of experience in designing, developing and integrating robots and engineers with expertise in artificial intelligence, machine learning and cloud applications. Many of the companies with which we compete for hiring experienced employees have greater resources than we have. If we fail to attract new technical personnel or fail to retain and motivate our current employees, our business and future growth prospects could be severely harmed.

### *We depend on the experience and expertise of our senior management team and key technical employees, and the loss of any key employee may impair our ability to operate effectively.*

Our success depends upon the continued services of our senior management team and key technical employees, such as our project management personnel and senior engineers. Each of our executive officers, key technical personnel and other employees could terminate his or her relationship with us at any time. The loss of any member of our senior management team might significantly delay or prevent the achievement of our business objectives and could materially harm our business and customer relationships. In addition, because of the highly technical nature of our robots, the loss of any significant number of our existing engineering and project management personnel could have a material adverse effect on our business and operating results.

### *If we fail to protect, or incur significant costs in defending, our intellectual property and other proprietary rights, our business and results of operations could be materially harmed.*

Our success depends on our ability to protect our intellectual property and other proprietary rights. We rely primarily on patents, trademarks, copyrights, trade secrets and unfair competition laws, as well as license agreements and other contractual provisions, to protect our intellectual property and other proprietary rights. Significant technology used in our products, however, is not the subject of any patent protection, and we may be unable to obtain patent protection on such technology in the future. Moreover, existing U.S. legal standards relating to the validity, enforceability and scope of protection of intellectual property rights offer only limited protection, may not provide us with any competitive advantages, and may be challenged by third parties. In addition, the laws of countries other than the United States in which we market our products may afford little or no effective protection of our intellectual property. Patents which may be granted to us in certain foreign countries may be subject to opposition proceedings brought by third parties or result in suits by us, which may be costly and result in adverse consequences for us. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing upon or misappropriating our intellectual property or otherwise gaining access to our technology. Unauthorized third parties may try to copy or reverse engineer our products or portions of our products or otherwise obtain and use our intellectual property. If we fail to protect our intellectual property and other proprietary rights, our business, results of operations or financial condition could be materially harmed.

In addition, defending our intellectual property rights may entail significant expense. We believe that certain products in the marketplace may infringe our existing intellectual property rights. We have, from time to time, resorted to legal proceedings to protect our intellectual property and may continue to do so in the future. For example, in 2017 we initiated a multi-party litigation at the U.S. International Trade Commission as well as in federal district court in Massachusetts based on claims of patent infringement. In November 2018, the ITC issued a Notice of Final Determination confirming that U.S. Patent No. 9,038,233 is valid and infringed, and that the infringing products for bObsweep, Inc., bObsweep USA, Hoover, and Shenzhen Silver Star Intelligent Technology Co., Ltd. should be barred from importation into the United States. Prior to the issuance of the Final Determination, iRobot entered into confidential settlements with Shenzhen Zhiyi Technology Co. Ltd. d/b/a iLife, Micro-Star International, Black & Decker, and Matsutek. There is no guarantee that we will prevail on other patent infringement claims against third parties. We may be required to expend significant resources to monitor and protect our intellectual property rights. In addition, any of our intellectual property rights may be challenged by others or invalidated through administrative processes or litigation. If we resort to legal proceedings to enforce our intellectual property rights or to determine the validity and scope of the intellectual property or other proprietary rights of others, the proceedings could result in significant expense to us and divert the attention and efforts of our management and technical employees, even if we were to prevail.

Table of Contents

***We may be sued by third parties for alleged infringement of their proprietary rights, which could be costly, time-consuming and limit our ability to use certain technologies in the future.***

We are currently defending multiple lawsuits based on claims of patent infringement. If the size of our markets increases, we would be more likely to be subject to claims that our technologies infringe upon the intellectual property or other proprietary rights of third parties. In addition, the vendors from which we license technology used in our products could become subject to similar infringement claims. Our vendors, or we, may not be able to withstand third-party infringement claims. Any claims, with or without merit, could be time-consuming and expensive, and could divert our management's attention away from the execution of our business plan. Moreover, any settlement or adverse judgment resulting from the claim could require us to pay substantial amounts or obtain a license to continue to use the technology that is the subject of the claim, or otherwise restrict or prohibit our use of the technology. There can be no assurance that we would be able to obtain a license from the third party asserting the claim on commercially reasonable terms, if at all, that we would be able to develop alternative technology on a timely basis, if at all, or that we would be able to obtain a license to use a suitable alternative technology to permit us to continue offering, and our customers to continue using, our affected product. In addition, we may be required to indemnify our retail and distribution partners for third-party intellectual property infringement claims, which would increase the cost to us of an adverse ruling in such a claim. An adverse determination could also prevent us from offering our products to others. Infringement claims asserted against us or our vendors may have a material adverse effect on our business, results of operations or financial condition.

In addition, we incorporate open source software into our products, and we may continue to incorporate open source software into our products in the future. Open source software is generally licensed by its authors or other third parties under open source licenses. Some of these licenses contain requirements that we make available source code for modifications or derivative works we create based upon the open source software, and that we license such modifications or derivative works under the terms of a particular open source license or other license granting third parties certain rights of further use. If an author or other third party that distributes open source software that we use or license were to allege that we had not complied with the conditions of the applicable license, we could be required to incur significant legal expenses defending against those allegations and could be subject to significant damages, enjoined from offering or selling our products that contained the open source software and required to comply with the foregoing conditions. Any of the foregoing could disrupt and harm our business and financial condition.

***Global economic conditions and any associated impact on consumer spending could have a material adverse effect on our business, results of operations and financial condition.***

Continued economic uncertainty and reductions in consumer spending, particularly in certain international markets such as the European Union, China and Japan, may result in reductions in sales of our consumer robots. Additionally, disruptions in credit markets may materially limit consumer credit availability and restrict credit availability of our retail customers, which would also impact purchases of our consumer robots. Any reduction in sales of our consumer robots, resulting from reductions in consumer spending or continued disruption in the availability of credit to retailers or consumers, could materially and adversely affect our business, results of operations and financial condition.

Because we are an increasingly global business that in the years ended December 29, 2018, December 30, 2017 and December 31, 2016 generated approximately 48.7%, 48.8% and 51.2%, respectively, of our total revenue from sales to customers outside of the United States, we are subject to a number of additional risks including foreign currency fluctuations. These risks are magnified with our expanding global presence as a result of our recent acquisitions of SODC and Robopolis. These foreign currency fluctuations may make our products more expensive to our distributors, which in turn may impact sales directly or the ability or willingness of our distribution partners to invest in growing product demand.

Our primary exposure to movements in foreign currency exchange rates relates to non-U.S. dollar denominated sales and operating expenses worldwide. Weakening of foreign currencies relative to the U.S. dollar could adversely affect the U.S. dollar value of our foreign currency-denominated sales and earnings, and lead us to raise international pricing, which may reduce demand for our products. In some circumstances, for competitive or other reasons, we may decide not to raise local prices to fully offset the strengthening of the U.S. dollar, or for any other reason, which would adversely affect the U.S. dollar value of our foreign currency denominated sales and earnings. Conversely, a strengthening of foreign currencies relative to the U.S. dollar, while generally beneficial to our foreign currency-denominated sales and earnings, could cause us to reduce international pricing, incur losses on our foreign currency derivative instruments, and incur increased operating expenses, thereby limiting any benefit. Additionally, strengthening of foreign currencies may also increase our cost of product components denominated in those currencies, thus adversely affecting gross margins.

We use derivative instruments, such as foreign currency forward contracts, to hedge certain exposures to fluctuations in foreign currency exchange rates. The use of such hedging activities may not offset any, or more than a portion, of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place. In addition, our counterparties may be unable to meet the terms of the agreements. We seek to mitigate this risk by limiting counterparties to major financial institutions and by spreading the risk across several major financial institutions.

Table of Contents

***We are subject to a variety of U.S. and foreign laws and regulations that are central to our business; our failure to comply with these laws and regulations could harm our business or our operating results.***

We are or may become subject to a variety of laws and regulations in the United States and abroad that involve matters central to our business, including laws and regulations regarding consumer protection, advertising, electronic commerce, intellectual property, manufacturing, anti-bribery and anti-corruption, and economic or other trade prohibitions or sanctions.

The increasingly global nature of our business operations subjects us to domestic and foreign laws and regulations such as the U.S. Foreign Corrupt Practices Act, or FCPA, the U.K. Bribery Act, and similar anti-bribery and anti-corruption laws in other jurisdictions. Our products are also subject to U.S. export controls, including the U.S. Department of Commerce's Export Administration Regulations and various economic and trade sanctions regulations established by the Treasury Department's Office of Foreign Assets Controls. Given the increasing number of foreign laws to which we are subject and the high level of complexity of these laws, there is a risk that some provisions may be inadvertently breached by us or by our subsidiaries, for example through fraudulent or negligent behavior of individual employees, our failure to comply with certain formal documentation requirements, or otherwise. If we incur liability for noncompliance under these laws or regulations, we may be forced to implement new measures to reduce our exposure to this liability. This may require us to expend substantial resources or to discontinue certain products or services, which would negatively affect our business, financial condition, and operating results. In addition, any negative publicity directed to us as a result of lawsuits, regulatory proceedings, and legislative proposals could harm our brand or otherwise impact the growth of our business. Any costs incurred as a result of compliance efforts or other liabilities under these laws or regulations could harm our business and operating results.

***Environmental laws and regulations and unforeseen costs could negatively impact our future earnings.***

The manufacture and sale of our products in certain states and countries may subject us to environmental and other regulations. We also face increasing complexity in our product design as we adjust to legal and regulatory requirements relating to our products. There is no assurance that such existing laws or future laws will not impair future earnings or results of operations.

***Business disruptions resulting from international uncertainties could negatively impact our profitability.***

We derive, and expect to continue to derive, a significant portion of our revenue from international sales in various European and Far East markets, and Canada, particularly following our acquisitions of SODC and Robopolis. For the fiscal years ended December 29, 2018, December 30, 2017 and, December 31, 2016, sales to non-U.S. customers accounted for 48.7%, 48.8% and 51.2% of total revenue, respectively. We expect that international revenues will continue to account for a significant percentage of our revenues for the foreseeable future. Our international revenue and operations are subject to a number of material risks, including, but not limited to:

- difficulties in staffing, managing and supporting operations in multiple countries;
- difficulties in enforcing agreements and collecting receivables through foreign legal systems and other relevant legal issues;
- fewer legal protections for intellectual property;
- foreign and U.S. taxation issues, tariffs, and international trade barriers;
- difficulties in obtaining any necessary governmental authorizations for the export of our products to certain foreign jurisdictions;
- potential fluctuations in foreign economies;
- government currency control and restrictions on repatriation of earnings;
- fluctuations in the value of foreign currencies and interest rates;
- general economic and political conditions in the markets in which we operate;
- domestic and international economic or political changes, hostilities and other disruptions in regions where we currently operate or may operate in the future;
- changes in foreign currency exchange rates;
- different and changing legal and regulatory requirements in the jurisdictions in which we currently operate or may operate in the future; and
- our relationships with international distributors, some of whom may be operating without written contracts.

Negative developments in any of these areas in one or more countries could result in a reduction in demand for our products, the cancellation or delay of orders already placed, threats to our intellectual property, difficulty in collecting receivables, and a higher cost of doing business, any of which could negatively impact our business, financial condition or results of operations. Moreover, our sales, including direct sales to customers outside the United States, are primarily

Table of Contents

denominated in U.S. dollars, and downward fluctuations in the value of foreign currencies relative to the U.S. dollar may make our products more expensive than other products, which could harm our business.

Moreover, the United Kingdom ("UK") held a referendum on June 23, 2016 in which a majority of voters voted to exit the European Union ("EU"). Due to the unprecedented nature of the proposed withdrawal, significant uncertainty exists surrounding the timing and terms of the proposed exit, and negotiations remain ongoing to determine the future terms of the UK's relationship with the EU. We have operations in the UK and business activities in several EU member states whose currencies, namely British Pound Sterling and Euro, economies, taxation, and trade regulation, among other factors, could be adversely impacted by the negotiations and outcomes of the UK's leaving the EU, which is likely to be a lengthy and complicated process. While we do not anticipate near term adverse effects on business operations, these events could have a material adverse effect on our business operations, results of operations and financial condition over time.

### If we experience a disaster or other business continuity problem, we may not be able to recover successfully, which could cause material financial loss, loss of human capital, regulatory actions, reputational harm, or legal liability.

If we experience a local or regional disaster or other business continuity problem, such as an earthquake, terrorist attack, pandemic or other natural or man-made disaster, our continued success will depend, in part, on the availability of our personnel, our office facilities, and the proper functioning of our computer, telecommunication and other related systems and operations. As we grow our operations in new geographic regions, the potential for particular types of natural or man-made disasters, political, economic or infrastructure instabilities, or other country- or region-specific business continuity risks increases.

### The effects of regulations relating to conflict minerals may adversely affect our business.

On August 22, 2012, under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the SEC adopted new requirements for companies that use certain minerals and metals, known as conflict minerals, in their products, whether or not these products are manufactured by third parties. These requirements require companies to research, disclose and report whether or not such minerals originate from the Democratic Republic of Congo and adjoining countries. The implementation of these requirements could adversely affect the sourcing, availability and pricing of such minerals if they are found to be used in the manufacture of our products. In addition, we continue to incur additional costs to comply with the disclosure requirements, including costs related to determining the source of any of the relevant minerals and metals used in our products. Since our supply chain is complex, we may not be able to sufficiently verify the origins for these minerals and metals used in our products through the due diligence procedures that we implement, which may harm our reputation. In such event, we may also face difficulties in satisfying customers who require that all of the components of our products are certified as conflict mineral free.

### Our income tax provision and other tax liabilities may be insufficient if taxing authorities are successful in asserting tax positions that are contrary to our position. Additionally, there is no guarantee that we will realize our deferred tax assets.

From time to time, we are audited by various federal, state, local and foreign authorities regarding income tax matters. Significant judgment is required to determine our provision for income taxes and our liabilities for federal, state, local and foreign taxes. Although we believe our approach to determining the appropriate tax treatment is supportable and in accordance with relevant authoritative guidance it is possible that a tax authority will take a final tax position that is materially different than that which is reflected in our income tax provision. Such differences could have a material adverse effect on our income tax provision or benefit, in the reporting period in which such determination is made and, consequently, on our results of operations, financial position and/or cash flows for such period.

The realization of our deferred tax assets ultimately depends on the existence of sufficient income in either the carryback or carryforward periods under the tax law. Due to significant estimates utilized in establishing a valuation allowance and the potential for changes in facts and circumstances, it is possible that we will be required to record a valuation allowance in future reporting periods. Our results of operations would be impacted negatively if we determine that a deferred tax asset valuation allowance is required in a future reporting period.

### Provisions in our certificate of incorporation and by-laws or Delaware law might discourage, delay or prevent a change of control of our company or changes in our management and, therefore, depress the trading price of our common stock.

Provisions of our certificate of incorporation and by-laws and Delaware law may discourage, delay or prevent a merger, acquisition or other change in control that stockholders may consider favorable, including transactions in which you might otherwise receive a premium for your shares of our common stock. These provisions may also prevent or frustrate attempts by our stockholders to replace or remove our management. These provisions include:

- limitations on the removal of directors;
- a classified board of directors so that not all members of our board are elected at one time;
- advance notice requirements for stockholder proposals and nominations;

Table of Contents

-    the inability of stockholders to act by written consent or to call special meetings;
-    the ability of our board of directors to make, alter or repeal our by-laws; and
-    the ability of our board of directors to designate the terms of and issue new series of preferred stock without stockholder approval.

The affirmative vote of the holders of at least 75% of our shares of capital stock entitled to vote is necessary to amend or repeal the above provisions of our certificate of incorporation. In addition, absent approval of our board of directors, our by-laws may only be amended or repealed by the affirmative vote of the holders of at least 75% of our shares of capital stock entitled to vote.

In addition, Section 203 of the Delaware General Corporation Law prohibits a publicly-held Delaware corporation from engaging in a business combination with an interested stockholder, generally a person which together with its affiliates owns, or within the last three years has owned, 15% of our voting stock, for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner.

The existence of the foregoing provisions and anti-takeover measures could limit the price that investors might be willing to pay in the future for shares of our common stock. They could also deter potential acquirers of our company, thereby reducing the likelihood that you could receive a premium for your common stock in an acquisition.

### Significant developments from the recent and potential changes in U.S. trade policies could have a material adverse effect on us.

The U.S. government has indicated its intent to alter its approach to international trade policy and in some cases to renegotiate, or potentially terminate, certain existing bilateral or multi-lateral trade agreements and treaties with foreign countries. Effective September 24, 2018, the U.S. government implemented a 10% tariff on certain goods imported from China, which include the majority of those imported by the Company. Effective March 2, 2019, these tariffs will increase to 25%. These new tariffs, and other governmental action relating to international trade agreements or policies, may adversely impact demand for our products, our costs, customers, suppliers and/or the U.S. economy or certain sectors thereof and, as a result, adversely impact our business. The implemented and announced tariffs may cause us to increase prices to our customers which may reduce demand, or, if we are unable to increase prices, result in lowering our margin on products sold. It remains unclear what the U.S. or foreign governments will or will not do with respect to tariffs, international trade agreements and policies on a short-term or long-term basis. We cannot predict future trade policy or the terms of any renegotiated trade agreements and their impacts on our business. The adoption and expansion of trade restrictions, the occurrence of a trade war, or other governmental action related to tariffs or trade agreements or policies has the potential to adversely impact demand for our products, our costs, our customers, our suppliers, and the U.S. economy, which in turn could adversely impact our business, financial condition and results of operations.

### Our products are complex and could have unknown defects or errors, which may give rise to claims against us, diminish our brand or divert our resources from other purposes.

Our robots rely on the interplay among behavior-based artificially intelligent systems, real-world dynamic sensors, user-friendly interfaces and tightly-integrated, electromechanical designs to accomplish their missions. Despite testing, our new or existing products have contained defects and errors and may in the future contain defects, errors or performance problems when first introduced, when new versions or enhancements are released, or even after these products have been used by our customers for a period of time. These problems could result in expensive and time-consuming design modifications or warranty charges, delays in the introduction of new products or enhancements, significant increases in our service and maintenance costs, exposure to liability for damages, mandatory or voluntary recall or product upgrades, damaged customer relationships and harm to our reputation, any of which could materially harm our results of operations and ability to achieve market acceptance. Our quality control procedures relating to the raw materials and components that it receives from third-party suppliers as well as our quality control procedures relating to its products after those products are designed, manufactured and packaged may not be sufficient. In addition, increased development and warranty costs, including the costs of any mandatory or voluntary recall, could be substantial and could reduce our operating margins. The existence of any defects, errors, or failures in our products could also lead to product liability claims or lawsuits against us. A successful product liability claim could result in substantial cost, diminish our brand and divert management's attention and resources, which could have a negative impact on our business, financial condition and results of operations.

19

Table of Contents

*We spend significant amounts on advertising and other marketing campaigns, which may not be successful or cost effective.*

We spend significant amounts on advertising and other marketing campaigns, such as television, print advertising, and social media, as well as increased promotional activities, to acquire new customers, and we expect our marketing expenses to increase in the future as we continue to spend significant amounts to increase awareness of our consumer robot products. For the years ended December 29, 2018, December 30, 2017 and December 31, 2016, sales and marketing expenses were $210.4 million, $162.1 million and $115.1 million, respectively, representing approximately 19.3%, 18.3%, and 17.4% of our revenue, respectively. While we seek to structure our advertising campaigns in the manner that we believe is most likely to encourage people to purchase our products, we may fail to identify advertising opportunities that satisfy our anticipated return on advertising spend as we scale our investments in marketing or to fully understand or estimate the conditions and behaviors that drive customer behavior. If any of our advertising campaigns prove less successful than anticipated in attracting customers, we may not be able to recover our advertising spend, and our revenue may fail to meet market expectations, either of which could have an adverse effect on our business. There can be no assurance that our advertising and other marketing efforts will result in increased sales of our products.

*We may not be able to obtain capital when desired on favorable terms, if at all, or without dilution to our stockholders.*

We anticipate that our current cash, cash equivalents, cash provided by operating activities and funds available through our credit facility, will be sufficient to meet our current and anticipated needs for general corporate purposes. We operate in an emerging technology market, however, which makes our prospects difficult to evaluate. It is possible that we may not generate sufficient cash flow from operations or otherwise have the capital resources to meet our future capital needs. In such cases we may need additional financing to execute on our current or future business strategies. If we raise additional funds through the issuance of equity or convertible debt securities, the percentage ownership of our stockholders could be significantly diluted, and these newly-issued securities may have rights, preferences or privileges senior to those of existing stockholders. We cannot assure you that additional financing will be available on terms favorable to us, or at all. If adequate funds are not available or are not available on acceptable terms, if and when needed, our ability to fund our operations, take advantage of unanticipated opportunities, develop or enhance our products, or otherwise respond to competitive pressures would be significantly limited. In addition, our access to credit through our credit facility may be limited by the restrictive financial covenants contained in that agreement, which require us to maintain profitability.

**ITEM 1B.** *UNRESOLVED STAFF COMMENTS*

None.

**ITEM 2.** *PROPERTIES*

Our corporate headquarters are located in Bedford, Massachusetts, where we lease approximately 240,000 square feet. This lease expires on April 30, 2030. We also lease smaller facilities around the world. We believe that our leased facilities and additional or alternative space available to us will be adequate to meet our needs for the foreseeable future.

**ITEM 3.** *LEGAL PROCEEDINGS*

From time to time and in the ordinary course of business, we are subject to various claims, charges and litigation. The outcome of litigation cannot be predicted with certainty and some lawsuits, claims or proceedings may be disposed of unfavorably to us, which could materially affect our financial condition or results of operations.

**ITEM 4.** *MINE SAFETY DISCLOSURES*

Not Applicable.

Table of Contents

**PART II**

| | |
|---|---|
| **ITEM 5.** | ***MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*** |

Our common stock is listed on The Nasdaq Global Select Market under the symbol "IRBT." As of January 31, 2019, there were approximately 27,796,614 shares of our common stock outstanding held by approximately 152 stockholders of record.

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock. We currently expect to retain future earnings, if any, to finance the growth and development of our business and we do not anticipate paying any cash dividends in the foreseeable future.

21

Table of Contents

**ITEM 6.** *SELECTED FINANCIAL DATA*

The following selected consolidated financial data are derived from the audited financial statements of the Company, and should be read in conjunction with our consolidated financial statements, the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this Annual Report on Form 10-K. The historical results are not necessarily indicative of the results of future operations.

| | | Year Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | December 29, 2018 | | December 30, 2017 | | December 31, 2016 | | January 2, 2016 | | December 27, 2014 |
| | | (In thousands, except earnings per share amounts) | | | | | | | |
| **Consolidated Statements of Income:** | | | | | | | | | |
| Total revenue | $ | 1,092,584 | $ | 883,911 | $ | 660,604 | $ | 616,778 | $ | 556,846 |
| Gross profit | | 555,428 | | 433,159 | | 319,315 | | 288,926 | | 258,055 |
| Operating income | | 105,822 | | 72,690 | | 57,557 | | 60,618 | | 53,117 |
| Income tax expense | | 20,630 | | 25,402 | | 19,422 | | 18,841 | | 14,606 |
| Net income | | 87,992 | | 50,964 | | 41,939 | | 44,130 | | 37,803 |
| **Net Income Per Share:** | | | | | | | | | |
| Basic | $ | 3.18 | $ | 1.85 | $ | 1.51 | $ | 1.49 | $ | 1.28 |
| Diluted | $ | 3.07 | $ | 1.77 | $ | 1.48 | $ | 1.47 | $ | 1.25 |
| **Shares Used In Per Share Calculations:** | | | | | | | | | |
| Basic | | 27,692 | | 27,611 | | 27,698 | | 29,550 | | 29,485 |
| Diluted | | 28,640 | | 28,753 | | 28,292 | | 30,107 | | 30,210 |
| **Consolidated Balance Sheet Data:** | | | | | | | | | |
| Cash and cash equivalents | $ | 130,373 | $ | 128,635 | $ | 214,523 | $ | 179,915 | $ | 185,957 |
| Short term investments | | 31,605 | | 37,225 | | 39,930 | | 33,124 | | 36,166 |
| Total assets | | 766,961 | | 691,522 | | 507,912 | | 521,743 | | 493,213 |
| Total liabilities | | 231,639 | | 221,195 | | 118,956 | | 104,332 | | 102,777 |
| Total stockholders' equity | | 535,322 | | 470,327 | | 388,956 | | 417,411 | | 390,436 |

22

Table of Contents

**ITEM 7.**          *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*The information contained in this section has been derived from our consolidated financial statements and should be read together with our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K. This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities and Exchange Act of 1934, as amended, or the Exchange Act, and are subject to the "safe harbor" created by those sections. In particular, statements contained in this Annual Report on Form 10-K that are not historical facts, including, but not limited to statements concerning new product sales, product development and offerings, our consumer robots, our competition, our strategy, our market position, market acceptance of our products, seasonal factors, the impact of our recent acquisitions of SODC and Robopolis, revenue recognition, our profits, growth of our revenues, composition of our revenues, our cost of revenues, units shipped, average selling prices, operating expenses, selling and marketing expenses, general and administrative expenses, research and development expenses, and compensation costs, our projected income tax rate, our credit and letter of credit facilities, our valuations of investments, valuation and composition of our stock-based awards, and liquidity, constitute forward-looking statements and are made under these safe harbor provisions. Some of the forward-looking statements can be identified by the use of forward-looking terms such as "believes," "expects," "may," "will," "should," "could," "seek," "intends," "plans," "estimates," "anticipates," or other comparable terms. Forward-looking statements involve inherent risks and uncertainties, which could cause actual results to differ materially from those in the forward-looking statements. We urge you to consider the risks and uncertainties discussed in greater detail under the heading "Risk Factors" in evaluating our forward-looking statements. We have no plans to update our forward-looking statements to reflect events or circumstances after the date of this report. We caution readers not to place undue reliance upon any such forward-looking statements, which speak only as of the date made.*

**Overview**

iRobot is a leading global consumer robot company that designs and builds robots that empower people to do more both inside and outside of the home. The Company's consumer robots help people find smarter ways to clean and accomplish more in their daily lives. iRobot's portfolio of solutions features proprietary technologies for the connected home and advanced concepts in cleaning, mapping and navigation, human-robot interaction, and physical solutions. Leveraging this portfolio, iRobot's engineers are building an ecosystem of robots to empower the smart home. For more than 25 years, we have been a pioneer in the robotics and consumer products industries. We sell our robots through a variety of distribution channels, including chain stores and other national retailers, through our on-line store, and through value-added distributors and resellers worldwide.

Over the past seventeen years, we have sold more than 25 million consumer robots worldwide. During 2016, we took several steps to become more focused on our well-established consumer robot business in order to capitalize on the substantial opportunities available to us within consumer markets. 2016 was a pivotal year for iRobot as we exited our non-consumer businesses to focus solely on products for the home. In the second quarter of 2016, we completed the sale of our defense and security business and exited the remote presence business. These actions were taken to solidify our position as the leader in diversified consumer robots and to focus on key technologies, with an emphasis on software, that allow our robots to more effectively understand the homes in which they operate.

During 2017, we expanded our global operations with the acquisition of two of our major distributors in Japan and Europe. On April 3, 2017, we closed the acquisition of the iRobot-related distribution business of Sales On Demand Corporation ("SODC") based in Tokyo, Japan for approximately $16.6 million in cash. On October 2, 2017, we closed the acquisition of our largest European distributor, Robopolis SAS ("Robopolis"), a French company, for a final purchase price, following adjustments for working capital pursuant to the agreement with Robopolis, of $169.4 million in cash, net of acquired cash of $38.0 million. This provided us more direct control of 75% of our global revenue through a direct presence in countries including Austria, Belgium, France, Germany, Japan, the Netherlands, Portugal and Spain.

In 2017, we launched Roomba 690 and 890, extending Wi-Fi connectivity to the entire Roomba line. In addition, we launched several connected product features, including push notifications, Clean Map Reports and integrations with Amazon Alexa, Google Assistant and IFTTT platform technology.

In 2018, iRobot sold more than $1 billion in consumer robots. The Company capitalized on incremental investments in research and development made and introduced new products in 2018. In the third quarter of 2018, iRobot introduced the Roomba i7 and i7+ in the U.S., robot vacuums that remember a home's floor plan and clean specific rooms by name. The Roomba i7+ allows customers to clean specific rooms in the home. Using Imprint™ Smart Mapping, the Roomba i7+ learns the home's floor plan, giving customers total control to choose which rooms to clean and when. When the Roomba i7+ robot vacuum is finished cleaning, it empties its own dust bin into the Clean Base™, which holds 30 bins of dirt.

Table of Contents

The Roomba i7 and i7+ further extend our product ecosystem, bringing a new level of intelligence and automation to robotic vacuum cleaners with the ability to learn, map and adapt to a home's floor plan. In the third quarter of 2018, the Company also introduced the Roomba e5 in the U.S., a highly-featured product at a more accessible price, to our lineup. In the fourth quarter of 2018, we also introduced the Roomba e5 in markets outside of the U.S. in advance of the holiday season.

As of December 29, 2018, we had 1,032 full-time employees. We have developed expertise in the disciplines necessary to design and build durable, high-performance and cost-effective robots through the close integration of software, electronics and hardware. Our core technologies serve as reusable building blocks that we adapt and expand to develop next generation and new products, reducing the time, cost and risk associated with product development. Our significant expertise in consumer needs, robot design, engineering and smart home technologies and trends positions us to capitalize on the growth we expect in the market for robot-based consumer products.

Our continued success depends upon our ability to respond to a number of future challenges. We believe the most significant of these include increasing competition and our ability to successfully develop and introduce products and product enhancements into both new and existing markets.

Our total revenue for 2018 was $1,092.6 million, which represents a 23.6% increase from 2017 revenue of $883.9 million. Domestic revenue grew $108.4 million, primarily as a result of strong sales of the Roomba 900 and 600 series robots, as well as the significant investments in advertising media and national promotions. International revenue grew by $100.2 million in 2018 with increases in most markets.

### *Fiscal Periods*

We operate and report using a 52-53 week fiscal year ending on the Saturday closest to December 31. Accordingly, our fiscal quarters will end on the Saturday that falls closest to the last day of the third month of each quarter.

### Critical Accounting Policies and Estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, revenue and expenses and the disclosure of contingent assets and liabilities in the consolidated financial statements. These estimates and judgments, include but are not limited to, revenue recognition including performance obligations, variable consideration and other obligations such as product returns and incentives; warranty costs; valuation of goodwill and acquired intangible assets; valuation of financial instruments; accounting for business combinations; evaluating loss contingencies; accounting for stock-based compensation including performance-based assessments; and accounting for income taxes and related valuation allowances. We base these estimates and judgments on historical experience, market participant fair value considerations, projected future cash flows and various other factors that we believe are reasonable under the circumstances. Actual results may differ from our estimates.

We believe that of our significant accounting policies, which are described in the notes to our consolidated financial statements, the following accounting policies involve a greater degree of judgment and complexity. Accordingly, we believe that the following accounting policies are the most critical to aid in fully understanding and evaluating our consolidated financial condition and results of operations.

### *Revenue Recognition*

We primarily derive our revenue from product sales. We sell products directly to consumers through on-line stores and indirectly through resellers and distributors. Revenue is recognized upon transfer of control of promised products or services to customers, generally as title and risk of loss pass, in an amount that reflects the consideration we expect to receive in exchange for those products or services. Taxes collected from customers, which are subsequently remitted to governmental authorities, are excluded from revenue. Shipping and handling expenses are considered fulfillment activities and are expensed as incurred.

Our product portfolio includes various consumer robots, many of which are Wi-Fi connected. The consumer robots are generally highly dependent on, and interrelated with, the embedded software and cannot function without the software. As such, the consumer robots are accounted for as a single performance obligation, and the revenue is recognized at a point in time when the control is transferred to distributors, resellers or directly to end customers through online stores. For consumer robots with Wi-Fi capability ("connected robots"), each sale represents an arrangement with multiple promises consisting of the robot, an app, cloud services and potential future unspecified software upgrades. We have determined that the app, cloud services and potential future unspecified software upgrades represent one promised service to the customer to enhance the functionality and interaction with the robot (referred to collectively as "Cloud Services"). Under the previous revenue accounting standard, revenue allocated to the app and future unspecified software upgrades was deferred and recognized on a straight-line basis over the expected life of the connected robot.

Upon the adoption of ASU No. 2014-09, "Revenue from Contracts with Customers," ("ASC 606") as of the beginning of fiscal year 2018, we concluded that, on a quantitative and qualitative basis, the Cloud Services did not constitute a material

24

Table of Contents

performance obligation for the then existing products and, as such, these services were not considered a separate performance obligation that required allocation of transaction price.

During the third quarter of 2018, we launched Roomba i7 and i7+ which have the ability to learn, map and adapt to a home's floor plan. We have concluded that the Cloud Services related to these new products are a material performance obligation. For contracts that contain multiple performance obligations, the transaction price is allocated to each performance obligation based on a relative standalone selling price ("SSP"). The SSP reflects our best estimate of what the selling prices of elements would be if they were sold regularly on a standalone basis. Revenue allocated to the robots is recognized at a point in time when control is transferred. Revenue allocated to the Cloud Services is deferred and recognized on a straight-line basis over the estimated period the software upgrades and services are expected to be provided.

Our products generally carry a one-year limited warranty that promises customers that delivered products are as specified. We do not consider these assurance-type warranties as a separate performance obligation and therefore, we account for such warranties under ASC 460, "Guarantees."

We provide limited rights of returns for direct-to-consumer sales generated through our on-line stores as well as certain resellers and distributors. In addition, we may provide other credits or incentives, including price protection, which are accounted for as variable consideration when estimating the amount of revenue to recognize. Where appropriate, these estimates take into consideration relevant factors such as our historical experience, current contractual requirements, specific known market events and trends and forecasted customer buying and payment patterns. Overall, these reserves reflect our best estimates, and the actual amounts of consideration ultimately received may differ from our estimates. Returns and credits are estimated at contract inception and updated at the end of each reporting period as additional information becomes available and only to the extent that it is probable that a significant reversal of any incremental revenue will not occur. As of December 29, 2018, we had reserves for product returns of $53.9 million and other credits and incentives of $97.7 million. As of December 30, 2017, we had reserves for product returns of $42.7 million and other credits and incentives of $61.4 million.

### Business Combinations

We account for transactions that represent business combinations under the acquisition method of accounting. We allocate the total consideration paid for each acquisition to the assets we acquire and liabilities we assume based on their fair values as of the date of acquisition, including identifiable intangible assets. We base the fair value of identifiable intangible assets acquired in a business combination on valuations that use information and assumptions determined by management and which consider management's best estimates of inputs and assumptions that a market participant would use. While we use best estimates and assumptions as part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, the estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the measurement period, which is generally one year from the acquisition date, any adjustment to the assets acquired and liabilities assumed is recorded against goodwill in the period in which the amount is determined. Any adjustment identified subsequent to the measurement period is included in operating results in the period in which the amount is determined.

### Inventory

Inventory is stated at the lower of cost or net realizable value with cost being determined using the first-in, first-out ("FIFO") method. We maintain a reserve for inventory items to provide for an estimated amount of excess or obsolete inventory.

### Warranty

We typically provide a one-year warranty (with the exception of European consumer products, which typically have a two-year warranty period) against defects in materials and workmanship and will either repair the goods, provide replacement products at no charge to the customer or refund amounts to the customer for defective products. We record estimated warranty costs, based on historical experience by product, at the time revenue is recognized. Actual results could differ from these estimates, which could cause increases or decreases to the warranty reserves in future periods.

### Goodwill and Other Long-Lived Assets

Goodwill represents the excess of the purchase price in a business combination over the fair value of the net tangible and intangible assets acquired. Goodwill is not amortized but rather is assessed for impairment at the reporting unit level (operating segment or one level below an operating segment) annually during our fourth quarter of each fiscal year or more frequently if we believe indicators of impairment exist. Goodwill impairment, if any, is determined by comparing the reporting unit's fair value to its carrying value. An impairment loss is recognized in an amount equal to the excess of the reporting unit's carrying value over its fair value, up to the amount of goodwill allocated to the reporting unit.

Other long-lived assets consist principally of completed technology, tradename, customer relationships, reacquired distribution rights and non-competition agreements. Reacquired distribution rights are amortized on an accelerated basis while

25

Table of Contents

all other intangible assets are amortized over their respective estimated useful lives on a straight-line basis, consistent with the pattern in which the economic benefits are being utilized.

We periodically evaluate the recoverability of other long-lived assets whenever events and changes in circumstances, such as reductions in demand or significant economic slowdowns in the industry, indicate that the carrying amount of an asset may not be fully recoverable. When indicators of impairment are present, the carrying values of the asset group are evaluated in relation to the future undiscounted cash flows of the underlying business. The net book value of the underlying asset is adjusted to fair value if the sum of the expected discounted cash flows is less than book value. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

The impairment assessment of goodwill and other long-lived assets involves significant estimates and assumptions, which may be unpredictable and inherently uncertain. These estimates and assumptions include identification of reporting units and asset groups, long-term growth rates, profitability, estimated useful lives, comparable market multiples, and discount rates. Any changes in these assumptions could impact the result of the impairment assessment. There was no impairment of goodwill or other long-lived assets during fiscal 2018, 2017 and 2016.

### Stock-Based Compensation

We account for stock-based compensation through recognition of the fair value of the stock-based compensation as a charge against earnings. The fair value of employee stock options is estimated at the grant date using the Black-Scholes option-pricing model. The fair value for time-based restricted stock units and performance-based restricted stock units is based on the closing share price of our common stock on the date of grant. For performance-based restricted stock units, the compensation cost is recognized based on the number of units expected to vest upon the achievement of the performance conditions. We recognize stock-based compensation as an expense on a straight-line basis, over the requisite service period. We account for forfeitures as they occur, rather than applying an estimated forfeiture rate, following our adoption of ASU No. 2016-09 in the first quarter of 2017.

### Accounting for Income Taxes

Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis using enacted tax rates in effect in the years in which those temporary differences are expected to be recovered or settled in each jurisdiction. A valuation allowance is provided if, based upon the weight of available evidence, it is more likely than not that the related benefits will not be realized. We regularly review the deferred tax assets for recoverability considering historical profitability, projected future taxable income, future reversals of existing taxable temporary differences, as well as feasible tax planning strategies in each jurisdiction. As of December 29, 2018, December 30, 2017 and December 31, 2016, we recorded a valuation allowance of $1.1 million, $0.8 million and $0.0 million, respectively, for certain foreign deferred tax assets for which we believe do not meet the "more likely than not" criteria for recognition.

We report a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return. We recognize interest and penalties, if any, related to unrecognized benefits in the income tax provision.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 (the "Act") was signed into law making significant changes to the Internal Revenue Code. Effective for our 2018 tax year, the Act reduces the statutory federal corporate tax rate from 35% to 21% and implements certain additional provisions including the Global Intangible Low-Taxed Income ("GILTI") inclusion and the Foreign Derived Intangible Income ("FDII") deduction. Upon the enactment of the Act in December 2017, we recorded a one-time provisional income tax provision of $11.9 million in the fourth quarter of 2017 which included a provisional amount of $8.9 million related to the remeasurement of certain deferred tax assets and liabilities based on the tax rates at which they are expected to reverse in the future and $3.0 million related to the one-time transition tax on the mandatory deemed repatriation of foreign earnings. On December 22, 2017, the SEC staff issued Staff Accounting Bulletin No. 118 ("SAB 118") to address the application of U.S. GAAP in situations when a registrant does not have the necessary information available, prepared, or analyzed (including computations) in reasonable detail to complete the accounting for certain income tax effects of the Act. In accordance with SAB 118, during the fourth quarter of 2018, we finalized our analysis of the income tax effects of the Act and determined no material adjustments to the provisional amounts recorded were required.

Table of Contents

**Overview of Results of Operations**

The following table sets forth our results of operations for the periods shown (in thousands):

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Revenue | $ 1,092,584 | $ 883,911 | $ 660,604 |
| Cost of revenue: | | | |
| Cost of product revenue | 518,612 | 438,114 | 337,832 |
| Amortization of acquired intangible assets | 18,544 | 12,638 | 3,457 |
| Total cost of revenue | 537,156 | 450,752 | 341,289 |
| Gross profit | 555,428 | 433,159 | 319,315 |
| Operating expenses: | | | |
| Research and development | 140,629 | 113,149 | 79,805 |
| Selling and marketing | 210,411 | 162,110 | 115,125 |
| General and administrative | 97,501 | 84,771 | 66,828 |
| Amortization of acquired intangible assets | 1,065 | 439 | - |
| Total operating expenses | 449,606 | 360,469 | 261,758 |
| Operating income | 105,822 | 72,690 | 57,557 |
| Other income, net | 2,800 | 3,676 | 3,804 |
| Income before income taxes | 108,622 | 76,366 | 61,361 |
| Income tax expense | 20,630 | 25,402 | 19,422 |
| Net income | $ 87,992 | $ 50,964 | $ 41,939 |

The following table sets forth our results of operations as a percentage of revenue for the periods shown:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Revenue | 100.0% | 100.0% | 100.0% |
| Cost of revenue: | | | |
| Cost of product revenue | 47.5 | 49.6 | 51.1 |
| Amortization of acquired intangible assets | 1.7 | 1.4 | 0.6 |
| Total cost of revenue | 49.2 | 51.0 | 51.7 |
| Gross margin | 50.8 | 49.0 | 48.3 |
| Operating expenses: | | | |
| Research and development | 12.9 | 12.8 | 12.1 |
| Selling and marketing | 19.3 | 18.3 | 17.4 |
| General and administrative | 8.9 | 9.6 | 10.1 |
| Amortization of acquired intangible assets | 0.1 | 0.1 | - |
| Total operating expenses | 41.2 | 40.8 | 39.6 |
| Operating income | 9.6 | 8.2 | 8.7 |
| Other income, net | 0.3 | 0.5 | 0.5 |
| Income before income taxes | 9.9 | 8.7 | 9.2 |
| Income tax expense | 1.9 | 2.9 | 2.9 |
| Net income | 8.0% | 5.8% | 6.3% |

27

Table of Contents

***Comparison of Years Ended December 29, 2018, December 30, 2017 and December 31, 2016***

***Revenue***

We primarily derive our revenue from product sales. We sell products directly to consumers through on-line stores and indirectly through resellers and distributors. We recognize revenue upon transfer of control of promised products or services to customers, generally as title and risk of loss pass, in an amount that reflects total consideration, net of estimated returns and allowances.

The following table shows revenue for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | | |
| Revenue | $ 1,092,584 | $ 883,911 | $ 660,604 | $ 208,673 | $ 223,307 |

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

Revenue increased 23.6% to $1,092.6 million in fiscal 2018 from $883.9 million in fiscal 2017. The $208.7 million increase in revenue was driven by a 21.6% increase in units shipped, primarily related to growth of sales of our Roomba 900 and 600 series robots, and a 6.5% increase in average selling price, partially due to the acquisition of Robopolis. Total robots shipped in fiscal 2018 were approximately 4.5 million units compared to approximately 3.7 million units in fiscal 2017. In fiscal 2018, domestic revenue increased $108.4 million, or 24.0%, and international revenue increased $100.2 million, or 23.2%, compared to fiscal 2017. Although the impact of the recent increases to tariffs on certain goods imported from China was not material for the year ended December 29, 2018, demand for our robots in 2019 could be adversely affected by these tariffs, including as a result of any tariff-related price increases we may implement.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Revenue increased 33.8% to $883.9 million in fiscal 2017 from $660.6 million in fiscal 2016. Revenue increased approximately $227.8 million, or 34.7%, in our consumer business while revenue decreased $3.1 million in our defense and security business as a result of the sale of our defense and security business unit in April 2016. The $227.8 million increase in revenue from our consumer business was driven by a 25.7% increase in units shipped and a 10.8% increase in average selling price. In fiscal 2017, domestic consumer revenue increased $133.2 million, or 41.8%, and international consumer revenue increased $94.6 million, or 28.1%, compared to fiscal 2016. Total consumer robots shipped in fiscal 2017 were approximately 3.7 million units compared to approximately 2.9 million units in fiscal 2016.

***Cost of Product Revenue***

Cost of product revenue includes the cost of materials, labor and overhead costs that go into the manufacture of our products. Overhead primarily includes costs such as freight, import duties, depreciation, warranty, tools and quality assurance costs. Material costs, which are our most significant cost items, can fluctuate materially on a periodic basis, although many components have been historically stable. There can be no assurance that our costs of materials will not increase. Contract manufacturer labor costs also comprise a significant portion of our cost of materials. We outsource the manufacture of our robots to contract manufacturers in Southern China. While labor costs in China traditionally have been favorable compared to labor costs elsewhere in the world, including the United States, they have been increasing for the last few years. In addition, fluctuations in currency exchange rates could increase the cost of labor. Consequently, the labor costs for our robots could increase in the future.

The following table shows cost of product revenue for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | | |
| Cost of product revenue | $ 518,612 | $ 438,114 | $ 337,832 | $ 80,498 | $ 100,282 |
| As a percentage of total revenue | 47.5% | 49.6% | 51.1% | | |

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

Cost of product revenue increased $80.5 million, or 18.4% to $518.6 million in fiscal 2018, compared to $438.1 million in fiscal 2017. The increase is primarily due to the 23.6% increase in revenue, partially offset by improvements in product cost. Although the impact of the recent increases to tariffs on certain goods imported from China was not material for the year ended December 29, 2018, our cost of product revenue could materially increase in 2019 as a result of these tariffs and adversely impact our results of operations.

28

Table of Contents

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Cost of product revenue increased $100.3 million, or 29.7% to $438.1 million in fiscal 2017, compared to $337.8 million in fiscal 2016. The increase is primarily due to the 33.8% increase in revenue as well as the impact from our acquisitions of the iRobot-related distribution business of SODC in April 2017 and Robopolis in October 2017.

### Gross Profit

Our gross profit as a percentage of revenue, referred to as our gross margin, varies according to the mix of products sold, total sales volume, the level of defective product returns, and levels of other product costs such as warranty, scrap, re-work and overhead.

The following table shows gross profit for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| Gross profit | $ 555,428 | $ 433,159 | $ 319,315 | $ 122,269 | $ 113,844 |
| Gross margin | 50.8% | 49.0% | 48.3% | | |

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

Gross profit increased $122.3 million, or 28.2%, to $555.4 million (50.8% of revenue) in fiscal 2018 from $433.2 million (49.0% of revenue) in fiscal 2017. The increase in gross margin was primarily driven by favorable product and region mix as well as the increase in average selling price resulting from our acquisition of Robopolis. Although the impact of the recent increases to tariffs on certain goods imported from China was not material for the year ended December 29, 2018, our cost of product revenue could materially increase, and accordingly, our gross margin could materially decrease, in 2019 as a result of these tariffs, and adversely impact our results of operations.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Gross profit increased $113.8 million, or 35.7%, to $433.2 million (49.0% of revenue) in fiscal 2017 from $319.3 million (48.3% of revenue) in fiscal 2016. The increase in gross margin was primarily driven by favorable product and region mix, partially offset by an increase in promotional support to our customers as well as the impact from our acquisitions of the iRobot-related distribution business of SODC in April 2017 and Robopolis in October 2017.

### Research and Development

Research and development expenses consist primarily of:

- salaries and related costs for our engineers;
- costs for high technology components used in product and prototype development;
- costs of test equipment used during product development; and
- occupancy and other overhead costs.

We have significantly expanded our research and development capabilities and expect to continue to expand these capabilities in the future. We are committed to consistently maintaining the level of innovative design and development of new products as we strive to enhance our ability to serve our existing consumer markets as well as new markets for robots. We anticipate that research and development expenses will increase in absolute dollars but remain relatively consistent as a percentage of revenue in the foreseeable future.

The following table shows research and development costs for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| Research and development | $ 140,629 | $ 113,149 | $ 79,805 | $ 27,480 | 33,344 |
| As a percentage of total revenue | 12.9% | 12.8% | 12.1% | | |

29

Table of Contents

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

Research and development expenses increased $27.5 million, or 24.3%, to $140.6 million (12.9% of revenue) in fiscal 2018 from $113.1 million (12.8% of revenue) in fiscal 2017. This increase is attributable to increased efforts in product development and continued product enhancements. These investments enabled us to launch new products including Roomba i7, i7+ and e5 during 2018, and we anticipate these investments will enable us to launch Terra and other new products in 2019. During 2018, people and program related costs increased $15.0 million and $11.5 million, respectively, compared to fiscal 2017.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Research and development expenses increased $33.3 million, or 41.8%, to $113.1 million (12.8% of revenue) in fiscal 2017 from $79.8 million (12.1% of revenue) in fiscal 2016. This increase is attributable to increased efforts in product development and continued product enhancements. During 2017, people and program related costs increased $19.7 million and $13.2 million, respectively, compared to fiscal 2016.

### Selling and Marketing

Our selling and marketing expenses consist primarily of:

- salaries and related costs for sales and marketing personnel;
- advertising, marketing and other brand-building costs;
- customer service costs; and
- travel and related costs.

We anticipate that in 2019, selling and marketing expenses will increase in absolute dollars but remain relatively consistent as a percentage of revenue in the foreseeable future as we launch new products and continue to build awareness of our products.

The following table shows selling and marketing costs for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
| Selling and marketing | $ 210,411 | $ 162,110 | $ 115,125 | $ 48,301 | 46,985 |
| As a percentage of total revenue | 19.3% | 18.3% | 17.4% | | |

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

Selling and marketing expenses increased by $48.3 million, or 29.8%, to $210.4 million (19.3% of revenue) in fiscal 2018 from $162.1 million (18.3% of revenue) in fiscal 2017. This increase is primarily attributable to marketing investments of $35.1 million to support our continued global marketing and branding efforts and higher people-related costs of $13.3 million including additional headcount related to our acquisitions of SODC and Robopolis in 2017.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Selling and marketing expenses increased by $47.0 million, or 40.8%, to $162.1 million (18.3% of revenue) in fiscal 2017 from $115.1 million (17.4% of revenue) in fiscal 2016. This increase is primarily attributable to increases of $35.3 million in investments in advertising media, national promotions and other selling and marketing costs incurred to support our continued global marketing and branding efforts and approximately $8.7 million in people-related costs including additional headcount related to our acquisitions of SODC and Robopolis.

### General and Administrative

Our general and administrative expenses consist primarily of:

- salaries and related costs for executives and administrative personnel;
- professional services costs;
- information systems and infrastructure costs;
- travel and related costs; and
- occupancy and other overhead costs.

Table of Contents

The following table shows general and administrative costs for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| General and administrative | $ 97,501 | $ 84,771 | $ 66,828 | $ 12,730 | 17,943 |
| As a percentage of total revenue | 8.9% | 9.6% | 10.1% | | |

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

General and administrative expenses increased by $12.7 million, or 15.0%, to $97.5 million (8.9% of revenue) in fiscal 2018 from $84.8 million (9.6% of revenue) in fiscal 2017. This increase is primarily attributable to an increase of $8.6 million in people-related costs including additional headcount related to our acquisitions of SODC and Robopolis in 2017 and $2.4 million related to investments in enterprise hardware and software maintenance, support and services.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

General and administrative expenses increased by $17.9 million, or 26.8%, to $84.8 million (9.6% of revenue) in fiscal 2017 from $66.8 million (10.1% of revenue) in fiscal 2016. This increase is primarily attributable to an increase of $7.6 million in legal and consulting costs mainly driven by acquisition expense and litigation expense where we continued to defend and protect our intellectual property, as well as increases of $7.0 million in people-related costs including additional headcount related to our acquisitions of SODC and Robopolis and $1.2 million related to investments in enterprise hardware and software maintenance, support and services.

### *Amortization of Acquired Intangible Assets*

Amortization of acquired technology and reacquired distribution rights are recorded within cost of revenue whereas the amortization of acquired customer relationships, non-compete agreements and tradenames are recorded within operating expenses. All acquired intangible assets, with the exception of the reacquired distribution rights, which are being amortized on an accelerated basis, are being amortized on a straight-line basis, which is consistent when the pattern in which the economic benefits are being utilized.

The following table shows total amortization expense for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| Cost of revenue | $ 18,544 | $ 12,638 | $ 3,457 | $ 5,906 | 9,181 |
| Operating expense | 1,065 | 439 | - | 626 | 439 |
| Total amortization expense | 19,609 | 13,077 | 3,457 | 6,532 | 9,620 |
| As a percentage of total revenue | 1.8% | 1.5% | 0.5% | | |

The increase in amortization of acquired intangible assets during fiscal 2018, as compared to fiscal 2017, and fiscal 2017, as compared to fiscal 2016 was related to acquired intangible assets from our acquisitions of SODC and Robopolis in 2017.

### *Other Income, Net*

Other income, net includes interest income, interest expense, foreign currency gains (losses) as well as gains (losses) from strategic investments. The following table shows other income, net for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
|---|---|---|---|---|---|
| Other income, net | $ 2,800 | $ 3,676 | $ 3,804 | $ (876) | $ (128) |
| As a percentage of total revenue | 0.3% | 0.5% | 0.5% | | |

Other income, net, amounted to $2.8 million, $3.7 million and $3.8 million for fiscal 2018, 2017 and 2016, respectively. During the year ended December 30, 2017, other income, net, also included a $2.2 million gain on business acquisition related to our acquisition of SODC, which represents the excess of the fair value of the net assets acquired over the purchase price. During the year ended December 31, 2016, other income, net, also included defense and security business transition services income of $1.2 million.

Table of Contents

### Income Tax Provision

The following table shows income tax provision for fiscal years 2018, 2017 and 2016 (dollars in thousands):

| | Fiscal Year Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 | $ Change 2018 vs. 2017 | $ Change 2017 vs. 2016 |
| Income tax provision | $ 20,630 | $ 25,402 | $ 19,422 | $ (4,772) | $ 5,980 |
| As a percentage of pre-tax income | 19.0% | 33.3% | 31.7% | | |

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

We recorded an income tax provision of $20.6 million and $25.4 million for fiscal 2018 and fiscal 2017, respectively. The $20.6 million provision for fiscal 2018 resulted in an effective income tax rate of 19.0%. The $25.4 million provision for fiscal 2017 resulted in an effective income tax rate of 33.3%.

Our effective income tax rate of 19.0% for fiscal 2018 differed from the federal statutory tax rate of 21% primarily due to the recognition of tax benefits related to stock-based compensation, partially offset by estimated taxes associated with a restructuring of the EMEA business and the remeasurement of certain deferred tax charges based on the tax rate at which it reversed. The decrease in the effective income tax rate of 19.0% for fiscal 2018 as compared to 33.3% for fiscal 2017 is primarily due to the recognition of benefits related to the reduction of the federal statutory tax rate from 35% in fiscal 2017 to 21% in fiscal 2018.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

We recorded an income tax provision of $25.4 million and $19.4 million for fiscal 2017 and fiscal 2016, respectively. The increase in our effective tax rate is primarily due to jurisdictional mix of earnings and the one-time income tax provision of $11.9 million related to the enactment of the Act during the fourth quarter of 2017, partially offset by the excess tax benefits of $11.7 million related to ASU 2016-09.

### Liquidity and Capital Resources

At December 29, 2018, our principal sources of liquidity were cash and cash equivalents totaling $130.4 million, short-term investments of $31.6 million and accounts receivable of $162.2 million. Our working capital, which represents our total current assets less total current liabilities, was $300.7 million as of December 29, 2018, compared to $237.0 million as of December 30, 2017.

We manufacture and distribute our products through contract manufacturers and third-party logistics providers. We believe that this approach gives us the advantages of relatively low capital investment and significant flexibility in scheduling production and managing inventory levels. By leasing our office facilities, we also minimize the cash needed for expansion. Accordingly, our capital spending is generally limited to leasehold improvements, computers, office furniture, product-specific production tooling, internal use software and test equipment. In the fiscal years ended December 29, 2018, December 30, 2017 and December 31, 2016, we spent $32.4 million, $23.4 million and $10.8 million respectively, on capital expenditures.

Our strategy for delivering consumer products to our distributors and retail customers gives us the flexibility to provide container shipments directly from our contract manufacturers in Southern China to our customers and, alternatively, allows our distributors and certain retail customers to take possession of product on a domestic basis. Accordingly, our inventory consists of goods shipped to our third-party logistics providers for the fulfillment of distributor, retail and direct-to-consumer sales. Our contract manufacturers are also responsible for purchasing and stocking components required for the production of our products, and they typically invoice us when the finished goods are shipped.

### Cash provided by operating activities

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

As of December 29, 2018, we held cash, cash equivalents and short-term investments of $162.0 million. Net cash provided by our operations for the fiscal year ended December 29, 2018 was $71.7 million, of which the principal components were our net income of $88.0 million and non-cash charges of $53.4 million, partially offset by changes in working capital. The changes in working capital include an increase in inventory of $58.5 million and accounts receivable of $23.9 million, partially offset by an $18.9 million increase in accounts payable and accrued liabilities primarily due to growth in our inventory. As of December 29, 2018, we did not have any borrowings outstanding under our credit facility.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

Net cash provided by our operations for the fiscal year ended December 30, 2017 was $76.3 million, of which the principal components were our net income of $51.0 million and non-cash charges of $42.9 million, partially offset by changes

32

Table of Contents

in working capital. The changes in working capital include an increase in accounts receivable of $53.3 million primarily due to increased sales, partially offset by a $40.9 million increase in accounts payable and accrued liabilities primarily due to growth in the business and timing of payments to our suppliers. As of December 30, 2017, we did not have any borrowings outstanding under our credit facility.

### Cash used in investing activities

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

During the year ended December 29, 2018, we invested $32.4 million in the purchase of property and equipment, including machinery and tooling for new products. We also purchased $6.4 million of marketable securities, while sales and maturities of marketable securities amounted to $14.0 million. In addition, we made strategic investments of $4.2 million and received proceeds from equity investments of $0.9 million.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

During the year ended December 30, 2017, we acquired SODC and Robopolis for a total of $148.8 million, net of cash acquired, and invested $23.4 million in the purchase of property and equipment, including machinery and tooling for new products. We also purchased $10.6 million of marketable securities, while sales and maturities of marketable securities amounted to $13.1 million. In addition, we received an earn-out payment of $1.3 million from a sold cost method investment.

### Cash (used in) provided by financing activities

*Year ended December 29, 2018 as compared to the year ended December 30, 2017*

During the year ended December 29, 2018, we completed our previously announced stock repurchase program and repurchased 798,794 shares of common stock for an aggregate purchase price of $50.0 million and received $10.4 million from employee stock plans. Shares issued upon vesting of restricted stock were net of 50,884 shares retained by us to cover employee tax withholdings of $3.5 million.

*Year ended December 30, 2017 as compared to the year ended December 31, 2016*

During the year ended December 30, 2017, we received $10.6 million from the exercise of stock options. Shares issued upon vesting of restricted stock were net of 51,229 shares retained by us to cover employee tax withholdings of $3.0 million.

### Working Capital Facility

#### Credit Facility

In June 2018, we entered into a new agreement with Bank of America, N.A., increasing the amount of our unsecured revolving line of credit from $75.0 million to $150.0 million. As of December 29, 2018, the full amount was available for borrowing. The new revolving line of credit is available to fund working capital and other corporate purposes. The new agreement extends the term of the credit facilities to June 2023. The interest on loans under the credit facility accrues, at our election, at either (1) LIBOR plus a margin, currently equal to 1.0%, based on our ratio of indebtedness to Adjusted EBITDA (the "Eurodollar Rate"), or (2) the lender's base rate. The lender's base rate is equal to the highest of (1) the federal funds rate plus 0.5%, (2) the lender's prime rate or (3) the Eurodollar Rate plus 1.0%.

As of December 29, 2018, we had no outstanding borrowings under our revolving credit facility. This credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on our ability to incur or guarantee additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, our stock, and consolidate or merge with other entities. In addition, we are required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

This credit facility contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, our obligations under the credit facility may be accelerated.

As of December 29, 2018, we were in compliance with all covenants under the revolving credit facility.

### Working Capital and Capital Expenditure Needs

We currently have no material cash commitments, except for normal recurring trade payables, expense accruals and operating leases, all of which we anticipate funding through working capital, funds provided by operating activities and our existing credit facility. We do not currently anticipate significant investment in property, plant and equipment, and we believe that our outsourced approach to manufacturing provides us with flexibility in both managing inventory levels and financing our inventory. We believe our existing cash and cash equivalents, short-term investments, cash provided by operating activities, and

33

Table of Contents

funds available through our credit facility will be sufficient to meet our working capital and capital expenditure needs over at least the next twelve months. In the event that our revenue plan does not meet our expectations, we may eliminate or curtail expenditures to mitigate the impact on our working capital. Our future capital requirements will depend on many factors, including our rate of revenue growth, the expansion of our marketing and sales activities, the timing and extent of spending to support product development efforts, the timing of introductions of new products and enhancements to existing products, the acquisition of new capabilities or technologies, and the continuing market acceptance of our products and services. Moreover, to the extent that existing cash and cash equivalents, short-term investments, cash from operations, and cash from short-term borrowing are insufficient to fund our future activities, we may need to raise additional funds through public or private equity or debt financing. As part of our business strategy, we may consider additional acquisitions of companies, technologies and products, which could also require us to seek additional equity or debt financing. Additional funds may not be available on terms favorable to us or at all.

**Contractual Obligations**

We generally do not enter into binding purchase commitments. Our principal commitments consist of obligations under our credit facility, leases for office space and minimum contractual obligations. Other obligations consist primarily of subscription services. The following table describes our commitments to settle contractual obligations in cash as of December 29, 2018 (in thousands):

| | Payments Due by Period | | | | |
| --- | --- | --- | --- | --- | --- |
| | Less Than 1 Year | 1 to 3 Years | 3 to 5 Years | More Than 5 Years | Total |
| Operating leases | $ 7,848 | $ 14,742 | $ 14,313 | $ 34,806 | $ 71,709 |
| Minimum contractual payments | 2,804 | 3,594 | - | - | 6,398 |
| Other obligations | 1,692 | 2,412 | - | - | 4,104 |
| Total | $ 12,344 | $ 20,748 | $ 14,313 | $ 34,806 | 82,211 |

At December 29, 2018, we had outstanding purchase orders aggregating approximately $113.6 million. The purchase orders, the majority of which are with our contract manufacturers for the purchase of inventory in the normal course of business, are for manufacturing and non-manufacturing related goods and services, and are generally cancelable without penalty. In circumstances where we determine that we have financial exposure associated with any of these commitments, we record a liability in the period in which that exposure is identified.

**Off-Balance Sheet Arrangements**

As of December 29, 2018, we had no off-balance sheet arrangements as defined in Item 303(a)(4) of Regulation S-K.

**Recently Adopted Accounting Pronouncements**

See Note 2 to the accompanying consolidated financial statements for a description of recently adopted accounting standards.

**Recently Issued Accounting Pronouncements**

See Note 2 to the accompanying consolidated financial statements for a description of certain recently issued accounting standards which may impact our financial statements in future reporting periods.

**ITEM 7A.** *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

**Exchange Rate Sensitivity**

Our international revenue and expenses are denominated in multiple currencies, including Japanese Yen, Canadian Dollars, Chinese Renminbi and Euros. As such, we have exposure to adverse changes in exchange rates associated with the revenue and operating expenses of our foreign operations. Any fluctuations in other currencies will have minimal direct impact on our international revenue.

In addition to international business conducted in foreign currencies, we have international revenue denominated in U.S. dollars. As the U.S. dollar strengthens or weakens against other currencies, our international distributors may be impacted, which could affect their profitability and our ability to maintain current pricing levels on our international consumer products.

We regularly monitor the forecast of non-U.S. dollar revenue and expenses and the level of non-U.S. dollar monetary asset and liability balances to determine if any actions, including possibly entering into foreign currency contracts, should be taken to minimize the impact of fluctuating exchange rates on our results of operations. Periodically, we enter into forward

Table of Contents

exchange contracts to hedge against foreign currency fluctuations. These contracts may or may not be designated as cash flow hedges for accounting purposes. We use cash flow hedges primarily to reduce the effects of foreign exchange rate changes on purchase and sales, primarily in Japanese Yen and Euros. At December 29, 2018 and December 30, 2017, we had outstanding cash flow hedges with a total notional value of $366.7 million and $73.7 million, respectively.

We also enter into economic hedges that are not designated as hedges from an accounting standpoint to reduce or eliminate the effects of foreign exchange rate changes typically related to short term trade receivables and payables. These contracts have maturities of two months or less. At December 29, 2018 and December 30, 2017, we had outstanding economic hedges with a total notional value of $56.0 million and $36.6 million, respectively.

At December 29, 2018, assuming all other variables are constant, if the U.S. Dollar weakened or strengthened by 10%, the fair market value of our foreign currency contracts would increase or decrease by approximately $40.0 million.

**Interest Rate Sensitivity**

At December 29, 2018, we had unrestricted cash and cash equivalents of $130.4 million and short term investments of $31.6 million. The unrestricted cash and cash equivalents are held for working capital purposes. We do not enter into investments for trading or speculative purposes. Some of the securities in which we invest, however, may be subject to market risk. This means that a change in prevailing interest rates may cause the fair market value of the investment to fluctuate. To minimize this risk in the future, we intend to maintain our portfolio of cash equivalents in a variety of securities, commercial paper, money market funds, debt securities and certificates of deposit. Due to the short-term nature of these investments, we believe we do not have any material exposure to changes in the fair value of our investment portfolio as a result of changes in interest rates. As of December 29, 2018, all of our cash and cash equivalents were held in demand deposits and money market funds.

Table of Contents

**ITEM 8.** *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**iROBOT CORPORATION**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 37 |
| Consolidated Balance Sheets at December 29, 2018 and December 30, 2017 | 39 |
| Consolidated Statements of Income for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016 | 40 |
| Consolidated Statements of Comprehensive Income for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016 | 40 |
| Consolidated Statements of Stockholders' Equity for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016 | 42 |
| Consolidated Statements of Cash Flows for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016 | 43 |
| Notes to Consolidated Financial Statements | 44 |

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
iRobot Corporation:

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of iRobot Corporation and its subsidiaries (the "Company") as of December 29, 2018 and December 30, 2017, and the related consolidated statements of income, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 29, 2018, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 29, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 29, 2018 and December 30, 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 29, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 29, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Table of Contents

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Boston, Massachusetts
February 14, 2019

We have served as the Company's auditor since 1999.

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except per share amounts)**

| | | December 29, 2018 | | December 30, 2017 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 130,373 | $ | 128,635 |
| Short term investments | | 31,605 | | 37,225 |
| Accounts receivable, net | | 162,166 | | 142,829 |
| Inventory | | 164,633 | | 106,932 |
| Other current assets | | 25,660 | | 19,105 |
| Total current assets | | 514,437 | | 434,726 |
| Property and equipment, net | | 57,026 | | 44,579 |
| Deferred tax assets | | 36,979 | | 31,531 |
| Goodwill | | 118,896 | | 121,440 |
| Intangible assets, net | | 24,273 | | 44,712 |
| Other assets | | 15,350 | | 14,534 |
| Total assets | $ | 766,961 | $ | 691,522 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 136,742 | $ | 116,316 |
| Accrued expenses | | 71,259 | | 73,647 |
| Deferred revenue and customer advances | | 5,756 | | 7,761 |
| Total current liabilities | | 213,757 | | 197,724 |
| Deferred tax liabilities | | 4,005 | | 9,539 |
| Other long-term liabilities | | 13,877 | | 13,932 |
| Total long-term liabilities | | 17,882 | | 23,471 |
| Total liabilities | | 231,639 | | 221,195 |
| Commitments and contingencies (Note 14) | | | | |
| Preferred stock, 5,000 shares authorized and none outstanding | | - | | - |
| Common stock, $0.01 par value, 100,000 shares authorized; 27,788 and 27,945 shares issued and outstanding, respectively | | 278 | | 279 |
| Additional paid-in capital | | 172,771 | | 190,067 |
| Retained earnings | | 367,021 | | 277,989 |
| Accumulated other comprehensive (loss) income | | (4,748) | | 1,992 |
| Total stockholders' equity | | 535,322 | | 470,327 |
| Total liabilities and stockholders' equity | $ | 766,961 | $ | 691,522 |

See accompanying Notes to Consolidated Financial Statements

39

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED STATEMENTS OF INCOME**
**(in thousands, except per share amounts)**

| | | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|---|
| | | December 29, 2018 | | December 30, 2017 | | December 31, 2016 |
| Revenue | $ | 1,092,584 | $ | 883,911 | $ | 660,604 |
| Cost of revenue: | | | | | | |
| Cost of product revenue | | 518,612 | | 438,114 | | 337,832 |
| Amortization of acquired intangible assets | | 18,544 | | 12,638 | | 3,457 |
| Total cost of revenue | | 537,156 | | 450,752 | | 341,289 |
| Gross profit | | 555,428 | | 433,159 | | 319,315 |
| Operating expenses: | | | | | | |
| Research and development | | 140,629 | | 113,149 | | 79,805 |
| Selling and marketing | | 210,411 | | 162,110 | | 115,125 |
| General and administrative | | 97,501 | | 84,771 | | 66,828 |
| Amortization of acquired intangible assets | | 1,065 | | 439 | | - |
| Total operating expenses | | 449,606 | | 360,469 | | 261,758 |
| Operating income | | 105,822 | | 72,690 | | 57,557 |
| Other income, net | | 2,800 | | 3,676 | | 3,804 |
| Income before income taxes | | 108,622 | | 76,366 | | 61,361 |
| Income tax expense | | 20,630 | | 25,402 | | 19,422 |
| Net income | $ | 87,992 | $ | 50,964 | $ | 41,939 |
| Net income per share: | | | | | | |
| Basic | $ | 3.18 | $ | 1.85 | $ | 1.51 |
| Diluted | $ | 3.07 | $ | 1.77 | $ | 1.48 |
| Number of shares used in per share calculations: | | | | | | |
| Basic | | 27,692 | | 27,611 | | 27,698 |
| Diluted | | 28,640 | | 28,753 | | 28,292 |

See accompanying Notes to Consolidated Financial Statements

40

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(in thousands)**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 29, 2018 | | December 30, 2017 | | December 31, 2016 | |
| Net income | $ | 87,992 | $ | 50,964 | $ | 41,939 |
| Other comprehensive income (loss): | | | | | | |
| Net foreign currency translation adjustments | | (5,896) | | 1,994 | | - |
| Net unrealized (losses) gains on cash flow hedges, net of tax | | (327) | | 490 | | - |
| Net gains on cash flow hedge reclassified into earnings, net of tax | | (499) | | (295) | | - |
| Net unrealized (losses) gains on marketable securities, net of tax | | (18) | | (46) | | 85 |
| Total comprehensive income | $ | 81,252 | $ | 53,107 | $ | 42,024 |

See accompanying Notes to Consolidated Financial Statements

41

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(in thousands)**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Value | | | | |
| **Balance at January 2, 2016** | 29,092 | $ 291 | $ 232,345 | $ 185,011 | $ (236) | $ 417,411 |
| Issuance of common stock under employee stock plans | 456 | 4 | 9,340 | | | 9,344 |
| Conversion of deferred compensation | 7 | - | - | | | - |
| Vesting of restricted stock units | 364 | 4 | (4) | | | - |
| Tax benefit of excess stock-based compensation deduction | | | 2,421 | | | 2,421 |
| Stock-based compensation | | | 15,995 | | | 15,995 |
| Stock withheld to cover tax withholdings requirements upon restricted stock vesting | (40) | - | (1,300) | | | (1,300) |
| Other comprehensive income | | | | | 85 | 85 |
| Directors' deferred compensation | | | 82 | | | 82 |
| Stock repurchases | (2,641) | (27) | (96,994) | | | (97,021) |
| Net income | | | | 41,939 | | 41,939 |
| **Balance at December 31, 2016** | 27,238 | $ 272 | $ 161,885 | $ 226,950 | $ (151) | $ 388,956 |
| Issuance of common stock under employee stock plans | 367 | 4 | 10,569 | | | 10,573 |
| Conversion of deferred compensation | 15 | - | - | | | - |
| Vesting of restricted stock units | 376 | 4 | (4) | | | - |
| Stock-based compensation | | | 19,751 | | | 19,751 |
| Stock withheld to cover tax withholdings requirements upon restricted stock vesting | (51) | (1) | (2,982) | | | (2,983) |
| Other comprehensive income | | | - | | 2,143 | 2,143 |
| Directors' deferred compensation | | | 65 | | | 65 |
| Cumulative effect of a change in accounting principle related to stock-based compensation | | | 783 | 75 | | 858 |
| Net income | | | | 50,964 | | 50,964 |
| **Balance at December 30, 2017** | 27,945 | $ 279 | $ 190,067 | $ 277,989 | $ 1,992 | $ 470,327 |
| Issuance of common stock under employee stock plans | 285 | 3 | 10,363 | | | 10,366 |
| Vesting of restricted stock units | 408 | 4 | (4) | | | - |
| Stock-based compensation | | | 25,804 | | | 25,804 |
| Stock withheld to cover tax withholdings requirements upon restricted stock vesting | (51) | - | (3,532) | | | (3,532) |
| Other comprehensive loss | | | | | (6,740) | (6,740) |
| Directors' deferred compensation | | | 65 | | | 65 |
| Stock repurchases | (799) | (8) | (49,992) | | | (50,000) |
| Cumulative effect of a change in accounting principle related to adoption of ASC 606 | | | | 1,040 | | 1,040 |
| Net income | | | | 87,992 | | 87,992 |
| **Balance at December 29, 2018** | 27,788 | $ 278 | $ 172,771 | $ 367,021 | $ (4,748) | $ 535,322 |

See accompanying Notes to Consolidated Financial Statements

Table of Contents

**iROBOT CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | | Fiscal Year Ended | | |
| --- | --- | --- | --- | --- |
| | | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| **Cash flows from operating activities:** | | | | |
| Net income | $ | 87,992 | $ 50,964 | $ 41,939 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | 36,574 | 25,499 | 13,606 |
| Gain on business acquisition | | - | (2,243) | - |
| Stock-based compensation | | 25,804 | 19,751 | 15,995 |
| Deferred income taxes, net | | (10,848) | (999) | 3,557 |
| Tax benefit of excess stock-based compensation deductions | | - | - | (2,971) |
| Deferred rent | | 1,374 | - | - |
| Other | | 463 | 864 | (2,361) |
| Changes in operating assets and liabilities - (use) source | | | | |
| Accounts receivable | | (23,920) | (53,251) | 25,682 |
| Inventory | | (58,546) | (1,470) | (981) |
| Other assets | | (8,533) | (10,562) | 3,187 |
| Accounts payable | | 22,470 | 17,457 | 6,502 |
| Accrued expenses | | (3,618) | 23,447 | 10,181 |
| Deferred revenue and customer advances | | 2,392 | 2,149 | 2,996 |
| Long-term liabilities | | 81 | 4,709 | (908) |
| Net cash provided by operating activities | | 71,685 | 76,315 | 116,424 |
| **Cash flows from investing activities:** | | | | |
| Additions of property and equipment | | (32,422) | (23,371) | (10,817) |
| Change in other assets | | (2,363) | (1,542) | (2,093) |
| Proceeds from sale of equity investments | | 856 | 1,267 | 634 |
| Proceeds from sale of business unit | | - | - | 23,520 |
| Cash paid for business acquisitions, net of cash acquired | | - | (148,765) | - |
| Purchases of investments | | (6,438) | (10,578) | (16,554) |
| Sales and maturities of investments | | 14,000 | 13,066 | 9,500 |
| Net cash (used in) provided by investing activities | | (26,367) | (169,923) | 4,190 |
| **Cash flows from financing activities:** | | | | |
| Proceeds from employee stock plans | | 10,366 | 10,573 | 9,344 |
| Income tax withholding payment associated with restricted stock vesting | | (3,532) | (2,983) | (1,300) |
| Stock repurchases | | (50,000) | - | (97,021) |
| Tax benefit of excess stock-based compensation deductions | | - | - | 2,971 |
| Net cash (used in) provided by financing activities | | (43,166) | 7,590 | (86,006) |
| Effect of exchange rate changes on cash and cash equivalents | | (414) | 130 | - |
| Net increase (decrease) in cash and cash equivalents | | 1,738 | (85,888) | 34,608 |
| Cash and cash equivalents, at beginning of period | | 128,635 | 214,523 | 179,915 |
| Cash and cash equivalents, at end of period | $ | 130,373 | $ 128,635 | $ 214,523 |
| **Supplemental disclosure of cash flow information** | | | | |
| Cash paid for income taxes | $ | 39,517 | $ 25,879 | $ 14,061 |
| Non-cash investing and financing activities: | | | | |
| Additions of property and equipment included in accounts payable | $ | 2,795 | $ 5,001 | $ 1,550 |

See accompanying Notes to Consolidated Financial Statements

43

Table of Contents

**iROBOT CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### 1.   Nature of the Business

iRobot Corporation ("iRobot" or the "Company") designs and builds robots that empower people to do more. The Company develops robotic technology and applies it to produce and market consumer robots. The Company's revenue is primarily generated from product sales through distributor and retail sales channels, as well as its on-line stores.

### 2.   Summary of Significant Accounting Policies

#### Basis of Presentation and Foreign Currency Translation

The accompanying consolidated financial statements include those of iRobot and its subsidiaries, after elimination of all intercompany balances and transactions. iRobot has prepared the accompanying consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP"). In addition, certain prior year amounts have been reclassified to conform to the current year presentation.

For the Company's subsidiaries that transact in a functional currency other than the U.S. dollar, assets and liabilities are translated into U.S. dollars at period-end foreign exchange rates. Revenues and expenses are translated into U.S. dollars at the average foreign exchange rates for the period. Translation adjustments are excluded from the determination of net income and are recorded in accumulated other comprehensive income (loss), a separate component of stockholders' equity.

#### Use of Estimates

The preparation of these financial statements in conformity with GAAP requires the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and revenue and expenses. These estimates and judgments, include but are not limited to, revenue recognition, including performance obligations, variable consideration and other obligations such as product returns and incentives; warranty costs; valuation of goodwill and acquired intangible assets; valuation of financial instruments; accounting for business combinations; evaluating loss contingencies; accounting for stock-based compensation including performance-based assessments; and accounting for income taxes and related valuation allowances. The Company bases these estimates and judgments on historical experience, market participant fair value considerations, projected future cash flows and various other factors that the Company believes are reasonable under the circumstances. Actual results may differ from the Company's estimates.

#### Fiscal Year-End

The Company operates and reports using a 52-53 week fiscal year ending on the Saturday closest to December 31. Accordingly, the Company's fiscal quarters end on the Saturday that falls closest to the last day of the third month of each quarter.

#### Business Combinations

The Company accounts for transactions that represent business combinations under the acquisition method of accounting. The Company allocates the total consideration paid for each acquisition to the assets it acquires and liabilities it assumes based on their fair values as of the date of acquisition, including identifiable intangible assets. The Company bases the fair value of identifiable intangible assets acquired in a business combination on valuations that use information and assumptions determined by management and which consider management's best estimates of inputs and assumptions that a market participant would use. While the Company uses its best estimates and assumptions as part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, its estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the measurement period, which is generally one year from the acquisition date, any adjustment to the assets acquired and liabilities assumed is recorded against goodwill in the period in which the amount is determined. Any adjustment identified subsequent to the measurement period is included in operating results in the period in which the amount is determined.

#### Cash and Cash Equivalents

The Company considers all highly liquid investments with maturity of three months or less at the time of purchase to be cash and cash equivalents. The Company invests its excess cash primarily in money market funds or demand deposit accounts of major financial institutions. Accordingly, its cash and cash equivalents are subject to minimal credit and market risk. At December 29, 2018 and December 30, 2017, cash and cash equivalents totaled $130.4 million and $128.6 million, respectively. These cash and cash equivalents are carried at cost, which approximates fair value.

44

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Short Term Investments*

The Company's investments are classified as available-for-sale and are recorded at fair value with any unrealized gain or loss recorded as an element of stockholders' equity. The fair value of investments is determined based on quoted market prices at the reporting date for those instruments. As of December 29, 2018 and December 30, 2017, investments consisted of (in thousands):

| | December 29, 2018 | | December 30, 2017 | |
| --- | --- | --- | --- | --- |
| | Cost | Fair Market Value | Cost | Fair Market Value |
| Corporate and government bonds | $ 30,035 | $ 29,605 | $ 37,767 | $ 37,225 |
| Convertible note | 2,000 | 2,000 | - | - |
| Total short term investments | $ 32,035 | $ 31,605 | $ 37,767 | $ 37,225 |

As of December 29, 2018, the Company's investments had maturity dates ranging from March 2019 to March 2021. The Company invests primarily in investment grade securities and limits the amount of investment in any single issuer.

*Accounts receivable allowances*

*Allowance for product returns*: The Company records an allowance for product returns for the estimated amount of product that may be returned. The allowance is based on specific terms and conditions included in the customer agreements, historical returns experience and various other assumptions that the Company believes are reasonable.

*Allowance for other credits and incentives:* The Company records an allowance related to customer incentives such as discounts, promotions, price protection and other support programs. The allowance is based on specific programs, expected usage and historical experience.

*Allowance for doubtful accounts*: The Company records an allowance for doubtful accounts for the estimated amount of accounts receivable that may not be collected based on an assessment of the potential risk of loss associated with delinquent accounts. The allowance including the activity within the allowance was immaterial for fiscal years 2018, 2017 and 2016.

Activity related to accounts receivable allowances was as follows (in thousands):

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| **Allowance for product returns** | | | |
| Balance at beginning of period | $ 42,693 | $ 27,673 | $ 25,992 |
| Acquired balance | - | 6,088 | - |
| Provision | 68,476 | 54,981 | 33,992 |
| Deduction | (56,164) | (43,831) | (28,826) |
| Other adjustments | (1,085) | (2,218) | (3,485) |
| Balance at end of period | $ 53,920 | $ 42,693 | $ 27,673 |
| | | | |
| **Allowance for other credits and incentives** | | | |
| Balance at beginning of period | $ 61,359 | $ 23,658 | $ 23,005 |
| Acquired balance | - | 11,932 | - |
| Adjustment related to adoption of ASC 606 | 1,192 | - | - |
| Provision | 198,371 | 110,605 | 47,419 |
| Deduction | (161,672) | (81,269) | (46,610) |
| Other adjustments | (1,513) | (3,567) | (156) |
| Balance at end of period | $ 97,737 | $ 61,359 | $ 23,658 |

*Inventory*

Inventory is stated at the lower of cost or net realizable value with cost being determined using the first-in, first-out ("FIFO") method. The Company maintains a reserve for inventory items to provide for an estimated amount of excess or obsolete inventory.

45

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Warranty*

The Company typically provides a one-year warranty (with the exception of European consumer products, which typically have a two-year warranty period) against defects in materials and workmanship and will either repair the goods, provide replacement products at no charge to the customer or refund amounts to the customer for defective products. The Company records estimated warranty costs, based on historical experience by product, at the time revenue is recognized. Actual results could differ from these estimates, which could cause increases or decreases to the warranty reserves in future periods.

*Property and Equipment*

Property and equipment are recorded at cost and consist primarily of computer equipment, leasehold improvements, business applications software, tooling and machinery. Depreciation is computed using the straight-line method over the estimated useful lives as follows:

|  | Estimated Useful Life |
|---|---|
| Computer and research equipment | 2-5 years |
| Furniture | 5 |
| Machinery | 2-5 |
| Tooling | 2-5 |
| Business applications software | 3-7 |
| Leasehold improvements | Lesser of economic benefit period or term of lease |

Expenditures for additions, renewals and betterments of property and equipment are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. As assets are retired or sold, the related cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is recognized.

*Goodwill and Other Long-Lived Assets*

Goodwill represents the excess of the purchase price in a business combination over the fair value of the net tangible and intangible assets acquired. Goodwill is not amortized but rather is assessed for impairment at the reporting unit level (operating segment or one level below an operating segment) annually during its fourth quarter of each fiscal year or more frequently if the Company believes indicators of impairment exist. Goodwill impairment, if any, is determined by comparing the reporting unit's fair value to its carrying value. An impairment loss is recognized in an amount equal to the excess of the reporting unit's carrying value over its fair value, up to the amount of goodwill allocated to the reporting unit.

Other long-lived assets consist principally of completed technology, tradename, customer relationships, reacquired distribution rights and non-competition agreements. Reacquired distribution rights are amortized on an accelerated basis while all other intangible assets are amortized over their respective estimated useful lives on a straight-line basis, consistent with the pattern in which the economic benefits are being utilized.

The Company periodically evaluates the recoverability of other long-lived assets whenever events and changes in circumstances, such as reductions in demand or significant economic slowdowns in the industry, indicate that the carrying amount of an asset may not be fully recoverable. When indicators of impairment are present, the carrying values of the asset group are evaluated in relation to the future undiscounted cash flows of the underlying business. The net book value of the underlying asset is adjusted to fair value if the sum of the expected discounted cash flows is less than book value. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

The impairment assessment of goodwill and other long-lived assets involves significant estimates and assumptions, which may be unpredictable and inherently uncertain. These estimates and assumptions include identification of reporting units and asset groups, long-term growth rates, profitability, estimated useful lives, comparable market multiples, and discount rates. Any changes in these assumptions could impact the result of the impairment assessment. There was no impairment of goodwill or other long-lived assets during fiscal 2018, 2017 and 2016.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Other Assets*

The Company holds non-marketable equity securities as part of its strategic investments portfolio. During the first quarter of 2018, the Company adopted Accounting Standards Update No. 2016-01, "Recognition and Measurement of Financial Assets and Financial Liabilities," which revises the classification and measurement of financial instruments. Upon adoption of this standard, the Company now classifies its cost method investments as equity securities without readily determinable fair values and measures these investments at cost, less any impairment, adjusted for observable price changes. These investments are valued using significant unobservable inputs or data in an inactive market and the valuation requires the Company's judgment due to the absence of market prices and inherent lack of liquidity. The estimated fair value is based on quantitative and qualitative factors including, but not limited to, subsequent financing activities by the investee and projected discounted cash flows. At December 29, 2018, other assets consisted primarily of equity securities without readily determinable fair values and an equity method investment totaling $15.1 million. There was no adjustment recorded to the carrying value of the Company's equity securities without readily determinable fair values as a result of the adoption of ASU 2016-01. At December 30, 2017, other assets consisted primarily of cost method investments and an equity method investment totaling $14.2 million.

*Financial Instruments and Hedging Activities*

The Company utilizes derivative instruments to hedge specific financial risks including foreign exchange risk. The Company does not engage in speculative hedging activity. In order to account for a derivative instrument as a hedge, specific criteria must be met, including: (i) ensuring at the inception of the hedge that formal documentation exists for both the hedging relationship and the entity's risk management objective and strategy for undertaking the hedge and (ii) at the inception of the hedge and on an ongoing basis, the hedging relationship is expected to be highly effective in achieving offsetting changes in fair value attributed to the hedged risk during the period that the hedge is designated. Further, an assessment of effectiveness is required whenever financial statements or earnings are reported. Absent meeting these criteria, changes in fair value are recognized in other income, net, in the consolidated statements of income. Once the underlying forecasted transaction is realized, the gain or loss from the derivative designated as a hedge of the transaction is reclassified from accumulated other comprehensive income (loss) to the statement of income, in revenue or cost of revenue.

*Fair Value Measurements*

The Company accounts for certain assets and liabilities at fair value. The fair value is established based on a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include:

- Level 1 - observable inputs such as quoted prices for identical instruments in active markets;
- Level 2 - inputs other than quoted prices in active markets that are either directly or indirectly observable; and
- Level 3 - unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

*Stock-Based Compensation*

The Company accounts for stock-based compensation through recognition of the fair value of the stock-based compensation as a charge against earnings. The fair value of employee stock options is estimated at the grant date using the Black-Scholes option-pricing model. The fair value for time-based restricted stock units and performance-based restricted stock units is based on the closing share price of the Company's common stock on the date of grant. For performance-based restricted stock units, the compensation cost is recognized based on the number of units expected to vest upon the achievement of the performance conditions. The Company recognizes stock-based compensation as an expense on a straight-line basis, over the requisite service period. The Company accounts for forfeitures as they occur, rather than applying an estimated forfeiture rate, following its adoption of ASU No. 2016-09 in the first quarter of 2017.

*Research and Development*

Costs incurred in the research and development of the Company's products are expensed as incurred.

*Advertising Expense*

The Company expenses advertising costs as they are incurred. During the years ended December 29, 2018, December 30, 2017 and December 31, 2016 advertising expense totaled $114.0 million, $91.8 million and $64.4 million, respectively, and are recorded within the selling and marketing expenses line item.

47

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

*Income Taxes*

Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis using enacted tax rates in effect in the years in which those temporary differences are expected to be recovered or settled in each jurisdiction. A valuation allowance is provided if, based upon the weight of available evidence, it is more likely than not that the related benefits will not be realized. The Company regularly reviews the deferred tax assets for recoverability considering historical profitability, projected future taxable income, future reversals of existing taxable temporary differences, as well as feasible tax planning strategies in each jurisdiction. As of December 29, 2018, December 30, 2017 and December 30, 2016, the Company recorded a valuation allowance of $1.1 million, $0.8 million and $0.0 million, respectively, for certain foreign deferred tax assets for which the Company believes do not meet the "more likely than not" criteria for recognition.

The Company reports a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return. The Company recognizes interest and penalties, if any, related to unrecognized tax benefits in the income tax provision.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 (the "Act") was signed into law making significant changes to the Internal Revenue Code. Effective for the Company's 2018 tax year, the Act reduces the statutory federal corporate tax rate from 35% to 21% and implements certain additional provisions including the Global Intangible Low-Taxed Income ("GILTI") inclusion and the Foreign Derived Intangible Income ("FDII") deduction. Upon the enactment of the Act in December 2017, the Company recorded a one-time provisional income tax provision of $11.9 million in the fourth quarter of 2017 which included a provisional amount of $8.9 million related to the remeasurement of certain deferred tax assets and liabilities based on the tax rates at which they are expected to reverse in the future and $3.0 million related to the one-time transition tax on the mandatory deemed repatriation of foreign earnings. On December 22, 2017, the SEC staff issued Staff Accounting Bulletin No. 118 ("SAB 118") to address the application of U.S. GAAP in situations when a registrant does not have the necessary information available, prepared, or analyzed (including computations) in reasonable detail to complete the accounting for certain income tax effects of the Act. In accordance with SAB 118, during the fourth quarter of 2018, the Company finalized its analysis of the income tax effects of the Act and there were no material adjustments to the provisional amounts recorded.

*Concentration of Credit Risk and Significant Customers*

Financial instruments which potentially expose the Company to concentrations of credit risk consist of accounts receivable. Management believes its credit policies are prudent and reflect normal industry terms and business risk. At December 29, 2018, two customers accounted for a total of 23.1% of the Company's accounts receivable balance. At December 30, 2017, one customer accounted for a total of 11.5% of the Company's accounts receivable balance. For the fiscal year ended December 29, 2018 and December 30, 2017, the Company generated 17.3% and 13.5%, respectively, of total revenue from one of its retailers (Amazon). For the fiscal year ended December 31, 2016 the Company generated 12.9%, 12.3% and 10.4% of total revenue from its distributor in Japan, Sales On Demand Corporation ("SODC"), Robopolis SAS, a network of affiliated European distributors ("Robopolis") and Amazon, respectively.

The Company maintains its cash in bank deposit accounts and money market funds at high quality financial institutions. The individual balances, at times, may exceed federally insured limits.

*Net Income Per Share*

Basic income per share is calculated using the Company's weighted-average outstanding common shares. Diluted income per share is calculated using the Company's weighted-average outstanding common shares including the dilutive effect of stock awards as determined under the treasury stock method. The following table presents the calculation of both basic and diluted net income per share:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Net income | $ 87,992 | $ 50,964 | $ 41,939 |
| Weighted-average shares outstanding | 27,692 | 27,611 | 27,698 |
| Dilutive effect of employee stock options and restricted stock units | 948 | 1,142 | 594 |
| Diluted weighted-average shares outstanding | 28,640 | 28,753 | 28,292 |
| Basic income per share | $ 3.18 | $ 1.85 | $ 1.51 |
| Diluted income per share | $ 3.07 | $ 1.77 | $ 1.48 |

48

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Restricted stock units and stock options representing approximately 0.0 million, 0.0 million and 0.4 million shares of common stock for the fiscal years ended December 29, 2018, December 30, 2017 and December 31, 2016, respectively, were excluded from the computation of diluted earnings per share as their effect would have been antidilutive.

*Recently Adopted Accounting Standards*

In February 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2018-02, "Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income," which provides an option to reclassify stranded tax effects within accumulated other comprehensive income to retained earnings in each period in which the effect of the change in the U.S. federal corporate income tax rate under the Tax Cuts and Jobs Act is recorded. This guidance is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, with early adoption permitted. During the first quarter of 2018, the Company early adopted this standard, which did not have a material impact on the Company's consolidated financial statements and related disclosures.

In August 2017, the FASB issued ASU No. 2017-12, "Derivatives and Hedging," that was created to better align accounting rules with a company's risk management activities, better reflect the economic results of hedging in the financial statements, and simplify hedge accounting treatment. The guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, with early adoption permitted. For cash flow hedges existing at the adoption date, the standard requires adoption on a modified retrospective basis with a cumulative-effect adjustment to the consolidated balance sheet as of the beginning of the year of adoption. During the fourth quarter of 2018, the Company early adopted this standard, which did not have a material impact on the Company's consolidated financial statements. The amended guidance requires modification to existing disclosure requirements on a prospective basis which have been updated in Note 10, "Derivative Instruments and Hedging."

In March 2017, the FASB issued ASU No. 2017-08, "Receivables - Nonrefundable Fees and Other Costs," which shortens the amortization period of certain callable debt securities held at a premium. The guidance is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, with early adoption permitted. During the fourth quarter of 2018, the Company early adopted this standard, which did not have a material impact on the Company's consolidated financial statements and related disclosures.

In October 2016, FASB issued ASU No. 2016-16, "Income Taxes: Intra-Entity Transfers of Assets Other Than Inventory." ASU 2016-16 clarifies the accounting for the current and deferred income taxes for an intra-entity transfer of an asset other than inventory. ASU 2016-16 is effective for fiscal years beginning after December 15, 2017. During the first quarter of 2018, the Company adopted this standard, which did not have a material impact on the Company's consolidated financial statements and related disclosures.

In January 2016, the FASB issued ASU No. 2016-01, "Recognition and Measurement of Financial Assets and Financial Liabilities," as amended by ASU No. 2018-03 in February 2018, which revises various aspects of the recognition, measurement, presentation and disclosure of financial instruments. The standard requires that marketable equity investments be measured at fair value with changes to fair value recognized in net income. ASU No. 2016-01 also provides a new measurement alternative for non-marketable equity investments that do not have a readily determinable fair value. Under the measurement alternative, investments are measured at cost, less any impairment, adjusted for changes from observable transactions for identical or similar investments of the same issuer. The Company adopted this guidance on December 31, 2017 and elected to record its non-marketable equity investments using the alternative measurement method, which did not have a material impact on the Company's consolidated financial statements and related disclosures.

In May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers," ("ASC 606") which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. On December 31, 2017, the Company adopted the guidance using the modified retrospective method applied to those contracts that were not completed as of the adoption date. Under the modified retrospective method, the Company recognized the cumulative effect of the adoption and recorded a net increase of $1.0 million to the beginning retained earnings as of December 31, 2017. See Note 3, "Revenue Recognition," for the required disclosures related to the impact of adopting this standard and a discussion of the Company's updated policies related to revenue recognition.

*Recently Issued Accounting Standards*

In August 2018, the FASB issued ASU No. 2018-15, "Intangibles - Goodwill and Other Internal-Use Software." The new standard aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal use software license). The amendments to this ASU are effective for fiscal years,

49

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

and interim periods within those fiscal years, beginning after December 15, 2019, with early adoption permitted. Implementation should be applied either retrospectively or prospectively to all implementation costs incurred after the date of adoption. The Company is currently evaluating the impact of the standard on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, "Fair Value Measurement: Disclosure Framework-Changes to the Disclosure Requirements for Fair Value Measurement." The amendment modifies disclosure requirements related to fair value measurement. The amendments to this ASU are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Implementation on a prospective or retrospective basis varies by specific disclosure requirement. Early adoption is permitted. The standard also allows for early adoption of any removed or modified disclosures upon issuance of this ASU while delaying adoption of the additional disclosures until their effective date. The Company does not believe this amendment will have a material impact on its consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, "Compensation - Stock Compensation: Improvements to Nonemployee Share-Based Payment Accounting (Topic 718)." The amendments in ASU No. 2018-07 expand the scope of Topic 718 to include share-based payments issued to nonemployees for goods or services. The amendments in this ASU are effective for annual periods beginning after December 15, 2018 and interim periods within those annual periods. Early adoption is permitted. The Company does not believe this amendment will have a material impact on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, "Measurement of Credit Losses on Financial Instruments," which amends the impairment model by requiring entities to use a forward-looking approach based on expected losses rather than incurred losses to estimate credit losses on certain types of financial instruments. This may result in the earlier recognition of allowances for losses. The guidance is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, with early adoption permitted. The Company is currently evaluating the impact of the standard on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, "Leases." ASU No. 2016-02 requires lessees to recognize the assets and liabilities on their balance sheet for the rights and obligations created by most leases and continue to recognize expenses on their income statements over the lease term. The guidance is effective for annual reporting periods beginning after December 15, 2018 and interim periods within those fiscal years, with early adoption permitted. In July 2018, the FASB issued ASU No. 2018-11, "Leases: Targeted Improvements," which provided either a modified retrospective transition approach with application in all comparative periods presented, or an alternative transition method, which permits a company to use its effective date as the date of initial application without restating comparative period financial statements. The Company expects to elect this alternative transition method and adopt the guidance prospectively. The Company also expects to elect the practical expedients allowed under the standard. The Company is in the process of aggregating and evaluating lease arrangements and implementing new processes and a lease accounting system. The Company expects the adoption will result in a material increase in the assets and liabilities upon adoption. The impact on the Company's results of operations and cash flows is not expected to be material.

From time to time, new accounting pronouncements are issued by FASB that are adopted by the Company as of the specified effective date. Unless otherwise discussed, the Company believes that recently issued standards, which are not yet effective, will not have a material impact on the Company's consolidated financial statements upon adoption.

**3.    Revenue Recognition**

The Company primarily derives its revenue from product sales. The Company sells products directly to consumers through on-line stores and indirectly through resellers and distributors. Revenue is recognized upon transfer of control of promised products or services to customers, generally as title and risk of loss pass, in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. Taxes collected from customers, which are subsequently remitted to governmental authorities, are excluded from revenue. Shipping and handling expenses are considered fulfillment activities and are expensed as incurred.

The Company's product portfolio includes various consumer robots, many of which are Wi-Fi connected. The consumer robots are generally highly dependent on, and interrelated with, the embedded software and cannot function without the software. As such, the consumer robots are accounted for as a single performance obligation, and the revenue is recognized at a point in time when the control is transferred to distributors, resellers or directly to end customers through online stores. For consumer robots with Wi-Fi capability ("connected robots"), each sale represents an arrangement with multiple promises consisting of the robot, an app, cloud services and potential future unspecified software upgrades. The Company has determined that the app, cloud services and potential future unspecified software upgrades represent one promised service to the customer to enhance the functionality and interaction with the robot (referred to collectively as "Cloud Services"). Under

50

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

the previous revenue accounting standard, revenue allocated to the app and future unspecified software upgrades was deferred and recognized on a straight-line basis over the expected life of the connected robot.

Upon the adoption of ASU No. 2014-09, "Revenue from Contracts with Customers," ("ASC 606") as of the beginning of fiscal year 2018, the Company concluded that, on a quantitative and qualitative basis, the Cloud Services did not constitute a material performance obligation for the then existing products and, as such, these services were not considered a separate performance obligation that required allocation of transaction price.

During the third quarter of 2018, the Company launched Roomba i7 and i7+ which have the ability to learn, map and adapt to a home's floor plan. The Company has concluded that the Cloud Services related to these new products are a material performance obligation. For contracts that contain multiple performance obligations, the transaction price is allocated to each performance obligation based on a relative standalone selling price ("SSP"). The SSP reflects the Company's best estimate of what the selling prices of elements would be if they were sold regularly on a standalone basis. Revenue allocated to the robots is recognized at a point in time when control is transferred. Revenue allocated to the Cloud Services is deferred and recognized on a straight-line basis over the estimated period the software upgrades and services are expected to be provided. The transaction price allocated to performance obligations that are unsatisfied as of December 29, 2018 is not material.

The Company's products generally carry a one-year limited warranty (with the exception of European consumer products, which typically have a two-year warranty period) that promises customers that delivered products are as specified. The Company does not consider these assurance-type warranties as a separate performance obligation and therefore, the Company accounts for such warranties under ASC 460, "Guarantees."

### Significant Judgments

The Company provides limited rights of returns for direct-to-consumer sales generated through its on-line stores as well as certain resellers and distributors. In addition, the Company may provide other credits or incentives, including price protection, which are accounted for as variable consideration when estimating the amount of revenue to recognize. Where appropriate, these estimates take into consideration relevant factors such as the Company's historical experience, current contractual requirements, specific known market events and trends and forecasted customer buying and payment patterns. Overall, these reserves reflect the Company's best estimates, and the actual amounts of consideration ultimately received may differ from the Company's estimates. Returns and credits are estimated at contract inception and updated at the end of each reporting period as additional information becomes available and only to the extent that it is probable that a significant reversal of any incremental revenue will not occur. As of December 29, 2018, the Company has reserves for product returns of $53.9 million and other credits and incentives of $97.7 million. As of December 30, 2017, the Company had reserves for product returns of $42.7 million and other credits and incentives of $61.4 million.

### Disaggregation of Revenue

The following table provides information about disaggregated revenue by geographical region for the year ended December 29, 2018 (in thousands):

|  | December 29, 2018 |
| --- | --- |
| Americas | $ 610,294 |
| EMEA | 311,659 |
| APAC | 170,631 |
| Total revenue | $ 1,092,584 |

### Contract Balances

The following table provides information about receivables and contract liabilities from contracts with customers (in thousands):

|  | December 29, 2018 (closing balance) | December 31, 2017 (opening balance) |
| --- | --- | --- |
| Accounts receivable, net | $ 162,166 | $ 141,637 |
| Contract liabilities | 5,756 | 6,685 |

The Company invoices customers based upon contractual billing schedules, and accounts receivable are recorded when the right to consideration becomes unconditional. Contract liabilities primarily relate to prepayments received from customers in advance of product shipments. The change in the opening and closing balances of the Company's contract assets and contract liabilities primarily results from the timing difference between the Company's performance and the customer's payment. During the year ended December 29, 2018, the Company recognized $6.7 million of the opening contract liability balance as

51

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

revenue upon transfer of the products to customers. Revenue recognized during the year ended December 29, 2018 related to performance obligations satisfied in a prior period is not material.

### Practical Expedients and Exemptions

The Company generally expenses sales commissions when incurred because the amortization period is generally one year or less. These costs are recorded within sales and marketing expenses.

The Company does not assess whether a prepayment received represents a significant financing component as the period between when the payment is received and the transfer of the products to the customer is generally one year or less.

The Company does not disclose the value of unsatisfied performance obligations for contracts with an original expected duration of one year or less.

### Financial Statement Impact of Adopting ASC 606

The Company adopted ASC 606 using the modified retrospective method. The cumulative effect of applying the new guidance to all contracts with customers that were not completed as of December 30, 2017 was recorded as an increase of $1.0 million to retained earnings as of the adoption date. The adoption of the new guidance had an immaterial impact to the Company's consolidated balance sheet and statement of income as of and for the year ended December 29, 2018.

### 4.    Business Combinations

#### Acquisition of Robopolis

On October 2, 2017, the Company closed the acquisition of its largest European distributor, Robopolis SAS, a French company ("Robopolis"), subsequently renamed iRobot France SAS. The acquisition will better enable the Company to maintain its leadership position and grow its business in several Western European countries through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. The initial purchase price was approximately $170.1 million in cash, net of acquired cash of $38.0 million, subject to the finalization of the working capital adjustment in accordance with the stock purchase agreement. During the first quarter of 2018, the working capital adjustment was finalized and resulted in a reduction in the purchase price of $0.7 million. During the fourth quarter of 2018, the Company finalized the allocation of the purchase price and recorded a $1.5 million adjustment for uncertain pre-acquisition income tax positions in various taxing jurisdictions against goodwill. The acquisition was a stock purchase. The results of operations for this acquisition have been included in the Company's operating results since the acquisition date.

The following table summarizes the final allocation of the purchase price (in thousands):

| | | |
|---|---|---|
| Cash | $ | 37,981 |
| Accounts receivable, net (1) | | 21,426 |
| Inventory | | 36,304 |
| Goodwill | | 80,419 |
| Intangible assets | | 36,597 |
| Other assets | | 2,456 |
| Total assets | | 215,183 |
| | | |
| Accounts payable | | (29,391) |
| Accrued expenses | | (3,376) |
| Deferred tax liabilities | | (10,864) |
| Other liabilities | | (2,138) |
| Total liabilities assumed | | (45,769) |
| Net assets acquired | $ | 169,414 |

(1) The accounts receivable balance includes reserves for product returns, discounts and promotions assumed as part of the acquisition.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table reflects the fair value of the acquired identifiable intangible assets and related estimates of useful lives (in thousands):

| | Useful Life | Fair Value |
|---|---|---|
| Reacquired distribution rights | 2.25 years | $ 29,296 |
| Customer relationships | 14 years | 7,029 |
| Non-competition agreements | 3 years | 272 |
| Total | | $ 36,597 |

*Acquisition of Sales On Demand Corporation*

On April 3, 2017, the Company closed its acquisition of the iRobot-related distribution business of Sales On Demand Corporation ("SODC"), iRobot Japan G.K., for approximately $16.6 million in cash, equal to the book value of the acquired assets. The acquisition will better enable the Company to maintain its leadership position and accelerate the growth of its business in Japan through direct control of pre- and post-sales market activities including sales, marketing, branding, channel relationships and customer service. It also expands the Company's presence and customer outreach opportunities in Japan. The acquisition was a stock purchase. The results of operations for this acquisition have been included in the Company's operating results since the acquisition date.

During the three months ended September 30, 2017, the Company finalized the purchase price allocation and made measurement period adjustments to the provisional amounts reported as the estimated fair values of assets acquired. These measurement period adjustments resulted in a $2.2 million non-taxable gain on business acquisition which represents the excess of the fair value of the net assets acquired over the purchase price. The gain on business acquisition was recorded within other income, net in the consolidated statements of income. The Company believes that the gain on business acquisition was due to the transaction not being subjected to a competitive bidding process and the purchase price being determined based on the net book value of the net assets acquired.

The following table summarizes the final allocation of the purchase price (in thousands):

| | |
|---|---|
| Cash | $ 125 |
| Accounts receivable, net (1) | (5,496) |
| Inventory | 18,290 |
| Other assets | 2,065 |
| Deferred tax assets, net | 409 |
| Goodwill | - |
| Intangible assets | 8,640 |
| Total assets acquired | 24,033 |
| | |
| Accrued expenses and other current liabilities | (4,450) |
| Other liabilities | (691) |
| Total liabilities assumed | (5,141) |
| Net assets acquired | $ 18,892 |
| Gain on business acquisition | (2,243) |
| Total purchase price | $ 16,649 |

) The accounts receivable balance reflects reserves for product returns, discounts and promotions assumed as part of the acquisition.

53

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table reflects the fair value of the acquired identifiable intangible assets and related estimates of useful lives (in thousands):

|  | Useful Life | Fair Value |
|---|---|---|
| Customer relationships | 13 years | $ 4,490 |
| Reacquired distribution rights | 9 months | 4,150 |
| Total |  | $ 8,640 |

**Pro Forma Results (Unaudited)**

The following table shows unaudited pro forma results of operations as if the Company had acquired Robopolis on January 3, 2016 (in thousands, except per share amounts):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Revenue | $ 1,092,584 | $ 901,612 | $ 718,917 |
| Net income | 87,992 | 51,887 | 53,320 |
| Net income per share: |  |  |  |
| Basic income per share | $ 3.18 | $ 1.88 | $ 1.93 |
| Diluted income per share | $ 3.07 | $ 1.80 | $ 1.88 |

The Company has not furnished pro forma financial information relating to its acquisition of SODC, because such information is not material, individually or in the aggregate, to its financial results. The unaudited pro forma results of operations are not necessarily indicative of the actual results that would have occurred had the transactions taken place at the beginning of the periods indicated.

5.    **Inventory**

Inventory consists of the following (in thousands):

|  | December 29, 2018 | December 30, 2017 |
|---|---|---|
| Raw materials | $ 2,992 | $ 4,036 |
| Finished goods | 161,641 | 102,896 |
|  | $ 164,633 | $ 106,932 |

6.    **Property and Equipment**

Property and equipment consists of the following (in thousands):

|  | December 29, 2018 | December 30, 2017 |
|---|---|---|
| Computer and equipment | $ 12,339 | $ 10,669 |
| Furniture | 5,231 | 4,120 |
| Machinery | 20,606 | 14,202 |
| Tooling | 39,675 | 31,783 |
| Leasehold improvements | 28,701 | 26,136 |
| Business applications software | 15,638 | 12,757 |
| Subtotal | 122,190 | 99,667 |
| Less: accumulated depreciation | 65,164 | 55,088 |
| Property and equipment, net | $ 57,026 | $ 44,579 |

54

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

As of December 29, 2018 and December 30, 2017, the net book value of capitalized internal-use software costs was $4.7 million and $2.8 million, respectively, which are included within business applications software.

Depreciation expense for the years ended December 29, 2018, December 30, 2017 and December 31, 2016 was $17.0 million, $12.3 million, and $10.0 million, respectively, which included amortization expense of $1.2 million, $1.5 million and $0.4 million, respectively, for capitalized internal-use software.

**7.     Goodwill and other intangible assets**

The following table summarizes the activity in the carrying amount of goodwill for fiscal years 2018 and 2017 (in thousands):

| | | |
|---|---|---:|
| Balance as of December 31, 2016 | $ | 41,041 |
| Acquisitions (Note 4) | | 79,558 |
| Effect of foreign currency translation | | 841 |
| Balance as of December 30, 2017 | | 121,440 |
| Purchase accounting adjustments (Note 4) | | 830 |
| Effect of foreign currency translation | | (3,374) |
| Balance as of December 29, 2018 | $ | 118,896 |

Intangible assets at December 29, 2018 and December 30, 2017 consisted of the following (in thousands):

| | December 29, 2018 | | | December 30, 2017 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net | Cost | Accumulated Amortization | Net |
| Completed technology | $ 26,900 | $ 21,607 | $ 5,293 | $ 26,900 | $ 18,150 | $ 8,750 |
| Tradename | 100 | 100 | - | 100 | 100 | - |
| Customer relationships | 11,291 | 1,365 | 9,926 | 11,594 | 418 | 11,176 |
| Reacquired distribution rights | 32,499 | 23,598 | 8,901 | 33,760 | 9,226 | 24,534 |
| Non-competition agreements | 263 | 110 | 153 | 275 | 23 | 252 |
| Total | $ 71,053 | $ 46,780 | $ 24,273 | $ 72,629 | $ 27,917 | $ 44,712 |

Amortization expense related to acquired intangible assets was $19.6 million, $13.1 million, and $3.5 million for the fiscal years ended December 29, 2018, December 30, 2017 and December 31, 2016, respectively.

The estimated future amortization expense related to current intangible assets in each of the five succeeding fiscal years is expected to be as follows (in thousands):

| | Cost of Revenue | Operating Expenses | Total |
|---|---|---|---|
| 2019 | $ 11,719 | $ 1,042 | $ 12,761 |
| 2020 | 900 | 1,020 | 1,920 |
| 2021 | 900 | 794 | 1,694 |
| 2022 | 675 | 794 | 1,469 |
| 2023 | - | 794 | 794 |
| Thereafter | - | 5,635 | 5,635 |
| Total | $ 14,194 | $ 10,079 | $ 24,273 |

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### 8.  Accrued Expenses

Accrued expenses consist of the following at (in thousands):

| | December 29, 2018 | | December 30, 2017 |
|---|---|---|---|
| Accrued bonus | $ | 21,226 | $ | 20,443 |
| Accrued warranty | | 11,964 | | 11,264 |
| Accrued sales and other taxes | | 11,397 | | 7,256 |
| Accrued other compensation | | 10,518 | | 9,071 |
| Accrued direct fulfillment costs | | 5,372 | | 1,885 |
| Accrued accounting fees | | 2,052 | | 1,221 |
| Accrued federal and state income taxes | | 1,936 | | 7,110 |
| Accrued other | | 6,794 | | 15,397 |
| | $ | 71,259 | $ | 73,647 |

### 9.  Working Capital Facility

*Credit Facility*

In June 2018, the Company entered into a new agreement with Bank of America, N.A., increasing the amount of its unsecured revolving line of credit from $75.0 million to $150.0 million. As of December 29, 2018, the full amount was available for borrowing. The new revolving line of credit is available to fund working capital and other corporate purposes. The new agreement extends the term of the credit facilities to June 2023. The interest on loans under the credit facility accrues, at the Company's election, at either (1) LIBOR plus a margin, currently equal to 1.0%, based on the Company's ratio of indebtedness to Adjusted EBITDA (the "Eurodollar Rate"), or (2) the lender's base rate. The lender's base rate is equal to the highest of (1) the federal funds rate plus 0.5%, (2) the lender's prime rate or (3) the Eurodollar Rate plus 1.0%.

As of December 29, 2018, the Company had no outstanding borrowings under its revolving credit facility. This credit facility contains customary terms and conditions for credit facilities of this type, including restrictions on the Company's ability to incur or guarantee additional indebtedness, create liens, enter into transactions with affiliates, make loans or investments, sell assets, pay dividends or make distributions on, or repurchase, the Company's stock, and consolidate or merge with other entities. In addition, the Company is required to meet certain financial covenants customary with this type of agreement, including maintaining a maximum ratio of indebtedness to Adjusted EBITDA and a minimum specified interest coverage ratio.

This credit facility contains customary events of default, including for payment defaults, breaches of representations, breaches of affirmative or negative covenants, cross defaults to other material indebtedness, bankruptcy and failure to discharge certain judgments. If a default occurs and is not cured within any applicable cure period or is not waived, the Company's obligations under the credit facility may be accelerated.

As of December 29, 2018, the Company was in compliance with all covenants under the revolving credit facility.

### 10.  Derivative Instruments and Hedging Activities

The Company operates internationally and, in the normal course of business, is exposed to fluctuations in foreign currency exchange rates. The foreign currency exposures typically arise from transactions denominated in currencies other than the functional currency of the Company's operations, primarily the Japanese Yen, Canadian dollar and the Euro. The Company uses derivative instruments that are designated in cash flow hedge relationships to reduce or eliminate the effects of foreign exchange rate changes on purchases and sales. These contracts have maturities of thirty-seven months or less. At December 29, 2018 and December 30, 2017, the Company had outstanding cash flow hedges with a total notional value of $366.7 million and $73.7 million, respectively.

The Company also enters into economic hedges that are not designated as hedges from an accounting standpoint to reduce or eliminate the effects of foreign exchange rate changes typically related to short term trade receivables and payables. These contracts typically have maturities of two months or less. At December 29, 2018 and December 30, 2017, the Company had outstanding economic hedges with a total notional value of $56.0 million and $36.6 million, respectively.

56

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The fair values of derivative instruments are as follows (in thousands):

| | | Fair Value | |
| --- | --- | --- | --- |
| | Classification | December 29, 2018 | December 30, 2017 |
| **Derivatives not designated as hedging instruments:** | | | |
| Foreign currency forward contracts | Other current assets | $ 551 | $ 413 |
| Foreign currency forward contracts | Accrued expenses | - | 221 |
| **Derivatives designated as cash flow hedges:** | | | |
| Foreign currency forward contracts | Other current assets | $ 53 | $ 488 |
| Foreign currency forward contracts | Other assets | 172 | 116 |
| Foreign currency forward contracts | Accrued expenses | 335 | 279 |
| Foreign currency forward contracts | Long-term liabilities | 795 | - |

Gains (losses) associated with derivative instruments not designated as hedging instruments are as follows (in thousands):

| | | Fiscal year ended | |
| --- | --- | --- | --- |
| | Classification | December 29, 2018 | December 30, 2017 |
| Gain (loss) recognized in income | Other income, net | $ 1,568 | $ (444) |

The following tables reflect the effect of derivatives designated as cash flow hedging for the years ended December 29, 2018 and December 30, 2017 (in thousands):

| | Gain (loss) recognized in OCI on Derivative (1) | |
| --- | --- | --- |
| | Fiscal year ended | |
| | December 29, 2018 | December 30, 2017 |
| Foreign currency forward contracts | $ (686) | $ 584 |

(1)    The amount represents the change in fair value of derivative contracts due to changes in spot rates.

| | Gain (loss) recognized in earnings on cash flow hedging instruments | | | |
| --- | --- | --- | --- | --- |
| | December 29, 2018 | | December 30, 2017 | |
| | Revenue | Cost of revenue | Revenue | Cost of revenue |
| Consolidated statements of income in which the effects of cash flow hedging instruments are recorded | $ 1,092,584 | $ 537,156 | $ 883,911 | $ 450,752 |
| | | | | |
| Gain or (loss) on cash flow hedging relationships: | | | | |
| Foreign currency forward contracts: | | | | |
| Amount of gain (loss) reclassified from AOCI into earnings | $ 948 | $ (386) | $ 320 | $ (63) |

**11.    Fair Value Measurements**

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The Company's financial assets and liabilities measured at fair value on a recurring basis at December 29, 2018, were as follows (in thousands):

| | Fair Value Measurements as of December 29, 2018 | | |
| --- | --- | --- | --- |
| | Level 1 | Level 2 (1) | Level 3 (2) |
| Assets: | | | |
| Money market funds | $ 3,730 | $ - | $ - |
| Corporate and government bonds, $30,035 at cost (3) | - | 29,605 | - |
| Convertible note | - | - | 2,000 |
| Derivative instruments (Note 10) | - | 776 | - |
| Total assets measured at fair value | $ 3,730 | $ 30,381 | $ 2,000 |
| | | | |
| Liabilities: | | | |
| Derivative instruments (Note 10) | $ - | $ 1,130 | $ - |
| Total liabilities measured at fair value | $ - | $ 1,130 | $ - |

The Company's financial assets and liabilities measured at fair value on a recurring basis at December 30, 2017, were as follows (in thousands):

| | Fair Value Measurements as of December 30, 2017 | | |
| --- | --- | --- | --- |
| | Level 1 | Level 2 (1) | Level 3 (2) |
| Assets: | | | |
| Money market funds | $ 3,165 | $ - | $ - |
| Corporate and government bonds, $37,767 at cost | - | 37,225 | - |
| Derivative instruments (Note 10) | - | 1,017 | - |
| Total assets measured at fair value | $ 3,165 | $ 38,242 | $ - |
| | | | |
| Liabilities: | | | |
| Derivative instruments (Note 10) | $ - | $ 500 | $ - |
| Total liabilities measured at fair value | $ - | $ 500 | $ - |

(1)     Level 2 fair value estimates are based on observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

(2)     Level 3 fair value estimates are based on inputs that are generally unobservable and typically reflect management's estimates of assumptions that market participants would use in pricing the asset or liability. The fair values are therefore determined using model-based techniques, including option pricing and discounted cash flow models. Unobservable inputs used in the models are significant to the fair values of the assets and liabilities.

(3)     As of December 29, 2018, the Company's investments had maturity dates ranging from March 2019 to March 2021.

During the year ended December 29, 2018, the Company invested in a non-marketable convertible note. The debt security is classified as available-for-sale and is included in short term investments on the consolidated balance sheet. The following table provides a summary of changes in fair value of our Level 3 investment for the year ended December 29, 2018 (in thousands):

| | |
| --- | --- |
| Balance as of December 30, 2017 | $ - |
| Investment | 2,000 |
| Balance as of December 29, 2018 | $ 2,000 |

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**12.    Stockholders' Equity**

*Preferred Stock*

The Company has authorized 5,000,000 shares of undesignated preferred stock with a par value of $0.01 per share. None of the preferred shares were issued and outstanding at December 29, 2018 and December 30, 2017.

*Common Stock*

Common stockholders are entitled to one vote for each share held and to receive dividends if and when declared by the Board of Directors and subject to and qualified by the rights of holders of the preferred stock. Upon dissolution or liquidation of the Company, holders of common stock will be entitled to receive all available assets subject to any preferential rights of any then outstanding preferred stock.

*Share Repurchase Activity*

On February 27, 2018, the Company's board of directors approved a stock repurchase program authorizing up to $50.0 million in share repurchases. This share repurchase program commenced on March 28, 2018 with an expiration date of December 28, 2018. As of June 30, 2018, the Company completed the repurchase program and repurchased 798,794 shares of common stock totaling $50.0 million.

On December 28, 2015, the Company announced a stock repurchase program, effective January 4, 2016 and ending on December 31, 2016, authorizing up to one million shares or $40 million in share repurchases. On March 1, 2016, the Company replaced the then-current stock repurchase program and entered into an accelerated share repurchase ("ASR") agreement to repurchase an aggregate of $85.0 million of common stock. During fiscal year 2016, the Company completed the repurchase program and repurchased 2,641,122 shares of common stock totaling $97.0 million.

**13.    Stock-Based Compensation**

The Company has awards and options outstanding under four stock incentive plans: the 2005 Stock Option and Incentive Plan (the "2005 Plan"), the Evolution Robotics, Inc. 2007 Stock Plan (the "2007 Plan"), the 2015 Stock Option and Incentive Plan (the "2015 Plan") and the 2018 Stock Option and Incentive Plan (the "2018 Plan" and together with 2005 Plan, the 2007 Plan, and the 2015 Plan, the "Plans"). The 2018 Plan is the only one of the four plans under which new awards may currently be granted. Under the 2018 Plan, which became effective on May 23, 2018, 1,750,000 shares were initially reserved for issuance in the form of incentive stock options, non-qualified stock options, stock appreciation rights, restricted stock awards, restricted stock units, unrestricted stock awards, cash-based awards, and dividend equivalent rights. Stock awards returned to the Plans, with the exception of those issued under the 2005 Plan and the 2007 Plan, as a result of their expiration, cancellation or termination are automatically made available for issuance under the 2018 Plan. Eligibility for incentive stock options is limited to those individuals whose employment status would qualify them for the tax treatment associated with incentive stock options in accordance with the Internal Revenue Code of 1986, as amended. As of December 29, 2018, there were 1,623,670 shares available for future grant under the 2018 Plan. The Company recognized $25.8 million, $19.8 million and $16.0 million of stock-based compensation expense during the fiscal years ended December 29, 2018, December 30, 2017, and December 31, 2016, respectively. Stock-based compensation breaks down by expense classification as follows (in thousands):

|  | Fiscal Year Ended | | |
| --- | --- | --- | --- |
|  | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Cost of revenue | $        1,407 | $        1,082 | $        760 |
| Research and development | 7,494 | 5,009 | 3,646 |
| Selling and marketing | 2,842 | 2,571 | 2,008 |
| General and administrative | 14,061 | 11,089 | 9,581 |
| Total | $        25,804 | $        19,751 | $        15,995 |

*Stock Options*

Options granted under the Plans are exercisable in full at any time subsequent to vesting, generally vest over four years, and expire five or ten years from the date of grant or, if earlier, 90 days from employee termination. The exercise price of stock options is typically equal to the Company's closing stock price on the date of grant.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

As of December 29, 2018, the unamortized compensation costs associated with stock options was $1.8 million with a weighted-average remaining recognition period of 1.29 years.

The following table summarizes stock option activity for fiscal years 2018, 2017 and 2016:

| | Number of Shares | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value(1) |
|---|---|---|---|---|---|
| Outstanding at January 2, 2016 | 1,287,550 | $ | 26.73 | | |
| Granted | 314,770 | | 38.03 | | |
| Exercised | (456,498) | | 20.47 | | |
| Canceled | (57,648) | | 33.28 | | |
| Outstanding at December 31, 2016 | 1,088,174 | $ | 32.27 | | |
| Granted | 10,975 | | 57.33 | | |
| Exercised | (367,267) | | 28.79 | | |
| Canceled | (18,928) | | 36.72 | | |
| Outstanding at December 30, 2017 | 712,954 | $ | 34.34 | | |
| Granted | - | | - | | |
| Exercised | (239,830) | | 33.40 | | |
| Canceled | (10,863) | | 46.20 | | |
| Outstanding at December 29, 2018 | 462,261 | $ | 34.55 | 3.58 years | $21.6 million |
| Vested and expected to vest at December 29, 2018 | 462,261 | $ | 34.55 | 3.58 years | $21.6 million |
| Exercisable as of December 29, 2018 | 317,997 | $ | 33.10 | 3.26 years | $15.3 million |

_____

(1)     The aggregate intrinsic value on the table above represents the difference between the Company's closing stock price on December 29, 2018 of $81.32 and the exercise price of the underlying in-the-money option.

There were no options granted for the fiscal year ended December 29, 2018. The fair value of each option grant for the fiscal years ended December 30, 2017, and December 31, 2016 was computed on the grant date using the Black-Scholes option-pricing model with the following assumptions:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Risk-free interest rate | - | 2.11% | 1.17% - 1.89% |
| Expected dividend yield | - | - | - |
| Expected life | - | 4.01 years | 4.01 - 4.03 years |
| Expected volatility | - | 38.0% | 38.9% - 42.1% |

The risk-free interest rate is derived from the average U.S. Treasury constant maturity rate, which approximates the rate in effect at the time of grant, commensurate with the expected life of the instrument. The dividend yield is zero based upon the fact the Company has never paid and has no present intention to pay cash dividends. The Company utilizes company specific historical data for purposes of establishing expected volatility and expected term.

During fiscal years 2018, 2017, and 2016, the total intrinsic value of stock options exercised was $14.9 million, $21.8 million, and $10.3 million, respectively.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table summarizes information about stock options outstanding at December 29, 2018:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $ 3.54 - $ 22.86 | 46,918 | 1.55 years | $ 19.84 | 46,918 | $ 19.84 |
| 26.59 - 32.38 | 83,084 | 3.51 | 30.98 | 62,968 | 31.05 |
| 33.14 - 33.14 | 85,984 | 4.19 | 33.14 | 48,436 | 33.14 |
| 33.29 - 34.30 | 71,864 | 3.26 | 34.07 | 57,664 | 34.07 |
| 35.43 - 37.08 | 28,276 | 2.52 | 35.69 | 28,276 | 35.69 |
| 37.62 - 37.62 | 78,419 | 4.44 | 37.62 | 38,874 | 37.62 |
| 39.09 - 39.09 | 23,367 | 4.70 | 39.09 | 7,566 | 39.09 |
| 43.35 - 43.35 | 19,194 | 2.19 | 43.35 | 19,194 | 43.35 |
| 57.33 - 57.33 | 8,046 | 5.19 | 57.33 | 2,985 | 57.33 |
| 58.55 - 58.55 | 17,109 | 4.95 | 58.55 | 5,116 | 58.55 |
| $ 3.54 - $58.55 | 462,261 | 3.58 years | $ 34.55 | 317,997 | $ 33.10 |

### Time-based Restricted Stock Units

Time-based restricted stock units entitle the holder to a specific number of shares of common stock upon vesting, typically over a four-year period. As of December 29, 2018, the unamortized compensation costs associated with restricted stock units was $44.0 million with a weighted-average remaining recognition period of 2.33 years.

The following table summarizes the time-based restricted stock unit activity for fiscal years 2018, 2017 and 2016:

| | Number of Shares Underlying Restricted Stock | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at January 2, 2016 | 933,877 | $ 31.42 |
| Granted | 458,237 | 37.93 |
| Vested | (358,018) | 30.81 |
| Forfeited | (98,917) | 32.13 |
| Outstanding at December 31, 2016 | 935,179 | $ 35.07 |
| Granted | 396,164 | 72.63 |
| Vested | (351,543) | 33.73 |
| Forfeited | (41,347) | 39.52 |
| Outstanding at December 30, 2017 | 938,453 | $ 51.24 |
| Granted | 307,614 | 81.55 |
| Vested | (351,816) | 47.30 |
| Forfeited | (38,362) | 60.62 |
| Outstanding at December 29, 2018 | 855,889 | $ 63.32 |

The aggregate intrinsic value of outstanding time-based restricted stock units at December 29, 2018 was $69.6 million based on the Company's closing stock price on December 29, 2018 of $81.32, with a weighted average remaining contractual term of 1.40 years.

### Performance-Based Restricted Stock Units

The Company grants performance-based restricted stock units ("PSUs") to certain of its employees. The PSUs have performance metrics based on financial performance of the Company measured at the end of a three-year performance period. For the 2017 and 2016 grant years, the performance metric for these awards is based on revenue, operating income and/or

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

operating income percent, with a threshold requirement for a minimum amount of revenue growth. Starting in 2018, the Company has removed revenue as a performance metric in the PSU plan design and changed the payout metric from three-year cumulative operating income as a percentage of annual revenue to three-year cumulative operating income in dollars. The number of shares actually earned at the end of the three-year period will range from 0% to 200% of the target number of PSUs granted based on the Company's performance against the performance conditions.

The unamortized fair value as of December 29, 2018 associated with performance based restricted stock units was $7.1 million with a weighted-average remaining recognition period of 1.24 years.

The following table summarizes the performance-based restricted stock unit activity for fiscal years 2018, 2017 and 2016:

| | Number of Shares Underlying PSU (1) | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding at January 2, 2016 | 90,492 | $ | 36.78 |
| Granted | 82,085 | | 33.36 |
| Vested | (5,625) | | 34.30 |
| Forfeited | (3,041) | | 34.30 |
| Outstanding at December 31, 2016 | 163,911 | $ | 35.03 |
| Granted | 105,650 | | 57.33 |
| Vested | (24,792) | | 43.35 |
| Forfeited | (2,708) | | 39.71 |
| Outstanding at December 30, 2017 | 242,061 | $ | 43.97 |
| Granted | 91,538 | | 68.41 |
| Vested | (56,259) | | 34.30 |
| Forfeited | (3,221) | | 45.71 |
| Outstanding at December 29, 2018 | 274,119 | $ | 54.10 |

_____
(1) Includes the target number of PSUs.

The aggregate intrinsic value of outstanding PSUs was $22.3 million based on the Company's closing stock price on December 29, 2018 of $81.32 with a weighted average remaining contractual term of 1.24 years.

### *Employee Stock Purchase Plan*

In May 2017, the Company's stockholders approved the 2017 Employee Stock Purchase Plan ("ESPP"). Eligible employees may purchase the Company's common stock through payroll deductions at a price equal to 85% of the lower of the fair market values of the stock as of the beginning or the end of six-month offering periods beginning November 15 and May 15 of each year. An employee's payroll deductions under the ESPP are limited to 15% of the employee's compensation, up to $4,000 each period, for the purchase of common stock not to exceed 1,000 shares per offering period. As of December 29, 2018, there were 631,542 shares reserved for future issuance under the ESPP. The Company recognized $1.0 million and $0.1 million of stock-based compensation expense during the fiscal years ended December 29, 2018 and December 30, 2017, respectively.

### 14.    Commitments and Contingencies

#### *Legal Proceedings*

From time to time and in the ordinary course of business, the Company is subject to various claims, charges and litigation. The outcome of litigation cannot be predicted with certainty and some lawsuits, claims or proceedings may be disposed of unfavorably to us, which could materially affect our financial condition or results of operations.

62

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

### Lease Obligations

The Company leases its facilities. Rental expense under operating leases for fiscal years 2018, 2017 and 2016 amounted to $12.9 million, $8.9 million, and $6.0 million, respectively. Future minimum rental payments under operating leases were as follows as of December 29, 2018 (in thousands):

|  | Operating Leases |
|---|---|
| 2019 | $ 7,848 |
| 2020 | 7,397 |
| 2021 | 7,345 |
| 2022 | 7,292 |
| 2023 | 7,021 |
| Thereafter | 34,806 |
| Total minimum lease payments | $ 71,709 |

### Outstanding Purchase Orders

At December 29, 2018, we had outstanding purchase orders aggregating approximately $113.6 million. The purchase orders, the majority of which are with our contract manufacturers for the purchase of inventory in the normal course of business, are for manufacturing and non-manufacturing related goods and services, and are generally cancelable without penalty. In circumstances where we determine that we have financial exposure associated with any of these commitments, we record a liability in the period in which that exposure is identified.

### Guarantees and Indemnification Obligations

The Company enters into standard indemnification agreements in the ordinary course of business. Pursuant to these agreements, the Company indemnifies and agrees to reimburse the indemnified party for losses incurred by the indemnified party, generally the Company's customers, in connection with any patent, copyright, trade secret or other proprietary right infringement claim by any third party. The term of these indemnification agreements is generally perpetual any time after execution of the agreement. The maximum potential amount of future payments the Company could be required to make under these indemnification agreements is unlimited. The Company has never incurred costs to defend lawsuits or settle claims related to these indemnification agreements. As a result, the Company believes the estimated fair value of these agreements is minimal. Accordingly, the Company has no liabilities recorded for these agreements as of December 29, 2018 and December 30, 2017, respectively.

### Warranty

The Company provides warranties on most products and has established a reserve for warranty obligations based on estimated warranty costs. The reserve is included as part of accrued expenses (Note 8) in the accompanying consolidated balance sheets.

Activity related to the warranty accrual was as follows (in thousands):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Balance at beginning of period | $ 11,264 | $ 8,464 | $ 6,907 |
| Liability assumed (1) | - | 2,186 | - |
| Provision | 10,798 | 8,591 | 7,494 |
| Warranty usage (2) | (10,098) | (7,977) | (5,937) |
| Balance at end of period | $ 11,964 | $ 11,264 | $ 8,464 |

_____
(1)    Warranty assumed as part of the acquisition of the iRobot-related distribution business of Sales On Demand Corporation.
(2)    Warranty usage includes costs incurred for warranty obligations.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**15.    Employee Benefits**

The Company sponsors a retirement plan under Section 401(k) of the Internal Revenue Code (the "Retirement Plan"). All Company employees, with the exception of temporary, contract and international employees are eligible to participate in the Retirement Plan after satisfying age requirements prescribed by the plan. Under the Retirement Plan, employees may make tax-deferred contributions, and the Company, at its sole discretion, and subject to the limits prescribed by the IRS, may make either a nonelective contribution on behalf of all eligible employees or a matching contribution on behalf of all plan participants.

The Company elected to make a matching contribution of approximately $2.8 million, $2.4 million and $1.7 million for the plan years ended December 29, 2018, December 30, 2017 and December 31, 2016, respectively. The employer contribution represents a matching contribution at a rate of 50% of each employee's first six percent contribution. Accordingly, each employee participating is entitled up to a maximum of three percent of his or her eligible annual payroll.

**16.    Income Taxes**

Income (loss) before provision for income taxes was as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Domestic | 113,078 | 71,382 | 61,706 |
| Foreign | (4,456) | 4,984 | (345) |
| Income before income taxes | $  108,622 | $  76,366 | $  61,361 |

The components of income tax expense were as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Current | | | |
| Federal | $  17,627 | $  17,555 | $  17,639 |
| State | 3,676 | 1,691 | 1,054 |
| Foreign | 10,732 | 7,355 | 310 |
| Total current income tax provision | 32,035 | 26,601 | 19,003 |
| Deferred | | | |
| Federal | $  (2,475) | $  6,664 | $  781 |
| State | (1,149) | (2,470) | (95) |
| Foreign | (7,781) | (5,393) | (267) |
| Total deferred income tax provision | (11,405) | (1,199) | 419 |
| Total income tax provision | $  20,630 | $  25,402 | $  19,422 |

Due to the adoption of ASU 2016-09 in 2017, all excess tax benefits and deficiencies are recognized as income tax expense in the Company's consolidated statement of income. This will result in increased volatility in the Company's effective tax rate.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 (the "Act") was signed into law making significant changes to the Internal Revenue Code. Effective for the Company's 2018 tax year, the Act reduces the statutory federal corporate tax rate from 35% to 21% and implements certain additional provisions including the Global Intangible Low-Taxed Income ("GILTI") inclusion and the Foreign Derived Intangible Income ("FDII") deduction. Upon the enactment of the Act in December 2017, the Company recorded a one-time provisional income tax provision of $11.9 million in the fourth quarter of 2017 which included a provisional amount of $8.9 million related to the remeasurement of certain deferred tax assets and liabilities based on the tax rates at which they are expected to reverse in the future and $3.0 million related to the one-time transition tax on the mandatory deemed repatriation of foreign earnings. On December 22, 2017, the SEC staff issued Staff Accounting Bulletin No. 118 ("SAB

64

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

118") to address the application of U.S. GAAP in situations when a registrant does not have the necessary information available, prepared, or analyzed (including computations) in reasonable detail to complete the accounting for certain income tax effects of the Act. In accordance with SAB 118, during the fourth quarter of 2018, the Company finalized its analysis of the income tax effects of the Act and determined no material adjustments to the provisional amounts recorded were required.

The reconciliation of statutory federal income tax to actual tax expense is as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Statutory federal income tax | $ 22,812 | $ 26,728 | $ 21,476 |
| Miscellaneous permanent items | 1,837 | 2,979 | 516 |
| State taxes (net of federal benefit) | 4,312 | 2,089 | 1,360 |
| Federal and state credits | (5,638) | (4,486) | (2,233) |
| Domestic production activities deduction | - | (1,528) | (1,731) |
| Excess tax benefits relating to stock-based compensation | (6,529) | (11,709) | - |
| Tax Cuts and Jobs Act of 2017 | 2,127 | 11,861 | - |
| Foreign-derived intangible income deduction | (2,678) | - | - |
| EMEA business restructuring | 2,292 | - | - |
| Other | 2,095 | (532) | 34 |
| | $ 20,630 | $ 25,402 | $ 19,422 |

The components of net deferred tax assets were as follows (in thousands):

| | December 29, 2018 | December 30, 2017 |
|---|---|---|
| Deferred tax assets | | |
| Reserves and accruals | $ 27,991 | $ 24,315 |
| Tax credits and net operating loss carryforwards | 7,781 | 6,810 |
| Property and equipment | 1,360 | 1,382 |
| Stock-based compensation | 4,975 | 4,277 |
| Gross deferred tax assets | 42,107 | 36,784 |
| Valuation allowance | (1,148) | (800) |
| Total deferred tax assets | 40,959 | 35,984 |
| Deferred tax liabilities | | |
| Intangible assets | 7,317 | 13,419 |
| Other | 668 | 573 |
| Total deferred tax liabilities | 7,985 | 13,992 |
| Net deferred tax assets | $ 32,974 | $ 21,992 |

The Company intends to continue to invest all of its unremitted foreign earnings, as well as the capital in its foreign subsidiaries, indefinitely outside of the U.S. At December 29, 2018, the Company has immaterial unremitted foreign earnings and any unrecognized deferred tax liability on these unremitted earnings would be immaterial.

The Company has foreign net operating loss carryforwards of $3.4 million and $0.1 million as of December 29, 2018 and December 30, 2017, respectively. The Company has state research and development credit carryforwards of $10.7 million and $10.1 million as of December 29, 2018 and December 30, 2017, respectively, which expire from 2027 to 2033. Under the Internal Revenue Code and state law, certain substantial changes in the Company's ownership could result in an annual limitation on the amount of these tax carryforwards which can be utilized in future years.

As of December 29, 2018, December 30, 2017 and December 31, 2016, the Company recorded a valuation allowance of $1.1 million, $0.8 million and $0.0 million, respectively, for certain foreign deferred tax assets for which the Company believes do not meet the "more likely than not" criteria for recognition.

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

A summary of the Company's adjustments to its gross unrecognized tax benefits in the current year is as follows (in thousands):

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 29, 2018 | December 30, 2017 | December 31, 2016 |
| Balance at beginning of period | $ 4,590 | $ 5,146 | $ 6,616 |
| Increase for tax positions related to the current year | 2,891 | 580 | 2,851 |
| Increase for tax positions related to acquisition | 1,493 | - | - |
| Increase (decrease) for tax positions related to prior years | 407 | (523) | (4,224) |
| Decreases for settlements with applicable taxing authorities | (2,262) | - | - |
| Decreases for lapses of statute of limitations | - | (613) | (97) |
| Balance at end of period | $ 7,119 | $ 4,590 | $ 5,146 |

During the fourth quarter of 2018, the Company finalized the purchase accounting related to its acquisition of Robopolis and recorded a $1.5 million adjustment for uncertain pre-acquisition income tax positions in various taxing jurisdictions against goodwill. In addition, the Company recorded a charge of $2.3 million for estimated taxes associated with a restructuring of the EMEA business during fiscal 2018. The Company accrues interest and, if applicable, penalties for any uncertain tax positions as a component of income tax expense. As of December 29, 2018, December 30, 2017 and December 31, 2016 there were no material accrued interest or penalties.

The Company is subject to taxation in the United States (federal and state) and foreign jurisdictions. The statute of limitations for examinations by the Internal Revenue Service (the "IRS") is closed for fiscal years prior to 2014. The statute of limitations for examinations by state tax authorities is closed for fiscal years prior to 2013. Federal and state carryforward attributes that were generated prior to fiscal 2014 and 2013, respectively, may still be adjusted upon examination by the federal or state tax authorities if they either have been or will be used in a period for which the statute of limitations is still open. The Company is currently under examination by the IRS for the years 2014 and 2015. There are other ongoing audits in various other jurisdictions that are not material to the Company's financial statements. The Company regularly assesses the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of its provision for income taxes. The Company continues to monitor the progress of ongoing discussions with tax authorities and the effect, if any, of the expected expiration of the statute of limitations in various taxing jurisdictions. The Company believes that an adequate provision has been made for any adjustments that may result from tax examinations. However, the outcome of tax audits cannot be predicted with certainty. If any issues addressed in the Company's tax audits are resolved in a manner not consistent with management's expectations, the Company could be required to adjust its provision for income taxes in the period such resolution occurs. Although the timing of resolution, settlement, and closure of audits is not certain, it is reasonably possible that certain U.S. federal and non-U.S. tax audits may be concluded within the next 12 months, which could increase or decrease the balance of the Company's gross unrecognized tax benefits. The Company does not expect a significant change in the amount of unrecognized tax benefits within the next 12 months. If all of the Company's unrecognized tax benefits as of December 29, 2018 were to become recognizable in the future, it would record a $7.4 million benefit, inclusive of interest, to the income tax provision.

**17.    Industry Segment, Geographic Information and Significant Customers**

The Company operates as one operating segment. The Company's consumer robots products are offered to consumers through distributor and retail sales channels, as well as its on-line stores.

*Geographic Information*

For the fiscal years ended December 29, 2018, December 30, 2017 and December 31, 2016, sales to non-U.S. customers accounted for 48.7%, 48.8% and 51.2% of total revenue, respectively.

*Significant Customers*

For the fiscal years ended December 29, 2018 and December 30, 2017, the Company generated 17.3% and 13.5% of total revenue from one of its retailers (Amazon), respectively. For the fiscal year ended December 31, 2016, the Company generated 12.9%, 12.3% and 10.4% of total revenue from its distributor in Japan ("SODC"), a network of affiliated European distributors ("Robopolis") and Amazon, respectively. On April 3, 2017, the Company acquired the iRobot-related distribution business of SODC, and on October 2, 2017, the Company acquired Robopolis (see Note 4).

66

Table of Contents

**iROBOT CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

18.    **Quarterly Information (Unaudited)**

The following information has been derived from unaudited consolidated financial statements that, in the opinion of management, include all recurring adjustments necessary for a fair statement of such information (in thousands, except per share amounts):

| | Fiscal Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 29, 2018 | September 29, 2018 | June 30, 2018 | March 31, 2018 | December 30, 2017 | September 30, 2017 | July 1, 2017 | April 1, 2017 |
| Revenue | $ 384,665 | $ 264,534 | $ 226,317 | $ 217,068 | $ 326,897 | $ 205,399 | $ 183,148 | $ 168,467 |
| Gross profit | 186,511 | 135,206 | 117,926 | 115,785 | 153,542 | 102,383 | 89,891 | 87,343 |
| Net income | 25,191 | 31,929 | 10,471 | 20,401 | 4,620 | 22,082 | 7,903 | 16,359 |
| Diluted earnings per share | $ 0.88 | $ 1.12 | $ 0.37 | $ 0.71 | $ 0.16 | $ 0.76 | $ 0.27 | $ 0.58 |

67

Table of Contents

**ITEM 9.**    *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

None.

**ITEM 9A.** *CONTROLS AND PROCEDURES*

**Evaluation of disclosure controls and procedures.**

As required by Rule 13a-15(b) under the Exchange Act, we have carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer (CEO) and our Chief Financial Officer (CFO), of the effectiveness, as of the end of the period covered by this report, of the design and operation of our "disclosure controls and procedures" as defined in Rule 13a-15(e) promulgated by the SEC under the Exchange Act. Based upon that evaluation, our CEO and our CFO concluded that our disclosure controls and procedures, as of the end of such period, were adequate and effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information was accumulated and communicated to management, as appropriate, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of management, including our principal executive and financial officers, we assessed the Company's internal control over financial reporting as of December 29, 2018, based on criteria for effective internal control over financial reporting established in *Internal Control - Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management concluded that the Company maintained effective internal control over financial reporting as of December 29, 2018 based on the specified criteria.

The effectiveness of the Company's internal control over financial reporting as of December 29, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

**Changes in Internal Control Over Financial Reporting**

During the quarter ended December 29, 2018, we have fully extended our oversight and monitoring processes that support our internal control over financial reporting to include entities acquired in the Robopolis SAS acquisition that were exempt in the prior year. There has been no other change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

68

Table of Contents

**ITEM 9B.** *OTHER INFORMATION*

*10b51-1 Trading Plans*

Our policy governing transactions in our securities by our directors, officers, and employees permits our officers, directors, funds affiliated with our directors, and certain other persons to enter into trading plans complying with Rule 10b5-l under the Securities Exchange Act of 1934, as amended. We have been advised that certain of our officers and directors (including Colin Angle, Chief Executive Officer, Russell Campanello, EVP, Human Resources and Corporate Communications, Christian Cerda, Chief Operating Officer, as well as Mohamad Ali, Deborah Ellinger, Andrew Miller and Michelle Stacy, each a director) of the Company have entered into trading plans (each a "Plan" and collectively, the "Plans") covering periods after the date of this Annual Report on Form 10-K in accordance with Rule 10b5-l and our policy governing transactions in our securities. Generally, under these trading plans, the individual relinquishes control over the transactions once the trading plan is put into place. Accordingly, sales under these plans may occur at any time, including possibly before, simultaneously with, or immediately after significant events involving our company.

We anticipate that, as permitted by Rule 10b5-l and our policy governing transactions in our securities, some or all of our officers, directors and employees may establish trading plans in the future. We intend to disclose the names of our executive officers and directors who establish a trading plan in compliance with Rule 10b5-l and the requirements of our policy governing transactions in our securities in our future quarterly and annual reports on Form 10-Q and 10-K filed with the Securities and Exchange Commission. We, however, undertake no obligation to update or revise the information provided herein, including for revision or termination of an established trading plan, other than in such quarterly and annual reports.

## PART III

**ITEM 10.** *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 29, 2018.

**ITEM 11.** *EXECUTIVE COMPENSATION*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 29, 2018.

**ITEM 12.**    *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 29, 2018.

**ITEM 13.** *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 29, 2018.

**ITEM 14.** *PRINCIPAL ACCOUNTING FEES AND SERVICES*

The information required under this item is incorporated herein by reference to the Company's definitive proxy statement pursuant to Regulation 14A, which proxy statement will be filed with the Securities and Exchange Commission not later than 120 days after the close of the Company's fiscal year ended December 29, 2018.

Table of Contents

**PART IV**

**ITEM 15.** *EXHIBITS, FINANCIAL STATEMENT SCHEDULES*

**(a)** The following are filed as part of this Annual Report on Form 10-K:

**1.**     **Financial Statements**

The following consolidated financial statements are included in Item 8:

Report of Independent Registered Public Accounting Firm

Consolidated Balance Sheets at December 29, 2018 and December 30, 2017

Consolidated Statements of Income for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016

Consolidated Statements of Comprehensive Income for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016

Consolidated Statements of Stockholders' Equity for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016

Consolidated Statements of Cash Flows for the Years ended December 29, 2018, December 30, 2017 and December 31, 2016

Notes to Consolidated Financial Statements

**2.**     **Financial Statement Schedules**

        All other schedules have been omitted since the required information is not present, or not present in amounts sufficient to require submission of the schedule, or because the information required is included in the consolidated financial statements or the Notes thereto.

**3.**     **Exhibits - See item 15(b) of this report below**

**(b)**          **Exhibits**

    The following exhibits are filed as part of and incorporated by reference into this Annual Report:

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Asset Purchase Agreement, dated as of February 2, 2016, by and between the Registrant and iRobot Defense Holdings, Inc. (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on February 4, 2016 and incorporated by reference herein) |
| 2.2 | Share Purchase Agreement, dated as of July 25, 2017, by and among the Registrant, iRobot UK Ltd., Robopolis SAS, the shareholders of Robopolis SAS named therein, and the Shareholders' Representative named therein (filed as Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on July 26, 2017 and incorporated by reference herein) |
| 3.1(1) | Form of Second Amended and Restated Certificate of Incorporation of the Registrant dated November 15, 2005 |
| 3.2 | Amended and Restated By-laws of the Registrant (filed as Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on March 9, 2016 and incorporated by reference herein) |
| 4.1(1) | Specimen Stock Certificate for shares of the Registrant's Common Stock |
| 10.1†(1) | Form of Indemnification Agreement between the Registrant and its Directors and Executive Officers |
| 10.2† | Form of Executive Agreement between the Registrant and certain executive officers of the Registrant, as amended (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended October 2, 2010 and incorporated by reference herein) |
| 10.3†(1) | Employment Agreement between the Registrant and Colin Angle, dated as of January 1, 1997 |
| 10.4† | 2005 Stock Option and Incentive Plan, as amended, and forms of agreements thereunder (filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 2, 2009 and incorporated by reference herein) |
| 10.5† | Non-Employee Directors' Deferred Compensation Program, as amended (filed as Exhibit 10.19 to the Registrant's Annual Report on Form 10-K for the year ended December 29, 2007 and incorporated by reference herein) |

Table of Contents

| 10.6 | Lease Agreement between the Registrant and Boston Properties Limited Partnership for premises located at 4-18 Crosby Drive, Bedford, Massachusetts, dated as of February 22, 2007 (as amended to date) (filed as Exhibit 10.6 to the Registrant's Annual Report on Form 10-K for the year ended December 30, 2017 and incorporated by reference herein) |
|---|---|
| 10.7† | Senior Executive Incentive Compensation Plan (filed as Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 2, 2011 and incorporated by reference herein) |
| 10.8† | Form of Deferred Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.9† | Form of Restricted Stock Award Agreement under the 2005 Stock Option and Incentive Plan (filed as Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 28, 2008 and incorporated by reference herein) |
| 10.10# | Manufacturing Services Agreement between the Registrant and Jabil Circuit, Inc., dated as of March 18, 2010 (as amended to date) (filed as Exhibit 10.10 to the Registrant's Annual Report on Form 10-K for the year ended December 30, 2017 and incorporated by reference herein) |
| 10.11 | Amended and Restated Credit Agreement between the Registrant and Bank of America N.A., dated December 20, 2013 (filed as Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.12 | First Amendment to Amended and Restated Credit Agreement between the Registrant and Bank of America N.A., dated June 29, 2018 (filed as Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on July 5, 2018 and incorporated by reference herein) |
| 10.13 | Amended and Restated Reimbursement Agreement between the Registrant and Bank of America N.A., dated December 20, 2013 (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 28, 2013 and incorporated by reference herein) |
| 10.14 | First Amendment to Amended and Restated Reimbursement Agreement between the Registrant and Bank of America N.A., dated June 29, 2018 (filed as Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on July 5, 2018 and incorporated by reference herein) |
| 10.15#* | Manufacturing Services Agreement between the Registrant and Kin Yat Industrial Company Limited, dated as of January 22, 2014 (as amended to date) |
| 10.16† | Evolution Robotics, Inc. 2007 Stock Plan and forms of agreements thereunder (filed as Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2014 and incorporated by reference herein) |
| 10.17† | 2015 Stock Option and Incentive Plan and forms of agreements thereunder (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 27, 2015 and incorporated by reference herein) |
| 10.18† | Form of Performance-Based Restricted Stock Unit Award Agreement under the 2015 Stock Option Incentive Plan (filed as Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended April 2, 2016 and incorporated by reference herein) |
| 10.19† | iRobot Corporation 2017 Employee Stock Purchase Plan (filed as Exhibit 10.18 to the Registrant's Annual Report on Form 10-K for the year ended December 30, 2017 and incorporated by reference herein) |
| 10.20† | iRobot Corporation 2018 Stock Option and Incentive Plan (filed as exhibit 99.1 to the Registrant's Registration Statement on Form S-8 filed on June 7, 2018 (File No. 333-225482) and incorporated by reference herein) |
| 21.1* | Subsidiaries of the Registrant |
| 23.1* | Consent of PricewaterhouseCoopers LLP |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this report on Form 10-K) |
| 31.1* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 31.2* | Certification Pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 |
| 32.1** | Certification Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101* | The following materials from the Registrant's Annual Report on Form 10-K for the year ended December 29, 2018 formatted in XBRL (eXtensible Business Reporting Language): (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Income, (iii) the Consolidated Statements of Comprehensive Income, (iv) the Consolidated Statements of Stockholders' Equity, (v) the Consolidated Statements of Cash Flows, and (vi) related notes to these financial statements |

†      Indicates a management contract or any compensatory plan, contract or arrangement.

71

Table of Contents

\#        Confidential treatment requested for portions of this document.

(1)       Incorporated by reference herein to the exhibits to the Company's Registration Statement on Form S-1 (File No. 333-126907)

\*        Filed herewith

\*\*      Furnished herewith

Table of Contents

Table of Contents

**ITEM 16.** *FORM 10-K SUMMARY*

Not applicable.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

iROBOT CORPORATION

By:    /s/ Colin M. Angle
_____
Colin M. Angle
Chairman of the Board,
Chief Executive Officer and Director

Date: February 14, 2019

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Colin M. Angle and Alison Dean, jointly and severally, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report on Form 10-K has been signed by the following persons in the capacities indicated on February 14, 2019.

| Signature | Title(s) |
|---|---|
| /s/ COLIN M. ANGLE<br>Colin M. Angle | Chairman of the Board, Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ ALISON DEAN<br>Alison Dean | Executive Vice President, Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) |
| /s/ MOHAMAD ALI<br>Mohamad Ali | Director |
| /s/ MICHAEL BELL<br>Michael Bell | Director |
| /s/ DEBORAH G. ELLINGER<br>Deborah G. Ellinger | Director |
| /s/ ELISHA FINNEY<br>Elisha Finney | Director |
| /s/ RUEY-BIN KAO<br>Ruey-Bin Kao | Director |

Table of Contents

/s/ ANDREW MILLER                                                          Director

Andrew Miller


/s/ MICHELLE V. STACY                                                     Director

Michelle V. Stacy


75

**Exhibit 10.15**

**MANUFACTURING SERVICES AGREEMENT**

**between**

**KIN YAT INDUSTRIAL COMPANY LIMITED**

**and**

**IROBOT CORPORATION**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

## MANUFACTURING SERVICES AGREEMENT

This Non-Exclusive Manufacturing Agreement (this "**Agreement**") is entered into by and between Kin Yat Industrial Company Limited, ("**Kin Yat**"), having offices at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong, and iRobot Corporation, a Delaware corporation **("iRobot")**, having its principal place of business at 8 Crosby Drive, Bedford, MA 01730. Kin Yat and iRobot are referred to herein as "**Party**" or "**Parties**".

### RECITALS

**A.** Kin Yat is in the business of providing sophisticated manufacturing services that are unique in kind and quality, including designing, developing, manufacturing, testing, configuring, assembling, packaging and shipping highly specialized electronic assemblies and systems.

**B.** iRobot is in the business of designing, developing, distributing, marketing and selling products containing highly specialized electronic assemblies and systems.

**C.** Whereas, the Parties desire that Kin Yat manufactures, tests, configures, assembles, packages and/or ships certain electronic assemblies and systems pursuant to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### TERMS

1    **Definitions.** In addition to terms defined elsewhere in this Agreement, the capitalized terms set forth below shall have the following meaning:

1.1 **"Additional Services"** means services such as, design for manufacturability, manufacturing design test support, computer assisted design for manufacturability, test development services, volume production and advanced packaging technologies all as specified and approved by iRobot and agreed to by Kin Yat.

1.2 **"Affiliate"** means with respect to a Person, any other Person which directly or indirectly controls, or is controlled by, or is under common control with, the specified Person. For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, 50% or more of the outstanding shares of any class of capital stock of such Person (or in the case of a Person that is not a corporation, 50% or more of any class of equity interest).

1.3 **"Assigned Components"** means the components or materials specifically identified in Schedule 1 as "assigned" and for which iRobot has identified the applicable supplier from whom Kin Yat is authorized to source such component or material for incorporation into the Product.

1.4 **"AVL"** means the confidential list of Suppliers Designated by iRobot from which Kin Yat is authorized to purchase the applicable Assigned Components and Generic Components, if any for use in the manufacture of Products.

1.5 **"Class Failure" "Class Failure"** means a defect caused by (i) Kin Yat's failure to manufacture the Product to conform to the Specifications or other requirements in this Agreement, or (ii) the failure of Kin Yat to comply with any applicable law, rule, regulation, court order or decree that is applicable to Kin Yat's performance of its obligations set forth in this Agreement, or (iii) the gross negligence or willful misconduct of Kin Yat's personnel performing Manufacturing Services for iRobot under this Agreement; wherein, such defect occurs in more than [***], attributable to the same root cause, of the total number of a particular Product (as identified by the applicable Product serial numbers) supplied under this Agreement over a rolling [***] period within the Warranty Period.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.6 **Kin Yat** shall be defined to include any Kin Yat Subsidiary. (if applicable).

1.7 **"Commercially Reasonable Efforts"** means those efforts that would be deemed both commercially practicable and reasonably financially prudent after having taken into account all relevant commercial considerations. **"Relevant commercial considerations"** shall be deemed to include, without limitation, (1) all pertinent facts and circumstances; (2) financial costs; (3) resource availability and impact; (4) probability of success; and (5) other commercial practicalities.

1.8 **"Components"** means those Assigned Components, Generic Components, and Consigned Components.

1.9 **"Consigned Components"** means those components or materials specifically identified in Schedule 1 as "consigned" and provided by or on behalf of iRobot to Kin Yat for assembly into Products.

1.10 **"Defect"** means Product that does not conform to Specifications within the warranty Period, resulting from, but not limited to, non-conforming Components, materials, processes, packaging, and transportation.

1.11 **"EDI"** shall mean electronic data interchange.

1.12 **"Effective Date"** shall mean the date upon which the terms and conditions of this Agreement shall become effective by and between the Parties. The Parties have agreed that the Effective Date of this Agreement shall be **September 23, 2013**.

1.13 **"Encumbrance"** means any encumbrance, lien, charge, hypothecation, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, right of set-off, any matter capable of registration against title, option, right of pre-emption, privilege or any contract to create any of the foregoing.

1.14 **"Fee and Price Schedule"** shall mean the prices and fees set forth in Schedule 2 for the applicable Product identified therein, and any future Fee and Price Schedule for new Product as added in writing from time to time upon mutual agreement of the Parties.

1.15 **"FCA"** means that Kin Yat must at its own expense and risk deliver the Product cleared for export into the custody of the designated carrier at the applicable Port of Origin.

1.16 **"Generic Components"** means the components or materials identified in Schedule 1 for incorporation into the Product and for which iRobot has not identified any specific supplier or source from whom Kin Yat is authorized to source such component or material.

1.17 **"including"** shall be defined to have the meaning "including, without limitation."

1.18 **"in writing"** shall mean written documents, EDI with phone confirmation, verified faxes and successfully transmitted e-mails.

1.19 **"Intellectual Property"** means any and all intellectual property and tangible embodiments thereof, including without limitation inventions, discoveries, designs, specifications, developments, methods, modifications, improvements, processes, know-how, show-how, techniques, algorithms, databases, computer software and code (including software and firmware listings, assemblers, applets, compilers, source code, object code, net lists, design tools, user interfaces, application programming interfaces, protocols, formats, documentation, annotations, comments, data, data structures, databases, data collections, system build software and instructions), mask works, formulae, techniques, supplier and customer lists, trade secrets, graphics or images, text, audio or visual works, materials that

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

2

document design or design processes, or that document research or testing, schematics, diagrams, product specifications and other works of authorship.

1.20 **"Intellectual Property - KIN YAT"** shall mean both Intellectual Property - Created by Kin Yat and Intellectual Property - Existing by Kin Yat, collectively.

1.21 **"Intellectual Property - Created by Kin Yat"** means any improvements to the Technical Manufacturing Information - KIN YAT that are newly created or developed, and reduced to practice by Kin Yat in (i) preparing any Product provided pursuant to this Agreement, or (ii) performing the Manufacturing Services or any other work provided pursuant to this Agreement; but shall not include any Intellectual Property - Existing by Kin Yat.

1.22 **"Intellectual Property - Existing by "Kin Yat"** means any Intellectual Property, including the Technical Manufacturing Information - KIN YAT, created or developed by Kin Yat outside the scope of this Agreement during the Term or owned or controlled by Kin Yat prior to the execution of this Agreement; and all improvements, modifications or enhancements to the foregoing made by or on behalf of Kin Yat.

1.23 **"Intellectual Property Rights"** means, collectively, all rights in, to and under patents, trade secret rights, copyrights, trademarks, service marks, trade dress and similar rights of any type under the laws of any governmental authority, including without limitation, all applications and registrations relating to the foregoing.

1.24 **"iRobot Intellectual Property"** means all Intellectual Property, tangible embodiments thereof and all other materials provided or made available to Kin Yat by iRobot, including, without limitation the Specifications.

1.25 **"iRobot Property"** means all property, including all Product and Consigned Components, other Components paid for my iRobot, inventories, work in process (WIP), Loaned Equipment, Specifications, test equipment, software and documentation, and support maintenance or design documentation, furnished to Kin Yat by iRobot or otherwise paid for by iRobot in connection with this Agreement for Kin Yat's use in performing its obligations hereunder.

1.26 **"iRobot Quarter End"** means iRobot's fiscal calendar which follows the 4-4-5 week format identified in Schedule 6, which Schedule shall be updated by iRobot on an annual basis on or before December 1st.

1.27 **"Lead-time"** means the mutually agreed upon minimum amount of time in advance of shipment that Kin Yat must receive a Purchase Order in order to deliver Product by the requested delivery date.

1.28 **"Loaned Equipment"** means capital equipment (including tools) which is loaned to Kin Yat by or on behalf of iRobot to be used by Kin Yat to perform the Manufacturing Services and includes all equipment, tools and fixtures purchased specifically for iRobot, by Kin Yat, to perform the Manufacturing Services and that are paid for in full by iRobot.

1.29 **"Manufacturing Services"** means the services performed by Kin Yat hereunder which shall include but not be limited to manufacturing, testing, configuring, assembling, packaging and/or shipping of the Product, and all Reasonable and Customary Support Services, and any Additional Services, all in accordance with the Specifications.

1.30 **"Marks"** means trademarks, service marks, trademark and service mark applications, trade dress, trade names, logos, insignia, symbols, designs or other marks identifying a Party or its products.

1.31 **"Materials Declaration Requirements"** means any requirements, obligations, standards, duties or responsibilities pursuant to any environmental, product composition and/or materials declaration laws, directives, or regulations, including international laws and treaties regarding such subject matter; and any regulations, interpretive guidance or enforcement policies related to any of the foregoing, including, but not limited to, the following examples: Directive 2002/95/EC of the European Parliament and of the Council of 27 January 2003 on the restriction of the use

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3

of certain hazardous substances in electrical and electronic equipment ("RoHS"), Directive 2002/96/EC of the European Parliament and of the Council of 27 January 2003 on waste electrical and electronic equipment ("WEEE"), and European Union Member State implementations of the foregoing; the People's Republic of China (PRC) Measures for the Administration of the Control of Pollution by Electronic Information Products (China RoHS) (电子信息产品污染控制管理办法) promulgated on February 28, 2006 (including any pre-market certification ("CCC mark") requirements thereunder and including relevant standards adopted by the PRC Ministry of Information Industry or other applicable PRC authority); PRC General Administration of Quality Supervision, Inspection and Quarantine's Circular 441 (2006); Japanese Industrial Standard C0950:2005(J-Moss Japan RoSH); the California Electronic Waste Recycling Act of 2003; Act on the Recycling of Electrical and Electronics Equipment and Automobiles (1.1.2008) (Korea RoHS), Waste Act (2004) and secondary legislation (based on EU directives ) (Croatia), Regulation (EC) No 1907/2006, Regulation concerning the Registration, Evaluation, Authorization and Restriction of Chemicals (REACH), establishing a European Chemicals Agency amending Directive 1999/45/EC and repealing Council Regulation (EEC) No 793/93 and Commission Regulation (EC) No 1488/94 as well as Council Directive 76/769/EEC and Commission Directives 91/155/EEC, 93/67/EEC, 93/105/EC and 2000/21/ECand/or other similar legislation. The Materials Declaration Requirements shall include compliance with Brazil RoHS, Mexico RoHS and Argentina RoHS as each of these countries promulgates their own legislation.

1.32 **Conflict Minerals.**

Kin Yat represents and warrants that it is in full compliance with conflict minerals laws, including, without limitation, Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 as it may be amended from time to time and any regulations, rules, decisions or orders relating thereto adopted by the Securities and Exchange Commission or successor governmental agency responsible for adopting regulations relating thereto (collectively, "Dodd-Frank Section 1502"). Kin Yat must cooperate with iRobot to make available to iRobot and/or its agents, material declarations that identify the sources of and amount of all substances contained in the Products. Unless iRobot specifically agrees in writing that a particular Product may contain a particular material, Kin Yat will also provide a statement that the Products do not contain various materials at issue in applicable laws and regulations. Kin Yat must declare each Product's compliance to all applicable hazardous material legislation and identify any substances that are banned or must be declared under applicable laws. In addition, Kin Yat will use Commercially Reasonable Efforts to make available documentation that supports the declaration. Without limiting the generality of the foregoing, Kin Yat agrees to disclose to iRobot, upon iRobot's request, to the extent known or discoverable by Kin Yat following reasonable inquiry, the original source of all minerals contained in the Product. If Kin Yat does not know the original source of the minerals, Kin Yat agrees to cooperate with iRobot, including disclosing from whom Kin Yat purchased the minerals and urging others to disclose such information, so that the original source of minerals can be accurately determined and reported. Kin Yat shall comply with all laws regarding the sourcing of minerals, including, without limitation, laws prohibiting the sourcing of minerals from mines controlled by combatants and Dodd-Frank Section 1502. Without any further consideration, Kin Yat shall provide such further cooperation as iRobot may reasonably require in order to meet any obligations it may have under conflict minerals laws, including, without limitation, under Dodd-Frank Section 1502.

1.33 **"Minimum Volume"** means the minimum volume**,** if any, set forth on Schedule 1 for a particular Product.

1.34 **"Newly Created Intellectual Property"** means, other than the Kin Yat Intellectual Property, any and all Intellectual Property, tangible embodiments thereof and all other materials created, developed, reduced to practice, or otherwise resulting from any work, Manufacturing Services or other services performed by either or both Parties, including, but not limited to, by any of its or their employees, agents or contractors, under this Agreement.

1.35 **"Non-Conforming Product"** means any Product that does not conform to the Specifications.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.36 **"Non-Disclosure Agreement"** means that certain Mutual Non-Disclosure Agreement between the Parties dated August 29, 2006, attached hereto as Schedule 4.

1.37 **"NRE Costs"** shall consist of expenses, excluding the Waived NRE Costs, incurred by Kin Yat under this Agreement, including design engineering services, testing, fixturing and tooling and other out-of-pocket costs, in each case for work performed by Kin Yat for iRobot pursuant to iRobot's prior written consent. For the avoidance of doubt, NRE Costs shall not include any costs or expenses incurred by Kin Yat for any Reasonable and Customary Support Services.

1.38 **"Port of Origin"** means [***] or another port designated by iRobot in writing.

1.39 **"Packaging and Shipping Specifications"** means the packaging and shipping specifications set forth in Schedule 1 and otherwise supplied and/or approved by iRobot.

1.40 **"Person"** means any corporation, business entity, natural person, firm, joint venture, limited or general partnership, limited liability entity, limited liability partnership, trust, unincorporated organization, association, government, or any department or agency of any government.

1.41 **"Product Specifications"** means the technical specifications and requirements provided by iRobot to Kin Yat for the manufacture and supply of Products or the provision of Manufacturing Services, including all manufacturing information, technical data and manuals, design information, drawings, documentation, packaging requirements, testing requirements, Specifications, or any other criteria written and provided to Kin Yat by iRobot, including the Quality and Test Procedures, the Packaging and Shipping Specifications, and the Materials Declaration Requirements.

1.42 **"Products"** means the products manufactured and assembled by Kin Yat on behalf of iRobot under this Agreement as identified in Schedule 1 (or any subsequent Schedule 1 prepared for any product to be manufactured hereunder) including any updates, renewals, modifications or amendments thereto.

1.43 "**Production Start Date**" means the first day immediately following the business week during which Kin Yat manufactures and delivers against the product quantities listed in Schedule 1

1.44 **"Proprietary Information and Technology"** means "Proprietary Information" as defined in the Non-Disclosure Agreement, as amended in Section 16 below.

1.45 **"Reasonable and Customary Support Services"** mean all services and activities related to reporting for iRobot and its customers, root cause analysis, testing, trials, inventory audits and reconciliation, development and delivery of samples, participation and support of any new Product introduction.

1.46 **"Product"** means any and all configurations of the "Product" SKUs manufactured and assembled by Kin Yat on behalf of iRobot under this Agreement as identified in the initial Schedule 1 to this Agreement.

1.47 **"Specifications"** means the technical specifications for manufacturing Products under this Agreement as set forth in Schedule 1, any bill of materials, designs, schematics, assembly drawings, process documentation, test specifications, current revision number, and Approved Vendor List, and other requirements otherwise supplied and/or approved by iRobot.  Specifications may be amended from time to time by amendments in the form of written engineering change orders agreed to by the Parties.

1.48 **"SOW"** means the statement of work for each Product set forth in any Schedule 1 as amended in writing from time to time upon mutual agreement of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

1.49 **"Subsidiary(ies)"** means any corporation, partnership, joint venture, limited liability entity, trust, association or other business entity of which a Party or one or more of its Subsidiaries, owns or controls more than 50% of the voting power for the election of directors, managers, partners, trustees or similar parties.

1.50 **"Suppliers Designated by iRobot"** means suppliers designated, specified and/or approved by iRobot.

1.51 **"Technical Manufacturing Information - KIN YAT"** means the manufacturing information, process and technology used by Kin Yat or third parties under its control to design, develop, test or manufacture the Products including, but not limited to: (i) specifications, software, test software, schematics, drawings, designs, mask works, topography or other materials pertinent to the most current revision level of manufacturing of the Products; (ii) copies of all inspection, manufacturing, test and quality control procedures and any other work processes; (iii) jig, fixture and tooling designs; (iv) Kin Yat general knowledge and information relating to the Products; and (v) support documentation.

1.52 **"Term"** means the Initial Term and each Renewal Term, collectively.

1.53 **"Quality and Test Procedures"** means the testing specifications, quality requirements, standards, procedures and parameters supplied and/or approved by iRobot, including without limitation, the specifications and quality requirements plans for the Product and certain Components attached hereto as Schedule 3.

1.54 **"Waived NRE Costs"** means, collectively, [***].

**2** List of Schedules. This Agreement includes the following Schedules for each Product to be manufactured hereunder, which are hereby incorporated herein and made a part of this Agreement:

Schedule 1 - Statement of Work and Specifications
Schedule 2 - Fee and Price Schedule (Final Kin Yat Quote)
Schedule 3 - Quality and Test Procedures
Schedule 4 - Non-Disclosure Agreement
Schedule 5 - Trademark Usage Guidelines
Schedule 6 - iRobot Quarter End

**3** Manufacturing Services. Kin Yat will manufacture the Product in accordance with the Specifications and any applicable Purchase Order. When requested by iRobot, and subject to appropriate fee and cost adjustments, Kin Yat will provide Additional Services for existing or future Product manufactured by Kin Yat for iRobot. iRobot shall be solely responsible for the sufficiency and adequacy of the Specifications.

3.1 Quality and Test Procedures. All Products manufactured and supplied by Kin Yat shall, at minimum, adhere to this Agreement and the Specifications attached hereto. Kin Yat shall continuously perform the applicable quality tests and procedures and monitor such compliance at all times, including during the preparation for production as well as during production. In addition to the minimum required tests specified, Kin Yat shall employ its own internal quality system and apply the necessary tools, processes and procedures to ensure that the contracted Product covered by this Agreement complies with the Specifications. This may include, but not be limited to, process control for parts and assemblies, incoming inspection of fabricated or sourced parts, final inspections, subassembly inspections and testing, etc. iRobot shall be solely responsible for the sufficiency and adequacy of the Specifications. Kin Yat is responsible for designing and/or purchasing and maintaining all necessary test and fixture equipment to conduct such testing and procedures. Kin Yat is responsible for worker's training, worker's instructions, preventive and/or on-conditional (as needed) maintenance plans, and calibration plans.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.2 <u>Packaging and Shipping.</u> Kin Yat will package and ship the Product in accordance with the Packaging and Shipping Specifications. iRobot shall be solely responsible for the sufficiency and adequacy of the Packaging and Shipping Specifications. In the event Kin Yat fails to comply with the Packaging and Shipping Specifications, Kin Yat will reimburse iRobot for the cost of rework to the extent that such error can be rectified with rework.

3.3 <u>Items to be Supplied by iRobot</u>. iRobot shall supply to Kin Yat, according to the terms and conditions specified herein, iRobot Proprietary Information and Technology and, if applicable, the Loaned Equipment if any, and Consigned Components pursuant to Section 12.1. iRobot will also provide to Kin Yat all Specifications, Quality and Test Procedures, Packaging and Shipping Specifications, Product design drawings, approved vendor listings where applicable, material component descriptions (including approved substitutions), manufacturing process requirements, and any other specifications necessary for Kin Yat to perform the Manufacturing Services. iRobot shall be solely responsible for delay in delivery, defects and enforcement of warranties related to the Consigned Components.

3.4 <u>Items to be Supplied by Kin Yat</u>. Kin Yat will employ the Kin Yat Manufacturing Process, the Reasonable and Customary Support Services, any required manufacturing technology, manufacturing capacity, labor, manufacturing and quality related fixtures, design services in support of manufacturing process (to include fixture design), transportation logistics (as required by FCA Port of Origin), systems and facilities necessary for Kin Yat to perform the Manufacturing Services. It is expected that engineering support (at Kin Yat's expense) of product, packaging and process improvements will continue for the life of the Product, even after all requirements are met. Tooling that is designed and fabricated specific to manufacture, assembly, inspection or testing of iRobot Product is the sole property of iRobot, including related design documentation

3.5 <u>Facilities Access</u>. iRobot shall have the right, during normal business hours by appointment and at its expense to inspect, review, monitor and oversee the Manufacturing Services, provided that such inspection shall not disrupt Kin Yat's normal business operations. iRobot shall cause each of its employees, agents and representatives who have access to Kin Yat's facilities, to maintain, preserve and protect all Proprietary Information and Technology of Kin Yat and the confidential or proprietary information and technology of Kin Yat's other customers in accordance with the Non-Disclosure Agreement. iRobot shall further have the right to bring iRobot's customers to Kin Yat's facility, by appointment and under the same obligations to Kin Yat surrounding protection of Kin Yat's Proprietary Information and Technology and Kin Yat's customers' confidential or proprietary information and technology. iRobot's employees have the right to obtain relevant artifacts (such as reports, process tracking charts etc.) and take photographs and videos of iRobot related Products, Components, manufacturing processes, tests, fixtures, tools or items at any time during the inspection with the consent of Kin Yat whose consent shall not be unreasonably withheld.

3.6 <u>Materials Procurement</u>.

3.6.1 Kin Yat will use Commercially Reasonable Efforts to procure Assigned Components and Generic Components from the applicable designated supplier per iRobot's AVL, where applicable, and otherwise from suppliers chosen by Kin Yat and approved by iRobot, in amounts necessary to fulfill Purchase Orders against the Forecasts. Kin Yat will be responsible for the quality inspection of all Components (except for the Consigned Components) and all other parts and adherence to the Product Specifications in the assembly and manufacturing process. iRobot will be responsible for the part functionality set forth in the iRobot Specifications. Kin Yat is responsible for managing, and the performance of, the suppliers of the Assigned Components and Generic Components, including but not limited to purchasing, component inventory control, customs paperwork and Value Added Tax (VAT), and is ultimately responsible for verifying that all Components conform to the Product Specifications. iRobot will be responsible for managing the pipeline of iRobot controlled Consigned Components. Kin Yat will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Kin Yat. Kin Yat shall use Commercially Reasonable Efforts to obtain terms and conditions that from all suppliers that allow return privileges for Generic Components (subject to agreed upon reasonable minimum order quantities). iRobot may authorize Kin Yat to procure Generic Components and Assigned Components necessary, without a Purchase

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Order, by issuing a written authorization to purchase such Components ("**Material Authorization**"), to meet specific Forecast or Purchase Order demand. In the event of schedule changes, Kin Yat shall use Commercially Reasonable Efforts to cancel all applicable material and parts purchase orders and reduce material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. iRobot shall be responsible for all liability for materials and parts Kin Yat cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Kin Yat acting on iRobot's Material Authorization or Purchase Order. Kin Yat's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components (except for the Consigned Components not controlled by Kin Yat) regardless of classification.

3.6.2 <u>End of Life Component Reporting</u>. Kin Yat is responsible for continuous monitoring of the AVL for end-of-life component condition. Kin Yat is responsible for periodic reporting, no less frequently than [***] of the market condition for each component of any currently in production by iRobot's product AVL.

3.6.3 <u>Long-Lead Components</u>. Kin Yat shall not purchase any Component designated in Schedule 2 as a "long lead" Component by iRobot without a Material Authorization. Kin Yat shall use Commercially Reasonable Efforts to continuously improve lead time for all Components. With iRobot's prior written consent, Kin Yat may pre-purchase Generic Components and Assigned Components, or pre-build sub assemblies, modules, core robots or even completed SKU quantities in order to meet Forecast volumes, or anticipated volumes under Purchase Orders.

3.6.4 <u>Exclusive Components</u>. With respect to any Assigned Components or Consigned Components (controlled by Kin Yat) that have been customized by a supplier or manufacturer specifically for any iRobot Product, Kin Yat shall require each such supplier not to sell or supply such custom Component to any other Person.

3.7 <u>Materials Declaration</u>.

3.7.1 iRobot shall notify Kin Yat in writing of the specific Materials Declaration Requirements that iRobot determines to be applicable to the Products and shall be solely liable for the adequacy and sufficiency of such determination and information. Kin Yat shall be responsible for collecting, and having available at all times, all third party supplier's documentation certifying compliance with such Materials Declaration Requirements with respect to any and all components, parts or material used in connection with the Manufacturing Services under this Agreement. Kin Yat shall utilize its supplier qualification process to ensure that each supplier, its Components and its documentation are trustworthy and in compliance with all such Materials Declaration Requirements. Upon written request of iRobot, Kin Yat shall provide to iRobot copies of such documents, including any compliance certificates.

3.7.2 Without limiting the foregoing Section 3.7.1, Kin Yat shall ensure that it has enforceable agreements with each of its suppliers under this Agreement, excluding suppliers of Consigned Components, so that Kin Yat may fulfill Kin Yat's obligations under this Section 3.7.1 and that iRobot is an intended third party beneficiary under such agreements.

3.8 <u>Product Evaluation.</u> Acceptance of the Product will occur upon iRobot's or its designee's receipt of the Product. Notwithstanding the foregoing, iRobot reserves the right to inspect or evaluate the Product to determine if it conforms, in all material respects, to the Specifications, either at Kin Yat's premise or third party location. Given reasonable and adequate advance notification to Kin Yat and by appointment, iRobot may, at its discretion, perform inspections of the Product at random or on a continual basis, on site at Kin Yat's premises. In the event that the Product does not meet the Specifications, such Product will be deemed Non-Conforming and iRobot will have all available remedies with respect to Non-Conforming Products as set forth in this Agreement. Acceptance, inspection or evaluation by iRobot does not relieve Kin Yat of its obligations to the services and warranties as set forth in this Agreement.

3.9 <u>Purchase Order Performance</u>.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.9.1 Kin Yat shall fill and deliver the Products purchased under a Purchase Order by the due date specified on such Purchase Order. Purchase Orders to Kin Yat will be launched at lead-times mutually agreed between Kin Yat and iRobot in advance of issuance of Purchase Orders.

3.9.2 Kin Yat agrees that time is of the essence with respect to all deliveries and performance. If Kin Yat fails to timely perform or deliver within [***] of the delivery requirements of any standalone Purchase Order from iRobot, for reasons under Kin Yat's direct control, Kin Yat is liable to iRobot for all direct, reasonable costs incurred as a result of such delay including expediting costs. In the event of a delay, Kin Yat shall use Commercially Reasonable Efforts to expedite delayed Products and/or performance, shall pay all reasonable expediting costs, including expedited delivery costs.

3.9.3 For purposes of this Agreement, "**On-time**" delivery means: delivery of 100% of the Products purchased under a Purchase Order are delivered by the due date indicated on iRobot's Purchase Order for such Products minus [***], plus [***]. Kin Yat will monitor and report to iRobot monthly "On-time" delivery per Purchase Order, and such report shall include the number of Purchase Orders placed by iRobot within the Lead Time versus number of Purchase Orders delivered On-time.

3.10 <u>Assigned and Consigned Components</u>.

3.10.1 iRobot may elect to assign a specific supplier and part number for any component or material, including for example; rechargeable batteries, battery chargers, masked IC components, motors, packaging material, and gears. In such case, Kin Yat shall source such Assigned Components from the applicable supplier and implement supply optimization inventory practices. Kin Yat will be responsible for all purchasing, quality control, component inventory control, [***] inventory management, customs paperwork and VAT for all Assigned and Generic Components. Kin Yat shall handle all Components as required by the Product Specification and as otherwise instructed by iRobot, and shall be responsible for any and all expenses related to its compliance with such material handling requirements. In the event that iRobot elects to transfer to Kin Yat the purchasing responsibility for any Consigned Component, Kin Yat shall assume such responsibility as soon as reasonably practicable. The Parties will work in good faith to identify and implement all reasonable measures to allow for Kin Yat to assume such purchasing responsibility for such Consigned Component. Except for any Consigned Components controlled by Kin Yat pursuant to this Section 3.10.1, iRobot shall be solely responsible for delay in delivery, defects and enforcement of warranties related to all Consigned Components.

3.10.2 Kin Yat will segregate, conspicuously identify and safeguard all iRobot owned and Consigned Components in such fashion to clearly identify the Consigned Components as the property of iRobot. Kin Yat shall maintain all Components, at its own expense, in efficient working order and good repair, and otherwise in accordance with the Product Specifications.

3.10.3 Upon placement of Consigned Components into Kin Yat's facility, title and possession of the materials shall transfer to iRobot as if it were an actual shipment of Product to iRobot. Insurance covering the Consigned Components will be the responsibility of iRobot. Such insurance includes a waiver of subrogation against Kin Yat. Kin Yat shall hold inventory on consignment for support of iRobot's Products and business at levels mutually agreed upon by iRobot and Kin Yat, but no less than an amount to satisfy Purchase Orders against the current Forecasts. Kin Yat will at all times utilize [***] inventory management for all Consigned Components. In the event that Kin Yat's failure to utilize [***] inventory management for all Consigned Components results in any such Component remaining in Kin Yat's inventory for more than [***], then Kin Yat shall, at its own expense, coordinate with the applicable supplier for the return and replacement of such Components for new or properly updated Components. If "iRobot" does not place Purchase Orders that consume Consigned Components consistent with applicable Forecast, the Parties will negotiate in good faith the disposition of Consigned Components held by Kin Yat. Kin Yat shall provide to iRobot upon request an accounting of all Consigned Components and all other Components, Products and materials of iRobot at Kin Yat's premises or otherwise under Kin Yat's control with reasonable details.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

3.10.4 <u>Sales of Products and Components</u>. Without iRobot's prior written consent, Kin Yat shall not, directly or indirectly, sell, supply or otherwise transfer any Product or Component to any Person other than iRobot or iRobot's designated customer or distributor.

**4 Quality**

4.1 <u>Governing Quality documents</u>.

4.1.1 <u>General Quality Requirements</u>. Kin Yat shall comply with the requirements stated therein for defining general iRobot supplier quality performance.

4.1.2 <u>Production Line Test Specification (PLTS)</u>. The PLTS is provided to Kin Yat by iRobot in order for Kin Yat to establish a production line test process to verify and to demonstrate that the contracted product has been assembled and minimally tested to meet the product requirements as defined in the relevant product specifications

4.1.3 <u>Design Validation Test Specification (DVTS)</u>. Suppliers who provide design services to iRobot shall demonstrate that the contracted product has been designed and qualification tested according to the DVTS to meet the performance requirements of its intended application as defined in the relevant product specifications.

4.2 Quality Management System. Kin Yat shall maintain a Quality System that is certified to an internationally recognized quality management system standard, such as ISO 9001 or equivalent.

4.3 Engineering Changes. Kin Yat shall not make any changes to product or design without receiving prior written approval from iRobot for the change request and for implementation of the change into production.

4.4. Manufacturing Changes. Kin Yat shall not make any changes to the manufacturing process that may affect the product form, fit, function or safety without receiving prior written approval from iRobot.

4.5 Defects. Defects in product resulting in failure to meet iRobot product specifications, due to inadequate assembly procedures and production verification testing are the responsibility of the Kin Yat regardless of whether the defect occurred during manufacturing or after iRobot acceptance.

4.6 Corrective Action. In the event that defects are produced, Kin Yat shall notify iRobot and implement containment activities to prevent further defective product from affecting iRobot supply chain. For defective product within Kin Yat's supply chain, Kin Yat shall make necessary arrangements, at its sole expense, to screen, rework and / or replace. Kin Yat shall supply to iRobot a written corrective action plan of its root cause(s) investigation and actions to prevent recurrence of identified root cause(s)

4.7 <u>Quality Control Plan (QCP)</u>. Kin Yat shall develop a Quality Control Plan (QCP), approved by iRobot, to define the necessary process controls and production testing and inspection methods to ensure the fabrication and assembly processes deliver products that meet the Specifications supplied by iRobot.

4.8 <u>Subcontractor Qualification</u>. Kin Yat shall be responsible for qualifying all subcontractors of all Assigned Components and Generic Components pursuant to Kin Yat's existing qualification methodology and process.

4.9 <u>Serial Number identification and traceability</u>. Kin Yat shall identify each unit of the contracted product produced with a unique identifier number. This serial number shall provide information relevant to the date of production, shift, line, and traceability to critical component lots/batches and processes. The format of this serial number shall be agreed upon between Kin Yat and iRobot prior to commencement of production.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

4.10 <u>Certifications</u>. Regulatory compliance certifications are required as a condition for the production, shipment, sale, and disposal of all iRobot products, and as such, iRobot is obligated to maintain a commitment to meeting all regulatory compliance requirements. As a condition of the compliance certification process, the Products and Kin Yat's manufacturing facility shall be subject to periodic audits and certification testing. Kin Yat shall provide objective evidence that it meets such requirements pertaining to all regulatory, quality, and compliance requirements and will provide such information upon request from iRobot. Objective evidence shall include, but is not limited to, existing certification documents and certification inspection reports from Kin Yat and each of its suppliers.

4.10.1 <u>Product Specific Certifications</u>. iRobot is responsible for maintaining all existing product certifications. Kin Yat shall comply, and shall cause its suppliers to comply, with any and all Product specific, certification-related requirements such as: informing iRobot of the source and manufacturing part number of every Component and validation that Kin Yat's processes are compliant to such certification requirements. Kin Yat shall support all recertification requirements for all Product certifications. All Product licenses and Product certifications shall be in iRobot's name. In the event that iRobot requires Product changes which result in Product recertification, iRobot will bear any licensing and external testing fees for all such Product certifications. In the event that Kin Yat requires Product changes which result in Product recertification, Kin Yat will notify iRobot immediately and bear any licensing and external testing fees for all product certifications.

4.10.2 <u>Manufacturing Facility Specific Certifications</u>. Kin Yat shall support and maintain any pre-requisite site specific requirements related to the Product certification requirements. Kin Yat shall bear any fees associated with these pre-requisite site specific certifications. All pre-requisite site specific certifications shall be maintained in Kin Yat's name. In the event that iRobot requires product or business changes which result in additional site specific certifications by Kin Yat, Kin Yat shall promptly take all actions necessary to comply with such requirements. In addition, Kin Yat shall promptly execute documents and take such further action as iRobot shall reasonably request in order to comply with any certification required by any customer or distributor of iRobot.

4.10.3 <u>Records Retention</u>. For a period of [***] from delivery of each Product (items produced under the [***] are considered Product), Kin Yat shall maintain accurate and complete records for all Products manufactured hereunder, including, but not limited to, all configuration and engineering records. This shall include all records relating to product traceability to ensure both forward and reverse traceability. Records shall contain, as a minimum, all information relating to the following:

[***]

4.10.4 <u>Product specification and standards</u>. All Products must conform in all respects to the Product Specifications provided by iRobot for the items stated on the bill of materials or Purchase Order. Any Kin Yat proposed change to Product requires mutual agreement in writing prior to implementing such change. Kin Yat shall notify iRobot in writing and receive approval of any changes to Components, other materials, parts or sources of supply, process chemistries, test procedures, quality reporting or other major processes, and to ensure that any such changes do not compromise the requirements under this Agreement or the Specifications, quality, or reliability of Products ordered, or which may affect form, fit or function.

4.10.5 <u>Secure Testing Facility</u>. Kin Yat shall provide intellectual property secure on-site facilities for iRobot's final inspection quality control team, as well as the necessary inspection technicians to assist during inspections.

4.11 <u>Returned Products</u>. Kin Yat shall establish a program for analyzing Product returns and for tracking Product return rates and failure types. Kin Yat will utilize iRobot provided Return product information in such analysis and tracking. Kin Yat shall provide objective evidence to demonstrate appropriate corrective actions, as needed, to address Product Returns root cause.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

11

4.12 <u>Recalls</u>. If iRobot reasonably decides to, or is required by any government authority or court of competent jurisdiction to, initiate a product recall, withdrawal or field correction with respect to, or if there is any governmental seizure of, any Product, iRobot will notify Kin Yat of the details regarding such action, including providing copies of all relevant documentation concerning such action. Kin Yat will assist iRobot in investigating any such situation and all regulatory contacts that are made and all activities concerning seizure, recall, withdrawal or field correction will be coordinated and made by iRobot, and all communications in connection with any recall, shall come solely from iRobot. If any such recall, withdrawal, field correction or seizure results from (i) failure of any Product to conform to the Specifications or any warranty or other requirement set forth in this Agreement, or (ii) the failure of Kin Yat to comply with any applicable law, rule, regulation, standard, court order or decree or (iii) the gross negligent or intentional wrongful act or omission of Kin Yat in connection with the production of Product hereunder, then, in addition to the rights, remedies and obligations under Section 5, Kin Yat shall be responsible for the full cost and expense of any such seizure, recall, withdrawal or field correction. For the purposes of this Agreement, the expenses of any recall, withdrawal, field correction or seizure shall include, without limitation, the out-of-pocket expenses of notification and destruction or return of the recalled Product and all other out-of-pocket costs incurred in connection with such recall, in addition to any lost profits of either Party under any circumstances or any administrative or overhead charge.

5      **Warranty & Remedy.**

5.1 <u>Kin Yat Warranty</u>. [***] warranty period.

5.1.1 <u>Product Warranty</u>. Kin Yat represents, warrants and covenants that: (i) it will perform the Manufacturing Services and manufacture the Product in accordance with IPC-A 610 Class 2 workmanship standard, the Product Specifications, applicable law, and the terms and conditions of this Agreement, (ii) the Products will be manufactured, processed and assembled by Kin Yat, and be free from defects in workmanship in accordance with the Product Specifications, (iii) the Products will conform, in all material respects, to the Product Specifications, be new or newly manufactured and include only new Components, and (iv) the Products will be free and clear of all Encumbrances. The foregoing warranty shall apply to any Product that is repaired or re-manufactured by or on behalf of Kin Yat under this Agreement. This Product warranty is extended to, and may only be enforced by, iRobot.

5.2 <u>Components Warranty</u>. Kin Yat will pass on to iRobot all warranties from Component suppliers to the extent that they are transferable. Kin Yat shall use Commercially Reasonable Efforts to ensure that all Assigned Components used in the Product are procured from suppliers on the AVL, unless otherwise agreed to by the Parties in writing.

5.3 <u>Survival of Warranty</u>. Product warranties will survive any inspection, delivery, acceptance or payment by iRobot and be in effect for the longer of (i) [***] from the date of invoice of the Product from Kin Yat to iRobot, (ii) for Products purchased by an end-user customer within [***] from the date such Product is initially delivered to iRobot or to iRobot's designated carrier, [***] of the warranty period from iRobot to such end-user customer for such Product, or (iii) such other term as agreed to by the Parties, following the date such Product is initially delivered to iRobot or to iRobot's designated carrier (such period, the "**Warranty Period**"). Should there be a breach of any of the warranties specified during the Warranty Period, Kin Yat will either (A) repair or replace the Product that contains a defect caused by a breach of the warranty set forth herein; or (B) issue a credit to iRobot in an amount equal to [***]. Product warranties will survive for the full term of the Warranty Period, regardless of whether such Product becomes obsolete or whether Kin Yat ceases to manufacture such Product or ceases to provide the Manufacturing Services.

5.4 <u>Repair or Replacement of Defective Product</u>. Kin Yat may elect, in its sole discretion, to repair or re-manufacture any Non-Conforming Products caused by a breach of the warranty set forth in this Section 5. Any such repair or re-manufacture shall be pursuant to Kin Yat's standard return material authorization process and procedure ("**RMA**"), pursuant to which iRobot will request an RMA number from Kin Yat for such Non-Conforming Product.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

12

iRobot shall then consign the Non-Conforming Products along with objective documentation of the applicable breach of warranty ("**Defect**"), FOB Kin Yat's repair facility in the same country and region as the Non-Conforming Products (or such other location as agreed to by the Parties in writing), and specify the Kin Yat assigned RMA number. Kin Yat will repair or re-manufacture the Non-Conforming Products within [***] of receipt by Kin Yat of such Non-Conforming Products, and in the event the Defect is confirmed, Kin Yat will reimburse iRobot for the reasonable cost of transporting the Non-Conforming Products to Kin Yat's designated facility and Kin Yat will deliver the repaired or re-manufactured Products, FCA iRobot's designated destination. If no such Defect is confirmed, iRobot shall reimburse Kin Yat for all fees, costs and expenses incurred to analyze and, if requested by iRobot, repair or re-manufacture the non-defective Products and iRobot shall bear responsibility for all transportation costs to and from Kin Yat's designated repair facility.

5.5 <u>Class Failure</u>. In the event that Kin Yat is notified (such notification being oral or otherwise) of a Class Failure, Kin Yat shall:

5.5.1 Within 24 hours of learning of such Class Failure, provide iRobot with a status report and details of a proposed interim solution; and

5.5.2 No later than [***] following notification of such Class Failure, provide iRobot with a root cause analysis and corrective action plan.

In each of the foregoing cases, iRobot will make available such information and assistance reasonably required to allow Kin Yat to conduct its root cause analysis and to provide its corrective action plan.

5.6 <u>Component Failures</u>. In the event that a Non-Conforming Product is the result of a Component, Kin Yat will pass on to iRobot all available warranty remedies pursuant to Section 5.2. In addition, Kin Yat will negotiate with the Component suppliers (save for the suppliers of Consigned Component not controlled by Kin Yat), at iRobot's discretion and with iRobot present or on iRobot's behalf, for additional remedies outside of the Component warranty pursuant to Section 5.2. Kin Yat shall not enter into any settlement with respect to Component failures that affects iRobot's rights or interests without iRobot's prior written approval, which shall not be unreasonably withheld. In the event that such negotiations do not resolve the matter to iRobot's reasonable satisfaction, and the available warranty remedies under Section 5.2 do not cover the full cost of Component repair or replacement, Kin Yat will provide iRobot with prior written notice regarding any additional costs required to repair or re-manufacture the affected Products. In the event that cost details are not readily available and iRobot requires immediate repair or replacement of the affected Products, iRobot may elect to authorize Kin Yat to proceed with repair or re-manufacture of the affected Products on a not to exceed basis. iRobot will be liable for any additional costs actually incurred by Kin Yat to repair or re-manufacture the affected Products, provided that iRobot has given Kin Yat written approval before such costs were incurred.

5.7 <u>Refunds due to Class Failure or Recall</u>. In the event any Class Failure or Recall of a Product results from a breach of any of the warranties under this Agreement during the Warranty Period, then Kin Yat shall promptly refund to iRobot the full purchase price paid for all Products subject to such Class Failure or Recall, and all other reasonable costs to cure the Class Failure or Recall (example: shipping costs, partner penalties etc).

5.8 <u>Third Party Repair and Re-Manufacture; Other Defects</u>. Notwithstanding anything to the contrary in this Agreement, iRobot may itself, or through a third party, and at its own expense, repair or re-manufacture any Product (whether or not such Product is defective) without any obligation or liability to Kin Yat. If iRobot wishes Kin Yat to undertake repair or re-manufacture of Products that are Non-Conforming due to reasons other than a breach by Kin Yat of its warranty obligations hereunder, the Parties will mutually agree on an allocation of costs for the repair and/or re-manufacture process prior to Kin Yat performing such work.

5.9 **<u>Limitation of Warranty</u>**.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

13

5.9.1 THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5 AND 16.3 ARE IN LIEU OF, AND EACH PARTY EXPRESSLY DISCLAIMS, AND EACH OTHER PARTY EXPRESSLY WAIVES, ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OR MISAPPROPRIATION OF ANY RIGHT, TITLE OR INTEREST OF ANY PARTY OR ANY THIRD PARTY. NO ORAL OR WRITTEN STATEMENT OR REPRESENTATION OUTSIDE OF THIS AGREEMENT BY EITHER  PARTY, ITS AGENTS OR EMPLOYEES SHALL CONSTITUTE OR CREATE A WARRANTY OR EXPAND THE SCOPE OF ANY WARRANTY HEREUNDER.

5.9.2 KIN YAT'S WARRANTY SHALL NOT APPLY TO ANY PRODUCT THAT HAS BEEN SUBJECTED TO TESTING FOR OTHER THAN SPECIFIED ELECTRICAL CHARACTERISTICS OR TO OPERATING AND/OR ENVIRONMENTAL CONDITIONS IN EXCESS OF THE MAXIMUM VALUES ESTABLISHED IN IROBOT'S APPLICABLE SPECIFICATIONS, OR TO HAVE BEEN THE SUBJECT OF ANYONE OTHER THAN KIN YAT OR ITS AGENTS OR CONTRACTORS MISHANDLING, ACCIDENT, MISUSE, NEGLECT, IMPROPER TESTING, IMPROPER OR UNAUTHORIZED REPAIR, ALTERATION, DAMAGE, ASSEMBLY, PROCESSING OR ANY OTHER INAPPROPRIATE OR UNAUTHORIZED ACTION OR INACTION THAT ALTERS PHYSICAL OR ELECTRICAL PROPERTIES. THIS WARRANTY SHALL NOT APPLY TO (a) ANY MATERIAL CONSIGNED OR SUPPLIED BY IROBOT TO KIN YAT INCLUDING BUT NOT LIMITED TO IROBOT INTELLECTUAL PROPERTY, IROBOT'S PROPRIETARY INFORMATION AND TECHNOLOGY AND IROBOT'S TOOLING, OR (b) ANY DEFECT IN THE PRODUCT ARISING FROM ANY DRAWING, DESIGN, SPECIFICATION, PROCESS, TESTING OR OTHER PROCEDURE, ADJUSTMENT OR MODIFICATION SUPPLIED AND APPROVED BY IROBOT.

5.10 ECO Upgrade. RMA's for any engineering changes or upgrades under any ECR or ECN upgrades will also be subject to the RMA process. Kin Yat will analyze each ECR and ECN and provide a per unit upgrade/change cost and expected completion and delivery date.

5.11 The Liability of Kin Yat to iRobot for any one act of default by reason of the breach of the warranty under this Agreement shall be limited to the extent that all or any damages (if proven) together shall in no event greater than [***] affected by such breach which has/have been received and accepted by Kin Yat and paid for by iRobot.

## 6 Limitation Of Liability; Specific Performance; Equitable Relief

6.1 EXCEPT WITH REGARD TO ANY LIABILITY THAT ARISES FROM A PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 19 OR A BREACH BY EITHER PARTY OF ITS CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 16, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON OR ENTITY UNDER ANY CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR OTHER LEGAL OR EQUITABLE CLAIM OR THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, LOSS OF GOODWILL OR BUSINESS PROFITS, LOST REVENUE, WORK STOPPAGE, DATA LOSS, COMPUTER FAILURE OR MALFUNCTION, OR FOR ANY AND ALL OTHER EXEMPLARY OR PUNITIVE DAMAGES WHETHER SUCH PARTY WAS INFORMED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE FOREGOING SHALL NOT EXCLUDE OR LIMIT EITHER PARTY'S LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING FROM ITS NEGLIGENCE TO THE EXTENT THAT SUCH LIABILITY CANNOT BY LAW BE LIMITED OR EXCLUDED.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

14

6.2  Kin Yat acknowledges and agrees that a breach by it of its obligations to perform the Manufacturing Services, including the manufacture and/or supply Product under this Agreement, would cause irreparable harm to iRobot because the Manufacturing Services are unique in kind and quality and, moreover, suitable substitutes are unobtainable or unreasonably difficult or inconvenient for iRobot to procure and Kin Yat further acknowledges and agrees that iRobot could not be adequately compensated by money damages. Accordingly, in addition to any other remedies that may be available, in law, in equity or otherwise, in the case of any such actual or threatened breach, iRobot shall be entitled to obtain specific performance (including an order of a court requiring that Kin Yat manufacture and/or supply Product under this Agreement), without the necessity of posting a bond or proving actual damages.  Finally, Kin Yat agrees that such equitable relief (including without limitation, specific performance), is a reasonable outcome of any actual or threatened breach contemplated by this Section 6.2, and Kin Yat hereby knowingly assumes the risk that a court or other tribunal may order specific performance. Kin Yat further acknowledges and agrees that any equitable relief ordered by a court or tribunal would not be a penalty.

6.3  iRobot retains all rights not expressly granted hereunder and any and all remedies herein expressly conferred upon iRobot will be deemed cumulative with, and not exclusive of, any other remedy conferred hereby, or by law or equity upon iRobot, and the exercise by iRobot of any one remedy will not preclude the exercise of any other remedy available under this Agreement or otherwise.

7 **Delivery, Risk of Loss and Payment Terms.** For purposes of this Agreement terms of sale for all Product shipments shall be FCA Port of Origin. (per Incoterms 2010). Risk of loss for Product shipments will pass to iRobot (or to iRobot's designee invoiced by Kin Yat) upon delivery to the Port of Origin and receipt by the freight partner responsible for delivering the goods to the appropriate destination. For any shipments where Kin Yat acts as an agent in completing the Shipper's Export Declaration and managing iRobot's exports on behalf of iRobot, where iRobot is the exporter of record (Principal Party in Interest - PPI), iRobot hereby grants Kin Yat a limited Power of Attorney to act on its behalf in managing its exports. Title for Product will pass to iRobot upon receipt of full payment for the purchase price by iRobot.

7.1  <u>Payment</u>. iRobot shall pay Kin Yat all monies when due, including all NRE Costs associated with this Agreement.  Payment of all invoices shall be net [***] from date of iRobot's receipt of each such invoice.  Payment to Kin Yat shall be in U.S. dollars and in immediately available funds. Any equipment, tooling, component, material or other goods or property, which is purchased by Kin Yat in order to perform its obligations under this Agreement, shall become the property of iRobot once Kin Yat is reimbursed for all NRE Costs, if any.  Kin Yat shall be responsible for maintaining, segregating and CONSPICUOUSLY labeling the iRobot Property as " iRobot PROPERTY" and carrying out applicable repairs based on reasonable wear and use. Kin Yat shall invoice iRobot for actual outstanding NRE Costs and other monies due at [***] intervals (or such other intervals as deemed appropriate) during the term of this Agreement and upon cancellation, termination or expiration of this Agreement. Kin Yat agrees to request advance written approval from iRobot should resource requirements, and thereby NRE Costs, increase materially relative to estimated NRE Costs initially agreed by the Parties. Upon such request, Kin Yat shall provide to iRobot reasonably detailed supporting documentation and/or descriptions of the NRE Costs for which Kin Yat seeks reimbursement. iRobot is not obligated to accept any additional reimbursement request from Kin Yat. Unless otherwise agreed by iRobot, all prices are FCA, Port of Origin.

7.2  <u>Taxes.</u> iRobot shall be responsible for all federal, foreign, state and local sales, use, excise and other taxes (except taxes based on Kin Yat's income), all delivery, shipping, and transportation charges and all foreign agent or brokerage fees, document fees, custom charges and duties.

7.3  <u>Disputed Invoices</u>. If a Kin Yat invoice does not meet the invoicing requirements of this Agreement, or iRobot in good faith disputes any invoiced charges, iRobot will notify Kin Yat of the disputed items in writing on or before the payment due date and may withhold payment of the disputed charges pending resolution of the dispute.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

7.4 <u>Reservation of Rights</u>. Any payments made by iRobot under the Agreement, and any acceptance of Products, will be without prejudice to iRobot's right to subsequently claim or determine that it has overpaid Kin Yat or to require Kin Yat to remedy any deficiencies in KinYat's performance as provided in this Agreement.

8 **Import and Export.** iRobot shall be the importer of record for all Product shipments to iRobot facilities and shall be responsible for obtaining any required import licenses necessary for iRobot to import Product and/or receive shipments of Product from Kin Yat or its designated carrier, any U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under US or foreign law applicable to iRobot's obligations under this Agreement. Kin Yat shall be responsible for obtaining any required export licenses necessary for Kin Yat to ship Product, including certificates of origin, manufacturer's affidavits, and U.S. Federal Communications Commission's identifier, if applicable and any other licenses required under US or foreign law applicable to Kin Yat's obligations under this Agreement. iRobot agrees that it shall not knowingly require Kin Yat to ship or deliver any Product, assembly, component or any technical data or software which violate any export controls or limitations imposed by the United States or any other governmental authority, or to any country for which an export license or other governmental approval is required at the time of export without first obtaining all necessary licenses and approvals and paying all duties and fees. Each Party shall be responsible for securing all applicable licenses, certifications, approvals and authorizations that are necessary for such Party to comply with applicable import and export laws, rules and regulations for the shipment and delivery of the Product under this Agreement. iRobot shall also be responsible for complying with any legislation or regulations governing the importation of the Product into the country of destination and for payment of any duties thereon.

9 **Cost Management.**

9.1 <u>Cost Summary and Management</u>. The cost summary included set forth on Schedule 2, prepared by Kin Yat, contains a detailed SKU-level (SKU as defined by iRobot) cost summary, Incoterm FCA Port of Origin, complete with all formulas and assumptions, to provide full access and visibility to all component, labor, assembly and mark-up costs. During each Renewal Term, the Parties shall meet from time to time on an executive level as required, but no less than on an [***], to identify cost reduction opportunities where each Party will share overall financial objectives of the on-going relationship between the Parties. Kin Yat shall at all times employ an Open Book Pricing approach to cost management and pricing of Components, Products and the Manufacturing Services to achieve Sustainable and Competitive Pricing for the Products and Manufacturing Services provided to iRobot under this Agreement. For purposes of this Agreement, the phrase **"Sustainable and Competitive Pricing"** means stable pricing over time for the Products and Manufacturing Services provided to iRobot under this Agreement that is favorable against that which could be reasonably attained from other contract manufacturers for comparable volumes of substantially similar products and comparable manufacturing services. For purposes of this Agreement, the term **"Open Book Pricing"** means providing detailed costing information to iRobot which includes; a fully-costed bill of materials, markups related to the sourcing and manufacturing of the Components and the Product and an explanation of all adders on material or value add (in place as of the Effective Date). In addition, Kin Yat shall provide detailed overviews of the relevant financial costing model to iRobot's representatives and professional advisors. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year.

9.2 <u>Price</u>. The Price for each Product is set forth in Schedule 2 (the "**Product Price**"), and includes the complete price for such Product, including the fully-costed bill of materials, Kin Yat's Gross Margin (as defined in Schedule 2), and any and all other added fees and costs related to the Manufacturing Services, Reasonable and Customary Support Services. The Product Price for each Product shall not be increased during the period beginning on the Effective Date and ending on [***], during such time Kin Yat shall manage its supply chain and absorb any and all increases. Pricing will be reviewed by the Parties on an [***] basis, on or before [***], and will be revised consistent with increases or decreases in materials, components, equipment and other costs and expenses applicable to the manufacture of the Product. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

9.3 Source Transparency. Kin Yat will submit a full list of suppliers to iRobot for each Product at the time of any cost summary submittal, along with the supplier part number (in case of Generic Components). Kin Yat will submit every supplier or part number change to iRobot for iRobot's approval before such change goes into effect, including a summary or certification that such proposed changed part conforms to the Product Specifications.

9.4 Cost Transparency. COGS (Cost of Goods Sold) is a key factor in iRobot engaging Kin Yat to produce and deliver the Product. So that iRobot has full visibility to the current and ongoing status of Kin Yat's COGS, Kin Yat will provide updated costing in the agreed upon format within [***] of any change submittal. If Kin Yat fails to provide cost impact information within [***] after any iRobot Specification changes, iRobot will consider the lack of response to mean that there is no cost impact. Any cost change would be considered valid only after iRobot's approval. No less frequently than [***], Kin Yat will, upon iRobot's request, provide a microeconomic report that includes all critical prices and costs included in the Product Price (such as labor, exchange rate or select material as required by iRobot).

**10 Tooling and fixtures.** iRobot shall own any and all tooling, fixtures, molds, equipment, software and firmware made available to Kin Yat by iRobot, developed for or on behalf of iRobot, or otherwise paid for by iRobot ("**iRobot Tooling**"). Kin Yat may manufacture, have manufactured, and use the iRobot Tooling only to perform the Manufacturing Services under the Agreement and shall use and treat the iRobot Tooling with a high degree of care, and in any case no less than the same degree of care it would for its own equipment, tooling, molds or supplies. Kin Yat shall attach an identifying label showing iRobot's ownership in a conspicuous place on each unit of iRobot Tooling, if possible, and shall secure and segregate the iRobot Tooling in such fashion to clearly identify the iRobot Tooling as the property of iRobot. Kin Yat shall maintain the iRobot Tooling, at its own expense, in efficient working order and good repair based on reasonable wear and use, and otherwise in accordance with iRobot's reasonable instructions. Kin Yat shall keep all iRobot Tooling free of any Encumbrances, and shall not transfer any iRobot Tooling, or any rights in the iRobot Tooling to any Person. Kin Yat shall deliver all iRobot Tooling to iRobot or iRobot's designee, or at iRobot's request, make available for pickup, upon the termination or expiration of this Agreement, or upon iRobot's earlier request. Kin Yat shall execute documents and take such further action as iRobot shall reasonably request to protect iRobot's interest in the iRobot Tooling. Kin Yat will at the expense of iRobot deliver to iRobot any of the above mentioned tooling within [***] upon iRobot's written request. Kin Yat will adhere to the record keeping of iRobot Tools in accordance with iRobot requirements set forth in Section 4.10.3 or as otherwise described Schedule 1. Kin Yat shall make such records available for inspection by iRobot or iRobot's designee Kin Yat upon iRobot's reasonable request.

**11      Forecast, Purchase Orders; Change Orders, Rescheduling and Cancellation**.

11.1 Forecast. iRobot will provide to Kin Yat, on a [***], a non-binding, rolling [***] planning forecasts at a core robot level and on a SKU based level, indicating iRobot's monthly Product requirements, as amended by iRobot from time to time (each, a "**Forecast**").

11.2 Purchase Orders. iRobot will issue orders for Products hereunder using its standard form of purchase order ("**Purchase Order**"). Each Purchase Order will identify the applicable Product by SKU, quantity, price denominated in US currency, delivery terms, and other customary terms. Except for the Product Price and delivery date contained in such Purchase Order, the terms and conditions in this Agreement shall prevail over any conflicting terms and conditions in any Purchase Order. Such Purchase Orders will be issued by iRobot at least [***] prior to the date of ex-factory for all Products on each such Purchase Order. For select SKUs and as defined in Schedule 1, iRobot and Kin Yat will develop strategies to achieve [***] lead time.

11.3 Purchase Order Acknowledgment. Kin Yat will notify iRobot electronically within [***] if it utilizes EDI, or if in writing, within [***] of receipt of a Purchase Order, and inform iRobot in writing of any reason Kin Yat is unable to meet a requested delivery date or any other Purchase Order requirements. The Purchase Order will not

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

constitute a binding obligation on Kin Yat until and unless Kin Yat accepts the Purchase Order in accordance with this Agreement.

11.4 Changes to Forecast: At any time, prior to the issue of a Purchase Order, iRobot may reschedule and/or cancel any forecast demand.

11.5 Changes to Manufacturing Services, Packaging and Shipping Specifications and Test Procedures. iRobot may, in writing, request a change to the Manufacturing Services, Packaging and Shipping Specifications and Test Procedures at any time. Within [***] after receipt of iRobot's written request Kin Yat will analyze the requested change and provide iRobot with an assessment of the effect that the requested change will have on cost, manufacturing, scheduling, delivery and implementation. iRobot will be responsible for all costs associated with any accepted changes. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules.

11.6 Production Increases, Rescheduling Delivery. iRobot may, in writing, request increases in production volume or acceleration of open Purchase Order at any time. If Kin Yat is unable to satisfy or comply with iRobot's requested increase in production volume within the requested time frame for delivery, Kin Yat will provide the reasons preventing Kin Yat from satisfying the requested increase within [***] after receipt of iRobot's request. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost and applicable delivery schedules. Kin Yat shall utilize its global supply network to assess availability of shared material across accounts to minimize instances in which Kin Yat is unable to meet an increase in a Purchase Order quantity requested by iRobot. It is further understood that iRobot will not incur additional chargers due to Kin Yat's decision to meet an accelerated delivery schedule or request for increased quantities by utilizing Generic Components from another account's material.

11.7 Product Configuration Changes and Engineering Changes. iRobot may request configuration or engineering changes to a Product in writing at any time. Kin Yat will analyze the request and determine if it can meet the requested changes within the required Lead-time. If Kin Yat can satisfy the requested change it will provide iRobot within [***] after receipt of the configuration or engineering request notice, a notice of acceptance of the requested changes. In the event that any requested change in the form, fit or function or Specification of any Product results in a significant increase in the cost of such Product, or in the length of time required for the manufacture or delivery thereof, then Kin Yat shall provide iRobot with a detailed cost analysis regarding such requested change using Open Book Pricing as contemplated under Section 9.1. Following iRobot's acknowledgment of such detailed cost analysis, the Parties will negotiate in good faith an equitable adjustment to the price of such Product and/or expected changes to the delivery schedule for such Product. If Kin Yat is unable to satisfy or comply with iRobot's requested changes within the requested time frame for delivery, Kin Yat will provide the reasons preventing Kin Yat from satisfying the requested increase within [***] after receipt of iRobot's request. Any such change shall be documented in writing and shall become effective only upon mutual written agreement of both Parties of the terms and conditions of such change, including changes in time required for performance, cost (including cost of materials on hand or on order in accordance with original Purchase Order) and applicable delivery schedules.

11.8 Treatment of Obsolete/End-of-Life Material. Upon receiving notice from iRobot of an engineering change or that any Product, component or assembly has become obsolete or has reached end-of-life, Kin Yat will, within a reasonable period after receiving such notice, provide iRobot with an analysis of iRobot's liability to Kin Yat for components and materials acquired or scheduled to be acquired to manufacture such Product. iRobot's liability shall include the price of finished Product and Kin Yat's costs (including cancellation fees and charges), plus applicable margin, of WIP, safety stock components and materials and components and materials on hand or on order within

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

18

applicable Lead-times. Kin Yat will use Commercially Reasonable Efforts to assist iRobot in minimizing iRobot's liability by taking the following steps:

- As soon as is commercially practical reduce or cancel Component and material orders to the extent contractually permitted.
- Return all Components and materials to the extent contractually permitted.
- Make all Commercially Reasonable Efforts to sell Components and materials to iRobot approved third parties.
- Assist iRobot to determine whether current WIP should be completed, scrapped or shipped to iRobot or its designee "as is".

11.9 Rescheduled Delivery out, reduction of quantity, and Cancellation of Orders. iRobot may request Kin Yat to reschedule the delivery date for any Product, decrease quantity on open Purchase Order, and cancel pending Purchase Orders in accordance with this Section. The charges to iRobot for deferring delivery of a Purchase Order, reducing quantity or cancellation of a Purchase Order are outlined below:

| Days Prior to Delivery Date | Reschedule Terms | Cancellation Liability |
|---|---|---|
| [***] Days | Kin Yat is not obligated to adhere to the request, but must consider each request in good faith. | iRobot may not cancel a Purchase Order to be delivered within [***] days of the applicable delivery date without payment to Kin Yat for the work incurred to date. |
| [***] Days from original delivery date | iRobot may reschedule out the delivery, reduce quantity or cancel the order. | Material on hand, non-cancelable and non-returnable materials, to the extent issued under a Material Authorization by iRobot, and applicable labor charges for WIP, provided, that such liability applies only to the extent that Kin Yat is unable to reallocate such material to any existing Purchase Order of iRobot, or, if authorized by iRobot, to a purchase order of another customer of Kin Yat. |

Notwithstanding anything to the contrary in this Agreement, any reschedule out of a delivery date, reduction of quantity and/or cancellation of a Purchase Order (in whole or in part) will not affect any Product Price.

**12 Logistics.** Kin Yat will maintain control over all Products while in Kin Yat's care, custody, and control. Kin Yats shall cooperate with iRobot and its suppliers and logistics services providers. Kin Yat will provide relevant and necessary information to iRobot relating to receipt, storing and shipment of Products. Kin Yat will coordinate with iRobot personnel, iRobot logistics services providers, and iRobot customers to execute the shipment of Products as instructed by iRobot.

12.1 Receiving. From time to time iRobot may ship Components, including batteries and Integrated Circuits (IC's, processors) directly to Kin Yat. Kin Yat will verify actual quantities and SKU's of such Components received as compared to the quantities and SKU's indicated on the shipping documents, process the Components into their inventory system, and notify iRobot of the quantity actually received by SKU. Kin Yat will also indicate any exceptions, at the time of reporting the receipt, as related to over, short or damage. The reporting of receipts and exceptions is made to iRobot.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

19

12.2 <u>Storage and maintenance of inventory</u>. All Products and Components will be stored in a manner to maintain inventory control and to prevent damage as instructed by iRobot reasonably. Kin Yat will maintain inventories and locations of iRobot Products and Components on their own perpetual inventory and/or warehouse management system. Kin Yat and iRobot will compare on a monthly basis all inventories, reconcile results and Kin Yat will cycle count the Components with the five highest variances.

12.3 <u>Physical inventory audit</u>.

12.3.1 On a [***] basis Kin Yat will arrange a cut-off date for and complete a physical inventory audit of all Consigned Components. Because the [***] Components contain valuable intellectual property of iRobot, there is no shrinkage allowance for such Components. Variances will be identified and reported to Kin Yat by iRobot within [***] of the physical inventory. Within [***] of being notified of any such variance, Kin Yat shall provide iRobot a written report that, in iRobot's sole discretion, explains the variance, or iRobot will charge or deduct from its next payment for the unexplained variance. All other Consigned Components are subject to a shrinkage allowance of [***]% of the volume of such Component or Product received during the [***] period immediately prior to the physical inventory audit.

12.3.2 On a [***] basis Kin Yat will arrange a cut-off date for and complete a physical inventory audit of all finished Products that have passed the applicable quality inspections, but remain unshipped and in Kin Yat's possession at the end of such quarter. Kin Yat shall deliver such audit report to iRobot by the second business day immediately following the end of each iRobot Quarter End.

12.4 <u>Shipping to iRobot locations</u>. Most of the Products are designed to withstand a maximum of two pallet high floor storage. Components, including chips and batteries must be single stacked on the floor or stored in pallet racks. iRobot may direct Kin Yat to ship to specific iRobot locations and distributions centers such as, but not limited to, [***]. Incoterms for sale to iRobot are FCA Port (or airport) of Origin. iRobot will select the freight forwarder and communicate local contacts to Kin Yat. Based on selection of forwarder or ocean carrier, iRobot will specify the Port of Origin. iRobot will be responsible for paying the transportation costs from the origin port or airport to the destination, Kin Yat will arrange empty container delivery in accordance with the shipping schedule communicated to Kin Yat by iRobot. Upon receipt of container, Kin Yat will inspect the container for any signs of damages to flooring, any holes in the roof or side of the containers, and any sign of tampering with the latching device (tampering to include drilling out rivets and replacing the rivets with bolts). If the container has holes, damages or signs of tampering Kin Yat will request a replacement container. Products will be loaded on the container, floor stacked, in a manner to prevent damage and to fully utilize the container. Kin Yat shall adhere to any specific pallet configuration requested and provided by iRobot. If there is a requirement to ship on wooden pallets, then the pallets must meet the guidelines of ISPM15 and be appropriately marked, indicating the pallets meet the standards. iRobot will be responsible for the costs associated with purchasing these pallets. Containers must be sealed with a cargo seal that meets or exceeds ISO/PAS 17712:2006.

12.5 <u>Direct shipment to iRobot Customers</u>. From time to time, iRobot may direct Kin Yat to arrange for shipping directly to iRobot's customers in accordance with specific Incoterms identified by iRobot at that time. The container inspection requirements and pallet requirements under Section 12.4 shall apply to any shipments directly to iRobot's customers.

12.6 <u>Inventory losses and gains</u>. As Kin Yat is responsible for the care, custody and control of iRobot's products, risk will be balanced with responsibility in the following way. Physical inventories and cycle counts will be conducted as indicated above. During the first month after the first anniversary date of the contract and each subsequent anniversary date, the losses and gains of inventory, based on iRobot's perpetual inventory will be netted and a final loss or gain identified.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**13 Duty to Mitigate Costs.** Both Parties shall, in good faith, undertake Commercially Reasonable Efforts to mitigate the costs of termination, expiration or cancellation. Kin Yat shall make Commercially Reasonable Efforts to cancel all applicable component and material purchase orders and reduce component inventory through return for credit programs or allocate such components and materials for alternate iRobot programs if applicable, or other customer orders provided the same can be used within [***] of the termination date.

**14 Term.** Unless earlier terminated as provided in Section 15 below, the term of this Agreement shall commence on the Effective Date and shall continue until the second anniversary of the Production Start Date (the "**Initial Term**"), and shall automatically renew for successive two-year terms (each, a "**Renewal Term**") unless (a) following the first Renewal Term, Kin Yat provides written notice to iRobot of its intent not to renew this Agreement within twelve (12) months prior to the end of the then existing Renewal Term, or (b) iRobot provides written notice to Kin Yat of its intent not to renew this Agreement within [***] prior to the end of the then existing Term.

**15 Termination.** This Agreement may be terminated as follows:

15.1 Termination for Cause. Either Party may terminate this Agreement based on the material breach by the other Party of the terms of this Agreement, provided that the Party alleged to be in material breach receives written notice setting forth the nature of the breach at least [***] prior to the intended termination date. During such time the Party in material breach may cure the alleged breach and if such breach is cured within such [***] period, no termination will occur and this Agreement will continue in accordance with its terms. If such breach shall not have been cured, termination shall occur upon the termination date set forth in such notice.

15.2 Termination for Bankruptcy/Insolvency. Upon the happening of any of the following events with respect to a Party, except as otherwise prohibited by the United States bankruptcy laws, this Agreement may be terminated immediately:

15.2.1 The appointment of a receiver or custodian to take possession of any or all of the assets of a Party, or should a Party make an assignment for the benefit of creditors, or should there be an attachment, execution, or other judicial seizure of all or a substantial portion of a Party's assets, and such attachment, execution or seizure is not discharged within [***].

15.2.2 A Party becomes a debtor, either voluntarily or involuntarily, under Title 11 of the United States Code or any other similar law and, in the case of an involuntary proceeding, such proceeding is not dismissed within [***] of the date of filing.

15.2.3 The dissolution or termination of the existence of a Party whether voluntarily, by operation of law or otherwise.

15.3 Termination Consequences.

15.3.1 If this Agreement is terminated for any reason, iRobot shall not be excused from performing its obligations under this Agreement with respect to payment for all monies due to Kin Yat hereunder including fees, costs and expenses incurred by Kin Yat up to and including the effective date of such termination in accordance with Section 15.3.3. The following Sections 3.8, 3.10.4, 4.5, 4.11.3, 4.13, 5, 6, 7, 8, 10, 13, 15.3, 15.4, 15.5, 16, 17.1, 17.2, 17.3, 17.4, 18, 19, 23, 25 and Schedule 4 shall survive the expiration, cancellation or termination of this Agreement.

15.3.2 All Purchase Orders issued prior to the effective date of the termination or expiration will be fulfilled pursuant to and subject to the terms of this Agreement, even if the delivery dates of Products under such Purchase Orders are after such effective date of expiration or termination.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

21

15.3.3 Within [***] of the effective date of the expiration or termination of this Agreement for any reason other than Kin Yat's material uncured breach, iRobot shall purchase at Kin Yat's cost any raw materials (including packaging materials) that Kin Yat has purchased exclusively for the production of Products for iRobot, WIP and finished Product that have not been shipped previously to iRobot. At its option iRobot may, in lieu of purchasing such raw materials at cost, place Purchase Orders with Kin Yat for additional Product under the terms of this Agreement in order to extinguish existing stocks of such raw materials. In the event that the Agreement terminates as a result of a material uncured breach by Kin Yat, iRobot shall be under no obligation to purchase any unused raw materials from Kin Yat.  In the event that the Agreement terminates for any other reason, iRobot shall purchase from Kin Yat all Product inventory (including WIP and finished Product).  Kin Yat shall accommodate last buy order from iRobot

15.3.4 Return of Product and Materials Supplied by iRobot. Upon the effective date of expiration or termination of this Agreement for any reason whatsoever, Kin Yat shall immediately deliver to iRobot or its designee all Product, Specifications, Components, packaging materials and other materials purchased by or on behalf of iRobot and all other materials or supplies provided by iRobot. Kin Yat shall also deliver to iRobot or its designee all Product produced hereunder, and shall invoice iRobot in accordance with the terms of Section 7.1.

15.4 Manufacturing Rights upon Termination. If Kin Yat ceases to manufacture and/or supply any Product due to any termination of this Agreement by iRobot pursuant to Sections 15.1 or 24, or if Kin Yat elects not to renew the Term pursuant to Section 14, then Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, worldwide, transferable, perpetual irrevocable license to all of its Intellectual Property Rights under the Technical Manufacturing Information - KIN YAT to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make Products and other versions of the Products. iRobot may sublicense these rights to third parties, provided any such third party complies with the terms of this license and any associated obligations of confidentiality. Upon iRobot's exercise of its rights under this Section 15.4, Kin Yat shall promptly provide to iRobot all information, including manufacturing know-how and other materials required to enable iRobot to independently manufacture, test and repair the Products.

15.5 Transition Assistance. Upon expiration or earlier termination of this Agreement, Kin Yat will support iRobot in making an orderly transition to a successor third party manufacturer during a period lasting no longer than [***] (the "**Transition Period**") at the expense of iRobot. During such Transition Period, (a) Kin Yat shall provide, in a timely and professional manner, services reasonably necessary to transition the Manufacturing Services to a successor third party manufacturer; and (b) all of the terms and conditions of this Agreement shall continue to be in full force and effect, including Manufacturer's obligations to continue providing the Manufacturing Services.  In addition, Kin Yat shall provide such technical assistance to iRobot or its designated third party manufacturer, as iRobot may reasonably request in connection with such transition. At the end of such Transition Period, or upon iRobot's earlier request, Kin Yat shall deliver to iRobot, or to iRobot's agent all tooling, fixtures, Components, Products (including WIP), tangible embodiments of iRobot's Proprietary Information and Technology and all documentation and materials related to the Products at the expense of iRobot.

16      **Confidentiality.**

16.1  Both parties acknowledge that, by reason of their relationship, they may have access to certain information and/or materials concerning the business, plans, products, services and clients (including, but not limited to, information and materials contained in technical data) and including information necessary for the Services ("Confidential Information"), which is confidential and of substantial value and which value would be impaired if such information were disclosed to third parties. The parties agree that the handling of confidential information shall be pursuant to the Non-Disclosure Agreement, which is incorporated herein by reference.

16.2 Kin Yat agrees that it will have any personnel of Kin Yat providing Services execute a written Non-Disclosure Agreement ("NDA") substantially similar in nature and scope to and no less protective of the Company than the Non-Disclosure Agreement.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

22

16.3 Each Party represents and warrants to the other that it has adopted policies and procedures with respect to the receipt and disclosure of confidential or proprietary information, such as the Proprietary Information and Technology with its employees, agents and representatives. Each Party represents and warrants to the other Party that it will cause each of its employees, agents and representatives to maintain and protect the confidentiality of the other Party's Proprietary Information and Technology pursuant to the terms and conditions of the Non-Disclosure Agreement.

**17   Intellectual Property Rights.**

17.1 Intellectual Property - Existing by Kin Yat.

17.1.5 Except for the license rights granted to iRobot under this section 17.1.1, Kin Yat shall retain all right, title and ownership to any and all Intellectual Property - Existing by Kin Yat and all Intellectual Property Rights therein.

17.1.6 Kin Yat shall not incorporate any Intellectual Property - Existing by Kin Yat into any Products without iRobot's prior written approval. To the extent any Intellectual Property - Existing by Kin Yat is incorporated by or on behalf of Kin Yat within or used by or on behalf of Kin Yat in connection with any Product, Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, license under all of its Intellectual Property Rights in or to the Intellectual Property - Existing by Kin Yat to make, have made, sell, offer for sale, import, use, reproduce, modify, adapt, display, distribute, and make other versions of, the Product and the right to sublicense third parties (including but not limited to manufactures, system integrators, value added resellers, distributors and other resellers) for iRobot to use, sell, test, improve, support and distribute the Products and to otherwise manufacture and support discontinued Products; provided however, that no license to the Technical Manufacturing Information - KIN YAT shall be granted under this Section 17.1.2.

17.2 Kin Yat Created Intellectual Property - Created by Kin Yat.

17.2.1 Except for the license rights granted to iRobot under 17.1.1, Kin Yat shall retain all right, title and ownership to any and all Intellectual Property - Created by Kin Yat and all Intellectual Property Rights therein.

17.2.2 Kin Yat hereby grants to iRobot a non-exclusive, royalty-free, fully paid up, worldwide, perpetual, irrevocable license under all of its Intellectual Property Rights in or to the Technical Manufacturing Information - KIN YAT developed under this Agreement that is unique to the Products for iRobot's internal use and the use by third party suppliers or manufacturers on behalf of iRobot to develop, design, improve, test and support the Products.

17.2.3 Any such unique Technical Manufacturing Information - KIN YAT will be used by Kin Yat solely for the design, development, testing and manufacturing of Products for iRobot.

17.3 iRobot Intellectual Property. iRobot shall retain all right, title and ownership to any and all iRobot Intellectual Property and all Intellectual Property Rights therein.

17.4 Newly Created Intellectual Property.

17.4.1 The Newly Created Intellectual Property constitutes "works made for hire" for iRobot, and iRobot will be considered the author and will be the owner of the Newly Created Intellectual Property and all Intellectual Property Rights therein or related thereto. If any Newly Created Intellectual Property does not qualify for treatment as "works made for hire", or if Kin Yat retains any interest in any Newly Created Intellectual Property for any other reason, Kin Yat hereby grants, assigns and transfers, and will grant, assign and transfer, to iRobot all ownership and interest in such Newly Developed Intellectual Property, including without limitation any and all Intellectual Property Rights in and to any Newly Created Intellectual Property or that claim or cover any Newly Created Intellectual Property. Kin Yat acknowledges that all personnel performing Manufacturing Services for iRobot under this Agreement have

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

23

executed appropriate agreements with Kin Yat so that Kin Yat may fulfill Kin Yat's obligations under this Section 17. Kin Yat agrees to execute any documents of assignment or registration requested by iRobot relating to any and all Newly Created Intellectual Property.  Kin Yat agrees to cooperate fully with iRobot, both during and after the engagement, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in or related to Newly Created Intellectual Property.

17.4.2 During the Term plus any period of support that may survive termination or expiration of this Agreement, Kin Yat agrees to inform iRobot of any Newly Created Intellectual Property.

17.5 <u>Trademark Usage</u>. Nothing in this Agreement gives either Party a right to use the other Party's Marks or implies the grant of any license from one Party to the other to use any Marks. Notwithstanding the foregoing, and subject to the terms and conditions of this Agreement, iRobot grants to Kin Yat a limited, non-exclusive, non-transferable, non-assignable, royalty-free license during the Term to reproduce any Mark set forth on Schedule 4, or otherwise designated in writing by iRobot (**"iRobot Marks"**) solely for the purpose placing such Marks on Products sold to iRobot and any applicable packaging, and for no other business or non-business purposes whatsoever and no other goods or services whatsoever, in accordance with the following:

17.5.1 All reproductions of iRobot Marks must be approved in writing by iRobot and must be in accordance with iRobot's then current Trademark Usage Guidelines (**"Mark Guidelines"**), a copy of which is included in Schedule 4;

17.5.2 Kin Yat may not combine any iRobot Marks with, or create a composite mark using any iRobot Mark with, a trademark of Kin Yat or any third party, or use any of the iRobot Marks or any part thereof as part of its corporate name, or use any name or mark confusingly similar to any of the iRobot Marks;

17.5.3 No other rights or licenses, except that expressed in this Section 17.5 are granted to Kin Yat in and to any iRobot Mark, whether expressly, by implication, by estoppel, or otherwise;

17.5.4 As between iRobot and Kin Yat, the iRobot Marks are and shall remain the sole and exclusive property of iRobot and Kin Yat shall not acquire any right, title or interest in or to any iRobot Mark as a result of this Agreement (other than the limited license expressly granted in this Section 17.5) and all use of the iRobot Marks by Kin Yat and all goodwill generated thereby shall inure solely to the benefit of iRobot;

17.5.5 Kin Yat admits the validity of, and agrees not to challenge the iRobot Marks;

17.5.6 If any application for registration is or has been filed in any country by Kin Yat which relates to any name or mark which, in the sole opinion of iRobot, is confusingly similar, deceptive or misleading with respect to any of the iRobot Marks, Kin Yat shall immediately abandon any such application or registration or at iRobot's sole discretion, assign it to iRobot, and reimburse iRobot for all costs and expenses of any opposition, cancellation or related legal proceedings, including attorney's fees, instigated by iRobot or its authorized representative, in connection with any such registration or application; and

17.5.7 Upon any notice from iRobot that Kin Yat's use of the iRobot's Marks fails to conform with the Mark Guidelines, or any other provision of this Section 17.5, Kin Yat shall cease use of the iRobot Marks, until such failure has been corrected to the satisfaction of iRobot.

17.6 <u>Kin Yat Marks</u>. Kin Yat agrees and warrants that it will not use any Kin Yat or third party Mark (excluding authorized Marks of the iRobot) on any Product, packaging materials or documentation without iRobot's prior written authorization.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

17.7 <u>Grant of License to iRobot Intellectual Property</u>. In addition to Clause 17.5, iRobot hereby grants to Kin Yat a limited, non-exclusive, non-transferable, non-assignable, non-sublicensable and royalty-free right and license to use iRobot Intellectual Property, Proprietary Information and Technology and specifications solely for the purpose of performing its obligations under this Agreement, including manufacturing Products pursuant to this Agreement and supplying such Products only to iRobot. Such limited right and license shall extend to no other materials or for any other purpose and shall terminate automatically upon expiration or termination of the relevant Purchase Order or this Agreement for any reason.

**18 Manufacturing Services for Competitive Products.** In order to protect the iRobot's Proprietary Information and Technology, during the Term of this Agreement and for a period of [***] following the termination of this Agreement for any reason, Kin Yat will not, without the iRobot's express written consent, engage in any design, development, manufacturing, testing, configuring, assembling, packaging, shipping and/or selling of any product that is or is intended to be, directly or indirectly competitive with any of the Products, including, without limitation, any robotic floor care product.

**19 Indemnification**.

19.1 <u>Kin Yat's Indemnity Obligations</u>. Kin Yat shall indemnify, defend and hold iRobot and its employees, Subsidiaries, Affiliates, successors and assigns ("**iRobot Indemnified Parties**") harmless from and against any and all losses, liabilities, damages (including consequential, special and/or punitive damages), claims, expenses, suits, recoveries, judgments and fines (including reasonable attorneys' fees and expenses) (collectively "**Losses**") that may be incurred by any iRobot Indemnified Party arising out of (a) any damage to property or injury or death occurring to any person arising out of any failure by Kin Yat to provide Product in conformance with the Specifications; (b) any injury to person or property or death occurring to any Kin Yat employees, subcontractors, agents or any other individuals on Kin Yat's premises, except to the extent such injury to person or property or death was caused by the presence of iRobot's employees or agents on Kin Yat's premises; (c) any claim, action or proceeding brought by any governmental authority arising out of or resulting from the Manufacturing Services for Product that does not conform to the Specifications; (d) any breach by Kin Yat of any of its respective obligations, representations or warranties under this Agreement, including a breach which results in a recall of Product as contemplated under Section 4; (e) any other grossly negligent or willful act or omission on the part of Kin Yat; (f) the operation, ownership or control of the facilities of Kin Yat, its Affiliates or its subcontractors or the manufacturing, generation, processing, storage, transportation, distribution, treatment, disposal or other handling of the Products or materials used in the manufacture and packaging of the Products, or associated by-product, raw materials, intermediates, wastes, hazardous materials, emissions, releases, spills, leaks or discharges, or returned Products, Kin Yat, Affiliates of Kin Yat, or subcontractors of Kin Yat or its Affiliates, or their officers, directors, employees, agents or contractors; (g) any claim relating to the infringement of patent or other intellectual property rights relating to the manufacturing process employed by Kin Yat in performing the Manufacturing Services for Products or that Kin Yat asserts as owning in connection with the manufacturing of the Product or (h) violation of any applicable law, regulation, or rule in connection with the Manufacturing Services for Products hereunder, provided that the indemnity under this Section 19.1 shall not apply if any Loss is caused by (1) Kin Yat's use of materials, trademarks and symbols supplied by iRobot, Kin Yat's reliance upon the Specifications, iRobot Intellectual Property, iRobot's Proprietary Information and Technology and/or the Packaging and Shipping Specifications in accordance with the terms of this Agreement, or (2) defects in design or product liability caused by iRobot or its agents, or (3) the gross negligence or willful misconduct of iRobot.

19.2 <u>iRobot's Indemnity Obligations</u>. Except to the extent subject to Kin Yat's indemnification of iRobot as provided in Section 19.1, iRobot shall indemnify, defend and hold Kin Yat and its employees, Subsidiaries, Affiliates, successors and assigns ("**Kin Yat Indemnified Parties**") harmless from and against any and all Losses, arising from any third party claims asserted against any Kin Yat Indemnified Party, to the extent based on any of the following: (a) making, using or selling the Product, proper and authorized use of the Specifications, iRobot Intellectual Property, Packaging and Shipping Specifications, Proprietary Information and Technology of iRobot, any Product, or any

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25

information, technology and processes supplied and/or approved by iRobot or otherwise required by iRobot of Kin Yat, in connection with Kin Yat's performance of its obligations under this Agreement; (b) any recall or actual noncompliance with Materials Declaration Requirements; (c) that Kin Yat's use of any item in subsection (a) in connection with performing its obligations under this Agreement infringes any patent, copyright or other intellectual property right of a third party, (d) performance of the Manufacturing Services in accordance with the Product Specifications, and (e) any other grossly negligent or willful act or omission on the part of iRobot.

19.3 Indemnification Procedures. Any Person that may be entitled to indemnification under this Agreement shall give the other Party prompt notice of any claim and cooperate with the indemnifying Party at its expense. The Indemnifying party shall have the right to assume the defense (at its own expense) of any such claim through counsel of its own choosing by so notifying the Party seeking indemnification within [***] of the first receipt of such notice. The Party seeking indemnification shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying party. The Indemnifying party shall not, without the prior written consent of the indemnified party, agree to the settlement, compromise or discharge claim.

**20 Relationship of Parties.** Kin Yat shall perform its obligations hereunder as an independent contractor. Nothing contained herein shall be construed to imply a partnership or joint venture relationship between the Parties. The Parties shall not be entitled to create any obligations on behalf of the other Party, except as expressly contemplated by this Agreement. The Parties will not enter into any contracts with third parties in the name of the other Party without the prior written consent of the other Party.

**21 Insurance.** During the Term and at all times that Kin Yat performs work for iRobot, Kin Yat will maintain in full force and effect, at Kin Yat's own expense, for the benefit of both Kin Yat and iRobot, insurance coverage to include:

21.1 Kin Yat shall maintain for the term of this Agreement, at its own expense: a comprehensive or commercial general liability policy including contractual liability products/completed operation and broad form property damage coverage, affording protection on an occurrence basis for claims arising out of bodily injury, death, and property damage, and having limits of not less than; a combined single limit of $[***] per occurrence with a $[***] aggregate limit of liability and (ii) Worker's Compensation insurance as required by the laws of the state, province, country or similar authority(ies) where the services will be performed (iii) Commercial Automobile Liability Insurance - bodily injury and property damage combined single limit of RMB[***]. Such comprehensive or commercial general liability policy insurance shall name iRobot as an additional insured and may not be canceled or changed without at least [***] prior written notice to iRobot. Prior to the commencement of Services, Kin Yat shall provide a certificate of insurance to iRobot evidencing these requirements and shall provide updated certificates as applicable. Kin Yat shall also be liable to maintain, at its sole expense, travel insurance coverage and any legally mandated health insurance.

21.2 Additional Requirements. All deductibles on policies providing coverage will be paid by Kin Yat. In the event Kin Yat is self-insured for matters described above, Kin Yat agrees to respond to any claims or losses made against or incurred by iRobot in the same fashion as if insurance had been purchased. In no event will the coverage or limits of any insurance required under this Section 21, or the lack or unavailability of any other insurance, be deemed to limit or diminish either Party's obligations or liability to the other Party under this Agreement, including but not limited to, each Party's indemnification obligations as set forth in Section 19. Kin Yat will obtain the necessary insurance within [***] of the Effective Date.

**22 Business Continuity Plan.**

22.1 Risk Management and Continuity Plans. Kin Yat will develop and keep current a formal business continuity plan detailing Kin Yat's plans, procedures and designated resources for timely response to and recovery from potential civil, natural, and physical plant disasters that could reasonably be expected to disrupt production and delivery to iRobot ("**Business Continuity Plan**"). Upon request, Kin Yat will make such plan available to iRobot or its designated representative for review.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

22.2 <u>Notification</u>. Kin Yat agrees to notify iRobot as soon as possible in the event of a crisis that disrupts manufacturing or delivery of Products. Unless authorized in advance in writing by iRobot, Kin Yat will not refer to iRobot in public and media communications about the crisis and subsequent recovery.

22.3 <u>Loss Control</u>. Kin Yat will be responsible for maintaining its facilities and operations in accordance with applicable fire protection and loss control laws, regulations and industry standards.

23 **Publicity.** Without the written consent of the other Party, neither Party shall refer to this Agreement in any publicity or advertising or disclose to any third party any of the terms of this Agreement. Notwithstanding the foregoing, neither Party will be prevented from, at any time, furnishing any information to any governmental or regulatory authority, including the United States Securities and Exchange Commission or any other foreign stock exchange regulatory authority, that it is by law, regulation, rule or other legal process obligated to disclose, so long as the other Party is given advance written notice of such disclosure pursuant to Section 2.4 of the Non-Disclosure Agreement. In addition, a Party may disclose the existence of this Agreement and its terms to its attorneys and accountants, suppliers, customers and others only to the extent necessary to perform its obligations and enforce its rights hereunder, and to existing and prospective investors and/or acquirers that are contemplating a potential investment in or acquisition of such Party, provided, however, that any and all such suppliers, customers, investors, acquirers and advisers are bound by agreements or, in the case of professional advisers, ethical duties, to treat, hold and maintain such information in accordance with the terms and conditions of the Non-Disclosure Agreement.

24 **Force Majeure.**

24.1 Subject to Section 24.2.2 below, neither Party shall be liable for any failure or delay in the performance of its obligations under this Agreement to the extent such failure or delay is due to causes beyond such party's reasonable control, including but not limited to, acts of God, acts of civil or military authority, legal restrictions, fires, explosion, embargo, mobilization, riot, epidemics, and to the extent the following are on a national basis, strikes, industrial disturbances, shortage of material, electricity, oil or transport, or restriction in the use of power. Events set forth above are referred to individually and collectively as "<u>Force Majeure Events</u>." The Parties expressly acknowledge that Force Majeure Events do not include vandalism, or the non-performance of third parties or subcontractors relied on for the delivery of the Manufacturing Services, unless such failure or non-performance by a third party or subcontractor is itself caused by a Force Majeure Event, as defined above. Upon the occurrence of a Force Majeure Event, the non-performing Party shall be excused from any further performance or observance of the affected obligation(s) for as long as such circumstances prevail, and such Party continues to attempt to recommence performance or observance to the greatest extent possible without delay.

24.2 Notwithstanding any other provision of this Section 24, a Force Majeure Event shall obligate and require Kin Yat to commence and successfully implement all of the Manufacturing Services relating to disaster recovery set forth in its Business Continuity Plan within the time period described therein. If a Force Majeure Event causes a material failure or delay in the performance of any Manufacturing Services for more than [***] consecutive days, iRobot may, at its option, and in addition to any other rights iRobot may have, procure such Manufacturing Services from an alternate source until Kin Yat is again able to provide such Manufacturing Services. iRobot shall continue to pay Kin Yat the charges due and payable hereunder during such period, but Kin Yat shall not be entitled to any additional payments as a result of the Force Majeure Event. If a Force Majeure Event causes a material failure or delay in the performance of any Manufacturing Services under this Agreement for more than [***] consecutive days, iRobot may, at its option, and in addition to any other rights iRobot may have, immediately terminate this Agreement without liability to Kin Yat.

25 **Miscellaneous.**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.1 <u>Notices</u>. All notices, demands and other communications made hereunder shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), by facsimile or EDI (with telephone confirmation) addressed to the respective Parties at the following addresses:

|  |  |
|---|---|
| Notice to Kin Yat: | Kin Yat Industrial Company Limited<br>7th Floor Galaxy Factory Building<br>25-27 Luk Hop Street<br>San Po Kong, Kowloon<br>Hong Kong<br>Facsimile: (852) 2351 1867<br>Attn: Mr. Vincent Fung |
| <u>with a copy to:</u> | Kin Yat Holdings Limited<br>25-27 Luk Hop Street<br>San Po Kong, Kowloon<br>Hong Kong<br>Facsimile: (852) 2351 1867<br>Attn: General Counsel |
| Notice to iRobot: | iRobot Corporation<br>8 Crosby Drive<br>Bedford, MA 01730<br>Facsimile: (781) 430-3001<br>Attn: General Counsel |

25.2 <u>Expenses and Costs</u>. Each Party shall pay their own expenses in connection with the negotiation of this Agreement. All fees and expenses incurred in connection with the resolution of Disputes shall be allocated as further provided in Section 25.15 below.

25.3 <u>Amendment</u>. No course of dealing between the Parties hereto shall be effective to amend, modify, or change any provision of this Agreement. This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Party against whom such change is to be enforced. The Parties may, subject to the provisions of this Section 25.3, from time to time, enter into supplemental written agreements for the purpose of adding any provisions to this Agreement or changing in any manner the rights and obligations of the Parties under this Agreement or any Schedule hereto. Any such supplemental written agreement executed by the Parties shall be binding upon the Parties.

25.4 <u>Partial Invalidity</u>. Whenever possible, each provision of this Agreement shall be interpreted in such a way as to be effective and valid under applicable law. If a provision is prohibited by or invalid under applicable law, it shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

25.5 <u>Monies</u>. All references to monies in this Agreement shall be deemed to mean lawful monies of the United States of America.

25.6 <u>Entire Agreement</u>. This Agreement, the Schedules and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the Parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements and negotiations by and between the Parties. Each Party acknowledges and agrees that no agreements, representations, warranties or collateral promises or inducements have been made by any Party to this Agreement except as expressly set forth herein or in the Schedules and any addenda

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

28

attached hereto or referenced herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement. These acknowledgments and agreements are contractual and not mere recitals. In the event of any inconsistency between the provisions of this Agreement and any Schedule and any addenda attached hereto or referenced herein, the provisions of this Agreement shall prevail unless expressly stipulated otherwise, in writing executed by the Parties. Pre-printed language on each Party's forms, including purchase orders, that conflict with the terms and conditions of this Agreement, are shall not constitute part of this Agreement and shall be deemed unenforceable.

25.7 <u>Binding Effect</u>. This Agreement shall be binding on the Parties and their successors and assigns; provided, however, that Kin Yat shall not assign, delegate or transfer, in whole or in part, this Agreement or any of its rights or obligations arising hereunder, without the prior written consent of iRobot. Any purported assignment without such consent shall be null and void.

25.8 <u>Anti-Corruption Laws.</u> Kin Yat represents that it has a copy of, and is familiar with, the United States Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2 (the "<u>FCPA</u>"), and the purposes of the FCPA, including the FCPA's prohibition of the payment or the gift of any item of value, either directly or indirectly, by or on behalf of a company organized under the laws of the United States of America or any of its states to an official, employee, or officer of, or person acting in an official capacity for, a government or international organization for the purpose of influencing any action or decision, or inducing him to use his influence with the government or organization in a manner contrary to his position or creating an improper advantage to assist a company in obtaining or retaining business for, with, or in that country or organization or directing business to any person. Kin Yat represents and warrants that it will take no action that would constitute a violation of the FCPA or any law. Moreover, Kin Yat represents and warrants that no government official is a principal, owner, officer, employee or agent of any entity in which Kin Yat has an interest, and no government official has any material financial interest in the business of Kin Yat. Further, Kin Yat represents and warrants that Kin Yat and its Affiliates do and shall comply with all applicable legal requirements and iRobot's policies against corrupt business practices, against money laundering and against facilitating or supporting persons who conspire to commit crimes or acts of terror against any person or government. Kin Yat agrees that it will notify iRobot in writing immediately of the occurrence of any event, which renders the foregoing representations and warranties of this paragraph incorrect.

25.9 <u>Child/Forced Prison Labor Laws</u>. Kin Yat, by signing this agreement, represents and warrants that it and its subcontractors/suppliers will comply with all applicable local government regulations regarding minimum wage, living conditions, overtime, working conditions, child labor laws and the applicable labor and environmental laws. Kin Yat further represents and warrants that it and its subcontractors/suppliers do not use any form of forced prison labor and/or child labor under the age of 15 or the minimum age required by local government, whichever is older.

25.10 <u>Waiver</u>. Waiver by either Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any other provision of this Agreement.

25.11 <u>Captions</u>. The captions contained in this Agreement are inserted only as a matter of convenience or reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions.

25.12 <u>Construction</u>. Since both Parties have engaged in the drafting of this Agreement, no presumption of construction against any Party shall apply.

25.13 <u>Section References</u>. All references to Sections or Schedules shall be deemed to be references to Sections of this Agreement and Schedules attached to this Agreement, except to the extent that any such reference specifically refers to another document. All references to Sections shall be deemed to also refer to all subsections of such Sections, if any.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.14 <u>Business Day</u>. If any time period set forth in this Agreement expires upon a Saturday, Sunday or U.S. national, legal or bank holiday, such period shall be extended to and through the next succeeding business day.

25.15 <u>Dispute Resolution</u>.

25.15.1 Kin Yat and iRobot mutually agree to the settlement by arbitration of all claims or controversies each party may have against the other relating in any manner whatsoever to this Agreement or its terms. Except for the right to obtain provisional remedies or interim relief, which right is preserved without any waiver of the right to arbitration, arbitration under this Agreement shall be the exclusive remedy for all such arbitrable claims. Kin Yat and iRobot also agree that arbitration shall be held in Boston, Massachusetts if such arbitration is sought by Kin Yat and in Hong Kong if such arbitration is sought by iRobot, and shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitrator(s) shall have the authority to award or grant both legal, equitable and declaratory relief. Such arbitration shall be final and binding on the parties.

25.15.2 Kin Yat and iRobot agree that in the event that any action, either civil or arbitral is brought to enforce this Agreement by either Kin Yat or iRobot, the prevailing party shall be entitled to an award of all reasonable attorneys' fees and legal costs, in addition to other relief.

25.15.3 The Parties agree that the existence, conduct and content of any negotiation or arbitration pursuant to this Section 25.15 shall be kept confidential and no Party shall disclose to any Person any information about such negotiation or arbitration, except as set forth in Section 16 or 23.

25.15.4 IN THE EVENT OF ANY DISPUTE BETWEEN THE PARTIES, WHETHER IT RESULTS IN PROCEEDINGS IN ANY COURT IN ANY JURISDICTION OR IN ARBITRATION, THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY, AND HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL, WAIVE ALL RIGHTS TO TRIAL BY JURY, AND AGREE THAT ANY AND ALL MATTERS SHALL BE DECIDED BY A JUDGE OR ARBITRATOR WITHOUT A JURY TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.

25.15.5 Notwithstanding anything contained in this Section 25.15 to the contrary, in the event that either Party is seeking temporary or preliminary injunctive relief, including any action for equitable relief, such Party may proceed in the Massachusetts Courts without prior negotiation or arbitration for the limited purpose of avoiding immediate and irreparable harm.

25.16 <u>Insider Trading</u>. Kin Yat will not, and will cause its Affiliates and Subsidiaries to not, transact in any securities of iRobot based on the manufacture of any Product under this Agreement or any Proprietary Information and Technology of the iRobot or from communicating any such information to any other Person in connection with the trading of such securities.

25.17 <u>Other Documents</u>. The Parties shall take all such actions and execute all such documents that may be necessary to carry out the purposes of this Agreement, whether or not specifically provided for in this Agreement.

25.18 <u>Counterparts</u>. This Agreement may be executed by facsimile and delivered in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one agreement.

25.19 <u>Even-Handed Construction</u>. The terms and conditions as set forth in this Agreement have been arrived at by sophisticated parties with equal bargaining power, each having an opportunity to consult with counsel, after mutual negotiation, and it is the intention of the Parties that its terms and conditions not be construed against any Party merely because it was prepared by one of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

25.20 <u>Governing Law and Jurisdiction</u>. All disputes, claims or controversies arising out of this Agreement, or the interpretation, negotiation, validity or performance of this Agreement, or the transactions contemplated hereby shall be governed by the laws of the State of New York, without application of conflicts of law principles. The provisions of the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives.

| **IROBOT CORPORATION** | | **KIN YAT INDUSTRIAL COMPANY LIMITED** | |
|---|---|---|---|
| By: | /s/ Alison Dean | By: | /s/ Vincent Fung |
| | Signature | | Signature |
| Name: | Alison Dean | Name: | Vincent Fung |
| | (Print) | | (Print) |
| Title: | CFO | Title: | Director |
| Date: | 1/22/14 * | Date: | Feb.10.2014 |
| | * agreed to be effective as of 9/23/13 | | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 1**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**STATEMENT OF WORK**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 2**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**

**FEE AND PRICE (FINAL QUOTE)**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 3**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**QUALITY AND TEST PROCEDURES**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 4**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**


**NON-DISCLOSURE AGREEMENT**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 5**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND iRobot**

**TRADEMARK USAGE GUIDELINES**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 6**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN Kin Yat AND IROBOT**


**IROBOT QUARTER END**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Amendment # 1 to Manufacturing Services Agreement Between: iRobot Corporation and Kin Yat Industrial Co. Ltd

**PARTIES**

(1)      **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA ("Buyer").

(2)      **Kin Yat Industrial Co. Ltd.,** a Hong Kong Company having its place of business at 7/F Galaxy Factory Building, 25-27 Luk Hop Steet, San Po Kong, Kowloon, Hong Kong (hereinafter referred to as ("Seller")

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated 23rd September, 2013 (the "Agreement").

**WHEREAS,** pursuant to clause 25.3 of the Agreement, the Parties wish to amend the Agreement;

For good and valuable consideration, Effective as of **(6 August 2014),** the following amendments are hereby agreed:

*Clause 7.3 will be replaced in its entirety with the following:*

<u>Disputed Invoices.</u> If a Kin Yat invoice does not meet the invoicing requirements of this Agreement, or iRobot in good faith disputes any invoiced charges, iRobot will notify Kin Yat of the disputed items in writing on or before the payment due date and may withhold payment of the disputed charges pending resolution of the dispute. With the exclusion of events beyond Kin Yat's control, such as quality related issues, late delivery or short shipment, any lack of timely payment by Kin Yat to any Supplier listed in Schedule 7, attached, will result in a deduction of the identical amount to any outstanding receivable of Kin Yat under this agreement.

If any conflict or inconsistency occurs between this Amendment and the Agreement, the provisions of this Amendment shall prevail. The remainder of the Agreement shall remain in full force and effect, unamended.

Signed by a duly authorised director or officer for and on behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |

Signed by a duly authorised director or officer for and on behalf of Kin Yat Industrial Co. Ltd

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Executive Director | /s/ Vincent Fung |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**SCHEDULE 7**
**TO MANUFACTURING SERVICES AGREEMENT**
**BETWEEN KIN YAT AND IROBOT**


**SUPPLIERS**


**JABIL CIRCUIT, INC.**


Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Amendment #2 to Master Supplier Agreement Between:
iRobot Corporation and Kin Yat Industrial Company, Ltd.

**Parties**

**iRobot Corporation**, a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

**Kin Yat Industrial Company, Ltd.**, a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong.

**WHEREAS**, the Parties executed the Master Supplier Agreement dated September 23, 2013 ("the Agreement").

**WHEREAS**, pursuant to Section 25.3 of the Agreement, the Parties wish to amend the Agreement as follows:

For good and valuable consideration, Effective as of June 1, 2015, the following amendments are hereby agreed:

Section 3.6.1 in the Agreement will be replaced in its entirety with the following:

3.6.1 Kin Yat will use Commercially Reasonable Efforts to procure Assigned Components from the applicable designated supplier per iRobot's AVL and Generic Components per iRobot's BOM, where applicable, and otherwise from suppliers chosen by Kin Yat and approved by iRobot, in amounts necessary to fulfill Purchase Orders and to procure under Material Authorizations. Kin Yat will be responsible for adherence to the Product Specifications in the assembly and manufacturing process. iRobot will be responsible for managing the pipeline of iRobot controlled Consigned Components. Kin Yat will be responsible for managing the pipeline of all Assigned Components, Generic Components, and any Consigned Components controlled by Kin Yat to the extent empowered by Company through its Material Authorizations and Purchase Orders. Company authorizes Kin Yat to procure Generic Components and Assigned Components necessary, without a Purchase Order from agreed upon distributors/suppliers, by issuing a written authorization to purchase such Components ("Material Authorization"), to meet specific Forecast or Purchase Order demand as well as any coverage which may be needed for NCNR and Long-Lead Components. In the event of schedule changes, Kin Yat will use Commercially Reasonable Efforts to cancel all applicable material and parts inventory through return for credit programs or allocate such materials and parts for other customer orders. iRobot retains all liability for materials and parts Kin Yat cannot return or reuse elsewhere after Commercially Reasonable Efforts to mitigate such liability, if those materials were ordered by Kin Yat acting on iRobot's Material Authorization or Purchase Order. Kin Yat's obligation to exercise Commercially Reasonable Efforts to return/reuse any materials shall extend to all Components regardless of classification, except for non-cancel/nonreturnable (NCNR) Components.

If any conflict or inconsistency occurs between the Amendment and the Master Supplier Agreement, the provisions of this Amendment shall prevail. The remainder of the Master Supplier Agreement shall remain in full force and effect, unamended.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |
| *Date:* | | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat Industrial Co. Ltd

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | July 6, 2015 | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**Amendment #3 to Manufacturing Services Agreement Between:**
**iRobot Corporation and Kin Yat Industrial Company Ltd.**

**Parties**

(1)    **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

(2)    **Kin Yat Industrial Company Ltd.,** a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated September 23, 2013 (the "Agreement").

**WHEREAS,** pursuant to section 25.3 of the Agreement, the Parties wish to amend the Agreement and update the Parties to the Agreement as follows:

**Parties:** The name of **iRobot Corporation** shall remain **iRobot Corporation** ("iRobot"). iRobot is a Delaware corporation having its principal office in 8 Crosby Drive Bedford MA. The name of **Kin Yat Industrial Company Ltd.** is hereby changed to **Kin Yat (HK) Holdings Limited ("Kin Yat"),** including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company Limited.** Kin Yat's principal office is located at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong.

All references to "iRobot" in Sections 3, 4.10, 4.12, 5, 7, 11, and 12 will also include Guangzhou iRobot Robot Technology Consulting Company Limited ("Guangzhou iRobot"). For avoidance of doubt, Guangzhou iRobot shall have the right and ability to purchase Product from Kin Yat, Kin Yat (Guizhou) Robot Company Limited, and from any Subsidiary of Kin Yat, issue Purchase Orders for Product under this Agreement, and enforce all related rights as if it were iRobot. Kin Yat agrees to indemnify, defend and hold harmless iRobot and its subsidiaries in accordance with the provisions under Section 19 of the Agreement. iRobot as the holding company of Guangzhou iRobot hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by Guangzhou iRobot of all of its obligations, and shall assume all liabilities of Guangzhou iRobot in accordance with the provisions of the Agreement set forth above. Kin Yat hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by its subsidiaries of all their obligations, and shall assume all liabilities of its subsidiaries, in accordance with the provisions of the Agreement with respect to its provision of manufacturing services and Additional Services under the Agreement.

If any conflict or inconsistency occurs between the Amendment and the Manufacturing Services Agreement, the provisions of this Amendment shall prevail. The remainder of the Manufacturing Services Agreement shall remain in full force and effect, unamended.

All parties below acknowledge and confirm the terms and conditions of the Agreement and this Amendment and agree to be bound by the terms and conditions of this Amendment.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamorano |
| *Date:* | Oct. 24, 2016 | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Signed by a duly authorised director or officer for and on
behalf of Guangzhou iRobot Robot Technology Consulting
Company Limited

| | | |
|---|---|---|
| *Print full name:* | Philip Li | *Signature:* |
| *Position:* | General Manager of Far East | /s/ Philip Li |
| *Date:* | Oct. 24, 2016 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat Industrial Company Ltd.

| | | |
|---|---|---|
| *Print full name:* | FUNG Wah Cheong, Vincent | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | Oct. 20, 2016 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat (HK) Holdings Limited

| | | |
|---|---|---|
| *Print full name:* | FUNG Wah Cheong, Vincent | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | Oct. 20, 2016 | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**Amendment #4 to Manufacturing Services Agreement Between: iRobot Corporation and
Kin Yat Industrial Company, Limited n/k/a Kin Yat (HK) Holdings Limited**

**Parties:**

(1)     **iRobot Corporation,** a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford Massachusetts, 01730, USA ("iRobot")

(2)     **Kin Yat (HK) Holdings Limited,** including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company limited ("Kin Yat"),** a Hong Kong corporation, having its principal place of business at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong

**WHEREAS,** the Parties executed the Manufacturing Services Agreement dated September 23, 2013 as amendment by Amendment No. 1 dated August 6, 2014 and as amended by Amendment No. 2 dated June 1, 2015 and as amended by Amendment No. 3 dated October 20, 2016 (the "Agreement").

**WHEREAS,** for good and valuable consideration, the Parties hereby acknowledge and agree effective as of March 24, 2017, that pursuant to section 25.3 of the Agreement, the Parties wish to amend the Agreement as follows:

Replace Section 7 Delivery. Risk of Loss and Payment Terms as follows:

**7 Delivery, Risk of Loss and Payment Terms.** For purposes of this Agreement terms of sale for Product shipments shall be:

For export shipments title and risk of loss for Product will pass to iRobot (or to iRobot's designee invoiced by Kin Yat) FCA Port of Origin (per Intercoms 2010). For any shipments where Kin Yat acts as an agent in completing the Shipper's Export Declaration and managing iRobot's exports on behalf of iRobot, where iRobot is the exporter of record (Principal Party in Interest - PPI), iRobot hereby grants Kin Yat a limited Power of Attorney to act on its behalf in managing its exports.

For domestic (mainland China) shipments, ownership of Product, delivery cost, and guarantee rests with Kin Yat until delivery at iRobot's distributor's assigned warehouse. Delivery for domestic shipments is DAP-iRobot distributor assigned warehouses. Said iRobot distributor assigned warehouse will be outlined on each individual P.O. issued. Once Product is delivered to iRobot's distributor's assigned warehouse, ownership of Product, delivery cost, and guarantee all transfer to iRobot's distributor.

For clarity, sections 7.1- 7.4 remain as written.

If any conflict or inconsistency occurs between this Amendment and the Manufacturing Services Agreement, the provisions of this Amendment shall prevail. The remainder of the Manufacturing Services Agreement shall remain in full force and effect, unamended.

All parties below acknowledge and confirm the terms and conditions of the Agreement and this

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Amendment and agree to be bound by the terms and conditions of this Amendment.

Signed by a duly authorised director or officer for and on
behalf of iRobot Corporation

| | | |
|---|---|---|
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamarano |
| *Date:* | March 23, 2017 | |

Signed by a duly authorised director or officer for and on
behalf of Kin Yat (HK) Holdings Limited

| | | |
|---|---|---|
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | March 23, 2017 | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**Amendment #5 to the Manufacturing Services Agreement**

Between:       iRobot Corporation and Kin Yat Industrial Company, Limited n/k/a Kin Yat (HK) Holdings Limited

**PARTIES:**

(1)    **iRobot Corporation**, a Delaware corporation with its principal place on business at 8 Crosby Drive, Bedford, Massachusetts, 01730, USA ("iRobot")

(2)    **Kin Yat (HK) Holdings Limited**, including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company Limited**, a Hong Kong corporation, having its principal place of business at 7/F, Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong ("Supplier") (together the "Parties")

**WHEREAS**, the Parties executed the Manufacturing Services Agreement dated September 23, 2013 as amended by Amendment No. 1 dated August 6, 2014 and as amended by Amendment No. 2 dated June 1, 2015 and as amended by Amendment No. 3 dated October 20 2016 and as amended by Amendment No. 4 dated March 24, 2017 (the "Agreement").

**WHEREAS**, for good and valuable consideration, the Parties hereby acknowledge and agree effective as on **March 1, 2018**, that pursuant to section 25.3 of the Agreement, the Parties wish to amend the Agreement as follows:

**Parties**: The name of **iRobot Corporation** is hereby changed to iRobot Corporation and its subsidiaries ("iRobot"), a Delaware corporation having its principal office in 8 Crosby Drive Bedford MA.

The name of **Kin Yat (HK) Holdings Limited**, including but not limited to its subsidiaries **Kin Yat Industrial Company Limited** and **Kin Yat (Guizhou) Robot Company Limited**, ("Kin Yat"). Kin Yat's principal office is located at 7/F., Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong remains unchanged.

If any conflict or inconsistency occurs between this Amendment and the Agreement, the provisions of this Amendment shall prevail. The remainder of the Agreement shall remain in full force and effect, unamended.

The Parties have indicated the agreement to and acceptance of the amendments by executing below.

|  |  |  |
|---|---|---|
| Signed by a duly authorised director or officer for and on behalf of iRobot Corporation | | |
| *Print full name:* | Oscar Zamorano | *Signature:* |
| *Position:* | SVP Operations & Supply Chain | /s/ Oscar Zamarano |
| *Date:* | | |

|  |  |  |
|---|---|---|
| Signed by a duly authorised director or officer for and on behalf of Kin Yat (HK) Holdings Limited | | |
| *Print full name:* | Vincent Fung | *Signature:* |
| *Position:* | Director | /s/ Vincent Fung |
| *Date:* | 19 April 2018 | |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**Amendment #6 to Manufacturing Services Agreement**
**Between: iRobot Corporation and Kin Yat Industrial Company Limited**

**Parties**

(1)    **iRobot Corporation**, a Delaware corporation with its principal place of business at 8 Crosby Drive, Bedford, Massachusetts, 01730 ("**iRobot**"); and

(2)    **Kin Yat Industrial Company Limited**, a Hong Kong corporation, having its principal place of business at 7/F, Galaxy Factory Building, 25-27 Luk Hop Street, San Po Kong, Kowloon, Hong Kong ("**Kin Yat**").

(iRobot and Kin Yat are each referred to as a Party or together as the Parties.)

**WHEREAS**, the Parties signed a Manufacturing Services Agreement effective from September 23, 2013, as amended (the "**MSA**");

(Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meanings as those defined in the MSA)

**AND WHEREAS**, despite that iRobot and Kin Yat has agreed on Product Price (as defined in the MSA) for fiscal year 2018 of iRobot (equivalent to the [***]) on or about [***] (the "**2018 Price**"), and that Kin Yat has the obligation under clause 3.9.2 of the MSA to timely perform its obligations under the MSA and deliver within [***] of the delivery requirements of each accepted Purchase Order (as defined in the MSA) the relevant Products (as defined in the MSA), Kin Yat has requested for and iRobot has agreed, in concert with this Amendment, to an increase in price for all Roomba Products as well as a bonus for timely delivery of Products for [***];

**AND WHEREAS**, to ensure that Kin Yat would produce and deliver products under the MSA, iRobot has conceded to Kin Yat's recent requests to increase the price for each goods and provide bonus payments in accordance with terms and conditions contained herein.

**NOW, THEREFORE**, in consideration of the agreements set forth herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties covenant and agree as follows:

1 Increase in Price
iRobot agrees to increase the price of each unit of all Roomba Products by US$[***] per unit above the 2018 Price for all Roomba Products procured under accepted Purchase Orders dated [***] or later to be delivered on or after [***] up to and including [***].

2 Bonuses
iRobot agrees to pay the following amount of bonus to Kin Yat under the following conditions :-

(1)    If the total units of Products delivered by Kin Yat under accepted Purchase Orders for delivery in [***] exceeds [***] units, iRobot agrees to pay to Kin Yat a bonus in the amount of US$[***];

(2)    If the total units of Products delivered by Kin Yat under accepted Purchase Orders for delivery in [***] exceeds [***] units, iRobot agrees to pay to Kin Yat additional bonus in the amount of US$[***];

(3)    If the total units of Products delivered by Kin Yat under accepted Purchase Orders for delivery in [***]exceeds [***] units, iRobot agrees to pay to Kin Yat further additional bonus in the amount of US$[***];

(4)    Within [***] upon fulfillment of each of the above-mentioned delivery targets, Kin Yat shall issue an invoice to iRobot stating the exact amount of Products delivered, the SKUs and details of the relevant Purchase Orders under which the Products were delivered;

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

(5)                    Upon receipts of the invoices and verification of contents of the same, iRobot shall pay such bonus to Kin Yat in accordance with the usual payment terms between the Parties.

3 Clause 3.6 of the MSA shall be amended by adding the following:

3.6 Payment for Materials. Kin Yat shall pay all designated suppliers promptly in accordance with all terms and conditions agreed to between Kin Yat and the supplier.

4 Clause 3.9.2 of the MSA shall be replaced in its entirety by the following:

3.9.2 Kin Yat agrees that time is of the essence with respect to all deliveries and performance. If Kin Yat fails to timely perform or deliver within [***] of the delivery requirements of any standalone Purchase Order from iRobot, Kin Yat is liable to iRobot for all reasonable and direct loss and damage iRobot may suffer as a result of such delay including but not limited to expediting costs. In the event of delay, Kin Yat shall use its best endeavours to minimize such delay and shall pay all expediting costs, including but not limited to expedited delivery costs and any additional labor costs. Notwithstanding the foregoing, nothing in this Clause 3.9.2 shall be interpreted as amending Clause 24 (force majeure) or having Kin Yat liable for loss of profits and other indirect, special or consequential loss of iRobot due to delay where Kin Yat uses Commercially Reasonable Efforts to provide timely delivery.

5 Clause 9.2 of the MSA shall be replaced in its entirety by the following:

9.2                    Price. The Price for each Product is set forth in Schedule 2 (the "Product Price), and includes the complete price for such Product, including the fully-costed bill of materials, Kin Yat's Gross Margin (as defined in Schedule 2), and any and all other added fees and costs related to the Manufacturing Services, Reasonable and Customary Support Services. The Product Price for each Product shall not be increased during the period beginning on the Effective Date and ending on [***], during such time Kin Yat shall manage its supply chain and absorb any and all increases. Pricing will be reviewed by the Parties on [***] basis, on or before [***], and will be revised consistent with increases or decreases in materials, components, equipment and other costs and expenses applicable to the manufacture of the Product. By [***], Kin Yat shall provide final fixed price quotation for upcoming iRobot fiscal year. Once such final fixed price quotation has been agreed by the Parties for the upcoming iRobot fiscal year, the Product Price based on such final fixed price quotation for that fiscal year shall not be increased for whatever reason.

In the event that there is any price increase or decrease over any materials supplied by suppliers that are assigned by iRobot after all other reasonable avenues have been exhausted to avoid such price increase (including but not limited to [***]),[***].

6 Clause 11.1 of the MSA shall be replaced in its entirety by the following:

11.1                  Forecast. iRobot will provide to Kin Yat, on [***], a non-binding, rolling [***] planning forecasts at a core robot level and on a SKU based level, indicating iRobot's monthly Product requirements, as amended by iRobot from time to time (each, a "**Forecast**"). Unless otherwise indicated by Kin Yat within [***] from receiving the Forecast or the amendment thereto by iRobot, Kin Yat is deemed to agree and undertake with iRobot that it will have the capacity and ability to manufacture, produce, and deliver such amount of Products as indicated in the Forecast. If Kin Yat indicates that it is not capable of manufacture, produce, and deliver such amount of Products as indicate in the Forecast within [***], the Parties shall negotiate to reach an mutually agreeable Forecast, provided that unless there is substantial change in the circumstances which is notified to iRobot in advance, Kin Yat is not entitled to unilaterally refuse to agree to the Forecast if the monthly production amount stated in such Forecast is substantially the same as the actual production volume for previous months. If Kin Yat unilaterally refuses to agree to a Forecast without notifying iRobot of any substantial change in the circumstances in advance, Kin Yat shall and undertakes to indemnify iRobot for any loss and damage it may incur due to such refusal.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

In particular for [***], in view of the tight supply of labor in China, both Kin Yat and iRobot agree that the Forecast of the production volume to be undertaken by Kin Yat's production facility in Shenzhen shall be approximately [***] units of Products. The production period for [***] will be divided into a [***] and [***]. During [***], Kin Yat will build approximately [***] units, and during [***] Kin Yat will build approximately [***] units. During each of [***] and [***], iRobot and Kin Yat will agree to evenly distribute production volume on [***] within the given period. Specifically, the [***] target production during [***] will be [***] units per [***], and the [***] target production during [***] will be [***] units per [***], it being understood that Kin Yat will absorb variations in production to the targets plus or minus [***].

7 Clause 11.2 of the MSA shall be replaced in its entirety by the following:

11.2        Purchase Orders. iRobot will issue orders for Products hereunder using its standard form of purchase order ("**Purchase Order**"). Each Purchase Order will identify the applicable Product by SKU, quantity, price denominated in US currency, delivery terms, and other customary terms. The Product Price stated in the Purchase Order shall be the same as agreed upon by the Parties in accordance with Clause 9.2 hereinabove. The delivery date contained in such Purchase Order shall correspond to the agreed lead time. The terms and conditions in this Agreement shall prevail over any conflicting terms and conditions in any Purchase Order. Such Purchase Orders will be issued by iRobot at least [***] prior to the date of ex-factory for all Products on each such Purchase Order. For select SKUs and as defined in Schedule 1, iRobot and Kin Yat will develop strategies to achieve [***] lead time. The total production volume in a month shall not deviate substantially from the amount stated in the correspondent Forecast for that particular month provided in accordance with Clause 11.1 above.

8 Clause 11.3 of the MSA shall be replaced in its entirety by the following:

11.3        Purchase Order Acknowledgment. Kin Yat will notify iRobot electronically within [***] if it utilizes EDI, or if in writing, within [***] of receipt of a Purchase Order. Unless the amount of Products stipulated in a Purchase Order exceeds the amount stated in the correspondent Forecast provided in accordance with Clause 11.1 above, Kin Yat is not entitled to refuse to accept such Purchase Order, under which circumstance such Purchase Order shall constitute a binding obligation on Kin Yat to perform its obligations in accordance with this Agreement.

9 Clause 11.6 of the MSA shall be replaced in its entirety by the following:

11.6        Production Increases. Rescheduling Delivery. iRobot may, in writing, request increases in production volume or acceleration of open Purchase Order at any time. Unless such request to increase production volume or acceleration of open Purchase Order would cause the production amount to exceed the relevant Forecast, Kin Yat is not entitled to refuse such request to increase production volume or acceleration of open Purchase Order and shall use its best endeavors to comply with such request in accordance with this Agreement, provided that unless the resultant total production volume in a month shall not deviate substantially from the amount stated in the correspondent Forecast for that particular month provided in accordance with Clause 11.1 above. Any such change to an open Purchase Order shall be documented in a written change order and shall become effective upon signature of iRobot. Kin Yat shall utilize its global supply network to assess availability of shared material across accounts to minimize instances in which Kin Yat is unable to meet an increase in a Purchase Order quantity requested by iRobot. It is further understood that iRobot will not incur additional charges due to Kin Yat's decision to meet an accelerated delivery schedule or request for increased quantities by utilizing Generic Components from another account's material.

10 If any conflict or inconsistency occurs between this Agreement and the MSA, the provisions of this Agreement shall prevail. The remainder of the MSA shall remain in full force and effect.

IN WITNESS WHEREOF, this Agreement shall take effect when it has been executed below by the duly authorized representatives of the Parties.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

Signed by a duly authorised director or officer for and on behalf of iRobot Corporation

By:                  /s/ Christian Cerda

Name:          Christian Cerda

Title:           Chief Operating Officer

Date:           15 October 2018

Signed by a duly authorised director or officer for and on behalf of Kin Yat (HK) Holdings Limited

By:                  /s/ Cheng Chor Kit

Name:          Cheng Chor Kit

Title:           Director

Date:           15 Oct 2018

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Exchange Act - [***] denotes omissions.

**Exhibit 21.1**

**iROBOT CORPORATION**
**SUBSIDIARIES OF THE REGISTRANT**

| Subsidiary Legal Name | Jurisdiction of Incorporation/Formation |
| --- | --- |
| iRobot Securities Corporation | Massachusetts |
| iRobot US Holdings Inc. | Delaware |
| iRobot Holdings LLC. | Delaware |
| iRobot (India) Private Limited | India |
| Guangzhou iRobot Technology Consulting Company Limited | China |
| Shanghai iRobot Robot Trading Co., Ltd. | China |
| iRobot (HK) Limited | Hong Kong |
| iRobot Japan G.K. | Japan |
| iRobot UK Ltd. | United Kingdom |
| iRobot France SAS | France |
| iRobot Belgium SPRL | Belgium |
| iRobot Portugal, Unipessoal Lda | Portugal |
| iRobot Austria GmbH | Austria |
| iRobot Germany GmbH | Germany |
| iRobot Netherlands B.V. | Netherlands |
| iRobot Iberia SL | Spain |

**Exhibit 23.1**

<u>CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</u>

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (Nos. 333-225482, 333-219686, 333-204669, 333-193998, 333-186700, 333-184320, 333-179593, 333-172333, 333-164993, 333-157306, 333-149373, 333-140707, 333-129576) of iRobot Corporation of our report dated February 14, 2019 relating to the consolidated financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Boston, Massachusetts
February 14, 2019

**Exhibit 31.1**

**Certifications**

I, Colin M. Angle, certify that:

1. I have reviewed this Annual Report on Form 10-K of iRobot Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 14, 2019

/s/ COLIN M. ANGLE

Colin M. Angle
Chief Executive Officer

**Exhibit 31.2**

**Certifications**

I, Alison Dean, certify that:

1.  I have reviewed this Annual Report on Form 10-K of iRobot Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 14, 2019

/s/ ALISON DEAN

Alison Dean
Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of iRobot Corporation (the "Company") for the year ended December 29, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Colin M. Angle, the Chief Executive Officer of the Company and Alison Dean, the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to our knowledge, that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

This certification is being provided pursuant to 18 U.S.C. 1350 and is not to be deemed a part of the Report, nor is it to be deemed to be "filed" for any purpose whatsoever.

Dated    February 14, 2019

/s/ COLIN M. ANGLE

Colin M. Angle
Chief Executive Officer

Dated    February 14, 2019

/s/ ALISON DEAN

Alison Dean
Chief Financial Officer