**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re IROBOT CORPORATION SECURITIES LITIGATION <br><br> This Document Relates To: <br><br> ALL ACTIONS | Master File No. 1:19-cv-12536-DJC <br><br> <u>CLASS ACTION</u> <br><br> **LEAVE TO FILE 30 PAGES GRANTED ON MAY 7, 2020** |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................... iii

I.  INTRODUCTION ..................................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS ................................................................... 3

 A.  Once the RVC Market Leader, iRobot in 2017 Began Facing Increasing
  Competition, Which Eroded Its Shelf Space, Sales, and Market Share ................. 3

 B.  Defendants Repeatedly Dismissed the Impact of Competition on iRobot ............. 5

 C.  Tariffs Compounded iRobot's Competition Problems ........................................... 6

 D.  Investors and Analysts Were Misled by Defendants' False Reassurances............. 7

 E.  As the Truth Emerged, iRobot's Stock Price Declined, Harming Investors .......... 7

III.  ARGUMENT.............................................................................................................. 8

 A.  Legal Standards on a Motion to Dismiss ............................................................... 8

 B.  The CAC Adequately Pleads Scienter .................................................................... 8

  1.  The CW Allegations Create a Strong Inference of Scienter ....................... 9

   (a)  The CWs Have a Sufficient Basis of Knowledge........................... 9

   (b)  The CWs' Statements Are Sufficiently Particularized and
    Strongly Indicative of Scienter ..................................................... 12

   (c)  Defendants' Purported Disclosures Do Not Negate Scienter ....... 16

   (d)  Defendants' Attacks on CW Allegations Regarding
    iRobot's Premium-Tier Strategy and Tariffs Fail......................... 17

  2.  The Core Operations Doctrine and Defendants' Close Monitoring
   of Competition and Tariff Issues Support Scienter................................... 18

  3.  Defendants Dean's and Cerda's Resignations Add to Scienter ................ 21

  4.  Defendants' Opposing Inferences Against Scienter Are
   Unpersuasive............................................................................................ 22

 C.  The CAC Adequately Pleads Falsity ..................................................................... 23

1.    Defendants' Statements Were Materially False and Misleading .............. 24

2.    Defendants' Misstatements Do Not Fall Within the Safe Harbor ............ 26

3.    Defendants' Misrepresentations Were Not Immaterial Puffery ............... 27

4.    Defendants' Opinion Statements Are Actionable .................................... 29

IV.    CONCLUSION ......................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acuity Brands, Inc. Sec. Litig.*,
   2019 U.S. Dist. LEXIS 231099
   (N.D. Ga. Aug. 12, 2019)........................................................................13, 16, 17, 18

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)...................................................................9, 13, 16

*In re Allaire Corp. Sec. Litig.*,
   224 F. Supp. 2d 319 (D. Mass. 2002) .................................................................28

*In re Ariad Pharmaceuticals, Inc. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016)...............................................................................22, 29

*In re Biopure Corp. Derivative Litig.*,
   424 F. Supp. 2d 305 (D. Mass. 2006) .................................................................18

*In re Boston Scientific Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012).................................................................................9

*Brumbaugh v. Wave Systems Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) .................................................................28

*In re Cabletron Systems, Inc.*,
   311 F.3d 11 (1st Cir. 2002).................................................................................10, 14, 15

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
   2019 WL 3451523 (D.N.J. July 31, 2019)..........................................................27

*CFTC v. JBW Capital, LLC*,
   812 F.3d 98 (1st Cir. 2016).................................................................................20

*City of Austin Police Retirement System v.
   ITT Educational Services, Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005).................................................................15

*City of Brockton Retirement System
   v. CVS Caremark Corp.*,
   2013 WL 6841927 (D.R.I. Dec. 30, 2013) .........................................................29

*Collier v. ModusLink Global Solutions, Inc.*,
   9 F. Supp. 3d 61 (D. Mass. 2014) (Casper, J.)................................................ *passim*

*In Re CommVault Systems, Inc. Sec. Litig.*,
    2016 WL 5745100 (D.N.J. Sept. 30, 2016) ..............................................................................11

*Corban v. Sarepta Therapeutics, Inc.*,
    2015 WL 1505693 (D. Mass. Mar. 31, 2015),
    *aff'd*, 868 F.3d 31 (1st Cir. 2017) .......................................................................................30

*In re Credit Suisse-AOL Sec. Litig.*,
    465 F. Supp. 2d 34 (D. Mass. 2006) ......................................................................................17

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .............................................................................11, 15, 18

*Dahhan v. OvaScience, Inc.*,
    321 F. Supp. 3d 247 (D. Mass. 2018) .......................................................................19, 20, 27

*Erste-Sparinvest Kapitalanlagegesellschaft MBH*
    *v. Seres Therapeutics, Inc.*,
    2018 WL 1567614 (D. Mass. Mar. 30, 2018) (Casper, J.) ....................................................18

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ............................................................................................12, 13

*Fitzer v. Security Dynamics Technologies, Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) .........................................................................................9

*Gerneth v. Chiasma, Inc.*,
    2018 WL 935418 (D. Mass. Feb. 15, 2018) (Casper, J.) ...........................................27, 28, 29

*Hill v. Gozani*,
    638 F.3d 40 (1st Cir. 2011) ......................................................................................................8

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) .....................................................................................21

*Karth v. Keryx Biopharmaceuticals, Inc.*,
    2018 WL 3518497 (D. Mass. July 19, 2018) (Casper, J.) ......................................................24

*Lamboy-Ortiz v. Ortiz-Velez*,
    630 F.3d 228 (1st Cir. 2010) ..................................................................................................22

*Limone v. Condon*,
    372 F.3d 39 (1st Cir. 2004) ....................................................................................................22

*Metzler Asset Management GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019) ..................................................................................................15

*Miller Investment Trust v. Morgan Stanley & Co., LLC*,
    308 F. Supp. 3d 411 (D. Mass. 2018) ...............................................................30

*Mississippi Public Employees' Retirement System*
    *v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008).................................................................................20

*Monec Holding AG v. Motorola Mobility, Inc.*,
    2014 WL 4402825 (D. Del. Sept. 5, 2014).........................................................24

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)................................................................14

*New Jersey Carpenters Pension & Annuity Funds*
    *v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)................................................................................11

*North Collier Fire Control & Rescue District*
    *Firefighter Pension Plan & Plymouth County*
    *Retirement Ass'n v. MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).....................................................21

*Omnicare, Inc. v. Laborers District Council*
    *Construction Industry Pension Fund*,
    575 U.S. 175 (2015).....................................................................................29, 30

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)..................................................................21

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
    614 F. App'x 237 (6th Cir. 2015) ......................................................................27

*In re PerkinElmer, Inc. Sec. Litig.*,
    286 F. Supp. 2d 46 (D. Mass. 2003) ..................................................................20

*Plumbers & Pipefitters National Pension Fund*
    *v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)..................................................................11

*Sanders v. AVEO Pharm., Inc.*,
    2015 WL 1276824
    (D. Mass. Mar. 20, 2015) (Casper, J.)........................................................ *passim*

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................................12

*Scritchfield v. Paolo*,
    274 F. Supp. 2d 163 (D.R.I. 2003)....................................................................28

v

*Simon v. Abiomed, Inc.*,
   37 F. Supp. 3d 499 (D. Mass. 2014) ..................................................................................12

*Sloman v. Presstek, Inc.*,
   2007 WL 2740047 (D.N.H. Sept. 18, 2007) ........................................................................26

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
   604 F. Supp. 2d 332 (D. Mass. 2009) ............................................................... *passim*

*In re Sonus Networks, Inc. Sec. Litig.*,
   2006 WL 1308165 (D. Mass. May 10, 2006) ........................................................................14

*Sousa v. Sonus Networks, Inc.*,
   261 F. Supp. 3d 112 (D. Mass. 2017) ..................................................................................30

*In re Stone & Webster, Inc. Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) ..................................................................................23, 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................9, 19, 22

*Washtenaw County  Employees Retirement System
   v. Avid Technology, Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ..................................................................................10, 13

*Washtenaw County  Employees' Retirement System
   v. Talbots, Inc.*,
   2013 WL 5348569 (D. Mass. Sept. 23, 2013) ........................................................................10

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   57 F. Supp. 3d 950 (D. Minn. 2014) ..................................................................................29

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ..................................................................................21

**Statutes and Rules**

15 U.S.C. § 78u-4(b) ..................................................................................8

Fed. R. Civ. P. 9(b) ..................................................................................8

Fed. R. Civ. P. 11(c)(2) ..................................................................................22

Fed. R. Civ. P. 15(a) ..................................................................................30

Lead Plaintiff ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss (ECF No. 77) the Consolidated Class Action Complaint (ECF No. 66, "CAC").[1]

## I.    INTRODUCTION

This securities fraud class action arises from Defendants' repeated misrepresentations about the impact of rising competition in the U.S. robot vacuum cleaner ("RVC") market on the sales of iRobot's flagship product, the Roomba. By September 2017, an influx of new competition offering similar features as the Roomba but at a much lower price—particularly Shark, which launched its own line of RVCs that same month—began to erode iRobot's sales, causing a *10% market share drop* by mid-2018 that Defendants concealed from investors. In fact, during the Class Period (September 13, 2017-October 22, 2019, inclusive), they repeatedly allayed investors' concerns about the emerging competition, falsely assuring, *e.g.*, that it was *not "substantially impacting [iRobot's] performance*," including its leading market share. After the U.S. government imposed tariffs on Chinese imports (including the Roomba) in 2018, Defendants doubled-down by minimizing the additional threat that the tariffs represented. They assured that iRobot's "competitive position" as a "premium player"—*i.e.*, its focus on higher-end, expensive products, demand for which was supposedly "less sensitive" to price increases— would enable it to pass off the tariff costs to consumers unaffected. In reality, however, the cheaper competition continued to only further erode Roomba demand and sales.

The truth regarding iRobot's waning competitive position was gradually revealed through a series of corrective disclosures of disappointing financial results, which were linked to the

---

[1]Unless otherwise noted, all emphasis herein is added; internal brackets, citations, or quotes are omitted; capitalized terms have the definitions ascribed to them in the CAC; citations to the CAC are designated as "¶___;"and citations to the memorandum of law in support of Defendants' motion to dismiss (ECF No. 78) are designated as "MTD __."

competition and tariff issues. These disclosures caused substantial drops in iRobot's stock price.

In their motion to dismiss, Defendants dispute only falsity and scienter. They repeatedly mischaracterize Plaintiff's claims as based on "forward-looking projections" about iRobot's financial guidance. *E.g.*, MTD at 2, 3. But, tellingly, they challenge only *7 out of 39* misstatements as forward-looking statements protected by the PSLRA Safe Harbor. Thus, as they concede, Plaintiff's claims primarily involve misrepresentations of *existing* fact about the impact that rising competition, as compounded by tariffs, was *already* having on iRobot's business.[2] For this reason, Defendants' "fraud by hindsight" argument also misses the mark. This is not a case of mere optimism that proved to be wrong in hindsight. Instead, the CAC pleads securities fraud based on Defendants' specific misrepresentations and omissions of adverse, *contemporaneous* facts known to them at the time of their misstatements.

Indeed, the CAC adequately alleges scienter based on*, inter alia*, multiple, well-placed confidential witnesses ("CWs"), who stated that Defendants internally were highly concerned about competition and tariffs during the Class Period, contrary to their positive public reassurances. In particular, CW 1 detailed Defendants' access to extensive market research data showing iRobot's declining sales, market share, and other key competitive trends due to rising competition, including through weekly Field Marketing Reports, which *Defendant Angle admitted to reading*, and weekly sales calls led by a senior iRobot marketing manager. Given that the Roomba generated *90%* of iRobot's revenue, this is also the prototypical case where the core operations doctrine applies, supporting scienter when viewed collectively with other allegations, including Defendants' close monitoring of these issues and suspicious resignations.

---

[2] That the CAC pleads a different theory of fraud than the initial complaints (MTD at 2) is of no bearing. This is common in such securities class actions after a lead plaintiff is appointed and conducts a thorough investigation of the claims, especially where, as here, the initial complaints were filed by other plaintiffs and counsel.

Defendants' truth-on-the-market argument that their public disclosures of competition and tariff risks preclude liability is meritless. Such disclosures of *potential* future risks—when those risks had *already* occurred—and the existence of competition *generally* were insufficient to inform investors of the truth given Defendants specifically denied or downplayed the *impact* of such issues on iRobot's business.[3] Analysts' positive reactions to Defendants' false reassurances—*e.g.*, that "increased competition *has had minimal impact on iRobot's [market] share*" and "[g]iven what appears to be *strong demand for [iRobot's] products . . . , we think that the tariffs could be largely offset*"—confirm that investors were misled about these risks during the Class Period. Likewise, Defendants' recurrent attempts to blame iRobot's disappointing financial results in 2019 on tariffs alone are belied by the CAC's well-pled allegations, including the accounts of multiple CWs who attributed the issues in large part to increased competition. Indeed, numerous analysts recognized this truth upon the alleged corrective disclosures. *See, e.g.*, ¶ 299 (after the final disclosure, Raymond James reported that "*the combination of Shark* and tariffs has upset [iRobot's] domestic RVC hegemony and we aren't sure the status quo can be restored").

## II.     STATEMENT OF RELEVANT FACTS

### A.     Once the RVC Market Leader, iRobot in 2017 Began Facing Increasing Competition, Which Eroded Its Shelf Space, Sales, and Market Share

iRobot's flagship product, the Roomba, launched in 2002 and accounted for *90%* of its revenue. ¶¶ 61-62.[4] As the first company to successfully market a robot vacuum, iRobot enjoyed

---

[3] In particular, Defendants' reliance on Angle's public testimony in June 2019, near the end of the Class Period (MTD at 1), is unavailing, including because just a month later he again falsely reassured investors that iRobot was "*not seeing any [market] share erosion due to competition.*"

[4] The Roomba is sold in two tiers: (1) less expensive, entry-level models, which represented 40% of iRobot's Roomba revenue; and (2) more expensive, premium-tier models with higher-end features and newer technology, which accounted for the other 60%. ¶ 63.

massive revenue growth and dominated the RVC market, particularly in the United States, which represented its most important region, for years leading up to the start of the Class Period. ¶¶ 61, 69-71. By 2017, however, iRobot began to face mounting competition from numerous new entrants into the RVC market, many of which, unlike in the past, now offered products with high-end features and performance similar to iRobot's premium-tier models, but at a much lower price. ¶¶ 64, 72, 74, 77, 78. Notably, in September 2017, SharkNinja (or "Shark"), the number one U.S. seller of traditional vacuums, launched its own line of RVCs, which analysts recognized had "features that appear to match capabilities of the iRobot [premium] Roomba 600 and 800 series, [but] with a lower price." ¶¶ 75-81. Thus, during the Class Period, investors were highly focused on iRobot's continued ability to fend off such increasing new competitive threats.

Unbeknownst to investors, however, as multiple former employees of iRobot and its market research agency confirmed, this increasing competition began to affect iRobot's business as early as March 2017, and its impact only worsened as the Class Period progressed. *E.g.*, ¶¶ 84-100. By the fall of 2017, Defendants internally became greatly concerned about this new competition, as iRobot began losing shelf space in major retail stores (a key indicator of competitive performance closely tracked by iRobot) to competitors such as Shark. ¶¶ 85-86, 89-90. Notably, this loss of shelf space only grew worse in 2018 and included the more desirable "endcap" space at the end of an aisle that iRobot had previously exclusively enjoyed. ¶¶ 96-97.

By early 2018, iRobot's internal sales monitoring also showed that its sales, particularly at the entry-level tier where the RVC market was most saturated with many new, cheaper options, began to decline substantially due to this increased competition. ¶¶ 93, 95, 114. As a result, iRobot quickly began losing U.S. market share—a decline known internally by early 2018. ¶ 94. Specifically, by the start of the Class Period and Shark's launch in September 2017,

4

iRobot's U.S. market share had already declined to 87% (from 92% in 2015), and, *less than a year later, i.e., by summer 2018*, it had fallen *another 10% to 77%. Id.*

Faced with this alarming internal data, particularly in the sales of its entry-level Roombas, by summer 2018, iRobot began to pivot its sales and marketing efforts almost exclusively to its premium-tier products. ¶¶ 113-16. The Company implemented this strategy shift, dubbed the "Champion Program," in October 2018, shortly after it launched its new line of even more expensive premium-tier Roombas, the i7 and i7+, in September 2018. *Id.; see also* ¶ 117. Thus, unbeknownst to investors, Defendants effectively ceded the entry-level segment of the RVC market—which still accounted for 40% of iRobot's revenue, and, in CW 1's words, was the "gas that made the engine go"—to its competition in favor of a risky bet on its expensive premium-tier line. ¶¶ 114, 120. But, due to rising competition, the new i7 models (and s9 premium-tier models launched later in the Class Period) sold poorly after their release because of their high prices and performance issues, which resulted in high return rates. ¶¶ 118-21.

**B.    Defendants Repeatedly Dismissed the Impact of Competition on iRobot**

Despite Defendants' knowledge of such troubling internal information, throughout the Class Period, they repeatedly dismissed investors' concerns about rising competition. For example, on September 13, 2017, Dean, in response to analysts' questions about Shark and other "competition starting to emerge," claimed that that this competition was "*not resonating*" with consumers. ¶ 101. Similarly, on October 25, 2017, Angle downplayed the new competition as "*not particularly material at this point in time*," insisting, *inter alia*, that "*[w]e don't view it as cannibalistic of our growth*." ¶¶ 103-04. In 2018, as internally iRobot saw competition further chip away at its shelf space, sales, and market share, Defendants publicly continued to insist that they were successfully combating these competitive threats. For example, in July 2018, Angle

assured that competitors had "*enter[ed the market] without substantially impacting* [iRobot's] performance" and that it "*continue[d] to have strong performance across price points*." ¶¶ 136, 139. Further, though Defendants knew by summer 2018 that iRobot's U.S. market share had dropped *10%* since Shark's launch, in public, Defendants denied any significant share erosion due to competition. For example, in December 2018, Dean assured that iRobot had "*been able to maintain [its market] share* despite the fact that these new entrants are coming in." ¶ 241. In February 2019, Angle stated that "[o]ur U.S. estimates for 2018 show *a 3 point share loss overall*," when in fact the actual loss (10%) was *more than triple* that figure. ¶¶ 162-63.

### C.    Tariffs Compounded iRobot's Competition Problems

In July 2018, the U.S. government announced that it would be implementing 10% tariffs on all Chinese imports, including iRobot's products, beginning in September 2018. ¶ 19. Defendants told investors they could mitigate the tariffs' impact by increasing pricing on only its newest, premium-tier i7 and i7+ Roombas (launched in September 2018). ¶¶ 145, 154. They also minimized the threat represented by such price increases on iRobot's most expensive line. ¶ 148. Defendants assured investors that iRobot, given its focus on the premium-tier, was better positioned to weather the adverse impact of tariffs than its lower-end competition, citing their "interim research" on "price elasticity" purportedly showing that consumers were less sensitive to price increases on higher-end products. ¶¶ 149, 154-55. For example, in October 2018, Angle asserted that "*iRobot is the premium player and that's very advantageous because price sensitivity at the high end is much lower than at the bottom end*," and thus it was "*better positioned than [its] major competitors [that] play at the low end to*" withstand the tariffs' impact. ¶¶ 148, 234. In reality, Defendants knew at this time that consumers were reluctant to pay the already high prices for iRobot's premium-tier Roombas due to cheaper competition, and

6

that tariff-related price increases only compounded this problem. ¶¶ 113-21, 150.

### D.        Investors and Analysts Were Misled by Defendants' False Reassurances

Investors, as evidenced by analysts' reactions, were misled by Defendants' statements dismissing competition and tariffs as significant risks to iRobot's business. For example, throughout the Class Period, after Defendants' misstatements, various analysts wrote that:

- Despite "increasing concerns that competition is increasing," "*we remain upbeat about . . . iRobot's position in the market*;"

- "[A]lthough competition is creeping up, *we believe . . . iRobot still has very strong market share*;"

- "[I]ncreased competition *has had minimal impact on iRobot's [market] share*;"

- "Given what appears to be *strong demand for [iRobot's] products* . . . , we think that the tariffs could be largely offset;"

- "[M]anagement emphasized that as a premium brand they believe there will be *less cost sensitivity vs. low end competitors* [due to tariff-related price increases];"

- "Our previous concerns regarding tariffs and the implication to iRobot's 2019 guidance *ended up being a non-event with overall sector demand more than offsetting this headwind . . . [despite] increasing competition*;"

- "*Encouragingly, demand for the i7/i7+ was ahead of [C]ompany expectations*, despite the pricing increase implemented during the quarter due to tariffs;"

- Although "[r]ising competition is a legitimate concern for iRobot, *[] the company continues to maintain and extend its lead*."

¶¶ 83, 151, 152, 164, 174, 213.

### E.        As the Truth Emerged, iRobot's Stock Price Declined, Harming Investors

The truth regarding the impact of competition, as exacerbated by tariffs, was revealed through four corrective disclosures (on February 7-8, 2018, April 23-24, 2019, July 23-24, 2019, and October 22-23, 2019) when iRobot announced disappointing financial results, which it

linked to competition and tariff issues. ¶¶ 270-99. Each disclosure caused substantial drops in iRobot's stock price (*32%, 23%, 17%,* and *9%*, respectively). ¶¶ 274, 281, 288, 298. The first three were only partial disclosures because each time, Defendants continued to downplay the risks that competition and tariffs represented, falsely reassuring investors, *inter alia*, that iRobot's product demand remained "strong" and denying any "[market] share erosion due to competition." ¶¶ 276, 282-83, 292-93. On the final date, Defendants revealed the full impact of increased competition, as exacerbated by tariffs, on iRobot, disclosing "suboptimal" customer demand after the tariff-related price hikes. ¶¶ 295-96; *see also* ¶ 299.

## III.    ARGUMENT

### A.    Legal Standards on a Motion to Dismiss

Securities fraud complaints must meet the particularity pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure ("Fed. R. Civ. P." or "Rule") 9(b). 15 U.S.C. § 78u-4(b); *Hill v. Gozani*, 638 F.3d 40, 51 (1st Cir. 2011). But the PSLRA "pleading standard is not an insurmountable bar." *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 69-70 (D. Mass. 2014) (Casper, J.). "Nor does the PSLRA require the plaintiff to 'plead evidence.'" *Id.* at 69. "[A]s with any Rule 12(b)(6) motion, the Court must accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor." *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *5 (D. Mass. Mar. 20, 2015) (Casper, J.).

### B.    The CAC Adequately Pleads Scienter

The PSLRA requires a plaintiff to plead facts giving rise to a "strong inference" of scienter. *Collier*, 9 F. Supp. 3d at 68. But the inference "need not be irrefutable," *id.* at 69, and "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations

8

*holistically*." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). "[W]here there are equally strong inferences for and against scienter, ***Tellabs now awards the draw to the [p]laintiff***." *Collier*, 9 F. Supp. 3d at 69. Scienter exists where a defendant "acted with fraudulent intent or knowing or reckless disregard of his obligation to disclose." *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 29 (1st Cir. 2012). "[T]he fact that the defendants published statements when they ***knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence*** of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

### 1.    The CW Allegations Create a Strong Inference of Scienter

#### (a)    The CWs Have a Sufficient Basis of Knowledge

The CAC adequately pleads scienter based on the accounts of six CWs, who collectively establish Defendants' knowledge of adverse internal information showing iRobot's declining sales, shelf space, and market share due to rising competition, as exacerbated by tariffs, which contradicted their public statements dismissing these risks. CW allegations can be relied upon if the CWs "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Collier*, 9 F. Supp. 3d at 70. Here, Defendants do not dispute that the CAC alleges these CWs' dates and locations of employment, titles, responsibilities, and reporting structure. *See* MTD at 11; ¶¶ 52-60. Such specifics are sufficient to show that the CWs were in a position to know the alleged information regarding iRobot's declining demand due to competition and tariffs. *See Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 22 (D. Mass. 2000) ("descri[ptions of] the specific employment positions [CWs] held" sufficient to show "that persons in those positions are likely to have knowledge of the facts described, including product demand").

For example, throughout the Class Period, CW 1 was a Marketing Development Manager

9

at CCS, a marketing agency contracted by iRobot to conduct extensive market research on its sales and competition at key retail stores across the U.S. ¶¶ 52, 84. The CAC provides many specifics regarding CW 1's responsibilities for gathering this market research data, which was communicated to Defendants through CCS's weekly Field Marketing Reports. ¶¶ 52-53, 84-90. Though Defendants claim that CW 1 did "no[t] report[] to any iRobot employee" (MTD at 11), in reality, CW 1 reported to a CCS manager only for administrative issues; for substantive issues related to iRobot products and sales, she *de facto* reported directly to iRobot personnel, including, notably, Rob Driscoll, a Senior Manager responsible for a large field marketing team across North America. ¶¶ 54-55 & n.6. CW 1 also wore an iRobot-branded shirt and interacted with iRobot personnel more frequently than with CCS employees, including through Driscoll's weekly sales calls, and bi-annual, multi-day trips to iRobot's headquarters with the entire CCS team and iRobot executives, ***including Angle and Dean***. ¶¶ 52, 55, 88, 98.

CW 2, a CCS Field Marketer in another region, corroborates CW 1's account. She described sales problems due to increased competition based on similar field visits to retail stores to gather market intelligence on iRobot's performance versus its competitors—findings that she also said were input into the Cognistix system and provided to iRobot corporate in a consolidated report. ¶¶ 56, 155. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29 (1st Cir. 2002) ("the corroborative nature of the other facts alleged (including from other sources)" supports CWs' reliability).

Defendants, citing no case law, attempt to discredit these two CWs' allegations on the basis that they were employees of a "third-party vendor." MTD at 11. But where, as here, the CWs are well-placed to know relevant internal information, that they were not directly employed by iRobot does not render their accounts unreliable. *See, e.g.*, *Washtenaw Cty. Emps.' Ret. Sys. v. Talbots, Inc.,* 2013 WL 5348569, at *31 & n.14 (D. Mass. Sept. 23, 2013) (CW had "strong basis

10

of knowledge" where she "worked as a *consultant* and observed [c]ompany stores during the [c]lass [p]eriod in that capacity"). Indeed, Defendants' cited case makes clear that while "[s]cienter involves wrongdoing by high-level company officials[,] *low-level employees or consultants* may well know of the wrongdoing" and thus may be used as CWs. *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 52 (1st Cir. 2008).

For similar reasons, Defendants' attempt to discount all of the CWs as "lower-level" employees also fails.[5] As "low-level employees" may know highly relevant information, *N.J. Carpenters*, 537 F.3d at 52, the CWs' seniority is not determinative of the basis of knowledge test. Indeed, courts routinely credit low-level CWs who are in a position to know relevant information. *E.g.*, *Crowell v. Ionics, Inc*., 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (allegations from, *e.g.*, a customer service clerk supported scienter where she had "personal knowledge of [relevant] sales practices"); *In Re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *7 (D.N.J. Sept. 30, 2016) (rejecting "argument that the CW[s], *as low level employees*, would not have first-hand knowledge" because "employees in the marketing departments, especially at the level of the [CWs], most likely had the firsthand knowledge as to *the impact occurring on the ground*").

Likewise, direct contact between the CWs and the Individual Defendants is not required to plead scienter. MTD at 11. *See Crowell*, 343 F. Supp. 2d at 19 (CWs supported scienter even though "[n]either is alleged to have communicated with [the individual defendants] or any other senior . . . executive"); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V*., 89 F.

---

[5] CW 4 was not "low-level"—she was a Country Manager for Canada, responsible for all aspects of iRobot business there, and reported to an SVP and General Manager of the Americas. ¶ 58.

Supp. 3d 602, 615-16 (S.D.N.Y. 2015) ("there is no baseline requirement of such contact").[6]

Finally, Defendants dismiss out-of-hand CW 5 because she left iRobot four months before the Class Period. MTD at 11-12. But such pre-class period evidence is often probative of scienter, particularly, for statements made at the start of the Class Period. *See, e.g., Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014) ("A witness need not have been at the company [for] the entire, *or indeed any*, of an asserted class period to have probative information."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[p]re-class data is relevant" to establish falsity and scienter "at the start of the class period"). CW 5's statement that iRobot was already concerned about competition when she left in March 2017 corroborates CW 1's account of Defendants' grave concerns about competition at the Class Period start. ¶ 92.

### (b)    The CWs' Statements Are Sufficiently Particularized and Strongly Indicative of Scienter

**Weekly Field Marketing Reports**: Per CW 1, Defendants received weekly Field Marketing Reports from CCS, based on extensive market research across the U.S., which detailed key adverse competition trends, including, notably, declining sales and shelf space at major retailers. ¶¶ 53, 87-90; *see also* ¶ 56. Defendants also had real-time access to pictures in the Cognistix database showing the declining shelf space, including the loss of valuable end cap space in 2018. ¶¶ 87, 90, 97.[7] CW 1 detailed at length the competitive intelligence gathered by

---

[6] *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015) (MTD at 11) only says that "contact with senior management" may be a factor in the court's analysis but does not prescribe any bright-line rule.

[7] Defendants' assertion that Plaintiff "fails to identify" any misstatement regarding shelf space (MTD at 13) ignores Angle's statement that, "[i]n the U.S. we continue to see new competitive products selling through Amazon marketplace, *but not on the shelves of retailers*," ¶ 246, which was false given iRobot was losing shelf space to new competition. For this reason, Defendants' falsity challenge to this statement, based on a formalistic interpretation of it (MTD at 25), fails.

CCS, highlights of which were compiled into the weekly reports that Defendants received. ¶¶ 52-53, 87-90; *see also* ¶¶ 56, 87 n.13 (CW 2 corroborating same). Crucially, Angle assured employees at a Company meeting attended by CW 1 that ***he regularly read these reports***. ¶ 91.

Such allegations are sufficiently particularized and present "classic evidence" of scienter as they contradicted Defendants' public statements downplaying the impact of competition on iRobot's business. *Aldridge*, 284 F.3d at 83. Indeed, one of the "indicia usually relied upon" for scienter is the "***divergence of internal reports and external statements on the same subject***." *Aveo*, 2015 WL 1276824, at *10. Notably, another court recently found scienter based on similar allegations of defendants' "access" to internal reports showing declining sales due to increased competition, contrary to their statements "discounting the effect of competition." *In re Acuity Brands, Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 231099, at *74-75 (N.D. Ga. Aug. 12, 2019).

Defendants' attempts to pick apart the Field Marketing Reports (MTD at 12-15) fail. "The [c]ourt cannot construe the PSLRA's pleading requirement to mean that confidential witnesses . . . must recall all possible details from their former positions." *Collier*, 9 F. Supp. 3d at 73; *see also Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 106 (D. Mass. 2014) ("not every question regarding relevant transactions must be answered at the pleading stage").[8]

**Weekly Sales Calls:** Per CW 1, the decreasing sales and shelf space, in addition to other adverse competitive trends, were also regularly discussed with iRobot Senior Manager Driscoll on his weekly sales calls with CCS and iRobot employees. ¶¶ 55, 88, 91. *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 344 (D. Mass. 2009) (CWs' "interactions with

---

[8] Defendants' cases (MTD at 13 n.6) are inapposite because, unlike the purely conclusory CW observations there, here CW 1 provided many details about the adverse competitive trends she saw from her market research and "specific data" (*id.*) quantifying those trends in her discussion of the *10%* market share drop that ultimately resulted from the shelf space and sales declines.

the executives at sales meetings . . . where, they allege, it was clear that the executives knew demand was decreasing" supported scienter as "absolute proof of scienter to survive a motion to dismiss" is not required). Importantly, CW 1 stated that on these calls, they also discussed iRobot's rapidly deteriorating *market share* due to rising competition—which Defendants ignore (MTD at 15-16). ¶¶ 88, 94. Specifically, after Shark's launch in September 2017, Defendants knew of a significant decline in its U.S. market share by *early 2018*. ¶ 94. By *mid-2018*, iRobot had lost *10%* of its U.S. market share, from *87%* at the start of the Class Period to *77%* in less than a year (in addition to a prior 5% decline in 2015-2017). *Id.* This was directly contrary to Defendants' later statements either denying any such market share erosion due to competition, or misrepresenting it as much lower (only 3%), as well as other statements minimizing the impact of competition on iRobot. Thus, the CAC pleads specific, undisclosed declines in a "financial metric" (MTD at 10) crucial to investors. *See* ¶ 152 (analysts noting "increased competition *has had minimal impact on iRobot's [market] share*").

Given Driscoll's senior position, and the Individual Defendants' close monitoring of competition issues, it is not credible that they would not have known of the key information discussed on these calls, particularly this major loss in market share of iRobot's core product in its most important region. *See infra*, Part III.B.2. In any event, Driscoll's knowledge, as an iRobot Senior Manager, is sufficient to establish corporate scienter. *See Cabletron*, 311 F.3d at 40 ("scienter [of] the company's agents is enough to plead scienter for the company").[9]

"**All Hands Meetings**:" Per CW 6, an iRobot engineer throughout the Class Period,

---

[9] *See also In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *22-23 (D. Mass. May 10, 2006) (rejecting argument that only "the knowledge of the officer making the statement at issue can be imputed to the corporation" as "[f]raud by agents of [the company] other than [the individual defendants] may be attributable to [the company]"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) (same and noting that "scienter by *management-level employees* is generally sufficient to attribute scienter to corporate defendants").

senior management's concerns about the effect of rising cheaper competition on iRobot's business were also discussed during town-hall style internal "All Hands Meetings," which all Individual Defendants attended and spoke at, from mid-2017 through the end of the Class Period. ¶ 99. In particular, CW 6 recalled one meeting where Angle or another executive discussed such competition issues, presenting charts detailing competitors and market share—corroborating CW 1's account that Defendants closely tracked iRobot's market share and competition. *Id.* CW 3 similarly stated that Angle attended and spoke at such meetings, including one where he discussed the additional pressure of tariffs on iRobot, which would negatively impact its sales and market share given the "price pressure" already exerted by competition. ¶ 155.

Critically, contrary to Defendants' claim that the CWs' knowledge is regionally limited (MTD at 12-13), these weekly sales calls led by Driscoll, who was in charge of a 39-person team *across North America*, and the All Hands Meetings were *nationwide* meetings. ¶¶ 54 & n.6, 88, 99. Thus, though CW 1 personally conducted market research in one region, she knew of similar declining performance across the country based on such calls.[10] Further, that CW 1 and CW 2 worked in different regions on opposite coasts of the United States but described similar problems further supports their nationwide scope. *Crowell*, 343 F. Supp. 2d at 19 (allegations from two CWs supported "company-wide" fraud where, *inter alia*, "these witnesses *were employees in different markets*, with personal knowledge of [the relevant] sales practices").[11] Thus, the CW accounts establish scienter as "[e]ach provides bits and pieces of the larger mosaic of allegations [p]laintiffs present," even if none "provided 'smoking gun' evidence." *Smith &*

---

[10] CW 1 also had access to the Cognistix database wherein CCS kept track of all of its market research data for iRobot and the weekly Field Marketing Reports, ¶ 53, and CW 2 confirmed that CCS's market research was based on stores *throughout the United States*. ¶ 56.

[11] Thus, *Metzler Asset Management GmbH v. Kingsley*, 928 F.3d 151, 165 (1st Cir. 2019) and *City of Austin Police Retirement System v. ITT Educational Services, Inc.*, 388 F. Supp. 2d 932, 945 (S.D. Ind. 2005), are inapposite, as they did not allege such nationwide knowledge.

*Wesson*, 604 F. Supp. 2d at 344.

          **(c)**        **Defendants' Purported Disclosures Do Not Negate Scienter**

Defendants' recurrent argument that their public disclosures negate scienter because they were "entirely consistent" with the CW allegations (MTD at 15, 22) is meritless. First, it ignores CW 1's statements about the 10% market share drop. Second, while Defendants generally disclosed that competition had increased, they repeatedly denied or understated the *impact* of this competition on iRobot. *See Acuity*, 2019 U.S. Dist. LEXIS 231099, at *75 n.18 (argument that defendants' disclosure of "the existence of competition . . . negates . . . scienter . . . misses the mark [] as the crux of [p]laintiffs' allegations is that *[d]efendants deliberately understated the impact increased competition was having on Acuity's business, not that there was increased competition, generally*."). Further, Defendants' warnings of *potential* future risks when those risks had *already materialized*, are insufficient. *See infra* at 27.

While Defendants focus on Angle's disclosure of "increased competitive pressure" on February 7, 2018, they ignore (while failing to challenge loss causation) that the CAC alleged this date as the first partial corrective disclosure. ¶¶ 208-13. This tempered disclosure of *some* competition impact did not reveal the full truth, particularly as Angle immediately falsely reassured investors, *e.g.*, that the "competitive pressure" was not significant enough to alter iRobot's aggressive guidance and that iRobot remained "well-equipped to win" against the competition in 2018. ¶¶ 208-12. Thus, investors remained unaware during the Class Period that increased competition was eroding iRobot's sales and market share to the extent it actually was, as evidenced by numerous analyst reports. *See supra*, Part II.D. *Aldridge*, 284 F.3d at 83 (scienter pled where defendants partially disclosed the truth but then "attempt[ed] to recharacterize the events"). Further, Defendants' arguments amount to the "truth on the market

defense[, which] is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint." *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 (D. Mass. 2006). They have not shown that "the corrective information [was] conveyed to the public with a ***degree of intensity and credibility sufficient to counter-balance effectively*** . . . the alleged misstatements." *Id.* [12]

### (d)    Defendants' Attacks on CW Allegations Regarding iRobot's Premium-Tier Strategy and Tariffs Fail

Defendants' arguments that CW statements regarding iRobot's premium-tier strategy and tariffs are insufficient (MTD at 16-19) are also unavailing. First, they claim that CW 1's account of the "Champion Program," which began in mid-2018, is entirely consistent with their public statements about iRobot's focus on the premium-tier. *Id.* at 17. But Defendants' statements that iRobot's "strategy has been in the premium end of the market" and that its "strategy ***hasn't changed***" (*id.*) conflict with the internal reality, which CW 1 described as a "***fundamental change***" in iRobot's sales and marketing efforts to focus on promoting premium-tier models almost exclusively—and thus effectively ceding the entry-level segment to the competition—as a result of cheaper lower-end competition eroding iRobot's entry-level sales in particular by that time. ¶¶ 114-21. For example, the Champion Program, which was implemented at a national training meeting at iRobot's headquarters in October 2018, included an internal directive to CCS employees ***not to waste their time promoting iRobot's entry-level models*** at lower-end stores like Target and Wal-Mart. ¶¶ 114, 120. This is ***not*** "what one would expect a company to do" (MTD at 17) when Defendants publicly are professing their commitment to iRobot's entry-level products. Thus, such CW accounts directly contradict Defendants' statements that, *e.g.*, iRobot

---

[12] Defendants' similar argument that they had no duty to disclose the omitted information in light of their disclosures of competition and tariff risks (MTD at 29-30) fails for the same reasons.

showed "continued strength *down at the entry-level price points*, which I think is *very material* in that we are *not simply getting pushed into premium only*." ¶ 136.

Defendants' attacks on CW 1's statement that iRobot externally, falsely blamed its poor financial results in early 2019 on tariffs (MTD at 17-18) fare no better. Per CW 1, on an internal conference call, iRobot instructed CCS employees that if store customers asked about iRobot's stock price drop after it reported poor results in early 2019 (*i.e.*, on April 23-24, 2019, *see* ¶¶ 166-68), they were to respond that it was only due to tariffs. ¶ 175. Contrary to this "party line," CW 1 stated that competition was mostly (75%) to blame for iRobot's poor results, as opposed to tariffs (25%), based on her personal knowledge of iRobot's declining sales due to competition, including its poor holiday season performance in late 2018. *Id.* CW 1's statement is not mere "speculat[ion]" just because she was not in a "finance[]" role (MTD at 18) as she was in a position to know of iRobot's declining sales and market share due to competition. *See supra* at 9-10.[13] Thus, such allegations further add to the inference that Defendants were deliberately trying to conceal the impact of competition on iRobot by blaming its underperformance on tariffs.

### 2.    The Core Operations Doctrine and Defendants' Close Monitoring of Competition and Tariff Issues Support Scienter

Under the core operations doctrine, "[f]acts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its officers." *Crowell,* 343 F. Supp. 2d at 19; *see also In re Biopure Corp. Derivative Litig.*, 424 F.

---

[13] CW 4, a high-level iRobot employee, similarly stated that rising competition (notably, Shark) had a "huge impact" on iRobot's sales in the U.S. in late 2018, noting that such competition and iRobot's efforts to mitigate the tariffs by building up U.S. inventory were a "*double whammy*" for iRobot. ¶¶132-34. Thus, CW 4 corroborated CW 1's account that tariffs were not the sole cause of iRobot's financial troubles. *See also* ¶ 155 (CW 2). Defendants' attempts to "dispute the reliability of [the] CW[]'s allegations" at most raise factual disputes improper at the "motion to dismiss [when] the Court may assume the factual allegations in the amended complaint to be true, including CW[] statements." *Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres Therapeutics, Inc.*, 2018 WL 1567614, at *3 n.1 (D. Mass. Mar. 30, 2018) (Casper, J.).

Supp. 2d 305, 307-08 (D. Mass. 2006) ("in cases in which *a company's primary product* [] is in jeopardy, courts have been willing to impute that knowledge to the company's officers"). Defendants do not contest that the Roomba was iRobot's core product. MTD at 19. Nor can they, given this "flagship product," which they touted as "the most important piece of our business today," accounted for *90%* of iRobot's revenues, and the U.S. market was its most important region. ¶¶ 307-11. Thus, this is the prototypical case where the core operations doctrine applies. *See Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018) ("[t]he importance of [the company's only developed treatment] supports the inference" of scienter).

Importantly, Plaintiff alleges core operations as one of *many* factors that together establish scienter under the *Tellabs* holistic analysis. Thus, Defendants' sole argument that core operations allegations are *alone* insufficient (MTD at 19) misses the mark, and the limited cases they cite in support, none of which included additional scienter allegations, are inapposite. Moreover, "[e]ven declining to infer scienter under the 'core operations theory,' . . . certainly, the role of the defendant in the company and the importance of the product at issue . . . to the company's bottom line are not immaterial to" scienter. *Aveo*, 2015 WL 1276824, at *10.

Further, per CWs, Defendants had access to and closely monitored Roomba market research showing adverse sales, market share, and other competition trends that contradicted their misstatements—including the weekly Field Market Reports, weekly sales calls, the Cognistix system, and All Hands Meetings—which support the application of core operations. ¶¶ 314-17, 320-21; Part III.B.1.(b), *supra*. *See Dahhan*, 321 F. Supp. 3d at 255 (allegations of defendants' "access to [relevant] data . . . support the strong inference [d]efendants knew, or were recklessly unaware of, the data"). iRobot also publicly represented that "Angle has *first-hand knowledge* of our operations and the major issues facing us" and has "*detailed knowledge*

19

of the Company . . . our client base, our prospects, *the strategic marketplace and our competitors*." ¶ 312. As COO, Cerda had direct responsibility for sales and marketing (¶ 50), and Dean, as CFO, had oversight over finance functions (¶ 49).[14]

Further, Defendants repeatedly told investors that they were personally involved in monitoring iRobot's internal analyses of Roomba demand in assuring that new competition and tariffs were not serious threats. ¶ 313. For example, Angle stated that "*we ha[d] done a lot of interim research on price elasticity*," and that "*we modeled*" the demand for premium-tier and entry-level products in insisting that iRobot was better-positioned to weather the impact of tariffs than its competitors. *Id.* This suggests Defendants knew their statements were false when made, or at the least they were reckless in not ascertaining the truth before speaking on those topics. *See CFTC v. JBW Capital, LLC*, 812 F.3d 98, 108 (1st Cir. 2016) ("[defendant's] own statements . . . provide direct evidence not only that he had accurate information about JBW's performance but also that he intentionally or recklessly withheld that information from investors"); *Dahhan*, 321 F. Supp. 3d at 255 (that "[d]efendants themselves claimed to . . . *closely track all aspects of the treatment*" supported scienter).[15]

Taken together, such allegations that Defendants' positions "would have given them not only access to, *but close familiarity with, the details* of [iRobot]'s affairs" support scienter. *In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54-55 (D. Mass. 2003). *See also Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91-92 (1st Cir. 2008) (defendant's role as

---

[14] Similarly, the Individual Defendants closely followed the impact of tariffs on iRobot. ¶¶ 232, 236-39, 245, 249, 255-56, 261. For example, per CWs, not only was Angle personally involved in iRobot's efforts to obtain a tariff exemption, he also discussed, at an All Hands Meeting, that the additional pressure of tariffs would negatively impact iRobot's sales and market share given the "price pressure" that competition was already exerting on the Company. ¶¶ 155, 323-25.

[15] Thus, Plaintiff has alleged much more than simply "repeated specific statements" and a "hands-on management style," distinguishing Defendants' cited cases. MTD at 21.

COO and "point person on" the device at issue added to scienter).[16]

### 3. Defendants Dean's and Cerda's Resignations Add to Scienter

The resignations of Defendants Dean and Cerda—key executives involved in monitoring Roomba sales and competition issues—further support scienter. Cerda resigned, effective immediately, mere weeks before the final corrective disclosure revealed the full impact of competition and tariffs on iRobot. ¶ 189. Only a few months later, iRobot announced Dean's resignation as CFO, after a 15-year tenure. ¶¶ 190-91, 197. The timing and circumstances of these resignations, combined with CW and other allegations, are indicative of scienter. *Collier*, 9 F. Supp. 3d at 76 (defendants' resignations, viewed in "the totality of all of the allegations," added to scienter). Thus, Defendants' attempt to once again "divide and conquer" the CAC's scienter allegations fails. *Id.*[17] Their argument that Cerda left iRobot to "bec[o]me CEO of another company," based on an extrinsic document (MTD at 21) is improper. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (on a motion to dismiss, courts may not "consider[] contents of a public record as an established fact and as evidence contradicting the complaint"). It is also unavailing. *See Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (defendant's resignation "to pursue another professional opportunity" added to scienter).[18]

---

[16] Defendants' attempt to recharacterize these allegations as "merely" inferring scienter from their positions (MTD at 19) fails, rendering their cases (*id.* at 19-20 & n.10) inapposite.

[17] Defendants' cases (MTD at 21 n.12) likewise merely say that resignations *on their own* are insufficient. The only case cited for the proposition that Dean's resignation was too far removed temporally from the fraud, *North Collier Fire Control & Rescue District Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) did not find the resignations insufficient on that basis; rather, it only found the resignations lacking on their own. *See also In re OSG Sec. Litig*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (resignation a few months after the end of the class period bolstered scienter).

[18] Defendants' reference to Rule 11 for Cerda (MTD at 30) is meritless and improper. In addition to his resignation, the CAC alleges that he had direct responsibility over sales and marketing and

#### 4.    Defendants' Opposing Inferences Against Scienter Are Unpersuasive

The above allegations, viewed "holistically," as they must be under *Tellabs*, raise a strong inference of scienter. Defendants attempt to escape that inference by arguing that it is more plausible that they genuinely "believed that [iRobot's] 2019 full-year revenue guidance was achievable," but the tariffs alone caused iRobot to underperform. MTD at 22. Their mischaracterization of Plaintiff's claim as a missed guidance case fails. *See Limone v. Condon*, 372 F.3d 39, 46 (1st Cir. 2004) ("Courts must be . . . careful . . . not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability."). The CAC alleges primarily ***non-forward-looking*** misrepresentations denying or downplaying any ***existing*** impact from competition on iRobot's business—contrary to ***contemporaneous***, undisclosed information that they had access to as per the CWs. *See supra*, Part III.B.1.(b). Thus, this is not a case of optimism that proved to be wrong in hindsight. *See Collier*, 9 F. Supp. 3d at 72-73 (rejecting "fraud by hindsight" argument based on "the contemporaneous nature of the confidential witness statements"). Rather, the stronger inference is that Defendants knowingly or recklessly concealed the true threat that new competition posed for as long as they could. *See In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 753 (1st Cir. 2016) ("it was ***knowingly or recklessly*** misleading for [defendants] to ***express optimism*** about [drug's] chances for approval . . . without disclosure of recent troubling developments [that]

---

access to data showing, by the time of his statements in March 2018, that iRobot's shelf space, sales, and market share had declined due to competition. *See* Parts II.A; III.B.1.(b), *supra*; *see also* Parts III.C.1; III.C.3; III.C.4, *infra* (his statements are actionable). Further, Defendants failed to follow the "carefully wrought procedures" for a Rule 11 motion, *Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 244 (1st Cir. 2010), including that it "must be made separately from any other motion" and only after giving the opponent 21 days to cure. Fed. R. Civ. P. 11(c)(2).

created an impermissible risk of misleading investors").[19]

Further, Defendants' attempt to blame iRobot's financial troubles on tariffs alone is belied by the CAC. *See supra* Parts II.A; III.B.1.(b); III.B.1.(d); ¶ 299 (analysts recognizing on the final disclosure that iRobot's "***destruction in earnings***" was due to "***the combination of Shark*** and tariffs [which] upset [iRobot's] domestic RVC hegemony"). This argument also misses the point. Certainly, the tariffs posed business risks, as analysts recognized and hence repeatedly asked Defendants about. *See* ¶¶ 127-39, 142. But rather than truthfully disclose these risks, Defendants doubled-down and minimized the threat that tariffs represented given iRobot's competition problems. *See supra*, at 6.[20]

### C.    The CAC Adequately Pleads Falsity

The "complaint must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading." *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 194 (1st Cir. 2005). Further, "[i]t is [] 'ultimately a question for the trier of fact . . . whether statements are false or misleading so as to be actionable under 10b-5.'" *Aveo*, 2015 WL 1276824, at *7. Here, Defendants primarily argue that the statements are not actionable because they are literally true, mere puffery, opinions, or forward-looking statements protected by the Safe Harbor. They are wrong.[21]

---

[19] Defendants' reliance on iRobot's "continued revenue growth" during the Class Period to dispute that new competition impacted iRobot's financial results (MTD at 22) is improper at this stage, and is a red herring. Competition increasingly eroded iRobot's revenue growth, ultimately causing it to miss revenue growth expectations and cut its earnings forecasts in 2019. ¶¶ 270-99.

[20] The lack of insider trading allegations, which Defendants note in passing (MTD at 2), does not negate scienter as, *inter alia*, it is "reasonable for [defendants] to refrain from selling stock during the [c]lass [p]eriod to avoid the appearance of wrongdoing." *Collier*, 9 F. Supp. 3d at 74.

[21] Defendants' motion is replete with end-runs around the briefing page limit, which was already extended at their request. ECF No. 76. They include, as Ex. A, a ten-page chart of misstatements wherein the third column contains 31 paragraphs of additional substantive argument regarding falsity not present in their brief. ECF No. 78-1. Defendants also submit as Ex. B a "timeline" of

### 1.    Defendants' Statements Were Materially False and Misleading

Defendants argue that seventeen statements are not false or misleading because they were supposedly truthful. MTD at 23. However, "[t]he disclosure required by the securities law is measured ***not by literal truth***, but by the ability of the material to accurately inform rather than mislead prospective buyers. . . . [I]f a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose ***the whole truth***." *Karth v. Keryx Biopharm., Inc.*, 2018 WL 3518497, at *4 (D. Mass. July 19, 2018) (Casper, J.). Defendants' statements, even if literally true, are actionable half-truths that misleadingly concealed or downplayed the impact of competition and tariffs on iRobot's business.

**Competition**: Defendants chose to tout iRobot's supposedly continued strong competitive position in the face of increasing competition, while concealing contrary, material facts, which rendered their statements "***so incomplete as to mislead***.'" *Aveo*, 2015 WL 1276824, at *6-7 (statements "downplaying and/or failing to disclose [the FDA's] concerns at the time was [] misleading as to the prospects of approval" of the drug). For example, statements asserting that iRobot "***maintained our segment position***" (¶ 215), even if literally true in that iRobot still led the U.S. RVC market, omitted the fact that competition had significantly eroded iRobot's sales and market share by that time, thus creating the false impression that competition was not

---

iRobot's disclosures regarding competition that purportedly preclude liability. ECF No. 78-2. In their brief, Defendants further include several single-spaced charts, one of which is over a page-long falsity argument against some statements. MTD at 11, 24-25. Such submissions are improper. *E.g., Monec Holding AG v. Motorola Mobility, Inc.*, 2014 WL 4402825, at *1 (D. Del. Sept. 5, 2014) (striking similar submissions due to the "impropriety of including legal analyses in charts attached as exhibits to the briefing, as opposed to including them in the briefing itself, for purposes of circumventing page limitations"). But if the Court considers Defendants' Ex. A, Plaintiff respectfully requests that it also consider Plaintiff's response (Pls. Ex. A).

24

materially impacting iRobot. *See also* ¶¶ 241, 248, 259; Pls. Ex. A, entries 13, 28, 31, 37, 38.[22]

Defendants also dispute the falsity of two statements denying (or greatly understating) any market "share erosion due to competition" in February and July 2019 based on a purported "timing problem" of the CAC's allegations about iRobot's 10% market share drop. MTD at 24. But Defendants' suggestion that this substantial market share drop, which CW 1 stated was readily apparent internally "*by* the summer of 2018" (¶ 94)—*not only during* the summer of 2018—disappeared subsequently in 2019, strains credulity. It also ignores her and other CWs' accounts that iRobot's performance only deteriorated, rather than improved, as the Class Period progressed. *See, e.g.*, ¶¶ 96, 99, 132-33, 155, 163, 175.

**Tariffs:** Defendants similarly touted iRobot's ability to weather the imposition of tariffs unscathed based on its purportedly "advantageous" focus on premium-tier products, demand for which was supposedly less sensitive to tariff-related price increases. For example, on October 24, 2018, Angle highlighted iRobot's "competitive positioning within this growing market," assuring that "*[a] tariff would impact most directly price points below which we play*" because "iRobot is the premium player and *that's very advantageous because price sensitivity at the high end is much lower than at the bottom end*," such that it was "*better positioned than our major competitors [that] play at the low end*" to withstand the tariff-related price increases without any significant impact to its demand. ¶ 234. *See also* ¶¶ 231, 235, 244, 254; Pls. Ex. A at entries 22-27, 29, 36. Defendants, however, omitted that increased competition was already severely

---

[22] Dean's statement in December 2018 that iRobot had "*been able to maintain [its market] share despite . . . new entrants [] coming in*" (¶ 241) was alleged to be "false" (MTD at 23) based on CW 1's statement that such competition had reduced iRobot's market share 10% by that time. ¶ 94. Likewise, statements touting continued "strong [] demand" and "tremendous success against the competition" (*e.g.*, ¶¶ 221, 224, 254, 260) were alleged to be "false," or at least misleading, based on CWs' accounts of declining sales and market share. *See supra* Part III.B.1.(b).

eroding iRobot's sales and market share by this time because Shark and others were offering RVCs with similar performance and features at a much lower price, which undermined Defendants' claims that price increases would not harm Roomba demand. *Supra*, Parts II.A.; II.C. Indeed, by this time, Defendants knew that iRobot's newest, most expensive premium products, the i7 and i7+, were selling poorly due to their high price and performance issues. ¶¶ 118, 120; *supra*, 6; Part II.A.[23] Defendants' omissions of such adverse facts created a misleading impression as to the supposed protection that iRobot's premium-tier focus provided in mitigating the tariffs' impact.

### 2.    Defendants' Misstatements Do Not Fall Within the Safe Harbor

Although Defendants assert that Plaintiff's claims hinge on forward-looking "predict[ions] and project[ions] [about] the future impact of" competition and tariffs (MTD at 2), in reality, they challenge *only 7 out of 39*[24] misstatements as forward-looking statements protected by the PSLRA Safe Harbor (*id.* at 28). Their Safe Harbor arguments are unavailing.

First, the Safe Harbor does not apply to representations of present or historical fact, "even though the statement might also contain a projection of future financial experience." *Stone & Webster*, 414 F.3d at 213. The statements challenged by Defendants are such misrepresentations "concerning present circumstances" that do not fall within the Safe Harbor even if they were "blend[ed]" with some "forward-looking representations." *Sloman v. Presstek, Inc.*, 2007 WL 2740047, at *5 (D.N.H. Sept. 18, 2007). For example, Angle asserted that "[w]e *continue* to gain space, exposure and momentum in the market . . . even with the availability of new competitive products"—a statement of *present* fact regarding iRobot's market performance versus its

---

[23] Defendants' attempt to dispute CW 1's account about i7 sales based on extrinsic statements about that line's revenue contributions (MTD at 25) is improper at this stage. *See supra* at 21.

[24] While Defendants' brief asserts that "eight" of the misstatements are forward-looking, their chart challenged only 7 statements as such. MTD at 28; Def. Ex. A entries 3, 8, 9, 25, 29, 33-34.

competitors that is not protected, even if it also referenced "U.S. revenue expectations." ¶ 202.[25]

Second, Defendants' statements were not accompanied by "meaningful" cautionary language that was both "substantive and tailored to the specific future projections" alleged to be misleading. *Smith & Wesson*, 604 F. Supp. 2d at 341. Defendants' vague, generic warnings about competition (MTD at 28-29), which are equally applicable to all companies, are insufficient. *See, e.g., Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at \*12 (D.N.J. July 31, 2019) (warnings that the "pricing of its products" may be threatened by "vigorous competition" that "may develop products comparable or superior to those offered by [defendant] at more competitive prices" were "too general" to invoke safe harbor).

Further, Defendants' warnings of ***potential*** future risks about competition and tariffs are insufficient when they knew those risks had ***already come to pass***. *See, e.g., Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at \*4 (D. Mass. Feb. 15, 2018) (Casper, J.) ("[c]autionary words about ***future*** risk cannot insulate from liability the failure to disclose ***that the risk has transpired***"). For example, while Defendants warned that increased competition "***could*** result in a loss of sales or market share," they knew in late 2017 that iRobot was ***already*** losing sales to rising competition, and by early 2018 that such competition was already significantly eroding its market share, resulting in a 10% drop by mid-2018. *See supra*, at 4-5.[26]

### 3.    Defendants' Misrepresentations Were Not Immaterial Puffery

Defendants' puffery argument (MTD at 25-27) is meritless. Statements may be dismissed

---

[25] *See also* Pls. Ex. A entries 3, 8, 9, 25, 29, 33, 34. The Safe Harbor also does not shield Defendants as this action alleges "[o]missions of existing facts [which] are not forward-looking statements, and are not protected by the PSLRA safe harbor." *Dahhan*, 321 F. Supp. 3d at 254.

[26] *Pension Fund Group v. Tempur-Pedic International, Inc.*, 614 F. App'x 237, 244 (6th Cir. 2015) is distinguishable on this basis. Indeed, it noted that "courts have denied safe-harbor protection when defendants' risk disclosures treat currently existing conditions as ***mere possibilities***." *Id.* Finally, the Safe Harbor does not shield Defendants' forward-looking statements because they were made with actual knowledge of their falsity (*see* Part III.B.).

as "puffery" only when they are "so vague, so general, or so loosely optimistic that a reasonable investor would find [them] unimportant to the total mix of information." *Smith & Wesson*, 604 F. Supp. 2d at 342. Given that "the recent trend is to consider expressions of corporate optimism carefully," "dismissals on this ground are increasingly rare." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 & n.11 (D. Mass. 2006); *see Gerneth*, 2018 WL 935418, at *3 ("Materiality is a mixed question of law and fact, and thus will rarely be dispositive in a motion to dismiss.").

Defendants' challenged statements were concrete, verifiable representations of fact, not loose, vague generalities. For example, Defendants repeatedly told investors that sales and demand remained "strong" and "successful" "across price points," despite increased competition and tariff-related price increases, including that iRobot was "***not simply getting pushed into premium only***"—representations of present or historical fact directly contrary to internal facts as reported by CWs. *See, e.g.*, ¶¶ 221, 224-26, 260; *see also* Pls. Ex. A entries 15-18, 20, 39. *See, e.g., Smith & Wesson*, 604 F. Supp. 2d at 342 ("***statements regarding the strength of past demand*** . . . are definite and important to a potential investor"). Similarly, Defendants' statements touting iRobot's continued dominant competitive position—*e.g.*, that iRobot was "well positioned" against competitors as a "premium player," which gave it an "advantageous" "competitive positioning within this growing market," ¶ 234, and that the Company had seen "tremendous success against the competition," ¶ 221—are "exactly the types of statements on which investors and markets rely." *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 337 (D. Mass. 2002) (statement that company's leadership position gave it a "competitive advantage" over rivals actionable).[27]

_____

[27] *See also Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 167, 176 (D.R.I. 2003) (statements touting, *e.g.*, the company's "dominant position in the market" and that its "proven early market

Further, "[m]ateriality is measured by whether the defendants' representations, taken together *and in context*, would have misled a reasonable investor." *Gerneth*, 2018 WL 935418, at *3. Here, the relevant context includes the fact that many of the challenged statements were made in direct response to questions from securities analysts raising these concerns. *See* Pls. Ex. A, entries 1, 4-12, 15-28, 35, 38, 39. *See, e.g., W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 970 (D. Minn. 2014) ("courts have typically found otherwise vague statements to be actionable when they were made in response to a specific inquiry from an analyst or investor"); *City of Brockton Ret. Sys. v. CVS Caremark Corp.*, 2013 WL 6841927, at *4-5 (D.R.I. Dec. 30, 2013) (rejecting puffery defense for statement made "in response to a question from a market analyst"). Thus, such assurances of continued "strong demand" for a product that generated *90%* of iRobot's revenues were not "so vague" that "a reasonable investor would find [them] *unimportant*." *Smith & Wesson*, 604 F. Supp. 2d at 342.[28]

### 4.    Defendants' Opinion Statements Are Actionable

Defendants also contend that twenty-two misstatements are inactionable statements of opinion because the CAC fails to plead that they were "not sincerely held." MTD at 27. But that is not the applicable standard. An opinion, "even if literally accurate" and "*sincerely held*," is actionable if it "omits material facts about the issuer's . . . knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175,

---

strategy is positioning it as a dominant . . . player" are actionable as "they clearly imply a comparison to competitors"). *See also* ¶¶ 208, 234, 248; Pls. Ex. A, entries 10, 15, 24, 26, 32.

[28] While accusing Plaintiff of "omitting context" from the misstatements, Defendants cite only one example where Plaintiff inadvertently left out the beginning of Dean's statement ("we're hoping") reassuring investors that the tariff-related "price increases mostly offset" iRobot's costs. MTD at 26-27. But such an "expression of [] hope without disclosure of recent troubling developments" is actionable where it misleads investors. *Ariad*, 842 F.3d at 753.

187-89 (2015); *see also Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 117-18 & n.6 (D. Mass. 2017) (under *Omnicare*, an opinion is actionable "if the speaker *either* did not in fact hold the stated opinion, *or* omitted material facts that, if known by investors, would lead them to doubt the reliability of the stated opinion"). Thus, Defendants misconstrue their only cited case, which sets forth the *Omnicare* standard and makes clear that alleging that Defendants "did not subjectively believe in" the opinion is *one* of *several* ways to plead the falsity of opinions. *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017). *See also Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 429 (D. Mass. 2018) ("falsity for an opinion [] requires subjective falsity *only* in the absence of allegations that an embedded statement of fact was untrue . . . or that there was a material omission in the opinion").

Even if considered opinions,[29] Defendants' statements here are actionable because they omitted material, known facts regarding declining Roomba store shelf space, sales, and market share due to increased competition, as compounded by tariffs, which conflicted with and rendered unreliable Defendants' positive assurances. *See supra*, Parts II.A; III.B.1.(b).[30]

## IV.    CONCLUSION

Defendants' motion should be denied in its entirety. If it is granted in whole or in part, Plaintiff respectfully requests leave to amend under Fed. R. Civ. P. 15(a) to cure any defects.

Dated:  July 3, 2020                              Respectfully Submitted,

---

[29] Plaintiff disputes that all of the challenged statements are opinions, as many did not use opinion qualifiers like "I think," and instead described existing facts or "express[ed] certainty." *Omnicare*, 575 U.S. at 176, 183. *E.g.*, ¶ 200 ("*what we found* with the competitors to date is that" their products were "*not resonating*" with consumers); ¶ 202 ("We *continue to gain* space, exposure, and momentum in the market . . . ). *See also* Pls.' Ex. A, entries 1, 3, 4, 6, 11, 19, 23, 24, 26, 33, 35.

[30] Because the CAC states Section 10(b) claims, the Court should also sustain the Section 20(a) claims as Defendants do not challenge Plaintiff's "control" allegations. *See* MTD at 9.

*/s/ James W. Johnson*
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Margaret Schmidt (*pro hac vice* forthcoming)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
ivasilchenko@labaton.com
jchristie@labaton.com
mschmidt@labaton.com

*Counsel for Lead Plaintiff Carpenters*
*Annuity Trust Fund for Northern California*
*and Carpenters Pension Trust Fund for*
*Northern California, and for the Class*

Guillaume Buell (BBO# 676566)
Madeline Korber (BBO#704128)
**THORNTON LAW FIRM LLP**
One Lincoln Street
Boston, Massachusetts 02111
Telephone: (617) 531-3933
Facsimile: (617) 720-2445
gbuell@tenlaw.com
mkorber@tenlaw.com

*Liaison Counsel for Lead Plaintiff*
*Carpenters Annuity Trust Fund for Northern*
*California and Carpenters Pension Trust*
*Fund for Northern California and the Class*

31

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed through the ECF system on July 3, 2020 and accordingly will be served electronically upon all registered participants identified on the Notice of Electronic Filing.

*/s/ James W. Johnson*
James W. Johnson