UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

IN RE: iROBOT CORPORATION
SECURITIES LITIGATION,

Civil Action
No. 19-12536-DJC

September 17, 2020
2:01 p.m.

_____


TRANSCRIPT OF MOTION HEARING VIA VIDEOCONFERENCE

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA   02210


DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA   02210
joycedebra@gmail.com

APPEARANCES:

FOR THE PLAINTIFFS:

IRINA VASILCHENKO, ESQ.
JAMES T. CHRISTIE, ESQ.
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
212-907-0700
ivasilchenko@labaton.com
jchristie@labaton.com

GUILLAUME BUELL, ESQ.
Thornton Law Firm LLP
1 Lincoln Street
Boston, MA 02111
617-531-3933
gbuell@tenlaw.com

FOR THE DEFENDANTS:

JAMES R. CARROLL, ESQ.
ALISHA QUINTANA NANDA, ESQ.
RENE H. DUBOIS, ESQ.
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street
Boston, MA 02116
617-573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
rene.dubois@skadden.com

P R O C E E D I N G S

(The following proceedings were held via videoconference before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on September 17, 2020.)

THE CLERK:  Civil action 19-12536, In Re: iRobot Corporate Securities Litigation.

To all participants, pursuant to local Rule 83.3, persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings.  Violation of these prohibitions may result in sanctions.

And would counsel, starting with the plaintiffs, I guess, please state your name for the record.

MS. VASILCHENKO:  Good afternoon.  This is Irina Vasilchenka from Labaton Sucharow on behalf of lead plaintiff. And I believe I'm joined by my colleagues here, also James Christie from Labaton Sucharow and my co-counsel, local counsel Guillaume Buell.

THE COURT:  Good afternoon.

MR. CARROLL:  Good afternoon, your Honor.  James Carroll on behalf of iRobot and the individual defendants. Also on, my partner, Alisha Nanda, Rene DuBois, and attending

from iRobot, Glen Weinstein and Maya Choksi.

THE COURT:  Good afternoon.

Counsel, I know we're here on the defendants' motion to dismiss.  I've had a chance to review the papers on either side, the motion papers, opposition, and the reply.  I'm prepared to hear argument.

Counsel, I'll give each side about 25 minutes.

Mr. Carroll, since it's your motion, if you want to reserve any of that time for rebuttal, I'll allow you to do that.

Counsel.

(Discussion off the record.)

MR. CARROLL:  Your Honor, thank you very much.

To set the table for this motion, your Honor, I'd like to briefly provide a little context on iRobot, move right into the pending motion, how we got here, and why we, respectfully, submit that this complaint lacks entirely the pleading of particularized facts sufficient to support a securities fraud complaint, most particularly so with respect to the absence of facts as to *scienter*.

So a little bit about iRobot.  iRobot is based in Bedford and was founded by professional scientists, robotic scientists coming out of M.I.T. roughly 30 years ago.  It makes some products that do mazing things.  Just a few examples.  The iRobot products have explored the Great Pyramids, they have

gone into the rubble after 9/11 as part of rescue efforts, and they're used, in part, by the United States military to try and detect mine fields.

The technology that iRobot is most known for, though, by consumers is its Roomba product line of robot vacuum cleaners.  iRobot was a pioneer in that space and has been a market leader in that space for more than a decade.  But, as your Honor well knows, any time you've been that successful in any particular consumer product space, with that success comes competition.

Now, germane to this motion is another background fact, which is that, as your Honor likely recalls, our current President started a trade war with China and imposed tariffs on products imported from China, that started in 2018.  The potential for tariffs on products manufactured in China put iRobot and many other companies, of course, like it in a bind. They can either keep the prices where they are and make a lot less money per unit or raise the prices and risk diminishing their demand.

iRobot had very strong results in 2017 and very strong results in 2018, and each year it beat its annual revenue guidance.

In connection with 2019, iRobot adjusted twice during the course of the year its revenue guidance downward.  It did it in July, it did it again in October.  And just two days

following the reduction of guidance in October, the stock price fell and a securities fraud lawsuit followed right away, as is so often the case.

The original complaint in the case, your Honor, embraced a rather bizarre channel stuffing theory. And the theory originally in the case was that iRobot, by virtue of purchasing some third-party distributors and bringing them into iRobot, had somehow stuffed the channel. A rather nonsensical theory, frankly, but one that's been entirely abandoned in the complaint before you. Following the PSLRA process, we now have in front of us a very different kind of complaint and one that would be fairly characterized as a garden variety securities fraud theory. And by that what I mean essentially is that the plaintiff claims that negative information that was disclosed in 2019 that caused the forward-looking guidance to be reduced was information that must have been known, or so the story goes, by the individual defendants throughout the class period, and they must have conspired to conceal that information from the market. That's the theory.

Now, because it's all too easy and common to bring those kind of fraud-by-hindsight claims, the PSLRA applies and imposes significant pleading standards again with respect to *scienter*.

Now, I note at the outset that the complaint here does not and cannot contend that any reported revenue or earnings

figure that iRobot reported in any of its 10-Qs or any of its 10-Ks were in any way inaccurate.  There's no claim of inaccurate reporting in that regard at all.  It's not about a question of historically inaccurate results.  Instead, what the complaint does is accuse iRobot and three executives of securities fraud for failing to accurately disclose the impact of increasing competition coming into the market and competing against its Roomba products, particularly its lower-level Roomba products; and two, for failing to adequately disclose the impact of the Trump tariffs on Roomba -- on the Roomba's market share.

Now, complaints that typically allege that kind of securities fraud case that survive a motion to dismiss are accompanied by allegations of *scienter* that are designed to answer the question of why is it that there would be this conspiracy to conceal information from the market?  So one often sees allegations of insider trading, allegations that executives conspired to delay the disclosure of information to allow options to vest or otherwise enrich themselves.  There's no such allegations in this case whatsoever.  Similarly, there are no allegations of any accounting irregularities.  There's no allegations of SEC investigation or none of any of the other hallmarks that often accompany security fraud complaints that often survive a motion to dismiss.

An extraordinary thing about the allegations in this

case, your Honor, is that the complaint points to alleged matters that were concealed that the company absolute made multiple and evolving disclosures about.

The complaint purports to challenge 39 different statements made by the company, and we've included a chart among our papers that go through them one by one, but it all boils down really to two subjects. The first, of course, is that there was increased competition from other robotic vacuum cleaner manufacturers and that impacted the market share; and the second, again, with the tariffs. And with that, if I could, your Honor, I'd like to put up, if Ms. Hourihan would allow us, I'd like to put up a slide to walk us through that very briefly.

THE COURT: So you may.

And Ms. Hourihan can switch you to the host or make you a co-host.

I guess, counsel -- and I think you might be about to get into this -- one of the arguments your opponents make here is that of the 39 statements, only seven can be appropriately characterized as forward-looking. What do you say to that characterization? Because I know much of your papers was focused on these statements being forward-looking as opposed to statements about what was actually occurring or what the individual defendants actually knew at the time, as opposed to a forecast.

MR. CARROLL: And I should ask Ms. Hourihan to allow Mr. DuBois, Mr. Rene DuBois, to get access to the controls.

THE COURT: Okay.

MR. CARROLL: Let me answer your question directly, your Honor.

THE COURT: Sure.

MR. CARROLL: It's only that smaller number that are protected by the express cautionary language that has to do with the statutory safe harbor. But that doesn't mean that the other statements are not so protected. Forward-looking statements and statements, as we'll see, of a company being optimistic about their products or proud of what their products have done in the marketplace, are not actionable, and that is the overwhelming bulk of the statements that are challenged here.

Let's go to the first slide, please.

So, your Honor, I wanted to briefly just take a look at -- and this is all in the record, in the very voluminous record before your Honor. This is an exhibit to our brief. In the middle of the page we've got the class period, this lengthy class period of over two years. And there's some examples, this is not by any means comprehensive, but examples about notices of increased competition.

You can see, your Honor, that even before the class period begins, iRobot is talking about increased competitive

pressures that could result in the loss of sales or market share.  That's before the class period even starts.

Moving a little bit to the right, I'll pick the one in March that I've highlighted.  March 2018, there's a reference there of five new competitors gaining placement at national retail chains with up to 3 SKUs.  What that says is competitors have gotten on the shelves, they've got shelf space at some big-box retailers.  This is happening, these disclosures about competition.

Further to the right, an acknowledgement in late '18, Over several years we've had more competition coming in from what we call our entry price points or the low end of the range.  That's the competition that's coming in at the base model Roomba products.  And as we'll see shortly, the company not only disclosed the competition, but then disclosed the impact that that competition had on the market share.  And I'll get there in a moment.  But that's the first cluster.

THE COURT:  That was the other question I had, was about the distinction I think your brothers and sisters make about there may have been disclosure of competitors coming into the market, and I see what's highlighted on this slide, but not necessarily the known impact as of that moment as opposed to a prediction about what -- that there might be potentially impact in the future as opposed to knowing that there had been impact.

MR. CARROLL:  Yes, indeed, your Honor, you're right to

point that out.  And I'll show you where the company actually disclosed what the market share was.  There's no mystery about that.

Very briefly, just to set the table, at the bottom part of the chart are examples of the disclosures about the tariffs.

I would respectfully submit, your Honor, that you could take judicial notice of the fact that our President is somewhat less than predictable and what he was going to do with the tariffs with respect to China was also difficult to predict.

iRobot from the outset made repeated disclosures about it.  Ultimately, iRobot decided it had to raise prices.  That, too, was disclosed.  So there's robust disclosure about both topics.

Now, in addition to those disclosures, I want to come right to the question your Honor is asking about.  I want to talk first about the company's guidance that it provided, and then I'll go to the market share.

iRobot, unlike most companies, updates annual guidance every quarter.  So what iRobot does early in the year, it tells the market where it thinks it will turn out for the whole year in terms of the actual revenue.  Many companies do that.

What iRobot does, which distinguishes itself in many regards, is it updates that guidance, the annual guidance, each

quarter and tells the market where it thinks it is.  And here's the example of it, again, all in the public record.

In 2017, you can see the guidance is increased and finishes above the -- the actual results finish above the last guidance.

In 2018, similar pattern, although the guidance holds for a couple of quarters and the changes are not as severe.

In 2019, which led to this suit being filed, you see that the guidance stays steady at $1.295 billion for the first couple of quarters and then drops slightly in successive quarters.  That's the guidance they put out to the market saying to the market every quarter --

THE COURT:  And can I just ask a question on that?

In terms of the 2019 disclosures adjusting the -- this is the adjusting the guidance downwards or where -- this is the revenue versus actual results, right?

MR. CARROLL:  So this is -- this is the company adjusting the guidance down, that's the blue bars.  Each quarter has its own --

THE COURT:  Okay.

MR. CARROLL:  And the green is how it turned out against the actual revenue.

THE COURT:  Actual for the -- actual for the year.

MR. CARROLL:  Yes.

THE COURT:  Okay.  Thank you.

MR. CARROLL: Okay. So that's what they do in terms of guidance, and it's updated at each quarter. And of course, your Honor, what goes into guidance? Well, what goes into guidance is how you think you're doing in terms of shelf space and competitors; and what goes in there is how you think these tariffs are going to impact you, and they update that every quarter.

Now, earlier, your Honor, you asked about market share. Now, here is the company's public disclosures, all in the record on this motion, about annual market share. The company doesn't make disclosures like it does with guidance and give intrayear updates as to market share. It discloses market share only after the year is completed, and you can see here with the year end '16 through '18, you see market share at 88 percent and then it drops down to 82 percent for calendar year 2018.

Now, that's critical, and we're going to come to that later, but this is the company disclosing that there has been a diminution in market share. This is what the complaint says the company doesn't disclose, and it's right there; and I'll come to that later when we're talking about so called Confidential Witness 1.

But I've now given your Honor a sense of the disclosure environment, both the disclosures that were made about competition, the disclosures that were made about

tariffs, and now we've looked at guidance updated quarterly, which is unusual, and then this disclosure that's made every year at the end of the year with respect to the market share.

Now, faced with all of that, what does the complaint attempt to do to state a securities fraud claim?  And I respectfully submit, your Honor, that the complaint attempts to do three things to create a fraud claim here and neither of them work.

THE COURT:  Can I just ask, counsel, just a question, not to be dense.  I have a sense of who would be on an analyst day call and an investors' call.  On the earnings call, I would assume that would be both investors and analysts; is that fair to say?

MR. CARROLL:  Most certainly.  Most certainly.

THE COURT:  Okay.  And so -- right.

And there's no -- but not necessarily people in the position of the CWs?

MR. CARROLL:  Well, I don't know that there would be any reason the CWs couldn't dial into certain of these calls, but what happens, as your Honor is well familiar with, the analysts get on these calls and then publish analyst reports, and some of them you see in the plaintiffs' records in the plaintiffs' complaint.  But this is a public statement widely disseminated with respect to what end of year market share is.  This is in the market.

THE COURT: Right. So the company conference presentation, that's also public but also inward facing?

MR. CARROLL: The company conference publication is public, but it's not inward facing. This is information disclosed out to the public markets.

THE COURT: Thank you.

MR. CARROLL: And, your Honor, you can see it, it's referenced in the analyst reports themselves. Okay.

THE COURT: Thank you.

MR. CARROLL: So against that backdrop, I suggested, your Honor, that there's three techniques that the complaint attempts to state a claim for securities fraud.

And I want to go to the first one, if I might, Rene, please.

So one of the things that this complaint does, it selectively quotes from documents and omits the context of documents that needs to be seen in order for the quotations to be fair.

I'm going to reference the first one. This appears in the complaint three times. It's a very lengthy complaint, but it is quite redundant. So on three different occasions this complaint alleges that defendant, Alison Dean, she was the CFO at the time, reassured investors that tariff-related price increases -- this is where iRobot is raising the prices to deal with the impact of the tariffs -- were not adversely impacting

iRobot's business because -- and this purports to quote Ms. Dean -- price increases mostly offset that incremental tariff cost.

That's what the complaint alleges that the CFO said. But when you go to the document and look at the transcript from the earnings call, you see that the complaint has omitted the text in red that is part of that same sentence.  And it doesn't say what the plaintiffs say it said.  Rather, Ms. Dean said, We're hoping that those price increases mostly offset that tariff cost.  There is a world of difference between portraying something as a statement of historical fact and a hope of what will happen based upon the judgments the company made as to how to handle its pricing.  You cannot base a claim for securities fraud by leaving information out.

We go to the next one, please, Mr. Dubois.

Your Honor, the complaint also takes things out of context, and here's an example of that, again, with respect to the CFO, Alison Dean.

The complaint says that Ms. Dean was misleading and that she downplayed the impact of increased competition and quotes her as saying, Our innovations have really resonated with the consumer base, and we've been able to maintain the share despite the fact that these new entrants are coming.  And she does indeed say that, your Honor.  This is part of a lengthy interview that is transcribed at a Raymond James

conference in December of 2018.  Those words are indeed in the transcript.  But at that part of the transcript Ms. Dean is talking about the arc of the company's strategy overall and how over many years they have introduced new products with features that they knew the customers wanted and that's why they were able to maintain their market share as a general matter.

If you go in that same transcript three or four inches down the same page, Ms. Dean addresses the circumstances specific to this case, what's happening with the competition in 2018.  And she says something that's much more specific and, taken in context, is quite different.  What she says there is saying, Even if some new competitors are coming in and taking some points of share, we don't view that loss of share in and itself as a bad thing as long as the segment is growing, and that's what we have been seeing to date.

What she's saying there, your Honor, is, Well, it's plain as day.  You can lose some market share, but if the market is growing, it's okay.

She's acknowledging that they lost the market share. Now, this is December 5, 2018.  You'll recall from the slide we looked at just a few moments ago that the company announced a diminution in the market share of 3 points just a few weeks later in early February.

Ms. Dean isn't saying that the market share has held steady.  She's saying that they've seen some diminution in

market share, and it's confirmed by iRobot just a few weeks later.

Again, you can't create a securities claim by taking things out of context, whether it's by leaving words out of a quote or quoting some piece of the article where the context is made very different by looking at the entirety of the article, and there's examples of that in this complaint on multiple occasions.

THE COURT:  Counsel, and just -- I think you have -- you've hit the 20-minute mark, maybe the 21-minute mark, just in case you wanted to reserve time for rebuttal.

MR. CARROLL:  Okay.  I'll be quite quick.  I want to hit the two other thins we see in this complaint.

One, your Honor, as we said, there's 39 challenged statements.  Most of them, overwhelming percentage of them, are statements of corporate optimism or opinion like this.  We feel quite good; we've had tremendous success; we've demonstrated continued strength.  Under the precedent in this circuit, your Honor, Boston Scientific, Shaw v. Digital and the like, this isn't actionable.

Finally, your Honor, I want to go to what the complaint purports to do with confidential witness statements, and particularly the one they rely on most, Confidential Witness Number 1.  And plaintiffs say that Confidential Witness Number 1 supports an allegation that by the summer of 2018,

iRobot's market share had fallen to 77 percent by the summer of 2018. iRobot doesn't make any public statements about what its market share is in the summer of 2018 or the summer of any other year. iRobot discloses market share at the end of the year once the year is over. Plaintiffs have no basis to contradict that, and Confidential Witness 1 doesn't contradict it. There is no statement contradicted by that.

Instead, what we have is an argument that says, well, quote, it strains credulity that the market share would have been 77 percent in the summer and be up at 82 percent at the end of the year. That's all they have. And of course it makes perfect sense. The majority of the Roombas are sold in the fourth quarter during the holiday season. That's when the sales take place. There's no basis, and Confidential Witness 1 provides none. Confidential Witness 6 is no better, your Honor. Confidential Witness 6 says there were all-hands meetings in which Colin Angle, the CEO, another executive, talked about competition and used charts and graphs. Imagine that, charts and graphs. Doesn't say what the charts and graphs said. There's no specificity to it whatsoever, and nothing even remotely that contradicts any allegation made in the complaint.

Your Honor, we'd respectfully submit that this complaint isn't close. There's a one-line request at the very end of the opposition that asks for an opportunity to amend,

but the plaintiffs don't say how they would make the next complaint any different or any better and don't come close to satisfying requirements to do so under Abiomed and the other cases in this district.  They've had plenty of opportunity to do so; they've been on notice of these deficiencies for many months.  We ask, respectfully, your Honor, that you dismiss the case and do it, please, with prejudice.

THE COURT:  Thank you.

Counsel, I will hear from the plaintiff.

MS. VASILCHENKO:  Good afternoon, your Honor.  This is Irina Vasilchenka on behalf of lead plaintiff.  How are you?

THE COURT:  Good afternoon, again.

MS. VASILCHENKO:  Please bear with me.  We also submitted some slides ahead of the meeting, and I hope that Ms. Hourihan was able to provide them to you.  Perhaps you can follow along with me as I give my presentation.  I don't have the capability of sharing my screen like my brother from the other side did, but I will try to go through the arguments that he made, and I might refer to the slides that we submitted from --

THE COURT:  Okay.  And give me one second, counsel.  I have them here.  Let me open them up.

Counsel, for what it's worth, I have them on my other screen.

MS. VASILCHENKO:  Great.  I don't want to go through

all of these, as I know that we are limited in time and that my brother from the other side referred to certain specific arguments.  I'll try to hit those points as quickly as I can, and I'll let your Honor kind of go through those slides if you think they will be helpful afterwards.

But starting with defendant disclosure arguments which you saw was a recurrent theme through their motion papers and again today, I think your Honor hit the nail right on the head when you asked Mr. Carroll, you know, how many of the statements are actually forward-looking statements that are protected by the safe harbor?  And the answer is, of course, very few, only seven out of 39.

So, of course, Mr. Carroll, you know, tried to sidestep that point and pointed out that their disclosures are relevant to the other misstatements as well.  Specifically they argued that their risk disclosures needed *scienter*.  Your Honor, that is true.  There are cases saying that fulsome, complete, non-misleading disclosures can weaken the inference of *scienter* in those cases.  That is not this case.

While Mr. Carroll pointed out several -- various disclosures in defendants' SEC filings, for example, where they vaguely, generically refer to future risks that there could be some impact from competitors that have entered the market, they also generically referred to competitors having entered the market, that there is increased competition.  Of course there's

nothing controversial about that, the market knew that, analysts knew that.  And in fact, because of that, analysts repeatedly asked the defendants on earnings calls, is it impacting the company?  And defendants repeatedly dismissed, denied, and downplayed the impact that they were seeing.

Your Honor, I'm asking if you can still see me; my screen is frozen.

MR. CARROLL:  Your Honor, you may be on mute

THE COURT:  Yes, I was on mute, I apologize.

I can still see you.  Your screen froze for a moment, but even when it froze I could still hear you.

MS. VASILCHENKO:  Okay, great.  I just couldn't see you, and you weren't reacting so I couldn't tell.  Logistics of these challenging times can be nerve-racking.

THE COURT:  Yes.

MS. VASILCHENKO:  I will try to carry on.

So, as I was saying, your Honor hit the nail on the head again when you asked Mr. Carroll, well, yes, the company disclosed that competition had increased.  Well, what about the impact?  Did they disclose the impact?  Mr. Carroll said, well, yes, yes, they did.  But we respectfully submit, your Honor, they did not.  Specifically, they did not disclose that this new competition had substantially impacted those sales beginning no later than late 2017 when Shark entered the market, the RVC market, and that had a tremendous negative

impact on the company sales, as reported by CW-1, and corroborated by various other CWs in the complaint.

And specifically, the key impact that the company did not disclose was this 10 percent market share loss that the company experienced within the year of Shark entering the market.

So by mid-2018, the summer of 2018, CW-1 reported that there was this known internal market share loss --

(Court reporter interrupted)

MS. VASILCHENKO:  -- of 10 percent.  This was the quantified figure that this CW remembered, and that was discussed on weekly sales calls with iRobot's senior manager Rob Driscoll, and CW-1 personally attended these sales calls and remembers that the significant market share loss was repeatedly discussed in detail on these sales calls.

So this 10 percent market share drop was known internally within the company no later than the summer of 2018, within the year.

THE COURT:  Counsel, which CW was that?  Remind me.

MS. VASILCHENKO:  CW-1, your Honor, the one that we do primarily rely on.  She was the one that was employed by the third-party marketing agency that defendants also went on and on about in their papers.  But she was responsible, among other things, for doing market research on iRobot's competition, sales at retail stores in the Seattle region.  And the

marketing agency also had similar employees all throughout the country, including CW-2 who was based on the East Coast and conducted similar market research on the East Coast.  But it was primarily CW-1 who discussed the extensive impact that the company was seeing internally on its declining sales and market share from its competition, which was not reported to the market.

THE COURT:  So, counsel, am I correct that CW-1, as to the individual defendants, there are no statements that you're relying on the idea of what their position in the company of knowing this 10 percent market share number?

MS. VASILCHENKO:  Well, we are relying on the fact that CW-1 learned of this information about the 10 percent market share loss in these weekly sales calls with iRobot sales and marketing personnel, which were led by a senior marketing manager, Rob Driscoll, who was fairly high up in the company within iRobot, and he was the one who discussed these market share drops with CW-1, as well as numerous other iRobot and CCS employees on those calls.

And because of Rob Driscoll's senior position with the company, we submit that it is just simply not credible that the individual defendants, who closely monitored competition issues, who closely monitored market share, who repeatedly publicly talked about market share and the fact that their competition wasn't really affecting the company, that these

individual defendants did not know of this substantial 10 percent market share drop that happened very quickly within a year of Shark's launch, that they did not know this when this was the core product of the company constituting over 90 percent of iRobot's revenues.

So I hope that answers your question, your Honor.  I'm not sure that's what you were asking, but I hope that answers it.

THE COURT:  Thank you.

MS. VASILCHENKO:  The other reason that we submit that defendants did know of these adverse competitive trends is that CW-1 described these weekly field marketing reports that she and various other CCS employees contributed, you know, the market research data that they conducted across the retail stores.  So they would gather the competitor intelligence at the retail stores, including declining sales trends, including declining store shelf space across the U.S., and they would submit those trends into their Cognistix database.  I think you might have seen that in the complaint, and that was an internal database that CCS had, and that the defendants had access to the pictures of the store shelf space in that.  And from the data that the CWs compiled into the Cognistix database, CCS would then provide these compilations of key findings of their market research into the weekly field marketing reports.  And those reports were sent to iRobot headquarters, including the

individual defendants, CW-1 said this.  And in fact, CW-1 said that defendant Angle, the CEO, specifically admitted to reading these weekly field marketing reports at one of the large nationwide meetings that CW-1 attended during the class period.

And Rob Driscoll, the iRobot senior manager, who led those weekly sales calls that CW-1 was on, repeatedly reiterated that point to CW-1 and various other CWs, showing that, based on his communications with defendant Angle, Mr. Angle had clearly read those reports, he would reference facts that he found relevant or interesting in there showing in fact that he had read them.

THE COURT:  So I guess I have a further question.  Meaning, am I to understand the argument as to at least this statement or the statements related to this that your argument is as to the omission being overly optimistic, there's no suggestion that there was a statement about market share that was different at that time, right?

MS. VASILCHENKO:  Your Honor, there are actually several market share statements that we've pointed out in our papers, but defendants' argument is that those statements came a little bit later, the specific market share statement by defendant Dean in December of 2018, as well as the February 2019 statement by defendant Angle, and then later statements denying any market share impact in 2019.

But, your Honor, if you actually look at those

misstatements themselves, you'll see that they're not limited in time in this way that defendants suggest.  I think they quote them a little bit misleadingly.

If you look at defendant Dean's statement, for example -- I'm trying to find that specific statement in my slides.  I believe she said over the last several years, you know, they have not seen any share erosion.

And similarly, the statements in February 2019 and later in 2019 did not refer only to, you know, what they were seeing in 2019.  They more generally said that we're not seeing any market share erosion.  And, therefore, we submit that at the very least they're materially misleading, if not outright false, in the fact that they do not disclose there was in fact this large, substantial drop in market share in 2019 -- in 2018 because of competition, specifically.

And Mr. Angle's statement in February of 2019, in fact, specifically talked about 2018 and talked about this slight share loss that they saw, which was only 3 percent.  And we allege that as a specific misstatement in the complaint that was false and misleading because they significantly understated the loss that actually happened.  So they say it was 3 percent, but, according to CW-1, it was more than triple that, 10 percent.  So at the very least those statements are false and misleading.

Also, you know, the fact that defendants try to

dispute that this 10 percent share loss somehow evaporated, disappeared later in 2018 and then 2019 is belied by the complaint, and frankly, common sense given that in 2019 the company reported substantial underperformance.  They missed revenue numbers substantially, and those are the three corrected disclosures that we allege in the complaint because of competition and because of tariffs.

So -- but there are also additional CW allegations that confirm things are only getting worse as the class period progressed; they weren't getting better, as defendants would wouldn't want you to believe, your Honor.

Specifically CW-4, who is a very highly placed employee within the company, he was the one who was the company manager for Canada and reported to the senior VP and general manager of the Americas, he said that in the third quarter of 2019, for example, there was a huge impact on U.S. sales, and he knew that because of his participation in weekly sales calls with the SVP of all the Americas, which included, you know, representatives from various other regions in the Americas, including the U.S., so he had a personal basis and knowledge of that.  And he said that, you know, sales became -- deteriorated in the third quarter of 2018 because of the competition impact and specifically Shark.  So that's CW-4 corroborating things are getting worse.

CW-2 similarly said that sales softened, declined in

early 2019 due to competition and tariff issues.

CW-1 also talked about the poor performance that the company had in December 2018 with the holiday season, it underperformed. I don't know if you remember that, your Honor, but there was actually a passage that said because of this underperformance the company instructed CW-1 and other CCS employees to not tell customers that this underperformance was related to competition, to tell them that it was only due to tariffs. So that was this party line that CW-1 remembered being specifically told in early 2019. Whereas, based on her personal experience of conducting this market research, competition issues actually accounted for more than 75 percent, you know, that's sort of her estimate that she gave, whereas tariffs related to about 25 percent.

So those are just some of the additional statements in the complaint that show that things are getting worse through the class period, not better. So it's just -- it makes no sense that CW-1 knows about this internal market share loss by no later than summer of 2018 and then, all of a sudden, things get better later in 2018 and then early 2018 when the specific market share statements are made.

Also, you know, there are other statements specifically from the summer of 2018 where defendants denied any competition impact, where analysts, again, are asking them, Well, yes we know that new competition has entered the market

but what kind of trends are we seeing?  What are you seeing?

This is actually paragraph 226 of the complaint where defendant Angle deals with a similar argument, similar question.  Again, this is in July of 2018, mid summer of 2018 when the company knows about a 10 percent market share drop.  And he's asked about these competitors entering the market -- let me find the exact language so I can quote it for your Honor.  And he talks about -- and said, I think that there's a very good indication that, yes, the market was somewhat disrupted at the end of Q4 of 2017, that the market growth certainly allowed for them, these competitors that he's talking about, to enter without substantially impacting the performance we have predicted and that the environment, while certainly competitive, is not demonstrating any new disruptions.  That's in July of 2018 when he's asked about competitors, and he's denying any significant impact from competition at the same time as there's this internal information about a 10 percent market share loss.

So, you know, reducing it that there's a substantial discrepancy what the defendants are telling publicly to investors and what they know within the company.

THE COURT:  So -- and counsel, and you obviously can spend your time however you'd like, but just noting that maybe you have -- Ms. Hourihan can correct me -- but I think about eight minutes left.

I did want you to turn to the issue of *scienter*, which I also know is an issue here.  I promise you I'll go back and look at what I think is Docket 84-1, which now has the chart as to each of the statements and the parties' relative positions about those.

But as to *scienter*, that's the other piece that defendants say is deficient here, and I did want to make sure that I heard you on that.

MS. VASILCHENKO:  Sure, your Honor.  And with respect to *scienter*, as you know, the pleading standards are under the PSLRA, do not say that the pleading standard is an insurmountable bar.  I think your Honor has recognized that over and over again in the Collier case that we cited in our opposition papers; and that a plaintiff is not required to plead evidence at this stage, that the *scienter* inference does not need to be irrefutable, and no smoking gun is required.

And here we submit that defendants did know or there was a classic fact pattern of *scienter* here in that defendants had internal information showing these adverse competitive trends, including declining sales and a 10 percent market share which were inconsistent with the public positive statements that they shared with investors denying any competition impact. And that is classic --

THE COURT:  Even in the light of statements about competition and tariffs over what appears to be -- again, I'll

go back and focus on the time period -- but what appears to be throughout the class period of September 13th of '17 through October of 2019?

MS. VASILCHENKO:  Yes, your Honor.  So we submit that this market share loss was visible internally already no later than early 2018.  And before that CW-1 talked about there being adverse trend of declining store shelf space, which was a key indicator of competition for iRobot that they closely tracked, including the individual defendants, and to which they had access to in the Cognistix database that I mentioned previously, as well as which were discussed in those weekly field marketing reports that were sent to the individual defendants and which defendant Angle specifically admitted to actually reading in that meeting that CW-1 attended.

So this is the prototypical case where there is such indicia of *scienter*, that there are those internal reports and other information showing negative impact of competition on the company, including the 10 percent share loss, whereas publicly defendants are concealing that information and dismissing or downplaying that impact.

THE COURT:  But I guess my question is, what would you have iRobot say at that point other than what they said in terms of competition could negatively impact, right, our revenue, and the threat of or the imposition of tariffs would, particularly where the market share -- I mean, is there a

disclosure -- is there a requirement of disclosing market share before year end?  I guess that's what I'm sort of struggling with here.

MS. VASILCHENKO:  I'm not sure if there's a requirement.  I think defendants are arguing that they did disclose market share figures by year end.  But our point, your Honor, is that those were not true, and we have some statements, like the February 2019 statement by defendant Angle, that says it's 3 percent, there's only been a 3 percent drop, where -- in 2018, where CW-1 internally said they knew it was actually 10 percent, more than triple that.

And, your Honor, this market share disclosure argument that defendants actually brought out for the first time at the hearing today, this, your Honor, was not in their motion to dismiss briefing before, and we submit that it's improper and they actually waived it under 1st Circuit law, including the case of U.S. v. Leoner-Aguirre, 939 F.3d 310-319, it's by the 1st Circuit in 2019, and it specifically said that arguments not raised in initial brief and is instead raised for the first time at oral argument are considered waived.  So we think it's improper.

But at the same time, be that as it may, it fails on the merits because they say that they disclosed market share. And if you turn to the slide in Mr. Carroll's deck, I think slide 3.  So they said they disclosed it on September 17, which

is the beginning of the class period, 88 percent.  That's actually consistent with CW-1 said that around that time he said or she said that was 87 percent.

Then they say disclosed that it was 85 percent, it dropped a little bit in March of 2018, and then stayed at 85 percent by year end 2018.

In contrast, CW-1 says repeatedly that by this time in mid to late 2018 there was a 10 percent drop from 87 percent, is the figure that she recalls, to 77 percent.  So that's very different than the 85 percent figure that they're reporting publicly.  And in fact, based on disclosures from March to December, it stated 85 percent, there was no drop.  That's what markets learn, that's what investors here and analysts are comforted by those kinds of disclosures, look, competition was really not affecting iRobot, everything was fine.

Your Honor, we actually have a slide in the deck that specifically includes the analyst reports that sort of echo these positive statements by the company.

THE COURT:  Which I do have your deck here.  What number is that?

MS. VASILCHENKO:  Slide 21.

THE COURT:  Thank you.

MS. VASILCHENKO:  You can see, for example, Piper Jaffray, Although competition is creeping up, we believe iRobot still has a very strong market share.

Loup Ventures in July of 2018, this is after that statement by defendant Angle that I talked about earlier where he dismisses any impact from competition in iRobot.  Loup Ventures says, Concerns around competition continue to be overblown.

Later in October, Sidoti & Company, a different analyst says, Given what appears to be strong demand for iRobot's products, we think the tariffs could be largely offset.  Again, that echoes sort of statements that defendants made around that period of time.

In October 2018, again, Piper Jaffray, Increased competition has had minimal impact on iRobot's market share.

So, again, our point is that these so-called disclosures that defendants repeatedly say they made did not adequately inform the market that there really was a significant impact on the company.  In fact, investors do not really learn that until 2019 when there was a series of these partial disclosures in 2019 showing missed revenue expectations, missed guidance numbers and the like, and analysts begin to realize, Oh, wow, there really is in fact market share erosion contrary to what the company had been saying all along.

So getting back to this market share argument.  As I've talked about, 85 percent, you know, they are publicly telling the market that things have not changed, it's still

about the same, whereas internally CW-1 in describing a 10 percent market share drop.  The defendants knew about because this was repeatedly discussed in those weekly sales calls that CW-1 attended and that were led by a senior marketing manager from iRobot who had personal interactions with defendant Angle.  As I spoke about earlier, he repeatedly apparently discussed these weekly field marketing reports that they received and showed that he had read them.

So it's just, in our mind, inconceivable that defendant Angle reads these weekly field marketing reports, talks to Mr. Driscoll who knows about the 10 percent market share drop, and that Mr. Driscoll chooses not to share this 10 percent market share drop with the individual defendant, who then goes publicly and talks about there being no impact on the company's market share, sales or the like.  So we submit that establishes *scienter*.

In addition to the CW allegations --

THE COURT:  Counsel, you're at your time, but I'll give you two more minutes just to finish up here.

MS. VASILCHENKO:  Thank you, your Honor.

Just to point out that we do have lots of other allegations of *scienter* that contributed -- that's on slide 22, core operations being one of them.  And we recognize, your Honor, that core operations alone is not enough to establish *scienter*, but we're not pleading just it by itself.  This is

just a plus factor, an additional element that supports *scienter* given those CW allegations that we talked about.  And here, this is the quintessential case that corroboration should apply because the Roomba was over 90 percent of the company's revenue.  We cited several cases from the District of Massachusetts which recognize that when it's a company key product, that obviously adds to the inference of *scienter*.

As well we have significant access and monitoring and of internal information allegations.  The CWs confirm that the defendants had access to things like the weekly field marketing report, the Cognistix database, and that they closely tracked this information and worst competitive trends, and defendant Angle acknowledging he read those weekly field marketing reports.

Defendants also publicly admitted as much.  You know, iRobot stated that Angle has firsthand knowledge of operations, including full knowledge of the company, the strategic marketplace, and our competitors.

Angle himself repeatedly said that he had done a lot of intra research, like price elasticity and various other competitive issues in assuring the market that they believed they were well positioned to weather the impact of tariffs because of this so-called premium focus on their products which they said were less sensitive to price increases, meaning that consumers would still be willing to buy them if the company

increased prices.

Well, of course CW-1 talked about internally the company sales already suffering because of all this new, cheaper competition, so why would consumers be buying these more expensive products when there's new competition that is cheaper and providing a similar type of performance and features as iRobot.  So given that they knew about this increased competition that was cheaper, that was already hurting demand, they knew that further price increases on those products would only hurt demand.  Of course, that's exactly what happened in 2019, as the company later admitted, about demand being diminished because of these price increases and they subsequently had to roll back those price increases as a result, whereas the competition, which was already cheaper, did not impose such tariff-related price increases.

There's also the suspicious resignations of defendants Dean and Cerda.  Again, we don't argue that they alone are enough to establish *scienter*, it's just another factor that the Court can and should consider, and I believe your Honor actually recognized in the Collier case that they can contribute to *scienter* if they're accompanied by other allegations, which we do have here, the CW allegations and other things that I talked about.

THE COURT:  Counsel, I think you're now at your extended time, but I will go back to your papers.

Thank you, counsel.

Mr. Carroll, I think you had used your time, but in fairness, I will give you two minutes, since I gave your sister a little extra time.

MR. CARROLL:  Thank you, your Honor.

Counsel said that this complaint presents a classic fact pattern of *scienter*.

Your Honor, the company here has made multiple disclosures over time on the very subject matters alleged to be non-disclosed and this company has twice during the class period reduced its guidance, twice.

There isn't a hint of an allegation of insider trading or any other impropriety that would suggest a motive or any *scienter* here in this complaint.

The allegation that the resignation of two executives in any way could contribute to an inference of *scienter* is, in a word, preposterous.  Cerda, the COO, resigned to take a job as the CEO of another company.  He gave himself a promotion.

Ms. Dean, the CFO, did resign four months after the class period concludes and then stayed around to help with the transition to the next CFO for another three months.  There's no inference of *scienter* to be drawn there.

With respect to Confidential Witness 1, accepting, which the complaint, frankly, doesn't give a good basis for it given her position in the lack of specific, but if you accept

as a fact a diminution in market share to 77 percent during the summer, you then must ask yourself what statement does that contradict? iRobot only provided end of year market share information. Of course that's what it did. You don't know what the year is going to look like until you get through the Christmas season at the end of the year.

Confidential Witness 1 in saying that market share was 77 percent in the summer of 2018 contradicts no statement made by iRobot, and iRobot's statements about what the market share actually were are correct and unchallenged by any particular contrary assertion here. It's year-end numbers, and that's all it is.

And finally, I'll rest, your Honor. There was a reference to Confidential Witness 4 saying that the competition was having a huge impact. "Huge" is what the complaint says, quote, huge. What on earth does that mean? What is the Court supposed to do with a confidential witness saying the impact was huge? What's huge to Confidential Witness Number 4? You're left to guess.

Respectfully, your Honor, there's nothing here, and we would ask that it be dismissed with prejudice. And thank you very much for the time.

THE COURT: Thank you.

Thank you to both sides for your arguments today and your slide decks on either side, which I've also received and

I'll have a chance to go back to as well.

I'll take the matter under advisement, and we'll go from there.

Thank you to all counsel.  Stay well.

(Court adjourned at 3:00 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Debra M. Joyce                    September 28, 2020
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter