**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| | ) | |
| **IN RE IROBOT CORPORATION** | ) | |
| **SECURITIES LITIGATION** | ) | **Civil Action No. 19-cv-12536-DJC** |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                 **March 12, 2021**

## I.    Introduction

Lead Plaintiffs Carpenters Annuity Trust Fund for Northern California and Carpenters Pension Trust Fund for Northern California ("Plaintiffs") have filed this lawsuit upon behalf of themselves and a proposed class under Fed. R. Civ. P. 23 against iRobot and its Chief Executive Officer ("CEO") Colin Angle ("Angle"), Chief Financial Officer ("CFO") Alison Dean ("Dean") and Chief Operating Officer ("COO") Christian Cerda ("Cerda") (collectively, "Defendants"), alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), promulgated thereunder, between September 13, 2017 and October 22, 2019 ("the Class Period"). D. 66.  Defendants have moved to dismiss the consolidated amended complaint.  D. 77.  For the reasons discussed below, the Court ALLOWS the motion to dismiss.

## II.    Factual Background

The following facts are as alleged in the consolidated amended complaint, D. 66, and the Court accepts them as true for the purpose of resolving the motion to dismiss.  Plaintiffs are shareholders of iRobot Corporation, a "global consumer robot company that primarily designs and

1

builds robot vacuum cleaners ("RVCs") and other related products that autonomously clean consumers' homes." D. 66 ¶ 61.  Plaintiffs have brought this class action on behalf of "all persons and entities who purchased publicly traded common stock of iRobot during the Class Period and were damaged thereby." Id. ¶ 345.

iRobot's flagship product is the Roomba, launched in 2002 and was the first RVC "to succeed commercially." Id. ¶ 2.  Two years after its launch, in 2004, Roomba sales "surpassed one million units" and by 2016 "over 14 million, with iRobot holding 70% market share of the global RVC market at that time." Id. ¶ 61.  At the start of the Class Period, in September 2017, Roomba held an approximate 85% share of the U.S. RVC market. Id. ¶ 69.  The Roomba accounted for 90% of iRobot's revenue during the Class Period, deeming it "by far [iRobot's] most important product." Id. ¶ 62.

A.    <u>Roomba Models and Tiers</u>

During the Class Period, iRobot manufactured Roomba models sold "in two distinct tiers: (1) less expensive, entry-level models that had fewer and more basic features and older, less-sophisticated technology, and (2) more expensive, premium-tier models that included more higher-end features and up-to-date technology." Id. ¶¶ 63.  The premium-tier Roomba sales accounted for 60% of iRobot's "overall Roomba revenue annually" during the Class Period with the entry-level Roomba sales accounting for the other 40%. Id.  Before the launch of the new "e5" "mid-level" Roomba in September 2018, the "600 series" entry-level Roombas were sold at approximately $300, compared to the e5 which retailed at $449. Id. ¶ 64.  The 800 and 900 series premium-tier Roombas, including extra features "such as dual, multi-surface brushes, proprietary camera-based navigation technology, advanced mapping technology, and Wi-Fi and smartphone connectivity" retailed "between $500 and $900, or more." Id. ¶ 65.

In September 2018, iRobot launched the i7 and i7+ premium-tier Roombas for $699 and $949, respectively.  Id. ¶ 66.  In May 2019, they released "the most expensive model in its history," the premium-tier s9 and s9+ models, sold at $999 and $1,299, respectively.  Id.  As part of its competitive business strategy, iRobot launched new premium-tier Roomba models every eighteen months to two years.  Id. ¶ 67.  iRobot implemented technology from older premium-tier Roombas into the entry-level 600 series models.  Id.  Plaintiffs allege that "[p]rior to and during the Class Period, Defendants repeatedly told investors that this strategy was key to iRobot's ability to stave off competition from companies that charged significantly less for their robotic vacuums."  Id. ¶ 68.  For example, in a February 8, 2018 fiscal year 2017 and fourth quarter 2017 earnings call, Angle explained that iRobot takes the "premium features and roll them down to ensure that [their] entry-level price points continue to be competitive and to ensure that [they] can hold off these lower tech entrants into the marketplace."  Id.

### B.    Roomba's Market Share and Growth

During the Class Period, Defendants relayed to investors "that iRobot was experiencing rapid and substantial revenue growth across all of its primary global regions and that this growth would continue for years to come."  Id. ¶ 70.  During a March 1, 2018 analyst call, Angle said that iRobot had experienced nearly a 40% compound annual growth rate ("CAGR") in North America, 24% CAGR in Europe, Middle East and Africa and 14% CAGR in Asia-Pacific, highlighting that "on a global basis, the robot vacuuming segment [was] moving in a very exciting direction," wherein they anticipated "continued strong momentum for years to come."  Id.  In his words then, given the "massive amount of revenue growth expected in the U.S. (39%)," the U.S. market was crucial for iRobot's financial success.  Id. ¶ 71.

C.      **Roomba's Increasing Competition in the RVC Market**

iRobot "began facing mounting pressure from new competition entering the RVC market" as the RVC market "grew from only a small fraction of the worldwide overall vacuum cleaner in the market in the early 2000s to approximately 20% by 2016." Id. ¶ 72.  Vacuum manufacturers Dyson, Bissell and Hoover launched RVCs beginning in 2014, 2015 and 2016 respectively, while electronic manufacturers Panasonic, LG and Samsung released RVCs in 2015 and 2016.  Id. iRobot also faced competition from "new RVC specialists" Neato Robotics, bObsweep and ECOVACS Robotics.  Id.

Neato launched its first RVC in 2010 and has since released other models including its most popular, the "Botvac." Id. ¶ 73.  At the beginning of the Class Period, Neato had just launched its flagship RVC, Botvac D7 Connected, "one of its highest-end RVCs." Id.  bObsweep introduced its RVCs, the bObi and bObi Pet, in the U.S. in 2015 and ECOVACS, began launching models such as its Deebot series in 2016. Id.  By the start of the Class Period, there were at least twenty different manufacturers attempting to gain market share from iRobot in the United States.  Id. ¶ 74.   Notably, SharkNinja, one of iRobot's biggest competitors and the number one seller of traditional upright vacuums in the United States announced three models of RVCs:  Shark ION 750, 720 and 700 on September 12, 2017, one day before the start of the Class Period.  Id. ¶ 75-76.  The Shark ION, along with other major competitors, would later be sold side-by-side with Roomba models at large online and retail stores including Amazon, Best Buy, Target, Walmart, Home Depot and Bed, Bath & Beyond.  Id. ¶ 79.  The Neato Botvac, Samsung Powerbot and bObsweep models all sold their vacuums at price points well below the cost of iRobot's models, with Samsung Powerbot, for instance, receiving better reviews from "top consumer electronics publications" than the comparable Roomba 980 for $300 less.  Id. ¶ 78.  Plaintiffs allege that,

according to multiple former iRobot employees, during the Class Period, new SharkNinja models as well as other competing RVCs began to take up more shelf room at retail stores "previously dedicated exclusively to Roombas," iRobot's product.  Id. ¶ 79.

Analysts at J.P. Morgan recognized the "competitive threat" of these newer RVC models, reporting in September 2017 that the Shark ION appeared to "match the capabilities of the iRobot Roomba 600 and 800 series, with a lower price."  Id. ¶ 80.  Analysts at Spruce Point Capital Management similarly reported on September 13, 2017 that "given Shark's historical success, [they] assume[d] that their entry into the market [would] translate into sales and margin pressure for iRobot beginning with Q4 2017."  Id. ¶ 81.

> **D.**     **iRobot's Alleged Material Misstatements or Omissions**

Plaintiffs allege that Defendants iRobot and Angle, Dean and Cerda (collectively, the "Individual Defendants") "consistently and misleadingly reassured the market that the new competition did not threaten [iRobot's] market share advantage or impact iRobot's revenues and gross margins because Roombas were equipped with superior technology and features that differentiated them from the competition."  Id. ¶ 83.  They further allege that analysts "were encouraged" by Defendant's false and misleading statements, "remaining confident of [iRobot's] continued dominance in the RVC market despite this increased competitive market."  Id.  As the market became increasingly saturated with greater competition, Plaintiffs allege that iRobot and the Individual Defendants had knowledge that the rising competition has begun to "significantly erode" iRobot's market share by early 2018, but failed to disclose to investors these "material, adverse competitive trends" regarding iRobot's performance.  Id. ¶ 84.

## III.    Procedural History

This class action was initiated on October 24, 2019 in the Southern District of New York. D.1.  The case was transferred to this Court.  D. 19, 21. This Court consolidated related actions, appointed lead plaintiffs and lead counsel.  D. 52.  Plaintiffs filed the consolidated amended complaint on April 3, 2020.  D. 66.  Defendants have now moved to dismiss.  D. 77.  After oral argument, the Court took this motion under advisement.  D. 87.

## IV.    Standard of Review

For allegations of securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act, Plaintiffs "must plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)," Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (citation omitted) and pursuant to the Private Securities Litigation Reform Act ("PSLRA"), must also "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." Id. (alteration in original) (citation and quotations omitted).  "[I]f an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  In re Cabletron Sys., Inc., 311 F.3d 11, 27 (1st Cir. 2002) (citation omitted).  The complaint must also, with "respect to each [alleged] act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Hill, 638 F.3d at 55 (alteration and omission in original) (citation and emphasis omitted).  Plaintiffs are not required, however, to plead evidence.  Id.  (citation omitted).

As part of the Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) inquiry, courts engage in a particularized scrutiny of private securities complaints.  See, e.g., Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009).  Nevertheless, the PSLRA's pleading standard is not an insurmountable bar.  Plaintiffs have made a range of allegations in support of

their argument that Defendants intentionally defrauded iRobot shareholders.  As required by Tellabs, the Court considers the allegations collectively to determine whether the allegations give rise to a strong inference of scienter.  Zucco, 552 F.3d at 992 (citing Tellabs, 551 U.S. at 323).

Still, as with any Rule 12(b)(6) motion, the Court must "accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the [P]laintiffs' favor." Id. (citation omitted).

## V.   Discussion

To state a Section 10(b)-5 claim, Plaintiffs must plead:  "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  Hill, 638 F.3d at 55 (citation omitted).  Defendants challenge the adequacy of the complaint as to any actionable misstatements or omissions as well as scienter.  D. 78 at 16, 29.

### A.   Plaintiffs Have Not Sufficiently Plead Material Misrepresentations and Omissions by Defendants

"To establish a material misrepresentation or omission, [Plaintiffs] must show 'that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'"  Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)).  Information is material if a "reasonable investor would have viewed it has having significantly altered the total mix of information made available."  Mississippi Pub. Employees Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008) (internal quotation marks and citation omitted).  "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor."  Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186 (2015).  The allegations in the complaint must also meet the standard under Fed. R.

7

Civ. P. 9(b) and the "heightened pleading requirements" imposed on private securities litigation. Miss. Pub. Employees, 523 F.3d at 85.   Although "'in most circumstances, disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact,'" Quaak v. Dexia, S.A., 445 F. Supp. 2d 130, 141 (D. Mass. 2006) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1ˢᵗ Cir. 1996)), dismissal is appropriate for securities fraud where "[t]he Court finds that, even taking all facts alleged as true, most of the challenged statements were not material misrepresentations or omissions."   Wasson v. LogMeIn, Inc., No. 18-cv-12330-ADB, 2020 WL 5946813, at *17 (D. Mass. Oct. 7, 2020).   Here, Plaintiffs have failed to show that any of Defendants' alleged statements are false or misleading.

The complaint challenges some thirty-nine statements as materially false or misleading at the time made.   D. 66 ¶ 200-263, D. 78-1.   These statements fall within a few categories: statements regarding consumer demand, statements regarding market share, statements regarding competition and statements of corporate optimism or opinion.   This Court agrees with Defendants that "at least seventeen of the challenged statements are not adequately alleged to be false or misleading and thus are not actionable as a matter of law," and will address them in tandem below. D. 78 at 30, D. 66 ¶ 200, 202, 203, 208, 211, 215, 221, 224, 231, 234, 241, 246, 248, 254, 258, 259.

### 1.   Statements Regarding Consumer Demand

Plaintiffs challenge multiple statements about consumer demand, but never assert that these statements are false.   They deem these statements misleading for failure to disclose known "materially adverse competitive trends."   Id. ¶ 206, 217, 228, 255.   Statements such as "'17 was still another year where we maintained our segment position" Id. ¶ 215, or "demand from U.S. retailers for our robots increased during the last quarter," Id. ¶ 202, do not, on their own, allege

how the omitted disclosure of the alleged "adverse competitive trends" rendered these otherwise factual statements misleading.  In re Cytyc Corp., No. 02-12399-NMG, 2005 WL 3801468, at *25 (D. Mass. Mar. 2, 2005) (finding that statement of past financial performance was not misleading by alleged failure to disclose present or future trends).  Without alleging that the aforementioned "historical fact[s] about consumer demand," D. 78 at 30, are false, or alleging particularly how the lack of disclosure concerning adverse competitive trends rendered these statements about past financial performance misleading, the complaint does not sufficiently plead specific facts under Section 10(b).  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1212 (1st Cir. 1996) (observing that "accurate reports of past successes do not [create] a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse").

### 2.    Statements Regarding Market Share

The complaint also challenges statements about market share:  "[o]ur U.S. estimates for 2018 show a 3-point share loss overall," D. 66 ¶ 248, and "the U.S. segment did not accelerate in the second quarter as we had expected, but we had maintained our segment share in this region and are not seeing any share erosion due to competition . . . we've held our share based on the data we are seeing.  The competition doesn't seem to have taken anything in the first half of the year." Id. ¶ 259.  Plaintiffs allege that these statements were misleading when made because "iRobot's market share had fallen an additional 10% to 77% by October 2018."  Id. ¶ 242, 249, 262. However, as Defendants contend, the complaint "fails to allege any particularized facts showing that this purported 10% market share decline representing a snapshot of time… remained static through the remainder of the year and in 2019 such that these statements discussing iRobot's market share as of the end of 2018 and first half of 2019 are not adequately alleged to be misleading."  D. 78 at 31.  Without any additional particularized facts surrounding how and why

the above statements are misleading at the time made, the statements are otherwise representations of iRobot's market share during a particular period, served a particular purpose and have not been shown, as alleged to be to be misleading.  See In re Smith & Wesson Holding Corp. Sec. Litig., 836 F. Supp. 2d 1, 8 (D. Mass. 2011) (finding that a statement "clearly intended" to refer to a company's acquisition in January 2007 and based on record sales in months leading to press release, were true, and thus "cannot be fairly argued" to be misleading).

### 3.    Statements Regarding Competition

Similarly, the challenged statements about competition and tariffs are not actionable. Plaintiffs rely upon retail market research data compiled by confidential witness 1 ("CW 1"), a former marketing development manager at a company contracted by iRobot to conduct market research on iRobot and its competitors' sales and other competitive trends, and confidential witness 2 ("CW 2"), a former field marketer responsible for going into retail stores throughout the United States to speak to their store contacts about the sales of iRobot's products.  The market research data was later submitted to undisclosed persons at iRobot in the form of weekly Field Marketing Reports (the "Reports").  See D. 66 ¶ 7, 52, 56.  Based upon such information, Plaintiffs contend that iRobot was aware during the Class Period that it was "increasingly losing store shelf space, sales and market share" to competitors and that these adverse trends contradicted the statements challenged in this suit.  Id. ¶ 8, 112.  The allegations related to CW 1 and 2, however, do not specify "any specific [R]eport itself, the information in the [R]eports they deem significant, or how such information rendered the representations at issue misleading."  Guerra v. Teradyne, Inc., No. 01-11789-NG, 2004 WL 1467065, at *25 (D. Mass. Jan. 16, 2004).  As Defendants contend, the allegations regarding the Reports also do not provide any "specific or quantifiable facts—no metric, projection, analysis, assumption, summary or other data reflecting iRobot's or

competitor' sales, inventory, shelf space, demand or market share."  D.78 at 20, D.66 ¶ 87-93; see In re Biogen Inc. Sec. Litig., 857 F.3d 34, 42 (1st Cir. 2017) (affirming dismissal on motion to dismiss finding that complaint failed to plead particularized facts giving rise to strong inference of scienter and rejecting confidential witness statements regarding alleged sales declines for failing to identify quantifiable facts with "any precision").  Despite alleging that Angle routinely read the Reports, Plaintiffs fail to indicate the rate at which shelf space was declining, any indicia of how much shelf space was available prior to competition intensifying, nation-wide, not just regional iRobot sales data, or even "how (if at all) the decline in shelf space was factored into iRobot's U.S. financial guidance."  D. 78 at 20; see Metzler Asset Mgmt. GmbH v. Kingsley, 928 F.3d 151, 165 (1st Cir. 2019) (affirming dismissal on motion to dismiss where, among other things, court rejected confidential witness statement about a single sales region because it "does not indicate that [the CW] knew that [defendant]'s generalized assessments of the magnitude of change in [sales decline] nationally for the company were untrue").

CW 1 alleged that Angle "frequently acknowledged specific information from the . . . Reports that he found relevant, thus showing that he had read them." D. 66 ¶ 91.  Yet, this sort of generalized assertion does not provide what specific information Angle ever found relevant, how he was relying on the Reports, when or even whether he was able to ascertain competition risks, and later use that information to mislead investors.  Simply stating that "iRobot was very 'plugged in' and aware" of decreasing shelf space problems does not suffice.  See Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 245 (1st Cir. 2015) (affirming dismissal and noting that "even if the CW's statements plausibly suggest that [Defendants were] acting improperly, they do not show that defendants' statements . . . were made with conscious intent to defraud or recklessly").  Defendants contend that allegations attributed to CW 1 and CW 2

regarding the Reports are 'so lacking in connecting detail' "to any challenged statement that they cannot give rise to a strong inference of scienter" as to Angle, Dean or Cerda.  D. 78 at 21 (citing In re Biogen, 857 F.3d at 42).  Specifically, they assert that Plaintiffs fail to allege how information contained in Reports, and allegedly read by Angle and others, contradicted any of Angle's statements "at the time they were made."  D. 78 at 21.  The same holds true for statements made by Dean or Cerda.  Plaintiffs further rely on the following statements from CW 1 and CW 2:

1. "iRobot's competitors' products were selling well and were 'definitely' eating into iRobot's U.S. market share significantly," D. 66 ¶ 94;

2. "[i]n the summer of 2018… store shelf space dedicated to iRobot products had substantially declined further," id. ¶ 96;

3. "[t]he increased competition from Shark, Neato, and other robot vacuums, which were lower priced had really hurt iRobot sales," Id. ¶ 114;

4. "iRobot was increasingly losing more and more sales to its competition," id. ¶ 121; and

5. "competition (specifically, Shark) began to heavily impact sales of iRobot products," id. ¶155.

As Defendants assert, these statements "stripped of [their] conclusory adjectives," Simon v. Abiomed, 37 F. Supp. 3d 499, 517 (D. Mass. 2014), generally describe that iRobot faced increasing competition starting in 2017, yet are "entirely consistent with what iRobot and its executives were already telling investors before and during the Class Period."  D. 78 at 21-22.  For one example, in a 2016 Form 10-K (dated February 17, 2017), iRobot informed investors that "increased competitive pressure could result in a loss of sales or market share or cause [iRobot] to lower prices for [its] products, any of which would harm [its] business and operating results."  D. 78 at 22.  For another example, in a February 2018 earnings call, Angle noted that there was "absolutely an

increased competitive pressure" from lower-cost RVCs.  Id.  Because the CW 1 and CW 2 statements are generalized assertions and not in conflict with disclosures made by iRobot during the Class Period, they cannot be alleged to be false or misleading.

Further, Plaintiffs propose that statements made during a February 7, 2019 earnings call "tout[ing] the Company's purportedly strong market share and sales of premium-tier Roombas to investors and downplay the impact of competition on [iRobot's] business" by alluding to the fact that competitors were not taking shelf space from them.  D. 66 ¶ 246.  They challenge Angle's assertion then:  "[i]n the U.S. we continue to see the new competitive products selling through Amazon marketplace, but not on shelves of retailers, where we still generate 60% of our domestic revenue."  Id.  While Plaintiffs contend that this statement was false as iRobot was "losing shelf space to new competition" as indicated by their own "real-time access to pictures in the Cognistix database showing the declining shelf space," D. 81 at 19, these statements are not false nor misleading but illustrate general corporate optimism.  See Shaw, 82 F.3d at 1218 (finding loose optimism or "self-directed corporate puffery" not actionable because "[t]he market is not that easily duped").  "Courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation . . . numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."  Id. at 1217.  Here, Angle's statement was generalized as it does not specify which competitors were selling on Amazon and not retail shelves and that iRobot was still selling strongly on shelves in stores.  Further, his statement was made in the context of sharing information regarding competitors and explaining that the company had recently "successfully launched 2 new products during the third quarter, the Roomba e5, [their] core product, offering premium features

at a lower price point; and [their] game-changing premium Roomba i7 and i7+ robots." D. 79-22 at 6.  Together, the e5 and i7 models, Angle added, contributed to the "24% year-over-year 2018 domestic revenue growth." Id. In other words, Angle is admitting to competition but lauding iRobot's perceived strength regarding premium RVC's and success on retail shelves.  He follows the statement mentioning that the "overall category for RVCs priced at more than $200 grew 27% in 2018 over 2017 in the U.S." which he attributes to competition running "an ad campaign throughout the fourth quarter, which [they] believed helped the category grow."  Id.  A reasonable investor, hearing these statements on the fourth quarter 2018 earnings call on February 7, 2019, would understand the context of a broader discussion regarding increased competition within the premium RVC market.  While Plaintiffs contend that Angle's statement that "new competitive products" were not selling "on the shelves of retailers" "is a concrete, verifiable representation of fact" that "when read in context, was not unimportant to a reasonable investor," D. 81-1 at 19, the statement acknowledges competition increasing but iRobot's continued strong presence on retail shelves.  Accordingly, such statement was not false or misleading.  See Shaw, 82 F.3d at 1217.

CW 1 stated that by summer 2018, "in response to increased competition and resultant poor Roomba sales, especially at the entry-level where the market was saturated by the competition, iRobot decided to refocus its sales and marketing efforts… to its premium-tier line."  Id. ¶15. According to CW 1, the "Champion Program" was "heavily focused on training sales representatives about those higher-end products' features, including much more aggressive demos of these products in the stores."  Id. ¶114. "Not only were customers hesitant to pay for premium version of a robot vacuum," the product had performance issues, and "[CW 1] had to give many of these models away to store managers as free samples so that stores would continue to sell them." Id. ¶118-119.  These free samples were given "in exchange for the store managers' agreement to

display the models in store for 90 days." Id. ¶ 119. Even as alleged, Plaintiffs fail to explain how CW 1's information about challenges in selling premium models made iRobot's statements regarding its business decision to shift focus to their newer, premium-tier RVCs false or misleading. That is, the record reflects that iRobot informed investors their "strategy has been in the premium end of the market" and that "strategy hasn't changed" despite other companies "trying to compete at the lower end of the premium" tier. D. 78 at 24 (citing 9/13/17 and 10/25/17 Conference and Earnings transcripts).

Similarly, CW 1's alleged statements related to tariffs' financial impact are insufficient. CW 1 stated that "during an internal conference call between iRobot and [Creative Channel Services], after the poor holiday season performance in late 2018, [Creative Channel Services] employees were instructed by iRobot that if customers asked about the reason for decline in iRobot's stock price that occurred in 2019 that store representatives were to inform them that this was only due to the tariffs." D. 66 ¶175. CW 1 was made aware of this instruction not by iRobot representatives directly, but through the National Field Team Manager at Creative Channel Services. Id. CW 1 claims that iRobot was "blaming the tariffs" when in reality, the "tariffs likely accounted for only 25% of iRobot's financial troubles, but that increased competition and saturation in the market accounted for the other 75%." Id. Even assuming that CW 1, a lower-level employee at a third-party marketing vendor, had the requisite knowledge to account for the relative impact of tariffs, this information is not at odds with iRobot's disclosures regarding tariffs. The company informed investors about such matters on two key moments during the Class Period: November 2, 2018 and February 14, 2019. In November of 2018, right before the "poor holiday season," iRobot disclosed that "[e]ffective September 24, 2018, the U.S. government implemented a ten percent (10%) tariff on certain goods imported from China," and that "[t]he implemented and

announced tariffs may cause [iRobot] to increase prices to [their] customers which may reduce demand, or, if [they were] unable to increase prices, result in lowering [their] margin on products sold." D. 78-2.  Similarly, in February 2019, after the 2018 holiday season, the company disclosed that the tariffs would increase to 25% effective March 2, 2019 and that similarly, this may cause iRobot to increase prices, risking drop in demand, or result in lowering their margin on products sold. Id.

Plaintiffs argue that Defendants misled investors regarding the impact of increased competition and trade tariffs on its financial guidance by failing to disclose negative trends of decreasing shelf-space demand and market share that were all intensified by iRobot's strategic plan to focus on premium-tier RVCs.  D. 66 ¶ 12, 199.  Defendants, on the other hand, contend that the complaint "'contains no specific allegations (whether from a confidential witness, a document or otherwise)' showing that the individually named defendants knew or recklessly disregarded that their statements about the impact of increased competition or tariffs on iRobot's financial performance were materially false and misleading at the time they were made."  D.78 at 17 (citing Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc., 140 F. Supp. 3d 120 at 132-33 (D. Mass. 2015)).  Plaintiffs rely on, for example, a statement made by Angle on September 13, 2018 at a Morgan Stanley Laguna Conference indicating that tariffs were not impacting iRobot's business to date, D. 66 ¶ 232, and compare this to CW4, iRobot's country manager for Canada from April 2014 to July 2019, who noted that "as iRobot was building up its U.S. inventory in 2Q18—as a way of mitigating some of the financial impact from the tariffs . . . its sales were also softening (as a result of increased competition)."  Id.  As alleged, these statements do not "state with particularity [the] facts giving rise to a strong inference that the [Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2).  In other words, while Plaintiffs allude to

incongruity between Angle's statements and information provided by CW4, they fail to allege with particularity, for instance, how Angle, knew or recklessly disregarded that his statement regarding lack of impact on business by tariffs to date in September 2018 were materially false or misleading at the time of the Morgan Stanley Laguna Conference.  The same can be said about Plaintiffs alleging that a month later on October 24, 2018, Angle mentioned that iRobot was "better positioned than [its] major competitors" with regards to withstanding tariff-related price increases without impact to its demand.  D. 81 at 32, D. 66 at ¶ 234.  While Plaintiffs contend that "by this time, Defendants knew that iRobot's newest, most expensive premium products, the i7 and i7+, were selling poorly due to their high price and performance issues," D. 81 at 33, D. 66 at ¶¶ 118, 120 they fail to allege with particularity how he knew or recklessly disregarded that his statement in October 2018 was materially false or misleading at the time.

### 4.    *Statements of Corporate Optimism or Opinion*

Statements of corporate optimism or opinions, as noted above, are not actionable. "[L]oosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available" are immaterial.  Shaw, 82 F.3d at 1217.  Such statements include those "about both a company's current state of affairs and its future prospects."  In re Boston Sci. Corp. Sec. Litig., No. 10-10593-DPW, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011), aff'd, 686 F.3d 21 (1st Cir. 2012).  As Defendants point out, "at least twenty-one" of the statements challenged by Plaintiffs are "precisely the sort of corporate optimism that is incapable of objective verification and immaterial as a matter of law."  D. 78 at 33, D. 66 ¶ 202-204, 208, 215-216, 221, 225-226, 234-235, 244, 246, 248, 252-253, 260.  Statements that amount to "rosy affirmation" of a company's prospects or products are not actionable statements for a securities

fraud claim.  In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 42 (D. Mass. 2016) (claiming that company sold a "terrific product that is going to perform very well in the market" was not actionable).  For instance, Plaintiffs challenge Angle's statement during a 2017 third quarter call stating that iRobot "continue[s] to gain space, exposure and momentum in the market, driving higher full year U.S. revenue expectations for the second time [that] year, even with the availability of new competitive products."  D. 66 at ¶ 202. They also challenge a similar statement by Angle during a second quarter 2019 earnings calls referring to the s9 Roomba demand and features as successful.  D. 66 at ¶ 260.  Plaintiffs contend that "Defendants repeatedly told investors that sales and demand remained 'strong' and 'successful' 'across price points,' despite increased competition and tariff-related price increases, including that iRobot was not 'simply getting pushed into premium only.'"  D. 81 at 35.  However, these statements related to market momentum or traction are not actionable.  In re Cytyc Corp., 2005 WL 3801468, at *22 (statements concerning "momentum" "on track" and "consistent" growth nonactionable).  Similarly, Angle's assertion during a fiscal year 2018 earnings call that iRobot's U.S. estimates for 2018 demonstrated that the company was "well positioned to continue [its] growth trajectory" in the market is not actionable. D. 66 at ¶ 248.  This portion of Angle's statement is but a general statement expressing optimism towards future financial success.  The same can be said about his comment that iRobot had "really good traction to-date" in 2019 with "the higher-priced" models, Id. at ¶ 253, where Angle was discussing revenue for same and subsequently expressed optimism.  See Colby v. Hologic, Inc., 817 F. Supp. 204, 210-11 (D. Mass. 1993) (dismissing as immaterial a statement that "prospects for long term growth are bright"); Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 301 (D. Mass. 2004) (holding that a statement in company press release indicating that company was positioned for long-term growth was nonactionable puffery).

18

For the aforementioned reasons, the Court concludes that Plaintiffs have failed to plead any material misrepresentations or omissions.

### B. The Allegations Pled in Amended Complaint Do Not Support a Strong Inference of Scienter

Even assuming *arguendo* that Plaintiffs have alleged any actionable statements, dismissal is still warranted here for the failure to allege scienter.  In a securities fraud case, Plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind.'" Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999) (quoting 15 U.S.C. § 78u–4(b)(2)).  Scienter, "'a mental state embracing intent to deceive, manipulate or defraud,' may be shown where the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002) (internal citations omitted).  The PSLRA's requirement to plead facts giving rise to a "strong inference" of scienter to mean that "a complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324.  Thus, in evaluating a securities class action complaint, courts "must take into account plausible opposing inferences."  Id. at 323. "[W]here there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008).  This is necessarily a fact-specific inquiry, Greebel, 194 F.3d at 196; Aldridge, 284 F.3d at 82, which may rely upon indirect evidence of scienter, Greebel, 194 F.3d at 202, but the inference may not just be a reasonable one, but a strong inference of scienter.  In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 195 (1st Cir. 2005) (internal quotation marks omitted) (quoting Cabletron, 311 F.3d at 38.  Courts conducting such an inquiry must determine "whether all of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323 (emphasis in original).

### 1.   *Lack of False/Misleading Statements*

"There is no set pattern of facts that will establish scienter; it is a case-by-case inquiry." ACA Fin. Guar. Corp., 512 F.3d at 66.   Yet, satisfactory evidence of scienter includes "clear allegations of admissions, internal records or witnessed discussions" suggesting that defendants were "aware that they were withholding vital information or at least were warned by others that this was so" when they made the misleading statements.   In re Boston Scientific Corp. Sec. Litig., 686 F.3d 21, 31 (1st Cir. 2012).   As discussed above, Plaintiffs have not sufficiently plead actionable false or misleading statements and accordingly, in the absence of such a showing, it may be difficult for this Court to find that Defendants acted with the necessary "state of mind" as to same.   See 15 U.S.C. §§ 78u-4(b)(1)-(2).

### 2.   *Individual Defendants' Positions Alone are Not Sufficient to Support a Strong Inference of Scienter*

Plaintiffs allege that Defendants had sufficient knowledge of their allegedly false or misleading statements because of their access and monitoring of "internal information sources." D. 66 ¶ 312-329.   Specifically, they allege that because Angle was CEO and Dean was COO, they "had intimate knowledge of [iRobot's] business operations, including Roomba sales and competitive trends and effects." They further contend that during the Class Period, Angle, Dean and Cerda "had access to a variety of internal information sources that tracked Roomba sales and market research on iRobot's competition, including specifically adverse competitive trends and effects."   Id. ¶ 314.   An attempt to infer scienter based largely on a person's professional role within a company has previously been rejected.   Orton, 344 F. Supp. 2d at 306 (noting that "a vague assertion that a defendant must have known about the fraud by virtue of his position of

authority [does not] suffice to prove a strong inference of scienter"). The complaint also alleges that "Defendant's close personal monitoring of the tariff issue and its effect on iRobot further shows that they knew or recklessly disregarded the falsity of their statements." D. 66 ¶ 329. Plaintiffs further allege that Angle, Dean and Cerda's own statements raise strong inference of scienter because as executives they "spoke at length about iRobot's financials" and acted as "hands-on managers who performed the necessary research and analyses required to make the representations about market share, demand and pricing." D. 66 ¶ 330-335. Yet, it is expected that "responsible management [will] engage in such monitoring," and absent any further information regarding what Angle, Dean and Cerda "learned from such monitoring, and whether what [they] learned was at odds with" iRobot's disclosures to investors about tariffs, a generalized statement about their monitoring is not sufficient indicia of scienter. See Metzler, 928 F.3d at 162 (affirming holding that investors' allegations failed to establish strong inference of scienter and explaining that "the fact that Biogen's leadership monitored . . . reporting metrics does not in and of itself suffice to create the 'strong inference' that [defendant]" made statements "with the requisite intent to deceive").

Finally, the timing and circumstances of Dean and Cerda's resignations do not support a strong inference of scienter. On September 13, 2019 (a month before the end of the Class Period), iRobot issued a press release announcing the immediate resignation of then COO Cerda. Instead of accepting the reasoning that he left to "pursue other career opportunities," Plaintiffs allege that his resignation was "highly suspicious and adds to a strong inference of scienter." Id. ¶ 338. This Court disagrees. As Defendants note, there is nothing inherently suspicious about "a COO resigning to become a CEO" of another company. D. 78 at 28. Absent any further particularized allegations, other than the timing of aligning with alleged corrective disclosures, the complaint

fails to allege sufficient facts to show that Cerda or Dean's departures were tied to their knowledge or even participation in the alleged fraud. See Metzler, 305 F. Supp. 3d at 219 (noting that allegation of abrupt resignation alone was insufficient to support inference of scienter). Similarly, this Court cannot find that the resignations of Cerda and Dean serve as indicia of scienter.

### 3. Roomba as the Core Operation

Given that the Roomba generated 90% of iRobot's revenue, Plaintiffs assert that the pending matter is "the prototypical case" where the core operations doctrine applies. D. 81 at 9. "[F]acts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its officers." Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (internal quotation marks and citation omitted). Defendants do not contest that the Roomba is a core product for iRobot, but dispute that such core product allegations are sufficient to give rise to a strong inference of scienter here. D. 78 at 26; see In re Psychemedics Corp. Sec. Litig., No. 17-10186, 2017 WL 5159212, at *6 (D. Mass. Nov. 7, 2017) (finding "plaintiff's 'core operation' theory stands naked, unadorned by any other piece of evidence purporting to establish the essential 'plus' factor—guilty knowledge on the part of [Defendants]); In re Biogen, 193 F. Supp. 3d at 51 (finding that the complaint's 'core allegations' fall short of adding sufficient weight" to plead a strong inference of scienter absent "other significant evidence of a defendant's intent or recklessness"). Considering the allegations here, as the core product constituting up to 90% of iRobot's revenue, the Roomba's importance to iRobot cannot be reasonably disputed. Still, as set forth in Tellabs, this Court must consider allegations collectively to determine whether they give rise to a strong inference of scienter. Even considering the full context of the allegations here, this Court does find that the Roomba's position as the core product tips towards a finding for a strong inference of scienter in the absence of further allegations of

Defendants' intent or recklessness or any "plus factor."  See In re A123 Sys., Inc. Sec. Litig., 930 F. Supp. 2d 278, 285 (D. Mass. 2013) (distinguishing Crowell, 343 F. Supp. 2d at 19 which involved core operations but also "allegations of the improper booking and accounting of fraudulent sales, buttressed by a 'plus factor'—an email pointing to the company's vice president as the author of the scheme") Although Plaintiffs point to Defendants' access and monitoring of Roomba market research, competition trends as well as the Reports, D. 81 at 19, they also fail to allege particularized facts as to such plus factor here.

4.      *Reliance Upon Confidential Witnesses Here Does Not Give Rise to Strong Inference of Scienter*

The crux of Plaintiff's allegation of a strong inference of scienter rests on the statements of six confidential witnesses ("CW").  D. 66 ¶ 52-60, 84-100.  Securities fraud plaintiffs may rely on confidential witnesses without specifically naming them "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  Cabletron, 311 F.3d at 29 (internal citation omitted).  Some courts have looked askance upon confidential sources that "were simply not positioned to know the information alleged, . . . report only [multi-layer] hearsay and . . . allege conclusory assertions of scienter."  Zucco, 552 F.3d at 996-98 and cases cited.

Here, even as alleged, a number of the CWs do not have a clear basis of knowledge to report on the inner workings of iRobot.  CW 1 worked in marketing and development at a third-party marketing agency, Creative Channel Services, conducting market research in Washington state and western Canada. CW 1 submitted market research data to another CCS employee who would convert the information into the Reports that she sent to iRobot.  D. 66 ¶ 52-53.  CW 2 worked as a field marketer also at Creative Channel Services from May 2015 through February 2019 and was responsible for going to U.S. retail stores to inquire about iRobot sales.  Id. ¶ 56.

CW 2 would then prepare a report of findings that was later "sent to iRobot corporate." Id. Neither CW1 or CW2 worked for or reported to any iRobot employee. D. 78 at 18. As Defendants contend, CW 1 and CW 2, employees at a third-party vendor, are never alleged to have even spoken to any of the Individual Defendants.

The other CWs worked for iRobot, but not in high-level positions. CW 3 worked at iRobot as a senior manager in Enterprise Data Services from November 2017 to August 2019 in IT business analytics focusing on "the secure and accurate transmission of financial data and supply chain information." D. 66 ¶ 57. In this role, CW 3 also attended "informal" supply chain meetings as well as iRobot "All Hands" meetings "where the topics of tariffs" were discussed, and Angle was present. Id. As Defendants note, there is no reporting line alleged to any individual related to this suit as to CW 3. D. 78 at 18.

CW 4 worked as country manager in Canada for iRobot from April 2014 to July 2019. In this role, CW 4 was responsible for "all aspects of iRobot business in Canada, including sales, marketing, supply chain and advertising." D. 66 ¶ 58. CW 4 reported to the Senior Vice President and General Manager of the Americas, who was responsible for overseeing iRobot's operations in North, South and Central America. Id. CW 4 participated in weekly conference calls with "sales teams and supply chain managers in the America . . . where forecasting and inventory were discussed each week." Id.

CW 5 worked at iRobot as a Senior Talent Acquisition Advisor from January 2016 to March 2017 and was responsible for recruiting for the marketing, product management and other iRobot teams. Id. ¶ 59. CW 6 worked for iRobot as a "Roboteer," or engineer, in iRobot's software department "working with large motor controls and various sensors." Id. ¶ 60.

CW 5 did not work at iRobot during the Class Period (beginning in September 2017) and thus cannot have "firsthand knowledge of the state of mind of [iRobot]'s management during [the class] period."  D.78 at 18; Abiomed, Inc., 778 F.3d at 245.  CW 3, CW 4 and CW6, although iRobot employees, also appear to "have had relatively little [or no] ongoing contact with senior management" at iRobot.  Abiomed, Inc., 778 F.3d at 245.  This undercuts the Plaintiffs' reliance upon them in the pleadings, particularly when the PSLRA requires that confidential witnesses allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).   CW 3 and CW 4, due to the nature of their roles, had access to financial and supply chain data which would afford them some basis of knowledge for opining as to same.  Yet, CW 3 has not been alleged to have any interaction with upper management, they cannot be considered to present a strong inference for scienter.  CW 4 did report to the Senior Vice President of the Americas, although still not sufficiently close to upper management like the Individual Defendants.  While Plaintiffs contend that the complaint "adequately alleges scienter based on, *inter alia*, multiple, well-placed confidential witnesses, who stated that Defendants internally were highly concerned about competition and tariffs during the Class Period, contrary to their positive public reassurances," D. 81 at 9, such does not suffice.  See In re Biogen, 857 F.3d at 43; Metzler, 305 F. Supp. 3d at 214 (finding that the allegations of the confidential witnesses were "not sufficient to support a strong inference of scienter on their own, and the complaint's 'additional scienter allegations'. . . not sufficient to tip the balance" such that the complaint's allegations are insufficient to support a strong inference of scienter").

While, as Plaintiffs note, this Court "cannot construe the PSLRA's pleading requirement to mean that confidential witnesses . . . must recall all possible details from their former positions," D. 81 at 20 (citing Collier v. ModusLink Glob. Sols., Inc., 9 F. Supp. 3d 61, 73 (D. Mass. 2014)),

even when viewed in conjunction with the alleged indicia of scienter, the information provided by the confidential witnesses does not suffice.  While the CWs' access to some of the same Reports as Defendant Angle or other iRobot information provides some basis of knowledge about the company, D. 81 at 17-18, absent any further indicia of scienter or any "plus factor" as mentioned above, such allegations fail to establish a strong inference of scienter.

5.      *Other Indicia of Scienter is Also Lacking Here*

Although there is no checklist for such showing of scienter, little of the indicia usually relied upon to support such strong inference is alleged here.  See Greebel, 194 F.3d at 196 (discussing the "many different types of evidence as relevant to show scienter").  There is no allegation of insider trading; no divergence of internal reports and external statements on the same subject; no personal gain to the Defendants or other allegations that reflect motive other than an implicit suggestion that the Defendants acted in self-interest to preserve their positions and, presumably, their salaries.  As discussed above, the allegations that are made here simply do not amount to a strong inference of scienter.

Given absence of pleading of actionable statements and scienter, the Court allows the motion to dismiss as to Count I.

**C.      Securities Act Section 20(a) Claim**

Under Section 20(a) of the Securities Exchange Act, when any "person" has been found liable for violating another section of the Securities Exchange Act:

> "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. § 78t(a).  Count II, alleging control person liability, rises and falls with the derivative

claim, Count I.  <u>Hill</u>, 638 F.3d at 70.  Accordingly, because Count I under Section 10(b) and Rule

10b-5 fails, so too must Count II.

## VI.     Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 77.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge